1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          19 CR 696 (PAE)

5   ARI TEMAN,

6              Defendant.
                                          Arraignment
7   ------------------------------x

8                                         New York, N.Y.
                                          October 21, 2019
9                                         10:05 a.m.

10  Before:

11
                     HON. PAUL A. ENGELMAYER,
12
                                          District Judge
13
                          APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16  BY:  JACOB GUTWILLIG
         Assistant United States Attorney
17
    DiRUZZO & COMPANY
18       Attorneys for Defendant
    BY:  JOSEPH A. DiRUZZO, III
19

20

21

22

23

24

25

 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, please state your

 3    appearances for the record, starting with the government.

 4              MR. GUTWILLIG:  Good morning, your Honor.  Jacob

 5    Gutwillig.

 6              THE COURT:  Good morning, Mr. Gutwillig.

 7              For the defense?

 8              MR. DiRUZZO:  Good morning, your Honor.  Joseph

 9    DiRuzzo on behalf of Mr. Ari Teman who is seated to my right.

10              THE COURT:  Very good.  Good morning to, Mr. DiRuzzo.

11              Good morning to you, Mr. Teman.  You may be seated.

12              This is our initial conference in the case.  My

13    understanding is that the defendant has been presented but not

14    arraigned and, therefore, we need to begin with an arraignment.

15              Is that correct?

16              MR. GUTWILLIG:  Yes, your Honor.

17              MR. DiRUZZO:  Your Honor, we are in possession of the

18    indictment.  We waive formal reading, enter a not guilty plea

19    to Count One, dispute the forfeiture allegation, and request a

20    public jury trial.

21              THE COURT:  Very good.  I now need to arraign the

22    defendant.  I appreciate your putting that on the record, but I

23    need to, nevertheless, inquire of him.

24              Have you had an opportunity to review with your client

25    the questions I'm apt to put to him by way of arraignment?

1          MR. DiRUZZO:  Yes, I have.

2          THE COURT:  Very good.  Mr. Smallman, would you kindly

3    administer the oath to the defendant.

4          (Defendant sworn)

5          THE COURT:  Very good.

6          You may be seated.  Mr. Teman, I'm going to ask you a

7    handful of questions ultimately leading up to the question how

8    you plead to the charges, and your counsel has indicated that

9    you intend to plead not guilty.

10          I nevertheless need to go through these questions just

11    to make sure essentially you're of sound mind, that you've

12    familiarized yourself with the charging instrument, the

13    indictment, before I ask you that question.

14          So I'm not asking these questions to pry, just to

15    enable myself to make sure that your answer is a knowing and

16    willing one.

17          What is your full name?

18          THE DEFENDANT:  Ari Teman.

19          THE COURT:  How old are you?

20          THE DEFENDANT:  Thirty-seven.

21          THE COURT:  How far did you go in school?

22          THE DEFENDANT:  Bachelor degree and then some

23    additional coursework.

24          THE COURT:  Are you able to understand and speak

25    English?

1           THE DEFENDANT:  Yes, your Honor.

2           THE COURT:  Have you ever been treated or hospitalized

3    for any mental illness?

4           THE DEFENDANT:  Yes, your Honor.

5           THE COURT:  When was that?

6           THE DEFENDANT:  From a period of about 2011 to 2013, I

7    was seeing a group of physicians, the head of which has since

8    been arrested twice and had his own children taken away for

9    medical abuse.  When I accused them of fraud, they told my

10   parents to stick me in a mental hospital.

11          THE COURT:  Would you move the microphone a little

12   closer to you.

13          THE DEFENDANT:  Sure.

14          THE COURT:  The bottom line is, what was the condition

15   that you were rightly or wrongly being treated for at the time?

16          THE DEFENDANT:  The correct diagnosis was an

17   upper-airway respiratory syndrome which was causing a sleeping

18   disorder.  I was not getting sufficient rem sleep.

19          After I had accused him, they told my parents who live

20   in Israel that I had borderline personality disorder and needed

21   to be hospitalized.  That hospital has since paid a settlement

22   for unlawful detainment.

23          THE COURT:  A settlement to you?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  When did the course of treatment, such as

```
 1    it was, end?

 2              THE DEFENDANT:  It was eight months starting in

 3    September of 2011.  So I guess the spring or summer of 2011.

 4              THE COURT:  So since 2012, have you ever been treated

 5    for any mental illness?

 6              THE DEFENDANT:  Other than PTSD, no.

 7              THE COURT:  When did the PTSD treatment stop, if it

 8    did?

 9              THE DEFENDANT:  I would say it's still somewhat

10    ongoing.  I sought a professional here in New York for about a

11    year, and that was very helpful.

12              THE COURT:  When did that end, seeing the person in

13    New York?

14              THE DEFENDANT:  I'm not exactly sure, but about two

15    years ago I would say.

16              THE COURT:  Here is the critical question, which is

17    whether you're symptomatic, whether you're experiencing at this

18    point any symptoms of PTSD or otherwise.  I'm asking just

19    because I need to be sure that you're of sound mind for this

20    whole matter, the arraignment and going forward.

21              So I'm just pushing you, just so I understand, whether

22    there's any ongoing condition.

23              THE DEFENDANT:  I appreciate that, your Honor.

24              I see a mental health provider, and I get somewhat

25    regular ketamine IVs.  I believe I'm of sound mind/body.  And
```

 1   given this more than surprising and depressing situation, have

 2   thankfully, with great struggle, with the depression which

 3   would come from such a situation, been able to get out of the

 4   house, at least before 2:00 in afternoon on most days, and

 5   conduct my business enough to try to kind of try to break even

 6   on legal fees.  So I think I am of sound mind and body.

 7           THE COURT:  Let me ask you:  Are you currently under

 8   the care of a doctor or psychiatrist for any condition?

 9           THE DEFENDANT:  I see a psychologist on a regular

10   basis.  It's also a requirement of the bond.

11           THE COURT:  Right.

12           THE DEFENDANT:  So I see Dr. Scheidt in Miami Beach.

13   I guess the ketamine IVs are overseen about I a psychiatrist.

14           THE COURT:  Have you ever been hospitalized or treated

15   for addiction to any drugs or alcohol?

16           THE DEFENDANT:  No, your Honor.

17           THE COURT:  In the past 24 hours -- you've referenced

18   ketamine.

19           In the past 24 hours, have you taken any drugs,

20   medicine, or pills or drunk any alcoholic beverages?

21           THE DEFENDANT:  No, your Honor.

22           THE COURT:  First of all, I'm sorry that you've had

23   the medical road that you have been on.  It sounds like it's

24   been challenging.

25           The most important question for me, for the purposes

1  of this proceeding is:  Is your mind clear today?

2            THE DEFENDANT:  I believe so, your Honor.

3            THE COURT:  Is there any reason you're hesitating?

4            THE DEFENDANT:  I would just assume that somebody who

5  is crazy would be so crazy that they wouldn't know that they're

6  crazy.  Your Honor, yes.  I believe I'm of sound mind and body,

7  and I look forward to defending this case and prevailing.

8            THE COURT:  Do you understand what's happening in this

9  proceeding?

10            THE DEFENDANT:  Yes.

11            THE COURT:  Have you had any difficulty understanding

12  any of the questions that I've put to you today?

13            THE DEFENDANT:  No, your Honor.

14            THE COURT:  Mr. DiRuzzo, how much time have you spent

15  with your client?

16            MR. DiRUZZO:  Judge, would you like me to stand or be

17  seated?

18            THE COURT:  I would stand, but just make sure you

19  speak into the mike.  The acoustics are not great.

20            MR. DiRUZZO:  I understand.  I pretty much spent the

21  entire day when we had the appearance before the magistrate

22  last month.  I've had a couple of phone calls with him.

23            I'm also co-counsel, and co-counsel has spent a

24  substantial amount of time very similarly with my client.  So I

25  have no reason to doubt his mental capacity to understand and

1    proceed today.

2         THE COURT:  That's fine.  I just want to make sure

3    that you have spent enough time to put yourself in a position

4    to express that.

5         You're confident your client is of clear mind?

6         MR. DiRUZZO:  I am.

7         THE COURT:  Mr. Teman, have you received a copy of the

8    indictment?

9         THE DEFENDANT:  Yes, your Honor.

10        THE COURT:  Have you read it?

11        THE DEFENDANT:  Yes, your Honor.

12        THE COURT:  Have you had time to consult with your

13   attorney about it?

14        THE DEFENDANT:  Yes, your Honor.

15        THE COURT:  Do you want me to read it out loud, or do

16   you waive its public reading?

17        THE DEFENDANT:  I waive it, your Honor.

18        THE COURT:  Thank you.

19        Now, formally, how do you plead to the charges?

20        THE DEFENDANT:  Not guilty, your Honor.

21        THE COURT:  Thank you.

22        Government, I take it you have no doubt about the

23   defendant's clarity of mind?

24        MR. GUTWILLIG:  No, your Honor.

25        THE COURT:  Having taken care of the arraignment, I

1  now need to learn more about the case and set us on a good

2  schedule.

3           Government, tell me briefly about the case.

4           MR. GUTWILLIG:  Yes, your Honor.

5           This is a case involving a single count of bank fraud.

6  The allegations set forth in the case before the case was

7  indicted detail the deposit of what the government believes are

8  fraudulent checks in the amount of approximately $260,000.

9  Subsequently, those funds were moved around, and certain of

10 them were wired in transactions.

11          The government has produced discovery in its

12 possession.

13          THE COURT:  Sorry.  I'll get to discovery in a moment.

14 I'm just eager to learn about the allegations.

15          What happened here?

16          MR. GUTWILLIG:  Yes, your Honor.  So between

17 approximately April 2019 and June 2019 was the period of the

18 alleged fraud.  During that time, there are surveillance photos

19 showing approximately 27 fraudulent checks being deposited in I

20 believe it was a Bank of America branch in Miami, in all of

21 Miami.  The checks totaled approximately $260,000.

22          THE COURT:  What makes them fraudulent?

23          MR. GUTWILLIG:  It's the government's understanding

24 that if you look at the checks, the checks themselves do not

25 appear to be issued by -- they were issued to a company called

GateGuard, which is a company we understand was operated by

Mr. Teman.

          The checks themselves -- I don't have an image in

front of me.  But we understand, from speaking with the

companies on behalf of the checks, that these were not

authorized or issued by those companies.

          THE COURT:  I'm sorry.  Whose account were the checks

drawn on?

          MR. GUTWILLIG:  I believe there were three separate

companies.

          THE COURT:  None of which were the defendant's

company?

          MR. GUTWILLIG:  None of which is the defendant's

companies.

          From speaking with those companies -- entity one,

entity two, and entity three in the complaint -- two entities

were operated by the same company.  Then there is another

entity.  None of those entities -- rather, each of those

entities said that they did not issue these checks or permit

them to be drawn from their account.

          Looking at the checks themselves, there were

approximately 18 fraudulent checks that appear to have been

issued by entity one totaling approximately $198,000;

approximately six fraudulent checks issued by entity two

totaling approximately $66,000; and approximately three

1  fraudulent checks made to have appeared to have been issued by

2  the third entity totaling approximately $33,000.

3         And each of the counterfeit checks include -- the

4  checks have been produced in discovery.  But each of the

5  counterfeit checks included on the bottom right corner of the

6  check the following text:  "Draw per contract.  No signature

7  required.  Note to bank.  This is a valid check.  You are

8  required by law to honor it.  Contact at" a website for

9  GateGuard.  And then "Contact us at 212.203.3714."

10        Based on our review and understanding, we understand

11  that GateGuard is a company operated by Mr. Teman, and the

12  phone number on the check is associated with GateGuard and

13  Mr. Teman.

14        THE COURT:  But what makes the checks fraudulent, in

15  the government's view, ultimately is that these are not

16  authorized instruments of the account holder so the

17  representation on the check that the account holder is

18  directing the withdrawal to the payee of that amount of money

19  is a false representation and the notation you just described

20  is, I take it, false insofar as it purports to be a directive

21  of the account holder?

22        MR. GUTWILLIG:  That's correct, your Honor.

23        THE COURT:  May I ask, just as a formal matter, why

24  the three victim accounts, if you will, are clustered into the

25  same count.

1          Are you not walking into a potential multiplicity

2    issue here?

3          MR. GUTWILLIG:  With three victim accounts.  The three

4    victim accounts -- I suppose they could theoretically be a

5    single count for each of the --

6          THE COURT:  That's the question.  I have no idea what

7    a trial would look like, if we're headed to one, but just

8    trying to think through issues here.  One has the scenario of

9    the split outcome here where some subset of victims are

10   determined to have not authorized a check and some subset have.

11   What do we then so and so forth.

12         Again, I'm not telling you how to do your work.  As

13   you described it, it sounded as if there is an issue here about

14   whether or not these belong in the same count.

15         MR. GUTWILLIG:  Yes.  Understood.  Two of the entities

16   my understanding are operated by the same company.  So

17   theoretically, were the counts to be split, those could be in

18   one count, and there could be a second count for the third

19   entity.

20         THE COURT:  I don't weigh in on this, but I would urge

21   you to give thought to that issue because there is no value

22   here in bumping into a curable legal problem down the road.  So

23   please give thought to that.

24         MR. GUTWILLIG:  Yes, your Honor.

25         THE COURT:  Now turn to discovery.

1          Sorry.  Before we do that, let me just get the

2     schedule here.

3          When was the defendant arrested on the complaint?  He

4     was arrested originally on a complaint?  That's how the case

5     began?

6          MR. GUTWILLIG:  That's correct.

7          THE COURT:  When was that?

8          MR. GUTWILLIG:  He was arrested on July 3 in Miami.

9          THE COURT:  What is the New York connection to the

10    case?

11         MR. GUTWILLIG:  He was spotted later transferring some

12    of the funds at a bank branch in New York City which I believe

13    was a Capital One branch.

14         THE COURT:  So the money was actually in New York

15    City?

16         MR. GUTWILLIG:  Yes.

17         THE COURT:  And the defendant was in New York City in

18    the service, you say, of the scheme?

19         MR. GUTWILLIG:  Yes.

20         THE COURT:  So he's arrested in Miami.

21         What happens next?

22         MR. GUTWILLIG:  He was arrested in Miami.  He was

23    presented here I believe approximately a month ago.  I don't

24    have the exact date, but he was presented here in magistrate

25    court thereafter.

1      THE COURT:  And was bailed at the time?

2      MR. GUTWILLIG:  Yes.  He was bailed.

3      THE COURT:  The same day?

4      MR. GUTWILLIG:  He was not bailed the same day in

5  Miami.  The same day in Miami, because it was over the 4th of

6  July holiday, as I imagine defense counsel will note, he was

7  not able to be bailed and released, although the government was

8  in support of bail, until the following Monday in Miami because

9  it was over the 4th of July holiday.  He was bailed on that day

10 and then was bailed since that and then again after the

11 presentment here in the Southern District.

12     THE COURT:  When was he indicted?

13     MR. GUTWILLIG:  He was indicted I believe

14 approximately three weeks ago.

15     THE COURT:  Was he presented after the indictment?

16     MR. GUTWILLIG:  He was not presented after the

17 indictment.  Approximately I would say seven to ten days

18 elapsed before we submitted a letter to your Honor asking to

19 exclude time since the indictment to this morning's conference.

20     THE COURT:  In the future, just to avoid any needless

21 reduction of time on the speedy trial clock, for future matters

22 like this, as soon as the clock is beginning to run, you ought

23 to get a letter in, after consulting with defense counsel,

24 seeking, if justified, which it almost always will be, an

25 exclusion of time so we don't have that situation.

1       What you're saying is that the indictment issued on

2  the 26th, according to Mr. Smallman; the letter seeking an

3  exclusion of time issue was requested on October 3; and the

4  Court signed it on October 4.  So it sounds as if approximately

5  seven or eight days have run off the speedy trial clock.

6       MR. GUTWILLIG:  Yes, your Honor.

7       THE COURT:  Tell me about discovery.

8       MR. GUTWILLIG:  Discovery has been produced.  It

9  consists primarily of video and surveillance photos from the

10  branch in Miami and also from the branch in New York where the

11  check were initially deposited and then also where the wire

12  transfer was made.  As your Honor said, the defendant was in

13  New York transferring the money that was deposited in Miami.

14       THE COURT:  Why was the bank fraud not complete in

15  Miami?

16       MR. GUTWILLIG:  I'm sorry?

17       THE COURT:  Is the bank fraud arguably complete in

18  Miami?

19       MR. GUTWILLIG:  With the deposit of the checks?

20       THE COURT:  Yes.

21       MR. GUTWILLIG:  So the bank fraud, I suppose, directly

22  could be complete in Miami with the deposit of the checks.  The

23  government's view is that it continued in New York when the

24  defendant went and wired the money that he had deposited in

25  Miami to other of his accounts and then also internationally

1    from New York.

2            THE COURT:  You should look into that as well because

3    before we go farther down the road here, you should make sure

4    that legally you're on sound footing contending that the

5    New York activity, after the deposit of the fraudulent checks,

6    is a necessary component or a component of the bank fraud here.

7            You may be right; you may be wrong.  Just run that to

8    ground.  I don't want to have a situation where late in the day

9    it becomes apparent that essentially this was a completed crime

10   as of Miami and that there isn't a legal basis for venue in

11   New York -- maybe there is; maybe there isn't -- or, for that

12   matter, jurisdiction in New York.

13           You just need to give thought to both of those issues.

14   I'd like to ask you to do so, please, promptly, both the issue

15   of the consolidation of the victims in one count but the issue

16   of the Southern District nexus to the case.

17           Again, I don't weigh in on that, but I want to make

18   sure that you cross your Ts and dot your Is so that we don't

19   have an issue later in the case.  So I'd ask you kindly, with

20   some dispatch, to run those issues to ground and submit a

21   letter obviously on the docket of the case letting me know what

22   you come up with.

23           MR. GUTWILLIG:  Yes, your Honor.

24           THE COURT:  Go ahead.  You were about to tell me about

25   discovery.

```
 1              MR. GUTWILLIG:  Discovery is not voluminous.  It's the

 2    images of the checks, the depositing of the checks, the video

 3    surveillance from the branch in New York wiring the money,

 4    additional bank records showing the transfers, and some

 5    post-arrest pictures and materials that were seized upon

 6    arrest.

 7              THE COURT:  May I ask you:  Is there discovery in the

 8    form of communications with the victim companies?

 9              MR. GUTWILLIG:  No, your Honor.  That communication

10    thus far has been between the agents and the company.  When we

11    receive those, we will --

12              THE COURT:  That's testimonial, if you will.

13              MR. GUTWILLIG:  That's testimonial, potentially as

14    3500.

15              THE COURT:  Do you know if the companies had any

16    pre-existing connection with Mr. Teman?

17              MR. GUTWILLIG:  My understanding is that -- and I

18    don't want to speak off the cuff.  I understand that at least

19    one of and I think all of the companies had some sort of

20    pre-existing relationship with Mr. Teman and had previously --

21              Again, I don't want to say specifically, but my

22    understanding is that they had previously conducted business

23    with Mr. Teman and that this business was not an authorized

24    transaction.

25              THE COURT:  That may well be.  It seems to me almost
```

1    inevitable in one way or the other that the writings reflecting

2    the pre-existing business relationship between Mr. Teman and

3    the victim companies are going to be brought into play.  If you

4    don't seek them from the victim companies, the defense surely

5    will.

6              So may I suggest that because -- this does not

7    preclude the defense from any proper subpoena that it wants to

8    pursue, but we will move faster here if the government takes

9    ownership of this.

10             It's hard for me to imagine that some exploration of

11   the defendant and those companies isn't going to be right at

12   the center of this case.  You should be taking steps to make

13   sure that this is produced.

14             Has that been sought by subpoena?

15             MR. GUTWILLIG:  No.  It has not been sought.

16             THE COURT:  Presumably it may well be voluntarily

17   produced.  It seems to me under the circumstances here that we

18   need to come to grips with that.  Otherwise, to the extent that

19   there is a defense of authorization or something, I don't want

20   to have a trial delay because the government never sought that

21   material.

22             MR. GUTWILLIG:  Yes, your Honor.

23             THE COURT:  May I ask you, just coming back to the

24   issue of the series of transactions, if one were to conclude

25   that the bank fraud were complete in Miami, hypothetically,

1    which is to say the money was deposited based on the false

2    pretense then and there and it was already converted to the

3    defendant's control, the wires to New York then become a

4    separate potential offense with the specified unlawful activity

5    offense being bank fraud and presumably the wire transfer

6    thereafter being money laundering.

7            Correct?

8            MR. GUTWILLIG:  Yes, your Honor.

9            THE COURT:  I'm going to ask the government again to

10   make sure you cross Ts and dot Is about how this is being

11   charged to make sure that we are careful.

12           MR. GUTWILLIG:  Yes, your Honor.

13           THE COURT:  Has the discovery you've described been

14   produced to the defense?

15           MR. GUTWILLIG:  Yes, your Honor.

16           THE COURT:  Has there been any additional discussion

17   with the defense about next steps, a timetable, likelihood of

18   trial, that sort of thing?

19           MR. GUTWILLIG:  There have been preliminary

20   discussions regarding a potential motion schedule.  I'll let

21   defense counsel address that.  But my understanding is that at

22   this point, defense counsel is not sure of exactly which

23   motions would be made.

24           THE COURT:  Very good.  Thank you.  Very helpful.

25           Okay.  Mr. DiRuzzo, the floor is yours.

1          MR. DiRUZZO:  Thank you, your Honor.

2          Briefly, without prejudice to the exact nature of the

3     motion practice that we anticipate, I think that, as the Court

4     has just teed in on, there are some legal issues, both

5     constitutional and statutory, that are going to have to be

6     vetted between the parties, at least initially, and potentially

7     with the Court's consideration.

8          The one thing I would say -- and I think it should

9     come as no surprise -- the language that is in the memo section

10    of the checks -- that language is not fraudulent because it is

11    not untrue.  That is going to be a substantial portion of this

12    case.  That being said, Judge, we don't have to get into the

13    nuts and bolts of that today.

14         But as far as a schedule goes, personally, in December

15    I have four trials.  So my December is just pretty much off the

16    board.  My November is pretty clear.  But given that we're

17    already at the very end of October and I don't know, because

18    I've never appeared before you, how much time you give for the

19    defense to produce the reciprocal discovery, experts, etc.,

20    Daubert hearings.

21         I just don't know at this point whether -- if the

22    Court wants to issue any motions hearing, right now I wouldn't

23    be opposed to it.  But I'd just ask the Court for flexibility.

24         THE COURT:  I'd be glad to accommodate you.  Let's

25    work through the life cycle of the case though first before we

```
 1    talk about a schedule.

 2            Without going into gory detail, can you tell me at

 3    present what motions you anticipate.  I take it there are no

 4    suppression motions.  It's not that type of case.

 5            MR. DiRUZZO:  No.  I don't believe there are going to

 6    be any type of suppression motions.

 7            THE COURT:  There are no searches or seizures or

 8    lineups or show-ups or post-arrest statements?

 9            Government?

10            MR. GUTWILLIG:  No.

11            MR. DiRUZZO:  I don't anticipate any motion to

12    suppress under either the Fourth or Fifth Amendment.  So I

13    don't anticipate that being the case.

14            The Court has focused in on multiplicity and venue

15    issues.  As for the venue, we'll have to discuss -- obviously

16    venue is waivable.  I'm not sure all of these issues would be

17    waivable.

18            THE COURT:  As to motions, one thing you're

19    contemplating, depending on how the indictment ultimately

20    reads, because there may be a superseder, is there may be a

21    multiplicity challenge based on the multiple victims in the one

22    count?

23            MR. DiRUZZO:  Correct.

24            THE COURT:  And there may not be a venue challenge

25    with the theory that it's charged as bank fraud.  The question
```

1    is whether it was complete before the conduct reached New York

2    City.

3                  MR. DiRUZZO:  Correct.

4                  THE COURT:  Are there other challenges, without

5    binding you, that you presently anticipate?

6                  MR. DiRUZZO:  Your Honor, at this point, we're looking

7    into whether there is a Speedy Trial Act violation.

8                  THE COURT:  How would that work?

9                  MR. DiRUZZO:  It's my understanding -- you'll have to

10   excuse me because the research on our end is not complete.

11                  My client was arrested in Miami, held over the 4th of

12   July weekend, spent, I believe, five days in custody.  And then

13   the indictment came down on the 26th.  Off the top of my head,

14   I want to say it's 30 days on the Speedy Trial Act between when

15   he was initially taken into custody and when the indictment was

16   handed down.

17                  THE COURT:  Were you representing your client at the

18   time of the complaint?  In other words, were you the initial

19   lawyer on the case?

20                  MR. DiRUZZO:  Let me be specific, Judge.  I was not

21   engaged when my client was presented to the magistrate in the

22   Southern District of Florida.  I was engaged subsequently, and

23   I was here for the presentment to the magistrate in the

24   Southern District of New York last month.

25                  Does that make sense?

```
 1            THE COURT:  That was on the complaint, not on the

 2   indictment.  Right?

 3            MR. DiRUZZO:  That is correct.  The indictment came

 4   out I want to say give or take a week later.

 5            THE COURT:  Let me ask Mr. Gutwillig.

 6            Usually when we have a gap of a couple months between

 7   an arrest on the one hand and an indictment, usually it's that

 8   the defendant has waived any challenge to the government's not

 9   indicting within 30 days.

10            Is that what happened here?

11            MR. GUTWILLIG:  No, your Honor.  There was not a

12   rollover here.  There was no kind of waiver of the indictment.

13   The government's position is that the speedy trial clock, for

14   purposes of this, began when the defendant was presented in

15   this district.  I would also note that --

16            THE COURT:  So he was arrested July 3?

17            MR. GUTWILLIG:  Correct.

18            THE COURT:  What led the defendant first to be

19   presented in this district on what I gather was September 6?

20            MR. GUTWILLIG:  So what led in terms of the timeline

21   between the arrest and the presentment?

22            THE COURT:  Yes.

23            MR. GUTWILLIG:  My understanding is that the defendant

24   was in the process of having initial counsel and then having

25   other counsel, and the government was in active communications
```

1    with prior and current counsel about finding a date to come up

2    here.

3             THE COURT:  The issue is whether it has any

4    consequence, given the subsequent indictment.  I don't know.

5    The subsequent indictment may clear away any issue presented

6    by -- let me back up.

7             It may well be that somebody could have moved before

8    the indictment for the dismissal of the complaint on the

9    grounds that an indictment by then should have issued absent

10   consent to a continuance.

11            It's another story entirely, once the indictment

12   in fact issues, whether any misstep with respect to the

13   complaint matters.  I'm asking you to put aside that issue and

14   just focus on the period of time between July 3 and early

15   September.

16            What was the legal justification in effect for not

17   indicting within 30 days of the arrest on the complaint?

18            MR. GUTWILLIG:  I think I'm probably not addressing

19   your Honor's question correctly.  The legal reason is that the

20   government's view is that the speedy trial clock did not begin

21   until he was presented in this district.

22            THE COURT:  This is a problem that I think I bumped

23   into.  May I suggest, before any motion is made along those

24   lines, that counsel confer.  I'm happy to hear any motion that

25   counsel makes.

1          On the other hand, it strikes me that there are at

2    least two issues that my colloquy with Mr. Gutwillig identifies

3    that could make such a motion dead on arrival.

4          One is whether the subsequent indictment cures any

5    problem from before.  And the second issue is whether it's

6    correct that the speedy trial clock from the point of view of

7    the obligation to indict 30 days after a complaint is triggered

8    by the arrest on the complaint or the presentment in the

9    district from which the complaint arises.

10          So may I urge you on that one to aim before you fire,

11    defense counsel, and let me know what you intend to do.

12          What Mr. Smallman, who is always on top of things, has

13    given me this as follows:  He's given me a post-it with the

14    following schedule which may be helpful.

15          On July 3, the defendant was arrested in Florida.  On

16    July 8, he was presented in Florida.  On July 8, the defendant

17    signed a waiver of a removal order, and an order issued.  On

18    July 10, the case was transferred to us.

19          That I think doesn't answer the legal question of when

20    the clock began to run.  And it's factually unclear to me why

21    it is that the defendant doesn't wind up reaching New York

22    until shortly after around Labor Day, but we'll see.

23          Let me throw out the following:  Mr. Gutwillig,

24    insofar as the defense is telling you that they are considering

25    challenges to multiplicity and venue, all the more reason for

1   you to jump on that right away because if it's your intention

2   to indict in a way that as much as you can, cures those

3   problems, I'd rather, if you're going to do that, you do it

4   before we get into a bunch of motions practice.

5           Mr. DiRuzzo, I think what that says to me is it would

6   be a waste of your time and all our time for me to set a

7   schedule that obliges you to move on those grounds right away

8   if in fact the government is going to be taking a fresh look at

9   the proper way to indict this case.  Better for you to be

10  taking aim at a superseder than taking aim at this indictment

11  and having your motions superseded away.

12          MR. DiRUZZO:  Understood.

13          THE COURT:  With that, what I'd like to do, thinking

14  out loud, is set a next conference date.

15          Let me back up:  Mr. DiRuzzo, assuming unsuccessful

16  motions, is this a case that you expect to go to trial?

17          I'm trying to figure out whether to set a trial

18  schedule now just so everyone can preserve the date.

19          Is this a viable trial?

20          MR. DiRUZZO:  I think so, Judge.

21          THE COURT:  Then why don't we do this.  Why don't we

22  work backwards.  I'm mindful that you have a busy schedule, and

23  I'm certainly not scheduling anything that's going to make a

24  mess of your other commitments, but I also want to be

25  respectful of the defendant's interest in a speedy trial and

 1    the system's interest in that.

 2           Could we have this trial in early March?  It sounds

 3    like it can't be more than about a week-long trial.

 4           Right, Mr. Gutwillig?

 5           MR. GUTWILLIG:  That's correct.

 6           MR. DiRUZZO:  Your Honor, that would not be a problem.

 7    I actually was anticipating we could have the trial before

 8    March.  I don't know what the Court's schedule is.

 9           As of right now, I do have a week-long trial at the

10    end of February.  My January and the beginning of February are

11    pretty clear.

12           THE COURT:  That's fine.  Right now, my druthers would

13    be, if you're talking about motions, to put this over a bit so

14    we can let the motions process run its course and you know

15    exactly what you're facing.

16           A month from now, you may find that your client is

17    facing an indictment that is reconfigured to have counts

18    specific to particular victims, and it may be that you're

19    facing a money laundering as opposed to a bank fraud indictment

20    or both or one or the other or exactly the same.

21           It strikes me that only once we have an indictment can

22    you then move against it.  At that point, I'll need a little

23    bit of time to sort things out.  Once I've ruled on any of the

24    challenges you have to any of the counts, at that point,

25    everyone's got to begin to mobilize for pretrial motions.

 1          There may or may not be motions in limine.  There may

 2   or may not be 404(b) disclosures that have implications.  I

 3   would rather schedule this on a date when we're getting it

 4   right the first time and building in enough time for anything

 5   that could conceivably happen.

 6          Can you try the case in March?

 7          MR. DiRUZZO:  Yes, your Honor.  Although to be clear,

 8   my client would prefer -- and I would be amenable -- at least

 9   for the purposes of motion practices, to resolve it sooner

10   rather than later.

11          THE COURT:  And I'm all for that.  We'll work

12   backwards in a moment and set a deadline in a moment for the

13   government to supersede, if that's its intention.

14          I'm trying to work backwards and put a trial date in

15   the schedule, and then we'll set up a rational schedule given

16   that.  So I'm trying to work with your schedule here.

17          Mr. Smallman tells me we could have this trial on --

18   suppose we did this trial Monday, March 9.  It sounds like

19   you've got something in late February.

20          Would that work?

21          MR. DiRUZZO:  The direct answer to your question is as

22   of right now, I believe so.  My one qualification, Judge, is I

23   don't have my co-counsel's calendar with me.  So I have no idea

24   what his schedule is like.

25          THE COURT:  In the future, my rules require

1  lead counsel to be at a hearing for just this reason.

2          MR. DiRUZZO:  Okay.

3          THE COURT:  I'm going to assume that your availability

4  means that your co-counsel is available too.  It's unhelpful to

5  me to have a counsel not be familiar with their schedule at a

6  scheduling conference.

7          MR. DiRUZZO:  Understood, your Honor.  So for that,

8  you have my apology.

9          As far as between me and my co-counsel, we'll work it

10  out.  Although in an ideal world -- I understand that nothing

11  in this world is ideal -- we'd prefer a trial sooner rather

12  than later.

13          Given that I have a trial in the end of February,

14  which there is a distinct possibility -- that's a civil tax

15  case that's going forward in Miami -- that judge's criminal

16  docket and the possibility that it could settle which is very

17  likely, I'm thinking that, if this Court has the time free,

18  either in late January or February.

19          THE COURT:  I have a three-week trial beginning

20  January 27.  So from my docket perspective, that's a problem.

21          MR. DiRUZZO:  Understood.

22          THE COURT:  The broader point is -- I could transfer

23  this to a colleague.  The broader point is that it seems to me

24  that the schedule that I'm floating for you now, which

25  anticipates trial in 4 1/2 months, is relatively brisk.  And I

1    think it allows for I think working through what are not

2    insubstantial issues here.

3         My concern is that if I were to set this right at the

4    beginning of January or something like that, we'd have a

5    situation where I'm a little concerned that there won't have

6    been enough time for you to adapt to any ruling that I make on

7    any motion directed to any superseding indictment.

8         That's the concern, which is I may or may not be

9    dealing with an indictment that looks rather different than the

10   one here.  I'm trying to build in enough time so that there is

11   no presently foreseeable basis for seeking an adjournment.

12        I want a firm date, rather than setting an early date

13   and then your coming to me and saying, Judge, I just got your

14   decision on the challenge to the indictment.  And given what is

15   surviving, we need the following discovery directed at third

16   parties.  I'm trying to set a schedule that is impregnable.

17        MR. DiRUZZO:  Understood, Judge.  Let me pose this

18   question to the Court, if the Court would be amenable to it.

19   I'm just thinking out loud.

20        We're at October 21 right now.  Two months for

21   discovery would be November 21, December 21.

22        THE COURT:  Do you see the problem?

23        MR. DiRUZZO:  Yes.  December 21, and then two to three

24   weeks later would basically be mid January.

25        And you said you were starting a three-week long

1    trial.

2          THE COURT:  I'm starting a three-week long trial on

3    January 27.  So giving you March 9 trial would seem to be a

4    rational schedule.  Let's focus on your client's interest.

5          The government may not supersede for a month.  I'm

6    hoping that they will come to terms with this, but I'm

7    certainly going to give them that amount of time to supersede.

8    The case is new.  Given that, until they've superseded, you

9    don't have something to shoot at in your motions.  That's the

10   problem.

11         MR. DiRUZZO:  That's a fair point.  I'll be in

12   discussions with counsel for the government, to the extent the

13   government is going to be seeking a superseding indictment.

14   For example, we may just waive on venue.

15         THE COURT:  That would help.  That would certainly get

16   rid of the venue challenge.

17         Let's focus on the trial date, and then we'll work out

18   the constituent dates.  The purpose of the trial date is

19   fundamentally to permit the various things that would need to

20   happen in this case to happen on a schedule that allows you to

21   prepare for and meet a trial on consequential charges like

22   these?

23         Does March 9 work for you?  Does it give you the time

24   you need to ably defend your client's interests?

25         MR. DiRUZZO:  Yes, Judge.  I'm just trying to be

1   considerate of my client's desire to get this done sooner

2   rather than later, which is why I was kicking the idea of

3   considering whether or not this would be more than a two- or

4   three-day trial.

5       THE COURT:  It's a criminal jury trial.  Jury

6   selection takes time.

7       MR. DiRUZZO:  Yes, Judge.  I've had plenty of criminal

8   jury trials and criminal jury trials.  But I've never tried a

9   criminal jury trial in this district, and I've never done it

10  with your Honor.

11      In your experience, are we looking at a half day for

12  jury selection or a day or day and a half?

13      THE COURT:  On a single-case defendant that doesn't

14  involve an inflammatory subject matter like deaths or drugs or

15  child porn or something like that, usually you would be opening

16  in the afternoon of the day the jury selection began.  So it

17  would be, in the ordinary, less than a day but more than the

18  morning, something like that.  Usually 2:00 or 3:00 you'd be

19  opening.

20      You've got three different victims.  Each of them has

21  a narrative here.  With each of them, you would be perhaps

22  exploring issues of authorization and the like.  There may well

23  be agent witnesses or summary witnesses summarizing the flow of

24  money.  I don't know.  If seems like a very straightforward

25  case.

```
 1              MR. DiRUZZO:  Yes.

 2              THE COURT:  It's rare to get a criminal trial done in

 3    two days.  It looks like a three- or four-day trial to me.

 4              Government, you tell me if that's a wrong estimate.

 5              MR. GUTWILLIG:  That's what the government would

 6    estimate as well.

 7              THE COURT:  Under the circumstances, I could, if you

 8    needed to, perhaps do this on January 20.  I have a trial

 9    beginning on the 27th.  I'm willing to do that.

10              (Pause)

11              THE COURT:  My druthers as between the two would be

12    March 9.  I'm willing to do it on January 20.  My strong advice

13    to you would be to do it on March 9 because if you choose --

14    I'll offer you the menu option.

15              But if you choose the 20th, I may well hold you to

16    that.  I expect I would.  And you may find yourself cramped for

17    time to the extent that, for example, there is defense

18    investigative work or subpoenas you want to get out.

19              I strongly urge you, understanding your client's

20    eagerness to get closure, to do the 9th of March.  It will give

21    you more time for important things.

22              MR. DiRUZZO:  How about this, Judge:  Could you give

23    me 24 hours to file a letter setting forth our preference

24    between January 20 and March 9?

25              (Pause)
```

1          THE COURT:  I'm going to ask counsel to keep open both

2   days.

3          MR. DiRUZZO:  Okay.

4          THE COURT:  I'm willing to receive a letter from each

5   of you by the end of the day tomorrow with your views about the

6   advisability of those days.

7          However, for the avoidance of any doubt, I'm going to

8   make the decision based on what I think is in the overall

9   interests of all parties to the case, the defense, as well as

10  the Court, and the government as well.

11         I'll certainly give weight to your views, and I will

12  be eager to see how you explain them.  But just to be clear,

13  you need to be prepared for either date.

14         MR. DiRUZZO:  Understood.  I appreciate that

15  accommodation, Judge.

16         THE COURT:  That's fine.  Then let's do this.  It

17  seems to me that rather than setting a broader schedule, that's

18  going to turn on which trial date we choose.  I do want to set

19  an immediate schedule.  Discovery has already been produced.

20         Government, how quickly, if you're going to supersede,

21  can you supersede?

22         MR. GUTWILLIG:  Your Honor suggested I believe earlier

23  a month.  The government would expect to do it sooner than that

24  but would appreciate the month, if your Honor is willing to

25  grant that.

1      THE COURT:  Why don't I set a next date in the case in

2  a month or approximately or a little bit more than that for

3  now.  And that way, at least --

4      Mr. Teman, it's really unhelpful when you roll your

5  eyes at the Court.

6      THE DEFENDANT:  That wasn't at all my intention,

7  your Honor.

8      THE COURT:  I know, but it is what you did.

9      THE DEFENDANT:  No.

10     THE COURT:  If it isn't obvious already, I'm trying to

11  be solicitous of your interests here.

12     THE DEFENDANT:  I appreciate that, your Honor.

13     THE COURT:  I appreciate that it's frustrating and no

14  fun to be charged with bank fraud.  But in the end, the

15  government has brought charges against you.

16     In the end, I need to have conferences in order to

17  engage in the way I'm engaging with counsel to make sure we

18  have a fair, thoughtful process that's attendant to all the

19  issues.

20     So I appreciate your frustration at being here.  If

21  there is a future conference and your counsel and you want to

22  seek to waive your appearance here, I'll entertain an

23  application for that, if it's too much of an inconvenience or

24  bother.

25     But ultimately, your interests are at stake here.  And

1   you should be happy that I want to meet with counsel multiple

2   times to make sure that I've got my arms around all the issues

3   in this case and I'm trying to be fair.

4          THE DEFENDANT:  Your Honor, just to clarify.  I was

5   not expressing disappointment in your Honor who has been very

6   fair and thorough.  This case has, by my understanding, already

7   taken two months longer than it should have based on the Speedy

8   Trial Act.

9          Your Honor, my frustration is that I run a business.

10  The business has my name on it.  I have to pay my employees.  I

11  have to obviously pay rent and buy food.  I have to go out into

12  the world and date.

13         Right now, there is a very public and very false

14  accusation against me, no pun intended, indicting my

15  credibility and trustworthiness that is costing my ability to

16  pay those who work for me.

17         And it is in -- this is destroying my life.  This is

18  destroying my company.  This is destroying a half decade of

19  work.  Without going into details --

20         THE COURT:  May I suggest you not go into details.

21         THE DEFENDANT:  I'm not.

22         THE COURT:  You should be speaking to me through

23  counsel on a matter like this.  It's not in your interests to

24  keep talking because something you may say could ultimately

25  present an issue for you.

1          May I suggest, if you have something like this to

2   communicate about the scheduling of the case, that belongs in

3   your counsel's letter to me due tomorrow.

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  I was commenting on the facial expression

6   when I suggested we have a conference in a month from now.

7   That's all that I was focusing on.

8          THE DEFENDANT:  Yes, your Honor.  It was not

9   frustration at the Court, just the speedy thing.

10          MR. DiRUZZO:  Just so we're clear, Judge, I think it's

11   just a very frustrating thing.  Like most of my defendants,

12   they don't want to be here.  This is his first experience.  On

13   behalf of my client, I'll make sure that he's more cognizant of

14   his body language.

15          THE COURT:  That's fine.  I appreciate the

16   frustration.  I just want him to understand I'm trying to cross

17   the Ts and dot the Is here substantially in his interest.

18          (Pause)

19          THE COURT:  Counsel, here is what I'm going to

20   propose:  That we have a next conference on Wednesday,

21   December 4, and that I give the government a month to return a

22   superseding indictment.

23          And that way, assuming those dates work, I can receive

24   letters from you beforehand letting me know what your

25   intentions are as to motions practice.  By then we'll have a

1    trial date.

2           And when I meet with you in early December, we can

3    take stock of a schedule for litigating motions, setting a due

4    date for requests to charge, voir dire, and the like.

5           MR. DiRUZZO:  Judge, unfortunately, I've got a civil

6    tax case that is set.  To be perfectly blunt, I'm going to be

7    moving to continue that.  Of course, I have no idea if the

8    judge will grant it.  That involves the week of December 2.

9    And I have a criminal 666 case and tax evasion case where I'm

10   an expert witness.  That case I do believe is probably going to

11   go.

12          THE COURT:  When is that?

13          MR. DiRUZZO:  That's set for Saint Thomas the week of

14   December 2 as well.

15          THE COURT:  You're going to be potentially in two

16   places at once.

17          MR. DiRUZZO:  Right.  I'm going to move on the civil

18   tax case.  But on the criminal case where I'm an expert, I

19   anticipate that that's probably going to go to trial.

20          If the Court is amenable, would it be too much to ask

21   for November 22.

22          THE COURT:  One moment.

23          (Pause)

24          THE COURT:  How about November 22 at 2:30 p.m.?

25          MR. DiRUZZO:  That's great, Judge.

1    THE COURT:  So why don't we do this:  Government, if

2    you're going to supersede, supersede by Monday, November 18,

3    please.

4    MR. GUTWILLIG:  Yes, your Honor.

5    THE COURT:  And please give defense counsel notice as

6    to what a superseder would look like.

7    Defense counsel, you can't move against a superseder

8    that hasn't happened, but I'd like you to have some idea of

9    what's coming --

10    By the end of the day on November 20, I'd like a

11    letter from each counsel letting me know, after you have

12    conferred, what their intentions are as to motions practice and

13    proposals for a schedule.  When I see you on November 22, I'll

14    therefore start off in an organized way.

15    MR. DiRUZZO:  Yes, your Honor.

16    THE COURT:  I think this works.  Government, you can

17    certainly decide, what, if any, changes you would be making to

18    the superseder by November 18.  I certainly encourage you to

19    get the superseder done earlier.  That would be helpful.  If

20    you don't, I'm giving you until the 18th.

21    MR. GUTWILLIG:  Yes, your Honor.

22    MR. DiRUZZO:  That works.

23    THE COURT:  Very good. is there a motion for an

24    exclusion of time until November 22?

25    MR. GUTWILLIG:  Yes, your Honor.  The government would

1   move to exclude time on the Speedy Trial Act until November 22

2   to continue to obtain and produce discovery and also to

3   consider superseding charges in this matter.

4           THE COURT:  Mr. DiRuzzo?

5           MR. DiRUZZO:  No objection, your Honor, with the

6   caveat that this waiver will not affect the time between -- the

7   pre-indictment time.

8           THE COURT:  Right.  The speedy trial exclusion purely

9   would obtain in between today, which is October 21, and our

10  next conference, which is November 22.

11          MR. DiRUZZO:  Agreed then.

12          THE COURT:  I will exclude that time under the Speedy

13  Trial Act, under Title 18, U.S. Code, Section 3161(h)(7)(A).  I

14  find that the interests of justice are outweighed by the

15  interests of the defense and the public in a speedy trial.

16          In particular, the excluded time will serve several

17  purposes.  All parties are now aware of the three victims that

18  the government contends who were the victims of the bank fraud.

19  The excluded time will permit the defense, in particular, to

20  prepare for trial and do discovery of its own with respect to

21  those matters.

22          The excluded time will also permit the government to

23  get any additional discovery to the defense, including from the

24  victim companies.  It will also allow all parties to take stock

25  of what appear to be plausible legal issues presented by the

1   current charges.  And to the extent the government reformulates

2   charges, it will allow all parties to consider the legal

3   viability of those charges.

4          I take it implicit in all of this is that there is a

5   possibility of a disposition as well; that the parties will be

6   discussing that?

7          MR. GUTWILLIG:  The government intends to discuss

8   that, your Honor.

9          MR. DiRUZZO:  Yes, your Honor.  I believe there are

10  certain facts the government is not aware of that hopefully

11  will change their view of the world.

12         THE COURT:  An additional reason, of course, for the

13  exclusion of time is to facilitate thoughtful discussions among

14  government and defense counsel.

15         May I suggest, defense counsel, that you have those

16  conversations sooner rather than later.  There is not a small

17  amount of inconvenience that I sense on behalf of the defense

18  table in being here.

19         To the extent that the case has the capacity to be

20  resolved pretrial, which can have advantages, including credit

21  under the guidelines and otherwise for acceptance of

22  responsibility, I encourage you to have those discussions.

23         I don't put my thumb on the scale as to the right

24  outcome here, but it's always a good idea for counsel to be

25  talking openly about what the terms of any disposition might

1   be.

2            I encourage you to do that soon so that you all can

3   avoid any potential use of resources that ultimately would

4   prove unnecessary, if in fact the same disposition were to be

5   reached later.

6            Anything further from the government?

7            MR. GUTWILLIG:  Nothing further.  Thank you.

8            THE COURT:  Anything further from the defense?

9            MR. DiRUZZO:  No, your Honor.

10           THE COURT:  I look forward to seeing you on

11   November 22.

12           Just to be clear, I'd like letters from each of you by

13   the end of day today about the trial dates, and I will promptly

14   choose among them and set a trial date so that you can at least

15   protect that part and free up the other part of your schedule.

16   The menu options for all of us to consider are January 20 and

17   March 9.  Thank you.  We stand adjourned.

18           MR. DiRUZZO:  Thank you.

19           (Adjourned)

20

21

22

23

24

25