1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        19 CR 696 (PAE)

5   ARI TEMAN,

6               Defendant.
                                          Conference
7   ------------------------------x

8                                         New York, N.Y.
                                          November 21, 2019
9                                         2:40 p.m.

10  Before:

11
                          HON. PAUL A. ENGELMAYER,
12
                                          District Judge
13
                              APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16  BY:  JACOB GUTWILLIG
         Assistant United States Attorney
17
    MARGULIS GELFAND
18  BY:  JUSTIN K. GELFAND
              -AND-
19  DiRUZZO & COMPANY
    BY:  JOSEPH A. DiRUZZO, III
20       Attorneys for Defendant

21

22

23

24

25

 1              THE COURT:  Good afternoon, everyone.  Let me take the

 2     role.

 3              Who do I have for the government?

 4              MR. GUTWILLIG:  Good afternoon, your Honor.  Jacob

 5     Gutwillig for the government.

 6              THE COURT:  Very good.  Good afternoon, Mr. Gutwillig.

 7              For Mr. Teman?

 8              MR. GELFAND:  Good afternoon, your Honor.  Justin

 9     Gelfand and Joseph DiRuzzo for Mr. Teman.

10              THE COURT:  And you are?

11              MR. GELFAND:  Gelfand, your Honor.

12              THE COURT:  And Mr. DiRuzzo?

13              MR. DiRUZZO:  Right.

14              THE COURT:  Good afternoon, Mr. Gelfand.  Good

15     afternoon, Mr. DiRuzzo. and good afternoon to you, Mr. Teman.

16     All right.

17              I think our first order of business is to arraign the

18     defendant on the superseding indictment.

19              Just briefly, when was it returned, Mr. Gutwillig?

20              MR. GUTWILLIG:  The superseding indictment was

21     returned on November 12 of this year.

22              THE COURT:  All right.  I'm going to arraign the

23     defendant in a moment.  But when we're done with that, I'm

24     going to be asking you to explain, just to make sure I

25     understand, essentially what's being charged in each count

1    going beyond the recitation of the charging language

2    essentially.

3            I'm trying to get a better understanding of what

4    happened here or what the government's allegation is as to the

5    conduct that underlies each count.  So just be prepared to do

6    that.  I'll also then be taking stock with you as regards to

7    discovery.

8            With that, Mr. Gelfand, have you had an opportunity to

9    review with your client the arraignment questions?

10           MR. GELFAND:  Yes, your Honor.  I have.

11           THE COURT:  Then let me just ask Mr. Teman to rise.

12           (Defendant sworn)

13           THE COURT:  Very good.  Thank you.

14           I asked you a number of questions earlier.

15           Has there been any change with respect to any medical

16   treatment that you're having or anything like that?

17           THE DEFENDANT:  No, your Honor.

18           THE COURT:  In the past 24 hours, have you taken any

19   drugs, medicine, or pills or drunk any alcoholic beverages?

20           THE DEFENDANT:  No, your Honor.

21           THE COURT:  Is your mind clear today?

22           THE DEFENDANT:  Yes, your Honor.

23           THE COURT:  Do you understand what's happening in this

24   proceeding?

25           THE DEFENDANT:  Yes, your Honor.

4

```
1          THE COURT:  Mr. Gelfand, do you have any doubt about
2    your client's clarity of mind today?
3          MR. GELFAND:  No, your Honor.
4          THE COURT:  Mr. Teman, have you received a copy of the
5    superseding indictment, the S1 indictment?
6          THE DEFENDANT:  Yes, your Honor.
7          THE COURT:  Have you read it?
8          THE DEFENDANT:  Yes, your Honor.
9          THE COURT:  Have you consulted with your counsel about
10   it?
11         THE DEFENDANT:  Yes, your Honor.
12         THE COURT:  Do you want me to read it out loud, or do
13   you waive its public reading?
14         THE DEFENDANT:  I waive it, your Honor.
15         THE COURT:  Thank you very much.
16         How do you plead to the charges?
17         THE DEFENDANT:  Not guilty.
18         THE COURT:  Thank you.  You may be seated.
19         All right.  Having taken care of the arraignment, let
20   me ask government counsel to, in as much detail as you can --
21   there are four charges here.  Tell me about them and the
22   conduct on which they are based.
23         MR. GUTWILLIG:  Yes, your Honor.  So the first count
24   in the superseding indictment is the same as the first count in
25   the original indictment.  The conduct underlying that briefly
```

1    is what the government alleges is that Mr. Teman in

2    approximately April of this year went into a branch of a

3    financial institution and deposited approximately 27 fraudulent

4    checks.

5            The checks were written on behalf of three entities,

6    and they were deposited into an account, the GateGuard account,

7    which the government believes is owned and operated by

8    Mr. Teman.

9            Subsequently, certain of those funds were transferred

10   to a second account the government believes is owned or

11   operated by Mr. Teman.  The Friend or Fraud account.

12           THE COURT:  The Friend or Fraud?

13           MR. GUTWILLIG:  That's correct.

14           THE COURT:  Is it really called "Fraud"?

15           MR. GUTWILLIG:  I believe the account is for the

16   Friend or Fraud which my understanding is a business startup by

17   Mr. Teman.

18           THE COURT:  Okay.

19           MR. GUTWILLIG:  At any rate, certain of those funds

20   initially deposited into the GateGuard account were

21   subsequently transferred into the Friend or Fraud account and

22   into another account associated with Mr. Teman.

23           Later -- I think it was in approximately late May, or

24   it could have been early June.  I think it's late May --

25   Mr. Teman went to a branch of a financial institution located

1    here in Manhattan and made a withdrawal from one of those

2    accounts certain of the funds.

3          So in the government's view, this is, for lack of a

4    better term, the first scheme -- the bank fraud on the

5    financial institution, depositing these checks which the

6    government's position is Mr. Teman did not have authorization

7    from those entities to deposit which were deposited into one of

8    his accounts, moved around, some of them were withdrawn.

9          THE COURT:  Let's pause on that.

10          Does that capture essentially the conduct underlying

11    Count One?

12          MR. GUTWILLIG:  That's correct.

13          THE COURT:  Just so I understand what the allegation

14    is as to what makes this fraudulent, are the checks themselves

15    the checks, if you will, of the account holder, or are the

16    checks themselves, putting aside any writing on them,

17    fabricated?

18          MR. GUTWILLIG:  My understanding is that the checks

19    are themselves fabricated.

20          THE COURT:  Okay.

21          MR. GUTWILLIG:  In the checks, typically, as I

22    understand it, a check would have in the bottom right-hand

23    corner the signature of the individual depositing it or

24    something like that.

25          These checks say -- I'm paraphrasing here -- this is a

```
 1    legal check.  It must be deposited to GateGuard, and then the

 2    phone number.

 3         And the checks are issued on behalf of these three

 4    entities who maintain that although I believe at least two, and

 5    I think perhaps all three of them had -- and we've produced

 6    statements from these entities from the individuals who worked

 7    there early to the defense -- ceased there business operations

 8    with Mr. Teman at that point and not given permission for him

 9    to draw on their accounts which he did through these checks.

10         THE COURT:  What is the name of the entity or entities

11    on whose account the original wave of checks, the 27, are

12    drawn?

13         MR. GUTWILLIG:  So there are three entities.  One

14    is -- let me just make sure I get them correct.  I believe one

15    is called -- if your Honor will just bear with me for a moment.

16         THE COURT:  Take your time.

17         MR. GUTWILLIG:  One is called ABJ Lenox LLC.  One is

18    called ABJ Milano, LLC.  And one is called -- I believe it's

19    405 West Realty or Coney Realty.

20         THE COURT:  You began to describe this at the last

21    conference, and forgive me for not remembering.

22         Does he have some affiliation, employment, contract,

23    or does he have some association with one or all of those

24    entities?

25         MR. GUTWILLIG:  So this is, as I understand it, the
```

1   crux of the dispute between the parties which is, as I

2   understand it, Mr. Teman believes that he had a contract with

3   each of these entities or a contract or some sort of terms of

4   service that was agreed to at some point that authorized him to

5   draw on their accounts in the event that he believed that they

6   owed him money, not artfully phrased.  But as I understand it,

7   terms of service.

8          THE COURT:  He has some contractual relationship that

9   somehow -- the allegation or the defense is that he had some

10  permission to do something that under some circumstances

11  results in the withdrawal of money.

12         MR. GUTWILLIG:  And the government's position is that,

13  first off, I'm not even sure if there is a contract.  If there

14  is, if its enforceable.  Even if it were enforceable, I don't

15  think you can authorize -- the government's position would be

16  that one cannot authorize you to essentially draw on their

17  account, unless you're an authorized signatory or something

18  else on the account.

19         THE COURT:  Speak into the mike a little more.

20         I think it would be well worth your running to ground

21  what the account holder says because there are important

22  distinctions to be mindful here between the civil and the

23  criminal law.

24         MR. GUTWILLIG:  And the account holders say that he

25  was not authorized to do this.  I understand that there is also

1    not necessarily -- not the same conduct here, but I understand

2    that there is a pending civil suit against Mr. Teman here in

3    Manhattan Supreme Court that is different conduct but related

4    to the same contracts.

5         The government's position is that this is not a

6    business dispute.  This is a bank fraud.

7         THE COURT:  Right.  But in other words, from your

8    perspective, he literally himself or somebody at his direction

9    or somebody who he's affiliated with manufacturers the actual

10   thing we're calling a check.  It was not a pre-existing check

11   belonging to the account holder, number one.

12        Number two, the directive or statement on the check,

13   to wit, that the account holder authorizes the withdrawal to a

14   payee of a designated sum, is also a false representation that

15   the account holder gave that direction.

16        MR. GUTWILLIG:  Yes.

17        THE COURT:  Okay.  When we spoke before, there was an

18   issue that I had raised that I had a curiosity about involving

19   venue.  If memory serves, that first transaction with the

20   deposit of the 27 fraudulent checks I think occurred in a

21   different state.

22        MR. GUTWILLIG:  That's correct.

23        THE COURT:  Walk me through the venue issue, the

24   locations here.

25        MR. GUTWILLIG:  So the deposit occurred in the

1    Southern District of Florida, the physical deposit I should

2    say.  In the government's view, in the first instance, the

3    account, the GateGuard business, is based in New York.

4              THE COURT:  Sorry.  The account?

5              MR. GUTWILLIG:  The GateGuard account and the Friend

6    or Fraud account.

7              THE COURT:  That's the account into which the 27

8    checks are in the first instance deposited.

9              MR. GUTWILLIG:  Into the GateGuard account.

10             THE COURT:  So Mr. Teman's account, if you will --

11   it's presumably a nationwide bank.  But his account is in

12   New York.

13             MR. GUTWILLIG:  My understanding is that the business

14   account is in New York.  Second, with respect to the completion

15   of the first scheme or the bank fraud, as it were, Mr. Teman

16   then goes to New York and, here in the Southern District of New

17   York, withdraws funds from one of these accounts.

18             And even if your Honor were not inclined -- the venue

19   argument on the first piece, that the accounts and business are

20   based in New York, the second that he then comes to New York

21   and then withdrawals from one of these accounts certain of the

22   proceeds of one of these checks.

23             THE COURT:  May I ask you.  I raised this last time,

24   but I remain concerned about it.

25             I assume that there will be at some point an argument

1     to me that the bank fraud is completed when, on false

2     pretenses, the money is removed from the victim account and put

3     into the GateGuard account.

4          And whatever else happens to it afterwards may be

5     money laundering.  It may be three other federal offenses, but

6     it's not bank fraud.  That is just a transfer of money.  It's a

7     transaction using the fruits of a completed bank fraud.

8          Have you consulted with appeals to make sure that your

9     theory about why this is an ongoing act of bank fraud as

10    opposed to a financial transaction involving a specified

11    unlawful activity but a completed bank fraud is incorrect?

12          MR. GUTWILLIG:  I consulted with appeals regarding

13    both the multiplicity issue your Honor had raised and also with

14    respect to money laundering or potential other charges.  The

15    view is that the bank fraud is of a piece all together going

16    first to the transfer and then the withdrawing.

17          Even in the first instance, that the depositing into

18    those accounts that are based in New York would serve as venue

19    here.  I'm happy to go back to appeals on that specific point.

20          THE COURT:  That point -- I thought I had been clear

21    in raising it.  The multiplicity is a separate issue.

22          But on the venue issue, I have no interest in

23    presiding over a trial where there is a spottable and

24    presumably curable legal deficiency which can be spotted at the

25    first and second conferences.

1    But my worry here is that -- and I haven't researched

2   this, but I have some familiarity with bank fraud -- there is a

3   nonfrivolous argument that the bank fraud itself is complete

4   when the financial institution that was the custodian of the

5   money parts with it and the money plops down in the defendant's

6   account.

7    Whatever else happens to the money thereafter could be

8   charged in other ways presumably but that it's no longer a bank

9   fraud.  It's simply a transaction with the fruits of a

10   completed bank fraud.

11    Has that precise question been vetted by the

12   government?

13    MR. GUTWILLIG:  I of course consulted with my

14   supervisor before charging and the superseding indictment on

15   venue and other points.  As to that specific question, whether

16   it was completed, I will go back.

17    THE COURT:  You need to because I think it's a

18   substantial question.  And the thrust of what you're trying to

19   allege here I understand, but I think you need to be absolutely

20   sure that that actually squares with bank fraud.

21    Presumably, the financial institution that you're

22   claiming was defrauded is the financial institution that housed

23   the victims' money, not the financial institution into which

24   the defendant held his money.

25    Correct?

1    MR. GUTWILLIG:  I think the allegation is as to --

2    yes.  I suppose that would be it.  The way that it's currently

3    conceived though is that the financial institution that he

4    deposited these checks into is the one upon which the fraud is

5    being perpetrated.

6    THE COURT:  I see.

7    Why is that?  Why is the depositing institution as

8    opposed to the surrendering institution the victim of the bank

9    fraud?

10    MR. GUTWILLIG:  I suppose it could be done either way,

11    but the checks are being deposited, and he's getting credit

12    into his account for funds that are not his.

13    I take your Honor's point that perhaps the fraud is on

14    the institution as to which the money is coming rather than the

15    institution which accepts the money into his account.

16    THE COURT:  He goes into a branch of his bank in

17    Florida and presents a check drawn on an account in Florida of

18    the victim.

19    MR. GUTWILLIG:  Drawn on an account in Florida of the

20    victim.  In terms of -- the three entities are based here from

21    which the funds were drawn.  The three entities -- ABJ Milano,

22    ABJ Lenox and Coney Realty -- are all New York based, not

23    Florida based.

24    THE COURT:  And their bank is where?

25    MR. GUTWILLIG:  Their bank is I believe it's either

1    JPMorgan Chase or in one of the cases Signature Bank.

2              THE COURT:  The issue I'm having is I'm having a

3    little difficulty pinning down, and it may be that you're

4    saying it clearly, and I'm not getting it.  But it may be

5    otherwise.

6              Which bank is the victim here?  Usually, but not

7    always, in a bad check case the victim is usually conceived as

8    that as the institution that parts with the money for obvious

9    reasons.

10             And the premise is that you're representing to that

11   bank that the directive being given to it, the check which

12   conveys an implicit or explicit message of authorization by the

13   account holder, is in fact an actual message on behalf of the

14   account holder.  It's a direction from the account holder.

15             So if the check is forged, it's usually conceived of

16   as a false representation to the custodial bank that the

17   account holder has directed the withdrawal of those funds.

18             You're offering a different theory which is that the

19   bank into which the money will flow from -- ultimately the

20   victim bank is also itself, in some sense, a victim.

21             Having thought about that one, I want to make sure

22   that you've got legal authority for the particular way you

23   framed this and that you're in a position to articulate clearly

24   to me and to the other table the theory here as to what bank or

25   banks are being charged as the victim here.

1     This is tricky stuff.  I bumped into tricky bank fraud

2  issues along not the same lines but similar ones when I was in

3  general crimes 30 springs ago.  I remember what a mess this can

4  be.

5     I want to make sure that -- we're still early in the

6  case -- we have clarity in the formulation of the indictment so

7  we don't wind up with some hiccup later on.

8     MR. GUTWILLIG:  Yes, your Honor.

9     THE COURT:  But right now, as you understand it, the

10 scheme which says to obtain monies, funds, credits, etc., is

11 not actually directed -- as you understand Count One, it's not

12 alleging that the custodial bank, the victims' bank, is the

13 bank that is defrauded.

14     But, rather, it's the defendant's own bank that stands

15 to take in money based on a false statement made to the other

16 bank, please release the money.  Its release has been

17 authorized by the account holder.

18     MR. GUTWILLIG:  So that is the conception under which

19 Count One is charged.  That said, the way that the indictment

20 is framed, if the victims are conceived of as the custodial

21 banks in the first instance, I'm not sure if that changes the

22 actual charge with respect to Count One.

23     THE COURT:  The problem is though that you can't

24 reformulate the charge after the indictment.  In other words,

25 the defense will surely ask for particularization, if you

1    haven't given it already.

2         While there are very strong limits to what is a proper

3    subject of particulars, I'd be surprised if they weren't

4    entitled to the identification of the bank, that is, the

5    victim.

6         MR. GUTWILLIG:  So to that point, all of the images of

7    the checks have been produced.

8         THE COURT:  Right.

9         MR. GUTWILLIG:  So with respect to that, certainly the

10   government has no problem identifying which banks those

11   accounts were held at and, indeed, has subpoenaed additional

12   records from those banks in order to be able to produce them to

13   the defense.

14        THE COURT:  That's all fine.  The issue is really what

15   the charge connotes.  I'm a little uncertain as to what you're

16   saying the charge is.  I think that you're saying that the bank

17   here that is the subject of the bank fraud is Mr. Teman's bank,

18   not ABJ's bank.

19        MR. GUTWILLIG:  That is how I have conceived it.

20   However, I take your Honor's point and will run to ground

21   whether the victim formulation of which institution, depositor

22   institution, is correct.

23        THE COURT:  We have a trial in two months.  The

24   underlying facts are not likely to change if you wind up

25   superseding to correct any misstep here, if there is one.  I'm

1    not saying there is or isn't.

2    But there is a related sequence of issues here that

3    needs closer attention.  One is who is the bank being

4    victimized.  More to the point is the theory of prosecution one

5    that is captured by bank fraud.

6    And then there's a related issue involving venue which

7    is essentially if the money leaves -- if the bank that is

8    victimized is ultimately the ABJ bank, how is that bank fraud

9    not completed once the money lands in the next bank over which

10    appears not to be in New York.

11    If the victim is the defendant's bank, what's the

12    extra victimization between -- and if that theory is even

13    viable, what's the extra victimization that occurs that's

14    covered by the bank fraud statute when Mr. Teman takes money

15    that by that point is in his account and switches it to another

16    account.

17    That sounds like a financial transaction involving

18    specified unlawful activity, 1957.  It doesn't sound like 1344

19    to me.  You'll need to run that to ground, but I'm officially

20    concerned about it.  So let's nail that down.

21    MR. GUTWILLIG:  Sure.

22    THE COURT:  So that's the theory of bank fraud.  And

23    it picks up all 27 checks.

24    MR. GUTWILLIG:  It picks up the first 27 checks.

25    THE COURT:  And the 27 checks there I take it are

1   properly, from the government's perspective, compressed into

2   one count because essentially they're birds of a feather -- the

3   same defendant, the same scheme, the same victim, and the three

4   companies are essentially corporate affiliates.

5           So there is no need to break those out into separate

6   counts?

7           MR. GUTWILLIG:  That is correct, except as to the last

8   point, my understanding is that two of the companies are

9   affiliates and one is a separate company.

10          So ABJ Lenox and ABJ Milano it is my understanding are

11  operated by the same company.  Coney Realty, to my

12  understanding, is separate.  However, as your Honor said, the

13  scheme or all together happened at the same time at the same

14  place with the group of checks.

15          THE COURT:  So what would the instruction to the jury

16  be if hypothetically they found that, for whatever reason,

17  there was no liability as to the ABJ entities but there was as

18  to the third entity, Realty?

19          MR. GUTWILLIG:  Coney Realty I think.

20          THE COURT:  Coney, C-o-n-e-y?

21          MR. GUTWILLIG:  C-o-n-e-y.

22          THE COURT:  What happens then?

23          MR. GUTWILLIG:  This is the issue I raised with

24  appeals.  My understanding -- and I spoke briefly with defense

25  counsel about whether there was multiplicity or duplicity,

1    whichever one it would be.

2         I suppose, taking a step back, it relates to

3    your Honor's first question with respect to who are the actual

4    victim banks.  And to your Honor's point, if it were conceived

5    of that way, then there could potentially be an issue as to

6    finding liability as to two but not the third.

7         So the government will have to go back and look at

8    that with respect to multiplicity.  The multiplicity issue has

9    been flagged for appeals and has been talked through.  I'm

10   happy to go back.

11        THE COURT:  We'll get to this a little later.  I

12   understand there will be motion practice here.  It may be to

13   the extent I have been unclear about the concerns I have about

14   various charging infirmities that are possibly present.  It may

15   be that the defense will conceive of this in a different way or

16   whatnot.

17        I'm just eager to not slow us up by a completely

18   foreseeable issue.  But if that were the case, presumably you

19   would then seek to supersede to avoid these problems.

20        In a situation where you've got multiple victims

21   covered by parallel schemes, there may be wisdom in the

22   government's considering what value there is in pressing them

23   into the same count.  I'm just saying.

24        So what's Count Two?

25        MR. GUTWILLIG:  Count Two is -- so earlier in

1    approximately March of 2019, the government alleges that

2    Mr. Teman deposited two additional checks via mobile deposit

3    into the same financial institution, also into the GateGuard

4    account.

5              Those two checks were issued -- this is one on behalf

6    of the first entity -- I'm sorry.  The third entity I mentioned

7    earlier, Coney Realty, and a second check on behalf of a fourth

8    entity which is a new victim as it were.

9              THE COURT:  A new what?

10             MR. GUTWILLIG:  A new entity.  So the first three

11   entities, the earlier fraud, which is captured by Count Two, is

12   on the basis of two checks that were deposited mobily, one from

13   entity three and one from entity four which has not been

14   mentioned earlier.

15             THE COURT:  Sorry.  These are independent of the 27

16   checks?

17             MR. GUTWILLIG:  They're independent of the 27, but one

18   of the two was ostensibly issued by one of the entities from

19   the first.

20             THE COURT:  One of the same victims.

21             MR. GUTWILLIG:  Correct.

22             THE COURT:  This is a separate bank fraud.  These are

23   also, you contend, counterfeit checks.  The checks themselves

24   are not what was received, if you will, by the account holder.

25             MR. GUTWILLIG:  Correct.  These checks differ from the

1    27 later checks in that in the bottom right-hand corner of

2    these two checks, there is a signature; whereas, in the 27

3    later checks, there is kind of a printed boilerplate of

4    something.

5         THE COURT:  Right.

6         MR. GUTWILLIG:  So the individuals behind these

7    accounts, the ultimate owners of these accounts it's the

8    government's contention did not sign these checks which is what

9    the basis of Counts Three and Four for aggravated identity

10   theft are based on the conduct in Count Two.

11        THE COURT:  This is bank fraud.  This is not

12   aggravated identity theft.

13        MR. GUTWILLIG:  Count Two is bank fraud.

14        THE COURT:  I'm focusing on Count Two.

15        MR. GUTWILLIG:  Sure.

16        THE COURT:  These are two checks in addition to the

17   27, but the manner of the alleged bank fraud is different

18   because it involves affixing an unauthorized wet signature, if

19   you will.

20        MR. GUTWILLIG:  Yes.  And also because these checks,

21   like the other checks, were not authorized, it's the

22   government's understanding, by the entities that issued them.

23        THE COURT:  And this is a fourth victim, not one of

24   the three that you mentioned earlier.

25        MR. GUTWILLIG:  The two checks have two separate

1    victims.  One is one of the three I mentioned earlier, and the

2    second set was from a fourth victim.

3              THE COURT:  I see.

4              Who is the fourth victim?

5              MR. GUTWILLIG:  The name -- I would need to look.  In

6    the superseding indictment, it's identified as victim 4.  I

7    would need to find the name of the company which I don't recall

8    offhand.

9              THE COURT:  By the way, what's the aggregate amount of

10   the Count One checks approximately?

11             MR. GUTWILLIG:  I believe it's approximately $260,000,

12   but I would just like to check.

13             THE COURT:  I'm just trying to get a ballpark.

14             What about the Count Two checks?

15             MR. GUTWILLIG:  Each of them I believe was

16   approximately $16,000 or $18,000.

17             THE COURT:  Great.  Thank you.

18             So tell me about Count Three.  Forgive me.  My bad.

19             Count Two, just come back to venue on this.  Again,

20   it's charged as a Southern District of New York offense.

21             Where does this occur?

22             MR. GUTWILLIG:  So, again, based on where the mobile

23   deposit, the IP address of the mobile deposit, we believe that

24   the device that accessed and did the mobile depositing was

25   within the Southern District of New York.

1          THE COURT:  So there the defendant, the actor here, is

2    actually in the SDNY electronically directing traffic.

3          MR. GUTWILLIG:  I can't say.  Presumably based on the

4    IP address if he's accessing his own account, yes.

5          THE COURT:  It's either he or circumstantially

6    somebody at his direction exercising his control.

7          MR. GUTWILLIG:  Correct.  In addition to that, again,

8    it's in the same GateGuard account in the first instance and

9    then transferred to the Friend or Fraud account.

10         Just to kind of tie this together a little bit, this

11   happened first.  The government learned of this in further

12   investigation.  This happened in about March of 2019.

13         So these to funds -- I believe they're each $16,000.

14   So call it $32,000 -- are deposited into the GateGuard account.

15         THE COURT:  Which is?  That's the defendant's account?

16         MR. GUTWILLIG:  The defendant's account, correct.

17         THE COURT:  When the defendant opened it, he opened it

18   in New York, but it's a national account like a Citibank

19   account?

20         MR. GUTWILLIG:  So I have not confirmed that when he

21   opened it, he opened it in New York.  That is my understanding,

22   but I don't want to represent that as a certain fact in the

23   record.  The business, the GateGuard business, to which this

24   account flowed, is based in New York.

25         THE COURT:  The theory of venue on Count Two is

1   essentially -- the frontline theory is the person who was

2   actually giving the electronic directive, the act of

3   presentment of the check, is doing that from an IP address in

4   this district.

5           MR. GUTWILLIG:  Into a business account based in this

6   district.

7           THE COURT:  It's a bank account for a business whose

8   brick-and-mortar operations may be in this district.  But the

9   bank account -- you're not in a position right now to say where

10  it is.

11          MR. GUTWILLIG:  Correct, although I believe it is in

12  New York, but I will confirm it.

13          THE COURT:  To the extent you're relying on a separate

14  theory that the company has business operations in New York,

15  whether or not that might supply venue in civil law or

16  something else, the requirements for bank fraud are different.

17          If I run a Thai restaurant in China Town over here but

18  have a bank account in Florida, it isn't clear to me that the

19  fact -- and somebody defrauds the bank in Florida of the money

20  of the Thai restaurant, it's not obvious to me that because

21  they serve food here in New York you've got a bank fraud in

22  New York.  I'd be wary about that theory, word to the wise.

23          MR. GUTWILLIG:  Yes.

24          THE COURT:  Tell me about Count Three.

25          MR. GUTWILLIG:  So Count Three is based on one of the

1    two checks in Count Two.  The signature on the check we believe

2    is not the individual who was associated with the account,

3    associated with the account holder and the ultimate owner, and

4    the same thing for Count Four.

5              THE COURT:  In each of those cases, again, the venue

6    you say is clear because it's literally physically occurring

7    electronically in New York.  That's where the communication

8    embedded the misappropriated identity is taking place.

9              MR. GUTWILLIG:  That is my understanding, and also

10   that these companies, as I understand it, are based in New York

11   which I take your Honor's point about China Town, but yes.

12             THE COURT:  An interesting question about how that

13   affects venue on aggravated identity theft.  It's a different

14   offense than bank fraud.  But usually the venue involves

15   something about the actus reus of the crime, not some

16   background of the victim.

17             That's the distinction between personal jurisdiction

18   in the civil sense and venue in the criminal sense.  I don't

19   want to keep putting you on the spot about this, but the

20   theories of venue relating to this count I take it have been

21   vetted up the chain?

22             MR. GUTWILLIG:  I have discussed the charging

23   decisions with my supervisor up the chain.  I will go back and

24   address all of this.

25             THE COURT:  Please do.  I'm not trying to give you a

1    hard time.  I'm just trying to make sure we litigate this case

2    on the merits and don't have some late-stage hiccup.

3              MR. GUTWILLIG:  Yes.

4              THE COURT:  Tell me, since we met at the initial

5    conference, first of all, as to the discovery identified back

6    then, was it all produced and on the time table projected?

7              MR. GUTWILLIG:  Yes.  I believe so.  I laid out in the

8    government's status letter that we produced an initial wave of

9    discovery prior to the first status conference and then

10   followed up on November 6 with additional discovery and then

11   Wednesday with additional discovery.

12             Certain of that discovery has included -- for example,

13   we reached out to these entities -- I don't want to use the

14   word "victim" loosely but the entities from which the checks

15   were allegedly fraudulently issued.

16             And certain of the communications with Mr. Teman from

17   the people or person who runs those entities were produced

18   which is, of course, 3500 material which is not Rule 16 but has

19   been produced early.

20             And also reports, agent reports, to provide a fuller

21   picture of what's gone on here and certain of the statements

22   from those who run the entities that these checks were not

23   authorized.

24             THE COURT:  All right.  To what degree have you

25   obtained further discovery since the initial conference?

1          MR. GUTWILLIG:  It's not been voluminous.  It has been

2     some emails, some additional bank records, some agent reports.

3     There are some outstanding subpoenas.  We also will of course

4     continue to reach out to these entities for any additional

5     information they may have and produce that as quickly as we

6     receive it.

7          THE COURT:  Has everything that you presently have in

8     hand been produced?

9          MR. GUTWILLIG:  Yes.

10          THE COURT:  And I take it the representation is this

11     is not voluminous.  There may be the fruits of a bank account

12     that take up a little bit of space because they're canceled

13     checks.  But in the main, this is a rather limited amount of

14     discovery?

15          MR. GUTWILLIG:  That's correct.

16          THE COURT:  I take it, at least for now, this is not a

17     heavy email case or anything like that?

18          MR. GUTWILLIG:  No.  To the extent that there is

19     voluminous email traffic, I don't know.  But it's not the case

20     that we've gone out and executed a search warrant on an email

21     address which will take months and months to review.

22          THE COURT:  Very good.

23          Any additional searches or seizures that you have

24     become aware of or executed since the first conference?

25          MR. GUTWILLIG:  No, your Honor.

 1              THE COURT:  Thank you.  Very helpful.

 2              Mr. Gelfand or Mr. DiRuzzo, who will be speaking for

 3    the defense?

 4              MR. GELFAND:  I will be speaking, your Honor.

 5    Mr. Gelfand.

 6              THE COURT:  Mr. Gelfand, before we start talking about

 7    the details of the schedule you propose, is there anything you

 8    want to raise or put on the table?

 9              MR. GELFAND:  No, your Honor.  We appreciate the

10    discovery that's been disclosed to date.  Mr. Gutwillig has

11    informed us that there are some outstanding subpoenas.  That's

12    par for the course obviously.

13              THE COURT:  Yes.

14              MR. GELFAND:  But obviously neither he nor I know

15    right now what that's going to entail in terms of what the

16    government is going to get.

17              THE COURT:  Right.  As to discovery, every indication

18    is that this is a very manageable case in terms of the volume

19    of discovery.

20              MR. GELFAND:  Yes, your Honor.  Having prosecuted and

21    defended white-collar cases throughout my career, I will tell

22    you that it's the least amount of discovery I've ever seen in a

23    white-collar case.

24              THE COURT:  May I ask you this question.  I don't

25    purport to understand the business or other relationship that

1    Mr. Teman and the people who are alleged to have been his

2    business victims.  Put aside the bank victims but the folks

3    associated with let's say the 27 checks.

4            I don't purport to understand what that is.  But is

5    that going to be part of the narrative of this case,

6    essentially the relationship or dealings between Mr. Teman and

7    the people whose accounts the money comes from?

8            MR. GELFAND:  Yes, your Honor.

9            THE COURT:  Do you have the documentation that you

10   ultimately will want or need to adequately vet whatever

11   theories you have about how that relationship bears on issues

12   like authorization here?

13           MR. GELFAND:  Yes, your Honor, with one brief caveat,

14   and that's that we do intend to issue a handful of defense

15   subpoenas to supplement our theory, depending on what's

16   returned.  However, we do have sufficient documentation to

17   support what we anticipate will be one of our theories of

18   defense.

19           THE COURT:  Have you made Rule 16 discovery then to

20   the government?

21           MR. GELFAND:  We have not yet, your Honor, in part,

22   because the government's discovery has been kind of an ongoing

23   disclosure.

24           THE COURT:  Has the government made a Rule 16 demand

25   on you?

1          MR. GELFAND:  The government has not made a formal

2     Rule 16 demand.  We have maintained the discovery.  We will

3     make a Rule 16 demand.

4          THE COURT:  I expect you to.  Just because their

5     discovery is rolling -- and it sounds like Mr. Gutwillig is

6     caught up.  He likely has the caveat that there are outstanding

7     issues, but it sounds like he's caught up in his obligations.

8          Regardless of whether there's anything outstanding on

9     the government's to-do list, that's not a justification for

10    your not providing your discovery, and I will look unkindly on

11    warehousing Rule 16 discovery that the defense has that the

12    government is entitled to.

13         MR. GELFAND:  And that is consistent with our

14    understanding, and we'll get on that immediately.

15         THE COURT:  Please do.

16         How voluminous is the discovery presently now that

17    goes beyond what you're getting from the government?

18    For example, discovery relating to the relationship between

19    Mr. Teman and the victim entities.

20         MR. GELFAND:  Less than 100 pages.

21         THE COURT:  All the easier to get it provided.

22         Do you have a sense of what additional volume you

23    anticipate?

24         MR. GELFAND:  We don't, your Honor.  The reason why is

25    because we anticipate subpoenaing discovery.  My understanding,

1   by way of background, just for the Court's benefit, is that the

2   government through law enforcement obtained certain records

3   from the "victims" who are not the financial institutions.

4              THE COURT:  Right.

5              MR. GELFAND:  But did not do so via a subpoena.  We

6   intend to subpoena documents to more comprehensibly get a

7   better grasp on what they had.

8              THE COURT:  Your perception is that not everything

9   that was potentially germane was produced in response to

10  whatever directive, informal or not, the government gave to the

11  "victims."

12             MR. GELFAND:  Yes, your Honor.  We take the government

13  at face value that they have.

14             THE COURT:  Right.

15             MR. GELFAND:  We don't believe that the "victims"

16  disclosed everything relevant.

17             THE COURT:  I guess the followup is:  What are we

18  talking about about volume?  I have no understanding of what

19  the relationship was between Mr. Teman and the victims.  But if

20  they have a long email relationship, that could be

21  transformative in terms of the quantity of paper going back and

22  forth.

23             Is that what we're looking at?

24             MR. GELFAND:  We're looking at what I anticipate to be

25  email and other correspondence.  And some of these

1  relationships do go back approximately one year.

2  THE COURT:  How voluminous would you expect that's

3  going to be?

4  MR. GELFAND:  In terms of paper volume, I would not

5  anticipate it's going to be particularly voluminous because

6  this is basically a vendor/customer relationship as opposed to,

7  for example, a professional services relationship.

8  THE COURT:  I don't mean to put you on the spot.  The

9  government brings the charges.  You don't have to showcase your

10  defense.

11  MR. GELFAND:  Sure.

12  THE COURT:  With that important caveat, to the extent

13  you're able to share, I am interested in understanding, putting

14  aside the formalities of the motions which we'll get to in a

15  moment here, but on the merits here, is the theory that

16  Mr. Teman was entitled to the money and entitled to the means

17  he allegedly used to go and get it?  Or that he was entitled to

18  the money and the ends justify the means?  I'm trying to

19  understand what the theory is.

20  MR. GELFAND:  The former, not the latter, your Honor.

21  The theory is that Mr. Teman had the authority to do what he is

22  alleged to have done.  I would add on top of that that he did

23  not act with any requisite mens rea.

24  THE COURT:  Right.  The government alleges that the 27

25  checks, for example, were created, if you will, by Mr. Teman.

 1   They were not created by the "victim" companies.

 2              Stopping at that point, again, not requiring you to

 3   answer, but if you're at liberty to do so, it helps me get an

 4   early grasp on the case.

 5              Is it the defense's view that this is an incorrect

 6   factual allegation?

 7              MR. GELFAND:  May I just confer with my client?

 8              THE COURT:  Of course.  Again, I'm not requiring you

 9   to answer.

10              MR. GELFAND:  Thank you, your Honor.

11              What I can represent to the Court is that we

12   anticipate that the evidence will show at trial that each of

13   the so-called "victim entities" -- and I put that in quotes

14   obviously -- have authorized Mr. Teman, to be more precise,

15   GateGuard, the corporate entity, through various written

16   agreements and payment terms that were, by the way, not

17   accessed by the government or recently disclosed by the

18   government until after the last status conference.

19              In other words, these are the payment terms where the

20   URL is actually listed on the alleged checks themselves.  These

21   payment terms authorized the conduct that is alleged to be

22   criminal in this case.

23              THE COURT:  So to be more precise, the government is

24   alleging that certain checks -- and I'm talking here about the

25   physical document -- were created by Mr. Teman.

1      If the evidence shows that that happened, the defense

2  would be that Mr. Teman was authorized to do that.

3      MR. GELFAND:  Yes, your Honor.

4      THE COURT:  All right.  Okay.  What else did you want

5  to put on the table before I start talking about scheduling

6  motions?

7      MR. GELFAND:  I just wanted to highlight something.

8  Perhaps as a practical matter -- this is putting the cart

9  before the horse with respect to motions.

10      I'm not trying to pre litigate anything.  But we do

11  believe, just to highlight for the Court's attention, that

12  there are significant Speedy Trial Act implications with

13  respect to when this case was initially indicted but more

14  specifically that are underscored with the government's kind of

15  evolution of the theory of the bank fraud.

16      THE COURT:  Pause on this.

17      The conduct itself occurred in 2019.

18      MR. GELFAND:  Yes, your Honor.

19      THE COURT:  So we're not talking about a

20  constitutional speedy trial issue.

21      MR. GELFAND:  Correct, your Honor.

22      THE COURT:  When was the indictment returned in this

23  case?

24      MR. GELFAND:  I don't have the exact dates in front of

25  me.  What I can represent to your Honor with specificity --

 1          THE COURT:  The original indictment --

 2          MR. GELFAND:  It was in June.

 3          THE COURT:  -- that I have looks like -- the complaint

 4   is dated June 20.  The indictment bearing the number 696 -- the

 5   indictment, September 26.  I got the case soon thereafter.

 6   When I had the initial conference, I certainly excluded time

 7   right away.

 8          How do we have a Speedy Trial Act issue?

 9          MR. GELFAND:  Mr. Teman was arrested on the criminal

10   complaint 98 days before the initial indictment was returned.

11   We anticipate supporting a motion to dismiss on Speedy Trial

12   Act grounds with authority that dictates that the indictment

13   has to be returned within 30 days of the arrest, which is a

14   consideration separate and apart from this Court --

15          THE COURT:  Where was he arrested?  Which district?

16          MR. GELFAND:  He was arrested in the Southern District

17   of Florida, your Honor.

18          THE COURT:  Was he then held in custody?

19          MR. GELFAND:  He was, your Honor.  He was arrested on

20   the afternoon of July 3 knowing that there was a federal court

21   holiday -- that was a Wednesday -- the following Thursday and

22   Friday.

23          THE COURT:  Right.

24          MR. GELFAND:  He was held in custody for approximately

25   five days.  He appeared on Monday morning and was released

1  pursuant to I believe it was a combination of a personal

2  recognizance bond or an unsecured bond.

3           THE COURT:  Right.

4           MR. GELFAND:  And from the date of the arrest, there

5  were no motions pending.  There were no exceptions to the

6  Speedy Trial Act at that point.

7           Our Speedy Trial Act challenge, to be very clear, has

8  nothing to do with the moment that Mr. Teman appeared in this

9  district or anything that happened thereafter.  It has to do

10 with the fact that the government had 30 days to seek an

11 indictment.

12          THE COURT:  In this district of course, as you know,

13 routinely more time is taken.  But an order of continuance is

14 sought and obtained usually on consent from the magistrate, and

15 the time is rolled over.

16          Was anything like that sought in Florida?

17          MR. GELFAND:  I was not counsel at the time.

18          THE COURT:  That may be dispositive of your motion.

19          Have you looked into that?

20          MR. GELFAND:  Your Honor, I have obtained the relevant

21 documents from Florida.  We have obviously have not filed our

22 motion yet with the Court.  We will certainly do our due

23 diligence, but I just wanted to highlight the fact --

24          THE COURT:  I'm pushing you on this because I want to

25 make sure -- just as I'm pushing the government on the

1   durability of its indictment, I'm pushing you on the viability

2   of your theories.

3          None of us have an interest in wasting time on

4   something that might be a fatally flawed theory.  You need to

5   run down whether there were orders of continuance because

6   whatever issues there may be with your theory, that's a biggy.

7          MR. GELFAND:  What I can represent to the Court is

8   that I have reviewed the entire docket from the Southern

9   District of Florida.  And there is no oral -- and there is not

10   an entry on the document or a written order of continuance.

11   What I can't represent to the Court is what was orally said in

12   court that day.

13          THE COURT:  Let me ask you this question.  It is

14   extremely rare, as I'm sure you know, for a Speedy Trial Act

15   violation to result in a dismissal with prejudice.  The fact

16   pattern here is a very, very, very far cry from anything I've

17   seen where any dismissal would be with prejudice.

18          Let's assume, for argument's sake, that the government

19   did not indict within 30 days net of orders of continuance.

20          First of all, is it clear to you then that the remedy

21   then is dismissal, putting aside the with prejudice, of the

22   ensuing indictment?

23          MR. GELFAND:  Yes, your Honor.

24          THE COURT:  What about a superseder that adds charges?

25   What about that?

1          MR. GELFAND:  Your Honor, I think, based on the

2    authority that I've reviewed, it turns on what the nature of

3    the additional charges are and whether they were encompassed or

4    at least arguably encompassed in the original charge in the

5    complaint.

6          THE COURT:  So what would that mean for charges 3 and

7    4?

8          MR. GELFAND:  Charges 3 and 4 are predicated on bank

9    fraud.  It's aggravated identity theft.

10         THE COURT:  Sorry.  Charges 3 and 4 are based on Count

11   Two.  Count Two involves two checks that were discovered later

12   on, checks 28 and 29.  My understanding is that the conduct on

13   which your client was arrested and indeed originally indicted

14   was limited to checks 1 through 27.

15         So even if your theory is right and even if it gets

16   your client the windfall of knocking out hypothetically the

17   count as to checks 1 through 27, how does it knock out any

18   counts based on 28 and 29?

19         MR. GELFAND:  Your Honor, we intend to brief the Court

20   based on the language that was specifically alleged in the

21   complaint, but I will represent to you that that's an issue

22   that we have considered.

23         Without conceding a position, I can see a universe

24   where the Court's analysis differs as to Counts One and Two

25   versus Counts Three and Four.

1          THE COURT:  Just to cut to the chase here –– in a

2    moment, I'll ask the government for its response on this.

3    Let's assume, for argument's sake, that there was a Speedy

4    Trial Act violation in the time it took to get an indictment ––

5    and one of the relevant issues here also may be the

6    intradistrict quality about this, but we'll see.  Let's suppose

7    there was that issue.

8          What's the theory as to why this is a breach that is

9    with prejudice?

10          The circuit will deal with one of those every three

11    years.  It's usually out of the Northern District, to be honest

12    with you.  And it's usually just a hair–raising story that is

13    vastly different from anything that this looks like.

14          What's the theory as to why a dismissal would be with

15    prejudice?

16          MR. GELFAND:  There are numerous factors, as it seems

17    like the Court is aware, that are required to be considered

18    within this circuit.  Those factors are not limited to just the

19    amount of time that has passed.  Obviously there are cases that

20    we're all familiar with where the government would wait two

21    years to indict or something ridiculous.

22          THE COURT:  It's usually where the defendant has been

23    in custody for four years and nobody excludes time and everyone

24    forgets about the case.  That's usually the background.

25          MR. GELFAND:  Sure.  But what we would submit is that

1    the legal analysis requires and certainly permits, within the

2    Court's discretion, a broader interpretation of those four

3    factors, including prejudice to the defendant.  It's not

4    limited to prejudice.  We do anticipate setting that out.  I'm

5    certainly happy to answer any of the Court's questions.

6              THE COURT:  No.  Look.  It's helpful to flesh this

7    out.  It may result in my getting sharper papers when they come

8    in.

9              Let me turn to Mr. Gutwillig.  Maybe you can quickly

10   put this to rest.

11             What was the reason why it took the time it took

12   between the appearance on July 8 in Florida and the

13   indictment --

14             the first indictment you said, Mr. Gutwillig, was

15   when?  Late September?

16             MR. GUTWILLIG:  September 26.

17             THE COURT:  So a little under three months after the

18   date of the arrest.

19             What was the reason for that?  Wasn't time excluded in

20   Florida?

21             MR. GUTWILLIG:  Whether the Court down there did

22   something on the record, I don't know.  The government did not

23   seek a continuance in the Southern District of Florida.

24             The government's position is that the speedy trial

25   clock for these purposes did not start to run until the

1    defendant was presented here in the Southern District of New

2    York.

3           THE COURT:  Sorry.  Let me just pause you on that.

4           If the defendant had been arrested in New York, you

5    would have had the clerk's office of the Southern District

6    hounding you to get an order of continuance or to get to the

7    grand jury within the 30th day.  Otherwise, the case would have

8    been dismissed.  That's just basic procedure.

9           Is there something different when the defendant is

10   arrested in a different district than is the one that is doing

11   the prosecuting?  Or does that same requirement hold?

12          MR. GUTWILLIG:  My understanding is the former.  Now,

13   the government --

14          THE COURT:  Sorry.  The "former" meaning you can just

15   indict whenever you want after 30 days, 60 days, 90 days if

16   it's in a different district?

17          MR. GUTWILLIG:  So the government will have to go back

18   and review that.  I'm not going to represent that position to

19   the Court.  The government's position here is that the speedy

20   trial clock began for purposes here.

21          Mr. Teman was out on bail when he appeared in this

22   district on September 6.  I should note that the government

23   made repeated efforts to have him appear earlier than that and

24   that the indictment was obtained within the 30-day period after

25   September 6 here in this district.

1          THE COURT:  So, in other words, from your

2     perspective -- he gets into the district when?

3          MR. GUTWILLIG:  September 6 I believe.

4          THE COURT:  Do you have a paper trail of the various

5     communications with the defense and perhaps with the U.S.

6     Attorney's Office in Florida or the court in Florida as to all

7     these matters?

8          MR. GUTWILLIG:  With respect to?

9          THE COURT:  From your perspective, the only issue that

10    you're identifying appears to be whether he was timely indicted

11    after his arrival in New York.  That may well be one issue, but

12    it's not the issue that the defense is raising here.

13         The defense is saying, if he didn't get an order of

14    continuance in Florida, the case should have been dismissed

15    after the 30th day there.  And they're further saying the

16    failure essentially to indict as long as you did, in the

17    absence of an order of continuance, is its own Speedy Trial Act

18    violation, however compliant you may have been later on in the

19    case, and they're saying that requires dismissal.  Whether or

20    not it's with prejudice is a second-stage question.

21         Have you looked into whether there was a violation of

22    the Speedy Trial Act presented by the apparent lack of an order

23    of continuance after the 30th day after Mr. Teman's either

24    arrest or appearance in Florida?

25         MR. GUTWILLIG:  I have looked into it.  I need to look

1    into it more in order to represent a clear position to the

2    Court, which I expected to do after the defense flagged that

3    they would be raising this issue and making this motion.  I

4    intend to, of course, oppose it.

5             THE COURT:  You should oppose it only --

6             MR. GUTWILLIG:  If it's meritorious.

7             THE COURT:  If that position is meritorious.  I have

8    to tell you, with respect, I'm a little alarmed.  If it was the

9    case that the government didn't seek a continuance in Florida,

10   that would be a dramatic deviation from the procedure that

11   would be used if the case was at all times indigenous to this

12   district.

13            It may be that something fell between the cracks, and

14   it wouldn't be the first time that that happened.  An order of

15   continuance violations have been committed by AUSAs in the

16   general crimes unit for many decades.  I may be hypothetically

17   looking at one.

18            I'm just saying that that happens, but there's an

19   inquiry that one needs to go through in terms of what happens

20   if you don't get the OC and there is an indictment on the 30th

21   day.

22            Is it then obligatory on the defendant to move.  If

23   the defendant doesn't move and remains out on bail, is there

24   something that changes because the defendant appears in

25   New York.  Was he directed in Florida to appear in New York,

 1   and is that part of the problem here.

 2        In other words, if he was obliged to be in New York in

 3   time, maybe that has some bearing.  Ultimately, there is an

 4   issue to chew over here.

 5        MR. GUTWILLIG:  Yes, your Honor.

 6        THE COURT:  May I ask you to, please, with great

 7   urgency, dig into that.  I'm concerned about that.  Again,

 8   before everyone spends a lot of time on this, I want to get to

 9   the bottom of this, and I'm expecting to schedule it faster

10   than the one you're proposing.  We'll see.

11        Go ahead.

12        MR. GELFAND:  Your Honor, I wanted to represent to the

13   Court, based on one of the Court's questions, I don't think

14   this changes any of the analyses that we are raising.

15        But I do want the Court to be aware that the

16   government did, at our request, make some accommodations as to

17   delaying the date that Mr. Teman needed to physically appear in

18   the Southern District of New York.  So I wanted the Court to be

19   clear.  There was no gamesmanship or anything.  That was a

20   practical matter.

21        THE COURT:  I appreciate that.  I will tell you, just

22   to be clear with you, that even if there was some technical

23   violation of the Speedy Trial Act, based on my knowledge of the

24   law, it would be startling to me, unless there are facts here

25   that are really not emerging, that the result would be a

1    windfall where Mr. Teman isn't ultimately able to face the

2    charges.

3         Let me put it a different way.  You're a country mile

4    from the cases under which a Speedy Trial Act violation is with

5    prejudice, reserving for you the right to bring to bear facts I

6    haven't seen.

7         That may mean that some separate indictment needs to

8    get brought.  It means maybe he's tried on the superseder, not

9    the original.  I don't know.  All of you need to run this to

10   ground soon.

11        MR. GELFAND:  Yes, your Honor.

12        THE COURT:  Let me just ask you, Mr. Gelfand.  Surely

13   Mr. Teman's defense had an interest, if the government failed

14   to get an order of continuance in Florida after 30 days had

15   passed, in moving to dismiss the case.

16        Did they do that?

17        MR. GELFAND:  Your Honor, we did not move to dismiss

18   the complaint.

19        THE COURT:  Right.

20        MR. GELFAND:  As a practical matter, procedurally I

21   believe that were we to file a Speedy Trial Act motion pursuant

22   to whatever deadline the Court sets, it would certainly be

23   timely.  Ultimately, the Court will have to rule on the merits.

24        THE COURT:  What was happening?  In other words, was

25   everyone expecting Mr. Teman to show up in New York and,

1    essentially, because he didn't show up in New York till

2    September 6, nobody really thought action in Florida was

3    needed?

4         In other words, everyone was waiting for him to get to

5    New York to start the action?  It sort of sounds that way.

6         MR. GELFAND:  I don't believe a motion in the Southern

7    District of Florida would have been procedurally proper because

8    there was no case pending there.

9         THE COURT:  That's a different question.  Let me try

10   it this way:  When Mr. Teman was presented on July 8, was

11   anything said about his making his way to New York?

12        MR. GELFAND:  With the caveat that I wasn't there, my

13   understanding is that in due course -- he presumably would have

14   been told that he had to go to New York.

15        THE COURT:  Was he given a date, or did he make a

16   commitment to get to New York?

17        MR. GELFAND:  No, your Honor.  Not that I'm aware of.

18        THE COURT:  What did the judge order as to a next day

19   in the case?

20        MR. GELFAND:  I don't believe there was an order,

21   your Honor.

22        THE COURT:  Somebody needs to order presumably the

23   transcript of the proceeding down there because I don't want to

24   have to rely on the memories or the secondhand accounts of

25   people who weren't there as to what happened.

 1              Defense, if you're making a motion here, when you get

 2     back to the office, please order the transcript on an expedited

 3     basis because that's going to potentially be an important

 4     source of material.

 5              MR. GELFAND:  Yes, your Honor.

 6              THE COURT:  Government, may I ask you just briefly,

 7     while I realize there is research yet to be done, I appreciate

 8     that your view is that all conduct in the Southern District has

 9     been above board.

10              Is it your view that the Speedy Trial Act, insofar as

11     it sets deadlines involving an arrested but not indicted

12     defendant, was complied with?

13              MR. GUTWILLIG:  That would be my view with the caveat

14     that if that is incorrect, the government will not take that

15     position.

16              THE COURT:  So a little more research is needed.

17              MR. GUTWILLIG:  I should say also that during this

18     time period, there was thought given to this issue.  It's not

19     that the government just forgot to submit a request for

20     continuance.

21              Your Honor, I think the defense may be correct.  We'll

22     check.  If that's the case, the government's position is that

23     the remedy would still not be dismissal of the indictment here.

24              THE COURT:  The remedy for Speedy Trial Act violations

25     is often dismissal.  The issue is whether it's with prejudice.

 1           MR. GUTWILLIG:  Yes.

 2           THE COURT:  I'm going to ask you to get ahead of that

 3    issue and take a look at what the cure would be.  If dismissal

 4    were the remedy but your view is that the facts did not support

 5    a with-prejudice dismissal, what happens then.  In other words,

 6    does the superseder here cure things?

 7           You just go to a new grand jury and wheel it out

 8    differently and start again I'm eager to understand that, but

 9    I'm eager to get our arms around this together promptly.

10           Defense, before we get to other motions, is there

11    anything else you wanted to raise?

12           MR. GELFAND:  Your Honor, the only other thing I would

13    raise is the government's theory as to venue today, without

14    holding them to whatever they represent in the pleadings, seems

15    to be as to Count Two and the aggravated identity theft counts,

16    Counts Three and Four, that there was some sort of IP address

17    evidence and/or cell site location evidence, whatever it may

18    be.

19           As a practical matter -- and I've certainly been

20    guilty of this -- unless I missed something in the discovery

21    which I have reviewed in the entirety, I don't believe that we

22    have any discovery related to that.  I would ask that we be

23    provided that immediately so that we can address that and

24    evaluate that with respect to our venue.

25           THE COURT:  Mr. Gutwillig, has that been produced in

1   discovery?

2         MR. GUTWILLIG:  The IP address is listed in the

3   spreadsheet that was produced in discovery.

4         THE COURT:  There you go.  Let's move on then.

5         So the proposed briefing schedule by the defense

6   anticipates motions due on the 27th of November which would be

7   Wednesday, the government's opposition due in two weeks, and

8   replies, if any, due in one week.  So with respect to speedy

9   trial, that's fine.  I'm happy to set that schedule.

10         Let's talk about suppression.  What, if anything, are

11   you moving to suppress?  Or is that just a placeholder?

12         MR. GELFAND:  Your Honor, it's not a placeholder, but

13   it's also not a decision that we've firmed up.  We obviously

14   don't have any intention of filing any motion with the Court

15   that we don't believe is appropriate and meritorious.  I'm

16   happy to flag the issue with the Court with the understanding

17   that we need to do additional digging.

18         THE COURT:  The reason why I'm asking is because

19   suppression motions may or may not entail factual hearings.

20   Therefore, the schedule may -- right now, depending on what

21   you're telling me, I may want to ask you to reserve a date for

22   a factual hearing.  Or maybe you're envisioning a suppression

23   motion that can be handled on the papers.  So tell me about it.

24         MR. GELFAND:  If I could flag the issue for the Court.

25   When Mr. Teman was arrested in the Southern District of Florida

on the complaint in this case.  Certain items were seized from

the place that he was arrested, in particular -- and this is

where the rub is -- the items were allegedly in plain view.

Putting that issue aside for a second, they were

seized by an NYPD police officer detective who was physically

present with deputy United States Marshals and, as I understand

it -- I'm calling them Miami police, whatever the law

enforcement entity is, the local law enforcement down in

Florida.

I believe that the theory is that they were seized

incident to the arrest in plain view by the NYPD officer

executing the arrest.  We believe that that raises, at a

minimum, a significant question about whether the NYPD

detective had the jurisdiction in the first place to execute

the arrest and, therefore, whether the exceptions to the

warrant requirement, because there's no dispute this was

without a warrant, whether the exceptions to the warrant

requirement would apply.  Based on the very narrow somewhat

legal issue, your Honor, it's quasi legal/quasi factual about

whether the NYPD was acting outside of his jurisdiction.

THE COURT:  He's accompanied though by other officers

who are within their jurisdiction?

MR. GELFAND:  Based on the discovery, yes, your Honor.

THE COURT:  Why would the remedy be suppression?  In

other words, if the other officers were also validly on the

1    premises, from a perspective of inevitable discovery, if it's

2    in plain view, if you assume away the invalidity, you've just

3    got some authorized person on the team.

4              Why does the Fourth Amendment give your client that

5    windfall?

6              MR. GELFAND:  Because the seizure itself was executed

7    by NYPD.  To the extent that the government would ultimately

8    argue some sort of inevitable discovery type exception --

9              THE COURT:  I think I just made that.

10             MR. GELFAND:  -- which the government, if they were

11   already, going to argue inevitable discovery as a practical

12   matter, I think that requires further analysis.

13             THE COURT:  Let me ask you a question:  Are you aware

14   of any case in which, from a Fourth Amendment perspective, the

15   inclusion on a team of a law enforcement officer from a

16   different district who didn't get whatever walking papers for

17   that district that may or may not have been required, that

18   results in a suppression remedy?

19             Whatever else it is, assuming that the seized items

20   were in plain view in a place in which arresting officers were

21   entitled to be, this is a new one on me.  It's a little bit

22   like if the officer hadn't taken his final exam or something

23   like that.  New on me that the defendant gets the benefit of

24   that.

25             Do you have a case for that?

1          MR. GELFAND:  Your Honor, I do not have a case for

2    that.  I want to be crystal clear.  When I said that we need to

3    do further digging, I'm not suggesting that is the remedy.

4          THE COURT:  You're looking into that.

5          MR. GELFAND:  Correct, your Honor.

6          THE COURT:  Are you assuming, or do you have reason to

7    believe that this NYPD officer had not been deputized in some

8    way to participate on the arrest team?

9          MR. GELFAND:  Two reasons, your Honor:  First, the

10   affidavit in support of the criminal complaint, as with any

11   affidavit that the Court is inevitably aware of, begins by

12   laying out this particular detective's credentials,

13   qualifications, so on and so forth.  There is no suggestion

14   that he was a task force officer or some other federal

15   designation.

16         THE COURT:  No.  Crime these days, more than in years

17   past, is cross-jurisdictional.  People from different districts

18   team up all the time.  Thinking back, if memory serves, the

19   hurdle to get somebody deputized to help out with an operation

20   like this is not constructing the Hoover Dam.  It's probably

21   about a one-minute task.

22         I'm asking you whether you have actually asked that

23   question, because it's not something that you necessarily

24   expect to be in a charging instrument or in a complaint.

25         Have you asked the government whether the officer was

1    permitted and authorized to be part of the arrest team?

2           MR. GELFAND:  Specifically, no, no, your Honor.  We

3    have requested, which resulted in some disclosure of additional

4    discovery two days ago -- we have requested all of the relevant

5    documents related to the seizure.  To be blunt, your Honor, if

6    the government were in a position to make that representation,

7    I think it would benefit everyone.

8           THE COURT:  It might moot the issue.

9           Before we get to the government's response, I think

10   you indicated at the first conference there may be more

11   conventional suppression issues.

12          Were you disputing that the things seized were in

13   plain view as opposed to in a drawer?  Or am I getting this

14   confused with another case?

15          MR. GELFAND:  I wasn't at the initial hearing.

16          THE COURT:  Fine.  Is there any other argument for

17   suppression?

18          MR. GELFAND:  No, your Honor.

19          THE COURT:  So the suppression issue entirely turns on

20   the officer's lawful participation on the arrest team?

21          MR. GELFAND:  Yes, your Honor.  We would be willing to

22   stipulate to the plain view fact as if the officer were here

23   and physically testifies.

24          THE COURT:  One thing I'm not going to be litigating

25   is whether or not the seized items were in plain view.  The

1    entirety of your suppression motion is about the officer's

2    station on the case.

3              MR. GELFAND:  Yes, your Honor.

4              THE COURT:  That's helpful.

5              Mr. Gutwillig, any insight into that?

6              MR. GUTWILLIG:  I don't, your Honor.  This is the

7    first I'm hearing of this.

8              THE COURT:  This is the first you've heard?

9              MR. GUTWILLIG:  Yes.  I have not asked the officer

10   whether he was appropriately deputized.

11             With respect to the additional request for discovery,

12   an additional request for discovery was made relating to the

13   arrest earlier this week.  The government had previously

14   produced the vouchers from the items seized, the photographs

15   from the seizure.

16             I believe what was produced later were the reports

17   generated by law enforcement and the officer's report of that

18   which is not, to my understanding, required to be produced at

19   this is juncture, but the government did produce any relevant

20   documents.

21             THE COURT:  May I suggest this.  I think Mr. Gelfand

22   is being pretty clear with us that this is an issue that has

23   the capacity to go away, the suppression issue.  So the sooner

24   you can nail down whatever authority he has, assuming that

25   there is authority, it sounds as if that may moot this issue.

1        If he wasn't authorized in whatever the required way,

2    we still have a separate issue which is does the Fourth

3    Amendment have anything to do with that.  But we'll see.  But

4    in any event, why don't you run that to ground.

5        Mr. Gelfand, I'm happy to set that same schedule for

6    the suppression motion.  I don't think -- yes.  You can have

7    your reply by December 18.  I might as well allow you to do it.

8    The reply may be that you're backing down.  We'll see.

9        Here is the question, Mr. Gelfand:  Can you imagine a

10   scenario in which we need to take factual testimony on this

11   issue?  Or is this realistically -- if you get an affidavit

12   that represents whatever the magic words are about

13   authorization, your client and the people on the defense team

14   are in no position to refute that.

15       Can you imagine any scenario in which there is a

16   disputed issue of fact that needs to be resolved in an

17   evidentiary hearing?

18           MR. GELFAND:  Can we confer for one minute?

19           THE COURT:  Yes.  Go ahead.

20           (Defense counsel conferred)

21           MR. GELFAND:  Thank you, your Honor.

22           THE COURT:  Yes.

23           MR. GELFAND:  I think that what we would see is if --

24   and I'm going to try to be very precise.  If the government

25   hypothetically were to provide us an evidentiary basis that

1   basically says he was deputized.  He acted under this

2   authority.  Here is the document that supports it, if there's a

3   document or something like that, I do not anticipate a world

4   where we would request or need factual findings based on

5   evidence in court by the Court about that.

6          But until we know what the government is basically

7   basing that assertion on, it's a tough question to answer.  So

8   I don't want to waive any rights, but I don't anticipate the

9   likelihood of an evidentiary hearing.

10          THE COURT:  Look.  I need to set a hearing date just

11  because trial is close enough that if there is an issue, you're

12  ready to go.

13          One moment.

14          (Pause)

15          THE COURT:  Counsel, I think we already have a

16  conference scheduled for 10:30 a.m. that day.  We'll try to

17  preserve a lot of our time that day as needed.

18          We'll use that conference.  If, heaven forbid, this

19  becomes a disputed factual issue, you'll need to make sure that

20  whoever the body is that is relevant to the issue is prepared

21  to testify then.

22          So, Mr. Gutwillig, that's really a government's side

23  scheduling issue.  So just be mindful.  That would be the date

24  of a hearing if we needed one.  It's my fervent hope of all

25  things that we can moot the need for that and we can resolve it

1    on the papers.

2        Defense, I'm looking for you to be clear in any reply

3    as to whether you're comfortable with the Court resolving it on

4    the papers or whether you're retracting the motion or whether

5    you're insisting on a hearing.

6        MR. GELFAND: Absolutely, your Honor.

7        THE COURT: All right. We've taken care of speedy

8    trial and suppression. Let's turn to improper venue.

9        Defense, which counts at this point are you

10    potentially going to move against on a venue theory?

11        MR. GELFAND: Your Honor, our initial intention was to

12    move against all counts on the venue theory. I do want to go

13    back with respect to the IP address evidence. That I need to

14    look more into and evaluate the impact that that has on Counts

15    Two, Three, and/or four.

16        THE COURT: Right. But as to One, you're definitely

17    intending to move as to improper venue?

18        MR. GELFAND: Yes, your Honor.

19        THE COURT: Just articulate briefly, briefly, why your

20    view is that venue is improper for a bank fraud charge on Count

21    One.

22        MR. GELFAND: Because as the Court no doubt is aware,

23    within the Second Circuit with bank fraud in a broader sense is

24    where the actual conduct comprising the crime from beginning to

25    end occurred, if there was a crime in the first place

1    obviously.

2          In this particular instance, we believe that even as

3    alleged when considered within the context of discovery -- and

4    that doesn't seem to be disputed -- all of the relevant conduct

5    occurred within the Southern District of Florida, not within

6    the Southern District of New York.

7          I agree with what the Court articulated in its

8    questions.  I'm not suggesting it's a finding or a

9    determination with respect to if there was a bank fraud, the

10   bank fraud ended before there was any inter-account transfer.

11         THE COURT:  May I ask you this.  You should both look

12   at *United States v. Morganstern*.  I think it's a 1991 case.  I

13   don't remember if it's reported or not.  I think it is.

14         But it picks up the authority in the area.  The case

15   dealt with issues of what constitutes bank fraud.  And

16   ultimately, it explains why, for example, check kiting isn't

17   bank fraud but why some false statement or misrepresentation

18   needs to be directed to the bank.  But mere insufficient funds,

19   for example, are not bank fraud.

20         So the focus of that line of authority -- and I think

21   *United States v. Williams* is the Supreme Court case that

22   delineates what is bank fraud versus what is not.  That's the

23   one that says check kiting isn't bank fraud.  But the basic

24   idea is the bank fraud is in the false representation or

25   pretense to a bank.

1          Right now, Mr. Gutwillig represents that it's actually

2     not the depositor, the victim companies' bank, at all, that is,

3     the victim.  But it is the bank that receives the fruits of the

4     money that are taken from a different bank based on false or

5     fraudulent representations made to the bank.

6          In other words, based on what Mr. Gutwillig has said,

7     I have no doubt that the Florida bank is a proper victim of the

8     bank fraud based on the conduct described.  The question is

9     whether the bank that receives the fruits of that is the victim

10    of bank fraud.

11         Mr. Gutwillig, fair warning.  This is a new one on me,

12    and I know bank fraud.  I'm extremely worried that you are

13    going to get an unsustainable bank fraud conviction if the

14    theory is that the fruits of a completed bank fraud passed

15    through some other bank.  You need to run that to ground.

16         But your premise though -- and I guess the question,

17    Mr. Gelfand, is what you're describing is really a blend of a

18    venue and a bank fraud, substantive bank fraud question.

19         Right?  If Mr. Gutwillig's premise is correct that the

20    bank fraud continues as the ill-gotten gains pass through

21    different bank accounts of the defendant, eventually, when you

22    get to a New York bank account, you'll have venue.  I know

23    you're calling it improper venue, but I think, for better or

24    worse, these are two halves of the same coin.

25         Am I right about that?

1              MR. GELFAND:  Yes, your Honor.  I would add one

2     additional consideration.  And that's that -- first of all, I

3     don't believe that Mr. Gutwillig is correct on the bank fraud

4     analysis.

5              THE COURT:  Right.  But if you're not going to

6     litigate that and you're just going to say there's no venue,

7     I'm ultimately going to have to run to ground what the outer

8     bounds are of bank fraud here.  In other words, this is a case

9     where I think the venue argument I think is inseparable from

10    the bank fraud analysis.

11             MR. GELFAND:  First of all, what's currently alleged

12    in the indictment, notwithstanding what Mr. Gutwillig said the

13    theory might be, doesn't suggest that the other financial

14    institutions are the "victim" of bank fraud.

15             THE COURT:  Well, I disagree.  The "To Wit:" clause

16    here could be read in either way.  It's a good reason why there

17    may be a need for particulars here.

18             But the "To wit:" clause here could be read to focus

19    on the depositing as opposed to the withdrawing institution.

20    The "To Wit:" clause reads:  "Teman deposited counterfeit

21    checks into an account held at a particular institution."

22             It's not crystal clear what the victim is, and I think

23    we need to be.  In no sense has the government returned an

24    indictment that's inconsistent with a description of same by

25    Mr. Gutwillig.  The issue is really whether it's a compliant

1    indictment.

2          Here is the point:  If you're going to be litigating

3    venue, I don't think you can responsibly litigate it without

4    dealing with the issue of whether this is proper bank fraud.

5    Because if Mr. Gutwillig's theory is correct, there likely is

6    proper venue.  If his theory is incorrect, there likely isn't,

7    but they're two halves of the same coin.

8          MR. GELFAND:  Understood.

9          THE COURT:  Let me just ask you the nuts-and-bolts

10   question here.  If you're right, if my suspicion is correct

11   that the only bank fraud victim on the facts as proffered is

12   the bank that surrenders control of the money, not the bank

13   who's lucky enough to have an account holder with more money,

14   if that is correct, it's not a lot of use to your client.

15         Either your client can be indicted then in Florida for

16   bank fraud or Mr. Gutwillig will come back and say, fine.

17   Count One is now called money laundering.  The bank fraud in

18   Florida is the specified unlawful activity, and the 1957

19   offense involves his engaging in a financial transaction with

20   the fruits of bank fraud, at which point, you're litigating

21   exactly the same issue with one more step which is did the

22   monies show up in New York.

23         You two need to talk because in the end, to be very

24   blunt, even if I'm completely right in spotting the frailty in

25   the current indictment, which I fear is there but I'm not sure,

1    this is a fixable problem, and your client is going to wind up

2    here in substance dealing with the same problem in the

3    underlying issue.

4              The question is the process by which we get to a place

5    in which a legally secure indictment is the one that he's being

6    charged on.  But in the end, on the factual proffer that

7    Mr. Gutwillig has gotten, your client is engaged in a

8    transaction in New York with the fruits of the same conduct

9    that Mr. Gutwillig calls bank fraud.

10             So if there was a bank fraud here, your client seems

11   extremely likely ultimately to be held to account for it, even

12   if it's in the context of a 1957 charge here.

13             This is all by way of there may be a value in you both

14   talking.  Okay?

15             MR. GELFAND:  Understood.

16             THE COURT:  The schedule you've got for that is fine

17   too.

18             Then as to a bill of particulars, I do not receive

19   bill of particulars motions until counsel have met and

20   conferred and communicated in writing as to a demand for the

21   particulars and the government has had an opportunity to

22   respond.  I don't know if that has happened yet.

23             Has there been a written demand by the defense of the

24   government for particulars?

25             MR. GELFAND:  There was an oral conversation.

 1          THE COURT:  Put it in writing, and let me get the

 2   response.  I want to resolve that based on a written exchange

 3   of communication so that I can see what was asked and what was

 4   responded to.  And that, in turn, will make sure that

 5   Mr. Gutwillig and his colleagues can evaluate what you're

 6   asking for and why.

 7          On the assumption that your oral communications

 8   preview what the written communications will show, what is the

 9   particularization that you have sought and not gotten?

10          MR. GELFAND:  The particularization that was inherent

11   in the motion we intended to file, but I think there are

12   actually more particulars.  Based on what's transpired today,

13   the initial issue was a very simple issue.

14          It was a formal disclosure for record purposes that we

15   were even willing to accept under seal of the name of the two

16   alleged victims for the aggravated identity theft counts.

17          I will represent that Mr. Gutwillig has disclosed to

18   us those names.  It's not like we're not aware of that.

19          THE COURT:  Right.

20          MR. GELFAND:  But when an indictment says victim 3 or

21   victim 4, I think for purposes of ensuring against double

22   jeopardy and certain amendments, those kind of

23   considerations --

24          THE COURT:  Right.  Is your concern just that

25   Mr. Gutwillig has only told you that orally?

 1          MR. GELFAND:  No.  He has actually put that into an

 2   email.  Our concern is that we believe that it should be in

 3   some sort of a pleading fashion.

 4          THE COURT:  It doesn't have to be in a pleading, but I

 5   certainly understand your point that you want to preserve a

 6   record of it so that three years from now, if he's charged

 7   again, you're able to point to something.

 8          Is it the concern that the government doesn't want to

 9   put that on ECF?

10          MR. GELFAND:  I don't know if that is the concern.  We

11   anticipated that possible concern.  That's why we said it could

12   be under seal.

13          THE COURT:  All right.  May I suggest.  It doesn't

14   sound like the government is breaching anything as to

15   particularizations because it sounds like he's giving you the

16   very information you want.  You have a legitimate interest in

17   memorializing this in a way that protects your client's

18   interest.

19          There are about five different ways I can think of off

20   the top of my head, including putting a letter on the record in

21   the case reflecting that the names of the victims are being

22   filed in a sealed document so that it's available so that there

23   is a determined way of solving this.

24          This will be a waste of my time if creative lawyers

25   can't solve this one without getting to me.  So please solve

1    that problem.  If that's all you got, you don't need to resolve

2    that.  You just need to be agreeable.

3           MR. GELFAND:  That's fair, your Honor.  With respect

4    to what was said today in court, I anticipate that we're going

5    to need to have discussions about additional particularities

6    based on Counts One and Two.

7           THE COURT:  Then write a letter right away to the

8    government seeking particulars.  As long as the end date for

9    the reply brief is the same, I will allow the two of you -- as

10   long as you put it in writing to me, I will approve an

11   agreed-upon modification.

12          So if, for example, you need a few more days to

13   formulate your request and you want to get it to the government

14   next Friday instead of next Wednesday, whatever, as long as you

15   two agree on that, I'm fine.

16          I can see where there may be value in providing a

17   little bit of air space for that conversation, particularly if

18   Mr. Gutwillig is, you know, running facts within his office

19   about the proper formulation of the charges here.

20          I'll approve the schedule, including, as necessary,

21   reply briefs.  At our final pretrial conference, I will need to

22   resolve whatever of these motions actually get made, although

23   it's my hope some will go away or some will be agreed to.

24          I need to set a due date -- I don't think I have

25   yet -- for proposed voir dire and proposed jury charges.  And

1    those are also things that I take up at the final conference.

2         If the final conference is on January 10, then can I

3    have proposed voir dire and requests to charge -- I don't want

4    to mess with your holidays.  Can we say Monday, January 6.

5         So January 6 for voir dire and requests to charge.

6    I'll issue an order along those lines.

7         MR. DiRUZZO:  Your Honor, may I inquire as to how

8    much, if at all, leeway or ability you give counsel to

9    participate in voir dire.  I've had some judges --

10         THE COURT:  The answer is I adhere to the virtually

11    unitary Southern District norm, which is that I'm delighted to

12    get your questions, but I ask the questions.  You don't.

13    That's a conversation for another day -- we've been here for a

14    while -- as to why I feel strongly that that results in a

15    neutral, rigorous, and efficient process.

16         MR. DiRUZZO:  Okay.

17         THE COURT:  A very productive conference.  The main

18    takeaway, beyond my thanks to you, because you've got a number

19    of homework assignments, is really my strong admonition to the

20    government to take a look at all these questions, please, with

21    not a premise that what has been done is correct or the best

22    practice but an independent, fresh premise.

23         There is a viable case to be brought here, but I have

24    considerable worry that the indictment has completely curable

25    flaws but flaws nonetheless.  And I am eager to get to the

1  bottom of the Florida speedy trial issue which also feels to me

2  like one which, if there is a problem, feels curable.  But I

3  don't want to be fretting about that in the days leading up to

4  trial, and I'm sure that's the last thing all of you want to do

5  either.

6         Anything further from you, Mr. Gutwillig?

7         MR. GUTWILLIG:  I would just like to note briefly for

8  your Honor --

9         THE COURT:  I've excluded time through the trial I

10  believe.  Correct?

11        MR. GUTWILLIG:  I just wanted to flag briefly for

12  your Honor -- I've spoken about this with defense counsel and

13  also informed the Court's deputy.  And certainly it doesn't

14  bear on the schedule from the government's perspective.  The

15  government would be ready.

16        I would just note that I have another trial

17  January 13.  So if it's not me, it will be somebody else.  I

18  just wanted to let the Court know.

19        THE COURT:  Fair enough.  Is your other trial likely

20  to go or not?

21        MR. GUTWILLIG:  I would estimate it as very likely to

22  go.

23        THE COURT:  Then you should get somebody on the team

24  who is, frankly, owning these issues now rather than later.

25  It's not fair to them to pick up a hot potato.

1      MR. GUTWILLIG:  And certainly that would not be my

2   intention.

3      THE COURT:  I know it's not your intention, but I want

4   to make sure.  It's the holidays.  I want to make sure you've

5   got somebody lined up that can be held to account for the

6   charging and other decisions the government makes.

7      I won't want to hear, particularly in a case in which

8   the defense is expressing speedy trial concerns, I don't want

9   the new AUSA to come on and say, I was newly added to the case.

10   I see some issues that I felt comfortable with Mr. Gutwillig

11   on.  I think more attention is needed, to which the answer will

12   be Judge Engelmayer on November 22 told Mr. Gutwillig to get

13   his trial partner chosen right away and his successor chosen

14   right away so that those issues can be cured and resolved with

15   dispatch.

16      MR. GUTWILLIG:  To be clear, this has all been

17   discussed internally to ensure that something like that does

18   not happen.

19      THE COURT:  Then let's have that person appear

20   promptly so I know who it is.

21      Mr. Gutwillig, my law clerk tells me I've only

22   excluded time through today.

23      Is there an application to exclude time through trial?

24      MR. GUTWILLIG:  Yes, your Honor.  The government would

25   move to exclude time under the Speedy Trial Act until trial to

1     continue with motion practice, producing whatever discovery may

2     continue, and pretrial preparation.

3                THE COURT:  Defense, any objection to that?

4                MR. GELFAND:  No objection, without waiving any prior

5     speedy trial issues.

6                THE COURT:  Let me ask you, Mr. Gelfand:

7     Notwithstanding all the issues that you have raised today,

8     without telling me any more specifics, are there discussions

9     that have commenced between the parties as to the possibility

10    of a resolution here?

11               MR. GELFAND:  Your Honor, what I can represent to the

12    Court is that we have thoroughly discussed that issue with our

13    client, and our client intends to proceed to trial.

14               THE COURT:  Okay.

15               MR. GELFAND:  Because of that, there have been very

16    few, if any, discussions with the government.

17               THE COURT:  As I'm sure you're aware, at a final

18    pretrial conference, one of the things that the judge needs to

19    do is to allocute the defendant after asking the government or

20    the defense about the existence of any formal plea offers that

21    were made.

22               Of course the reason for that is to avoid issues down

23    the road, 2255s and the like, where the allegation is made that

24    a defendant was left unaware of a plea offer.

25               It sounds as if there hasn't been a formal plea offer.

1    Whatever the facts are, I'll ask you, counsel, to get together

2    beforehand and you in turn to speak with your client beforehand

3    because at that final conference, I'll ask the government for

4    its account of plea discussions, I'll ask defense counsel, and

5    then I'll ask the defendant.  Heaven knows, there ought to be a

6    meeting of the minds, but I don't want anyone unprepared for

7    that.

8            MR. GELFAND:  Absolutely, your Honor.

9            THE COURT:  Anything further from the defense?

10           MR. DiRUZZO:  Yes.  Judge, I just want to make sure

11   that we comply with your personal preferences.  Given that

12   we've already talked about the pending motions, I'm going to

13   assume that we don't have to file them with the Court.  We just

14   go right ahead and file the motions.

15           THE COURT:  Yes.  You may do so.  I would ask for two

16   courtesy copies of any motion and attachment to my chambers.

17           MR. DiRUZZO:  Two copies?

18           THE COURT:  Yes.  Two copies, one for me, and one for

19   my law clerk.

20           MR. DiRUZZO:  Yes, Judge.  When I get back to Florida,

21   I will reach out to the Southern District of Florida

22   magistrate.

23           THE COURT:  Why don't you have your office do that

24   before you get back to Florida.

25           MR. DiRUZZO:  I will call my associate and see if I

1    can get him to do that.  However, here is my concern, that I

2    get in the transcript request and we don't get the transcript

3    back, even on an expedited basis, before the 27th.

4         THE COURT:  If you and the government speak and agree

5    on a modest extension of time, as long as the reply brief stays

6    the same, as long as you two are in agreement -- I want you to

7    be collegial about this, and I want you to set revised dates

8    that are mutually respectful -- I'm not going to have a problem

9    with a brief adjournment of those dates, particularly to

10   facilitate the transcript.

11        It may be that Mr. Gutwillig's memory of something

12   makes it clear that in some way that transcript would be

13   unhelpful.  But it sure sounds to me as if it would be because

14   I am eager to understand how things were left in Florida.

15        MR. DiRUZZO:  I highly doubt Mr. Gutwillig was the

16   AUSA on the case.

17        THE COURT:  No.  But he would surely have notes.  If

18   he was speaking to a peer AUSA, the natural question is what

19   happened in magistrate's court.

20        MR. DiRUZZO:  Okay.

21        THE COURT:  In any event, I would ultimately like to

22   get that document.  If ultimately Mr. Gutwillig says to you,

23   it's a nothing order.  Nothing happened of any relevance, while

24   I will still need it, you probably want to go ahead and file

25   your brief and just get me the transcript later on when you get

1    it.

2            MR. DiRUZZO:  Understood.

3            THE COURT:  Nothing further from anyone?

4            MR. GELFAND:  No, your Honor.  Thank you.

5            THE COURT:  I wish everyone a healthy and happy

6    holiday, and I look forward to seeing you in January.

7            MR. GELFAND:  Thank you, your Honor.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25