K1AHTEMC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                         19 Cr. 696 (PAE)

ARI TEMAN,

                                       Conference
          Defendant.

------------------------------x

                                  New York, N.Y.
                                  January 10, 2020
                                  11:00 a.m.

Before:

                  HON. PAUL A. ENGELMAYER,

                                  District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
KEDAR SANJAH BHATIA
EDWARD IMPERATORE
     Assistant United States Attorneys

JOSEPH ANDREW DiRUZZO III
JUSTIN GELFAND
     Attorneys for Defendant

Also Present:  William Magliocco, Paralegal Specialist USAO

K1AHTEMC

1          (Case called)

2          MR. BHATIA:  Good morning, your Honor.  Kedar Bhatia

3   and Edward Imperatore, for the United States.  We're joined at

4   counsel table by Will Magliocco, a paralegal specialist in the

5   U.S. Attorney's Office.

6          THE COURT:  Good morning, Mr. Bhatia.

7          Good morning, Mr. Bhatia.

8          And good morning to you, Mr. Magliocco.

9          MR. DIRUZZO:  Good morning, your Honor.  Joseph

10  DiRuzzo, on behalf of Mr. Ari Teman.

11         THE COURT:  Good morning.

12         MR. GELFAND:  Good morning, your Honor.  Joseph

13  Gelfand on behalf of Ari Teman, who is present and on bond.

14         THE COURT:  Good morning to both of you.

15         Good morning to you, Mr. Teman.

16         All right.  We have a formidable agenda before us

17  today, and I want to, before marching through it, identify by

18  topic header the sequence of topics I intend to go through.

19  And of course, if I have missed anything, there will be an

20  opportunity at the end for you to raise other issues.

21         Step one will involve arraigning Mr. Teman on the S2

22  indictment.  I then will take up with the government Rule 16

23  discovery, what, if any, Rule 16 discovery has been produced

24  since the last conference and whether anything, improbable as

25  it might seem, is outstanding.  I will then resolve all of the

K1AHTEMC

1    motions *in limine* that are pending in a bench ruling.  That

2    will take some time.

3            The next module I will discuss with you is the length

4    of trial and my sitting schedule during the course of the

5    trial, the daily schedule that we have here, just so we're all

6    on the same page.  I think of all of you, Mr. Imperatore is the

7    only one who been on trial before me, so I want to make sure

8    all aware of that.

9            I will then have an extensive discussion about aspects

10   of voir dire, including the method that I use for voir dire and

11   including a summary of the case that I intend to present to the

12   venire which I want to run by counsel for their comments.  I

13   will then take up issues of courtroom technology with you.

14   Then there will be some mechanical issues about where witnesses

15   are to be questioned from and jury addresses, and the like.  I

16   will take up then issues with you about materials I need to be

17   provided to my chambers, whether in the context of 3,500

18   material, exhibit binders, a daily exhibit list, that sort of

19   thing.  I want to raise a question about the verdict form.  I

20   need to put on the record any plea offers that have been made

21   to the defendant, as far as this is our final pretrial

22   conference, and then there's a final grand jury matter that I

23   have a word or two about.

24           All right.  That's the agenda.  So that's the sequence

25   in which you can expect me to proceed.  Let's begin with the

K1AHTEMC

1    arraignment of Mr. Teman.

2              Defense counsel, who will be taking the lead at this

3    conference?

4              MR. GELFAND:  I will, your Honor, Justin Gelfand.

5              THE COURT:  Very good.  Thank you, Mr. Gelfand.

6              Have you had an opportunity to review with your client

7    the questions that I am apt to put to him by way of arraigning

8    him on the S2 indictment?

9              MR. GELFAND:  Yes, your Honor.

10             THE COURT:  All right.  Mr. Teman, I'm going to have

11   Mr. Smallman administer the oath to you; and then I'll ask you

12   several questions to make sure you're of clear mind; that

13   you've read the S2 indictment; and I will receive your plea,

14   which I expect, from counsel's preview, will be a not guilty

15   plea.

16             Mr. Smallman, will you swear the defendant.

17             (Defendant sworn)

18             THE COURT:  Thank you.

19             Mr. Teman, you may be seated.  What is your full name?

20             THE DEFENDANT:  Ari Baruch Teman.

21             THE COURT:  How old are you?

22             THE DEFENDANT:  37.

23             THE COURT:  How far did you go in school?

24             THE DEFENDANT:  College and some additional

25   coursework.

K1AHTEMC

| | |
|---|---|
| 1 | THE COURT:  All right.  I know the answer to this |
| 2 | question, but are you able to speak and read English? |
| 3 | THE DEFENDANT:  Yes. |
| 4 | THE COURT:  I understand that you are presently under |
| 5 | the care of a medical professional? |
| 6 | THE DEFENDANT:  Yes, your Honor. |
| 7 | THE COURT:  All right.  Apart from what we covered in |
| 8 | the robing room, are you under the care of any other medical |
| 9 | professional? |
| 10 | THE DEFENDANT:  Not on any ongoing basis, your Honor. |
| 11 | THE COURT:  All right.  In the past 24 hours, apart |
| 12 | from sleep medication, have you taken any drugs, medicine, or |
| 13 | pills, or drunk any alcoholic beverages? |
| 14 | THE DEFENDANT:  No, nothing unrelated to sleep. |
| 15 | THE COURT:  Does the sleep medication impair your |
| 16 | ability to understand what people are saying to you? |
| 17 | THE DEFENDANT:  I don't believe so. |
| 18 | THE COURT:  Does it impair your ability to |
| 19 | communicate? |
| 20 | THE DEFENDANT:  No, I don't think so. |
| 21 | THE COURT:  Does it impair your reasoning ability? |
| 22 | THE DEFENDANT:  I don't think so. |
| 23 | THE COURT:  Is your mind clear today? |
| 24 | THE DEFENDANT:  Feels like it is, your Honor. |
| 25 | THE COURT:  Is there any reason to think that it is |

K1AHTEMC

1   not?

2          THE DEFENDANT:  No, your Honor.

3          THE COURT:  Do you understand what's happening in this

4   proceeding?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Mr. Gelfand, are you confident that your

7   client understands what's happening in this proceeding and is

8   capable of making an informed plea as to the charges in the S2?

9          MR. GELFAND:  Yes, your Honor.  For the record, I've

10  spent approximately an hour and a half with him this morning as

11  well.

12         THE COURT:  And that confirms your confidence that his

13  mind is totally clear?

14         MR. GELFAND:  It does, your Honor.

15         THE COURT:  All right.  Mr. Teman, have you received a

16  copy of the most recent indictment, the S2 indictment, returned

17  on January 3?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  Have you had an opportunity to -- have you

20  read it?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  Have you had an opportunity to consult

23  with your attorneys about it?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:   Do you want me to read it out loud, or do

K1AHTEMC

1    you waive its public reading?

2              THE DEFENDANT:  I waive the reading, your Honor.

3              THE COURT:  Thank you.

4              How do you plead to the charges?

5              THE DEFENDANT:  Not guilty.

6              THE COURT:  Having taken care of the arraignment, I

7    think I need to formally ask defense counsel the following:

8    The new indictment does not appear to add new events so much as

9    add charges relating to existing events.  Nevertheless, just as

10   an excess of caution, it appears to me that everyone's fully

11   prepared to go to trial on the date indicated, but I want to

12   ask you just to confirm that.

13             MR. GELFAND:  Yes, your Honor.

14             THE COURT:  Very good.  All right.  Government, same?

15             MR. BHATIA:  Yes, your Honor.

16             THE COURT:  Anything else that anyone believes I need

17   to take up by way of arraignment or related events?

18             MR. BHATIA:  Nothing from the government.

19             MR. GELFAND:  No, your Honor.

20             THE COURT:  OK.  Let's turn to Rule 16 discovery.

21   Mr. Bhatia, I realize you are a newcomer to the case, and I

22   appreciate your taking it over.  Since the last conference, has

23   there been any Rule 16 discovery that the government has come

24   into possession of and/or that has been produced to the

25   defense?

K1AHTEMC

1            MR. BHATIA:  Yes, your Honor.  We've been producing --

2      we made at least two or three productions since then on a

3      rolling basis as we've received documents.  Those documents

4      have principally consisted of bank records and email

5      correspondence that we've received from particular witnesses in

6      the case.  I think that's sort of the substance of it.

7            THE COURT:  What's the scale of the new material?

8            MR. BHATIA:  Not too voluminous.  I think, for the

9      emails, they were maybe in the 100 to 200 range.

10            THE COURT:  100 to 200 emails?

11            MR. BHATIA:  Emails, yes.  I don't think it's been

12      particularly voluminous, and we don't expect any voluminous

13      discovery in the future.  But, of course, we don't know, but I

14      don't expect any.

15            THE COURT:  Is there any outstanding Rule 16 discovery

16      that is in your possession, custody, or control that has not

17      been produced to the defendant?

18            MR. BHATIA:  Yes, your Honor.  As we get closer to

19      trial, we're producing on a rolling basis, so I think we might

20      have received documents yesterday or maybe the day before that

21      we're planning to produce today, but nothing that we're waiting

22      to produce.

23            THE COURT:  Do I have your commitment that, to the

24      extent you come into possession of Rule 16 discovery, you will

25      quite properly turn it around for the defense?

K1AHTEMC

1           MR. BHATIA:  Yes, your Honor.

2           THE COURT:  All right.  Defense, anything with respect

3    to ongoing discovery?

4           MR. GELFAND:  No, your Honor.  We received discovery,

5    as government counsel indicated, on a rolling basis.  The most

6    recent production of that was electronically produced

7    yesterday.  Because we were traveling, we haven't yet had a

8    chance to review it, but I accept the government's

9    representations as to the nature of it.

10          THE COURT:  So far, to the extent you've gotten new

11   discovery, I take it none of it is on a scale that inhibits

12   your trial preparation?

13          MR. GELFAND:  No, your Honor.  The other thing I would

14   note for the record is that we too, on behalf of the defense,

15   have disclosed Rule 16 discovery to the prosecution in several

16   disclosures, also on a rolling basis, much like the prosecutor.

17   We did have a couple of requests for documents outstanding.

18   Obviously, to the extent that we receive those documents and to

19   the extent that it falls under Rule 16, we'll that provide that

20   forthwith to the government.

21          THE COURT:  There's nothing along those line for me to

22   resolve, but I appreciate your giving me a heads-up about that.

23          Nothing further vis-a-vis discovery?

24          MR. BHATIA:  Nothing.

25          MR. GELFAND:  Correct.

K1AHTEMC

1          THE COURT:  I'm going to turn now to a bench ruling

2    that I have on the *in limine*.  All right.  Here goes.

3          Defendant, Ari Teman, has been charged with bank

4    fraud, wire fraud, and aggravated identity theft.  His trial is

5    set to begin on January 21, 2020.  The Court has received *in*

6    *limine* from Teman and the government and has also received

7    opposition papers from each.

8          The following bench decision resolves all these

9    motions.  I will not be issuing a written decision.  Instead, I

10   will simply issue an order reflecting the fact that the motions

11   were resolved for the reasons set forth on the record today.

12   So if the content of what I say today is important to you, you

13   will need to order the transcript of this conference, as I

14   expect you would be anyway.

15         All right.  I will first going to address the

16   government's motion in limine that relates to Detective Daniel

17   Alessandrino.  Alessandrino is a member of the New York Police

18   Department who was present at Teman's arrest in Florida.  The

19   defense has subpoenaed Alessandrino for potential testimony but

20   has not indicated the subject matter of this testimony.

21         The government moves that, if called to testify by the

22   defense, Alessandrino's direct examination be limited to

23   relevant, nonhearsay topics.  Teman responds that he may not

24   call Alessandrino at all, but if he does so, he will not

25   solicit hearsay testimony.

1          On its face, the government's motion does no more than

2     ask the Court to enforce the Rules of Evidence.  For whatever

3     value that may have, I can certainly grant that relief, which

4     is completely unobjectionable, insofar as the government's

5     motion does no more than ask the Court to do its job.  For

6     future reference, it's not clear what purpose a motion like

7     this serves, but there it is.  I remind counsel that any

8     testimony from any witness, whether Alessandrino or anyone

9     else, must comply with the Federal Rules of Evidence, it must

10    be relevant, it must comply with the hearsay rules, and it must

11    satisfy 403.

12         As to Alessandrino's testimony specifically, however,

13    there's nothing concrete at this point for the Court to

14    resolve.  I am certainly not going to require the defense,

15    prior to trial, to disclose the subjects of any testimony that

16    Detective Alessandrino might be asked to give.  The defense is

17    entitled to keep its strategy to itself.  It is not apparent

18    whether Alessandrino would be in a position to offer admissible

19    testimony.  The government suggests not, but it is premature to

20    decide.  That may turn on developments during the trial.  If

21    the defense does decide to call Alessandrino, the Court will

22    ask for a specific offer of proof from the defense so that the

23    Court can determine before he is called to the stand whether

24    there are proper bases for calling him to testify.

25         So, defense counsel, if you are going to go this

K1AHTEMC

1    route, please be prepared to give me, outside the presence of

2    the jury, a detailed proffer as to the purpose or purposes for

3    which you would be calling Alessandrino.

4              I'm now going to turn to the government's motion in

5    limine seeking to exclude evidence of specific, noncriminal

6    acts on Teman's part.  The government asks that the Court

7    exclude any evidence of noncriminal acts or arguments by Teman

8    to the same effect, to suggest that because Teman complied with

9    the law or treated customers fairly on other occasions, he is

10   not guilty with respect to the crimes charged.  As an example,

11   the government envisions that Teman might offer evidence that

12   he did not defraud customers other than Entities 1 through 4,

13   whose checks are at issue here.  The government envisions that

14   Teman might argue that this makes it more likely that he did

15   not defraud Entities 1 through 4 either.  In response, Teman

16   asks the Court to reserve judgment because the government's

17   motion is addressed to an abstraction, as the government has

18   not pointed to any specific evidence that it is seeking to

19   exclude.  Teman promises that, to the extent he seeks to elicit

20   evidence of his law-abiding behavior, he would comply with the

21   Rules of Evidence governing character evidence.

22             Given the general level at which this issue has thus

23   far been briefed, Teman is right that there is nothing concrete

24   to resolve.  The Court can do no more at this point than

25   identify the governing legal principles with which I expect

K1AHTEMC

1  counsel are already familiar.  At a general level, the

2  government's characterization in its contention is right.  It

3  is black letter law that "a defendant may not seek to establish

4  his innocence ... through proof of the absence of criminal acts

5  on specific occasions." Citing *United States v. Scarpa*, 897

6  F.2d 63, 70 (2d Cir. 1990); *accord United States v. Williams*,

7  205 F.3d 23, 34 (2d Cir. 2002).  Although a criminal defendant

8  may introduce reputation or opinion testimony of a particular

9  character trait, under Federal Rule of Evidence 404(a)(2), such

10  character evidence may not take the form of evidence of

11  specific good acts or the lack of other bad acts.  To allow

12  evidence of these specific noncriminal acts could "cause the

13  jury to make a forbidden propensity inference"; i.e., that a

14  defendant's prior good, honest acts suggest that he has a good,

15  honest character, therefore proving that he acted in accordance

16  with such character during the charged incidents.  *See Jones v.*

17  *Stinson*, 229 F.3d 112, 120 (2d Cir. 2000).  That inference is

18  prohibited by Rule 404(a)(1).

19          Consistent with this, the Second Circuit has time and

20  again upheld the exclusion of evidence of a defendant's lawful

21  acts when offered for this purpose.  For example, in the United

22  States v. Walker, 191 F.3d 326, 336 (2d Cir. 1999), the circuit

23  upheld the exclusion of evidence that a defendant who was

24  charged with preparing false asylum applications had prepared

25  proper asylum applications in the past, because such evidence

K1AHTEMC

1    was being offered to disprove that he had acted with fraudulent

2    intent in the case at hand.  Similarly, considering a defendant

3    charged with bribery in the *United States v. O'Connor*, 580 F.2d

4    38, 43 (2d Cir. 1978), the circuit held that evidence that the

5    defendant had not received bribes in the past should have been

6    excluded as improper character evidence.

7           That said, there are limited exceptions.  Under

8    Rule 405(b), where the defendant's character is an essential

9    element of a charge or defense, such evidence may be admitted.

10   *See United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997).

11   That principle does not appear to be implicated in this case.

12   There are other cases that allow specific incidents of lawful

13   conduct to be received under a defensive application of

14   Rule 404(b), for example, to show that the conduct at issue was

15   part of a common scheme or plan.  *See Jones*, 229 F.3d at 120;

16   *see also United States v. Aboumoussallem*, 726 F.2d 906, 911-12

17   (2d Cir. 1984).

18           I cannot do more here than recite those background

19   standards.  Teman has not stated an intention to offer evidence

20   along these lines, and he well may not.  In the event that

21   Teman intends to elicit proof of noncriminal acts on his part,

22   whether during the examination of government witnesses or as

23   part of a defense case, the Court will require beforehand an

24   offer of proof outside the presence of the jury.  The

25   government will then be at liberty to exclude such evidence

K1AHTEMC

based on the lines of authority that I've just reviewed.  I

therefore deny the government's motion as premature, without

prejudice to the government's right to move anew once a

situation involving concrete evidence implicating these

principles has crystallized.

I will next address the government's *in limine* seeking

a ruling permitting it to admit into evidence, pursuant to

Rule 404(b), the check stock seized from the defendant's office

space on July 3, 2019.  I will also address at this point

Teman's related motion in limine to preclude the government

from offering as yet unnoticed Rule 404(b) evidence.

On July 3, 2019, Teman was arrested at his office in

Miami Beach, Florida.  In connection with the arrest, law

enforcement offers seized a ream of "check stock" in plain view

in Teman's office.  Check stock is specialty paper that an

individual can use to print checks.  According to the

government, each page of check stock looks like an 8.5" x 11"

sheet of paper, except the top third is the outline of a check

and certain security features, such as a string of text

printed in the border of the check frame.  The check stock

seized from Teman's office space contains security features

that appear to be different from the ones on the checks

deposited on March 28, 2019, and April 19, 2019, which are the

subject of the charges in this case.  On December 31, 2019, the

government provided notice of its intent to introduce at trial,

K1AHTEMC

1    under Rule 404(b), the check stock that was seized from Teman's

2    office on July 3, 2019.

3          Rule 404(b)(1), of course, prohibits evidence of a

4    crime, wrong, or other act being used to show propensity, that

5    on a particular occasion the person acted in accordance with a

6    particular character trait.  But Rule 404(b)(2) provides that

7    such evidence "may be admissible" for other purposes, such as

8    to prove "motive, opportunity, intent, preparation, plan,

9    knowledge, identity, absence of mistake, or lack of accident,"

10    provided the probative value of such evidence is not outweighed

11    by the risk of unfair prejudice.  *See United States v. Ortiz*,

12    857 F.2d 900, 903 (2d Cir. 1988).  Under Rule 404(b)(2), on

13    request by a defendant in a criminal case, the prosecutor must

14    provide reasonable notice of the general nature of any

15    Rule 404(b) evidence that the prosecutor intends to offer at

16    trial and "do so before trial -- or during trial if the court,

17    for good cause, excuses lack of pretrial notice."

18          The Second Circuit takes a "inclusionary approach" to

19    Rule 404(b) under which evidence of crimes, wrongs, and other

20    acts may be received "for any purpose other than to show a

21    defendant's criminal propensity, as long as the evidence is

22    relevant and satisfies the probative-prejudice balancing test

23    of Rule 403."  *See, e.g., United States v. Carboni*, 204 F.3d

24    39, 44 (2d Cir. 2000); *see also United States v. Teague*, 93

25    F.3d 81, 84 (2d Cir. 1996), in which the circuit held that the

K1AHTEMC

1    state of mind required for the offense is a "proper purpose"

2    for admission of other crimes evidence under Rule 404(b).

3    Evidence offered for a permissible purpose, however, is

4    nevertheless inadmissible "if the other act or acts are not

5    sufficiently similar to the conduct at issue."  United States

6    v. Gordon, 987 F.2d 902, 909 (2d Cir. 1993).  Finally, for

7    evidence to be received under Rule 404(b), it must relate to an

8    issue in dispute.  For example, in United States v. Scott, 677

9    F.3d 72, 83 (2d Cir. 2012), the circuit found an abuse in

10   discretion in admitting evidence under Rule 404(b) to show

11   identity where identity was not in dispute.

12           So turning to the check stock, the government moves

13   for a ruling permitting it to admit into evidence the check

14   stock seized from Teman's office on July 3, 2019, subject, of

15   course, to the check stock's authentication as such at trial.

16   The government argues that such evidence is admissible under

17   Rule 404(b) as evidence of Teman's motive, intent, plan,

18   identity, *modus operandi*, and the absence of mistake or lack of

19   accident with respect to the charged offenses.

20           The Court agrees and will receive such evidence at

21   trial, subject to its authentication.  The blank check stock

22   seized at Teman's office is germane for reasons apart from

23   propensity.  It shows his knowledge and familiarity with the

24   process of creating checks and in turn is germane to the

25   government's claim that he did so here by fabricating the

allegedly unauthorized checks at issue.  The average person may
not have blank check stock lying around his or her home or
office.  Teman's possession of check stock, even if it is not
identical to the check stock allegedly used in this case, tends
to establish his facility and familiarity with material similar
to that used in the alleged crimes.  The recovery of check
stock in Teman's office makes it more likely that Teman, as
opposed to someone else, created the specific checks charged in
the indictment.  It also makes it more likely that Teman knew
what he was doing when, using such stock, he created allegedly
unauthorized checks with the features and terms those checks
contained.  And once the check's probative value is recognized,
there is no offsetting basis to exclude them.  Possession of
check stock is not inherently a bad act at all.  It is just an
act.  It does not inherently reflect ill or well on a person's
character.  And Teman has not made any argument that
countervailing factors identified in Rule 403 favor exclusion
of the check stock.  He's not identified any unfair prejudice,
confusion, or delay that may flow from receiving this check
stock into evidence.

          Teman does offer two arguments in opposition to the
motion in limine.

          First, he notes that the check stock was seized from
his office in July 2019, after the check deposits at issue,
which occurred in late March 2019 and mid-April 2019.  But the

K1AHTEMC

gap between these events is just a few short months.  Teman

offers no reason why this small passage of time would make his

possession of check stock in July 2019 completely nonprobative

of his familiarity with the use of check stock just a few

months earlier.  Nor does he identify any supportive case law.

In the Court's judgment, Teman's possession of blank check

stock soon after the events at issue may fairly be argued by

the government as evidence of Teman's capacity to commit the

acts charged in the indictment.  *See, for example, United*

*States v. DeFiore*, 720 F.2d 757, 764 (2d Cir. 1983), which held

other acts admissible under Rule 404(b) "even though they

antedated the limitations period."  The passage of time instead

goes to the weight of the evidence.  Defense counsel are free

to argue before the jury that the checks found in Teman's

office in July 2019 do not speak to his check-creation

capabilities three to four months earlier, and the government

is free to argue the opposite.  That's why we have jurors.

          Second, Teman argues that the possession of check

stock at an office is not inherently incriminating.  Under

Rule 404(b), that point is a nonstarter.  Under the rules,

prior acts need not be "bad acts" or inherently incriminating

acts to be admissible.  They need not be *malum in se*.  They

need only be relevant, offered for a proper purpose, and more

probative than unfairly prejudicial.  And prior act evidence

that is on its face benign is frequently admitted at trial.

K1AHTEMC

1    For example, a defendant's access on a different date to the

2    scene of a crime, such as an office or an apartment or a car,

3    is frequently admitted under Rule 404(b) as proof of

4    opportunity or knowledge.  Such evidence takes on an

5    incriminating quality only in conjunction with the other

6    evidence in the case, such as the case here.  This point, too,

7    goes to the weight, not the admissibility, of the evidence.

8    Teman's counsel is at liberty to argue that possession of check

9    stock is no big deal and should not be treated as such here.

10           The Court therefore grants the government's motion to

11   receive the check stock seized from Teman's office on July 3,

12   2019, provided that the check stock is properly authenticated

13   at trial as having been seen there.

14           The Court does, however, request letters from counsel

15   as to a proper limiting instruction regarding the purposes for

16   which the jury may and may not consider the check stock seized

17   from Teman's office on July 3, 2019.  Counsel are to confer

18   promptly on this point and to submit a joint letter by next

19   Wednesday, January 15, setting out what I expect will be their

20   agreement on the text of such an instruction or, failing that,

21   their separate views as to the text of such an instruction.

22           I turn now to Teman's motion in limine to preclude the

23   government from offering Rule 404(b) evidence at trial

24   concerning any matter not included in the government's notice

25   provided to Teman on December 31, 2019.

K1AHTEMC

1        As background, on December 31, 2019, the government

2   gave notice of its intent to introduce, under Rule 404(b), the

3   check stock I've just addressed.  On January 2, 2020, counsel

4   for Teman emailed government counsel and requested notice of

5   any other Rule 404(b) evidence the government intends to

6   introduce at trial.

7        As noted, Rule 404(b) requires, on request, that a

8   prosecutor offering such evidence give reasonable notice of the

9   general nature of any such evidence and do so before trial --

10  or during trial if the Court, for good cause, excuses lack of

11  pretrial notice.  The advisory committee notes to Rule 404(b)

12  state that "no specific time limits are stated in recognition

13  that what constitutes a reasonable request or disclosure will

14  depend largely on the circumstances of each case."

15       In seeking to exclude any as yet unnoticed 404(b)

16  evidence, Teman cites a 2011 decision in which my colleague,

17  Judge Pauley, excluded other act evidence disclosed

18  approximately one month before trial on the ground that the

19  government had failed to provide defendants with reasonable

20  notice.  That is *United States v. Daugerdas*, 2011 WL 573587, at

21  page 2 (S.D.N.Y. Feb. 16, 2011).  But that case is readily

22  distinguishable.  It involves an unusually complicated

23  conspiracy by numerous defendants over the course of nearly a

24  decade to repeatedly commit complex tax fraud, largely through

25  the use of sophisticated fraudulent tax shelters.  And prior to

K1AHTEMC

the ruling cited by Teman, Judge Pauley had warned the
government "repeatedly about the need to cabin its proof and to
provide advance disclosure of the transactions to be offered at
trial." Id., in light of the massive universe of complex
business transactions spanning a decade that the defendants
otherwise would have had to prepare to defend at trial.  Those
factors are not present here.  It's not clear to the Court that
were the government to unearth additional 404(b) evidence,
Teman would, to anything like the degree presented in
*Daugerdas*, be hamstrung in preparing to meet it.

            To be sure, the government's December 31, 2019, and
January 2, 2020, letters imply that the government does not
have any present intention to offer further Rule 404(b)
evidence beyond the check stock, but it's axiomatic that the
government's investigation is ongoing up to and through trial.
It is therefore possible that additional Rule 404(b) evidence
will come to light or take on new relevance before or during
trial.  And Rule 404(b) allows the prosecution to disclose
other act evidence even as late as "during trial if the court,
for good cause, excuses lack of pretrial notice."  Citing the
text of Rule 404(b).

            The Court therefore denies defendant's motion to
preclude unnoticed 404(b) evidence categorically as premature.
If there is such an application, Teman will be at liberty to
seek to bar such evidence as untimely, and the Court would then

K1AHTEMC

1  determine, in the context of a particularized controversy,

2  whether the lack of prior notice was justified by good cause.

3  Without a concrete scenario before it, however, the government

4  cannot make an informed ruling.  The Court expects the

5  government to provide prompt notice to defense counsel and the

6  Court of any additional 404(b) evidence, if any, as soon as it

7  develops an intention to offer such, so as to assure that the

8  issue of admissibility is thoughtfully and thoroughly

9  litigated.

10       Next, Teman has moved *in limine* to admit the Federal

11  Reserve Board's Federal Register Notice dated November 21,

12  2005.  The notice relates to amendments to the fed's Regulation

13  CC that define "remotely created checks." Teman's position is

14  that the checks at issue in this case were valid "remotely

15  created checks (or RCCs) under the regulation.  He seeks to

16  admit the Federal Register Notice as Defense Exhibit A to

17  assist the jury in concluding that that is so.

18       The Court denies the motion to receive the Federal

19  Register Notice for two independent reasons.

20       For one, Defense Exhibit A spectacularly fails the

21  test for admissibility under Rule 403.  Under Rule 403, the

22  Court may exclude relevant evidence if its probative value is

23  substantially outweighed by a danger of confusing the issues or

24  misleading the jury.  The Federal Register Notice has, at best,

25  limited probative value.  The key factual issue the government

seeks to prove at trial is not whether the checks Teman

deposited technically qualify or not as "remotely created

checks," that term does not appear in the superseding

indictment or, for that matter, the earlier indictment.  It is

Teman, not the indictment, who seeks to inject the concept of

"remotely created checks" into the case.  The indictment

alleges instead that Teman deposited the checks while

pretending to have authorization from the account holders to do

so, whereas in fact he had created and negotiated the checks

without such permission.  The Federal Register Notice does not

tend to prove or disprove any fact of consequence to these

charges.  The notice says nothing about whether the account

holders, the alleged -- who along with the banks were alleged

victims in this case, authorized the creation and negotiation

of the checks, and the notice says nothing whatsoever about

Teman's state of mind.

          The Federal Register Notice is germane only insofar as

it might serve to educate the jury about the background fact

that there is such a thing as a remotely created check and that

the remote creation and presentation of such checks are not

itself unlawful acts.  There may be value to the jury's being

informed of that.  An old-fashioned juror may not know about

that, but that legal concept can easily be communicated to the

jury by other means, in particular by an instruction from the

Court, as I will explain in a few moments.

K1AHTEMC

1          On the flip side of the Rule 403 balance, the Federal

2    Register Notice would create unimaginable jury confusion.  The

3    notice is an 18-page, single-spaced regulatory document.  It

4    purports to define the term "remotely created check," and then

5    it discusses in expansive detail, among other things, the

6    regulation's administrative history.  It also sets out in

7    numbing detail the fed's section-by-section legal analysis of

8    the regulation.  Teman's notion that the search for truth in

9    this case would be furthered by inviting the 12 deliberating

10   jurors to wade through this technical, abstruse, academic, and

11   legalistic discussion in this document regarding RCCs is

12   ill-conceived.  Such an exercise would promote extreme

13   confusion.  It could easily lead the jury to think, wrongly,

14   that to reach a just verdict they are obliged to grasp the fine

15   points of this ponderous regulatory document.  The capacity of

16   this document to produce confusion vastly outweighs any

17   marginal probative value that it might contain.

18          Second, Exhibit A is a legal document.  It represents

19   and explains a point of federal law, a federal regulation.  The

20   defense admits this in its motion.  It notes that the exhibit

21   "remains federal law."  I'm citing docket 60 at page 2.  As

22   such, for the defense to thrust the Federal Register notice's

23   long text before the jury would be grossly to invade the

24   Court's province as the entity responsible for explicating law

25   for the jury.  It is black letter law that "it is not for

K1AHTEMC

1    witnesses to instruct the jury as to applicable principles of

2    law, but rather for the judge." *See F.H. Krear and Co. v.*

3    *Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir. 1987).

4    Teman's proposal to put before the jury the Federal Register

5    Notice, a legal document setting out and explicating in

6    tendentious detail a federal banking regulation, breaches this

7    foundational principle, whether the notice would be

8    authenticated by a witness or stipulation.

9              The Court therefore, under Rule 403, denies Teman's

10   motion to admit Defense Exhibit A.

11             However, the Court can imagine a circumstance in which

12   there would be good reason to educate the jury about the

13   central point that the defense presumably seeks to extract from

14   the Federal Reserve Notice, to wit, that a remotely created

15   check, created by a payee with the authorization of the payor

16   is a recognized and lawful instrument.  The Court's present

17   instinct is that the best and proper way to convey this point

18   to the jury is by means of a brief instruction from the Court

19   to be given at an appropriate point during the trial.  The

20   Court does not rule out, however, that an alternative

21   acceptable way to educate the jury about this background fact

22   would be by means of a brief stipulation.  The Court directs

23   counsel to meet and confer forthwith on this issue with an eye

24   towards agreeing on the text of a jury instruction and/or a

25   joint stipulation.

K1AHTEMC

1          The Court directs the parties to submit by the close

2     of business Wednesday, January 15, a joint letter containing a

3     proposed jury instruction on this topic.  If the parties cannot

4     agree on the terms of such a jury instruction, the letter is to

5     contain the parties' respective proposed instructions.  Should

6     the parties agree on a factual stipulation to convey the

7     necessary information, the letter is to include that too.

8          The Court next addresses Teman's motion to exclude an

9     anguished typewritten note that Teman wrote to, *inter alia*, the

10    United States Attorney's Office.  The note, which expresses

11    rage at numerous persons, was the subject of a telephone call

12    among the Court, counsel, and Teman on December 12, 2019, the

13    transcript of which the Court has ordered sealed.  Teman argues

14    that the note is irrelevant and/or that any probative value it

15    has is outweighed by countervailing factors under Rule 403,

16    including the risk of unfair prejudice and confusion.  The

17    government asks the Court to reserve ruling -- reserve on this

18    issue pending trial.

19          At this juncture, the Court is prepared only to say

20    that the vast majority of the note is plainly both irrelevant

21    and unfairly prejudicial.  However, the government is correct

22    to observe that at points in the note Teman does address facts

23    and circumstances potentially relevant to the charges in this

24    case.  These include reference to persons whose checks he is

25    alleged to have deposited without their authorization.  Under

1    these circumstances, the proper course is for the Court to

2    reserve judgment on Teman's motion, because it is conceivable

3    that a snippet or snippets within the letter could be properly

4    admitted or used during cross-examination of Teman, should he

5    testify.  For avoidance of doubt, however, the government is

6    not to attempt to use any part of the note in any way without

7    the explicit prior approval of the Court.  Should the

8    government determine that it wishes to pursue use of any

9    portion of the note for any purpose at trial, it is to notify

10   the Court and the defense forthwith, outside the presence of

11   the jury.

12           Next, I will address Teman's motion in limine to

13   preclude testimony from a person whom Teman depicts as a

14   government expert witness.  The witness in question is Bank of

15   America vice president and senior investigator Karen

16   Finocchiaro.  On January 6, 2020, the government gave notice to

17   the defense that it intended to call Finocchiaro to testify

18   about Bank of America's charge-back processes, as well as

19   information related to some of Teman's accounts at the bank.

20   Docket 61-1 at 1.  As described by the government, a

21   charge-back is a process that occurs when a bank, having sent

22   money to another entity, seeks to have that money returned

23   because the bank suspects a fraudulent transaction.  See docket

24   54 at 2.  After the charge-back is initiated, the Federal

25   Reserve automatically transfers the money from the receiving

entity back to the original bank.  Id.  The government expects

Finocchiaro to testify about Bank of America's procedures for

initiating and completing a charge-back and for responding to

charge-back requests from other banks.  Docket 61-1 at 1.

Teman seeks to preclude Finocchiaro's testimony,

arguing that she is an expert and that the government failed to

provide the notice required for expert witnesses under Federal

Rule of Criminal Procedure 16(a)(1)(G).  The government

responds that Finocchiaro's testimony is not that of an expert

and that it has no intention to elicit expert testimony from

her.  It depicts her testimony as that of a lay fact witness

describing the operations of a component of her workplace.  It

states that it provided notice to the defense about the content

of Finocchiaro's testimony "in an abundance of caution."

Docket 61-1.  At the most, Finocchiaro -- the government argues

Finocchiaro's testimony could be categorized as lay opinion

testimony.

Under Federal Rule of Evidence 602, a witness' factual

testimony is admissible as long as the witness has personal

knowledge, subject, of course, to other rules like Rule 403.

*See United States v. Cuti,* 720 F.3d 453, 457 (2d Cir. 2013).

Opinion testimony of a lay witness is also admissible, but it

is limited under Rule 701 to opinions that are (1) rationally

based on the witness' perception; (2) helpful to understanding

the witness' testimony or a fact at issue; and (3) not based on

scientific, technical, or other specialized knowledge.  Expert

witnesses must meet additional requirements for their opinion

testimony to be admissible.  Under Rule 702, such witnesses

must be qualified as a result of their knowledge, skill,

experience, training, or education, and their opinions must be

(1) helpful to the jury in understanding evidence or

determining a fact at issue, (2) be based on sufficient facts

or data, (3) be the product of reliable principles and methods,

and (4) reliably apply the principles and methods to the facts

of the case at hand.  In short, expert opinion testimony must

be both relevant and reliable.  See Daubert v. Merrill Dow

Pharmaceuticals, 509 U.S. 579, 590-91 (1993).

          The first-order question here is whether Finocchiaro

is a fact witness or an opinion witness.  Based on the

government's proffer of her anticipated testimony, she is

characterized properly as a fact witness.  The government has

represented only that Finocchiaro will testify as to Bank of

America's charge-back processes and procedures, and while the

government is not explicit on this point, the Court assumes

that her personal knowledge of these procedures comes from her

experience as a Bank of America senior investigator.  Assuming

that to be so, her account of the charge-back procedures at her

employer constitutes fact testimony from a fact witness.  The

government has not provided any opinion that she would offer

about these procedures.

1          The Second Circuit's decision in *United States v.*

2   *Marsh*, 568 F.App'x 15 (2d Cir. 2014), is apposite authority on

3   this point.  There, a law enforcement agent who was trained in

4   retrieving text messages and data from cell phones testified in

5   a criminal trial during which he explained his training,

6   described how he extracted messages from phones in that case,

7   and conveyed the contents of the extracted messages.  Id. At

8   17.  The Second Circuit rejected a challenge that the agent's

9   testimony was improper expert opinion testimony from a

10  nonexpert.  It explained that the agent "did not purport to

11  render an opinion based on the application of specialized

12  knowledge to a particular set of facts." Id.  The same is true

13  here.  The government's proffer does not foreshadow any opinion

14  testimony based on application of specialized knowledge to

15  facts.

16          Accordingly, assuming the government lays the proper

17  foundation as to why Finocchiaro has personal knowledge of the

18  matters about which she will testify, her testimony as

19  proffered is admissible fact testimony of a lay witness.

20  Teman's motion to exclude such testimony is therefore denied.

21          For avoidance of doubt, this ruling does not authorize

22  and should not embolden the government to elicit expert

23  testimony from Finocchiaro.  The Court suspects that she will

24  testify solely based on personal knowledge about relevant

25  practices and procedures at her employer, Bank of America.

K1AHTEMC

1          Finally, I will turn to the government's most recent

2     motion, which asks the Court to preclude expert opinion

3     testimony that Teman proposes to offer.  Teman's proposed

4     expert is J. Benjamin Davis.  Davis is a lawyer whose practice

5     focuses on the financial services industry and who, according

6     to Teman, has had extensive experience with check negotiation

7     issues.  See docket 74-1 at 1.  On January 5, 2020, Teman gave

8     the government notice of Davis' anticipated testimony.  See Id.

9     Teman states that Davis' testimony would include, inter alia,

10    descriptions of what constitutes a "remotely created check" and

11    what constitutes a "counterfeit check" and his opinions that

12    the checks were "valid RCC" and thus not counterfeit.  See Id.

13    At 2-4.

14          The government seeks to preclude Davis' testimony for

15    three reasons:  First, that it is irrelevant and will not be

16    helpful to the jury; second, that it improperly intrudes on the

17    province of the Court to give legal instruction to the jury;

18    and third, that his opinions are not the product of reliable

19    principles and methods, as required under Rule 702.  Teman

20    disagrees on all fronts.

21          I will first address Davis' testimony related to RCCs,

22    followed by his testimony related to counterfeit checks.

23          First, as to whether Teman's checks constitute valid

24    RCCs, the Court will exclude this testimony.  Davis' testimony

25    about RCCs is simply irrelevant.  This issue mirrors the issue

K1AHTEMC

1    raised by the Federal Register Notice discussed earlier, and

2    which I am also excluding.  As I reviewed in connection with

3    that notice, this case does not concern the technical

4    regulatory question of whether the checks meet the Federal

5    Reserve Board's definition of a valid RCC, as interpreted by

6    Davis or otherwise.  This is a criminal case, and the issue on

7    Counts One through Four is whether the government has

8    established beyond a reasonable doubt that Teman is guilty of

9    bank fraud or wire fraud.  On those counts, the government

10   alleges that Teman's fraudulent scheme consisted of

11   representing to the bank or banks at which he deposited the

12   checks that he had authorization from the owner of the account

13   on which the checks purported to be drawn to create those

14   checks and to deposit them into his own accounts.  The

15   indictment alleges that Teman, in fact, lacked such

16   authorization.  And as to Teman's fraudulent intent, the

17   indictment alleges that Teman acted with intent to defraud when

18   he pretended to have such authorization.

19         Davis' testimony about technical compliance with RCC

20   regulations has no bearing on either the act or the intent

21   requirement of these criminal statutes.  If Teman had the

22   customer's authorization to create and deposit the checks, it

23   does not matter whether he did or did not technically comply

24   with the Federal Reserve requirements for an RCC.

25   Contrariwise, if Teman otherwise complied with the technical

K1AHTEMC

1  requirements for an RCC but did not have the customer's

2  authorization to create and deposit into his account a check

3  drawn on the customer's account, and yet intended to do so and

4  did so with the intent to defraud, no amount of compliance with

5  other technical regulatory specifications will serve as a

6  defense.  Davis is not a fact witness.  He is thus unqualified

7  and incompetent to discuss whether Teman's customers authorized

8  the checks in question, whether Teman knew or did not know

9  about such authorization or lack of authorization, and what

10  Teman's state of mind was when he negotiated the checks.

11  Davis' discussions of whether the checks are "valid" in some

12  technical sense does not bear on any issue at hand in this

13  criminal trial.  Further, on the other side of the Rule 403

14  balance, Davis' commentary on these points, like the Federal

15  Reserve Notice, would serve to confuse the jury as to what the

16  issues they must decide are.

17         Finally, any testimony in this area by lawyer Davis

18  would invade the Court's province to instruct the jury as to

19  the law.  As I have discussed with regard to the Federal

20  Reserve Notice, to the extent there is a value in explaining to

21  the jury that checks can lawfully be remotely created and

22  negotiated, the Court is open to doing so through an

23  instruction, and I've invited the parties to propose such an

24  instruction to the Court by Wednesday, January 15.

25         Second, as to whether Teman's checks qualify by some

technical standard as "counterfeit," Davis' testimony is also

irrelevant.  Davis proposes to testify that "a counterfeit

check is a check in which all features have been fabricated

(i.e., it is not from check stock that originally belonged to

the account holder), including the signature of an authorized

signer on the account." Docket 74-1 at 2.  Davis would then

testify that, in his opinion, the checks do not meet this

definition and are thus not counterfeit.  I will also exclude

this testimony.  It is not relevant to any issue presented in

this criminal case.  The allegation here, again, is that Teman

falsely represented that he had customer authorization to

create and negotiate the checks made out to him.  Teman's guilt

or innocence here does not turn on whether every last feature

of a particular check was fabricated or only some parts.

Again, the allegation here is that Teman falsified and falsely

represented the fact of the account holder's authorization for

Teman to create and negotiate a check.  If so, and if Teman

acted with intent to defraud in doing so, subject to the

jurisdictional elements, the elements of bank and wire fraud

will have been established.  That is so even if hypothetically

some feature of the check stock was not fabricated by Teman.

          Here's an illustration.  If Teman, for example, had

taken preexisting, preprinted but blank checks of the account

holder and then, without authorization, filled out these checks

to himself and negotiated them, with intent to defraud, and if

K1AHTEMC

the jurisdictional elements were established, he would be

guilty of the offenses charged, notwithstanding the fact that,

say, the account holder's preprinted address appeared on the

checks.  Davis' technical discussion of how the checks align

with his understanding of the word "counterfeit" does not

assist the jury in evaluating whether any element of bank or

wire fraud has been established.  As with Davis' proposed

testimony about RCCs, his pontificating on this subject, too,

would serve only to confuse and distract the jury.

I will therefore preclude Davis from testifying on

this subject too.

There is, however, one caveat.  Although this case is

not brought under a federal statute regarding counterfeit

checks, but instead, as relevant here under the bank and wire

fraud statutes, the government in the "to wit" clauses of

Counts One through Four of the indictment has chosen to use the

adjective "counterfeit" to describe the checks that Teman

deposited.  From both the indictment and the government's

account in its filings in this case in its theory of liability,

it seems clear to the Court that, in context, the term

"counterfeit" is being used in the "to wit" clauses in the lay

sense to describe the fact of checks that were created without

the account holder's authorization.  Insofar as the checks

purported to have been drawn by the account holder to the

payees in the sums indicated, but in fact had not been, they

K1AHTEMC

1    were "counterfeit."  There's no indication, in the indictment

2    or otherwise, that by use of that adjective, the grand jury

3    intended some other technical meaning of counterfeit, such as

4    the one that Davis may have in mind, in which he contends that

5    literally every jot and tittle of the check must have been

6    fabricated by the defendant before it may be called

7    counterfeit.

8           I will, however, confirm with the government that the

9    use of the term "counterfeit" in the "to wit" clause of the

10   indictment was not based on the grand jury's having been

11   presented with a technical definition of the concept of

12   counterfeit along the lines that Davis proposes to use.  If it

13   were unexpectedly to turn out that the indictment was returned

14   pursuant to such an instruction, I would then, of course, have

15   to reassess this ruling.

16          I'll also say this to defense counsel.  I do not

17   expect this case to take an unexpected turn that would make

18   expert testimony in any of these technical points relevant.

19   But trials sometimes take unexpected courses.  You are at

20   liberty, outside the presence of the jury, to make the argument

21   that some development at trial has created a justification for

22   expert testimony along the lines proffered.

23          And that concludes my ruling.

24          So, Mr. Bhatia, let's just go to that last point.  I'm

25   not asking you to disclose the transcript of the grand jury,

K1AHTEMC

1    but I am trying to understand what was meant by the term

2    "counterfeit."  Was the grand jury given a definition of the

3    term "counterfeit"?

4             MR. BHATIA:  No, your Honor.  I think what you

5    described in your ruling --

6             THE COURT:  Speak into the mic a little bit more.

7             MR. BHATIA:  When you described in your ruling the use

8    of counterfeit in the lay sense as sort of non-genuine or

9    non-authorized, I think that was the intended --

10            THE COURT:  That was theory presented to the jury?

11            MR. BHATIA:  That's right.

12            THE COURT:  That's certainly consistent with the text

13   of the indictment in this case.

14            All right.  That concludes, then, my ruling.  We'll

15   take a ten-minute recess, and when we come back we'll continue.

16            (Recess)

17            THE COURT:  Continuing on with the issues before us,

18   trial length, particularly given the rulings that I've made,

19   that may inform something about the length of the trial.

20            Government, do you have an estimate of the number --

21   how long the trial will be?

22            MR. BHATIA:  Your Honor, I think in the three- to

23   four-day range, that will include cross.

24            THE COURT:  When you make that estimate, are you

25   taking into account jury selection and jury arguments?

K1AHTEMC

1        MR. BHATIA:  I think the government can close by the

2    end of the fourth day.

3        THE COURT:  What assumption, if any, are you making

4    about a defense case when you make that estimate?

5        MR. BHATIA:  That's just based on the government's

6    case.

7        THE COURT:  That assumes no defense case?

8        MR. BHATIA:  Yes.

9        THE COURT:  Three to four days.

10        Defense, anything you want to share?  I'm just trying

11    to think about this from a planning perspective, including what

12    to say to the venire.

13        MR. GELFAND:  Obviously, without waiving any rights,

14    your Honor, I would anticipate an approximately one-day defense

15    case, if any.

16        THE COURT:  So that's helpful.  Putting all that

17    together, we're going to be starting on Tuesday, January 21.  I

18    will sit that Friday.  So that gives us four days the first

19    week.  I suppose what I ought to say is the parties expect the

20    trial to be over between one and two weeks.  Does that sound

21    like a fair estimate?  Probably erring on the lower side, but

22    I'll find words to the venire along those lines.  That sound

23    right?

24        MR. GELFAND:  With us, your Honor.

25        MR. BHATIA:  That sounds appropriate.

K1AHTEMC

1          THE COURT:  All right.  I don't think this will

2      matter, but I'm wide open the last week, save that if this is

3      still ongoing on Thursday, the 30th, I have a long-scheduled

4      speaking engagement in Midtown which would knock out an extra

5      long lunch period, but otherwise I have no blocks on my time,

6      at least through that day.

7          Mr. Smallman points out that I have a multi-defendant

8      case on Wednesday morning at 9 o'clock, but based on the

9      estimates I'm getting, it sounds as if there's a good chance

10     the jury will be out by then deliberating, in which case we can

11     accommodate both.  We'll see.  In any event, my chambers will

12     take stock of how this case is going with you late in the first

13     week and decide what, if any, implications it has for this

14     conference, but this takes precedence.

15         All right.  As to my daily schedule, I expect counsel

16     and the defendant to be in their seats and ready to go at

17     9:00 a.m. sharp each day of the trial.  Set aside for a moment

18     the very first day of the trial where the same will apply, the

19     ordinary schedule that I use when we have a jury is as follows:

20     Counsel are expected to be in their seats at 9:00 a.m.  I tell

21     the jury they need to be ready to go and ready to be brought

22     out at 9:30, but we invite them to come as early as 8:45 when

23     we have breakfast available to them in the jury room, and that

24     often has the result of getting jurors here early.

25         Between 9:00 and 9:30 we use the time to work through

K1AHTEMC

1    issues that may come up during the trial day or, for that

2    matter, later in the trial.  But at 9:30, as soon as the last

3    juror has arrived, we bring the jury out, and we sit till

4    5:00 p.m.  I try to sit a full day to project to the jury that

5    we're respecting their time.  We'll take a break in midmorning

6    and midafternoon, a comfort break, of ten to 15 minutes, and

7    we'll take a lunch break in the middle of the day.  But

8    otherwise, we're going to work relentlessly from 9:30 to 5:00

9    with the jury.

10            After 5:00 p.m., you should expect to be here to the

11   extent that there may be issues for the next day or for a jury

12   charge, or whatnot, that I need to take up with you.  While, if

13   necessary, of course, I will take sidebars, I prefer to avoid

14   doing so when I -- as much as possible.  I prefer instead to

15   take up issues with you at the start of the day, at the end of

16   the day, and so I very much value getting letters or getting

17   previews from counsel at those points, either before the day

18   starts or afterwards, so that I can ideally resolve issues, not

19   in the crucible at the sidebar but with a little more

20   forethought and deliberation.  It's already clear to me from

21   the extensive motion in limine briefing that both sides have

22   that sensibility.  I was glad to see it, but I want to

23   encourage you to keep doing that, to keep raising issues so I

24   can have an opportunity to think on them and not be forced to

25   think fast.  Avoiding sidebars also keeps us moving quickly.

K1AHTEMC

1    Juries hate it when we take long breaks doing that.  I will if

2    necessary, but I'd like to minimize it.

3            On January 21 we will start at 9:00 a.m.  Fair

4    warning, though, is that it will take some time to get us a

5    panel in all likelihood.  The jury will need to -- the video

6    will need to get -- assuming the people who are sitting are

7    there for their first week, will need to get trained on jury

8    service.  They'll need to watch the video, and they'll need to

9    be brought across the street.  And I have it on good authority

10   that there's a high-profile case that might take precedence

11   over ours in terms of completing questionnaires, and whatnot.

12   So we will get started, but there might be some need for some

13   sort of break.  I just don't know.  Just fair warning.  In any

14   event, because I won't see you between now and the 21st,

15   there's every chance a variety of housekeeping issues will pop

16   up, so be in your seats at 9:00 a.m. on the 21st.

17           I'm about to turn to voir dire.  Any questions about

18   the schedule, though?

19           MR. BHATIA:  No, your Honor.

20           MR. GELFAND:  No, your Honor.  One question, just

21   housekeeping question.  To the extent that any evidentiary

22   objections do require more detail, would the Court like us to

23   request sidebar or just make the objection?

24           THE COURT:  Try to make the objection in the first

25   instance just by reference to the --

K1AHTEMC

1          MR. GELFAND:  Rules.

2          THE COURT:  -- the rule of evidence, and I may prompt

3   you for elaboration if I need help.  If there's something

4   fundamental, I'm open to your requesting a sidebar, but choose

5   wisely.

6          MR. GELFAND:  Appreciate it.  Thank you.

7          THE COURT:  Very good.  I should say -- this is

8   particularly relevant for the government since you go first --

9   you need to always have your next witness handy.  The threat I

10  always make is if it's 4:45 and the last witness is done and

11  you don't have somebody else in the witness room, you'll be

12  taken as resting.  So be sure there's always someone on the

13  on-deck circle.

14          MR. BHATIA:  Understood.

15          THE COURT:  Let's turn to voir dire.  You've given me

16  the length of the trial that I will use, and I'll find words to

17  capture that.  Given the length of the trial, I think we're OK

18  just going with two alternates.  Anyone think otherwise?  Seems

19  like a short enough trial that I don't need more.

20          MR. DIRUZZO:  That's fine, Judge.

21          MR. BHATIA:  That's fine.

22          THE COURT:  All right.  So as to jury selection -- and

23  Mr. Imperatore knows this, but for everyone's benefit -- I use

24  the struck panel method.  That means what I will be doing is

25  having Mr. Smallman, in the first instance, identify 32

K1AHTEMC

1   prospective jurors numbered 1 through 32, and they will be --

2   the first eight will be in the first row of the jury box, nine

3   through 16 will be in the second row, and then 17 through 32

4   will be in the first few rows of the pews out here.  Each juror

5   will retain their number.  So if Juror 17 gets removed, the

6   successor juror will take the spot of No. 17 as opposed to

7   re-calibrating the rows.  That makes your housekeeping and your

8   paperwork in mind easier.

9          I will direct a lengthy series of questions at them

10  aimed at determining whether there is any valid basis for a

11  for-cause challenge.  And eventually, at the end of that

12  process, we'll have 32 people who have cleared for-cause

13  challenges.  At that point we have a short one-page

14  biographical questionnaire -- I use the same one in every

15  case -- that elicits information about employment, family

16  members' employment, education, hobbies, reading habits, and so

17  forth.  The final question, which counsel constantly tell me is

18  in some respects more revealing than many of the ones that come

19  before, asks if there's a famous person the juror admires and

20  briefly why.  Sometimes that smokes out latent interests,

21  biases, and so forth.

22          In any event, you'll have the benefit of all that

23  information.  I will then give you a very short break, but a

24  very short one, to determine how you intend to use your

25  strikes, and I'll then bring counsel into the robing room for

K1AHTEMC

1    the purpose of exercising your strikes.

2              This is important.  This just gets to the mechanics.

3    Under the rules, with respect to the jury as opposed to

4    alternates, the defense has ten strikes and the government has

5    six.  Those initial strikes are all to be directed to Nos.  1

6    through 28 of the 32.  Those are the people eligible to be our

7    regular jurors.  We will go, as per usual, in six rounds.  The

8    first four of which the defense will have two strikes and then

9    the government will have one, and the last two that each side

10   will have one strike.  The 12 People that remain will be our

11   jurors.

12             You need not go in sequence.  You can strike No. 27

13   and then in the next round strike No. 1.  There's no sequencing

14   requirement here.  But if you waive a strike in a particular

15   round, you can't use it again.  You can go back and use other

16   ones, but you can't use that one again.  So, defense, in round

17   two, if you say we waive our two strikes, you can't get those

18   back even though your round three strikes remain.

19             You should not, though, direct those first strikes,

20   ten the defense, six for the government, at the alternate

21   candidates, No. 29 through 32.  At the end of the exercise of

22   the strikes, as I said, the first 12 will be our jurors, if

23   somebody has waived a strike, the effect of that is, in effect,

24   to strike No. 28.  So after we have figured out who the 12

25   jurors are, each of you will then have one strike to be used as

K1AHTEMC

1   against Nos. 29 through 32, and the two that survive that

2   process, or the first two that do, will be our alternates.

3          As is commonly the case in federal court, but just to

4   make the point clear, the Court alone does the questioning of

5   the jurors.  There are no counsel questions.

6          Any questions about the mechanics of voir dire?

7          MR. BHATIA:  No, your Honor.

8          MR. DIRUZZO:  No, your Honor.

9          THE COURT:  Who will be at each table during the

10  trial?  Will it be the three people at each table who are here

11  now?

12         MR. BHATIA:  From the government, yes, your Honor.

13  One moment.

14         (Counsel confer)

15         MR. BHATIA:  Your Honor, we also have a case agent.

16  We have not made a decision yet about whether he will testify

17  as a witness at trial, but we may request that he sit at

18  counsel table.

19         THE COURT:  I think, under the rule, he is

20  permitted to sit here whether or not he is -- I think it's

21  Rule 615.  He's allowed to sit at the table as the embodiment

22  of the government's case, the government's corporate

23  representative.  Just let Mr. Smallman -- or, rather, let my

24  law clerks know beforehand, because they're going to be

25  preparing a script for voir dire, and I need to know who's

K1AHTEMC

1  going to be there.

2          MR. BHATIA:  We will.

3          MR. GELFAND:  It will be --

4          THE COURT:  Defense?

5          MR. GELFAND:  It will be exactly as you say, your

6  Honor.

7          THE COURT:  There's a point in voir dire where one by

8  one I ask you both each of you to rise and look at the jury,

9  look here and at the venire in the back.  Listen closely to my

10  command for when you should get up.  I don't want all three of

11  you getting up.  I want it one by one, and I will choreograph

12  it that way.

13          Please -- and Mr. Smallman points out he will need to

14  know who's here for the appearance sheet, so tell him too.

15  Fair enough.

16          Do not say "hello" to the jury, please.  It annoys

17  them to have people sucking up in that sort of a way, and I'm

18  asking you just to simply get up and let them see you.  But

19  it's not an opportunity to wish them all well.

20          All right.  For voir dire, I will need an alphabetical

21  list of all names that may come up in the case.  These are not

22  just witnesses, but names that may come up.  What I appreciate

23  is one list of human being names and one list of corporate

24  names, but make those separate and make them alphabetic.  You

25  should get rid of the people who are named and present at the

1    trial table.  There's no need to include the lawyers or

2    Mr. Teman on that list.  I'll ask the government to get that to

3    me after consultation with the defense.  If you have other

4    names, please just add that.

5         All right.  Let me briefly read to you just a very

6    short statement that I intend to give to the venire, as I do in

7    all cases, just so they have a general understanding of what

8    the case is about.  I try to make this very stripped down.

9    It's not an opportunity to figure out what all the curlicues

10   are in the case, but really just to smoke out issues of bias in

11   case somebody has had a life experience that looks like this

12   case.

13        This is what I propose to read to the venire.  When

14   I'm done reading this to you, I'll ask you if there are any

15   inaccuracies or any necessary edits:

16        "So you can understand the reason for the questions I

17   will be asking you shortly, I will now tell you briefly about

18   this case.  I want you to understand that nothing I say today

19   regarding the description of the case is evidence.  The

20   evidence that you will consider, if selected as a juror, will

21   come only from the trial testimony of witnesses, from the

22   reading of" -- sorry -- "from the trial testimony of witnesses

23   and from exhibits that are entered into evidence.

24        "As I have explained, this is a criminal case.  It is

25   entitled United States of America v. Ari Teman.  Mr. Teman has

K1AHTEMC

1  been charged with committing federal crimes in an indictment

2  returned by a grand jury sitting in this district.  I will now

3  summarize the charges in this case in order to determine

4  whether anything about this case may make it inappropriate for

5  any of you to sit on the jury.

6        "In summary, the indictment charges Mr. Teman with

7  committing fraud by depositing into bank accounts that he

8  controlled checks drawn on other people's accounts but which

9  Mr. Teman was not authorized to deposit.  It alleges that

10 Mr. Teman did this with two checks in approximately March 2019.

11 It alleges that Mr. Teman did this again between April and

12 June 2019, this time with 27 checks.  In each instance, the

13 indictment alleges that Mr. Teman later used money that he had

14 and deposited for his personal benefit.

15       "In connection with each set of deposits, the

16 indictment charges Mr. Teman with three crimes: Bank fraud,

17 wire fraud, and aggravated identity theft.  Mr. Teman denies

18 these charges.

19       "Now, let me stress that an indictment is not

20 evidence.  It simply contains the charges against the

21 defendant, and no inference may be drawn against the defendant

22 from the existence of the indictment.  You must always keep in

23 mind that the defendant is presumed innocent, that he has

24 entered a plea of not guilty to the charges against him, and

25 that the government must prove the charges in the indictment

1    beyond a reasonable doubt."

2              So, counsel, tell me, any issues with that summary?

3              MR. DIRUZZO:  Judge, I would just ask that there --

4    there are two things:  One, the description of evidence, I

5    think it also needs to have an inclusion for stipulation of the

6    parties.

7              THE COURT:  From trial testimony stipulations of the

8    parties?

9              MR. DIRUZZO:  And documentary evidence.

10             THE COURT:  It says exhibits, so that's fine.

11   Stipulation, good catch, yes.

12             MR. DIRUZZO:  Then I believe you said Mr. Teman

13   deposited checks belonging to people, and I believe the alleged

14   victims are all entities.

15             THE COURT:  OK.  In other words, I should change

16   "people" to "companies" or "entities"?  What's the right word?

17             MR. DIRUZZO:  Companies, businesses.

18             MR. GELFAND:  Companies or businesses.  I don't know.

19   There's one other thing, your Honor, I may have misheard.

20             THE COURT:  Sorry, one second.  It says:  "In summary,

21   the indictment charges Mr. Teman with committing fraud by

22   depositing into bank accounts that he controlled checks drawn

23   on other people's accounts ..." and you want "people" changed

24   to "businesses."  I'm not sure, in the context here, people is

25   a shorthand for meaning other than Mr. Teman.  But what would

K1AHTEMC

1    you propose I change?

2              MR. GELFAND:  Companies.

3              MR. DIRUZZO:  Companies.

4              THE COURT:  On the accounts of -- I just want to make

5    sure it's clear these are companies, of course, that are not

6    his.

7              MR. DIRUZZO:  Yes.

8              MR. GELFAND:  "Customers of Mr. Teman's company"?

9              THE COURT:  The business relationship, that's for you

10   all to litigate.

11             Government, what's your view?

12             MR. BHATIA:  Your Honor, I think it may be fair to say

13   "on the accounts of others" to keep it most neutral, "checks of

14   others."

15             THE COURT:  "On the accounts of others," that's fine.

16   I can say "checks drawn on the accounts of others."  All right.

17   I'm not going to commit that I will use that language, but

18   that's certainly adequate.  I may play with it a bit, but I

19   take the defense point not to use the word "people" when it's

20   actually corporate accounts.

21             MR. GELFAND:  On an unrelated note, I might have

22   misheard this, your Honor, but the aggravated identity theft

23   counts are actually only associated with the March checks, and

24   I think the summary might have conflated that they were

25   associated with the --

K1AHTEMC

1          THE COURT:  Yes, right.

2          MR. GELFAND:  I don't remember the exact language, but

3    I just wanted to flag that for the Court.

4          THE COURT:  Right.  I have written "in connection with

5    each set of deposits, it charges him with three crimes," and

6    that's not correct.  Why don't I say "in connection with these

7    deposits," that way it doesn't specify how the aggravated

8    identity --

9          MR. GELFAND:  That's fine, your Honor.

10         THE COURT:  Very good.  With three -- it's irrelevant

11   to the jury in jury selection whether there are multiple

12   instances of separate crimes.  I think it's enough to say three

13   crimes or sets of crimes, bank fraud, wire fraud, and

14   aggravated identity theft.

15         Are we OK with the description as edited?

16         MR. BHATIA:  Yes, your Honor, I think with the change

17   for aggravated identity theft, it all sounds good.

18         THE COURT:  Good.

19         MR. DIRUZZO:  We're fine, Judge.

20         THE COURT:  Thank you, counsel.

21         All right.  Next issue is courtroom technology.  I

22   know you're going to be meeting with Mr. Smallman for a

23   walk-through, but just so I understand, government, you're

24   going to be starting off.  How are you going to be -- how

25   voluminous are the exhibits in this case, and how do you intend

K1AHTEMC

1    to make them known to the jury?

2              MR. BHATIA:  Your Honor, I don't think the exhibits

3    are too voluminous in this case.  What do you mean by how --

4              THE COURT:  Are you going to use the ELMO?  Are you

5    going to hand out hard copies?  Are you going to --

6              MR. BHATIA:  I think we're intending to use the

7    courtroom --

8              THE COURT:  Computer system?

9              MR. BHATIA:  -- computer system.

10             THE COURT:  Not the ELMO at the podium?

11             MR. BHATIA:  That's right.

12             THE COURT:  All the more important, because it's a

13   balky courtroom and important that -- I guess this is probably

14   more for Mr. Magliocco than anyone in the courtroom -- you be

15   ready for prime time, so work with Mr. Smallman and be ready

16   beforehand.

17             MR. BHATIA:  Yes.

18             THE COURT:  Mr. Smallman points out that Mr. Magliocco

19   has ably assisted me, I think, in the Rivera trial?  Rivera --

20   Polanco?

21             MR. MAGLIOCCO:  Polanco trial.

22             THE COURT:  Quite right.  Defense, what about you?

23   What are your thoughts as to technology?

24             MR. GELFAND:  Your Honor, our instinct, as of now, is

25   to rely primarily on the ELMO, as far as documentary exhibits.

K1AHTEMC

1    We also are going to make sure that we're fully situated with

2    the court's AV equipment so we can electronically display, as

3    well, using common software.

4              THE COURT:  The issue would be for you, for example,

5    if there was something produced in discovery that you want to

6    show to the witness, just make sure that you have tested your

7    ability to use that.  The jurors can't stand fumbling around

8    and long delays.  So you will benefit as much as anyone by your

9    being crisp in the use of that.

10             MR. GELFAND:  Absolutely, your Honor.

11             THE COURT:  Very good.  Anything else on courtroom

12   technology?

13             MR. BHATIA:  Nothing, your Honor.

14             THE COURT:  OK.  Jury addresses.  We have a -- it's

15   not present here right now, but we have a portable podium that

16   will be before the jury.  Not that, but a portable one.  It

17   will be right in front of the jury box.  The important thing is

18   that it does not contain a microphone, so Mr. Smallman has a

19   handheld wireless mic which we usually lie down on the bar

20   before the jury right next to the podium, and that will pick up

21   everyone's voice.  What it means is, though, you shouldn't be

22   straying far from the podium because you'll lose the mic.  So

23   just as an FYI.

24             With respect to questioning of witnesses, you're to

25   question the witnesses from the podium back here.  Please,

1   except for presenting documents to the witness, you shouldn't

2   be questioning from the well of the courtroom.  It's an

3   ancient, old courtroom.  If you're far from the mic, it's hard

4   to be heard.  You'll surely hear me from time to time asking

5   people to keep their voices up.

6           All right.  3,500 material.  Has the government

7   provided 3,500 to the defense; if so, when does it intend to do

8   so?

9           MR. BHATIA:  Your Honor, we have not produced 3,500,

10  but we plan to do it in the first half of next week.

11          THE COURT:  All right.  I can't order you to do it on

12  a particular date, but can you commit to a specific date so the

13  defense knows?

14          MR. BHATIA:  We can produce it by Wednesday of next

15  week.

16          THE COURT:  How voluminous is the 3,500 material?

17          MR. BHATIA:  I don't expect it to be very voluminous,

18  certainly not beyond what has already been produced as

19  discovery.

20          THE COURT:  Not beyond what?

21          MR. BHATIA:  Not beyond what has been produced in

22  discovery.

23          THE COURT:  I don't know what that means.

24          MR. BHATIA:  Some of the 3,500 has already been

25  produced as Rule 16 discovery.

K1AHTEMC

1      THE COURT:  Right.

2      MR. BHATIA:  It may not be new.  I don't expect it to

3  be voluminous, though.

4      THE COURT:  All right.  Please, when you get the

5  binders -- or binder or binders, please get two sets of that to

6  my chambers as well.  I will often flip through it beforehand

7  just to get a sense of what's coming, and it's important for me

8  and my law clerk each to have a set of that.

9      MR. BHATIA:  We will.

10      THE COURT:  All right.  Government, also, just in the

11  interest of enabling the defense to prepare, it is my practice

12  to ask you each day who the next witnesses are likely to be.

13  Obviously, in the event there's a good reason, you may need to

14  shake it up, but nobody benefits by mystification.  So I will

15  expect you to give the defense a sense of who your next

16  witnesses are at the end of each day.

17      MR. BHATIA:  Understood.

18      THE COURT:  Obviously, you can do so beforehand,

19  before even that, all the better.  That also allows me to

20  prepare for the next day's testimony.

21      To the extent that you're updating 3,500 material, per

22  usual, I expect that I would get hand delivered to us whatever

23  additional three-hole punched supplements there are as they get

24  generated.  Usually counsel tend to give it to my chambers at

25  the end of the court day or at the beginning of the next court

K1AHTEMC

1    day.

2          Government, I would welcome a pair of exhibit binders

3    as well.  Obviously, you're at liberty to update those.  I

4    assume that you can get those to me the Friday before trial,

5    the 17th.

6          MR. BHATIA:  We will.

7          THE COURT:  And, obviously, the same to the defense.

8          All right.  I have benefited by the government's

9    preparation of an exhibit list and your updating it on a daily

10   basis to annotate what has been received in evidence, that way

11   it makes sure that both tables in the court are on the same

12   page and have no doubt of what's been received in evidence.  I

13   ask you to kindly prepare that.  I'm rather sure we did that in

14   the Polanco trial.

15         Verdict form.  This is about as straightforward as it

16   gets, but, defense, do you have any issues with -- I may make

17   some nonsubstantive changes, but any issues with the verdict

18   form as provided by the government?

19         MR. GELFAND:  Not at first glance.  The only question,

20   depending on what ultimately turns on disputes at trial, is

21   whether we would request any special interrogatories.

22         THE COURT:  Right.  There's no sentencing factor here.

23         MR. GELFAND:  Correct.

24         THE COURT:  What would the purpose be of a special

25   interrogatory?

K1AHTEMC

| 1 | MR. GELFAND:  I don't anticipate there will be any.  I

2    just wanted to get a carve-out theoretical exception.

3          THE COURT:  If you come up with some issue with the

4    verdict form, let me know as soon as possible.

5          MR. GELFAND:  Absolutely.

6          THE COURT:  Almost done here.  Plea offers.  This

7    being our last conference, I need to put on the table and raise

8    whether any plea offers have been made to the defendant and to

9    confirm that they were communicated to him.  For the benefit,

10   in particular, of Mr. Teman, the reason courts do this is not

11   to pry but, rather, because from time to time one gets

12   post-trial complaints by defendants that plea offers were never

13   communicated to them.  Sometimes these happen years after the

14   fact.  It's important that a Court inquire at this stage

15   whether there was any such thing, just so that there's a clear

16   understanding from everybody about what happened as to the plea

17   process.

18         Government, can you put on the table what, if any,

19   plea offers have been made in this case.

20         MR. BHATIA:  Your Honor, no formal plea offers have

21   been made in this case.

22         THE COURT:  I take it there must have been some

23   informal discussion, or not even that?

24         MR. BHATIA:  We have had informal discussion at

25   different stages of the case, but there hasn't been a formal

K1AHTEMC

1  offer.

2        THE COURT:  All right.  Mr. Gelfand, is that correct?

3        MR. GELFAND:  Yes, your Honor, it is.  What I would

4  note, for the record, is that Mr. Teman has consistently

5  expressed his intention to proceed to trial and his lack of

6  interest in any sort of plea.  As a practical matter,

7  government counsel being government counsel and defense counsel

8  being defense counsel, we have engaged in just some very

9  general dialogue over the course of this case, nothing that has

10  materialized in an offer, either by the government or a request

11  by the defense.

12        THE COURT:  I'm going to ask Mr. Teman just to confirm

13  that's his understanding.

14        Mr. Teman, is it correct that you are unaware of any

15  plea offer, any formal plea offer, having been made to you?

16        THE DEFENDANT:  Correct, your Honor.

17        THE COURT:  Any counsel believe I need to inquire

18  further about this subject?

19        MR. BHATIA:  No, your Honor.

20        MR. GELFAND:  No, your Honor.

21        THE COURT:  All right.  There's a final matter

22  relating to the grand jury which I'll take up in a moment, but

23  before that, does anyone have anything else relating to the

24  trial that they want to raise?

25        MR. BHATIA:  No, your Honor.

K1AHTEMC

1          MR. DIRUZZO:  Your Honor, before we get into the grand

2     jury portion, early this morning, earlier this morning, counsel

3     for the government provided us with a letter indicating they

4     have effectively changed the alleged victims for the aggravated

5     identity counts.  We view this, given the government's past

6     representations -- and I'm sorry I don't have a copy, but I

7     literally got the email with the letter while we were in the

8     courthouse, your Honor, so I don't have a copy to provide the

9     Court -- but as a result of the government's total change in

10    its position as to who the alleged victims of the agg. ID

11    counts are, we're taking the view that the government now has

12    to have *Brady* information because the government has made

13    representations in the past that are now totally inconsistent.

14    And we believe that, at a minimum, the information and the

15    testimony before the grand jury that resulted in the previous

16    indictment and previous superseding indictment will be *Brady*,

17    some form of *Brady* material.

18         THE COURT:  Let's unpack this.  Who are you told is

19    the victim of -- is Entity 3, the -- Count Five charges

20    aggravated identity theft for March 2019.  It says that Teman

21    deposited a check using the personal identifying information of

22    an individual associated with Entity 3.  Who's Entity 3?

23         MR. DIRUZZO:  Your Honor, unfortunately, given that it

24    just came to me via email, the only way I'd be able to answer

25    that would be to look on my phone, which I have turned off, and

1  I don't want to offend the Court.

2          THE COURT:  You're not offending the Court.  I'm just

3  trying -- you're telling me there's been a switch, so I'm

4  trying to figure out who it was earlier and who it is now.

5          MR. GELFAND:  Your Honor, I think this may help.  The

6  government, by letter this morning, indicated that the entity

7  referenced in Count Five is Mercer, whatever the formal name

8  is.

9          THE COURT:  Right.

10          MR. GELFAND:  And then the entity referenced in Count

11  Six is Coney.

12          THE COURT:  Count Six refers to Entity 4.

13          MR. GELFAND:  Correct.

14          THE COURT:  Spell Coney.

15          MR. GELFAND:  Coney, C-o-n-e-y.

16          THE COURT:  And those same counts appeared in the

17  preceding indictment, correct?

18          MR. GELFAND:  Correct, your Honor.

19          THE COURT:  Are you saying that you were told that

20  either Entity 3 or 4 were different than Mercer and Coney,

21  respectively, earlier?

22          MR. GELFAND:  No, the entities were not different.

23  What was different -- I can -- just for the Court's benefit, by

24  email dated November 12 of 2019, government counsel,

25  Mr. Gutwillig, in an email to me, cc'ing Mr. DiRuzzo, stated --

K1AHTEMC

1    I don't know if the Court's OK with me naming the alleged

2    victims.

3            THE COURT:  Sorry?

4            MR. GELFAND:  Is the Court OK with me naming the

5    alleged victims?

6            THE COURT:  Sure.  There is a *Brady* issue here.

7            MR. GELFAND:  Stating "the victims are, one, for Count

8    Three, which was the prior enumeration, Peter Rebenwurvel,

9    R-e-b-e-n-w-u-r-v-e-l, and for Count Four, Gina, G-i-n-a, Hom,

10   H-o-m, and then --

11           THE COURT:  Meaning that Rebenwurvel was associated

12   with Mercer, and Hom was associated with Coney?

13           MR. GELFAND:  Rebenwurvel actually related to how

14   Count Three was charged previously as Coney and Hom was Mercer.

15           THE COURT:  I'm confused.

16           MR. GELFAND:  Rebenwurvel is associated --

17           THE COURT:  Sorry, the original Count Three, is that

18   the current Count Five, or is it the current --

19           MR. GELFAND:  The original Count Three is the current

20   Count Six.

21           THE COURT:  So the original Count Three --

22           MR. BHATIA:  Your Honor, if I might offer some

23   clarity?

24           THE COURT:  That would be great.

25           MR. BHATIA:  The original Count Three -- sorry, the

K1AHTEMC

first superseding Count Three is now Count Five.  And for Count

Three previously and now Count Five, the corporate entity is

Coney Realty.

THE COURT:  Count Three and Five.  So what defense

counsel said was wrong earlier that Mercer is --

MR. BHATIA:  I think they just flipped.

THE COURT:  I'm sorry.  You need to speak up.

MR. BHATIA:  Yes, your Honor.  It was incorrect.

THE COURT:  Let me see if I've got this right.  I'm

going to ask you, Mr. Gelfand, just to listen closely to what

my colloquy with government counsel is.  This may clear things

up.  It may be that it's utterly unnecessary to involve me

because there hasn't apparently been a dialogue with counsel,

but let's see if we can work this out.

Count Five, government counsel, identifies Entity 3.

Who is Entity 3?

MR. BHATIA:  Entity 3 is Five -- well, it's 518

West 204th LLC, which is operated by -- I say "operated" in the

lay sense -- associated with or operated by Coney Realty.

THE COURT:  All right.  So Count Five, Entity 3, is

Coney in the vernacular, and Count Six, Entity 4, is who?

MR. BHATIA:  It's Crystal Real Estate.  It's actually

18 Mercer Equity, but it's really sort of operated by Crystal

Real Estate.

THE COURT:  Is there a Mercer involved?  So that's

K1AHTEMC

1   Mercer in that sense?

2          MR. BHATIA:  The corporate entity is 18 Mercer Equity,

3   I think, Inc. Or LLC, and it's operated by Crystal Real Estate.

4          THE COURT:  All right.  What was the predecessor count

5   to the current Count Five?

6          MR. BHATIA:  Count Three.

7          THE COURT:  What was the predecessor count to the

8   current Count Six?

9          MR. BHATIA:  Count Four.

10          THE COURT:  All right.  So focusing on the current

11   Count Five where it's this 518 West 204th LLC operated by

12   Coney, was that the same entity that Mr. Gutwillig indicated

13   was the victim of count -- of the earlier Count Three?

14          MR. BHATIA:  I can clarify the victim question.  The

15   corporate entities for the checks that were drawn were the

16   same.

17          THE COURT:  Right.

18          MR. BHATIA:  Previously Coney, now Coney.

19          THE COURT:  Right.

20          MR. BHATIA:  Previously, the government had agreed

21   that the victim of identity theft, the individual, the person,

22   was Peter Rebenwurvel.  The government disclosed this morning

23   in a letter providing particulars that the victim -- the

24   victim, persons whose means of identification have been taken,

25   are three individuals:  Peter Rebenwurvel -- let me make sure I

K1AHTEMC

1    say it right from my letter -- Michael Haas.

2              THE COURT:  Michael, spell the last name.

3              MR. BHATIA:  H-a-a-s.

4              THE COURT:  Right.

5              MR. BHATIA:  And Ephraim Nuremberg.  Actually, your

6    Honor, I now realize the source of confusion here.  In the

7    indictment, what I described was correct.  I believe in the

8    bill of particulars today, we flipped the entities.  That's the

9    source of confusion.

10             THE COURT:  The source of confusion is that your

11   letter today is wrong?

12             MR. BHATIA:  The letter flips Count Five and Count

13   Six.  We'll give them a new letter.

14             THE COURT:  All right.  Once you correct your

15   letter --

16             MR. BHATIA:  That's right.

17             THE COURT:  -- will there be symmetry between your

18   disclosures as to the earlier Count Three and the current Count

19   Five?

20             MR. BHATIA:  No.

21             THE COURT:  What's changed?

22             MR. BHATIA:  Previously the government had agreed with

23   defense counsel -- the government and defense counsel had

24   agreed to file a stipulation providing the particulars.  I

25   think we've now had a sense that a letter providing those

K1AHTEMC

1    particulars is sufficient.  But previously we had agreed that

2    the victim of the identity theft count for Coney was Peter

3    Rebenwurvel.

4                  THE COURT:  Right.

5                  MR. BHATIA:  We now believe that the victims were

6    three individuals.  So the first one was relating to the first

7    superseding indictment, and as to the second superseding

8    indictment, we're alleging that it's these three individuals.

9                  THE COURT:  That's all fine and good, but the

10   indictment doesn't say that.  Count Five of the superseder uses

11   singular.  It says an individual associated with Entity 3.  Who

12   did the grand jury -- what was the charge to the grand jury as

13   to who that individual was?  We can't have a shifting target.

14   That reflects a charge by the grand jury.  That's what the

15   defendant will be tried on.  Who's that individual?

16                  MR. BHATIA:  Your Honor --

17                  THE COURT:  Can't just say three people if you say "an

18   individual."

19                  MR. BHATIA:  I just want to tread lightly, knowing

20   that I'm in the domain of the grand jury.

21                  THE COURT:  But, look, sorry, but the grand jury

22   formulates the charges.  The government doesn't add content to

23   and change the charges.  And for better or worse, you went to

24   the grand jury and said "an individual."  Who is that

25   individual?

K1AHTEMC

1          MR. BHATIA:  May I have a moment, your Honor?

2          THE COURT:  Yes.

3          (Counsel confer)

4          MR. BHATIA:  Thank you, your Honor.

5          The grand jury was presented with the fact that

6     individuals associated with the company had not authorized the

7     check, and signers on the account had not authorized the check.

8          THE COURT:  Right.

9          MR. BHATIA:  The government has learned that the three

10    signers on the account, the signers on the two victim accounts,

11    were the people identified in the particulars here.

12         THE COURT:  Right.  I'm not stating you don't have a

13    factual basis.  The question is what was to be presented to the

14    jury here?  It needs to track the indictment returned by the

15    grand jury.  So the question is what is meant when you say "an

16    individual"?  Was that a somewhat inexact way of saying three

17    individuals?

18         MR. BHATIA:  I think it was an inexact way of saying

19    three individuals.

20         THE COURT:  What was presented to the grand jury?  Was

21    the grand jury presented with the evidence substantiating that

22    the personal identification of three individuals was --

23         MR. BHATIA:  My recollection is that the grand jury

24    was not presented with a single name.  It was not presented

25    with a victim.  It was presented with --

K1AHTEMC

1          THE COURT:  All three?

2          MR. BHATIA:  It was -- I shouldn't say it was even

3     presented all three.  I believe it was presented with testimony

4     that no one associated with the company, as far as the

5     investigation has revealed, authorized the checks.

6          THE COURT:  Right.  But that goes to the fraud counts.

7     Here the issue is the personal identifying information of an

8     individual.  The challenge for you here is that presumably

9     there was something before the grand jury that substantiates

10    that allegation.  It doesn't sound as if there was an attempt

11    made to challenge the grand jury to any particular individual.

12    It sounds as if you're representing to me that the grand jury

13    had a basis for concluding that three separate people's

14    personal identification information was used on the check that

15    Teman deposited.  Is that correct?

16         MR. BHATIA:  The grand jury was not given a number of

17    authorized signers on the account.  So the grand jury was not

18    presented with a name or two names or three names.  But the

19    fact that, based on the investigation, whoever the persons may

20    be, person or persons may be, did not authorize the account --

21    or did not authorize the checks.  So the grand jury was not

22    presented with one name or two names or three names.

23         THE COURT:  All right.  They were presented, rather,

24    with the idea that the identifying information of people

25    associated with the entity was used?

K1AHTEMC

1        MR. BHATIA:  That's correct.

2        THE COURT:  Not the specifics of that?

3        MR. BHATIA:  I think that's a more succinct way of

4   saying that.

5        THE COURT:  Be that as it may, there's no obligation

6   that that's the means by which you present the case to the

7   grand jury.  The issue is suppose the jury here, six of them

8   think that Rebenwurvel's personal identifying information was

9   used and six of them think that it's Hom or Haas and six think

10   it's Nuremberg, and there's no 12 that agree on any one person.

11   What do you do then?

12        MR. BHATIA:  Your Honor, we are in tune to the

13   unanimity issues here.  And, actually, I think we are intending

14   to submit an instruction regarding other parts of unanimity

15   involved in this case.  Here, as I understand it, in terms of

16   the offense, the means of identification needs to identify

17   people.  So I believe as the -- I believe there's not going to

18   be a unanimity requirement here, as long as the jury finds that

19   the means of identification were capable of identifying

20   specific people.

21        THE COURT:  Well, let me ask you, just to make this

22   easier, did all these rise or fall together?  I mean, is it the

23   same check that uses all three people's names?

24        MR. BHATIA:  It's a check with sort of a squiggle

25   mark, and that is -- that's using the identification of one of

K1AHTEMC

1    these three people.

2              THE COURT:  Here's the sentence in the indictment:

3    "Teman deposited a check using the personal identifying

4    information of an individual associated with Entity 3."  I

5    think you're saying to me that that check, therefore, must have

6    the personal identifying information of all three of the people

7    you are mentioning.  Is that what you're saying?

8              MR. BHATIA:  The check, yes, could identify those

9    three people, but it does not have the personal identification

10   information of each person.

11             THE COURT:  I'm totally confused.

12             (Counsel confer)

13             MR. BHATIA:  Your Honor, I can maybe provide some

14   clarity.  Let me take Count Five, for example.  The government

15   is alleging that the defendant deposited a check designed to

16   look as if it came from Coney Realty, and on that check has the

17   name of Coney Realty at the top, has the corporate entity and

18   then Coney entity, and it has the routing number associated

19   with a particular bank account, the account number, and it has

20   a sign, a signature, on it.  The government has learned that

21   there are three authorized signers for that Coney Realty

22   account, and so the government's alleging that the defendant

23   used the means of identification of one of those three people

24   on the check.

25             THE COURT:  I see.  I'm sorry.  So when you say he

K1AHTEMC

 1    deposited a check, the locution isn't clear to me whether that

 2    means that the personal identifying information is literally

 3    physically on the check or it was used in connection with a

 4    deposit by some means other than writing it on the check.  Just

 5    help me with that.  What does he do?

 6         MR. BHATIA:  What I mean is that by including the

 7    signature there, along with the routing number and the name of

 8    the account, the defendant is essentially seeking to mimic one

 9    of those people to demonstrate, as the government believes,

10    fraudulently, that he had authorization to deposit the checks.

11    So the signature is co-opting the means of identification of

12    those three people.

13         THE COURT:  Let me get this right.  You're not saying

14    that he, separate from what appears on the check, does

15    something with someone's identifying information.  He doesn't

16    hold up a fake driver's license or something like that.  The

17    entirety of the allegation about the personally identifying

18    information of this individual is physically contained on the

19    physical check itself, is that correct?

20         MR. BHATIA:  That's right.

21         THE COURT:  All right.  Does it have the name of any

22    of these people on that check in any place?

23         MR. BHATIA:  The check does not.

24         THE COURT:  Does it have the signature or purported

25    signature of any of those people on the check?

K1AHTEMC

1          MR. BHATIA:  It has a purported signature on that.

2          THE COURT:  To the extent it's legible, what does it

3    say?

4          MR. BHATIA:  It doesn't -- the signature at least -- I

5    don't think it appears to be one of those three people.

6          THE COURT:  All right.  Is there any other identifying

7    information -- name, rank, serial number, social security

8    number, date of birth, DNA?  Is there something about addresses

9    or something about any of those people that appears on the

10   check?

11         MR. BHATIA:  No, your Honor.

12         THE COURT:  So you have a signature.  If you read

13   aloud the word on the signature, is the signature the name of

14   the corporate entity or the name of the individual?

15         MR. BHATIA:  I don't think you could read aloud the

16   signature.

17         THE COURT:  So how does this count get to the jury?

18   In other words, what's the means of identification of another

19   person here?  I understand that you're saying that he pretends

20   to be the corporate entity or pretends to be a representative

21   of the corporate entity, and that's all good and fine as a mean

22   and method of the wire and bank fraud.  Got you loud and clear

23   on that.  But aggravated identity theft, I'm struggling with

24   that a bit.  Walk me through that.

25         MR. BHATIA:  Your Honor, I believe under the statute

K1AHTEMC

1    it's the means of identification that together -- or I think

2    it's something to the effect of together or in combination with

3    can identify another person.  Here, using the corporate account

4    and the account number and the name plus the signature could

5    lead someone at the bank to conclude, for example, Peter

6    Rebenwurvel must have signed this check.  So we believe that

7    that is the valid basis for an aggravated identity theft count.

8           THE COURT:  Whose identity is being misused?  Is it

9    Peter's?  Is it the company?  Whose identity is being stolen

10   here?  Is it the individual associated with the corporate

11   entity or is it the corporate entity?

12          MR. BHATIA:  It's the authorized signers for that

13   account.

14          THE COURT:  Let's go to the elements.  Let's put aside

15   the "to wit" clause for a moment.

16          He knowingly transferred, possessed, and used,

17   according to the indictment, without lawful authority a means

18   of identification of another person.  What means of

19   identification are connoted by Count Five?

20          MR. BHATIA:  The signature is the -- I believe that

21   the signature taken in combination with the account number and

22   the name is the means of identification of another person.

23          THE COURT:  So any defendant who forges a check on

24   somebody else's account is committing aggravated identity

25   theft, even if they don't present any evidence/statement saying

K1AHTEMC

1    I'm that person?  It follows, right, just if you sign as

2    somebody, you are using a means of identification, right?

3            MR. BHATIA:  I believe it's right, your Honor, that --

4    check fraud is sort of the prototypical example of aggravated

5    identity theft when we've taken a look at the legislative

6    history on this point.  So for that reason, we think --

7            THE COURT:  Right, check fraud is usually -- in the

8    classic aggravated identity theft.  It's more than simply

9    boldly going into a bank and depositing it into Judge

10   Engelmayer's account a check written out to Judge Judy.  It's

11   more that I would present -- it's usually the identification

12   substantiating the other identity that would be used, and

13   that's usually -- not that that's the only way, but that's

14   usually the way in which those cases manifest.  What you're

15   saying is the deposit into person A's account of a check made

16   out to person B, something like that is in and of itself,

17   without more, aggravated identity theft.

18           I can't resolve that here and now, but it does seem to

19   me this is not so much a *Brady* issue, as it's been explicating,

20   it's an issue of whether or not the evidence that you are

21   committing to me is really the only evidence of aggravated

22   identity theft, what's contained on the check, meets the legal

23   requirements for that count.  I don't think -- defense counsel,

24   you've raised a valid issue, but I think you've mispackaged it.

25   It's not a Brady issue.  The government's explained to me now

1    that, in effect, whereas they said one, they're saying three

2    now because it could have been any of those people who are

3    authorized signers; and therefore, the presentation of the

4    check, in the government's theory, is a form of theft of any

5    authorized signer.  I don't think that's a Brady issue.  It's

6    really a sufficiency issue of whether or not the means of

7    commission here satisfied aggravated identity theft.

8              I think the right way to go here is by your taking a

9    close internal look at this question.  There's no value in our

10   going to the jury -- if, ultimately, the conduct you've

11   described can't get to the jury, there's no point in starting

12   there.  So why don't you dig into it and get me a letter by

13   Wednesday that explains what evidence will be used to show the

14   crime of aggravated identity theft and what the law is as to

15   whether or not it can get to a jury.

16             MR. BHATIA:  Your Honor, we'll put in that letter, and

17   I'll make two -- I'll just say two things:  One, we have

18   conferred internally within the office, including with our

19   appeals unit, about this issue.  It's something that we spoke

20   to them about.  Of course we'll put in the letter.

21             The second is, of course, the caveat that I have to

22   make, which is that our investigation continues, and we'll

23   continue our investigation up until and through trial.

24             THE COURT:  That's all fine and good, but you've got

25   charges here right now.  And I understand that if you can

K1AHTEMC

develop evidence that he walked into the bank and presented the

social security card for Peter Rebenwurvel, the case looks

different.  But on the assumption that this crime is over and

done and is limited -- the evidence is limited to the check

itself on which, I take it, handwriting that is not legible as

any particular person's but is treated by the bank as some

authorized signatory of the corporate account holder, the

question is whether that alone is aggravated identity --

MR. BHATIA:  Understood.

THE COURT:  -- and what we do with (a) the inability

to argue that it's any particular person's identity, but (b)

even if it was just one signatory, whether simply the

presentation of a check, as much as that might be bank fraud

and wire fraud, is also aggravated identity theft without more?

I think I need a letter along those lines.  Why don't I give

you till Wednesday.

Defense, if you want to respond, you've got till

Friday.  When I meet with you on Tuesday morning, assuming the

government is still pursuing that count and assuming the

defense is still arguing that the claim is unsustainable, I'll

hear from you then.  I would very rarely dismiss a count before

we started the trial, but the law does permit, where the

government gives what it acknowledges to be a thorough going

proffer of all the evidence, it does give the Court authority

to do that.  I'm reluctant to do it other than that, but if

1    you're literally committing to me that the only relevant

2    evidence is going to be the check itself, there is a basis on

3    which the Court can legally make that determination.  So

4    please, please take a close look at it.

5            But, look, Mr. DiRuzzo, I think you're the one who

6    raised this issue.  I don't think it's really a Brady issue.

7    You now understand why the government said what it said.

8            MR. DIRUZZO:  I do.  But, obviously, I don't have the

9    benefit of what was said before the grand jury.  I could very

10   well imagine if someone testified initially that it was Peter

11   Rebenwurvel and then now someone's testifying that it's not

12   Peter but it's Peter and maybe other people but we're not

13   entirely sure, the shifting testimony before the grand jury

14   could very well be Brady.

15           THE COURT:  Let me ask the government counsel, without

16   telling me the content of what came before the grand jury, are

17   you aware of any witness who has changed their testimony as to

18   any of the events that we're talking about or their version of

19   events, as opposed to the government's understanding of who the

20   signers of -- the eligible signers were that has changed?

21           MR. BHATIA:  I'll give, first, the caveat that I have

22   to give.  I wasn't in the grand jury the first time.

23           THE COURT:  You have assuredly reviewed the

24   transcript.

25           MR. BHATIA:  I have.  I believe it's the former of

1    what you said -- or it's the latter, I should say.  It's new

2    evidence and continuing investigation.  But we'll go back and

3    confirm that there's nothing we need to disclose that's Brady.

4                THE COURT:  If there was somebody at the bank who

5    originally said he said he's Peter Rebenwurvel and then later

6    said the defendant said he's one of the following three people

7    or he's not Peter Rebenwurvel, then you're in potential

8    Brady-land.  If instead what happens hand is the government has

9    developed a more sophisticated understanding of who the

10   authorized signatories are, it's not a Brady issue.  The

11   government is entitled to refine its charges as it understands

12   the facts.  That's not Brady.

13               The issue, though, is a different one that your

14   question raises which is, is the conduct described aggravated

15   identity theft?  I've never had occasion to look into it.

16   Perhaps Mr. Bhatia is right.  It's certainly not the paradigm

17   of the way we think of the offense, but that's not to say it's

18   not the offense.  So a letter is the way to smoke that out.

19               Anything further about the trial before we return to

20   the grand jury issue?

21               MR. GELFAND:  Trial, no, but one other pending letter

22   motion.  We'd filed a request permitting Mr. Teman to travel to

23   St. Louis where my office is based.

24               THE COURT:  Does the government object to Mr. Teman's

25   traveling to St. Louis where, I take it, one of his lawyers is

K1AHTEMC

1    based?

2              MR. BHATIA:  No objection.

3              THE COURT:  Has Mr. Teman been in any way out of

4    compliance with the terms of his pretrial release?

5              MR. BHATIA:  I haven't spoken with the Pretrial

6    Services officer recently.  I do understand from a

7    representation from defense counsel that they did -- am I right

8    -- that they did speak to the Pretrial Services officer who had

9    no objection.

10             MR. GELFAND:  Your Honor, for the record, I spoke with

11   the New York pretrial officer and with the Southern District of

12   Florida pretrial officer, both have expressed no objection to

13   that.

14             THE COURT:  I'm going to trust, as an officer of the

15   court, your representation of that.

16             What is the state of Mr. Teman's travel documents?

17   Does he have -- I mean, he doesn't need a passport to travel

18   with, correct, to travel to St. Louis with?

19             MR. GELFAND:  No, he just as a Florida driver's

20   license.

21             THE COURT:  Who's got his passport?

22             THE DEFENDANT:  Your Honor, I believe the Florida

23   probation or court.

24             THE COURT:  Pretrial.  Look, Mr. Gelfand, given the

25   government's consent and your representation that pretrial

K1AHTEMC

1   consents, I'm fine with it, but I don't want this to be an

2   occasion for him to get his hands on a passport that was taken

3   away as part of the bail package.  I assume he, like the rest

4   of us, can travel domestically without a passport.

5            MR. GELFAND:  Yes, your Honor.  He wouldn't travel the

6   same way he traveled up here from Florida for court.

7            THE COURT:  In that case, I will authorize it.  Please

8   get me an agreed order today.  I'm out next week.  Get me an

9   agreed order today.  It doesn't need to be agreed.  It can be

10  from the defense along the lines that I described.  I'll be

11  happy to authorize it.

12           MR. GELFAND:  Thank you.

13           THE COURT:  Very good.  Anything further besides the

14  grand jury matter?

15           MR. BHATIA:  Nothing, your Honor.

16           THE COURT:  All right.  Let me then briefly take up

17  that last matter.

18           All right.  I have this morning spoken with Judge

19  Kevin Castel.  He is the Part 1 judge, and --

20           MR. GELFAND:  Your Honor, I'm sorry to interrupt you.

21  I just wanted to note for the record, just so I'm on the right

22  side of where I need to be, obviously, I represent Mr. Teman

23  admitted pro hac vice.  I am not entered on the grand jury

24  matter, and I wanted to raise that with the Court.  I'm not

25  sure that --

K1AHTEMC

1           THE COURT:  Sorry.  Who represents the -- it's

2    Mr. DiRuzzo?

3           MR. DIRUZZO:  Correct, your Honor.

4           THE COURT:  Given the highly general statement I'm

5    about to make, I don't think there's any problem with your

6    presence.

7           MR. GELFAND:  OK.

8           THE COURT:  But thank you for your candor about that.

9           MR. GELFAND:  Thank you.

10          THE COURT:  I've spoken with Judge Castel.  He is the

11   judge sitting in Part 1.  He is the judge to which, in the

12   first instance, grand jury matters are properly addressed.  He

13   has referred the matter to me in an order that assigns the

14   grand jury dispute to me, given its obvious connection to this

15   current proceeding, will issue today.  So, briefly, I have

16   received from Judge Castel this morning the defense petition to

17   quash three grand jury subpoenas dated December 18 directed at

18   three entities associated or said to be associated with

19   Mr. Teman, and I have received on Wednesday night from the

20   government as, I guess, a courtesy copy its opposition.  I also

21   received, I guess, as a courtesy copy as well, an *ex parte*

22   letter from the government addressing these matters.

23          I will note that I think the letter was actually

24   addressed to me as the trial judge in the case, even though

25   this is a grand jury matter.  Until I spoke to Judge Castel

K1AHTEMC

this morning, this was not my matter.  You really have to be

faithful about addressing these things to the judge responsible

for them, Judge Castel.

That said, there was ample good reason for it to be

transferred to me.  The issues that are litigated by the

defense, in particular, involve this case insofar as the

defense is claiming that the grand jury subpoena either was

intended to or could function as a way of getting trial

evidence.  So it's quite proper that it winds up with me, but

as a formal matter, in the initial -- in the first instance, it

was for the Part 1 judge.

In any event, now that the matter is in my court, I've

reviewed these materials.  I will state for the record that the

government's *ex parte* letter was appropriately submitted *ex*

*parte*.  It concerns core grand jury matters as to which grand

jury secrecy applies.  Mr. Teman and these companies have

absolutely no right to any notice of the matters that are

reflected in that letter.

Here's how I intend to proceed.  I'm going to give the

defense until Friday, January 17, to respond to the

government's public submission, that is to say, the non-ex

parte submission.  I'm not going to invite argument on these

matters at this time, and that's for a couple of reasons.

First of all, I haven't adequately studied the issues

presented.  I just spoke with Judge Castel this morning and

83

have arranged the reassignment to myself with his consent, and
I am interested in getting Mr. Teman's reply before I do so.

Second of all, the purpose of this conference is the
upcoming trial, not a separate grand jury proceeding.  So I'm
not inviting argument or discussion today on the defense
application to quash the subpoena.

For avoidance of doubt, I note that Mr. Teman is
arguing really two things.  One is there's a Fifth Amendment
privilege that protects against the production that's requested
here.  Second, he's arguing that the grand jury subpoena is
being used by the government predominantly for an improper
purpose, that is to say, as a means of gaining evidence for use
in the upcoming trial.  Now, the government properly notes that
at the time the subpoenas were issued on December 18, the grand
jury had not yet been asked to return and hadn't returned the
S2 superseding indictment.  The accusation that the defense
makes is a bit out of time in the sense that at the time the
subpoena was returned, we know for a fact that the government
was in the superseding process.  So there was an open grand
jury matter relating to this case, putting aside whatever else
the grand jury might or might not be investigating.  So there's
assuredly at the time a valid grand jury purpose for the
subpoena.

Even if I need to say this, the date, December 18, on
which the subpoenas were issued, called into significant

K1AHTEMC

1    question whether it was at all realistic that there would be a

2    production in response that would come in before the date the

3    government had to get to the grand jury to supersede as it had

4    promised to in this case.  Be that as it may, there was an open

5    grand jury proceeding.

6            At this point, however, the fact for all of us is that

7    the grand jury has returned its superseding indictment.  It did

8    so on January 3, and so whatever else the grand jury may or may

9    not be investigating as to the charges that Mr. Teman will face

10   in the trial beginning January 21, those charges are set.  They

11   may be reduced if there's a basis for a voluntary dismissal or

12   dismissal by the Court of some charge, but there's not going to

13   be an expansion.  Those charges are set.  In other words, there

14   won't be any further superseders prior to the date of trial as

15   to what Mr. Teman is being tried on beginning January 21.

16           So Mr. Teman's concern at this point is that whatever

17   the government's intentions had been as of December 18 when it

18   had an ongoing grand jury proceeding relating to this trial, to

19   the extent that the government might be pursuing compliance

20   with a subpoena so that they could be -- the return could be

21   used in connection with this case, that purpose would not be

22   proper because the indictment is already in place and can't be

23   superseded.

24           So here's the easy way to resolve this issue.  My

25   intention is going to be to resolve the grand jury privilege

K1AHTEMC

1    dispute shortly after the completion of the trial.  That way,

2    by definition, that will be in a few short weeks.  That will

3    moot any possible claim that the grand jury subpoena, even if

4    issued with pure purposes, is at this point being pursued for

5    the purpose of bolstering the government's trial proof in an

6    already indicted case.  I will resolve the issue promptly after

7    the trial is resolved, assuming that there is a verdict as

8    opposed to a hung jury.  There can't be any claim at that point

9    that the government's insistence on continued compliance with a

10   grand jury subpoena is aimed at bolstering its trial proof.

11   That's the clean and easy way to resolve the issue here.

12             Any objection to that?

13             MR. DIRUZZO:  No, your Honor.

14             MR. BHATIA:  No, your Honor.

15             THE COURT:  All right.  So we'll go that route.

16             Anything further from anyone?

17             MR. GELFAND:  Just two quick questions, your Honor.

18   One, does the Court have a preference as to whatever numbering

19   convention the defense uses for exhibits?  I know some courts

20   do.

21             THE COURT:  Sequential would be great.

22             MR. GELFAND:  A, B, doesn't make a difference?

23             THE COURT:  Prime numbers.  Right, you can use letters

24   or numbers, no.  But, look, I would ask you, to the extent

25   there are defense exhibits that are offered during the course

1    of the trial, make sure that you've -- I expect the

2    government's daily log of what's been received will include

3    defense exhibits.  I'm looking for a one-stop shop.  You should

4    look at that to make sure that they're accurately tabulating

5    any defense exhibits that have been received.

6            MR. GELFAND:  Absolutely.  Just one other quick

7    housekeeping question.  It sounds like, based on the

8    government's representation, there's virtually no chance that

9    if we have any defense witnesses, that they're going to have to

10   be here before Thursday.  Is that fair?  I don't want to -- if

11   I don't need to, I don't want to inconvenience anyone more than

12   I have to by telling them --

13           THE COURT:  Mr. Bhatia, what is the earliest

14   conceivable date on which the government could rest?

15           MR. BHATIA:  Your Honor, I think, of course, we always

16   give a conservative estimate for what we think will be the

17   trial, but on the earliest that we could conceivably close, I

18   believe it's probably sometime Wednesday.  Then, of course,

19   that depends on the length of cross and how the evidence comes

20   in, but it could be sometime Wednesday.

21           THE COURT:  There you have it.

22           MR. GELFAND:  We can work with that.

23           THE COURT:   Look, I appreciate that the witnesses in

24   question may be coming from other states, or maybe not?

25           MR. GELFAND:  I don't believe so, your Honor.

K1AHTEMC

1          THE COURT:  Well, then --

2          MR. GELFAND:  We'll make it work.

3          THE COURT:  The legal principle of no big deal

4   probably applies here, right?  If it's in the same state, you

5   can take stock at the end of the day Wednesday of how things

6   are going.  I'm happy to ask Mr. Bhatia, at your request,

7   whether at that point it's clear that the government will fill

8   the day on Wednesday.  But if, in fact, there's a scenario

9   under which the government's going to rest and there's enough

10   time to have the usual Rule 29 colloquy and then you might be

11   on the clock, I think you will need to have that person there.

12   I really am serious about using all of our time.

13          MR. GELFAND:  No problem, your Honor.  Thank you.

14          THE COURT:  Very good.  Yes.

15          MR. DIRUZZO:  Judge, my experience trying cases, I

16   find that judges kind of have three different buckets for

17   openings for exhibits.  Some judges will say if it's not

18   admitted, you can't publish it, you can't refer to it, you

19   can't show it to the jury in opening.  You can refer to it in

20   the abstract.  There are other judges, if everyone agrees it's

21   coming in, you can refer to it, maybe put up on the ELMO in

22   opening.  I just want to get your take because I don't want to

23   get an objection.

24          THE COURT:  I'm not going to answer an abstract

25   question.  I've had the occasional civil case where it's clear

K1AHTEMC

1    that the copyright infringing video's coming in, and it's an

2    incoherent opening without it.  This is not that case.

3              What do you have in mind?

4              MR. DIRUZZO:  Like the contracts, in particular.

5              THE COURT:  The government?

6              MR. BHATIA:  Your Honor, I think it might be helpful

7    for us to confer with the defense on this.  Right now I'm not

8    sure what contracts in particular they're referencing.  I'm not

9    really aware of any contracts, but I don't know what contracts

10   in particular, so it's hard for us to answer that question.

11             THE COURT:  Let me ask the question.  Mr. DiRuzzo, I

12   can't remember a criminal case in which, other than something

13   like a map, I've allowed counsel to use exhibits during the

14   opening.  It's just a little too fraught because we don't know,

15   in a criminal case, what's going to come in and what's not.

16             MR. DIRUZZO:  I understand, Judge.

17             THE COURT:  So absent explicit authorization of the

18   Court, you are not to use exhibits in the opening statement.

19             MR. DIRUZZO:  OK.

20             THE COURT:  That's easier.  If you confer with the

21   government and everyone agrees that something's clearly coming

22   in, I will reconsider, but even then, unless I've affirmatively

23   authorized it, no exhibits in the opening, and you should

24   prepare accordingly.

25             MR. DIRUZZO:  OK.  Thanks, Judge.

K1AHTEMC

1          THE COURT:  Anything further from anyone?

2          MR. BHATIA:  Nothing, your Honor.

3          MR. GELFAND:  Can we just confer with Mr. Teman for a

4     moment?

5          (Counsel confer)

6          MR. GELFAND:  We have nothing further, your Honor.

7     Thank you.

8          THE COURT:  All right.  Before we adjourn, I want to

9     just take a moment and compliment and thank everyone for the

10    level of attention to detail that went into all of the motions

11    that preceded the conference.  That helps me.  As a result of

12    your raising those issues early, you've come out of this

13    conference with a pretty good sense of what the ground rules at

14    trial will be and what's in and what's out.  Keep doing that.

15    Although I will be away teaching next week, I will be getting

16    things from chambers.  If there's some other dispute that

17    arises, to the extent I can helpfully resolve it beforehand or

18    at least answer it on Tuesday morning, I'm happy to do so, but

19    we all benefit by clarity of ground rules, so keep it up.

20    That's very valuable to me.

21         Government, with respect to Counts Five and Six, I'm

22    not telling you what to do.  You'll make your own judgment

23    about whether or not the law permits you to get to a jury on

24    the theory of aggravated identity theft that you have here.  I

25    would urge the government to reflect on what that theory, those

K1AHTEMC

1    counts, add to the four preceding counts.  In other words, if

2    the theory is a lack of authorization, it's not obvious to me

3    that there's a scenario under which Counts Five or Six come out

4    in your favor and Counts One through Four do not.  I could be

5    wrong about that.  Maybe I'm missing something, but you ought

6    to be having a thoughtful conversation whether it adds more

7    heat than light to add on to those counts if there aren't more

8    facts than the ones you have proffered to me in support of

9    those claims.  Your choice.  Just saying.

10            MR. BHATIA:  Thank you, your Honor.

11            THE COURT:  All right.  Thank you.  We stand

12   adjourned.

13            (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25