K1LVTEM1 corrected

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 CR 696 (PAE)

5    ARI TEMAN,

6              Defendant.                  JURY TRIAL

7    ------------------------------x

8                                          New York, N.Y.
                                           January 21, 2020
9                                          9:00 a.m.

10
     Before:
11
                    HON. PAUL A. ENGELMAYER,
12
                                           District Judge
13

14                       APPEARANCES

15
     GEOFFREY S. BERMAN,
16        United States Attorney for the
          Southern District of New York
17   KEDAR S. BHATIA
     EDWARD A. IMPERATORE
18        Assistant United States Attorneys

19   JOSEPH A. DIRUZZO, III
     JUSTIN GELFAND
20        Attorneys for Defendant

21   ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                    WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25
```

K1LVTEM1   corrected

1          (Case called)

2          MR. BHATIA:  Good morning, your Honor.

3          Kedar Bhatia and Edward Imperatore, for the United

4   States.

5          We're joined at counsel table by Detective Daniel

6   Alessandrino of the New York Police Department, and Paralegal

7   Specialist William Magliocco of the U.S. Attorney's Office.

8          THE COURT:  All right.  Very good.

9          Good morning Mr. Bhatia; good morning, Mr. Imperatore;

10  good morning, Mr. Magliocco; and good morning, Detective

11  Alessandrino.

12          Did I get everyone's pronunciation correct?

13          Very good.

14          And for the defense.

15          MR. GELFAND:  Good morning, your Honor.

16          Joseph DiRuzzo and Justin Gelfand on behalf of Mr.

17  Teman, who is on bond and present in the courtroom.

18          THE COURT:  All right.  Very good.

19          Good morning, Mr. DiRuzzo; good morning, Mr. Gelfand;

20  and good morning to you, Mr. Teman.

21          You may all be seated.

22          All right.  I have a number of matters to take up

23  before we have jury selection this morning.  You should know

24  that while I had anticipated that we might have a delay in jury

25  selection because another case, a large case, was going to be

K1LVTEM1  corrected

1   picking a jury today, due to reasons specific to that case,

2   that case apparently is not going forward today.  So my

3   expectation is that we are batting first, if you will, in terms

4   of what the jury clerk will do.

5          So it will be a little while.  The jurors have to show

6   up; they need to be inculcated in the process of being a juror.

7          But once they are ready to dispense jurors to a court,

8   I think we come first.  So hopefully we'll be making productive

9   use of time today.

10          All right.  There are quite a number of things to take

11   up this morning.  And I have a bench ruling which will address

12   both the proposed instructions that you gave me on the check

13   stub and the RCC issues; and will also resolve what are now two

14   additional, effectively, sets of motions *in limine* that I have

15   had letter briefed over the course of the week.  I then have a

16   number of other issues I want to raise with you.

17          Before I embark on the bench ruling, let me just take

18   stock with counsel if there's anything that I need to be

19   attentive to today.  Any issue you want to raise?

20          (Counsel conferred)

21          MR. BHATIA:  Your Honor, you may have noticed in the

22   briefing on the motion to quash there is reference to a

23   subpoena to the defendant -- if-as-or-when subpoena to the

24   defendant.  Previously we have --

25          THE COURT:  This is a motion to quash the grand jury

K1LVTEM1  corrected

1    subpoena?

2              MR. BHATIA:  That's right.

3              THE COURT:  I'm ignoring that until after the trial.

4              MR. BHATIA:  So what I wanted to say is I wanted to --

5    with leave of the Court, I'd like to give the defendant the

6    if-as-or-when subpoena that we were intending to serve on him

7    previously.

8              THE COURT:  With respect to this trial.

9              MR. BHATIA:  With respect to this trial.

10             THE COURT:  You're welcome to do so, of course.

11             And to be clear, defense, while the grand jury

12   subpoena is something I will reserve resolution on until after

13   the trial, so that there's no doubt, the if-and-and-when

14   subpoena, if I've got that right, is a separate beast.  That's

15   not being suspended.  The obligations that attach to a

16   defendant's production of documents, when and if he testifies,

17   are not suspended merely because there's a separate grand jury

18   controversy afoot.

19             So take a look at that subpoena.  I don't know whether

20   or not there are any issues I need to deal with; but understand

21   that it is a completely separate issue from the grand jury

22   matter that's been tabled.

23             MR. GELFAND:  Your Honor, we appreciate that.

24             We do anticipate that there are completely separate

25   issues, in particular regarding the nature of the subpoena and

K1LVTEM1  corrected

1      what it requires of Mr. Teman, the defendant in this case.

2                With the permission of the Court, we'll do our best by

3      the end of today -- obviously not the court day, but by

4      midnight tonight -- to file anything that we believe is

5      appropriate.  But I just wanted to raise that with the Court.

6                THE COURT:  That's fine.  I'm not going to resolve

7      anything without hearing your response.  If you can get me

8      something tonight, that would be great.

9                I will need a copy, of course, of the subpoena that

10     was just hand-delivered by the AUSA to the defense.  So why

11     don't you attach it to your letter.

12               MR. GELFAND:  Yes, your Honor.  Thank you.

13               THE COURT:  All right.  Very good.

14               Anything else to raise?

15               MR. BHATIA:  Yes, your Honor.

16               Just regarding that subpoena, we'll provide a copy of

17     it to the Court today.

18               And in addition, I wanted to just note for the record

19     that we sent it electronically to defense counsel on January

20     12th to ask if they would accept service.  We didn't hear

21     anything back.  And then we saw on our -- their motion to quash

22     on Friday.

23               THE COURT:  All right.  Look, defense, just so that we

24     don't have any delays, while I appreciate that there may be

25     colorable objections to aspects of the subpoena, maybe the

K1LVTEM1  corrected

1   whole thing, be prepared, nevertheless, to produce in response

2   to it, so that if I disagree with whatever arguments you are

3   going to be making, we don't have a situation where we are

4   then -- only then engaged in document collection.  Okay?

5              MR. GELFAND:  Yes, your Honor.

6              THE COURT:  All right.

7              Anything else to raise?

8              MR. BHATIA:  Nothing else from the government.

9              MR. GELFAND:  Not for the defense, your Honor.

10             THE COURT:  All right.

11             Let me just quickly take care of a few discrete things

12   before getting into the bench decision.

13             First of all, I just want to make sure, I believe we

14   covered this at a prior conference, but the defense is not

15   making an advice of counsel defense in this case; correct?

16   There's been no notice of that and I haven't seen anything to

17   that effect.

18             (Counsel conferred)

19             MR. DiRUZZO:  Your Honor, we are.  And although --

20             THE COURT:  When did you give notice of that?

21             MR. DiRUZZO:  I don't believe that Rule 12.1, 2, or 3

22   requires advanced notice of an advice of counsel defense.

23             THE COURT:  Tell me what the advice of counsel defense

24   consists of; in other words, who and what.  I want to make sure

25   that there's -- I read through the government exhibit binder.

K1LVTEM1 corrected

1    There are a lot of documents where Mr. Teman has threatened

2    lawsuits and the like.  I didn't see any reference to counsel.

3    I wasn't aware that there was an advice of counsel defense

4    here.  Go ahead, tell me about it.

5            MR. DiRUZZO:  Your Honor, in the documents the

6    government has produced in discovery, there's been emails from

7    a Mr. Ariel Reinitz, who works for the law firm -- is a partner

8    of the law firm of FisherBroyles.  Mr. Reinitz is Mr. Teman's

9    attorney.  And Mr. Reinitz is and has been intimately involved

10   with, among other things, the collection efforts of GateGuard's

11   to GateGuard's customers, including some of the customers that

12   are at issue in this case.

13           Does that answer your Honor's question?

14           THE COURT:  And did you give notice to the government

15   that there was a potential advice of counsel defense here?

16           MR. DiRUZZO:  No, your Honor.  We didn't believe the

17   rules contemplate that.  We believe that constitutionally we

18   are not required to do so.

19           THE COURT:  All right.

20           And it's your expectation that Mr. -- give me the

21   spelling of that person's name?

22           MR. DiRUZZO:  R-E-I-N-I-T-Z.

23           THE COURT:  And is it your expectation that he may be

24   called as a witness on the defense case?

25           MR. GELFAND:  Yes, your Honor.  We anticipate calling

K1LVTEM1  corrected

1    him as a witness.  I would also note that he was included on

2    the joint proposed witness list for the voir dire that was

3    submitted by the parties.

4                THE COURT:  Okay.  Government?

5                (Counsel conferred)

6                MR. BHATIA:  Your Honor, we haven't received any

7    notice of an advice of counsel defense.  I'll also note that I

8    don't believe there's any joint witness list in this case.  We

9    submitted a list of the names and entities that might come up

10   during the course of trial.  So we certainly haven't had notice

11   of calling an attorney as a defendant -- as a witness.

12               THE COURT:  Was the defense obligated to do so?

13               (Counsel conferred)

14               MR. BHATIA:  Your Honor, as an affirmative defense, we

15   do believe they are required to do so and they haven't provided

16   any notice of it.  In addition, we've received Rule 16

17   discovery, but we haven't received any discovery involving

18   attorney-client communications between Mr. Teman and

19   Mr. Reinitz.

20               THE COURT:  All right.

21               Look, obviously this is something that requires letter

22   briefing; so I would welcome a letter tonight from the

23   government with its views about the advice of counsel defense:

24               A, whether or not there was required notice; B, what,

25   if any, discovery at this stage is required of the defense; C,

K1LVTEM1 corrected

1    assuming that the witness is to go forward, what, if any,

2    discovery would later be provided.

3          I don't think I saw, defense, in your proposed jury

4    charge an instruction on the advice of counsel defense.

5          Was there one?

6          MR. GELFAND:  There wasn't one.

7          THE COURT:  Why was there not one?

8          MR. GELFAND:  Because when the jury instructions were

9    due, we were, candidly, still receiving discovery from the

10   government.  Within the past week, your Honor, we received

11   5,000 new pages from the government, and we were still making

12   strategic decisions.

13         THE COURT:  I appreciate that.

14         But as you well know, when you submit proposed

15   charges, you are supposed to be inclusive, not exclusive.  It

16   looks like that's an act of hiding the ball, when apparently

17   you were considering it all along and didn't include it in the

18   proposed jury charges.

19         MR. GELFAND:  Your Honor, our intention certainly

20   wasn't to hide the ball.

21         The other thing I would note, and I would point the

22   Court's attention to a Second Circuit case called *Scully,* which

23   clearly and accurately states that advice of counsel is not an

24   affirmative defense in the criminal context; it's a way to

25   defeat or otherwise challenge the *mens rea*.

K1LVTEM1   corrected

1    THE COURT:  I understand that.  And I didn't take

2  Mr. Bhatia's characterization as an affirmative defense as

3  changing that fundamental principle.  The issue is always

4  whether or not the government can establish beyond a reasonable

5  doubt the *mens rea* requirement of the statute.  That's not the

6  point.

7    The issue here is whether notice was required of the

8  intention to call a -- to invoke that defense; and what, if

9  any, implications there are from the failure of the defense to

10  include an instruction along those lines in its request to

11  charge.

12    You were, I take it, at least considering such a

13  defense at the time you submitted the request to charge?

14    MR. GELFAND:  Considering, yes.  But given that that

15  obviously -- it comes with the possible arguments of waiver and

16  implied waiver, etc.  We did not include an instruction.  We

17  will submit a supplemental instruction for the Court's

18  consideration.

19    THE COURT:  Yes, please do so tonight.

20    Look, I will wait for the government's letter as to

21  addressing this point, and I'll give you a brief opportunity to

22  respond.  But as you can see, I, reading through the Rule 16

23  materials, immediately recognized that this case had at least

24  the potential to implicate advice of counsel issues, because

25  your client is repeatedly threatening legal action.  I couldn't

K1LVTEM1 corrected

 1    tell whether he's doing that on his own dime or with the advice

 2    of counsel, but it leapt off the page as an obvious issue.

 3           Government, have you asked the defense in writing or

 4    orally whether it would be pursuing an advice of counsel

 5    defense?  I mean, it leaps off the page from the discovery you

 6    have provided as a subject that a court would be curious about.

 7    I assume you must have thought about this.

 8           MR. BHATIA:  No, your Honor, I don't believe -- I know

 9    in our initial discovery letter we make certain requests.  I

10    don't recall -- I don't believe that the advice of counsel was

11    one of those.

12           THE COURT:  In your letter to me tonight, you should

13    concretely address whether or not the government explicitly or

14    implicitly has asked the defense about that subject.  It may

15    well be that any obligation the defense had may have been only

16    in response to a question by the government.  I don't know the

17    law in the area enough to opine confidently, but I expect a

18    comprehensive letter on this point.

19           I would also welcome each of your submitting the

20    proposed instruction as to advice of counsel along with your

21    letter.

22           So, government, get me a letter tonight.

23           Defense, get me a letter as quickly as possible

24    thereafter, but no later than tomorrow night.  Okay?

25           MR. GELFAND:  Yes, your Honor.

K1LVTEM1                corrected

1              THE COURT:  All right.

2              Next.  Just raising issues here.

3              It appears to me that Count One embraces checks from

4    three entities:  Entities 1, 2, and 3.

5              Count Two embraces checks from two entities:  Entities

6    3 and 4.

7              It strikes me as entirely likely that, at a minimum,

8    there will need to be an instruction with respect to unanimity,

9    lest there be a risk that six jurors convict as to Entity 1,

10   and six convict as a Entity 2, and there's no unanimity as to

11   any of them.

12             Beyond that, though, there is a substantial question

13   of whether or not the verdict form, which, as submitted by the

14   government and acquiesced then by the defense, simply answers

15   yes or no, guilty or not guilty, for each count, ought to take

16   account of the fact that the counts bundle together multiple

17   victims that may have multiple entities that may have different

18   narratives associated with them.

19             It seems to me there's a substantial argument here

20   that the verdict form ought to inquire more specifically of the

21   jury with respect to particular entities.  I'd welcome each

22   side giving thought to that.  I don't need to decide that now;

23   but, again, in preparing for today, that leapt out at me as a

24   relevant question.

25             All right.  Government, you have moved to dismiss

K1LVTEM1 corrected

 1   Counts Five and Six; is that correct?

 2              MR. BHATIA:  That's correct.

 3              THE COURT:  All right.

 4              Defense, I take it, no objection?

 5              MR. GELFAND:  No objection.

 6              THE COURT:  All right.  Then I will dismiss Counts

 7   Five and Six on the government's motion.

 8              All right.  With that, I want to read aloud some bench

 9   rulings to you.

10              All right.  As before, there's not going to be a

11   written opinion.  The rulings I'm about to make will be

12   reflected in the transcript here.  And so if you need the text

13   of the ruling, you'll need to order the transcript.

14              I should ask, counsel, I assume you've ordered or plan

15   to order daily copy?

16              MR. BHATIA:  That's right.

17              THE COURT:  All right.  Very good.

18              I will need that, because obviously it's likely to be

19   a relatively short trial.  And when the jury goes out, if they

20   ask for excerpts of testimony, I want to make sure that we all

21   have the transcript handy so that you can very promptly search

22   the transcripts for responsive material.

23              All right.  I have received, counsel, your joint

24   letter dated January 15th, docketed at Docket 80.  That letter

25   sets out the parties' views as to potential instructions as to

K1LVTEM1 corrected

1    two discrete points.  I had asked for your input as to these in

2    my bench ruling on January 10, resolving the various motions *in*

3    *limine*.  Here is how I presently intend to address each

4    subject:

5        First, as to the check stock found in Teman's

6    possession at the time of his arrest, I asked counsel for "a

7    proper limiting instruction regarding the purposes for which

8    the jury may and may not consider the check stock seized from

9    Mr. Teman's office on July 3rd, 2019."  That is a direct quote

10    from my bench opinion.

11        Counsel, what you submitted is not at all responsive

12    to what I asked you to do.  You have, instead, agreed upon a

13    completely generic proposed instruction setting forth legal

14    principles governing similar act evidence in general which does

15    not refer at all to the check stock.  With all respect, the

16    instruction you gave me is unhelpful for that purpose, it is

17    useless; indeed, it is arguably worse than unhelpful, because

18    it states to the jury at the outset, before setting out these

19    general generic principles, and I quote:  "The government has

20    offered evidence tending to show that on another occasion, the

21    defendant engaged in conduct similar to the charges in the

22    indictment.

23        That statement is, to my knowledge, factually false.

24    I cannot imagine what the two of you were thinking or all four

25    of you were thinking about in asking me to tell the jury that.

K1LVTEM1   corrected

1          The government has not given Rule 404(b) notice, and

2     the Court has not been informed of any evidence that might be

3     offered at trial that Teman ever deposited or tried to deposit

4     unauthorized checks other than those charged.  I do not know

5     what counsel were thinking in proposing that I tell the jury

6     that effectively there is such evidence.

7          To defense counsel in particular, I note that the

8     statement in the joint proposed instruction could affirmatively

9     harm your client in inaccurately implying that there has been

10    evidence at trial of his deposit of unauthorized checks other

11    than those charged in the indictment, or that the check stock

12    found in his office had been used to create other unauthorized

13    checks.

14         I have taken it upon myself to draft an alternative

15    instruction which I will read to you for your views.  But,

16    counsel, I expect better of you and you need to do better when

17    the Court asks you for a proposed instruction.  The instruction

18    you proposed was both nonresponsive and misleading.

19         With that, here goes as to the proposed instruction.

20         "You have heard testimony that at the time of the

21    defendant's arrest on July 3rd, 2019, blank check stock was

22    seized from his office.  It is for you to decide whether or not

23    to credit this testimony.  If you do, I want to instruct you as

24    to the strictly limited purposes for which you may consider

25    this check stock.

K1LVTEM1    corrected

1          "Specifically, you may consider this evidence to the

2    extent, if any, that you concluded it bears on the defendant's

3    knowledge; in particular, whether he had the knowledge and

4    capability to create the checks at issue in this case.  You may

5    also consider this evidence to the extent, if any, that you

6    conclude that it bears on the defendant's intentions in

7    connection with respect to the use of the checks at issue in

8    this case.

9          "However, you may not consider the check stock found

10   in the defendant's office for any other purpose.  Specifically,

11   you may not consider it as indicating that the defendant

12   engaged in any unlawful conduct other than that alleged in the

13   indictment.  You may not consider this evidence as indicating

14   that the defendant had a criminal personality or a bad

15   character.  This evidence instead was admitted for much more

16   limited purposes and you may consider it only for these

17   purposes."

18         Are there any objections to that instruction?

19         MR. DiRUZZO:  No, your Honor.

20         MR. BHATIA:  No, your Honor.

21         THE COURT:  All right.

22         I will ask counsel to alert me when counsel believes

23   it is an appropriate time for me to give that instruction.

24         Now, as to the instruction as to remotely created

25   checks, or RCCs, I propose to give the following instruction to

K1LVTEM1 corrected

1   the jury:  As you will see, it draws on both sides' proposed

2   instructions on this point.  The main point I want to leave the

3   jury with is that RCCs are a lawful thing, while making clear

4   that the issues in this case do not involve technical

5   compliance with the regulatory definition of RCCs.

6          Here goes:

7          "You have heard reference to something called a

8   remotely created check, also known for short as an RCC.  A

9   remotely created check is a check that is not created by the

10  paying bank and that does not bear a signature applied or

11  purported to be applied by the person on whose account the

12  check is drawn.

13         "I instruct you that the banking laws in this country

14  do permit the use of remotely created checks under certain

15  circumstances, provided, of course, that the customer on whose

16  account the check is drawn has authorized the check.  However,

17  this case does not involve whether or not the checks in

18  question here meet the technical definition of a remotely

19  created check, and you should not concern yourself with that.

20         "The question for you will be whether or not the

21  government has proven beyond a reasonable doubt the elements of

22  the offenses charged, which, again, are bank fraud and wire

23  fraud.  I will instruct you on the elements of those offenses

24  later in the trial, after all of the evidence has been

25  received."

K1LVTEM1   corrected

1                Are there any objections to that instruction?

2                MR. BHATIA:  No objection.

3                MR. GELFAND:  No objection.

4                THE COURT:  All right.

5                Then here, too, I'll ask counsel to alert me when

6      counsel believe it's an appropriate time for me to give that

7      instruction.

8                MR. DiRUZZO:  Judge, I already know.  I'd ask that

9      instruction be given directly after openings.

10               THE COURT:  No, there won't be –– my instruction, as

11     you just heard me say is –– it's going to be triggered by

12     evidence.  Once there's some evidence in the case, I'll be glad

13     to give that instruction.

14               MR. DiRUZZO:  Oh, okay.

15               THE COURT:  In other words, I don't know who the first

16     witness is going to be, but I will wait until there's a factual

17     basis for it.

18               MR. DiRUZZO:  Okay.  Understood, your Honor.

19               THE COURT:  It just seems to me otherwise it's sitting

20     out there in the air unconnected to specific evidence.  But

21     given the nature of the case, I expect we'll get there soon.

22               All right.  I'm next going to turn to Teman's motion

23     to preclude the government from calling as a witness Karen

24     Finocchiaro of Bank of America.  I previously denied Teman's

25     motion to preclude her from being called, which was based on

K1LVTEM1  corrected

the incorrect claim that her testimony would be that of an

expert witness.  In my January 10th bench ruling, I held that

she is a pure fact witness who would testify based on her job

experience as a senior investigator at the bank on Bank of

America's handling of chargebacks and the like.

Teman now moves, see Docket 81, to preclude

Ms. Finocchiaro's testimony on a separate ground.  Teman

contends that the government has violated its *Giglio*

obligations by failing to turn over records relating to

approximately seven different lawsuits in which Bank of America

has been sued either by federal regulators like the SEC or FTC

or CFPB, or in civil litigation.  The government opposes this

motion.  It notes that it has provided *Jencks* Act material for

Ms. Finocchiaro and has conducted a full *Giglio* inquiry as to

her.  See Docket 82.

I deny Teman's motion.  I regard it, frankly, as

frivolous.  The defense has not indicated that the lawsuits

have any connection or anything whatsoever to do with

Ms. Finocchiaro.  The defense has not represented that she was

a party or a witness to any of these matters.  The defense has

not represented that she has personal knowledge of any of them.

The defense has not articulated any theory under which she

received some form of benefit from the resolution, if any, of

any of these cases.

Teman's motion appears to proceed from the premise

K1LVTEM1   corrected

1    that because Ms. Finocchiaro works at Bank of America and is in

2    position from her employment there to offer testimony as a fact

3    witness, the door is therefore open to impeach her based on

4    unrelated business practices and unrelated litigations and

5    investigations regarding Bank of America.  Teman's motion may

6    also proceed from the premise that ostensible impeachment

7    material that might attach to other persons at Bank of America

8    may be used to impeach Ms. Finocchiaro in this unrelated

9    matter.

10          Teman does not recite any evidence supporting either

11   of these remarkable propositions.  Taken to its logical

12   extreme, Teman's theory would open the floodgates to vast

13   productions relating to wholly unrelated controversies under

14   the ostensible rubric of *Giglio* for any bank witness called by

15   the government in a criminal case in which a bank was a victim,

16   even, say, the bank teller who identifies the bank robber.

17   Again, there's no legal authority for that.  Teman does not

18   offer any reason for the Court to doubt the government's

19   representation that it has fully searched for and produced all

20   *Jencks* material and *Giglio* material, if any, for

21   Ms. Finocchiaro.

22          As an aside, I would note that conceptually, if Bank

23   of America, as one of the alleged fraud victims here, had

24   received a benefit from the government in connection with this

25   case, for example, as a condition of producing documents or

K1LVTEM1   corrected

1    making a witness available for testimony, the government would

2    have a possible -- if not likely -- constitutional disclosure

3    obligation with respect to that.  Whether that would be

4    conceived of as *Giglio* or *Brady* would depend on the specific

5    facts, as would whether it would rise in connection with

6    Ms. Finocchiaro's testimony as a fact witness as opposed to in

7    some other context.

8            But there has been no suggestion whatsoever that

9    anything like that happened here.  The lawsuits that the

10   defense cites have nothing -- zero -- to do with Teman or the

11   landlords whose checks he allegedly created and deposited with

12   the authorization he allegedly pretended to have.  Whatever the

13   circumstances are under which a benefit to Bank of America

14   might be disclosable as *Giglio* for one of its fact witnesses,

15   those circumstances are not present here.

16           And for much the same reasons, under Rules of Evidence

17   402 and 403, I would not permit the defense to cross-examine

18   Ms. Finocchiaro about unrelated disputes or litigations or

19   investigations involving Bank of America, if that is the use to

20   which the defense had in mind in seeking such materials.  Such

21   matters are irrelevant to the issues to be tried here.  And

22   even if they were glancingly relevant, which they are not, any

23   probative value to such inquiries would be vastly outweighed by

24   the potential for confusion created by inquiries at this

25   criminal trial into other unrelated areas in which Bank of

K1LVTEM1   corrected

1   America has had business controversies.  Bank of America is not

2   on trial here; Mr. Teman is.  And he is on trial on specific

3   charges that do not implicate Bank of America's unrelated

4   regulatory and litigation history.

5          Finally, as a separate basis for denying the *Giglio*

6   motion here, I note that the *Giglio* obligation extends only to

7   the prosecution team.  There is no basis to believe that the

8   U.S. Attorney's Office here has any knowledge or records of the

9   lawsuits cited by the defense.  Thus, even if *Giglio* applied --

10  and it does not -- there would be nothing that the government

11  here would be obliged to produce.

12         Turning next to the final issue.

13         The government moves to limit the defense's

14  cross-examination of two witnesses:  Joseph Soleimani and Elie

15  Gabay.  Each was a landlord or a representative of a landlord

16  and, as such, each was a customer of Teman's.  The parties have

17  filed letters as to this issue; the government's is dated

18  January 19th, the defense's is dated January 20th.  Neither

19  party's letter has been filed on the public docket of this

20  case.

21         At the outset, I direct both parties to file these

22  letters publicly on the docket of this case by tonight.  On the

23  face of the parties' letter, there is no apparent justification

24  for this motion to be litigated outside of public view.  The

25  matters discussed in the letters are in the nature of lawsuits

K1LVTEM1 corrected

and publicly disclosed complaints.  The allegations in these
lawsuits and complaints may be unflattering to witnesses or
perhaps to Teman, but there is no basis to override the
public's right to access litigation on this motion *in limine*.

In the event counsel believe there are discrete facts
contained in these letters that are properly redacted, I will
authorize you to publicly file the letters with narrow
redactions keyed to genuinely confidential matters.  I will
then determine whether there is a basis for such redactions.
Because the request for filing under seal originated with the
government, I will direct that the government make its public
filing first.  The defense should then follow with its
redactions until the Court has ruled respecting the areas, if
any, in which the government continues to assert a basis for
filing under seal.

Now, as to the content of the government's motion,
Soleimani is a principal of ABJ Properties.  Teman allegedly
deposited into accounts he controlled 24 checks of ABJ's,
totaling $264,000, allegedly without ABJ's authorization.
Gabay is a managing director of Coney Management LLC, which
manages properties in the New York area.

Teman is alleged to have deposited into accounts he
controlled a check for $18,000, and later three checks totaling
$33,000, each drawn on the account of a company managed by
Coney, again, without Coney's authorization.

K1LVTEM1 corrected

1          The testimony of these witnesses appears likely to be

2    important at trial.  The government's core allegation as to

3    each set of checks is that Teman pretended he had authorization

4    to deposit checks drawn on the customer's account into his bank

5    account, whereas, in fact, he did not.  A key factual issue,

6    therefore, appears to be whether Teman had been authorized or

7    believed he had been authorized by ABJ and/or Coney to create

8    and deposit checks drawn on their accounts.

9          Fulsome cross-examination is therefore in order as to

10   the course of dealings that Teman had with these companies,

11   including these two witnesses, to enable the jury to take into

12   account the full measure of the relationships that Teman had

13   with these customers, which may shed light on whether to credit

14   the government's claim of a lack of authorization or Teman's

15   defense of authorization.  The Court will permit searching and

16   thorough cross-examination as to Teman's dealings with these

17   customers.

18         To its credit, the government's letter is not seeking

19   to restrict cross-examination about communications or dealings

20   between these customers and Teman.  Instead, the government

21   seeks to preclude inquiry into extrinsic matters involving

22   these companies which did not involve Teman, such as complaints

23   or lawsuits brought by or on behalf of tenants.  The government

24   disclosed these matters to the defense and what the Court takes

25   to be an appropriate excess of caution.

K1LVTEM1   corrected

1          The government does not represent -- and nor does

2     Teman -- that the claims of improprieties made against these

3     two customers have any direct bearing on the customers'

4     dealings with Teman.  Teman does not allege, for example, that

5     the tenants' grievances towards these customers bears on

6     whether the customers gave Teman permission to create and

7     deposit the checks in question.  Instead, Teman's theory of

8     relevance is instead solely that Soleimani's and Gabay's

9     conduct towards tenants bears on their character for

10    truthfulness.

11         I will begin with Soleimani.

12         With one narrow exception, I will exclude all the

13    evidence that the government's letter puts at issue with

14    respect to him.

15         Specifically, the government seeks to preclude

16    examination of him as to lawsuits and tenant complaints largely

17    about the physical conditions of housing his company provided

18    or that caused slip-and-falls and the like.  These complaints

19    are inadmissible.  Whether or not Soleimani is a punctilious

20    landlord or a negligent or cruel or thoughtless landlord does

21    not bear on his credibility.

22         Relatedly the New York Public Advocate last month

23    included Soleimani on its list of the city's worst landlords

24    based on the number of open violations with the city's

25    Department of Housing Preservation and Development, or HPD.

K1LVTEM1  corrected

1    These violations relate to vermin, defective doors, and the

2    perpetuation of hazards.  These regulatory violations or

3    alleged violations do not, however, bear on Soleimani's

4    character for truth-telling.  They are inadmissible to impeach

5    his trial testimony.

6              Notably, Federal Rule of Evidence 609 addresses the

7    limited circumstances under which a much more serious bad

8    act -- a criminal conviction -- can be used to impeach a

9    witness.  Where the conviction is not one like perjury that

10   intrinsically goes to credibility, it is inadmissible as a tool

11   of impeachment, unless the offense was a felony committed

12   within the last ten years.  The regulatory violations that are

13   pending or open against Soleimani do not rise or come close to

14   this level.

15             The government, in fact, represents that it has

16   confirmed that neither Soleimani nor Gabay has a criminal

17   record.  The Court will therefore exclude all evidence of

18   violations or alleged violations of housing codes such as those

19   tracked by HPD and all evidence of tenant complaints against

20   these landlords.

21             And for avoidance of doubt, obviously that means,

22   defense, there should not be a peep about this in your

23   addresses to the jury.

24             I do so for two independent reasons under the rules of

25   evidence:  First, allegations of mismanagement, negligence, or

K1LVTEM1 corrected

being a rotten landlord are irrelevant to credibility under

Rule 402.  Second, even if such allegations had some bearing on

Soleimani's credibility, their probative value would be vastly

outweighed by various countervailing factors under Rule 403.

Inquiry into these alleged housing code-type violations would

tend to confuse the jury, prolong the trial, and invite a trial

within a trial as to these separate incidents.  Such evidence

would also create a grave risk of unfair prejudice to the

government and the public insofar as the jury might be led to

exonerate Teman of frauds of which the evidence might otherwise

establish his guilt because they were swayed by such testimony

to loathe the landlords whose checks Teman deposited.

          There is, however, one allegation that is different in

nature.  The government's letter discloses that Soleimani's

company, ABJ Housing, was fined by the New York Housing Court

in connection with a tenant, Stanley Howell, who refused to

leave his apartment in exchange for monetary payment.

          In the housing court case involving ABJ and Howell,

the Court found in an October 2018 decision, that because ABJ

initiated negotiations with the tenant, ABJ's conduct

constituted harassment within the meaning of the New York City

Administrative Code.  This conduct too, to the extent I've

addressed it so far, is also not a proper ground for

impeachment.  Harassment is distinct from lying.

          However, as Teman points out in his response, the

K1LVTEM1 corrected

housing court judge, Jack Stoller, found in his written

decision the following:  Referring to ABJ Housing as the

petitioner and Howell as the respondent, Stoller wrote:

      "Petitioner did not dispute respondent's testimony

that petitioner's employees stated that petitioner would not

renew respondent's lease if respondent did not surrender the

subject premises, an empty threat against a rent-stabilized

tenant who is entitled to a lease renewal by operation of law.

Misleading a tenant into believing that the tenant has no other

option but to vacate a rent-stabilized apartment voids an

out-of-court surrender."  See Exhibit A to the government's

letter, at 4.  And I have eliminated the case law citations in

Judge Stoller's opinion.

      Judge Stoller's opinion does not disclose whether

Soleimani personally was one of the ABJ employees who

misleadingly told Howell that his lease would not be renewed if

he did not surrender the premises.  If not, there is no basis

to use another employee's misleading statement as a means at

this trial to impeach Soleimani.  Soleimani's trial testimony

here would not be meaningfully discredited merely because of an

employee of his misled a tenant.

      But it is possible that Soleimani was among the

employees who personally made that misrepresentation to Howell.

If so, although the question under 403 is a close one under

which a court could rule either way, I would then permit the

K1LVTEM1  corrected

1    defense at this trial, as a means of impeachment, to establish

2    through a single question or two put to Soleimani that a judge

3    found that in 2017, he had misled a tenant to believe wrongly

4    that his lease could not be renewed.  To be sure, I would not

5    permit under Rule 403 more extended inquiry into this matter,

6    nor would I permit extrinsic evidence of this incident to be

7    received, for example, testimony by Howell or examination of

8    Soleimani regarding what happened and whether he agrees or not

9    with Judge Stoller's finding.

10           But a targeted leading question that elicits from

11   Soleimani the fact of this discrete finding by a judge that he

12   misled a tenant on this subject would assist the jury to assess

13   Soleimani's credibility without turning this proceeding into a

14   trial within a trial about the episode relating to landlord ABJ

15   and tenant Howell.

16           And so, government, I will ask you to please inquire

17   of Soleimani whether there was evidence in the housing court

18   case that he was among the ABJ personnel who dealt with Howell.

19   If his answer leaves any doubt in your mind, you need to follow

20   up and do so immediately.  Then promptly report back to the

21   Court and the defense.  I expect that if the answer is yes,

22   that Soleimani was among the ABJ personnel who dealt with

23   Howell, that Soleimani will have no difficulty on the stand

24   here answering yes to a question from defense counsel about

25   whether a judge so found.  Obviously the government is at

K1LVTEM1 corrected

liberty to pull the poison and ask the question on direct as

well.  Cross-examination will then move on to other issues.

    For a voidance of doubt, though, defense counsel, in

your opening statement, you are not to refer to such matters,

and you are not to inquire into them in court unless and until

I have given you the affirmative green light to do so.

    That ends my ruling as to Soleimani.

    The bottom line is that, at most, a single question or

two about the housing court finding of misleading a tenant may

be put to the witness; and then, only upon confirmation that

Judge Stoller's opinion was referencing ABJ personnel that

included Soleimani personally.  Otherwise, Soleimani's conduct

as a landlord, including court actions and complaints and

statements by the New York Public Advocate, is excluded under

Rule 403.

    As to Gabay, I will exclude the evidence proffered by

the government.  There is much less of it as to Gabay than as

to Soleimani.  But that which is addressed in the government's

letter does not involve false statements or falsehoods.

Significantly, too, unlike the incident involving ABJ and

Howell, addressed by Judge Stoller, there is no indication that

any finding of dishonesty or untruthfulness has ever been made

as to Gabay.

    In questioning Gabay, Teman would therefore be trying

to prove up heretofore unestablished claims of sharp business

K1LVTEM1                          corrected

1    practices such as rent overcharges that on their own terms have

2    nothing to do with the bank and wire fraud charges here.  Rule

3    403 clearly precludes such an inquiry, which would be in the

4    nature of a trial within a trial, into extrinsic acts of

5    possible bad behavior.  Whatever slight probative value might

6    be yielded by this exercise is vastly overcome by the risks of

7    confusion, delay, distraction, and unfair prejudice.

8           Finally, I reject as frivolous Teman's claim that

9    precluding this evidence somehow violates his Confrontation

10   Clause constitutional rights.  Teman does not have a

11   constitutional right to probe into unrelated business practices

12   of the witnesses against him, even if such inquiry might tend

13   to dirty up the witness by making them look like a careless or

14   callus landlord.  Teman notably does not cite any authority

15   supporting that proposition.

16          All right.  Therein ends the ruling.

17          Government counsel, I saw a lot of ferment at your

18   table.  Is there something you need to bring to my attention?

19          (Counsel conferred)

20          MR. BHATIA:  Your Honor, we will inquire with

21   Mr. Soleimani about more of the facts surrounding this

22   incident.  But we wanted to clarify that if Mr. Soleimani was

23   not involved in making the misrepresentations to Mr. Howell,

24   then no inquiry would be made of him on the topic.

25          THE COURT:  Correct.

K1LVTEM1   corrected

1           The issue is whether because the judge's opinion

2     refers to people at ABJ, personnel without name, it's left

3     unclear to me whether Soleimani was among those people.  To be

4     sure, the issue is not whether what Mr. Soleimani tells you

5     now, the issue is whether there was evidence at the proceeding

6     before Judge Stoller that he interacted with the tenant.  If

7     there was evidence that he interacted with the tenant, this is

8     coming in.

9           MR. BHATIA:  Evidence that he interacted with the

10    tenant in any --

11          THE COURT:  Okay.  More precisely, that he interacted

12    with the tenant with respect to the issue of renewal.  I expect

13    that you will not credulously take Mr. Soleimani's point of

14    view on this.  Mr. Soleimani may or may not have denied in

15    front of Judge Stoller that he personally made those

16    statements.  Realistically, if he is among the people

17    interacting with the tenant, I think the safer course here is

18    to -- would be for the Court to permit the line of -- that

19    single question or two, rather than creating an open appellate

20    issue about whether you too aggressively took Soleimani's side

21    in denying -- in perhaps arguing that although he dealt with a

22    tenant, it was somebody else in his company who made the

23    misrepresentations.  The judge's opinion is indistinct if

24    Soleimani is among the people dealing with the tenant, given

25    his role at ABJ.  It seems to me the safer course here is to

K1LVTEM1   corrected

1    permit that line of impeachment which will be over and done

2    within the context of this proceeding in a matter of a few

3    seconds.

4              MR. BHATIA:  Understood.

5              We'll inquire with Mr. Soleimani and we'll give an

6    update to the Court.

7              THE COURT:  Very good.  Thank you.

8              All right.  Anything further from the government as to

9    the range of rulings I've just made?

10             MR. BHATIA:  Your Honor, nothing regarding the oral

11   ruling you made.  But we do have another point regarding the

12   advice of counsel defense.

13             THE COURT:  Yes.

14             MR. BHATIA:  Do you want to hear that now or --

15             THE COURT:  Let me just tidy up the ruling here.

16             Defense, anything about the range of rulings I've just

17   made?

18             MR. GELFAND:  No, your Honor.

19             Just to make sure we're on the same page, we will not

20   address the issue regarding Soleimani in any way, shape, or

21   form until the Court gives us the green light.

22             THE COURT:  Bingo.

23             MR. GELFAND:  The Court will only give us the green

24   light if Mr. Soleimani was involved with these interactions.

25             THE COURT:  Right.  If there is evidence that he was

K1LVTEM1 corrected

1     interacting personally with a tenant, I think the factual

2     predicate for the limited inquiry exists.  But, to be clear,

3     until I've given the green light, let's not go there.

4                MR. GELFAND:  Understood.  Thank you, Judge.

5                THE COURT:  All right.

6                So with that, yes, Mr. Bhatia, you had something about

7     advice of counsel.

8                MR. BHATIA:  Yes, your Honor.

9                As we understand it, the advice of counsel defense

10    requires several elements to be met.  Among them, that the

11    defendant sought the legal advice relevant to the conduct at

12    issue in the trial; whether he provided all the relevant facts

13    to his counsel; whether his counsel considered those facts and

14    then relayed relevant advice; then whether the client took the

15    advice; and then, of course, that he consulted prior to taking

16    action.  The Court's familiar with those elements.

17               THE COURT:  I am.

18               MR. BHATIA:  Here, there's nothing that appears to be

19    relevant to the conduct at issue in this trial.  If the lawyer

20    was involved in assisting with collection efforts, then it

21    might not be relevant at all to the conduct at issue in this

22    trial, which is whether the defendant had authorization to file

23    the checks in question.

24               And so at this point we'd ask for a proffer from the

25    defense about what facts might establish that defense.  That

K1LVTEM1   corrected

1    will help the government, sort of, think about --

2              THE COURT:  Well, listen -- thank you.  You may be

3    seated.

4              It goes without saying that the mere involvement of a

5    lawyer in a situation does not establish the advice of counsel

6    defense.  I think in generic terms, Mr. Bhatia's description

7    broadly captures the essence of the advice of counsel defense,

8    which requires that all material facts be disclosed and that

9    the attorney's advice then cover essentially the conduct at

10   issue here.  The actual terms of the advice of counsel defense

11   are familiar ones.

12             Whether an advice of counsel instruction is given to

13   the jury obviously will depend on whether the facts permit

14   that.  The defense is obviously running a grave risk if it

15   tries to suggest an advice of counsel and ultimately the advice

16   of counsel elements are not made out here.  In that case you

17   are running a risk of an instruction to the jury that you can't

18   possibly meet on the facts, which, if anything, could prove

19   unhelpful to the defense.

20             So I'm assuming that all the defense is doing at this

21   point is exploring the possibility of an advice of counsel

22   defense and is not committed to give one.

23             MR. GELFAND:  Your Honor, I don't know if this

24   addresses the Court's inquiry, but we're well aware of what in

25   the Second Circuit is required for an advice of counsel

K1LVTEM1 corrected

1    instruction as far as foundation on an evidentiary basis.  We

2    anticipate that the evidence will establish that.

3            THE COURT:  You're saying that Mr.  -- the evidence is

4    going to show that Mr. Teman disclosed to Mr. Reinitz all

5    relevant dealings with respect to each of the customers in

6    question before he created and negotiated each of the checks?

7            MR. GELFAND:  Yes, your Honor.

8            THE COURT:  And did he do that in writing?

9            MR. GELFAND:  No, your Honor.

10           THE COURT:  Is there any memorialization that he did

11   that?

12           MR. GELFAND:  Your Honor, I apologize.  There was

13   frequent communication by email and other channels.

14           THE COURT:  I want that produced to me tonight.  We'll

15   see about it being produced to the government, but I want all

16   of that documentation produced to me tonight.

17           Surely if you've been planning all along to consider

18   this defense, you've got it.  I want all that documentation

19   from lawyer and client produced; because I do not want to have

20   a situation where because the issue was raised late in the day,

21   we need to take an adjournment of the trial where I work

22   through these issues.  So I want that produced to me in full

23   tonight.

24           MR. GELFAND:  Yes, your Honor.

25           THE COURT:  But you're saying that Mr. Teman -- and I

K1LVTEM1  corrected

1    don't pretend to know the range of dealings with the relevant

2    customers that precedes Mr. Teman's creating and negotiating

3    checks, if he, in fact, is the person who did that in each

4    case.  I don't pretend to know what all those were.

5         But you're telling me that you have checked with the

6    lawyer, and the lawyer is prepared to testify that as to the

7    narrative -- the relevant parts of the narrative with each

8    customer, Mr. Teman made a full disclosure?

9         MR. GELFAND:  Yes, your Honor.

10        THE COURT:  So if the customer, for example, disputed

11   that a debt was owed, Mr. Teman faithfully disclosed that in

12   advance to his counsel?

13        MR. GELFAND:  Yes, your Honor.

14        And to even take that one step further, this lawyer

15   was the corporate counsel -- I'm using that term loosely, was

16   Mr. Teman's lawyer with respect to these matters for over a

17   year prior to the alleged criminal conduct.  And to be clear,

18   we have disclosed to the government in discovery written

19   communications from the lawyer on Mr. Teman's behalf to two of

20   the three entities, to Coney and ABJ.

21        THE COURT:  Right.  Sorry.

22        But the involvement of the lawyer, a lawyer can be a

23   collection agent, a lawyer may or may not have access to oral

24   communications between Teman and the customer, a lawyer may or

25   may not have access to email communications between Teman and

K1LVTEM1   corrected

1      the customer; and yet those may be quite material to an advice

2      of counsel defense.  If the question is put at one level, does

3      the contract allow the creation of remotely created checks,

4      that's one thing.  Another issue is does the -- am I allowed to

5      unilaterally go and cut a check for a debt that the customer

6      denies owing.

7                And the question is going to be whether the full range

8      of communications, for example, was showcased to the lawyer,

9      and the lawyer's advice specifically addressed that, and

10     whether the lawyer under oath is going to come here and say

11     that.

12               MR. GELFAND:  Yes, your Honor.  And what I'm

13     proffering --

14               THE COURT:  Is he going to do that?

15               MR. GELFAND:  Yes, your Honor.

16               THE COURT:  All right.  Well, let's get me all the

17     evidence on that.

18               Are you preparing to -- you haven't given prior notice

19     of an advice of counsel defense.  I take it you're not

20     proposing to open on that.

21               MR. GELFAND:  Your Honor, to be clear, there is no

22     notice requirement as a matter of constitutional law.

23               THE COURT:  But you didn't even include it in your

24     requests to charge; in other words, you misled me.  The point

25     is, you know, requests to charge are supposed to anticipate the

K1LVTEM1 corrected

1    issues that might come up.  You've been sitting on this as a

2    possibility.

3            How the government missed this issue and didn't raise

4    it with me before is beyond me.  But any first-year law student

5    reading the Rule 16 disclosures can see that the case -- that

6    the defense is going to hint at an advice of counsel defense

7    here.  Whether or not it makes it or not, I don't know.  I

8    don't know how you didn't disclose that.  It looks as if you're

9    hiding the ball.

10           MR. GELFAND:  Your Honor, we're not hiding the ball

11   per se.  As a practical matter, Rule 12 lists three specific

12   defenses that have to be disclosed; this isn't one of them.

13   There's case law that expressly says that we don't have to

14   provide advanced notice of this defense in advance of trial.

15   There is some cases where the -- I'm sorry, where the

16   prosecution has actually affirmatively moved *in limine* or

17   otherwise raised with the court aspects of this defense.  And

18   courts have ruled in different ways on that.  But that didn't

19   happen here.

20           And so as a practical matter, we're entitled to put on

21   a defense.

22           THE COURT:  I agree with you.  I'm troubled by what

23   looks to be this strategic excision of it from your requests to

24   charge here.  It looks as if you were trying to avoid a motion

25   *in limine* being raised by not including it in your requests to

K1LVTEM1 corrected

1    charge.  When I asked for requests to charge, I don't want you

2    to hide the ball and leave out the ones that would suggest

3    motions *in limine*.  And the problem is that presumably, had you

4    included that in your requests to charge, the government would

5    have been sensitized to the fact that this issue was there and

6    we could have ventilated whether this is a case in which advice

7    of counsel is viable or not pretrial.  And because you didn't

8    include it in the requests to charge, we can't do that.

9           MR. GELFAND:  Your Honor, I appreciate what the Court

10   is saying.

11          THE COURT:  It's a sharp practice.  You're not from

12   the Southern District of New York.  I can tell you in the

13   Southern District of New York a lawyer who leaves out something

14   like that that they are considering would be regarded as

15   significantly below the standards of ethics that we anticipate

16   from lawyers here.  I'm going to be very blunt with you.

17   That's not good.

18          MR. GELFAND:  Your Honor, I can represent that that is

19   certainly not our intention.

20          THE COURT:  Let me ask you this:  Did you think about

21   including an advice of counsel instruction in your requests to

22   charge to me?  Was that something that crossed your mind?

23          MR. GELFAND:  In an academic way, yes, but we hadn't

24   fully --

25          THE COURT:  So when you, in an academic way, thought

K1LVTEM1   corrected

1      about it, tell me what your academic thinking was in deciding

2      not to include it, when you included the other things, like

3      unanimity.  In other words, what was your thinking academically

4      in not including that?

5              MR. GELFAND:  First of all, not yet having the

6      totality of discovery.  Second of all --

7              THE COURT:  Sorry.  Wait a minute.

8              You're an officer of the Court.

9              MR. GELFAND:  Yes, your Honor.

10             THE COURT:  You know what the allegations are here.

11     The discovery as to an advice of counsel defense is uniquely

12     within the defendant's custody and control; it involves your

13     client's communications with his lawyer.  Whether or not there

14     is a defense to the allegations in the indictment does not bear

15     on whether or not there is a potential advice of counsel

16     defense that you are reserving the right to make.

17             I understand that if the government's discovery

18     teaches you that there's something blatant that your client

19     didn't disclose to his lawyer you may think twice about going

20     for that defense, I get that.  But it was clearly very much a

21     plausible possibility at the time in an academic way you

22     decided not to tell me that this might be a defense.

23             I've drafted the proposed jury charge in this case

24     already, subject to editing it depending on how the case comes

25     in.  I don't have an advice of counsel defense because you had

K1LVTEM1                corrected

1      not indicated you want one.

2                Thank you.

3                I mean, you know, you've got to elevate your game

4      here.  That's sleazy.

5                MR. GELFAND:  Your Honor, what I can say is that's

6      certainly not my intention.  That's not how I practice.

7                THE COURT:  That's all great and good, but it looks

8      like it was.  Just because you say that doesn't mean it's true.

9      You thought about it in an academic way; you decided not to

10     include it.

11               I want the full scope of documentary evidence from

12     Mr. Teman and his lawyer.  I want it produced to me tonight.

13     And I want you ready to produce it to the government the moment

14     that I so authorize so that there's no delay.

15               Understood?

16               MR. GELFAND:  Yes, your Honor.

17               THE COURT:  So I want you to have -- in addition to

18     being produced to me, have a full pair of hard copies in court

19     tomorrow morning so that if I conclude it needs to be produced,

20     you can hand it over to the government table.

21               MR. GELFAND:  Yes, your Honor.

22               THE COURT:  All right.

23               Government, anything?

24               MR. BHATIA:  Your Honor, we note that at this point

25     the defendant still has not waived privilege over these topics,

K1LVTEM1 corrected

1    so we couldn't request discovery.  These are documents we'd

2    request, but even as of today of jury selection, there's been

3    no waiver of privilege.

4              THE COURT:  Sorry.  Did you ask for documents relating

5    to communications between Mr. Teman and his counsel?

6              MR. BHATIA:  So that was actually the next topic I was

7    just about to get into.

8              We served grand jury subpoenas, as you know, in

9    December.  And for those subpoenas, we requested the basis for

10   any believed authority to deposit these checks, among other

11   things.

12             THE COURT:  Right.  Sorry.

13             But that was a grand jury subpoena that you submitted

14   a few weeks before the trial was scheduled.  And I have

15   determined that, given the date on which you submitted them,

16   right before Christmas, weeks before the trial, I respect that

17   you represent there's a *bona fide* basis for seeking a

18   superseder and will assess that for sure after the end of the

19   trial.  That's a grand jury subpoena; that's not about the

20   charges brought here.  Bottom line is it wasn't realistic to

21   get that material in time.

22             MR. BHATIA:  Your Honor, I think it goes to the idea

23   they knew we were asking about the perceived authority.  And I

24   think to get to this trial, immediately after your Honor's

25   ruling, I believe it was January 10th, we served trial

K1LVTEM1 corrected

 1    subpoenas.

 2                THE COURT:  Right.

 3                MR. BHATIA:  We served them electronically to defense

 4    counsel, who had accepted them electronically in the past.

 5    This time they just never got back to us on whether they were

 6    accepting service.  And we found out Friday that they weren't

 7    accepting service.

 8                THE COURT:  Defense counsel, is that true?

 9                Sit down.  One moment.

10                Is that true?

11                MR. DiRUZZO:  Yes.  But I just want to make sure --

12                THE COURT:  Are you telling me that on January 10th,

13    having previously accepted service of subpoenas, you declined

14    to accept service?

15                MR. DiRUZZO:  Your Honor, I don't believe we've ever

16    accepted service previously on a grand jury subpoena.

17                THE COURT:  I'm not talking about the grand jury

18    subpoena, and you know that.  Mr. Bhatia has said they served

19    you trial subpoenas, after I made it clear that the grand jury

20    subpoena wouldn't be resolved until after this trial is over.

21                Yes or no, did you receive trial subpoenas from the

22    government on or after January 10th?

23                MR. DiRUZZO:  Yes, we received --

24                THE COURT:  Did you accept service of those trial

25    subpoenas, as I gather counsel had been accepting service

K1LVTEM1 corrected

1    throughout, yes or no?

2              MR. DiRUZZO:  No, we did not accept service.

3              THE COURT:  All right.

4              Government, please serve Mr. Teman with those

5    subpoenas right now.  Defense, those are to be responded to by

6    5:01 p.m. today.

7              Defense counsel, you are in the process of blowing

8    your credibility with the Court.  Did you tell government

9    counsel -- when did you tell government counsel that you would

10   not accept service of the subpoenas that were served?

11             MR. DiRUZZO:  Your Honor, I don't want to make a

12   misrepresentation to the Court.

13             THE COURT:  Good.

14             MR. DiRUZZO:  We had numerous phone calls between the

15   four attorneys before you.  I can't say for sure when exactly

16   the conversation was, but I know for sure that we never made

17   representations that we had the authority on behalf of our

18   client to accept service.

19             THE COURT:  Look, do you dispute that on or about

20   January 10th, Mr. Bhatia emailed you trial subpoenas?

21             MR. DiRUZZO:  That I do not dispute.

22             THE COURT:  And did you say anything to him indicating

23   that you were not accepting service of those?

24             MR. DiRUZZO:  I believe that we had email

25   correspondence, and we indicated that we were not authorized to

K1LVTEM1 corrected

1   accept service.

2          THE COURT:  What day was that?

3          MR. DiRUZZO:  Your Honor, I would have to check my

4   emails.  I can't say for sure.

5          THE COURT:  Mr. Bhatia?

6          MR. BHATIA:  Your Honor, my recollection of the

7   timeline is this:  On January 10th, which was the day of the

8   Court's conference, I think now maybe a little over a week ago,

9   we served the subpoenas.  Your Honor, at that conference, had

10  requested the defense to respond to the grand jury subpoena

11  petition to quash by last Friday.  So that was the 17th.

12         THE COURT:  I understand.  That relates to the grand

13  jury.  I'm focused on this trial here.

14         MR. BHATIA:  So, your Honor, it's relevant because

15  that was the first time we had heard in their filing that they

16  weren't accepting service.

17         THE COURT:  When was that, on what day?

18         MR. BHATIA:  I believe January 18th, this last Friday.

19  So we saw in a filing that defense counsel said we had

20  attempted to serve subpoenas.  And so that prompted in our

21  mind, maybe for the first time defense counsel may not be

22  serving these subpoenas.  At that point we emailed defense

23  counsel to say, Do you accept service?  Please let us know

24  promptly.

25         THE COURT:  All right.

K1LVTEM1    corrected

1          MR. BHATIA:  And we heard at that point --

2          THE COURT:  Mr. Gelfand, is government's factual

3     representation correct that it wasn't until the -- what did you

4     say, the 18th or the 17th?

5          MR. BHATIA:  The 18th, your Honor.

6          THE COURT:  -- it wasn't until the 18th that you

7     expressly conveyed you weren't accepting service?

8          MR. DiRUZZO:  I have no reason to doubt or contest the

9     government's representation at this point, Judge.  I don't have

10    the emails in front of me.  I just -- I can't say no.  I have

11    to say --

12         THE COURT:  Government, please, I'm going to take a

13    two-minute recess.  Government, serve the defendant right now.

14         (Recess)

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K1L7TEM2

1          THE COURT:  Government, have you now served the trial

2     subpoenas on the defendant?

3          MR. BHATIA:  Your Honor, to be clear, at the beginning

4     of the conference when I asked to serve a subpoena, that's when

5     I served the if-as-when subpoena, and at the second break I

6     served the three trial subpoenas on the corporate entities,

7     which we had sent --

8          THE COURT:  Very good.  And that's separate.

9          MR. BHATIA:  All four of them have now been served --

10    and we can give you a copy, your Honor -- three trial

11    subpoenas, three corporate entities, and one if-as-when

12    subpoena to the defendant.

13         THE COURT:  Defense counsel, Mr. Gelfand, you are

14    telling me now that the defendant is going to be defending on

15    grounds of advice of counsel, correct?

16         MR. DIRUZZO:  Yes, your Honor, that's what we intend.

17         THE COURT:  All right.  You are, I take it, therefore

18    waiving the privilege as it relates to communications with his

19    counsel on this subject.

20         MR. DIRUZZO:  I believe we have to.  I believe that's

21    the nature --

22         THE COURT:  There is no attorney/client privilege now

23    that survives as it relates to the defendant's communications

24    with his counsel Mr. Reinitz with respect to the issues in this

25    litigation -- in this case.

K1L7TEM2

1          MR. DIRUZZO:  With that important caveat, the issues

2     in this litigation, because obviously my client has extensive

3     dealings with other litigations, other simple stuff.

4          THE COURT:  Attorney/client privilege is a subject

5     matter concept.  The subject matter here involves Mr. Teman's

6     dealings with the customers who were denominated as entities 1,

7     2, 3 and 4.  I take it that's the scope of the waiver.

8          MR. DIRUZZO:  Right.

9          THE COURT:  And obviously therefore the checks

10    purportedly drawn on the accounts of those entities that are at

11    issue in this case, you agree that too is within the scope of

12    the waiver.

13         MR. DIRUZZO:  Right.

14         THE COURT:  All right.  Here is what I would like to

15    do.  It's 10 o'clock.  I think we are safe, Mr. Smallman tells

16    me, for a half hour just while the jury gets acclimated.  If no

17    one has anything else to raise, I will be back here at, let us

18    say, at 10:25.  I invite counsel to do whatever research you

19    can in the interim with respect to the advice of counsel

20    defense.

21         One of the immediate issues for me involves the

22    defense's opening statement.  It is not crystal clear to me

23    whether the government has done anything to date that has

24    created an obligation on the defense to disclose the potential

25    advice of counsel defense here.  It's not clear to me either

K1L7TEM2

1     what if any free-standing obligation the defense might have had

2     with respect to that point.  A natural issue is under the

3     circumstances here where the defense did not volunteer the

4     advice of counsel defense or include a proposed instruction to

5     that effect, whether the defense should be permitted to open on

6     that point.  I'm not expressing a view one way or the other,

7     but I would welcome some legal guidance on that point.  I will

8     see you in 25 minutes.

9           MR. BHATIA:  Your Honor, I just want to say on the

10    topic of timing of when the advice of counsel could present

11    itself, the government expects that it could close -- I should

12    say it could rest its case as early as tomorrow afternoon.  So,

13    I think nothing you have said about timing, briefings and

14    discovery would get in the way of that, but we just wanted to

15    give your Honor some notice that it could be as early as --

16          THE COURT:  Well, I appreciate that, and that's good

17    to know, and obviously the defense needs to have its witnesses

18    here at the close of the government's case.

19          The immediate issue, given the emergence of a possible

20    or apparently committed advice of counsel defense is whether

21    there has been some breach with respect to notice and what if

22    any implications there are for the defense opening.

23          I want to reserve on that.  One possible outcome here

24    is that we defer openings until tomorrow morning just to make

25    sure that I get this right.  It has somehow gone unaddressed by

K1L7TEM2

1    all counsel.

2            Again I will see you at 10:30, and please be prepared

3    to give me guidance on that then.  Thank you.

4            Mr. Imperatore?

5            MR. IMPERATORE:  I just want to raise an issue with

6    respect to notice on advice of counsel.  It's still not crystal

7    clear to the government from what defense has said -- even

8    assuming that what they've disclosed on the record today

9    constitutes notice -- whether the advice that was sought really

10   goes to the central issue in this case, which is whether Mr.

11   Teman had authorization to deposit the checks, as opposed to

12   some collateral issue that the lawyer could have been involved

13   in, for example, collection efforts with respect to Bank of

14   America.

15           So we're asking for whether, in connection with notice

16   here, did the defendant actually seek before acting a lawyer's

17   advice with respect to depositing the checks at issue in this

18   case.  It's not clear to us from what has been said whether

19   that actually took place.

20           THE COURT:  That is what I understood to be the

21   central issue here.  The central dispute is whether or not Mr.

22   Teman had the authority to create and deposit these customer

23   checks, and the intent to defraud element, that is, the mens

24   rea with respect to essentially both bank and wire fraud

25   centrally turns on that issue.

K1L7TEM2

1          The defense appears to be representing that a lawyer

2     told Mr. Teman on a full presentation of the facts that he had

3     the legal right to do what he did.  And, defense counsel,

4     that's the question I am putting to you.  The documents you

5     will be producing to me at the close of the trial today I

6     expect will shed more light on whether that really happened.  I

7     will see you at 10:30.

8          (Recess)

9          THE COURT:  All right.  Back on the record.  It's

10    10:40.  I am told that the jury venire will be here at about

11    10:45, so we will be getting going with jury selection shortly.

12    Let me just ask if in the short interim period if counsel have

13    found any apposite legal authority that bears on whether there

14    was either in general or on the facts here a notice obligation

15    on the part of the defense.  Yes?

16          MR. DIRUZZO:  Your Honor, moments ago we e-mailed your

17    chambers, cc'ing counsel for the government, the case United

18    States v. Wilkerson, 388 F.Supp. 3rd 969, a 2019 case out of

19    the Eastern District of Tennessee that addressed a government

20    motion in limine in a healthcare fraud case where the

21    government attempted to move in limine to require the defendant

22    to disclose an advice of counsel defense in advance of trial.

23    Your Honor, that case we submit is well reasoned, with

24    citations not only to the Second Circuit case of Scully but

25    also to the Supreme Court's decision in Wardius v. Oregon, 412

K1L7TEM2

U.S. 470 at 476, a 1973 case.  We believe this case stands for
the proposition that an advice of counsel defense, one, is not
an affirmative defense, as that concept is known under the
civil rules, under Federal Civil Procedure 8, and that it would
be unconstitutional to require a defendant to affirmatively
require him to provide this information in advance of trial to
the government, and that in particular Rule 16, Rule 12.1.2.3
do not provide or impose that obligation upon a criminal
defendant.

        The court in that case further notes that a criminal
defendant might make up their minds and tell everyone ahead of
trial.  On the other hand, the defendant could wait and decide
what defenses if any to raise once they see what evidence the
government presents.

        So we submit that this case the Court should adopt and
it stands for the proposition that what happened here,
especially given that the government did not affirmatively move
in limine, even though the Court in the Wilkerson case
addressed in that context and denied the government's motion in
limine, that it just adds to we believe this Court will be
settled position to allow us to not only raise an advice of
counsel defense but what happened here was appropriate under
the circumstances.

        THE COURT:  May I ask you if Wilkerson identifies any
contrary authority?

K1L7TEM2

1    MR. DIRUZZO:  Yes.  Wilkerson did say that this issue

2    was not without different views, and Wilkerson at the bottom of

3    page 4 of the West.Law pdf does cite to a D.C. District Court

4    case, U.S. v. Crowder, 325 F.Supp. third 131.  It's a 2018

5    case.  And it cites to also United States v. Meredith, a

6    Western District of Kentucky case.

7                THE COURT:  Very good.  Thank you.

8                All right.  Government, anything?

9                MR. BHATIA:  Your Honor, I think at least upon a quick

10   review Wilkerson might be different in the sense that here the

11   government --

12               THE COURT:  I will ask you if you found any authority

13   supporting an application to preclude the defense from pursuing

14   an advice of counsel defense either in general or in their

15   opening.

16               MR. BHATIA:  No, your Honor.

17               THE COURT:  Are you asking me to preclude that?

18               MR. BHATIA:  At this point we're not asking your Honor

19   to preclude it, but we do have a different specific request

20   related to the advice of counsel defense.

21               The government, of course, has conferred with people

22   in the office and thought about this issue.  At this point the

23   government doesn't have a lot of facts about it.  As you know,

24   we just learned about it.  The government is therefore

25   requesting an adjournment of jury selection for 24 hours.  The

K1L7TEM2

purpose of that is that we're concerned about swearing in a
jury and having jeopardy attach prior to really knowing
anything about this defense and what the trial might look like,
what the scope of discovery is.  I don't know if -- we're
prepared it take on a heavy lift, your Honor, of course, to
review this and ensure that the Court and the parties'
schedules are not interrupted unduly, but at the same time it
does raise some concern about having a panel sworn while at the
same time there might be dozens or hundreds of thousands of
pages of discovery out there.  There might be obligations that
we have to put on a case in which we're responding to this
advice of counsel defense, which itself could -- we just don't
know a lot, your Honor, and so for that reason we would request
an adjournment for 24 hours to select a jury, and that will
allow the Court and the government to evaluate whether there
might be a need for a further adjournment or whether there is a
need for motion practice.  It will give us those options, and
we believe that swearing in a jury now is going to preclude a
lot of those options.

        THE COURT:  Defense?

        MR. DIRUZZO:  Your Honor, we don't believe that's
called for under the circumstances, given that the defense
doesn't have an obligation to front this information under the
rules, and given that the government just last week produced
over 5,000 pages of documents.

K1L7TEM2

1          THE COURT:  I'm sorry.  Wait a minute.  Maybe you're

2     right and maybe you're wrong.  And let's assume even that

3     you're more likely right than wrong that there is no

4     obligation.  What is the harm in waiting 24 hours?  In other

5     words, I could have had more opportunity to reflect on this

6     issue had, for example, you included this in your request to

7     charge.  The only reason this issue came up was because when I

8     read the Rule 16 binder it leapt out at me as something that

9     had gone unaddressed but I thought it's obvious that the

10     defense must be considering such a motion.  Had I not raised

11     it, we would have been off to the races.  What is the practical

12     harm in waiting 24 hours?  I mean your client is way within his

13     speedy trial rights.  The trial has been -- the indictment was

14     of relatively recent vintage.  My job is to get things right.

15     What's the harm in a 24 hour delay?

16          MR. DIRUZZO:  Your Honor, may I have one minute?

17          THE COURT:  Yes.  Your client is not in custody.

18          MR. DIRUZZO:  Your Honor, we would defer to the Court.

19          THE COURT:  I mean, look, I'm listening, as you can

20     tell, but on the one side of the equation is the incremental

21     inconvenience and extra night in a hotel room for counsel, the

22     trial starting a day late.  On the flip side -- but there is

23     not a lot else -- on the flip side this is a consequential

24     issue, and the risk of picking a jury now -- if there is

25     perhaps going to be a longer adjournment for some reason

K1L7TEM2

1    unexpected, if the jury has been impaneled we have all sorts of

2    double jeopardy issues.

3            Mr. Bhatia is right if I pick a jury and swear a jury

4    that in practice puts us on a time gun.  I still expect the

5    trial will begin tomorrow, but this gives us a chance this

6    afternoon to work through the issues, the volume of materials

7    in question, to determine whether or not you have an obligation

8    to produce those materials in response to the subpoenas.  It

9    seems to me that better to make those decisions without the

10   artificial urgency of an impaneled jury.

11           Do you have a counter argument?

12           MR. DIRUZZO:  No.

13           THE COURT:  Counsel, I think what I'm going to do is

14   as follows:  I think we will adjourn jury selection to 9:30

15   tomorrow, but I want to see you this afternoon.  May I suggest

16   that we reconvene at 2 p.m.?  I know you're free.  And I really

17   want to work through the full range of issues here.  I want to

18   understand -- off the record.

19           I will see you at 2 p.m. but I want to work through

20   the range of issues.  I was about to, Mr. Gelfand, go through

21   those -- Mr. DiRuzzo.

22           MR. DIRUZZO:  Your Honor, given the Court's ruling

23   regarding the production of documents at 5 o'clock, just after

24   5 o'clock today, we are going to have our client dilligently

25   work on that and pull the stuff together to comply.

K1L7TEM2

1    Obviously -- well, not obviously -- it's going to take a little
2    bit of time and we're concerned about meeting the Court's
3    deadline.  So, we would like the Court to consider if Mr. Teman
4    could be excused from the 2 o'clock hearing.  That way he can
5    get right on it and there won't be any delay in meeting the
6    Court's deadline.  I just want to bring that to the Court's
7    tension.

8          THE COURT:  I'm sorry.  Don't you have a legal
9    assistant at one of your offices who could do that?  This is
10   important.  This involves the attorney/client advice.  Mr.
11   Teman is -- counsel, when I speak to you please don't speak to
12   somebody else.

13         Mr. Teman ought to be part of the brain trust here
14   that considers what I am going to be raising at 2 o'clock.
15   There will be issues about whether or not there is anything in
16   the rules or your correspondence that precludes this issue from
17   being raised in opening or pursued at trial.  Thus far I'm not
18   seeing anything that precludes that, but I want to be careful
19   about it.  I want to be sure that I'm making a thoughtful
20   judgment about the production of documents, if any, that is
21   required here.  And it seems to me that the discussion we have
22   may be informative to Mr. Teman as to the risks and rewards of
23   pursuing this line of defense.

24         I am certainly aware of cases in which defendants have
25   regretted running up the flag pole advice of counsel defenses

K1L7TEM2

1    only to find that the facts did not bear out the predicates for

2    that.  That's a risk that a defendant who pursues this route

3    runs.  There may be a real value for Mr. Teman as I gather a

4    nonlawyer to hear counsel's colloquy with the Court.

5         MR. DIRUZZO:  OK.  How about this, your Honor, for

6    your consideration?  We believe that we will be able to produce

7    to the government some documents by the Court's deadline.  I

8    want to build in a little bit of slack so that we could produce

9    a couple hours later just to make sure we have all the

10   documents that the government wants and that way alleviate my

11   concern that if we don't have strict compliance with the

12   Court's order by 5:01 that we might subject my client to some

13   type of contempt proceeding or what have you.

14        THE COURT:  Mr. DiRuzzo, you are prepared to produce

15   to the court pursuant to my request, and to the government

16   pursuant to its subpoena, at 5:01 a good amount of the

17   responsive materials, but given just the press of business you

18   would ask for leave to continue the rolling production into the

19   evening.

20        MR. DIRUZZO:  Yes.  And we anticipate the production

21   would come to the government via like a Drop Box type vehicle

22   manner.

23        THE COURT:  OK.  But the concept here is that the

24   government will receive the full production this evening; it's

25   just that it may come in several tranches beginning at 5

K1L7TEM2

          1    o'clock.

          2            MR. DIRUZZO:  Exactly.

          3            THE COURT:  But what you're not going to be doing is

          4    objecting to the obligation to produce.

          5            MR. DIRUZZO:  Correct.

          6            THE COURT:  OK.  Can you estimate for me what the

          7    volume of the communications of the documents here looks like?

          8            MR. DIRUZZO:  May I inquire with my client?

          9            THE COURT:  Yes, of course.

         10            MR. DIRUZZO:  Your Honor, it's my understanding that

         11    it's hundreds of e-mails spread over a timeframe of multiple

         12    years, and it would not surprise me that multiple of these

         13    e-mails have embedded attachments in them.  We believe that a

         14    good majority of these e-mails are already in the possession of

         15    the government because these e-mails were directed to ABJ,

         16    Coney and DiRuzzo.

         17            THE COURT:  And who were the parties to these e-mails?

         18    These are e-mails that would, you say, be privileged but for

         19    the waiver of the privilege, or not?

         20            MR. DIRUZZO:  No, I'm referring to the subpoena

         21    directed at the corporations, where the Court ordered for us to

         22    produce those corporate documents, records that are subpoena to

         23    subpoena duces tecum by 5:01.  Those responsive documents would

         24    be e-mails between Mr. Teman and individuals at GateGuard,

         25    mainly Mr. Teman, Mr. Teman attorney Mr. Reinitz and the

K1L7TEM2

1      individuals associated with ABJ, Coney and Mercer.

2             THE COURT:  Let me break this down.  There are really

3      two distinct document issues here.  There is likely

4      considerable overlap among them, but just to be precise one

5      issue involves the government's trial subpoenas which they

6      thought they had effectively served on you on January 10 and

7      which you notified them on the 18th or so you were not

8      accepting service of and therefore I ordered be served today

9      and be responded to today, given the disappointing gamesmanship

10     at the back table about those subpoenas.

11            MR. DIRUZZO:  That's what I was referring to, correct.

12            THE COURT:  Right.  As to those, will those materials

13     contain attorney/client communications with the attorney at

14     issue here Mr. Reinitz?

15            MR. DIRUZZO:  No.  We have Mr. Reinitz -- during the

16     break I was on the phone with him -- that being Mr. Reinitz --

17     letting him know he needs to pull together all of the e-mails

18     between Mr. Reinitz and Mr. Teman, and he is working on that.

19     That was not what I was referring to.  Because I believe your

20     Honor said that we had produced those to you tonight and be

21     prepared to produce those.

22            THE COURT:  OK.  But are those responsive?  Because

23     they're coming from Reinitz, you're saying they are not

24     responsive to the government's subpoenas to the company?  I

25     mean Reinitz is an agent of the company, right?  He is an

K1L7TEM2

1    employee.  So if the subject matter of the government's trial

2    subpoena includes employees or agents of the company,

3    presumably it covers Reinitz.  Is he outside lawyer or is he an

4    employee of the company?

5              MR. DIRUZZO:  Outside lawyer.

6              THE COURT:  But he is an agent of the company?  He is

7    a client?  The principal is the company; he is their agent?

8              MR. DIRUZZO:  Mr. Reinitz would be Mr. Teman's and

9    Gate Guard's agent, yes.

10             THE COURT:  And does the subpoena from the government

11   require the production materials in the company's custody,

12   possession and control?

13             MR. DIRUZZO:  With the Court's indulgence.  Yes, your

14   Honor, paragraph 3.

15             THE COURT:  All right.  By definition, the agent is

16   controlled by the principal.  It seems to me that you can't

17   claim that Reinitz is outside the company's control.  He is

18   their lawyer.  If the client says give me your reports, the

19   lawyer has to produce those.

20             So, with the benefit of this colloquy and you're now

21   having focused a little more on the subpoena, is it your still

22   your view that materials physically possessed by Reinitz are

23   outside the scope of the government subpoena?

24             MR. DIRUZZO:  No, your Honor.  But if I may clarify, I

25   was looking for a little bit more time for my client Mr. Teman

K1L7TEM2

1   to provide the documents to the government that are responsive

2   to the trial subpoena served on the entities.  Separate and

3   apart, Mr. Reinitz is working as --

4          THE COURT:  But it's not separate and apart, Mr.

5   DiRuzzo.  If Reinitz is an agent of the company and the

6   government subpoena to the company picks up documents possessed

7   in the company's control.  That includes the agents that the

8   company controls; that includes Reinitz.

9          And you're not disagreeing with that.  You're nodding.

10         MR. DIRUZZO:  No, I agree there is a substantial

11  overlap.

12         THE COURT:  So let's put aside my request for advice

13  of counsel related documents.  Let's focus simply on the

14  government subpoena.  In terms of the content of that subpoena

15  does -- any reason to think it doesn't reach communications

16  between Reinitz and the company, including its Officer Teman

17  relating to the matters at issue in this case.  I assume it

18  must reach that.  I haven't seen the subpoena.

19         MR. DIRUZZO:  I would agree.  There may be some

20  exceptions but for the most part I agree.

21         THE COURT:  If that's really the case, we are really

22  talking about attorney/client communications I take it that

23  are -- or communications relating to advice of counsel that are

24  both responsive to the government's trial subpoena and to my

25  oral court order.

K1L7TEM2

1          MR. DIRUZZO:  Exactly.

2          THE COURT:  So, let's focus on government subpoena

3    here.  You with waived privilege with respect to the

4    attorney/client communications bounded by the subject matter of

5    this case.

6          MR. DIRUZZO:  Correct.

7          THE COURT:  You have agreed to produce materials

8    responsive to the subpoena to the government today beginning at

9    5 o'clock and then rolling in the evening, correct?

10         MR. DIRUZZO:  Correct.

11         THE COURT:  So QED, to the extent that attorney/client

12   communications are responsive to the subpoena, those will be

13   produced today whether from the servers of the company directly

14   or from its agent Reinitz, correct?

15         MR. DIRUZZO:  Correct.

16         THE COURT:  OK.  And so your application is simply for

17   grace on my part to relieve you from the obligation to produce

18   all that at 501.  You are prepared to produce as much as you

19   can by 5:01 and the balance rolling in the evening as fast as

20   you can.

21         MR. DIRUZZO:  Exactly.

22         THE COURT:  But to be clear, in effect that is going

23   to discharge, it sounds like, the production obligation of my

24   separate oral order about advice of counsel, because it doesn't

25   sound like there are advice of counsel documents other than

K1L7TEM2

1    that are possessed by the company or its legal agent Reinitz,

2    correct?

3              MR. DIRUZZO:  Correct.

4              THE COURT:  OK.  So I think we're dealing with one

5    issue, not two, and I would welcome then receiving on the same

6    schedule as the government the documents that you are producing

7    to the government.

8              MR. DIRUZZO:  OK.

9              THE COURT:  I am just trying to make this easy, but I

10   think working through this, given the privilege waiver, given

11   that the attorney is an agent of the company, and given that

12   the government's subpoena is broad enough to pick up the

13   attorney/client communications here, it seems to me all this

14   stuff gets produced tonight pursuant to the subpoena.  You are

15   not disagreeing with that, are you?

16             MR. DIRUZZO:  No.  My concern I want to make sure my

17   client is not held in contempt because we couldn't get

18   everything out at 5:01.

19             THE COURT:  Before I bless what sounds like a

20   reasonable proposal, let me hear from the government.  Mr.

21   Bhatia?

22             MR. BHATIA:  May we have just a moment?

23             THE COURT:  Yes.

24             MR. BHATIA:  So, to be clear, we understand that the

25   subpoenas will cover records sufficient to establish the advice

K1L7TEM2

1   of counsel defense, the one at trial, but we do reserve --

2           THE COURT:  Does your subpoena -- without perhaps

3   literally saying those words, because it sounds like you

4   haven't given thought to the advice of counsel defense until I

5   raised it -- does the subpoena nevertheless in its verbal

6   formulation, is it broad enough to pick up materials that are

7   responsive to the advice of counsel defense?

8           MR. BHATIA:  The subpoena could pick up some records

9   that are responsive -- that would implicate the advice of

10  counsel defense -- but it may not encompass all of them.

11          THE COURT:  Look, you may sit down.  I just want to be

12  able to look at Mr. DiRuzzo.

13          Counsel, I am trying to be a force for clarity and

14  good here.  It seems to me that given the privilege waiver here

15  what I don't want to have happen is that because the

16  government's formulation in its January 10 subpoena may have

17  not picked up the words "advice of counsel" the defense winds

18  up making an incomplete production.

19          Mr. Bhatia, if it is your intention to broaden the

20  subpoena that you wrote on January 10 and served today to pick

21  that up, may I suggest you take the subpoena back, handwrite in

22  "sufficient" to pick up the balance of those documents, so

23  there is no technical issue here under which the defense is

24  able to claim that certain documents fell outside of the

25  subpoena calls.

K1L7TEM2

 1          Mr. DiRuzzo is helping you here because he is

 2   acknowledging his expectation on a first read that the subpoena

 3   already picks that stuff up, but just so we don't have any

 4   verbal gamesmanship here, the better course -- and I will take

 5   a five minute recess now -- is to modify the subpoena to

 6   explicitly pick up communications bearing on advice of counsel

 7   with respect to the matters at issue in this case.

 8          MR. BHATIA:  We will.

 9          THE COURT:  I think that solves our -- that closes

10   that gap, correct?

11          MR. BHATIA:  That's right.

12          THE COURT:  Mr. DiRuzzo?

13          MR. DIRUZZO:  Your Honor, we would be amenable to

14   counsel for the government amending the e-mail because it's an

15   e-mail, and that way it's documented.

16          THE COURT:  Why don't we do this:  We will take a five

17   minute recess.  Government counsel will write out what it

18   purposes.  They will run it by you.  I am sure you will

19   agree -- because you have been agreeable to the idea of

20   proposing this -- and we will put it on the transcript of the

21   hearing when we resume in five minutes.  That way you've got it

22   in writing too.

23          Look, in the meantime when I come back in five minutes

24   let's talk through about what is happening at 2 o'clock.  I

25   just want to make sure collectively we're issue spotting.  It

K1L7TEM2

1    doesn't sound like the volume of documents here -- although it

2    will give a late night to government counsel -- is so

3    foreboding as to require further adjournment, but we will see.

4    But there obviously is going to be an issue about whether there

5    is something that precludes the defense from proceeding as to

6    advice of counsel.  I am not hearing it yet.  I'm not seeing

7    anything on first read anything in the Federal Rules or the

8    parties' back-and-forth that in any way precludes it.  It looks

9    as if it's a tool in the defense tool box.  They can choose to

10   use it with all the risks and rewards that doing so entails.  I

11   am not finally resolving that, but it's my first initial

12   instinct, but I will want to make sure that we take that up so

13   there is complete clarity beginning this afternoon at to

14   whether or not that's in play.  I want you all to know what is

15   fairly in play in terms of opening statements.  I will see you

16   in five minutes.

17        (Recess)

18        THE COURT:  All right.  Be seated.

19        Government counsel, have you worked up an annotation

20   to your trial subpoena that is sufficient to comfortably

21   embrace the advice of counsel documentation that you are

22   seeking and that Mr. DiRuzzo is said it's prepared to produce

23   today?

24        MR. BHATIA:  Your Honor, we actually just finished

25   formulating the proposal.  We have not talked about it with

K1L7TEM2

1    defense counsel.

2            THE COURT:  I will stay on the bench.  Take a moment

3    with the defense.

4            MR. GELFAND:  Your Honor, we're fine.

5            THE COURT:  So, defense, Mr. Gelfand, you are fine

6    with what the government is articulating as its addition to the

7    terms of the subpoena that was served in person today?

8            MR. GELFAND:  Yes.

9            THE COURT:  Great.

10           Mr. Bhatia, would you kindly slowly for the benefit of

11   the court reporter put that language on the record.

12           MR. BHATIA:  Yes, your Honor.  So we propose to put at

13   the end of the subpoena a phrase that states "For avoidance of

14   doubt, this subpoena calls for the production of any and all

15   documents relating to communications with attorneys and

16   documents reviewed by attorneys relating to the allegations in

17   the indictment, business dealings with the entities listed in

18   the indictment, contracts, terms and conditions and payment

19   terms, the checks listed herein, including but not limited to

20   any communications with Mr. Teman about, or documents provided

21   by Mr. Teman, and any documents that could support an advice of

22   counsel defense.

23           THE COURT:  Very good.  And we all agree -- I think

24   defense counsel has -- that the subpoena runs to employees and

25   agents of Mr. Teman's companies which specifically includes at

K1L7TEM2

1    least the agents part attorney Reinitz, right?

2              MR. GELFAND:  Yes.

3              THE COURT:  I think we're then at peace with respect

4    to the scope of the document production obligation.  And, Mr.

5    DiRuzzo, I appreciate your proposal essentially to make a first

6    production at five and then rolling productions thereafter.

7              If you're able to make a first production before five,

8    I know that all concerned -- the government as well as the

9    Court -- would appreciate it.

10             MR. DIRUZZO:  Understood, your Honor.

11             THE COURT:  I will ask that -- I don't know how

12   voluminous this will be.  In the end I will need this in a

13   binder form.  I don't know what sort of a legal support network

14   you have here in New York.  That will help me.  I will give you

15   a little bit of leave on that, but ultimately it's hard for me

16   on the bench to consult something electronic.  I proceed more

17   the old fashioned way, as the government has in its Rule 16

18   binder, so please get to that.

19             MR. DIRUZZO:  Understood.

20             THE COURT:  OK.  So I think this leaves us then with

21   what we're taking up at 2 o'clock.  This has all happened all

22   of a sudden.  I raised this at the very outset of the

23   conference, and it turns out that I awoke a sleeping giant of

24   an issue here, and so I want to make sure that together we have

25   covered all the angles at 2 o'clock so that there aren't any

K1L7TEM2

1    surprises.

2          One potential issue is whether, as I said, the defense

3    is -- is there something that precludes the defense from

4    opening on advice of counsel.  I'm not seeing it, but I want to

5    make sure I have the parties' respective views on that.  I

6    would like each of you to commit to whether there is any legal

7    basis for the defense to be precluded from doing that.  Again,

8    I'm not seeing it, but I think it's responsible for me to ask

9    for your views.

10          A second question -- and I offer this really for the

11   benefit of Mr. Teman -- is what happens, the defense opens on

12   advice of counsel, then ultimately the facts at trial do not

13   make out the prerequisites of that.  I have a memory that what

14   winds up happening in effect is that there is an instruction by

15   the jury that advises them that advice of counsel is not

16   available here, in effect that you have heard references to it,

17   that a requirement is that all material facts be disclosed.  If

18   there isn't a factual basis on which the jury could so find,

19   there might be a basis for me to instruct the jury explicitly

20   that it doesn't apply here, although the jury may consider the

21   communications with counsel for what they're worth in

22   evaluating the broader issue of intent.  But the issue here is

23   in effect what happens and how it could redound to Mr. Teman's

24   detriment if he opens on advice of counsel and ultimately can't

25   keep the promise.  And I want to make sure that your client --

K1L7TEM2

 1    who has obviously been a consumer of legal talent over the

 2    years, as the discovery reflects, is mindful of the risks and

 3    rewards of going to this place.

 4            In other words, it's not at all surprising to me would

 5    have thought about an advice of counsel defense -- it leaps off

 6    the page reading the Rule 16 material -- but it's another story

 7    when you decide to go there.  I just want to make sure that we

 8    have a discussion about what happens if Mr. Teman can't keep

 9    the promise that you are perhaps proposing to make in opening.

10    I want him either out of solicitude for him to be aware of what

11    the consequences might be.  So, I welcome counsel's opining on

12    that.  Again, I will make a final decision as to any

13    instructions later in the case when there is a factual

14    predicate, but I think given the apparent importance of the

15    issue I want to make sure we have covered this.

16            I will also want a clear statement from the defense

17    that the only advice of counsel that we are talking about comes

18    from Reinitz and not from somebody else.  I don't want this to

19    be an Oh Henry story where there is another surprise ending on

20    the last page and it turns out there is another mystery lawyer.

21            I am understanding from what you have proffered that

22    the advice of counsel turns defense, such as it is, turns

23    solely on an advice from Reinitz.  I want to make sure that

24    there is clarity about that.

25            Government, are there any other issues that you think

K1L7TEM2

1    are profitably addressed at 2 o'clock?

2              MR. BHATIA:  Your Honor, nothing else for 2 o'clock.

3    I will say we would ask to the extent the defense has any

4    documents already marked as exhibits that might be relevant to

5    the attorney/client defense, that they produce those now.  It

6    might help all of us to sort of get started on this.

7              THE COURT:  I agree.  Defense counsel, as you can

8    tell, I'm disappointed to say the least at the way the trial

9    subpoena was in my view sandbagged.  Under those circumstances

10   I think it's absolutely right for me to ride you to produce

11   everything you can as soon as you can, and so to the extent

12   you've got materials now or before 2 o'clock and before 5

13   o'clock, these should be produced forthwith.

14             To be sure, the government could have raised this

15   issue and been explicit about advice of counsel earlier.  It's

16   obvious from the Rule 16 material that Mr. Teman has had

17   lawyers drafting legal documents, and he is referencing

18   lawsuits.  This was a spottable issue to say the least.  I'm

19   certainly not inclined to put over the trial further on account

20   of the production of documents that may be coming today, but

21   I'm also not inclined to give you any incentive or interest in

22   delaying the production.

23             At least some of these materials were -- should have

24   been produced shortly after the January 10 subpoenas -- trial

25   subpoenas that the government served, and only because of what

K1L7TEM2

 1  I regard as described to me as sharp practice were those

 2  productions not made earlier.  So, I want you to jam on that

 3  and get it going promptly.

 4              MR. GELFAND:  I would just represent for the

 5  government's benefit is that I am 99.9 percent sure -- and will

 6  be 100 percent sure after we break for this morning -- that

 7  anything that is premarked as a defense exhibit has been

 8  disclosed to the government.  Obviously -- including, by the

 9  way, documents, for example, e-mail correspondence, from

10  Mr. Reinitz to various people, which were disclosed early on in

11  this case.  So, we will double check to Mr. Bhatia's request

12  and make sure that that's the case, and if something fell by

13  the wayside, we will certainly follow up with that.

14              THE COURT:  So when you say predisclosed, does that

15  mean materials that are not in the government's exhibit binder

16  but which have been produced by the defense?

17              MR. GELFAND:  Yes, your Honor.

18              THE COURT:  And what's the volume of that?

19              MR. GELFAND:  The amount of documents that we have

20  disclosed --

21              THE COURT:  Disclosed meaning produced, right?

22              MR. GELFAND:  -- produced in discovery -- fall into

23  thousands of pages, are anticipated potential exhibits which

24  will obviously depend on what the government does in its case

25  --

K1L7TEM2

1          THE COURT:  Of course.

2          MR. GELFAND:  -- is a much smaller sub set.

3          THE COURT:  Right.  But, in other words, you've

4    produced thousands of pages already to the government.  Have

5    you within that universe done anything to tag the documents

6    that are apt to be and if not certain to be defense exhibits?

7          MR. GELFAND:  In the context of some discussions that

8    we had with stipulations, we e-mailed them plus or minus about

9    ten or so premarked defense exhibits -- the earliest possible

10   defense exhibits -- that were marked as exhibits.  And as

11   hopefully the Court can appreciate, some of what we have marked

12   as exhibits are actually duplicative of government marked

13   exhibits.

14         THE COURT:  Sure.  When I read through the

15   government's exhibit binder I can't say that I remember.  I had

16   no idea who Reinitz specifically was, but I can say I remember

17   seeing communications with him.

18         Presumably if you are going to pursue an advice of

19   counsel defense and are claiming that there was comprehensive

20   disclosure of all material issues, some of that I guess you

21   would contend is memorialized in documents.  And I take it

22   those would be among the documents that you would be also

23   intending to offer at trial if you go that route?

24         MR. GELFAND:  Your Honor, to be clear, our intention

25   with the advice of counsel defense at trial is to elicit it

K1L7TEM2

primarily through testimony and through e-mail correspondence

that is not privileged that has been disclosed to the

government and in some cases disclosed by the government.

THE COURT:  The testimony would be of Reinitz and/or

Teman.  Are there other people who are privy to the alleged

advice of counsel?

MR. GELFAND:  No, your Honor.

THE COURT:  All right.  So it's ultimately Mr. Teman's

decision whether to call a witness and whether to testify

himself, but what you're saying is if you're committing to an

advice of counsel defense, since there is presumably nobody

else who can authenticate written communications -- let alone

oral communications -- between Reinitz and Teman, one or both

of them needs to testify in order for you to get that out there

before the jury.

MR. GELFAND:  Yes, your Honor.  But to be clear, we

don't have an intention at least at this point of introducing

any documents that are communications between Mr. Reinitz and

Mr. Teman.  The communications at issue are written

communications as opposed to testimonial -- anticipated

testimony of Mr. Rinitz are communications between Mr. Rinitz

and, for example, Elie Gabay and Jospeh Saleimani.

THE COURT:  And those would -- would those be relevant

to advice of counsel or something else?

MR. GELFAND:  Only in a very circumstantial way.  It's

K1L7TEM2

1    not the core of the advice of counsel defense, but they clearly

2    establish that prior to the dates at issue Mr. Teman had legal

3    counsel in connection with this issue.  So I would say

4    circumstantially it's relevant.

5              THE COURT:  Well, they're relevant, you are saying,

6    insofar as they show the existence of a counsel relationship.

7    That may not ultimately be in dispute.  But the substance of

8    the communications that Reinitz allegedly had with, let's say,

9    @Mr. Gabay, does the content of that bear on an advice of

10   counsel defense?

11             MR. GELFAND:  It does, because the content of that --

12   but circumstantially -- the content of that is Mr. Reinitz

13   explaining to Mr. Gabay and Mr. Soleimani -- and I am

14   paraphrasing -- that they were contractually bound by the same

15   contracts that form the basis of what we anticipate is the

16   authority to issue the RCCs.

17             THE COURT:  All right.  And so to the extent it bears

18   on the advice of counsel defense, it documented communication

19   between Reinitz, let's say, and Gabay -- I will just use Gabay

20   as an example -- would tend to corroborate that if Reinitz was

21   speaking with Gabay about contractual authority, it stands to

22   reason he was speaking with his client about contractual

23   authority to create an RCC.

24             MR. GELFAND:  Yes, your Honor.  If that's all we had,

25   there is no advice of counsel defense.  I said if that's all we

K1L7TEM2

 1   had, then there is no advice of counsel defense, but I think

 2   it's relevant in that it corroborates --

 3           THE COURT:  Just explain to me -- because you

 4   understand the facts of the case better than I -- what would it

 5   take then -- without limiting you to it -- what more would it

 6   take in your view for there to be a viable advice of counsel

 7   defense here?  What would need to be disclosed?

 8           MR. GELFAND:  Testimony -- or other events, but I

 9   anticipate it would be testimony -- that Mr. Reinitz had all of

10   the relevant material information to give advice.

11           THE COURT:  Right.  I mean just again because you

12   understand the back story and I don't, but in general what

13   might that be beyond the existence of a contract that says what

14   it says?

15           MR. GELFAND:  First of all, Mr. Reinitz was the

16   counsel for the company for a substantial amount of time prior

17   to this.

18           THE COURT:  Right.

19           MR. GELFAND:  And so he personally had access to the

20   records of Gate Guard.  He who was involved in some capacity in

21   various instances of revising or editing them.  He personally

22   communicated with two of the three customers -- in particular

23   Mr. Soleimani and Mr. Gabay -- that are at issue of the three

24   entities listed in this indictment, with respect to their

25   obligations for the money, the fees if you will, that were

K1L7TEM2

1    ultimately deposited into Bank of America through the RCCs that

2    are at issue in this case.  He had communications with Mr.

3    Teman, in particular oral communications that I anticipate he

4    would testify to.  He had further communications subsequent to

5    the act -- which I don't think would be relevant at all -- with

6    a lawyer for Mr. Soleimani, when Mr. Soleimani retained

7    counsel.  I think the Court can obviously address the relevance

8    of that and the admissibility of that later.

9                As a practical matter --

10                THE COURT:  Yeah.  I mean I'm not sure -- it's not

11   obvious to me what the communications between outside counsel

12   and outside counsel are.  The issue is really what is

13   communicated to the defendant as it informs the defendant's

14   state of mind, because in the end the issue is whether the

15   defendant did or didn't have the mens rea called for by the

16   bank and wire fraud statutes.

17                MR. GELFAND:  And to be clear, I agree generally

18   speaking -- obviously we can take up specific language from the

19   jury instruction standpoint -- with what Mr. Bhatia represented

20   to the Court are the elements in essence of reliance of

21   counsel.  It's set out pretty clearly in the Scully case.  In

22   any event, we believe that Mr. Reinitz's testimony will

23   establish an evidentiary foundation for the jury to conclude,

24   if it wants to, sufficient grounds --

25                THE COURT:  Will Mr. Reinitz's testimony be able to

K1L7TEM2

1    place in time the communications he had with Mr. Teman?

2                MR. GELFAND:  Yes, I believe it will.  These were

3    ongoing communications for over a year.

4                THE COURT:  Sure.  But the question is at some point

5    is something left out before Mr. Teman creates and deposits the

6    check?  In other words, I have read through the exhibit binder.

7    In at least one of the contracts there appears to be a written

8    provision authorizing the creation of RCCs.  There is a

9    separate issue of under what circumstances.  Let's suppose a

10   customer disputes that they owe money and conveys that to Teman

11   such that there is a clear dispute between the customer and

12   Teman as to whether or not a debt is owed.  Right?  The

13   question is whether -- where it's not an undisputed debt but

14   it's a disputed one -- whether Teman has conveyed to his lawyer

15   the customer's denial of a legal -- of an obligation to pay the

16   debt and the customer's factual basis for same.

17               Again, I don't know whether that's all that's going on

18   there, but that at least was -- on the face of the government's

19   exhibits, it seems to me apparent that at least to some of the

20   asserted debts here the customer -- it's not like it's an

21   undisputed debt that Mr. Teman is using his asserted

22   contractual authority to cause to be paid.  There appear to be

23   disputes with the customers, and even statements by Teman that

24   his company is shutting down, and then at some point afterwards

25   I gather Mr. Teman uses that purported contractual authority.

K1L7TEM2

1   The question with respect to advice of counsel is did counsel

2   know before Mr. Teman did that all of that which the customer

3   said, including denying the existence of the debt, and in the

4   face of that did the counsel then say you may nevertheless

5   create a check to pay yourself a debt that the customer denies

6   having.

7            MR. GELFAND:  Yes, your Honor.  I anticipate that the

8   testimony would be that he did have all of that relevant

9   information.

10           THE COURT:  That the lawyer knew exactly what the

11  customer was saying and denying, and in the face of that told

12  Mr. Teman go ahead and write a check on the customer's account

13  without notice to the customer?

14           MR. GELFAND:  Yes, your Honor.  I don't want to -- I

15  mean the specificity of the words may be a little different but

16  in substance yes.

17           THE COURT:  OK.  Well, we'll see.  That's helpful.

18  But, in other words, I take it that you are acknowledging that

19  it isn't merely the face of the words of the contract but the

20  course of dealings between Teman and the customer that inform

21  what needed to be disclosed before an advice of counsel defense

22  could get to a jury.

23           MR. GELFAND:  Yes, your Honor, for the advice of

24  counsel issue.  I think separate and apart from the advice of

25  counsel issue there is just a general lack of mens rea defense

K1L7TEM2

1   on the contract itself which doesn't require --

2          THE COURT:  Sure.  And you are at liberty to argue

3   that even if there is never a lawyer involved, that Mr. Teman

4   read the contract to empower him to do all sorts of things and

5   that those documents are not consistent with finding intent to

6   defraud beyond a reasonable doubt.  You are at liberty to make

7   that argument, and I fully anticipated that from the review of

8   the discovery materials.  What was unclear to me from them was

9   whether you intended to add to it the advice of counsel defense

10  with all that it requires.  And I now know that the answer is

11  barring a change of heart, yes.

12         MR. GELFAND:  Yes, your Honor.  And I think this might

13  help, because I gather what the Court is asking in substance is

14  did Mr. Reinitz have more than just the documents, more than

15  just the contracts.  And the answer is abundantly yes.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

K1LVTEM3

1          THE COURT:  But more than that, there is a narrative

2     presumably that exists with each of these customer

3     relationships.  I'm ill-positioned at this point to define what

4     parts of that narrative are material as opposed to background

5     noise.  But there are -- whatever the material components of

6     the business disputes or business relationship are, you're

7     representing to me that Reinitz knew them, knew that -- that

8     Teman had made sure Reinitz knew them before asking Reinitz for

9     his advice on whether he could create/negotiate the checks.

10          MR. GELFAND:  Yes.  Or just to be even more precise,

11     that Mr. Reinitz's source of knowledge in some instances was

12     from his own personal interactions.  In other words, he's a

13     fact witness as well.

14          THE COURT:  Sure.  But Mr. Teman needs to know that

15     Mr. Reinitz knew those facts for the advice of counsel defense

16     to apply.

17          MR. GELFAND:  Of course.

18          So, for example, there's instances where Mr. Reinitz,

19     at Mr. Teman's request, communicates directly with, for

20     example, Joseph Soleimani about the contractual obligations.

21     So obviously Mr. Teman directs Mr. Reinitz to do that.  I think

22     that he obviously knows that Mr. Reinitz did it.

23          And Mr. Reinitz, I anticipate, would testify to

24     those -- within the rules of evidence, but to those

25     interactions and how that, you know, was communicated to

K1LVTEM3

1    Mr. Teman.  Because obviously -- and I want to be clear.  Our

2    intention is not to elicit testimony directly about what

3    Mr. Reinitz believed, other than as it was communicated to

4    Mr. Teman.

5            THE COURT:  The advice of counsel defense requires the

6    attorney -- the client to have ensured that the material

7    information was communicated to the lawyer.  I'm not aware that

8    there's any means of communication that's needed.  So whether

9    it's, Read these documents, or, Hear my story, or, here, Speak

10   to the counterparty and report back to me, I can imagine any

11   number of different ways, but the central ingredient here is

12   that the client, Teman, assured that his lawyer knows the

13   material facts before asking for legal advice on them.  And

14   you've charted out a confident position that, presumably with

15   respect to each set of entities, the attorney was known by

16   Mr. Teman to know all of the material facts and nevertheless

17   gave him an unambiguous green light to engage in the conduct

18   that the government says was unlawful.

19           MR. GELFAND:  That's what I anticipate the testimony

20   would be, your Honor.

21           THE COURT:  What is Reinitz's legal expertise?

22           MR. GELFAND:  He's a partner at a law firm called

23   FisherBroyles.  He is a, kind of, general corporate lawyer who

24   also, as I understand it, has somewhat of a subspecialty in

25   intellectual property, but doesn't limit his practice to that.

K1LVTEM3

1          And he served as corporate -- I at the very least use

2     the word corporate counsel, meaning counsel to Mr. Teman and

3     some of the entities at issue, not limited to GateGuard, going

4     all the way back to, I believe it was, 2014 or 2015.  GateGuard

5     didn't even exist until 2016, and that was at a prior firm that

6     he was at.  And then he became GateGuard's counsel over -- I'll

7     get the exact date, but over a year before the alleged

8     allegations.

9          THE COURT:  And the conduct at issue is in 2019.  From

10     the Rule 16 -- excuse me, from the government exhibit binder,

11     it looked as if there was some issue with respect to GateGuard,

12     I suppose, in 2018?  You don't have to answer, but if you're

13     able, since we're talking about it, I'm just curious what --

14     does GateGuard have business issues?  Does it go under?  What

15     happens with it?

16          MR. GELFAND:  No, your Honor.  There's a single email

17     that we actually intended to introduce the response to the

18     email, if the Court is referring to an email from Mr. Teman to

19     Ben Soleimani and Joseph Soleimani, the principals of ABJ.

20          THE COURT:  I think that this is referenced actually

21     in one of the government's letters on a motion *in limine*, that

22     there had been some business reversal or Mr. Teman had

23     represented to one or more of the customers that his company

24     was having issues in 2018, I thought.  I may be misrecalling.

25          MR. GELFAND:  Your Honor, I don't believe that you're

K1LVTEM3

misrecalling.  I think there is a dispute within -- as to what

that factual narrative actually is between the parties and what

the documents bear out.  But, no, GateGuard continued to

operate to this day.

THE COURT:  Were there ever any civil litigations that

actually were brought with respect to any of the victims in

this -- not victims, the customer, the alleged victims -- the

alleged nonbank victims in this case?

MR. GELFAND:  To my knowledge, your Honor, none of the

victims initiated -- the alleged victims, initiated any civil

litigation, and GateGuard did not initiate --

THE COURT:  Mr. Teman repeatedly threatens legal

action in the documents.  Did he or his companies ever initiate

any with respect to any of the customers at issue here?

MR. GELFAND:  May I confer about that?

THE COURT:  Yes, of course.

(Counsel and defendant conferred)

MR. GELFAND:  Your Honor, no litigation was actually

filed.

THE COURT:  May I ask you, before I just turn to the

government, and then I'll give you a break so that you can all

think about these issues before 2, today you have articulated

very confidently the existence of what you contend to be a

checkmate advice of counsel defense here.

Accepting, for argument's sake, that that is so, with

K1LVTEM3

1    all the time that there was had between the complaint and the

2    indictment and then after the indictment, why would you put

3    Mr. Teman through the rigors of going to trial if you thought

4    that there was a winning advice of counsel argument here?

5              One of the reasons I'm a little surprised at this turn

6    of events is that while it seemed to be clear that there must

7    be a counsel in the picture here, if the advice of counsel

8    defense was as clear as it is, the government has a history of

9    nolle'ing cases when they are persuaded that, unbeknownst to

10   what they thought when they charged it, they were wrong, why

11   not take a whack at that.  I don't want to get into plea

12   discussions or anything like that, but that would seem to me,

13   if you're right, would have been a natural course for counsel

14   to at least raise.

15             MR. GELFAND:  Your Honor, without obviously getting

16   into any privileged communications between our clients and us,

17   what I can represent is that over the course of this case --

18   and I understand that to some extent there's just a natural

19   evolution of this happening, the government's entire theory of

20   prosecution has consistently changed.

21             And for example -- and I think this will perhaps shed

22   some light on some of the strategic decisions, if you will --

23   as a practical matter, the government initially arrested

24   Mr. Teman literally without looking at -- much less reviewing

25   or knowing -- the existence of the contracts that are at issue.

K1LVTEM3

And they arrested him on a bank fraud allegation on a criminal

complaint out of state.  That's a fairly unusual set of

circumstances.  No federal agency involved in the

investigation.  I'm not saying there's anything improper with

that, but I'm just saying it is unusual.

When we brought the existence of the contracts to the

attention of the U.S. Attorney's Office, the theory of

prosecution just kept changing, where it was basically no

matter what the defense brings to us, we'll just basically

draft a narrative that isn't -- I'm not saying maliciously, but

that essentially isn't, You're right, we should have looked at

these contracts in advance; we should have understood these

contracts in advance.

And furthermore, we weren't fully confident that we

were intending to proceed on an advice of counsel defense until

very recently.  And one of the reasons why is because the

government announced that they were intending to supersede,

which they have the right to do.  They ultimately superseded on

January 2nd.  They told us in broad strokes that there would be

additional counts by our fraud counts, etc.

At that point we knew there was going to be a new

operative charging document.  And we didn't even have the

charging document and these specific allegations in the

indictment, which, of course, would inform the decision of what

to raise and when to raise with the prosecutors.  To state the

K1LVTEM3

1    obvious, we need to know what the charges are before any

2    defenses are committed to.

3              That, to be clear, was January 2nd, approximately

4    three weeks ago.  And so it's been a moving train.  We believe

5    that Mr. Teman obviously has announced to this Court that, you

6    know, he is exercising his right to a trial.  And, you know,

7    we've prepared accordingly.

8              THE COURT:  Fair enough.

9              I was eager to understand the context for not

10   attempting to get the government to drop the charges.  For

11   better or worse, you've explained what the series of events

12   was, and I appreciate it.

13             MR. GELFAND:  Thank you, your Honor.

14             THE COURT:  All right.

15             Is there anything we need to take up before I see you

16   at 2 o'clock?

17             MR. BHATIA:  Nothing.

18             THE COURT:  All right.

19             MR. DiRUZZO:  Just one thing, your Honor.

20             I assume that we can leave our stuff here in the

21   courtroom; it will be locked.

22             THE COURT:  Mr. Smallman?

23             THE DEPUTY CLERK:  It won't be locked.

24             THE COURT:  It won't be locked.  I think it's

25   historically proven a safe place, but I think you'll need a

K1LVTEM3

1    GateGuard or something to protect it.  I can't give you

2    lock-solid assurance, but I think it's pretty safe.

3               MR. DiRUZZO:  Okay.  Thank you your Honor.

4               THE COURT:  Very good.  I'll see you at 2 o'clock.

5          Thank you.

6               But, look, do, everybody, issue a spot here.  I want

7    to make sure that once we proceed to trial, we don't have

8    unexpected surprises.  I want counsel always to know what the

9    ground rules are.

10              See you at 2 o'clock.  Thank you.

11              (Luncheon recess)

12                    A F T E R N O O N   S E S S I O N

13                             2:07 P.M.

14              THE COURT:  All right.

15              Be seated, counsel.  Welcome back.

16              Thank you for gathering this afternoon just to follow

17   up on the colloquy that we began to have about the emergence of

18   advice of counsel as a potential issue in the case.

19              I should note that having reviewed some of the case

20   law during the break, I am reminded that the shorthand locution

21   that we all tend to use in an advice of counsel defense is, in

22   fact, not correct; and as *Scully* makes clear, the proper

23   formulation relates to advice of -- to evidence of advice of

24   counsel as bearing on the government's burden in establishing

25   the intent requirement.

K1LVTEM3

1          In any event, to the extent that I -- and presumably

2    everybody else here -- slips into using the locution "advice of

3    counsel defense," I will take it as mutually understood that

4    that's just a shorthand, and what we all mean to say,

5    consistent with *Scully*, is advice of counsel as a component of

6    the jury's analysis as to intent.

7          All right.  Before we broke, I identified at least

8    three issues that I thought would be worth raising with you.

9    Let me go through the issues I have in my mind -- I've come up

10   with a fourth -- and then see what else you all have.

11         The first issue is whether there is any application by

12   the government or any basis to preclude or limit what the

13   defense can do in opening with respect to advice of counsel.

14         MR. BHATIA:  No, your Honor, there's no application

15   from the government at this point to preclude any opening on

16   advice of counsel.

17         THE COURT:  Very good.

18         I didn't think there would be, but I wanted to give

19   you the opportunity.

20         MR. BHATIA:  Thank you.

21         THE COURT:  All right.

22         Defense, is there anything you want to bring to my

23   attention *vis-à-vis* opening statements with respect to this

24   issue?  You're not required to do so, but I'm always eager

25   to -- nobody wants to get a sustained objection.  If there's

K1LVTEM3

```
1    something you feel you need to or would benefit by alerting me
2    to, I'm happy to consider it.
3              MR. DiRUZZO:  Sure, your Honor.
4              Just conceptually, I think advice of counsel,
5    self-defense, defense of others, duress, all of those are
6    appropriately made to the jury in opening.
7              THE COURT:  You're not going to be making a
8    self-defense --
9              MR. DiRUZZO:  No, no, no.
10             THE COURT:  I'm sorry.
11             MR. DiRUZZO:  But just those -- what we typically
12   think of as reasons why they call it an affirmative defense,
13   why you call it as bearing on the jury's consideration of
14   intent or mens rea is appropriately -- appropriate for defense
15   counsel to raise it at opening; and then, you know, it becomes
16   part of the case.  But there is nothing that, from my view,
17   precludes a defense counsel from doing that before the jury.
18             THE COURT:  And I'm in agreement.
19             I think the case law that I have seen, based on an
20   early peek, does suggest that there are sometimes situations in
21   which there's been a government motion in limine and in which
22   one can reliably make a judgment beforehand whether there is a
23   basis or not for such a defense.  And in the case in which one
24   could actually get to clarity before the opening, that might
25   have implications.  We're not in that case.
```

K1LVTEM3

1          Quite to the contrary, defense counsel has proffered

2     that they have evidence that will check all the boxes with

3     respect to an advice of counsel instruction, we'll see.  But

4     there's certainly no basis for precluding your referencing it

5     in opening.

6          All right.  The second issue involves -- and again,

7     this is entirely conjectural, but I like to plan.  One scenario

8     is that there will be sufficient evidence for the jury to find

9     that all the ingredients of an advice of counsel defense are

10    met.  If that is the case, *Scully* certainly provides a very

11    useful template for what an advice of counsel instruction might

12    look like.

13         The alternative scenario though involves one where the

14    Court can determine essentially as a matter of law that

15    material facts were not shared with counsel.  Again, no reason

16    to assume one way or the other whether that will be true here.

17    But just for the purposes of making sure that the Court is

18    prepared, I am interested in your judgment about what happens

19    if the defense opens, in effect, on advice of counsel, and the

20    evidence then doesn't permit a jury to find all the

21    ingredients, for example, material disclosure, disclosure of

22    all material information to the lawyer are met; or that, for

23    example, the client didn't abide by the lawyer's guidance as to

24    how to proceed in the face of those disclosures.

25         I'd welcome counsel's judgment as to what the

K1LVTEM3

1    instruction looks like to the Court under that situation.

2         MR. BHATIA:  Your Honor, it's something we would have

3    to give more thought to on the wording of an instruction.  But

4    we do believe that it is within the Court's discretion to give

5    an instruction to the kind that you referenced before, saying

6    it's not for the jury to consider the advice of counsel, and

7    then elaborate on that.  I think there are different ways to

8    give that type of instruction; but we do think it's within the

9    Court's discretion to give that.

10         THE COURT:  My memory is that even where an advice of

11   counsel instruction is inappropriate, the conversations with

12   the lawyer, nevertheless, are received and may be considered as

13   they bear on the defendant's intent.  The issue is really how

14   to package that for the jury in a situation where there have

15   been noises made about an advice of counsel defense.  And I

16   would want to make sure that the jury was well-instructed that

17   that defense doesn't apply.

18         So, look, it's premature to solicit an instruction for

19   a fact pattern that has not been factually triggered, but I

20   want each of you to do your homework on that so that when and

21   if we get there, and there's a scenario under which the trial

22   moves quickly, I immediately get something in writing from you.

23   So both sides are charged with being prepared in the event that

24   we wind up in that place to be able to give me your written

25   guidance.

K1LVTEM3

1            Yes.

2            MR. GELFAND:  And we'll certainly do so, your Honor.

3            Just as, kind of, food for thought, for lack of a

4      better way of putting it, I think that there's a basis to

5      include additional language in a general good-faith

6      instruction, which was submitted by both parties outside of

7      advice of counsel, that would basically draw the jury's

8      attention as to what they can and can't consider.

9            THE COURT:  Right.  The issue is you are making a --

10     you are going out not on a limb, but you are making a

11     judgment -- you are essentially putting advice of counsel out

12     there in a way that may or may not require some commentary for

13     the Court, if ultimately the evidence doesn't permit that form

14     of a defense.  That's a choice.  We'll see.  And you'll guide

15     Mr. Teman as to how far it makes sense strategically for the

16     defense to go in an opening on this point.

17           My concern is that with you going there, I want to

18     make sure that I am ready to instruct the jury in a way that

19     corrects any misapprehension, if needed.  And I agree with you

20     that one forum in which to do that might be under the

21     good-faith header or it might not.  But there is a scenario

22     under which I need to say something, and I want you all to be

23     at work on what that would be on that scenario.

24           MR. GELFAND:  Absolutely, your Honor.

25           The other thing I just wanted to just offer for the

K1LVTEM3

1    benefit of the Court and the record is that we have discussed

2    this issue with our client.  And I believe that he understands

3    the ramifications of anticipating that we will lay a sufficient

4    evidentiary foundation for an instruction; and that the Court

5    could theoretically conclude otherwise based on what actually

6    happens at trial.

7              THE COURT:  The ramifications being what?  Without

8    probing into attorney-client communications, if you could

9    proffer what the ramifications, as you refer to them, are, I

10   would welcome that.

11             MR. GELFAND:  Yes, your Honor.

12             First of all, that the Court -- that there is -- just

13   to back up 30,000 feet, that there is such a thing as an advice

14   of counsel instruction within the Second Circuit.  That the

15   language is obviously subject to the Court, but generally

16   includes pretty well-settled ingredients.

17             That there is a possibility that, first of all, the

18   Court would not give that instruction based on the evidence

19   that actually comes out at trial, regardless of what we

20   anticipate the evidence is going to be.  And that in the event

21   that the Court does not give that instruction, there's also

22   certainly a possibility, if not a probability, that the Court

23   would instruct the jury so as not to permit the jury to

24   essentially go down a road that the law doesn't permit them to

25   go down.

K1LVTEM3

| | |
|---|---|
| 1 | THE COURT:  And depending on what counsel have said in |
| 2 | their opening, there may be a need to be more pointed in |
| 3 | instructing them why the advice of counsel defense doesn't |
| 4 | apply. |
| 5 | MR. GELFAND:  Yes, your Honor. |
| 6 | THE COURT:  I mean, again, we're dealing with |
| 7 | possibilities. |
| 8 | All right.  May I take a moment and just inquire of |
| 9 | your client? |
| 10 | MR. GELFAND:  Yes, your Honor. |
| 11 | THE COURT:  Mr. Teman, good afternoon. |
| 12 | THE DEFENDANT:  Good afternoon, your Honor. |
| 13 | THE COURT:  You've been obviously listening |
| 14 | attentively to this.  I want to make sure though that you are |
| 15 | well-informed, so as in conjunction with your lawyers, to guide |
| 16 | how they choose to defend you in their jury addresses in |
| 17 | particular. |
| 18 | Have you had an opportunity to discuss so far at |
| 19 | length with your counsel the pros and cons of anchoring your |
| 20 | articulation of the case to the jury at trial heavily on an |
| 21 | advice of counsel "defense"? |
| 22 | THE DEFENDANT:  Yes, your Honor. |
| 23 | THE COURT:  All right.  Very good. |
| 24 | And without getting into the detail, have counsel |
| 25 | advised you of what, in their judgment, the pros and cons of a |

1   trial defense along those lines would be?

2              THE DEFENDANT:  In great detail, your Honor.

3              THE COURT:  Okay.  Very good.  I'm glad to hear it.

4         I don't have anything further to inquire about that.

5         Again, just, counsel, be prepared.

6         I'm not sure, Mr. DiRuzzo, if you're the right one to

7   ask, but I'll turn the floor to you and you let me know.

8         I just want to confirm that the only lawyer relevant

9   to the advice of counsel instruction is, in fact, Mr. Reinitz;

10  there's no other lawyer as to whom this instruction pertains.

11             MR. DiRUZZO:  Correct.

12             THE COURT:  Okay.

13        Final question for me, and then I'll open the floor if

14  there's anything else worthy of consideration, involves jury

15  selection tomorrow.  I don't think the existence of a potential

16  advice of counsel issue in the case changes anything I would

17  say to the venire about the case or any questions I would ask.

18        The description of the case, which I've lightly

19  modified, but not in consequential ways, I don't think is

20  changed by the potential of a "defense" along these lines.  I

21  already was going to be asking the jury about, you know,

22  lawyers in their family and friend group and legal knowledge on

23  their part.  I don't think it's necessary to start probing

24  further their views generically of lawyers.

25        But since the case has taken this turn, let me just

K1LVTEM3

1   ask counsel if anyone thinks there's anything I ought to be

2   sensitive to in voir dire, now that we know that this is part

3   of the case?

4             MR. BHATIA:  Nothing, your Honor.

5             I think the questions prior remain the same.  Maybe

6   the weight and the way we think about them as far as cause

7   challenges might change, but I think the questions should

8   remain the same.

9             THE COURT:  Defense?

10            MR. GELFAND:  Your Honor, I agree.

11            And the one thing -- and I think this would be

12  included in the Court's voir dire anyway is we had included

13  Ariel Reinitz's name as a name that they --

14            THE COURT:  Right.

15            MR. GELFAND:  Obviously we just want to make sure no

16  one has been represented by Mr. Reinitz or --

17            THE COURT:  Yes.  His name will be on the list and

18  I'll leave it at that.

19            He's a New York lawyer, right?

20            MR. GELFAND:  He is.  He's with a firm called

21  FisherBroyles, which has --

22            THE COURT:  Fisher, last name?

23            MR. GELFAND:  Broyles, B-R-O-Y-L-E-S.

24            THE COURT:  Is that on the list of entities?

25            MR. GELFAND:  It is not on the list.

K1LVTEM3

1          THE COURT:  Okay.  Then let me add it to the list

2    alphabetically.  Fisher, spelled B-R-O-Y-L-E-S?

3          MR. GELFAND:  Correct.

4          THE COURT:  How big a firm is that?  It's not one

5    that's familiar to me.

6          MR. GELFAND:  He had said a couple hundred lawyers --

7          THE COURT:  Oh, wow.

8          MR. GELFAND:  -- based around the country.

9          He was previously -- I don't know if the Court cares

10   about this, he was previously with Lowenstein Sandler.

11         THE COURT:  Is that name going to come up?

12         MR. GELFAND:  Only if he was going to say, I

13   previously worked here, in a very background way.

14         THE COURT:  But he wasn't at Lowenstein when he

15   advised Teman in connection with this case?

16         MR. GELFAND:  His relationship with Mr. Teman began

17   when he was at Lowenstein.  However, with respect to the very

18   concrete advice relevant to this case, he was at FisherBroyles.

19         THE COURT:  Anyone want me to ask about Lowenstein

20   Sandler?  It sounds like it will come up only as part of his

21   professional background.  Sounds unnecessary.

22         MR. BHATIA:  I don't think we need to reference it.

23         MR. GELFAND:  I would agree with the Court.  I just

24   wanted to raise that.

25         THE COURT:  Fine.

K1LVTEM3

1          Look, then I'll just say the FisherBroyles law firm,

2     just so that they have some idea what type of entity we are

3     talking about.

4          Okay.  And I take it there's nothing, defense counsel,

5     you know -- there's nothing about Mr. Reinitz's practice or

6     something that's going to come out that would be

7     attention-getting or the kind of thing that either side would

8     want to know with respect to the jury's reaction to?  His

9     practice sounds pretty meat-and-potatoes.

10         MR. DiRUZZO:  For example, it's not like he represents

11    Mr. Avenatti or some other famous --

12         THE COURT:  Just to choose a random person on the 13th

13    floor of this courthouse.

14         MR. DiRUZZO:  Right, right.  Something along those

15    lines.  He doesn't represent, as far as we're aware, any person

16    of public fame or anything like that that would generate some

17    type of feelings one way or the other from the jury.

18         THE COURT:  All right.  Very good.

19         All right.  So those are all the questions I have for

20    you.  And you've got your homework assignment about both the

21    instruction and the instruction in the event the elements

22    aren't met.

23         Let me just go around the horn and, beginning with the

24    government, ask if there's anything else, given all the ferment

25    this morning, that you wanted to raise.

K1LVTEM3

1          MR. BHATIA:  No, your Honor.  I think once we get to

2     take a look at the documents, we might have more thoughts to

3     provide; but for right now, we'll take a look and then we'll

4     see where we go from there.

5          THE COURT:  Great.  Look, I'm happy for you to give

6     more thoughts at that point.  Given the preview that

7     Mr. Gelfand gave though, it sounds as if the way in which they

8     intend to establish the elements of advice of counsel relies

9     substantially more on oral testimony than the documents.  So

10    the documents may give you some insight, but it sounds like

11    they're really not going to allow you to answer the question

12    whether there will or won't be evidence allowing all the

13    pillars of an advice of counsel instruction to be met.

14         MR. BHATIA:  Understood.

15         THE COURT:  All right.

16         Defense, anything from you?

17         MR. DiRUZZO:  No, your Honor.  Although I did want to

18    provide, with my opposing counsel, a flash drive with our first

19    tranche of document production.

20         THE COURT:  Great.  I'll let you give my copy to my

21    law clerk, and the government's to it.

22         MR. DiRUZZO:  Sure.

23         THE COURT:  Let me ask, we're going to have the jury

24    come in at 9:30 tomorrow or as soon thereafter as the jury

25    assembly -- jury clerk is able to pull names and bring them

K1LVTEM3

1          over here.  I expect that will be in short order.

2                     So the question is does anybody expect -- what is the

3          likelihood that we'll have business to take up tomorrow morning

4          that will last more than a half hour?  You are obliged to be

5          here, per my usual practice, at 9.  The question is ought you

6          be here earlier?

7                     MR. DiRUZZO:  Your Honor, from Mr. Teman's behalf, I

8          don't believe that we're going to have much; although, as a

9          matter of full disclosure, we're still -- "we" being the

10         attorneys writ large, still working on some stipulations

11         regarding bank documents and the like.

12                    THE COURT:  Does it make sense to, just in an excess

13         of caution, have you here at 8:30 tomorrow?  And I say that not

14         wanting to punish you, but given that the government is going

15         to be reviewing a bunch of documents into the evening, heaven

16         knows what might get stirred up with that.  Once the jury

17         venire is here, we're going to get started with them.

18                    I have a little voice here -- not literally -- that is

19         saying to me it's prudent for us to have an extra bit of time

20         together in case something else comes up.

21                    MR. DiRUZZO:  We have no problem with that, Judge.

22         Half an hour is not going to move the needle.

23                    THE COURT:  All right.  Then why don't we plan on

24         being here at 8:30 in the morning.

25                    Counsel, if there's anything of consequence you intend

K1LVTEM3

1    to raise, if you don't have the time to write the usual

2    letter -- and as an aside, I very much have appreciated the

3    letter-writing I've gotten on each side already.  As you can

4    tell, I dig into that immediately and try to resolve things

5    promptly; because my goal is to allow you to be the masters of

6    your cases and to know what my rulings are.

7            If you're unable in the time available to write one of

8    those letters, at least shoot me an email so that my chambers

9    and I, when we get in very early tomorrow morning, have some

10   idea what's coming from each of you.  Okay?

11           MR. BHATIA:  Understood.

12           THE COURT:  All right.  Very good.

13           Anything further from the government before we adjourn

14   for the afternoon?

15           Sorry, from the government.

16           MR. DiRUZZO:  I'm sorry.

17           (Counsel conferred)

18           MR. BHATIA:  Your Honor, earlier when we had met this

19   morning, your Honor had referenced a letter on a few different

20   topics.  Were you still looking for a letter on those topics,

21   your Honor?  I think one of them was whether notice was

22   required, whether there's discovery to be done on the advice of

23   counsel issue.

24           THE COURT:  No, no, I think we're covered on that.

25           My crack staff has run down the law on notice.  And

K1LVTEM3

1    the thrust of it is that while there isn't an affirmative

2    freestanding duty in the federal rules, courts have broad

3    discretion to impose notice and disclosure requirements outside

4    the rules, including with respect to advice of counsel.  I

5    could read into the record a number of citations, but I don't

6    think anyone is disagreeing.

7         I think, in effect, what we did today discharged

8    exactly those -- that authority.  In effect, with the extra day

9    here and the process I've used at least to help break the

10   logjam with respect to documents, you are now on notice that

11   the defense is coming; you've been given a preview that it is

12   substantially anchored in oral as opposed to substantially

13   written communications; you have a notion of where they are

14   going; and you've got, I think, a full production of documents

15   from the parties to the privilege relationship.  We've also

16   confirmed the waiver of the privilege to the full contours of

17   this case.

18        So I think, in practice, I have come to discharge the

19   authority I have here in a way that seems proportionate to the

20   challenge.  I don't need any more law from you, unless there's

21   an issue you've spotted.

22        MR. BHATIA:  That's good.  I just wanted to make sure

23   you weren't waiting for a letter that we didn't file.

24        THE COURT:  You're caught up.

25        Okay.  Defense, anything from you?

K1LVTEM3

1          MR. GELFAND:  Just two discrete, completely unrelated

2     to this, evidentiary issues I just wanted to make the Court

3     aware of just so that the Court, as requested, is not

4     essentially caught in the middle of testimony without advanced

5     notice.

6          There are two records that originate from government

7     premarked exhibits that I would anticipate they intend to

8     introduce into evidence.  One set of records involve

9     "surveillance photos" from various bank cameras.

10         THE COURT:  Yes.

11         MR. GELFAND:  My understanding is that the government

12    intends to -- the government conceives of these -- and I don't

13    want to speak for the government -- as "business records,"

14    which we don't dispute that they came -- meaning the

15    documents -- from Bank of America.  We're not wasting the

16    Court's time on things.

17         There's additional foundation rooted in the case law

18    that has to be set before any photographic evidence is accepted

19    into the record.  And if the government intends to introduce

20    that with someone who can't lay that foundation, I just wanted

21    the Court to be aware that we anticipate objections along those

22    lines.

23         THE COURT:  One moment.

24         (Pause)

25         THE COURT:  So I noticed these as well, the Exhibits

K1LVTEM3

1   110 through 112.  Right?

2              MR. GELFAND:  Yes, your Honor.

3              THE COURT:  You're not making a 403 argument, which

4   would probably be hard here since it's a picture of a person

5   who looks like your client dressed in unremarkable clothing in

6   an unremarkable setting of a bank.  You're laying a foundation

7   for admission as a business record.

8              MR. GELFAND:  It's a 901 basic objection, your Honor.

9   It's an authentication objection.

10             THE COURT:  Right.

11             MR. GELFAND:  The parties have engaged in brief

12  dialogue about this.  But I think there's just a fundamental

13  lack of a meeting of the minds as to what's required to

14  introduce this into evidence.  And I just wanted to --

15             THE COURT:  What, in your view, would be the means of

16  authenticating it?

17             MR. GELFAND:  Testimony from a witness who was either

18  present and can say it fairly and accurately depicts what's in

19  the photo, or testimony from someone who's sufficiently

20  familiar with the recording devices.

21             THE COURT:  I assume that, in fact, there's nobody who

22  necessarily saw Mr. Teman or anyone else who -- it looks like

23  he's using a machine, right?  No?  Is he dealing with a human

24  being or using a machine here?

25             MR. GELFAND:  There's different photographs.  The

K1LVTEM3

1    beginning -- some originate from ATM machines, some originate

2    from a human interaction, like 111, for example.

3            THE COURT:  Right.

4            Let me turn to the government.

5            Government, I take it there's not a live witness who

6    remembers dealing with a person who looks like this on or about

7    the days indicated?

8            MR. BHATIA:  No, your Honor.

9            THE COURT:  So what's the means by which the photos

10   would be authenticated?

11           MR. BHATIA:  The government will seek to introduce

12   these through senior investigator Karen Finocchiaro, who's a

13   Bank of America investigator.  She, herself -- I believe she,

14   herself, pulled these photographs from their records.  And so I

15   think she'll be able to lay a foundation that these are kept in

16   the ordinary course of Bank of America's business and, sort of,

17   lay the normal business record foundation, which to us seems

18   sufficient to put in the record.

19           THE COURT:  In other words, she will be able to

20   testify based on her familiarity with what she does, that the

21   records are created in the ordinary course of Bank of America's

22   business, and they are maintained in the ordinary course, and

23   that she retrieved them from some -- from a storage area, if

24   you will, the place in which they are routinely maintained?

25           MR. BHATIA:  That's right.

K1LVTEM3

1          THE COURT:  Let me ask you, Mr. Gelfand, is there some

2     reason conceptually -- we'll see whether or not the witness is

3     up to the challenge of being a business records custodian, but

4     the government has proffered that she is and then, given her

5     job title, it would not be surprising if she were.

6          Is there some reason why conceptually one means of

7     authenticating a record like this isn't as a business record;

8     in other words, there may be others, but why not?

9          MR. GELFAND:  Two reasons, your Honor.

10          The first is that we had actually reached out directly

11    to Bank of America asking for the video footage itself.  And

12    our understanding from Bank of America -- and I'm

13    paraphrasing -- is that we don't keep that, we don't have that.

14    It's destroyed.

15          THE COURT:  These are stills though.

16          MR. GELFAND:  These are stills, as I understand it,

17    that were directly taken from video footage.

18          THE COURT:  Right.

19          So the witness though presumably will testify that she

20    retrieved these, or at least counsel is representing, from some

21    regularly maintained database.  Whether or not it continues to

22    be maintained, at least as of the time it was taken, these

23    apparently still existed.

24          Taking as true what somebody told you, which is that

25    the database that once kept these records doesn't any longer,

K1LVTEM3

1    what's the relevance there?  There are plenty of databases that

2    override, but there are still business record hubs during the

3    period of time before they are overwritten.

4              MR. GELFAND:  I think it would turn, your Honor, on

5    what she specifically says about the extent to which these were

6    kept and maintained in the ordinary course of business.

7              THE COURT:  Right.

8              MR. GELFAND:  It probably states the obvious; it

9    depends on whether she can lay an accurate foundation.

10              THE COURT:  Right.  I think that's about as far as we

11    can go here.

12              I take it you are not saying to me that, as a concept,

13    something about a security footage like this is out of bounds

14    as a business record.  It's just blocking and tackling; it's

15    can she lay the foundation.  And if you voir dire her about

16    whether the records still exist and why they don't, that may or

17    may not give you some traction in opposing admission.

18              MR. GELFAND:  Correct, your Honor.

19              I just wanted to give the Court a heads-up that this

20    was an issue that might not otherwise be foreseeable.

21              THE COURT:  Okay.  And you've also now given the

22    government a heads-up.  And that's useful, because rather than

23    detaining us, if Ms. Finocchiaro -- if I've mangled the name,

24    don't tell her.  But she now -- the government will now see

25    what it can do to make sure that she, in fact, is qualified to

K1LVTEM3

1    say what the government hopes she -- what she needs to say to

2    get this in and, if not, it won't come in, we'll see.  But I'm

3    glad to have the notice; it will save us time in front of the

4    jury.

5           MR. GELFAND:  In that regard, your Honor, there's one

6    other --

7           THE COURT:  But let me just ask you, do you have any

8    reason to think, Mr. Gelfand, that the analysis will differ as

9    between 110, 111, and 112, or are we likely all in or all out

10   based on authentication?

11          MR. GELFAND:  Without knowing what she's going to say,

12   assuming they all come from the same databases and things like

13   that, no I think it would all be --

14          THE COURT:  May I ask you, is there a reason why the

15   parties have been unable to stipulate to this?  She's

16   testifying anyway, so it may not be a big deal; but it's within

17   the ambit of things that people often stipulate to.

18          MR. GELFAND:  Your Honor, we have gone back and forth

19   in terms of proposed written stipulations.  We spoke with

20   government counsel just before the Court took the bench, both

21   this morning and this afternoon.  We're going to speak again on

22   stipulations.  My anticipation is that we can reach

23   stipulations to the majority of bank records.

24          THE COURT:  Okay.

25          MR. GELFAND:  We don't want to waste anyone's time.

K1LVTEM3

The government doesn't want to waste anyone's name.  We

appreciate that.

THE COURT:  And, look, I don't know where this would

fit in, but -- and we'll see how much she can say.  It isn't

obvious to me that there is -- unless it's really disputed that

your client is the one who negotiated the checks, maybe it is,

it's not obvious to me that this is a big deal.

And so, again, your judgment, you're not obliged to

stipulate to anything, eight-plus years of doing this and

trials in a prior life tell me that juries are not happy about

lawyers in either direction fighting about nonevents.

So the question is really whether -- while you're at

liberty to insist on your rights that they lay every

foundation, the question is just whether it's worthwhile,

particularly if it turns out to be an unsuccessful effort and

the jury is like, Why did we go through that?

MR. GELFAND:  Yes, your Honor.

THE COURT:  Your choice, but I'm just saying.

MR. GELFAND:  I appreciate that.

Most juries hate record custodians, not personally,

but --

THE COURT:  We won't tell Ms. Finocchiaro that either.

MR. GELFAND:  The other exhibit doesn't relate to

authenticity.  There's exhibits -- I'm trying to find the

government's number, the "interview transcription" with --

K1LVTEM3

1          THE COURT:  You're looking for a government exhibit

2     number?

3          MR. GELFAND:  Yeah.

4          Your Honor, it's Government Exhibit 126 and 128.

5          THE COURT:  Yes, I wondered about these.

6          What are these?

7          MR. GELFAND:  Good question.

8          THE COURT:  Sorry, what's your application?

9          MR. GELFAND:  Our issue, your Honor, is that we are

10    not disputing that these came from the bank; in other words,

11    we're not being crazy.  But what appears here is that there are

12    multiple levels of hearsay that would not make it just readily

13    and easily admissible under just a general business --

14         THE COURT:  What does this reflect, just a call by

15    somebody affiliated with one of the customer accounts

16    claiming -- disputing a check and a charge?

17         MR. GELFAND:  It's unclear who the declarants are.  It

18    appears that Ilana Habibian -- we asked the government about

19    this yesterday by phone -- is a bank employee.

20         THE COURT:  Right.

21         MR. GELFAND:  Then there's reference to Benjamin

22    Soleimani, there's reference to Joseph Soleimani.  And it

23    appears to be kind of notes or a transcription of some sort of

24    question and answer.

25         THE COURT:  Right.

K1LVTEM3

1           And is the concern authentication or is the concern

2    that there are statements here that you would not want received

3    for the truth of the matter asserted because they are in the

4    nature of the customer denying permission?

5           Looks like the latter.

6           MR. GELFAND:  The latter, your Honor.

7           And to the extent -- this was done with a bank, as

8    opposed to with the government; so I don't think there's any

9    testimonial applications of the confrontation clause.

10          However, it appears that this is basically a way to

11   "back-door" on statements by someone that were actually written

12   down by someone else.

13          THE COURT:  Well, there are a couple of questions

14   here.  But one is authenticating these records; perhaps they

15   are easily authenticated as a business record or otherwise.

16          But then the issue is there is hearsay here to the

17   extent that the statements are taken for the truth of the

18   matter asserted.  The broad point is the customer seems to be

19   alerting the bank to a dispute about a charge.

20          Let me ask the government, by what means will these

21   come in, and for what purpose would they be coming in?

22          MR. BHATIA:  Your Honor, we believe that these would

23   come in through a JPMorgan Chase records custodian.  They could

24   also come in through -- I think they'd come in as a records

25   custodian.

K1LVTEM3

1          THE COURT:  All right.  So who's that?  Is that --

2          MR. BHATIA:  I think I have the name somewhere in my

3    records, but I don't recall the name right now.

4          THE COURT:  But that person would be called as a

5    witness?

6          MR. BHATIA:  They would be called as a witness.

7          THE COURT:  What are these records?  What's the

8    species of records?  How do we refer to these?

9          MR. BHATIA:  So these records are stored, as I

10   understand it, in the JPMorgan Chase loss system.  It's an

11   internal system that they have to record records like these

12   regarding, I think, fraud investigations.  But I believe it's

13   like a regularly kept --

14         THE COURT:  But it's a regularly kept log of customer

15   calls?

16         MR. BHATIA:  In this case it's a customer call, that's

17   right.

18         THE COURT:  All right.

19         So let's assume for argument's sake that your witness

20   is able to say, Here at JPMorgan we prepare a typed synopsis of

21   customer calls, and then we regularly maintain them in a

22   database.  That gets you through one level of hearsay, that

23   these words were said to JPMorgan Chase.  That doesn't get you

24   to the second level of hearsay, which is that what the customer

25   said to JPMorgan Chase can be taken for the truth of the matter

K1LVTEM3

1    asserted.

2              The customer could have also said that, you know,

3    Mr. Imperatore was the shooter on the grassy knoll; it doesn't

4    come in for the truth of the matter asserted.

5              The point is there's a second layer of hearsay here.

6    What do you propose to do about that?

7              (Counsel conferred)

8              MR. BHATIA:  So, your Honor, I think on one hand these

9    are statements -- we believe that these are statements of

10   Joseph Soleimani, one of the witnesses that we expect to call

11   at trial.

12             THE COURT:  Still is hearsay if it's for the truth of

13   the matter asserted, unless there's a hearsay exception.

14             MR. BHATIA:  So we think that's a prior consistent

15   statement.

16             THE COURT:  To rebut a charge of recent fabrication.

17             MR. BHATIA:  We believe that that's going to be one of

18   the -- that could be a line of attack regarding this witness.

19             THE COURT:  Well, let's see.  What's the date -- the

20   Soleimani call appears to be May 2nd, 2019.

21             MR. BHATIA:  That's right.

22             THE COURT:  And when does he go to the authorities?

23             MR. BHATIA:  This is the time when he reported to the

24   bank, at least, that he wanted this to be charged back.

25             THE COURT:  Okay.  And your theory is that this is a

K1LVTEM3

1  prior consistent statement to rebut a charge by the defense

2  that Mr. Soleimani, some time after this date -- only after

3  this date developed the theory that he -- that the charges were

4  unauthorized?

5       MR. BHATIA:  We believe that it might be argued that

6  Mr. Soleimani is only now saying that he never authorized these

7  checks.  And it's not a genuine belief that he wants these --

8  that he wasn't -- that these checks weren't authorized.  So we

9  believe that it might be challenged that this is a recent

10  fabrication.

11      THE COURT:  But if the defense's view is that all

12  along he's been fabricating it, and that he never authorized

13  it, and that whenever he started to say it, it was a

14  fabrication -- in other words, the idea of the charge -- the

15  exception with respect to prior consistent statements is that

16  there was some motive that developed in between to lie.

17      In this case, though, I'm not sure why that works.

18  The victims are the ones who catalyze the whole case, and they

19  apparently do so with a call like this.  So why is it that this

20  is really to rebut a charge of recent fabrication?  Is there

21  something that happens in between?

22      MR. BHATIA:  So, of course, we aren't exactly sure

23  what the defense's cross-examination and arguments might be.

24  But we also believe that under this rule, under -- I want to

25  pull up the right rule, it's 801(d)(1)(B), it's also

K1LVTEM3

 1      appropriate to rehabilitate a declarant's credibility as a

 2      witness when attacked on other grounds.

 3              THE COURT:  Right.  Go ahead.

 4              MR. BHATIA:  And so we believe that, in particular, if

 5      the argument here is that this isn't a genuinely held belief,

 6      then it's also relevant that Mr. Soleimani made the same claim

 7      on a different date.

 8              THE COURT:  Why is it important that these statements,

 9      as opposed to Mr. Soleimani's testimony, come in for the truth

10      of the matter asserted?  They clearly come in for other

11      purposes.  They explain the bank's later conduct; they

12      essentially unspool the events in this case.  The issue is

13      solely for the truth of the matter asserted.  I'm assuming here

14      that a business records foundation comes in for the fact of the

15      complaint by Soleimani.  Presumably he's going to testify to

16      the same effect at trial, right?

17              MR. BHATIA:  That's right.

18              THE COURT:  So why does it matter if his earlier

19      statements to the bank come in for the truth of the matter

20      asserted as opposed to simply to reflect the fact that he first

21      made the claim at a particular date and then that's what caused

22      the bank to act?  What difference does it make?

23              MR. BHATIA:  I think it might affect the weight given

24      to the evidence by the jury.  I think we're entitled to say

25      that he made a true statement before, and he's making a true

K1LVTEM3

1     statement today that you can credit fully.  And I think we're

2     entitled to under 801.

3              THE COURT:  One possibility you're offering is

4     801(d)(1)(B)(i).  But that requires a recent fabrication or a

5     recent improper influence or motive in so testifying.  Again,

6     we'll see whether or not the testimony supplies that.

7              But the defense may simply be all along he was making

8     this up for the oldest motive known to man, he wanted more

9     money.  And it's not that there is something recent; it's just

10    that all along he's telling a falsehood that Teman didn't have

11    a right to create or negotiate these checks.  It's not that

12    something recent happened, he just -- he doesn't like the deal

13    he struck with Teman and he wants his money back.

14             That's one possibility.

15             I don't know whether you're going to get a recent

16    fabrication claim here as opposed to a wholesale, all along

17    fabrication claim here.

18             The other argument is to rehabilitate the declarant's

19    credibility as a witness when attacked on another ground.

20             What might that ground be that properly triggers this?

21             MR. BHATIA:  I think that other ground might be that

22    this is not a generally held belief, which is like what you've

23    referenced earlier, that he doesn't genuinely believe these

24    were unauthorized, but he's welshing on a deal.

25             So I think there his credibility is being attacked as

K1LVTEM3

1    sort of not giving truthful --

2              THE COURT:  On the grounds that he's been saying this

3    all along, in effect.

4              MR. BHATIA:  It is rehabilitative to say he's been

5    saying this all along.

6              THE COURT:  Or, I guess, the argument would be the

7    fact that he made the statement soon after getting the account

8    statement revealing the deduction or the charge is an indicator

9    that he meant what he said; he reacted quickly.

10             MR. BHATIA:  That's right.

11             THE COURT:  Defense counsel, for what it's worth, I

12   would think that it does tend to support the witness's

13   credibility to the extent that soon after receiving the account

14   statement with the disputed charge, he reacted to it in the way

15   that one would argue a person who felt that the charge was

16   bogus did.

17             So I'm happy to hear argument at the time, but

18   assuming authentication, I think that latter point supplies a

19   good reason to allow this to come in for the truth.  It's not

20   that it's recent fabrication; it's that it is credibility

21   enhancing that he made the statement soon after getting the

22   account statement.

23             MR. GELFAND:  Can I just clarify something and perhaps

24   a government proffer would help with this.

25             At first and second reading of this document, it was

K1LVTEM3

1      unclear to me whether the declarant was Benjamin Soleimani,

2      because there's a thing that says "authentication known

3      customer."

4                  THE COURT:  Right.

5                  MR. GELFAND:  And it actually occurs twice.  And then

6      it just says, Signer to contact Joseph Soleimani.  And then

7      it's unclear who's actually calling, at least from the face of

8      the record.

9                  THE COURT:  Right.

10                 Who is Benjamin Soleimani, government counsel?

11                 MR. BHATIA:  Benjamin Soleimani and Joseph Soleimani

12     are the two principals of ABJ; they are brothers.

13                 THE COURT:  Right.

14                 MR. BHATIA:  We believe though that the declarant in

15     these records -- and this is what I expect the evidence will

16     show -- was Joseph Soleimani.

17                 THE COURT:  It looks so.  Right.

18                 MR. GELFAND:  Okay.

19                 THE COURT:  Anything follow from that or just --

20                 MR. GELFAND:  Obviously if it wasn't Joseph Soleimani,

21     and Benjamin Soleimani is not testifying.

22                 THE COURT:  Right.  Understood.

23                 Look, they are both principals of ABJ.  The thesis

24     here you are presumably suggesting is that ABJ made this up

25     after the fact.  And to the extent that ABJ gets the account

K1LVTEM3

1    statement and one of its principals calls fraud on it right

2    away is not irrelevant in formulating a judgment about whether

3    ABJ, through whichever principal, genuinely believed it never

4    agreed to this.

5          We'll see if it's authenticated.  But my instinct at

6    this point is that it likely does come in for the truth of the

7    matter asserted.  We'll see.

8          Appreciate your raising the issue early.

9          MR. GELFAND:  Understood.

10          There's one other brief issue.

11          Some of the government's more recent *Jencks* material

12   that's been disclosed in more recent discovery within the last

13   week or so includes statements by witnesses -- in particular,

14   bank-type witnesses, bank investigators, things like that --

15   that these were deemed to be "fraudulent" or fraud.  And I

16   would ask that those witnesses not opine in front of the jury

17   that something is or isn't fraud, because ultimately that's

18   what this trial is about.

19          THE COURT:  Why isn't the right answer for me to

20   just -- well, what would be the purpose of their saying that

21   government counsel -- in other words, how is that integral to

22   the narrative here?

23          MR. BHATIA:  I think it's important to show the steps

24   that different parties took in triggering the chargebacks in

25   question here.  We expect that -- as I think I've mentioned, we

K1LVTEM3

1    expect that one of the defenses might be the victims were just

2    looking out for themselves and were trying to get their money

3    back.  In fact, I think it will be shown that they went through

4    a process, and some of those process involves flagging

5    fraudulent activity.

6              THE COURT:  Wait a minute.

7              The fact that some munchkin at JPMorgan Chase

8    concludes that something is fraud doesn't make it so.  They

9    haven't done a full investigation.

10             Did anyone at JPMorgan Chase, for example, ever look

11   at any of the contracts between a Teman company and a customer?

12   Probably not.

13             MR. BHATIA:  They didn't, your Honor.

14             THE COURT:  Right.

15             So the real issue is if they use the label "fraud" in

16   the course of their work, the most important thing is that I

17   instruct the jury that whatever label JPMorgan Chase uses must

18   be disregarded by you as simply -- as anything other than

19   simply describing the internal label they put on it.  In the

20   end, it is for the jury to determine whether or not the

21   elements of the types of fraud here are established.  That's

22   the relevant point.

23             MR. BHATIA:  That's right.

24             THE COURT:  Defense counsel, the word "fraud" is all

25   over the case.  It's going to be in my voir dire.  So I'm not

K1LVTEM3

1     sure it's quite like saying heroin or something.

2             So it seems to me that the fact that the bank made

3     that conclusion, which is presumably derivative of what the

4     customer told them, if anything, it gives you an opportunity --

5     it allows you to say, Did the customer tell you that there was

6     a contract, or whatever your cross would be.  But I think the

7     right answer is for you to ask me to give a limiting

8     instruction to the jury that whatever label the bank put on

9     this is of no moment.

10            MR. GELFAND:  We appreciate that.

11            We'll propose a limiting instruction.

12            THE COURT:  That's fine.

13            I'm certainly prepared to do one with or without

14    particular wording, but I think that's the right call.

15            It's hard, where the bank has a nomenclature for a

16    process like this to -- for me to police their grammar.  And

17    sometimes doing that suggests, when the word slips out, that

18    there's actually some importance to it.  So it seems to me the

19    defense's interest is better protected by my giving a firm

20    instruction rather than making it look like it's all that

21    radioactive.

22            MR. GELFAND:  I think that's fair.

23            Our concern, as I think the Court understands, is that

24    the jury goes back and says, Well, these seasoned bank

25    investigators say this is fraud; it must be bank fraud.

K1LVTEM3

1          THE COURT:  Look, that plays into your defense of a

2     rush to judgment, right?

3          MR. GELFAND:  Sure.

4          THE COURT:  You're then going to treat the bank as

5     synonymous with the government as having rushed to judgment and

6     not looked at the contract before making a decision.  So

7     another way to look at this is an opportunity for you.

8          MR. GELFAND:  Understood.

9          THE COURT:  All right.

10         Anything further?  Go ahead.  Yes.

11         MR. DiRUZZO:  I have one thing, Judge.

12         In thinking about the privilege issues, would the

13    Court be amenable for the parties submitting protective and a

14    clawback order?  Because obviously the privilege issues that

15    we're talking about are going to be waived.  But in the

16    production that the government is going to get, there very well

17    could be a straight email.  And I don't want unrelated civil

18    litigation --

19         THE COURT:  I see.

20         Let me just say this:  You want to make sure that in

21    litigating advice of counsel here, you're not waiving any more

22    than is necessary.

23         MR. DiRUZZO:  Correct.

24         THE COURT:  The parties can negotiate what they want

25    to negotiate.  I'm certainly not understanding your waiver with

K1LVTEM3

1    respect to this case as intending to waive as to any other

2    controversy.  But as it relates to potential civil litigation,

3    hypothetically, with the banks or whatnot, it's hard for me to

4    see how there isn't a waiver here that runs to this

5    controversy.  So I'm not --

6          MR. DiRUZZO:  To be a little more precise, Judge, I'm

7    worried about that Mr. Reinitz is going to divulge an email on

8    unrelated civil litigation that has nothing to do with bank

9    fraud, RCCs --

10          THE COURT:  I see.  You want to make sure that if

11   there's an overproduction here, you have a right to claw back

12   the document or at least make sure that a production of

13   privileged material on an exogenous subject isn't treated as a

14   waiver.

15          MR. DiRUZZO:  Exactly.

16          THE COURT:  All right.  I'm happy to just announce now

17   that you have the right -- if you act promptly -- to claw back

18   unrelated materials if they are produced in the course of your

19   forthcoming production of attorney-client materials.  But, as

20   with all issues with respect to errant productions, fortune

21   favors the well-prepared and the swift, meaning an attempt to

22   claw back a document is more likely to be respected if it's

23   done sooner rather than later.

24          MR. DiRUZZO:  Okay.  Understood.  Thank you, Judge.

25          THE COURT:  Does that give you the comfort you need?

K1LVTEM3

1            MR. DiRUZZO:  Yes, it does.

2            THE COURT:  Okay.  Very good.

3            Anything further from anyone?

4            MR. DiRUZZO:  No, Judge.

5            MR. BHATIA:  No, your Honor.

6            THE COURT:  All right.

7            I'll see you at 8:30.

8            And again, I expect an email, copying the other side,

9   to my chambers if there's anything of any consequence that you

10  intend to raise tomorrow morning.

11           Thank you.  See you at 8:30.

12           (Adjourned to January 22, 2020 at 8:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25