K1M7TEM1 CORRECTED

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                              19 CR 696 (PAE)

5  ARI TEMAN,

6            Defendant.                      JURY TRIAL

7  ------------------------------x

8                                   New York, N.Y.
                                     January 22, 2020
9                                    8:30 a.m.

10
   Before:
11
                    HON. PAUL A. ENGELMAYER,
12
                                     District Judge
13

14                          APPEARANCES

15
   GEOFFREY S. BERMAN,
16      United States Attorney for the
        Southern District of New York
17 KEDAR S. BHATIA
   EDWARD A. IMPERATORE
18      Assistant United States Attorneys

19 JOSEPH A. DIRUZZO, III
   JUSTIN GELFAND
20      Attorneys for Defendant

21 ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                  WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25

K1M7TEM1  CORRECTED

1          (In open court)

2          THE COURT:  All right.  Good morning, counsel.  Be

3     seated.

4          Thank you, everyone, for the hard overnight work.  Oh,

5     Mr. Teman is not here.

6          MR. GELFAND:  He just went to the restroom.

7          THE COURT:  All right.  Do you waive his appearance?

8     We've got business to take care of.  He really needs to be in

9     his seat.

10         MR. GELFAND:  Absolutely.

11         THE COURT:  There are a handful of issues that came in

12    overnight.  Before turning to the two specific issues raised by

13    the government's letters, let me just take care of one item

14    which should be self explanatory and obvious, but I want to

15    make absolutely sure there is no misapprehension among counsel.

16         Defense counsel, there are a handful of subjects that

17    obviously should not be properly included in a defense opening

18    here, but insofar as you're out of district and we have had a

19    hiccup or two, I want to make absolutely sure that the Court's

20    pretrial rulings are not to be commented on in an opening; the

21    defendant spending time in jail after his arrest is not

22    properly part of an opening; the speedy trial violation that

23    the court found is not properly part of an opening; good

24    character evidence, you know, per the commentary before doesn't

25    belong in the opening.  I don't know if you're planning to say

K1M7TEM1   CORRECTED

1   something about whether Mr. Teman does or doesn't have a

2   criminal record, but I don't know whether that's going to be

3   coming into evidence somehow or on what theory, but unless

4   you've got a coherent theory under which that's going to be

5   received in evidence, it shouldn't be commented upon.  All

6   agree?

7           MR. DIRUZZO:  Yes, your Honor.  I will be giving

8   opening, and I understand what you said, and it's not a

9   problem.

10          THE COURT:  Great.  I just want to make sure you're

11  sticking to the facts and the issues here and not courting

12  objections.  I don't like objections during an opening, but if

13  there is something that's well over the line, I will sustain

14  it, and that doesn't ever make anybody happy.

15          So I have received two letters from the government.

16  One I think is quite straightforward, which just involves a

17  specific exhibit from Bank of America's records, exhibit 34.

18          Defense, were you actually offering this document?

19  The government's letter at docket 84 raises the issue of

20  whether Defense Exhibit 34 -- which appears to involve some

21  other customer -- is being offered.  Obviously you haven't had

22  a chance to respond.  I can't imagine what the theory of

23  relevance would be.

24          MR. DIRUZZO:  Your Honor, our theory is that it goes

25  to Mr. Teman's intent, because this is another RCC with the

1    same language, drop our contract, no signature required, in the

2    bottom right-hand side.  It was drawn on Signature Bank, one of

3    the banks that I believe --

4            THE COURT:  Why does it go to his state of mind that

5    he engaged in the same conduct?  It doesn't mean that it's

6    legal or illegal.  It could be ripping off the other customer

7    or not, but it just means he did the same thing.  I mean it's

8    not like somebody advised him at the bank, yeah, this is a

9    great thing to do, and you must have gotten the customer's

10   permission.

11           MR. DIRUZZO:  No, but it goes towards his concept that

12   RCCs are permissible under the law.

13           THE COURT:  One moment.

14           Mr. Teman, you need to be in your seat at 8:30.  Your

15   counsel waived your appearance so I could proceed, but you need

16   to be here.

17           Go ahead.

18           MR. DIRUZZO:  It goes towards his belief that RCCs

19   were permissible under the law, there is nothing nefarious or

20   improper with an RCC.

21           THE COURT:  Wait.  Because he has a check that he

22   deposits as an RCC to some other customer doesn't go to his

23   belief.  It doesn't make it more likely that he believes that

24   these are legal or illegal.  It could be that he ripped off

25   another customer, or it could be that another customer gave him

1    authorization that these customers did not.  We're not going to

2    try the case of Gold Management.

3            First of all, it should have been obvious under the

4    principles that I set out earlier in response to the

5    government's motion in limine that quote unquote good character

6    evidence, specific instances, are not admissible.  But beyond

7    that, this invites a trial within a trial because who knows

8    what the course of dealings were with this other customer who

9    is not the subject of an indictment.  The dealings with Gold

10   may or may not situate Gold in a different position from the

11   landlords who are entities 1, 2, 3 and 4, and so whatever he

12   did or didn't do with respect to Gold, A, it appears to be in

13   the nature of quote unquote good character evidence; but, B,

14   beyond that would only be potentially germane if the fact

15   pattern was on all fours with the other customers.  And we're

16   not going to have a trial within a trial about his business

17   relationship involving a customer who is not a subject of the

18   charges here.

19           MR. DIRUZZO:  I understand, your Honor, and I

20   understand your ruling, and I would just submit that you take

21   Defense Exhibit 34 as our offer of proof.

22           THE COURT:  Very good.  So, Exhibit 34 is out; I will

23   grant the government's motion at docket 84.

24           All right.  The second issue involves the scope of the

25   waiver.  As expressed yesterday, the defendant in order to

K1M7TEM1  CORRECTED

1    facilitate his advice of counsel defense, made a subject matter

2    waiver scope with respect to lawyer Reinitz with respect to

3    advice and communications with Reinitz with respect to the

4    issues in this case, i.e., involving the use of RCCs and the

5    like.  The government raises the issue of whether the defense

6    intends to assert a temporal limit to that waiver, with the

7    limit being the date of the defendant's arrest.  The government

8    notes that at least for some period of time Mr. Reinitz appears

9    to have represented the defendant in connection with the

10   initial proceedings in this case.

11          So, let me ask the defense a few factual questions.

12   When, if at all, did Mr. Teman terminate the representation of

13   himself or his companies by Mr. Reinitz?  Or does that

14   representation continue to this day?

15          MR. GELFAND:  It continues to this day, your Honor.

16          THE COURT:  So Mr. Reinitz continues to represent the

17   defendant and his companies?

18          MR. GELFAND:  Yes, your Honor.

19          THE COURT:  In a business way.

20          MR. GELFAND:  Yes, your Honor.

21          THE COURT:  And when, if at all, did Mr. Reinitz

22   represent the defendant in connection with the criminal case?

23          MR. GELFAND:  Your Honor, when Mr. Teman was arrested

24   out of state, my understanding is Mr. Teman advised the

25   authorities arresting him, you know, Mr. Reinitz is my lawyer.

K1M7TEM1  CORRECTED

1    He didn't have a reason to believe he needed a criminal defense

2    lawyer at the time.  He didn't have a criminal defense lawyer

3    at the time.

4              THE COURT:  Well, he obviously needed a criminal

5    defense attorney if he was arrested.  You're simply saying he

6    didn't have one yet.

7              MR. GELFAND:  The arrest was a surprise to Mr. Teman.

8              THE COURT:  Right.  But once he's arrested he needs a

9    criminal defense lawyer.

10             MR. GELFAND:  No, of course, your Honor.  But I'm

11    saying it's not like he had someone lined up prior to.

12             THE COURT:  So what happens?

13             MR. GELFAND:  So, as I understand it -- I wasn't

14    involved in the case at the time -- Mr. Reinitz makes initial

15    contact with Detective Alessandrino, who ultimately gives him

16    the prior assistant U.S. attorney's name and contact info,

17    Mr. Gutwillig, and there is some very early conversations of

18    essentially where is he, what's the charge, what is the

19    charging document, and then Mr. Reinitz works to facilitate

20    getting Mr. Teman criminal counsel initially in Florida for the

21    initial matters, and ultimately here, ultimately culminating in

22    Mr. Teman retaining Mr. DiRuzzo and I initially.

23             THE COURT:  You two are the next lawyers in after

24    Mr. Reinitz?

25             MR. GELFAND:  We're the next lawyers to formally

K1M7TEM1  CORRECTED

1    represent Mr. Teman.  Mr. Reinitz facilitated or participated

2    in some discussions with other potential lawyers.

3             THE COURT:  Understood, right.  And then the issue and

4    to what degree did Mr. Reinitz participate formally or

5    informally in the representation of Mr. Teman in connection

6    with this matter by which I mean the arrest forward?

7             MR. GELFAND:  Your Honor, can I have one minute,

8    please?

9             THE COURT:  Sure.  I would -- sure.

10            MR. BHATIA:  Your Honor?

11            MR. GELFAND:  Your Honor, my understanding is that

12   Mr. Reinitz did not represent Mr. Teman in the criminal matter,

13   but as essentially civil counsel or corporate counsel

14   Mr. Reinitz was involved -- including with us -- on certain

15   discussions relevant to diligence, about possible defenses,

16   understanding the underlying facts, things like that.

17            THE COURT:  Well, that complicates things then because

18   for obvious reasons.  I mean he is a fact -- you obviously

19   would like to use him as a fact witness.  You can't have this

20   as a sword and a shield.  His communications with Mr. Teman

21   relating to this subject matter are fair game.  You can't be

22   drawing lines within that.

23            MR. GELFAND:  We agree, your Honor.  The issue is

24   the -- I think there is a very --

25            THE COURT:  I mean he continues to represent the Teman

1    companies to this day and Mr. Teman in a business level.

2              MR. GELFAND:  Yes, your Honor.

3              THE COURT:  So, is there anything -- I appreciate that

4    communications about the terms of bail are separate; that's a

5    different subject matter.  Communications that don't relate to

6    the business practices at issue are a different story, but the

7    waiver here relates to the business practices at issue.  You

8    aren't trying to limit any inquiry about that by time, are you?

9              MR. GELFAND:  No, your Honor.  What we are limiting,

10   to be very precise, is communications that are not about

11   essentially reliance on the contracts, the RCCs, the subject

12   matter related to these entities, but that are about you may

13   want to hire this lawyer, you may want to hire this lawyer.

14             THE COURT:  There may not be a controversy here.  If

15   what you're saying is Mr. Reinitz provided advice -- whether we

16   call it legal or business -- he has provided advice about the

17   retention of counsel or things like that, that's outside of the

18   scope of a waiver because it's a different subject matter.  But

19   to the extent that Mr. Reinitz spoke with Mr. Teman at any

20   point before or after last July 3 relating to RCCs, checks, his

21   dealings with entities 1 through 4, those subjects are fair

22   game for inquiry given the waiver.

23             MR. GELFAND:  We don't disagree, your Honor.

24             THE COURT:  OK.  So I think that moots the

25   government's motion.  In other words, you are not in fact

1    drawing a temporal limit within the subject matter, to wit, Mr.

2    Teman's business dealings with entities 1 through 4, his RCCs,

3    the check, creation and negotiating practices at issue both

4    historically and going forward.  That's within the scope of the

5    waiver.  What you want to make sure is that the government

6    doesn't get into issues involving, for example, the selection

7    of legal representatives or the negotiation of bail terms or

8    the like, or consideration of a guilty plea or not.

9              MR. GELFAND:  Correct, your Honor.

10             THE COURT:  Have I articulated the line correctly?

11             MR. GELFAND:  Yes, your Honor.  And, to be clear,

12   we -- what teed up this issue was actually not the defense's

13   approach to the Court's order yesterday, but was a separate

14   subpoena that the government issued to Mr. Reinitz last night.

15   And there was a second draft of it, as I understand it.

16   Mr. Reinitz sent us a copy of the subpoena, the trial subpoena.

17   The subpoena added -- initially it was for all intents and

18   purposes, essentially the scope of the Court's order with a

19   couple extra things of dates -- records of dates when he spoke

20   with Mr. Teman, things that I'm sure Mr. Reinitz will respond

21   to.  The additional aspect was any communications that

22   Mr. Reinitz had with Mr. Teman about the complaint or the

23   indictment, and that involves communications that we believe

24   are outside the limited waiver.

25             THE COURT:  Well, the answer is it may include some,

1   but it may include ones that are within the scope of the

2   waiver.  If Mr. Reinitz and Mr. Teman spoke about the business

3   practices that are implicated by the complaint, that's clearly

4   within the scope of the waiver, correct?

5            MR. GELFAND:  Yes, your Honor.

6            THE COURT:  Whereas if they spoke about the

7   implications of being a federal felon, or being arrested, or

8   having an ankle bracelet, or a particular cosigner, or the

9   terms of engagement of a criminal defense specialist, that's

10  outside the scope of the waiver.

11           MR. GELFAND:  That's our theory.

12           THE COURT:  But you would agree that conversations he

13  had with Mr. Teman about the conduct at issue, including Mr.

14  Teman's dealings with the four entities, the charged conduct,

15  regardless of the date and time of those communications, are

16  within the scope of the subject matter waiver.

17           MR. GELFAND:  Yes, your Honor.

18           THE COURT:  OK.  Government, have we cleared up the

19  issue?  Is there some scenario that you think has been left

20  blurry?

21           MR. BHATIA:  I think your Honor has covered most of

22  it.  I just want to be clear just so there isn't some confusion

23  down the road.  It is our view that a conversation like

24  regarding the indictment -- in Count One we charged certain

25  checks, you told me in Count One -- I think -- let me rephrase

1    that.  Conversations regarding the complaint or the indictment

2    and the substance of it I think would still be covered by the

3    waiver.

4              THE COURT:  Well, the substance of it certainly, but

5    the legal implications from a criminal defense perspective of,

6    let's say, pleading guilty, or going to trial, or who to hire,

7    that's a different story.  And so I think the line here

8    involves if they are looking back retrospectively about the

9    conduct at issue and discussing that, Mr. Gelfand is candidly

10   saying that's within the scope of the waiver -- and he is

11   nodding now.  And, similarly, if they continue to discuss these

12   business practices going forward -- for whatever relevance that

13   theoretically might have or not -- that's within the scope of

14   the waiver; it's a subject matter waiver.

15             But Mr. Teman -- presumably not knowing any other

16   lawyer -- got his business lawyer involved in the early process

17   of staffing his case, and although presumably Mr. Reinitz knows

18   little about criminal law, he knew enough to work the phone and

19   try to spot talent.  That hunt for a legal team doesn't seem to

20   me to be within the scope -- and I don't think you're saying

21   otherwise -- even though one can imagine conversations about

22   the complaint influencing that:  Who is a good white collar

23   lawyer?  Who has had experience with bank fraud?  In that

24   respect it's glancingly touching the complaint, but it's

25   clearly not what any of us understand to be the scope of the

K1M7TEM1   CORRECTED

1    waiver.  Do you agree with that?

2              MR. BHATIA:  I agree with part of what you said, that

3    I would call it maybe the administrative part of finding a good

4    lawyer, negotiating terms of engagement wouldn't be covered.

5    In fact I'm not sure that would be relevant to this case

6    anyway.

7              But conversations about should I take a guilty plea or

8    should I not take a guilty plea to the conduct that you

9    previously advised me about, I do think would be covered.  What

10    I want to make clear is that it is the government's position

11    that --

12              THE COURT:  Let's see if this is an academic issue or

13    not.

14              Defense counsel, without giving me the content -- if

15    we need to go into the robing room for an in camera discussion,

16    we will -- can you tell me declaratively now whether Mr. Teman

17    had any discussions with Mr. Reinitz at any point about whether

18    or not to take a plea in this case?

19              MR. GELFAND:  Based on my client's recollection and

20    everything I know about the case, never.

21              THE COURT:  Did Mr. Reinitz continue to be any part of

22    the defense group here after present counsel were retained?

23    Did he assist in any way in shaping the representation of Mr.

24    Teman in this case?  If so, we have an issue.

25              MR. GELFAND:  No, your Honor, but I want to caveat

K1M7TEM1   CORRECTED

1    that with one small caveat, and that's at various times

2    Mr. Reinitz directly provided us information, documents, no

3    different from any other witness.

4            THE COURT:  But that's in his capacity as a fact

5    witness as to advice of counsel.  But did he play any role in

6    shaping the defense in this case?  You would not be asserting

7    an attorney/client privilege based on a common interest

8    communication.  The privilege you have is the waived one, here

9    involving your communications with a fact witness, and you have

10   now waived a privilege as to that.  Do I have that right?

11           MR. GELFAND:  You do, your Honor.  He did not

12   participate in any way other than as a fact witness.  And, to

13   be precise, some communications, Mr. Reinitz in the ordinary

14   course of his practice may have used phrases like "privileged"

15   and "confidential" in giving them to us, but I don't draw any

16   significance to that in our analysis.

17           THE COURT:  You are not claiming he has ever been part

18   of the defense team of this case.

19           MR. GELFAND:  No, your Honor.

20           THE COURT:  And when was the first of you or

21   Mr. Gelfand retained in this case?

22           MR. GELFAND:  I am Mr. Gelfand.

23           THE COURT:  Forgive me.  When was the first of you and

24   Mr. DiRuzzo retained in this case?

25           MR. GELFAND:  Very soon after Mr. Teman was released

1    on bond in Florida.

2            THE COURT:  So late in the first half of July, July 8,

3    9 or 10.

4            MR. GELFAND:  Yes, your Honor.  As a technical matter

5    maybe just a week or two later.

6            THE COURT:  But you are saying from the point in which

7    you were retained forward, the only communications you have

8    had -- speaking now about you and Mr. DiRuzzo -- with

9    Mr. Reinitz bear on in effect his role as a fact witness as

10   opposed to shaping the criminal defense effort here.

11           MR. GELFAND:  Yes, again with one caveat, and that's

12   there is some related civil -- not related at all -- unrelated

13   civil issues, and Mr. Reinitz in representing Mr. Teman or his

14   companies in those completely unrelated matters at various

15   times inquired about whether or not certain things might have

16   an impact on the criminal case.

17           THE COURT:  What are the unrelated matters?

18           MR. GELFAND:  There is a civil litigation involving a

19   company called MVI.  It's a dispute over a rival intercom

20   system.

21           THE COURT:  So that's a competitor dispute, not a

22   dispute with a customer.

23           MR. GELFAND:  Correct.  It's a trade secret case, as I

24   understand it.

25           THE COURT:  So, I understand Mr. Reinitz I gather

K1M7TEM1 CORRECTED

1   represents Mr. Teman in connection with competitor disputes.

2          MR. GELFAND:  Yes, your Honor.

3          THE COURT:  And the reason that became a germane

4   subject with the criminal defense team here -- again be

5   careful, I don't want you to inadvertently comprise unrelated

6   legal interests of Mr. Teman.  I just want to make sure that

7   I'm setting clear ground rules.  Can you explain what led that

8   to be a germane subject for you?

9          MR. GELFAND:  Yes, your Honor.  Generally, not limited

10  to that matter, but matters completely unrelated to the

11  entities in this case, and to the RCCs or anything like that,

12  as with any ongoing litigation there was some general

13  discussion, matter of, you know -- I am going to phrase this

14  broadly -- but if we do something in the civil case, could that

15  have a negative impact on the other case.

16         THE COURT:  Right.

17         MR. GELFAND:  As a practical matter, just to be clear

18  with the Court, Mr. Reinitz -- when we got involved in the

19  case -- me being Mr. Justin Gelfand -- I went to college with

20  Mr. Teman.  That's how I know Mr. Teman.

21         THE COURT:  What college?

22         MR. GELFAND:  Brandeis University.  As a practical

23  matter we were certainly not in touch on a daily basis or

24  anything like that from college, but Mr. Teman with Mr. Reinitz

25  initially retained counsel that I don't know who represented

K1M7TEM1  CORRECTED

1  him in the bond hearings and things like that.

2                    THE COURT:  In Florida.

3              MR. GELFAND:  In Florida.  And Eric Irons in another

4  attorney who played a minimal role in the very early stages of

5  the criminal case.  There are some communications that I am

6  aware of between Mr. Reinitz and those two attorneys.  Then Mr.

7  Teman reached out directly to me.

8                    THE COURT:  Right.

9              MR. GELFAND:  And doing my diligence I had some

10  initial conversations with Mr. Reinitz, who I understood had

11  been in very broad strokes essentially quote unquote corporate

12  counsel quite some time, to obviously do my diligence, educate

13  myself about the case.  And understanding all those things,

14  there are some early communications between Mr. Reinitz and his

15  other attorneys that preceded my involvement in the case that

16  we are aware of, and then there is communications from the time

17  I got involved.

18              I mean candidly, your Honor, the nature -- and I am

19  happy to speak in very general terms -- the nature of the

20  conversations about what I'm calling the unrelated litigation

21  fell into the category of, to be blunt, generally if a

22  defendant facing criminal charges, you know, can avoid being

23  put under oath, that's a good thing.

24                    THE COURT:  I see.  In other words, the concern -- for

25  example, in those cases there is an interplay, because if Mr.

K1M7TEM1   CORRECTED

1    Teman is deposed in those cases he may say something, he may be

2    questioned about the pending criminal case here.  If he invokes

3    his Fifth Amendment privileges in that case, that may hurt him

4    in that case in order to protect him here, and so somebody was

5    mediating the relationship between his interests in the two

6    cases.

7              MR. GELFAND:  Yes, your Honor.  And there were

8    discussions that were not fact witness discussions but

9    lawyer-to-lawyer discussions in that vein.

10             THE COURT:  I think we have gotten to a point where

11   there ought to be clarity here.  Mr. Gelfand, as always, you

12   have been gracious and clear.

13             I want to make sure, government, that at this point

14   there is clarity, and it seems to me that what you are seeking

15   you have gotten that which is reasonable, which is to say that

16   the subject matter of the conduct here -- regardless of time

17   scope -- is covered by the waiver as to the Teman/Reinitz

18   communication, but there may be a limited subset of

19   Reinitz/Teman conversations that are out of bounds, what you

20   call the administrative or bail subjects, or advice about, for

21   example, the interplay between this action and other

22   litigations that Reinitz represents Teman on.  I don't think

23   that's really in play here.

24             Do you need any more clarity from the court?

25             MR. BHATIA:  Can I just have a moment to confer with

K1M7TEM1  CORRECTED

1    defense counsel for a moment?

2              THE COURT:  Yes, you may.

3              OK, counsel have conferred with each other and amongst

4    themselves.  Mr. Bhatia, anything further?

5              MR. BHATIA:  Yes, thank you, Judge Engelmayer.

6    Apologies for the delay.

7              THE COURT:  No worries.

8              MR. BHATIA:  I spoke to defense counsel.  I was

9    prompted to have this conversation because as part of the

10   discovery of the conversations involving Mr. Reinitz we

11   received this morning one draft of a letter dated January 22

12   from Mr. Reinitz and then another draft --

13             THE COURT:  January 22 this year.

14             MR. BHATIA:  That's today.  We received a letter dated

15   today from Mr. Reinitz sent to defense counsel, and then we

16   received a second version of that letter, a final draft maybe.

17   We wanted to make sure that there weren't conversations that

18   would say make version one look like version two.  Defense

19   counsel has represented that there weren't those

20   communications.  But we think conversations like that would be

21   fair game to get into.

22             THE COURT:  It depends on the context.  If they're

23   taking about baseball, that's one thing.  If they are talking

24   about the implications of a different civil litigation on this,

25   that's also out of bounds.  If they are talking about the

1    content of the charges in this case or the business practices

2    at issue, things like that, that's within the scope.  Think

3    we've covered that.

4            MR. BHATIA:  I think it does have to do with the scope

5    here, so I think those would be germane, and they would be fair

6    for us to get into and then be subject to the waiver.  So I

7    think at this point, without more specifics about what exact

8    areas we would get into, I think we are all on the same page.

9            THE COURT:  My goal with all of these rulings is to

10   let counsel try their case without interruption in front of the

11   jury by me.  I want you to have clarity as to the ground rules

12   so we fight it out beforehand with enough notice so that you

13   can organize your courtroom advocacy.

14           Have we achieved the necessary clarity as to the

15   advice of counsel issue?

16           MR. BHATIA:  I think so.

17           THE COURT:  All right.

18           Look, given the sensitivity of counsel issues --

19   although as a general matter I love to have issues addressed

20   other than at side bars when at all possible -- as the trial

21   moves on, if we see that you're in an area where you have any

22   sense that there could be anything ticklish, you may ask for a

23   sidebar about that, and I will be solicitous of that,

24   particularly where it involves Mr. Reinitz, because I want to

25   make sure in areas involving attorney/client and waiver that we

1    don't inadvertently have something coming up in front of the

2    jury that was outside the scope of the waiver.  But I think you

3    have the necessary clarity.

4         I understood the main spirit of your letter to be

5    resisting the idea of a temporal sunset on the waiver -- on the

6    subject matter waiver -- and you have gotten clarity both from

7    me and from Mr. Gelfand that there is no temporal sunset on the

8    subject matter waiver.

9         MR. BHATIA:  Thank you.

10        THE COURT:  All right.  I think we have now taken care

11   of the matters that were the subject of letters.

12        Beginning with the government -- I would like to give

13   you a break before the jury comes -- does anyone have anything

14   else to raise begin with the government?

15        MR. BHATIA:  No, your Honor.

16        THE COURT:  Mr. DiRuzzo?

17        MR. DIRUZZO:  Yes, your Honor.  Just so it's clear and

18   for purposes of the record.

19        THE COURT:  Sorry, just a little clearer.  This is an

20   old and wonderful but a fun house of a courtroom, so please

21   always speak loudly and into the mics.

22        MR. DIRUZZO:  Sure.  So, your Honor, in complying with

23   this Court's order, we do have a binder of the privileged

24   information to give to you.

25        THE COURT:  These are the materials that were given to

K1M7TEM1  CORRECTED

1    the government, right?  I'm not getting something that the

2    government doesn't already have.

3              MR. DIRUZZO:  Correct, your Honor.

4              Your Honor, last night -- yesterday asked for

5    materials both in paper and electronically.  I provided to your

6    chambers the documents electronically.  I also provided those

7    same documents to the government electronically.  The problem

8    that I have with this binder is this binder, the paper, is

9    incomplete.  There are a couple tranches that got to both your

10   chambers and the government 2 o'clock in the morning, and as

11   you can imagine --

12             THE COURT:  All is forgiven; I appreciate that.

13   That's fine.  So, can you just top it up so that by tomorrow

14   morning I have whatever the balance is?

15             MR. DIRUZZO:  Sure.  I will give it to you all at one

16   time.

17             THE COURT:  Well, why don't you give me what you have,

18   give it to my law clerk.  I don't know that any of it is likely

19   to be germane today, but I try to keep ahead of things so that

20   to the extent I can flip through it, it just gives me more

21   insight into the case, and I will take the balance when you get

22   it.

23             MR. DIRUZZO:  Counsel for the government did mention

24   those letters.

25             THE COURT:  Those letters?

K1M7TEM1  CORRECTED

1          MR. DIRUZZO:  The letters from Mr. Reinitz that are

2    dated today.

3          THE COURT:  Right.

4          MR. DIRUZZO:  The first letter I received at

5    approximately 2:15 in the morning.  I immediately included that

6    in the production electronically to chambers, because I was

7    having a problem with the USA FX, my log-in.  I was using

8    cocounsel's long-in who was asleep at the time.  I was unable

9    to upload them to the government.  In the morning I uploaded

10   them, but I also had received from Mr. Reinitz an updated, a

11   final version, so to speak, of the letter, and that's why there

12   are two letters dated the same that look very similar but are

13   not.  Just so it's clear, between 2 o'clock in the morning and

14   6:15 or so neither myself or Mr. Gelfand had any conversations

15   with Mr. Reinitz.

16         THE COURT:  I am relieved to hear that, that's good.

17         MR. DIRUZZO:  So if there was any confusion as to

18   these documents.

19         THE COURT:  No, I didn't infer anything nefarious, but

20   I appreciate the clarity.

21         Anything else from the defense?

22         MR. GELFAND:  No, your Honor.

23         THE COURT:  Let me check with Mr. Smallman.

24         Go ahead, Mr. Bhatia.

25         MR. BHATIA:  One more thing.  I just want to note for

K1M7TEM1  CORRECTED

1    the record that in reviewing some of the documents produced

2    yesterday by the defense I did identify some documents that I

3    think might remain privileged and might not be part of the

4    waiver in this case, so I just want to note for the record I

5    alerted defense counsel this morning.

6            THE COURT:  That's professional and good for you to do

7    that.  Defense counsel raised the possibility of a claw back.

8    Particularly given the warp speed this has arisen, it's not

9    surprising.  And I appreciate your professionalism in spotting

10   the issue, alerting the defense and alerting the Court.

11           If no one else has anything, let me just check with

12   Mr. Smallman about the earliest possible time that our venire

13   could get here.

14           Mr. Smallman estimates that we won't have anybody

15   before 9:45.  So, you are, as we say in Fourth Amendment law,

16   free to leave until 9:40.  I will be apt to be here any time

17   from 9:40 or thereafter, depending on what I hear from Mr.

18   Smallman and the jury clerk.  Thank you.

19           (Recess)

20           (Continued on next page)

21

22

23

24

25

K1MVTEM2

1          THE COURT:  Mr. Smallman tells me that the venire is

2    here; he's just waiting for one or two of them to finish

3    comfort break and then we'll bring them in.

4          I'm joined on the bench by Judge Lewis Liman, who is

5    new to the S.D.N.Y. and will be sitting here for whatever

6    guidance he can get from watching a jury selection.  I'll

7    introduce him to the jury as such, but he'll be here for jury

8    selection, but not the balance of the trial.

9          MR. BHATIA:  Your Honor?

10          THE COURT:  Yes.

11          MR. BHATIA:  We can just discuss one matter before the

12    jury comes here.

13          We agreed to a bank records stipulation, and I just

14    wanted to let the Court know about that.  And we'll read that

15    out -- I expect to read that out with the first witness.

16          THE COURT:  Very good.

17          MR. BHATIA:  Is a Bank of America representative.

18          THE COURT:  Very good.

19          Just to remind you, just given the old courtroom, just

20    speak a little louder.

21          MR. BHATIA:  Excuse me.

22          THE COURT:  Thank you.

23          I think I mentioned this at an earlier pretrial

24    conference, but each day I value getting an updated exhibit

25    list with a mark annotating what's been received and through

K1MVTEM2

1    what witness.  So make sure that's added to the list.

2              MR. BHATIA:  We will.

3              THE COURT:  Okay.  Mr. Gelfand.

4              MR. GELFAND:  Your Honor, I just wanted to note for

5    the record that on behalf of Mr. Teman, as his legal counsel,

6    we signed the stipulation.  He's well aware of it.  He fully

7    agrees with it.

8              THE COURT:  Very good.  Thank you.

9              (Jury selection commenced)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1M7TEM3

1          (A jury was selected and sworn)

2          THE COURT:  All right.  Counsel is there anything to

3     raise while we have this break?

4          MR. DIRUZZO:  Yes, your Honor.  The defense would

5     invoke the rule of sequestration.

6          THE COURT:  What does that mean?

7          MR. DIRUZZO:  That means that when a potential witness

8     has yet to testify, that they can't sit in the room to hear

9     other witnesses, or opening statements, or something of that

10    nature.

11         THE COURT:  I have not heard it referred to as that,

12    but you're invoking your rights under Rule 615.

13         MR. DIRUZZO:  Yes.

14         THE COURT:  Very good.  Government, are there any -- I

15    take it, Detective Alessandrino as a party agent is permitted

16    under 615 to be at the table.

17         MR. BHATIA:  That's right.

18         THE COURT:  But the other witnesses you have will in

19    fact have been sent from the courtroom during other testimony.

20         MR. BHATIA:  That's right.

21         THE COURT:  And I assume you are making the same

22    application with respect to the defense.

23         MR. BHATIA:  Yes.

24         THE COURT:  Very good, I am happy to grant that.  It's

25    not the nomenclature I ordinarily around here but the concept

K1M7TEM3

1    of course equally applies.

2             Anything else to raise with me?  No, Judge.

3             THE COURT:  Government?

4             MR. BHATIA:  Your Honor, briefly, we have learned that

5    in the last few days the defendant has make public statements

6    on social media -- various social media platforms -- about this

7    case.

8             THE COURT:  What comments has he made?

9             MR. BHATIA:  He made a comment I think about how he is

10   going to come here and beat the United States government, and

11   something about eating the government's case for lunch and

12   stuff like that.

13            THE COURT:  Do you have an application?

14            MR. BHATIA:  Yes, we would request that the Court ask

15   the defendant not to make public comments on social media about

16   the case during the pendency of the trial.

17            THE COURT:  Defense?

18            MR. BHATIA:  I'm sorry.  And to take down the comments

19   that have been posted.

20            THE COURT:  Defense?

21            MR. GELFAND:  We have no objection to that.

22            THE COURT:  Look, I didn't think to order it because

23   it struck me as obviously inappropriate for the defendant or

24   his lawyers to be making statements about the case on social

25   media.  Please take those down forthwith, and please do not

1    continue to advocate your position on social media about the

2    case.  The case will be tried in the courtroom.

3         OK.  I mean any time, Mr. Teman, you do that you

4    create a risk that somebody who is not abiding by my rules will

5    stumble upon your statements.  It may be to your benefit, it

6    may be to your detriment, but certainly it's to the detriment

7    of the system of justice, anything which will give weight to

8    something that's being said about the case out of court.  The

9    government I'm sure is independently heeding that admonition,

10   but it's important that the case be tried in the courtroom

11   only.  All right, thank you.  And defense, I understand you

12   too consent to that.

13        MR. GELFAND:  Yes, your Honor.

14        THE COURT:  Let me ask, government, after we have the

15   opening statements, who will your first witness be?

16        MR. BHATIA:  The government's first witness will be

17   Karen Finocchiaro.  She is the investigator from Bank of

18   America.

19        THE COURT:  OK.  And I have of course two limiting

20   instructions that I have read to you and you are all fine with.

21   One of them involving the check stock is clearly not implicated

22   by her testimony, but the other involving the RCCs may or may

23   not be.  Do you expect there to be testimony from her

24   referencing the concept of a remotely created check?

25        MR. BHATIA:  She might get into the concept of

K1M7TEM3

1   remotely created checks, and I have spoken to defense counsel,

2   and I understand that they will request -- they have requested

3   that the instruction be read as soon as the witness makes the

4   first comment about RCCs.

5          THE COURT:  Look, you are the master of the direct

6   examination.  Does your examination cover that topic?

7          MR. BHATIA:  I believe it does, yes.  I'm sorry, it

8   does, your Honor.

9          THE COURT:  All right.  Look, I mean I'm happy as soon

10  as you have put a question to the witness that elicited an

11  answer referring to that, I am happy for either counsel to give

12  me a prompt that this is a good moment for the RCC instruction.

13         Thinking ahead as well to Ms. Finocchiaro's testimony,

14  are there any other areas where anyone can imagine a limiting

15  instruction being warranted?

16         MR. BHATIA:  Not from the government.

17         THE COURT:  Defense?

18         MR. GELFAND:  No, your Honor.  The only other area is

19  the surveillance photo issue, depending on the foundation.

20         THE COURT:  Was there any progress made among counsel

21  overnight about that issue?

22         MR. GELFAND:  We agreed on every other Bank of America

23  exhibit; we did not agree on that.  I'm not saying that we're

24  going to necessarily object; it just depends on the testimony.

25         THE COURT:  In other words, it's not stipulated to.

K1M7TEM3

1          And, Mr. Bhatia, again you're not obliged to tip your

2     hand, but were you able to shore up or make progress with

3     respect to the authentication issue that was addressed

4     yesterday?

5          MR. BHATIA:  We do believe that she will be able to

6     lay the proper foundation.

7          THE COURT:  Very good.  OK.  Then take a five minute

8     comfort break.  I will be back in five minutes.  Mr. Smallman

9     will reposition the podium here before we resume.

10          (Recess)

11          THE COURT:  Members of the jury, now that you have

12     been sworn, I want to give you some preliminary instructions to

13     guide you in your participation in this trial.

14          To begin with, you are here to administer justice in

15     this case according to the law and the evidence.  You are to

16     perform this task with complete fairness and impartiality, and

17     without bias, prejudice or sympathy for or against the

18     government or the defense.

19          It will be your duty to find from the evidence what

20     the facts are.  You and you alone will be the judges of the

21     facts.  You will then have to apply those facts to the law as

22     the Court will give it to you.  You must follow that law

23     whether you agree with it or not.  Nothing the Court may say or

24     do during the course of this trial is intended to indicate or

25     should be taken by you as indicating what your verdict should

1    be.

2              The evidence from which you will find the facts will

3    consist of the testimony of witnesses, documents and other

4    things received into the record as evidence, as well as any

5    facts that the parties agree or stipulate to, or that the Court

6    may instruct you to find.

7              Certain things are not evidence and must not be

8    considered by you, and I'm going to list them for you now.

9              First of all, statements, and argument and questions

10   by lawyers are not evidence, nor are my own statements to you

11   evidence.  Only the answers given by witnesses are evidence.

12             Second, objections to questions are not evidence.  The

13   lawyers have an obligation to their clients to make an

14   objection when they believe evidence being offered is improper

15   under the rules of evidence.  You should not be influenced by

16   the Court's ruling on an objection.  If I sustain an objection,

17   you should ignore the question.  If I overrule the objection,

18   you should treat the answer just like any other.  If you are

19   instructed that some type of evidence is being received for a

20   limited purpose only, you must follow that instruction.

21             Third, testimony the Court has excluded or told you to

22   disregard is not evidence and must not be considered.

23             Finally, anything you may have seen or heard outside

24   the courtroom is not evidence and must be disregarded.  You are

25   to decide this case solely on the evidence presented here in

K1M7TEM3

1   this courtroom.

2          Now, when you are determining the facts, keep in mind

3   that there are really two types of evidence:  Direct evidence

4   and circumstantial evidence.  Direct evidence is direct proof

5   of a fact, such as the testimony of an eye witness.

6   Circumstantial evidence is proof of facts from which you may

7   infer or conclude that other facts exist.  And the word "infer"

8   or the expression to draw an inference simply means to find

9   that a fact exists from proof of another fact.  An inference is

10  to be drawn only if it's logical and reasonable to do so, not

11  by speculation or guesswork.  In a moment I will give you an

12  example that I think will make this all very clear.

13         In deciding whether to draw an inference, you must

14  look at and consider all of the facts in light of reason,

15  common sense and experience.  Whether a given inference is or

16  is not to be drawn is entirely a matter for you the jury to

17  decide.  Circumstantial evidence doesn't necessarily prove less

18  than direct evidence, nor does it necessarily prove more.

19         And here is an example to help you think about the

20  difference between direct and circumstantial evidence.  Let's

21  assume that when you came into the courthouse this morning, the

22  sun was shining and it was a nice day outdoors, and let's also

23  assume that the courtroom blinds here were closed, they were

24  drawn, so you couldn't look outside.  And let's assume further

25  that as you were sitting here somebody walked in with an

1    umbrella that was dripping wet and a few moments later someone

2    else walked in with a raincoat that was dripping wet.

3           Now, because you couldn't look outside the courtroom,

4    and you couldn't see whether it was raining, because there is

5    no witness on the witness stand saying it's raining outside,

6    you wouldn't have any direct evidence of the fact that it was

7    range, but on the combination of facts that I have asked you to

8    assume it would be reasonable and logical for you to conclude

9    that it had begun to rain.

10          That's all there is to circumstantial evidence.  You

11   are inferring on the basis of reason, experience and common

12   sense from one established fact -- all these dripping, wet

13   raincoats and umbrellas -- the existence or nonexistence of

14   some other fact it's begun to rain.  I will give you more

15   instructions on this, as well as other matters, at the end of

16   the case.  The important point right now to keep in mind is

17   that you can consider both types of evidence.

18          One of most important tasks as jurors is to evaluate

19   the credibility of the witnesses who will appear before you --

20   that is, how truthful and believable they are.  Listen

21   carefully as each witness testifies during both direct and

22   cross-examination, and consider whether the witness is telling

23   the truth.  It will be up to you to decide which witnesses to

24   believe, which witnesses not to believe, and how much of any

25   witness's testimony to accept or to reject.

Now, how do you decide what to believe and what not to believe?  You are going to listen to the witnesses, observe their testimony, and then decide as you would decide such questions in your own life.  Did they know what they were talking about?  Were they candid, honest, open and truthful?  Did they have a reason to falsify, exaggerate or distort their testimony?  Sometimes it's not what a witness says but how he or she says it that may give you a clue as to whether or not to accept that witness's version of an incident or an event as credible and believable.

In short, the way a witness testifies may play an important part in your reaching a judgment as to whether or not you can accept the witness's testimony as reliable.

Under the law, as I mentioned earlier, a defendant in a criminal case is presumed innocent and cannot be found guilty of the crimes charged unless a jury, having heard all of the evidence in the case, unanimously decides that the evidence proves the defendant guilty beyond a reasonable doubt.

In a criminal case the burden of proof always remains with the prosecution -- the government.  For the jury to return a verdict of guilty as to the defendant, the government must prove that the defendant is guilty beyond a reasonable doubt.  A person charged with a crime has absolutely no burden to prove that he is not guilty, and if the defendant chooses not to present any proof, that decision cannot be held against him and

1    may not enter into your deliberations at all.

2            Now, a few words about your conduct as jurors.

3            First, during the trial you are not to discuss the

4    case with anyone, nor are you to permit anyone to discuss it

5    with you.  This includes posting anything on the Internet about

6    the case, whether it be on personal blogs, Facebook or Twitter.

7    Until you retire to the jury room at the end of the case to

8    deliberate you simply are not to talk about this case with

9    anyone, including your partner, family or close friends.  Do

10   not even discuss the case with each other until you begin your

11   actual deliberations at the end of the trial.

12           Second, please do not while you are serving as jurors

13   in this trial have any conversations with the parties, the

14   attorneys, or any witnesses in this case, whether in the

15   courtroom, the hallways, the elevators, outside or anywhere

16   else.  And by that I mean not only avoid talking about the

17   case, don't talk to them at all, even to say good morning or to

18   acknowledge any of these people.  As I explained briefly

19   earlier, somebody seeing a juror in conversation with a party,

20   a lawyer or a witness might think that something improper was

21   being discussed, and to avoid even the appearance of

22   impropriety avoid any such contact or conversation.  And so I

23   can tell you that when the parties, lawyers and witnesses pass

24   you in the hall without even acknowledging your presence, they

25   don't mean to be rude; they are simply following my

1    instruction.

2         Third, do not read or listen to anything outside the

3    courtroom that relates to this case in any way.  And,

4    similarly, you are not to allow anyone to speak with you about

5    the case.  If you were approached by anyone to speak about it,

6    politely but firmly tell them that the judge has directed you

7    not to do so.  If any person seeks to contact you about this

8    case, you are required to report the incident promptly to me by

9    sending me a note through my courtroom deputy Mr. Smallman.

10        Also, please be sure that I'm informed if any person

11   you know comes into this courtroom.  This is a public trial,

12   and so at least in theory that could happen.  But it's

13   important that you do not hear from them about what may have

14   happened in the court while the jury was not present.  If you

15   should see a friend or relative come into court, send me a note

16   through Mr. Smallman at your first opportunity.

17        Fourth, do not try to do any research or make any

18   investigation about the case or the issues presented by the

19   case.  For example, do not go onto the Internet tonight and

20   research any matters relating to this case.  Do not call up

21   your lawyer friends and ask about the type of matters at issue

22   in the case.

23        Fifth, I know that many of you use cell phones,

24   iPhones, BlackBerries, the Internet, and all sorts of other

25   tools of technology.  You must not use these tools to

K1M7TEM3

1   communicate electronically with anyone about the case.  That

2   includes your family and friends.  You may not communicate with

3   anybody about the case on your cell phone, meaning iPhones,

4   e-mails, text messaging, Twitter, any blog or website, any

5   Internet chat room, or by any way or any social networking

6   website.  That means nothing on Facebook, LinkedIn, Youtube,

7   the full gamut.  If I haven't listed a website, it doesn't mean

8   can you go access the case or communicate about it.  The answer

9   is it's a complete no, you can't do that.

10          And, finally, do not form any opinion until all of the

11   evidence is in.  The case can be presented only step by step,

12   witness by witness, until all the evidence is before you.  Keep

13   an open mind until you start your deliberations at the end of

14   the case.

15          Now, note taking.  Mr. Smallman has given each of you

16   a note pad and a pen, and you are permitted take notes during

17   the trial.  Please write your name on the cover of the pad.  If

18   you do take notes, please do so only in these pads.

19          Remember that any notes you take are for your use

20   only, and they are only to be used as an aid for your memory.

21   Your memory controls.  If you do take notes, be careful not to

22   get so involved or wrapped up in the note-taking process that

23   you're not listening to the evidence.  Once you are in your

24   deliberations, if there is a disagreement between one juror's

25   notes and another juror's notes, or between one juror's notes

K1M7TEM3

and another juror's recollection, or one juror's recollection

and another juror's recollection, there is a solution for that.

You can ask to have the court reporter read back the portion of

the testimony that is germane to the disagreement you are

having, or we can have that portion of the transcript sent back

to you to the jury room, because ultimately it's the official

court transcript that controls, not any juror's notes.

During the course of the trial, exhibits will be

received into evidence, and they will be marked by exhibit

number.  So, if there is an exhibit that are you particularly

interested in seeing, or seeing more of than you have seen here

in the courtroom, write down the exhibit number, and when you

are in your deliberations, you will be able to ask to see the

exhibit.  We will also be giving you a list of all witnesses

who testified during the trial as well as a list of all

exhibits that were received during the trial, and that will in

turn help you in calling for or identifying any material you

want to see while you are in your deliberations.

We are now going to begin the evidence portion of the

trial.  As I said earlier this morning, we are going to begin

each day promptly at 9:30 and continue until approximately 5

p.m.  Please, please be on time.  If any of you are late, we

have to wait because we can't start until all of you are here.

And all of us -- meaning me, the lawyers, the parties, and the

witnesses and your fellow jurors -- will have to wait.  If we

K1M7TEM3

<table>
<tr><td>1</td><td>lose ten, 20 minutes each day because somebody is late, we may</td></tr>
<tr><td>2</td><td>not be able to get the trial completed on the day that we</td></tr>
<tr><td>3</td><td>otherwise would have been able to do so.</td></tr>
<tr><td>4</td><td>        Let me tell you now how the trial will proceed.</td></tr>
<tr><td>5</td><td>First, we're going to have opening statements.  The government</td></tr>
<tr><td>6</td><td>is going to make an opening statement, and after that I expect</td></tr>
<tr><td>7</td><td>the attorney for the defendant will make an opening statement</td></tr>
<tr><td>8</td><td>as well, but they are not required to do so.  The opening</td></tr>
<tr><td>9</td><td>statements are neither evidence nor argument.  They are simply</td></tr>
<tr><td>10</td><td>outlines of what the attorneys believe the evidence will show,</td></tr>
<tr><td>11</td><td>and they are given to help you follow the evidence as it is</td></tr>
<tr><td>12</td><td>presented.</td></tr>
<tr><td>13</td><td>        After the opening statements, the government will</td></tr>
<tr><td>14</td><td>present its case.  The government will call its witnesses, and</td></tr>
<tr><td>15</td><td>after each witness testifies on direct examination, counsel for</td></tr>
<tr><td>16</td><td>the defendant will have an opportunity to cross-examine the</td></tr>
<tr><td>17</td><td>witness.  After the cross-examination, there may be a little</td></tr>
<tr><td>18</td><td>bit of what we call redirect and recross examination.</td></tr>
<tr><td>19</td><td>        After the government's case, the government will rest.</td></tr>
<tr><td>20</td><td>The defendant may then present a defense case if he wishes.</td></tr>
<tr><td>21</td><td>But, again because of the presumption of innocence, the</td></tr>
<tr><td>22</td><td>defendant is not required to present or offer any proof.  If</td></tr>
<tr><td>23</td><td>the defendant does present the defense case, the defense</td></tr>
<tr><td>24</td><td>witnesses will testify, and the government will have an</td></tr>
<tr><td>25</td><td>opportunity to cross-examine them.</td></tr>
</table>

1          After the evidence is completed and all sides have

2     rested, the attorneys will give their summations, and this is

3     the opportunity for the lawyers to summarize the evidence and

4     to give their closing arguments to you about what it has or has

5     not shown.

6          After the summations, I will give you instructions on

7     the law, and you will then finally retire to deliberate on your

8     verdict.

9          You have a tremendously important task as jurors, it

10    is to determine the facts.  You, and not the court, are the

11    sole judge of the facts.  The Constitution itself recognizes

12    your unique role in our system of justice, and so, please, pay

13    careful attention to the witnesses and the evidence received at

14    trial as well as my instructions on the law.

15         With that, we will now begin with counsel's opening

16    statements.  Mr. Smallman, would you put the microphone by the

17    lectern, and we will hear first from the government.

18         Mr. Bhatia, you may proceed.

19         MR. BHATIA:  This is a case about greed, fraud and

20    theft.  This is a case about how this man, the defendant, Ari

21    Teman, carried out a brazen scam to steal his own clients'

22    money.  You see, the defendant had a business, and he decided

23    that some of his customers owed him money.  And what did he do?

24    He decided to steal it right out of their bank accounts.

25         The defendant created dozens of checks, fake checks,

1    drawn against his customers' bank accounts.  He pretended that

2    his customers had authorized him to deposit those checks, but

3    that was a blatant lie.  None of the customers even knew he was

4    going to take the checks out of their account, and none of them

5    had ever told him that he was able to do that.  It was all part

6    of the defendant's scheme to treat his customers' bank accounts

7    as his own personal piggy bank.  It was theft, plain and

8    simple.

9            Using these fake checks, the defendant stole hundreds

10   of thousands of dollars from his customers, money that was not

11   his, money that he did not have permission to take, and money

12   that he used to line his own pockets.

13           Ladies and gentlemen, this opening statement is the

14   government's opportunity to outline what the evidence will

15   show, so let's discuss in more detail what you will hear and

16   see during the trial.

17           You will learn that the defendant had a business where

18   he sold intercom units to apartment buildings.  The defendant

19   told the customers that these intercoms would allow residents

20   to speak with people who were at the door and hear what they

21   were saying.  After hearing the defendant's sales pitch some

22   customers, including some here in New York, decided to buy one

23   of his intercom systems.  They paid him a few thousand dollars

24   for each intercom, and they paid him using checks from their

25   own bank accounts.  You will hear that after the customers paid

1    the defendant they immediately started having problems with the

2    intercom.  The intercoms didn't work properly, and the

3    customers complained to the defendant.  Some of them decided

4    they had to stop using the intercoms.

5           How did the defendant react?  He got angry, very

6    angry.  You called them names, he called them liars.  He wasn't

7    happy they were doing business with him.  He still wanted their

8    money.

9           Did the defendant try to resolve this dispute in a

10   civilized way?  No.  Did he file a lawsuit saying they owed him

11   money, like he said he would do over and over?  No.  Instead

12   the defendant the evidence will show that the defendant came up

13   with a scam to steal their money, a blatant scam to take

14   thousands and thousands of dollars right out of their bank

15   accounts, without their knowledge and without their permission.

16          You will learn that the defendant created these

17   checks -- these fake checks -- from scratch, entirely from

18   scratch, 29 checks in total.  The defendant knew the customers'

19   bank accounts numbers because they had written him checks, and

20   at the bottom of those checks was the account number.  He took

21   that number and put them on the checks that he created.

22          Using those checks, these fake checks, he deposited

23   them into his own bank account.  Some of the checks were worth

24   $5,000, some were worth $10,000, and some of the checks were

25   worth $18,000; more than $300,000 in total, $300,000.

K1M7TEM3                          Opening - Mr. Bhatia

1          The defendant pretended that the checks were issued

2     with his customers' permission.  That was a blatant lie.  Did

3     the defendant ask his customers if he could create or deposit

4     the checks?  No.  Did he ask for their permission to take this

5     money out of their bank account?  No.  Instead, he created the

6     checks without their knowledge and without their permission and

7     then deposited the checks into his own bank account.

8          You will hear that the defendant came up with a false

9     cover story to try to trick the banks into thinking that these

10    were authorized checks.  On some of the checks he scribbled a

11    fake signature and wrote that the checks were authorized by a

12    so-called contract.  That was a lie.  On other checks he put a

13    link to his website.  Buried in that link was another link, and

14    there, in a long list of fine print, was the way the defendant

15    created a false appearance that he was allowed to take this

16    money.  In reality, these were lies and the checks were fake,

17    checks the defendant created from scratch without his

18    customers' knowledge and without their permission.  It was a

19    blatant fraud.

20         And the defendant used other tricks to fool the banks.

21    You will see that he put his own phone number on the checks and

22    told the banks to call him, not the customers, if the banks had

23    any questions.  You will see that the defendant falsely stated

24    on the memo line of these checks -- that's where you can put a

25    description of what the check is for -- that these were for

K1M7TEM3                        Opening – Mr. Bhatia

1   payments for bogus fees that the customers had never agreed to

2   pay.  All of these were lies to trick the bank into accepting

3   the check.

4          Some of the defendant's customers -- now his

5   victims -- eventually saw the fraudulent checks when they

6   looked into their bank records.  Some of them heard about the

7   checks when their banks reached out about potentially

8   fraudulent activity.

9          When they saw the checks -- when the customers saw the

10  checks -- they were shocked.  They realized that someone had

11  written fake checks from their account without their

12  authorization, without their permission, and without ever

13  telling them.

14         When the defendant deposited these fake checks, the

15  money came out of his customers' account, and money was put

16  into the defendant's account.  Again, more than $300,000 in

17  total.  The defendant drained the money out of his bank account

18  where he deposited the checks and sent it to other accounts

19  that he owned.  Those accounts included his personal bank

20  account.  You will see that he also withdrew some of the money

21  in cash.  In one case he had withdrawn $4,000 from a bank

22  teller here in Manhattan.

23         Not surprisingly, the defendant's scheme came crashing

24  down and he got caught.  The banks learned that the defendant's

25  checks were fake and that the customers had never given

1    authorization for him to create and issue checks without

2    telling them.  But Bank of America -- this is where the

3    defendant deposited the checks -- was stuck holding the bag.

4    Bank of America found out about the fraud, and it had to pay

5    back money to the defendant's customers.

6            Now, ordinarily they might take that money out of the

7    money he deposited and send it back, but in this case the

8    defendant had already transferred that money into his other

9    accounts, so Bank of America wasn't able to get that money.

10   And you will see records and hear testimony that Bank of

11   America had to pay about $260,000 out of its own money to repay

12   the defendant's customers.  That's $260,000 because of the

13   defendant's fraud.

14           So that's an overview of what we expect the evidence

15   will show:  The defendant created fake checks from scratch

16   without his customers' knowledge, without their permission, and

17   deposited them into his own bank account.

18           Let me now tell you how we are going to prove it to

19   you.  As a general matter, during this trial you will hear from

20   witnesses and you will see documents.  You will hear testimony

21   that the defendant's customers -- the people the defendant

22   stole from -- they will tell you about their dealings with the

23   defendant and how the defendant demanded money.  You will hear

24   about his threats.  You will learn about their shock and

25   distress when they learned that the defendant had issued checks

K1M7TEM3                    Opening - Mr. Bhatia

1    for tens of thousands of dollars written right out of their

2    accounts and without telling them.

3            The defendant never asked if he could take that money.

4    In fact, the customers will tell you that if the defendant had

5    ever asked, if they had given him permission to take money out

6    of their accounts whenever he thought he deserved it, they

7    would never have given it to him.

8            You will also hear from bank representatives.  A Bank

9    of America employee will testify, and she will tell you how the

10   defendant created fake checks, show you what the defendant did

11   with that money, and explain how Bank of America lost hundreds

12   of thousands of dollars by having to pay the defendant's

13   customers.

14           You will also hear from employees at other banks where

15   the defendant's customers had their own bank accounts.  Those

16   individuals will tell you how the banks -- at first unaware of

17   the defendant's fraud -- had processed the checks, sent money

18   out of those accounts, causing hundreds of thousands of dollars

19   to be withdrawn from the customers' accounts without their

20   permission.

21           You will also see documents during the course of this

22   trial.  You will see for yourselves the fake checks that the

23   defendant created.  You will see the way the defendant crafted

24   those checks to create the false appearance that his customers

25   had authorized them.

1          You will see bank records showing the hundreds of

2     thousands of dollars that were taken out of the customers'

3     accounts and put into the defendant's accounts.  You will also

4     see the way the defendant transferred the money out of that

5     account where he deposited it, and you will see how he spent

6     and withdrew the money.

7          You will also see e-mails.  You will see e-mails

8     between the defendant and his customers.  You will see how the

9     defendant got angry when his customers complained about their

10    product.  You will see how he got angry when they told him that

11    they were done with it.  You will also see how he crafted his

12    fake, bogus cover story to try to cover up his scheme and to

13    get away with it.

14         So that's an overview of the types of evidence you

15    will see and hear about the defendant's fraud scheme.  I am

16    going to sit down in a moment.  At the end of this trial, after

17    you have seen all the evidence and heard from all the

18    witnesses, I will have another opportunity to speak with you.

19    Until then, I ask you to do three things:

20         First, pay close attention to the evidence.  Second,

21    follow Judge Engelmayer's instructions on the law.  Finally,

22    use your common sense, the same common sense that you use in

23    your everyday lives.

24         If you do those three things, you will reach the only

25    verdict that is consistent with the evidence, with the law and

K1M7TEM3                     Opening – Mr. DiRuzzo

1    with your common sense:  That the defendant, Ari Teman, is

2    guilty as charged.

3            THE COURT:  All right.  Thank you, Mr. Bhatia.

4            Mr. DiRuzzo.

5            MR. DIRUZZO:  Thank you, your Honor.  May it please

6    the Court, counselors, ladies and gentlemen of the jury.

7            I am Joseph DiRuzzo.  Along with Mr. Gelfand we

8    represent Mr. Ari Teman.

9            Ladies and gentlemen, this criminal case is about one

10   thing:  Did Ari Teman have the criminal intent to commit the

11   four crimes alleged in the indictment?  The answers are clear:

12   No.

13           The evidence will show that Mr. Teman had no criminal

14   intent, which is a complete defense to all four crimes,

15   because, one, his company, GateGuard, had written contracts

16   with express payment terms with all of its customers, including

17   the ones at issue in this case, that permitted GateGuard to

18   create and deposit remotely created checks when money was due

19   and owing to GateGuard; and, two, that before doing the acts

20   that the government claims were crimes, Mr. Teman took the

21   extra cautious step of consulting with his long-time attorney

22   to make sure that what he was doing was legal.  But each of

23   these two important facts reflect what this case is really

24   about:  That Mr. Teman never intended to defraud any bank nor

25   defraud any of GateGuard's customers, and that whether he had

1    any intention of fraud is what this entire case is about.  This

2    is not a civil case.

3           While the events that occurred in March and April of

4    last year form the events that are alleged in the indictment,

5    like all stories there is a bit of background information that

6    you need to know.  Ari Teman has a college education and an

7    entrepreneurial spirit, but he is not a lawyer.  He has never

8    attended law school.  By day he runs start-up tech companies,

9    and on the side he performs as a stand-up comedian.

10          One of Mr. Teman's tech start-ups is called GateGuard,

11   and the evidence will show that GateGuard was formed by Mr.

12   Teman in 2016.  GateGuard is a technology company that provides

13   an integrated hardware and software platform for use in

14   apartments, co-ops and condo apartments.

15          GateGuard integrated facial recognition, the Internet

16   and an intercom system to allow for more secure entry and exit

17   into buildings.  Individuals would have their face scanned,

18   which would in turn allow the building to know exactly who was

19   entering and when.  This allowed buildings to be sure that

20   people who were on the lease were the actual tenants, that

21   illegal Airbnbs weren't occurring, and that guests and delivery

22   people coming and going into buildings were properly logged and

23   tracked.  This information was provided to the building/clients

24   of GateGuard as a function of the GateGuard platform.

25          When Mr. Teman formed GateGuard there were no face

1   recognition/point of entry systems on the market, and with most

2   new technology companies getting GateGuard up and running from

3   proved concept to the market cost Mr. Teman a lot of money.

4   But when GateGuard was up and running, Mr. Teman marketed

5   GateGuard throughout the country, and you will hear evidence --

6   and I don't believe it will be in dispute -- that GateGuard had

7   clients throughout the country, major metropolitan areas, and

8   in particular New York City.

9            During the time period alleged in the indictment, and

10  continuing to today, GateGuard has several hundred customers

11  using its products; however, we fully admit that in the

12  beginning there were certain bugs in the product that required

13  troubleshooting.  However, you will also hear that GateGuard

14  actively worked to resolve these bugs, and Mr. Teman himself

15  was active in the product improvement.

16           Now, of the several hundred customers that GateGuard

17  had -- or has -- like all businesses there are a few problem

18  clients, and you will hear about the three problem customers in

19  this case:  ABJ, Coney Realty and Mercer Realty, which

20  represent approximately one percent of GateGuard's customers.

21           You will also hear that ABJ, Coney and Mercer were

22  some of the first customers of Gateway.  The evidence will show

23  that anyone who wanted to sign up as a customer of GateGuard --

24  including the three at issue here -- had to sign up at

25  GateGuard's website.  There was no other way to be a GateGuard

K1M7TEM3                    Opening - Mr. DiRuzzo

1    customer.

2         The way that it works is that everyone input their

3    information into the computer system via the website, just like

4    do for iTunes, just like you do for Netflix.  There were no

5    exceptions.

6         Further, you will hear that when someone signed up for

7    GateGuard there was a prompt that informed the customer that it

8    was bound by GateGuard's terms and conditions and GateGuard's

9    payment conditions, which I will collectively refer to as the

10   GateGuard contract.  You will see that the terms and condition

11   and payment terms as it governed the nature of the contractual

12   relationship between GateGuard, Coney, ABJ and Mercer.

13   Further, in the event the government doesn't show you the

14   GateGuard terms and conditions -- the GateGuard payment

15   terms -- we will introduce these documents into evidence

16   ourselves for your consideration.

17        Now, turning to the terms and conditions.  That

18   document is 17 pages and is relevant here.  Section 5 addressed

19   orders and fees.

20        Pricing:  GateGuard customers expressly agreed to the

21   pricing terms which were referenced in Section 5 and

22   hyperlinked to GateGuard's website.  Additionally, the

23   GateGuard terms and conditions had a severability clause that

24   meant if any provision of the terms and conditions was

25   unenforceable, the rest of the contract was still valid.

K1M7TEM3                    Opening - Mr. DiRuzzo

1          Now, turning to the pricing.  The pricing is listed

2     out in painful detail, all the fees that a GateGuard customer

3     will be responsible for.  There were sections including, among

4     others, court appearances, charge-back fees, nonpayment fees,

5     cancellation fees, etcetera.  And as is especially important

6     here, the pricing terms included a section on payment and a

7     section on authorization to make bank withdrawals.

8          Now, these two interlocking provisions detail not only

9     how GateGuard could obtain payment from its not-paying clients

10    but the reasoning behind it.  Specifically, the pricing

11    agreement allowed GateGuard to charge its clients via ACH or

12    debit, and it also expressly gave GateGuard "permission to

13    write and sign checks with your checking and/or savings account

14    information to do a bank draw against your entity (or entities)

15    for the amount it or they owe."

16         A check from another person's account or another

17    business' account based on advanced authorization is known as a

18    remotely created check.  You will hear it referred to in this

19    case as an RCC.  And we anticipate at some point you will hear

20    a little more from the judge about the definition of an RCC.

21    But you will hear testimony, and you will see e-mails from Mr.

22    Teman to the three customers at issue -- ABJ, Coney and

23    Mercer -- informing each that there was a contract, and that

24    the contract allowed GateGuard to receive payments from each

25    customer.

1           As to Coney, you will see an e-mail from Mr. Elie

2     Gabay to Mr. Teman where Mr. Gabay e-mails Mr. Teman with

3     proposed changes -- what attorneys refer to as a markup or a

4     red lined document -- to the GateGuard terms and conditions.

5     While none of these edits or mark-ups or changes to the

6     GateGuard terms and conditions were accepted by Mr. Teman,

7     Mr. Gabay clearly read the terms and conditions and even marked

8     up Section 5 that addressed the pricing.

9           Now, as to Mercer, you will see an e-mail from Bonnie

10    Soon-Osberger where she acknowledges she reviewed the terms and

11    conditions.  She e-mailed Mr. Teman with questions about the

12    terms and conditions.  Mr. Teman responded via e-mail and

13    replied to her, and Ms. Soon-Osberger begged Mr. Teman for his

14    timely reply, and she acknowledged that Mr. Teman had addressed

15    Mercer's concerns about the terms and conditions.

16          Now, as to ABJ, you will see invoices from GateGuard

17    to ABJ, where at the bottom of each invoice is a prominent

18    display that "payor accept terms at

19    GateGuard.XYZ4/legal/4/turns.php."

20          Further, you will also see that Mr. Teman's attorney,

21    Mr. Ariel Reinitz, e-mailed Joe Soleimani, one of ABJ's

22    principals, and Mr. Reinitz reiterated to ABJ that ABJ had a

23    binding contract with GateGuard.  And Mr. Reinitz, on behalf of

24    GateGuard, even provided hyperlinks to Mr. Soleimani of both

25    GateGuard's terms and conditions and the pricing document

1   itself.

2          So you will see -- and the if the government does not

3   introduce it, we intend to introduce this document ourselves --

4   the RCCs that the government alleges were counterfeit checks.

5   But you will see on every single check, every single RCC, on

6   the bottom right-hand side, a statement "draw per contract, no

7   signature required."

8          You also will see in the majority of these checks the

9   government alleges to be counterfeit, the RCCs, that the

10  language is even more transparent in that "draw per contract,

11  no signature required.  Note to bank:  Call me.  This is a

12  valid check.  You are required by law to honor it.  Contact at

13  GateGuard.XYZfor/legal/for/terms.phb accepted by the above

14  client.  Contact us at 212-203-3714 with questions."

15         The evidence will show that before these RCCs were

16  created, Mr. Teman sought and obtained the legal advice of his

17  attorney -- his long-time attorney, Mr. Aerial Reinitz -- and

18  Mr. Reinitz conducted his review of the GateGuard terms and

19  conditions and pricing, and Mr. Reinitz concluded that there

20  was a valid contract, that the contract was enforceable, and

21  that the contract allowed for GateGuard to be paid via RCC, the

22  very RCCs that the government alleges are counterfeit.

23  Mr. Reinitz provided this legal advice to Mr. Teman.  Mr. Teman

24  justifiably relied on his legal advice, and Mr. Teman acted in

25  accordance with the legal advice that he was given by his

1    attorney.

2              Consequently, Mr. Teman deposited these checks in a

3    banker of America branch in Miami Beach, Florida, where its

4    company headquarters were located.

5              Now, Mr. Teman did not hide his identity, he didn't go

6    in there with any type of disguise, and he used his driver's

7    license to identify himself.  Bank of America placed a one-week

8    hold on the deposit, and unfortunately ABJ disputed the

9    validity of these checks.  In response, GateGuard and Mr.

10   Teman's attorney, Mr. Reinitz, proactively reached out to Bank

11   of America and informed Bank of America that all the RCCs were

12   fully agreed to by GateGuard's customers and were consistent

13   with the GateGuard payment plans.  Mr. Reinitz e-mailed Bank of

14   America with copies of the terms and condition, the payment

15   terms, and provided a detailed explanation of why the RCCs were

16   appropriate, and in all events this was a billing dispute

17   between GateGuard and GateGuard's customers.  If The government

18   does not introduce this e-mail into evidence, we intend to show

19   it to you so you can review it and consider it yourself.

20             Now, at the end of the day everything that GateGuard

21   and Mr. Teman did was transparent and authorized with

22   GateGuard's terms, conditions and payment terms, the GateGuard

23   contract.

24             Now, ladies and gentlemen of the jury, I will end

25   where I began:  Mr. Teman is not guilty of any crime because

K1M7TEM3                          Opening – Mr. DiRuzzo

1   the checks were not counterfeit; instead, ABJ, Coney and Mercer

2   all provided GateGuard with the contractual authorization to

3   issue the RCCs that are at issue here, and moreover, Mr. Teman

4   had no criminal intent as he sought and obtained legal advice

5   from Mr. Reinitz, who specifically informed Mr. Teman that he

6   was legally able to issue the RCCs as provided for in the

7   pricing portion of the GateGuard contract.

8           Now, at the end of this trial, ladies and gentlemen,

9   we are going to be asking for you to return a not guilty

10  verdict, because we do not believe -- nor will the government

11  be able to show -- that Mr. Teman committed a crime here.

12          THE COURT:  Thank you, Mr. DiRuzzo.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K1MVTEM4                         Finocchiaro - direct

1              MR. BHATIA:  The government calls Karen Finocchiaro.

2    KAREN FINOCCHIARO,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5              THE COURT:  Good afternoon, Ms. Finocchiaro.

6              Welcome to the Court.

7              I'll ask you to please project your voice.  This an

8    old and big courtroom and the acoustics aren't great.

9              Counsel, you may inquire.

10   DIRECT EXAMINATION

11   BY MR. BHATIA:

12   Q.  Ms. Finocchiaro, where do you work?

13   A.  Bank of America.

14   Q.  What's your title there?

15   A.  A vice president and senior fraud investigator.

16   Q.  And how long have you been at Bank of America?

17   A.  Twenty-three years.

18   Q.  And prior to being a senior investigator, what role did you

19   have at the bank?

20   A.  I was a strategic analyst.

21   Q.  As a senior fraud investigator, what are your day-to-day

22   responsibilities?

23   A.  I conduct our fraud investigations for our enterprise, for

24   everything from our credit card portfolio, our checking

25   accounts, and savings accounts.

1    Q.  Approximately how many investigations have you conducted

2    involving fraudulent checks?

3    A.  Thousands.

4    Q.  And what about investigations involving returns of checks

5    between banks?

6    A.  Thousands.

7    Q.  Senior Investigator Finocchiaro, what is a check at a very

8    basic level?

9    A.  A check is a paper item.  The check typically has the

10   maker's information in the upper left-hand corner, date, it has

11   a signatory line, a memo line, and a pay to the order line.

12   Q.  And what does it mean for a check to be deposited?

13   A.  It's when a check is negotiated at a financial institution

14   or an ATM or cashed by a subject.  So it would be -- to be

15   negotiated is to be signed, made out to, made payable to, and

16   conducted.

17   Q.  Is a deposit essentially when someone gives the check to

18   the bank to start the payment process?

19   A.  That is correct.

20   Q.  And when a check is deposited, what happens next?

21   A.  So once the check is deposited, we have two processes:  For

22   larger financial institutions, the checks will go through a

23   bank-to-bank process.  In other situations, for smaller

24   financial institutions, they do go through the Federal Reserve

25   versus going through the clearinghouse.

K1MVTEM4                          Finocchiaro - direct

1    Q.  Is JPMorgan one of those larger banks?

2    A.  Yes, it is.

3    Q.  So that goes through the interbank process?

4    A.  Right, it goes through the interbank clearing.

5    Q.  What about Signature Bank?

6    A.  Signature Bank is a smaller financial institution, so those

7    checks will process through the Federal Reserve.

8    Q.  And ultimately, does a check transfer money between one

9    account to another account?

10   A.  Yes, it does.

11   Q.  And can it also be used to transfer money between banks?

12   A.  Yes, it is.

13              MR. BHATIA:  Your Honor, with the Court's permission,

14   I'd like to read Government Exhibit 501, which is a stipulation

15   between the parties.

16              THE COURT:  Very good.

17              Before Mr. Bhatia reads a stipulation, let me just

18   explain for a moment what a stipulation is.

19              A stipulation is an agreement between the parties that

20   a particular fact or facts is true.  You are required to accept

21   that stipulation as true, as accurate, what is contained

22   therein.  The lawyers have agreed that these facts are true.

23              It is for you, the jury, to decide what weight, if

24   any, you give to the fact that the parties have agreed upon.

25              Counsel, you may do so.

K1MVTEM4                        Finocchiaro - direct

1           MR. BHATIA:  Government Exhibit 501, bank record

2    stipulation.

3           It is hereby stipulated and agreed, by and between the

4    United States of America, by Geoffrey S. Berman, United States

5    Attorney, Kedar S. Bhatia and Edward Imperatore, Assistant

6    United States Attorneys, of counsel, and Ari Teman, the

7    defendant, by and through his counsel, Justin Gelfand, Esq. and

8    Joseph DiRuzzo, Esq., that:

9           Government Exhibits 101, 102, 201, 202, 203, 204, 205,

10   and 206; and Defense Exhibits 17, 34, and 52 are true and

11   correct copies of bank records from bank accounts at Bank of

12   America North America in the name of GateGuard Inc., with

13   account number ending in 8085.

14          Government Exhibits 103 and 104 are true and correct

15   copies of bank records from a bank account at Bank of America

16   North America in the name of Friend or Fraud, Inc., with

17   account number ending in 0351.

18          Government Exhibits 105 and 106 are true and correct

19   copies of bank records from a bank account at Bank of America

20   North America in the name of Touchless Labs LLC, with account

21   number ending in 1046.

22          Government Exhibits 107 and 108 are true and correct

23   copies of bank records from a Bank of America account at Bank

24   of America North America in the name of Ari Teman, with account

25   number ending in 5580.

1          Government Exhibit 113 is a true and correct copy of

2     bank records from bank accounts at Bank of America North

3     America in the name of GateGuard, Inc., with account number

4     ending in 8085; in the name of Friend or Fraud, Inc., with

5     account number ending in 0351; in the name of Touchless Labs

6     LLC, with account number ending in 1046; and in the name of Ari

7     Teman, with account numbers ending in 7673 and 5580.

8          Government Exhibits 121, 122, 126, 127, and 130, and

9     Defense Exhibits 50 -- and Defense Exhibit 50, are true and

10    correct copies of bank records from bank accounts at JPMorgan

11    Chase Bank North America in the name of ABJ Lenox LLC, with

12    account number ending in 9100.

13         Government Exhibits 123, 124, 128, 129, and 131, and

14    Defense Exhibits 49 and 51, are true and correct copies of bank

15    records from bank accounts at JPMorgan Chase Bank North America

16    in the name of ABJ Milano, with account number ending in 1672.

17         Government Exhibits 141, 142, and 143, and Defense

18    Exhibit 29, are true and correct copies of bank records from

19    bank accounts at Signature Bank North America in the name of 18

20    Mercy Equity, Inc., with account number ending in 8293.

21         Government Exhibits 144, 145, 146, and 150, and

22    Defense Exhibit 29, are true and correct copies of bank records

23    from bank accounts at Signature Bank North America in the name

24    of 518 West 204 LLC, with account number ending in 6525.

25         The records I described in paragraphs 1 through 9

1   above were made at or near the time of the occurrence of the

2   matter set forth in the records by or from information

3   transmitted by a person with knowledge of those matters; B,

4   kept in the course of regularly conducted business activity;

5   and C, made by the regularly conducted business activity as a

6   regular practice.

7           It is further stipulated and agreed that Government

8   Exhibits 101 through 108, 114, 121 through 124, 126 through

9   131, 141 through 146, 150, and 201 through 206, and Defense

10  Exhibits 17, 29, 34, 52, 49, 50, and 51, consist of records

11  that constitute business records pursuant to Rule 803(6) of the

12  Federal Rules of Evidence.

13          The defendant reserves any Rule 10(c) objection to the

14  admission for the truth of the matter asserted of any statement

15  contained in Government Exhibits 126 and 128.

16          Your Honor, with that, I'd offer Government Exhibits

17  101 through 108, 114, 201 through 206 into evidence.

18          THE COURT:  Sorry.  Give me those numbers again

19  kindly.

20          MR. BHATIA:  Government Exhibits 101 through 108, 114,

21  and then Government Exhibits 201 through 206.

22          THE COURT:  Is there any objection?

23          MR. GELFAND:  No objection, your Honor.

24          THE COURT:  All right.  I'll receive those exhibits.

25          (Government's Exhibits 101 through 108, 114, 201

K1MVTEM4                              Finocchiaro - direct

1    through 206 received in evidence)

2              THE COURT:  And Mr. Bhatia, are you also offering the

3    stipulation itself, Exhibit 508?

4              MR. BHATIA:  Yes, your Honor.

5              THE COURT:  All right.  That's received as well.

6              MR. BHATIA:  It's 501.

7              THE COURT:  501.  Forgive me, 501 is also received.

8              (Government's Exhibit 501 received in evidence)

9    BY MR. BHATIA:

10   Q.  Ms. Finocchiaro, back to you.

11   A.  Yes.

12   Q.  All right.

13             MR. BHATIA:  Mr. Magliocco, could you publish

14   Government Exhibit 201 for the jury and for the Court.

15             Mr. Magliocco, could you zoom in on the top portion of

16   the page here.

17             THE COURT:  Let me just ask the ladies and gentlemen

18   of the jury, can everybody see the exhibit on your screen?  If

19   at any point during the trial you are unable to see something

20   that's being shown to the members of the jury, raise your hand,

21   get my attention and Mr. Smallman's, and we'll be on it.

22   BY MR. BHATIA:

23   Q.  Ms. Finocchiaro, are you able to see the check on the

24   screen over there?

25   A.  Yes, I am.

K1MVTEM4                          Finocchiaro - direct

1    Q.  Is this an example of a check?

2    A.  Yes, it is.

3    Q.  And who is this check addressed to?

4    A.  The check is addressed to GateGuard, Inc.

5    Q.  And is that shown here on the maybe middle left side of the

6    check?

7    A.  Yes, it is.  It's in the "pay to the order" section.

8    Q.  And does that mean it's written to be deposited into that

9    account?

10   A.  Yes, it is.

11   Q.  And where is the money -- what account is the money meant

12   to come from?

13   A.  It's coming from 518 West 205 LLC, drawn on Signature Bank,

14   account number is in the bottom right-hand corner, as

15   1503226525.

16   Q.  And is the account number at the bottom -- what's the

17   relevance of the account number at the bottom in drawing the

18   check?

19   A.  That is the account that the funds are to be drawn from and

20   placed into the Bank of America account.

21   Q.  So is the bottom number what allows the check to be

22   processed from a given account?

23   A.  Yes, it is.

24   Q.  Okay.

25            THE COURT:  Mr. Bhatia, I'm looking for a good

K1MVTEM4                     Finocchiaro - direct

1    stopping point because the jury's mid-afternoon snack has

2    arrived.  Let me know when you're at a good you point.

3              MR. BHATIA:  I think this is a fine stopping point.

4              THE COURT:  All right.

5              Ladies and gentlemen, we'll take a 15-minute recess.

6              As I told you during jury selection, every afternoon

7    we have coffee and treats, if you will.  So by all means enjoy

8    in the jury room.

9              As you'll get used to my hearing me say, please do not

10   discuss the case.  I'll see you in 15 minutes.  Mr. Smallman

11   will bring you out.

12             (Jury not present)

13             THE COURT:  Counsel, anything to raise before we take

14   a brief recess?

15             MR. GELFAND:  No, your Honor.

16             THE COURT:  All right.  I'll see you in 12 minutes.

17   Thank you.  Just a minute or two before the jury comes down.

18   Thank you.

19             The witness may step down.

20             (Witness steps down)

21             (Recess)

22             THE COURT:  Mr. Smallman, let's get the jury.  And

23   let's have the witness in the box please.

24             (Jury present)

25             THE COURT:  Welcome back, ladies and gentlemen.  I

1    hope you had a good break.

2              Ms. Finocchiaro, I will remind you you're still under

3    oath.

4              Mr. Bhatia, you may inquire.

5    BY MR. BHATIA:

6    Q.  Ms. Finocchiaro, I'm going to hop back into exhibits for a

7    moment.  Do you have in the binder in front of you a disk

8    marked as Government Exhibit 113?

9    A.  I do, yes.

10   Q.  And have you reviewed the contents of that disk?

11   A.  Yes, I have.

12   Q.  How do you know that's the disk that you reviewed?

13   A.  It is the disk -- I signed the disk, actually.

14   Q.  And is there one file on that disk or is there more than

15   one?

16   A.  There's multiple files.

17   Q.  What's the substance of the files on that disk?

18   A.  It's actually one spreadsheet.  It has multiple tabs.  It

19   has tabs containing customer information, specific

20   account-level detail that would be seen on a statement, but

21   it's in a ledger format.  It has online banking details.  And

22   it has wire transfer information as well.

23             MR. BHATIA:  The government offers Government Exhibit

24   113.

25             THE COURT:  Any objection?

1          MR. GELFAND:  No, your Honor.

2          THE COURT:  Received.

3          (Government's Exhibit 113 received in evidence)

4          MR. BHATIA:  Mr. Magliocco, if you could pull back up

5    Government Exhibit 201.  We could take a look again at the

6    check image.

7    Q.  Is there a signature featured on this account, on this

8    check?

9    A.  There is a signature.  There's a squiggly line.

10   Q.  And what's the check number that you see?

11   A.  The check number is Check No. 1.

12   Q.  As a general matter, what is a check number?

13   A.  It's the number -- it's the series that we -- that we issue

14   the checks.  So you can have Checks 1, 1000, 101.  It's just

15   the number of the check.

16   Q.  Do checks typically go in a sequence?

17   A.  They typically go in a sequence.

18   Q.  What's the date listed on this check?

19   A.  3/28 of 2019.

20   Q.  Does it identify -- you may have mentioned this earlier,

21   but does it identify the bank where these funds are being drawn

22   from?

23   A.  Signature Bank.

24   Q.  Is there another way to know which bank the funds are

25   coming from?

K1MVTEM4                        Finocchiaro - direct

1    A.  The ABA routing number, which is the set of numbers in the

2    middle.  That also identifies the financial institution that

3    owns that account.

4    Q.  According to Government Exhibit 101, who is the -- who is

5    the person authorized to sign on the GateGuard, Inc. account?

6    A.  On the GateGuard, Inc. account, the sole signer is Mr. Ari

7    B. Teman.

8    Q.  Okay.  Is there a signatory other than Mr. Teman on that

9    account?

10   A.  No, there is not.

11   Q.  And according to Exhibit 201, was this check deposited into

12   an account at Bank of America?

13   A.  Yes, it was.

14   Q.  Into what account was this check deposited?

15   A.  It was into the GateGuard, Inc. account.

16   Q.  And what was the date on which it was deposited?

17   A.  The date of deposit was of 3/28 of 2019.

18            MR. BHATIA:  Mr. Magliocco, could you please publish

19   Government Exhibit 202.  And can we take a look at the check

20   image at the top.

21   Q.  Ms. Finocchiaro, who is this check addressed to?

22   A.  This check is made out to GateGuard, Inc.

23   Q.  That's the same company as the first one, right?

24   A.  That is correct.

25   Q.  And who is this -- who are the funds purportedly coming

1    from?

2    A.   They are coming from 18 Mercer Equity, Inc.  And the check

3    is drawn off of Signature Bank.

4    Q.   Okay.  Is there something listed in the memo line?

5    A.   There is.  So this one indicates "device removal fee."

6    Q.   As a general matter, what is a memo line on a check?

7    A.   So a memo line is kind of a description.  You can just put

8    in a small note of what the actual transaction is relating to.

9    Q.   And what's the date listed on this check?

10   A.   The date is 3/28 of 2019.

11   Q.   And what was the date that this check was actually

12   deposited?

13   A.   3/28 of 2019.

14   Q.   And what's the amount stated on this check?

15   A.   For 18,000.

16   Q.   Is that the same as the amount of the last check?

17   A.   Yes, it is.

18   Q.   Okay.  Have you reviewed records that show how these past

19   two checks were deposited?

20   A.   Yes, I have.

21        MR. BHATIA:  Mr. Magliocco, could you please publish

22   Government Exhibit 113.  And in particular, I'll direct you to

23   the device removal tab -- excuse me, the device tab.

24        Let's take a look at the extended detail tab, and rows

25   38 to 46, if you could highlight those.

K1MVTEM4                          Finocchiaro - direct

1   Q.  So this is a lot of data.  What is -- as a general matter,

2   what does this table show?

3   A.  So what this data shows is anytime someone logs into online

4   banking, it does show in the session ID, there's also listed on

5   here the date and the time of the exact login.  Column C is an

6   access ID, so it shows the online banking access ID that the

7   customer uses to login.

8             Column D shows the type of browser that's being

9   utilized.  Column E would give us a numeric number for a

10  session ID.  So column F actually indicates whether it was --

11  what was done within that session, so corresponding to column,

12  I believe, E.

13  Q.  A lot of columns.

14  A.  It's moving, so -- and then column J gives a detailed

15  description of what was done.  So if there's funds that are

16  being transferred, it would show the to and from account

17  number, and it gives IP information as well.

18  Q.  Do the highlighted rows here correspond to the checks that

19  you just testified about?

20  A.  Yes, they do.

21  Q.  Okay.  And are you able to see from here how those

22  checks -- how they were literally deposited?

23  A.  They were mobile deposit checks.

24  Q.  What does "mobile deposit" mean?

25  A.  It means that you can capture an image from your mobile

K1MVTEM4                          Finocchiaro - direct

1    device and upload that into the online banking environment.

2    And it loads that image into the account.

3    Q.  What's the step-by-step process for doing mobile deposit?

4    A.  So you would log into your online banking.  You would

5    authenticate as being the client.  You would then go in, you

6    see your accounts listed.  You choose the account that you

7    would like to take action in, so whether you would like to view

8    the deposit history or if you'd like to choose to make a

9    deposit.  You would choose the specific account that you'd make

10   the deposit into, and then you'd load the mobile image.

11   Q.  Have you -- as part of your role as a senior fraud

12   investigator, have you handled matters involving mobile

13   application?

14   A.  Yes, I do.

15   Q.  And have you become familiar with what information is

16   available from the mobile application?

17   A.  Yes.

18   Q.  When an individual logs into the mobile application, what

19   information is presented to them?

20   A.  Their current balance information is available to them in

21   that mobile application.

22   Q.  Do they see the balance of different accounts or just one

23   account?

24   A.  If the profile is set up having multiple different accounts

25   in it, then you can see multiple different accounts and the

1    balance information.

2    Q.  According to this table that we're looking at here, what's

3    the user ID for the person who deposited the checks?

4    A.  It is Ari B. Teman.

5    Q.  And is that shown in column C here?

6    A.  Yes, it is.

7             MR. BHATIA:  Mr. Magliocco, could you zoom in a little

8    bit on maybe rows 38 and 46.

9    Q.  Okay.  So that's shown in column C; is that right?

10   A.  That is correct.

11   Q.  And in column B, what's shown there?

12   A.  In column B, it is the date and time.

13   Q.  Okay.  So what's the date and time of the two transactions

14   that are highlighted here?

15   A.  3/28 of 2019, the first one was at 17:08:37, and the second

16   one was at 17:12:08.

17   Q.  And are you able to see here in column -- right after I,

18   what the amount of these deposits was?

19   A.  The amount of the deposit is shown, so it's -- it says:

20   Action equal make deposit amount equals 18,000.

21             So they were both shown there.

22   Q.  Is the amount 18,000, does that mean an $18,000 deposit?

23   A.  In this case there was two $18,000 deposits, there's one

24   memo line for each.

25   Q.  And are you able to see into what account these were

1    deposited?

2    A.  Yes.  So it shows it in -- it's so small.

3    Q.  We'll take a look at another table.

4    A.  So, yeah, it does show the account number in which the

5    funds are going into.  So this is -- just to give indication,

6    this is all done in a code environment.  So it's pulled -- so

7    the data is pulled from our sequel servers.

8              THE COURT:  Can I ask the witness just to keep your

9    voice up so the ladies and gentlemen can hear you better, of

10   the jury?  Thank you.

11   Q.  Is there a table that would show you which IP address is

12   associated with these transactions?

13   A.  Yes.  And actually, the information is on this table.  It's

14   located in the same string, so between the two highlighted

15   yellow versions.  It's over -- it will say IP, and it's listed

16   as 74.203.64.198.

17   Q.  Where is that on the screen?

18   A.  So it is located in line 42, all the way to the right-hand

19   side.  So it's right kind of where that pink blip is.

20   Q.  Is there a tab that will show you what physical location is

21   associated with that IP address?

22   A.  I'm sorry?

23   Q.  Is there a table that would show you what physical location

24   is associated with that IP address?

25   A.  Yes.  That information is on the OLB detail tab, but it's

1   also listed on the device tab.  So I think you're going to look

2   at the device tab.

3            MR. BHATIA:  Mr. Magliocco, can we go to the device

4   tab.

5   Q.  And why don't you draw our attention to the rows that

6   involve the transactions here.

7   A.  So row 79, down to 83.  So you'll see the IP address is

8   listed in column E, and it lists it as being in column P as

9   being --

10           THE COURT:  May I just ask government counsel --

11  A.  It's column P, and it's listed as New York, New York.

12           THE COURT:  The type here is microscopic.  The jury is

13  struggling to see it.  If you intend to draw their attention to

14  lines here, you would do best to have the lines that you're

15  focusing on magnified just to facilitate the jury's review.

16           MR. BHATIA:  Okay.  Let's zoom in even further then.

17  A.  So I draw our attention to column E which has the IP.  And

18  then over -- column E, which has the IP location, and then the

19  physical location in column P.

20  Q.  And is that physical location in column P based off of the

21  IP address?

22  A.  Yes, it is.

23  Q.  And what is it listed here as the location?

24  A.  New York, New York.

25  Q.  Okay.  And I should ask this question:  What is an IP

1   address?

2   A.  It's an internet protocol address.  So it gives a distinct

3   location in which an online banking login is being conducted.

4   Q.  Have you become familiar with the process for how Bank of

5   America handles mobile deposits?

6   A.  Yes.

7   Q.  And the process through which a check is submitted through

8   a mobile deposit?

9   A.  Yes.

10  Q.  Describe that process.

11  A.  So the process through the mobile deposit we went through.

12  Basically, you login through the online banking, you would

13  upload the image, and it would make the deposit into your

14  account, so versus going to a teller or an ATM, you can do that

15  through the mobile application.

16  Q.  And there are, sort of, the electronic communications sent

17  from the bank when doing mobile deposit; is that right?

18  A.  That is correct.

19  Q.  And is there one state where electronic communications are

20  routed for a mobile deposit?

21  A.  Can you restate?

22  Q.  Is there a location through which electronic communications

23  are routed associated with mobile deposit?

24  A.  The information flows through our servers which are located

25  in Texas.

1    Q.  So if someone does a mobile deposit, there's some

2    communication sent to Texas?

3    A.  That is correct.

4    Q.  Okay.  I'll direct your attention to the tab ending in 8085

5    of this document, and rows 50 and 53 in particular.

6            MR. BHATIA:  And we can zoom way in.

7    Q.  Okay.  Ms. Finocchiaro, have you reviewed this record

8    before?

9    A.  Yes, I have.

10   Q.  And are these the two rows that correspond to the checks

11   that you testified about?

12   A.  Yes, they are.

13   Q.  Okay.  And starting here in column D for both of these

14   checks, these are the highlighted rows, what's the account into

15   which these were deposited?

16   A.  They were into the GateGuard, Inc. account.

17   Q.  Okay.  And are you able to see what the value of those

18   transactions was?

19   A.  They were $18,000 each.

20   Q.  And what's shown in column G?

21   A.  Column G is the ledger balance once the checks are

22   deposited into the account.

23   Q.  So at the end of the day, after these checks were

24   deposited, there was 38,995.96 in that account; is that

25   correct?

1    A.  Yes, that's correct.

2    Q.  Okay.  And does this table -- if we go up or down, are we

3    going to see what happened before or afterwards?

4    A.  Yes.  So the information is in a daytime descending order.

5    So the information below would be anything that happened prior,

6    and the information above would be anything that happened after

7    the deposit was completed.

8    Q.  Okay.  If we look at transactions going up this

9    spreadsheet, those happened after these checks?

10   A.  That is correct.

11   Q.  Okay.  I'll direct your attention to row 48.

12           MR. BHATIA:  Mr. Magliocco, if you could highlight row

13   48.

14   Q.  What transaction do you see happening in that row?

15   A.  On 3/29, there was an online banking transfer; and it was

16   transferring $35,000 from the GateGuard, Inc. account to the

17   account that ends in 0351.

18   Q.  So is that the day after these two deposits?

19   A.  Yes, it is.

20   Q.  Is that $35,000 leaving the account?

21   A.  Yes, it is.

22   Q.  And it's going to another account?

23   A.  It is going into the 0351.

24   Q.  And based on your review of records, including Government

25   Exhibit 103 and 104, have you identified the account holder for

K1MVTEM4                          Finocchiaro - direct

1   the account ending in 0351?

2   A.   Yes, I have.

3   Q.   Who is it?

4   A.   That account is held in the name of Friend or Fraud, and

5   the sole signer was Mr. Ari B. Teman.

6   Q.   Based on -- was there any other signer on that account?

7   A.   No, there's not.

8   Q.   I'll direct your attention to the next tab here ending in

9   0351.  That's for the Friend or Fraud account.  And directing

10  your attention now to row 74, if we can zoom in on that.  73

11  rather.

12          And does row 73 here, we'll zoom in, does that show

13  the money coming into that account?

14  A.   Yes, it does.  In column E it lists it as a deposit of

15  35,000, and it's coming from the 8085 account, which was

16  GateGuard.

17  Q.   Okay.  And is there another -- so I'll direct your

18  attention now to row 74.  That's the one right below it.  Are

19  you able to see there what transactions have been taking place

20  in row 74?

21  A.   Yes.  In row 74, there was a $20,000 movement; it was a

22  withdrawal, and the funds were being placed into the account

23  that ends in 1046.

24  Q.   So you were able to see $35,000 coming into this account,

25  and then $20,000 going to a third account?

K1MVTEM4                         Finocchiaro - direct

1   A.  That is correct.

2   Q.  And were you able to identify, based on Government Exhibit

3   105, who is the account holder for the account ending in 1046?

4   A.  Yes, account 1046 --

5   Q.  You can take a look.  It's Government Exhibit 105.

6   A.  That would be the account in the name of Touchless Labs

7   LLC.

8   Q.  And have you reviewed records showing who the signatory is

9   for that account?

10  A.  Yes.

11  Q.  And is that in the same record that you're looking at now?

12  A.  Yes, it is.

13  Q.  Who's the authorized signer for that account?

14  A.  That's Ari B. Teman as well.

15  Q.  And is he the only authorized signer?

16  A.  Yes, he is.

17  Q.  So is he the only authorized signer for all three accounts

18  we talked about?

19  A.  Yes, he is.

20  Q.  Okay.  Now we'll go to a third spreadsheet.

21        I'll direct your attention to the tab ending in 1046

22  at the bottom here and, in particular, row 32.

23        Does row 32 reflect money coming into that account?

24  A.  Yes, it does.  It shows the deposit located in column E,

25  $20,000 on 3/29; and it was coming from the account 0351.

1   Q.  Okay.  Now, going back to the first spreadsheet we looked

2   at, 8085, I'll direct your attention back to row 48.  We looked

3   at this one before.  That shows the -- does that show the

4   $35,000 leaving that account?

5   A.  Yes, it does.

6   Q.  The day after the deposits?

7   A.  Yes.

8   Q.  And how much money is left in that account at the end of

9   the day after that transfer?

10  A.  4,000 -- or at the end of the day it would be $3,995.96.

11  Q.  I'd like to change topics for a moment and ask you

12  something about a chargeback.  Are you familiar with the term

13  "chargeback"?

14  A.  Yes.

15  Q.  What is a chargeback?

16  A.  A chargeback is essentially when a check is returning, so

17  it's when the check is presented to the financial institution.

18  However, the maker bank has established that for some reason

19  the check is no good, so it could be -- whether it would be

20  nonsufficient funds, altered or fictitious, or a counterfeit

21  check.

22  Q.  Is a chargeback one way to unwind a transaction?

23  A.  Correct.

24  Q.  What are some examples of things that could trigger

25  chargebacks?

K1MVTEM4                        Finocchiaro - direct

A.   Counterfeits, checks that are -- have been -- had a stop

payment that was placed on those, or checks that have been

deemed by the customer to not be legitimate checks.

Q.   And how does Bank of America decide whether to honor a

chargeback request from another bank?

A.   Banks honor each other's chargebacks.  So if we receive a

chargeback, it is honored based on the fact that the maker

financial institution is indicating that the check for any

reason is not good.

Q.   So if there's a chargeback in an account, where does the

money come from to fund the money going back?

A.   If there's -- if the funds have been removed from the

account and we don't have a right to offset, the bank would be

standing at that time at a loss and there would be a negative

balance.

Q.   That's in an instance where there isn't enough money in the

account to fund the chargeback.  But if there is enough money

in the account, what happens?

A.   If there's enough money in the account, then the funds

would just be deducted from the available balance.

Q.   So in the instance where there's -- there are $100 in the

account, and there's a $50 chargeback, what happens?

A.   It would leave $50 in the account and it would recourse

that 50.

Q.   What happens if there's only $10 in that account and

1   there's a $50 chargeback?

2   A.  It's going to leave the account in a deficit of $40.

3          THE COURT:  Sorry, a little louder please.

4   A.  It's going to leave the account in a deficit of $40.

5   Q.  And who would be responsible for those $40?

6   A.  So it's the responsibility of the customer to make good on

7   the balance in the account; so if the account's in a negative,

8   that it is brought to a positive balance.

9   Q.  Would the bank pay that $40 first?

10  A.  It does.  It does honor the chargeback, and it recourses

11  the money back to the maker bank.

12  Q.  And then what are the bank's options to try to get those

13  $40 back?

14  A.  We do -- we look for the right to offset between accounts,

15  which means that we have the right to recover money that would

16  have been transferred from one account to another.  And then

17  after we've completed the process of the investigation, it

18  would go to collections at that time.  The only time that we

19  don't file for collections is when the account is being worked

20  actively by law enforcement in regards to a criminal

21  investigation.

22         MR. BHATIA:  Mr. Magliocco, if we could scroll up this

23  page just a bit to row 30.

24  Q.  What's the date of the transaction in row 30?

25  A.  It's on 4/2 of 2019.

1  Q.  Is that a couple of days after the other -- the deposits we

2  talked about?

3  A.  Yes, it is.

4  Q.  And what transactions are you seeing happen in row 30?

5  A.  In row 30, this is 36,000, and it was for the returned item

6  chargeback.  Basically, it lumped the two together.  So when

7  they came through on the same day, instead of doing two $18,000

8  chargebacks, it does put those together and recourses the

9  account for a lump sum of 36,000.

10  Q.  How much money was in this account on the day before the

11  chargeback?

12  A.  On the day before the chargeback, there was $4,695.30.

13  Q.  And after the chargeback, how much was left in the account?

14  A.  The account was sitting at a negative balance of

15  $29,036.56.

16  Q.  And so how did Bank of America come up with the funds to

17  pay the $36,000 chargeback if there was only $4,695.30 before?

18  A.  Bank of America has the responsibility to make -- to

19  provide the funds back to the maker bank.  So we're sitting at

20  a loss at that time.

21  Q.  So Bank of America had to pay those extra funds?

22  A.  Correct.

23  Q.  Okay.  Ms. Finocchiaro, I'd like to direct your attention

24  now to some activity in April 2019.

25           MR. BHATIA:  Mr. Magliocco --

1    Q.  Actually, Ms. Finocchiaro, I'm going to show you Government

2    Exhibits 110 through 112.  They should be in a binder in front

3    of you.  Do you recognize those documents?

4    A.  Yes, I do.

5    Q.  As a general matter, what are they?

6    A.  These are still frame images from our video surveillance

7    system.

8    Q.  And how do you recognize those documents in particular?

9    A.  I created the document.

10   Q.  Are you familiar with how electronic surveillance records

11   are created at Bank of America?

12   A.  Yes.

13   Q.  And how are you familiar with that?

14   A.  I use our video retrieval system.  So there are -- it's an

15   active running system.  It captures all of our images at all of

16   our ATMs, including our banking centers and our ATMs.

17   Q.  If you want to find the photograph or a video associated

18   with a given transaction, what do you do?

19   A.  I would pull the specific account for the date, time, and

20   location.  I would enter the video retrieval system, and I

21   would choose the specific location and the specific machine or

22   teller that the transaction would have occurred.

23   Q.  Does the bank collect photographs or surveillance of many

24   transactions or does it pick transactions in particular?

25   A.  No.  So it's a live-stream feed.  And we're able to go back

K1MVTEM4                    Finocchiaro - direct

1    in from a 120-day period and review all transactions second by

2    second, minute by minute, and for specific locations.

3    Q.  Are you a custodian of records for Bank of America?

4    A.  Yes, I am.

5    Q.  When these records, that is, Government Exhibits 110, 111,

6    and 112 -- were these records created and maintained by Bank of

7    America in the ordinary course of business?

8    A.  Yes, they were.

9    Q.  Were they made at or near the time of the acts described in

10   them by someone with knowledge of them?

11   A.  Yes, they were.

12          MR. BHATIA:  Your Honor, the government offers

13   Government Exhibits 110, 111, and 112.

14          THE COURT:  Is there an objection?

15          MR. GELFAND:  No, your Honor.

16          THE COURT:  All right.

17          They are all received, 110, 111, and 112.

18          (Government's Exhibits 110, 111, 112 received in

19   evidence)

20          MR. BHATIA:  Mr. Magliocco, could you please publish

21   Government Exhibit 111 in evidence.

22   Q.  Ms. Finocchiaro, what does the first page of this document

23   show?

24   A.  This is a transaction that was being completed at our

25   Lincoln Road Financial Center.  It was on 4/19 of 2019 at 18:00

K1MVTEM4                        Finocchiaro - direct

1    hours.  And it was listed as our LT1, so it was a transaction

2    that was being conducted with our Teller No. 1.

3    Q.  Quickly flipping to page 2, what does page 2 show?

4    A.  It's a transaction in the same sequence.  It's on 4/19 of

5    2019 at 18:05.  And again, it was at our Lincoln Road Financial

6    Center.

7    Q.  That's about five minutes later?

8    A.  That is correct.

9    Q.  And what about page 3?

10   A.  It was on 4/19/2019 at 18:05, so it was just a different

11   angle and the same minute.

12   Q.  Have you reviewed account records and identified

13   transactions happening around the same time these photographs

14   were taken?

15   A.  Yes, I did.

16        MR. BHATIA:  Mr. Magliocco, could you please publish

17   Government Exhibit 205 in evidence.

18   Q.  What does this document show?

19   A.  So this is a check that was being deposited.  It was -- the

20   maker bank was JPMorgan Chase.  And it was from account ABJ

21   Lenox LLC.  The account number on the bottom right-hand corner

22   is 833579100.

23   Q.  And have you reviewed bank records showing whether this was

24   taken around the same time as those photographs?

25   A.  Yes, it was.

K1MVTEM4                        Finocchiaro - direct

1    Q.   Into what account -- what account is this check addressed

2    to?

3    A.   GateGuard, Inc.

4    Q.   Is that the same one we talked about before?

5    A.   Yes, it is.

6    Q.   Who is the check written from -- or who is the account

7    holder that it's drawn from?

8    A.   ABJ Lenox LLC.

9    Q.   And what's the bank where these funds would come from?

10   A.   JPMorgan Chase.

11   Q.   That's listed up there in the top middle of the check?

12   A.   That is correct.

13   Q.   Okay.  And in the memo line, what do you see there?

14   A.   In the memo line it lists device removal, 539 Lenox Avenue

15   (gate).

16   Q.   And in the signature line, do you see a physical signature?

17   A.   There is not.

18   Q.   What do you see instead?

19   A.   There is a notation that indicates:  Draw per contract.  No

20   signature required.  Note to bank, this is a valid check.  You

21   are required by law -- contract at -- oh, contact at GateGuard

22   XYZ, legal terms, PHP accepted by above client.  Contact us

23   212-203-3714 with questions.

24   Q.   And you can take a look at the hard copy in front of you.

25   How many checks do you see in Government Exhibit 205?

K1MVTEM4                        Finocchiaro - direct

1  A.  Eighteen.

2  Q.  Okay.  And are all 18 of those checks addressed to

3  GateGuard, Inc.?

4  A.  All 18 are addressed to GateGuard, Inc., yes.

5  Q.  And are they all written from ABJ Lenox?

6  A.  Yes, they are.

7  Q.  Let's look at another example check.

8         MR. BHATIA:  Can we turn to the second page of this

9  document.

10  Q.  Okay.  Is this another check from ABJ Lenox LLC?

11  A.  Yes, it is.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K1mdtem5                         Finocchiaro - direct

1   Q.  And is this one also for $18,000?

2   A.  It is for 18,000.

3   Q.  And what is listed in the memo line here?

4   A.  Device removal fee, 102 West 138th Street, gate.

5   Q.  Let's look at another example.

6        Mr. Magliocco, could we go to page 7 of this document.

7        In this check, what is listed in the memo line?

8   A.  Attorney use fee, 539 Lenox Avenue, Gate.

9   Q.  What is listed as the value of this check?

10  A.  $5,000.

11  Q.  OK.  That's different than the two we looked at a moment

12  ago?

13  A.  That is correct.

14  Q.  And, Mr. Magliocco, could we go to page 13 for another

15  example.

16        What's listed here in the memo line of this check?

17  A.  Collection fee, 539 Lenox Avenue, Gate.

18  Q.  And what about the value of this check?

19  A.  It was for $10,000.

20  Q.  OK.  This one is also from the ABJ Lenox account to the

21  GateGuard Inc. account?

22  A.  That is correct.

23        MR. BHATIA:  Mr. Magliocco, could you please publish

24  Government Exhibit 204.

25  Q.  Ms. Finocchiaro, are you able to identify which account

1   these checks were drawn from?

2   A.  It's ABJ Milano LLC.

3   Q.  Is that true for all the checks in this exhibit?

4   A.  Yes, it is.

5   Q.  Now, are these all addressed to the GateGuard Inc. account?

6   A.  Yes, they are.

7   Q.  How does the signature area compare to the previous check?

8   A.  It is the same.  It lists, "Draw per contract, no signature

9   required."

10  Q.  Ms. Finocchiaro, were these checks deposited at the same

11  time as the 18 that we just talked about?

12  A.  Yes, they were.

13  Q.  And at the same branch?

14  A.  Yes, they were.

15  Q.  OK.  Who is the -- which bank is sending the money for

16  these checks?

17  A.  These checks in this series are JPMorgan Chase.

18  Q.  How many checks are in this exhibit?

19  A.  Six.

20  Q.  And are these all made out from an ABJ Milano account at

21  the top?

22  A.  Yes, they are.  Yes.

23  Q.  OK.  And last set of checks for now.  I will direct your

24  attention to Government Exhibit 203.  I'll direct your

25  attention to the check image at the top here.

1              How many checks are in this set of government exhibit?

2    A.   There are three.

3    Q.   Are they all made out from 518 West 205 LLC at the top?

4    A.   Yes, they are.

5    Q.   And are they all made out to the GateGuard Inc. account?

6    A.   Yes, they are.

7    Q.   And these were deposited at the same time as the last two

8    sets of checks we talked about?

9    A.   Yes, they are.

10   Q.   OK.  When checks are deposited at a Bank of America branch,

11   what steps are taken to digitize the image of the check?

12   A.   The checks are scanned into our system and added to our

13   image view system and housed, so anytime we need to view the

14   images, that we can view the images of all deposits.

15   Q.   Are these scanned at the bank where they are first

16   deposited?

17   A.   Yes, they are.

18   Q.   And what happens with that picture from there?

19   A.   There are sent into the video imaging system.  It is a

20   record of the account, and at any time, like I said, if we need

21   to be able to see that image, we can view that image.

22   Q.   Are the checks also transmitted to the Federal Reserve or

23   through the interbank clearing process?

24   A.   Yes.  So in this case these are drawn on signature banks,

25   so they would have gone through the Federal Reserve.  The

1    JPMorganChase go through an interbank clearing system.

2    Q.  The check image in addition to sort of the information from

3    the transaction?

4    A.  Correct.

5    Q.  OK.  I will now direct your attention back to the

6    spreadsheet that we were looking at earlier.  That is

7    Government Exhibit 113, and the tab underneath 805.

8            So the tab underneath 805, that is the GateGuard Inc.

9    account?

10   A.  8085 is GateGuard Inc. yes.

11   Q.  Thank you, 8085.

12           And this is the same account that was left with a

13   negative balance on April 2, 2019?

14   A.  That is correct.

15   Q.  OK.  Now, if we can scroll up to row 16, Mr. Magliocco.

16           I'm sorry.  That's right.

17           What do you see in row 16?  What transaction is taking

18   place in row 16?

19   A.  So in the 8085 GateGuard account, there was a deposit that

20   was completed for $297,000.  And it is a counter credit, which

21   means that it was a transaction that was done at a financial

22   center with a teller.

23   Q.  And is this transaction listed in row 16, did that

24   transaction happen around the same time as this photograph was

25   taken?

K1mdtem5                          Finocchiaro – direct

1    A.  Yes, it was.

2    Q.  And is the $297,000 the total value of the checks that you

3    testified about?

4    A.  Yes.

5    Q.  The three?

6    A.  The 203, 204 and 205 exhibits.

7    Q.  And at the end of the day, after that transaction, what is

8    the value of the account?

9    A.  Once the checks were deposited, the ending balance was

10   $271,803.12.

11   Q.  And what is the date of the deposit there?

12   A.  It was on 4/19/2019.

13   Q.  Based on your review of Government Exhibits 203, 204 and

14   205, is the date on the check the same as the date of the

15   deposit?

16   A.  Yes, it is.

17   Q.  OK.

18           Let's take a look at row 13, which is just three rows

19   up from where we were looking.  So that means it happens later,

20   right?

21   A.  That is correct.

22   Q.  OK.  And what is the date of the transaction in row 13?

23   A.  In row 13, it is a withdrawal and it was on 4/24.  It is

24   indicating a return item chargeback is completed.

25   Q.  What does a return item chargeback mean?

K1mdtem5                          Finocchiaro - direct

1    A.  It means that a few of the checks from that bulk deposit of

2    the $297,000 was returned, that they were indicating

3    counterfeit.

4    Q.  Is there a record that would show you which of those checks

5    from that 27-check deposit were the subject of a chargeback

6    here?

7    A.  On this tab, no.

8    Q.  Would that be in Government Exhibit 114 or somewhere else?

9    A.  It would be, yes.

10            MR. BHATIA:  Mr. Magliocco, could we go to Government

11   Exhibit 114 for a moment.

12            I will direct your attention to the third page at the

13   bottom.

14            Can you zoom in on the last two rows there.  I'm

15   sorry.  It is the three rows above that.

16   Q.  So looking at I think the bottom three rows that are zoomed

17   in here, what is the date of these transactions?

18   A.  The date of the transactions were, again, 4/19 of 2019.

19   Q.  And what is shown in this record?

20   A.  So this record from left to right, it is the date of the

21   returned item chargeback, so it is the date that Bank of

22   America is notified that the checks are returning for

23   counterfeit.  It tells us the dollar amount per item, and it

24   tells us the reason that those checks are returning.

25   Q.  What is the listed reason here?

K1mdtem5                         Finocchiaro - direct

1   A.  It is counterfeit check.

2   Q.  Is that a description that you get from another bank, or is

3   that something that Bank of America would apply?

4   A.  No, that is something that -- they have to apply a return

5   reason code when they are sending us the chargeback.

6   Q.  Is the chargeback in this instance requested by Bank of

7   America or does the other -- does the other bank say I would

8   like to undo this transaction?

9   A.  It is the other bank indicating that their customer has

10  indicated that the transaction is not a legitimate transaction,

11  so it is them requesting.

12  Q.  The chargebacks that are shown here were initiated outside

13  of Bank of America?

14  A.  That is correct.

15  Q.  Is that true of all the transaction in this document?

16  A.  That is correct.

17  Q.  OK.

18          MR. BHATIA:  Mr. Magliocco, I would like to -- if you

19  could please go back to Government Exhibit 113.  That is the

20  spreadsheet.

21  Q.  So row 13 here shows the $33,000 chargeback, is that right?

22  A.  That is correct.

23  Q.  And then if you go up to row 12, what transaction do you

24  see there?

25  A.  On row 12 it is indicating that from the GateGuard Inc.

1    account, it is withdrawing $225,000 on 4/26 of 2019.  It is an

2    online banking transfer that's being completed to the account

3    that is checking account 0351.

4    Q.  So it shows $225,000 being sent to the account ending in

5    0351?

6    A.  That is correct.

7    Q.  Is that the Friend or Fraud account that you testified

8    about previously?

9    A.  Yes, it is.

10   Q.  Who is the author or signer for that account?

11   A.  It is Ari B. Teman.

12   Q.  Ms. Finocchiaro, one row above it, so row 11, what

13   transaction do you see take place in that row?

14   A.  That is an online banking transfer that's being completed

15   out of GateGuard into -- from online banking into checking

16   account 5580.

17   Q.  And based on your review of Government Exhibit 107, do you

18   know who the account holder is for the account ending in 5580?

19   A.  That is the account for -- it is a personal account for Ari

20   B. Teman.

21   Q.  Is there an authorized signer for that account?

22   A.  He is the sole signer for this account.

23   Q.  That one is a personal account instead of a business

24   account, is that right?

25   A.  That is correct.

1    Q.  So on the day before these two transfers, what is the total

2    value of the account?

3    A.  On the day prior to that transfer, it was 200 and --

4    $10,167.12.

5    Q.  After those transactions, it is $10,167.12, right?

6    A.  That is -- no.  I'm sorry, on the day after.  So it would

7    be on 4/29, and it would be a ledger balance of 4,624.51.

8    Q.  OK.  So with those two transactions, it goes from

9    approximately $238,000 to $10,000, is that right?

10   A.  It goes down to -- it goes, yes, correct.

11           MR. BHATIA:  OK.  Mr. Magliocco, I would like to

12   direct your attention to the tab ending in 0351, which is the

13   tab associated with the Friend or Fraud account.  And row 36,

14   scroll up to it.

15   Q.  What transaction do you see happening in row 36, Ms.

16   Finocchiaro?

17   A.  That is the $225,000 being transferred from account 8085 in

18   the name of GateGuard.

19   Q.  That is the money going from the GateGuard account to the

20   Friend or Fraud account?

21   A.  That is correct.

22   Q.  I would like to direct your attention now to row 34 -- let

23   me step back.

24           What is the date of the transaction you just testified

25   about in row 36?

1    A.  4/26 of 2019.

2    Q.  Now looking at row 34, what is the date of that

3    transaction?

4    A.  4/26/2019.

5    Q.  And what transaction is happening there?

6    A.  It is a $4,500 cash withdrawal that's being completed from

7    the online banking transferring the funds from GateGuard -- I'm

8    sorry, from Friend or Fraud over to account 5580.

9    Q.  And based on your review of Government Exhibit 107, who is

10   the account holder for that account?

11   A.  For 5580, it is Ari Teman.  Actually, 5580 is Touchless --

12          (Pause)

13          5580 is Ari B. Teman.

14   Q.  And isn't there another transaction on the same day,

15   according to this spreadsheet?

16   A.  On 4/26 --

17   Q.  That is right.

18   A.  -- there is a transaction via online banking.  It's a

19   withdrawal transferring 180,000 to account -- checking account

20   1046.

21   Q.  OK.  And do you see another transaction from that account

22   in row 29?

23   A.  There was -- on 4/29, there was a transaction which was a

24   deposit of $125,400, and it was an online banking transfer from

25   checking account 1046.

1    Q.  So are you seeing the money going into the account 1046 and

2    then coming back three days later?

3    A.  That is correct.

4    Q.  OK.  I'll direct your attention to row 32 here.

5             Are you seeing -- there a wire transaction in that

6    row?

7    A.  Yes, there is.  It is an international wire that's

8    conducted on 4/29.

9    Q.  And are you able -- is there any more information you can

10   get about where it is being sent to -- the beneficiary, I

11   should say?

12   A.  Yes.  It was -- I can't pronounce it, but Zuhuhai Taichiuan

13   Cloud Tech ID -- Tech and then there is an ID number.

14   Q.  In row 24 -- scroll up just a bit -- is there another wire

15   transaction there?

16   A.  There is another wire transaction.  It is being conducted

17   on 5/1, and it is going to beneficiary of ZBT International

18   Limited.

19   Q.  And now I will direct your attention to row 10.

20            This is all under the Friend or Fraud account, is that

21   right?

22   A.  I do believe so.  If you can scroll over --

23            THE COURT:  A little louder, please.

24   A.  It is in the Friend or Fraud Inc. account, yes.

25   Q.  This is the account where money was transferred from the

1    GateGuard account to this account?

2    A.   That is correct.

3    Q.   OK.  So in row 10, what transaction do you see here taking

4    place?

5    A.   That is on 5/8, there was a $4,000 withdrawal, and it is a

6    customer withdrawal image.  So it was a transaction that was

7    taking $4,000 out of a physical teller.

8    Q.   Ms. Finocchiaro, I would like to direct your attention to

9    Government Exhibit 112. in evidence.

10        What's the date listed here on this document?

11   A.   5/8 of 2019.

12   Q.   What is this?

13   A.   This is showing a cash withdrawal transaction at our 1 Penn

14   Plaza location on 5/8 at 15:04.

15   Q.   Based on your review of this record and the account record,

16   what is the connection between the $4,000 transaction and this

17   photograph?

18   A.   This is the photograph of Mr. Teman completing the

19   transaction for the cash withdrawal.

20   Q.   All right.  Let's switch topic now.  We'll talk about

21   chargebacks again.

22        Based on your review of the Bank of America records,

23   was there a chargeback of some of the funds deposited into the

24   GateGuard account in April 2019?

25   A.   Yes, there was.

1   Q.   OK.   Let's take a look again at Government Exhibit 114, and

2   I will direct your attention to the first page.

3            If we can zoom in on just the first row.

4            Ms. Finocchiaro, what is listed here as the -- what is

5   the description listed here for why this chargeback took place?

6   A.   RCC breach of warranty.   So that is a remotely created

7   check breach of warranty.

8            MR. BHATIA:   One moment.

9            (Pause)

10           Your Honor, this might be an appropriate time for the

11   instruction regarding relief credit checks.

12           MR. GELFAND:   I would join in that request.

13           THE COURT:   Counsel, has the expression been used yet

14   in the receipt of evidence?

15           MR. BHATIA:   The witness just used it.

16           THE COURT:   All right.   Very good.

17           Ladies and gentlemen, you have just heard reference to

18   something called a remotely created check, also known for short

19   as an "RCC."   A remotely created check is a check that is not

20   created by the paying bank and that does not bear a signature

21   applied or purported to be applied by the person on whose

22   account the check is drawn. I instruct you that the banking

23   laws of this country do permit the use of remotely created

24   checks under certain circumstances, provided, of course, that

25   the customer on whose account the check is drawn has authorized

1    the check.  However, this case does not involve whether or not

2    the checks in question here meet the technical definition of a

3    remotely created check, and you should not concern yourself

4    with that.  The question for you will be whether the government

5    has proven beyond a reasonable doubt the elements of the

6    offenses charged, which, again, are bank fraud and wire fraud.

7              I will instruct you on the elements of those offenses

8    later in the trial after all of the evidence has been received.

9              And that ends the instruction.  Go ahead.

10             Thank you, counsel.

11   BY MR. BHATIA:

12   Q.  As you understand it, what does "RCC warranty breach" mean

13   as a reason for a chargeback?

14   A.  It means that the maker has disputed at this point that

15   there is a breach of warranty, so there is an agreement and

16   that the agreement has failed.

17   Q.  And based on your review of these records, was all of the

18   $297,000 deposited from the 27 checks subject to a chargeback?

19   A.  They were all subject to a chargeback, correct.

20             MR. BHATIA:  Mr. Magliocco, could we go back to

21   Government Exhibit 113.

22             If you could go to row 3.  I'm sorry, in the tab

23   ending in 8085.

24   Q.  Ms. Finocchiaro, what is happening in row 3?

25   A.  On 5/7, we received a return item chargeback for a total

K1mdtem5                          Finocchiaro - direct

1   aggregate amount of $264,000.

2   Q.  And is that another chargeback?

3   A.  It is.  It is a chargeback for all of the items totaling

4   264,000.

5   Q.  So between this $264,000 chargeback and the one in row 13,

6   are those all -- does that cover all the 27 checks?

7   A.  Yes, it does.

8   Q.  OK.  And we don't need to switch tabs, but we saw a few

9   photographs from the $4,000 transaction, is that right?

10  A.  Yes.

11  Q.  The $4,000 was withdrawn from the teller?

12  A.  Yes, it was.

13  Q.  Was that transaction done at a bank here in Manhattan?

14  A.  Yes, it was.

15  Q.  OK.  After this chargeback for $264,000, the one here, so

16  after all the chargebacks for all the checks, what is the value

17  of the account?

18  A.  We are sitting at a negative amount of $260,319.81.

19  Q.  How is Bank of America able to return $264,000 if there was

20  only about $4,000 in the account?

21  A.  We are currently sitting on a total loss amount in regards

22  to that.

23  Q.  Bank of America had to pay the money out?

24  A.  That is correct.

25  Q.  It had to cover it?

1    A.  That is correct.

2    Q.  We mentioned earlier that chargeback requests can come from

3    another bank, right?

4    A.  Correct.

5    Q.  So the other bank is saying we need to get the money back.

6          What happens if Bank of America's customer says this

7    transaction is authorized but the other bank says it is not

8    authorized, what does Bank of America do?

9    A.  So we look at the information.  However, it was indicated

10   that it was looked at as a dispute between the customer, the

11   maker and the depositor, and at that point it is not -- it's

12   not within our decision to rectify that matter.

13   Q.  In that scenario where the other bank says it is not

14   authorized, Bank of America's customer says it is, does the

15   transaction go through or does it not go through?

16   A.  So the chargeback does remain on the account.  We do remain

17   in the negative.  It is the customer's responsibility to make

18   the balance whole.

19   Q.  So the practice of Bank of America is to honor the

20   chargeback?

21   A.  That is correct.

22   Q.  Did there come a time when the GateGuard account was

23   closed?

24   A.  Yes, there was.

25   Q.  And what was the value remaining in the account when it was

1    closed?

2    A.   In the GateGuard account, the total negative balance was

3    $260,319.81.

4    Q.   And you testified about two other accounts, the Friend or

5    Fraud account and the Touchless Labs account?

6    A.   Correct.

7    Q.   Were those accounts closed as well?

8    A.   Yes, they were.

9    Q.   And was there a positive balance or a negative balance in

10   those accounts?

11   A.   Can we look at the --

12   Q.   Let's take a look at those tabs.  I will direct your

13   attention to the tab ending in 0351.  That is for the Friend or

14   Fraud account that you testified about?

15   A.   Correct.  So at that time when the account was closed, it

16   was at a positive balance of $8,386.

17   Q.   And what about the account ending in 1046?  That is the

18   Touchless Labs account.

19   A.   We were sitting at a positive balance of $86,558.18.

20   Q.   What did Bank of America do with the money in those

21   accounts?

22   A.   So those fund were immediately sent to hold harmless in

23   regard -- it is a holding -- it is a holding account that the

24   bank has.  We review the account for offset to see if we're

25   able to utilize the funds from the transfer to offset the loss

K1mdtem5                          Finocchiaro - direct

1    that was incurred based on the returned item chargeback.

2    Q.  Before that, did there come a time when the bank, or Bank

3    of America, tried to return the deposited balance funds in

4    those accounts?

5    A.  Yes.

6    Q.  What happened?

7    A.  So the funds were -- the checks were cut for the individual

8    accounts and the physical check was mailed.

9    Q.  Let's unpack that.  So in this account, for example, there

10   is $86,558.18 at the time of closing, is that right?

11   A.  That is correct.

12   Q.  Approximately?

13          What did Bank of America do with that $86,000?

14   A.  The funds were placed into an official item and they were

15   mailed to the customer.

16   Q.  A check was mailed to the customer?

17   A.  Correct.

18   Q.  Is the same true of the other account?

19   A.  That is correct.

20   Q.  OK.  What happened with those checks?

21   A.  The checks were returned in the mail for the address.

22   Q.  You mentioned something about -- you mentioned something

23   called an offset.  I want to unpack that a little bit.

24          If there is a negative account -- if there is a

25   negative balance when a chargeback happens, does Bank of

1   America try to take some steps to get some of that money so it

2   can pay for the chargeback?

3   A.  We do.  So we look at the events that occurred, so the

4   transactions that were incoming, what was the trail of events

5   after that, so we look to see where the funds were transferred

6   to to see if we can offset to bring those funds back to cover

7   the loss that's being sustained.

8   Q.  If an individual had three accounts at the bank, for

9   example, and there was a chargeback from one, could the bank

10  try to use the funds in the other account to pay for it?

11  A.  So we do not have the right to offset when the tax

12  identification number is different from one entity to the

13  other.

14  Q.  So if it was an individual -- three personal accounts,

15  would the bank typically be able to draw funds from the other

16  accounts?

17  A.  Yes.

18  Q.  If it was for three different businesses, for three

19  different tax numbers, would the bank typically be able to use

20  the funds?

21  A.  We cannot offset our loss when it is a different tax

22  identification number.

23  Q.  And based on your review of the records admitted into

24  evidence earlier today, do you know if the three accounts that

25  you talked about had different tax ID numbers?

K1mdtem5                              Finocchiaro - cross

1    A.   They did.

2    Q.   So as a general matter, is the bank able to recover funds

3    from those three accounts?

4    A.   We were not.

5              MR. BHATIA:  Nothing further, your Honor.

6              THE COURT:  All right.  Thank you.

7              Cross-examination, Mr. Gelfand.

8              MR. GELFAND:  Thank you, your Honor.

9              THE COURT:  Yes.  You may inquire.

10   CROSS-EXAMINATION

11   BY MR. GELFAND:

12   Q.   Good afternoon, Ms. Finocchiaro.

13   A.   Good afternoon.

14   Q.   Did I pronounce that right?

15   A.   Yes.

16   Q.   Ms. Finocchiaro, you and I have never met, correct?

17   A.   That is correct.

18   Q.   You and I have never spoken, correct?

19   A.   That is correct.

20   Q.   You did, on the other hand, meet several times with the

21   prosecutors to prepare for your testimony, correct?

22   A.   I did.

23   Q.   And you spoke with them several times by phone, correct?

24   A.   I did.

25   Q.   OK.  Now, you testified that you are the senior fraud

K1mdtem5                          Finocchiaro - cross

1    investigator, or a senior fraud investigator at Bank of

2    America, correct?

3    A.  Yes.

4    Q.  And you have been there for quite some time, correct?

5    A.  Yes.

6    Q.  You testified that in your job, you've conducted thousands

7    of investigations; those were your words, correct?

8    A.  Correct.

9    Q.  OK.  Could I ask you to speak up a little bit?

10   A.  Yes, that is correct.

11   Q.  Now, obviously, you're not law enforcement.  When you say

12   "investigations," you mean investigations on behalf of the

13   bank, correct?

14   A.  That is correct.

15   Q.  And your job is to protect, if possible, the bank's

16   interests, correct?

17   A.  Correct.

18   Q.  OK.  And would you agree with me that when conducting any

19   sort of investigation, it is important to obtain all relevant

20   information, to the extent possible?

21   A.  Yes, that is correct.

22   Q.  And so, in other words, just to speak simply, if there are

23   two sides to a story, it is important to actually get both of

24   those sides, correct?

25   A.  Correct.

K1mdtem5                          Finocchiaro - cross

1   Q.   OK.   The contracts that are referenced on the checks that

2   you've testified about, you testified that there is a URL,

3   correct?

4   A.   That is correct.

5   Q.   And just to be clear, what is a "URL"?

6   A.   It's a hyperlink that would take you to -- you can take

7   that link and Google that and you can identify the subject of

8   that link.

9   Q.   So it is very simple to access that website; you just take

10  it into a Web browser, correct?

11  A.   That is correct.

12  Q.   Did you do that over the course of your investigation?

13  A.   Early on in the investigation, I do believe that I did,

14  yes.

15  Q.   And that took you to GateGuard's website and terms and

16  conditions and payment terms, correct?

17  A.   So the bank actually blocks the links, so I was not able to

18  view that, but I would have attempted to do that.

19  Q.   When you say the bank blocks the links, meaning your

20  computer security?

21  A.   Computer security or IT department does not allow certain

22  links to be processed.

23  Q.   OK.   Did you take an iPhone, for example and, just look up

24  the website?

25  A.   I did not.

1  Q.  So to this day, have you actually read the GateGuard

2  contract?

3  A.  I did not.

4  Q.  Now, you testified about a number of what the government

5  called checks, basically these 29, quote-unquote, checks or

6  RCCs, correct?

7  A.  Correct.

8  Q.  OK.  Now, in total there were initially, as you testified,

9  two mobile deposits into the GateGuard account in March,

10  March 28th of 2019, correct?

11  A.  That is correct.

12  Q.  And two mobile -- I'm sorry, and 27 checks deposited

13  physically at a bank branch in Miami, Florida?

14  A.  That is correct.

15  Q.  And that was in April, essentially three weeks later,

16  April 2019, correct?

17  A.  Correct.

18  Q.  OK.  And we looked at a number of those checks.  I'm not

19  going to show you all of them but I want to ask you a couple of

20  questions about them.

21         MR. GELFAND:  If I can turn on the Elmo, please?

22         Your Honor, I'm showing the witness Government's

23  Exhibit 201, which was previously admitted.

24         THE COURT:  Very good.

25  BY MR. GELFAND:

K1mdtem5                         Finocchiaro - cross

1    Q.  Now, can you, just to refresh our memory, you've testified

2    to Government's Exhibit 201.  It was one of the first documents

3    that the prosecutor showed you, correct?

4    A.  That is correct.

5    Q.  OK.  This was one of the March 28, 2019 mobile deposits,

6    correct?

7    A.  That is correct.

8    Q.  OK.  And you would agree with me, would you not, that this

9    expressly includes the phrase, "Draw per contract, no signature

10   required," correct?

11   A.  Correct.

12   Q.  OK.  And you testified that there is essentially, I'll use

13   your phrase, a squiggly line, correct?

14   A.  Correct.

15   Q.  In fact, that is the same squiggly line, if you will, as on

16   the endorsement section of the check, correct?

17   A.  That is correct.

18   Q.  Now, when you sign an endorsement of a check, we all have

19   this life experience, you are signing that you are the one

20   depositing the check, correct?

21   A.  Correct.

22   Q.  So it is pretty clear that if in fact Ari Teman was the one

23   depositing this check and then signing on the back, that,

24   quote-unquote, signature squiggly line represented is Ari

25   Teman's signature, correct?

1    A.  Yes.

2    Q.  OK.  Just to be clear, when we look at, for example, the

3    only other one introduced into evidence deposited that day --

4    for the record, this is Government Exhibit 202 -- do you see

5    that in front of you?

6    A.  Yes, I do.

7    Q.  OK.  And that, too, includes the same squiggly line in both

8    sections of the check, correct?

9    A.  There is a squiggly line for the signature on the top.  It

10   looks like a straight line across the bottom underlining

11   "Deposit only."

12   Q.  OK.  Can we agree that all four of these squiggly lines

13   look awfully similar?

14   A.  They do look awfully similar.

15   Q.  OK.  Both of these include, "Draw per contract, no

16   signature required," correct?

17   A.  Correct.

18   Q.  And, in fact, you testified that these two -- I am going to

19   loosely use the word checks -- these two documents were

20   deposited into the Bank of America account for GateGuard Inc.,

21   correct?

22   A.  Correct.

23   Q.  OK.  And GateGuard had been a longtime customer of Bank of

24   America as of March of 2019, the day that they were deposited,

25   correct?

1    A.   Correct.

2    Q.   OK.  And you've reviewed in preparing for your testimony

3    today and in investigating this case for the bank, you've

4    reviewed extensive bank records, it sounds like, correct?

5    A.   Correct.

6    Q.   So is it fair to say that you are at least probably more

7    familiar than the average person with GateGuard's banking

8    activity at Bank of America?

9    A.   Yes.

10   Q.   OK.  And in fact, GateGuard opened its account -- I'm

11   talking about GateGuard specifically -- in 2016 with Bank of

12   America, correct?

13   A.   I would have to refresh but I do believe that is correct.

14   Q.   OK.  And when a customer opens an account with a bank, the

15   customer fills out some paperwork with the bank, correct?

16   A.   That is correct.

17   Q.   OK.  And what's the purpose, just generally speaking, of

18   the paperwork that the customer fills out?

19   A.   There is a signature card that's required, so it houses the

20   customer's signature.  It's the deposit agreement, and the

21   rights and responsibilities of the customer.

22   Q.   You used the phrase "signature card."  That is a kind of

23   pretty important document in banking lexicon, correct?

24   A.   That is correct.

25   Q.   The signature card is basically the bank's way of knowing

K1mdtem5                     Finocchiaro - cross

1    who the person authorized to conduct business for this account

2    is, correct?

3    A.   Correct.

4    Q.   And you testified on direct examination that with respect

5    to GateGuard, the Friend or Fraud Incorporated account, the Ari

6    Teman individual account, essentially all the accounts that you

7    have testified to at Bank of America, the one person with

8    signature authority Was Ari Teman correct?

9    A.   That is correct.

10   Q.   And bank of America obviously knew that because Bank of

11   America had the signature card and the other depository

12   documents -- my word not yours -- in its possession, correct?

13   A.   Correct.

14   Q.   So I'm showing you, for example, what's been introduced as

15   Government Exhibit 101.

16        Can you just tell me generally what this document is

17   at Bank of America?

18   A.   It is just indicating that the account is being opened

19   under the name of GateGuard, that the -- it is being opened

20   with a corporation out of Delaware.  It is indicating that it

21   was being opened on the 17th of November of 2016, with Ari B.

22   Teman as the president.

23   Q.   OK.  So to be clear, it's -- in March of 2019, in April of

24   2019, the dates that are relevant to this case for purposes of

25   Bank of America, Bank of America clearly knows that GateGuard

1   is a company, of course, but it is Ari Teman at least as far as

2   Bank of America is concerned?

3   A.  Correct.

4   Q.  And, in fact, there is a signature -- forgive my phrase for

5   using the word signature card but it is not literally a card.

6   What are we looking at on the screen here on page Bates number

7   173?

8   A.  It would be the account number ending in 8085, and the

9   signature, the squiggly line indicating he is the president.

10  Q.  OK.  So we've used the commonly used phrase "signature

11  card."  Is this, even though it is a document, not a card, is

12  this a signature card?

13  A.  Yes, it is.

14  Q.  OK.  And this contains the same squiggly line that we see

15  on these checks, correct?

16  A.  Correct.

17  Q.  Fair to say that the squiggly line on those checks, clearly

18  if Bank of America looked at any of its documents, it would

19  know that's Ari Teman's signature, correct?

20  A.  Correct.

21  Q.  OK.  Now, if we look back at the March deposits, you

22  testified that these were deposited through online banking,

23  correct?

24  A.  Correct.

25  Q.  And online banking, to access an account, you testified

1   that you are familiar with that system at Bank of America,

2   correct?

3   A.  Correct.

4   Q.  OK.  It's obviously not easy from a bank security

5   standpoint for someone to log into an online banking

6   application, correct?

7           In other words, if I wanted to log into your online

8   banking interface, I would have to know your username and

9   password, correct?

10  A.  That is correct.

11  Q.  There might even be other futures of authentication, there

12  might not, but is that fair to say?

13  A.  It is.

14  Q.  OK.  In other words, logging into online banking is, for

15  all intents and purposes, the practical equivalent of walking

16  into a bank and introducing yourself, correct?

17  A.  It's logging in with your specific username and your

18  specific password, also from a known device, so we capture the

19  device information as well to know that it is a known device

20  that you typically log into.

21  Q.  OK.  So, in other words, there is no concealing by the

22  depositing of these two RCCs that you've identified as

23  Government's Exhibits 101 and 102 in March of 2019, that those

24  are deposited through GateGuard's specific security features,

25  correct?

K1mdtem5                     Finocchiaro - cross

1    A.  Correct.

2    Q.  So whoever deposited them --

3           I know you weren't physically standing there, correct?

4    A.  Correct.

5    Q.  -- had to have access to those features, correct?

6    A.  Exactly, yes.

7    Q.  And Bank of America's reasonable assumption is that must be

8    the person who's, first of all, endorsing the check, right?

9    A.  Correct.

10   Q.  And it must be the person who at least has signature

11   authority or some sort of authority over the account?

12   A.  Correct.

13   Q.  OK.  Now, to be clear, these two RCCs, as you testified,

14   clearly use the language "Draw per contract, no signature

15   required," correct?

16   A.  Correct.

17   Q.  OK.  And that's not hidden somewhere; that's essentially

18   front and center on the check, correct?

19   A.  Correct.

20   Q.  OK.  And both of these include the check number.  For

21   example, 201 includes check number 1, correct?

22   A.  Correct.

23   Q.  202 includes check number 1, correct?

24   A.  Correct.

25   Q.  Fair to say that these specifics documents, 201 and 202,

1    clearly indicate to Bank of America that these are RCCs
2    regardless of whether they were drawn with authority or not?
3    A.  Correct.
4    Q.  OK.  In other words, that's not a secret to the bank,
5    correct?
6    A.  Correct.
7    Q.  It's front and center, it is on the document, there is no
8    hiding it, correct?
9    A.  Correct.
10   Q.  OK.  And Bank of America obviously understood that these
11   were RCCs, correct?
12   A.  When they were deposited, the checks are imaged, so we
13   would have known at that time that the checks were from the
14   maker bank, but we wouldn't have seen that they were remotely
15   created checks without physically looking at the checks.
16   Q.  OK.  Let me break that down for a second.
17           When Bank of America physically looks at the checks,
18   Bank of America clearly knows they are RCCs, corrects?
19   A.  Right.  If the item is viewed when it is deposited, they
20   would know that it was an RCC.
21   Q.  OK.  And in fact, you testified in total about 29
22   documents, correct?
23   A.  Correct.
24   Q.  They all clearly indicate to anyone looking at them who
25   knows what an RCC is that they are an RCC, correct?

1    A.  Correct.

2    Q.  And Bank of America readily acknowledges that, correct?

3    A.  Correct.

4    Q.  OK.  The catch, as I understood your testimony on direct

5    examination, is that Bank of America had no way of controlling

6    what another bank's customer tells the other bank, correct?

7    A.  We do not, no.

8    Q.  So, for example, if I understood your testimony correctly,

9    if ABJ, for example, tells I don't remember whether it was ABJ

10   or it was JPMorgan's signature, but you know what I am talking

11   about, right?

12   A.  Yes.

13   Q.  If ABJ tells its bank that is not Bank of America that

14   these were not authorized, that there is no contract, in

15   essence, Bank of America doesn't independently kind of

16   arbitrate that dispute, correct?

17   A.  Do we dispute that?  Is that what you are asking?

18   Q.  Yes.

19   A.  We would review -- we may review that, but there was not a

20   dispute.

21   Q.  In other words, Bank of America is not essentially

22   adjudicating that billing dispute between GateGuard, defender,

23   and its customer, correct?

24   A.  Correct.

25   Q.  So if the customer is wrong, either intentionally or

1    otherwise, and actually there is a contract authorizing this,

2    then Bank of America can't control the fact that it is a

3    chargeback, correct?

4    A.  Correct.

5             MR. BHATIA:  Objection to form.

6             THE COURT:  Overruled.

7    BY MR. GELFAND:

8    Q.  You can answer the question.

9    A.  Correct.

10   Q.  OK.  Now, you testified that in April, Mr. Teman -- I'll

11   just connect the dots -- walks into a Bank of America branch,

12   and you testified there is surveillance footage and other

13   documents from that day, correct?

14   A.  Correct.

15   Q.  So we've got two days.  We talked about the mobile deposits

16   on those two initial checks, correct?

17   A.  Correct.

18   Q.  And then there is this 27 other checks that are broken down

19   into a couple of government exhibits.

20   A.  Correct.

21   Q.  I am happy to show you any of them that you would like.

22   I'm certainly not trying to trick you or anything.  But can we

23   agree that all of those checks include the exact same RCC link

24   which is on those 27 checks?

25   A.  They do, yes.

1   Q.  And you've reviewed those prior to testifying, correct?

2   A.  Yes.

3   Q.  So if we just look, for example, at one of them -- we'll

4   look in a minute.

5          You testified that Bank of America captured

6   essentially video -- I am going to probably make it sound more

7   exciting than it is -- video surveillance footage, correct?

8   A.  Correct.

9   Q.  OK.  In capturing video surveillance footage, if I

10  understood your testimony correctly, you were actually the one

11  who within, whatever amount of days, 120 days or something,

12  went and physically got the screenshots that have been

13  introduced into evidence, correct?

14  A.  That is correct.

15  Q.  OK.  And in doing that, you did that -- how many days is it

16  stored?

17  A.  It's stored for 120 days.

18  Q.  OK.  And so within essentially the first couple of months,

19  after that happens -- four months I guess -- you or someone

20  with your similar position at Bank of America can go out and

21  actually access the whole video, not just screenshots, correct?

22  A.  That is correct.

23  Q.  OK.  And I presume that you watched the whole video in

24  capturing the screenshots?

25  A.  I did, yes.

1    Q.  OK.  The truth is at the bank that day, Mr. Teman was

2    actually there for quite some time, correct?

3    A.  Correct.  It takes time to process that amount of checks.

4    Q.  And Mr. Teman, as you have seen these, quote-unquote,

5    surveillance footage, the clips that you have, when Mr. Teman

6    walked into the bank, he interacted with a number of different

7    people, correct?

8    A.  Correct.

9    Q.  There was actually a manager who was involved in the

10   transaction, correct?

11   A.  I'm not sure if it was a manager or who the other person

12   was.

13   Q.  Did it appear that someone brought in someone else's

14   assistance?

15   A.  Yes.

16   Q.  OK.  And throughout the entire interaction, Mr. Teman

17   clearly identified himself, correct?

18   A.  Correct.

19   Q.  He showed his driver's license, correct?

20   A.  Correct.

21   Q.  He signed a deposit slip, correct?

22   A.  Correct.

23   Q.  And obviously on the deposit slip is the correct

24   information, correct?

25   A.  Yes.

1   Q.  OK.  So Mr. Teman is walking in plain view into Bank of

2   America on April 19th of 2019, if I have the date right?

3   A.  April 19th, yes.

4   Q.  OK.  And clearly identifying himself to the bank as

5   himself, correct?

6   A.  Correct.

7   Q.  Now, in processing these particular checks, Mr. Teman

8   actually goes physically to a teller, correct?

9   A.  Correct.

10  Q.  Just so we're speaking the same language, literally the

11  same kind of teller you would get if you walked into any branch

12  today and cashed a check?

13  A.  Correct.

14  Q.  Or got cash or whatever?

15  A.  Correct.

16  Q.  If we looked, for example, at Exhibit 111 -- to refresh our

17  memory, do you see 111 in front of you on the screen?

18  A.  Yes, I do.

19  Q.  I'm going to show the black-and-white version, but the one

20  in evidence is the color one, correct?

21  A.  Correct.

22  Q.  OK.  Fair to say that this -- as you testified, this is on

23  April 19th.  This reflects the interaction with the deposit,

24  correct?

25  A.  That is correct.

1    Q.  With the teller, correct?

2    A.  Correct.

3    Q.  And whoever this person is, this is obviously the teller,

4    correct?

5    A.  That is correct.

6    Q.  OK.  Now, fair to say that if you look at this, Mr. Teman

7    made no efforts at all to disguise his identity?

8    A.  Correct.

9    Q.  OK.  He was not wearing a hat?

10   A.  No.

11   Q.  He doesn't have like a silly mustache or anything, correct?

12   A.  Correct.

13   Q.  OK.  In fact, this branch of Bank of America, you had to

14   have an opportunity to research which branch that was, correct?

15   A.  That is correct.  It was our Lincoln Road Financial Center.

16   Q.  In fact, that is directly across the street from

17   GateGuard's office at the time in Florida, correct?

18   A.  I do believe that is directly across the street.

19   Q.  OK.  And obviously you have that address; you've

20   investigated this for quite some time, correct?

21   A.  Correct, yes.

22   Q.  So fair to say Mr. Teman was also a regular customer at the

23   bank?

24   A.  I do believe that he has done some other activity in our

25   financial center there, yes.

1    Q.   OK.  Now, if we look at just one of those other batches of

2    checks --

3              THE COURT:  Mr. Gelfand, I am looking for a natural

4    break point for the evening.  You let me know when you are at

5    one.

6              MR. GELFAND:  Whenever the Court would like.

7              THE COURT:  I don't want to interrupt the sequence.

8    If this is a good time?

9              MR. GELFAND:  Now is a fine transition time, your

10   Honor.

11             THE COURT:  All right.  Very good.

12             Ladies and gentlemen, we are going to adjourn for the

13   evening.  We've made good progress today, and I appreciate how

14   attentive all of you have been.  I want to wish you a good

15   evening.  And I will remind you, as I did earlier, please do

16   not discuss or research the case.

17             As to our schedule, at 8:45 tomorrow Mr. Smallman has

18   arranged for breakfast for you in the jury room.  As he will

19   explain to you, you should come straight to the jury room.  You

20   are at liberty to take us up on the invitation of free food;

21   you are not obliged to do so.  But I need to have you here at

22   9:30 promptly.  As soon as you are all here at 9:30, I will

23   bring you all out and we'll have a full day of work and make

24   some real headway.

25             Have a good evening.  I look forward to seeing you

K1mdtem5                         Finocchiaro – cross

1    tomorrow.

2              Sorry, one other thing.  Please, take your notepads

3    and pens to the jury room but do not take them home.  Leave

4    them in the jury room.  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1mdtem5

1           (Jury not present)

2           THE COURT:  All right.  Counsel, be seated.

3           Just for planning purposes, Mr. Gelfand, without

4    holding you to it, how much longer do you expect on cross?

5           MR. GELFAND:  20 minutes.

6           THE COURT:  20 minutes, OK.

7           And Ms. Finocchiaro just whispered to me that she has

8    a flight tomorrow.  Counsel will coordinate about that.  But in

9    any event, she is our first witness tomorrow, and hopefully the

10   jury will be here on time and you will get out promptly.

11          OK.  You may step down.

12          (Witness excused)

13          THE COURT:  Before we adjourn for the evening, let me

14   just go around and ask if anyone has anything to raise.

15          Government?

16          MR. BHATIA:  Nothing, your Honor.

17          THE COURT:  All right.

18          Defense?

19          MR. GELFAND:  No, your Honor.

20          THE COURT:  All right.  In terms of just small

21   homework assignments you still have from day one is, from the

22   government, just to get me the updated daily exhibit list, and

23   I am still expecting advice of counsel written proposed

24   instructions from each of you.

25          Very good.  If you could -- I am taking a guilty plea

K1mdtem5

1    here momentarily.  You don't have to clear off the whole table,

2    but clear off enough space so that there are, let's say, two

3    spots at each table.  Thank you.

4         MR. IMPERATORE:  Your Honor, I'm sorry.  With the

5    Court's permission, I would like to request to attend a

6    pretrial conference tomorrow at 2 o'clock before Judge Rakoff.

7    Brian Blais will be taking my place.

8         THE COURT:  My permission isn't needed but I am happy

9    to grant it, of course.  That is fine.  And I will introduce

10   Mr. Blais to the jury.

11        Sorry.  May I ask, just for my preparation overnight,

12   government, without holding you to it but it will be useful for

13   all concerned, after this witness, who are your next several

14   witnesses?

15        MR. BHATIA:  So we've given the defense sort of the

16   balance of our list.

17        THE COURT:  But for my benefit?

18        MR. BHATIA:  Yes, for your benefit now:  Elie Gabay,

19   he is an individual associated with Coney LLC, one of the

20   customers.

21        Bonnie Soon-Osberger, she is an individual associated

22   with 18 Mercer Equity, another one of the customers.

23        THE COURT:  Right.

24        MR. BHATIA:  And then Joseph Soleimani could be

25   tomorrow.  He is the individual associated with ABJ Properties.

K1mdtem5

1            THE COURT:  Right.

2            MR. BHATIA:  Jackson Hom and Gina -- I'm sorry,

3    Jacquie Monzon and Gina Hom, who are both from Crystal Real

4    Estate.

5            THE COURT:  Terrific.  OK.  That gives me enough to

6    work on.

7            You should expect at the end of tomorrow I will be

8    taking stock with everyone of how we are doing and how we are

9    looking in terms of time.  It is usually my practice at the end

10   of each week to alert the jury how we're doing, and in a

11   shorter trial like this, I want to generally keep them abreast.

12   So as soon as I have a good sense of how we are doing, that

13   might be useful.

14           Have a good evening, counsel

15           MR. GELFAND:  Can we safely not have any witnesses

16   tomorrow?

17           THE COURT:  Government, it sounds like it is a

18   completely safe thing, correct?

19           MR. BHATIA:  I think that's right.

20           THE COURT:  Yes.

21           MR. GELFAND:  Thank you, your Honor.

22           THE COURT:  Thank you for asking.

23           Thank you.  We stand adjourned.

24           Off the record.

25           (Pause)

K1mdtem5

1              THE COURT:  Counsel, 9 o'clock tomorrow for counsel

2      and the court reporter.

3              (Adjourned to 9 a.m., January 23, 2020)

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                             Page

 3   KAREN FINOCCHIARO

 4   Direct By Mr. Bhatia . . . . . . . . . . . . 185

 5   Cross By Mr. Gelfand . . . . . . . . . . . . 236

 6                       GOVERNMENT EXHIBITS

 7   Exhibit No.                              Received

 8    101 through 108, 114, 201 through 206  . . . 190

 9    501   . . . . . . . . . . . . . . . . . . . 191

10    113   . . . . . . . . . . . . . . . . . . . 195

11    110, 111, 112   . . . . . . . . . . . . . . 213

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```