K1NVTEM1   CORRECTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      19 CR 696 (PAE)

ARI TEMAN,

            Defendant.         JURY TRIAL

------------------------------x

                           New York, N.Y.
                           January 23, 2020
                           9:05 a.m.

Before:

            HON. PAUL A. ENGELMAYER,

                           District Judge

                  APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
KEDAR S. BHATIA
EDWARD A. IMPERATORE
    Assistant United States Attorneys

JOSEPH A. DIRUZZO, III
JUSTIN GELFAND
    Attorneys for Defendant

ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
               WILLIAM MAGLIOCCO, Paralegal, USAO

K1NVTEM1    CORRECTED

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  Good morning, everybody.
 3              I have nothing of my own initiative to take up with
 4    you this morning.  I note that I received an email late
 5    yesterday, shortly after the end of the court day, from
 6    Mr. Bhatia stating that it was at least possible that the
 7    government would rest today.
 8              THE DEPUTY CLERK:  Judge, one moment please.
 9              (Pause)
10              THE COURT:  We'll see.  But, either way, I've
11    previously given the defense dispensation not to have to call
12    any witnesses today, and that stands.
13              All right.  With that, just going around the horn,
14    government, do you have anything to raise this morning?
15              MR. BHATIA:  Nothing, your Honor.
16              We noticed that defense filed -- made a filing
17    yesterday with the -- with their proposed advice of counsel
18    defense.  I wanted to let the Court know that we're vetting it
19    and looking into it and we'll get something to the Court.
20              THE COURT:  Great.
21              Scully gives you a pretty good roadmap.  I would be
22    interested in seeing if there's any go-by from a colleague
23    since Scully, but it seems to me that Scully couldn't be more
24    useful guidance on the subject.  But obviously I'm eager to see
25    what you come up with.
```

K1NVTEM1    CORRECTED

1          MR. BHATIA:  Thank you.

2          THE COURT:  Do you have the just updated exhibit list

3      for me?

4          MR. MAGLIOCCO:  Yes.  It's in the binder.

5          THE COURT:  Where is it?

6          MR. MAGLIOCCO:  It's in your binder.

7          THE COURT:  Oh, I'm sorry, no, no.  I prefer to just

8      have it by hand so that I can have it by my side as I work.

9          Thank you.  Thank you very much, Mr. Magliocco.

10          All right.  So, government, anything to raise from

11      you?

12          MR. BHATIA:  Nothing, your Honor.

13          THE COURT:  Defense?

14          MR. GELFAND:  Two very short matters, your Honor.

15          THE COURT:  Yes.  Go ahead.

16          MR. GELFAND:  The first, the parties are in agreement

17      on, I just wanted to advise the Court on that, and that is that

18      there were -- in discovery, within the past week or so, there

19      were -- and it was appropriately disclosed to us; we appreciate

20      it.  There were allegations by two government witnesses, one

21      involving charges via credit card to Sublet Spy, which is

22      another business not the subject of this trial.

23          THE COURT:  Another business run by Mr. Teman?

24          MR. GELFAND:  Yes, your Honor.

25          THE COURT:  I'm sorry, when you say "charges," just, I

1   don't know what you mean by -- allegations or --

2            MR. GELFAND:  There were allegations that we would

3   dispute, but there were allegations that Sublet Spy

4   essentially, on a monthly basis, charged a certain witness's

5   credit card that the witness claimed shouldn't have been

6   charged.

7            THE COURT:  Right.

8            MR. GELFAND:  We would move to exclude that.  The

9   government has no intention of getting into it, so it's beyond

10   dispute.

11            THE COURT:  All right.  In other words, both sides

12   agree that that's not a proper subject for examination?

13            MR. GELFAND:  Yes, your Honor.

14            THE COURT:  Government, is that correct?

15            MR. BHATIA:  That's right.  At this time we don't have

16   an intention of getting into it.

17            THE COURT:  All right.  Then in the event that events

18   change that, the door is opened by something that is elicited,

19   please seek a sidebar before anybody going there.  But I'll

20   take that as off limits, unless somebody raises it with me.

21            MR. GELFAND:  The second issue falls under the same

22   category, also not a dispute between the parties.  And that's

23   that one of the government's anticipated witnesses, Joseph

24   Soleimani, via *Jencks*, for lack of a better way of putting it,

25   basically made -- he has a theory that Mr. Teman contacted

K1NVTEM1    CORRECTED

1    tenants of his on one occasion and had them send rent checks

2    somewhere else, not clear exactly where.  We also would ask

3    that that theory or that testimony, that allegation, be

4    excluded from trial.

5         THE COURT:  Have you taken that up with the

6    government?

7         MR. GELFAND:  We have.  And that falls under the same

8    category, your Honor.  There's no dispute.

9         THE COURT:  All right.  Mr. Bhatia, is that correct?

10        MR. BHATIA:  That's right, your Honor.

11        And also, subject, of course, to facts changing during

12    trial, and also the defense's representation that they don't

13    intend to get into that on cross, we wouldn't intend to get

14    into it in our --

15        THE COURT:  All right.  Well, then I will heed what

16    both of you are jointly saying, which is you both believe this

17    is either irrelevant or its relevance is outweighed by

18    countervailing 403 factors.

19        So as with the first subject, in the event that

20    anyone's mind changes because something has happened at trial,

21    raise it with me first; don't go there without affirmative

22    permission from the Court.

23        MR. GELFAND:  Yes, your Honor.

24        The third thing is really just for the record.

25        Obviously, this day and age, *Jencks* material is

K1NVTEM1    CORRECTED

1   disclosed in advance of trial, has been disclosed in advance of

2   trial.  We appreciate that.  But we would just ask the Court to

3   permit us to make a continuing request throughout trial at the

4   close of every government witness for full disclosure of *Jencks*

5   material.

6           THE COURT:  Right.  I took as a given that if the

7   government meets with a witness after the court day and

8   generates additional 3500 material, that is subject to the

9   ongoing obligation.  I doubt the government disputes that.

10          MR. GELFAND:  Yes.  We just wanted to be on the record

11  requesting *Jencks*.

12          THE COURT:  Mr. Bhatia, you're in agreement, correct?

13          MR. BHATIA:  That's right, your Honor.

14          We're producing on a rolling basis.

15          THE COURT:  Very good.

16          MR. GELFAND:  Thank you, your Honor.

17          THE COURT:  Mr. Smallman advised me that the defense

18  might want to bring to my attention exhibits that it may or may

19  not use today, something -- I couldn't quite follow what the

20  specific request was.

21          MR. GELFAND:  It was a pure housekeeping matter, your

22  Honor.

23          In the ordinary course of just trial preparation, we

24  have premarked certain exhibits that we obviously might or

25  might not introduce at trial.  All relative have been disclosed

K1NVTEM1    CORRECTED

1    to the government in discovery, some with exhibit stickers on

2    it, some without.  But there's going to be no surprises there.

3             What I was wanting to know is whether the Court

4    basically wanted an advanced copy of those or whether we should

5    just take it up as the witnesses testify.

6             THE COURT:  If you're not going to offer it, I don't

7    need to see it.

8             MR. GELFAND:  Okay.

9             THE COURT:  If you are going to offer it, I'd be happy

10   to have it with the exhibit number as marked, if only to just

11   keep my papers in order.  And if it's not clear, I leave it to

12   your good judgment.  But, either way, at the time that you

13   present the exhibit to the witness, I'll need a copy.  I'd like

14   one for my law clerk as well.

15            Your call.  I'm happy to have it if you're going to be

16   offering it.

17            MR. GELFAND:  Okay.  I just wanted to raise that.

18            We'll get it organized ourselves with that guidance

19   and provide it accordingly.

20            THE COURT:  Very good.

21            One moment.

22            All right.  I don't have anything further.

23            Anyone?  Nothing to raise?

24            MR. BHATIA:  No, your Honor.

25            MR. GELFAND:  No, your Honor.

K1NVTEM1   CORRECTED

1          THE COURT:  Defense, is it still your expectation --

2     not holding you to it -- that Ms. Finocchiaro will be on cross

3     for approximately 20 more minutes or so?

4          MR. GELFAND:  It is, your Honor.  And I've had that

5     opportunity to get it even more organized, so hopefully that

6     saves some time.

7          THE COURT:  Very good.

8          Why don't we have her in the box before the jury comes

9     in so that they are not wasting time watching her march

10    forward.

11         And government, your next witness will still be Elie

12    Gabay?

13         MR. BHATIA:  That's right.

14         THE COURT:  Very good.

15         And that witness will be here and ready to go as soon

16    as Finocchiaro is done?

17         MR. BHATIA:  That's right.

18         THE COURT:  Terrific.

19         All right.  I will be ready to take the bench at 9:30,

20    or as soon as Mr. Smallman tells me thereafter that the jury is

21    here.  Thank you, see you at 9:30.

22         (Recess)

23         MR. GELFAND:  Your Honor, may I approach and provide

24    you two copies of exhibits?

25         THE COURT:  You may.

K1NVTEM1                    Finocchiaro - cross

1              These are defense exhibits that may or may not be used

2      during this witness's examination?

3              MR. GELFAND:  Correct, your Honor.

4              THE COURT:  Very good.

5              MR. GELFAND:  Thank you.

6              THE COURT:  Is this one set or two?

7              MR. GELFAND:  That's one set, your Honor.  I was not

8      aware of the request for the law clerk.

9              THE COURT:  Oh, okay.  Going forward, that would be

10     great.  Thank you.

11             (Jury present)

12             THE COURT:  I hope you all had a good evening.

13             We're about to resume with the trial.

14             Ms. Finocchiaro, I'll remind you that you're still

15     under oath.

16             THE WITNESS:  Yes.

17             THE COURT:  Mr. Gelfand, you may inquire.

18             MR. GELFAND:  Thank you, your Honor.

19     KAREN FINOCCHIARO, resumed.

20     CROSS-EXAMINATION (continued)

21     BY MR. GELFAND:

22     Q.  Good morning, Ms. Finocchiaro.

23     A.  Good morning.

24     Q.  Can I ask you to speak up a little bit in the mic.

25     A.  Good morning.

K1NVTEM1                          Finocchiaro - cross

1    Q.  Good morning.

2           Ms. Finocchiaro, when we left off yesterday, we had

3    ended our discussion on the March 28th, 2019 RCCs; correct?

4    A.  Correct.

5    Q.  And as you testified, those were two of the 29 total RCCs

6    that are at issue in this case; correct?

7    A.  That is correct.

8    Q.  And you're familiar with all of the RCCs, not just the two

9    that we discussed; correct?

10   A.  Correct.

11   Q.  Okay.  And as we talked about yesterday, all 29 of those

12   RCCs clearly bear indicia to the bank that they are, in fact,

13   RCCs; correct?

14   A.  Correct.

15   Q.  Okay.  Now, directing your attention to the April 19th --

16   if I have the date right -- 2019, deposits, there were 27

17   deposits in the bank that you testified -- I'm sorry, the

18   deposits of 27 RCCs into the bank that you testified about

19   yesterday; correct?

20   A.  Correct.

21   Q.  And we talked about what actually happened in the bank

22   itself; correct?

23   A.  Correct.

24   Q.  And the screenshots that you provided from the video

25   footage that you collected early on in this matter; correct?

K1NVTEM1                         Finocchiaro - cross

1    A.   Correct.

2    Q.   And to be clear, the video itself is no longer available;

3    correct?

4    A.   Correct.

5    Q.   Are you aware that we have requested the video, but that

6    your bank told us that it's no longer available?

7    A.   Correct.  If it's after 120 days, it's no longer available.

8    Q.   Okay.  And to be clear, early on, as far as you know, at

9    least, no one on the bank took any efforts to preserve the

10   video itself, as opposed to the screenshots that we've all

11   seen; correct?

12   A.   As far as I'm aware, there was not a preservation letter

13   that was requested to save the film.

14   Q.   Okay.  During that time period, you were in contact with

15   the NYPD detective; correct?

16   A.   That is correct.

17   Q.   And the NYPD never requested that that be preserved;

18   correct?

19   A.   That is correct.

20   Q.   Did the film video footage have audio as well or is it just

21   soundless?

22   A.   It does not have audio.

23   Q.   Okay.  So based on your review of the film -- well, just to

24   be clear, you've watched the whole film; correct?

25   A.   Correct.

K1NVTEM1                        Finocchiaro - cross

1   Q.  Based on your review of the film, as you described

2   yesterday, it was -- and I'm approximating, but approximately a

3   one-hour video of Mr. Teman physically in the Miami bank

4   branch; correct?

5   A.  I don't recall the duration, but there was a lengthy

6   period.

7   Q.  In other words, this wasn't some two-minute episode of

8   going to a bank teller; correct?

9   A.  Not that I recall.

10  Q.  Now, I want to direct your attention to some of those April

11  19th RCCs.  I'm showing you what's been previously admitted as

12  Government's Exhibit 205.

13          THE COURT:  Ladies and gentlemen, can everyone see the

14  monitor okay?

15          THE JURY:  Yes.

16          THE COURT:  Good.

17  Q.  And you recognize this document; correct?

18  A.  I do.

19  Q.  Okay.  When the prosecutor asked you about some of these

20  RCCs yesterday, is it fair to say that the numbers might be

21  different and the entities are the three entities identified in

22  this case, but that substantively these are virtually identical

23  documents?

24  A.  They are similar.  Some of them are different, with the

25  disclosure that's read.

K1NVTEM1                    Finocchiaro - cross

1   Q.  To be clear, on each of these April 19th, 2019 documents,

2   the same language appears on the bottom; correct?

3   A.  I believe -- without looking at all of the checks in that

4   series, I do believe that they are all similar with this, this

5   disclosure.

6   Q.  Okay.  I'm happy to show you them, but it sounds like

7   you're fairly confident?

8   A.  Yes.

9   Q.  Okay.  So if we look at just any of them, for example, this

10  is the top page, Bates No. 35 of Exhibit 205, they all clearly

11  say, "Draw per contract.  No signature required."  Correct?

12  A.  Correct.

13  Q.  They all include the URL that you testified about

14  yesterday; correct?

15  A.  Correct.

16  Q.  They indicate that the above client, referring in this

17  case, for example, to ABJ Lennox LLC, accepted the terms;

18  correct?

19  A.  They do -- that's what the check indicates, that draw per

20  contract.

21  Q.  I'm just asking you what it says.  To be clear, you don't

22  know one way or the other whether or not those individuals

23  accepted the terms or didn't; correct?

24  A.  That is correct.

25  Q.  To this day, Bank of America is not taking a position on

K1NVTEM1                      Finocchiaro - cross

1   whether that's a true statement or a false statement; correct?

2   A.  That is correct.

3            THE COURT:  Ms. Finocchiaro, just kindly keep your

4   voice up.  Speak a little more into the microphone.

5   A.  That is correct.

6            THE COURT:  Thank you.

7   Q.  And then there is the contact info that you testified about

8   that is GateGuard's contact number; correct?

9   A.  I would believe that would be GateGuard's contact

10  information if it was provided on the document.

11  Q.  You testified that you couldn't access the URL just because

12  of, essentially, Bank of America's IT filter?

13  A.  Correct.

14  Q.  Correct.

15           And you didn't make any efforts to look through other

16  avenues, like your phone or home computer or anything like

17  that; correct?

18  A.  Correct.

19  Q.  Did you ever call this number with questions?

20  A.  I did not.

21  Q.  You described, based on your experience in the banking

22  industry, various characteristics of checks or RCCs in general;

23  correct?

24  A.  Correct.

25  Q.  And one of the things that you testified about was the memo

K1NVTEM1                        Finocchiaro - cross

1     line; correct?

2     A.  Correct.

3     Q.  Is it fair to say that the memo line, as far as Bank of

4     America is concerned, is not a particularly important line?

5     A.  It's a description line, so it's not -- I mean, it does

6     give a description of what the check may be for, but it's

7     typically in reference for the -- if the customer were to have

8     viewed the check, so the maker, that they would have a

9     description of what that was for.

10    Q.  Okay.  Basically, a shorthand convenience factor for the --

11    A.  Correct.  It's not required.

12    Q.  Okay.  And so fair to say when it comes to whether the bank

13    honors or doesn't honor -- and when I say "the bank," I mean

14    Bank of America, honors or doesn't honor a check, the memo line

15    itself is not a factor?

16    A.  It is not.

17    Q.  Now, these 27 RCCs do not include or purport to include any

18    sort of check number; correct?

19    A.  They do not.

20    Q.  They don't contain any signature; in fact, they say that in

21    very clear terms.  Correct?

22    A.  Correct.

23    Q.  And just to be clear, for the benefit of all of us, there's

24    some notations on the top.  Those are bank notations; correct?

25    A.  That is correct.

276

1    Q.  In other words, this was not -- whatever handwriting up

2    here is on the top left corner of some of these checks, I don't

3    mean this in a bad way, but that's something the bank wrote on

4    it, not what either Mr. Teman wrote --

5    A.  I do believe that it's something that the teller has -- has

6    signed or put their initials on.

7    Q.  Now, you testified yesterday when the government showed you

8    that voluminous spreadsheet --

9    A.  Yes.

10   Q.  -- that there was a reference to counter credit on April

11   19th of 2019; correct?

12   A.  Correct.

13   Q.  Okay.  To be clear, that's also reflected in Government

14   Exhibit 102, which is admitted.

15           Can you just tell me, do you recognize what this

16   document is, just so we can contextualize ourselves?

17   A.  That is the customer statement for GateGuard.

18   Q.  I'm sorry?

19   A.  For GateGuard.

20   Q.  These are Bank of America's bank statements, if you will,

21   for GateGuard for a select period of time?

22   A.  That is correct.

23   Q.  You provided these to the government; correct?

24   A.  I did.  That is correct.

25   Q.  And if we look through this statement just briefly, we see

1    the relevant time frame for April; correct?

2    A.  That is correct, yes.

3    Q.  And we see on April 19th of 2019 the counter credit

4    referenced in the amount of $297,000; correct?

5    A.  That is correct.

6    Q.  And even though this is a different document, this is

7    essentially the document or the same data from which the

8    spreadsheet was populated; correct?

9    A.  That is correct.

10   Q.  To be clear, when the deposit was made, a deposit slip was

11   completed and kept in the ordinary course and practice of the

12   bank; correct?

13   A.  That is correct.

14   Q.  Okay.

15           And just so we all understand, what is a deposit slip?

16   A.  A deposit slip is something that the customer fills out

17   when they are making the deposit.  It has the customer's name,

18   account number that it's being deposited to, and the amount

19   that is being deposited.  It describes whether you're

20   depositing cash or whether you're depositing checks.

21   Q.  I'm showing you what's been admitted as Government's

22   Exhibit 206.  Can you tell us what that is?

23   A.  That is the deposit slip on 4/19 for the deposit to

24   GateGuard for the amount of $297,000.

25   Q.  Okay.  So to be clear, just in simple English, this is the

1    deposit slip that correlates with the deposit that you've been

2    testifying about; correct?

3    A.  That is correct.

4    Q.  And you pulled this and provided it for the government;

5    correct?

6    A.  That is correct.

7    Q.  It references April 19th, the date; correct?

8    A.  Correct.

9    Q.  It references the same amount; correct?

10   A.  That is correct.

11   Q.  And it references GateGuard and its business location in

12   Miami Beach on that same road as the bank branch, Lincoln Road;

13   correct?

14   A.  That is correct.

15   Q.  Now, if we look -- it's a little bit tough to see.  I'm

16   showing you on the bottom -- I'm going to zoom in as much as I

17   can.  Can you see that on the screen in front of you, ma'am?

18   A.  I can, yes.

19   Q.  Okay.  This text that appears on the bottom, that's

20   generated by the bank; correct?

21   A.  That is correct.

22   Q.  Okay.  And it references the date, the time, the deposit;

23   correct?

24   A.  That is correct.

25   Q.  The available balance of approximately 20-some thousand

K1NVTEM1                        Finocchiaro - cross

1    dollars; correct?

2    A.  That is correct.

3    Q.  And then can you read the part that I've circled on the

4    screen, beginning with "holds"?

5    A.  "Holds applied see hold notice deposit."

6    Q.  Okay.  What does that mean?

7    A.  It means that applicable holds were placed on the checks

8    that are coming in.

9    Q.  When you say "holds were placed," that means that

10   GateGuard, Mr. Teman, whoever you want to say, didn't have

11   access to this money until the holds were lifted; correct?

12   A.  That is correct.

13   Q.  Okay.  So to be clear, when we see things like counter

14   credit of $297,000 on April 19th, no one actually had access to

15   that money on that day; correct?

16   A.  On that day, he would not have had access to that; he would

17   have only had access to what is indicated as the available

18   balance.

19   Q.  Which was the amount of money previously in the account

20   that has nothing to do with these deposits; correct?

21   A.  That is correct.

22   Q.  So, in other words, he would have access to the money he

23   had, he wouldn't have access to the money that was deposited

24   via these RCCs?

25   A.  Right.  He can see the deposit and he can see the amount in

1   there, but he's not able to access the account at that time.

2   Q.  And, in fact, as a bank employee of Bank of America, an

3   investigator for two decades plus, are you familiar with bank

4   forms?

5   A.  Yes.

6   Q.  Are you familiar with -- this says "see hold notice."  Are

7   you familiar with Bank of America notices of hold?

8   A.  Typically, yes.  Our holds are for two days if they are an

9   on-us check, meaning that it's a Bank of America check that's

10  being deposited.  Obviously we have the ability at that time to

11  see the source of funds in another account.  Our hold notices

12  are, in fact, typically seven days for a check that is another

13  bank.  So in this case, Signature or JPMorgan Chase, we would

14  apply a seven-day hold.

15  Q.  Okay.  And, in fact, that's exactly what happened here;

16  correct?

17  A.  That is correct.

18  Q.  And this notice of hold, that's basically a receipt that's

19  given to the person making the deposit; correct?

20  A.  That is correct.

21  Q.  Okay.  And have you seen the notice of hold that was issued

22  in this case?

23  A.  I did not see -- I mean, I noticed that there was a hold

24  that was applied, it's a standard typical hold; but I didn't

25  see any additional documentation in regards to the hold.

1           MR. GELFAND:  Okay.  If I may approach and show the

2      witness what's been premarked as Defense Exhibit 16.

3           THE COURT:  This is just for the witness right now,

4      it's not in evidence.

5           MR. GELFAND:  Yes.

6           THE COURT:  All right.

7           Ladies and gentlemen, from time to time, a document

8      will be shown or an exhibit will be shown to the witness and

9      will be accessible to counsel and not to you.  The reason

10     that's happening is that until I rule that the exhibit can be

11     received in evidence, you can't see it.

12          So I need to look at it, the witness needs to look at

13     it, the lawyers may need to ask questions to the witness about

14     it.  Once I decide it can properly be received in evidence,

15     Mr. Smallman pushes a button, and then it's accessible to you.

16     We're not trying to hide anything from you; I just need to go

17     through the hoops of making sure that it's properly received in

18     evidence.

19          Go ahead.

20          MR. GELFAND:  Thank you.

21          THE COURT:  Mr. Smallman.  Yes.  Very good.

22          Go ahead.

23     BY MR. GELFAND:

24     Q.  I'll zoom in on the text, but just so that we're clear for

25     the record, can you see the whole context of this document

K1NVTEM1                        Finocchiaro - cross

1   right now?

2   A.  It's cut off on the side.

3   Q.  To be clear, this was not directly provided by the bank;

4   correct?

5   A.  I did not provide this.

6   Q.  Okay.

7           MR. GELFAND:  Your Honor, can I show the witness a

8   hard copy of this?  I think it's pretty tough --

9           THE COURT:  I'm sorry, Mr. Gelfand, a little louder.

10          MR. GELFAND:  Can I show the witness a hard copy of

11   this?

12          THE COURT:  You may.  It appears though what's on the

13   screen is cut off on the document itself.

14          MR. GELFAND:  Yes, your Honor.

15   BY MR. GELFAND:

16   Q.  Does that appear to be a photograph of a notice of hold

17   form issued by Bank of America?

18   A.  It does appear to be.

19   Q.  And specifically, if you look -- without reading it into

20   the record, if you look at the dates, the total deposit number,

21   and the hold code, does this appear to correlate with the

22   deposit slip and the April 19th deposit?

23   A.  Yes, it does.

24          MR. GELFAND:  Your Honor, at this point I would move

25   Defense Exhibit 16 into evidence.

K1NVTEM1                    Finocchiaro - cross

1                THE COURT:  Any objection?

2                MR. BHATIA:  No objection, your Honor.

3                THE COURT:  Defense Exhibit 16 is received.

4                (Defendant's Exhibit 16 received in evidence)

5                THE COURT:  Do you now want that published to the

6      jury?

7                MR. GELFAND:  Yes, your Honor.

8                THE COURT:  Mr. Smallman.  Thank you.

9                MR. GELFAND:  Thank you.

10               THE COURT:  All right.  Ladies and gentlemen, it

11     should now be on your monitors.

12               Sorry.  It should now be on your monitors.

13               MR. GELFAND:  When I do my job.

14     BY MR. GELFAND:

15     Q.  So this is a little bit tough to read on just the

16     presentation of it, but can you just read for all of us the

17     date of the notice of hold?

18     A.  4/19/2019.

19     Q.  And then the amount is the same, $297,000?

20     A.  That is correct.

21     Q.  This is unfortunately going to be very difficult for the

22     jury to read, but can you tell us when the $292,000 will be

23     available?

24     A.  On 4/26 of 2019.

25     Q.  So seven days later; correct?

K1NVTEM1                         Finocchiaro - cross

1    A.  Correct.

2    Q.  And that's consistent with what you testified you

3    anticipated the hold would be; correct?

4    A.  Correct.

5    Q.  Fair to say that's what happened here?

6    A.  Correct.

7    Q.  So between April 19th and April 26th, the money was not

8    available to anyone; correct?

9    A.  Correct.

10   Q.  Okay.  And, in fact, based on your review of what actually

11   happened at the bank branch, Mr. Teman was actually handed this

12   notice of hold; correct?

13   A.  It should have been -- it was provided, yes.

14   Q.  Okay.  And there wasn't any pushback by Mr. Teman of, Hold

15   on.  If it's not available right now, let me have these RCCs

16   back, or anything crazy like that, right?

17   A.  I wasn't present.  I'm unaware.

18   Q.  Based on what you observed on the video that you watched

19   that's no longer available, does anything like that appear?

20   A.  There's no audio, so I'm unable to indicate.

21   Q.  The deposits maintained -- I'm sorry, the RCCs were

22   maintained in Bank of America's possession after that

23   interaction with the teller; correct?

24   A.  Correct.

25   Q.  Now, you then testified that --

1          THE COURT:  Mr. Gelfand, can the witness put the

2     exhibit down?

3          MR. GELFAND:  Yes, your Honor.

4          THE COURT:  Okay.

5          MR. GELFAND:  Thank you.

6     Q.  The purpose of the hold is to confirm that the funds should

7     be made available; correct?

8     A.  Right.  It levels as an expectation for the customer that

9     the funds are on hold and when the funds would be available.

10    Q.  Now, the government showed you what's been marked as

11    Exhibit 114.  Do you recognize that document?

12    A.  I do, yes.

13    Q.  Over and over on this document there's the text "RCC

14    warranty breach"; correct?

15    A.  Correct.

16    Q.  And that's under the column "Reason"; correct?

17    A.  That is correct.

18    Q.  Does Bank of America populate that column?

19    A.  This is something that is digitally sent to us with the

20    reason code and the explanation of the reason code from the

21    maker bank.

22    Q.  Okay.  So to be clear, Bank of America is not

23    characterizing the event as an RCC warranty breach; in this

24    case, Signature Bank and JPMorgan are doing that.  Correct?

25    A.  That is correct.

K1NVTEM1                         Finocchiaro - cross

1   Q.  Bank of America is just reporting what's told to Bank of
2   America; correct?
3   A.  That is correct.
4   Q.  And if we look through this document, these RCC warranty
5   breach notations are correlated with many of the RCCs that were
6   received in evidence; correct?
7   A.  That is correct.
8   Q.  And on the second page of this document, we see that
9   language again, and then the prosecutor asked you questions
10  about the five or four, quote/unquote, counterfeit check
11  designations at the bottom; correct?
12  A.  That is correct.
13  Q.  And this was the same reason code column; correct?
14  A.  Correct.
15  Q.  Okay.  So again, this is not Bank of America saying this is
16  a counterfeit check; correct?
17  A.  That is correct.
18  Q.  This is the reason or the code generated by, you said, the
19  maker bank, I just want to be very precise, Signature and/or
20  JPMorgan?
21  A.  That is correct.
22  Q.  And is it fair to say that what's basically being
23  communicated to Bank of America in this instance is that those
24  banks' customers are saying that this is an unauthorized RCC?
25  A.  That is correct.

K1NVTEM1                          Finocchiaro - cross

1    Q.  In charging back -- I think that's the term you used

2    yesterday; correct?

3    A.  A chargeback; correct.

4    Q.  In requesting or insisting on chargebacks from Bank of

5    America, none of these other banks provided the GateGuard terms

6    and conditions or payment terms to Bank of America; correct?

7    A.  That is not required.

8    Q.  Fair enough.  But I'm just asking if that happened?

9    A.  They did not.

10   Q.  Okay.  Now, when you testified yesterday, you testified to

11   that document.  But the bank also sends individuals -- in this

12   case account holders like GateGuard -- correspondence if checks

13   are basically returned; correct?

14   A.  That is correct.  It is provided.

15            MR. GELFAND:  Your Honor, at this point, pursuant to

16   the stipulation read by government counsel yesterday, I would

17   move into evidence Defense Exhibit 52.

18            THE COURT:  Any objection?

19            MR. BHATIA:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit 52 received in evidence)

22            MR. GELFAND:  May I publish it, your Honor?

23            THE COURT:  You may.

24   Q.  Do you see Exhibit 52?

25   A.  Yes, I do.

K1NVTEM1                    Finocchiaro - cross

1   Q.  Okay.  And these use the same language, "RCC breach" on

2   them; correct?

3   A.  Correct.

4   Q.  And then on the side, Bank of America says:  "Return

5   reason-4 RCC warranty breach"; correct?

6   A.  That is correct.

7   Q.  And they reference copies, in this case, of 24 checks;

8   correct?

9   A.  I haven't seen all of the checks, but most of the checks

10  should be present on the document.

11  Q.  Okay.  I'll ask it another way.

12          The bank provided copies of each of the RCCs that are

13  at issue in --

14  A.  That is correct.  Yes.

15  Q.  And that would be inclusive in the document; correct?

16  A.  Correct.

17  Q.  Okay.  And what does "return reason-4" mean, if you know?

18  A.  I don't know the code right offhand.

19  Q.  But, again, what this is communicating to the customer,

20  GateGuard, is that these were RCCs that were basically not

21  honored by the customer, for example, ABJ or the others on

22  here?

23  A.  That is correct.

24  Q.  So Bank of America is not saying to Mr. Teman or GateGuard,

25  These are counterfeit checks, these are fake checks, anything

K1NVTEM1                    Finocchiaro - cross

1    along those lines.  They are saying, We processed them as RCCs.

2    And the banks that they were drawn on said that their customers

3    are saying we didn't authorize this?

4    A.   In regards to the RCCs, their return reason is RCC.

5    However, some of them are listed as counterfeit.

6    Q.   By those banks; correct?

7    A.   That is correct.

8    Q.   Okay.  Now, in processing the RCCs, you testified that

9    there was the seven-day hold.  And then yesterday the

10   prosecutor walked you through transfers within Bank of America

11   of money that followed, started on April 26th and followed the

12   next couple of weeks; correct?

13   A.   That is correct.

14   Q.   Okay.  And, in fact, each of those transfers were made from

15   GateGuard's Bank of America account to other Bank of America

16   accounts; correct?

17   A.   That is correct.

18   Q.   And each of those accounts, starting with, for example, the

19   corporate accounts, Friend or Fraud Incorporated, Touchless

20   Labs LLC, those are other businesses that Bank of America holds

21   accounts for, held accounts for, that were associated with Ari

22   Teman; correct?

23   A.   Correct.

24   Q.   And the bank was on notice for quite some time that these

25   were Ari Teman's businesses; correct?

K1NVTEM1                         Finocchiaro - cross

1   A.  Correct.

2   Q.  So I showed you, for example, the signature card yesterday

3   for GateGuard; correct?

4   A.  Correct.

5   Q.  I'm going to show you Government Exhibit 103 real briefly.

6   Is this the signature card for Friend or Fraud?

7   A.  It is, yes.

8   Q.  And does it reference that Friend or Fraud is controlled by

9   Ari Teman, at least as far as the bank is concerned, since

10  April of 2016?

11  A.  That is correct.

12  Q.  And similarly, I'm going to show you Government Exhibit

13  105.  Again, just at least as far as the bank is concerned,

14  does it show you Touchless Labs LLC as controlled by Ari Teman

15  since March of 2016?

16  A.  Yes, it does.

17  Q.  And these are Delaware entities; correct?

18  A.  That is correct.

19  Q.  So to be clear, when money was moved, money was moved

20  essentially from one account that Ari Teman controlled to other

21  accounts that Ari Teman controlled as far as Bank of America is

22  concerned?

23  A.  That is correct.

24  Q.  And have you reviewed the bank records of these entities?

25  A.  Yes, I have.

1   Q.  Fair to say that they are operating entities, at least they

2   appear to be based on the transactions?

3   A.  Yes.

4            MR. BHATIA:  Objection, your Honor.

5            THE COURT:  One moment.

6            Sustained.

7   Q.  Are there deposits into these accounts?

8   A.  I'd need to see the records for each of those accounts, but

9   based on my recollection, I do believe that there was other

10  deposits and other transactions in those accounts.

11  Q.  In other words, unrelated to GateGuard?

12  A.  Correct.

13  Q.  Now, you testified that on April 26, some money was moved

14  from the Friend or Fraud corporate account to an individual

15  account also at Bank of America held in the name of Ari Teman;

16  correct?

17  A.  Correct.

18  Q.  And, in fact, there were some questions about money from

19  that account.  And a couple of days later, on April 29th and

20  May 1st, the prosecutor asked you about international wire

21  transfers to China; correct?

22  A.  Correct.

23  Q.  And you read -- well, rack your brain on what the company

24  was, but there was a Chinese entity bank account that those

25  checks were sent to; correct?

1  A.  Correct.

2  Q.  Are you aware that that company is a supplier for

3  GateGuard?

4           MR. BHATIA:  Objection.

5           THE COURT:  Sustained.

6  Q.  You testified on May 8th that $4,000 was withdrawn in cash;

7  correct?

8  A.  That is correct.

9  Q.  To be clear, what's a cashier's check?

10  A.  A cashier's check is an official item that the customer can

11  purchase from their account so the cash is withdrawn, it's

12  turned into an official item.

13  Q.  Okay.  And to be clear, what happened here is that,

14  quote/unquote –– let's back up for a second.

15           If I walk into a Bank of America branch and I purchase

16  a $4,000 cashier's check, for example, the bank's not

17  physically handing me $4,000 of cash and I'm not physically

18  handing it back; correct?

19  A.  Correct.

20  Q.  The bank is basically treating it as a, quote/unquote, cash

21  withdrawal, but, for all intents and purposes, just giving me a

22  cashier's check to whomever I ask it be written out to;

23  correct?

24  A.  Correct.

25  Q.  And the reason that a cashier's check is significant is

1   that the person receiving it has security that the bank will

2   honor it?

3   A.  It's an official item that's then drawn on the bank.  And

4   it's not specific to that account any longer, it's -- it's an

5   official item that's issued by the bank.

6   Q.  Okay.  In this particular case, if you know, was a

7   cashier's check issued to a Levi Herman on that day in the

8   amount of $4,000?

9   A.  I'm unable -- I do not have that information.

10  Q.  Okay.  That wouldn't be reflected in the bank statements

11  though; correct?

12  A.  It would not.

13  Q.  It would just be reflected as a, quote/unquote, cash

14  withdrawal; correct?

15  A.  Correct.

16  Q.  Is it fair to say, based on the bank statements you've

17  reviewed, you can't say one way or the other whether Mr. Teman

18  walked out of the bank with cash or walked out of the bank with

19  a cashier's check to an individual?

20  A.  Unless it's an exhibit, I'm unable to.

21  Q.  And it's not something that was provided to the government;

22  correct?

23  A.  Not that I recall.

24  Q.  Okay.  Now, after the bank received the RCC chargebacks

25  from Signature Bank and JPMorgan Chase, the bank had

K1NVTEM1                    Finocchiaro - cross

1    interactions with Ariel Reinitz on GateGuard's behalf; correct?

2    A.  Can you say the name again?

3    Q.  Let me ask this:  Are you aware that GateGuard's attorney

4    had communications with Bank of America in May of 2019 about

5    the nature of what you've testified about, about these RCCs?

6              MR. BHATIA:  Objection, your Honor.  401, 403.

7              THE COURT:  Foundation.  Sustained.

8    Q.  Ms. Finocchiaro, the bank -- the government asked you

9    questions on direct examination about how the bank was

10   considering the offset issue yesterday; correct?

11   A.  Correct.

12   Q.  In the context of those discussions, did the bank have

13   communications with GateGuard's legal counsel, Ariel Reinitz?

14             MR. BHATIA:  Objection.

15             THE COURT:  Sustained.  Lack of foundation.

16             She's a records custodian.  You can ask her if she had

17   those communications.

18   Q.  Have you seen records of communications held by the bank

19   with any attorney on behalf of GateGuard?

20             MR. BHATIA:  Objection.

21             THE COURT:  Just a yes or no.

22   A.  Yes.

23   Q.  And based on your review of those records, were there

24   communications -- I'm not asking about the substance of them.

25   Were there communications between GateGuard's legal counsel and

1    Bank of America about the offset issue?

2              THE COURT:  Just a yes or a no.

3    A.  Trying to recall.  I do not believe that there was any

4    questions in regards to the offset.

5              THE COURT:  Mr. Gelfand, if the records are not in

6    evidence, it would be hearsay for her to be speaking about

7    their content.  Let's move on.

8    Q.  Now, you testified yesterday that the bank essentially is

9    holding a significant amount of money from GateGuard and other

10   accounts that you've testified about, Touchless Labs, etc.;

11   correct?

12   A.  The bank has the funds that are in -- being -- that are in

13   an account; they are not being held.  The checks were -- in

14   fact, I had indicated yesterday -- sent to the mailing address

15   for Mr. Ari B. Teman in regards to each and every account.  And

16   the checks were returned to the bank based on the address

17   provided.

18   Q.  Now, during this whole time period, what I mean by "this

19   whole time period" is between March and April of 2019, when the

20   RCCs were deposited and when Bank of America was made aware

21   that there was a criminal investigation, the bank had processed

22   these as basically breach warranty RCCs; correct?

23   A.  They were processed as breach of warranty and counterfeit,

24   yes.

25   Q.  And is it fair to say that the government, meaning law

K1NVTEM1                        Finocchiaro - cross

1    enforcement, came to Bank of America requesting information

2    about this as opposed to Bank of America going to law

3    enforcement?

4              MR. BHATIA:  Objection.

5              THE COURT:  Foundation.  Sustained.

6    Q.  When did you first become involved in providing information

7    to the government, meaning law enforcement, in connection with

8    this case?

9    A.  It was on April the -- or, I'm sorry, May the 15th.

10   Q.  Did you contact them or did they contact you?

11   A.  They were in contact with me.

12   Q.  I'm sorry, I couldn't hear you.

13   A.  They were in contact with me.

14   Q.  Okay.  Who initiated the contact?

15             MR. BHATIA:  Objection.  401 and 403.

16             THE COURT:  Sustained.  Relevance.

17   Q.  Over the course of the next several months, you provided

18   information to the government in connection with this case from

19   the bank; correct?

20             MR. BHATIA:  Objection.

21             THE COURT:  Overruled.

22   A.  I was in contact and I did provide information in regards

23   to the account.

24   Q.  Finally, just showing you, just briefly, again, for

25   example, Defense Exhibit 52, just an example of one of the

K1NVTEM1                        Finocchiaro - cross

1   RCCs, as far as -- well, to be clear for a second, these were

2   all made payable to GateGuard, Inc., the corporation; correct?

3   A.   That is correct.

4   Q.   Fair to say the bank doesn't know one way or the other

5   whether there's anything on here that is false?

6   A.   When the check is presented, we're not aware at that time.

7   Q.   And to be clear, as you previously testified, you don't

8   know whether anything in this "draw per contract" box is false;

9   correct?

10  A.   Correct.

11  Q.   And the rest of the RCCs basically just include the payor,

12  the payee, the dollar amount, the memo line, and the date;

13  correct?

14  A.   Correct.

15          MR. GELFAND:  Your Honor, may I have one minute?

16          THE COURT:  You may.

17          (Counsel conferred)

18          MR. GELFAND:  I have no further questions.

19          Thank you, ma'am.

20          THE COURT:  All right.

21          Thank you, Mr. Gelfand.

22          Any redirect, Mr. Bhatia?

23          MR. BHATIA:  Excuse me?

24          THE COURT:  Any redirect?

25          MR. BHATIA:  Yes, your Honor.

1   REDIRECT EXAMINATION

2   BY MR. BHATIA:

3   Q.  Ms. Finocchiaro, you testified -- you were asked some

4   questions about Bank of America's financial responsibilities,

5   right?

6   A.  That is correct.

7   Q.  And do you recall being asked some questions on

8   cross-examination about how Bank of America reviews checks?

9   A.  Yes.

10  Q.  And its obligations when funds are coming out of accounts?

11  A.  Correct.

12  Q.  And are accounts at Bank of America insured by the Federal

13  Deposit Insurance Corporation?

14  A.  Yes, they are.

15  Q.  That's the FDIC?

16  A.  Yes, they are.

17  Q.  And when Bank of America is trying to determine if a check

18  is authorized, if it's legitimate, is it trying to find out if

19  the person receiving the money is authorized to receive it or

20  if the person sending the money authorized the money to be

21  sent?

22  A.  It's authorizing was the money authorized to be sent and

23  received.

24          MR. BHATIA:  Could we pull up as an example Government

25  Exhibit 201.  We can go to the top of this page.  Thank you.

1   Q.  So just to get a little bit more specific, this was a check

2   deposited at Bank of America?

3   A.  That is correct.

4   Q.  And you were asked some questions about whether this

5   signature is Ari Teman's; is that right?

6   A.  Correct.

7   Q.  Or whether it looks like the ones on the signature cards?

8   A.  Correct.

9   Q.  And Ari Teman is GateGuard -- or is the signatory for

10  GateGuard, right?

11  A.  Yes.  Correct.

12  Q.  What information -- so he was the one getting the money,

13  right?

14  A.  He was the one receiving the funds, essentially, on behalf

15  of GateGuard.

16  Q.  The person receiving the funds is usually happy to get

17  them?

18          MR. GELFAND:  Objection, your Honor.

19          THE COURT:  One moment.

20          Sustained.

21  Q.  The person who was sending -- the person who was going to

22  have less money than they had before was up here, right, 518

23  Coney 205 LLC?

24  A.  In this check case, yes.

25  Q.  And what information did the bank receive about whether

K1NVTEM1                    Finocchiaro - redirect

1   that person had authorized the check?

2   A.  If the initial deposit we didn't have any information, it

3   goes to the clearinghouse process, the Federal Reserve.  And

4   then we receive back the information.  So at the time of the

5   deposit we did not.

6   Q.  And at the time, what -- subsequently, what information did

7   the bank get about whether that person, 518 West 205 LLC, had

8   approved the check?

9   A.  We received the information that they were not approving

10  this check; that essentially it was a breach of warranty and,

11  in some cases, they were counterfeit.

12  Q.  And is that true of all of the 29 checks that you testified

13  about?

14  A.  That is correct.

15  Q.  So you received information that the person sending the

16  money had not authorized it?

17  A.  Correct.

18  Q.  And the bank wasn't as interested in whether the person

19  receiving the money was authorized to receive it?

20  A.  Correct.

21  Q.  Do you recall answering some questions about a hold, a

22  seven-day hold?

23  A.  Yes.

24  Q.  Do you recall that the day that checks were deposited in

25  April was April 19, 2019?

K1NVTEM1                    Finocchiaro - redirect

1    A.  It was April 19th, 2019.

2    Q.  There's a seven-day hold, right?

3    A.  That is correct.

4    Q.  And so that would be, I think -- seven days -- April 26th?

5    A.  That is correct.

6    Q.  Okay.

7              MR. BHATIA:  Mr. Magliocco, could you pull up

8    Government Exhibit 102 and page 3 of that document.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1ndtem2                          Finocchiaro - redirect

1            (Pause)

2            MR. BHATIA:  Excuse me.  It is the document with Bates

3   number 958 at the bottom.

4            THE COURT:  This is a part of Exhibit 102?

5            MR. BHATIA:  That is right.

6   BY MR. BHATIA:

7   Q.  If I can direct your attention to the bottom of this page,

8   to the section titled, "Withdrawals and other Debits.

9            Do you recall testifying yesterday about the account

10  035 -- 0351 is the Friend or Fraud account?

11  A.  That is correct.

12  Q.  And 5580 is Ari Teman's personal account?

13            You can take a look at the exhibits in front of you,

14  Government Exhibits 107 or 108.

15            (Pause)

16  A.  5580 is the personal account for Ari Teman.

17  Q.  OK.  So the hold on the $297,000, the balance of that was

18  released on April 26, 2019, right?

19  A.  That is correct.

20  Q.  That's the date he was able to -- that was the date most of

21  those funds were available?

22  A.  That is correct.

23  Q.  And is it right that on this document if it shows that on

24  April 26, 2019, the day those funds were available, there was

25  that day a transfer of $225,000 to the Friend or Fraud account?

1    A.  Yes, there was.

2    Q.  On that same day there was a transfer of $3,600 into the

3    Ari Teman's personal account?

4    A.  That is correct.

5    Q.  And then three days later there is a transfer of 5,500 in

6    the same account?

7    A.  That is correct.

8    Q.  So those were all within three days of when those funds

9    became available, right?

10   A.  The same day and three days later, yes.

11              MR. BHATIA:  No further questions, your Honor.

12              THE COURT:  All right.  Any recross, Mr. Gelfand?

13              MR. GELFAND:  Very briefly, your Honor.

14              THE COURT:  Of course.

15   RECROSS-EXAMINATION

16   BY MR. GELFAND:

17   Q.  The prosecutor just asked you a few minutes ago whether the

18   bank had received information that the checks were not

19   authorized, correct?

20   A.  Correct.

21   Q.  OK.  To be Crystal clear, when you said that the bank got

22   information, is it fair to say that what you mean is that the

23   other banks told you that that's what their customers told

24   you -- told them?

25   A.  Correct.  We received the return item chargeback indicating

K1ndtem2                      Finocchiaro - recross

```
 1    that they were counterfeit and in breach of warranty.
 2    Q.  As opposed to Bank of America making an independent
 3    determination of whether that was true or not true?
 4    A.  We received the information from the corresponding
 5    financial institution, and we rely on that information to be
 6    factual.
 7    Q.  Do you know someone named Cheryl Harrison?
 8    A.  I do, yes.
 9    Q.  Who is Cheryl Harrison?
10    A.  She is in our compliance and regulatory compliance filing
11    department.
12    Q.  And what is compliance within Bank of America's context?
13              MR. BHATIA:  Objection, your Honor.  Scope.
14              THE COURT:  Sustained.  Beyond the scope.
15              MR. GELFAND:  Your Honor, may we approach for
16    additional context?  May we approach because I think --
17              THE COURT:  For a brief sidebar, yes.
18              (Continued on next page)
19
20
21
22
23
24
25
```

1              (At the sidebar)

2              THE COURT:  What is the issue?

3              MR. GELFAND:  Your Honor, the government disclosed

4    over the weekend to us, and we actually disclosed to the

5    government, correspondence from Cheryl Harrison, who is a Bank

6    of America employee, consisting of a single email between her

7    and Ariel Reinitz on May 28th of 2019, and the email

8    correspondence directly relates to a question that the

9    prosecutor asked on redirect about what information the bank

10   got essentially as to whether these were authorized or not.

11   The information in the course of the email that was maintained

12   by the bank and provided to this witness -- and then, by

13   extension, to the government and then to us -- clearly

14   indicates that these were authorized by GateGuard's customers.

15             THE COURT:  This is out of bounds for several reasons.

16   First of all, it is out of the timeframe that the witness is

17   speaking about.

18             Second of all, this is hearsay.  This is a

19   communication from Ariel Reinitz, the attorney for the

20   government, to somebody else from the bank after the fact.  She

21   is not part and parcel of some close investigation, and that is

22   not what the redirect is about.  You are at liberty to pursue

23   this with Mr. Reinitz.  You are at liberty to pursue it with

24   the other bank employee.  But this witness is essentially a

25   custodian of records who is explaining the bank's holding

K1ndtem2                           Finocchiaro - recross

1    processes.  The follow-along conversation between a lawyer for

2    Mr. Teman and somebody else are well outside the scope of the

3    inquiry that has been put here and are outside of the witness'

4    competence to address.  So, sustained.

5              MR. GELFAND:  OK.  Thank you, your Honor.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  At the sidebar, I continued to sustain the

3    objection.

4              Mr. Gelfand.

5    BY MR. GELFAND:

6    Q.  Finally, Ms. Finocchiaro, the prosecutor asked you

7    questions about whether or not the bank was insured by the

8    FDIC, correct?

9    A.  Correct.

10   Q.  OK.  And to be clear, you also testified -- I just want to

11   make sure we are not confused on terminology -- that some of

12   these checks were processed through the Federal Reserve System,

13   correct?

14   A.  Correct.

15   Q.  And the FDIC and the Federal Reserve system are two totally

16   separate concepts, correct?

17   A.  Correct.

18   Q.  OK.  Just to be clear, when you testified that these checks

19   were processed through the Federal Reserve System, to the

20   extent you know, that's basically just a way that banks in

21   American banking process checks; they don't independently

22   confirm the veracity of what is on checks or anything like

23   that, correct?

24   A.  Correct.

25              MR. GELFAND:  Your Honor, I have no further questions.

K1ndtem2

Thank you.

1

2              THE COURT:  All right.  Any reredirect?

3              MR. BHATIA:  No, your Honor.

4              THE COURT:  All right.  Ms. Finocchiaro, you may step

5     down.  Your testimony is complete.  Thank you.

6              (Witness excused)

7              THE COURT:  Government, please call your next witness.

8              MR. BHATIA:  The government calls Elie Gabay.

9              THE COURT:  Ladies and gentlemen, while we wait for

10    the next witness, if you want to stretch your legs, feel free

11    to do so, or not.

12    ELIE GABAY,

13         called as a witness by the government,

14         having been duly affirmed, testified as follows:

15              THE CLERK:  Please be seated.

16              State and spell your full name for the record.

17              THE WITNESS:  Elie Gabay, E-l-i-e G-a-b-a-y.

18              THE COURT:  All right.  Good morning, Mr. Gabay.  I

19    will ask you to please speak close to the mic, and keep your

20    voice up so that everyone can hear you in this old large

21    courtroom.

22              Counsel, you may inquire.

23    BY MR. BHATIA:

24    Q.  Mr. Gabay, where do you work?

25    A.  Coney Management.

K1ndtem2

1   Q.   And what is your title there?

2   A.   Managing director.

3   Q.   How long have you had that title?

4   A.   About eleven years.

5   Q.   And what kind of work does Coney Management do?

6   A.   Manages commercial properties.

7           THE COURT:  A little louder, please.

8   A.   Manages commercial properties.

9   Q.   And about how many buildings does it manage?

10  A.   About 60.

11  Q.   And as a general matter, where are the properties that it

12  manages?

13  A.   In New York City.

14  Q.   You are a managing director there.  What are your

15  day-to-day responsibilities?

16  A.   Overseeing the management of the properties on site and

17  overseeing the back office functions involving managing those

18  properties.

19  Q.   In 2018, what role did you have in managing and overseeing

20  the financial activity of those entities?

21  A.   The same as I have today.  Overseeing income, rents,

22  receipts coming in, expenses, checks going out to vendors.

23  Q.   Do you generally oversee the financial activity of those

24  entities?

25  A.   Yes.

K1ndtem2

1    Q.  And does that involve approving expenses?

2    A.  Yes.

3    Q.  Do you also have -- what role do you have involving

4    contracts?

5    A.  I negotiate contracts when necessary.

6    Q.  And are you also authorized to approve them?

7    A.  Yes.

8    Q.  What role do you have in coordinating vendors?

9    A.  I coordinate with vendors in all matters involving the

10   management of the properties.

11   Q.  OK.  And what role do you have involving the checking

12   accounts of those companies?

13   A.  I'm a signer on some of them, and I oversee the monthly

14   reporting that we do when we reconcile those bank accounts

15   against our books.

16   Q.  Are you familiar with the building at 518 West 204 Street?

17   A.  Yes.

18   Q.  Where is that generally?

19   A.  In northern Manhattan.

20   Q.  And how are you familiar with that building?

21   A.  We manage the building.

22   Q.  So all the things you talked about managing, do you also do

23   those for 518 West 204?

24   A.  Yes.

25   Q.  And are you familiar with 518 West 204 LLC?

K1ndtem2

```
 1    A.  Yes.

 2    Q.  What is the LLC?

 3    A.  It's the entity that owns the property 518 West 204 Street.

 4    Q.  Does Coney Management itself own 518 West 204 LLC?

 5    A.  No.

 6    Q.  Who owns the company?

 7    A.  It's made up of a group of partners, individuals and some

 8    entities.

 9    Q.  What is the relationship between Coney Management, where

10    you work, and the corporation 518 West 204 LLC?

11    A.  We are the managing agent.  Coney Management is the

12    managing agent of 518 West 204.

13    Q.  What does it mean to be a managing agent?

14    A.  To do all the tasks that I described earlier, to manage the

15    day-to-day operations, to oversee all financial matters

16    relating to the property.

17    Q.  Do you see anyone in this courtroom who you recognize from

18    your previous business dealings?

19    A.  I do.

20    Q.  Who do you recognize?

21    A.  Ari Teman, standing up there.

22    Q.  And would you please identify Mr. Teman by an article of

23    clothing he is wearing?

24    A.  A blue suit, purplish tie.

25             MR. BHATIA:  Your Honor, may the record reflect that
```

K1ndtem2

| | |
|---|---|
| 1 | that witness has identified the defendant? |
| 2 | THE COURT:  The record will so reflect. |
| 3 | BY MR. BHATIA: |
| 4 | Q.  How did you first meet Mr. Teman? |
| 5 | A.  I had met him at some trade shows relating to some of the |
| 6 | products that he was selling. |
| 7 | Q.  Around when do you think you met him? |
| 8 | A.  Sometime in 2016, 2017, around that time. |
| 9 | Q.  You said he was selling some products.  What products was |
| 10 | he selling? |
| 11 | A.  He was selling technology -- my first discussions with him |
| 12 | were relating to technology to identify illegal subleases. |
| 13 | Q.  What was the name of the product he was selling? |
| 14 | A.  Sublet Spy. |
| 15 | Q.  Did you later enroll -- did you later subscribe to Sublet |
| 16 | Spy? |
| 17 | A.  I did. |
| 18 | Q.  And did there come a time when you purchased another |
| 19 | product from Mr. Teman? |
| 20 | A.  Yes. |
| 21 | Q.  And what was that product? |
| 22 | A.  GateGuard. |
| 23 | Q.  What does GateGuard sell? |
| 24 | A.  GateGuard is an intercom system which is placed at the |
| 25 | entrance door of commercial properties, and it was supposed to |

1    add an additional layer of verification and identification for

2    any parties trying to come into the building who are

3    unauthorized.

4    Q.  What role does an intercom have in the safety of a building

5    at its entrance?

6    A.  It makes sure that only people that are authorized to enter

7    the building enter the building and keeps anyone else out by

8    not buzzing the door unless either they are buzzed in from

9    somebody upstairs or they have a code or something like that.

10   Q.  When did you first hear about GateGuard?

11   A.  Sometime in late 2016, early 2017.

12   Q.  And did you -- did there come a time when you met Mr. Teman

13   to discuss buying an intercom?

14   A.  Yes.

15   Q.  Describe that meeting.

16   A.  We first discussed it at a trade show where he was showing

17   me some of the functionality and how it worked.  We later had a

18   meeting in my office with some other members of my team in

19   order to get a little bit more intimately acquainted with how

20   it works and just get to know it better.

21   Q.  Based on -- fair to say he gave you the sales pitch?

22   A.  Yes.

23   Q.  So after the sales pitch, what did you tell Mr. Teman about

24   moving forward with GateGuard?

25   A.  We were considering rolling it out on a large scale across

K1ndtem2

1   a big chunk of our properties, but because it was a fairly new

2   product, we would want to test it out first to see how it

3   worked.

4   Q.  Just taking a step back for a minute.  Where was that

5   meeting with Mr. Teman?

6   A.  There was a meeting at the trade show, and that may have

7   been in Manhattan, I think, but the meeting in our office was

8   in Brooklyn.

9   Q.  OK.  So when you were talking about rolling it out on a

10  larger scale, what commitments did you make to Mr. Teman?

11  A.  There were no commitments made at the meeting.  It was

12  conceptual:  This is what we think.  This is how we would like

13  to see it happen.

14          Nothing was firm partially because Mr. Teman said that

15  he had a newer version that was in development which he needed

16  to fly to some other place in order to oversee the

17  manufacturing of, so the final product wasn't really in place

18  yet.

19  Q.  And was there -- did you have a need for a particular

20  intercom before those later models would be available?

21  A.  Yes.  There came a time when we had an immediate need for

22  an intercom system at 518 West 204th Street, and that happened

23  during the time that we were having discussions.  And rather

24  than put in a temporary intercom and wait for the updated model

25  to come out, we decided to talk to Mr. Teman about putting a

K1ndtem2

1    system in since we had an immediate need.

2    Q.  So the later model might come out later but there was an

3    immediate need for an intercom now?

4    A.  Right.  So we would put this one in on a temporary basis

5    and eventually swap it out.

6    Q.  OK.  Mr. Gabay, I'd like to direct your attention to

7    Government Exhibits 412 through 418.  They are in a binder to

8    your right.  If you could take -- to your left, I'm sorry.  My

9    right.  If you could take a look at 412 through 418 and look up

10   at me for a moment when you are finished.

11           (Pause)

12   A.  412?

13   Q.  412 through 418.

14           (Pause)

15           Mr. Gabay, just to give you an idea, I am going to ask

16   you if you recognize those documents.  That is my question for

17   now.

18   A.  Yes, I do.

19   Q.  OK.  How do you recognize 412 through 418?

20   A.  These are emails that either I sent or I received.

21           MR. BHATIA:  OK.  And, your Honor, the government

22   offers Government Exhibits 412 through 418.

23           THE COURT:  I think he needs to be more precise about

24   who the emails were with.

25           MR. BHATIA:  OK.

K1ndtem2

1    Q.  Who were the emails with?

2            All of those emails were to or from you, right?

3    A.  Yes.

4    Q.  And who were the emails with?

5    A.  412 is an email from -- which is auto-generated from the

6    intercom panel, and the others are from Ari Teman.

7    Q.  OK.  Mr. Gabay -- your Honor, the government now offers

8    Exhibits 412 through 418.

9            THE COURT:  Any objection?

10           MR. GELFAND:  No, your Honor.

11           THE COURT:  They are all received.

12           (Government's Exhibits 412 through 418 received in

13   evidence)

14           MR. BHATIA:  Mr. Magliocco, I would like to publish

15   Government Exhibit 412.

16           Mr. Gabay, we are going to call up an exhibit for you.

17           THE COURT:  Can you enlarge the exhibit?  The jury is

18   struggling with it a little bit.  Thank you.

19   Q.  Mr. Gabay, who is this email from?

20   A.  This email is from the intercom system.

21   Q.  And who is this email to?

22   A.  To me.

23   Q.  As a general matter, what information are you getting in

24   this email?

25   A.  It's a notification that Ana Esterg, from Apartment 22 at

K1ndtem2

1    518 West 204th Street, got a buzz but didn't log into the

2    apartment.

3    Q.  Does this message tell you that the intercom is working?

4    A.  Yes.

5    Q.  Did you ever receive an invoice related to this purchase?

6    A.  Yes.

7    Q.  I would like to direct your attention to Government Exhibit

8    413.

9    A.  413.

10   Q.  So I would like to direct your attention to the top of this

11   email.

12   A.  OK.

13   Q.  Who is this email from?

14   A.  Ari Teman.

15   Q.  And who is it to?

16   A.  To me.

17   Q.  What is the date of this email?

18   A.  January 19, 2018.

19   Q.  That is the same day as you got the email saying that your

20   device is working, right?

21   A.  Yes.

22   Q.  And so --

23   A.  Yeah, sorry.

24   Q.  Is there an attachment to this email?

25   A.  There is.

K1ndtem2

1    Q.  And is that an invoice?

2    A.  Yes.

3    Q.  I would like to direct your attention to page 3 of this

4    document.

5            You can follow along on the screen, if that is

6    helpful.  We will blow it up for you.

7            So I would like to first direct your attention to the

8    top of this email -- of this invoice, I should say.

9            Who is this email from -- who is this invoice from?

10   A.  GateGuard Inc., a division of Teman.

11   Q.  And is it to you?

12   A.  It has my email address on it, but it's got another entity

13   on it.

14   Q.  This is the invoice that was emailed to you?

15   A.  Yes.

16   Q.  What is the balance on this invoice?

17   A.  $3,600.

18   Q.  And if we go further down that page, we can take a look at

19   what you are being invoiced for.

20           What is the first entry on this invoice?

21   A.  GateGuard Version 1 Panel.

22   Q.  What is it listed here in the description?

23   A.  "To be credited to Panel 2.0 monthly fees when installed."

24   Q.  And the cost is $3,600?

25   A.  Yes.

K1ndtem2

1   Q.  And in the far right column, it says, "Line Total."

2           You are not being charged for anything else, right?

3   A.  That is correct.

4   Q.  The total value of this invoice was $3,600, right?

5   A.  Yes.

6   Q.  What did you think you were buying when you received this

7   invoice?

8   A.  I was buying the version one panel as a temporary solution,

9   and eventually it will be credited against the newer panel once

10  that came in.

11  Q.  I would like to direct your attention to the bottom of this

12  page now.

13          In the bottom left corner, there is something that

14  says, "Terms."  It says, "Buyer sets Terms & Conditions at

15  https://GateGuard.xyz."  Do you see that?

16  A.  I do.

17  Q.  Did you click on that link?

18  A.  I don't recall clicking on that link.

19          THE COURT:  Sorry.  A little louder, please.

20  A.  I don't recall clicking on that link.

21  Q.  Why not?

22  A.  Why don't I recall it?

23  Q.  Do you recall why you might not have clicked on that link?

24  A.  No.

25  Q.  I would now -- did there come a time when you paid for

K1ndtem2

1    this -- when you paid this invoice?

2    A.  Yes.

3    Q.  After receiving this invoice, did there come a time when

4    you did go to Mr. Teman's website?

5    A.  Yes.

6    Q.  And when was that?

7    A.  It was later on, as we were negotiating the larger

8    agreement.

9    Q.  So that was -- this is just an invoice for one device, is

10   that right?

11   A.  Correct.

12   Q.  When you received this invoice, what did you think that you

13   were buying with just this invoice?

14   A.  Just that one device.

15   Q.  OK.  At the same time, were there conversations about other

16   purchases?

17   A.  There were conversations.

18   Q.  What were those conversations?

19   A.  Discussions and negotiations about how to structure the

20   terms of the larger purchase.

21   Q.  I'll direct your attention to Government Exhibit 414, and

22   there is an email message on the third page of that document.

23   A.  Do I still need this binder?

24   Q.  You don't need the binder.

25            In this message, Mr. Teman says:  "Here is the form to

K1ndtem2

1    complete the order for the 10 Version 2.0 devices you put into

2    PropertyPanel.xyz," and then he later includes a hyperlink.

3    What was Mr. Teman sending you?

4    A.   He was sending me an online order form.

5    Q.   And did you go to that link?

6    A.   I believe so.

7    Q.   And did there come a time after going to that link when you

8    saw so-called "Terms & Conditions" on Mr. Teman's website?

9    A.   Yes.

10   Q.   When did you first see those terms and conditions?

11   A.   It must have been around the time of this email.

12   Q.   What was your reaction to seeing them?

13   A.   I was pretty surprised by many of them and felt that they

14   needed to be negotiated.

15   Q.   What about them seemed surprising?

16   A.   They seemed very one-sided and aggressive in nature.

17   Q.   And at the time you saw those terms, did you feel that you

18   had been bound by them?

19   A.   No.

20   Q.   Did you feel you had agreed to those terms?

21   A.   No.

22   Q.   Why not?

23        MR. GELFAND:  Your Honor, I object to the question

24   about the way he felt.

25        THE COURT:  Sustained.

K1ndtem2

```
 1    Q.  In your mind, were you bound by those terms?

 2    A.  No.

 3            MR. GELFAND:  The same objection.

 4            THE COURT:  Sustained.

 5    Q.  In your mind, did you agree to those terms?

 6            MR. GELFAND:  I am going to object, your Honor.

 7            THE COURT:  Sustained.

 8    Q.  Did there come a time when you expressed your views about

 9    those terms and conditions to Mr. Teman?

10    A.  Yes.

11    Q.  And so going back to this document, I will direct your

12    attention to an email message at the bottom of the first page,

13    dated January 23, 2018.  You wrote here:  "Section 5K and 5L or

14    your terms and conditions are pretty brutal.  I stopped reading

15    after I saw them.  I don't usually get nitpicky but we need to

16    discuss these."

17            What were you telling Mr. Teman?

18    A.  I was telling him that we needed to discuss the terms and

19    conditions.

20    Q.  And was that a reference to a page on his website?

21    A.  Yes.

22    Q.  What did you mean, that they were pretty brutal?

23    A.  I'd have to see them to remember it, but judging by my

24    language, they seemed one-sided and very aggressive.

25    Q.  When you said that they were pretty brutal, were you
```

K1ndtem2

1     conveying anything about whether you agreed to those terms?

2     A.   My next sentence says that we need to discuss them, so I

3     meant we need to negotiate them.

4     Q.   What was the date of that email to Mr. Teman?

5     A.   January 23, 2018.

6     Q.   And at that point Mr. Teman had installed a GateGuard

7     device at 518 West 204, right?

8     A.   Yes.

9     Q.   I'll direct your attention to an email above this one that

10    says -- let's pull it up.  He wrote back:  "Sure.  Call me."

11         Did you have a subsequent call with Mr. Teman?

12    A.   Yes.

13    Q.   On that call, what, if anything, did Mr. Teman say about

14    payment terms?

15    A.   I don't recall specifics about that conversation.

16    Q.   On that conversation, did you commit to abiding by the

17    terms and conditions?

18         MR. GELFAND:  Your Honor, objection.  The witness has

19    testified he doesn't recall.

20         THE COURT:  Overruled.

21         You may answer it.

22         THE WITNESS:  Repeat the question.

23    BY MR. BHATIA:

24    Q.   On that call that says, "Sure, call me," did you say

25    anything about committing to the terms and conditions?

K1ndtem2

1    A.  I don't think so, no.

2              THE COURT:  Please speak louder.

3              THE WITNESS:  Sure.

4              THE COURT:  Just repeat the answer.

5    A.  I don't think so, no.

6    Q.  At any time did you have a phone call with Mr. Teman where

7    you told him you agreed to the terms and conditions?

8    A.  No.

9    Q.  So you didn't have one after this either?

10   A.  No.

11   Q.  OK.  Did there come a time when you actually paid the

12   invoice for -- when you actually paid the invoice that you

13   testified about earlier today?

14   A.  Yes.

15   Q.  So I'll direct your attention now to Government Exhibit

16   146.

17             MR. BHATIA:  Your Honor, at this point, I think we

18   need to offer that into evidence.

19             If I could have one moment?

20             One moment, your Honor.

21             (Pause)

22             MR. BHATIA:  Your Honor, the government offers into

23   evidence, pursuant to a stipulation that we read off yesterday,

24   Exhibits 141 through 146.

25             THE COURT:  Any objection?

K1ndtem2

```
 1              MR. GELFAND:  No objection.

 2              THE COURT:  Those are all received.

 3              (Government's Exhibits 141 through 146 received in

 4     evidence)

 5     BY MR. BHATIA:

 6     Q.  Mr. Gabay, I would like to direct your attention to

 7     Government Exhibit 146.  We'll put it up on the screen.

 8              On the top right here is a check image, is that right?

 9     A.  Yes.

10     Q.  Do you recognize this check?

11              THE COURT:  Can you enlarge it, please, for the

12     benefit of the jury?

13     A.  I do.

14     Q.  And is this check issued by 518 West 204 LLC?

15     A.  Yes, it is.

16     Q.  Is this the check that you issued for the invoice that you

17     had received?

18     A.  Yes.

19     Q.  When you issued this check, what were you agreeing to do

20     with GateGuard?  What were you agreeing to purchase from

21     GateGuard?

22     A.  The intercom panel.

23     Q.  Had you spoken on the phone with Mr. Teman about GateGuard?

24     A.  I had.

25     Q.  And you described meetings with GateGuard?
```

K1ndtem2

1    A.   Yes.

2    Q.   During those phone calls and meetings, did Mr. Teman tell

3    you anything about authority to draw checks on behalf of 518

4    West 204 LLC?

5    A.   No.

6    Q.   Did he tell you anything about a ten-year commitment to

7    paying him monthly fees?

8    A.   No.

9    Q.   At the time you issued this check, had Mr. Teman told you

10   anything about paying a device removal fee if you removed the

11   device?

12   A.   No.

13   Q.   This check is dated January 31, 2018, is that right?

14   A.   Yes.

15   Q.   At the time you paid this check, had you -- did you believe

16   that you were buying a GateGuard intercom?

17   A.   Did I what?

18   Q.   Did you believe that you were purchasing and owning a

19   GateGuard intercom?

20   A.   Yes.

21   Q.   Did you believe that you would be subject to a fee if you

22   decided to remove the intercom and do something else?

23   A.   No.

24   Q.   At the time you issued this check, what commitments had you

25   made to GateGuard about future purchases?

K1ndtem2

```
1    A.  There were no commitments, there were just negotiations.

2    Q.  At the time you issued this check, were you giving Mr. --

3    had you given Mr. Teman authority to draw checks from your

4    accounts?

5    A.  No.

6    Q.  If Mr. Teman had said I'd like authority to issue checks on

7    your behalf, why don't you give me a check, what would you have

8    said?

9              MR. GELFAND:  Objection, your Honor.  It calls for

10   speculation.

11             THE COURT:  Overruled.

12             THE WITNESS:  That means I can answer it?

13             THE COURT:  You may answer it.  Thank you.

14   A.  I would have said no.

15   Q.  Why would you have said no?

16   A.  Because we don't authorize anyone to draw on our

17   accounts -- any of our vendors to draw funds from our accounts

18   other than specific categories, such as utilities or mortgages.

19   Q.  So what are the categories where you do allow people to

20   draw funds?

21   A.  Only mortgage payments or utilities.

22   Q.  And why do you not let other people draw funds from your

23   accounts?

24   A.  That's just the way our policy is structured.  We like to

25   see invoices come in.  We like to authorize each payment and go
```

K1ndtem2

1    through our accounts payable process.

2    Q.  Is there a practical effect -- is there a practical reason

3    you don't want people automatically drawing funds from that

4    account?

5    A.  Practical reason?  I don't understand what you mean.

6    Q.  Is there a reason you want to manually approve expenses

7    going out of that account?

8    A.  Yeah, to make sure that they are authorized.

9    Q.  At the time you paid this check, did you have any contract

10   with Mr. Teman?

11   A.  No.

12   Q.  And at the time you issued this check, had you signed

13   anything called the terms and conditions?

14   A.  No.

15   Q.  After paying for this first device, did you have other

16   conversations with Mr. Teman about other purchases after paying

17   this?

18   A.  Yes.

19   Q.  What was the substance of those conversations?

20   A.  It was negotiating the rollout of Version 2.0 across

21   multiple properties.

22   Q.  I'll direct your attention to Government Exhibit 415, which

23   we will pull up on the screen for you.

24            I will direct your attention to an email at the bottom

25   of the first page.

K1ndtem2

```
1          We can scroll up a little bit, and we can see this is
2   from -- this is a message from Ari Teman?
3   A.  Yes.
4   Q.  And it is an email to you?
5   A.  Yes.
6   Q.  And who is Yoni Irom?
7   A.  That is an attorney.
8   Q.  OK.  In this message -- now go to the contents of it --
9   what was Mr. Teman sort of conveying to you?
10          THE COURT:  Let's let the jury read the message first.
11          MR. BHATIA:  OK.
12          (Pause)
13          THE COURT:  OK.  Go ahead.
14  BY MR. BHATIA:
15  Q.  At this point, is Mr. Teman giving you a proposal?
16  A.  He's directing me to fill out some sort of template to go
17  through the process of finalizing the order for the 20 -- for
18  the units for the 20 buildings.
19  Q.  Now, if we go further up this page on this document, you
20  send a message to Mr. Teman, and in that message you write --
21  and now we have it up here -- you write:  "Proposed changes to
22  terms and conditions attached.  Let's discuss once you've had a
23  chance to review."
24          What were you sending Mr. Teman?
25  A.  Red lines terms and conditions.
```

330

K1ndtem2

1    Q.  So let's turn to page 3 of this document.

2             These are the same terms and conditions that you

3    described as pretty brutal earlier?

4    A.  Yes.

5    Q.  So on page 3 of this document -- if we pull it up.  You can

6    zoom in on the text on this page.

7             Can you read the top three lines?

8    A.  "Terms & conditions, GateGuard Inc.  Last revised:

9    November 30, 2017, 3:30 p.m."

10   Q.  Are these the terms and conditions that you had seen

11   before?

12   A.  I believe so.

13   Q.  And where did you get this document from?

14   A.  From his website.

15   Q.  And what you are sending him, is that like a Microsoft Word

16   document?

17   A.  Yes.

18   Q.  Did you send it with any edits in this document?

19   A.  I did.

20   Q.  When you sent it to him, why did you make edits?

21   A.  Because I felt the terms and conditions were brutal.

22   Q.  And did you believe that these terms and conditions had any

23   effect on the intercom that you had already purchased?

24   A.  Had any effect?

25   Q.  Were these terms and conditions related to that earlier

K1ndtem2

1     intercom?

2     A.  I didn't think so, no.

3     Q.  What intercoms might these terms and conditions relate to?

4     A.  The ones that we were negotiating to purchase.

5     Q.  Turn your attention now to the seventh page of this

6     document, and I will direct your attention to a paragraph right

7     under the heading 5.

8              Pull it up.

9              Fair to say this is a long document?

10    A.  Yes.

11    Q.  OK.  So this section is called "Orders and Fees," right?

12    A.  Yes.

13    Q.  And, in quotes, "Pricing"?

14    A.  Yes.

15    Q.  You made two edits here, right?

16    A.  I did.

17    Q.  What is the edit -- the second edit further down this page,

18    you struck some language.  We don't need to get into legalese,

19    but what would you say that you were striking out here?

20    A.  I was striking out the language that enabled GateGuard to

21    increase pricing at a rate of 100 percent per year.

22    Q.  Was that an unusual provision for you?

23    A.  Highly unusual.

24    Q.  Why?  Why did you think that might be an issue?

25    A.  I think it would be an issue if pricing can be doubled on

K1ndtem2

```
 1   an annual basis at his discretion.
 2   Q.  Further up this page, there is a URL.  Do you see that URL?
 3   A.  I do.
 4   Q.  And did you click on that link?
 5   A.  I don't recall.
 6   Q.  Do you recall ever seeing another Web page that had similar
 7   conditions?
 8   A.  Similar conditions to what?
 9   Q.  Do you recall ever seeing another page like a Terms &
10   Conditions?
11   A.  No.
12   Q.  OK.  To the best of your memory, did Mr. Teman ever draw
13   your attention to that website?
14   A.  No.
15   Q.  And to the best of your memory, did he ever send you a copy
16   of that website?
17   A.  A copy of the website?
18   Q.  Did he ever send you the text of what's in that link?
19   A.  No, I don't think so.
20   Q.  By sending back these terms and conditions, were you
21   agreeing to them?
22   A.  No.  It was a negotiation.
23   Q.  You would say this is mid-negotiation, right?
24   A.  Yes.
25   Q.  Going back to your email now, so that is page 1 of this
```

K1ndtem2

1    document, towards the top.

2              (Pause)

3              THE COURT:  Do you need to put it up on the screen.

4              MR. BHATIA:  We will play it.

5    Q.  In this email where you attached these terms and

6    conditions, you wrote:  "Proposed changes to terms and

7    conditions attached.  Let's discuss once you've had a chance to

8    review."

9              By saying you wanted to discuss, were you conveying

10   anything about whether you had already agreed to these

11   conditions?

12   A.  No.

13   Q.  What did you mean to tell Mr. Teman about the terms?

14   A.  That I had proposed some changes and we should discuss

15   further.

16   Q.  And you didn't agree to them as is?

17   A.  Absolutely not.

18   Q.  Did you hear from Mr. Teman after you sent this email?

19   A.  I believe we spoke, yes, and I think in response to some of

20   my comments.

21   Q.  You continued to talk to Mr. Teman about the GateGuard --

22   about buying more GateGuard product, is that right?

23   A.  I did.

24   Q.  Did there come a time when you decided that you did not

25   want to purchase more GateGuard intercoms?

K1ndtem2

```
 1    A.   Yes.

 2    Q.   What led you to that conclusion?

 3    A.   We were having some challenges with the unit that had been

 4    installed, and during the troubleshooting process I

 5    communicated with Mr. Teman that until some of these issues

 6    were resolved, we'd like to put a hold on any further

 7    discussions on the larger order.

 8    Q.   Let's just take a step back.

 9         You said that you had some issues with the device.

10    What kind of issues?

11    A.   Connection issues.  We got some feedback from tenants that

12    either felt like they weren't able to get in when they needed

13    to get in or weren't able to buzz people in when they needed to

14    buzz people in.  The last piece which I remember was that there

15    was a connectivity issue where the unit wasn't working as

16    promised.

17    Q.   How many times a day would you say an intercom is used in

18    one of your buildings?

19    A.   It depends on the size of the building.

20    Q.   If there were ten tenants in the building, how many times a

21    day do you think the intercom would be used?

22    A.   It would be tough to say.  It depends on how many guests

23    they have and so many other factors.

24    Q.   It could be dozens of times?

25    A.   Yes.
```

K1ndtem2

1   Q.  So is it a problem for you if the intercom is not working

2   properly?

3   A.  Yes, it is.

4   Q.  And did tenants complain to you?

5   A.  Yes.

6   Q.  And did you relay complaints to Mr. Teman?

7   A.  Yes.

8   Q.  What did he say in response to those complaints?

9   A.  He worked on the issues that were coming up, and we worked

10  together in order to resolve them.

11  Q.  Did you find that despite his work, there were still

12  problems coming up?

13  A.  Yes.

14  Q.  And ultimately what happened to your discussions about

15  buying more GateGuard intercoms?

16  A.  When I relayed the intention to put the larger order on

17  hold, I got a very nasty email from Mr. Teman and the

18  relationship deteriorated after that.

19  Q.  I would like to direct your attention to Government Exhibit

20  416.  And at the top of this page, there is a message between

21  you and Mr. Teman.

22          You wrote:  "Updated feedback on my end below.

23          "'Given all of the issues we are having with Teman's

24  system, I am very hesitant to move forward with him.  I think

25  we need to put this entire project on hold.  And wait.'"

```
 1              What were you relaying to Mr. Teman?
 2   A.  I was relaying to him that due to the challenges and the
 3   issues that we had with the system, we would be suspending any
 4   further discussion about the larger order until they were
 5   resolved.
 6   Q.  You are describing feedback on your end and then quoting
 7   some language.  Are you quoting someone else here?
 8   A.  Just probably quoting just the general feedback that I'm
 9   getting.
10   Q.  So in the office there was a conclusion to put this on
11   hold?
12   A.  Yeah.
13   Q.  It was not just your decision?
14   A.  No.
15   Q.  After --
16              THE COURT:  Counsel, I am looking for a good moment
17   for a mid-morning break.  Is this it, or would you like to go
18   on a little longer?
19              MR. BHATIA:  I have a few more questions on this top.
20              THE COURT:  Very good.
21              MR. BHATIA:  And then I will let you know.
22              THE COURT:  Keep going.
23   BY MR. BHATIA:
24   Q.  Did you ever -- after saying that you were hesitant to move
25   forward, did you ever buy any intercoms?
```

K1ndtem2

1   A.  Did I ever?

2   Q.  After sending this message, did you buy any other

3   intercoms -- intercoms from Mr. Teman?

4   A.  No.

5   Q.  OK.  Did you buy anything else from Mr. Teman?

6   A.  No.

7            MR. BHATIA:  Your Honor, this might be a good point

8   for a break.

9            THE COURT:  All right.  Ladies and gentlemen, we're

10  going to take our mid-morning break.  Mr. Smallman will come

11  get you in 15 minutes.

12           Enjoy your break and, as always, do not discuss the

13  case.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

K1ndtem2

```
 1                    (Jury not present)
 2               THE COURT:  All right.  The witness may step down.
 3               Counsel, anything to raise before we take our break?
 4               MR. BHATIA:  No, your Honor.
 5               THE COURT:  All right.  I will see you just before the
 6      jury comes back.  Thank you.  Have a good break.
 7                    (Recess)
 8                    (Jury not present)
 9               THE COURT:  All right.  Let's get the witness and the
10      jury.
11               Government counsel, so that I don't have to keep
12      reminding the witness, do encourage him to speak up.  He speaks
13      very softly.
14               And government counsel, to the extent that -- there
15      you go, here he is.  Please repeatedly just keep your voice up
16      and speak right into the mic.
17               May I just suggest to the government table, given the
18      size of some of the type on some of the documents, so that I
19      don't have to keep interjecting, as a general matter, let's
20      blow up the relevant language so the jury can see it without
21      straining.  Thank you.
22               MR. BHATIA:  Understood.
23                    (Continued on next page)
24
25
```

K1ndtem2

```
 1              (Jury present)
 2              THE COURT:  All right.  Welcome back, ladies and
 3    gentlemen.
 4              Please be seated.
 5              Mr. Gabay, I will remind you that you are still under
 6    oath.
 7              And, counsel, you may inquire.
 8    BY MR. BHATIA:
 9    Q.  Mr. Gabay, to be clear, were there problems with the one
10    GateGuard device that you owned?
11    A.  Yes.
12    Q.  There were problems with the one at 518 West 204?
13    A.  Yes.
14    Q.  What were those problems?
15    A.  We were having issues connecting.  There were a variety of
16    issues with getting tenants to use it properly or get it to run
17    the way we needed it to run.
18    Q.  Did the tenants seem upset about it?
19    A.  They did.
20    Q.  And they were relaying those concerns to you?
21    A.  Yes.
22    Q.  And having a faulty intercom, does that also lead to
23    getting complaints with the city?
24    A.  Yes.
25    Q.  It can be a big problem for you, is that right?
```

K1ndtem2

1   A.  Yes.

2   Q.  And did you relay those concerns to Mr. Teman?

3   A.  I did.

4   Q.  These were reoccurring problems, is that right?

5   A.  Yes.

6   Q.  Ultimately, was he able to stop the problems from

7  reoccurring?

8   A.  Many of them were taken care of.  The connectivity issues

9  were still not resolved.

10  Q.  Connectivity means the ability of the intercom -- the

11  ability of the intercom to connect to the Internet?

12  A.  Yes, and for us to connect to the intercom remotely to

13  update or --

14  Q.  Is that the main purpose of the intercom, as far as you can

15  tell?

16  A.  No, that's not the main purpose.

17  Q.  Is it an important part of the product?

18  A.  Yes.

19  Q.  And it wasn't working?

20  A.  Correct.

21  Q.  And you told Mr. Teman, right?

22  A.  Yes.

23  Q.  And you said -- you kept having these problems?

24  A.  Yes.

25  Q.  Would you describe yourself as a satisfied customer?

341

K1ndtem2

1   A.  No.

2   Q.  Did there come a time after the first device when you

3   bought more of them?

4   A.  No.

5   Q.  Why not?

6   A.  Because we weren't happy with the first one.

7   Q.  You sent over -- you testified about some edits you made to

8   the terms and conditions.

9   A.  Yes.

10  Q.  As part of your negotiations, right?

11  A.  Yes.

12  Q.  And at the time -- at any time, did you ever have an

13  agreement with Mr. Teman?

14  A.  About what?

15  Q.  About these terms and conditions.

16  A.  No.

17  Q.  Did you ever have any agreement about purchasing more

18  devices?

19  A.  No.

20  Q.  Did you feel that you had any agreement -- excuse me.

21          Did you have any agreement beyond buying the one

22  device that you paid for?

23          MR. GELFAND:  Objection, your Honor.

24          THE COURT:  One moment.

25          (Pause)

K1ndtem2

1              THE COURT:  Overruled.

2              You may answer.

3              THE WITNESS:  Can you repeat the question?

4       BY MR. BHATIA:

5       Q.  Did you have any agreement with Mr. Teman other than paying

6       for the one device that you owned and the invoice that you

7       received?

8       A.  No.

9              THE COURT:  Wait.  Just to be more precise, is the

10      question other than in connection with the first intercom, did

11      he have any agreement with Mr. Teman?  Is that the question?

12             That's the way I understood what you were asking, but

13      I want to make sure there is clarity in your question.

14             MR. BHATIA:  I mean other than -- let me rephrase the

15      question.

16             THE COURT:  Thank you.

17      Q.  Mr. Teman installed one intercom in one of your buildings,

18      right?

19      A.  Correct.

20      Q.  And you paid $3,600 for that intercom?

21      A.  Correct.

22      Q.  Did you have any agreement with Mr. Teman beyond him

23      installing the device and you paying $3,600 for that device?

24      A.  No.

25      Q.  Did you have any agreement called Terms & Conditions?

K1ndtem2

1   A.  No.

2   Q.  Did you have any written signature with both of your

3   signatures at the bottom?

4   A.  No.

5   Q.  Did Mr. Teman at any time, ever, tell you about fees for

6   removing that device?

7   A.  Yes, after -- once the relationship deteriorated, he

8   started sending me emails about these fees that I supposedly

9   owed him.

10  Q.  Prior to when the relationship deteriorated, when you put

11  that -- is that after you decided to put the negotiations on

12  hold?

13  A.  Yes.

14  Q.  Prior to that, had Mr. Teman ever told you about a fee for

15  removing a device from your own building?

16  A.  Not that I recall.

17  Q.  You thought you owned the device -- you owned the device,

18  right?

19  A.  Well, it was a temporary device that we owned until the new

20  one would come in.

21  Q.  Does it make sense to you to pay a fee to remove your own

22  device from your own building?

23  A.  No.

24  Q.  Is that something that would have stood out to you if you

25  had agreed to pay that fee?

K1ndtem2

```
 1    A.  Yes.
 2    Q.  Did Mr. Teman ever direct your attention to language that
 3    said you had to pay a fee to remove a device?
 4    A.  No.
 5    Q.  If you had seen that language, would that have stood out to
 6    you?
 7    A.  Yes.
 8    Q.  And if you had seen language that said you were committing
 9    to paying a fee for removing the device, what would you have
10    done?
11              MR. GELFAND:  Objection, your Honor.  It calls for
12    speculation.  The same objection as earlier.
13              THE COURT:  Yes.  Sustained.
14              (Pause)
15              No.  Overruled.  I am going to reverse on that.
16              The witness may answer.
17    BY MR. BHATIA:
18    Q.  You can answer, Mr. Gabay.
19    A.  Repeat the question, please.
20    Q.  If you had seen something that said by buying the one
21    intercom for $3,600, you would be paying a cancellation fee or
22    a device removal fee, what would you have done?
23    A.  I would have removed that language.
24    Q.  Would you have spoken to Mr. Teman about it?
25    A.  Absolutely.
```

1    Q.  Would you have told him that you didn't agree to that?

2    A.  Yes.

3    Q.  You don't remember ever seeing that language?

4    A.  No.

5    Q.  You never saw that language?

6    A.  That's correct.

7    Q.  Before the break, we spoke about -- you saw an email where

8    you decided to put the negotiations on hold, right?

9    A.  Yes.

10   Q.  And how did Mr. Teman react to that?

11   A.  He sent a very nasty and aggressive email saying -- I don't

12   remember the exact words, but it was kind of unpleasant after

13   that.

14   Q.  When you sent him that message, were you saying that we're

15   never going to do business with you again, or were you

16   conveying that we just need to take some time?

17   A.  We just need to take some time.

18              (Continued on next page)

19

20

21

22

23

24

25

K1NVTEM3                    Gabay - direct

1  BY MR. BHATIA:

2  Q.  And is that because of the issues that you were having with

3  the first device?

4  A.  Yes.

5        MR. BHATIA:  Mr. Magliocco, can we please publish

6  Government Exhibit 417.

7  Q.  And, in particular, I'll direct your attention to an email

8  at the bottom of page 2, which we can blow up, which we'll blow

9  up for you.

10       This is your email that you previously spoke about,

11  right?  This is where you said updated feedback below, and you

12  told him to put the project on hold?

13  A.  Yes.

14  Q.  Okay.  Now, going to page 1 of this document, in response

15  to that, Mr. Teman sent you a message.  And we'll take a look

16  at the -- we can blow up the whole email.

17       He sent this to you on the same day, right?  This is

18  from April 26th, 2019?

19       THE COURT:  Counsel, you said April 26?

20  A.  I don't see --

21       THE COURT:  One moment.

22       MR. BHATIA:  March 26, I'm sorry.

23  A.  Yes.

24  Q.  It's from March 26.  This is a message from Ari Teman to

25  you?

K1NVTEM3                         Gabay - direct

1    A.  Yes.

2    Q.  And is this the response he had that you thought was

3    unusual?

4    A.  Yes.

5    Q.  Here he's saying:  I'm going to sue you for -- I'll direct

6    your attention to this.  This is the very last line of the

7    email.  He says:  I'm going to sue --

8               THE COURT:  Sorry.  Do you want to take a moment and

9    let the jury read the email?

10              MR. BHATIA:  Sure.

11              (Pause)

12              THE COURT:  While the jury is reading the email, can I

13   briefly see counsel at the sidebar?  And I'll ask the witness

14   to step down please.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  There is an extraordinary amount of

3    leading going on.  The questions are almost repeatedly leading

4    and not close.  In the absence of an objection, I'll permit

5    them to stand; they facilitate the examination and the

6    examination moves more quickly.

7          I did want to spot the issue, though, because the

8    amount of leading is really unusual.  Please, do your best,

9    certainly if there is an objection, to abide by the rules about

10   leading questions.  You're consistently putting the answer in

11   the witness's mouth in the form of a question.

12         Mr. Gelfand, I take it that the defense is not

13   objecting to that for strategic reasons to let this move along.

14         MR. GELFAND:  Yes, your Honor.  And when it comes to

15   things like background info, I tend to just ignore the form

16   issues.

17         THE COURT:  That's fine.

18         MR. GELFAND:  When it comes to more substantive

19   things, we'll certainly object.

20         THE COURT:  That's fine.

21         As to the presentation of exhibits to the jury, if

22   you're putting an email in front of the jury that involves the

23   exchange between the witness and the defendant, so as not to

24   frustrate the jury, I think you need to give them the time to

25   at least absorb the email before zipping right to a portion

K1NVTEM3                          Gabay - direct

1      towards the back end.  Otherwise, it's very hard for them to

2      understand the context of what's being asked about.

3                  MR. BHATIA:  I understand.

4                  THE COURT:  All right.  Thank you.

5                  (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                THE COURT:  You may proceed.

3    BY MR. BHATIA:

4    Q.  Mr. Gabay, in the second paragraph here, you wrote --

5    Mr. Teman wrote:  You promised to not judge us based on the old

6    device, which I didn't want to install for you because it

7    relies on internet.  And you have Spectrum that always goes

8    offline.

9                What's he referring to there?

10   A.  He's referring to the device that was installed at 518 West

11   204th Street.

12   Q.  Did you ever make any -- what promises, if any, did you

13   make to Mr. Teman regarding evaluating him for future purchase?

14   A.  I don't recall making any promises about anything.

15   Q.  And now going further down this page, in the last paragraph

16   he writes:  Your manager is an idiot and your internet has been

17   off for days.  As I said and as your super told him, I cannot

18   fix your manager being an idiot, but that's not my problem.  My

19   problem is you do not keep your end of contracts.  You waste my

20   time, you make false promises.  This is why they invented

21   attorneys.  I'm done with you.  Pay the bill before you try to

22   talk or it goes to my attorneys.  I'm also going to sue you for

23   interrupting my business for the last two months with your

24   lies.

25                He mentions in here keeping you under contracts.

1            Do you have a contract with Mr. Teman?

2    A.  No.

3    Q.  Did you have any idea what contract he was referring to?

4    A.  No.

5    Q.  And he references false promises.  Had you made any

6    promises to Mr. Teman?

7    A.  Not that I can recall, no.

8    Q.  He says here too:  This is why they invented attorneys.

9    What do you think -- how did you interpret that?

10            MR. GELFAND:  Objection, your Honor.

11            THE COURT:  Sustained.

12   Q.  What did it mean to you when he wrote, This is why they

13   invented attorneys?

14            MR. GELFAND:  Your Honor, same objection.

15            THE COURT:  Sustained.

16   Q.  Mr. Teman wrote:  I'm going to sue you for interrupting my

17   business for the last two months with your lies.  Had he ever

18   spoken to you about a lawsuit before?

19   A.  No.

20   Q.  Do you take this as him threatening to sue you?

21   A.  Threatening some sort of legal action.

22   Q.  After this email, were there other times when Mr. Teman

23   threatened you?

24   A.  I believe so.

25   Q.  Were those on the phone or in email?

1   A.  There are some other emails that I received from him which

2   did have some other threats about placing liens, and I can't

3   remember exactly what else.

4   Q.  And going back to the document that's Government Exhibit

5   417.  At the top of this page and in the first sentence, we'll

6   pull it up, Mr. Teman here writes:  Please pay the full invoice

7   for the GateGuard device you got 100 percent bad faith

8   immediately before we release anything further.

9            Does he attach an invoice here to this email?

10  A.  Yeah, it shows that there's an attachment.

11  Q.  Had you already paid the invoice that you agreed to pay for

12  the one device?

13  A.  Yes.

14  Q.  This is a different invoice?

15  A.  It's got a different invoice number, yeah.

16            THE COURT:  Sorry.  Louder, please.

17  A.  It's got a different invoice number.

18  Q.  I'll direct your attention to page 9 of this document which

19  shows the invoice.  This is the invoice that you received on

20  March 26th after sending him the email about putting your

21  project on hold?

22  A.  Yes.

23  Q.  This is a different invoice, right?

24  A.  Different than what?

25  Q.  This is not the same as the $3,600 invoice?

1    A.  No, it's not.

2    Q.  What's the balance due for this invoice?

3    A.  $18,286.

4    Q.  Had you agreed to pay that value of money to Mr. Teman?

5    A.  No.

6    Q.  If we can go through now and look at the items listed in

7    the invoice.  It's listed here, GateGuard Version 1 panel.  And

8    the unit cost is now $14,999.

9            Had you agreed to pay that amount for the GateGuard

10   panels?

11   A.  No.

12   Q.  And you had only at that point purchased one panel?

13   A.  Correct.

14   Q.  Did you ever buy another panel?

15   A.  No.

16   Q.  And here there's also a -- it looks like it says:

17   Installation wired basement Version 1.  And it lists a cost of

18   $1,499.  Had you agreed to pay $1,499 for installation?

19   A.  I don't know what the original $3600 included, what the

20   cost was for installation.  But, no, not like this.

21   Q.  You don't remember paying, on top of $15,000, another $1500

22   for installation?

23            MR. GELFAND:  Objection, your Honor.  Leading.

24            THE COURT:  One moment.

25            Sustained.

1    Q.  There's listed here, as well, a monthly service.  And it

2    says:  First year up front.  And it lists the value of -- the

3    unit cost of $149, quantity of 12, and a total of $1,788.

4              Had you agreed to pay that amount of money to

5    Mr. Teman for monthly service?

6    A.  No.

7    Q.  After this invoice in this email, this was the day you

8    initially put the project on hold; is that right?

9    A.  I believe so.

10   Q.  Did there ever come a time when Mr. Teman threatened to

11   place a lien on one of your buildings?

12   A.  Yes.

13   Q.  I'd like to direct your attention to Government Exhibit

14   418, which we'll pull up for you.  And in particular, I'd like

15   to direct your attention to the second-to-last paragraph.  Why

16   don't we take a look at the second-to-last paragraph.

17             This is an email from Mr. Teman to you and to others.

18             He says:  Take this to your father-in-law or whoever

19   is the adult supervision, and explain that if your end of the

20   contract isn't upheld, we're putting a lien on your building

21   tomorrow.  You will never get the opportunity to invest in our

22   company, but you sure as hell will pay your bill -- pay you

23   bill.

24             He references a lien in this message, right?

25   A.  Yes.

1    Q.  What's a lien?

2    A.  A lien is -- I don't know the legal explanation, but a lien

3    is some sort of monetary claim that can be placed against the

4    ownership of a property.

5    Q.  Is a lien something that signals someone owes you money or

6    you owe someone money?

7    A.  You owe someone money.

8    Q.  It's something that if someone believes you owe money, they

9    can try to put on one of your buildings?

10   A.  That's correct.

11   Q.  Is it a significant problem, as someone who manages

12   properties?

13   A.  It is a problem if you have a lien other than the bank on

14   your property.

15   Q.  As far as you know, did he ever actually place a lien on

16   your buildings?

17   A.  Not as far as I know.

18   Q.  It was referenced in this email, but as far as you know, it

19   wasn't actually done?

20   A.  That's correct.

21   Q.  Now, at any time did Mr. Teman ever say that he would issue

22   checks against Coney Management's accounts if it did not pay

23   this invoice?

24   A.  No.

25   Q.  At any point did Mr. Teman ever ask permission to pay

1    himself by issuing checks from Coney's bank accounts?

2    A.  No.

3    Q.  And if he had asked your permission to do that, to write

4    checks from your accounts to himself, what would you have said?

5    A.  I would have said no.

6    Q.  Why is that?

7    A.  Because we don't allow other people to write checks on our

8    accounts.

9    Q.  Turning now -- this email is dated March 18, 2018, right?

10   A.  March 27th.

11   Q.  March 27th, that's right.

12           How did your relationship with Mr. Teman continue

13   throughout 2018?

14   A.  Continued to deteriorate and nonexistent.

15   Q.  What do you mean deteriorate?

16   A.  I was getting emails like this and found no reason to

17   continue dealing with him.

18   Q.  I want to understand what was in your head throughout 2018.

19   Would you describe them as threatening or some other way?

20   A.  Definitely threatening, yes.

21   Q.  And that happened throughout 2018?

22   A.  There were few different emails and claims from Mr. Teman

23   and his attorney.

24   Q.  At any point did you ever purchase more intercoms?

25   A.  No.

K1NVTEM3                        Gabay - direct

1    Q.  Did you ever tell him, after he put the project on hold,

2    that you wanted to buy more intercoms?

3    A.  No.

4    Q.  Mr. Gabay, I'd like to direct your attention to April 2019.

5    Did there come a time when you learned about certain activity

6    in the 518 West 204 bank account?

7    A.  Yes.

8    Q.  And did that activity involve checks that you had not

9    authorized?

10   A.  Yes.

11   Q.  How did you learn about those checks?

12   A.  We were notified by our bank that a check had been

13   presented.  And they contacted us to verify whether it was

14   authorized.

15   Q.  Did they send you a picture of that check?

16   A.  Yes.

17          MR. BHATIA:  Mr. Magliocco, if we could publish

18   Government Exhibit 201.  And we'll pull up a check image at the

19   top of this page.

20   Q.  When did you first see this check?

21   A.  Some time in March or April of 2019, I don't remember the

22   exact date.

23   Q.  What was your reaction to seeing it?

24   A.  I was surprised and I was upset.

25   Q.  What about it surprised you?

1    A.  I was surprised that somebody would attempt to write up

2    their own check and draw it up from our account.

3    Q.  Had you ever authorized this check?

4    A.  No.

5    Q.  Did you agree that -- had you agreed that any particular

6    person could deposit this check?

7    A.  No.

8    Q.  Did you or anyone else at Coney Management authorized this

9    check?

10   A.  No.

11   Q.  Are you familiar with checks issued from this account?

12   A.  Other checks?

13   Q.  Other checks.

14   A.  Yes.

15   Q.  You've seen them as part of your day-to-day

16   responsibilities?

17   A.  Yes.

18   Q.  And how do those checks compare -- we'll go into detail,

19   but as a general matter, how do those checks compare to this

20   check?

21   A.  They look completely different in their format and layout

22   and text.

23   Q.  And starting at the top left part of this check image, how

24   does the name listed as 518 West 205 LLC compare to what's on

25   your checks?

1    A.  518 West 205 LLC is not an entity that we operate.

2    Q.  Is there one that you operate with a similar name?

3    A.  518 West 204 LLC.

4    Q.  204 versus 205?

5    A.  Correct.

6    Q.  And this check says care of Coney Realty, right?

7    A.  That's correct.

8    Q.  What's the association with being Coney Realty and 518 West

9    205 LLC?

10   A.  There is no association.

11   Q.  Is there an association between another Coney entity and

12   518 West 205 -- West 204?

13   A.  Yes, Coney Management.

14   Q.  Coney Management oversees West 204, right?

15   A.  Yes.

16   Q.  Not Coney Realty?

17   A.  Correct.

18   Q.  In addition, if you go to the bottom now right corner of

19   this check, it has what looks like maybe a signature.  Is that

20   any signature -- are you familiar with -- you said you're

21   familiar with other checks from this account?

22   A.  I am.

23   Q.  You've seen the other checks from other people who write

24   from that account?

25   A.  No other people write checks from this account, just our

1   office.

2   Q.  Does that signature appear to be any of the -- does that

3   signature appear like any of the people who write checks from

4   your account?

5   A.  No.

6   Q.  Further below it says:  "Draw per contract, no signature

7   required."  Is that language that appears on the checks that

8   you issue from your account?

9   A.  No.

10  Q.  It says:  "Draw per contract."  Did you have a contract

11  with Mr. Teman?

12  A.  No.

13  Q.  In the memo line it says:  "Device removal fee."  Prior

14  to -- before seeing this check, had you ever heard of a device

15  removal fee?

16  A.  In his emails to me.

17  Q.  In his emails to you after -- was that after the

18  relationship deteriorated?

19  A.  Yes.

20  Q.  Had you ever told him -- had you ever given him authority

21  to draw -- to pay a device removal fee?

22  A.  No.

23  Q.  Had you authorized anyone from your company to pay a device

24  removal fee?

25  A.  No.

1  Q.  Had you told Mr. Teman that he was authorized to draw a

2  check for a device removal fee?

3  A.  No.

4  Q.  Prior to seeing this check, what conversations, if any, did

5  you have with the defendant in which he said that he was

6  authorized to draw this check?

7  A.  We didn't have any conversations authorizing him to draw

8  checks from the account.

9  Q.  If you had a conversation where Mr. Teman had told you, I'm

10  authorized to draw a check from your account, would that have

11  stood out in your memory?

12  A.  Yes.

13  Q.  Why would that have stood out?

14  A.  Because we don't allow vendors outside of specific ones to

15  draw funds from our account, to draw any sort of funds or make

16  checks from our account.

17  Q.  If he had told you in an email that he had the authority to

18  draw checks from your account, would that have stood out in

19  your mind?

20  A.  Yes.

21  Q.  And what would you have said -- what would you have done in

22  response to seeing that in an email?

23  A.  I would have told him that he was unauthorized.

24  Q.  Did you learn about additional checks from the same

25  account?

 1    A.  Yes.

 2    Q.  I should say this one is dated March 28th, 2019; is that

 3    right?

 4    A.  Yes.

 5    Q.  And so did you learn about additional checks after March

 6    28th, 2019?

 7    A.  Yes.

 8    Q.  How did you learn about those checks?

 9    A.  We were notified by our bank that additional checks had

10    been presented to be cashed on this account.

11    Q.  For the March 2018 checks, what did you tell your bank --

12    now I'm going back to the March ones.  In the March 2019

13    checks, I should say, what did you tell your bank about --

14          THE COURT:  One moment, counsel.  I think you said the

15    March 2018 checks.  Are you referring to this check that's on

16    the screen or something else?

17          MR. BHATIA:  Let me rephrase that.  I'm referring to

18    this check.

19          THE COURT:  That's 2019.

20    Q.  March 2019.  What did you tell your bank with regards to

21    this check?

22    A.  That it was unauthorized.

23    Q.  And why did you tell your bank that?

24    A.  Because it was unauthorized.

25    Q.  And what did your bank do in response to that?

1   A.  They declined to cash it from whoever presented it; and

2   instructed us that since fraud -- fraudulent activity was on

3   the account, they instructed us to close the account.  Or they

4   actually closed the account.

5   Q.  As far as you know, they did close the account?

6   A.  Yes.

7   Q.  So someone would not be able to draw checks on that account

8   in the future?

9   A.  That's correct.

10  Q.  Did there come a time when you learned that someone did try

11  to draw checks from that account?

12  A.  Yes.

13  Q.  How did you hear about that?

14  A.  Also we were notified by the bank that additional checks

15  were attempting to be cashed from this account.

16  Q.  Did they send you any images of those checks?

17  A.  Yes.

18  Q.  I'd like to direct your attention to Government Exhibit 203

19  which we'll pull up on the screen.

20          By way of example, let's look at the first page of

21  this document.  Is this a check image that your bank had given

22  to you?

23  A.  Yes.

24  Q.  And is this also drawn from the 518 -- it lists here 518

25  West 205 LLC?

1    A.   Yes.

2    Q.   That's not an entity associated with Coney at all, right?

3    A.   That's correct.

4    Q.   That would be 518 West 204 LLC?

5    A.   That's right.

6    Q.   And this check looks a little different; is that right?

7    A.   Yes.

8    Q.   It says:  "Draw per contract.  No signature required."  Is

9    that right?

10   A.   Yes.

11   Q.   And below that it says:  "This is a valid check.  You are

12   required by law to honor it."  It says:  "Contract at

13   gateguard.xyz/legal/terms.php accepted by above client."

14        Had you accepted that contract?

15   A.   No.

16   Q.   Did you have any contract with Mr. Teman?

17   A.   No.

18   Q.   It says:  "Contact us at 212-203-3714 with questions."

19        Is that your phone number?

20   A.   No, it's not.

21   Q.   Do you know whose phone number that is?

22   A.   I don't know offhand.

23   Q.   In the bottom left corner of this is what's called a

24   chargeback fee.  Do you see that?

25   A.   Yes.

1   Q.  Prior to this check, had you ever heard of a chargeback

2   fee?

3   A.  No.

4   Q.  Had you ever agreed to pay a chargeback fee?

5   A.  No.

6   Q.  The check at the bottom lists a bank number -- sorry, a

7   routing number and account number.  Are those numbers that come

8   back to the 518 West 204 LLC account?

9   A.  I would assume so.

10   Q.  That's how checks would get to that account, right?

11   A.  Correct.

12   Q.  Had you ever given Mr. Teman your bank account number or

13   bank routing number?

14   A.  No.

15   Q.  Did he ever ask you for a form that would give it to you?

16   A.  No.

17   Q.  In which you would give to him?

18   A.  No.

19   Q.  If he had asked you for a form authorizing withdrawals from

20   your bank account, how would you have reacted?

21   A.  He did ask and we said no.

22   Q.  Why did you say no?

23   A.  Because it's not the way we operate.  We only do things by

24   invoice where we issue the check.  He had requested that we

25   enter an order using a CH, and we asked him for invoices only.

1   Q.   You mentioned that you do business via invoice.   Why do you

2   do business via invoice?

3   A.   We feel that it allows for better records and checks and

4   balances, and it's just the way we've decided to run our

5   business process.

6   Q.   What does it mean that you require an invoice?

7   A.   If somebody wants to get paid, they have to send us an

8   invoice.  When they send us an invoice, we write out a check.

9   Q.   Do you receive an invoice -- so that happens with other

10  vendors, right?

11  A.   That happens with all vendors.

12  Q.   And with people who need to get paid by Coney Management,

13  right?

14  A.   Correct.

15  Q.   And in some cases, do you have contracts with those people?

16  A.   In some cases, yes.

17  Q.   And in the cases where you have a contract with them, do

18  they still send you an invoice?

19  A.   Yes.

20  Q.   Why is that?

21  A.   Because a contract is a contract.  And there is an invoice

22  which has an invoice number, sometimes there are payment terms.

23  So there will be an initial payment, and then a subsequent

24  invoice for a first installment or and monthly payment or

25  something like that.

1    Q.  Do you ever just pay because -- do you pay expenses because

2    they are identified in an invoice -- in a contract alone?

3    A.  No.

4    Q.  You need an invoice as well?

5    A.  Correct.

6    Q.  Did you authorize anyone to deposit this check shown here

7    in Exhibit 203?

8    A.  No.

9    Q.  You can flip through in the binder there.  There are other

10   checks in Exhibit 203.  Did you authorize any of those?  Take a

11   look and that will be my question.

12   A.  No, I didn't authorize these.

13   Q.  In fact, at the time of these checks, that's April 19th,

14   2019, was this bank account open?

15   A.  I don't believe it was.

16   Q.  Why had it been closed?

17   A.  Because we had received notification that a fraudulent

18   check had been created and cashed against the account.

19   Q.  The date on those checks is April 19th, 2019?

20   A.  That's correct.

21   Q.  Do you observe a holiday that began on that date?

22   A.  I do.

23   Q.  What holiday?

24   A.  Passover.

25   Q.  And had you spoken with Mr. Teman in the past about your

1    observance of religious holidays?

2    A.   No, I don't think so.

3    Q.   That's a formal way of saying you and Mr. Teman talked

4    about some of the Jewish holidays; is that right?

5              MR. GELFAND:  Objection.  Leading.

6              THE COURT:  The witness said no.  Next question.

7    Q.   When you observed --

8              THE COURT:  Sorry.  The witness said, No, I don't

9    think so.  So it assumes a fact not in evidence.

10             Next question.

11   Q.   When you observe this holiday, what is your practice with

12   respect to electronic communications?

13             MR. GELFAND:  Objection.  Relevance, your Honor.  403.

14             Object to relevance and 403.

15             THE COURT:  Overruled.

16             THE WITNESS:  Answer?

17             THE COURT:  You may answer.

18   A.   For the first two days and the last two days of the

19   holiday, I am completely disconnected from any electronics and

20   don't use them.

21   Q.   And this check was deposited on that first day of that

22   holiday?

23   A.   No, this check was deposited on the eve of that holiday.

24   Q.   So for the next two days, you wouldn't be accessing your

25   electronic devices?

1    A.   Correct.

2    Q.   Do other people in your office observe that holiday?

3    A.   Yes.

4    Q.   Do they have similar practices?

5    A.   Yes.

6    Q.   When you were a customer of Sublet Spy or GateGuard, did

7    you meet with Mr. Teman in person?

8    A.   I met with him in person, yes.

9    Q.   And did you speak with him over the phone?

10   A.   I did.

11   Q.   When, if ever, did Mr. Teman tell you that he would deposit

12   checks that he wrote from the 518 West 204 LLC account?

13             MR. GELFAND:  Objection, your Honor.

14             Asked and answered.

15             THE COURT:  One moment.

16             Overruled.

17   A.   Never.

18   Q.   When, if ever, have you ever allowed any vendor to write

19   checks on their own behalf from the 518 West 204 LLC account?

20             MR. GELFAND:  Objection, your Honor.

21             Asked and answered.

22             THE COURT:  Sustained.

23             MR. BHATIA:  One moment, your Honor.

24             (Counsel conferred)

25             MR. BHATIA:  No further questions, your Honor.

1           THE COURT:  All right.  Cross-examination.

2           Mr. Gelfand.

3    CROSS-EXAMINATION

4    BY MR. GELFAND:

5    Q.  Good afternoon, Mr. Gabay.

6    A.  Good afternoon.

7    Q.  Mr. Gabay, my name is Justin Gelfand.  I'm an attorney for

8    Mr. Teman.  You and I have never met; correct?

9    A.  That's correct.

10   Q.  You and I have never spoken; correct?

11   A.  Correct.

12   Q.  Mr. Gabay, you testified that your company owns and manages

13   properties, you said commercial properties, in New York City;

14   correct?

15   A.  Manages.

16   Q.  Okay.  And when you say "commercial properties," just to be

17   clear, these are apartment buildings that people live in, they

18   are commercial properties in the sense that they are owned?

19   A.  They are apartment buildings, yes.

20   Q.  And in doing so and operating the company, you regularly

21   enter into business relationships with vendors; correct?

22   A.  That's correct.

23   Q.  And you regularly enter into contracts and other agreements

24   with those vendors; correct?

25   A.  Yes.

1    Q.   Is it fair to say that just in the ordinary course of the

2    business of your company, those business relationships can

3    often take different forms in the sense of how the agreements

4    are entered into?

5    A.   In our company they usually have a similar form.

6    Q.   To be clear, sometimes the terms of contracts will be

7    negotiated; correct?

8    A.   Yes.

9    Q.   Sometimes the company will accept terms and become a

10   customer; correct?

11   A.   Sometimes.

12   Q.   And the point here is that different business

13   relationships, different transactions, inevitably just take

14   different form, depending on who the vendor is that you're

15   dealing with; correct?

16   A.   Okay.

17   Q.   Now, you agree that your company did, in fact, have a

18   business relationship with GateGuard; correct?

19   A.   That's correct.

20   Q.   And you agree that you chose to become a customer of

21   GateGuard; correct?

22   A.   Yes.

23   Q.   And you agree, as you testified while the prosecutor was

24   asking you questions, that at the time that you did,

25   GateGuard's system was unique based on what was on the market;

1    correct?

2                    MR. BHATIA:  Objection, your Honor.

3                    THE COURT:  Sustained.

4    Q.  When you became a customer of GateGuard, were you familiar

5    with other available possible intercom and technology systems?

6    A.  Yes, we had looked at others.

7    Q.  Is it fair to say GateGuard's system was cutting-edge?

8    A.  It claimed to be.

9    Q.  And, in fact, you expressed an interest in it because it

10   was cutting-edge; correct?

11   A.  That's correct.

12   Q.  Now, to be clear, at the time you knew that GateGuard had

13   customers all over New York City; correct?

14   A.  That's what I was told.

15   Q.  Okay.  And, in fact, as you testified, you actually met

16   personally with Ari Teman at a trade show; correct?

17   A.  Correct.

18   Q.  And just generally speaking, what do you mean by "trade

19   show"?

20   A.  A trade show is a place where people in and around a

21   specific industry will come and exhibit products or services.

22   Q.  And the trade show that you -- that GateGuard was -- or had

23   a presence in, do you recall what that trade show was?

24   A.  I don't remember which one it was.

25   Q.  Okay.  GateGuard had a booth, in essence, at that trade

1   show; correct?

2   A.  Yes.

3   Q.  And in that trade show, you had an opportunity to see at

4   least a demo of GateGuard's technology at the time; correct?

5   A.  Part of it, yeah.

6   Q.  And after that trade show, you had actually asked Mr. Teman

7   to do a personal demo of the GateGuard equipment and

8   technology; correct?

9   A.  That's correct.

10  Q.  And you said that that happened, I believe, at your office

11  in greater New York?

12  A.  Yeah.

13  Q.  Now, that meeting, Mr. Teman was present on behalf of

14  GateGuard; correct?

15  A.  Correct.

16  Q.  And who else was present on behalf of your company, if

17  anyone?

18  A.  We had some of the managers there.

19  Q.  During this meeting, you had an opportunity to see what

20  GateGuard's intercom system was; correct?

21  A.  Part of the functionality.  We were told that there was

22  some other things which were in development.

23  Q.  And, in fact, is it fair to say that when you initially

24  bought the GateGuard -- or became a customer of GateGuard, it

25  wasn't just an intercom, there was a website interface as well?

K1NVTEM3                      Gabay - cross

1    A.   Correct.

2    Q.   And the website interface enabled you or others in your

3    company to actually see time-stamped logs and photographs of

4    who was entering your building at any given time; correct?

5    A.   Yes.

6    Q.   And that was valuable to you because you could actually use

7    that information for whatever business purpose you have;

8    correct?

9    A.   Yes.

10   Q.   So, for example, if you wanted to see if the same person

11   was going into Unit 110, you would have pictures of the dates

12   and times of everyone that was going into Unit 110; correct?

13   A.   I believe so, yeah.

14   Q.   And you had an opportunity throughout your entire business

15   relationship with GateGuard to log into that web-based system

16   and access those logs for your building; correct?

17   A.   Yeah, I believe so, yeah.

18   Q.   And you or others in your company did, in fact, do that;

19   correct?

20   A.   Yes.

21   Q.   In doing that, there's not only photographs and time stamps

22   that are taken, but there's ways to basically organize the data

23   on your end; correct?

24   A.   I'm not familiar with the complete functionality of the

25   interface.

1    Q.  Now, to log into the system at GateGuard, did you need a

2    user name/password type setup?

3    A.  Yeah.

4    Q.  So to be clear, some random person off the street couldn't

5    get access to the data that GateGuard was storing for you;

6    correct?

7    A.  That's correct.

8    Q.  And GateGuard was storing that data indefinitely for you;

9    correct?

10   A.  I don't know if it was indefinite or not.

11   Q.  Was there a limit?

12   A.  I don't know.

13   Q.  Were there ever times that you logged on and couldn't see

14   certain records because it was too old?

15   A.  Not that I recall.

16   Q.  The point is, is it fair to say that when you were a

17   customer of GateGuard, it was more than just a physical device;

18   there was an entire web-based application of technology there?

19   A.  Yes.

20   Q.  And data storage?

21   A.  I'm sorry?

22   Q.  And data storage.

23   A.  Yes.

24   Q.  Now, you testified that you had basically bought

25   essentially the 1.0 version of the intercom device; correct?

1   A.   Yes.

2   Q.   And you testified that at the time you were aware that

3   GateGuard overseas was manufacturing essentially the next

4   generation of the system; correct?

5   A.   I was told that the funds from our deposits were going to

6   be used to get the manufacturing off the ground.

7   Q.   And your understanding or at least what was communicated to

8   you was that that manufacturing was happening in China;

9   correct?

10  A.   Correct.

11  Q.   And you were interested in getting the first system,

12  essentially getting in early, but ultimately, at the time,

13  upgrading when the new technology was available; correct?

14  A.   No.  We had an immediate need, and so we spoke with

15  Mr. Teman about putting in that version 1.0 on a temporary

16  basis.

17  Q.   To become a GateGuard customer when you did -- we're going

18  to get to the other stuff later -- so we're on the same page,

19  you readily admit that you bought the system that you claim you

20  believed you paid $3600 for; correct?

21  A.   I paid $3600.

22  Q.   And you got a device?

23  A.   To use the system, yes.

24  Q.   To become a customer of GateGuard at that time, you had to

25  do so on GateGuard's website; correct?

1    A.  I don't know.

2    Q.  You're saying no or you're saying you don't remember?

3    A.  I'm saying I don't know.

4    Q.  Okay.  Do you know if it was you or someone else at your

5    company that actually signed up for GateGuard?

6    A.  I don't recall.

7    Q.  So your testimony, if I understand it, is that it could

8    have been someone else at your company that signed up for

9    GateGuard on the website?

10            MR. BHATIA:  Objection, your Honor.  Foundation.

11            THE COURT:  Sustained.

12            Assumes a fact not in evidence.

13   Q.  Do other people at your company have the authority to sign

14   up for vendors like GateGuard?

15   A.  No.

16   Q.  So sitting here today, to be clear, you're not denying that

17   you signed up online, you're just saying you don't remember?

18   A.  That's correct.

19            THE COURT:  Mr. Gelfand, can you just clarify what you

20   mean by "signed up online"?  I think it's unclear to me what

21   that is conveying, just for clarity for the jury.

22            MR. GELFAND:  Sure.

23   Q.  To actually become a GateGuard customer, you had to provide

24   GateGuard certain information about your building; correct?

25   A.  I guess so.

K1NVTEM3                      Gabay - cross

1    Q.  And in doing so, you had to, if you recall, check a box on

2    the website to become a customer?

3    A.  I don't recall.

4    Q.  You don't recall.  Okay.

5           To be clear -- well --

6    A.  Do you want me to explain my answer?

7    Q.  Sure, I'm happy to have you explain your answer.

8    A.  Okay.  So the reason I don't recall doing this is because

9    had I filled out a form, I would have put in the correct owning

10   entity in that form.  But as you can see from the invoice, the

11   invoices were not made out to our owning entity, they were made

12   out to a prior owner.  I would have not put in that prior

13   owner's entity in the form if I signed up for the service.

14   Q.  Let me get this straight for a second.  I appreciate your

15   explanation, but is it your testimony under oath that you

16   remember how it was you became a customer of GateGuard?

17   A.  No, it's not.  My testimony is if I would have signed up, I

18   would have put in our entity information.

19   Q.  Now, at least at some point, as the prosecutor asked you,

20   you went on to the GateGuard website and downloaded the terms

21   and conditions; correct?

22   A.  That's correct.

23   Q.  And you actually downloaded them and put them into a

24   Microsoft Word document; correct?

25   A.  That's correct.

1    Q.  And you essentially took that document and used redlining

2    or markup revision features to show proposed edits to that

3    document; correct?

4    A.  That's correct.

5    Q.  Okay.  Do you see Exhibit 415 in front of you?

6    A.  Yes.

7    Q.  Now, Exhibit 415, as you went over with the prosecutor --

8              THE COURT:  Can the ladies and gentlemen of the jury

9    see it now?  Okay.  Very good.  Thank you.

10   Q.  This was a March 25th, 2018 email from you to Mr. Teman,

11   cc'ing Yoni, or Jonathan, Irom, and including a document;

12   correct?

13   A.  Correct.

14   Q.  That document was your markup of the terms and conditions;

15   correct?

16   A.  Correct.

17   Q.  And to be clear, you identified that this document that the

18   prosecutor put into evidence is a document that you personally

19   downloaded and then marked up; correct?

20   A.  That's correct.

21   Q.  Okay.  So this is from you.  It's not from the defense, for

22   lack of a better way of putting it; correct?

23   A.  That's correct.

24   Q.  Tell me the date that appears on the revision or last

25   revision on these terms and conditions.

1  A.  It was last revised November 30th, 2017 at 3:30 p.m.

2  Q.  And to be clear, you agree with me that that date was

3  before you ever became a GateGuard customer; correct?

4  A.  I'm not sure.

5  Q.  Would that first email from support.teman refresh your

6  memory as to the date?

7  A.  I'm sorry, say again?

8  Q.  I'm showing you Exhibit 412.  Was this the first

9  correspondence that you essentially received confirming the

10 system worked?

11 A.  It must have been early on.  I don't know if it's the

12 first.

13 Q.  Fair to say that's January of 2018?

14 A.  Correct.

15 Q.  After the November 2017 date on the terms and conditions;

16 correct?

17 A.  Correct.

18 Q.  On the document that you marked up, first of all, you

19 initially sent a draft to Mr. Teman and an attorney; correct?

20 A.  I responded to an email from Mr. Teman who had cc'd his

21 attorney on his initial discussions with me.

22 Q.  Okay.  And you had basically sent a follow-up saying,

23 Sorry, I didn't mean to cc your attorney.  Paraphrased.

24 A.  That's correct.  I didn't know if he wanted that to be.

25 Q.  Okay.  In this markup that you did, on this November 2017

1    revision, do you see there's a Section 5?

2    A.   I do.

3    Q.   And Section 5, if I can zoom in for you, refers to orders

4    and fees, pricing; correct?

5    A.   Correct.

6    Q.   And could you read the beginning of this paragraph?

7    A.   You may purchase subscriptions to services by submitting

8    orders via the site.  All orders are subject to acceptance by

9    GateGuard.  The applicable fees shall be stipulated in the

10   price list made available by GateGuard on the site from time to

11   time and subject to the additional payment terms stipulated

12   at --

13   Q.   The website?

14   A.   -- the website a/k/a pricing.

15   Q.   From time to time; correct?

16   A.   From time to time, yes.

17   Q.   Okay.  And at least at the time that you were doing the

18   markup, you obviously read this paragraph because you proposed

19   a change to "reasonably," and then you proposed deleting some

20   language at the bottom of that paragraph; correct?

21   A.   That's correct.

22   Q.   But your testimony is that you didn't click on the payment

23   URL?

24   A.   My testimony is that I don't recall clicking on it.

25   Q.   Now, in becoming -- back up for a second.

1            We talked briefly about the logs that GateGuard

2     maintained for your building on its website; correct?

3     A.   Yes.

4     Q.   And is it fair to say there are thousands of pages of logs

5     of people coming into and out of the building in that related

6     data?

7     A.   I don't know how many pages there are.

8     Q.   Is it a large number?

9     A.   I don't know.

10    Q.   You testified that there were instances early on whether

11    some troubleshooting was necessary; correct?

12    A.   Correct.

13    Q.   And GateGuard provided that tech support; correct?

14    A.   Correct.

15    Q.   GateGuard was responsive to problems that it could fix;

16    correct?

17    A.   Correct.

18    Q.   And there was a time when there was a problem at your

19    building with Spectrum; correct?

20    A.   I believe so.

21    Q.   And to be clear, the early iteration of GateGuard did not

22    have a 4G router; correct?

23    A.   I don't believe it did.

24    Q.   It relied on you to have viable internet --

25    A.   Correct.

1    Q.   -- to work; correct?

2    A.   Yes.

3    Q.   And GateGuard couldn't control whether your internet

4    worked; correct?

5    A.   Correct.

6    Q.   That building at the time at least obtained its internet

7    from Spectrum; correct?

8    A.   Correct.

9    Q.   So through some troubleshooting with your -- whatever the

10   title is, but the on-site property manager, it was brought to

11   your attention that there was a problem with the internet

12   connection and that it wasn't actually a problem with

13   GateGuard; correct?

14   A.   At one point, yes.

15   Q.   And at the time, GateGuard -- even though it turns out it

16   wasn't able to fix that because it was a separate internet

17   problem, GateGuard was working with your company to figure that

18   out and to fix it, if at all possible; correct?

19   A.   Yes.

20   Q.   Now, throughout a fairly lengthy period of time, that

21   building used the GateGuard intercom; correct?

22   A.   What do you mean by "lengthy period of time"?

23   Q.   How long did you use the intercom system?

24   A.   Probably for a few months.

25   Q.   And during that time, it was used every day; correct?

1    A.   Yes.

2    Q.   And the government showed you, you testified, it's Exhibit

3    413, the initial invoice correspondence for becoming a

4    GateGuard -- when you became a GateGuard customer; correct?

5    A.   I'm not seeing anything here.   Oh.

6    Q.   Do you see on the top the correspondence you previously

7    testified to?

8    A.   Yes.

9    Q.   Okay.   And what's the date there?

10   A.   January 19, 2018.

11   Q.   Again, after the November 2017 date; correct?

12   A.   That's right.

13   Q.   And if you look through this correspondence, initially

14   there was supposed to be a $3600 fee and a security deposit of

15   $849; correct?

16   A.   Mr. Teman notified me of the 849 for the first time in this

17   email.   Our discussions previously had been $3600 only.

18   Q.   And you had asked him to basically waive the security

19   deposit; correct?

20   A.   I had asked him to agree to our original discussion price

21   of $3600.

22   Q.   And the invoice reflects zero dollars charged to you for

23   the security deposit; correct?

24   A.   Correct.

25   Q.   With a unit cost, meaning not charged to you, of $849;

1    correct?

2    A.  Correct.

3    Q.  And what's the date of the invoice?

4    A.  January 19th, 2018.

5    Q.  At the bottom of this invoice, where it says "terms," can

6    you tell me -- can you read what that says?

7    A.  Buyer accepts terms and conditions at a website,

8    gateguard.xyz.

9    Q.  And you paid this invoice; correct?

10   A.  Yes, it was paid.

11   Q.  Now, you testified -- to be clear, that invoice we just

12   said was January 19th of 2018; correct?

13   A.  Correct.

14   Q.  Then Government Exhibit 414 is additional email

15   correspondence between you and Mr. Teman; correct?

16   A.  Correct.

17   Q.  The prosecutor asked you about this email from you saying:

18   Sections 5K and 5L of your terms and conditions are pretty

19   brutal.  I stopped reading after I saw them.  Correct?

20   A.  Correct.

21   Q.  That email was within days that the invoice was sent;

22   correct?

23   A.  Correct.

24   Q.  So this wasn't some discussion when you were marking this

25   up months later; correct?

1   A.   This was a discussion related to the larger order.

2   Q.   My question was on timing.  It was a couple of days after

3   the invoice was sent; correct?

4   A.   That's right.

5   Q.   And, in fact, the way you paid the invoice was by check;

6   correct?

7   A.   That's right.

8          MR. GELFAND:  Counsel, what exhibit number was that

9   check?  Exhibit 146?

10  Q.   I'm showing you what's been previously admitted as

11  Government's Exhibit 146.  Can you see that on the screen in

12  front of you, Mr. Gabay?

13  A.   Yes.

14  Q.   Now, you testified previously that this was your check, in

15  other words, your company's check?

16  A.   That's correct.

17  Q.   And this was for the payment for the invoice of $3600 that

18  we just discussed; correct?

19  A.   Correct.

20  Q.   What's the date on that check?

21  A.   January 31st, 2018.

22  Q.   Is it fair to say January 19th, the invoice is generated;

23  correct?

24  A.   Yes.

25  Q.   January 23rd, you send a markup of terms and conditions

1   with proposed changes; correct?

2   A.   Yes.

3   Q.   January 31st, eight days after that, you send in the check

4   for the invoice?

5   A.   That is accurate.

6   Q.   And the invoice expressly says that you agree to the terms

7   and conditions that we just read?

8   A.   That's what the invoice says.

9   Q.   That's on the bottom; correct?

10  A.   That's what it says, yes.

11  Q.   And the invoice obviously predates you sending the check;

12  correct?

13  A.   Yes.

14  Q.   Now, if I understood your testimony correctly, is it your

15  testimony that you believe that you paid 3600 bucks for this

16  device, and then you can use it and GateGuard's web-based

17  interface forever?

18  A.   I think this device and this $3600 was part of a larger

19  pending deal.

20  Q.   Meaning that you understood that additional monies would be

21  owed; correct?

22  A.   I understood that this device would be replaced for a newer

23  device which had more functionality, which is what we had -- we

24  were in discussions to sign up for.  But that this device was

25  going to be put in on a temporary basis, because we had an

1    immediate need.

2    Q.  And the point -- and you knew at the time that, as we've

3    previously talked about, that the newer device was being

4    manufactured at the time; correct?

5    A.  That's what I was told, yes.

6    Q.  Okay.  And so you understood that to have GateGuard on an

7    ongoing basis, it was going to cost you more than 3600 bucks;

8    correct?

9    A.  Once the deal was finalized, yes.

10   Q.  And you expected to pay more money to GateGuard; correct?

11   A.  When the deal was finalized.

12   Q.  Yes?

13   A.  Yes.

14   Q.  Okay.  Now, you testified that in March, essentially

15   communications broke down between you and Mr. Teman; correct?

16   A.  Correct.

17   Q.  And the government asked you questions about some email

18   correspondence regarding those communications; correct?

19   A.  Correct.

20   Q.  The government showed you, so we can get some dates

21   straight, Government Exhibit 416.  Do you see that in front of

22   you?

23   A.  Yes.

24   Q.  This email, I'll zoom in so we can all see it, where you

25   said that the quotes, if I understood your testimony correctly,

1   was basically, what, a general consensus within the office?

2   A.  Yeah.

3   Q.  Okay.  The email was from you to Mr. Teman; correct?

4   A.  Correct.

5   Q.  And it references an invoice for 20 buildings and a

6   document called a convertible note; correct?

7   A.  It references an email with that title.

8   Q.  And there was previous correspondence that you testified

9   about involving this initial correspondence where Mr. Teman had

10  cc'd a lawyer; correct?

11  A.  I'm sorry, can you repeat that?

12  Q.  Yes.  Prior to this correspondence -- this was a response

13  to an email; correct?

14  A.  Correct.

15  Q.  March 13th of the same exhibit, there's the initial email

16  from Mr. Teman to you, cc'ing an attorney; correct?

17  A.  Yes.

18  Q.  And the prosecutor had you read this, or part of it, into

19  the record.  And it references the bottom enumerated No. 2.

20  Can you read that?  Can you see that?

21  A.  Yes.

22  Q.  Okay.  This references a note for Friend or Fraud, Inc.,

23  identifying it as essentially the parent company for GateGuard

24  Incorporated, among other companies; correct?

25  A.  Correct.

1    Q.   And it says:  If you have any questions, contact this guy

2    that represented Waze; correct?

3    A.   Correct.

4    Q.   Who is cc'd on the email; correct?

5    A.   Correct.

6    Q.   And the reason you were getting this is because at the time

7    you were actually interested in investing in GateGuard;

8    correct?

9    A.   That's correct.

10   Q.   And you were interested in investing in GateGuard because

11   it was cutting-edge; correct?

12   A.   Correct.

13   Q.   So to keep our dates straight –– I'm sorry.  To keep our

14   dates straight, you send this email on March 26th of 2018,

15   responding to that basically saying, my words, Time out.  We're

16   not moving forward.  Correct?

17   A.   Correct.

18   Q.   And that's at approximately 5 p.m. on March 26th?

19   A.   Correct.

20   Q.   Soon thereafter, you testified that you received email

21   correspondence from Mr. Teman's or GateGuard's attorney;

22   correct?

23   A.   Correct.

24   Q.   And that was an individual named Ariel Reinitz; correct?

25   A.   Yes.

1          MR. GELFAND:  Your Honor, may I show just the witness

2     a document?

3          THE COURT:  You may.

4     Q.  I'm showing you just for the record what's been previously

5     marked as Defendant's Exhibit 36.  Can you see that on the

6     screen in front of you?

7          THE COURT:  A little larger please.

8          MR. GELFAND:  Yes.

9          JUROR:  Can we see?

10          THE COURT:  It's not in evidence.

11          MR. GELFAND:  May I proceed, your Honor?

12          THE COURT:  One moment.

13          Go ahead.

14          One moment.

15     Q.  Do you recognize --

16          THE COURT:  One moment.

17          MR. GELFAND:  I'm sorry.

18          THE COURT:  All right.  Counsel, you need to tilt your

19     monitor so it's not visible to the jury as to exhibits that are

20     not yet in evidence.

21          MR. GELFAND:  Oh, sorry about that.

22          THE COURT:  That goes for both tables.

23          Okay.  Ladies and gentlemen, this may or may not be

24     received in evidence, but until it is, it's properly kept from

25     you.

K1NVTEM3                          Gabay - cross

1              Go ahead.

2              JUROR:  We don't see that far away.

3              THE COURT:  All the better then.  Very good.

4              So go ahead, Mr. Gelfand.

5    BY MR. GELFAND:

6    Q.  Mr. Gabay, do you recognize the email that's in front of

7    you?

8    A.  I do.

9    Q.  And is this an email -- a true and accurate copy of email

10   correspondence between you and Mr. Reinitz?

11   A.  It appears so, yes.

12   Q.  And the same thread that you previously testified about,

13   re-invoice for 20 buildings and convertible note?

14   A.  Correct.

15             MR. GELFAND:  Your Honor, I move Defendant's Exhibit

16   36 into evidence.

17             THE COURT:  Any objection?

18             MR. BHATIA:  No objection.

19             THE COURT:  Received.

20             (Defendant's Exhibit 36 received in evidence)

21             MR. GELFAND:  May I publish it for the jury?

22             THE COURT:  You may.

23             You're not publishing; you've taken it off the Elmo.

24             MR. GELFAND:  Yes, I was getting ready to --

25             THE COURT:  Okay.

K1NVTEM3                          Gabay - cross

1    Q.  Okay.  So just to back up for a second, we just testified

2    about a chain, a string of emails, if you will, re-invoice for

3    20 buildings; correct?

4    A.  That's correct.

5    Q.  And you testified earlier about a March 26, 2018,

6    essentially, approximately, 5 o'clock email from you saying --

7    again, my words, not yours -- Time out.  Correct?

8    A.  Yes.

9    Q.  Okay.  About a day and-a-half later, March 28th, at

10   approximately 1:40 p.m., you received this email, Defendant's

11   Exhibit 36, from Ariel Reinitz; correct?

12   A.  Yes.

13   Q.  And Ariel Reinitz identifies himself as a partner at the

14   law firm of FisherBroyles, with a New York address and about, I

15   don't know, 15 or so cities at the bottom; correct?

16   A.  Yes.

17   Q.  And the email identifies to you that Mr. Reinitz is an

18   attorney representing GateGuard; correct?

19   A.  Yes.

20   Q.  Could you please read this paragraph that I've highlighted

21   on the screen.  It's the one beginning "As outlined below."

22   A.  As outlined below --

23           THE COURT:  Read it, sorry, a little bit more slowly

24   for the benefit of the court reporter and the jury.

25   A.  Sorry.  As outlined below, GateGuard has provided materials

1    and performed labor on one or more of Coney Realty's buildings,

2    and the corresponding invoices are now past due.  Coney Realty

3    has also entered into agreements with GateGuard for devices and

4    services, payments for which are now due.

5    Q.  And then if we jump forward, first of all, just so everyone

6    is clear, the next paragraph basically says that these invoices

7    and agreements are important to GateGuard; correct?

8    A.  Correct.

9    Q.  And then Mr. Reinitz says, essentially, Let's see if we can

10   reach a mutual amicable resolution.  Correct?

11   A.  Correct.

12   Q.  And to that end, he makes a request of you; correct?

13   A.  He does.

14   Q.  He says:  Please reply with a prompt introduction to the

15   appropriate personnel at Coney Realty or your counsel having

16   authority to resolve this matter.  Correct?

17   A.  Correct.

18   Q.  And then he says:  Absent a prompt response from Coney

19   Realty, GateGuard may initiate further legal action, including,

20   but not limited to, the filing of a mechanic's lien.

21   Sincerely, Ariel Reinitz, and his signature block.  Correct?

22   A.  Correct.

23   Q.  You didn't respond to this email, did you?

24   A.  I don't recall if I responded.

25            MR. BHATIA:  Judge Engelmayer, we believe there's

K1NVTEM3                          Gabay - cross

1   hearsay in this document --

2              THE COURT:  Sorry, you're speaking --

3              MR. BHATIA:  Excuse me.

4              We believe there's hearsay in this document, and we'd

5   request an appropriate instruction.

6              THE COURT:  Sorry.  You didn't object on that ground

7   when it was received.  It's in evidence.

8              Next question.

9   BY MR. GELFAND:

10  Q.  Now, after this email -- I'm sorry, I think you just

11  answered it, but I didn't hear you.

12             THE COURT:  Sorry.  Let me just clarify something.

13             The document is in evidence.

14             Ladies and gentlemen, you may consider this document

15  as it reflects upon the discussions between the lawyer,

16  Reinitz, and the witness, Gabay.

17             To the extent there are statements of fact, however,

18  that are in this document, you may not take them as necessarily

19  true or false; they are just simply being put before you to

20  capture the discussions between the lawyer and Mr. Gabay.

21             But the fact that something is said by the lawyer in

22  the document does not necessarily make it so, and you may not

23  consider what is in the document for the truth of the matter

24  asserted.

25             Counsel, in the future, if a document that embeds

1    hearsay like that is being offered, you need to object at the

2    time rather than accede to its receipt.

3              MR. BHATIA:  I understand.

4              THE COURT:  Go ahead.

5    BY MR. GELFAND:

6    Q.  And I'm sorry, I just didn't catch your answer before as to

7    whether or not you responded to this email.

8    A.  I don't recall if I responded.  I'm not sure.  I'd have to

9    check.

10   Q.  Now, you testified, jumping ahead, that you were made aware

11   by your bank of the checks, the RCCs, that were deposited into

12   the Bank of America account of GateGuard and directed

13   ultimately to your bank; correct?

14   A.  Yes.

15   Q.  And to be clear, your bank was Signature Bank; correct?

16   A.  Correct.

17   Q.  And if I understood your testimony correctly, your bank

18   essentially brought these RCCs to your attention and asked

19   whether they were authorized, in essence; correct?

20   A.  That's correct, my office.

21   Q.  Your office?

22   A.  Yeah.

23   Q.  And your office provided a response to Signature Bank, in

24   essence, saying that they weren't authorized; correct?

25   A.  That's correct.

1    Q.  And when you say your office, who are the -- I'm not asking

2    for everyone, but who are essentially the main players that

3    would have been involved in this?

4    A.  Involved in this how?

5    Q.  Communications with Signature Bank, those kinds of things.

6    A.  It might be Michael Haas, who's a signer on the account.

7    Q.  You said Michael Haas?

8    A.  Correct.

9    Q.  Okay.  And who is Michael Haas?

10   A.  He's one of the principals of Coney Management.

11   Q.  Fair to say you and Michael Haas work very closely

12   together?

13   A.  Yes.

14   Q.  You testified at the way beginning of your direct

15   examination with the prosecutor that essentially you take on

16   responsibility for the financial operations of Coney; correct?

17   A.  Some of them, yes.

18   Q.  And Michael Haas is just as involved in that; correct?

19   A.  Correct.

20   Q.  Now, I was asking you about the checks that say, Draw per

21   contract.  No signature required, that your bank brought to

22   your attention.  Correct?

23   A.  I'm sorry, say again?

24   Q.  I was asking you about the checks that say, Draw per

25   contract.  No signature required, that were brought to your

1  attention; correct?

2  A.  Correct.  That you asked me about them?

3  Q.  Yes.

4  A.  Yes, you did ask me about them.

5  Q.  And your company informed Signature Bank that you didn't

6  authorize them; correct?

7  A.  That's correct.

8  Q.  Now, let's back up for a second.

9        Signature Bank asked your company questions about this

10  to find out if it should credit your account or charge back the

11  checks; correct?

12  A.  They sent an email asking if this check was authorized by

13  our office, and we said no.

14  Q.  And you would agree with me that it wouldn't be true to

15  tell Signature Bank that your company didn't even know

16  GateGuard or what GateGuard was; correct?

17  A.  We knew what GateGuard was, yes.

18  Q.  So it would be a lie to say you didn't know that; correct?

19  A.  That I didn't know what?

20  Q.  What GateGuard was.

21  A.  Correct.

22  Q.  Okay.  And you'd agree with me that it would also be a lie

23  to tell your bank that your company has no recollection or

24  record of ever owing GateGuard any money; correct?

25  A.  At that point in time we had no recollection of owing

1   GateGuard any money at that point in time; correct.

2   Q.  Ever owing money.

3   A.  Well, we owed them money between January 19th and January

4   31st.

5   Q.  Yes.

6   A.  And we paid that invoice.

7   Q.  Yes.  You knew exactly who GateGuard was, as you've

8   previously testified about?

9   A.  Correct.

10  Q.  And at some point you owed GateGuard money; correct?

11  A.  Correct.

12          MR. GELFAND:  Your Honor, pursuant to our stipulation

13  with the government, at this point I move Defense Exhibit D-29

14  into evidence.

15          THE COURT:  D?

16          MR. GELFAND:  I'm sorry, I just said D dash, for

17  defense exhibit.  Exhibit 29.

18          THE COURT:  Defense Exhibit 29.

19          Any objection?

20          MR. BHATIA:  No objection.

21          THE COURT:  I don't believe I have a copy of that,

22  counsel.

23          MR. GELFAND:  I can approach, your Honor.

24          THE COURT:  Thank you.

25          MR. GELFAND:  Can you see this on the screen?

```
 1              THE COURT:  One moment.

 2              MR. GELFAND:  I'm sorry.

 3              THE COURT:  Received.

 4              (Defendant's Exhibit 29 received in evidence)

 5              THE COURT:  Do you wish to publish it to the jury?

 6              MR. GELFAND:  Yes, your Honor.

 7              THE COURT:  You may do so.

 8              MR. GELFAND:  Thank you.

 9   BY MR. GELFAND:

10   Q.  Can you see this on the screen in front of you, sir?

11   A.  Yes.

12   Q.  Okay.  This is an affidavit.  The bank calls it an

13   affidavit of counterfeit or stolen check business; correct?

14   A.  Correct.

15   Q.  And specifically this references the check to GateGuard,

16   Inc. in the amount of $18,000, Check No. 1; correct?

17   A.  Correct.

18   Q.  Now, to be clear, this is a form -- let me just back up so

19   that the jury has some context.

20              It's a one-page form; correct?

21   A.  It appears so.

22   Q.  And if we look at it, you identified Michael Haas.  For the

23   court reporter, it's H-A-A-S.

24   A.  Correct.

25   Q.  And this is the owner of the entity that we're talking
```

1    about; correct?

2    A.   One of them, yes.

3    Q.   I'm sorry, you said one of them, yes?

4    A.   Yes.

5    Q.   Okay.  Can you please read what No. 6 says?

6    A.   Neither I nor the company knows the payees on these checks

7    or have any recollection or record of the company ever owing

8    these payees any money whatsoever.

9    Q.   The payee is GateGuard, Inc.; correct?

10   A.   Yes.

11   Q.   And your company is telling the bank that you don't know

12   who GateGuard is; correct?

13   A.   That's what it says.

14   Q.   Can you please read the bottom paragraph, beginning with

15   "Affiant is aware"?

16   A.   Affiant is aware that this affidavit is being provided to

17   the bank to obtain for the company reimbursement of the amounts

18   of these checks.  The bank will rely on this affidavit to

19   recover the amounts paid with respect to these checks.  And any

20   false statement made in this affidavit is a violation of the

21   law.  Affiant represents and warrants that all statements

22   contained in this affidavit are true and complete in all

23   respects.

24   Q.   And this is dated and notarized on April 4th of 2019;

25   correct?

K1NVTEM3                         Gabay - cross

1    A.   That's correct.

2    Q.   And the notary is Ephraim Niehenberg; correct?

3    A.   Yes.

4    Q.   Do you know that person?

5    A.   I do.

6    Q.   Who is that?

7    A.   That is a manager in my office.

8    Q.   I'm sorry?

9    A.   A manager in my office.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. GELFAND:  May I proceed?

2           THE COURT:  You may inquire.

3           MR. GELFAND:  Thank you.

4   BY MR. GELFAND:

5   Q.  To the best of your knowledge, to this day, have you or

6   anyone else at your company ever made any efforts to correct

7   any false statements to Signature Bank in connection with this?

8           MR. BHATIA:  Objection, your Honor.

9           THE COURT:  Overruled.

10  A.  Are you referring to any specific --

11          THE COURT:  Sorry.  Let me rephrase the question for

12  you.  Get rid of the word "false."  It assumes a fact not in

13  evidence.

14          You may ask whether there has been any attempt to make

15  any revisions to this document.

16          MR. GELFAND:  Fair enough.

17  BY MR. GELFAND:

18  Q.  To this day, have you on your company ever revised this

19  affidavit or a similar document?

20  A.  I'm not aware.

21          MR. GELFAND:  Your Honor, I have no further questions.

22          THE COURT:  All right.  Ladies and gentlemen, this is

23  a good time, I think, for our lunch break.  Mr. Smallman will

24  come get you at 2 o'clock and bring you into the jury box.

25          Have a good lunch.  As always, please do not discuss

k1ndtem4a

1    the case.

2              THE CLERK:  All rise.

3              (Jury not present)

4              THE COURT:  All right.  Be seated.

5              Counsel, I have an item or two, very small, for you,

6    but before I go, does anybody have anything to raise with me?

7              MR. BHATIA:  No, your Honor.  May the witness be

8    excused?

9              THE COURT:  Yes, please, actually.

10             MR. GELFAND:  No, your Honor.

11             THE WITNESS:  Do I need to come back?

12             THE COURT:  You absolutely will need to come back.

13   Government counsel will give you instructions about where to be

14   and when, but I will need you here by 2 o'clock.

15             So, stay outside.  Government counsel will explain the

16   logistics.

17             (Witness not present)

18             All right.  Just a couple of things.

19             Counsel, this goes for everybody but I think

20   especially for government counsel:  When you are reading a

21   document, the natural impulse is to speed up, but it becomes

22   very hard for the jury and especially hard for the court

23   reporter to absorb what is being said.  So just take the time

24   to slow down anytime you are reading a document to be picked up

25   by the court reporter.

k1ndtem4a

1            MR. BHATIA:  Yes.  Thank you.

2            THE COURT:  All right.  Defense Exhibit 36 is,

3    although clearly admissible, also clearly embedded with a lot

4    of hearsay.  I was surprised there was no objection by

5    government counsel.

6            Mr. Imperatore, I am speaking to your co-counsel here.

7    It is unhelpful for me for him to be unable to hear me.

8            MR. IMPERATORE:  I apologize, your Honor.

9            THE COURT:  Mr. Bhatia, I was very surprised there was

10    no objection to the exhibit.  It's full of hearsay.  It is

11    clearly admissible to explain the course of dealings between

12    the witness and the defendant, and it may yet bear on advice of

13    counsel, as it will later emerge.  Notwithstanding the lack of

14    timely objection to it, ultimately I rethought my first

15    instinct and agreed it made sense to instruct the jury what we

16    all I think would agree is correct, which is that the

17    statements that are in that document can't be treated for the

18    truth of the matter asserted.  But, please, be more attentive.

19    Just because a document can be received for a limited purpose

20    doesn't mean it can be received for all purposes, and in the

21    end it is on you to police that by your objections so that I

22    know that there is a limiting instruction to be given.  OK?

23            MR. BHATIA:  Understood.

24            THE COURT:  One thing that is becoming quite clear to

25    me is that the defense request for a unanimity instruction with

1    respect to the counts here that embed multiple customers is

2    almost certainly a wise instruction.  I don't know yet what the

3    other narratives will be, but it seems to me clear that each

4    customer has its own narrative with respect to Mr. Teman, and,

5    therefore, it seems to me extremely likely that a unanimity

6    instruction will be needed.  And it may well be as well, and I

7    increasingly think this is possible, that something on the

8    verdict form will be needed to specify vis-a-vis particular

9    victims -- not victims but particular customers whose checks

10   are at issue on particular accounts.  I think that will help

11   assure, essentially, that the unanimity instruction is needed.

12        So I will ask counsel overnight to confer about the

13   verdict form that the government has previously submitted and

14   see if you can agree on, assuming that I am to ask for

15   specification vis-a-vis particular accounts, how the

16   specification by customer ought to be done.  I don't know that

17   it is needed by check.  It may be that the customers can be

18   treated as a unity with respect to these accounts.  I'm seeing

19   Mr. Gelfand nodding.  But it is almost certainly the case that

20   something fruitful could be done there, and I would rather you

21   get started on that discussion sooner rather than later.

22        Again, I am not committing that we would revise the

23   verdict form in that way, but given the likely need for a

24   unanimity instruction, I can see logic to the verdict form

25   similarly focusing the jury's attention on a customer-specific

k1ndtem4a

1    basis.

2              Mr. Blais, I take it, will be stepping in for you,

3    Mr. Imperatore, at 2 o'clock?

4              MR. IMPERATORE:  That is correct.

5              THE COURT:  That is fine.  I will introduce him to the

6    jury.  When do you think you will be back?

7              MR. IMPERATORE:  It is a pretrial conference, your

8    Honor.  I expect it could last anywhere from 30 minutes to an

9    hour or so.

10             THE COURT:  I take it you will be substituting for

11   Mr. Blais as soon as you can get here?

12             MR. IMPERATORE:  Yes.

13             THE COURT:  Very good.

14             And, finally, just on the daily exhibit list, I'll ask

15   the government's legal assistant to the please include the

16   defense exhibits.

17             And defense, you gave me some exhibits today but they

18   didn't include Exhibit 36, and they didn't include I think the

19   one -- Exhibit 29, a subset of the exhibits that you handed up

20   to me.

21             MR. GELFAND:  Yes, your Honor.

22             THE COURT:  So I will need a running set of the

23   exhibits that you are offering.

24             MR. GELFAND:  Absolutely.

25             THE COURT:  Very good.

k1ndtem4a

1              Have a good lunch.  I will see you five minutes before

2    2.  Thank you.

3              (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1ndtem4b

**A F T E R N O O N   S E S S I O N**

1:59 p.m.

1    (Jury, witness, and Mr. Imperatore not present)

2    (AUSA Brian Blais present)

3    THE COURT:  All right.  Welcome back, counsel.

4    Mr. Smallman tells me we are waiting on two jurors.

5    Government, without holding you to it, short or long

6    redirect for this witness?

7    MR. BHATIA:  Very short.

8    THE COURT:  OK.  Very good.

9    And the next witness is who

10   MR. BHATIA:  Bonnie Soon-Osberger.

11   THE COURT:  OK.  Very good.  That person is waiting

12   and ready to be brought in?

13   MR. BHATIA:  She is coming up in the elevator.  Is she

14   out there.

15   A VOICE:  She is on her way up.

16   THE COURT:  Very good.  Anyone have anything to take

17   up with me before we get the jury once Mr. Smallman tells me

18   they are here?

19   MR. GELFAND:  No, your Honor.

20   THE COURT:  OK.  Counsel, in the course of the

21   examination, Mr. Bhatia asked me for a limiting instruction on

22   Defense Exhibit 36, which I gave, but I gave it, I realize, on

23   the spot.  Does anybody believe any clarification is needed

K1ndtem4b

1    with respect to the instruction I gave?

2              MR. GELFAND:  Not from the defense, your Honor.

3              MR. BHATIA:  No, your Honor.  We'll take another look

4    when we get the transcript.  If we think there is something

5    else, but my recollection is it is fine.

6              THE COURT:  OK.  In the event there are further

7    documents of this nature, for example, communications between

8    Ms. Reinitz and another customer as to whom the defendant's

9    dealings are in dispute, presumably there would be occasion for

10   a similar limiting instruction, and at that point if you have

11   something concrete to recommend, I will hear you at the sidebar

12   and I can surely formulate it at that point to be broad enough

13   up to pick up, looking backwards, Exhibit 36 as well.  I am

14   mindful of that.  As I gave it, I gave it, you know, on the

15   spur of the moment with little chance to reflect.  I want to

16   make sure that something like that is -- that an instruction

17   like that is well tailored.

18             MR. BHATIA:  Thank you.

19             THE COURT:  All right.  Let's get the witness.

20             THE CLERK:  Everybody is here.

21             THE COURT:  Let's bring them in.

22             (Continued on next page)

23

24

25

1           (Witness and jury present)

2           THE COURT:  All right.  Welcome back, ladies and

3     gentlemen.  Please be seated.

4           I hope you all had a good lunch.

5           You'll note a new face at the government table.

6     Mr. Imperatore has a court appearance in another matter and

7     will be back rejoining us a little later this afternoon, and in

8     his stead is Assistant United States Attorney Brian Blais,

9     whose name I mentioned to you during the course of jury

10    selection.  So that's the explanation for the change in party

11    personnel.

12          We are ready to resume with the trial.

13          Mr. Gabay, I will remind you that you are still under

14    oath.

15          THE WITNESS:  Yes.

16          THE COURT:  And, Mr. Bhatia, you may inquire with

17    redirect examination.

18          MR. BHATIA:  Thank you.

19          Your Honor, the government offers Government Exhibit

20    150 into evidence pursuant to the stipulation.

21          THE COURT:  One?

22          MR. BHATIA:  1-5-0.

23          THE COURT:  Any objection?

24          MR. GELFAND:  No objection, your Honor.

25          THE COURT:  It is received.

1                (Government's Exhibit 150 received in evidence)

2                MR. BHATIA:  Mr. Magliocco, if we can pull up

3      Government Exhibit 150 for Mr. Gabay.

4                (Pause)

5                Just a moment, your Honor.  It looks like we are --

6                THE COURT:  Take your time.  There we go.  I saw

7      something for a moment.  There we go.

8                MR. BHATIA:  There we go.

9      REDIRECT EXAMINATION

10     BY MR. BHATIA:

11     Q.  Mr. Gabay, you were asked a few questions about this

12     document during your direct examination -- during your

13     cross-examination, is that right?

14     A.  Yes.

15     Q.  This looks like an affidavit signed by Michael Haas, is

16     that right?

17     A.  That is correct.

18     Q.  Is he also the person who had signed the check issued to

19     Mr. Teman by Coney Management?

20     A.  Not by Coney Management, by 518 West 204 Street.

21                THE COURT:  I'm sorry.  Just one moment.

22                I'm just going to remind Mr. Gabay, please, to keep

23     your voice up.  Thank you.

24                THE WITNESS:  Sure.  My apologies.

25     BY MR. BHATIA:

K1ndtem4b                    Gabay - redirect

1   Q.  You were shown Government Exhibit 146, which is a check

2   written from 518 West 204 to Mr. Teman, to GateGuard.

3           Was Mr. Haas the one who signed that check?

4   A.  Yes.

5   Q.  And he is the person who signed this affidavit here?

6   A.  Yes.

7           THE COURT:  Mr. Bhatia, before you continue, this

8   document is marked and it has been received as Government

9   Exhibit 150.  The witness was questioned on a document that at

10  least in my first look appears to be identical but which was

11  marked as Defense Exhibit 29.  Just for everyone's benefit, are

12  those in fact identical documents?

13          MR. BHATIA:  Yes, your Honor.

14          THE COURT:  Very good.  Thank you.

15  BY MR. BHATIA:

16  Q.  You are familiar with some of the business records of Coney

17  Management, is that right?

18  A.  Yes.

19  Q.  You have seen them around the office?

20  A.  Yes.

21  Q.  Is this a record that -- is this a common record of Coney

22  Management's?

23  A.  What do you mean by "common"?

24  Q.  Is this a document from Coney Management or is this a

25  document that came from Signature Bank?

1   A.   The document form came from Signature Bank.

2   Q.   OK.   I will direct your attention to the boxes for 5 and 6,

3   or numbers 5 and 6 below.

4            In question number 5, there is a check box, right?

5   A.   Yes.

6   Q.   And Mr. Haas selected, "The checks were written on check

7   forms that were not authorized by the company," is that right?

8   A.   Yes.

9   Q.   And in number 6, are there any check boxes?

10  A.   No.

11  Q.   OK.   You said this is a document from Signature Bank,

12  right?

13  A.   That is correct.

14           MR. BHATIA:   Your Honor, no further questions.

15           THE COURT:   All right.   Any recross?

16           MR. GELFAND:   No, your Honor.

17           THE COURT:   All right.   Then, Mr. Gabay, you can step

18  down.   Your testimony is complete.   Thank you.

19           THE WITNESS:   Thank you.

20           (Witness excused)

21           THE COURT:   Government, call your next witnesses.

22           MR. BHATIA:   The government calls Bonnie

23  Soon-Osberger.

24  BONNIE SOON-OSBERGER,

25       called as a witness by the government,

 1          having been duly sworn, testified as follows:

 2                  THE CLERK:  Thank you.  Please be seated.

 3                  Use the microphone as best you can, please.

 4                  State and spell your full name for the record.

 5                  THE WITNESS:  My full name is Bonnie.  My last name is

 6     Soon-Osberger.

 7                  THE COURT:  How do you spell your last name?

 8                  THE WITNESS:  Sure, S-o-o-n - O-s-b-e-r-g-e-r.

 9                  THE COURT:  All right.  Good afternoon, Ms.

10     Soon-Osberger.  Welcome to court.

11                  THE WITNESS:  Good afternoon.

12                  THE COURT:  I will ask you to just keep your voice up.

13     If you need, bend the microphone close to you, but just keep

14     your voice up so it can be heard in this large courtroom.

15                  THE WITNESS:  Sure.

16                  THE COURT:  Thank you.

17                  Mr. Bhatia, you may inquire.

18     DIRECT EXAMINATION

19     BY MR. BHATIA:

20     Q.  Ms. Soon-Osberger, where do you live?

21     A.  I live on 18 Mercer Street.

22     Q.  And is that in Manhattan?

23     A.  That's in Manhattan, that's correct.

24     Q.  And is that a cooperative building, or is it some other

25     type of building?

K1ndtem4b                    Soon-Osberger - direct

1    A.  It IS a cooperative building.

2    Q.  Are those sometimes called co-ops?

3    A.  Yes, co-ops, cooperatives.

4    Q.  Have you ever had a role on your co-op's board of

5    directors?

6    A.  Yes.

7    Q.  When?

8    A.  From October 2017 to January 2019.

9    Q.  And what was your role on the board of directors?

10   A.  I was the treasurer for the board.

11   Q.  What were some of your day-to-day responsibilities?

12   A.  Maintain the expenditures, the budgets, make sure that all

13   expenditures doesn't exceed our budget.  And also for that

14   particular year when we had a board meeting there was a bunch

15   of projects that was voted for, so I was to manage those

16   projects, look for the vendor, and submit bids for those

17   projects to my board members and get it approved and

18   implemented.

19   Q.  Did you have responsibilities involving purchasing devices

20   for the building?

21   A.  Sure.  I was -- I had the responsibility to go and obtain

22   bids, look for vendors and obtain bids, submit bids for

23   approval.

24   Q.  And did you also work with a management company for 18

25   Mercer?

K1ndtem4b                    Soon-Osberger - direct

1   A.  Yes, I did.  I worked with a management company.

2   Q.  While you were on the board of directors, who was the

3   management company?

4   A.  It was Crystal Real Estate Management.

5   Q.  Who were the individuals who you worked with at Crystal

6   Real Estate Management?

7   A.  I worked with Jackie Morton and I worked with Gina Hom; I

8   think that is her last name, H-o-m.

9   Q.  Are you familiar with the term, 18 Mercer Equity Inc.?

10  A.  Yes.

11  Q.  What is 18 Mercer Equity Inc.?

12  A.  That's our corporation.  That's our incorporation for the

13  co-op.

14  Q.  If I refer to that as 18 Mercer Equity --

15  A.  Yes, you can.

16  Q.  -- you will know that I am referring to the corporate

17  entity?

18  A.  Yes.

19  Q.  All right.  In 2019 -- in 2018, 2019, who was managing the

20  bank accounts for --

21  A.  It was Crystal Real Estate Management.

22  Q.  And what do they do involving the finances of the company?

23  A.  They pay all of our bills.  They collect all of our

24  maintenance, and then from the maintenance they pay our bills.

25  And whatever project we have going on, we would submit for --

1    once we get the approval, we submit the invoice for them to

2    pay.

3    Q.   What's the name -- what is the title you use to describe

4    people who live in the building?

5    A.   We're shareholders and we're leasees, so the incorporation

6    required that if we buy the floor or we buy into the shares, we

7    have a right to live there, so we become a leasee to the

8    building.

9    Q.   Were any shareholders or leasees authorized to sign checks

10   on behalf of 18 Mercer Equity Inc.?

11   A.   No.

12   Q.   Who wrote the checks for the company?

13   A.   The real estate company.

14   Q.   Is that Crystal Real Estate Management?

15   A.   That's Crystal Real Estate, yeah, who we employ.

16   Q.   They were the only ones authorized to sign for that

17   account?

18   A.   Yes.

19   Q.   What about board members?  Were board members authorized to

20   sign?

21   A.   No, we have no access to checks and we don't sign checks

22   either, access or sign checks.

23   Q.   Why didn't Crystal Real Estate, as opposed to a shareholder

24   or board of director, have authority to sign for the account?

25   A.   I mean, it existed before me, but it's just so that it

1   keeps the separation of duties.  We have board members that

2   vote for a specific expenditures, and then from there it gets

3   submitted for approval so that there is a layer of checks and

4   balances.

5   Q.  Can you elaborate on that?  What are the checks and

6   balances?

7   A.  Checks and balances is, like I said, there is a budget that

8   we started with, and then there is bills that goes against

9   those budgets.  So once we approve it, instead of one of us

10  writing the check, we have a third party like Crystal

11  Management write the check, but we approve it before they can

12  write the check.  So that is the checks-and-balances approval

13  and then issuing the checks.  So that way with the checks and

14  balances, if a third party entity like a management company, if

15  they write the check, then there is a checks and balances that

16  the shareholders then get access to that, writing the check and

17  approving the issuing of the checks.

18  Q.  Let's change topics for a moment.

19          Did there come a time when you met Ari Teman?

20  A.  Yes, I did.

21  Q.  How did you meet Mr. Teman?

22  A.  I was at the cooperative, the condo cooperative trade show.

23  Q.  Do you remember approximately when that was?

24  A.  That was approximately October 2017.

25  Q.  What were you doing at that convention?

K1ndtem4b                    Soon-Osberger - direct

1   A.  We were approved for some projects, which is putting in a

2   new intercom, security systems, and then renovating the lobby.

3   So since I was a new board member, that was the first place

4   that the president and myself started to look for vendors.

5   That's why we attended that show.

6   Q.  What was Mr. Teman doing at the convention?

7   A.  He had a booth -- he had a trade show booth at the trade

8   show.  So there is a lot of vendors and they have their booths,

9   and they have their product and demonstrating their products

10  there.

11  Q.  Did he talk to you about any particular products at the

12  trade show?

13  A.  He was showing his intercom panel, so he was demonstrating

14  it to people that came by to the booth.  So my president and my

15  husband and myself, we saw it and we went by there and we

16  talked to Ari about the panel, the intercom system.

17  Q.  Did there come a time when you were considering buying a

18  GateGuard intercom?

19  A.  I mean, yeah.  We talked to a lot of intercom companies, so

20  GateGuard was one of them that attracted to us because of the

21  smart technology.  So, yes, we took away their information and

22  brochure, and then we looked at all the intercom systems that

23  we gathered information on from the show.

24  Q.  What conversations, if any, did you have with Mr. Teman

25  about pricing for an intercom device?

K1ndtem4b                    Soon-Osberger - direct

1   A.  He mentioned that to purchase a panel, the pricing, I think

2   the price point was about $2,500 for a panel, a system, like

3   that was there, that was being displayed.

4   Q.  When you spoke to him about pricing, did he mention

5   anything about a cancellation fee?

6   A.  No.

7   Q.  And did he mention anything about a device removal fee?

8   A.  No.

9   Q.  When you spoke to him about pricing, did he say anything

10  about an attorney use fee if he had to bring in an attorney in

11  a dispute?

12  A.  No.

13  Q.  When he spoke to you, based on your conversations with him,

14  what did you understand your agreement might be with him if you

15  purchased the device?

16  A.  What it sounded like was that we would purchase that unit

17  that was there, and it has all the capability of a facial

18  recognition, it opens for delivery people, it monitored people

19  coming in and out of the building, and that they would charge a

20  service fee for the monitoring service.

21  Q.  For the monitoring service.

22          Did there come a time when you saw any terms and

23  conditions on Mr. Teman's website?

24  A.  Not at the show, no.

25  Q.  Following the show, when you were thinking about purchasing

K1ndtem4b                    Soon-Osberger - direct

1  an intercom, did there come a time when you saw the terms and

2  conditions?

3  A.  Yes.

4  Q.  What was your reaction to them?

5  A.  It was very lengthy and I went through all of it.  A couple

6  of things -- three things that caught me, my attention, was

7  that there was no specific pricing on there.  And then the

8  second thing was that there was going to be a 300-percentage

9  markup the next year.  And then lastly I had a question also

10  about there is no mention about the annual service, what kind

11  of service it includes.

12  Q.  Ms. Soon-Osberger, there is a binder to your left.  Would

13  you take a look at Government Exhibits 441, 442, 443, and 431,

14  and my question is just going to be do you recognize those

15  documents?

16  A.  441, and then what else?

17  Q.  It is 441, 442, 443 and 431.

18  A.  431.

19       (Pause)

20       OK.

21  Q.  Do you recognize those documents?

22  A.  Yes.

23  Q.  As a general matter, what do they reflect?

24  A.  There is the terms and conditions of GateGuard.  And then

25  there is communications between Ari, myself.  And then there is

1   communication between Jackie and myself, the management

2   company.  And then there is a copy of the invoice.

3          MR. BHATIA:  Your Honor, the government offers

4   Government Exhibits 441, 442, 443 and 431.

5          THE COURT:  Is there an objection?

6          MR. DiRUZZO:  None.

7          THE COURT:  They are all received.

8          (Government's Exhibits 431, 441, 442, 443 received in

9   evidence)

10  BY MR. BHATIA:

11  Q.  Ms. Soon-Osberger, I would like to direct your attention to

12  Government Exhibit 441.

13         MR. BHATIA:  Mr. Magliocco, can you put it up on the

14  screen.

15  Q.  If you can read the top three lines here.

16  A.  The top three lines?

17         THE COURT:  Read it slowly and loudly, please.

18  A.  "Hi there.  Please read these terms carefully as they

19  contain important information regarding your legal rights,

20  remedies and obligations."

21  Q.  I'm sorry.  Above that it says, "Terms & Conditions,

22  GateGuard Inc. last revised:  November 30, 2017, 3:30 p.m.,"

23  right?

24  A.  Yes.

25  Q.  If we can zoom out.  In the bottom right corner of this

K1ndtem4b                    Soon-Osberger - direct

1    page, we will zoom in there, it says "March 23, 2018" in the

2    very bottom.

3    A.   Mm-hmm.

4    Q.   Do you know why it says that on that document?

5    A.   Likely, that is when the document was downloaded.

6    Q.   Is this a document that you -- how did you come to have

7    this document?

8    A.   Well, there's some transaction before this.  I contacted

9    Ari after the show and told him that I was interested in the

10   product, can you send some information.  And so he pointed out

11   to his website, and I went in there and looked at some videos.

12        And then I said further if we'll continue to be

13   interested, how do we proceed to the next step.  And that's

14   when he said you go onto the site and then you can sign up and

15   order the product.  And so I went on the site.  I ordered the

16   product, looked at it.

17        Before I ordered -- well, I had to submit some sort of

18   ordering process or some sort of interest process, because

19   that's when I can get more information from him about the

20   product.  So that's when there is a terms -- I asked him about

21   a contract, you know, can I see a contract, and that's when he

22   said that there is a terms and conditions in that ordering

23   process.

24   Q.   So you were directed to this Terms & Conditions.

25        What was your -- you mentioned earlier that there was

1  nothing specific to 18 Mercer.  Why was that significant to

2  you?

3  A.  When we went to the cooperative show, there was a special

4  deal that was going on, and so that was a deal that I went and

5  that was the one that I sought out that applied to us was that

6  particular offering that he had at the show.  Some of this

7  information I thought could be not pertaining to a cooperative

8  or it may be a management type of scenario.  To my

9  recollection, this is what it was for, just because I realized

10 that when we went to the show we were co-op owners.

11 Q.  So you thought there was, if I'm understanding you

12 correctly, there was something about this agreement that you

13 thought might not reflect -- that might make it not applicable

14 to a co-op board?

15 A.  Yeah.

16 Q.  What was that?

17 A.  We weren't leasing the product, we were purchasing the

18 product, so the product was informed by us that we would buy

19 the panel, the unit.

20 Q.  You were buying the product outright, is that right?

21 A.  Yeah.  That was my recollection, that it was offered to us,

22 that this is the amount for the product, to buy the product?

23 Q.  In your conversations with Mr. Teman, did the topic of

24 buying the product outright come up?

25 A.  Yeah.  I mean he told me the price is -- this unit is

K1ndtem4b                     Soon-Osberger - direct

1    approximately 2500 for the -- to purchase this product, or this

2    panel, that is the price of this panel.

3    Q.  To buy the product outright?

4    A.  Yes.

5    Q.  And did anything else -- what, if anything, did you take

6    from the fact that this was a Web page as opposed to a written

7    document -- as opposed to a memorialized document?

8    A.  Well, one thing that caught my attention was that this

9    was -- it could be edited.  It could be edited, so that if at

10   anytime he wants to change something, it could be changed and I

11   wouldn't know about that.  There was not a process of an

12   editing version that was going to mention -- inform me that

13   there is going to be changes to that.

14   Q.  Have you previously entered signed written contracts with

15   other vendors?

16   A.  Yes.

17   Q.  And how did those contrast with a Web page like you are

18   seeing here?

19   A.  The previous contracts we have, the pricing, the terms,

20   payments, and then terms and conditions listed out attached to

21   that particular document, and then there would be signature

22   required by myself and then the vendors, so we agree on the

23   pricing and the terms and conditions.

24   Q.  Ms. Soon-Osberger, I would like to direct your attention to

25   page 5 of this document and to the second full paragraph.

K1ndtem4b                          Soon-Osberger - direct

1      Just a little bit further down, after that.  It is

2  under the header for 5, the first paragraph.

3  A.  Yes.

4  Q.  So this paragraph here is labeled price of -- there is a

5  reference to pricing in this paragraph, right?

6  A.  Mm-hmm.

7  Q.  Had you spoken to Mr. Teman about the price of the device

8  you were purchasing?

9  A.  At the show he told me an approximate amount.  So I asked

10 him for the specific amount, because when we do bidding, I have

11 to have exact amount.  So I asked him to send me the pricing.

12 Q.  Did he send you a price?

13 A.  He sent me an invoice.

14 Q.  And on that invoice it listed a specific price?

15 A.  Yeah, it has a price.  I think it is 431.  Or something

16 like that.  Yes.

17 Q.  Did you believe that there were additional payment terms in

18 addition to the price that you were paying?

19 A.  No.  Because he told me he wouldn't submit the invoice, it

20 was just the amount, the installation, and then the service

21 fee, which he billed me in advance for an entire year.

22 Q.  So you read this agreement -- sorry.  You read the Terms &

23 Conditions page, right?

24 A.  Yes.

25 Q.  And there is -- you can see here in the middle of this

K1ndtem4b                    Soon-Osberger - direct

1    paragraph, there is -- it says, "The applicable fees shall be

2    as stipulated in the price list made available by GateGuard on

3    the site from time to time and subject to the additional

4    payment terms stipulated out," and then there is a Web page.

5                   Did you click on that link?

6    A.   I didn't because the pricing was what he mentioned to me at

7    the show.  That's why I contacted him and asked him to give me

8    the specific pricing for our deal or for what we discussed at

9    the show, to send me a price that was told to me.

10   Q.   Did there ever come a time when you saw an agreement that

11   referenced a 30-year contract with Mr. Teman?

12   A.   No.

13   Q.   Did there ever come a time when you saw a document that

14   would allow Mr. Teman to write a check on behalf of 18 Mercer?

15   A.   No.

16   Q.   Would either of those terms have stood out in your mind?

17   A.   If I read it, absolutely.  Absolutely.

18   Q.   If you had read those terms, what would your reaction have

19   been?

20   A.   I would not agree to that.  It's not a practice that our

21   co-op would abide by.  We wouldn't do that.  The only people

22   that can write checks is our management, approved by the board.

23   All the invoices are submitted, approved, and then handed over

24   to the management to write the check.

25   Q.   If you had seen either of those provisions, what, if

1   anything, would you have said to Mr. Teman?

2   A.  I'm not in a position to do something like that.  I

3   couldn't be able to sign something like that or approve

4   something like that.

5   Q.  I would like to direct your attention to page 3 of this

6   document.  It is an email message beginning on page 3 and

7   continuing onto page 4.

8            I'm sorry.  This is Government Exhibit 442.

9            THE COURT:  We are now in 442?

10           MR. BHATIA:  Yes.  I am now in Government Exhibit 442.

11           It starts on this page and it goes onto the next page.

12           I'm sorry.  I am going to change one more time.  This

13   is a document on page 5 of the same --

14           THE COURT:  The same document on page 5?

15           MR. BHATIA:  Government Exhibit 442 and it is page 5,

16   and it is this message on the screen.

17   Q.  Ms. Soon-Osberger, did there come a time when you spoke --

18   when you messaged with Mr. Teman about your thoughts on the

19   terms and conditions?

20   A.  Yes.

21   Q.  And is this before or after you purchased an intercom

22   device from him?

23   A.  This was before.

24   Q.  This was before?

25   A.  Yes.

K1ndtem4b                          Soon-Osberger - direct

1    Q.   And in this message, you're including a couple clauses that

2    you have questions about, is that right?

3    A.   Yes.

4    Q.   And did you -- if you had -- you testified previously that

5    you never saw a provision about -- you did not see a provision

6    about allowing him to draw checks from your account.

7    A.   That's true.

8    Q.   If you had seen that, would that have been something you

9    would have included in this message?

10   A.   Absolutely.  I just don't have authority to allow people to

11   write checks; I don't have authority for that, so, yes.

12   Q.   If you had seen a provision requiring your company to pay

13   fees for 30 years, is that something that you might have raised

14   with Mr. Teman?

15   A.   Yes.

16   Q.   As a general matter, what are you relating to Mr. Teman in

17   this message?

18   A.   These are points that I have concern about the terms and

19   conditions as it applied to us.

20   Q.   These are the terms and conditions that you testified about

21   a minute ago?

22          THE COURT:  A little louder, now, counsel, for the

23   members of the jury, please.

24   Q.   You are referring to the terms and conditions that you

25   testified about a moment ago, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2   Q.  And I would now like to direct your attention to the email

3   message now beginning on page 3 and continuing onto page 4.

4           At the bottom of this page it says:  "On Thursday,

5   March 29, 2018 at 2:12 p.m. Ari Teman wrote:  Hi, Bonnie."

6           And on the next page, he has some text.

7   A.  Mm-hmm.

8   Q.  What was Mr. Teman relating to you here?

9   A.  Realizing we were asking for some references.  The bottom

10  is thanking him for the condition -- addressing the concerns.

11          THE COURT:  Sorry.  I don't think the witness is

12  looking at the document on the screen.  She is referring to a

13  different part of this document.  Please direct her attention.

14  BY MR. BHATIA:

15  Q.  Ms. Soon-Osberger, you can look at it on the screen here

16  just so that we are all on the same page.

17  A.  OK.

18  Q.  Is he responding to your comments from below?

19  A.  Mm-hmm.

20  Q.  And what was your reaction on seeing his comments?

21  A.  Well, he was addressing, adjusting, and directing the items

22  that I had about -- the concerns I have, so this is the reply,

23  his reply.

24  Q.  And was one of the terms that you had questions about

25  relating to increasing prices?

1    A.   Yes.

2    Q.   What was in the terms and conditions you had seen about

3    raising prices?

4    A.   He was going to increase -- he would increase over

5    300 percent next year and the following year, and point one is

6    addressing that.

7              THE COURT:   Ms. Soon-Osberger, if you could speak into

8    the microphone, please?

9    A.   The point one is addressing, replying to the 300 percent

10   increase for the following year after we signed up with them.

11   So, that's addressing that.

12   Q.   Were you generally -- were you satisfied with Mr. Teman's

13   responses?

14   A.   Yeah.  Yeah.

15   Q.   OK.  And I'm going to direct your attention to an email

16   message on page 6 of this document.  It is at the bottom of the

17   page.

18             THE COURT:   Counsel, page 6?

19             MR. BHATIA:   Page 6.

20             THE COURT:   Of 442?

21             On the version you have given the Court, it just has a

22   couple of address tabs.

23             MR. BHATIA:   One moment, your Honor.

24             (Pause)

25   BY MR. BHATIA:

K1ndtem4b                      Soon-Osberger - direct

1  Q.  Ms. Soon-Osberger, you email respond -- did you respond to

2  Mr. Teman and his comments to you?

3  A.  Yes, I did.

4  Q.  Did you tell him that you agreed -- well...

5  A.  Yes.

6          THE COURT:  I'm sorry.  There is no question.  I think

7  counsel retracted the question.

8  Q.  Turn to page 3 of this document in the middle of the page.

9  A.  Mm-hmm.

10  Q.  You write to him, and we'll pull it up, you write -- I'll

11  give the jury a moment to read this.

12          (Pause)

13  A.  Did you want me to read it?

14          THE COURT:  There is no question pending.

15  Q.  No, nothing for you to read.

16          (Pause)

17          The first line here, you say:  "thank you so much for

18  your replies and you have addressed our concerns related to the

19  terms and conditions."

20          When you wrote that, were you agreeing to a provision

21  about -- that would allow Mr. Teman to draw checks from your

22  account?

23  A.  No.

24  Q.  Were you agreeing to a provision that would require you to

25  pay monthly fees for 30 years?

1  A.  No.

2  Q.  And were you at that point agreeing to an $18,000 device

3  removal fee?

4  A.  No.

5  Q.  At that point, had you heard of a device removal fee?

6  A.  No.

7  Q.  You had testified earlier about owning the device.  How did

8  that affect your view of whether there should be a device

9  removal fee?

10  A.  If I owned the device, I have the option to not use the

11  device if the device doesn't work for me, so I wouldn't think

12  that there is any removal of the device -- unless I hired him

13  specifically to remove the device, then I would inquire with

14  him the pricing of that service.  If there is a removal fee, I

15  would ask for the amount of that removal fee, if that service

16  was deemed necessary.

17  Q.  Did there come a time when you agreed to actually buy the

18  device?

19  A.  When I -- when I paid for that invoice, the 2,500, that was

20  my device.  Because there is a point that I asked him the terms

21  and conditions about the leasing.  I concerned with leasing.

22  He said it was a tax loophole, to my understanding, so --

23          MR. BHATIA:  If we can publish Government Exhibit 431

24  and page 3 of that document.  We can talk about the invoice.

25  A.  Mm-hmm.

K1ndtem4b                    Soon-Osberger - direct

1   Q.  If we can look at the line items listed on this invoice.

2   A.  Mm-hmm.

3   Q.  The first item here, it's a little bit hard to read, but it

4   says, "GateGuard 2.0 panel, cooperative show price."  And it

5   lists the unit cost of $2,499.

6       What did you believe you were buying for $2,499?

7   A.  The panel, the intercom system.  That was exactly what it

8   says, cooperative show price; when we talked about it at the

9   show, it was the purchase of this unit.

10  Q.  What role did the actual price of this device play in your

11  decision to purchase it?

12  A.  What's that?

13  Q.  This may not be an obvious question, but how did the price

14  of $2,499 affect your decision to buy it or not?

15  A.  We compared to another system that was compared to this and

16  it was like a $5,000 system, so we felt that this was -- this

17  is $2,500 and we own it.  So if something happened, it's

18  $2,500, so we thought that this is the right decision to go

19  with this unit.

20  Q.  When you bought this, did you believe you were buying the

21  device outright?

22  A.  Yes.

23  Q.  Did you relay this invoice to Crystal Real Estate

24  Management?

25  A.  Yes.

1    Q.   And what happened next?

2    A.   They proceed to pay the invoice for this amount.  Of

3    course, this was submitted to our board for approval to pay.

4    So then management have this invoice to pay based on approval

5    by our board members.

6    Q.   Did the board members approve that?

7    A.   Yes.

8    Q.   Then you relayed it to Crystal Real Estate?

9    A.   To -- yeah.

10   Q.   Did there come a time when the intercom was installed in

11   the building?

12   A.   Yes.

13   Q.   What was your experience with the intercom?

14   A.   From day one, it was -- it was surprising because when this

15   install was done, he removed our old system and he had left a

16   hole but he put his system on top of our mailbox.  It kind of

17   stuck out, and it was very low, so it didn't make sense to --

18   anybody couldn't see the person who is coming to ring the

19   doorbell, you couldn't see the face because it really is that

20   low.  And Ari said that it was disability approval, it has to

21   be at that height.

22        I had a couple of concerns because it doesn't look

23   like it could capture the facial, and also it is right on top

24   of our mailbox so our mail -- our mail person can't get into

25   the key box, and that day it didn't work.  So, I had concerns

K1ndtem4b                        Soon-Osberger - direct

1    about how we are going to get in and out of the building.

2    Q.   Did the GateGuard device work as you expected it to?

3    A.   No.

4    Q.   Did you relay those concerns to Mr. Teman?

5    A.   Yes.

6    Q.   What was his reaction when you told him about your concerns

7    about the device?

8    A.   He mentioned something about the Internet access, that the

9    Internet was not the appropriate Internet service for the

10   system.

11   Q.   And ultimately was there a time that you decided it was

12   time to move on from the GateGuard device?

13   A.   Yeah, after a lengthy time, after we tried multiple -- two

14   different Internet services, it still didn't work, and so

15   finally we had to just replace the system, because it was from

16   August to January we had no access -- the mailman had no

17   access, our delivery people had no access, our gas had no

18   access.  We had to come down from the building to receive

19   anybody that needed to come into the building.  So we worked

20   with them as long as we can, but just after a length of time,

21   everyone in the building just got impatient and then we decided

22   we have to move on.

23   Q.   What happened -- did there come a time when you relayed

24   that information to Mr. Teman, that you needed to move on?

25   A.   Yes, I did.

1   Q.  How did he react?

2              THE COURT:  Back up.  How was it conveyed, please?

3   Q.  How was it conveyed to Mr. Teman?

4   A.  By email.  I mentioned to him that it's not working; the

5   system, we plug it in, it's not working.  We tried the IP

6   addresses he was asking, just multiple requests he had related

7   to our services and each time it just didn't work.  And so at

8   one point I said we need to move on, we do need to have the

9   system removed, and that's when he was sending an email that we

10  would be charged.  And in that one email he said he would put a

11  lien on the building.

12  Q.  I would like to direct your attention to Government Exhibit

13  443, and I would like to direct your attention to an email

14  message at the bottom of page 6 and continuing onto page 7.

15             I'm sorry.  The bottom of page 5 and continuing on

16  page 6.

17             Who is this email from?

18  A.  It was from Ari.

19             THE COURT:  Just one moment.  I am trying to find it.

20             (Pause)

21             Counsel, you said this is Exhibit 44?

22             MR. BHATIA:  443.

23             THE COURT:  One moment.  Sorry.  Apologies.

24             (Pause)

25             Yes.  Go ahead.

K1ndtem4b                    Soon-Osberger - direct

```
 1   BY MR. BHATIA:
 2   Q.  Ms. Soon-Osberger, this is an email from Ari Teman and it's
 3   to Jackie Monzon, Shelley Pecot and you, is that right?
 4   A.  Yes.
 5   Q.  And in the first sentence, he writes:  "As a reminder, you
 6   are not allowed to touch or move our device and there's an
 7   $18,000 fine for removing it."
 8           What was your reaction upon reading that?
 9   A.  I was shocked.
10   Q.  Why were you shocked?
11   A.  Why would we be fined --
12           THE COURT:  Sorry.  Start again.  Please speak into
13   the microphone.
14   A.  I was shocked because that we're going to be charged an
15   $18,000 fine for removing a product that doesn't work.
16   Q.  How did the $18,000 fine compare to the price of the device
17   itself?
18   A.  The panel is 2,500, which is what we purchased.  So this
19   $18,000 doesn't make any -- doesn't make any sense.  It is --
20   it's -- I mean, to me it was a bullying type of scenario when
21   someone sends an email like that to me.
22   Q.  And in the next line, he says, "We will enforce the
23   contract, and we will remove anything placed on the building
24   against it and restore service."
25           How did you react to the references to removing
```

1   anything placed on the building against it and restoring

2   service?

3   A.  Well, that's exactly what I said.  It's why would he remove

4   something that we were going to implement, something that

5   works, replace something that we much needed.  Again, we left

6   that system many months and tried to work with him.  We have

7   Verizon DSL.  We had Spectrum put in.  We spent a lot of money

8   on different services, Internet services -- Spectrum Internet

9   services just so we can help to make the system work and it

10  never worked.

11  Q.  Outside of this email, were there any instances where

12  Mr. Teman threatened to sue -- what instances, if any, were

13  there where Mr. Teman threatened to sue you or 18 Mercer?

14  A.  I believe there is another email that has I'm going to

15  place a lien on your building if this is -- if we are going to

16  remove the system.

17  Q.  What would be the significance of a lien on your building

18  at 18 Mercer Street?

19  A.  What I understand a lien is, that it would put -- you can't

20  move any money in or out, you can't make any transaction for

21  the co-operation.

22  Q.  Did there ever come a time when Mr. Teman threatened to sue

23  you or other members of the board?

24  A.  I think that -- I recollect -- it is my recollection that

25  there was other emails that he had threatened us if we

K1ndtem4b                      Soon-Osberger - cross

1   didn't -- if we were to remove this system.

2   Q.  Ms. Soon-Osberger, I would now like to direct your

3   attention to Government Exhibit 202.

4           At the top of this page, it says, "18 Mercer Equity

5   Inc."

6           Is that the corporation that owns the building at 18

7   Mercer Street?

8   A.  Mm-hmm.

9   Q.  And this is a check for $18,000, dated March 28, 2019.

10          Did you authorize Mr. Teman to deposit this check?

11  A.  Absolutely not.

12  Q.  Did you authorize anyone else to deposit a check for

13  $18,000 to GateGuard Inc.?

14  A.  Absolutely not.

15  Q.  In the bottom left corner there is a reference to "Device

16  Removal Fee."  Had you ever agreed to an $18,000 device removal

17  fee?

18  A.  Absolutely not.

19          MR. BHATIA:  Your Honor, no further questions.

20          THE COURT:  All right.  Cross-examination.

21          MR. DiRUZZO:  Thank you, your Honor.

22          THE COURT:  Yes.  Mr. DiRuzzo, you may inquire.

23  CROSS-EXAMINATION

24  BY MR. DiRUZZO:

25  Q.  Good afternoon, ma'am.

1    A.  Good afternoon.

2    Q.  I'm going to ask you a series of questions.  If I go too

3    fast, don't speak loud enough, or you don't understand a

4    question, just let me know.  I will either repeat or rephrase

5    the question.  OK?

6    A.  Yep.

7    Q.  Ma'am, we've never talked before, correct?

8    A.  No.

9    Q.  And let me start with trying to get a little background

10   here.

11          I have some emails of yours.  After your name there is

12   an acronym, "PMP"?

13   A.  Yes.

14   Q.  What is that, ma'am?

15   A.  Project management professional.

16   Q.  And are you a project manager, is that your occupation?

17   A.  It was.

18   Q.  So would managing projects like talking to vendors and

19   doing modifications to a building, that would be something that

20   you are used to doing?

21   A.  No.  I manage business solution teams.  So what I do is I

22   work for IBM.  We go and sought out solutions for a company

23   that does have issues.  And then what we do is locate the

24   system, the process, or the equipment, the technology.  And

25   once we identify where the problem area is, we build a team

1   to -- we hire a team and build a team to solve those issues,

2   whether it is in the process people or equipment or technology.

3   Q.   OK.   So you are pretty comfortable with modern technology;

4   isn't that fair to say?

5   A.   Yeah.   Yeah.

6   Q.   OK.   So, now, in your direct testimony, you mentioned that

7   you were the treasurer for your co-op board, is that correct?

8   A.   Mm-hmm.   Mm-hmm.

9   Q.   And part of your duty is, of course, representing the

10  board, but you also represent everyone in the co-op

11  collectively, right?

12  A.   Yeah.

13  Q.   And it is your job to make sure that you do things that are

14  in the best interest of the co-op, correct?

15  A.   That's right.

16  Q.   And in that vein, you went to -- if I get it correctly, you

17  went to a trade show with other individuals to try to look at

18  some intercom systems; that was your testimony?

19  A.   Mm-hmm.   Mm-hmm.

20  Q.   And you testified on direct that what attracted you, at

21  least in part, to Mr. Teman's GateGuard system was that it had

22  some cutting-edge technology; is that fair to say?

23  A.   Yes.

24  Q.   Could you explain to the jury what exactly was that

25  cutting-edge technology that differentiated it from other

K1ndtem4b                    Soon-Osberger - cross

1   systems in the same space?

2   A.  For sure.  The system had face recognition, and that was

3   surprising to me because that was very cutting edge in America,

4   anyway.  We had attended a trade show, it was very popular, and

5   I recognized what it is.  So I went over to see this technology

6   that has face recognition.  So that attracted me along with

7   having the access to call your phone whenever somebody

8   accessed, like a delivery person or a guest.  So those type of

9   functionalities was very attractive.

10  Q.  OK.  So you would agree with my characterization, that was

11  an integrated hardware and software platform; does that sound

12  right to you?

13  A.  Yes, I think so because you need Internet services and,

14  yeah.

15  Q.  And as a result, Mr. Teman's system, it collected data, and

16  that data would be available to the Mercer co-op board,

17  correct?

18  A.  Mm-hmm.  Mm-hmm.

19  Q.  And that was part of the appeal of the GateGuard system was

20  the ability of the system to, in essence, collect this data and

21  make it available upon demand, correct?

22  A.  Yeah.  Most of the technology, it collects data, yeah.

23  Q.  And this -- the interface was a Web-based interface; you

24  would agree with me?

25  A.  Yes.

K1ndtem4b                        Soon-Osberger - cross

1   Q.  You had to go on the Internet, your had to go on your

2   browser, Firefox, put in the website, go on the login password

3   in order to get into the GateGuard website, correct?

4   A.  Yeah -- well, more like a mobile device that we were

5   attracted to.  You can use a mobile device to unlock the door

6   or to see somebody who are in front of your door, yeah.

7   Q.  To be a little more specific, not so much the individuals

8   that have a co-op would be able to let someone in via mobile

9   device.  I am talking for the co-op board, the management, that

10  it would be able to login through the GateGuard website,

11  correct, in order to see what's going on?

12  A.  That was up to the management.  The management would have

13  access to do that.

14  Q.  OK.  But the management corporation or business, Crystal,

15  that you referred to, those are the ones that effectively did

16  it on behalf of the co-op board?

17  A.  Yeah.  What we were interested in if we wanted information

18  about who came in and out of the building or data, then, yes,

19  we would go to them for that information.

20  Q.  Now, you also testified that one of the things that

21  attracted you was the price.  You said the price was -- this is

22  my characterization not yours -- it was half the price of the

23  next competitor?  Did you say Mr. Teman's was 2,500 and the

24  next competitor was 5,000?

25  A.  I think it was like somewhere around 5,000, yes.

K1ndtem4b                    Soon-Osberger - cross

1    Q.  So that was a pretty good deal?

2    A.  I think so, yes.

3    Q.  Now, you knew that, when you were getting this deal, that

4    in order for the device to work, it had to be connected to the

5    Internet and it had to have service for a long period of time.

6    In other words, you aren't just going to buy the device,

7    install it yourself, and expect it to work because it wouldn't;

8    you would agree with that?

9    A.  Of course.  Of course.

10   Q.  In other words, you would have, or your board would have an

11   ongoing relationship with GateGuard not only once the device

12   was installed but days, months, years in the future in order to

13   make sure that the device connectivity and activity still

14   worked?

15   A.  If they were -- if they were to continue service on an

16   ongoing basis for the system, yes.

17   Q.  Now, when you talked to Mr. Teman at the trade show, he

18   pointed you to the GateGuard website, is that correct?

19   A.  I think he said you can go in there and find more

20   information, yes.

21   Q.  And I assume -- correct me if I am wrong -- you actually

22   went to the GateGuard website and looked around a little bit,

23   correct?

24   A.  When he pointed me to it, yes, I went in to look at the

25   Channel 5 interview that took place.

K1ndtem4b                    Soon-Osberger - cross

```
 1   Q.  And that was the video that you mentioned on your direct
 2   examination, was it?
 3   A.  I took a look at it, yeah.  Yes.
 4   Q.  And part of the -- now, let's talk -- I want to switch
 5   gears a little bit and talk about the terms and conditions.
 6            Showing you what's been marked as and entered into
 7   evidence as Government Exhibit 441.
 8            And this is the document that we were just talking
 9   about not too long ago on direct examination, correct?
10   A.  Mm-hmm.  Mm-hmm.
11   Q.  You would admit, this is a fairly long -- a fairly long and
12   involved, 22-page document, correct, ma'am?
13   A.  Mm-hmm.
14   Q.  With a lot of, for lack of better terms, like contract
15   language, legalese, correct?
16   A.  Mm-hmm.
17   Q.  And you actually -- you yourself, you looked at and you
18   reviewed this document, correct?
19   A.  Mm-hmm.
20   Q.  And --
21            THE COURT:  Sorry.  Just try and answer questions
22   "yes" or "no."
23   A.  Yes.  Sorry.  Yes.
24   Q.  And there were other members of your co-op board that also
25   looked at this document, correct?
```

K1ndtem4b                        Soon-Osberger - cross

1    A.  Yes.

2    Q.  And could you tell the jury who those individuals were?

3    A.  The president, Stephanie Phillips.

4    Q.  Anyone else?

5    A.  No, but we did make it available for all the board members.

6    Q.  And for the jury's edification, could you tell the jury who

7    the other board members were?

8    A.  The other board member at that time was Roberta -- I forgot

9    her last name, she is an Italian lady.  She just moved in.  And

10   then it was Margaret Cummings, and then -- who else was that on

11   that board?  Phillips, me --

12   Q.  If you can't remember, ma'am, that is fine.

13   A.  Yeah, there is only five board members.

14   Q.  So there is five board members?

15   A.  Yes.

16   Q.  OK I assume -- correct me if I am wrong -- that in order

17   for the board to approve something, you probably need three out

18   of five board members to agree?

19   A.  That's correct.  We sent out -- usually we sent out

20   documents for them to look at and then we ask for approval.

21   Q.  OK.  Now, ma'am, I'm going to flip to -- ma'am, can you see

22   Section 5, "Orders"?

23              THE COURT:  Do you want this published to the jury?

24              MR. DiRUZZO:  Yes, please, your Honor.  Sorry.  It has

25   been admitted into evidence.

Q.   OK.  Ma'am, do you see that there?

A.   Mm-hmm.

Q.   So this is the orders and fees pricing quotes.  Do you see

that section there?

A.   That's right.

Q.   And, now, part of your discussion on direct examination was

that you took issue with this little portion right here, about

talking about raising the monthly fees of a hundred percent per

year but no more than 350 percent.  Do you see that there,

ma'am?

A.   Mm-hmm.

Q.   So that's a portion of at least the terms and conditions

that you or the board collectively took issue with; you would

agree with that?

A.   Mm-hmm.  Mm-hmm.

Q.   But it says right here that this document is subject to the

additional payment terms stipulated at, and there is a URL.  Do

you see that there, ma'am?

A.   Mm-hmm.  Mm-hmm.

Q.   And, ma'am, is it your testimony that you did not click on

that URL?

A.   We have to collect information for bidders.  We need either

a contract that we can sign with the other party or specific

pricing.  So, this doesn't give me all that information.  He

could have a generic, default pricing for whatever he's

K1ndtem4b                    Soon-Osberger - cross

1    offering, but I need -- I asked Ari for pricing so that I can

2    have specific -- I can't just submit this to my board.  I have

3    to have the exact pricing that he gives me so that I can line

4    up, which I did after he gave me the invoice, to line up with

5    other vendors the costs of all the specific bids.  So clicking

6    on that doesn't give me information directly that I can submit

7    for board approval.

8    Q.  I understand, ma'am, but my question is just a little more

9    direct and simple.

10   A.  Mm-hmm.

11   Q.  Did you click on that URL?

12   A.  I did not.

13   Q.  And as the next follow up, you could have, though, if you

14   wanted to?  You had the ability, correct?

15   A.  I could.  And I could, yes, but --

16   Q.  But you chose not to?

17   A.  Not that I choose not to, but the way we do our job,

18   bidding for a job, is a pricing and a signed contract and --

19   Q.  I understand, ma'am, but --

20              THE COURT:  Let the witness finish her answer, please.

21   A.  Yes.  So I need exact pricing, and the contract and the

22   pricing, especially the pricing to put together the bid, and

23   that's when Ari gave me that particular invoice, that is what

24   we are approving.  That's what we're paying.  That's our

25   pricing.

1   Q.  Ma'am, I understand.  But you would agree with me that

2   Mr. Teman is not on your board and wasn't privy to the internal

3   rules and mechanisms of your co-op board; you would agree with

4   that?

5   A.  I agree, but he knew that I was trying to collect prices

6   for bids to make a determination to move forward with the

7   intercom system.

8   Q.  Ma'am, during your course of interaction with Mr. Teman,

9   you reviewed the terms and conditions and submitted it to the

10  board for the board's approval, which the board did approve,

11  correct?

12  A.  Mm-hmm.

13          THE COURT:  One moment.

14          Counsel, I think there is a compound question.  You

15  submitted -- you said she submitted the terms and conditions

16  and you submitted it for approval.  Break those down into

17  separate questions so it is clear what you were asking was

18  submitted, please.

19          MR. DiRUZZO:  Sure.

20  BY MR. DiRUZZO:

21  Q.  Ma'am, you submitted the terms and conditions to the board,

22  correct?

23  A.  Yes.

24  Q.  And the board approved the terms and conditions, correct?

25  A.  They approved the contract and they approved the pricing,

K1ndtem4b                        Soon-Osberger - cross

1    yes.

2    Q.  I want to be very specific with my terminology here now.

3    When I say "terms and conditions," I'm referring to this

4    document right here, which is Government Exhibit 441.

5    A.  So what we do is we submit the bids and we submit whatever

6    documents that we have, which is these documents included, for

7    the board to review, and then we take a vote and we have the

8    majority to move forward.

9    Q.  Correct me if I am wrong, but I don't think there is a

10   dispute, this is the document, Government Exhibit 441, that was

11   submitted to your board?

12   A.  That's right.

13   Q.  And that the board approved?

14   A.  That's right.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K1NVTEM5                        Soon-Osberger - cross

1    BY MR. DiRUZZO:

2    Q.  Ma'am, I'm showing you what's been marked as -- admitted in

3    evidence, Government Exhibit 442.  Starting at the top, ma'am,

4    that right there, that's your email address; correct?

5    A.  That's right.

6    Q.  And then you say here that:  Ari, we were reviewing your

7    terms and conditions, and have inquiries regarding the

8    following.  And then it goes on.

9         That's your email to Mr. Teman; correct?

10   A.  That's right.

11   Q.  And this portion right here, this first part in quotes,

12   about the 100 percent per year and no more than 350 percent,

13   that language actually comes from Section 5 of the terms and

14   conditions, which is Government Exhibit 441.  You would agree

15   with me that that's where that language comes from?

16   A.  Mm-hmm.  Mm-hmm.

17   Q.  Now, going down a little farther, this language right

18   here -- and I'm not going to read it all, but has a bunch of

19   hyperlinks in it to at least the GateGuard and the related

20   company property panel websites.  Do you see that there, ma'am?

21   A.  Number --

22        THE COURT:  Please answer yes or no, kindly, as

23   opposed to "mm-hmm."

24   A.  I was just going to ask, is this --

25        THE COURT:  One moment.

1    A.  Okay.  Okay.  That's fine.

2             THE COURT:  Just for the record, counsel has circled

3    the paragraph that begins, "You agree that GateGuard will run."

4             Go ahead, counsel.

5    BY MR. DiRUZZO:

6    Q.  So, ma'am, that's -- you cut-and-pasted that portion of the

7    terms and conditions into your email that you sent Mr. Teman;

8    correct?

9    A.  That's right.

10   Q.  And in that portion that you cut-and-pasted into your email

11   included hyperlinks also from the terms and conditions;

12   correct?

13   A.  Mm-hmm.

14   Q.  Because you had concerns with this section and the

15   hyperlinks that this section incorporates; correct?

16            THE COURT:  Sorry.  We need an answer.

17   A.  I was referring to the monthly fee here.

18   Q.  I understand that, ma'am.  But this -- this paragraph that

19   you put in quotes, you did that; correct?

20   A.  Yes.

21   Q.  Because you had concerns about that language; correct?

22   A.  About the monthly fees, yes.

23   Q.  I'm not asking about the monthly fees.  I'm asking about --

24   A.  You're asking if I accept the entirety of this paragraph

25   when I paste that on there and had that increase.

1   Q.  I'm asking you did that because you had concerns about that

2   language that you personally quoted and pasted into your email?

3   A.  Yes, I have -- I have concern about that, that -- yes, that

4   paragraph or the -- yes.

5   Q.  Then you would also agree with me that Mr. Teman

6   responded -- and it goes on to the next page.  And he responded

7   to you and asked at the very bottom, "Does that help?"  You

8   would agree with that, right, ma'am?

9   A.  Yes, yes.

10   Q.  To which you replied that he addressed your concerns

11   related to the terms and conditions; correct?

12   A.  Yup, related to those topics of the terms and conditions,

13   yes.

14   Q.  So you would agree that Mr. Teman was responsive to your

15   emails and the concerns that you expressed to him?

16   A.  Yes.

17          THE COURT:  Mr. DiRuzzo, I'm looking for a natural

18   break for our mid-afternoon -- natural point for our

19   mid-afternoon break.  Is this a good point or do you --

20          MR. DiRUZZO:  This is fine, Judge.

21          THE COURT:  All right.  Ladies and gentlemen, I'm

22   informed by Mr. Smallman that the mid-afternoon coffee, etc.,

23   has arrived.  So we'll take a 15-minute recess.  In 15 minutes,

24   Mr. Smallman will come get you.

25          As always, please don't discuss the case.

K1NVTEM5                          Soon-Osberger - cross

 1              (Jury not present)

 2              THE COURT:  Okay.  Anyone have anything to raise

 3     before we take the break?

 4              MR. BHATIA:  No.

 5              THE COURT:  All right.  I'll see you just a few

 6     moments before 15 minutes.  Have a good break, everyone.

 7              I'll need the witness back in the box before the jury

 8     comes out.

 9              (Recess)

10              THE COURT:  Let's get the witness in the box and let's

11     get the jury.  Welcome back, Mr. Imperatore.

12              MR. IMPERATORE:  Yes, your Honor.  Thank you.

13              THE COURT:  Mr. DiRuzzo, for planning purposes, how

14     much further on cross, approximately?

15              MR. DiRUZZO:  Best guess, 10 to 15.

16              THE COURT:  Very good.  Thank you.

17              (Jury present)

18              THE COURT:  Ms. Soon-Osberger, I'll remind you that

19     you are still under oath.

20              And Mr. DiRuzzo, you may inquire.

21     BY MR. DiRUZZO:

22     Q.  Okay, ma'am.  I'm going to shift gears a little bit.  I'm

23     going to turn your attention to -- show this to the jury and to

24     the witness, Government Exhibit 431, which is already in

25     evidence.

1                And ma'am, this is an email from you to board, and cc

2     Caroline, Gina, and Jackie, with the subject of Invoice for the

3     New Intercom System.  So this is an email that you sent to

4     those individuals; correct?

5     A.  Mm-hmm.

6                THE COURT:  Sorry.  You need to answer yes or no and

7     speak into the microphone.

8                THE WITNESS:  I'm sorry.  Yes.

9     Q.  And that listed out particularly here the one-year annual

10    amount, which is just under $600; correct?

11    A.  That's correct.  Yes.

12    Q.  And that information that you relayed in the body of your

13    email -- I know it's probably a little difficult for everyone

14    to see right here, but this is the invoice that you receive

15    from Mr. Teman's business GateGuard; correct?

16    A.  It look different from the other invoice.

17    Q.  It looks different.  How does it look different, ma'am?

18    We'll start off --

19                THE COURT:  I think, Mr. DiRuzzo, it would be helpful

20    if you -- if I'm correct, you've just gone two pages beyond the

21    email you showed her in the same exhibit.  If you identify it

22    that way, we can speed things along.  Why don't you have her

23    flip through that or something.

24                MR. DiRUZZO:  Sure.

25                THE COURT:  Rather than detaining us.

 1              MR. DiRUZZO:  Sure.

 2    Q.  Take a look at the binder, Government Exhibit 431.  It

 3    should be a three-page document.

 4              So, ma'am, this document which is on the screen right

 5    now, the document that you have in the binder on your lap in

 6    paper form?

 7    A.  It's missing the information.  I assume it's just not on

 8    here, displayed here.

 9    Q.  Okay.  But this document, is that in the binder that you

10    have?

11    A.  It's just missing the information, but, yeah, I think it's

12    the same thing.  Right?

13              THE COURT:  Sorry.  First of all, please keep your

14    voice up.

15              What do you mean by it's missing the information?

16    This document is the attachment to the email that counsel was

17    asking you about.

18              THE WITNESS:  Yeah, it's just -- it's just information

19    here that's not clear on the screen.  I just want to make sure

20    that it's a different document, so I just want to make sure.

21              THE COURT:  I see.  All right.

22              Then let me ask defense counsel just to show the

23    witness the entire document.  Her point is that only a portion

24    of the invoice is being portrayed on the screen.  So show her

25    the entire thing.

1          MR. DiRUZZO:  I understand.

2          THE COURT:  I'm just trying to move us past this

3     confusion.

4          MR. DiRUZZO:  Okay.

5     BY MR. DiRUZZO:

6     Q.  Is that better ma'am?

7     A.  Yup.

8     Q.  Okay.  So now, ma'am, so let's talk about this portion

9     right here.  First year paid up front, that's basically $50 a

10    month for a year, just under $600; correct?

11    A.  That's -- yes.

12    Q.  And the reason that your co-op board was billed per years

13    worth $50 a month is because there was going to be reoccurring

14    fees that the board -- for your co-op building was going to be

15    responsible for, to use the functionality of the GateGuard

16    system, the device, for the first year, and then you would have

17    to pay for it again for the second year and the third year;

18    correct?

19    A.  Like most monitoring and hosting services, if we decide to

20    go with -- continue that type of monitoring services or that

21    particular equipment, then, yes, we renew another year.

22    Q.  Okay.  Now, ma'am, I'm going to switch gears again to a

23    little discussion about Crystal Management.

24          So based on your direct testimony, Crystal Management

25    was the management company that was in charge of the building,

1   for lack of a better term?

2   A.  Yes.

3   Q.  And like all management companies, I assume Crystal

4   collected the co-op or the HOA fees from everyone on a monthly

5   basis?

6   A.  Yes.

7   Q.  And then Crystal would dispense money to the vendors,

8   whoever the co-op would have an expense to?

9   A.  Yes.

10  Q.  So my understanding on your direct testimony was that the

11  condo or the co-op board itself didn't write checks; instead,

12  it directed Crystal on its behalf to issue checks to pay bills

13  for your co-op board.  Is my understanding correct?

14  A.  Yes.

15  Q.  So, in other words, you couldn't write a check off of

16  whatever bank account, because the co-op board didn't actually

17  have a bank account in its own name.  Is that my understanding?

18  A.  It has checking account its own name.

19  Q.  Okay.  So it had a checking account in its own name, but

20  Crystal wrote checks off of the board's bank account, or did

21  Crystal write checks off of Crystal's own bank account?  If you

22  could clarify that for us.

23  A.  What my recollection is that we approve for bank account to

24  be opened on our behalf when we transition over to Crystal so

25  we have our own bank account.

1    Q.   Okay.  So what I'm hearing, correct me if I'm wrong, the

2    board had its own bank account, but Crystal had signatory

3    authority over that bank account?

4    A.   That's right.

5    Q.   Okay.

6    A.   That's right.

7    Q.   And Crystal -- given that it had signatory authority over

8    the bank account, you would agree with me that, as a result,

9    Crystal had the legal capacity to pay bills on behalf of the

10   board?

11   A.   They only pay bill on everything we approve, yes.

12   Q.   I understand that.  But Crystal though had the ability, the

13   authority, to pay bills on behalf of the co-op?

14   A.   That's right.

15   Q.   On behalf of the board?

16   A.   That's right.  That's right.

17   Q.   And as far as signatory authority goes, no one on the board

18   at the co-op, for example, yourself, had that signatory

19   authority to issue checks?

20   A.   No.

21   Q.   That's not correct?

22   A.   Oh, we don't have -- right, we don't sign checks, no, we

23   don't have authority to sign checks.

24   Q.   I just want to make sure there's no confusion.

25            So, for example, you, yourself, you could not write a

1    check on behalf of the co-op board; is that correct?

2    A.   That's correct.

3    Q.   Now, ma'am, I'm going to switch gears again to the actual

4    device.

5              Now, it's my understanding that the device was in --

6    you know what?  Can you just explain -- paint a little picture

7    to the jury as to what the building looks like, like when you

8    enter, where the device was when you first came in?

9    A.   It's on the right-hand side.  So you come up to the

10   entrance.  We have a -- we have our front door, and then we

11   have a panel -- we have a side panel on the right to the left.

12   And so the intercom system is on the right-hand side of the

13   building.

14   Q.   Okay.  So when an individual walks up, you walk up, and

15   then the device is to the right?

16   A.   The device is on the right-hand side, yes.

17   Q.   Okay.  Now, it's my understanding that your testimony was

18   it was too low and that was a problem?  The device was too low?

19   A.   That was one of the problem.

20   Q.   Okay.  Let's talk about that problem.

21             But the reason that the device was too low, at least

22   from your point of view, is that people had to, like, bend down

23   in order to get their face -- a snapshot taken, is that my

24   understanding?

25             THE COURT:  She doesn't know what your understanding

1    is.

2    Q.  Let me phrase it this way, ma'am:  The device is too low,

3    so the complaints were that people had to bend down in order to

4    look at the device?

5    A.  The device was positioned where it doesn't capture the

6    person's face.  If it's a FaceNet recognition, it's not

7    capturing the person's face, period.

8    Q.  I understand.  But why wasn't it capturing the face?  My

9    understanding -- and correct me if I'm wrong -- that part of

10   the complaint was that the device was too low so that when

11   people walked up to it, it wouldn't capture their face, it

12   would capture their chest or something like that?

13              MR. BHATIA:  Objection, your Honor.

14              THE COURT:  Sorry.  What's the objection?

15              MR. BHATIA:  Compound question.

16              THE COURT:  Yes.  Also cease asking about your

17   understanding.  It's complicating the question.  Just ask her

18   what the facts are.

19              MR. DiRUZZO:  Sure.

20   Q.  Ma'am, was the device too low in that it took a picture of

21   someone's chest instead of their face?

22   A.  That's my assessment.  And I was looking for Ari.  Is it

23   because it's low, because my concern was it's not capturing the

24   first person's face.  Could it be it's too low.  I don't know.

25   That's why I was looking for him to give me an answer.

1    Q.  But, ma'am --

2    A.  Why isn't it capturing the face of the person?

3    Q.  But, ma'am, wasn't the reason that it was positioned where

4    it was was the device had to be Americans with Disability Act

5    compliant?

6    A.  That's what Ari is saying.

7    Q.  And you would agree with me that the Americans with

8    Disabilities Act, also known as the ADA, that's a federal law?

9               MR. BHATIA:  Objection, your Honor.

10              THE COURT:  Sustained.  There's no evidence that that

11   is, in fact, true.  Then this case is not about the Americans

12   with Disabilities Act.  Counsel, move on.

13   BY MR. DiRUZZO:

14   Q.  Now, ma'am, the device was moved from its initial position

15   to a different position on the building; is that correct?

16   A.  I believe that happen in January, maybe it was December or

17   January.  Months we were working with Ari on it.  And we had to

18   move it because the mailman can't -- it's illegal -- the

19   mailman can't get to the mailbox.  And we just could not have

20   that there anymore.

21              And there's a hole, there's a big hole where the old

22   panel was.  So the person that we had come and do our lobby,

23   just move it, cover the panel, and so that the mailman can

24   access to the -- to the mailbox.  And so if Ari can't explain

25   where its positioning is not capturing the face, and there's a

1    hole in the panel, we move that onto where the hole is, and so

2    that the mailman can get to that.

3            And then right from the start, Ari knows, he said,

4    When you're -- he said that you can have your contractor move

5    that -- that panel.

6    Q.  Just so we're clear, ma'am, it was a contractor that the

7    board hired or Crystal hired to move the device?

8    A.  It was a contractor to the corporation, yes.

9    Q.  Just for clarity, it wasn't GateGuard and Mr. Teman that

10   moved it, it was the co-op board that moved it?

11   A.  Not co-op board, but contractor to the co-op board, yes.

12   But that was January, after months and months of working with

13   Ari.

14           MR. DiRUZZO:  The Court's indulgence, your Honor.

15           (Counsel conferred)

16           MR. DiRUZZO:  Yield the witness, your Honor.

17           THE COURT:  All right.  Any redirect?

18           MR. BHATIA:  Briefly, your Honor.

19           THE COURT:  Go ahead.

20   REDIRECT EXAMINATION

21   BY MR. BHATIA:

22   Q.  Ms. Soon-Osberger, you were asked a few questions about

23   what Mr. Teman promised you regarding the device, right?  Some

24   of the features of it and how it would -- how it involved

25   facial recognition?  Did the device work?

1    A.  There's no such thing as facial recognition in that device.

2                THE COURT:  One moment.

3                Counsel, the witness was shaking her head, I think,

4    intending to convey either a no or yes.

5                You need to use words.

6    A.  No, it did not have.

7    Q.  It did not.  What was wrong with it?

8    A.  What's that?

9    Q.  What was wrong with the device?

10   A.  What was wrong?

11               First of all, it was not facial recognition at all.

12   Facial recognition means your face goes into that system and

13   opens the door.  That never even existed.

14               Secondly, there's no -- it never did a handshake to

15   our intercom, our network system, to open the door, to dial

16   somebody if somebody's at the door and they press the button to

17   the guest.  The delivery person, you give them access to it,

18   they can't access because it isn't opening the door for them.

19   Q.  How long did you have the intercom installed in the

20   building?

21   A.  We had it August to almost about January 10th.

22   Q.  So that's several months?

23   A.  Five, six months.

24   Q.  How long did it actually work?

25   A.  How long did it work?  It didn't -- I think it worked like

1    it will -- it will open up one time, and then you do a second

2    time, it doesn't work anymore.

3    Q.  Why did you keep -- I'm sorry.

4    A.  Sorry.  It keep looking for the internet service the second

5    time.

6    Q.  Why did you keep it installed so long if it didn't work?

7    A.  Because we were trying to work with Ari.  He keep giving us

8    reason why it doesn't work.  So we tried different things and

9    we tried different things.  And we try a different network

10   services.  We pay a lot of money to get Spectrum in there to

11   install the network system.  We got the Spectrum, we connected

12   it, and it didn't work.  Nothing worked.

13   Q.  And did he tell you what would happen if you removed the

14   device?

15   A.  He was threatening, yeah, that he would charge the $18,000.

16   Q.  Was that part of the reason you kept it so long?

17   A.  Yeah, yeah, it's all these threats were -- yeah.

18            MR. BHATIA:  No further questions, your Honor.

19            THE COURT:  All right.

20            Any recross, Mr. DiRuzzo?

21            MR. DiRUZZO:  Quickly, your Honor.

22            THE COURT:  Go ahead.

23   RECROSS EXAMINATION

24   BY MR. DiRUZZO:

25   Q.  Ma'am, the system worked insofar as, at a minimum, it

1    provided a bunch of data or information when you go onto the

2    site, you could login and view the logs of people coming and

3    going into the building; correct?

4    A.  It logged the system trying to come in and go out.  It

5    never opened the door for anybody.

6    Q.  Okay.  But my question was though the system did collect

7    data, and that data was available to the board; correct?

8    A.  The foremost reason we bought the system is so that people

9    can access the building, delivery people, guests of the

10   shareholders, anybody that need a virtual key to access or not

11   have to use a key, that was another functionality that we were

12   looking for.  It's a functionality of exiting, entering.

13          The data really didn't -- we weren't even have access

14   to it.  Management have access.  If we needed information, we

15   go to them for it.  It's not something that was a priority when

16   we look for the system.  It was the entering and exiting

17   capability.

18   Q.  Now, ma'am, you testified that Mr. Teman threatened to

19   start litigation against the board; correct?

20   A.  Yes.

21   Q.  But the board was more than able to start its own

22   litigation to contest the validity of the contract; correct?

23   A.  I'm not understanding, that something I didn't --

24   Q.  Let me ask it a different way:  Mr. Teman threatened to

25   sue; correct?

1    A.   Mm-hmm.

2    Q.   The board could have sued Mr. Teman and GateGuard, but it

3    chose not to?

4              MR. BHATIA:   Objection, your Honor.

5              THE COURT:   Sustained.   Beyond the scope.

6              MR. DiRUZZO:   Nothing further, your Honor.

7              THE COURT:   All right.

8              Any re-redirect?

9              MR. BHATIA:   No.

10             THE COURT:   All right.

11             Ms. Soon-Osberger, you may step down.   Your testimony

12   is complete.   Thank you.

13             (Witness excused)

14             THE COURT:   Government, call your next witness.

15             MR. BHATIA:   The government calls Gina Hom.

16   GINA HOM,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19             THE COURT:   All right.   Good afternoon, Ms. Hom.

20             Welcome to court.

21             I'll ask you kindly to keep your voice up.   So lean

22   into the mic and really shout it out so that everyone in this

23   large old courtroom can hear you.

24             THE WITNESS:   Okay.

25             THE COURT:   All right.

1           Counsel you, may inquire.

2    DIRECT EXAMINATION

3    BY MR. BHATIA:

4    Q.  Ms. Hom, where do you work?

5    A.  Crystal Real Estate Management.

6    Q.  What's your title there?

7    A.  Vice president.

8    Q.  What are your day-to-day responsibilities as a vice

9    president?

10   A.  I oversee all the finances on all the properties that we

11   manage.

12   Q.  And are you familiar with the building at 18 Mercer Street?

13   A.  Yes.

14   Q.  What's your familiarity with it?

15   A.  We used to manage that property about a year ago.

16   Q.  At Crystal Real Estate Management, you were the management

17   company for 18 --

18   A.  Correct.  Correct.

19   Q.  And what kind of work did you do on behalf of 18 Mercer

20   Street?

21   A.  We oversaw the day-to-day operations.

22   Q.  What kind of work did you do with regards to finances?

23   A.  We collected the maintenance, we paid vendor bills, we paid

24   the mortgage, we paid utilities, repair bills.

25   Q.  You say "we."  Who else --

1   A.  Real estate management, I'm sorry.

2   Q.  At Crystal Real Estate Management, what kind of work did

3   you do with regard to paying expenses?

4   A.  As invoices came in, we would pay the repair bills or any

5   of the maintenance bills, "maintenance" meaning elevator,

6   boiler.

7   Q.  At Crystal Real Estate Management, who is authorized to

8   sign for the 18 Mercer account?

9   A.  It was myself and my partner, Jackeline Monzon.

10  Q.  Okay.  Are you familiar with the entity 18 Mercer Equity,

11  Inc.?

12  A.  Yes.

13  Q.  What is that?

14  A.  That is a cooperative that Crystal Real Estate Management

15  was hired to manage.

16  Q.  And did you manage the account for -- the bank account for

17  18 Mercer Equity, Inc.?

18  A.  Yes, we did.

19  Q.  What kind of funds went into that account?

20  A.  The funds were any maintenance collected for the property

21  on a monthly basis.

22  Q.  So those are the shareholders' monthly maintenance

23  payments?

24  A.  Correct.

25  Q.  What was the process for approving expenses on the 18

1   Mercer Equity account?

2   A.   Any invoices that comes in for any day-to-day operations of

3   the property, the managing agent, which was my partner,

4   Jackeline Monzon, would review the invoice and approve it.

5   Q.   And would you require any other approvals in order to pay

6   out an expense?

7   A.   If it was a major repair or expense, then the board would

8   have to approve it as well.

9   Q.   Were invoices required to pay expenses?

10  A.   I'm sorry?

11  Q.   Were invoices required in order to pay expenses?

12  A.   Yes, they were.

13  Q.   Shifting gears now, are you familiar with the GateGuard

14  intercom?

15  A.   Yes, I am.

16  Q.   I'm sorry.  Go ahead.

17  A.   I'm sorry.  That was a company that was hired to install

18  new intercom system.

19  Q.   And did they install one at 18 Mercer Street?

20  A.   To the best of my knowledge, yes.

21  Q.   What was the experience of the shareholders of 18 Mercer

22  with the GateGuard intercom?

23          MR. DiRUZZO:  Objection.  Hearsay.

24          THE COURT:  Sustained.

25  Q.   Did there come a time when you were approved to pay an

1    invoice for the 18 Mercer Equity account to GateGuard?

2    A.  Yes, I was.

3    Q.  I'd like to direct your attention to Government Exhibit 143

4    in evidence.  Is this a check that you issued to GateGuard,

5    Inc.?

6    A.  Yes, it is.

7    Q.  How do you know that?

8    A.  Because that is my signature on the bottom.

9    Q.  And does this look like the checks you issued on behalf of

10   18 Mercer Equity, Inc.?

11   A.  Yes, it is.

12   Q.  And this is a check for $3,947.88.  Walk us through the

13   process from getting an invoice to paying out this check.

14   A.  Okay.  With regard to this particular invoice, it was

15   emailed out by the board saying that this was a deposit needed

16   in order for GateGuard to install the new intercom system.

17   Q.  What happens after you get an --

18   A.  After I get -- I'm sorry.  After I get the invoice, I enter

19   into the system, and then I issue the check.  And I do not

20   recall if the check was mailed or if it was picked up.

21   Q.  You mentioned two things, you mentioned an invoice and you

22   mentioned an email.

23   A.  Correct.

24   Q.  Are both of those things required in order to pay that

25   expense or is only one of them required?

K1NVTEM5                        Hom - direct

1  A.  On this particular case, yes.

2  Q.  I'm sorry, are both required?

3  A.  The email was sent by the board with their approval to pay

4  this invoice.  And attach the email was a copy of an invoice.

5  Q.  In order to pay an invoice for a vendor like GateGuard, you

6  would require both an invoice and a board approval?

7  A.  Correct.

8  Q.  Okay.  I'd like to direct your attention to Government

9  Exhibit 143, also in evidence.

10          I'm sorry.  I'll direct your attention to Government

11  Exhibit 201 and 202.  Let me look at 202 first.

12          Is this a check that you issued from the 18 Mercer

13  Equity account?

14  A.  No, it is not.

15  Q.  Did you authorize this check?

16  A.  No, I did not.

17  Q.  And how do you know that?

18  A.  Because the font and the whole entire look of the check is

19  not what I'm familiar with.  And that is not my signature on

20  the bottom of the check.

21  Q.  Did there come a time in March 2019 when you learned about

22  an unauthorized -- when you reported an unauthorized check in

23  the 18 Mercer Equity account?

24  A.  Yes.

25  Q.  How did you find out about that check?

1    A.   After we -- Crystal Real Estate Management terminated the

2    contract of 18 Mercer, which would have ended March 31st, on or

3    about the 15th of March.  I was checking the bank account on a

4    daily basis to make sure that any outstanding checks that we

5    had issued on behalf of 18 Mercer has cleared so I can close

6    the account.  At that point I noticed an $18,000 check from the

7    night before had gone through the bank.  And I know I did not

8    issue an $18,000 check.

9    Q.   Is this the check that you saw?

10   A.   Yes.

11   Q.   What was your reaction to seeing it?

12   A.   Shocked.  And at that point I called the bank and had them

13   place a stop payment on it.

14   Q.   Why were you shocked?

15   A.   Because I did not issue a check.  And it overdrew my

16   account.  I'm sorry, not my account, 18 Mercer's account.

17   Q.   It overdrew the account?

18   A.   Correct.

19   Q.   And when you reported this check as unauthorized -- is that

20   right?  You did that?

21   A.   Yes, I did.  I emailed the bank.

22   Q.   Did you ask the board first whether this was authorized?

23   A.   No.

24   Q.   Why not?

25   A.   Because the only people that were authorized to issue any

1   payments on this would have been myself or Jackeline.  And

2   neither one of us had done it.

3   Q.  Fair to say that because you didn't authorize the check,

4   you were able to report it as unauthorized?

5   A.  Correct.

6           MR. BHATIA:  One moment, your Honor.

7           (Counsel conferred)

8   Q.  Did you ever see an invoice in connection with this check?

9   A.  With this -- the $18,000 check?

10  Q.  Yes.

11  A.  No, I did not.

12  Q.  Did you ever receive -- did there ever come a time when you

13  received an invoice for $18,000 from GateGuard, Inc.?

14  A.  No, I did not.

15  Q.  Did there ever come a time when you had approval from

16  Bonnie to write a check for $18,000?

17  A.  No, I did not.

18          MR. BHATIA:  No further questions, your Honor.

19          THE COURT:  All right.

20          Cross-examination.  Mr. DiRuzzo.

21  CROSS-EXAMINATION

22  BY MR. DiRUZZO:

23  Q.  Good afternoon, ma'am.

24  A.  Good afternoon.

25  Q.  My name is Joseph DiRuzzo.  I represent Mr. Teman.

1              We've never spoken before; correct?

2    A.  Correct.

3    Q.  And so I'm going to ask you a couple questions.  If I speak

4    too fast, don't speak loud enough, just let me know.  I'll

5    either repeat or rephrase.

6    A.  Okay.

7    Q.  Ma'am, I'm going to start off with talking about Crystal's

8    relationship with 18 Mercer.  It's my understanding that you,

9    "you" being Crystal, were the management company for 18 Mercer;

10   correct?

11   A.  Correct.

12   Q.  And you did for Mercer what I assume you do for most co-op

13   or condo buildings, you accept monthly fees and then you pay

14   monthly bills; is that correct?

15   A.  Correct.

16   Q.  And in doing so, you would issue checks.  And I'm going to

17   show you an example of a check.  Government Exhibit 143 is

18   already admitted in evidence.  And this is the document that

19   you just testified about.

20             Ma'am, this is -- is this your signature, is that my

21   understanding?  Did you write this check?

22             THE COURT:  Please don't ask about your understanding.

23   She doesn't know it.  Just ask whether it's her signature.

24   Q.  Is that your signature, ma'am?

25   A.  That one, yes.

1   Q.  Now, to be clear, this check off of this bank account, that

2   wasn't Crystal's money, that was Mercer's money; correct?

3   A.  That's correct.

4   Q.  So it's a Mercer bank account that you manage, run; that

5   fair to say?

6   A.  Correct.

7   Q.  Now, ma'am, I'm showing you what's been marked as

8   Government Exhibit 202, which is already in evidence.

9           Do you see that in front of yourself, ma'am?

10  A.  There's nothing on my screen.

11  Q.  Are you able to see that, ma'am?

12  A.  Yes.

13  Q.  Now, ma'am, on the bottom right-hand side, do you see this

14  language right there, "Draw per contract.  No signature

15  required"?

16  A.  Yes.

17  Q.  Ma'am, you were aware that Mercer had a contract with

18  GateGuard; correct?

19  A.  No.

20  Q.  You weren't aware of that?

21  A.  I was not aware they had a contract.  I know that they had

22  an agreement with them.

23  Q.  Okay.

24  A.  As far as I know.

25  Q.  Well, what's your understanding of the agreement that you

1   believed Mercer had with GateGuard?

2   A.   That they hired -- 18 Mercer hired GateGuard to install the

3   new intercom system.

4   Q.   Okay.  But that was the extent of your understanding of the

5   business relationship between Mercer and GateGuard?

6   A.   Correct.

7   Q.   I'm showing you a document that's been admitted in

8   evidence, Government Exhibit 431.  And bottom of the first page

9   here, can you see that?  Are you able to read that, ma'am?

10  Would you like me to blow it up a little bit?

11  A.   No, that's okay.  I see it.

12  Q.   Okay.  Ma'am, is that your email address?

13  A.   Yes, it is.

14  Q.   So you received this email from Ms. Soon-Osberger; correct?

15  A.   Yes.

16  Q.   And this email had an attachment.  Are you able to see that

17  there, ma'am?

18  A.   A little blurry, but --

19          THE COURT:  Can you zoom it, counsel?  Thank you.

20  Q.   Is that a little better, ma'am?

21  A.   Yes.

22  Q.   And you would agree with me that that's -- this is the

23  attachment that came with the email that I just referenced that

24  you received from Ms. Soon-Osberger; correct?

25  A.   Yes.

1    Q.  And, ma'am, do you see that right there:  Buyer accepts

2    terms and conditions at, then there's a website?

3    A.  Yes.

4    Q.  Ma'am, you actually saw this document, because you signed

5    the check in the amount of just under $4,000; correct?

6    A.  Correct.

7    Q.  And, ma'am, did you bother to take a look at the terms and

8    conditions that were referenced in this invoice?

9    A.  No, because it was -- I was instructed by the board to pay

10   on their behalf.

11   Q.  So, ma'am, I'm showing you what's been marked and admitted

12   in evidence as Government Exhibit 441.

13           Ma'am, can you see that in front of you?

14   A.  Yes.

15   Q.  Ma'am, this is a GateGuard terms and conditions.  So is it

16   your testimony that you never saw -- or let me say it another

17   way.  Is your testimony that you were never provided this

18   document by anyone at the board of 18 Mercer?

19   A.  I never saw this, no.

20   Q.  I understand.

21   A.  I never saw the terms and conditions.

22   Q.  But my question was were you ever provided it by anyone at

23   18 Mercer?

24   A.  No.

25   Q.  And, ma'am, when you communicated with Signature Bank that

1    there was no authorization -- well, let me back up a step.

2              Returning your attention to Government Exhibit 202,

3    this portion right here, "Draw per contract," you never went to

4    the board at 18 Mercer to inquire if the board had entered into

5    a contract with GateGuard that would have allowed GateGuard to

6    issue this check?

7    A.  No.

8    Q.  And I just want to make sure it's clear, because I phrased

9    my question in the negative.  So I asked you, you never went

10   to --

11   A.  I never went to the board with regard to this check.

12   Q.  And because you've never seen the terms and conditions, you

13   were never provided the terms and conditions, you obviously

14   didn't have the opportunity to read the terms and conditions;

15   correct?

16   A.  That's correct.

17             MR. BHATIA:  Objection.

18             THE COURT:  Overruled.

19             MR. DiRUZZO:  Yield the witness, your Honor.

20             THE COURT:  Any redirect?

21             (Counsel conferred)

22   REDIRECT EXAMINATION

23   BY MR. BHATIA:

24   Q.  Ms. Hom, you were one of the authorized signers for the 18

25   Mercer Equity account?

1   A.   I'm sorry?

2   Q.   You were one of the authorized signers for the 18 Mercer

3   Equity account?

4   A.   Yes.

5   Q.   And you paid certain vendors when there's a contract

6   between the board and that vendor, right?

7   A.   Correct.

8   Q.   In those instances, was there an invoice?

9   A.   Yes.

10   Q.   Was an invoice required even if there was a contract?

11   A.   At all times, yes.

12   Q.   Why was an invoice required?

13   A.   Because that was proof of what the vendor did.  And in this

14   case, the board would have had to approve any installation of

15   any agreement that they made with them.

16   Q.   Did you ever pay checks based on a contract alone?

17   A.   No.

18            MR. BHATIA:  No further questions, your Honor.

19            THE COURT:  Any recross?

20            MR. DiRUZZO:  Yes, your Honor.

21   RECROSS EXAMINATION

22   BY MR. DiRUZZO:

23   Q.   Ma'am, the vendors of 18 Mercer, they would have been privy

24   to your relationship with Crystal -- let me say this -- phrase

25   it this way:  The requirement that you had that you needed an

1   invoice before you would issue a check on behalf of 18 Mercer,

2   that requirement was between Crystal and 18 Mercer; correct?

3   A.  No.

4   Q.  Where did that requirement come from?

5   A.  We -- Crystal Real Estate Management always has invoices.

6   Any vendors that we pay, any checks that we issue, we always

7   have an invoice.

8   Q.  So is that Crystal's rule or is that 18 Mercer's rule?

9   A.  Both.

10  Q.  So you both have the same rule?

11  A.  Yes.

12  Q.  But you would agree with me that the vendors of 18 Mercer

13  might not know about that rule; correct?

14  A.  They would if they were -- they want a check issued, yes.

15  If they wanted a check issued, we would ask them to submit

16  invoice for payment.

17  Q.  Well, ma'am, if someone from the board of 18 Mercer

18  informed an 18 Mercer vendor that an invoice was not needed,

19  you wouldn't have been able to control that, would you?

20  A.  We would need receipts of anything that was done.

21          MR. DiRUZZO:  No further questions.

22          THE COURT:  Any re-redirect?

23          MR. BHATIA:  No, your Honor.

24          THE COURT:  Ms. Hom, you may step down.  Your

25  testimony is complete.  Thank you.

484

K1NVTEM5

1            (Witness excused)

2            THE COURT:  Government, call your next witness.

3            MR. BHATIA:  The government calls Joseph Soleimani.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1ndtem6                    Soleimani – direct

1            THE COURT:  Ladies and gentlemen, if you want to take

2   a moment and stretch your legs, this is a good moment while we

3   wait for the witness.

4            (Pause)

5   JOSEPH SOLEIMANI,

6        called as a witness by the government,

7        having been duly sworn, testified as follows:

8            THE CLERK:  Please be seated.

9            State and spell your full name for the record, please.

10           THE WITNESS:  Joseph Soleimani, J-o-s-e-p-h

11  S-o-l-e-i-m-a-n-i.

12           THE COURT:  All right.  Good afternoon, Mr. Soleimani.

13  All right.  Welcome to the court.

14           I can already tell that you have a soft voice.  That

15  won't work.  I need you to really bellow it out.  So lean into

16  the mic.  Keep your voice up so that everyone here can hear

17  you.

18           Counsel, you may inquire.

19  DIRECT EXAMINATION

20  BY MR. BHATIA:

21  Q.  Mr. Soleimani, where do you work?

22  A.  ABJ Properties.

23  Q.  And what is your title there?

24  A.  Vice president.

25  Q.  How long have you had the title of vice president?

K1ndtem6                        Soleimani - direct

1    A.   14 years.

2    Q.   What kind of work does ABJ Properties do?

3    A.   It is a property management company.

4    Q.   And what does it mean to be a property management company?

5    A.   We oversee operations of several properties.

6    Q.   You may have to speak up just a little bit louder.

7    A.   We oversee operations of several properties.

8    Q.   Thank you.

9         What types of properties does it manage?

10   A.   Multifamily and mixed use.

11   Q.   As a general matter, where are those buildings located?

12   A.   Northern Manhattan and Bronx.

13   Q.   And focusing on you now, as vice president, what are your

14   duties?

15   A.   I oversee building managers, the accounting, the legal, and

16   overall day-to-day operations.

17   Q.   About how many buildings does ABJ Properties manage?

18   A.   50.

19   Q.   And so do you play that role for all of those buildings?

20   A.   Yes.

21   Q.   In the finances, are you involved in budgeting?

22   A.   Yes.

23   Q.   Do you have responsibilities over writing checks?

24   A.   Yes.

25   Q.   And do you have a role in invoicing and paying expenses?

1    A.   Yes.

2    Q.   What is your role with regards to negotiating and approving

3    contracts?

4    A.   I'm authorized to approve and negotiate those contracts.

5    Q.   Are you familiar with a company called ABJ Milano LLC?

6    A.   Yes.

7    Q.   What is it?

8    A.   ABJ Milano LLC is an entity that owned several properties

9    which ABJ Properties managed.

10   Q.   Are you familiar with a term -- the name ABJ Lenox LLC?

11   A.   Yes.

12   Q.   And what is ABJ Lenox?

13   A.   ABJ Lenox also owns several properties that were managed by

14   ABJ Properties.

15   Q.   OK.  And what is the connection between -- I promise you we

16   won't keep using the long names all the time, but ABJ

17   Properties, ABJ Lenox and ABJ Milano, what is the connection

18   between the three of those?

19   A.   ABJ Properties managed the properties owned by the other

20   two entities.

21   Q.   And who are the owners of ABJ Properties?

22   A.   Myself and my brother Benjamin.

23   Q.   How do you and your brother divide day-to-day

24   responsibilities at ABJ Properties?

25   A.   He handles more of the acquisitions, dispositions.  I

1    handle more of the day-to-day operations.

2    Q.  If there was a contract between -- or if there is an

3    agreement between ABJ Properties and a vendor, who would enter

4    into that agreement?

5    A.  I would.

6    Q.  Changing topics now.

7            How did you first meet Mr. Teman?

8    A.  I reached out to him regarding his Sublet Spy software.

9    Q.  When did you first meet -- when did you first meet

10   Mr. Teman?

11   A.  It was late 2016, around November/December.

12   Q.  And is there a person in this courtroom today that you

13   recognize as Mr. Teman?

14   A.  Yes.

15   Q.  Can you identify him by an article of clothing?

16   A.  Sure.  He's wearing a silver tie, blue suit.

17           MR. BHATIA:  Your Honor, I would like the record --

18   with the Court's permission, I would like the record to reflect

19   that the witness has identified the defendant.

20           MR. GELFAND:  No objection.

21           THE COURT:  The record so reflects.

22   BY MR. BHATIA:

23   Q.  Is that a person you had done business with in the past?

24   A.  Yes.

25   Q.  When you first met Mr. Teman, was there a product he was

1    selling?

2    A.  Yes.

3    Q.  What was that product?

4    A.  He was selling the Sublet Spy software.

5    Q.  And what did he tell you was Sublet Spy?

6    A.  Sublet Spy was software that would catch people who were

7    using their apartment for Airbnb or other short-term sublet

8    services.

9    Q.  Did you ultimately subscribe to Sublet Spy?

10   A.  Yes.

11   Q.  When was that?

12   A.  That was soon after I met him.

13   Q.  Did there come a time when ABJ Properties purchased another

14   product from Mr. Teman?

15   A.  Yes.

16   Q.  What was that product?

17   A.  That was the GateGuard system.

18   Q.  And what did he tell you was GateGuard?

19   A.  GateGuard is an intercom and door entry system.

20   Q.  What did he tell you were the features of the device?

21   A.  People could enter a code or would be able to enter the

22   building using facial recognition.  It would also act as an

23   intercom.  Someone could ring on the intercom, it would go to

24   your phone, tablet, or your computer.

25   Q.  Did there come a time when you agreed to purchase some

K1ndtem6                        Soleimani - direct

 1  intercom devices?

 2  A.  Yes.

 3  Q.  In how many properties?

 4  A.  Seven.

 5  Q.  If you could take a look at -- and there is a binder to

 6  your left -- Government Exhibits 401 through 409.  I am just

 7  going to ask you if you recognize them.

 8          (Pause)

 9  A.  Yes, I recognize these.

10  Q.  How do you recognize them, as a general matter?

11  A.  They're either pictures I recognize or emails that I was

12  part of.

13  Q.  And are the emails with or to or from a particular person?

14  A.  Yes.

15  Q.  Who?

16  A.  Ari Teman.

17          MR. BHATIA:  Your Honor, the government offers

18  Government Exhibits 401 through 409.

19          THE COURT:  Any objection?

20          MR. GELFAND:  May I have one minute?

21          THE COURT:  Of course.

22          (Pause)

23          MR. GELFAND:  May I confer with Mr. Bhatia for a

24  moment?

25          THE COURT:  Go ahead.

1          (Pause)

2          MR. GELFAND:  Your Honor, can we approach the sidebar

3     for a minute?

4          THE COURT:  Sure.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            MR. GELFAND:  Your Honor, there is a rule of

3       completeness issue.  I don't want to get into the narrative in

4       front of the jury.  One of the emails that the government is

5       seeking to admit is an email from Mr. Teman that basically says

6       GateGuard is closing down.

7            THE COURT:  What email is it, what document?

8            MR. BHATIA:  403.

9            THE COURT:  All right.  This is document 403, and it

10      is an email from Mr. Teman to Mr. Soleimani on March 9, 2018.

11           Go ahead.  What is the issue?

12           MR. GELFAND:  There is a follow up to that email

13      immediately responding from Ben Soleimani, cc'ing Joseph

14      Soleimani and Mr. Teman, basically saying don't shut it down,

15      and we would move to admit that under the rule of completeness

16      if this is coming in.

17           THE COURT:  Is there any objection to that?

18           MR. BHATIA:  Yes, your Honor.  I don't think the out

19      of court statement of Mr. Soleimani should be able to come in

20      just because this one is.  Mr. Ben Soleimani is not likely to

21      be called as a witness.

22           THE COURT:  Let me ask you this question.  Is that

23      email from Mr. Ben Soleimani to -- it is a reply, so it will be

24      to, among others, this witness, correct?

25           MR. GELFAND:  Yes, your Honor.

K1ndtem6                    Soleimani - direct

1          THE COURT:  Why do I need to address it now?  Why

2    can't I address it on cross?

3          MR. GELFAND:  I can move it in on cross.

4          THE COURT:  Hand me a copy, and on cross I will make

5    an independent informed by the direct.  I will reserve on that.

6          MR. GELFAND:  Thank you.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2            THE COURT:  I will receive Government Exhibits 401

3    through 409.

4            Counsel, you may inquire.

5            (Government's Exhibits 401 through 409 received in

6    evidence)

7            MR. BHATIA:  One moment, your Honor.

8            (Pause)

9    BY MR. BHATIA:

10   Q.  Mr. Soleimani, can you also take a look at Government

11   Exhibits 409A through 409B?

12   A.  OK.

13   Q.  Do you recognize those?

14   A.  409A appears to be invoices I received.  409B I do not

15   recognize.

16   Q.  I'm sorry?

17   A.  409B I do not recognize.

18           MR. BHATIA:  One moment, your Honor.  May I approach

19   the witness?

20           THE COURT:  You may.

21           (Pause)

22   Q.  All right.  Now, you are looking at 409B?

23   A.  Yes.

24   Q.  Do you recognize 409B?

25   A.  Yes.

K1ndtem6                         Soleimani - direct

1   Q.  What are the two of those documents?

2   A.  These are invoices for the GateGuard system.

3   Q.  Are those invoices that were sent to you?

4   A.  Yes.

5   Q.  And are they invoices that you paid?

6   A.  Yes.

7            MR. BHATIA:  Your Honor, the government moves to admit

8   409A and 409B.

9            THE COURT:  Any objection?

10           MR. GELFAND:  No objection.

11           THE COURT:  Those are both received.

12           (Government's Exhibits 409A and 409B received in

13   evidence)

14   BY MR. BHATIA:

15   Q.  Getting back to substance, did you end up purchasing any

16   GateGuard devices?

17   A.  Yes.

18   Q.  And did you convey that to Mr. Teman, that you wanted to

19   buy them?

20   A.  Yes.

21   Q.  How did you pay for the intercom devices?

22   A.  Via check.

23   Q.  And did you receive an invoice for those devices?

24   A.  Yes.

25   Q.  I'd like to display on the screen Government Exhibit

K1ndtem6                    Soleimani - direct

1   409A -- you can take a look at it -- in evidence.

2            So, 409A, is this document a set of invoices to you?

3   A.  Yes.

4   Q.  And they are made out to ABJ Properties, right?

5   A.  Correct.

6   Q.  And your name is Joseph Soleimani below that?

7   A.  Yes.

8   Q.  And it has your email address as well?

9   A.  Correct.

10  Q.  So could we look at now the items listed in this invoice.

11           In the first row it says:  Quantity one, GateGuard.xyz

12  Panel.  There is a unit price of 500, and an amount 500.

13           There is also lines for installation and monthly

14  service.

15           Did you pay this invoice in full?

16  A.  Yes.

17  Q.  Did you pay all the invoices in Government Exhibits 409A

18  and 409B?

19  A.  To my recollection, yes.

20  Q.  Did the price that you paid for your GateGuard devices

21  include service?

22  A.  Yes.

23  Q.  How much service did it include?

24  A.  Six months.

25  Q.  Did you own the intercoms when you purchased them?

1   A.  As far as I knew, yes.

2   Q.  At the time you believed you owned them?

3   A.  Yes.

4   Q.  And had you had conversations with Mr. Teman about

5   purchasing those devices?

6   A.  Yes.

7   Q.  You guys had a back and forth?

8   A.  Yes.

9   Q.  Did you meet in person at any time?

10  A.  Yes.

11  Q.  What conversations, if any, did you have over the phone?

12         THE COURT:  In person, is that your question?

13         MR. BHATIA:  I asked him previously about in person.

14  Now I am asking about the phone.

15         THE COURT:  Very good.

16  A.  I don't recall the details of the phone conversations.

17  Q.  Did your conversations include pricing?

18  A.  Yes.

19  Q.  Did they include what you would pay for the device?

20  A.  Yes.

21  Q.  During those conversation, what, if anything, did Mr. Teman

22  tell you about whether he would have the authority to draw

23  checks on behalf of ABJ Properties?

24  A.  That was never mentioned.

25  Q.  What, if anything, did he say during those conversations --

1    let me be more specific.

2            When you were talking to him about buying these first

3    devices, what, if anything, did Mr. Teman tell you about

4    whether you would be committed to a ten-year contract?

5    A.   There was no discussion about any kind of contract.

6    Q.   And during these same conversations -- and I am going to

7    make it specific to those conversations -- what, if anything,

8    did he tell you about his authority to write checks on behalf

9    of ABJ Properties?

10   A.   He never mentioned anything of that sort.

11   Q.   At the time you purchased the intercoms, the ones listed in

12   Government Exhibits 409A and 409B -- let me rephrase that.

13           After you paid the invoices for 409A and 409B, did

14   Mr. Teman tell you that you had not paid in full?

15   A.   At some very later point, yeah.

16   Q.   But right after you paid it, you didn't hear anything from

17   him about that?

18   A.   No.

19   Q.   At the time you -- prior to paying for these intercoms, had

20   Mr. Teman ever told you anything about paying a fee if you

21   wanted to stop using the devices?

22   A.   No.

23   Q.   Did he mention anything to you about a device removal fee?

24   A.   No.

25   Q.   Could you take another look at 409A?

1   A.   Sure.

2   Q.   What is the date on this invoice?

3   A.   March 2nd, 2017.

4   Q.   OK.   I would like to direct your attention to Government

5   Exhibit 401.

6           MR. BHATIA:   If we can zoom in on just the top, the

7   subject, the attachment line.

8   Q.   Is this an email from Ari Teman to you and your brother,

9   Benjamin?

10  A.   Yes.

11  Q.   And the date on this email is September 25, 2017?

12  A.   Correct.

13  Q.   He writes -- the subject line is, "We're live."  What does

14  that mean to you?

15  A.   That means that the first system was installed.

16  Q.   This is September 2017?

17  A.   Yes.

18  Q.   Let's talk about the intercoms that were installed.

19           How did they perform?

20  A.   They did not perform well.

21  Q.   What issues did you have with the intercoms?

22  A.   The system would very often shut down and have to restart.

23  The facial recognition wouldn't work.  The intercom wouldn't

24  work.  And that was pretty much the major issues.

25  Q.   Did you receive complaints from tenants?

K1ndtem6                        Soleimani - direct

1    A.  Yes.

2    Q.  And what was the gist of those -- what was the substance of

3    those complaints?

4               MR. GELFAND:  Objection, your Honor.

5               THE COURT:  Counsel.

6               MR. BHATIA:  Your Honor, I believe they are admissible

7    not for the truth of the matter asserted.

8               THE COURT:  For what separate purpose are they

9    admissible?

10              MR. BHATIA:  For the intent on the witness here.

11              THE COURT:  All right.  I will receive the -- ladies

12   and gentlemen, the witness is about to relate conversations he

13   had with tenants about the intercoms.  I'm admitting the

14   statements by the tenants to the witness solely to explain the

15   witness' understanding and state of mind and his later

16   behavior, but you shouldn't take as necessarily true or not

17   true what the tenants said.  They are not here to testify.  So

18   it is, as we say in the law, hearsay.  You can consider what

19   the tenants said solely as it further reflects on the witness'

20   understanding and state of mind and his later actions.

21              Go ahead.

22   BY MR. BHATIA:

23   Q.  What did the tenants tell you about the GateGuard -- about

24   the issues with the GateGuard device?

25   A.  They were say8ing that they oftentimes were locked out of

1    the building because they couldn't get in.  There was no way to

2    get in without using the system, the GateGuard system.

3    Oftentimes, they couldn't get packages because the intercom

4    wasn't working.  These were not doorman buildings, there is no

5    package room, so they had no way to get those packages if the

6    intercom was not working.

7    Q.  And did you observe any problems with the intercom

8    yourself?

9    A.  Yes.

10   Q.  What problems did you observe yourself?

11   A.  I observed similar problems.

12   Q.  And did there come a time when you relayed those concerns

13   to Mr. Teman?

14   A.  Yes.

15   Q.  What did he say?

16   A.  Oftentimes he would blame it on either the Internet not

17   working, the power not strong enough, or simply me or the

18   tenants did not know how to use it.

19   Q.  When you received complaints from tenants, is that a

20   problem for you as somebody who manages those buildings?

21   A.  Yes.

22   Q.  Can it result in regulatory issues?

23   A.  Yes.

24   Q.  And have you dealt with problems in the past -- have you

25   sort of had to deal with tenant issues in the past?

1   A.  Yes.

2   Q.  In 2018, did the housing court find in one case that your

3   company had misled a tenant about whether he could renew his

4   lease?

5   A.  Yes.

6   Q.  And did you misrepresent anything to the tenant or was it

7   others in your company?

8   A.  It was others.

9   Q.  And did you and ABJ resolve that matter?

10  A.  Yes.

11  Q.  And did that have anything to do with GateGuard or

12  Mr. Teman?

13  A.  No.

14  Q.  OK.  But regarding GateGuard, you did receive complaints

15  from tenants?

16  A.  Yes.

17  Q.  And you relayed those to Mr. Teman?

18  A.  Yes.

19  Q.  Did there come a time when Mr. Teman told you that he was

20  shutting down GateGuard?

21  A.  Yes.

22  Q.  Did he tell you that in text messages?

23  A.  He said it several times I believe by email and text

24  message.

25  Q.  He said it more than once?

1    A.  Yes.

2              MR. BHATIA:  Mr. Magliocco, could you please publish

3    for the witness Government Exhibit 403.

4    Q.  Mr. Soleimani, you may want to follow along on the screen

5    so that we can all be sure that we are looking at the same

6    thing.  If you are having trouble seeing it, though, you can

7    look at the binder.

8              At the top of this email, it shows that it is -- if

9    you can zoom in a little bit on just the header -- it shows

10   that it's an email from Mr. Teman to you and your brother,

11   right?

12   A.  Yes.

13   Q.  And it is dated March 2018?

14   A.  Yes.

15   Q.  Was Mr. Teman telling you that he was shutting down his

16   system?

17   A.  Yes.

18   Q.  And why was that significant to you as somebody who had his

19   devices installed in your buildings?

20   A.  Because it would mean that the tenants would be locked out

21   permanently until the system is changed.

22   Q.  Did you -- what did you tell Mr. Teman when he said he was

23   shutting down GateGuard?

24   A.  I tried to convince him not to shut down.

25   Q.  Did you try to reassure him?

1    A.  I guess you could say that.

2    Q.  At that point, how would you describe your relationship

3    with Mr. Teman?

4    A.  It was OK.  There were a lot of issues that we were still

5    dealing with on the system, but we were trying to maintain that

6    relationship.

7    Q.  Would you describe it as otherwise friendly?

8    A.  Yes.

9    Q.  Did you or your brother make comments to Mr. Teman to ask

10   him to keep the GateGuard devices in place?

11   A.  Yes.

12   Q.  What effect would it have on a building if GateGuard shut

13   down unexpectedly?

14   A.  We would be getting a lot of complaints.  We would be

15   issued housing violations, possible fines.

16   Q.  Did there come a time when GateGuard was installed in your

17   buildings when you saw something called the Terms & Conditions

18   on a website?

19   A.  No.

20   Q.  Did there come a time when through a WhatsApp message

21   Mr. Teman directed you to the terms Web page?

22   A.  Yes.

23   Q.  Could you take a look at Government Exhibit 409C.  I'm

24   going to ask you if you recognize it.

25             (Pause)

 1  A.  I don't have a 409C.

 2  Q.  Mr. Magliocco will bring one up for you.

 3          THE COURT:  Sorry.  Is 409C in evidence?

 4          MR. BHATIA:  It is not in evidence, your Honor.

 5          THE COURT:  Let's get it up.  Thank you.

 6          (Pause)

 7  Q.  Do you recognize this?

 8  A.  Yes.

 9  Q.  As a general matter, what is this document?

10  A.  This is a WhatsApp chat between me and Ari Teman.

11          MR. BHATIA:  Your Honor, the government offers

12  Government Exhibit 409C.

13          THE COURT:  Any objection?

14          MR. GELFAND:  No, you Honor.

15          THE COURT:  It is received.

16          (Government's Exhibit 409C received in evidence)

17          MR. BHATIA:  You can pull this up on the screen.

18  BY MR. BHATIA:

19  Q.  I'm going to direct your attention to the line starting --

20  the third line from the top, it says:  "Joe S. This is

21  happening way too often."

22          Mr. Teman said, "It's restarting."

23          And you responded, "That's not good enough for me.  I

24  can't have tenants/visitors waiting for the system to restart.

25  it either works or it doesn't."

1           What were you relaying to Mr. Teman here?

2    A.   That we were getting complaints still that the system was

3    not functioning properly and we needed it to work 24/7, not

4    only part of the time.

5    Q.   OK.  Further down on this page, at 9:45:20, Mr. Teman says:

6    "The actual terms our clients are responsible to have CAT5 at

7    the door.  We did it for you but it's not the terms."

8           Then you respond:  "Send me the terms I signed for.  I

9    will review it."

10          Two rows down, Mr. Teman sends you a URL.

11          Why did you say, "Send me the terms I signed for, I

12   will review it"?

13   A.   Because I knew I never signed any kind of terms.

14   Q.   You have not had any agreement with Mr. Teman other than to

15   buy the devices and for him to install them?

16   A.   Correct.

17   Q.   And did you go to the URL shown here on this page?

18   A.   At a later point.

19   Q.   So looking down on the screen for a moment, further in this

20   chat, you say, "I don't see a signature there."

21          And then you list some things that you had agreed to.

22          You say, "I also agreed to a May 1st guarantee.  I

23   also agreed to tablets.  Should we keep going?"

24          What were you relaying to Mr. Teman here?

25   A.   Originally the intercom was supposed to be installed by

K1ndtem6                    Soleimani - direct

1    May 1st, and I paid for tablets to put in individual apartments

2    in full, which I believe is around $8,000, which never arrived.

3    Q.  At this point, had you agreed to any terms and conditions

4    with Mr. Teman?

5    A.  No.

6    Q.  So you talked a little bit earlier about your problems with

7    the GateGuard device.  Did there ever come a time when you

8    started looking for other alternatives?

9    A.  Yes.

10   Q.  What did you do?

11   A.  Sorry?

12   Q.  What did you do to look for other alternatives to

13   GateGuard?

14   A.  I looked into other systems.

15   Q.  And did there come a time when you installed one of those

16   alternatives in your building?

17   A.  Yes.

18   Q.  What happened?

19   A.  We installed a device in a different building, where my

20   office was located, so that we could test it out ourself on a

21   daily basis and make sure we didn't have similar problems

22   should we choose to replace these systems.

23   Q.  Did there come a time when Mr. Teman learned about the

24   device you had installed that was not a GateGuard intercom?

25   A.  Yes.

1    Q.  How did he react?

2    A.  He was not happy about it.

3    Q.  What, if anything, did he say to you?

4    A.  I believe I received some threats to remove the system.  He

5    sent someone to take a picture of it.  And he told us we had to

6    take it off.

7              MR. BHATIA:  I would like to publish for the witness

8    Government Exhibit 404.  We can zoom in on the text part of

9    this document.

10             I will give the jury just a moment to read it.

11             (Pause)

12   Q.  The first line of this document is:  "Because you're a

13   dishonest snake, a fraud, and a thief, all communication will

14   be in writing."

15             What was Mr. Teman referring to?  Why was Mr. --

16             MR. GELFAND:  Objection.

17             THE COURT:  Sustained.

18   Q.  Did something happen prior to this email that could have

19   prompted Mr. Teman to write this to you?

20             THE COURT:  Did something happen prior to this email

21   is the question?

22   Q.  Did something happen prior to this email?

23   A.  Yes.

24   Q.  What happened?

25   A.  I installed a different device in a different building.

K1ndtem6                          Soleimani - direct

1    Q.  Was there any contract that limited your ability to install

2    a different device in one of your buildings?

3    A.  No.

4    Q.  In your conversations with Mr. Teman around this time, did

5    he say anything about why he thought you should not have

6    installed that device?

7    A.  Not that I recall.

8    Q.  Did he say anything about an agreement that you had with

9    him to not install devices?

10              MR. GELFAND:  Your Honor, I object to this line of

11   questioning as leading.

12              THE COURT:  Sustained.

13   BY MR. BHATIA:

14   Q.  Did there come a time when Mr. Teman said that you owed him

15   money?

16   A.  Yes.

17              MR. BHATIA:  Your Honor, I would like to publish for

18   the witness Government Exhibit 405.

19              THE COURT:  You may.

20              MR. BHATIA:  And I'll direct your attention to an

21   email, the email at the bottom of the first page.

22              THE COURT:  You will need to blow this up.  It is

23   tiny.

24              MR. BHATIA:  The middle and bottom, I should say.

25              (Pause)

1   Q.  There is a lot of text here so I will direct your attention

2   to a part of it.

3              At the end of the first paragraph, Mr. Teman says to

4   you:  "The amount we sent to collections last week is 268,116,"

5   and then he lists an amount per device.

6              Had you agreed to pay that amount to Mr. Teman?

7   A.  No.

8   Q.  In fact, how much had you agreed to pay Mr. Teman per

9   device?

10  A.  $1,743.

11  Q.  And that was the amount reflected on those invoices we

12  looked at earlier?

13  A.  Yes.

14  Q.  Had you ever agreed to pay Mr. Teman more than the value of

15  those invoices?

16  A.  No.

17  Q.  The second-to-last line of this email is:  "Now, decide if

18  you want to fight me or pay" me -- excuse me.

19              "Now, decide if you want to fight me or pay, but if

20  you fight, you will pay more."  how did you interpret that?

21  A.  I interpreted that as he was going to sue us.

22  Q.  Is that something that he had said on more than one

23  occasion or just once?

24  A.  Yes, he said that multiple times.

25  Q.  Did he say that to you in text messages or emails, or how

1    did he say it?

2    A.  I believe both.

3    Q.  I would like to direct your attention now to the email at

4    the top of this page.

5           This is your response to him.  And the first sentence

6    is:  "can you please send me the invoices which you are

7    claiming we owe you?"

8           THE COURT:  Can you just blow up the text a little

9    more for the benefit of our jury?

10          (Pause)

11          You can do the entire first email.  Even as blown up,

12   it starts so small that it is hard for them to read on those

13   monitors.  Thank you.

14          (Pause)

15          MR. BHATIA:  I will read again the first -- now I will

16   read the second sentence, too.

17          "Can you please send me the invoices which you are

18   claiming we owe you?  Not sure why we owe you money but I'm

19   glad to look into it."

20   Q.  Why were you asking Mr. Teman to send you invoices?

21   A.  I wanted to see what he was claiming.

22   Q.  Did you know why he was asking you to pay more than

23   $200,000?

24   A.  No, I have no idea.

25   Q.  Had you ever agreed to pay him that amount of money?

1   A.  No.

2   Q.  I would like to direct your attention to Government Exhibit

3   406, and there is an email on the top of the first page.

4           At the very top of this email, we can keep this part

5   blown up, but it is from Ari Teman to Eric Schutzer, Ben

6   Soleimani, and it looks like Joe, Joe Soleimani's email.

7           Now, in the text of this email, the first line is

8   Mr. Teman saying:  "Let's get the liens on ABJ buildings by

9   Wednesday."

10          How did you interpret that?

11  A.  I interpreted that as he was going to put liens on several

12  properties.

13  Q.  Several of your properties?

14  A.  Yes.

15  Q.  He mentioned in this second line, "They've now stolen from

16  Sublet Spy over $12,000."

17          Did he tell you anything more about that?

18  A.  Not that I recall.

19  Q.  Had you ever agreed to pay Sublet Spy $12,000?

20  A.  Yes.

21  Q.  Further down this page, he says, "Let's go ahead with the

22  District Attorney's Office on Monday regarding the criminal

23  fraud charges.  Their fraud is now nearing half a million

24  dollars."

25          As far as you know, did he ever report you to the

K1ndtem6                          Soleimani - direct

1    District Attorney's Office?

2    A.  Not that I know of.

3    Q.  Did you receive other messages that you would -- in which

4    Mr. Teman threatened you with legal action?

5    A.  Yes.

6    Q.  What was the substance of those communications?

7    A.  There were liens he was going to file.  He was going to

8    report --

9            MR. GELFAND:  Your Honor, I would object to just the

10   general narrative of the substance of a bunch of ambiguous

11   communications.  If he wants to ask about specific

12   communications, that's fine.

13           THE COURT:  Overruled.

14           You may answer.

15   A.  He said he was going to report us to the Mayor's Office,

16   report us to the Attorney General's Office.  I believe those

17   were the extent.

18   Q.  He mentioned -- did he mention putting liens on any

19   buildings?

20   A.  Yes.

21           MR. GELFAND:  Objection.  Asked and answered, your

22   Honor.

23           THE COURT:  Overruled.

24   Q.  And did he in fact put liens on any of your buildings?

25   A.  Yes.

1    Q.  Which ones?

2    A.  342, 346 Lenox Avenue, and 100 West 138th Street.

3    Q.  And what happened with those liens, as far as you know?

4    A.  As far as I know, they're no longer in existence.

5            THE COURT:  Speak louder, please.

6    A.  They are no longer in existence as far as I know.

7    Q.  I know you are not a lawyer, but can you tell us anything

8    more about those?

9    A.  Yes.  From what I understand --

10           MR. GELFAND:  Objection, your Honor.

11           THE COURT:  Sustained.  He is in the process of

12   reporting hearsay.

13           Next question.

14   BY MR. BHATIA:

15   Q.  This message is from August 2018.  Can you describe your

16   relationship with Mr. Teman in the second half of 2018?

17   A.  It was not good at that point.

18   Q.  Can you elaborate?

19   A.  Yeah.  We removed all the systems.  We replaced them with

20   another system, a competitor.  And our relationship was

21   completely sour.

22   Q.  Were you communicating regularly with him?

23   A.  No.

24           THE COURT:  Mr. Bhatia, is this a good stopping point?

25   I am looking for a good one to break for the day.

K1ndtem6

1          MR. BHATIA:  It is.

2          THE COURT:  All right.  Ladies and gentlemen, it is a

3    few minutes before 5.  We've made a lot of progress today, and

4    I think it is a good time for a break.  So I'm going to wish

5    you well and wish you a very good, safe trip home and a good

6    evening tonight.

7          The same schedule for tomorrow.  We'll have breakfast

8    for you at 8:45.  I'll need you in your seats and ready in

9    there so I can bring you out at 9:30 so we can get going

10   tomorrow.  The attorneys tell me we are making good time, and

11   that should be apparent to all.  They are working very hard.

12         I wish you a good evening.  I'll see you tomorrow.

13         THE CLERK:  All rise.

14         (Continued on next page)

K1ndtem6

1              (Jury not present)

2              THE COURT:  Mr. Smallman, would you close the door.

3              All right.  The witness may step down and step out.  I

4    have a few questions for counsel outside the witness' presence.

5              Witness, you should stick around so that counsel can

6    tell you where to be, including tomorrow morning.

7              (Witness not present )

8              THE COURT:  All right.  Counsel, just -- we obviously

9    made a lot of progress today, although we didn't quite carry

10   through on the promise to, or the hope of finishing today.

11   Without holding you to it -- I know this is an important

12   witness -- approximately how much longer is there in the

13   direct?

14             MR. BHATIA:  I would say around 20 to 30 minutes.

15             THE COURT:  Very good.  How many other government

16   witnesses at this point do you anticipate?

17             MR. BHATIA:  At this point I think there might only be

18   one more witness after this.

19             THE COURT:  Is that Ms. Monzon?

20             MR. BHATIA:  No.  That is John Motto from Signature

21   Bank.

22             THE COURT:  Ah, OK.  All right.  No other --

23             MR. BHATIA:  Obviously, we have to go back and think

24   about it, but I think there should be one or two witnesses.

25             THE COURT:  Again, barring an unexpected development

K1ndtem6

1    and even budgeting a fair amount of time for cross of this

2    witness and the next witness, there is every likelihood that

3    the government will rest before the middle of the day tomorrow?

4                MR. BHATIA:  That is I think a fair expectation.

5                THE COURT:  If not conservative?

6                MR. BHATIA:  Obviously, we will go back and sort of

7    think about it --

8                THE COURT:  Right.  I'm not telling you what to do or

9    not do.  I am just trying to get a sense of where we stand.

10               May I ask you, on Exhibit 406 there is a redaction, or

11   an apparent redaction after the word "Joe."

12               MR. BHATIA:  We redacted his email address at an

13   earlier stage of this proceeding, and I think we gave the

14   government stamp for that exhibit.  We can --

15               THE COURT:  I ask only because it is attention

16   getting.  The natural question that arose for me is whether

17   there is an expletive or something like that there.  But given

18   that everyone else's email address is all over the documents,

19   it seemed that's not clear what the point of that is.

20               Be that as it may, you may want to unredact it and

21   receive it in unredacted form, or at least elicit what is

22   underneath it, just because it creates a natural question.

23   Nothing else has been redacted, as I understand it, in the

24   entire case.

25               MR. BHATIA:  You are right, your Honor.  When we leave

1    the court, we will --

2                THE COURT:  You will have leave to do that, OK.

3                All right.  Defense, anything to -- government,

4    anything to raise before we adjourn?

5                Do you have anything to raise with me before we

6    adjourn?

7                MR. BHATIA:  We do, your Honor.  One thing -- we would

8    like -- since we might be resting tomorrow morning, we would

9    like to ask for the defense's witnesses or at least the ones

10   they expect to call tomorrow.

11               THE COURT:  Well, the defense of course has no

12   obligation to call witness -- you may be seated -- but defense

13   counsel, the point is well taken.  In the event that the

14   government rests tomorrow, as seems likely, if this follows a

15   form in many criminal cases, there will be a brief motion from

16   the defense and whatever limited adjournment is needed for me

17   to hear that.  Following that, assuming the motion is not

18   granted or granted in full, we would move on to the defense

19   case.

20               I think it's fair, without asking you to commit what

21   you presently anticipate, understanding that you have a range

22   of motion here and you are not bound by what you say.

23               MR. GELFAND:  We anticipate, as we've told government

24   counsel, calling Ariel Reinitz as a witness.  We have a handful

25   of other witnesses under subpoena that depending on the

testimony that we hear between now and the rest of the case

will determine whether we call them.  Those witnesses would be

two-minute witnesses.

THE COURT:  They are all, I take it, in New York?

MR. GELFAND:  Yes, your Honor.

THE COURT:  All right.  Have you alerted the

government to who they are?

MR. GELFAND:  There is an NYPD detective whose name is

escaping me.  I assume we could issue a subpoena to him and to

Detective Alessandrino.  The only reason we would call him is

if Mr. Soleimani denies making a statement to him, as reflected

in the police report.

THE COURT:  What is the statement?

MR. GELFAND:  He claimed that $180,000 was

unauthorized in terms of the checks at issue.

THE COURT:  How many checks, defense counsel, were in

fact drawn on the Soleimani or the ABJ, if that is the right

way to put it, accounts that are at issue in March and April of

2019?

MR. GELFAND:  JPMorganChase credited their account

$196,000.

THE COURT:  And so you are concerned that the witness

will not acknowledge making a statement to law enforcement that

180,000 was unauthorized?

MR. GELFAND:  Yes, your Honor.  To be clear, I am not

1   saying that -- I have no idea -- in the event that he flat out

2   denies making that statement to the law enforcement officer --

3          THE COURT:  Right.

4          MR. GELFAND:  -- I think we would be entitled to call

5   the law enforcement officer.

6          THE COURT:  Not expressing skepticism, just confusion

7   as to what the purpose is.  In other words, I'm assuming that

8   the witness, consistent with what I have been able to divine so

9   far from his examination, will dispute that he ever authorized

10  any of the 2019 checks that were drawn on ABJ.  You are telling

11  me those add up to about 190.  The witness apparently told law

12  enforcement that the 180 is unauthorized.

13         Is your point that he is implicitly acknowledging the

14  $10,000 is authorized?  I am trying to understand what the

15  purpose is of that.  It sounds like he is making, in effect, a

16  statement that is consistent with his testimony here, to wit, I

17  didn't authorize that.

18         MR. GELFAND:  Your Honor, I think that is a jury

19  question, yes, your Honor, but it is inconsistent with what the

20  government is alleging is unauthorized.

21         THE COURT:  Because the witness is underballing it by

22  $10,000 and therefore is tacitly admitting that at least 10,000

23  of the 190 or so was authorized; is that the purpose?

24         MR. GELFAND:  Yes, your Honor.  I'm not exactly clear

25  on the math, but I could represent that there is a disparity in

1    the math.

2            THE COURT:  But that is the point.  The relevance lies

3    in the delta between the total of the checks and the witness'

4    statement.

5            MR. GELFAND:  Yes, your Honor.

6            THE COURT:  We'll take that up as it comes.

7            What about Alessandrino, where does he fit in?

8            MR. GELFAND:  Well, the government represented to us,

9    unless that's changed, that they intended to call Detective

10   Alessandrino.

11           THE COURT:  So far that is not in the tentative order.

12   Maybe it will happen.  But I thought you were reserving the

13   right to call him, and I am trying to understand what that is

14   for.  Maybe not.  I thought you were saying he was a defense

15   witness.

16           MR. GELFAND:  It would be a different statement.

17   Detective Alessandrino also interviewed Mr. Soleimani.

18   Mr. Soleimani made statements to Detective Alessandrino.  In

19   particular, Mr. Soleimani represented that his company ended

20   all business with Mr. Teman in October of 2017, and said that

21   no checks were authorized after October of 2017.

22           THE COURT:  All right.  Look, I'm not going to rule

23   about a hypothetical.  It should go without saying that to the

24   extent that a line of inquiry like this might be authorized,

25   you would need to squarely confront the witness with the

K1ndtem6

1  contrary proposition and we'll see where we go.  I will leave

2  it at that.  OK.

3           But, in other words, we're looking at Reinitz for sure

4  and then a possibility of one or two law enforcement witnesses,

5  putting aside the possibility of Mr. Teman's testimony?

6           MR. GELFAND:  Yes, based on where we presently stand.

7           THE COURT:  OK.  I ask only that you keep government

8  counsel apprised of your intentions, without locking you in.

9  And the only reason is that otherwise we have at least some

10  possibility of, you know, a lapse of time enabling counsel to

11  prepare.  Much as you had quite substantial notice of who

12  they're calling, I want to make sure that, you know, the

13  truth-seeking process is respected and there is at least some

14  degree of notice here.

15           MR. GELFAND:  Yes.  The one thing I should say is

16  that -- I apologize, I had assumed, albeit I guess incorrectly,

17  that because Detective Morales is an NYPD colleague of

18  Detective Alessandrino, that our subpoena to Detective Morales

19  was known to the government.  Apparently it wasn't.

20           THE COURT:  So it is a large organization.  I don't

21  know why --

22           MR. GELFAND:  I appreciate that, but certainly that

23  would be the limited scope of his testimony.  So there is no,

24  you know --

25           THE COURT:  All right.  They are now on notice.

K1ndtem6

1          OK.  Be sure that you have the searching conversation

2     you need to with your client about it being his right, as

3     opposed to counsel's, whether or not to testify.  In the event

4     that Mr. Teman doesn't testify, chooses not to, I will need to

5     allocute him outside the presence of the jury to confirm that

6     he understands that that is his right and that he has made a

7     thoughtful decision about that.  Obviously, he may choose the

8     opposite course and testify, but I want to make sure that there

9     is no doubt that Mr. Teman understands that that in our system

10    is his call.

11         MR. GELFAND:  Absolutely.  We certainly explained that

12    to Mr. Teman.  We will continue to have that discussion.

13         THE COURT:  All right.  So just playing out the

14    schedule for tomorrow, we're going to get almost certainly to

15    the defense case.  It is unclear whether we will get through

16    the defense case.  Without holding you to it, assuming that

17    Mr. Reinitz testifies, purely ballparking in terms of

18    approximate length, what length witness would you envision him

19    to be on direct?

20         MR. GELFAND:  I think the direct examination would be

21    somewhere in the vicinity of an hour.

22         THE COURT:  OK.  That's about what I would have

23    expected.  That is helpful to know and that is useful, I'm

24    sure, for the government in its preparations.  So I guess the

25    open question then is how far we could possibly get if we

possibly end the defense case tomorrow.  And I assume the

question on all your minds is would we go any farther than

that.  And I think the government will obviously have an

opportunity to have a rebuttal case, so you ought to be

prepared for that, if that's the direction things are going and

I don't know what you have been thinking about.  But if the

question is is there any scenario in which we would get to jury

arguments, it is unimaginable that we would.  And I certainly

want you to feel comfortable knowing that we are not going to

do that.

          We obviously need to have a charge conference in

between.  My staff and I will be taking a look at the charge

overnight.  And my best guess is that it is more likely we

would do that on -- assuming the defense case was to end and

there was to be no rebuttal case, or a short one, either way,

that would wrap up on Friday.  More likely than not, we would

do that early on Monday morning, but it's not out of the

question we'll do it tomorrow.  We'll see.  My best guess is I

want to take some time.

          Given how fast we are moving, I think it is all the

more important that I get the government's advice of counsel

instruction and that I get your -- defense, you have given me

your unanimity instruction.  I assume that is unchanged.

Government, I need some language from you.  I assume that is a

sentence or two, but I need to make sure we get that.  But I

1    really would like a proposed, ideally jointly, verdict form,

2    but now that we're into the third customer narrative, it's

3    clear to me that each customer narrative is its own story and

4    they don't necessarily travel up or down together.  In any

5    event, I think there is likely value -- although I will be glad

6    to hear from you at the time of the charge conference -- there

7    is likely value in a verdict form that reinforces the unanimity

8    instruction by asking for customer-specific findings.  I am

9    keeping an open mind, but at a minimum, on the assumption that

10   I went that route, I will want your guidance to me as to what a

11   verdict form would look like.

12            MR. BHATIA:  Your Honor.

13            THE COURT:  Yes.

14            MR. BHATIA:  On this topic, Mr. Imperatore and I have

15   conferred within our office with people who have handled this,

16   including Mr. Blais, who was here earlier.  It is our sense

17   that a unanimity instruction may not be required.  On the bank

18   fraud counts, the victim here is Bank of America, and as a

19   result we don't think that there needs to be a special --

20   either a unanimity instruction --

21            THE COURT:  You are telling me that if the jurors do

22   not agree unanimously on any single check, the defendant can be

23   convicted?

24            MR. BHATIA:  I think they have to believe that the

25   victim here, Bank of America, was defrauded, but I'm not sure

1    they have to agree on a single check as the subject.

2            THE COURT:  Why don't you get me a legal memo on that

3    overnight, because it would surprise me if that were the case.

4    And it would seem to me to be inviting an appellate issue, if

5    the case comes out the way you want, to not have some form of

6    unanimity instruction here.  It's hard for me to imagine a

7    scenario here in which within each customer relationship the

8    jury splits the baby as to particular checks.  It is likely

9    that each set of customer checks travels up or down together.

10           I'm not sure what the value is here, though, of an

11   instruction that would permit the jury hypothetically to

12   convict if, you know, four of them believe that JPMorgan was --

13   or that Bank of America, rather, was defrauded with respect to

14   ABJ and four believe that they were defrauded with respect to

15   Gabay and four believe they were defrauded with respect to

16   Soon-Osberger.

17           Maybe you are technically right.  I am skeptical of

18   that.  I'm not sure that the government really has any interest

19   other than some arid academic technical one in pursuing that

20   argument.  I can't imagine why you wouldn't want an instruction

21   that requires them to convict to -- at least be unanimous on at

22   least a check or a customer relationship.  We'll see.  But I

23   would be very surprised if you put it that way to your

24   department chiefs if anybody thinks that is a rational way to

25   go.

1          MR. BHATIA:  We will of course confer with them.  We

2     will do that more.  We did.  And I just didn't want the Court

3     to be surprised.  We will put in a letter, but we understand.

4          THE COURT:  I'm urging that a degree of common sense

5     break out here.  I don't know why -- it's hard for me to

6     imagine that a unanimity instruction, at least at the level at

7     which I am envisioning it, doesn't at least guard against some

8     degree of legal risk, and I can't imagine what the practical

9     harm would be under the fact patten here.  It is just hard for

10    me to see why you would sail into that where you would at that

11    point have to be arguing harmless error.  I don't understand

12    that.

13         MR. BHATIA:  Understood.

14         THE COURT:  And the defense has been, you know,

15    rightly -- I mean, has been early in identifying to you a

16    unanimity instruction that is wise here.

17         All right.  I will see you all at 9 o'clock tomorrow.

18    Thank you.

19         MR. BHATIA:  Your Honor, there is one more thing.

20         We had requested Rule 26.2 materials on several

21    occasions.  The defense has identified a few 26.2 materials

22    they have produced.  We just want to get --

23         THE COURT:  What do you mean by "26.2 materials"?

24         MR. BHATIA:  That is written statements of the

25    witnesses that they intend to call.

1            THE COURT:  Jencks Act?

2            MR. BHATIA:  Yes.

3            THE COURT:  Reverse Jencks.  Right.

4            Defense, when are you going to produce that?

5            MR. GELFAND:  We have produced it.  With respect to

6    the two NYPD detectives, that's government discovery.

7            THE COURT:  Right.  But with respect to Reinitz --

8            MR. GELFAND:  With respect to Mr. Reinitz, we have

9    produced early letters.  We have also given the Court a copy of

10   it.

11           THE COURT:  But is that a comprehensive production of

12   your 3500 material as exists as of now?

13           MR. GELFAND:  Yes, your Honor.

14           Just for the record, we produced recordings that

15   Mr. Reinitz had with Bank of America which would fall within

16   that reverse Jencks.

17           THE COURT:  Do you have -- look, I mean, to the extent

18   counsel took notes of witness interviews, as the government

19   took notes of its witness interviews, have those all been

20   produced as to Reinitz?

21           MR. GELFAND:  Our own notes have been not.  I will go

22   back and check to see --

23           THE COURT:  Have been produced or have not been

24   produced?

25           MR. GELFAND:  Have not been produced, your Honor.

K1ndtem6

1          THE COURT:  Do they exist?

2          MR. GELFAND:  I don't know.  I have to go back and

3     check.

4          THE COURT:  Sorry.  Counsel, you are an officer of the

5     court.  Have you interviewed Reinitz?

6          MR. GELFAND:  Your Honor, we have interviewed Reinitz.

7          THE COURT:  Did you take notes?

8          MR. GELFAND:  I'm sure we took notes, your Honor.

9          THE COURT:  I'm sure you did.  Then the answer is

10    you've got --

11         MR. GELFAND:  I'm not saying I'm not identifying off

12    the top of my head right now specific -- it is not that we are

13    holding back.

14         THE COURT:  I understand that.  But if you took notes

15    that qualify as 3500 material when interviewing Reinitz, much

16    as the government took notes that qualify as 3500 material when

17    interviewing Gabay, refers Jencks applies.  And so, you know,

18    be prepared to produce it.  And if you hold it back, you know,

19    the last minute, there may be a need for some delay to enable

20    the government to absorb it.

21         MR. GELFAND:  Yes, your Honor.

22         THE COURT:  It is disquieting in particular because of

23    the background here, where, you know, there was no reference in

24    otherwise comprehensive instructions to an advice of counsel

25    instruction.  I continue to regard that as a -- you called it

K1ndtem6

1    an academic decision, I call it gamesmanship.  To be sure, the

2    government should have spotted this one, too, but in the end it

3    was on you to include that if you thought it was a possible

4    here.  And I am not going to be happy to find that the reverse

5    Jencks is untimely produced or late produced, more to the

6    point, requiring an adjournment and, you know, so that the

7    government can absorb it.

8         MR. GELFAND:  Your Honor, what I can represent is that

9    in assembling the information that we provided regarding Mr.

10   Reinitz to the government, we veered on the side of including

11   things that do not fall within the category of, quote-unquote,

12   privileged communications but would fall into the category of

13   reverse Jencks for that purpose.

14        THE COURT:  Very good.  We have a privilege waiver as

15   it relates to Reinitz.  So this is a Jencks issue at this

16   point, right?  In other words, if you interviewed Reinitz, just

17   like the government interviewed Gabay, 3500 material applies

18   symmetrically, right, the obligation?

19        MR. GELFAND:  Yes, your Honor, I understand.  What we

20   need to do, and will do, your Honor, and will do immediately is

21   go back -- it would be the category of our notes.

22        THE COURT:  Just as you've gotten notes from

23   Mr. Bhatia of his notes or perhaps the prior A.U.S.A.  I'm

24   sure -- I mean, I've read the 3500 binder.  You've got those

25   from the prior A.U.S.A.  They have been painstaking in getting,

K1ndtem6

1    marking the 3500 material.  The legal obligation is reciprocal

2    upon a government demand, which Mr. Bhatia represents has been

3    made and upon your forming the intention to call the witness.

4             MR. GELFAND:  Yes.  I just want to be clear with the

5    Court that we've been very inclusive for that reason.

6             THE COURT:  So far.

7             MR. GELFAND:  Yes.

8             THE COURT:  But probably the thing that they may care

9    about most is actually counsel's notes of the witness, which is

10   almost always the 3500 material that the defense most eagerly

11   awaits from the government as to its witnesses.  I'm just

12   saying I appreciate that you've not ignored your obligations on

13   that in its entirety; you have produced some, and that's great.

14   The obligation applies to your own notes, and I'm asking you

15   not to needlessly cause us an adjournment.

16            MR. GELFAND:  We will not, your Honor.

17            THE COURT:  All right.

18            Anything further from the government?

19            MR. BHATIA:  Your Honor, we also believe that emails

20   between Mr. Reinitz and counsel could also fall under that.

21            THE COURT:  Sure.  I mean, it is just typed versus

22   handwritten.  Jencks doesn't differentiate.  Just as you had

23   all of those scheduling emails and the like that you produced

24   for your witnesses, the logic is if Jencks applies in one

25   direction, it applies in the other.  I'm sure defense counsel

K1ndtem6

1    knows that.

2              Anything else from the government?

3              MR. BHATIA:  Nothing else.

4              THE COURT:  Anything else from the defense?

5              MR. GELFAND:  No, your Honor.

6              THE COURT:  I will see you all at 9 o'clock.  Thank

7    you for a productive day.  I will see you tomorrow.

8              (Adjourned to 9 a.m. January 24, 2020)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   KAREN FINOCCHIARO

 4   Cross By Mr. Gelfand . . . . . . . . . . . . . 269

 5   Redirect By Mr. Bhatia . . . . . . . . . . . 298

 6   Recross By Mr. Gelfand . . . . . . . . . . . 303

 7   ELIE GABAY

 8   Cross By Mr. Gelfand . . . . . . . . . . . . . 370

 9   Redirect By Mr. Bhatia . . . . . . . . . . . 412

10   BONNIE SOON-OSBERGER

11   Direct By Mr. Bhatia . . . . . . . . . . . . 415

12   Cross By Mr. DiRuzzo . . . . . . . . . . . . 441

13   Redirect By Mr. Bhatia . . . . . . . . . . . 465

14   Recross By Mr. DiRuzzo . . . . . . . . . . . 467

15   GINA HOM

16   Direct By Mr. Bhatia . . . . . . . . . . . . 470

17   Cross By Mr. DiRuzzo . . . . . . . . . . . . 476

18   Redirect By Mr. Bhatia . . . . . . . . . . . 481

19   Recross By Mr. DiRuzzo . . . . . . . . . . . 482

20   JOSEPH SOLEIMANI

21   Direct By Mr. Bhatia . . . . . . . . . . . . 485

22                     GOVERNMENT EXHIBITS

23   Exhibit No.                              Received

24    412 through 418   . . . . . . . . . . . . . 316

25    141 through 146   . . . . . . . . . . . . . 325
```

1   150    . . . . . . . . . . . . . . . . . 412

2   431, 441, 442, 443  . . . . . . . . . . . . 423

3   401 through 409   . . . . . . . . . . . . . 494

4   409A and 409B   . . . . . . . . . . . . . . 495

5   409C   . . . . . . . . . . . . . . . . . . 505

6                    DEFENDANT EXHIBITS

7   Exhibit No.                           Received

8   16    . . . . . . . . . . . . . . . . . . 283

9   52    . . . . . . . . . . . . . . . . . . 287

10  36    . . . . . . . . . . . . . . . . . . 392

11  29    . . . . . . . . . . . . . . . . . . 400

12

13

14

15

16

17

18

19

20

21

22

23

24

25