K1RVTEM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                                19 CR 696 (PAE)

ARI TEMAN,

             Defendant.                    JURY TRIAL

------------------------------x

                        New York, N.Y.
                        January 27, 2020
                        9:00 a.m.

Before:

           HON. PAUL A. ENGELMAYER,

                        District Judge

               APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
KEDAR S. BHATIA
EDWARD A. IMPERATORE
    Assistant United States Attorneys

JOSEPH A. DIRUZZO, III
JUSTIN GELFAND
    Attorneys for Defendant

ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                WILLIAM MAGLIOCCO, Paralegal, USAO

1           (Trial resumed; jury not present)

2           THE COURT:  All right.  Good morning, everyone.

3           This morning I had my law clerk drop off to the

4    courtroom at 8:15 two copies for each side of the present draft

5    of the jury instructions.  And I'm going to give one copy to

6    Mr. Smallman to mark as Court Exhibit 1.  And I did so in

7    recognition of what appears to be a likelihood that we will

8    have a charge conference today, and perhaps on the early side

9    today.

10          In that regard, I was helpfully guided by an email

11   that I received from Mr. DiRuzzo projecting the likelihood of a

12   charge conference this morning.  And, Mr. DiRuzzo, I thank you

13   for that; because it certainly sharpened our understanding of

14   what the necessary schedule would be and, in turn, got me to

15   make sure that we had the charge to you earlier today so you'd

16   have some time to absorb it.  So thank you for that.

17          MR. DiRUZZO:  You're welcome, Judge.

18          THE COURT:  And again, not holding you to it, but I

19   take it that that is the defense's current intention.

20          MR. DiRUZZO:  Yes.

21          THE COURT:  Let me ask you this then, defense counsel:

22   Right now we have Mr. Reinitz still on the stand.  After he is

23   done with his testimony, am I correct to infer that right now

24   you do not expect to call any other witness?

25          MR. DiRUZZO:  As it currently stands, obviously

1    subject to --

2             THE COURT:  I'm sorry.

3             MR. DiRUZZO:  As it currently stands, but subject to

4    consultation with our client --

5             THE COURT:  Right.

6             MR. DiRUZZO:  -- there will be no witnesses other than

7    potentially Mr. Teman.

8             THE COURT:  Than what?

9             MR. DiRUZZO:  Mr. Teman.

10            THE COURT:  Right.  Understood.

11            From your email, I inferred that at this point it is

12   relatively less likely than 50 percent that he would be

13   testifying and, hence, that there would be a charge conference

14   this morning.  Were Mr. Teman to testify, it almost would seem

15   to be a certainty that the charge conference would be, at the

16   earliest, this afternoon.

17            MR. DiRUZZO:  I agree.

18            THE COURT:  So I want to make sure I was reading those

19   tea leaves correctly.

20            MR. DiRUZZO:  You were.

21            THE COURT:  Okay.

22            Given that, may I ask this:  Does it make sense for me

23   now to allocute Mr. Teman on his right to testify?

24   Understanding that I will check in again with defense counsel

25   after the DiRuzzo testimony.  The reason I had this thought is

K1RVTEM1

1    that if I don't do that now, after Mr. DiRuzzo testifies, I

2    will need to bring you all to the sidebar -- sorry, not

3    Mr. DiRuzzo, Mr. Reinitz.  Forgive me.  I would need to then

4    bring you to the sidebar, confirm that Mr. Teman was not

5    testifying, kick the jury out for a five-minute, at most,

6    colloquy with Mr. Teman, bring them back in for you to rest,

7    and then likely kick them out again.

8              That seemed cumbersome.

9              And so if you're okay with my inquiring of Mr. Teman

10   now of his right to testify so that he understands that it's

11   his choice, and that doesn't in any way lock you in, but at

12   least that way we can get that exercise over with now and make

13   sure that it's clear on the record he knows that this is his

14   decision.  Is that okay with you, defense counsel?

15             MR. DiRUZZO:  Yes.

16             THE COURT:  Yes, both of you?

17             MR. DiRUZZO:  Yes.

18             THE COURT:  Okay.  Very good.

19             And have you had a chance to review this colloquy with

20   Mr. Teman?  I don't want him to be caught off guard.

21             MR. GELFAND:  Yes, your Honor.

22             We've discussed with Mr. Teman extensively the

23   decision of whether or not to testify.  It can certainly be

24   guided by the advice that he receives from his attorneys;

25   however, that decision is ultimately his, and his alone.

1         I'm confident that he understands that.  I'm confident

2    that he still understands that even if he changes his mind

3    after Mr. Reinitz finishes his testimony, that he understands

4    that the Court will obviously permit him to testify or not to

5    testify as he chooses.

6         THE COURT:  Very good.  All right.

7         I think that answers all of those questions.

8         Let me just take this up with Mr. Teman.

9         Mr. Teman, good morning.

10        THE DEFENDANT:  Good morning, your Honor.

11        THE COURT:  I hope you had a restful weekend.

12        THE DEFENDANT:  As best you could under the

13   circumstances.

14        THE COURT:  Of course.  Of course.

15        So I'm obliged to have an on-the-record discussion

16   with you making sure that you understand that ultimately the

17   decision whether to testify on your own behalf is your

18   decision, not your counsels'.  So I just need to go

19   step-by-step through a few questions with you.

20        Have you discussed with your counsel -- just yes or

21   no -- whether or not you ought to testify in this case?

22        THE DEFENDANT:  Yes.

23        THE COURT:  And has counsel made clear to you that

24   ultimately that is your decision, not counsels' decision?

25        THE DEFENDANT:  Yes.

K1RVTEM1

1          THE COURT:  Do you understand that it is ultimately
2   your decision, not counsels' decision?
3          THE DEFENDANT:  Yes.
4          THE COURT:  And even if counsel were to recommend a
5   different course, it is your call, not theirs, whether to
6   override them.
7          THE DEFENDANT:  Yes.
8          THE COURT:  Do you have any questions for me about
9   that issue, as to whose decision it is?
10          THE DEFENDANT:  No, your Honor.
11          THE COURT:  All right.
12          At this point -- counsel has represented to me that at
13   this point your decision is not to testify.  Understanding that
14   developments during the balance of the Reinitz examination, or
15   if something else happens during that part of the trial, could
16   change your mind, at this point, is it your determination not
17   to testify?
18          THE DEFENDANT:  That's correct, your Honor.
19          THE COURT:  All right.
20          And is that something that you have given substantial
21   thought to?
22          THE DEFENDANT:  Very much, your Honor.
23          THE COURT:  Is that something you've spent substantial
24   time speaking with your able counsel about?
25          THE DEFENDANT:  Yes, your Honor.

867

K1RVTEM1

```
1              THE COURT:  All right.
2              And to be clear, the decision at this point not to
3     testify is yours; it is not something that's being forced on
4     you, but it's an independent decision that is yours to make and
5     that you are making.
6              THE DEFENDANT:  Yes, your Honor.
7              THE COURT:  Okay.
8              In the event that, at the close of the defense case --
9     let me try -- let me back that up.
10             After Mr. Reinitz testifies, I will turn to the
11    defense and say, Defense, or defense counsel.  And I expect,
12    based on your current inclination, that defense counsel would
13    then say:  The defense rests.
14             If that is so, I will be taking that as connoting that
15    you have checked in again with them, and have reaffirmed your
16    decision not to testify; and that you continue to understand
17    that it's your decision.
18             THE DEFENDANT:  Yes, your Honor.
19             THE COURT:  Understand.
20             So that's how I'm going to interpret it if the defense
21    says that you are -- that the defense rests.  Okay?
22             THE DEFENDANT:  Yes.
23             THE COURT:  Anything else any counsel believes I need
24    to take up with Mr. Teman with respect to his right to testify?
25             MR. GELFAND:  Just briefly, your Honor, I just make a
```

K1RVTEM1

1    record that Mr. Teman has discussed this independently with

2    Mr. DiRuzzo and with me, and jointly with Mr. DiRuzzo and with

3    me.  We've had many discussions.

4                THE COURT:  Very good.

5                Mr. Teman, is that correct?

6                THE DEFENDANT:  Yes, your Honor.

7                THE COURT:  Good.  I'm glad to hear it.

8                I take it, Mr. Teman, you are satisfied, as well, with

9    the representation you've had at this trial?

10                THE DEFENDANT:  Extremely satisfied, your Honor.

11                THE COURT:  You should be.

12                THE DEFENDANT:  Thank you.

13                THE COURT:  Okay.  Very good.

14                All right.  Then just walking through this process,

15    defense counsel, if you need more time, if, after the Reinitz

16    testimony ends you're not prepared at that moment to rest, but

17    need some time with your counsel, when I turn to you and say,

18    Defense, I'm certainly happy to excuse the jury briefly because

19    I'm mindful of the gravity of this moment in the case.  And if

20    you need to check back in with Mr. Teman, I'll give you the

21    opportunity to do so; I'd ask you to only do that if there is

22    actually really something to be discussed.

23                MR. GELFAND:  Absolutely.

24                THE COURT:  Okay.

25                But I certainly will honor that request.

K1RVTEM1

1          All right.  Let me just cover some ground that I asked

2     my law clerk just to remind counsel of when she came

3     downstairs.

4          There are a number of documents that need to go to the

5     jury in connection with their deliberations.  There are, of

6     course, the charges.  And once I have the charge in final, I

7     will have a copy of the charge for each juror.  That's for my

8     chambers to prepare.

9          We've also prepared a verdict sheet, a verdict form,

10    which is as simple as can be; it literally reads:  All verdicts

11    must be unanimous.  Please indicate your verdict with a

12    checkmark, and even draws a picture of a checkmark.  And then

13    afterwards, for each of the four counts says "guilty or not

14    guilty," and it essentially tracks the verdict form that had

15    been provided to me earlier.

16         In contrast to that though, I've included signatures

17    for all 12 jurors, as is my practice.

18         I'll hand a copy to counsel momentarily.  In fact,

19    I'll have Mr. Smallman do that right now as we proceed.

20         Next.  And these are creations that I look to the

21    government to prepare.

22         We will need a one-sheet -- one-page witness list that

23    lists in chronologic order the witnesses who testified.  All I

24    need is just their names; but it's a guide to the jury so they

25    don't forget who testified, and it's an easy menu option they

870

K1RVTEM1

1    can use in requesting testimony.

2              I'm looking at Mr. Magliocco on the assumption that

3    this likely falls to him.

4              Second, I will need an exhibit list.  And counsel, let

5    me ask this:  Counsel have been very helpfully providing to me

6    a daily updated exhibit list that lists by exhibit number the

7    description, the witness through whom the exhibit was received,

8    and the date that it was received.  The list now includes

9    defense exhibits as well.

10             Before this gets to the jury, we will need to

11   eliminate any exhibit that was not received.  And I assume,

12   Mr. Magliocco, that's a very quick computer operation; correct?

13             You can speak.

14             MR. MAGLIOCCO:  Yes.

15             THE COURT:  Okay.  Very good.

16             Okay.  Defense counsel, let me just confirm with you

17   that if we prepare an exhibit list that essentially is using

18   the government's form here and just deletes the unadmitted

19   exhibits, you're fine with it; there's no editorializing or

20   something in here that you're concerned going to the jury.

21             MR. DiRUZZO:  Agreed, your Honor.

22             THE COURT:  All right.  Fine.

23             So I will need then, Mr. Magliocco, as soon as you

24   can -- as soon as we're done with Reinitz, a final version --

25   if you email it to my chambers, we'll take care of the copying.

1          All right.  It looks like we're in good shape on that.

2          I will need, as well, copies of exhibits.  I don't

3     personally need them; but in the expectation that the jury asks

4     for exhibits, you either need to have several copies handy -- I

5     usually ask for three -- or be in a position where, in very

6     quick order, you are able to make copies of anything that is

7     requested.

8          I don't, on my own initiative, send particular

9     exhibits to the jury.  But my experience is, very early on, we

10    get a menu list, a note that requests specific exhibits.  I can

11    imagine in my own mind ones that would be of more or greater

12    interest here.  But either way, I need the government to be

13    ready to have those copies.

14         In the same vein, to the extent that there are

15    requests for testimony -- and because I've had a trial with

16    Mr. Magliocco and Mr. Imperatore, I'm sure they're familiar

17    with this -- what will ordinarily happen is I will ask counsel

18    looking at the transcripts to confer and identify the

19    responsive portions of the transcript.  More often than not,

20    counsel agree on almost everything that's responsive, and I am

21    left to referee the very, very few, if any, disputes.

22         But, in any event, once that's identified, the

23    government usually has on its system the software that enables

24    it to extract the responsive pages and line numbers and to

25    auto-redact the balance of pages on which some parts, but not

872

K1RVTEM1

1    all parts, are relevant.  I'll be looking to the government to

2    do the physical preparation of the pages.

3            Rather than bringing the jury out for an extended

4    readback, my practice is instead to send in the transcripts to

5    the jury, while admonishing them that the mere fact that those

6    portions are before them should not lead them to give outsized

7    weight to those transcript pages.

8            I take it nobody has any objection to that efficient

9    procedure?

10           MR. DiRUZZO:  No, your Honor.  Although I just assumed

11   that we'll have a quick moment to review, just to make sure

12   that there's no errors on the transcript, effectively just an

13   errata check.

14           THE COURT:  Oh, sure.  Sure.  In other words,

15   you'll -- absolutely.  Both parties will agree or not on what

16   portions are responsive, I'll referee any disputes, and you'll

17   get a chance to check, in effect, Mr. Magliocco's work in

18   making sure that what he has pulled is responsive to what's

19   either been agreed or court-ordered.

20           MR. DiRUZZO:  Great, your Honor.

21           THE COURT:  And then finally, the indictment.

22           Of course, the indictment here needs to be redacted to

23   strike Exhibits 5 and 6.  And I had my law clerk ask government

24   counsel to make sure that they have sent us a redacted

25   indictment that gets rid of Counts Five and Six.

K1RVTEM1

1          I don't think there's anything else though in this

2     indictment that is extraneous; there isn't forfeiture language

3     or there isn't, you know, references to excluded evidence or

4     anything like that.  Correct about that, counsel?

5          MR. BHATIA:  That's correct, your Honor.  I don't

6     believe there's anything that needs to be struck.

7          THE COURT:  I think it's a very bare-form indictment.

8          MR. DiRUZZO:  Your Honor, I'm actually --

9          THE COURT:  Sorry.  You need to speak into the mic.

10          MR. DiRUZZO:  I'm scrolling through it right now, and

11     there is a forfeiture allegation starting at page -- bottom of

12     page 7.

13          THE COURT:  All right.  Government, I take it you'll

14     eliminate the forfeiture allegation?  That's not a jury issue

15     here, right?

16          MR. BHATIA:  We'll take that out as well.

17          THE COURT:  Everyone agree that that is not a jury

18     issue?

19          MR. BHATIA:  Yes, your Honor.

20          MR. DiRUZZO:  Your Honor, given that -- it's my

21     understanding that a forfeiture provision is something that the

22     jury could consider.  Your Honor, if you give me -- I haven't

23     looked at that portion of the criminal rules in a while.

24          THE COURT:  Take a moment.

25          (Pause)

1          THE COURT:  Let me just break in by asking government

2     counsel -- I may put Mr. Imperatore on the spot here.

3          The one trial I've had which involved a forfeiture

4     allegation going to the jury was his trial, an insider trading

5     case.  And there, the government had seized the proceeds of the

6     bank account that was used by -- or the securities account that

7     was used by the alleged insider trader, the defendant.  We had

8     a two-stage process in which, after a conviction, we had a

9     separate forfeiture trial.

10          Nobody has given me jury instructions as to that

11    point.  I'm not aware of anything that's been seized here

12    either, although maybe I've missed something.

13          Mr. Imperatore, let me just look to you, just because

14    you've been down this road before.  Is this a case in which

15    there's any need to go to the jury on forfeiture?

16          MR. IMPERATORE:  There is not, your Honor.

17          So your Honor is correct that the defendant has a

18    right to request that in the event that he's convicted, that

19    the jury -- after it reaches its jury verdict on the counts in

20    the indictment, the defendant is entitled to have the jury

21    consider the forfeiture issue.

22          However, for obvious reasons, it's extremely unusual

23    for a defendant to make such a request.  And in any event, the

24    jury is not allowed to consider the forfeiture allegations at

25    the time it is deliberating on whether the defendant has

K1RVTEM1

1    committed the crime --

2                THE COURT:  That much I understand.

3          There's no question that at the time this goes to the

4    jury, the forfeiture allegation would be struck while the jury

5    resolves guilt or innocence.

6          The question is whether -- assuming a conviction on

7    any or all counts -- the defense has a right to go to the jury

8    on the forfeiture allegation.  It's, candidly, government, not

9    clear to me what you would be pursuing here, whether you would

10   really be pursuing forfeiture on top of restitution in the

11   context of a case such as this.

12         In your insider trading case, there was an issue

13   because the fruits of the insider trading had been grown by

14   multiple fold; and so the forfeiture recovery outstripped, in

15   some sense, the restitutionary recovery.

16         In contrast here, it appears to be just a unitary pot

17   of money; there's no change in it.  I don't know, in a moment

18   I'll ask defense counsel whether in the event of a conviction

19   they really would be asking me to retain the jury so we could

20   have a new set of evidence and arguments relating to

21   forfeiture, in which case I don't know why nobody has given me

22   any instructions as to that or whether the government at that

23   point realistically would be seeking restitution, which turns

24   out to be the same song.

25                MR. IMPERATORE:  We agree, your Honor.  There has been

K1RVTEM1

1    no specific property, that -- unlike in the insider trading

2    case that your Honor has presided over, there's been no

3    specific property that has been held or seized by the

4    government.  To the government's understanding, any proceeds

5    the defendant had were dissipated, so it does not strike the

6    government as a case for which the jury should be detained to

7    make a forfeiture determination.

8            THE COURT:  Right.  But I mean there's a different

9    consequence here, which is if that's the position you're

10   taking, and the defense is asking for a jury verdict on

11   forfeiture, it would seem to follow that at the time of a

12   hypothetical sentencing -- assuming a conviction here -- you

13   would be seeking restitution, but not forfeiture.  Because

14   either you're prepared to pursue forfeiture in front of the

15   jury, which doesn't strike me as adding any obvious value to

16   the government here, or you're pursuing restitution.

17           MR. IMPERATORE:  That's correct, your Honor.

18           But I think let's see what the defense requests.  I

19   think the government would reserve its right to seek

20   forfeiture.

21           THE COURT:  Well, then in that case, government, you

22   need to get me charges for -- let's see what the defense

23   requests.  But I note that nobody here appears, until I raised

24   this, to have thought of this as even a conceivable jury issue.

25           Mr. DiRuzzo.

1                MR. DiRUZZO:  Your Honor, we would agree.  I don't

2       think that there is anything to forfeit.  I think any amount

3       would be restitutionary in nature.  So in that sense, I don't

4       think there's anything there.  I think this is a somewhat

5       academic exercise.

6                However, given my client's right under 32.2(b)(5), we

7       would be asking for a jury determination if the government

8       actually believes that there is something to forfeit.

9                THE COURT:  All right.  Let me put it this way then:

10               Defense counsel is correct that if you are pursuing

11      forfeiture, they have a legal right to have the jury, I think,

12      make that determination.  It's the very rare criminal case

13      where defense counsel invokes that right.  And in the context

14      of this case, it's not obvious to me that there's any

15      additional factual matter to be resolved.  I would simply be

16      giving jury charges on the basis of the evidence that's gone in

17      about whether a finite sum is forfeitable.

18               I do note though that neither side has given me

19      proposed instructions on that, even instructions as to what to

20      say to the jury in the first phase, letting them know that

21      there might be an additional question or two that I need to

22      send them back with, in the event of -- depending on their

23      verdict.  I could easily caret in a sentence to that effect.

24               Government, it's my hope -- and I think I'm reading

25      the body language right here -- that you are not, in fact --

K1RVTEM1

1    bless you -- pursuing forfeiture here.  If so, I need proposed

2    instructions within an hour, because we may be going to the

3    jury very soon.

4              MR. IMPERATORE:  Your Honor, this is the first the

5    defense has ever raised this issue.

6              THE COURT:  No, no, no.  You indicted on this; you

7    indicted the case.  This is your case to indict.  They never

8    waived a jury right as to forfeiture.

9              The issue has gone unspotted.  You can't throw it on

10   the defense.

11             MR. IMPERATORE:  Your Honor, respectfully, I think it

12   is -- it is the defense's right to request a jury verdict on

13   forfeiture, but this is the first they've ever raised this

14   issue.  It's extremely unusual.  I think we reserve the right

15   to consider whether we want to seek forfeiture.

16             THE COURT:  Then please tell the U.S. Attorney's

17   Office that by 10:30 I want proposed instructions as to

18   forfeiture or I will regard the issue as waived.

19             Counsel, you know, you got the email last night also

20   saying that we are likely to get to the jury -- to a charge

21   conference this morning.  You put forfeiture in the indictment.

22   I appreciate that it is rare that forfeiture issues are

23   litigated by a jury.  It looks as if that was included and then

24   lost sight of.  But, in the end, as counsel at government table

25   knows as well as anyone having tried one of these cases, I need

K1RVTEM1

1    to be prepared, if the defense is insisting on its right to a

2    jury trial on forfeiture, to put a question to the jury.  I

3    need a proposed charge.  And I don't propose to have our jury

4    waiting while we figure that out.

5           What I, in all likelihood, will wind up doing, if

6    nobody stands down here, as soon as the jury deliberates,

7    begins to deliberate, we'll have a separate charge conference

8    as to what would be a very discrete, narrow instruction as to

9    forfeiture.  It's my hope that saner heads will prevail here

10   and that the reality of the situation here, which is that this

11   is a restitution case and the forfeiture seems duplicative,

12   will sink in and there won't be a need to pursue that.

13          But in the end, the government is continuing to insist

14   on forfeiture and the defense is insisting on its right to have

15   a jury make that determination, I need charges from you.  So

16   please email somebody in appeals to get me whatever charge

17   would be apt to this situation so that I'm in a position

18   promptly to have a charge conference on that point.  I don't

19   want to detain the jury because nobody thought about this

20   issue.  Okay?

21          MR. IMPERATORE:  Yes, your Honor.

22          THE COURT:  I'm sorry.  I apologize for the abruptness

23   of the request, but neither side flagged this as an issue for

24   me; neither side appears to have thought about it till I

25   mentioned the idea of redacting the indictment.  But one way or

K1RVTEM1

1    the other, the defense has the legal rights that it has; it

2    doesn't appear to have waived them.  The government, until it

3    forgoes the forfeiture, can't assume that the defense has

4    waived that right.  So there it is.

5         All right.  That, I think, then lists everything I

6    have for this morning.  Before we talk about a potential charge

7    conference, is there anything else that anyone wants to take up

8    with me?

9         MR. DiRUZZO:  No, your Honor.

10        MR. BHATIA:  No, your Honor.

11        THE COURT:  All right.

12        Counsel, may I suggest -- we have about five minutes

13   together, and I am eager to not waste the jury's time

14   needlessly later on -- let us get started then with the

15   potential charge conference.  It may be that there's relatively

16   little ground to cover.  And we'll stop as soon as I'm notified

17   by Mr. Smallman that we have all jurors here and that it is

18   9:30.

19        My practice is not to jump around throughout the

20   charge, but to ask each of you the first page on which you have

21   proposed changes to the charge and roll forward through the

22   proposed charge from there.

23        Mr. DiRuzzo, I'm mindful that at 12:17 a.m. I got a

24   document from the defense, docketed at docket 90, that raises a

25   concern about, quote/unquote, constructive amendment.  Your

K1RVTEM1

1   letter appears to track a motion *in limine* that I denied

2   earlier relating to your conception of what the word

3   "counterfeit" means in the to wit clause of the indictment.  I

4   will take up that issue when we get to the page of the charge

5   that implicates that concern.

6          All right.  So with that, government, what is the

7   first page in the charge that you have any comment on?

8          (Counsel conferred)

9          MR. BHATIA:  Your Honor, Mr. Imperatore and I are sort

10  of still reviewing the charge.  At this point we don't have any

11  comments on it.

12         THE COURT:  That was a good answer.

13         Okay.  Thank you.  Very good, Mr. Bhatia.

14         Defense, what's the first page on which you have an

15  issue?

16         MR. DiRUZZO:  15P, particular investigative techniques

17  not required.

18         THE COURT:  Let's turn to page 15.

19         Yes, what's the concern?

20         MR. DiRUZZO:  In the first line it says:  During the

21  trial, your testimony of witnesses and argument by counsel that

22  the government did not utilize specific investigative

23  techniques, I don't believe we've ever made that argument,

24  because there's been no government witness called in this case.

25  The case agent --

1          THE COURT:  This is a good question.  This is a

2     standard charge.  I guess the question is is there any factual

3     predicate for this, government?

4          MR. BHATIA:  Your Honor, the closest one that comes to

5     mind is I recall a line of cross-examination with

6     Ms. Finocchiaro about investigation done by the bank.  I don't

7     recall -- of course, there wasn't a government agent called.

8     So I don't think that there is a factual predicate.  I don't

9     think there is a factual predicate for it.

10          THE COURT:  I alerted them, of course, in jury

11     selection that I would instruct them to this -- on this point.

12     And I think it's worth doing, because *sua sponte* juries

13     sometimes will meditate on this issue.  But I think Mr. DiRuzzo

14     may well be factually correct that the lead-in sentence here is

15     just -- is not accurate; that there isn't a factual prompt.

16     Obviously we'll see what happens in closing argument.  It may

17     be that there is some faulting of the government for how it

18     built its case.

19          Defense, I take it your concern is less about the

20     concept of the instruction and more that the first sentence is

21     factually not correct.  The instruction itself is

22     unobjectionable, I take it.

23          MR. DiRUZZO:  As a general matter, I would agree.  But

24     given that there is no government witness to say that -- you

25     know, that there's argument by counsel the government did not

K1RVTEM1

1    use specific investigative techniques is just untethered to the

2    record.

3              THE COURT:  Right.

4              Government, what's your view about what to do with P?

5              MR. BHATIA:  Your Honor, I think this instruction is

6    still appropriate.

7              THE COURT:  Right.  But I mean not the first -- the

8    first sentence would need to be revised, would it not?

9              MR. BHATIA:  I think that's right.  I think it

10   would -- well, of course, we don't know how the rest of the

11   argument --

12             THE COURT:  I assuming that Mr. DiRuzzo's implicit

13   representation sticks, which is that there won't be argument on

14   that point in summation, we'll see how that goes.  Then the

15   first sentence does need to be revised, does it not?  There

16   hasn't been any line of examination of a witness about what was

17   or wasn't -- was there any examination of any witness, a bank

18   or a customer, about what the government asked them or sought

19   from them?  Was that ever probed?  I thought there was

20   something like that.

21             MR. BHATIA:  I believe with Ms. Finocchiaro it was

22   brought up, like, whether we brought this to the bank or the

23   bank brought it to us.  And then I think there were some

24   questions about -- I recall some questions about what kinds of

25   work they had done and who they had asked, if they had asked

1    customers or if they just relied on representations.  And there

2    were questions as well about the surveillance video, if I

3    recall correctly.

4              MR. GELFAND:  Your Honor, I can help.

5              THE COURT:  Just remind me what was -- there is

6    something out there that Mr. Bhatia is alluding to that I have

7    a similar memory of.  I can't put my finger on it.

8              MR. GELFAND:  I'm going 100 percent off memory, your

9    Honor.  But on my cross-examination of Ms. Finocchiaro for Bank

10   of America, I did inquire of her as to whether or not Bank of

11   America essentially, phrased differently, but basically went to

12   the government or went to law enforcement versus whether law

13   enforcement went to her, "her" being the bank.  And that was,

14   as I recall, kind of the extent of that line of questioning.

15             THE COURT:  Was there anything further about her

16   interactions with the government, Mr. Gelfand?

17             MR. GELFAND:  There was a preliminary question or two

18   right at the outset of cross-examination about her meeting with

19   the government, not meeting with us.

20             THE COURT:  That's a little different.  That's

21   preparation.

22             MR. GELFAND:  Yes, your Honor.

23             THE COURT:  All right.  One moment.

24             (Pause)

25             THE COURT:  All right.  Here's how I would propose to

K1RVTEM1

1    reformulate the first sentence, which I think uses the passive

2    voice to solve the problem:

3              During the trial you have heard testimony of witnesses

4    bearing on the investigative techniques used in this case.

5              I think that is broad enough to pick up the concept

6    without misleading anybody as to factually what happened here.

7              Anyone have a problem with that?

8              MR. DiRUZZO:  No, your Honor.

9              THE COURT:  Government?

10             MR. BHATIA:  No.

11             THE COURT:  All right.  Let's solve the P problem that

12   way.  Thank you, counsel.  Good catch by the defense.

13             All right.  Next page, defense?

14             MR. GELFAND:  Fairly obvious, your Honor, but on page

15   16, the issue about the defendant's testimony.

16             THE COURT:  Yes.  Quite right.

17             I take it you're fine with either paragraph.  And I

18   will at this point get rid of R and get rid of, under S, "if

19   applicable," if the current intention of the defendant sticks.

20             MR. GELFAND:  Yes, your Honor.

21             THE COURT:  Okay?  Thank you.  Good catch.

22             Next, defense?

23             MR. GELFAND:  Pages 18, your Honor.

24             THE COURT:  All right.  Before you get to -- let's

25   start on 18.  That's where I have -- I wanted to respond to

886

K1RVTEM1

1    Mr. DiRuzzo's letter of early this morning.  So let me take

2    care of that.

3           Mr. DiRuzzo, your claim is that there is a

4    constructive amendment here.  Based on the same theory of your

5    earlier motion *in limine*, you conceive of a counterfeit check

6    in a particular distinct way.

7           Based on my resolution of that earlier argument and my

8    colloquy of the government, I understand the use of the word

9    "counterfeit" in the to wit clause here to be in the

10   vernacular; to wit, that the defendant created these checks and

11   that they were unauthorized by the account holder, not that

12   there were some other technical features of the check that

13   meets or don't meet somebody else's definition of counterfeit.

14          As a result -- I'm just waiting for counsel to stop

15   talking.  As a result, I have formulated the count here on

16   pages 18 and later on -- as to bank fraud, and later on as to

17   wire fraud, to track what I understand to be the meaning of

18   "counterfeit" as used in the indictment, to wit, that the

19   defendant created the checks and that they were not authorized

20   by the account holder.  And that is why the description of

21   Counts One and Two on page 18, and later on the wire fraud

22   counts, I have formulated that way.

23          I therefore deny the motion for terming this

24   indictment for relief on the grounds that there is a

25   constructive amendment.  The government did not define

K1RVTEM1

1    "counterfeit" in the to wit clause in some specialized,

2    stylized, technical way.  They have represented -- consistent

3    with the common sense use of the term -- that counterfeit in

4    this case means created by the defendant without the

5    authorization of the account holder, meaning the authorization

6    of this particular check or the particular checks in question.

7            And as a result, I've formulated the charge in the

8    indictment as I have so as to state that the defendant, quote,

9    allegedly -- it says here:  Count One charges the defendant

10   with committing a bank fraud scheme in connection with the

11   deposit in April 2019 of 27 checks allegedly by creating,

12   comma, and then making the false pretense and representation to

13   the bank that he had the account holder's authority to deposit,

14   comma, these checks.  That aligns with my understanding of the

15   government's meaning of "counterfeit" as presented to the grand

16   jury.

17           Mr. Bhatia, do I have that correct?  That is, in fact,

18   the theory of bank fraud liability that the indictment captures

19   and was presented to the grand jury?

20           MR. BHATIA:  That's right, your Honor.  That's the lay

21   sense of being inauthentic or not authorized.

22           THE COURT:  Right.  In any event, Mr. DiRuzzo, you

23   have your objection.  But I wanted to, at that point, address a

24   constructive amendment, because that is how I understand, as

25   previously ruled, the to wit clause's use of the word

K1RVTEM1

1    "counterfeit."  And I think you've operated throughout the

2    trial on that understanding as well.

3         MR. GELFAND:  Can we just, just to preserve the issue,

4    make a further record on this, your Honor?

5         THE COURT:  You may.  And then I want to just finish

6    your objection on 18, and we need to get the jury, because they

7    are here.

8         MR. GELFAND:  Yes, your Honor.

9         THE COURT:  Go ahead.

10        MR. GELFAND:  Obviously we would incorporate

11   everything that we wrote in the letter to the Court

12   anticipating this issue and wanting to preserve this issue.

13        All we would note for the record, in addition, your

14   Honor, is that obviously we have no independent -- on the

15   defense, no independent way of knowing what was actually

16   communicated to the grand jury.  Obviously we have government

17   counsel's representations; government counsel is an officer of

18   the Court.  We appreciate all of those parameters.

19        But what we do have in this case is the grand jury's

20   words, if you will, as formulated in the indictment.  That's

21   certainly what the grand jury handed down, presumably with a

22   sufficient vote.  And those words, we believe, speak for

23   themselves and should be the words that the jury ultimately has

24   to --

25        THE COURT:  Look, let me offer this thought:  If what

K1RVTEM1

1    you're suggesting is that there might have been a

2    mischaracterization of what was put before the grand jury, in

3    the event of a conviction in this case, I expect there will be

4    post-trial motions.  You're at liberty to seek the Court's --

5    to invite the Court to review the grand jury transcript to test

6    that proposition.

7              MR. GELFAND:  Thank you, your Honor.

8              All we would ask -- and I appreciate -- I know where

9    the Court is going to go with this, but we would formally ask

10   that the jury in this case be instructed that it has to find

11   that these were counterfeit checks, without any sort of

12   characterization, using the exact words in all four counts of

13   the indictment.

14             THE COURT:  All right.  Thank you.

15             I don't think that's an element of bank fraud here.

16   And I think I have captured the to wit clause by putting it in

17   the English prose that I read aloud a moment ago.

18             All right.  Anything else on page 18?  And then we'll

19   take a one-minute comfort break for all.

20             MR. GELFAND:  No.

21             THE COURT:  All right.

22             Defense counsel, just for my planning purposes, we're

23   obviously in mid charge conference, how much more do you have

24   in terms of objections or issues to raise with the charges?  Is

25   there a lot or a little?

K1RVTEM1

1          MR. GELFAND:  Approximately two issues, your Honor.

2     Not a lot.

3          THE COURT:  Very good.  All right.  Then very good.

4          Look, I'll give counsel a two-minute comfort break.

5     But be back in your seats in two minutes, and have the witness

6     here in two minutes.  Thank you.

7          MR. IMPERATORE:  Your Honor?  Apologies.  I want to

8     raise an issue about the forfeiture determination.

9          In Rule -- I'm just looking at the rule once again

10    with fresh eyes.  In Rule 32.2(b)(1)(A) --

11         THE COURT:  32.2(b) --

12         MR. IMPERATORE:   -- (b)(1)(A).  It sets out --

13         THE COURT:  One moment.  Go ahead.

14         MR. IMPERATORE:  So it sets out how forfeiture

15    determinations are made.  And I read this rule to have

16    different requirements with respect to what the specific

17    forfeiture determination is.

18         As set out here, it says that -- it says that the

19    Court must determine -- when it comes to the personal money

20    judgment, it says that the Court must determine the amount of

21    money that the defendant will be ordered to pay.

22         THE COURT:  Where are you looking?

23         MR. IMPERATORE:  I'm sorry, at the very bottom of Rule

24    32.2(b)(1)(A).

25         THE COURT:  Right.

891

K1RVTEM1

1          MR. IMPERATORE:  So I'm trying to recall from our

2    prior trial whether the jury's determination is one that goes

3    to whether there is specific property that is forfeitable, as

4    opposed to the --

5          THE COURT:  Your indictment does not identify specific

6    property.

7          MR. IMPERATORE:  Correct.

8          THE COURT:  Because nothing has been, in fact, seized

9    here.

10          MR. IMPERATORE:  That's correct.

11          THE COURT:  You'd be seeking, in effect, a defined

12    sum, but not a specific piece of property to forfeit.

13          MR. IMPERATORE:  Yes.

14          THE COURT:  Well, look, I mean, if your judgment is

15    ultimately that a jury verdict is not needed here, you're at

16    liberty to preserve your right to forfeiture.  But you're

17    running the risk that if you're wrong about your assessment

18    that a jury verdict is not needed, you will have forgone that

19    opportunity.

20          I will tell you that the only trial in my eight-plus

21    years' experience in which a forfeiture trial was had before a

22    jury was yours.  And there, there was a specific property; it

23    was an investment account in which the fruits of the alleged

24    illegal insider trading scheme had grown some after the scheme

25    was -- the charged scheme was complete.  There was good reason

1      to forfeit that.

2                  So you may well be right that the trigger here for the

3      jury trial right is specific property.  It has not been

4      researched by anybody here.  I'm happy -- if your judgment is

5      you'll run that risk and not pursue a jury proceeding, that's

6      fine, in which case you're still pursuing forfeiture, but you

7      may lose that right if your legal premise is wrong that the

8      defense wasn't entitled to a jury verdict.  I'm happy to go

9      that way.  That makes ample sense.

10                 MR. IMPERATORE:  Your Honor, I think we'll have the

11     opportunity to research this while --

12                 THE COURT:  Okay.  But if, ultimately, your -- and

13     what you say aligns with experience, but it doesn't -- it's not

14     something I've had occasion to research.  And apparently this

15     is -- was an unanticipated issue.

16                 All right.  Let's get Mr. Reinitz in the box.  And

17     Mr. Smallman, as soon as I'm back, we'll get the jury.

18                 (Recess)

19                 THE COURT:  All right.  Mr. Smallman, please get the

20     jury.

21                 (Jury present)

22                 THE COURT:  Good morning, ladies and gentlemen.

23     Welcome back.  I hope everyone had a very good weekend.

24                 Please be seated.

25                 We'll resume now with the trial, in particular, with

1    the cross-examination of Mr. Reinitz.

2           Mr. Reinitz, I'll remind you that you're still under

3    oath.

4           Government counsel, you may inquire.

5    ARIEL REINITZ, resumed.

6    CROSS-EXAMINATION  (continued)

7    BY MR. BHATIA:

8    Q.  Mr. Reinitz, good morning.

9    A.  Good morning.

10   Q.  When we were talking on Friday, you were testifying about

11   some text messages you had exchanged with Mr. Teman; is that

12   right?

13   A.  That's correct.

14   Q.  Let's take a look.

15          MR. BHATIA:  Publishing for the jury Government

16   Exhibit 702 in evidence.

17   Q.  Mr. Reinitz, this is an excerpt of a WhatsApp conversation

18   you had with Mr. Teman, right?

19   A.  Before we get too far, I can't see it on the monitor here.

20   I'm sorry.

21          THE COURT:  Sorry.  That's on us.

22          Okay.  There we go.

23   A.  Can you repeat the question?  I'm sorry.

24   Q.  This is a WhatsApp conversation you had with Mr. Teman,

25   right?

K1RVTEM1                    Reinitz - cross

1    A.  Yes.

2    Q.  And this is dated January 2nd, 2019; is that right?

3    A.  Yes.

4    Q.  And just so we can orient ourselves in this chat,

5    Mr. Teman's messages are on the left, right?

6    A.  Yes.

7    Q.  He says -- Mr. Teman says to you:  I have ABJ checks

8    photos.  Our contract allows me to draw their account.  I

9    should just deposit checks from them.  Totally legal, I think.

10            Those are his words, right?

11   A.  Yes.

12   Q.  Those aren't your words?

13   A.  No, they are not.

14   Q.  And you wrote back:  No.

15            Is that right?

16   A.  Yes.

17   Q.  Those are your words to him?

18   A.  That was my word to him, yes.

19   Q.  Your word to him.  That's right.

20            And he responded with a question mark, right?

21   A.  That's right.

22   Q.  And your response is:  Bad idea.

23            Those are your words?

24   A.  Those are my words.

25   Q.  And further down, you quote his message; is that right?

1    A.  Yes.

2    Q.  And then you say again:  Bad idea.

3    A.  Yes.

4    Q.  Those are your words?

5    A.  Yes.

6    Q.  Further down this page, Mr. Teman says to you:  Why?  They

7    entered into a contract allowing us to draw from their

8    accounts, so we are not breaking any law.

9            Those are his words to you, right?

10   A.  Yes.

11   Q.  And he references a contract; is that right?

12   A.  Yes.

13   Q.  He's referencing a contract when he's talking to you?

14   A.  Yes.

15   Q.  And you say, a few lines down:  Because they are likely to

16   call the police.

17           Those are your words, right?

18   A.  Yup.

19   Q.  You told him that you thought the customers were likely to

20   call the police?

21   A.  Yes.

22   Q.  And you said:  And you will be arrested.

23           Right?

24   A.  Mm-hmm.  Yes.

25   Q.  And you were telling him that --

```
 1              THE COURT:  Sorry.  Just wait for Mr. Reinitz to
 2    finish his answer.
 3    A.  Yes.
 4              THE COURT:  Go ahead.
 5    Q.  You were telling him that he would be arrested, right?
 6    A.  Yes.
 7    Q.  And you said:  And you will have a criminal case to deal
 8    with.  And then you can start explaining about your contract.
 9              You're referencing a contract now to him, right?
10    A.  Yes.
11    Q.  You reference your contract?
12    A.  Yes.
13    Q.  And then you say, in quotes, "and not breaking any laws,"
14    right?
15    A.  Yes.
16    Q.  You put "not breaking any laws" in quotes, right?
17    A.  Yes, I was quoting Mr. Teman's -- I don't know if it was an
18    exact quote -- yeah, effectively an exact quote from his
19    message above.
20    Q.  You were quoting what he said about not breaking any laws?
21    A.  That's right.
22    Q.  Mr. Teman, further down this message, says:  I don't think
23    they will.  They owe the money.  And I'll put on the memo,
24    payment drawn per contract.
25              And he puts a hyperlink, right?
```

K1RVTEM1                          Reinitz - cross

1    A.   Yes.

2    Q.   That's his proposal to you?

3    A.   That was his proposal, yes.

4    Q.   And you wrote, further down this page:  You asked my

5    opinion.  I gave it.  Maybe you're right.  Maybe they'll just

6    throw up their hands.

7              We'll continue.

8              That's your message, right?

9    A.   Yes.

10   Q.   You asked my opinion.  I gave it.  Maybe you're right.

11   Maybe they'll just throw up their hands and say, Oh, well, we

12   tried to stiff him, but Teman outsmarted us.  Too bad.  Have

13   fun, Ari.  Don't spend it all in one place.

14             That's what you're saying to him, right?

15   A.   Yes.

16   Q.   Excuse me.

17   A.   Yes, that's what I wrote to him, yes.

18   Q.   And you're telling him how they might respond if he does

19   draw these checks?

20   A.   To be frank, at least the second portion of what I intended

21   as a bit of a sarcastic -- you could say almost a joke, in the

22   sense that of course I didn't expect his customers, after those

23   deposits were deposited, to, again, throw up their hands, as it

24   were, and not to, you know, dispute the charge.

25             But, yes, that's what I wrote.

K1RVTEM1                    Reinitz – cross

1    Q.  Right.  Because what you really told him was, "Bad idea,"

2    right?

3    A.  That's right.  I wrote it was a bad idea.  As I mentioned,

4    I believe, testified on Friday, my suggestion was that it was a

5    bad idea because I expected that the customer may dispute it

6    and there may be, you know, a criminal accusation.

7    Q.  You said he will be arrested, right?  That's what you wrote

8    on the page before?

9    A.  That's right.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. BHATIA:

2    Q.  A few lines down from that Mr. Teman says to you, "Yes.  Or

3    they'll just accept a loss and ask for the intercoms, like, OK,

4    well, at least we'd like to get the intercoms for that money."

5    Right?  That's what he's saying to you?

6    A.  That's what he wrote, yes.

7    Q.  He is saying to you that they'll just accept the loss and

8    ask for the intercoms," right?

9    A.  That's what he wrote, yes.

10   Q.  You tell Mr. Teman, "My opinion is that you are greater

11   than 50 percent likely to be arrested for the activities you

12   propose.  How you chose to proceed is up to you."  Those are

13   your words to him, right?

14   A.  Yes.

15   Q.  And this is in January 2019?

16   A.  That's right.  Yes, those are my words to him.

17   Q.  In January 2019 you wrote "greater than 50 percent likely

18   to be arrested," right?

19   A.  That's right.

20   Q.  And the activities he is proposing here you say "for the

21   activities you propose," you mean drawing a check on a

22   customer's account, right?

23   A.  That's right.  I expected that the customers may call the

24   police, and under the circumstances Mr. Teman may have to go

25   deal with a criminal accusation, even if ultimately the

1   accusation was resolved in his favor based on his agreement and

2   my advice to him regarding his ability to legally draw the

3   checks under his agreement with the customers.

4   Q.  My question was:  What you're writing here is the activity

5   you proposed, right?

6   A.  That's right.

7           MR. BHATIA:  I would like to show for the witness only

8   Government Exhibit 727.

9           THE COURT:  727?

10          MR. BHATIA:  727.

11          THE COURT:  One moment.

12  Q.  Mr. Reinitz, do you recognize this?

13          THE COURT:  One moment.  Go ahead.

14  Q.  Mr. Reinitz, do you recognize this?

15  A.  Yes.

16  Q.  What is it?

17  A.  If you could slide the page up.

18          THE COURT:  It's not in evidence so don't read from

19  it.

20  A.  Sure.  That's a message from Mr. Teman to me dated April 2,

21  2019.

22  Q.  How do you recognize this?

23  A.  I believe that's a copy that I provided to you.

24          MR. BHATIA:  Your Honor, the government offers

25  Government Exhibit 727.

1              THE COURT:  Any objection?

2              MR. GELFAND:  No, your Honor.

3              THE COURT:  Received.

4              MR. BHATIA:  If we can publish this to the jury.

5              THE COURT:  Ladies and gentlemen, can everyone see the

6      monitors?

7              (Government Exhibit 727 received in evidence)

8      Q.  On Friday you testified about a part of this message, so I

9      want to go through the whole thing.  This is Mr. Teman's

10     message to you; is that right?

11     A.  Yes.

12     Q.  He says, "Meanwhile Bank of America put a hold on two

13     $18,000 checks we drew from people's accounts who remove

14     devices (as our contract explicitly allows) from us we'll see

15     if we get that hold released but we're in the hole about 30

16     grand."  Is that right?

17     A.  That's what the message says.

18     Q.  He is writing to you "as our contract explicitly allows,"

19     right?

20     A.  Yes.

21     Q.  He is telling you -- I am showing you will the exhibit

22     again -- he is referencing these checks after he created them,

23     right?

24     A.  In this message, yes, it was after he deposited them.

25     Q.  And he is also referencing these checks after he deposited

K1R7TEM2                        Reinitz - cross

1    them, right?

2    A.   In this message, yes.

3    Q.   And this is after the charge-back, right?

4    A.   Can you clarify what you mean by the charge-back?

5    Q.   There is after two of those checks were subject to a

6    charge-back?

7    A.   Based on Mr. Teman's message, yes, that's my understanding.

8    Q.   And this is also after the message we saw from January 2019

9    where you said it was a bad idea, right?

10   A.   Yes.

11   Q.   Let's take a look at your response.

12            THE COURT:   What document?

13            MR. BHATIA:   This is now Government Exhibit 704 in

14   evidence.

15            THE COURT:   One moment.   Go ahead.

16   Q.   I am showing to the witness Government Exhibit 704 in

17   evidence.   At the top here, Mr. Reinitz, is Mr. Teman's message

18   to you, right?   It's quoted.

19   A.   Yes.

20   Q.   And you say, "Not sure I follow but this sounds bad."

21   Those are your words to him, right?

22   A.   Yes.

23   Q.   On April 2, 2019 you said "not sure I follow"  Right?

24   A.   Yes.

25   Q.   And then you told him, "This sounds bad."

K1R7TEM2                        Reinitz - cross

1    A.  Yes.

2    Q.  Moving down the page Mr. Teman says, "Yes, very."  And then

3    writes, "Our contract states explicitly if you remove devices

4    there is an $18K fee, and then we can draw your account, again

5    outright saying we can print a check and draw your account (a

6    bank draw -- very common in real estate)."

7           This is Mr. Teman talking to you, right?

8    A.  Yes.

9    Q.  He is talking to you about "our contract states

10   explicitly"?

11   A.  Yes, those are his words.

12   Q.  And your response is "Understood.  I don't know all the ins

13   and outs of this but sounds like a bad idea.  I suggest you

14   provide them with advanced, explicit notification of the

15   charge, amount, and specific basis in the agreement for doing

16   so."  You wrote to him "I don't know all the ins and outs,

17   right?

18   A.  Yes I was referring to --

19           THE COURT:  Yes or no.

20   A.  Yes.

21   Q.  On this page you wrote "I don't know all the ins and outs

22   of this."  Right?

23   A.  Those are the words I wrote, yes.

24   Q.  And you wrote "but sounds like a bad idea."  Right?

25   A.  Yes, I did.

1    Q.  Bad idea is the same thing you told him in January 2019,

2    right?

3    A.  The same words?

4    Q.  Actually the same exact words.

5    A.  Yes.

6    Q.  And I'd now like to show the witness -- actually scroll

7    down the page a bit.  You say, "If you are hitting their

8    accounts out of the blue" --

9            THE COURT:  Slow down.  When you are reading it you

10   are speeding up.

11   Q.  You wrote.  "If you are hitting their accounts out of the

12   blue, I expect this will become a criminal matter sooner or

13   later."  Those are your words, right?

14   A.  Yes.

15   Q.  You told him again in this chat "this will become a

16   criminal matter sooner or later.

17   A.  Yes.

18   Q.  We're in a criminal matter today, right?

19   A.  We sure are.

20   Q.  This is what actually happened, right?

21   A.  It's exactly what happened.

22   Q.  I'd like to show for the witness only Government Exhibit

23   728.

24           Mr. Reinitz, do you recognize this document?

25   A.  Yes.

1    Q.  Are these messages between you and Mr. Teman?

2    A.  Yes.

3    Q.  Do you recognize these?

4    A.  Yes.

5    Q.  How do you recognize them?

6    A.  I provided them to you.

7            MR. BHATIA:  Your Honor, the government offers

8    Government Exhibit 728.

9            THE COURT:  Any objection?

10           MR. GELFAND:  No, your Honor.

11           THE COURT:  Received.

12           (Government Exhibit 728 received in evidence)

13           MR. BHATIA:  You can publish this to the jury.

14   Q.  Mr. Reinitz, these are more conversations but these are

15   dated April 3, 2019; is that right?

16   A.  Yes.

17   Q.  At the top.  And this is Mr. Teman on the left and you on

18   the right?

19   A.  Yes.

20   Q.  Mr. Teman writes to you in the first message, "I think

21   maybe we invoice ABJ the device removal fees, they have like 7

22   buildings at 18K each and then draw their accounts."  A few

23   lines down your response to him --

24           Do you see that?  Is that Mr. Teman talking to you?

25   A.  Yes, at the top, that's correct.

1   Q.  And a couple lines down you respond, "I've already told you

2   I think it's a bad idea.  You've been back and forth with ABJ

3   several times now."  You're saying bad idea, right?

4   A.  Yes, those are my words.

5   Q.  That's actually the same words you used the day before,

6   right?

7   A.  Yeah.

8   Q.  And the same words you used in January 2019?

9   A.  Sure is.

10  Q.  Bad idea.

11  A.  Bad idea.

12  Q.  And you said that he has been back and forth with ABJ

13  several times now; is that right?

14  A.  That's what I wrote.

15  Q.  Your words?

16  A.  Those are my words.

17  Q.  Further down this page you wrote, "Your threats carry

18  little weight at this point and they have indicated they don't

19  believe they owe money."  Is that right?

20  A.  That's what I wrote, that's correct.

21  Q.  And you were telling him that ABJ has indicated they don't

22  believe they owe you money, right?

23  A.  That's correct.

24  Q.  And your next line is "If you hit their accounts I think

25  50/50 they call cops."  Those are your words?

K1R7TEM2                    Reinitz - cross

1    A.  Yes.

2    Q.  And when you said "if you hit their accounts" you mean

3    drawing a check from their bank accounts, right?

4    A.  Yeah, among other options, yes, that would be included,

5    yes.

6    Q.  You think that could cause them to call the cops.

7    A.  I think that's what they might do.  That's what I thought

8    at the time and what I wrote to Mr. Teman.

9    Q.  And your next line is "If I was advising them, that's

10   probably what I would tell them to do"?  Right?

11   A.  That's right.

12   Q.  That's what you wrote to him.

13   A.  That's what I wrote to him.

14   Q.  That if you were advising ABJ, you would tell them to call

15   the cops.

16   A.  In their position, understanding what they had -- you know,

17   their position was regarding their status with GateGuard,

18   that's what I wrote, if I were advising them, yes, I might tell

19   them to do that.

20          MR. BHATIA:  Your Honor, I would like to show for the

21   witness only Government Exhibit 729.

22          THE COURT:  Go ahead.

23   Q.  Mr. Reinitz, do you recognize this?

24   A.  Yes.

25          MR. BHATIA:  Your Honor, may I approach the witness to

K1R7TEM2                    Reinitz - cross

1    hand him some documents?

2              THE COURT:  Yes, you may.

3    Q.  Mr. Reinitz, I am handing you what has been marked as

4    Government Exhibit 729 for identification purposes only, and

5    Exhibit 731 for identification purposes only.

6    A.  OK.

7    Q.  Mr. Reinitz, was the date of the chats in Government

8    Exhibit 729 April 10, 2019?

9    A.  I mean as I'm looking at it now, I'm not sure.

10   Q.  Can Government Exhibit 731 refresh your recollection?

11   A.  Yes.

12   Q.  Do you recognize these chats?

13             THE COURT:  I think you've asked if it refreshes his

14   recollection, but you haven't established what the refreshed

15   recollection is.

16   Q.  Does this refresh your recollection that these chats were

17   sent on April 10, 2019?

18   A.  Yes, they were sent on April 10, 2019.

19   Q.  And what are these?  What is this chat?

20   A.  Those are two messages from myself to Mr. Teman.

21   Q.  The next page of this conversation, do you recognize these

22   chats?

23             THE COURT:  What document number?

24             MR. BHATIA:  This is the same document but the next

25   page.

K1R7TEM2                        Reinitz - cross

1              THE COURT:  Very good.  Thank you.

2    A.  Yes.

3    Q.  Are these further messages between you and Mr. Teman?

4    A.  Yes.

5    Q.  Do you recognize what's on the third page of this document?

6    A.  Yes.

7    Q.  What is this?

8    A.  It's another message from myself to Mr. Teman.

9              MR. BHATIA:  Your Honor, the government offers

10   Government Exhibit 729.

11             THE COURT:  Any objection?

12             MR. GELFAND:  No, your Honor.

13             THE COURT:  It's received.

14             (Government Exhibit 729 received in evidence)

15             MR. BHATIA:  You can publish this exhibit for the

16   jury.

17   Q.  Mr. Reinitz, this is a message from you, right?

18   A.  Two messages from me, yes.

19   Q.  Two.  And these are to Mr. Teman, right?

20   A.  Yes.

21   Q.  These were sent on April 10, 2019?

22   A.  Yes.

23   Q.  OK.  And you told Mr. Teman on April 10, 2019 this banking

24   stuff is no joke, right?

25   A.  "The banking stuff is not a joke"  Yes, that's what I

1    wrote.

2    Q.   And you wrote to him "There are federal regulations on this

3    stuff.  You can't just hit someone's bank account if you know

4    they dispute the charge."  Those are your words, right?

5    A.   That's right.

6    Q.   You were telling Mr. Teman that.

7    A.   Yes.

8    Q.   You also wrote to Mr. Teman a message on the top left here;

9    is that right?

10   A.   Yes.

11   Q.   You wrote "Honestly, I don't know anything about this

12   stuff."  That's from you, right?

13   A.   Yes, that's what I wrote.

14   Q.   Those are your words on April 10, 2019?

15   A.   Yes.

16   Q.   You wrote "I honestly don't know anything about this stuff,

17   right?

18   A.   There is more, but, yeah, that's what I wrote.

19   Q.   And then you said, "But there are serious state and fed

20   regulations on this.  You claim that your contract allows you

21   to debit their accounts even after they explicitly protest.

22   I'm just not sure it's that simple."  That's you talking,

23   right?

24   A.   Yes.

25   Q.   You told Mr. Teman on April 10, 2019 that you claim that

1    your contract allows you to debit their accounts.  That's what

2    you wrote to him?

3    A.  Yes, to debit their accounts using -- yes, that's what I

4    wrote.

5    Q.  Your words here are "to debit their accounts"?

6    A.  Yes, in reference to debit payments.

7    Q.  Debit payments means withdrawing money, right?

8    A.  It's a more specific form.  There is debit cards, credit

9    cards, so that is in referencing to debiting using a debit

10   payment.

11   Q.  And you wrote "I'm just not sure it's that simple."  Those

12   are your words?

13   A.  That's right.

14   Q.  Further down this page you also wrote to Mr. Teman, "And it

15   also may be (again speaking out of ignorance) a clear violation

16   of some federal banging violation, in which case your "simple

17   can't miss idea" is now a federal crime."  That's what you

18   wrote to Mr. Teman, right?

19   A.  In reference to his prior messages.

20   Q.  Mr. Reinitz, I'm asking are those your words?

21   A.  Those are my words, yes.

22   Q.  Those are your words on April 10, 2019, right?

23   A.  Yes.

24   Q.  And you were speaking to Mr. Teman?

25   A.  Yes, I was.

K1R7TEM2                           Reinitz - cross

1    Q.  And you wrote "speaking out of ignorance," right?

2    A.  Those are my words, yes.

3    Q.  And you wrote "a clear violation of some federal banking

4    regulation"  Is that right?

5    A.  That's right.

6    Q.  You also then wrote "simple can't miss idea" in quotes.

7    Right?  Those are your quotes?

8    A.  Those are my quotes.

9    Q.  Your quotes to Mr. Teman.

10   A.  Yes.

11   Q.  And you wrote "now a federal crime," right?

12   A.  Yeah.

13   Q.  You wrote federal crime, not federal arrest, right?

14   A.  Again in reference to Mr. Teman's previous messages, yes,

15   that's what I wrote.

16   Q.  And that's actually what happened, right, he was charged

17   with a crime?

18   A.  That's what I understand.

19   Q.  That's why we're here?

20   A.  You can tell me but, yeah, that's what I understand.

21   Q.  Mr. Reinitz, you testified on Friday that you were not part

22   of any negotiations between 18 Mercer, Coney Management and ABJ

23   and Mr. Teman over the purchase of the intercoms, right?

24   A.  Purchase?  No.  That's correct, I did not -- I was not

25   involved in any purchase.

1    Q.  And you never saw any contracts -- and you never saw any

2    agreements between Mr. Teman and any of those parties with a

3    signature at the bottom, right?

4    A.  I saw several -- I saw contracts.  I didn't see a contract

5    with a signature at the bottom, no, that's correct.

6    Q.  That's my question.  You didn't see any sort of document

7    with signatures at the bottom of that page?

8    A.  Signatures as we lawyers would refer to it?  No, not an ink

9    signature on a page, no.

10   Q.  You testified about terms and conditions on Friday, right?

11   A.  As I recall, yes.

12   Q.  You were shown a document called terms and conditions?

13   A.  I was shown several documents, but among them out of there

14   I think there were several sets of terms.

15   Q.  And along with the terms and conditions is a link to

16   something called payment terms, right?

17   A.  There was a link contained -- if we're talking about the

18   same thing, Mr. Bhatia, there is a link contained within the

19   terms and conditions that references payment terms, yes -- is a

20   link to another page which contains payment terms.

21   Q.  Right.  Just so we're on the same page, there is one

22   document called terms and conditions, right?

23   A.  That is correct.

24   Q.  And there is another document called payment terms, right?

25   A.  That's right.

1   Q.  Those are both web pages; is that right?

2   A.  Yes.

3   Q.  They are pages on Mr. Teman's website?

4   A.  On GateGuard's website, yes.

5   Q.  That's right.  And there is a link from the terms and

6   conditions to the payment terms, right?

7   A.  Yes.

8   Q.  There is an URL that you can click on?

9   A.  Yes.

10  Q.  You don't know for a fact whether any of the individuals in

11  this case actually clicked on that link, do you?

12  A.  Do I know for a fact?  I do not know for a fact if they

13  clicked on the link.  I know for a fact that they --

14  Q.  I am only asking if you know for a fact yes or no whether

15  they clicked on that link?

16  A.  I don't know for a fact, no.

17  Q.  Mr. Reinitz, you testified on Friday about when you first

18  started having conversations with Mr. Teman about the payment

19  terms.  Do you remember that?

20  A.  Roughly, yeah.

21  Q.  And you are an attorney, right?

22  A.  Yes.

23  Q.  You bill for your time?

24  A.  Sometimes.

25  Q.  You have billed GateGuard for their work, right?

1    A.  Yes.

2    Q.  For your work on their behalf, I should say.

3    A.  Some of it.

4    Q.  And you received a subpoena in this case, right?

5    A.  I did.

6    Q.  And you produced documents pursuant to that subpoena?

7    A.  I did.

8    Q.  Some of those documents were invoices, right?

9    A.  They were.

10   Q.  Invoices from your firm to GateGuard, right?

11   A.  Yes.

12   Q.  The first time you sent an invoice listing "consult on

13   payment and ACH issues" was May 2019, right?

14   A.  Yes, that's right.

15   Q.  You had sent him bills before that, right?

16   A.  On other matters, yes.

17   Q.  Mr. Reinitz, you testified on Friday that you received

18   thousands of dollars in legal fees from Mr. Teman, right?

19   A.  Yes.

20   Q.  From GateGuard, I should say.

21   A.  From GateGuard, yes.

22   Q.  I'd like to direct your attention to Government Exhibit 102

23   in evidence, and in particular page 7 of that document.  Do you

24   see a deposit of $297,000 on 4/19/2019?

25   A.  If you can zoom in a little.  Yes, I see that.

K1R7TEM2                        Reinitz - cross

1   Q.  Do you see that?  $297,000 is the value of the 27 checks

2   Mr. Teman deposited on April 19, 2019, right?

3   A.  I take your word for it.  I don't know for certain, but if

4   you can show them to me, I can add them up.

5   Q.  But you're not certain.

6   A.  You're asking me to tell you -- that's my understanding and

7   my recollection.

8   Q.  OK, understood.  I will just say you see the $297,000 here,

9   right?

10  A.  I don't have a reason to dispute what you're telling me.

11  I'm just saying if you are asking me to tell you exactly how it

12  was itemized, if it was 27 or -- I mean I can't tell you right

13  not.  If you show me the checks, and can tell you for certain.

14  Q.  So here at the top of the page it says GateGuard, Inc.  Do

15  you see that?

16  A.  I do, yes.

17  Q.  And this is an account ending in 8085?

18  A.  Yes.

19  Q.  Going further down this page do you see a transfer -- a

20  withdrawal, I should say, listed here for $225,000?

21  A.  Yes.

22  Q.  And that's dated April 26, 2019, right?

23  A.  Yes.

24  Q.  And it looks like it's going to transfer to checking 0351?

25  A.  Yes, I see that.

K1R7TEM2                        Reinitz - cross

1              MR. BHATIA:  I am showing the witness Government

2     Exhibit -- I am publishing for the witness Government Exhibit

3     104 in evidence, and this is page 9 of that document.

4     Q.  Do you see at the top of this page it has account ending

5     0351?

6     A.  Yes.

7     Q.  And this is a Friend or Fraud account, right?

8     A.  Yes.

9     Q.  And that's another one of Mr. Teman's companies?

10    A.  Yes.

11    Q.  And on this page you see a deposit of $225,000?

12    A.  Yes.

13    Q.  That's April 26, 2019?

14    A.  Yes.

15    Q.  And you can see on the same date April 26, 2019 a transfer

16    of $180,000 to checking account ending in 1046.  Do you see

17    that?

18    A.  Yes.

19    Q.  That's $180,000?

20    A.  Yes.

21             MR. BHATIA:  I'm publishing for the witness Government

22    Exhibit 106 in evidence, and this is page 7 of that document.

23    Q.  Do you see account ending in 1046 at the top?

24    A.  Yes.

25    Q.  Touchless Labs LLC?

1   A.  Yes.

2   Q.  That's another one of Mr. Teman's companies?

3   A.  Yes.

4   Q.  Do you see here a deposit of $180,000?

5   A.  Yes.

6   Q.  And that's on April 26, 2019?

7   A.  Yes.

8   Q.  Is that right?

9   A.  Yes.

10  Q.  And further down the page on April 29, 2019 it says

11  "Transfer Touchless Labs LLC:  Fischer Broyles.  Is that your

12  firm?

13  A.  Yes.  It's misspelled but that's my firm.

14  Q.  And there is one transfer for $15,000, right?

15  A.  Yes.

16  Q.  And there's another transfer for $1500?

17  A.  Yes.

18  Q.  And those are both on April 29, 2019, right?

19  A.  Yes.

20          MR. BHATIA:  Your Honor, may I have a moment?

21          THE COURT:  Yes, you may.

22          THE WITNESS:  Should I step down?

23          THE COURT:  No.

24          MR. BHATIA:  Nothing further, your Honor.

25          THE COURT:  All right.  Any redirect examination,

K1R7TEM2                        Reinitz - redirect

1    Mr. Gelfand?

2              MR. GELFAND:  Yes, your Honor.  Thank you.

3    REDIRECT EXAMINATION

4    BY MR. GELFAND:

5    Q.  Good morning, Mr. Reinitz.

6    A.  Hi.

7    Q.  Mr. Reinitz, on cross-examination you were asked a bunch of

8    questions about the WhatsApp chats, correct?

9    A.  Several, yes.

10   Q.  Are WhatsApp chats basically a form of text messaging?

11   A.  That's how I use them.

12   Q.  OK.  How, if at all, between January 2019 and March and

13   April of 2019 did you communicate with Mr. Teman outside of

14   WhatsApp?

15   A.  E-mail, phone, in addition to WhatsApp.  I would say

16   between the three of those, that's where most of our

17   communications went.

18   Q.  I am going to ask you more specifically, but just generally

19   yes or no, did you discuss the subject matter that you

20   testified about this morning about the WhatsApp chats with Mr.

21   Teman by telephone?

22   A.  Yes.

23   Q.  Now, I want to show you some of the documents that the

24   prosecutor showed you last Friday and today.

25             MR. GELFAND:  Could I publish for the jury Government

1    Exhibit 702, your Honor?

2              THE COURT:  What number?

3              MR. GELFAND:  702.

4              THE COURT:  In evidence?  Yes, you may.

5    Q.  You were asked about this document this morning, correct?

6    A.  Yes.

7    Q.  Just to refresh our recollection, what is the date of this

8    conversation?  And I will zoom in for you so you can see.

9    A.  January 2, 2019.

10   Q.  On January 2nd of 2019 could you please read what Mr. Teman

11   writes to you.

12   A.  "I have ABJ checks (photos).  Our contract allows me to

13   draw their account.  I should just deposit checks from them

14   (totally legal I think)."

15   Q.  Then Mr. Teman continues down there, correct?

16   A.  Yes.

17   Q.  So even though it's different colors, just so we're not

18   confused, the statement you just read and the statement that I

19   just circled, is that both Mr. Teman's statements?

20   A.  Yes.

21   Q.  Can you please read the next Mr. Teman statement beginning

22   with "Why".

23   A.  "Why?  They entered into a contract allows us to draw from

24   their accounts."

25   Q.  Now, that was on January 2, correct?

1   A.  Yes.

2   Q.  Between January 2nd of 2019 and March 28, 2019, what if any

3   advice did you give Mr. Teman about whether or not it was legal

4   to deposit RCCs against the accounts of Coney, ABJ and Mercer?

5   A.  My advice to Mr. Teman was that it was technically legal.

6   His agreement, GateGuard's terms and payment terms gave

7   GateGuard the explicit authority to deposit the RCCs drawn on

8   the accounts of those entities you mentioned, Coney, ABJ and

9   Mercer, but I was concerned that practically there may be

10  consequences that Mr. Teman may encounter if the dispute from

11  those customers was escalated by them.

12  Q.  First of all, how often during that time period, meaning --

13  let's be very precise, January of 2019 to March 28th of 2019 --

14  how often during that time period did you speak to Mr. Teman by

15  phone or in any format other than WhatsApp?

16  A.  Roughly, you know, maybe two to four times a week.  Pretty

17  frequently.  Maybe less, but I would say -- I'm sorry, at

18  minimum once a week.

19  Q.  In those phone conversations did you discuss this subject

20  matter?

21  A.  Yes.

22  Q.  What if anything did you discuss -- did you explain to Mr.

23  Teman about your legal advice in contrast with your pragmatic

24  concerns?

25  A.  My legal advice was, you know, again, as I just testified.

K1R7TEM2                          Reinitz - redirect

1    Legally the payment -- my advice to Mr. Teman, direct and

2    unambiguous advice, was legally he had the authority to draw

3    the payments, specifically to deposit RCCs drawn on the

4    accounts of the entities we've mentioned, but I had practical

5    concerns about what the consequences would be.  In other words,

6    once the payments were deposited I was concerned that there

7    would be a further dispute whether it was with the banking

8    institutions or with the customers, and I was concerned where

9    that might lead.

10   Q.  Now, if you look at Government Exhibit 702, you testified

11   that was January 2, 2019; is that correct?

12   A.  You're referring to an exhibit number?  I'm sorry.

13   Q.  I'm sorry, the one that's on the screen in front of you.

14   A.  Yes, January 2, 2019.

15   Q.  Then I want to show you --

16            Your Honor, these are all in evidence.  I'm going to

17   publish Government Exhibit 727.

18            THE COURT:  You may.

19   Q.  What is the date on the next WhatsApp chat the government

20   showed you?

21   A.  April 2, 2019.

22   Q.  Now, you were asked about the statement here "Meanwhile

23   Bank of America put a hold ..."  Correct?

24   A.  Yes.

25   Q.  To be clear, prior to April 2nd of 2019 were you aware that

1    Mr. Teman intended to deposit the two checks that were

2    deposited on March 28th of 2019?

3    A.  Yes.

4    Q.  And what if any advice did you give Mr. Teman prior to

5    March 28th of 2019 about whether depositing those RCCs in the

6    name of Mercer and Coney respectively was legal?

7    A.  My legal advice was that it was legal, that the terms --

8    GateGuard's terms and payment terms -- authorized Mr. Teman to

9    deposit those checks.

10   Q.  I am showing you what has been marked as -- I'm sorry --

11   what has been introduced as Government Exhibit 728.  Do you see

12   Government Exhibit 728 in front of you?

13   A.  Yes.

14   Q.  What is the date of these WhatsApp chats?

15   A.  April 3, 2019.

16   Q.  Who is speaking in this top section of the box that I've --

17   the top left white and color that I've marked on the screen?

18   A.  Mr. Teman.

19   Q.  Could you please read what Mr. Teman says to you.

20   A.  "I think maybe we invoice ABJ the device removal fees, they

21   have like 7 buildings at $18K each and then draw their

22   accounts.  We can put into the invoice a reminder link to the

23   terms and a reminder that collections cases add additional fees

24   as outlined at _ "

25            "I think we also send a lawyer letter to Signature

K1R7TEM2                    Reinitz - redirect

1   Bank and their other bank saying these assets owe us hundreds

2   of thousands of dollars in fees and were, we believe, knowingly

3   involved in fraud and federal perjury and trade secret theft."

4   Q.  The government then refreshed your recollection as to the

5   date of Government Exhibit 729.  To be clear, was that April

6   10th of 2019?

7   A.  Yes.

8   Q.  Who is speaking on Government Exhibit 729?

9   A.  I am.

10  Q.  Could you please read exactly what you write.

11  A.  "The banking stuff is not a joke.  There are federal

12  regulations on this stuff.  You can't just hit someone's bank

13  account if you know they dispute the charge."

14  Q.  Was this part of an ongoing conversation you were having

15  with Mr. Teman by phone?

16  A.  Yes.

17  Q.  What specifically did you communicate to Mr. Teman by phone

18  on or before April 10th of 2019 about federal regulations?

19  A.  In this instance, as I recall, I was referring to the --

20  excuse me -- debit and credit card charges, which as I

21  understand it there are regulations regarding whether a credit

22  or debit card charge can be charged after a customer disputes

23  it.  That's what I was referencing.  And he and I had discussed

24  that by phone, and that's what I was referencing in this

25  message.

1    Q.  Was this conversation about RCCs?

2    A.  No.

3    Q.  If you look at the next page.

4              THE COURT:  Which exhibit?

5              MR. GELFAND:  The next page, still Exhibit 729, page

6    2.

7              THE COURT:  Very well.

8    Q.  Is this a continuation of that same conversation?

9    A.  I would need to see the full message, I guess, but I

10   believe -- if it's the same set that Mr. Bhatia just showed me,

11   then, yes, it's a continuation.

12   Q.  At 7:09 a.m. on April 10 you write "You claim that your

13   contract allows you to debit their accounts even after they

14   explicitly protest.  I'm just not sure it's that simple."  Was

15   that in the context of a discussion about RCCs?

16   A.  No.

17   Q.  What was that discussion about with Mr. Teman?

18   A.  As it says, debit charges or the equivalent -- I believe in

19   most cases credit card charges -- we were discussing -- or I

20   was referring to, and we were discussing in that context

21   whether if a customer disputes and you have their credit card

22   on file, was GateGuard authorized to continue to charge their

23   credit card -- or debit their debit card.

24   Q.  Approximately two minutes later --

25              Your Honor, this is the same exhibit,  bottom of page

1    2, for the record.

2              When you referenced "a federal crime," was that in

3    connection to credit or debit card transactions?

4    A.  Yes.  Yes.

5    Q.  And in fact if we go to the last page -- page 3 of 3 for

6    the record, of Government Exhibit 729 -- first of all, who is

7    speaking there?

8    A.  I am.

9    Q.  Could you please read what you write to Mr. Teman.

10   A.  "There are regulations around automatic debit agreements.

11   Including, if the payer tells you to stop, you must stop."

12   Q.  Prior to March 28th of 2019, what if any advice did you

13   give Mr. Teman about whether that same rule applies to RCCs?

14   A.  My advice to Mr. Teman was that it did not, to my

15   knowledge -- and based on my research -- apply to RCCs.

16   Q.  Now, you were asked about your communications with Joseph

17   Soleimani and Elie Gabay.  Did you personally communicate by

18   phone and e-mail with Joseph Soleimani and Elie Gabay --

19   meaning ABJ and Coney -- about debts owed to GateGuard back in

20   2018?

21   A.  I personally communicated with Mr. Soleimani by phone and

22   e-mail.  I personally communicated with Mr. Gabay, to the best

23   of my recollection, only by e-mail.

24   Q.  Prior to March 28th of 2019 did Mr. Teman provide to you

25   his written e-mail correspondence with these two individuals as

1    it related to billing disputes?

2    A.   E-mails, yes.  He provided e-mails, as well as additional

3    communications, I believe, text message, WhatsApp messages as

4    well.

5    Q.   Now, did any of the correspondence that Mr. Teman provided

6    you regarding his communications with Joseph Soleimani

7    specifically reference the fees that were ultimately the

8    subject of the RCCs?

9    A.   To the best of my recollection, yes.

10   Q.   Would it refresh your recollection to see that e-mail

11   correspondence?

12   A.   Yes.

13           MR. GELFAND:  Your Honor, may I show just the witness?

14   I just want to make sure I'm showing just the witness.

15           THE COURT:  I don't know what exhibit.

16           MR. GELFAND:  Defense Exhibit 71.

17           THE COURT:  Have you given me a copy?

18           MR. GELFAND:  I haven't.

19           THE COURT:  Please hand it up.

20           MR. GELFAND:  May I?

21           THE COURT:  Yes.

22           You may show it to the witness.

23           MR. GELFAND:  Thank you, your Honor.

24   Q.   Without reading any of it into the record, can you tell me

25   if you see what has been marked as Defendant's 71, Mr. Reinitz?

K1R7TEM2                          Reinitz - redirect

1    A.  Yes, I see it.

2    Q.  Just generally speaking, just by topic what is it?

3    A.  It's an e-mail between Mr. Teman and Mr. Soleimani.

4    Q.  What is the date of that e-mail?

5    A.  May 22, 2018.

6    Q.  Was this e-mail provided to you by Mr. Teman prior to March

7    28th of 2019.

8    A.  Yes?

9            MR. GELFAND:  Your Honor, I move Defendant's Exhibit

10   71 into evidence.

11           THE COURT:  Any objection?

12           MR. BHATIA:  Yes, your Honor, objection.  801.

13           THE COURT:  Did this e-mail, Mr. Reinitz, form any

14   part of the legal advice you later gave to the defendant?

15           THE WITNESS:  Yes.

16           THE COURT:  Overruled.  I will receive it.

17           (Defendant's Exhibit 71 received in evidence)

18           MR. GELFAND:  Thank you, your Honor.  May I publish

19   this?

20           THE COURT:  Let me reformulate the question.

21           Did this e-mail inform the legal advice that you gave

22   subsequently to the defendant?

23           THE WITNESS:  Yes, your Honor.

24           THE COURT:  Yes, you may publish it.

25           MR. GELFAND:  Thank you, your Honor.

1   Q.  I am going to zoom in.  Can you see this on the screen in

2   front of you?

3   A.  Yes.

4   Q.  Can you tell me first of all who this e-mail is from.

5   A.  Ari Teman, Ari@teman.com.

6   Q.  Who is this e-mail to?

7   A.  Joseph Soleimani.

8   Q.  What is the date of this e-mail?

9   A.  May 22, 2018.

10  Q.  Could you please read the first paragraph beginning with

11  "Joe," and then "When you ..."

12              THE COURT:  Mr. Gelfand, let me just use this

13  opportunity to remind the jury of a limiting instruction I gave

14  last week.

15              You are in the process again of hearing communications

16  between Mr. Teman and Mr. Reinitz, and you may consider these

17  communications to the extent they bear on Mr. Teman's state of

18  mind and his intentions at the times of the events at issue,

19  but there are various factual representations that are embedded

20  in these e-mails, statements that Mr. Teman makes to Mr.

21  Soleimani, for example.  You may not treat those as necessarily

22  true or false.  You are not to consider them for the truth or

23  falsity of what Mr. Teman is stating in the e-mail.  You're

24  receiving this e-mail communication because it's part and

25  parcel of the information that was given to Mr. Reinitz before

1    Mr. Reinitz says he gave legal advice to the defendant.

2            Go ahead.

3            MR. GELFAND:  Thank you, your Honor.

4    Q.  Mr. Reinitz, can you please read the brief paragraph

5    beginning after "Joe".

6    A.  "Joe, when you signed up for GateGuard you signed a

7    contract that includes steep fines for removing or disabling

8    devices ($18,000 per device) and includes a multi-year contract

9    to pay for service.  There are no cancellations or early

10   terminations.  Monthly bills past-due incur a major collection

11   fee.  The bill per device is the 10 years of service minus the

12   6 months paid up front (6 months times $99 plus $149 times 9

13   years times 12 months), and the $18,000 fee for removing power

14   from the devices disabling their use.  The amount we sent to

15   collections last week is $268,116 (44,686/device)."

16   Q.  Approximately when did you first become aware of this

17   e-mail correspondence between Mr. Teman and Mr. Soleimani?

18   A.  To the best of my recollection, it would have been maybe

19   September -- August or September 2018.

20   Q.  I am showing you what has been previously admitted as

21   Defendant's Exhibit 14.  Who is this correspondence from?

22   A.  Me.

23   Q.  To whom?

24   A.  Joseph Soleimani.

25   Q.  On what date?

1    A.   October 11, 2018.

2    Q.   Could you please read this sentence that I have circled.

3    A.   "The invoice indicates that your agreement with GateGuard

4    is subject to the terms available here" -- with a hyperlink --

5    "and here" with a second hyperlink.

6    Q.   Were the hyperlinks to the contracts?

7    A.   The hyperlinks, as I recall -- I mean we can look at the

8    e-mail itself -- the GateGuard terms and conditions was the

9    first hyperlink, and the GateGuard payment terms was the second

10   hyperlink.

11   Q.   You testified on cross-examination that you did not know

12   whether any of the three entities -- meaning Coney, ABJ or

13   Mercer -- actually clicked on the payment terms link, correct?

14   A.   I don't know firsthand.

15           THE COURT:   The question is what you testified to on

16   cross-examination.

17           THE WITNESS:   I apologize, your Honor.

18   A.   That's correct.

19   Q.   OK.   Prior to March 28th of 2019 -- and for ABJ April 19th

20   of 2019 -- what, if anything, did you communicate to Mr. Teman

21   about how that fact, whether they actually clicked on the

22   payment terms, impacts the legality of the RCCs?

23   A.   My advice to Mr. Teman with regard to whether or not a

24   particular customer clicked on the terms was that in having

25   reviewed GateGuard's sign-up process, having reviewed

1    correspondence with the individual customers, it was my legal

2    opinion and my advice specifically to him that the customers at

3    minimum had what was called constructive notice.  They had been

4    provided numerous opportunities to click on the terms.  Mr.

5    Teman and GateGuard were very up front and direct about

6    notifying them of the terms.  And it was possible they had not

7    clicked on the terms, but my advice was legally they had enough

8    notice that the terms were binding and effective on those

9    customers.

10   Q.  You testified that there was an invoice in May of 2019 from

11   your firm about payment terms and ACH matters, if I heard your

12   testimony correctly.  Correct?

13   A.  Yes, that's correct.

14   Q.  Did you provide invoices to the government from your law

15   firm in connection with invoices generated to GateGuard in

16   connection with this case?

17   A.  Yes.

18          MR. GELFAND:  Your Honor, I guess I'm going to remark

19   this a defense exhibit, 72.

20          THE COURT:  What is it in my binder?

21          MR. GELFAND:  Government Exhibit 732.

22          THE COURT:  Go ahead.  You may inquire.

23          MR. GELFAND:  May I show it just to the witness?

24          THE COURT:  Just to the witness.

25   Q.  Mr. Reinitz, just for your benefit so you can see what

K1R7TEM2                          Reinitz - redirect

1    Defendant's Exhibit 72 is, I'm going to show you a series of

2    papers and then I'm going to ask you a couple questions about

3    it.

4    A.  OK.

5    Q.  Tell me if I'm going too fast.  Do you recognize what I've

6    marked as Defendant's Exhibit 72?

7    A.  Yes.

8    Q.  What is Defendant's Exhibit 72?

9    A.  It's a collection of several invoices from my firm to

10   GateGuard.

11           MR. GELFAND:  Your Honor, I move Defendant's Exhibit

12   72 into evidence.

13           THE COURT:  Any objection?

14           MR. BHATIA:  Yes, your Honor.  401, 403, 801.

15           THE COURT:  Sustained for now.  You may be able to lay

16   a better foundation, but for now there is a valid 801

17   objection.

18   Q.  Between November 2018 and March 10th of 2018 -- and I can

19   refresh your recollection if it would help -- I may have

20   misspoke.  Let me rephrase.

21           Between November 9th of 2018 and May 10 of 2019, in

22   that time period how many invoices did Fisher Broyles issue to

23   GateGuard Inc.?

24   A.  I would have to review the materials that you just showed

25   if you want an exact number.

1          MR. GELFAND:  May I approach, your Honor?

2          THE COURT:  Yes.

3          MR. GELFAND:  Would that refresh your recollection?

4          THE WITNESS:  If you can repeat the question.

5    Q.  Between let's say November 1, 2018 and May 10, 2019, how

6    many invoices did your firm send to GateGuard for legal work?

7    A.  I'm sorry.  The packet I just counted four invoices there.

8          MR. BHATIA:  Objection, your Honor.

9          THE COURT:  Sustained.  That was not the question.

10         MR. BHATIA:  Move to strike.

11         THE COURT:  The issue is do you have a memory of how

12   many invoices your firm sent during that period?

13         THE WITNESS:  I don't have a memory of the exact

14   number.  I provided them all, and I can count them.

15   Q.  Are you familiar --

16         THE COURT:  Mr. Gelfand, you're welcome to elicit

17   whether there is a minimum number, but he can't tell from what

18   you handed him whether that's the entirety, and he has so

19   testified.

20         MR. GELFAND:  I can move on.

21         THE COURT:  Let's do that.

22   Q.  On May 10, 2019 did your firm generate an invoice to

23   GateGuard?

24   A.  Yes.

25   Q.  Did that invoice reference reviewing contract and terms and

1   conditions for same?

2   A.  Yes.

3   Q.  When was the work reflected in that May 10th invoice

4   actually conducted by members of your firm?

5   A.  The work that's referenced there, I would have to look

6   back.  I believe it would have been in that instance in April

7   of 2019.

8   Q.  Did you bill GateGuard for every minute or hour that you

9   worked for them?

10  A.  I wish, but no I didn't.

11  Q.  Mr. Reinitz, you testified that you are a licensed

12  attorney, correct?

13  A.  Yes.

14  Q.  If I understood your testimony correctly, you testified

15  that you have been GateGuard's counsel and Mr. Teman's counsel

16  for several years, correct?

17  A.  Yes.

18  Q.  Mr. Teman -- I'm sorry.  Mr. Reinitz, when you gave Mr.

19  Teman the advice that you testified about prior to March 28th

20  of 2019 involving the RCCs to these three entities -- ABJ,

21  Coney and Mercer -- did you believe that you had all of the

22  information you needed to give that advice?

23  A.  Yes.

24          MR. GELFAND:  Your Honor, may I have one moment?

25          THE COURT:  Yes.

K1R7TEM2                      Reinitz - recross

1            MR. GELFAND:  I have no further questions, your Honor.

2  Thank you.

3            THE COURT:  Any recross?

4            MR. BHATIA:  Very briefly, your Honor.

5            THE COURT:  Go ahead.

6  RECROSS EXAMINATION

7  BY MR. BHATIA:

8  Q.  Mr. Reinitz, you testified just a moment ago that you had

9  given Mr. Teman certain advice over the phone, right?

10 A.  Yes.

11 Q.  So you had chats and you also had advice that you gave him

12 over the phone?

13 A.  Chats, phone, e-mail, yes.

14 Q.  You don't have recordings of those phone conversations, do

15 you?

16            THE COURT:  Speak a little louder so everyone can hear

17 you.

18            MR. BHATIA:  Your Honor, I will ask a different

19 question.

20 Q.  What you told Mr. -- I am showing you what has been marked

21 as Government Exhibit 729 in evidence.

22            What you told Mr. Teman on April 10, 2019, at the

23 bottom of this page is, "in which case your 'simple, can't miss

24 idea' is now a federal crime."  That's what you said, right?

25 A.  Yes.

K1R7TEM2

1           MR. BHATIA:  No further questions, your Honor.

2           THE COURT:  All right.  Any re-redirect?

3           MR. GELFAND:  No, your Honor.

4           THE COURT:  Mr. Reinitz, you may step down.  Your

5    testimony is completed.

6           THE WITNESS:  Thank you, your Honor.

7           (Witness excused)

8           THE COURT:  Defense?

9           MR. GELFAND:  May we just have ten seconds?

10          THE COURT:  Of course.

11          MR. GELFAND:  Your Honor, the defense rests.

12          THE COURT:  All right.  Ladies and gentlemen, you have

13   just heard defense counsel represent that the defense rests.

14   That means that the defense case is now complete.  We are at an

15   important juncture at the trial in which I need to spend a

16   little time with counsel.

17          What I'm going to do for the time being is just give

18   you your midmorning 15 minute break and bring you back in.  At

19   that point I will be in a better position to tell you where

20   we're headed over the course of the balance of the day, but I

21   need to take a little more time with the lawyers.  I will see

22   you in 15 minutes.  Please don't discuss the case.

23

24          (Continued on next page)

25

K1R7TEM2

1          (Jury not present)

2          THE COURT:  All right.  Be seated.  To begin with, let

3    me just confirm, Mr. Teman, that that was in fact your decision

4    not to testify.

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  And you understood that it was your

7    decision and yours alone to make.

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  OK.  With the defense having rested, there

10   are a handful of things we need to take up.

11         First of all, with respect to forfeiture -- go ahead.

12         MR. GELFAND:  I just didn't want to waive anything,

13   but I'm happy to take up our Rule 29 motion at whatever time

14   the Court would prefer.  I just wanted to notify the Court that

15   we were moving pursuant to Rule 29 at the close of the defense

16   case for judgment of acquittal.

17         THE COURT:  Very good.

18         MR. GELFAND:  We would incorporate all of the

19   arguments previously raised, and we would just assert as a

20   general matter that as to all counts and all elements of all

21   counts there is no reasonable basis that a reasonable jury even

22   in the light most favorable to the government could convict Mr.

23   Teman.  We would ask the Court to enter a judgment of acquittal

24   as to all possible counts.

25         THE COURT:  Is there any particular element you are

1    drawing to my attention now?

2              MR. GELFAND:  Your Honor, no differently than what we

3    previously referenced.  We are obviously happy to reargue it.

4              THE COURT:  It's not necessary.  I mean, look, having

5    found sufficient evidence on which a jury could convict on all

6    elements of all counts, including with respect to venue, which

7    was a significant focus -- not an element but a significant

8    focus of the discussion before -- that evidence has not been

9    removed from the pile.  There therefore remains sufficient

10   evidence, in my judgment, on which a jury could return a

11   verdict for the government.  I therefore deny the Rule 29

12   motion.

13             MR. GELFAND:  Thank you.

14             THE COURT:  Again depending on the direction the case

15   takes, there may or may not be any occasion for defense counsel

16   to make a post-verdict motion along those same lines, and you

17   are absolutely at liberty if that series of events comes to

18   pass to do so, and I will be happy to reassess afresh arguments

19   you make based on a closer view of the transcript and the

20   record.

21             MR. GELFAND:  Thank you.  I just wanted to preserve

22   the record.

23             THE COURT:  Having taken care of that, government,

24   where are we on forfeiture?

25             MR. BHATIA:  Yes, your Honor.  Having reviewed Rule

1    32.2, we believe under 32.2B5 there is no right to a jury

2    determination unless there is an issue of forfeiture as to a

3    specific property.  Here at this time the government is not

4    seeking forfeiture of specific property, and accordingly we

5    don't believe there is that right to jury determination.

6         THE COURT:  Defense counsel, in my limited review that

7    I have been able to undertake since the subject unexpectedly

8    came up earlier this morning, that aligns with my understanding

9    as well that the right to a jury verdict with respect to

10   forfeiture is triggered by a claim as to specific property, as

11   to which none is made here.  Do you have a different view of

12   the law?

13        MR. DIRUZZO:  Your Honor, it's my understanding that

14   the government is seeking to forfeit the money that's in -- and

15   I could be wrong -- the Bank of America accounts that are in

16   essence not in GateGuard or Mr. Teman's --

17        THE COURT:  That does not appear in the indictment

18   though, does it?

19        MR. DIRUZZO:  No it doesn't.  That's my understanding

20   of what they're getting at.

21        THE COURT:  They may be getting at a quantum, some

22   dollar amount of money, but I didn't understand the indictment

23   to seek to forfeit the specific contents of a specific account.

24        MR. DIRUZZO:  That is correct.

25        THE COURT:  Government, is that correct?

K1R7TEM2

1              MR. BHATIA:  Your Honor, we considered forfeiting

2     those as substitute assets.

3              THE COURT:  That's a different story.

4              MR. BHATIA:  Defense counsel is correct.

5              THE COURT:  OK.

6              MR. BHATIA:  I'm sorry, your Honor is correct, we're

7     not seeking specific property here.  We were considering those

8     as substituted assets.

9              THE COURT:  Defense, given that, is there a basis for

10    a jury determination here as to forfeiture?

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25


MR. DiRUZZO: I don't think so, Judge.

THE COURT: All right. Look, so as to be clear, the government, to the extent that you prove wrong in your assessment of what a jury determination is needed for with respect to forfeiture, in not pursuing a jury determination, you are forgoing that right. I don't think that means you have forgone anything here because, in fact, the indictment doesn't seek any specific property to be forfeited. But just for clarity's sake, that is what has just happened, agree?

MR. BHATIA: Yes, your Honor.

THE COURT: All right. Very good.

All right. So forfeiture will not go to the jury. And that means, in particular, in any event, the indictment that goes to the jury can't include forfeiture language. And there won't be a second stage of deliberations in the event of a guilty verdict.

All right. I need to complete the charge conference. But I think, regardless, the better judgment here will be to give everybody some break so that you can get ready for closing arguments.

Let me do this -- so you will get a break after this, the question will just be how long.

Let's see if we can finish the charge conference promptly now, which, in turn, will give me a much better idea how much time we need to allocate, once I bring the jury in,

 1    for a break before closing arguments.

 2              We were on page 18, and nobody had anything further on

 3    18.  Government, I think you had indicated, without prejudice,

 4    that thus far you have no other changes.

 5              Defense, what's your next page?

 6              MR. GELFAND:  It's page 33, your Honor.

 7              THE COURT:  Cooking with gas.  All right.  We're up to

 8    page 33.  Good.

 9              And that is on which instruction?

10              MR. GELFAND:  It's the conscious avoidance

11    instruction, your Honor.

12              THE COURT:  Yes.

13              MR. GELFAND:  We would object to the inclusion of a

14    conscious avoidance instruction on the grounds that there is no

15    basis.  However, in the event the Court gives a conscious

16    avoidance instruction, we would specifically focus on the

17    language starting at the bottom of page 33, your Honor,

18    beginning with:  Here, the government argues that the defendant

19    consciously avoided.  And it continues as to what the defendant

20    argues.

21              At this point, nobody has argued anything.

22              THE COURT:  I appreciate that.  And nor has the --

23    nobody has had an argument -- an opportunity to do so.  But I

24    was drawing on our colloquy on Friday, when I asked the

25    government what the basis was for a conscious avoidance charge.

K1RVTEM3

1    And I understood Mr. Bhatia to articulate the argument here.

2    And you, in turn, to -- at least implicitly -- articulate the

3    response.  I'm happy to fine-tune those to make sure they

4    accurately capture your contentions.

5            But the reason for specifying what the basis is here

6    is as follows.  Otherwise, I think there is a risk of a

7    conscious avoidance charge running amuck and potentially being

8    used to the defendant's detriment to address other issues or

9    arguments that counsel are not making.

10           I understood Mr. Bhatia to be making one argument, and

11   one argument alone, relative to conscious avoidance, which is

12   that the defendant, before, quote/unquote, hitting the accounts

13   of his customers, didn't say to them, by invoice or otherwise,

14   you know, You owe $18,000 for the following.  And Mr. Bhatia's

15   point, which aligns well with some of the text messages with

16   Mr. Reinitz, is that that was a deliberate attempt not to have

17   the customer say, You can't do that.

18           Again, you have a counterargument, perhaps more than

19   the one that's summarized here.  But I think there's value in

20   sharpening for the jury the distinct factual context in which

21   this instruction -- to which it's relevant, lest the

22   instruction otherwise be rooted around with or used to -- as

23   mischievously to cover other scenarios that it's not intended

24   for.

25           So on Mr. Bhatia's previous proffer, Mr. Gelfand, I do

K1RVTEM3

1     think this is a case in which there is a factual basis for a

2     conscious avoidance instruction.  I was personally struck by

3     the fact that there are a lot of invoices for other services in

4     the case; and that the dog that doesn't appear to bark here are

5     invoices for the most -- or perhaps even all -- of the RCCs

6     here.

7             And frankly, particularly in light of the

8     communications with counsel, there's a significant argument

9     that that looks strategic; that Mr. Teman is trying to avoid

10    having a customer categorically object to the charge, with

11    counsel having advised him that banking laws look unkindly on

12    an attempt unilaterally to dock somebody for a charge which the

13    customer has objected to.

14            I understand on redirect that you attempted to

15    recontextualize that as involving a credit card charge,

16    presumably.  But the jury would be entitled to disbelieve

17    Mr. Reinitz, to say the least, and to regard his advice as --

18    which doesn't say credit cards only, as equally applicable to

19    hitting a customer with an unnoticed RCC.  So it seems to me

20    that there's a factual basis for a conscious avoidance

21    instruction and you have a response.  Now the challenge is to

22    make sure that I've accurately captured each side's

23    contentions.

24            Mr. Bhatia, does the paragraph on page 33 that begins

25    with "Here" accurately capture your contention?

1            MR. BHATIA:  It does, your Honor.  Although I believe

2       there's also a factual predicate based on the fact that, as

3       alleged, the operative provision about withdrawing funds was

4       itself nestled within contracts.  So I think there's a second

5       ground for a conscious avoidance, a factual predicate there as

6       well, for the idea that the initial provision itself might not

7       be objected to.

8            Let me rephrase that.

9            If a customer had seen it, they would have objected to

10      it.  If the defendant nestled it within contracts, then the

11      defendant -- the witness might not -- the customer might not

12      object to it.

13           THE COURT:  You're saying that independent of the

14      invoices from March and April, that the defendant chose a

15      roundabout way of trying to put his customers on notice of the

16      payment provisions.

17           MR. BHATIA:  That's right.

18           THE COURT:  Defense counsel, understanding that you

19      factually controvert the argument, why is that also not a

20      legally viable theory on which a conscious avoidance

21      instruction is valid?  I appreciate that -- I'm happy to

22      summarize your counterargument if I include that, but why is

23      that also not something that a jury could apply a conscious

24      avoidance instruction to?

25           MR. GELFAND:  Let me make sure that I understand --

947

K1RVTEM3

1          THE COURT:  The point is that Mr. Teman used fine

2     prints and hyperlinks to alert the jury to the whole RCC

3     avenue, rather than doing so more frontally.

4          MR. GELFAND:  First of all, without litigating the

5     facts right now, I don't think that's accurate.  It's the same

6     size font, it's -- the whole idea that this is, quote/unquote,

7     fine print we would take issue with.

8          But I think more to the point of the conscious

9     avoidance analysis, I don't think that directly speaks to good

10    faith or conscious avoidance.  In other words, the documents

11    speak for themselves.

12          THE COURT:  I think, Mr. Bhatia, I'm going to leave

13    that one out.  You're at liberty to argue the point that

14    Mr. Teman wasn't trying very hard to draw his clients'

15    attention to the RCC formulation.  But it seems to me that the

16    really more substantial argument for conscious avoidance is the

17    one that's articulated here.

18          MR. BHATIA:  I understand, your Honor.

19          I think what you said yesterday is right, which is

20    that the earlier conduct is bound up in consciousness of guilt

21    and some other issues.  So I understand why it might not be

22    appropriate.

23          THE COURT:  Right.

24          There's a lot of evidence here that forms a basis of

25    consciousness of guilt.  But conscious avoidance involves

1    denying a knowledge of a fact.  And here, I think the -- I

2    think as the draft jury instruction captures it, that is a

3    valid instruction as to whether the customers would reject the

4    charge.

5          And if anything, Mr. Reinitz's testimony made that

6    even more relevant as a theory, insofar as Mr. Reinitz, on one

7    reading of this advice, tells Mr. Teman, banking laws say if

8    the customer rejects a check, you can't simply unilaterally

9    take from them.  Given that, the conscious avoidance charge as

10   to that set of facts has particular traction.

11         MR. BHATIA:  That's right.

12         THE COURT:  So with no edit, then, I take it, to the

13   conscious avoidance instruction, Mr. Bhatia, as I put it, from

14   the government's perspective; correct?

15         MR. BHATIA:  That's what I was going to say.

16         THE COURT:  All right.  So, defense counsel, just give

17   me -- I'm happy to consider a tweak as to how you'll

18   recapitulate this.

19         MR. GELFAND:  Your Honor, we're happy to propose that

20   now or --

21         THE COURT:  I'd rather now, because I will be giving

22   you a break and then getting into the print function with

23   respect to the charge.

24         MR. GELFAND:  Your Honor, what we would propose in the

25   alternative to our objection -- obviously in general to the

K1RVTEM3

1    instruction -- is that the sentence on page 34 that begins with

2    "The defendant disputes" --

3                    THE COURT:  Right.

4                    MR. GELFAND:  -- "that he consciously avoided learning

5    such information," we would ask that the Court add the

6    following language to the end of that sentence:  Comma and

7    communicated with his customers, comma, both personally and

8    through his attorney, comma, Ariel Reinitz.

9                    THE COURT:  What's the end of the sentence?

10   Communicated what?

11                   MR. GELFAND:  Communicated about the relevant facts.

12   In other words, I want to be careful in not having the Court

13   basically comment on the facts.

14                   THE COURT:  All right.  I'll just say the relevant

15   facts.  That's fine.  I'm happy to include that clause.

16               I mean, look, I did note that the dog that didn't bark

17   in Mr. Reinitz's testimony for all of the approvals of RCCs

18   conceptually was that Mr. Reinitz was presented with the

19   specific charges in advance of the RCCs being hit.  The

20   questions were tightly phrased by counsel to discuss RCCs as a

21   generic matter, not about the specific charges.  That was not a

22   subject of cross-examination.  But you're welcome to go at

23   that.  In any event, I think your clause is well-taken.

24               Government, any objection to my refining the defense

25   statement of its counter-theory this way?

K1RVTEM3

1          MR. BHATIA:  What's the exact language that --

2          THE COURT:  The defendant disputes that he consciously

3     avoided learning such information.  He contends -- he argues

4     that he communicated with his customers, both personally and

5     through his attorney, the relevant facts.

6          MR. BHATIA:  Your Honor, I'm not sure it's appropriate

7     there to build that in.  I think it seems to not encompass all

8     the conduct that could be covered by a conscious avoidance.  I

9     think it might mislead.

10         THE COURT:  I think, as I read that aloud,

11    Mr. Gelfand, I too actually was having a balkiness about it.

12         The issue here is -- I think the right way to do this

13    is if you want to get in the idea of the communications he had,

14    I'm happy to say, He argued that -- argues that he believes in

15    good faith, comma, based on communications with his customers,

16    comma.  I'm happy to do that.  I think that's a better way to

17    capture it.

18         So would you like me to do that?  In other words,

19    after the word "good faith," to caret in the idea that you

20    want, that there were communications he had with customers and

21    the like?

22         MR. GELFAND:  Yes, your Honor.  We would also add "and

23    his attorney."

24         THE COURT:  Okay.  Based on communications with his

25    customers.

951

K1RVTEM3

1          (Pause)

2          THE COURT:  All right.  How about this:  The defendant

3     disputes that he consciously avoided learning such information.

4     He argues that he believes in good faith, based on his

5     communications with his customers and his understanding of

6     communications he believes his attorney had had with his

7     customers, that the customers had given him advance approval

8     for these charges and also advance approval to remotely create

9     checks on their accounts as a means of paying the debts that

10    they owed him.

11         That captures your concept.

12         MR. GELFAND:  That works.

13         THE COURT:  Government?

14         That is the defense argument, even though you refute

15    it.

16         MR. BHATIA:  I don't take objection there to that part

17    of it.  I don't recall if Mr. Reinitz testified that he had

18    communications with the witnesses in which -- the customers in

19    which they acknowledged the agreement and then he relayed that

20    to Mr. Teman.  I recall him testifying that he had

21    conversations with Mr. Soleimani and with Mr. Gabay.  I don't

22    recall him testifying that he then relayed those to the

23    defendant in a way that would negate a conscious avoidance

24    instruction.  I only want to make sure the factual predicate is

25    there.

1          MR. GELFAND:  Your Honor, there's the email about the

2     release from Mr. Soleimani that Mr. Reinitz expressly shared

3     with --

4          THE COURT:  I think there's enough here to justify the

5     defense formulation.

6          All right.  I need to get the jury just to give them

7     some instructions.  Defense, I understood you only had one

8     other thing to go with respect to the charge?

9          MR. GELFAND:  One other objection and one request for

10    an additional charge that we submitted.

11         THE COURT:  All right.  Just what is -- just in a

12    sentence, what is that other charge, just so I have a sense of

13    how long we're going to take?

14         MR. GELFAND:  An RCC charge, your Honor.

15         THE COURT:  All right.  We'll get to that.

16         All right.  Counsel, it's 11:15.  I need to finish the

17    charge conference.  And then obviously we have a little bit of

18    a document production process, both us and Mr. Magliocco.  And

19    I'm hopeful that he is well on his way on what he needs to do.

20         Government, I take it you're confident that

21    Mr. Magliocco will be able to attend to what he needs to by,

22    let us say, 1 o'clock; correct?

23         MR. BHATIA:  I think that's right, your Honor.  If we

24    find out otherwise, we'll let the Court know immediately.

25         THE COURT:  Here is my proposal, which is:  I bring

K1RVTEM3

1     the jury out, excuse them till 1.  It's 11:15.  I'm hopeful

2     that our business together won't take more than a half hour.

3     In any event, it will give you an hour and-a-quarter both to

4     wolf down some food and to prepare final thoughts on summation.

5              Does that give everyone the time they need?

6              MR. BHATIA:  I think so, your Honor.

7              But we do have a few points that we flagged for the

8     request to charge.  I just wanted to let your Honor --

9              THE COURT:  You do now?

10             MR. BHATIA:  We do actually.

11             THE COURT:  All right.  I will be glad to take that

12    up.  Nevertheless, just the schedule that I've just proposed

13    works, should I give another 15 minutes to counsel and have the

14    jury come back at 1:15?  I want to make sure you have enough

15    time to eat and reflect, but I also want to make good use of

16    the jury's time.

17             MR. BHATIA:  It works for the government.

18             THE COURT:  1 or 1:15, do you care?

19             MR. BHATIA:  I think 1:15 might be better.  I think as

20    long as it lets us finish all the summations and rebuttals

21    today, then I think 1:15 works.

22             THE COURT:  How long do you expect your main summation

23    to be?

24             MR. BHATIA:  I think about an hour, your Honor.

25             THE COURT:  Defense, how long do you think yours will

1   be?

2              MR. GELFAND:  Probably shorter, your Honor, but I

3   would ask for the same amount of time.

4              THE COURT:  I think at 1:15, if it's an hour and an

5   hour, even with a break, how long is rebuttal going to take,

6   half hour?

7              MR. BHATIA:  I think that's right.

8              THE COURT:  I think if we do 1:15, we should be fine.

9   Don't you agree?

10             MR. GELFAND:  Yes, your Honor.

11             THE COURT:  All right.  So let's bring in the jury.

12  I'll have them ready to go at 1:15.  They should have had

13  lunch.  All right.  While the jury comes in, may I just see one

14  lawyer from each side at the sidebar?  Just one housekeeping

15  matter.  I don't need the court reporter.

16             (Pause)

17             (Jury present)

18             THE COURT:  All right, ladies and gentlemen, be

19  seated.

20             You've now completed hearing all the evidence in the

21  case.  And the next step in the case with respect to the jury

22  will be hearing closing arguments from counsel.

23             Before the lawyers present their closing arguments,

24  they are entitled to know precisely the legal instructions that

25  I will give to you after their closing arguments.  I'm still in

1     the process of working out issues with them, as is customary in

2     a case like this.

3                So what we are going to do is take an extra long lunch

4     break now.  And I'm going to ask you all to be back and ready

5     to come out at 1:15.  It's now 11:18.  And at 1:15, when you

6     come out, you'll hear closing arguments from the lawyers.  The

7     government goes first; then the defense; and then, because the

8     government bears the burden of proof, the government gets a

9     rebuttal summation.  So you'll hear all those arguments from

10    counsel this afternoon beginning at 1:15.

11               But as you can see, we're making smart progress with

12    respect to the case.

13               So have a good lunch.  As always, don't discuss the

14    case, but be ready for Mr. Smallman to bring you out at 1:15.

15               (Jury not present)

16               THE COURT:  Just before going back to the charge, I

17    just want to make sure that, Mr. Magliocco, we're on all fours

18    with him.

19               I will be needing from him the exhibit list, the

20    witness list, and the redacted indictment.  I assume also, as

21    well, he'll be ready with copies of exhibits.  But I need those

22    three things.  I will ask that he, one by one, email them to

23    our chambers.  I'm assuming with respect to everything the --

24    you should copy defense counsel.  I'm assuming defense counsel

25    won't have any objection to these rather unremarkable

1    documents.  But, defense counsel, look immediately what you

2    get, in the event there is an objection.

3              I'd like to get this soon, because I don't know

4    whether I'll begin charging the jury today; depends on the

5    length of closing arguments.  But if I do, I want to have handy

6    with me the handouts, which are 12 of all of the same documents

7    for each juror.  So I don't want my chambers to still be

8    copying and producing while we are hearing closing arguments.

9    I want my staff to be able to be here during summations.  So

10   please have Mr. Magliocco get us those things seriatim.

11             MR. BHATIA:  We will.

12             THE COURT:  So let's continue through the proposed

13   charge.  We're on page 34.  And I know that at the end I have

14   to come back to the RCC request that I gather the defense will

15   give.

16             All right.  What's the next page that the defense has

17   after page 34?

18             MR. GELFAND:  35, your Honor, instruction J, false

19   exculpatory statements.

20             THE COURT:  Right.

21             MR. GELFAND:  There weren't any false exculpatory

22   statements in this case.

23             THE COURT:  Government, you had asked for this

24   instruction, I believe.  What are the false exculpatory

25   statements in the record, if any?

1          MR. BHATIA:  Your Honor, I believe there are some in

2     the chats that were admitted through Mr. Reinitz.  There are

3     some statements in there in which the defendant is stating his

4     authority -- you know, his professed authority to deposit the

5     checks.  So we think that under that rubric, this is

6     appropriate.

7          THE COURT:  That's what I assumed this referred to,

8     which is the defendant's claim that customers had approved

9     various charges.  Again, the defense is entitled to dispute

10    that.

11         This is a customary formulation of the charge.

12    Assuming, Mr. Gelfand, that I am to give it, is there anything

13    you want me to say here?  For example, these are the post hoc

14    statements he makes to his lawyers about what just happened.

15         MR. GELFAND:  I understand.  I'm just reviewing it.

16         THE COURT:  Say again?

17         MR. GELFAND:  I understand.  I'm just reviewing it

18    just to make sure.

19         Would the Court be willing to add in the second

20    sentence, where it says:  The government claims that these

21    statements in which the defendant exculpated himself are false,

22    the government claims, comma, and the defense disputes, comma?

23         THE COURT:  Why don't I just say, The defense disputes

24    this, just at the end -- an additional sentence.

25         MR. GELFAND:  Sure.

K1RVTEM3

1          THE COURT:  That adds balance.  That's fine.

2          All right.  With that change, understanding that you

3     oppose giving such an instruction generally, are you okay with

4     the wording of the instruction?

5          MR. GELFAND:  Yes, your Honor.

6          THE COURT:  Government?

7          MR. BHATIA:  The addition is fine.

8          THE COURT:  All right.  Defense, do you have anything

9     else apart from the RCC instruction?

10          MR. GELFAND:  No, your Honor.

11          THE COURT:  All right.  Before we get to that,

12     government, I think you came up with several additional --

13     several objections.  Just in order, what page are they on?

14          MR. BHATIA:  18 is the first one, your Honor.

15          THE COURT:  Sorry, 18?

16          MR. BHATIA:  Page 18.

17          THE COURT:  Go ahead.

18          MR. BHATIA:  This is in Counts One and Two, bank

19     fraud.

20          THE COURT:  Right.

21          MR. BHATIA:  In the second paragraph, there's a

22     statement there saying:  Deposit an April 2019 of 27 checks.

23     And then I think our concern is about the rest of that

24     sentence:  Allegedly by creating and then making the false --

25          THE COURT:  Right.

1          MR. BHATIA:  That seems a bit too narrow, your Honor.

2     That's focused there on pretenses and representations, at least

3     under the bank fraud statute --

4          THE COURT:  I appreciate that.  How else is the bank

5     being defrauded, except by the deposit of checks that are being

6     deposited based on a false claim of authorization?  I mean, I

7     appreciate that the fraud statute has different dimensions, but

8     there are cases in which the same conduct, if established,

9     makes out both variants.

10          How else is the bank being defrauded, except that it's

11     being told that the customer has approved this, when it hasn't?

12     I mean, an RCC is a not inherently illegal thing; so it's not

13     that he is claiming these are other than RCCs.

14          MR. BHATIA:  I think that our concern is, in

15     particular, about focusing the case on authority.  That could

16     convey that this boils down to a contract dispute, and that

17     nominal authority would obviate criminal culpability.

18          THE COURT:  The case has been tried entirely on the

19     basis of the dispute about whether the defendant believed he

20     had authority or was pretending that he had authority.  If that

21     wasn't the theory of liability, if there's something else,

22     that's news to me.  In other words, I don't understand what the

23     alternative theory is here.

24          If the defendant believed he had authority to do what

25     he did, why is there a bank fraud?  He deposited the money and

1    he took it out when it cleared.  He's innocent under those

2    circumstances.

3         MR. BHATIA:  The defendant could have a belief that he

4    is nominally legally authorized under a contract dispute.  But

5    he knows the customer is going to dispute it and, as a result,

6    that results in --

7         THE COURT:  Sorry.  But that goes under the intent to

8    defraud; but that ultimately is about the authority.

9         If, in fact, he has the right, legally, the authority,

10   to dispute this -- to deposit the checks, he doesn't have

11   intent to defraud here.  What else is he representing to the

12   bank?

13        If, in fact -- if you could look into his mind and

14   conclude that Mr. Teman believed he had the authority to

15   deposit the checks, he's not then making a false statement to

16   the bank; there's no freestanding obligation in that

17   circumstance to tell the bank that this is a fairly arguable

18   legal question or something like that.  Then it's just a civil

19   dispute.

20        The issue here is whether he falsely pretended to the

21   bank that he had the customer authority to create and deposit

22   the checks.  That's what the case has always been about.

23        And witness your use of the word "counterfeit."  Now,

24   I agree with you that there is no basis known to me under which

25   some additional theory of counterfeit, some technical

K1RVTEM3

1    definition applies; but when you and I discussed this last

2    week, it was understood that the term "counterfeit" as returned

3    in this case meant created and without authority.

4            So, I mean, I just don't get what you're saying,

5    except as a theoretical matter, what the theory of fraud here

6    is other than the false pretense and representation to the bank

7    that he had the customer's authority.  It's entirely the way

8    the case has been charged and litigated.

9            Articulate for me some other theory of fraud, assuming

10   that those facts are untrue and they run in Mr. Teman's favor.

11           MR. BHATIA:  Your Honor, if we may have a moment.

12           (Counsel conferred)

13           MR. BHATIA:  Your Honor, I think as far as the theory

14   of criminal culpability, I think you're right.  You're right

15   that ultimately that's what the case came down to, that's how

16   the evidence came in, about whether the defendant was

17   authorized and knew he was authorized or not.

18           We have a separate concern with this language here,

19   which is that by focusing --

20           THE COURT:  All right.  So you agree that whether we

21   are talking about the scheme to defraud or the false pretenses

22   or representations theory, it ultimately comes down to the

23   false pretense of customer authorization.

24           MR. BHATIA:  That's right.

25           THE COURT:  Okay.  Go ahead.

1          MR. BHATIA:  The separate concern is that by focusing

2     on the false pretense and representation, it could be conveyed

3     to the jury that this is reading out the scheme to defraud

4     element of bank fraud.

5          THE COURT:  So you don't want to necessarily track the

6     statutory language.  Well, what's the alternative language you

7     want?  It seems to me that this captures what your theory is

8     and avoids editorializing and using, in fact, statutory prose.

9     But I'm open to an alternative tweak.  I'm trying to neutrally

10    capture your theory here, what the indictment alleges.

11         MR. BHATIA:  I think we could stop after 27 checks.

12    So deposit in April 2019 of 27 checks.

13         THE COURT:  No, no.  Sorry.  Mr. Bhatia, I'm trying to

14    be a force for clarity for the jury.  All that does is to

15    mystify them as to what the theory of liability is here, by

16    getting rid of an articulation of the theory of liability.  And

17    particularly where the indictment uses the word "counterfeit,"

18    but it's not brought under a counterfeiting statute, and you

19    have explained -- and it's consistent with the balance of the

20    indictment -- that that means creation of checks without

21    customer authority, I think I need to articulate that for them.

22    The problem here is that eliminating the explanation here

23    ultimately deprives the jury of useful guidance.

24         If you can't prove to the -- persuade the jury beyond

25    a reasonable doubt that the defendant falsely pretended to the

1    bank that he had customer authority to deposit these checks,

2    you lose the case.  That's what the case is about.  And if you

3    prevail on that, which implicitly means that the advice of

4    counsel defense fails, subject to the other technical elements,

5    you likely win this case.  But that's what the case has always

6    been about.

7            I don't understand why you'd want to deprive the jury

8    of a clear articulation of what you have said to me is the

9    theory here.  That was in your opening statement.  My job is to

10   add clarity here, not to turn this into a battle of equitable

11   arguments.  The theory of fraud here is about pretending to

12   have customer authority, knowing he didn't have it.

13           MR. BHATIA:  I think that's what the fact -- I mean

14   that's, I think, what the fact -- that's what the witnesses

15   testified about.  I just want to make sure that the language

16   here doesn't read out the first element and convey to the

17   jury --

18           THE COURT:  It says "committing a bank fraud scheme"

19   in the very first sentence of the paragraph.  And the later

20   instructions make it clear that both species of bank fraud

21   liability can often collapse -- overlap, as they clearly do in

22   this case.

23           MR. BHATIA:  Your Honor, this is --

24           THE COURT:  In the event there is a defense argument

25   that tends to make the suggestion that why I've read out the

1    scheme liability, I will very forcefully correct that,

2    Mr. Gelfand or Mr. DiRuzzo, who's ever doing the jury argument,

3    don't do that.  That's clearly not what I'm intending to do.

4    I'm trying to explain in explain English the theory of fraud

5    here.

6         But Mr. Bhatia's point is well-taken.  If counsel were

7    to attempt to suggest that my shorthand for describing the

8    scheme here was reading out the scheme to defraud means of

9    establishing 1344, I will correct that in unequivocally firm

10   terms.

11        MR. GELFAND:  We're not going to do that.

12        THE COURT:  I didn't think you were.

13        All right.  Government, anything else?

14        MR. BHATIA:  Yes, your Honor, on page 20.

15        THE COURT:  Yes.

16        MR. BHATIA:  This is in the first full paragraph.

17   There's a sentence:  However, you must be unanimous in your

18   view as to the type of scheme or artifice that existed.

19        I think we wanted to change that to say that:  In your

20   view as to at least one -- I think at least one of the types of

21   scheme or artifice that existed.  I think it's not that

22   there's --

23        THE COURT:  That's fine.

24        So as to say:  As to at least one type of scheme or

25   artifice that existed.

1              That's fine.  I understand.  The point is well-taken.

2              Defense, no objection?

3              MR. GELFAND:  No objection.

4              THE COURT:  All right.  Very good.  Good catch.

5              MR. BHATIA:  Your Honor, this is on page 31.

6              THE COURT:  One second.

7              MR. BHATIA:  It's right before the good-faith

8      instruction.

9              THE COURT:  Yes.  This is unanimity.

10             MR. BHATIA:  That's right.

11             THE COURT:  The subject we covered last week.

12             MR. BHATIA:  We did.

13             The last line says:  Unanimous agreement as to either

14     entity.

15             We wanted to -- we propose changing that to at least

16     one entity -- "unanimous agreement as to at least one entity,"

17     just to imply it's not either/or.

18             THE COURT:  It means the same thing; you just think

19     it's clearer prose.

20             MR. BHATIA:  That's right.

21             THE COURT:  Defense, I think that's fine.

22             MR. GELFAND:  That's fine, your Honor.

23             I just want to make sure that sentence is not

24     confusing, because this is kind of a hypothetical involving two

25     entities as opposed to three.

1          THE COURT:  I used Count Two to make it easier,

2    because it's fewer entities involved.

3          MR. GELFAND:  Sure.  I'm just saying so when you say

4    as to either entity, that makes sense within the context of

5    that hypothetical.

6          THE COURT:  Yes.  But in the context of -- it says

7    here one entity.  I think that's fine.  Mr. Bhatia's point is

8    just as a matter of prose, "one" is clearer than "either."

9          MR. GELFAND:  That's fine.

10          THE COURT:  Okay.  Good.

11          Anything else?

12          MR. BHATIA:  The last one is on the next page, your

13    Honor.  The first line --

14          THE COURT:  But otherwise, look, we spent a little

15    time discussing unanimity.  I'm not going to give a special

16    verdict, but I did want to make sure, given the way the case

17    was tried, that the jury is in agreement as to a particular

18    entity.  You were skeptical of my chambers' ability to

19    formulate a unanimity instruction that's key to the customer.

20    With the change you've made, I think it does clearly enough

21    capture the concept.  Do you have a problem with the way it is

22    wordsmithed?

23          MR. BHATIA:  No, your Honor.  I think it's good.

24          THE COURT:  Okay.  Go ahead.

25          MR. BHATIA:  The next one, your Honor, is on page 32.

page

1   It's the first line of the advice of counsel --

2              THE COURT:  Right.

3              MR. BHATIA:  -- instruction.

4              We propose changing in the first line:  "You have

5   heard evidence that the defendant received advice from a

6   lawyer," to, "You have heard evidence that the defendant

7   consulted with a lawyer."

8              THE COURT:  That's fine.  That's fine.

9              MR. BHATIA:  And that's it from the government.

10             THE COURT:  That's what?

11             MR. BHATIA:  Oh, one moment, your Honor.

12             THE COURT:  That's fine.

13             Defense, I take it, no problem with that, right?

14             MR. GELFAND:  We're fine with that.

15             THE COURT:  I thought so.  Okay.

16             MR. BHATIA:  And it's come up through the testimony of

17  various witnesses, in cross-examination in particular, that

18  there may be some argument that there was carelessness on

19  behalf of some of the customers in this case.  For that reason

20  we think it may be appropriate to have a sort of form

21  instruction on how the carelessness or gullibility of a witness

22  is no defense.

23             THE COURT:  Where -- did you propose that?

24             MR. BHATIA:  I'd have to take a look at our

25  instructions.  Actually, I think it might have been part of our

K1RVTEM3

1   good-faith instruction, your Honor.

2          Your Honor, I don't believe it was in our request --

3          THE COURT:  I have to say though, you know, it's a

4   terrific jury argument, if the focus is to dump on the

5   customers here, it's a terrific response to remind them that

6   the focus of the instructions is on the defendant's state of

7   mind, and that the customers aren't on trial.  You've got

8   plenty of bases to argue that there were sharp practices with

9   respect to the customers.

10          But defense counsel is also at liberty to impeach the

11   customers and to claim that they've got a monetary interest;

12   and that they regret the agreement they entered into and feel

13   like fools for doing so, but they entered into the agreement;

14   and that the defendant had a good-faith basis to believe that

15   they were thereby bound.

16          One moment.

17          (Pause)

18          THE COURT:  And my law clerk aptly points out that

19   with respect to the bank fraud charge, we do say:  If you find

20   that a scheme or artifice existed, it is irrelevant whether you

21   believe that the bank was careful, careless, gullible, or even

22   negligent.

23          Insofar as the bank is actually the victim here, that

24   language gives you the cover you need as to the bank; and that

25   language is, I believe, picked up as well in the wire fraud

1   charges.  I'm not sure it's necessary, since the customers

2   aren't the victims here, to replicate that language as it

3   relates to the customers.  You are both at liberty to argue

4   what the customers' behavior connotes; and you are at liberty

5   to -- if the defense tries to blame any of the victims here,

6   that opens a lot of doors.

7           If you're looking at -- it opens the door to arguing

8   that that's an irrelevancy and a distraction and another means

9   of taking advantage.  There's a lot of stuff that's been

10  admitted in the case without objection in which the defendant

11  was taking advantage of his customers or at least claiming to

12  by doing bad things to them on High Holy Days.  That's a door

13  the defense may not want to open; but if they go there, you'll

14  both go there.

15          MR. BHATIA:  Understood.

16          THE COURT:  But it doesn't seem to me that's a legal

17  charge.

18          Okay.  Anything further from the government?

19          MR. BHATIA:  Nothing further.

20          THE COURT:  Defense, other than RCCs, anything from

21  you?

22          MR. GELFAND:  No, your Honor.

23          THE COURT:  So, look, just to cut to the chase and get

24  you to lunch, we discussed the RCCs prior to trial.  And I

25  resolved the dispute there by not permitting expert witnesses

1    as to RCCs or professor or whatever.  And you had -- I think

2    that wisdom has been borne out that the relevant point is that

3    the jury needs to understand that an RCC is a lawful thing;

4    that this case is not about the small points of RCC compliance,

5    but ultimately is about authorization or not.

6              My instructions make it clear that they should heed

7    the instructions I've given during the course of the case.  I

8    don't see a need though to repeat that in my final instructions

9    any more than any of the other instructions -- limiting

10   instructions and the like I've given along the way.

11             Is there something -- some different content you are

12   seeking about RCCs other than what I have already instructed

13   them?

14             MR. GELFAND:  Your Honor, different content, no.  But

15   I think that because RCCs surfaced as much as we anticipated

16   before trial they would, and there are exhibits, there's

17   testimony about RCCs as recently as the last Signature Bank

18   witness, the Bank of America witness.

19             Perhaps a way to make it easy, because this isn't

20   really a hearsay limiting instruction, it's a more important

21   substantive instruction.  We're just concerned that if it's not

22   in writing to the jury, that we're really depriving the jury of

23   some clarity on that issue.  And maybe just including somewhere

24   other the Court's previous instruction to the jury in writing

25   would solve that concern instead of reinventing the wheel.

1              THE COURT:  One moment.

2              I'm reluctant to highlight that particular

3    instruction, but I'm happy to find a way to capture in my

4    instructions a reminder that they are to heed the instructions

5    I've given them over the course of this short trial.  Delighted

6    to find a way to do that, but I am reluctant to elevate the RCC

7    instruction.

8              It may be of importance to you because you would like

9    to portray the case in a way that's more focused on the RCCs.

10   I suspect the government would like to focus the case more on

11   the -- not the formality of how an RCC works, but more the idea

12   that the customers didn't approve these particular charges.

13             Be that as it may, I'm not going to shift -- I'm not

14   going to tilt the terrain in one direction by isolating a

15   particular instruction.  But I'm delighted to remind them that

16   they are to follow all the instructions I've given.

17             Do you have a thought as to where to put that concept?

18             MR. GELFAND:  Perhaps even at the outset of the

19   introductory remarks.  Now it is time for me to instruct you as

20   to the law that governs the case.

21             THE COURT:  Right.

22             MR. GELFAND:  It could be phrased a lot better, but

23   essentially:  I remind you that during this trial I gave you

24   instructions.

25             THE COURT:  Right.  Okay.  One moment.

1          In that paragraph.

2          (Pause)

3          THE COURT:  I could add a sentence right at the

4  beginning of B along the following lines:  I've instructed you

5  during the trial as to various matters, and you should of

6  course continue to follow those instructions.

7          And then pick up with what I have.  It's pretty hard

8  to argue with that.  But that incorporates by reference all

9  that comes before without hyping the RCC instruction.

10         MR. GELFAND:  We certainly have no objection to that

11  language.

12         MR. BHATIA:  No objection.

13         THE COURT:  All right.  I realize, Mr. Gelfand, it

14  doesn't highlight the RCCs as much as you've wanted, but it

15  does provide a hook for reminding them that all my

16  instructions, which necessarily picks up that one, apply.

17         MR. GELFAND:  I understand, your Honor.

18         Just for the record, we would just request that the

19  Court give our requested RCC instruction and include that

20  instruction in the Court's final instructions.

21         THE COURT:  All right.  Look, again, I don't think

22  that is warranted.  I'm not by any means persuaded that the

23  instruction is, on its own terms, fair and balanced.  But

24  beyond that, it doesn't seem to me necessary here in the

25  context of a charge about the elements of two criminal statutes

1     to be hyping that area of technical civil banking law.

2              I think RCCs, as relevant here, are really more of a

3     factual matter than anything; and they've been, I think, ably

4     ventilated before the jury.  I'd be surprised if any juror was

5     of the view at this point that an RCC was in some sense

6     inherently unlawful, which is no doubt your concern.  I think

7     it's clear from my instruction and clear from the banking

8     witnesses' testimony that RCCs are a recognized thing.

9              One moment.

10             (Pause)

11             THE COURT:  All right.  Anything else from either side

12    as to my instructions?

13             MR. BHATIA:  Nothing from the government.

14             MR. GELFAND:  No, your Honor.

15             THE COURT:  All right.  Again, who will be doing --

16    Mr. Bhatia, I take it you'll be doing both jury addresses for

17    the government?

18             MR. BHATIA:  That's right.

19             THE COURT:  And who will be doing it for the defense?

20             MR. GELFAND:  I will, your Honor.

21             THE COURT:  All right.  So, again, you'll be speaking

22    from the portable podium with the portable mic.  Please stay

23    close to the mic, just so that your words are picked up.

24             And I'll say this to both of you, although with

25    particular regard to Mr. Bhatia:  In reading, your natural

1    impulse is both to speak softly, but to really speed up the

2    pace.  It's hard -- if not impossible -- for the court

3    reporter, and I don't want to interrupt you to slow you down to

4    make sure that you're speaking at a normal rate of speed, but

5    it also becomes hard for the jury to follow.

6              So I'm not limiting your time; I'm confident we'll get

7    in all the jury addresses if we start promptly at 1:15.  But

8    please, just speak at a -- modulate yourself to speak at a

9    slower rate of speed.

10             And Mr. Imperatore, perhaps, so that I don't need to

11   butt in, because I really like to be quiet during summations,

12   slip Mr. Bhatia a note if you sense that things are going a

13   little too 45 RPM, as we used to say.

14             All right.  Anything further before we take a lunch

15   break?

16             MR. GELFAND:  Just quick clarity, your Honor.

17             Obviously for the substance of summation, I'll stay

18   behind the podium.  There are some exhibits that I'm going to

19   want to show via the Elmo.  Would the Court be okay if

20   Mr. DiRuzzo basically just assists with that?

21             THE COURT:  Of course.  Of course.

22             And, look, your voice is loud enough that if you need

23   to speak while you're operating the Elmo, I imagine you'll find

24   a way through it.  But, as a general matter, stick to the mic,

25   because as you can see just from the experience we've had here

K1RVTEM3

1    when people go away from the mic or speak softly, either a

2    juror can't hear or I need to butt in or the court reporter

3    can't hear, and Mr. Smallman starts passing me notes about the

4    court reporter's difficulties in hearing.  So I try to be

5    attentive to that.

6              MR. GELFAND:  Thank you.

7              THE COURT:  All right.  So, government, please have

8    Mr. Magliocco firing us off those things.

9              We have a jury snack coming at the usual time.

10   Depending on when Mr. Smallman tells me it arrives, the jury

11   will either be fed between the first and second summation or

12   the second and third.  But my expectation is I will give a

13   short break between both summations so as to allow each

14   responding advocate a little bit of time to adapt.

15             So the jury lunch -- the jury snack won't unfairly

16   favor one side or another; there will be a break between both

17   summations.

18             Thank you.  Have a good lunch.

19             Why don't you be in your seats at 1:10, as opposed to

20   1:15.  Thank you, counsel.

21             MR. GELFAND:  Thank you.

22             (Luncheon recess)

23             (Continued on next page)

24

25

1                        AFTERNOON SESSION

2                            1:15 p.m.

3           (Jury not present)

4           THE COURT:  Does anyone have anything to raise with

5     me?

6           MR. BHATIA:  Nothing from the government.

7           MR. GELFAND:  Nothing from the defense.

8           THE COURT:  And, Mr. Magliocco, thank you for being an

9     active correspondent with my chambers.  I think we have a full

10    set of all the materials we need for the jury's care package,

11    and I thank you for that.

12          I am told by Mr. Smallman we still need two jurors, so

13    we will wait.

14          (Jury present)

15          THE COURT:  Welcome back, ladies and gentlemen.

16    Everyone may be seated.  I hope you all had a good and long

17    lunch break.  We are now about to move to the part of the case

18    in which counsel will give you their closing arguments, in

19    which they share with you their views about what the evidence

20    has shown.  We will begin with the government.

21          Mr. Bhatia.

22          MR. BHATIA:  Ladies and gentlemen, the evidence has

23    proven that the defendant carried out a scheme to steal money

24    from his own customers.  He wrote dozens of checks, fake

25    checks, in order to make money and to take money out of their

1    bank accounts.  He pretended that his customers had authorized

2    him to issue those checks.  That was a lie.  The evidence has

3    shown you that none of his customers ever allowed him to take

4    money out of their bank accounts or ever even knew that he was

5    going to take it, and through his fraud the defendant lined his

6    own pockets with more than $300,000 that he wasn't entitled to,

7    and because of the defendant's scheme, his bank, Bank of

8    America, lost more than a quarter million dollars.  In short,

9    ladies and gentlemen, the evidence proves beyond a reasonable

10   doubt that the defendant, Ari Teman, committed a blatant fraud,

11   a brazen fraud, and that he is guilty of all the charges in the

12   indictment.

13           This is the government's summation.  It's our

14   opportunity to tie together for you all of the evidence that

15   came in during this trial.  This summation will have four

16   parts.  First, I will talk about what is not really in dispute

17   here.  Second, I will talk about one of the issues that might

18   be in dispute, which is whether the defendant had criminal

19   intent when he deposited the checks.  Third, we will talk about

20   the defendant's supposed defenses -- what I think they might

21   be -- and why they fail.  And, finally, I will specifically

22   talk about some of the elements of the charged offenses.

23           What's not in dispute?  There is quite a bit that's

24   not in dispute in this case.  Ladies and gentlemen, you have

25   heard that the defendant sold intercoms to three customers.

1    Those customers:  18 Mercer -- which you heard about, and you

2    heard about Bonne Soon-Osberger.  You also heard testimony from

3    Gina Hom, who is from Crystal Real Estate, the real estate

4    company that managed the 18 Mercer account.  You also heard

5    from Elie Gabay.  He's the first customer you heard from.  He

6    is from Coney Management.  They operate the account for 518

7    West 204 LLC.  And you will also heard from Joseph Soleimani.

8    He worked at ABJ Properties.  And two of his companies, ABJ

9    Lenox and ABJ Milano own some buildings that had GateGuard

10   intercoms.

11          There is no dispute that all three of these customers

12   bought intercom devices.  Mr. Teman sent them invoices, and

13   using checks from their own bank accounts they paid those

14   invoices.  For a couple thousand dollars they got a few

15   intercoms.  For Mr. Gabay, he got one.  For Ms. Soon-Osberger,

16   she got one for her building.  And in Mr. Soleimani's case he

17   received 7 for several of his buildings.

18          And there is no dispute that the customers were not

19   satisfied.  They weren't happy with the intercom devices.  You

20   heard from Mr. Gabay and Mr. Soleimani that they got

21   complaints, and ultimately they decided to stop using the

22   intercoms.

23          Ladies and gentlemen, there is no dispute that after

24   those three customers decided to stop using the intercoms they

25   bought, the defendant issued checks against their bank

1    accounts, a total of 29 checks totaling $333,000.  And there is

2    no dispute that the defendant -- not the customers -- created

3    those checks from scratch and deposited them in his bank

4    account, the GateGuard account at Bank of America.

5            You saw the checks.  And we will take a look at them

6    on the screen.  They represented to the defendant's bank, Bank

7    of America, that the defendant was depositing the checks with

8    the permission of his customers.  Here is a check made out for

9    $18,000 from the 518 West 205 LLC account -- that's Elie

10   Gabay's Coney Management account -- to GateGuard.  Instead of a

11   signature -- you normally see a signature at the bottom right

12   corner of a check -- here Mr. Teman wrote "Draw per contract.

13   No signature required."  Those were the words of Mr. Teman.

14   Those were not his customers' words.  And by depositing these

15   checks, money was taken of his customers' accounts and

16   transferred to Mr. Teman's account at Bank of America.  The

17   defendant spent that money by moving it out of his account and

18   then spending it however he wanted to.  And ultimately the

19   customers' banks told Bank of America that these were

20   fraudulent transactions.  Accordingly, Bank of America had to

21   send back the money.  But because Mr. Teman had already taken

22   it out of his account, there wasn't enough money for Bank of

23   America to repay it, so Bank of America had to spend $260,000

24   of its own money to repay those other customers.  So that's

25   what is not really in dispute

1          What is in dispute here is whether the defendant acted

2     with criminal intent when he cut and deposited those checks.

3     Ladies and gentlemen, the evidence proves beyond a reasonable

4     doubt that the defendant represented to the banks that he was

5     issuing checks with the permission of his customers and that

6     was a lie.  The defendant had no permission to issue these

7     checks and he knew it.  Let me talk you through some of the

8     ways that we know he knew he didn't have permission.

9          First, you know from the customers themselves that

10    they never gave the defendant permission to write or deposit

11    these checks.  The defendant knew it.  All three of the

12    customers -- Mr. Gabay, Ms. Soon-Osberger and Mr. Soleimani --

13    told you squarely and told you without hesitation that they did

14    not give Mr. Teman any permission to write those checks.  They

15    all told you the exact same thing, and in fact their stories

16    were largely pretty similar:  Mr. Teman absolutely did not have

17    permission to create and deposit those checks.  And they told

18    you they had no idea he was going to do it.

19         Let's take a look first at some of Mr. Gabay's

20    testimony.  He told you -- and this is on his questioning:

21    "Q.  At any point did Mr. Teman ever ask permission to pay

22    himself by issuing checks from Coney's bank accounts?

23    "A.  No.

24    "Q.  And if he had asked your permission to do that, to write

25    checks from your accounts to himself, what would you have said?

1   "A.   I would have said no."

2          And what did Mr. Soleimani say?  Mr. Soleimani told

3   you the same thing:

4   "Q.   What did he ever tell you during those conversations about

5   his authority to draw checks on behalf of those entities?

6   "A.   He never mentioned anything.

7   "Q.   And if he had mentioned them, would that have stuck out to

8   you?

9   "A.   Yes.

10  "Q.   And what would have been your reaction if you had heard

11  about them?

12  "A.   I would have denied it.

13  "Q.   What do you mean denied it?

14  "A.   Denied his authority to draw any checks out of my

15  account."

16         That's what Mr. Soleimani told you.  He told you the

17  same thing all the other witnessers did, which is that if Mr.

18  Teman had ever asked those customers can I draw a check from

19  your account when I think I deserve money, of course they would

20  have said no.  Of course they would have said no.

21         You heard Ms. Bonnie Soon-Osberger tell you the same

22  thing.  I asked her:

23  "Q.   You testified previously that you never saw any provision

24  about -- you did not see a provision about allowing him to draw

25  checks from your account.

1    "A.  That's true.

2    "Q.  If you had seen that, would that have been something you

3    would have included in this message?"  That was the message

4    where she sent comments on the terms and conditions.  She said:

5    "A.  Absolutely.  I just don't have the authority to allow

6    people to write checks; I don't have authority for that, so

7    yes."

8           And then she was asked when shown the check that Mr.

9    Teman wrote:

10   "Q.  Did you authorize Mr. Teman to deposit this check?

11   "A.  Absolutely not.

12          Those are the three customers:  Mr. Gabay, Mr.

13   Soleimani and Ms. Soon-Osberger.  But you also heard from Gina

14   Hom.  She testified on Thursday.  She said she worked at

15   Crystal Management.  That was the management company for the 18

16   Mercer account, and she is actually one of the authorized

17   signers on that account.  Here is what she told you.  She was

18   asked:

19   "Q.  Did you ask the board first whether this was authorized?"

20   That was when she found out about Mr. Teman's check.

21   "A.  No.

22   "Q.  Why not?

23   "A.  Because the only people that were authorized to issue any

24   payments on this would have been myself or Jackeline.  And

25   neither one of us had done it."

1          She didn't even need to ask the board.  It was so

2     obvious to her if Jackeline or I didn't sign this check, it's

3     not authorized.  It doesn't matter what contract is out there.

4     It doesn't matter what Mr. Teman thinks he is owed.  If I

5     didn't write the check, if Jackeline didn't approve the check,

6     it's not an authorized check.  It's that simple.

7          In fact, you heard that from a lot of the witnesses.

8     The defendant never asked them for permission to issue the

9     checks and withdraw money from their bank accounts, and they

10    all told you the same thing.  And this is obvious; this is

11    common sense.  If the defendant had ever asked them for

12    authorization, if he had ever asked them when I think I'm owed

13    money can I draw from your bank account, of course they would

14    have said no.

15         Earlier on when we opened this case last week I said

16    we will ask you to pay attention to the law, pay attention to

17    the facts and use your common sense.  Your common sense also

18    tells you if someone had asked for your corporate account, can

19    I draw money when I think I deserve it, of course you would

20    have said no.  If somebody had asked you that, of course that

21    would stand out in your mind.  And you also know, why because

22    these defendants told you.  They wanted total control over

23    their bank accounts, and they didn't want outside vendors to

24    have access to them.  They decide when check gets paid.  If an

25    invoice comes in, they can decide to pay it.  In fact, you

1    heard the defendant at one point actually did ask Mr. Gabay for

2    permission to use what is called an ACH.  You heard some

3    testimony about how that is used to withdraw funds.  And what

4    did Mr. Gabay say?  No, you can't take money out of my bank

5    account.  Here is what he said:

6    "Q.  If he had asked you for a form authorizing withdrawals

7    from your bank account, how would you have reacted?

8    "A.  He did ask and we said no.

9    "Q.  Why did you say no?

10   "A.  Because it's note the way we operate.  We only do things

11   by invoice where we issue the check.  He had requested that we

12   enter an order using ACH, and we asked him for invoices only."

13          How else do you know that the customers didn't

14   authorize these checks?  You know it from their reaction when

15   they realized the checks were issued against their account.

16   They were shocked.  They were horrified someone had written a

17   fake check, pretending that they had authorized it, and

18   deposited into their own account.  The victims immediately told

19   their banks, and they told the banks these checks weren't

20   authorized.  Mr. Gabay immediately informed his bank and closed

21   his account.  Ms. Hom immediately told her bank and closed the

22   account.  Mr. Soleimani told the bank, closed the account and

23   then even reported the fraud to the police.

24          Now, let me ask you a basic common sense question:

25   Why didn't the defendant just ask his customers for permission?

1   Why didn't he say, "Can I draw this out of your account?"

2   Because he knew they would say no.  Of course they would say

3   no.  Mr. Gabay, Ms. Soon-Osberger and Mr. Soleimani told you

4   that they would have never agreed to let him write these

5   checks.  The fact that he never asked though is devastating

6   proof that he knew this was a fraud, that he had fraudulent

7   intent, and that he knew he didn't have permission.  He knew if

8   he had asked, they would have said no.

9          You didn't see a single e-mail or message where Mr.

10  Teman told a customer if you don't pay, I'm going to write a

11  fake check from your account and address it to myself.  He knew

12  this was a fraud.  He didn't want them to say explicitly no, no

13  way.  If he had asked the customers and they had said no, then

14  the defendant could never have claimed after the fact that he

15  had their authorization.  And he knew it, so he never asked

16  them.  The defendant knew he was committing a fraud plain and

17  simple.  So that's the first reason you know the defendant

18  acted with criminal intent.  Another reason you know that is

19  because he tried and failed and then tried again.

20         You saw the defendant tried to take money from the 518

21  West 204 account even after the customer had reversed those

22  charges.  Let me take this piecemeal.

23         In March 2019 Mr. Teman created a fake check from the

24  518 account worth $18,000 and deposited it into his GateGuard

25  bank account.  He claimed it was for a device removal fee.

1   That was the March 2019 check that we talked about.  You have

2   seen it a couple times now.  He claimed it was for a device

3   removal fee, and Mr. Gabay quickly found out about it and told

4   his bank and the charge was reversed.  In fact, Mr. Gabay

5   closed his account.

6           Did the defendant stop?  Of course not.  Three weeks

7   later -- and these are the April 2019 checks -- Mr. Teman

8   doubled down.  On the same account he wrote three more checks.

9   After these ones had been reversed, after the customer had

10  said, no, no way, wrote three more checks.  In fact, one of

11  those checks was again for a device removal fee.  He tried to

12  get the fee the first time; the customer said this is not

13  authorize and reversed it; and then he tried again for the same

14  fee, except this time it wasn't enough to write one check for

15  $18,000; this time he added another check for $10,000 for a

16  cancellation fee and another check for $5,000 for an attorney

17  use fee.

18          So, you know that the defendant had fraudulent intent,

19  that he had criminal intent, because he tried once, knew the

20  customer didn't want it, and then he tried again.  So, that's

21  the second reason.

22          Now the third reason.  You know from the fact that the

23  defendant never sent invoices for any of the fees that he

24  charged.  You know because the defendant did not send invoices

25  for $18,000, for $10,000 and for $5,000 before he wrote checks

1    from their accounts.

2           Ladies and gentlemen, you heard about how the

3    defendant sent invoices to each of these three customers when

4    they actually bought devices.  That was 2017 for Mr. Soleimani

5    and in early 2018 for Mr. Gabay and Ms. Soon-Osberger.  He sent

6    them real invoices; they said I agree to these; and they paid

7    him with checks out of their account.

8           You heard each of the witnesses tell you how an

9    invoice is how they decide whether to pay for something.  They

10   needed Mr. Teman to send him an invoice so they could decide

11   whether they were going to pay.  In fact, the defendant did

12   send them those invoice and they did pay.  But you heard the

13   defendant did not once send his customers any invoices for the

14   fraudulent checks that he deposited in March 2019 and April

15   2019.  He never sent them any invoices for $18,000 for a device

16   removal fee, and then $10,000 for a cancellation fee, and

17   $5,000 for an attorney use fee.  Why not?  Because he knew that

18   his customers would dispute the payments and tell him that he

19   wasn't entitled to collect them.

20          You saw the e-mail where Mr. Teman told Mr. Soleimani

21   that he owed more than $260,000 -- an incredible amount of

22   money considering that Mr. Soleimani paid a couple thousand

23   dollars for seven intercoms.  Mr. Soleimani responded when Mr.

24   Teman told him he owed him that much money:  "Can you send me

25   the invoices which you are claiming we owe you?  Not sure why

1    we owe you money but I'm glad to look into it."  That's the way

2    you do business.  If somebody owes you money, you can send them

3    an invoice, and they can decide I'm going to pay it or I'm

4    going to contest it.  He did that.  He did that with the

5    earlier intercoms.  But what he never did was send them

6    invoices for the money that he stole.  And that's another

7    reason you know that he had criminal intent.

8            You saw another invoice.  With Mr. Gabay he sent him

9    an invoice for $18,286 for a GateGuard panel.  This was the

10   same day that Mr. Gabay told him we need to put the project on

11   hold.  Mr. Teman got upset and said, you know what, you owe me

12   a lot more money.  So, he sent him a new invoice; this was for

13   $18,286.  That was another way he sent him an invoice.

14   Mr. Gabay decided I don't owe this and he didn't pay it.  But

15   again he never sent him the invoices for the money that he

16   ended up stealing.  So, that's one way you know that the

17   defendant had criminal intent, because he knew how to really do

18   business -- send someone an invoice -- and he didn't do it with

19   the checks he stole.

20           So, what's another way you know the defendant had

21   criminal intent?  The fees that the defendant tried to take --

22   here totaling more than $300,000 -- were totally

23   disproportionate to what the people had paid in the first

24   place.  You heard from each of these customers that they paid a

25   couple thousand dollars for their intercoms.  Mr. Gabay paid

1    $3600.  Later Mr. Teman wrote a check for a device removal fee

2    for a device he already owned that was on his own building for

3    $18,000, so a $3600 device and a $18,000 fee that the customer

4    never agreed to pay.

5           The same was true for the other customers here.  Ms.

6    Soon-Osberger paid -- sorry -- paid about $3,947 for a device

7    and installation and some service.  That's about $4,000.  And

8    then what did Mr. Teman do?  He wrote a check -- a fake

9    check -- for $18,000 based on her account, again under a

10   so-called device removal fee.  That's how you know this wasn't

11   normal business practice.  That's how you know this wasn't

12   above board, and that's how you know this was fraud.

13          The same thing was true for Mr. Soleimani.  He bought

14   seven devices, and he paid about $1700 for each device.  In

15   April 2019 Mr. Teman wrote checks worth $33,000 for each of

16   those devices, almost $200,000 in total, after Mr. Soleimani

17   paid just a few thousand dollars for each device.  There is

18   absolutely no way -- no way -- that the defendant believed

19   these were legitimate fees.  There is absolutely no way he

20   thought he was really entitled to them.  And for you there is

21   absolutely no way he thought he had permission to take almost

22   $200,000 in fees off of a device that Mr. Soleimani paid a

23   couple thousand dollars for.  That's fraud.  So that's the

24   fourth reason.

25          You also know that the defendant had criminal intent

1    because he knew the lawful ways to recover money.  You heard

2    each of the witnesses in this case, each of the customers, tell

3    you that Mr. Teman when he got upset threatened them with

4    lawsuits; he threatened them with liens; he threatened to send

5    them to a collection agency.  He even threatened to foreclose

6    on some of Mr. Soleimani's buildings.  But did he do that in

7    the end?  No.  He knew he could file a lawsuit.  He knew he

8    could file a lien.  He knew he could send it to collections.

9    He knew he could do all of those things.  But in the end he

10   stole their money using fake checks.  That's how you know Mr.

11   Teman had fraudulent intent, because he knew the right way to

12   do things.  He knew what was available, and in fact he

13   threatened them.  You heard Ms. Soon-Osberger tell you he

14   threatened lawsuits.  You heard Mr. Soleimani and Mr. Gabay say

15   the same thing.  So, there is the sixth way you know the

16   defendant had criminal intent.

17          Look at the checks themselves.  It's plain as day from

18   the face of the checks that they're fake and that Mr. Teman did

19   everything he could to make them look real.

20          Let's take a look at an example.  This is a March 2019

21   check from 518 West 205 LLC account.  Of course by now you know

22   there is no such thing as 518 West 205 LLC -- you know it's

23   West 204 -- and Coney Realty has nothing to do with this -- you

24   know it's actually Coney Management -- but there is a lot of

25   features of this check that show that Mr. Teman did his

1    darndest to make it look real.  There is a squiggle.  That's

2    designed to make it look like a person, like the customer, had

3    authorized these checks.

4         You also see the fine print.  "Draw per contract."

5    You can see that right below the squiggle.  You can see "Draw

6    per contract.  No signature required."  Those are Mr. Teman's

7    words; those are not the words of his customer.  Those are not

8    the words of the person losing money in this scheme.  Those are

9    the words of Mr. Teman.  Fine.  He thinks there is a draw per

10   contract.  This check is made to look like the customer

11   approved that contract and that the customer thought no

12   signature was required.  If you asked Ms. Soon-Osberger was a

13   signature required for her checks -- yes.  If you ask Mr. Gabay

14   was a signature required for his checks -- yes.  If you asked

15   Mr. Soleimani was a signature required for his checks -- yes.

16        So, this is one of the March 18 checks.  Let's take a

17   look at the April 2019 checks; they look a little bit

18   different.  In these checks -- this is one in particular again

19   from 518 West 205 LLC -- he is trying to do a little better

20   this time, after the earlier March 2019 checks were canceled.

21   The checks themselves show the defendant knew this was fraud

22   and tried to get away with it.  He changed the check number --

23   the last ones were check number one -- to check number 19001.

24   You heard testimony from Mr. John Motto from Signature Bank --

25   he was the last government witness you heard -- and he told you

1    that one of the red flags that the bank looks for is the check

2    number, whether the check is in sequence.

3            So, Mr. Teman thought a check 001 might be a little

4    suspicious, and instead, with the April 2019 checks he put

5    check 190001, 19002 and 19003.  Now let's look at the

6    disclaimer at the bottom of these checks.  Mr. Teman is telling

7    the bank "Draw per contract.  No signature required."  Those

8    are his words; those are not the words of his customer.  Those

9    are not Gina Hom's words.  In this case those were not Elie

10   Gabay's words.  Those were not Mr. Soleimani's words.  He

11   said -- oh, he goes even further and says this is a valid

12   check -- again, his words, not his customers.  He said you are

13   required by law to honor it -- also his words.  He writes

14   accepted by above client -- also his words -- and contact us

15   with questions.

16           Now, he is not saying contact the customer.  He is not

17   saying call Mr. Soleimani.  He's not saying call Mr. Gabay.

18   He's not saying call the clients who agreed to this contract.

19   Instead what he is saying is call me; I will tell you that this

20   is approved; I will tell you this is authorized.  Ladies and

21   gentlemen, that's fraud.  It shows you fraudulent intent.

22           So, there is another reason you know the defendant

23   acted with criminal intent:  Look at when he timed his

24   deposits.  You heard Mr. Gabay and Mr. Soleimani testify that

25   they observed the Passover holiday.  That's the holiday that

1    started on the very day after the April 2019 checks which were

2    drawn on their accounts.  And they told you that as part of

3    their observance of that holiday they don't use electronic

4    devices for two days.  When did Mr. Teman deposit these checks?

5    The day before.  That's fraudulent intent, ladies and

6    gentlemen.  That shows you the defendant knew he didn't have

7    permission.  It shows you the defendant wanted a lead time to

8    get these checks cleared.  Why did he deposit that day of all

9    days?  Because he knew it was a fraud.  So there is another way

10   you know the defendant had criminal intent.  Those are seven

11   ways.

12            We will do an 8th.  The defendant moved the money

13   around his accounts.  I should say you should follow the money.

14   Look at the way he moved the money around his Bank of America

15   accounts before the bank would freeze it.  The defendant

16   deposited the March 2019 checks via mobile deposit the same day

17   he deposits checks, March 28, 2019.  Critically the very next

18   day -- that's March 29, 2019 -- he transferred almost all of

19   that money into another account when there is a chargeback on

20   April 2.  So, March 28 he deposits, March 29 he transfers.  On

21   April 2 Bank of America finds out that the customers didn't

22   really authorize this.  They had to return that money.  But of

23   course they couldn't get it back from Mr. Teman because he had

24   already transferred it into other accounts.  That's important

25   for two reasons.  First, that sort of explains to you how Bank

1    of America suffered the loss.  He transferred the money out of

2    the account so they couldn't return it.  But, second, it also

3    shows that he absolutely knew these checks would be rejected,

4    and he absolutely knew they would be subject to a chargeback

5    because he absolutely knew that his customers had never

6    authorized these payments.  He knew the moment he deposited

7    these checks on March 28 and the moment he moved the money out

8    of his account on March 29 so that Bank of America couldn't get

9    it back, so that his customers couldn't get it back.  That's

10   fraudulent intent.

11          And these were also fees apparently earned by

12   GateGuard, right?  These might be fees for a device removal for

13   a GateGuard device.  Why would he transfer them to his Friend

14   or Fraud account, or his Touchless Lab account, except to get

15   them out of the account where Bank of America would be able to

16   get the money back.  That shows fraudulent intent.  That's what

17   he did in March of 2018.  He did it again in April of 2019.

18   The defendant did the exact same thing; he deposited the 27

19   checks worth $297,000 on April 19, 2019 -- the same day he put

20   on the checks.

21          You heard Ms. Finocchiaro tell you about the seven day

22   hold.  So, he deposited the checks -- and you can see it here

23   on the screen -- on April 19, 2019.  There is a $297,000

24   deposit.  Those fees became available on April 26.

25   Unfortunately, before then $33,000 were subject to a

1   chargeback.  So on April 26, the day the money became

2   available, Mr. Teman transferred nearly all the money in that

3   account to another account.  He only left $10,000.  So that

4   again shows you fraudulent intent.  The defendant knew that

5   this money would get charge backed and he transferred almost

6   all of it out of that account.  The day, the very day it became

7   available to him.  That's fraudulent intent.

8           So those are the eight reasons -- at least eight

9   reasons -- you know that there was fraudulent intent and that

10  the overwhelming evidence proves beyond a reasonable doubt that

11  the defendant knew he was committing a fraud.

12          Now let me turn to some of the defense arguments that

13  you've heard about.  I don't know what the defense will say in

14  their summation, but I think based on some of the questioning

15  and some of the testimony we've heard we can guess that there

16  will be at least two.

17          But let me be clear, the defendant -- the government

18  bears the burden of proof in this case, and we embrace that

19  burden.  The defendant has no obligation to cross-examine

20  witnesses, or to put on any evidence, or to call any witnesses,

21  but in this case they have.  They have cross-examined

22  witnesses.  They have called their own witness, and they have

23  put in evidence.  So, you have the responsibility to evaluate

24  the defendant's arguments and their evidence just as you would

25  any other.  You have a responsibility to review the evidence

1    and see whether it makes any sense.  So let's turn to the

2    defendant's main arguments.

3            First, the defendant will argue -- may argue that he

4    was authorized by a so-called contract to issue these checks.

5    Second, you may hear about an advice of counsel defense.

6    Ladies and gentlemen, for the reasons we're about to discuss,

7    those defenses are not only meritless but they are two more

8    reasons that you know that the defendant had fraudulent intent.

9            Let's talk about the contract first.  The defense has

10   argued that there is a term or a disclaimer put on a website

11   buried deep in Mr. Teman's GateGuard website that somehow gave

12   him authorization to issue these checks.  But critically none

13   of the customers in this case ever saw those provisions.  None

14   of the defendant's customers ever actually laid eyes on

15   anything saying that Mr. Teman could take money out of their

16   accounts.  None of them had ever seen those payment terms, and

17   their actions back that up.

18           Mr. Gabay and Ms. Soon-Osberger gave Mr. Teman

19   feedback on parts of the terms and conditions.  On Mr. Gabay's

20   part that was when he was negotiating for a broader order.  On

21   Ms. Soon-Osberger's part, that was when she was trying to

22   figure out whether to buy the device.  And they told you they

23   gave him comments on the parts that caused them concern.  They

24   didn't comment on the most offensive part of the payment terms,

25   and that's because they didn't see it.  They told you they

1    didn't see it, and I think that action backs that up.  They

2    gave him comments, but of course they didn't give him comments

3    on parts they didn't see.

4          In November 2017, when Mr. Soleimani was a brand new

5    GateGuard customer, he exchanged messages with Mr. Teman where

6    he showed also himself that he had never seen these terms and

7    conditions.  If they didn't see the payment terms, how could

8    they possibly have agreed to them?  And if they didn't see the

9    terms, how could they have given Mr. Teman authorization to

10   write these checks to himself?  The answer is that they never

11   agreed.

12         So, ask yourselves this:  Why didn't the defendant

13   bring any of these terms to his customers' attention?  Because

14   he knew they would never have agreed to them.  All the victims

15   said that.  They were crystal clear.  And if you knew that they

16   had seen those terms, they absolutely would told him that he

17   did not have authority to draw money from those accounts.

18         Another thing.  You know that the payment terms

19   website -- that's a web page -- was buried deep within a series

20   of links; it was buried deep in the terms and conditions of Mr.

21   Teman's website.  First you had to go to the website.  Then you

22   had to go to the terms and conditions.  Then you had to go to

23   the payment terms.  From there, buried deep on the seventh page

24   in paragraph 5 was a link on the terms and conditions, another

25   website, and buried in there was this provision that

1    purportedly said Mr. Teman could take funds whenever he wanted

2    them; that he could draw from their account if he thought he

3    was owed money.

4        Why was that key provision -- that key term -- buried

5    in a series of websites?  Because the defendant was hiding it

6    to build his own cover story.  The defendant buried that clause

7    deep in his payment terms where no one would ever see it, and

8    no one would ever object to it, and then later used it as a

9    fake justification to draw checks from their accounts.  He kept

10   it there to later give himself a license to deal.  Ladies and

11   gentlemen, the payment terms on Mr. Teman's website are not a

12   license to steal, and the way the defendant buried it is

13   important here.

14       Part of your decision will be to evaluate whether the

15   defendant had fraudulent intent.  Ask yourselves, if the

16   defendant really thought he was authorized to do this, really

17   thought he was going to draw funds from someone's account as a

18   normal way to do business, would he have buried it deep in

19   payment terms deep in the terms and conditions?  No, it's

20   fraud.  It's fraudulent intent, and it's information that you

21   can use to determine that the defendant had the fraudulent

22   intent to meet all the elements of the crimes we've talked

23   about.

24       Keep in mind regarding the payment terms as well that

25   there is no evidence in this case -- not a single shred of

999

1    it -- that shows you the payment terms that might have been in

2    effect -- if they were -- at the time these customers bought

3    their devices.

4            You heard Mr. Soleimani's testimony that he bought his

5    devices in the spring of 2017 and bought another one later

6    2017.  You heard from Ms. Soon-Osberger and Mr. Gabay that they

7    purchased their devices in early 2018.  The only copy of the

8    payment terms you have seen in this case came in when Mr.

9    Reinitz was on the stand and it's dated 2019.  So, the evidence

10   in this case does not show at all what the defendant might want

11   it to, which is that there were these payment terms that let

12   him draw funds from their accounts.  In fact, you have heard

13   quite the opposite, you have heard testimony from the three

14   customers in this case that they never saw anything that would

15   let him take money out of their accounts.  So that's the

16   contract.

17           Now let's talk about the advice of counsel.  The

18   defendant may also argue that he didn't have the necessary

19   criminal intent because he consulted with a lawyer and he

20   relied in good faith on the advice of that lawyer.  Now, Judge

21   Engelmayer will instruct you on the law and the elements of the

22   so-called advice of counsel defense.

23           Here the defendant's advice of counsel defense fails

24   for three reasons:  First, he did not seek his attorney's

25   advice in good faith; second, he did not present all the facts

1   to his attorney; and, three, he did not follow his attorney's

2   advice before he took action.  So, he didn't seek the advice in

3   good faith; he didn't present all the facts to his attorney;

4   and he didn't follow his attorney's advice before he took

5   action.

6         Now, Mr. Reinitz -- that was the attorney who

7   testified -- got up on the stand and told you supposedly that

8   Mr. Teman -- Mr. Reinitz told Mr. Teman that he had

9   authorization to issue the checks.  But you've also seen the

10  chats.  You have seen the WhatsApp chats where Mr. Teman and

11  Mr. Reinitz are actually talking about the advice, where Mr.

12  Reinitz is really telling him what is going on, where he really

13  tells him whether this is a good idea.  We introduced those

14  chats on cross-examination.  They undermine everything Mr.

15  Reinitz told you, and there is not a shred of evidence to

16  support his story.

17        Let's take a look.  So this is a chat exchange that

18  took place on January 2, 2019.  Mr. Teman told Mr. Reinitz, "I

19  have ABJ checks (photos).  Our contract allows me to draw their

20  account.  I should just deposit checks from them" -- and this

21  is Mr. Teman's words -- "(totally legal I think)."

22        what does Mr. Reinitz say?  Not what he said on the

23  stand, not that this is OK, not that this is authorized.  He

24  says "No." Mr. Teman says question mark.  Mr. Reinitz responds

25  "Bad idea."  Bad idea.  You remember he keeps using the same

1    phrase over and over, it's a bad idea.

2             When Mr. Teman was going to deposit the checks from

3    his customers without telling them, Mr. Reinitz again told him,

4    no, bad idea.

5             So, What do these chats show?  What's the punch line?

6    Contrary to what Mr. Reinitz and defense counsel want you to

7    believe, a lawyer never sanctioned Mr. Teman's plans.  A lawyer

8    never said it was legal and didn't say it was a good idea; he

9    said bad idea; he said no.

10            When Mr. Teman tells Mr. Reinitz that the customers

11   entered into a contract, he said that the contract allows him

12   to draw from their accounts.  And Mr. Teman says on the stand

13   that he is not the breaking any law -- I'm sorry -- Mr. Teman

14   says in the chats he is not breaking any law.  And how did Mr.

15   Reinitz respond?  He said "Because they're likely to call the

16   police and you will be arrested.  And you have a criminal case

17   to deal with.  And then you can start explaining about your

18   contract and not breaking any laws."

19            So here is the chat.  You can see Mr. Teman asking

20   Ryan. "why?  They entered into a contract allowing us to draw

21   from their accounts.  So we're not breaking any law."  What

22   does his attorney say when he asked him about this?  "Because

23   they are likely to call police and you will be arrested and

24   have a criminal case to deal with.  And then you can start

25   explaining about your contract and 'not breaking any laws'".

1    That's the advice he got from his lawyer.  That's what his

2    lawyer told him.  His lawyer didn't say this is OK.  His lawyer

3    didn't say go ahead and do it.  I think Mr. Reinitz actually

4    said that he had said you can do this from any customer

5    accounts.  That's not what he is saying in these chats.  In

6    these chats he is saying because they're likely to call the

7    police and you will be arrested.

8         That was Mr. Reinitz's advice to Mr. Teman.  He didn't

9    say great idea.  He didn't say it was totally lawful.  He

10   didn't even say it's lawful.  He said you will be arrested.

11        Then Mr. Teman keeps pushing.  He tells the lawyer, "I

12   don't think they will, they owe the money."  He says he will

13   put in the memo line of the check "payment drawn per contract"

14   and the link to his terms and conditions.

15        Ladies and gentlemen, the defendant kept pushing.  You

16   will see in these chats -- they are in evidence -- they are in

17   the 700 series -- that Mr. Teman kept pushing.  He kept pushing

18   and kept pushing.  He wanted his lawyer to bless this idea.  He

19   wanted his lawyer to sanction this idea.  And of course Mr.

20   Reinitz said no.

21        These chats are crystal clear.  Mr. Reinitz told him:

22   "You asked me opinion, I gave it.  Maybe you're right."  Then

23   he said on the stand, he sarcastically said maybe they'll just

24   throw up their hands up and say, oh, well, we tried to stiff

25   Teman but he outsmarted us.  Too bad.  Have fun, Ari, don't

1   spend it all in one place.  Mr. Reinitz is making fun of Mr.

2   Teman's idea.  He's being sarcastic.  He's saying I think your

3   customers are going to be upset, I think they're going to call

4   the police, I think you're going to be arrested.

5        Mr. Reinitz also told him in the same conversation "My

6   opinion is that you are greater than 50 percent likely to be

7   arrested for the activities you propose.  How you choose to

8   proceed is up to you."  That's how Mr. Teman's attorney leaves

9   the conversation in January 2019.  In January 2019 -- before

10  Mr. Teman ever deposits the check -- his lawyer tells him "My

11  opinion is that you are greater than 50 percent likely to be

12  arrested for the activities you propose."  Greater than 50

13  percent.

14       So those were the communications before the March 2019

15  checks.  The checks were then deposited -- as you've now heard

16  a million times -- on March 28, 2019.  Mr. Teman sought his

17  attorney's advice, gave misleading advice, pushed back on the

18  advice, and then ultimately did not follow what his lawyer told

19  him to do.  That's not much of an advice of counsel defense,

20  and it fails here.

21       Now let's go to April 2019.  This is after those

22  initial two checks that were drawn on the 18 Mercer account and

23  the Coney Realty account.  The government also introduced into

24  evidence those chat exchanges.  They took place after those

25  checks.  Let's take a look at the first one.

1          In this chat Mr. Teman had just told Mr. Reinitz what

2     happened.  He told him about the two $18,000 chargebacks.  How

3     does Mr. Reinitz respond?  "Not sure I follow but this sounds

4     bad."  Mr. Teman then pushes, he says, "Our contract lets me do

5     it."  Again he references a contract, by the way.  Mr. Teman

6     here is completely misrepresenting to his attorney the status

7     of this relationship.  There is no contract.  You've seen it.

8     There is no piece of paper signed by the two parties; there are

9     terms and conditions on his website.  But Mr. Teman tells his

10    attorney when he is seeking advice "our contract states

11    explicitly".  And what does Mr. Reinitz say in response?

12    "Understood.  I don't know all the ins and outs of this but it

13    sounds like a bad idea."

14         Mr. Reinitz in this chat is telling you two things:

15    First, he wasn't consulted before these checks were filed.  He

16    doesn't know all the ins and outs.  But he also tells you Mr.

17    Reinitz didn't give him solid legal advice; he is still trying

18    to figure out the ins and outs.  And Mr. Reinitz is also

19    telling you -- and you can see this from the chat -- that even

20    after these first two checks are deposited, it sounds like a

21    bad idea.  Sounds like a bad idea.

22         He later told him "After hitting their accounts out of

23    the blue, I expect this to become a criminal matter sooner or

24    later."  That's not much of an advice of counsel defense, and

25    it fails.

1          Now, there are further conversations on the same day.

2     This is a similar conversation that took place also in April

3     2019.  Mr. Reinitz says "I've already told you I think it's a

4     bad idea.  You've been back and forth with ABJ several times

5     now.  Your threats carry little weight at this point and they

6     have indicated they don't believe they owe you money.  If you

7     hit their accounts I think 50/50 they call cops.  If I was

8     advising them that's probably what I would tell them to do."

9          Ladies and gentlemen, it's more proof that Mr. Reinitz

10    did not sanction this idea.  He did not bless this idea.  He

11    didn't say it's lawful if you go out and draw checks from

12    anyone's accounts.  He says it's a bad idea, and he says that

13    50/50 they're going to call the cops, and he is specifically

14    referencing ABJ.  That's Mr. Soleimani.  Those are the checks

15    he went and deposited in April 2019.

16         He goes on.  Mr. Reinitz says, "Honestly, I don't know

17    anything about this stuff.  But there are serious state and fed

18    regulations on this.  You claim" -- that's Mr. Teman claiming

19    -- "that your contract allows you to debit their accounts even

20    after they explicitly protest.  I'm just not sure it's that

21    simple".

22         Again, Mr. Reinitz is saying I don't know anything

23    about this stuff.  That's his lawyer -- after he has already

24    deposited two fake checks and gotten chargebacks -- saying I

25    don't know anything about this stuff.  That's not an advice of

1    counsel defense, ladies and gentlemen.  That's his lawyer

2    saying I don't know anything about this.  And then his lawyer

3    says, look, maybe if I did know something, there are serious

4    state and federal regulations on this.

5         Mr. Reinitz goes on "And it also may be (again ...

6    speaking out of ignorance) a clear violation of some federal

7    banking regulation.  In which case your "simple can't miss

8    idea" is now a federal crime."  That's not Mr. Reinitz saying

9    it's OK.  That's Mr. Reinitz saying, I don't know much, I'm

10   speaking out of ignorance, but my hunch it it's a federal

11   crime.  And again Mr. Reinitz is mocking Mr. Teman's "simple

12   can't miss idea".

13        Ladies and gentlemen, we talked all about these chats,

14   so I will just tell you this:  The advice of counsel defense

15   fails absolutely.  In fact, these chats with Mr. Reinitz also

16   show you that the defendant had fraudulent intent.  The

17   defendant consulted his attorney.  His attorney told him you're

18   going to be arrested; it's a federal crime; if I was

19   representing your customers I would tell them to call the

20   police.  That's what his attorney says.  And that's after he

21   does two of the checks and before he does 27 more checks.

22   Ladies and gentlemen, this is fraudulent intent.  This is proof

23   that the defendant knew this was wrong, knew he didn't have

24   permission to do it.

25        So now that I've talked about the two defenses, let me

1  talk about the charges in this case.

2         Count One charges the defendant with one count of bank

3  fraud in connection with the 27 checks that he deposit in the

4  April 2019.  Those were the checks he created from Elie Gabay

5  and Joseph Soleimani's bank accounts.

6         Count Two listed here charges the defendant with one

7  count of bank fraud in connection with the two checks he

8  deposited in March of 2019.  So, Counts One and Two are both

9  bank fraud.  Count One relates to the April checks, Count Two

10 relates to the March checks.

11        Count Three charges the defendant with one count of

12 wire fraud in connection with the 27 checks from April 2019,

13 and then Count Four -- also charging wire fraud -- charges him

14 in regards to the two checks from March of 2019.

15        So the first two counts are bank fraud, the second two

16 counts are wire fraud.

17        You have heard overwhelming evidence that proves the

18 defendant's guilt on each of these charges.  In a bit Judge

19 Engelmayer will give you instructions on the law.  Let me say a

20 few words about a couple of these elements though.

21        I expect Judge Engelmayer will instruct you that for

22 the two bank fraud counts the government must prove that the

23 bank that was the subject of the fraud was insured by the

24 Federal Deposit Insurance Corporation.  You heard from

25 witnesses at Bank of America and Signature Bank that those

1    banks were insured by the FDIC, so that takes care of the FDIC

2    requirement of the two bank fraud counts.

3           In addition, I expect you will be instructed that the

4    government must prove that the interstate wires were used in

5    furtherance of the wire fraud counts, so that's Counts Three

6    and Four.  The government is required to prove there were

7    interstate wires used for those two counts.

8           For Count Three -- those are the checks from April

9    2019 -- you heard Ms. Finocchiaro tell you -- she was the

10   witness who testified very first from Bank of America -- that

11   all the checks are scanned when they are first deposited at a

12   branch.  That was a branch in Florida.  Then you heard

13   Mr. Motto say -- Ms. Finocchiaro told you those checks go to

14   the Federal Reserve.  Then you heard Mr. Motto say at the very

15   end say that Signature Bank pulls those images from the Federal

16   Reserve and looks at them as part of their review here in

17   Manhattan.  So, that's the wire for Count Four, and that's

18   quite clear.

19          In Count Four your heard there were checks deposited

20   via mobile deposit.  Ms. Finocchiaro told you that all the

21   communications for mobile deposits are routed through Texas.

22   So, you know that the communications started in Manhattan --

23   you knew that because of the spreadsheet that Ms. Finocchiaro

24   testified about -- they went to Texas because they're mobile

25   deposits.

1          I expect you will be instructed that the government

2     must prove venue for each offense by a preponderance of the

3     evidence.  That is proven as well.  For the April 2019 checks

4     charged in Counts One and Three you heard that Signature Bank

5     reviewed the checks here in Manhattan as part of their fraud

6     review.  You also heard and you saw surveillance photos showing

7     that Mr. Teman withdraw $4,000 from a bank teller here in

8     Manhattan that he received because of his fraud scheme.

9          For the March 2019 checks charged in Counts Two and

10    Four -- those are the two checks -- you heard that the

11    defendant deposited those checks via mobile deposit from here

12    in Manhattan.

13         Ladies and gentlemen, make no mistake, this is not a

14    close case.  It's a simple case, and the proof is overwhelming.

15    Ari Teman created fake checks worth hundreds of thousands of

16    dollars, lied about having permission from his customers, and

17    then deposited those checks into his account.  Then he moved

18    that money into another account before Bank of America could

19    get it back.  When you evaluate all the evidence, you will

20    return the only verdict that is consistent with the evidence,

21    the law and your common sense:  The defendant Ari Teman is

22    guilty as charged.

23         THE COURT:  Thank you Mr. Bhatia.

24         Ladies and gentlemen, we are going to take a 15 minute

25    break in between each jury arguments.  So, we will take a

 1    15 Minute recess now, and when you come back we will hear from

 2    the defense.

 3              Ladies and gentlemen, as always, do not discuss the

 4    case.  I will see you in 15 minutes.

 5              (Jury not present)

 6              THE COURT:  All right, counsel.  Anything to raise

 7    before I give you a brief recess?

 8              MR. GELFAND:  No, your Honor.

 9              THE COURT:  I will see you a minute or two before the

10    jury is ready.  Are you going to be needing the monitor here?

11              MR. GELFAND:  It will probably be helpful.

12              THE COURT:  OK, very good, we will keep it up.  I will

13    see you in a few minutes.

14              (Recess)

15              THE COURT:  Mr. Smallman, let's get the jury.

16              (Jury present)

17              THE COURT:  Welcome back, ladies and gentlemen.

18    Please be seated.  We will hear from the defense.

19              Mr. Gelfand.

20              MR. GELFAND:  Thank you, your Honor.

21              Good afternoon.  Members of the jury, this case, as

22    Mr. DiRuzzo told you a few days ago, last week, ultimately

23    boils down to one fundamental question:  Did Ari Teman act with

24    the criminal intent that differentiates what you could

25    basically call a billing dispute from a banking crime?  In

1   other words, is there not even reasonable doubt -- much less

2   solid proof -- that Mr. Teman believed that he had the

3   authority to deposit the RCCs at issue when he deposited those

4   RCCs on March 28 and on April 19 of last year, of 2019?

5           Now, members of the jury, the question before you in

6   this case is not about whether Mr. Teman, or GateGuard, or

7   Coney, or ABJ, or Mercer, or Bank of America is ultimately on

8   the hook for this money.  This is a federal criminal trial, and

9   what brings us here together is that one question, whether Mr.

10  Teman acted with the intent necessary to actually make this

11  bank fraud or wire fraud.

12          Now, members of the jury, at the beginning of this

13  case we told you that obviously we don't have the burden of

14  proving anything in this case.  Our Constitution doesn't impose

15  that on anyone charged with a crime.  But we told you that we

16  would bring important evidence to you in this case if it didn't

17  come out through the government's case.  And we did.  We

18  delivered on our promise.  We brought to you the full

19  contracts, the terms and conditions and the payment terms that

20  are referenced on the face of the RCCs.  We brought to you the

21  invoices which are time stamped going all the way back to 2017

22  and 2018 which clearly reference the URL, the Internet web

23  address for the terms and conditions and the payment terms on

24  the GateGuard website.  We brought to you e-mail correspondence

25  that's time stamped going all the way back to 2018, way before

1    there was ever any sort of allegation, way before any of the

2    activity alleged to be criminal in this case even occurred.

3    And we brought those to you because it's important, because you

4    can't understand this case without seeing all of the relevant

5    facts from essentially a 360 degree perspective.  You need to

6    see it from all angles to actually understand what happened.

7         Now, members of the jury, I want to start where the

8    prosecutor spent a large part of his case -- of his closing

9    argument -- and that is on this issue of criminal intent.

10   Because I submit to you, members of the jury, that Mr. Teman --

11   and the evidence clearly shows it -- lacked the criminal intent

12   necessary to commit bank fraud or wire fraud.

13        Now, the story begins, not surprisingly, with the

14   terms and conditions that were publicly available to the world

15   and certainly to the customers, the one percent approximately

16   of GateGuard's hundreds of customers that came into this

17   courtroom and testified in this case.

18        Understand one thing, members of the jury, the copy of

19   the terms and conditions that you have in evidence in this case

20   as you heard from that witness stand actually came from one of

21   the government witnesses, one of the people the government

22   calls the quote unquote victims.  The terms and conditions are

23   dated all the way back to 2017, and they clearly reference

24   payment terms on the GateGuard's website.

25        I want to show you the government exhibit.  It's

1    Government Exhibit 441.  And if you flip through to Section 5,

2    to be clear, there is no fine print.  It's normal text.  Orders

3    and fees "pricing" and then something if you just look at this

4    jumps off the page, a URL, a/k/a pricing, in other words

5    something to click on to see the payment terms on the website.

6            You have seen the payment terms that expressly in no

7    uncertain terms in simple English -- it's Defendant's Exhibit

8    2 -- give GateGuard the right to draw and deposit remotely

9    created checks.  You have heard that term throughout this case,

10   RCCs.

11           You have seen the payment terms, if you look at

12   Defendant's Exhibit 2.  To be clear, Ariel Reinitz -- and I'm

13   going to talk a lot more about him in a few minutes --

14   testified from that witness stand -- he's the attorney for

15   GateGuard from Fisher Broyles the law firm -- he testified in

16   no uncertain terms that this section, permission to make bank

17   draws and other account draws, was always, since has been

18   involved, part of the GateGuard payment terms; and he testified

19   that he not only heard that from Mr. Teman, but he testified

20   that he personally reviewed those hyperlinks.  In fact, there

21   is an e-mail that you have in evidence that you can reference

22   that expressly says by Mr. Reinitz to Mr. Soleimani, all the

23   way back in 2018, Mr. Reinitz actually includes a link himself

24   to the terms and conditions and the payment terms, actually

25   includes two hyperlinks.  And he told us this morning on the

1     witness stand what those were for.

2            Defendant's Exhibit 2 clearly states -- not in some

3     legalese fine print, hereto indemnify nonsense -- it says in

4     simple English "You give us permission to write and sign checks

5     with your checking and/or savings accounts information to do a

6     bank draw against your entity (or entities) for the amount it

7     (or they) owe."

8            And this document which you have in evidence -- it's

9     Defendant's Exhibit 2 for those of you taking notes -- this

10    document clearly identifies and enumerates the payment terms.

11    In other words, if you remove the device, it's X; if we have to

12    talk to a lawyer, it's Y.

13           So at its core, members of the jury, that document is

14    critically important, and that's why we introduced it in our

15    case.

16           Now, members of the jury, use your common sense for a

17    second, your life experience.  That's why we have juries.

18    That's why juries are so important, to protect people charged

19    with crimes in our country.  The payment terms document on its

20    face eviscerates what the government is trying to sell to you,

21    which is that there is no basis, none whatsoever, for Mr. Teman

22    to have believed in March and April of 2019 that he had the

23    authority to do what his company's contract expressly gave him

24    the authority to do.

25           Now, members of the jury, I want you to think about

1   something for a second.  Look at Mr. Teman's actions in this

2   case.  Look at what he did at the bank branch in Florida when

3   he walked in with 27 remotely created checks.  He walked into

4   the bank himself.  He didn't send some underling or someone

5   else.  You saw the quote unquote surveillance pictures.  He

6   wasn't disguised in any way.  He wasn't wearing a hat; he

7   wasn't wearing one of those silly mustaches or something

8   absurd.  He sat and stood with the teller and someone else,

9   possibly the manager.  The Bank of America witness told you

10  that he provided his driver's license even though he was a

11  known customer to Bank of America because this was literally

12  the branch across the street from his office in Miami,

13  GateGuard's office.  You saw that he deposited the RCCs with a

14  seven day hold.  It's Defendant's Exhibit 16 that we introduced

15  into evidence.  He didn't push back on the idea that it was

16  going to take seven days to process this.  And you saw that on

17  the RCCs themselves he wrote on the face of all 29 checks

18  language that the Bank of America witness, Ms. Finocchiaro --

19  and even the Signature Bank witness whose name is escaping me,

20  but the gentleman who essentially looks for those kinds of

21  checks -- they both acknowledged readily that these 29 checks

22  that bring us here together in this courtroom clearly and at

23  first glance indicate that these are remotely created checks,

24  RCCs.  They told you that the language on the checks -- I'm

25  showing you Defendant's Exhibit 52.  This is a Bank of America

 1    record -- not only indicates that this is an RCC, the whole

 2    "Draw per contract.  No signature required" -- but if you

 3    actually look at Bank of America's own records -- not to

 4    mention the testimony in this case -- they actually processed

 5    this as an RCC immediately, and for good reason, because they

 6    recognized at face value that they were RCCs, and she explained

 7    when I asked her questions on cross-examination that they

 8    processed this as this return reason for RCC warranty breach,

 9    in essence, that the other banks -- JP Morgan Chase and

10    Signature Bank -- had been told by their customers that these

11    weren't authorized.

12           Now, members of the jury, the important thing here

13    that clearly demonstrates the complete lack of criminal intent

14    is that these are not some pathetic attempts at counterfeit

15    checks.

16           By the way, the two signatures, the whole sideshow on

17    the March RCCs, you saw the bank records.  You saw as the Bank

18    of America witness clearly identified -- you saw yourselves --

19    that Ari Teman's same signature appears on the front of those

20    checks and on the back, the deposit portion of the check, they

21    appear on the signature cards and Bank of America's records

22    since 2016 -- there is nothing fraudulent.  There is no intent

23    to deceive on the face of these documents.  What Mr. Teman's

24    actions show is that he thought what he was doing was legal.

25           Now, members of the jury, that's important, because

1    obviously Judge Engelmayer is going to instruct you on the law,
2    but for all four counts -- the wire fraud counts and the bank
3    fraud counts -- I anticipate the judge is going to explain to
4    you what the intent is, and it includes acting willfully.  I
5    anticipate that the judge is going to explain to you that
6    willfully means in essence that you're doing something to
7    either disobey or disregard the law.
8            Now, members of the jury, we're going to get to the
9    most important testimony in this whole trial, and that's Ariel
10   Reinitz, but I submit to you that if you look at Mr. Teman's
11   actions, and if you look at the words in 2018 by Mr. Teman,
12   time stamped in e-mailed that came into evidence that you have
13   to look at when you go back into that jury room, I encourage
14   you to look at them because it's going to show you something
15   important.  It's going to show you that throughout the entirety
16   of this time period, going way back before 2019, Mr. Teman
17   clearly articulated to customers that there were contracts that
18   governed GateGuard's business relationship.
19           Now, members of the jury, you also saw that Mr.
20   Teman's lawyer, Ariel Reinitz, also directly communicated with
21   two of the three customers at issue -- Mr. Soleimani, ABJ, and
22   Mr. Eli Gabay, Coney.
23           (Continued on next page)
24
25

1      MR. GELFAND:  You have two very important emails in

2  evidence in that regard.  If you're taking notes, it's

3  Defendant's Exhibit 14 and Defendant's Exhibit 36.  And I

4  apologize that we never make it easy with the numbering.

5      But those emails from March of 2018 and October 2018

6  respectively, clearly show, for example, Defendant's 36, Ariel

7  Reinitz telling Mr. Gabay that Coney Realty entered into

8  agreements with GateGuard; that these invoices and agreements

9  are of substantial commercial significance to GateGuard.

10  Mr. Reinitz told you he obviously, not surprisingly, shared

11  this information with Mr. Teman.

12      Fast forward a couple of months to Mr. Soleimani,

13  October of 2018, Defendant's Exhibit 36 -- I'm sorry,

14  Defendant's Exhibit 14.  Attached is one of GateGuard's

15  invoices.  The invoice indicates that your agreement with

16  GateGuard is subject to the terms available here and here,

17  hyperlinked.  You heard the testimony.  Mr. Gabay never even

18  responded to that email.

19      And you saw one of the most interesting emails entered

20  into evidence in this trial:  The response in that dialogue

21  from Mr. Soleimani in which he asks GateGuard's attorney, Ariel

22  Reinitz, for a release.  Remember, members of the jury, when

23  Mr. Soleimani was testifying, Mr. Soleimani, approximately a

24  year after he started using the GateGuard system, even though

25  he claimed that he didn't like the system, wanted to

1    essentially get the 2.0 version, quote/unquote.  And he was

2    communicating directly about that.  And what he said is, in

3    essence, If I'm going to do that, I need a release.

4           Now, members of the jury, use your common sense.

5    People ask for a release from liability when they believe it's

6    at least possible, if not plausible, that there are contracts

7    that subject them to responsibilities.  That's what they are

8    asking to be released from.

9           So I ask you the million-dollar question, members of

10   the jury:  If Mr. Soleimani even believed that that was

11   possible, why is it so crazy to believe that Mr. Teman believed

12   that it was possible, when Mr. Reinitz told you himself that he

13   shared that request, that email, with his client, Mr. Teman?

14          Members of the jury, everything Mr. Teman said and did

15   reflects Mr. Teman's belief that what he did was legal.

16   Whether it was a good idea or a bad idea is not the issue.

17   Whether he was right or whether he was wrong is not the issue.

18   The issue, members of the jury, is whether Mr. Teman believed

19   that he was violating the law.  And the evidence clearly

20   demonstrates otherwise.

21          Now, I want to talk for a minute about the

22   government's eight arguments for criminal intent.  I want to

23   talk very briefly about these.  It's important to understand

24   that there's no there there.

25          So first the government says customers never gave

1    permission.  Members of the jury, that argument falls apart

2    like a house of cards at the second you bring into the equation

3    the contracts clearly giving authority; and that the second you

4    clearly bring in the under-oath testimony in this courtroom on

5    Friday afternoon and this morning by Ariel Reinitz.

6              Number two, the government claims that Mr. Teman tried

7    and failed and tried again.  First of all, as Ariel Reinitz

8    explained to you, the dialogue continued.  And before March

9    28th of 2019 and continuing to April 19th of 2019 -- the two

10   dates that ultimately matter in this case -- he consistently

11   told Mr. Teman that what he was doing, the RCCs in this case,

12   was legal.

13             Now, members of the jury, there's an important kind of

14   side note here, and that's a document you have in evidence from

15   Signature Bank.  Elie Gabay testified as the only witness that

16   you heard from for Coney Realty.  But Elie Gabay told you who

17   Michael Haas was.  He told you that Michael Haas was

18   essentially the other principal.

19             You saw, by the way, Government's Exhibit 150 that you

20   have in evidence, the affidavit that Michael Haas submitted to

21   Signature Bank about the Coney RCC paid to GateGuard or payable

22   to GateGuard on March 28th.  You see in here number six,

23   under-oath affidavit:  Now neither I nor the company knows the

24   payees on these checks -- that's GateGuard -- or have any

25   recollection or record of the company ever owing these payees

1    any money whatsoever.

2              So Signature Bank, as you heard the testimony,

3    processes a chargeback because Michael Haas, on behalf of Coney

4    Realty, submits an under-oath affidavit to them basically

5    saying, among other things, We don't even know who GateGuard

6    is, even though Eli Gabay testified under oath in no uncertain

7    terms not only that they knew who GateGuard was -- remember,

8    Eli Gabay was so into the cutting-edge technology that

9    GateGuard has, he told you from the witness stand he actually

10   at one point wanted to invest in GateGuard.

11             They clearly knew who GateGuard was.

12             The government says there's no invoices.  Members of

13   the jury, let's think about this for a second.  First of all,

14   when you get to late March of 2019 and mid-to-late April of

15   2019, Mr. Teman clearly had from his lawyer direct

16   communications from his lawyer, Ariel Reinitz, to Joseph

17   Soleimani and Eli Gabay, ABJ and Coney, written attempts that

18   you have in evidence trying to collect the money that was owed.

19             This was not a surprise.  This was not hidden.  But

20   you do have prior invoices that reference in no uncertain terms

21   any customer on the bottom, it's not fine print, it's one of

22   the very few lines of text on those invoices, a reference to go

23   to a publicly available website.

24             Now, members of the jury, this isn't some abstract,

25   esoteric, publicly available website.  Eli Gabay testified that

K1RVTEM5                    Summations - Mr. Gelfand

1    that website is where he downloaded the terms of conditions

2    that he marked up approximately two and-a-half days -- in other

3    words, he marked it up and then sent the markup approximately

4    two and-a-half days after the first invoice from GateGuard was

5    issued.

6             Bonnie Soon-Osberger, you have emails in evidence,

7    they are asking Mr. Teman questions, all of which he answered,

8    about the terms of conditions.  Look at Eli Gabay's markup, by

9    the way.  He adds the word "reasonably," literally one sentence

10   after the payment terms URL.  To suggest that this was somehow

11   not something that any of these people had the opportunity to

12   at least click on, much less they have clicked on, it's pretty

13   obvious.

14            And then you have ABJ again asking for release.

15            The sideshow about the fees being disproportionate,

16   first of all, that's not evidence of any sort of intent.  But

17   even if you assume for the sake of argument it is, the fees are

18   not at all disproportionate; the fees are reflected in the

19   pricing terms, but they are not actually disproportionate when

20   you understand the business model that you heard testimony

21   about.

22            This was cutting-edge technology.  All of these

23   customers -- not to mention the hundreds of others -- wanted

24   it.  They paid very little up front.  It's the old school cell

25   phone model.  You pay a little up front, but you're

1    contractually bound to basically spread the overall cost over

2    time.  Every single one of those witnesses that came into

3    court, the customers, told you from that witness stand that

4    they benefited from and accessed the logs that GateGuard

5    stored, the data, essentially the tech interface.  This is not

6    just an intercom where you push a button; it's an organizable,

7    technological interface.

8         Mr. Soleimani, for whatever reason he would do this,

9    told you -- by the way, it works.  You can see Mr. Soleimani on

10   Defendant's Exhibit 70.  But, in any event, he told you that he

11   actually used the logs to evict tenants that, I guess, he

12   believed, were violating the law or whatever, were subject to

13   eviction.

14        The point is they used all of this.  That's not -- use

15   your common sense.  That's not paid 3600 bucks once and then

16   forever you have access to unlimited photo/video storage, etc.,

17   organizable on the GateGuard website.

18        The government says, number five, that Mr. Teman knew

19   how to lawfully recover money.  Members of the jury, Ariel

20   Reinitz, GateGuard's lawyer, Mr. Teman's lawyer, testified

21   under oath that he told Mr. Teman before March 28th of 2019

22   that this was a lawful way to recover money.  And members of

23   the jury, the government wants you to ignore that testimony.

24        They say, Look at the checks themselves.  That's

25   number six.  Please look at the checks themselves.  They are

1    the best evidence of a lack of intent.  It's Mr. Teman saying

2    to the bank, in obvious words, This is not some counterfeit

3    nonsense check that I hope just slides through.  This is an

4    RCC, draw per contract, no signature required.  Bank of America

5    never looked at the URL to this day?  Nobody decided to pick up

6    the phone to call GateGuard with questions?  Those are not the

7    kinds of things you put on a check that you hope just slides

8    under the radar because you're pulling a fast one.  Those are

9    the kinds of things you're essentially screaming and writing to

10   the bank saying, I'm giving you RCCs; they are authorized per

11   contract.  Here's the contract, by the way.  Please look at it.

12   And if you have any questions, call me.  That's not the sign of

13   someone acting with criminal intent.

14        The timing.  They talk about this two-day holiday.

15   Members of the jury, Defendant's Exhibit 16, a seven-day hold

16   that the bank gave Mr. Teman on the 19th, the day that they

17   were deposited.

18        And then this last sideshow about moving money around.

19   Members of the jury, this makes no sense.  Think about this for

20   a second.  We took time with the Bank of America witness to

21   show you that each of the accounts, the Friend or Fraud

22   Incorporated account Mr. Reinitz told you is the parent company

23   of GateGuard; Touchless Labs LLC, we walked through the bank

24   records.  Bank of America knew, there's no hiding it, all of

25   these companies were clearly, since 2016 in Bank of America's

1    records that you have in evidence, controlled by Ari Teman.  So

2    there's no moving money around to other bank accounts or

3    getting large amounts of cash and putting them in some storage

4    unit or something.  The money stayed at Bank of America in

5    accounts expressly associated with Ari Teman.

6          Now members of the jury, I want to talk about what I

7    submit to you is the most important testimony that you heard at

8    this trial, testimony from Ariel Reinitz, the attorney.

9          Now, I anticipate when Judge Engelmayer instructs you

10   in a few minutes, he's going to tell you that advice of counsel

11   is a complete defense to all four charges in this case -- both

12   wire fraud counts and both bank fraud counts -- as long as

13   Mr. Teman in good faith sought the advice of his attorney, the

14   attorney was provided all of the relevant material information,

15   and then he followed the advice.

16         The logic is simple:  In this country, we're not all

17   experts on everything.  Mr. Teman is a tech entrepreneur that

18   had really cool cutting-edge technology, and might have been

19   very good at that.  But from early on, this wasn't some one-off

20   lawyer he once talked to in March.  Early on he went to his

21   longtime lawyer at a law firm with a New York presence, with

22   approximately 250 attorneys, and he sought legal advice.

23         Now, members of the jury, understand one thing:  What

24   the government is really asking you to do, because you have to,

25   for the government, to obtain a conviction on any of these

1   counts, is to find that Mr. Reinitz, when he testified under

2   oath in no uncertain terms that he gave Mr. Teman the advice

3   before March 28th of 2019 that depositing these RCCs was legal,

4   they are asking you to find that he is lying; that this New

5   York attorney didn't actually say that.

6          Members of the jury, one of your jobs as jurors is to

7   consider the credibility of all witnesses.  When you come to

8   jury service, there's a lot of things you have to kind of leave

9   behind, if you will; but your common sense, your life

10  experience, isn't one of them.

11         So I want you to ask yourself a simple question when

12  you're evaluating Mr. Reinitz's testimony:  What's his motive

13  to come into court and lie and say that he told Mr. Teman,

14  prior to March 28th of 2019, that this was legal?  What's the

15  motive of this partner at a New York law firm, a licensed

16  professional who practices in this very courtroom?  For what?

17  $15,000 of legal fees?  Really?

18         Members of the jury, as Mr. Reinitz explained this

19  morning, when you look at those WhatsApp chat snippets, it's

20  like any text message conversation that doesn't tell the

21  totality of the communications.  Mr. Reinitz told you that the

22  real important communications -- as you can imagine would

23  happen anyway -- happened by phone, not a little one word here

24  and there.  And that a large chunk of these snippets that you

25  were shown in evidence by the government involved conversations

K1RVTEM5                    Summations - Mr. Gelfand

1   about debit deposits or debit withdrawals that, by the way, you

2   want to talk about Mr. Teman following his lawyer's advice?

3   Mr. Reinitz told you on that issue, he said, No, these are

4   complicated banking regs.  Don't do it.  You know Mr. Teman

5   never did that?

6          Mr. Reinitz also told Mr. Teman in no uncertain terms,

7   as he told you this from that witness stand, that he always

8   told Mr. Teman that this was legal and that he believed that he

9   had all of the relevant information.  By the way, not only from

10  Mr. Teman, including from Mr. Teman, but also from being

11  GateGuard's lawyer for as long as he was, and having direct

12  access to some of the important documents, not to mention being

13  a player.

14         So, members of the jury, the sideshow about do you

15  have an inked contract, a signed contract, try that with

16  iTunes, try that with NetFlix.  Members of the jury, this is a

17  digital company that you heard testimony the way you sign up --

18  you heard this not only from Eli Gabay, from Bonnie

19  Soon-Osberger, you heard this from Ariel Reinitz.  The way you

20  sign up is you go online, you plug in information, and you

21  acknowledge the terms and conditions.

22         So, members of the jury, I want to talk for a few

23  minutes about kind of the three customers, if you will.  I want

24  to start with the first one you heard testimony from, Eli

25  Gabay.

1    Two and-a-half days after the invoice that you have in
2    evidence is dated -- they presumably received it sometime soon
3    thereafter -- he emails Mr. Teman a marked-up contract, a
4    redlined contract, in other words, proposed edits.  And what he
5    says is that he wants parts of that contract to be modified.
6    One of those parts, as we talked about a few minutes ago.  Was
7    in Section 5, the pricing terms.  And he says in no uncertain
8    terms that he wants the word "reasonably" added literally the
9    line below the hyperlink, the big blue hyperlink.
10    Now, members of the jury, he told you that a billing
11    dispute arose in March of 2019 with GateGuard, with Mr. Teman.
12    And he told you that within a day or two of that billing
13    dispute arising, Mr. Teman did what he does:  He turned it over
14    to his lawyer, Ariel Reinitz.  You have an email from Ariel
15    Reinitz directly to Mr. Gabay about that billing dispute
16    referencing Mr. Gabay's or Coney's contractual obligations, the
17    agreement.
18    Mr. Reinitz actively tries to collect the debt from
19    Coney, the debt that's the subject of the RCCs.  Mr. Teman is
20    obviously aware of this.
21    Then, when the RCCs are ultimately drawn, his business
22    partner, the other principal, Michael Haas, submits a false
23    under-oath affidavit to Signature Bank saying they don't even
24    know who GateGuard is, even though Mr. Gabay testified that at
25    one point he thought GateGuard's cutting-edge technology was so

1    cool, he wanted to invest in it, well before they told their

2    bank in connection with the RCCs at issue in this case that

3    they didn't even know who GateGuard was.

4           Now, members of the jury, the next two witnesses, but

5    the customer that you heard from was Mercer.  Bonnie

6    Soon-Osberger told you something very important.  She not only

7    saw the terms and conditions before they voted on their

8    five-member board to essentially become a GateGuard customer,

9    to agree to the terms and conditions, she told you that she saw

10   them on GateGuard's website.  She provided it to the members of

11   her five-member board.

12          But then Gina Hom from Crystal Management, whatever

13   it's called, comes in.  And Gina Hom says that when she's asked

14   by the bank, Did you authorize these RCCs or this one RCC, Gina

15   Hom says, I didn't even know that there was a contract, even

16   though there's a clear disconnect.  I'm not saying it's

17   malicious, but there's a clear disconnect between the board

18   which votes -- they needed at least three votes, as you heard

19   the testimony -- on the terms and conditions, and then she

20   actually asks Mr. Teman questions, all of which Mr. Teman

21   addresses in writing to her satisfaction.

22          So then we've got Joseph Soleimani.  He testified that

23   he used the system.  There were glitches with it, but it

24   obviously worked.  You have Defendant's Exhibit 70 in evidence;

25   it's a close-up of Mr. Soleimani and his -- behind him someone,

1   I believe he said it was a staff member or something, one of

2   his colleagues.  You have the second page of this, which is the

3   logs that clearly are from one of the ABJ apartments, the Lenox

4   Avenue one or one of the Lenox Avenue ones, that's the subject

5   of this.

6           And what Mr. Soleimani said, and it was very

7   important, I asked him point-blank what we call a nonleading

8   question:  When you signed up for GateGuard, is it your

9   testimony that you don't remember whether you signed up online

10  or are you denying that you signed up online?  And remember

11  what he said.  He thought about it for a second.  And he said

12  that he didn't recall signing up online.

13          Members of the jury, the invoices that ABJ were sent

14  predate the checks that ABJ sent in to pay those initial

15  GateGuard fees clearly on the invoices indicating an agreement

16  and the URL.  And about a year later, when you actually look at

17  the chronology of this and reconstruct the timeline, as we've

18  tried to do here, you have Joseph Soleimani essentially wanting

19  the next generation and, as we talked about, a release from

20  GateGuard.  And he's asking this not even to Mr. Teman

21  directly, but to Mr. Teman's lawyer, based on Mr. Teman's

22  lawyer's representations that there are contracts, terms and

23  conditions, and payment terms that were hyperlinked in that

24  email.

25          Now, members of the jury, you heard from Bank of

1    America that, at the end of the day, they saw these for what

2    they were:  RCCs.  They saw them immediately as RCCs.  And they

3    processed them in real time as RCCs, as you can see in

4    defendant's Exhibit 52.

5          So members of the jury, what we're asking you, when

6    you go back into that jury room, I'm asking you to engage with

7    the evidence, to really think about what these witnesses told

8    you and what the documents show you, all of them.  Because we

9    submit that when you look at this from a 360-degree angle,

10   you'll see a couple of clear facts:

11         Number one, this was not a split-second decision by

12   Ari Teman.  There were months of deliberations and

13   communications between him and his attorney that he clearly

14   believed, based on the evidence that you have, outside of any

15   communications with his attorney, that the contracts authorized

16   GateGuard to draw RCCs and these fee amounts on the account.

17         But number two, that he didn't just go to a bank and

18   do this.  He took the extra step and made sure to contact and

19   consult his longtime lawyer at a reputable law firm to make

20   sure that what he was doing was legal.

21         And number three, that Mr. Teman, when he did it, did

22   so in broad daylight, clearly conveying to Bank of America and

23   to anyone else that would ever look at these documents that

24   what he was representing to the bank is that these were RCCs

25   based on contracts that are available publicly to anyone who

1    wants to click on a single website; and that if you have any
2    questions, call GateGuard.
3              Now, members of the jury, when you go back into the
4    deliberation room, I encourage you to start with asking
5    yourself one question, and that is, was Mr. Reinitz telling the
6    truth when he testified from that witness stand that he gave
7    Mr. Teman the advice that he told you he gave him?  Because I
8    submit to you that when you apply the legal instruction on
9    advice of counsel that you'll have in writing that Judge
10   Engelmayer is going to give to you, that unless you unanimously
11   agree somehow that Mr. Reinitz was lying to you when he said
12   that, that's the end of the case.  Because you can't possibly
13   be guilty of any of these crimes unless you believe that he
14   lied to you.
15             Now, members of the jury, this trial, over the last
16   five days or so, has reminded me a little bit of a short story
17   about a young lawyer in Springfield, Illinois.
18             The lawyer goes to his friend and says, How many legs
19   does a pig have?
20             The friend says, Four.
21             The lawyer says, What if I were to tell you a tail is
22   a leg?
23             The friend says, Well, then I guess it would be five
24   legs.
25             And that young lawyer, Abraham Lincoln, tells his

1  friend, No.  Just because I tell you that a tail is a leg, that

2  doesn't mean a tail is a leg.

3      Members of the jury, no matter how many times the

4  government wants to tell us that this was fraud, this was

5  fraud, this was fraud, the bottom line is the actual facts, the

6  evidence, clearly bears otherwise.

7      Members of the jury, I want to leave you with

8  something that's very important to me, and that's that when

9  Judge Engelmayer instructs you on the law, he's going to tell

10  you something that's important.  He's going to tell you that

11  all -- obviously on the defense we have no burden of proof.

12  What that means is that all of the evidence in this case has to

13  come from the prosecution.  They have to dispel every

14  reasonable doubt that still remains in your mind for you to

15  find Mr. Teman guilty of anything.  Not one of them, not two

16  reasonable doubts, not 17 of them, but the raft of reasonable

17  doubts that continue to remain at the end of this trial have to

18  somehow disappear in each of your minds unanimously.

19      Members of the jury, each of you, when you go back and

20  deliberate, each of you has the power and the duty and the

21  responsibility to have the courage to say no and to end this

22  nightmare for Mr. Teman.  We can't choose in this country

23  whether we're charged with a crime, but we have juries like you

24  to protect us from unjust allegations.

25      Members of the jury, I'm not going to get a chance to

1   address you again.  That's completely normal.  The prosecution

2   gets the first word and the last word.  But I want you to

3   engage with what you hear from the prosecutor.  Because you

4   know we have something to say about it.  And I want you to

5   think about what we would say.  I don't want you to just take

6   it at face value, because we're not going to have a chance to

7   address it directly.

8          Members of the jury, you've paid incredibly great

9   attention throughout the last week.  You've taken notes, you've

10  watched the witnesses.  There's nobody who appreciates that

11  more than Mr. Teman.  When you go back to that jury room, I'm

12  going to ask that you do the one thing and the only thing that

13  the evidence warrants, and that is to find Mr. Teman not guilty

14  of each and every one of these counts.  Because when you

15  consider the advice of counsel, when you consider Mr. Teman's

16  intent, I submit to you, members of the jury, that all four of

17  these counts on those issues, at least, rise and fall together.

18         Thank you very much for your time.  Thank you for your

19  consideration.  Mr. Teman greatly appreciates it.

20         Thank you, your Honor.

21         THE COURT:  Thank you, Mr. Gelfand.

22         Ladies and gentlemen, Mr. Smallman tells me that your

23  afternoon coffee and snack has arrived.  I'll see you in 15

24  minutes.  As always, please don't discuss the case.

25         (Jury not present)

1              THE COURT:  All right, counsel.

2              Anyone have anything to raise before we take a recess?

3              MR. BHATIA:  No, your Honor.

4              MR. GELFAND:  No, your Honor.

5              THE COURT:  For your planning purposes, given the

6      hour, I'm not going to charge them today; it does not make any

7      sense to start after 4 o'clock reading them a long charge, when

8      I would like them fresh when they absorb it.

9              So I will excuse them, I expect, at the end of the

10     rebuttal summation, I'll take care of a little bit of

11     housekeeping with you, and then I'll excuse you.

12             Thank you.

13             (Recess)

14             THE COURT:  Okay.  Let's get the jury.

15             Counsel, insofar as I will be excusing the jury for

16     the day after the last summation, I'll give you an opportunity

17     just by show of hands if you have anything to raise with me at

18     the sidebar.  Limit that to things that need to be taken up

19     before I excuse the jury.  There will be plenty of time

20     together afterwards.

21             (Jury present)

22             THE COURT:  All right.  Welcome back, everyone.

23             Please be seated.

24             I hope you all had a good break.

25             We'll hear now the government's rebuttal.

1        Mr. Bhatia.

2        MR. BHATIA:  Ladies and gentlemen, you now know the

3    defendant created 29 checks from scratch.  He took the number

4    right off of the check that his customers had given him and put

5    it on his own check.  And then he created them, 29 checks in

6    total, worth more than $300,000.  The defense is that his

7    lawyer had blessed this; his lawyer had blessed this like a

8    fairy godmother might say, You have criminal intent, but now

9    it's A-OK.

10        That's not what happened.

11        Ladies and gentlemen, a lawyer can't turn the

12    defendant's criminal intent on its head.  You know through the

13    eight things that I mentioned the defendant had fraudulent

14    intent.  He moved the money around, he never told his

15    customers, he made the checks look like his customers had

16    approved them, he put his own photo on the checks.  None of

17    that -- absolutely none of that -- is negated by what you heard

18    from Mr. Reinitz.

19        Let's get into it.

20        So the defendant talked a lot about -- excuse me,

21    defense spoke about the advice of counsel defense.

22        As Judge Engelmayer, I suspect, will instruct you,

23    there are essentially three elements to the advice of counsel

24    defense.

25        First, that the defendant, in good faith and honestly,

1    sought the advice of an attorney; second, that he fully and

2    honestly laid out the material facts; and then finally, he

3    followed that advice.

4         All three of those are missing here.

5         Here, the defendant didn't seek the advice of counsel

6    before he acted.  You saw in the chats -- they are in the 700

7    series -- that he sought the advice of his lawyer way after the

8    fact.  In fact, when he sought his advice, his lawyer's advice

9    in January of 2019, his lawyer said, Don't do it.  Bad idea.

10   Then he went back, after he got the chargebacks, and his lawyer

11   said the same thing:  Bad idea.  His lawyer said, If I was

12   advising your customer, I would tell them to call the police.

13        You saw the chats and so you know what happened.  The

14   chats are the only thing from Mr. Reinitz that you know to be

15   true.  And I submit that the advice of counsel defense fails on

16   its face, whether you believe Mr. Reinitz or not.

17        But I do think when you go back to the jury room

18   you'll be tasked with the responsibility to evaluate all the

19   witnesses, to evaluate what they had to gain, what they had to

20   lose from testifying, what their motives might be, how they

21   presented, how they testified on the stand, like your

22   subjective view of how they did.

23        Mr. Reinitz was, by far, the least credible witness

24   that you heard from during this trial.  I submit that

25   Mr. Reinitz is actually the only witness in this entire trial

1    who had any motive to lie, any motive to lie at all.

2           First, you know that Mr. Reinitz is billing GateGuard.

3    You know that Mr. Reinitz is GateGuard's attorney.  He's paid

4    by them, he invoices them, he represents them in other matters,

5    he wants to keep getting paid.

6           You also know that in this very case, he got paid from

7    the defendant's fraud scheme.  I showed you those exhibits, and

8    you can take a look at them.  They are the invoices, they are

9    the bank statements in the 100 series.  And there's also the

10   big spreadsheet in Government Exhibit 113.  And it shows you

11   the defendant moved money from one account to another to

12   another, and then paid Mr. Reinitz $16,000 from the money that

13   he stole from his customers and the money that Bank of America

14   had to front to him.

15          Mr. Reinitz is the only one in this whole case who had

16   anything on the line, and he lied to you.  He lied to you once,

17   and he lied to you again, and he lied to you again.

18          Ladies and gentlemen, I think this advice of counsel

19   defense fails; and I submit to you that it fails on the

20   elements.  But I also believe you should have a very difficult

21   time trusting Mr. Reinitz and believing his testimony and

22   ultimately crediting it.

23          Mr. Reinitz is also essentially a member of the

24   defense Teman.  You heard that last year he was emailing

25   helpful cases to the defense.  You heard that as recently as

1   the week before the trial he was giving them ideas and tips.

2   He's GateGuard's lawyer.  It's not incredible.  Of course he's

3   their lawyer; of course he wants them to win.  And because of

4   that, the testimony that he gave you should not be credited.

5          Now, I'll tell you about some specific lies that

6   Mr. Reinitz made.

7          First is that on Friday, he testified that he didn't

8   know about the March 2019 checks.  Those are the two checks,

9   the one from Mercer and one from the Coney account.  He

10  testified on Friday that he didn't know about those checks

11  until Mr. Teman messaged him on WhatsApp.  And you saw those

12  messages; we've gone through them now a couple of times.  Those

13  messages, he says, I'm not sure I follow, but it doesn't sound

14  good.  He says, I don't know the ins and outs, but it sounds

15  like a bad idea.  Those were his messages when he first heard

16  about the scheme.  Those were his messages when he first heard

17  that Mr. Teman deposited those checks and when he first heard

18  that there were chargebacks.

19         But sometime over the weekend -- I don't know how it

20  was or why it was -- Mr. Reinitz decided that that wasn't

21  helpful testimony for Mr. Teman.  You heard Mr. Reinitz today,

22  this morning, on that stand right there, tell you that he had

23  heard about the checks beforehand; that Mr. Teman had talked to

24  him about the checks and about drawing accounts from Coney and

25  18 Mercer beforehand.

1            Ladies and gentlemen, you've seen the chats.  You've

2   actually seen with your own eyes how Mr. Reinitz responded when

3   he first heard about the checks.  He said, I don't know the ins

4   and outs.  He said, I don't follow, but it doesn't sound good.

5   That was his response.  We've seen that.  His testimony on

6   Friday was sort of consistent with that.  And then today he had

7   an about-face.  Today he decided he needed to tell you

8   something else.

9            You've also seen another lie from Mr. Reinitz.  He

10  testified on Friday that he consulted with Mr. Teman about

11  payment terms and about ACH deposits as long ago as mid 2018.

12  That was around the time he was hired.  He said, We spoke about

13  that and we spoke about it on several occasions since then.

14  That's what he told you.

15           Today though, I asked about the invoices.  I asked

16  him, Did you bill for that time?  When did you first bill him

17  for anything having to do with ACH?

18           And what did he tell you?  May of 2019, a year later,

19  once Mr. Teman had started getting chargebacks.

20           And then Mr. Gelfand asked him, Well, when did that

21  work happen?  You billed in May '19, when did you actually bill

22  for it?

23           He said, April 2019.  That was the time when all those

24  text messages or those website messages where Mr. Teman is

25  telling him I had these chargebacks, and Mr. Reinitz tells him,

1    Stop.  Bad idea.

2            So he did the work then and he billed for it after

3    Mr. Teman had already deposited the checks.  That's not what he

4    told you on Friday.

5            So I submit that you should have a very difficult time

6    crediting Mr. Reinitz's testimony in the face of the

7    overwhelming evidence that Mr. Teman knew what he was doing was

8    fraudulent.  And the only person -- the only thing you've heard

9    that contradicts that is Mr. Reinitz's uncorroborated

10   testimony.  It's totally uncorroborated.

11           He said in the chats, Bad idea.  I don't know much

12   about this.  I don't know the ins and outs.

13           His testimony about any proof, about any messages,

14   about any emails, about any recordings, is that, On the phone I

15   told him it was perfectly lawful.  That's what he told you.

16           The chats say, Bad idea.  Don't do it.  I don't know

17   the ins and outs.  On the stand he told you, On the phone

18   though I told him it was okay.  Don't worry about it.

19           Ladies and gentlemen of the jury, I think you should

20   have a very difficult time crediting that testimony.

21           Ultimately, he still fails -- Mr. Teman still fails to

22   meet the elements of the good-faith defense.

23           First, that in good faith he sought the testimony of a

24   lawyer.  You've seen in the chats he sought the advice of a

25   lawyer after he already deposited the checks.

1        You've also seen that he didn't fully and honestly lay
2   out the facts.  You've seen the chats.  Over and over he tells
3   Mr. Reinitz, We have a contract.  We have a contract.  They
4   agreed to the contract.
5        There's no contract.  There's not one contract in this
6   case.  And certainly there's not a contract if you were to ask
7   the customers.  So Mr. Teman's representations to his own
8   lawyer did not fully and honestly lay out the facts and,
9   therefore, it fails the second element of the advice of counsel
10  defense.
11       And finally, that Mr. Teman in good faith followed
12  that advice.  You've seen the chats that his lawyer told him,
13  Don't do it.  I would call the -- I would tell someone to call
14  the police.  They are going to call the police.  A greater than
15  50 percent chance you'll be arrested.  That's what his attorney
16  told him to do.  And, of course, he went ahead and deposited
17  the checks.
18       Ladies and gentlemen of the jury, I submit that all
19  three elements of the good-faith defense are not met here.
20       Now, ultimately what this case comes down to, as
21  defense counsel acknowledged, is criminal intent.  The proof of
22  criminal intent here is overwhelming.  The defendant showed it
23  once, he showed it twice, he showed it again.
24       And I submit that perhaps the most obvious proof here
25  of criminal intent is that there's a $260,000 hole right now at

1    Bank of America.  There's $260,000 -- more than a quarter

2    million dollars -- missing.  Someone else had to pay for that.

3    Bank of America had to pay for that.

4            The defense wants you to believe that Mr. Teman did

5    not have fraudulent intent when he set that course of action in

6    motion.  They want you to believe that somehow, in a perfectly

7    lawful, perfectly reasonable, perfectly blessed course of

8    action, Mr. Teman ripped the bank account numbers off of his

9    customers' checks, put them on his own checks, wrote on those

10   checks that his customers were okay with it, that there was a

11   contract, that his customers thought there was no signature

12   required.  Then he deposited those checks, he deposited two of

13   them.  Both of them got returned because the customer

14   disagreed.  Then he tried 27 more, including some on the same

15   customer, and those got returned.  And Mr. Teman and the

16   defense wants you to believe that there was no criminal intent.

17           Ladies and gentlemen, we walked through a couple

18   reasons.  I think all eight of those reasons apply.  But it's

19   quite simple:  There's $260,000 missing from $300,000 that

20   customers say they never approved.  That's criminal intent.

21           The defendant stole from his own customers and left

22   Bank of America holding the bag.  He did it out of greed and he

23   did it to steal every last dollar.  And he thought he could get

24   away with it because of some fine print listed on a website.

25           The defendant wanted his lawyers one day in a criminal

1    proceeding to be able to say there is a contract.  He wanted

2    his lawyers to get up in court, maybe in federal court,

3    Mr. Reinitz told you it might be a federal crime, and tell a

4    jury this was blessed because of a contract.  This was in the

5    payment terms, the payment terms that none of these customers

6    had ever heard of or seen.  He wanted his lawyer to be able to

7    get up here and tell you that it was all blessed because of a

8    contract.  It wasn't.

9              Ladies and gentlemen of the jury, it was the

10   defendant's fraud scheme.  The evidence of the defendant's

11   guilt is overwhelming and it's compelling.  Hold Ari Teman

12   accountable.  Find him guilty.

13             THE COURT:  All right.  Thank you, Mr. Bhatia.

14             All right.  Ladies and gentlemen, in a few moments

15   we're going to break for the day, and let me explain why.

16             The next step in the case will involve my giving you

17   detailed instructions on the legal principles, as well as the

18   procedures that will govern your deliberations.  This will take

19   a little bit of time.  And I want to make sure that you're

20   fresh to hear what I have to say; and that you begin your

21   deliberations promptly upon the completion of what I have to

22   say.

23             It's now closing in on 4 o'clock, and it has been a

24   long day, and it's been a day when I can tell that you've all

25   been actively listening to the series of jury addresses you

1    heard, and beforehand you heard testimony.  I think the

2    interests of justice and sanity favor giving you an early

3    adjournment today so that you can come in fresh tomorrow.

4            So we're about to adjourn.  The usual instruction

5    applies.  Please do not discuss the case.  Do not research the

6    case.

7            Let me tell you a little bit about the schedule

8    tomorrow.  The same schedule applies in the sense that we'll

9    have breakfast available for you at 8:45, and I'll need you to

10   be ready to come out promptly at 9:30.

11           At that point I will give you instructions as to the

12   law and, as I said, that will take a little bit of time.

13           At the end of my giving you the instructions, I will

14   give you as well through Mr. Smallman a care package.  It will

15   include a full courtesy copy for each of you of the

16   instructions that I've just read, it will include a list of

17   exhibits, it will include a list in order of the witnesses who

18   testified, it will include a verdict form that will help you in

19   guiding your deliberations.  You'll each have a full set of

20   that.  And then I'll send you into the jury room to deliberate.

21           Unlike the usual day though when we sit in court,

22   lunch is on us.  I want to make sure that if you're

23   deliberating, you're able to power through lunch and take a

24   break in the room as you wish, but I want you to be able to

25   work through lunch to the extent you want.

1    So when you come in tomorrow morning, Mr. Smallman

2    will have a menu to fill out, and please fill it out.  So that

3    as soon as I begin to give you instructions, he can go deliver

4    your takeout menus.

5    You're not obliged to still be deliberating at

6    lunchtime, but the lunch will be there for you if you are

7    deliberating at that point in the day.

8    We'll continue on.  There will be a -- mid afternoon

9    there will be, as you continue to deliberate, the usual

10   afternoon food.  And if you're still deliberating at the end of

11   the day, you'll adjourn at 5 o'clock to resume on what would

12   then be Wednesday.

13   So that's the schedule for tomorrow.  I hope that is

14   clear.

15   Have a good evening.  I'll see you here promptly at

16   9:30 tomorrow.  Thank you.

17   Sorry.  Let me just see a show of hands.

18   Counsel, anything to raise before -- that we need the

19   jury for?

20   Very good.  You're excused.  See you tomorrow.

21   (Jury not present)

22   THE COURT:  All right.  Be seated.

23   Counsel, I have very little to take up with you.

24   First of all, let me just confirm with the defense

25   that you are fine with the various documents that the

```
 1   government prepared:  The redaction of the indictment, the
 2   witness list, and the exhibit list.
 3            MR. GELFAND:  Yes, your Honor.
 4            THE COURT:  All right.
 5            With respect to the charges, the only change I intend
 6   to make is a typographical error.  I think I referred to the
 7   address as West 205th; it's, in fact, as I was reminded by
 8   Mr. Bhatia's summation, West 204th.
 9            Is there anything else, with the benefit now of
10   reflection and having heard closing arguments, that anyone
11   thinks needs to be changed in the instructions?
12            MR. BHATIA:  Not from the government, your Honor.
13            If we identify anything overnight, we'll let you know
14   promptly.
15            THE COURT:  All right.  We're about to hit the print
16   button upstairs; so overnight, you're not going to be getting a
17   very responsive chambers.  So if you're going to focus on that
18   at all, please do so immediately.
19            MR. BHATIA:  We don't intend to.  No edits from us.
20            MR. GELFAND:  Not for the defense, your Honor.
21            THE COURT:  All right.
22            And government, you are prepared -- I'm looking at
23   Mr. Magliocco.  To the extent that the jury wants copies of
24   exhibits, you'll have at the ready or promptly preferable,
25   three copies of any hard copy exhibit?
```

K1RVTEM5

1              MR. MAGLIOCCO:  Yes, your Honor.

2              THE COURT:  Very good.

3              And you've got the wherewithal to prepare redacted

4    versions of the transcript.  And each of you should have the

5    transcript from each day of court so far; correct?

6              MR. MAGLIOCCO:  Yes, your Honor.

7              THE COURT:  All right.  I think that's all I've got.

8              All right.  We stand adjourned.  Thank you.

9              See you at -- be here at 9 tomorrow in case something

10   does come up.  Okay?

11             (Adjourned to January 28, 2020, at 9 o'clock a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   ARIEL REINITZ

 4   Cross By Mr. Bhatia . . . . . . . . . . . . 893

 5   Redirect By Mr. Gelfand  . . . . . . . . . . 919

 6   Recross By Mr. Bhatia  . . . . . . . . . . . 936

 7                    GOVERNMENT EXHIBITS

 8   Exhibit No.                             Received

 9    727    . . . . . . . . . . . . . . . . . . 901

10    728    . . . . . . . . . . . . . . . . . . 905

11    729    . . . . . . . . . . . . . . . . . . 909

12                    DEFENDANT EXHIBITS

13   Exhibit No.                             Received

14    71   . . . . . . . . . . . . . . . . . . 928

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300