K1T7TENF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          19 CR 696 (PAE)

ARI TEMAN,

                Defendant.              JURY TRIAL

------------------------------x

                                        New York, N.Y.
                                        January 29, 2020
                                        9:40 a.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                        District Judge

                        APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
KEDAR S. BHATIA
EDWARD A. IMPERATORE
     Assistant United States Attorneys

JOSEPH A. DIRUZZO, III
JUSTIN GELFAND
     Attorneys for Defendant

ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
               WILLIAM MAGLIOCCO, Paralegal, USAO

K1T7TEN1

1            (Trial resumed; jury not present)

2            (Time noted 9:42 a.m.; jury not present)

3            THE COURT:  Good morning, everyone.  Mr. Smallman

4    tells me the jury is here, and so I will bring them out into

5    the courtroom.  I had an off-the-record conversation with

6    counsel earlier when I appeared.  Nobody had anything to raise,

7    save that counsel noted a change in the handwriting on some of

8    the more recent jury notes, and I will, at counsel's good

9    suggestion, remind them to have the foreperson initial each

10   note.

11           Does anyone have anything to raise before the jury

12   comes in?

13           MR. GELFAND:  No, your Honor.

14           MR. BHATIA:  No, your Honor.

15           (Time noted 9:44 a.m.; jury present).

16           THE COURT:  Good morning, ladies and gentlemen.

17   Please be seated.  All right.  I will note for the record that

18   all 12 members of our jury are here.  I hope everyone had a

19   good evening and a good morning.  You may now, with everyone

20   here, resume your deliberations.

21           One matter purely of housekeeping.  I would ask just

22   for future notes from the jury that each of them be initialed

23   by your foreperson.

24           OK.  Very good.  With that, you may resume your

25   deliberations.  I will see you at a later point.  Thank you.

1    (Jury resumes their deliberations at 9:46 a.m.)

2    THE COURT:  All right, counsel, be seated.  As I

3  mentioned yesterday, I have a multi-defendant conference this

4  morning in one of the downstairs courtrooms.  Mr. Smallman will

5  be assisting me with that conference.  My law clerk will be

6  here in Mr. Smallman's sted.  In the event we get a note, the

7  CSO will notify my law clerk, we will share the note with you,

8  and I will respond as soon as I can.

9    Steve our court reporter, who is assisting with this

10  trial, will also be covering that conference, so we will be

11  traveling as a pack back and forth as needed.  I will need one

12  person again from each team to stay close.  My conference

13  begins at 10:30.  I don't know whether or not we will be called

14  upon by our jury to do anything between now and then.  See you

15  soon.

16    (Time noted 10:33; jury not present).

17    THE COURT:  All right.  Be seated.  Ladies and

18  gentlemen, I have gotten a note which we're going to mark as

19  jury note 8.  It reads "Good morning.  We the jury have reached

20  a verdict," and it's signed by the foreperson number 2.

21    So, in a moment I will bring out the jury, and my

22  practice is that I have Mr. Smallman take the verdict form from

23  the foreperson; I review it just to make sure it is in form, in

24  good order; and then I read aloud the verdict and ask the

25  foreperson to confirm that that is in fact the jury's verdict.

K1T7TEN1

1    Upon the request of any party, then I poll the jury to make

2    sure that is in fact each member's verdict.  Is there a request

3    for me to poll the jury?

4              MR. DIRUZZO:  Yes, your Honor.

5              THE COURT:  All right, then we will do that.

6              Obviously I am in no position to know what the verdict

7    will be, but my practice regardless is to meet with the jury to

8    thank them for their service.  When I do that I also will tell

9    them that they are at liberty to speak with anybody they wish

10   to, but they're not required to speak with anybody, and I tell

11   them as well that they may wish to consider -- if they are

12   speaking about their experience with anybody -- hesitating to

13   share what other people said in the jury room other than

14   themselves.  In other words, it's one thing to talk about your

15   own views, it's another thing to give up what other jurors

16   said.  It's up to them ultimately, but that's the guidance I

17   give them.

18             I don't know whether or not the nature of the verdict

19   will require us to have any further business together but,

20   regardless, I will ask you all to stay.  When I go visit the

21   jury to thank them, I will then come back out and take care of

22   what, if any, business remains.

23             Anything counsel wishes to raise before Mr. Smallman

24   brings in the jury?

25             MR. BHATIA:  No, your Honor.

1          MR. DIRUZZO:  No, your Honor.

2          THE COURT:  All right.  Mr. Smallman, let's bring in

3     the jury.

4          MR. DIRUZZO:  One thing, your Honor.  I assume you

5     would like counsel and the defendant to stand when you

6     pronounce the verdict?

7          THE COURT:  It's not necessary.

8          MR. DIRUZZO:  OK.

9          (Time noted 10:37 a.m.; jury present)

10          THE COURT:  Ladies and gentlemen, be seated.  I have

11     received a note which reads "Good morning.  We the jury have

12     reached a verdict," and it's signed by your foreperson.  May I

13     ask that the foreperson please hand to Mr. Smallman a copy of

14     your signed verdict form.

15          All right.  I have reviewed the verdict form, and it

16     is in good order, and it has been signed by 12 people.  Here is

17     what I'm going to do.  I'm going to read aloud the verdict form

18     and then I will ask the foreperson whether this is in fact the

19     jury's verdict.  And I will expect -- I will read it, and you

20     will let me know whether or not I have read it correctly.

21          After that, Mr. Smallman one by one will ask each

22     member of the jury whether what I've read aloud is in fact the

23     jury's verdict.  So listen as I read aloud the verdict form so

24     that you can answer his question.

25          After that, I will have some closing words of thanks

K1T7TEN1                         Verdict

1   and excuse you, and then I will be pleased to spend a moment

2   with you in the jury room thanking you in person for your

3   service.

4           All right, with that, the jury's verdict is as

5   follows:

6           On Count one, charging bank fraud with respect to the

7   April 2019 checks:  The jury's verdict is guilty.

8           With respect to Count Two, charging bank fraud with

9   respect to the March 2019 checks:  The jury's verdict is

10  guilty.

11          With respect to Count Three, charging wire fraud with

12  respect to the April 2019 checks:  The jury's verdict is

13  guilty.

14          With respect to Count Four, charging wire fraud as to

15  the March 2019 checks:  The jury's verdict is guilty.

16          And following the verdict appear the signatures of 12

17  people.

18          Juror 2, is that in fact the jury's verdict?

19          JUROR:  Yes, it is, your Honor.

20          THE COURT:  Thank you.

21          Mr. Smallman, if you would kindly poll the jury.

22          DEPURTY CLERK:  Juror 1, is that your verdict?

23          JUROR:  Yes.

24          DEPURTY CLERK:  Number two?

25          JUROR:  Yes.

K1T7TEN1                              Verdict

1              DEPURTY CLERK:  Juror 3?

2              JUROR:  Yes.

3              DEPURTY CLERK:  Juror 4?

4              JUROR:  Yes.

5              DEPURTY CLERK:  Juror 5?

6              JUROR:  Yes.

7              DEPURTY CLERK:  Juror 6?

8              JUROR:  Yes.

9              DEPURTY CLERK:  Juror 7?

10             JUROR:  Yes.

11             DEPURTY CLERK:  Juror 8?

12             JUROR:  Yes.

13             DEPURTY CLERK:  Juror 9?

14             JUROR:  Yes.

15             DEPURTY CLERK:  Juror 10?

16             JUROR:  Yes.

17             DEPURTY CLERK:  11?

18             JUROR:  Yes.

19             DEPURTY CLERK:  And Juror 12?

20             JUROR:  Yes.

21             DEPURTY CLERK:  Thank you.

22             THE COURT:  All right.  Ladies and gentlemen, I am

23   about to excuse you, but I just want to take a moment and thank

24   you.  One of the real honors of my job is being able to watch

25   at least in the detached way that I do jurors do their job --

1    at least the public parts of their job.  It was quite apparent

2    to me that from Wednesday through today all of you have been

3    really locked in and very, very focused on the awesome

4    responsibility you have as jurors.  I could tell that just from

5    the level of attention you were paying during the trial, the

6    active note taking, the active listening that was apparent on

7    all of your faces, and the thoughtful detailed notes and the

8    obvious intensity that you brought to your deliberations.

9           We are all blessed and fortunate to have members of

10   the public serving as jurors like you, doing your job as

11   conscientiously and sincerely as you did, and I thank you from

12   the bottom of my heart for your service.

13          In a moment, what I'm going to do is ask you to go

14   into the jury room, collect your things.  I'm going to come in

15   with the members of my staff so I can shake all of your hands

16   and thank you for your service and answer any questions and get

17   any feedback you have about your jury service.

18          So, with that, you have my thanks.  I will see you in

19   the jury room in just a moment.  As I said at the beginning,

20   with this you are now excused from your jury service.  You will

21   get a letter from me in the mail in short order thanking you

22   formally for your service but as a result of this your jury

23   duty is now complete.  Thank you.  I will see you in the jury

24   room in a moment.

25          (Jury dismissed)

K1T7TEN1

1        THE COURT:  All right.  Be seated.  Counsel, I will be

2   out in a few minutes to take care of the various things that

3   one must take care of after a verdict of this nature.  The

4   items I have on my list to cover include the defendant's status

5   between now and the date of sentencing, the date for any

6   post-trial motions, a sentencing date, and then there is the

7   outstanding issue of the grand jury subpoena.

8        There may be other issues we need to take up.  To the

9   extent counsel want to confer on any of those matters, this

10  will be a good time to do that.  When I come out I will take up

11  those and any other issues that counsel wish to raise.

12       (Recess)

13       THE COURT:  We're going to mark the jury's verdict

14  form as juror note 9.  All right.  So, there are a number of

15  issues to take up.  Let's begin with a sentencing date and a

16  motions date.

17       Defense, do you expect to be making post trial

18  motions?

19       MR. DIRUZZO:  Yes, your Honor, we anticipate a 29(c)

20  and a motion for a new trial.  We have asked counsel for the

21  government if they would be amenable for a two-week extension

22  from the normal time, that would be four weeks in total.

23       THE COURT:  Just give me the proposal as to when you

24  would like to submit your motion.  You can expect me to be

25  receptive.

1    MR. DIRUZZO:  Certainly, Judge.  Today is the 29th, so

2    February 26.

3    THE COURT:  For your motion?

4    MR. DIRUZZO:  For our post-trial motions, correct.

5    THE COURT:  Government, when would you want to respond

6    to that?

7    MR. BHATIA:  We would request a month from that date,

8    your Honor.

9    THE COURT:  Four weeks from the 26th?  So that would

10   be March 25, correct?

11   MR. BHATIA:  That's right.

12   THE COURT:  All right.  Defense, I'm happy to set that

13   schedule.  I don't think, knowing the case well as I do, that I

14   will need a reply.  I think after I read the motions, if there

15   is something that I need further help on, I will commission a

16   reply, but I'm not going to build a reply into the schedule and

17   add to the work.  I think I can be able to make an assessment

18   in whatever direction based on the two motions, and if I need a

19   reply, I will commission one.

20   MR. DIRUZZO:  OK, Judge.

21   THE COURT:  So, I'm happy to approve those dates.

22   All right.  With respect to sentencing, I would

23   envision a date approximately four months from now, counsel?

24   Any reason why there is some special problem here that should

25   suggest something shorter?  Defense counsel, I assume you are

K1T7TEN1

1    not seeking an expedited sentencing date which would mean for

2    going the draft PSR?

3                MR. DIRUZZO:  Correct, we are not expediting, so four

4    months would be perfectly fine, your Honor.

5                THE COURT:  The norm in this district is about three

6    and a half months, but given the need to resolve post-trial

7    motions, it seems to me smart to add a couple weeks.

8                Counsel, how about June the 4th at 10 a.m.?

9                MR. BHATIA:  That's good for the government.

10               MR. DIRUZZO:  That's good for us.

11               THE COURT:  Let's assume that is the date.  Obviously,

12   in the event there is some unexpected change of circumstance,

13   I'm certainly open to moving that, but let's set sentencing

14   down for June the 4th.

15               Defense submissions in connection with sentencing are

16   due two weeks before sentencing, and the government's

17   submission is due one week before sentencing.

18               Defense, you should arrange for any pretrial interview

19   of your client by the probation department within the next two

20   weeks and, government, you should get your offense version to

21   the probation department within the next two weeks.

22               MR. BHATIA:  We will.

23               THE COURT:  So, having taken care of motions and

24   sentencing, there is the issue of the defendant's continued

25   release and the terms of that release pending sentencing.

1          Government?

2          MR. BHATIA:  Yes, your Honor.  In this case we are

3    seeking remand, and the reason for that is under 3143, your

4    Honor, there is a presumption here at this stage of the

5    proceeding, and of course the circumstances have changed quite

6    a bit from before trial.

7          THE COURT:  One moment.  This is not, of course, the

8    case under 3143 where detention is mandatory, correct?  This is

9    not like a heavy duty narcotics case or something like that.

10         MR. BHATIA:  No.

11         THE COURT:  So, refresh my memory, a post-trial

12   presentencing in a nonmandatory case, what the standards now

13   are.

14         MR. BHATIA:  At this point, your Honor, the Court must

15   find by clear and convincing evidence that the person is not

16   likely to flee or pose a danger of safety to other persons or

17   the community.

18         THE COURT:  So clear and convincing applies both to

19   the flight and danger provisions, and the burden is on the

20   defendant.

21         MR. BHATIA:  That's right.

22         THE COURT:  And which are you invoking here in making

23   that argument?  Danger, flight, or both?

24         MR. BHATIA:  Both, your Honor.

25         THE COURT:  Explain.

K1T7TEN1

1    MR. BHATIA:  So, under a risk of flight, your Honor,

2    we have conferred with defense counsel about this.  As we

3    understand it, the defendant does not have substantial assets

4    that could be used to secure a bond otherwise, and we think

5    that those also tend to show lack of ties to the community,

6    which goes to the risk of flight.

7         THE COURT:  I'm sorry, let's slow down here.  What are

8    the current terms of release?

9         MR. BHATIA:  A $25,000 bond cosigned by one

10   financially responsible person.

11        THE COURT:  Who is that?

12        MR. BHATIA:  I don't recall at this point, your Honor,

13   who the FRB is.

14        THE COURT:  Who is it, defense counsel?

15        MR. GELFAND:  An individual named Levi Herman.

16        THE COURT:  Who is that?

17        MR. GELFAND:  A close friend of Mr. Teman's.

18        THE COURT:  OK.  Go ahead, government counsel.  And

19   your concern is that the existing bond and Mr. Herman's

20   signature on it are not enough to insure the defendant's

21   presence?

22        MR. BHATIA:  That's right, your Honor.

23        THE COURT:  What has the defendant's presence been

24   like with pretrial supervision and appearance in court?

25        MR. BHATIA:  The defendant has appeared in court and,

K1T7TEN1

1    as we understand it, he has complied with the terms of his

2    pretrial supervision, except we have noted for your Honor

3    before trial and during trial the defendant's statements about

4    the victims in this case, and the defendant made public

5    statements disparaging witnesses in this case.

6              THE COURT:  Right.  But, look, there was no order in

7    place directing him not to do that.  It wasn't a smart decision

8    but it wasn't against any rule or law.  Once I directed him not

9    to do that, did he comply?

10             Government?  Once I directed him not to disparage the

11   victims, are you aware of any noncompliance by the defendant?

12             MR. BHATIA:  Not after that.

13             THE COURT:  I am trying to understand -- look, I

14   appreciate your views about the defendant, but what's the

15   basis -- articulate for me why you think he is likely to flee?

16             I appreciate that the burden is on the defendant, but

17   the burden is arguably met simply by the track record, which is

18   that Mr. Teman has shown up; he has shown up despite of the

19   distress that the note that we are all aware of reflected.  The

20   facts on the ground suggest that he is going to show up.  Do

21   you have his travel documents?

22             MR. BHATIA:  I believe he has surrendered his

23   passport, your Honor, yes.

24             THE COURT:  All right, you believe he has surrendered

25   his travel documents.  Is there any reason to think he has

K1T7TEN1

assets abroad?

          MR. BHATIA:  We don't, your Honor.

          THE COURT:  Is there any reason to believe he has any
existing travel documents?

          MR. BHATIA:  No.

          THE COURT:  Is there any to believe he has friends or
family abroad?

          MR. BHATIA:  I don't know one way or the other.

          THE COURT:  So, just articulate for me -- beyond the
fact that he has now been convicted of this offense and that he
is no fan of the customers whose testimony was presented
against him, what's the reason to think he is not going to show
up?

          MR. BHATIA:  Your Honor, at this point there is a
substantial sentence, at least a guideline sentence -- there is
a possibility of a substantial sentence awaiting the defendant,
your Honor, and so we think that that is a substantially
changed circumstance.  And the defendant, as far as we know,
doesn't have other financial ties that tie him to the United
States, or that would require him to come to court, and so we
think that at this point the defendant can't show by clear and
convincing evidence that he will reappear.

          THE COURT:  What about the fact that he has shown up
each time?  I mean he was facing a substantial sentence.  The
evidence that you have offered is not different from what he

K1T7TEN1

1    would have realistically expected.

2              You know, day in and day out he has been here.  Why

3    doesn't that clear the legal burden?  I am asking you to

4    explain to me why you're worried about Ari Teman not showing

5    up.

6              MR. BHATIA:  I think prior to trial the defendant had

7    every expectation he would be acquitted, and I think the jury's

8    verdict has changed that fact, and so I think at this point the

9    possibility of a jail sentence has come into more stark relief.

10             THE COURT:  Let me hear from defense counsel briefly

11   on flight, and then we will turn to danger.

12             MR. DIRUZZO:  Your Honor, we submit that Mr. Teman has

13   always showed up; he has always complied.  His compliance

14   demonstrates, as your Honor has noted, that he is not a flight

15   risk.  It is true that Mr. Teman for better or worse does not

16   have substantial assets.  He is not that well healed, so to

17   speak, so he can't give up as a security that which he does not

18   have.

19             THE COURT:  Let me ask you this.  I mean this is a

20   very light bail package and the circumstances have changed.

21   Part of my job is to tailor any bail package to the needs of

22   assuring his appearance.  Surely he has somebody else who has

23   moral suasion over him than Mr. Herman.  Are there other

24   potential signatories here?

25             MR. DIRUZZO:  With the Court's indulgence.

1          THE COURT:  Does he have parents, that kind of thing?

2          MR. DIRUZZO:  Your Honor, we believe that Mr. Teman's

3     college rabbi would be amenable to signing some type of bond to

4     ensure Mr. Teman's appearance between now and sentencing.

5          THE COURT:  What?

6          MR. DIRUZZO:  To ensure Mr. Teman's appearance, that

7     he doesn't leave.

8          THE COURT:  Look, my inclination would be to intensify

9     the conditions of release just to assure his appearance, and

10    I'm trying to work through with you what the tools are in the

11    tool box.

12         There is the possibility of electronic monitoring, and

13    there is the possibility of another cosigner.  I think you're

14    representing to me that there is not a possibility of posting

15    any security because Mr. Teman apparently doesn't have money,

16    or so you represent.

17         MR. DIRUZZO:  Yes, your Honor.  But there is the

18    possibility that Mr. Teman's college rabbi would be willing to

19    sign.

20         THE COURT:  We would need to obviously have the

21    government have access to him to determine whether there is

22    moral suasion, and if not that person there would be somebody

23    else.  Does Mr. Teman have parents?

24         MR. DIRUZZO:  Yes, he does.

25         THE COURT:  Would they be in a position to cosign?

K1T7TEN1

1            MR. DIRUZZO:  No, he has -- my understanding is he is

2       estranged from his family.

3            THE COURT:  Where does his family live?

4            MR. DIRUZZO:  Unfortunately, his parents -- most of

5       his cousins live in the States but his parents do live in

6       Israel.  And he hasn't talked to them for an extended period of

7       time.

8            THE COURT:  Does he have siblings?

9            MR. DIRUZZO:  I believe he has one sister, but he is

10      also estranged from his sister and hasn't spoken to her in

11      quite some time.  He is not exactly sure of her whereabouts.

12           We would submit, your Honor, that the possibility of

13      perhaps an electronic monitor would be sufficient to alleviate

14      any concerns that the prosecution or the Court may have.

15           THE COURT:  Government, what about a revised bail

16      package that puts in place intensified pretrial supervision,

17      essentially electronic monitoring effective immediately by

18      pretrial and adding a cosigner to sign the PRB?  The idea would

19      then be if there is any slip-up, you will be right back in here

20      seeking remand, but at least I'm going step by step and not

21      jumping to the conclusion that Mr. Teman is not going to

22      appear.

23           MR. BHATIA:  Your Honor, I think an intermediary

24      ground might be home detention with electronic monitoring.  I

25      think that would allow the defendant -- that would allow to

1    ensure the defendant appear for sentencing.

2            THE COURT:  Where is the defendant's home?

3            MR. BHATIA:  The defendant, as I understand it, lives

4    in Florida.

5            THE COURT:  So, you're proposing home detention with

6    electronic monitoring?

7            MR. BHATIA:  That's right.

8            THE COURT:  And I take it with leave to attend to

9    medical appointments and the like and otherwise as approved by

10   the pretrial services -- by pretrial services?

11           MR. BHATIA:  That's correct.

12           THE COURT:  All right.  And what's your view about the

13   addition of another signatory?

14           MR. BHATIA:  I think an additional signatory would be

15   appropriate.  I think that makes sense.  And if there were to

16   be an additional signatory, then an increase in the bond value

17   as well.  Right now it's a $25,000 bond.

18           THE COURT:  All right.  Defense counsel, I understood,

19   Mr. DiRuzzo, you to be fine with electronic monitoring.  Often

20   that goes with home detention; that's part of what makes

21   electronic monitoring effective.

22           Obviously, electronic monitoring permits the subject

23   to attend to medical appointments, and if there is another

24   carve-out or two that you need me to put on the record, I can,

25   otherwise it's usually left to the discretion of pretrial

K1T7TEN1

1   services.  What's your view about that?

2          MR. DIRUZZO:  Just for clarity, medical and mental

3   health, the full ambit, but yes.

4          THE COURT:  All right.  But with those carve-outs

5   you're fine with that?

6          MR. DIRUZZO:  Yes.

7          THE COURT:  I mean what I'm concerned about, to be

8   honest -- based on the little exchange I've had with you -- is

9   the level of estrangement that Mr. Teman has from people who

10  are usually close to a defendant.  It's a circumstance that

11  raises a natural concern about rootlessness.

12         Can you tell me something about his roots?  In other

13  words, are their anchors in his life?  He doesn't have any

14  money.  It sounds like his job, therefore, must be in some

15  degree of perilous shape.  The members of his immediate yet

16  family don't speak to him.  Help me out here.

17         MR. DIRUZZO:  With the court's indulgence, your Honor.

18         THE COURT:  Yes.

19         MR. BHATIA:  Your Honor, I just have one comment

20  before you resume with defense counsel.  My recollection is

21  that Levy Herman might have been the individual who received

22  the $4,000 check, the bank deposit from the scheme, as we

23  alleged in the case.

24         THE COURT:  Right.

25         MR. BHATIA:  We wanted to flag that fact for your

1    Honor.

2              THE COURT:  Duly flagged, but I'm not sure that

3    changes anything.  I mean --

4              MR. BHATIA:  In addition, the fact that the

5    defendant's parents are abroad also raises questions.

6              THE COURT:  I am hearing you.  I mean I am startled by

7    the level of estrangement in the defendant's life, and that is

8    a source of concern.  I'm working through that with counsel to

9    make sure that my outcome here is measured to the facts as they

10   are emerging.

11             MR. GELFAND:  Your Honor, just kind of backing up for

12   a second, and just because we're on the record now I know that

13   some of these brief at the time immaterial conversations had

14   come out, but I have known Mr. Teman personally since freshman

15   year of college.  We have maintained a friendship since then.

16   What I can represent is that he has built his own roots in New

17   York and subsequently Florida -- in the Southern District of

18   Florida, to be precise.  He was fairly sick several years ago.

19   During that time period, your Honor, his parents, he was

20   estranged from them, they didn't come to see him, they didn't

21   come to help him in any way.  There is no relationship there,

22   and as a practical matter he has built kind of a family

23   environment for himself.

24             There is an individual rabbi KLar -- K-l-a-r -- and

25   that individual's family -- who unremarkable at the time but in

1    a remarkable way had showed up to watch portions of this trial

2    and to support Mr. Teman.  They are kind of where Mr. Teman

3    tends to go -- when bond conditions were not at issue -- for

4    religious holidays.

5            THE COURT:  That's in New York?  That person is a New

6    Yorker?

7            Mr. Teman, just in your legal interests, let me hear

8    through counsel.

9            MR. GELFAND:  The sons live in Manhattan, your Honor.

10   The parents live in West Orange.

11           THE COURT:  If I have a home detention with electronic

12   monitoring, will he be in Florida or New York?

13           MR. GELFAND:  Florida, your Honor, in his Miami

14   apartment.

15           THE COURT:  How is Mr. Teman affording the travel back

16   and forth to New York and whatever hotel or stay arrangement he

17   had during and in connection with the trial?

18           MR. GELFAND:  Your Honor, to be candid, he has

19   exhausted most of his resources, and so, as I understand it, he

20   had some money saved up that's basically exhausted.  He has

21   been able to borrow some additional funds to just kind of pay

22   the expenses, as I understand it, your Honor.

23           As a practical matter, I mean he is not going

24   anywhere.  He has fully been engaged with his defense.  He came

25   to St. Louis, to my office, with the Court's permission several

K1T7TEN1

1  weeks ago.  I will represent, your Honor, something I have

2  never done with any other client, he stayed at my house with my

3  family.  You know, he has known about the obvious possible

4  consequences.  Of course, we all hoped the verdict would come

5  down a different way -- that goes without saying in any

6  trial -- however, he is aware of the possible consequences, and

7  obviously the process that the court will go through for

8  sentencing.  He has fully been engaged in his defense.  He has

9  been here every single time.  He has been in regular contact

10  with his pretrial services officer.

11       THE COURT:  You're not aware of any breach of any

12  condition of pretrial supervision.

13       MR. GELFAND:  No, your Honor, I'm not.  And on top of

14  all of this there are pretty serious -- as the Court is

15  aware -- mental health issues that are finally kind of under --

16  as much as mental health conditions can ever be totally under

17  control, they are under control in the sense that he has a team

18  of people and it seems to be working.  I mean candidly we've

19  noticed a difference since the note that we are all aware of,

20  and more common contact in the weeks leading up to trial, and I

21  would like him to continue with that for everyone's benefit,

22  including obviously his own but not limited to his own.

23       THE COURT:  All right.  Does anyone have anything else

24  to add?

25       MR. BHATIA:  No, your Honor.

K1T7TEN1

1         MR. GELFAND:  No.

2         THE COURT:  I think it is actually a closer question

3    than I had first appreciated, but in the end Mr. Teman's

4    consistent compliance with the terms of pretrial supervision,

5    coupled with the Draconian consequences to him were he not to

6    comply, allows me by a narrow margin to conclude that he has

7    met his burden of showing by clear and convincing evidence that

8    he is not a risk of flight.

9         That is contingent on certain conditions being imposed

10   and subject to the conversation I'm about to have with the

11   government about danger to the community.  It seems to me to

12   assure his appearance, I would make the following changes to

13   the existing regimen.

14        Specifically, I will impose a condition of home

15   detention with electronic monitoring, with leave of course to

16   attend to medical and mental health appointments.

17        Second, I will ask that there be a second signatory to

18   the existing $25,000 personal recognizance bond.

19        Government counsel, I don't think the difference

20   between $25,000 and $50,000 is consequential here.  $25,000 is

21   still a lot of money, and somebody is not going to want to

22   forego that.  The central issue here is not between 25 and let

23   us say $50,000.  It turns on whether the individual in question

24   is somebody who has moral suasion over Mr. Teman so that Mr.

25   Teman would not want that person to lose that amount of money.

K1T7TEN1

1          So, I will add home detention with electronic

2    monitoring, with carve-outs for medical and mental health

3    appointments and otherwise as supervised by the probation

4    department.   And I will add the requirement of a second

5    cosigner to the existing bond.

6          This is all contingent on my not being persuaded that

7    there is a danger to the community.

8          Mr. Bhatia, you have an argument, I gather, you want

9    to make as to that?

10         MR. BHATIA:  Yes, your Honor.  The danger to the

11   community is with regard to the comments made about a victim as

12   well as the comments made about the Court in the letter.

13         THE COURT:  What comment did he make about the Court?

14         MR. BHATIA:  There were comments in the note about the

15   prosecutor and the Court.  There is also the tweet that was

16   right before trial.

17         THE COURT:  The comments that I saw about the

18   prosecutor were snarky and went to -- were jibes.  Why is that

19   a danger to the community?  That's just juvenile speech.

20         MR. BHATIA:  Your Honor, I think those are the facts

21   we have, and I think on the defendant's burden I think it also

22   contributes to the need for detention.

23         THE COURT:  Is there any reason to think he is going

24   to hurt somebody?

25         MR. BHATIA:  No.

K1T7TEN1

1        THE COURT:  Is there a reason to think he is going to

2   defraud somebody?

3        MR. BHATIA:  Your Honor, I think that's probably a

4   closer call.

5        THE COURT:  That's the issue here.

6        MR. BHATIA:  I think we are aware of instances where

7   we think the defendant has taken action against people who have

8   sort of -- one moment, your Honor.

9        Your Honor, so I wanted to confer with Mr. Imperatore

10  for a moment.  As we mentioned in our grand jury letter, we are

11  aware of other conduct that we believe is fraudulent.

12        THE COURT:  Right.

13        MR. BHATIA:  So that does give us pause.  The

14  defendant -- also as we heard at trial -- has hundreds of

15  GateGuard customers, and so that gives him access.

16        THE COURT:  Why isn't the right answer to say -- to

17  add as a condition the defendant is not to create or deposit

18  any remotely created check and is not to draw on any other

19  person's credit card -- bill any other person's credit card

20  without the express written permission of the pretrial services

21  officer?

22        MR. BHATIA:  I think that would be appropriate.

23        THE COURT:  That should guard against the sort of

24  mischief one would naturally be worried about, right?

25        MR. BHATIA:  I think that's right.  And I think we

K1T7TEN1

1     would also ask for no new lines of credit and some of the other

2     standard bail conditions.

3             THE COURT:  Mr. Gelfand, that sounds reasonable,

4     doesn't it?

5             MR. GELFAND:  Yes, your Honor, it does.  To be blunt,

6     obviously Mr. Teman is well aware of the possible consequences

7     of --

8             THE COURT:  I understand that.  But, look, because he

9     doesn't want the bail to be revoked pending sentencing, if I am

10    explicit that a condition of bail is the ones I just

11    mentioned -- including no remotely created checks -- that gives

12    him an extra determinable incentive.

13            MR. GELFAND:  Yes, your Honor.

14            THE COURT:  So what I am going to do is in addition to

15    what I previous wrote is I'm going to write in the following:

16    "Defendant is not to create or deposit any remotely created

17    check.  Defendant is not to" -- help me, Mr. Gelfand, with the

18    right formulation to the use of credit cards.  He presumably

19    has credit cards from other people.  I don't want him to hit

20    those.  I want to come up with the right formulation.

21            Mr. Gelfand?

22            MR. GELFAND:  I think the way to go is my

23    understanding is that with some historic business transactions

24    there is kind of an infrastructure of what we understand is

25    agreed upon but, in any event, essentially recurring automatic

K1T7TEN1

1    credit card transactions.

2           What we would say is to give Mr. Teman a day or two to

3    basically stop those from happening through I think it's PayPal

4    or whatever the infrastructure is.

5           THE COURT:  I am going to write "Defendant is to

6    immediately terminate all auto pay" --

7           MR. GELFAND:  And then we would ask that any such

8    transactions be permissible upon written approval obtained

9    between now and the time that the transaction occurs.

10          THE COURT:  All right.  "Defendant is to immediately

11   terminate all auto pay credit card arrangements.  Defendant" --

12   one moment -- "with him or any company" -- "any business with

13   which he is affiliated."

14          I want to make it clear that this binds GateGuard and

15   the other companies.

16          Mr. Gelfand, here is what I propose:  "Defendant is

17   not to create or deposit any remotely created check.  Defendant

18   is to immediately terminate all auto pay credit card

19   arrangements with him or any business with which he is

20   affiliated.  Defendant may not invoice or bill any person or

21   business without the written approval of his pretrial services

22   officer."

23          It seems to me that that should protect against any

24   potential fraud, while building in some flexibility and some

25   ability to do business.  But I am worried under the

K1T7TEN1

circumstances here -- particularly given the financial need

that is evident on the face of this case, and is evidence on

the colloquy we've had -- I want to avoid any latitude --

assuming compliance with these conditions -- to rip somebody

off.

MR. GELFAND:  One second, your Honor?

THE COURT:  Yes.

MR. GELFAND:  I don't think this will move the needle

one way or the other, but there is just a very practical impact

on a word.  Apparently PayPal's interface basically permits the

immediate suspension of any sort of auto pay, and what we would

ask is that he be ordered to immediately suspend, which

effectively --

THE COURT:  Why don't I say "suspend or terminate".

MR. GELFAND:  Fair enough.

THE COURT:  That's fine.

MR. GELFAND:  And then could I request two unrelated

--

THE COURT:  "Immediately suspend or terminate."  One

moment.  Go ahead.

MR. GELFAND:  Your Honor, these are unrelated to that

issue.

THE COURT:  All right.  Let me just finish that issue.

Are we done with danger to the community?  Anyone have anything

else to add?

K1T7TEN1

  1          MR. BHATIA:  Your Honor, on the bail, we wanted to get

  2    a representation from the defense, if possible, about the fact

  3    that Mr. Teman is only a United States citizen and does not

  4    have any other travel documents.  I wasn't a part of the case

  5    when the initial bail conditions were set, so I'm not familiar.

  6          THE COURT:  Mr. Gelfand, I think that's a more than

  7    fair question.  Is your client only an American citizen?

  8          MR. GELFAND:  Your Honor, my understanding is my

  9    client is only a U.S. citizen and that he has no travel

10    documents other than the U.S. passport that was turned over.

11          THE COURT:  I am going to ask that to Mr. Teman.

12          Mr. Teman, are you under oath.  Do you understand

13    that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  If you make a false statement in response

16    to what I am about to say, that could subject you to penalties

17    of perjury.

18          THE DEFENDANT:  I understand.

19          THE COURT:  Are you a citizen of any country other

20    than the United States?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  And have you surrender all of your travel

23    documents including passports?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  OK, very good.

K1T7TEN1

1    I think, Mr. Bhatia, that does the trick.  With that

2    then -- again, finding it a close call -- I do find that Mr.

3    Teman by clear and convincing evidence has shown me that

4    subject to the rather muscular conditions I put in place he is

5    not a danger to the community.

6    There is no basis other than speculation for me to

7    assume that Mr. Teman could be a danger in any way other than

8    in a financial or fraud way.  There is no history.  He hasn't

9    been physically harming people or threatening people.  I'm

10   certainly aware that he has made provocative remarks to

11   customers; he has engaged in juvenile speech; he has shown a

12   vindictive streak, including a commentary about taking adverse

13   action against people on days when they are deeply religious

14   observant.  None of this reflects well on him, but in the end

15   none of it suggests an aptitude towards violence or anything

16   like that.  The real risk is that he would financially harm

17   somebody.  The conditions that I have read into the record a

18   moment ago seems to me are sufficient safeguards against that

19   conduct.

20   In the event there is a breach of any of those, Mr.

21   Teman, be aware strict rules apply.  If you breach any of these

22   conditions, you can expect the government to move for your

23   remand, and you can expect me to be receptive to such an

24   application.  Do you understand that?

25   MR. GELFAND:  Yes, Judge.

K1T7TEN1

| | |
|---|---|
| 1 | THE COURT:  Mr. Teman, do you understand that? |
| 2 | THE DEFENDANT:  Yes, your Honor. |
| 3 | THE COURT:  Government, anything further? |
| 4 | MR. BHATIA:  Nothing further. |
| 5 | THE COURT:  All right. |
| 6 | MR. GELFAND:  Your Honor, I'm sorry.  Two quick issues |
| 7 | that I would request the Court to include in its conditions. |
| 8 | Number one, my understanding is that his mental health |
| 9 | and medical providers -- and I think he had actually referenced |
| 10 | this to you early on in this case -- they basically have him |
| 11 | doing several mile walks outside on a daily basis.  I would ask |
| 12 | that he be permitted to continue that. |
| 13 | THE COURT:  Look, I've said defendant has leave to |
| 14 | attend to medical and mental health appointments.  I construe |
| 15 | that to mean obligations that are ordered by such a |
| 16 | professional. |
| 17 | MR. GELFAND:  OK.  And then the other issue -- which I |
| 18 | think is already embedded in the pretrial conditions -- is I |
| 19 | don't know whether this will be necessary, but permission to |
| 20 | travel if necessary to St. Louis to meet with me in preparation |
| 21 | for sentencing. |
| 22 | THE COURT:  Why is that necessary? |
| 23 | MR. GELFAND:  It's probably not. |
| 24 | THE COURT:  Let's wait and see if it's necessary. |
| 25 | MR. GELFAND:  OK. |

1          THE COURT:  I'm not averse to it, but it's a different

2     type of representation than in connection with trial.  My guess

3     is between phone, Skype and your existing bond of friendship

4     and trust, you can probably get a lot done remotely, but I'm

5     disinclined to needlessly do that.  Right now the travel

6     restrictions are presumably the Southern District of New York

7     and the Southern District of Florida.

8          MR. GELFAND:  That's fine.  And if we need anything

9     more --

10          THE COURT:  I'm sorry.  Right now it's the Southern

11     District and Eastern Districts of New York -- which includes

12     our airports -- and the Southern District of Florida.  If on an

13     ad hoc basis you need leave for him to come visit you, I am

14     certainly not inflexible.

15          MR. GELFAND:  Understand.

16          THE COURT:  Anything else with respect to bail?

17          MR. BHATIA:  Nothing else.

18          THE COURT:  Look, Mr. Teman, let me just speak to you

19     directly.  You know, you've got sentencing coming up in four

20     plus months.  How you behave, how you comply with the

21     conditions of release, has potential consequences in terms of

22     sentencing.  It's an opportunity for you to demonstrate your

23     ability to comply with the law, in particular the rules that I

24     have set out as conditions of your release.

25          So, to begin with, if nothing else, your self interest

1    in making as good a presentation as you can in connection with

2    sentencing should lead you to scrupulously comply with these

3    conditions.  Beyond that though there is the risk that if you

4    don't comply, the government will move for your remand and I,

5    if I find a breach, will grant that.  That's the last place you

6    want to be in.  So, you are well advised to turn square corners

7    here, and if you have any doubt about whether something is

8    permissible, be in touch with your very able and dedicated

9    counsel to guide you before you do something.  Understood?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  All right.  I'm going to sign this.

12    Anything else with respect to bail?

13            MR. BHATIA:  No, your Honor.

14            THE COURT:  All right.  Now, in terms of the cosigner,

15    I have given a week to get the second cosigner.  Defense, what

16    you should do is arrange for the government to meet that person

17    soon so we don't need to adjourn that date.

18            Government, your role here is to determine whether the

19    person has moral suasion, whether they are an appropriate

20    cosigner, whether there is a risk to them of losing the

21    $25,000.  The fact that they may have had some business

22    arrangement with the defendant may in some sense factor into

23    the analysis.  It's not clear to me that it makes the person

24    less as opposed to a more suitable signatory.  It would be

25    surprising for a defendant to have a signatory with whom he had

K1T7TEN1

1    more detached -- more close ties -- and sometimes those include

2    financial ones.

3              MR. BHATIA:  Understood.

4              THE COURT:  All right.  Is there anything else I need

5    to take up other than the grand jury subpoena?

6              MR. GELFAND:  Logistically, just for within the

7    Southern District of New York, as far as the ankle bracelet and

8    things like that, where Mr. Teman has to go and when to get

9    that?  Florida?

10             THE COURT:  I think he should report to pretrial right

11   now, and they will guide him as to that.  Pretrial is in 500

12   Pearl.

13             MR. GELFAND:  OK.

14             THE COURT:  Anything else other than the grand jury

15   subpoena?

16             MR. BHATIA:  No, your Honor.

17             MR. GELFAND:  No, your Honor.

18             THE COURT:  All right.  So, we stand adjourned as it

19   relates to the criminal case.  We are now going to create a

20   separate transcript.

21             (Trial concluded)

22

23

24

25