UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-CR-696-PAE |
| | ) | |
| ARI TEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

Defendant Ari Teman ("Teman"), by and through undersigned counsel, Alan Dershowitz[1], Justin Gelfand, and Joseph DiRuzzo, respectfully moves this Court to enter a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29(c). In the alternative, Teman moves this Court to grant him a new trial pursuant to Rule 33.

### I.    Relevant Background

Teman proceeded to trial on a second superseding indictment charging him with two counts of bank fraud and two counts of wire fraud. (Doc. 55). Each count expressly alleged that Teman "deposited counterfeit checks." (*Id.*). Counts One and Three allege that Teman deposited "counterfeit checks" in April 2019 at a Bank of America branch in the Southern District of Florida. (*See id.*). Counts Two and Four allege that Teman deposited "counterfeit checks" by remote deposit in March 2019. (*See id.*).

---

[1] Mr. Dershowitz is of counsel to Teman and will seek *pro hac vice* admission in this case.

Prior to trial, Teman provided notice pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) that he intended to call J. Benjamin Davis ("Davis") as an expert witness. (Doc. 74-1). The Government moved *in limine* to preclude Davis's testimony, asserting three grounds in support: relevance; usurping the Court's role; and lack of reliability. (*See* Doc. 74). Teman opposed the Government's motion, explaining:

> One of Teman's core theories of defense is that the checks at issue were valid remotely created checks ("RCCs"). The relevant bank records expressly include the term "RCCs," the checks at issue were processed by the bank as "RCCs," and the defense anticipates the evidence will show that Teman knew what an RCC was before the incidents alleged in the indictment occurred.

(Doc. 77 at 2). Importantly, and in conjunction with Teman's Rule 29(c) motion filed concurrently, Davis's testimony was critical "[b]ecause the checks at issue were RCCs, the checks at issue were not counterfeit checks and were not processed as counterfeit checks." (Doc. 77 at 3).

At the January 10, 2020 pretrial conference, this Court entered an *ore tenus* order granting the Government's motion *in limine* and precluded Teman from calling Davis at trial.

This case was tried before a jury commencing on January 22, 2020. Teman invoked the "rule of sequestration" under Federal Rule of Evidence 615, which the Court acknowledged. (*See* TR. at 27). On the morning of January 24, 2020, Teman raised the issue of a violation of Rule 615. (TR. at 537). Specifically, on January 23, 2020, this Court adjourned for the day while a Government witness—Soleimani—was on the stand in the middle of his direct examination. Soleimani was *the* witness who initially made a criminal complaint against Teman in connection with this case. Prior to taking the stand the next morning, Soleimani was contacted by Government counsel to discuss his testimony. Remarkably, counsel for the Government asserted that "it was appropriate for us to have a conversation with [Soleimani] about some facts that we thought might

come up in the trial, and we did it in part so that we could give the Court and the parties some more information about possible prior inconsistent statements." (TR. at 538). The inconsistent statement addressed the "delta" between the $180,000 reported as lost/stolen/unauthorized versus the full value of the chargeback (*i.e.*, $190,000). Counsel for Teman argued that

> the delta would lead us into grounds that there is the possibility that some of the charges were actually authorized, which then in turn at least allows us to make the argument that perhaps all of these charges in fact were authorized. That vein of cross-examination, that line, you know, was appropriately disclosed to your Honor, but at the same time the government should not have disclosed that to the witness.

(TR. at 541). Ultimately, this Court rejected Teman's contention that the Government's disclosure of what happened on the record and outside the witness's presence constituted a violation of Rule 615.  (TR. at 539).

At the close of the Government's case, Teman timely moved for a judgment of acquittal pursuant to Rule 29. Teman again timely moved for a judgment of acquittal at the close of the defense case. In denying Teman's motion for judgment of acquittal, this Court expressly stated, "[i]n the event of a guilty verdict on one or more counts, I would be happy to reassess a new post-trial Rule 29(c) motion with respect to venue on that point, a thoughtfully briefed motion." (TR. at 724).

The jury then returned a guilty verdict as to all counts on January 29, 2020. This Court granted Teman's *ore tenus* motion to extend the time to file his Rule 29 and Rule 33 motion to February 26, 2020.  (*See* TR. at 1136). Accordingly, this motion is timely.

## II.     This Court Should Enter a Judgment of Acquittal on All Counts

Rule 29(c)(2) provides, "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." To prevail, Teman must demonstrate, "considering all of the

evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Eppolito*, 534 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). In conducting its independent analysis, this Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)).

However, in doing so, this Court has the responsibility of protecting Teman's Fifth Amendment rights. *See, e.g., United States v. Valle*, 807 F.3d 508, 513-15 (2d Cir. 2015) (If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could reasonably find guilt beyond a reasonable doubt") (alteration in original) (internal quotations omitted). As the Second Circuit has repeatedly emphasized, this means that

> specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.

*Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

A. **The Government Did Not Prove What It Alleged in the Indictment: That Teman "Deposited Counterfeit Checks"**

1.   *Overview*

An unauthorized remotely created check ("RCC") is not the same as a "counterfeit check." Indeed, the Federal Reserve Board's Federal Register Notice dated November 21, 2005 regarding amendments to its Regulation CC states that RCC's "typically are created when the holder of a checking account authorizes a payee to draw a check on that account but does not actually sign the check." *See* Proposed Defense Exhibit A (excluded by this Court before trial).[2] The Federal Reserve Board further explained that an RCC is sometimes called a "telecheck," a "preauthorized draft[]," and a "paper draft." *See id.* at n. 1. The term "counterfeit check" appears nowhere in the notice filed in the Federal Register or in the federal regulations governing remotely created checks. *See id.* Rather, the notice explains that, "[i]n place of the signature of the account-holder, the remotely created check generally bears a statement that the customer authorized the check or bears the customer's printed or typed name." *Id.*; *see also* 12 C.F.R. § 229.2(fff) ("Definitions") ("Remotely created check means a check that is not created by the paying bank and that does not bear a signature applied, or purported to be applied, by the person on whose account the check is drawn").

An RCC—whether authorized or not—is not a "counterfeit check," regardless of what it is. In fact, the Electronic Check Clearing House Organization (ECCHO) rules governing breach of warranty claim processes and deadlines expressly apply different rules and different warranties for unauthorized RCCs and for counterfeit checks. *Compare* Rule 8 which "applies to an

---

[2]  Also available at https://www.federalreserve.gov/boarddocs/press/bcreg/2005/20051121/attachment.pdf (last accessed February 25, 2019).

unauthorized remotely created check (RCC) otherwise referred to as an 'unsigned draft'" and Rule 9 claims which "are for signature items and refer to a forged or counterfeit check…").[3] In that regard, because all RCCs are created by the payee (not the paying bank), an RCC cannot, by definition, be "counterfeit."

In this case, Teman was not charged with depositing unauthorized RCCs. *See* Second Superseding Indictment (Doc. 55). The terms "remotely created check," "RCC," or "unauthorized" appear nowhere within the four corners of the indictment. (*Id*.) Rather, each count expressly alleges that Teman "deposited counterfeit checks." (Doc. 55). The grand jury did not find probable cause for bank fraud or wire fraud on the basis that Teman deposited unauthorized RCCs—a form of payment that is markedly different from conventional checks under both federal regulations and banking protocols. The grand jury only found probable cause that Teman "deposited counterfeit checks." (*Id*.) Thus, to sustain a conviction on any of the counts of conviction, the Government had to prove beyond a reasonable doubt that Teman "deposited counterfeit checks," *not* that Teman deposited unauthorized RCCs. (*Id*.)

To further illustrate the distinction, consider the following hypothetical: Sara gives John a check signed by Sara for $100. While John is on the way to the bank to deposit the check, Sara calls John, the two speak, and Sara expressly tells John that he is not authorized to deposit the check because she accidentally provided it under the mistaken belief that she still owed $100 to John. If John proceeds in depositing the check, he may well have deposited an *unauthorized* check. But regardless of the legality of John's conduct, the check he deposited cannot be characterized as

---

[3] *See* "Understanding 'Rule 8' and 'Rule 9' Warranty and Claims Processes" (Sept. 2018), available at https://www.eccho.org/wordpress/wp-content/uploads/Rules89WhitePaper52016final-2018.pdf (last accessed February 25, 2019).

"counterfeit" under any definition. In other words, "unauthorized" is not a synonym for "counterfeit" because, as this hypothetical demonstrates, a check—whether remotely created or not—can be *unauthorized* and yet in no way even arguably be *counterfeit*.

### 2.     *This Court Constructively Amended the Indictment*

The Fifth Amendment provides, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury[.]" The "right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment." *Stirone v. United States*, 361 U.S. 212, 218-19 (1960). "[A] constructive amendment occurs either where (1) an additional element sufficient for conviction is added, or (2) an element essential to the crime charged is altered[.]" *United States v. Dove,* 884 F.3d 138, 146 (2d Cir. 2018) (internal citations omitted).

"After an indictment has been returned and criminal proceedings are underway, the indictment's charges may not be broadened by amendment, either literal or constructive, except by the grand jury itself." *United States v. Adamson*, 291 F.3d 606, 614 (9th Cir. 2002) (citing *Stirone*, 361 U.S. at 215-16) (emphasis added). As the Eighth Circuit has explained, "[a] constructive amendment occurs when the essential elements of the offense as charged in the indictment are altered in such a manner—often through the evidence presented at trial or the jury instructions—that the jury is allowed to convict the defendant of an offense different from or in addition to the offenses charged in the indictment." *United States v. Whirlwind Soldier*, 499 F.3d 862, 870 (8th Cir. 2007) (internal citations omitted). A "constructive amendment of an indictment is reversible error per se." *Id*.

"An amendment of form and not of substance occurs when the defendant is not misled in any sense, is not subjected to any added burdens, and is not otherwise prejudiced." *United States v. Cook*, 745 F.2d 1311, 1316 (10th Cir. 1984). A "court may amend an indictment in any way that does not strike any portion of the charging paragraph and thus does not change the charged offense." *Id.* "As further protection for the defendant, the amendment must be sufficiently definite and certain; it is not to take the defendant by surprise; and any evidence the defendant had before the amendment should be equally available after the amendment." *Id.*

Teman has a "substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and dismissed as harmless error." *Stirone*, 361 U.S. at 217.

In determining whether an unconstitutional constructive amendment of an indictment has occurred, the focal point is "whether the change involves an expansion or a narrowing of the charges." *United States v. Hall*, 536 F.2d 313, 319 (10th Cir. 1976). "[T]he trial court is precluded from amending an indictment so as to...broaden the possible bases for conviction[.]" *United States v. Brooks*, 438 F.3d 1231, 1237 (10th Cir. 2006). As the Tenth Circuit explained, "to decide that question, we therefore compare the indictment with the district court proceedings to discern if those proceedings broadened the possible bases for conviction beyond those found in the operative charging document." *United States v. Farr*, 536 F.3d 1174, 1180 (10th Cir. 2008) (reversing tax evasion conviction for constructive amendment of indictment).

In *Howard v. Daggett*, the Ninth Circuit grappled with similar circumstances. 526 F.2d 1388 (9th Cir. 1975). There, the defendant was charged with inducing two particular women, specifically named in the indictment, to engage in prostitution. *Id.* at 1389. However, the

Government's evidence at trial dealt with more than two women. *Id*. A jury instruction permitted conviction based on evidence regarding women other than the two named in the indictment. *Id.* at 1390. Reversing, the court explained,

> The grand jury might have indicted appellant in a general allegation, without specifying the women to whom his alleged illegal acts or purposes related. But it did not do so. To allow the jury to consider the evidence respecting the other alleged prostitutes was to allow the jury to convict of a charge not brought by the grand jury. The supplemental instruction constituted an impermissible amendment of the indictment that 'destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury.'

*Id*.

The Ninth Circuit is not alone in its insistence that the Government prove what it alleges in an indictment returned by a grand jury in order to secure a conviction. In *Farr*, a tax evasion case, "the district court essentially allowed the jury to consider two possible bases for conviction— the flawed one outlined in the indictment and another more accurate one added at trial." 536 F.3d at 1181. That court noted, "the government opted to include in its indictment particulars" and "the language employed by the government in its indictments becomes an essential and delimiting part of the charge itself, such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars." *Id*. Farr was charged with evading the quarterly employment tax for a business and his attorney waited until opening statement to argue that an individual cannot personally owe the employment taxes of the corporation. *Id*. Reversing the conviction because the district court gave a jury instruction that did not hold the Government to what the indictment alleged, the Tenth Circuit explained that the Government may have been "in a 'ditch' but it was a ditch created by the government's own charging document." *Id*. The

"charging document"—not the prosecution's conception of what the Executive Branch meant by certain terminology—was determinative. *Id*.

In instructing the jury as it did, this Court shifted the focus away from the language of the indictment itself—and instead impermissibly focused on Government counsel's *ex post facto* representation as to what the prosecution intended the phrase "counterfeit check" to mean. (*See* TR. at 887) ("That aligns with my understanding of the government's meaning of 'counterfeit' as presented to the grand jury"). The fatal flaw in that approach is that the charging document included particulars—namely that Teman committed all four counts by committing specific acts: "depositing counterfeit checks." (Doc. 55). By charging particulars the Government could not prove at trial (because the RCCs were not "counterfeit checks" regardless of whether they were authorized), the Government was no doubt "in a 'ditch' but it was a ditch created by the government's own charging document." *Farr*, 536 F.3d at 1181. As the Tenth Circuit explained in its thoughtful analysis of the constructive amendment issue, "to decide that question, we therefore *compare the indictment with the district court proceedings* to discern if those proceedings broadened the possible bases for conviction *beyond those found in the operative charging document*." *Farr*, 536 F.3d at 1180 (emphasis added). In other words, the analysis is limited to comparing what actually transpired at trial and the four corners of the charging document— because the indictment reflects the words of the grand jury, regardless of what the prosecution may have intended.

By refusing to require the jury to find that Teman "deposited counterfeit checks," this Court unconstitutionally broadened the bases for possible conviction. *See Brooks*, 438 F.3d at 1237 ("[T]he trial court is precluded from amending an indictment so as to...broaden the possible bases

for conviction"); *see also United States v. Leichtnam*, 948 F.2d 370, 377 (7th Cir. 1991) ("Any 'broadening [of] the possible bases for conviction from that which appeared in the indictment is fatal. It is reversible per se") (internal citations omitted); *Whirlwind Soldier*, 499 F.3d at 870 (Eighth Circuit explaining that "a constructive amendment of an indictment is reversible error per se).

Even more, in doing so, this Court struck a portion of the charging paragraph as to each count. *See Cook*, 745 F.2d at 1316 (a "court may amend an indictment in any way that does not strike any portion of the charging paragraph and thus does not change the charged offense"). This too constitutes reversible error.

The Second Circuit has noted that "an indictment drawn in more general terms may support a conviction on alternate bases, even though an indictment with specific charging terms will not." *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988). The indictment in this case could not be more specific: it alleged that Teman "deposited counterfeit checks" as the manner and means on which both the bank fraud and wire fraud counts are premised. *See also United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997) (where indictment alleging conspiracy to possess with intent to distribute controlled substances involving cocaine and methamphetamine, jury instruction that permitted conviction on basis of marijuana transaction was an unconstitutional constructive amendment because defendant "was not given notice of the core criminality to be proven at trial").

The bottom line is this: an RCC—even if unauthorized—is not a counterfeit check. The grand jury did *not* charge Teman with committing bank fraud or wire fraud by depositing unauthorized checks or RCCs. Nevertheless, this Court permitted the jury to convict on these grounds, without any factual finding that Teman deposited a single counterfeit check, as charged

11

in the indictment. While this forms the basis for a new trial under Rule 33 (*see infra*), this also forms the basis for a judgment of acquittal because the Government failed to carry its burden of proving that Teman deposited counterfeit checks. In this case, the actions of this Court broadened the possible bases for conviction from the bases which appeared within the four corners of the indictment—Teman could be convicted for depositing unauthorized RCCs despite such RCCs not being "counterfeit checks." *See United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) ("A constructive amendment occurs where the actions of the court 'broaden the possible bases for conviction from that which appeared in the indictment'") (quoting *United States v. Banki,* 685 F.3d 99, 118 (2d Cir.2011), *as amended* (Feb. 22, 2012) (internal quotation marks omitted)). "Even if an indictment might have been drawn in more general terms to encompass the ultimate conviction, where 'only one particular kind of [criminal conduct] is charged ... a conviction must rest on that charge and not another.'" *Id*. (quoting *United States v. Zingaro,* 858 F.2d 94, 99 (2d Cir.1988) (internal quotation marks omitted)).

As a matter of law, "constructive amendments are *per se* violations of the Fifth Amendment that require reversal even without a showing of prejudice to the defendant." *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996) (internal quotations and citations omitted).

3.    *The Government Did Not Attempt to Establish—and Did Not Establish—That the RCCs Were "Counterfeit Checks"*

The record—both at the close of the Government's case and at the close of the defense case—contains no evidence upon which a reasonable jury could possibly conclude that the 29 RCCs at issue were "counterfeit checks." Indeed, over Teman's adamant objection at every opportunity, this Court did not require the jury to find that Teman "deposited counterfeit checks" as expressly alleged in the indictment. (*See* Doc. 55). Instead, even at the jury instructions

conference, this Court posited that "counterfeit in this case means created by the defendant without the authorization of the account holder, meaning the authorization of this particular check or the particular checks in question."[4] (TR. at 887). This Court continued, "[t]hat aligns with my understanding of the government's meaning of 'counterfeit' as presented to the grand jury." (*Id.*). Accordingly, rather than being required to conclude that the RCCs at issue were "counterfeit checks," the jury was incorrectly instructed it could convict Teman even if the Government did not prove the RCCs were "counterfeit"—as expressly alleged in the indictment—but did prove the checks were unauthorized RCCs—an allegation conspicuously absent from the indictment. This is manifest error which entitles Teman to a judgment of acquittal.

Even in the light most favorable to the Government, the evidence is insufficient to support a conviction on any count because there is no evidence whatsoever that the RCCs at issue were "counterfeit checks."

4. *Even Proof that Teman Deposited RCCs Without Authorization—a Fact Teman Adamantly Disputes and the Evidence Overwhelmingly Rebuts—is Insufficient to Survive a Rule 29 Motion Because the RCCs Did Not Contain any Material Misrepresentations*

All four counts of conviction expressly alleged that the bank and wire fraud was carried out "by means of false and fraudulent pretenses, representations, and promises." (Doc. 55.)

The Supreme Court has expressly held that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Williams v. United States*, 458 U.S. 279,

---

[4] Whether this Court constructively amended the indictment turns on a comparison between the four corners of the indictment and what transpired at trial. However, over Teman's objection, this Court focused the inquiry on what the prosecution presented to the grand jury regarding the meaning of the term "counterfeit checks." Teman has no way of verifying the accuracy of the Government's representations on this issue. Thus, to the extent this remains a relevant consideration, Teman moves this Court to permit him access to the grand jury transcripts or, in the alternative, Teman moves this Court to conduct an *in camera* review. Considering the prosecution also did not understand what an RCC was when it filed its motion *in limine* regarding seized check stock *after* the case was presented to the grand jury, it is unlikely the grand jury was instructed that "counterfeit check" meant unauthorized RCC.

284-85 (1982). The circuit courts have appropriately acknowledged and respected this limitation. *See, e.g., United States v. Briggs*, 939 F.2d 222, 226 (5th Cir. 1991) ("Although this reasoning has been criticized as overly technical, we are of course bound by it"). Indeed, as the Second Circuit has recognized, a "course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to the funds does not alone constitute false or fraudulent pretenses or representations." *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998).

Thus, it is black letter law that the act of depositing checks (or RCCs)—regardless of whether Teman believed he was entitled the funds or knew he was not—is insufficient to sustain a conviction for bank fraud or wire fraud. Instead, the checks themselves had to contain some material factual misrepresentation. *See id*. ("A misrepresentation is material if it is capable of influencing a bank's actions"). On this issue, the evidence could not be clearer.

The March checks each state: "Draw per contract, no signature required." The April checks each state: "Draw per contract, no signature required" followed by:

> "NOTE TO BANK: This is a valid check. You are required by law It Contract at gateguard.xyz/legal/terms.php accepted by above client. Contact us 212-203-3714 with questions[.]"

As the Bank of America witness readily admitted under oath on cross-examination, each of the RCCs was immediately identifiable as an RCC:

Q. And as you testified, those were two of the 29 total RCCs that are at issue in this case; correct?

A. That is correct.

Q. And you're familiar with all of the RCCs, not just the two that we discussed; correct?

A. Correct.

Q. Okay. *And as we talked about yesterday, all 29 of those RCCs clearly bear indicia to the bank that they are, in fact, RCCs; correct*?

A. *Correct*.

(TR. at 270) (emphasis added).

As the undisputed testimony revealed, "[d]raw per contract, no signature required" simply referenced that these were RCCs.[5] Thus, unless there was no contract, this statement clearly cannot constitute a material misrepresentation (or a misrepresentation at all). And as the evidence clearly established, there was a contract between the relevant parties consisting of Terms and Conditions and Payment Terms. Indeed, the April checks correctly directed the bank to the contract by providing the URL and represented that the contract was accepted by the "above client"—all of which each of the three customers who testified at trial admitted under oath.

Specifically, Elie Gabay (Coney Realty) testified:

Q. January 23rd, you send a markup of terms and conditions with proposed changes; correct?

A. Yes.

Q. January 31st, eight days after that, you send in the check for the invoice?

A. That is accurate.

Q. And the invoice expressly says that you agree to the terms and conditions that we just read?

A. That's what the invoice says.

(TR. at 386-387).

---

[5] *See* 12 CFR Appendix E to Part 229: "Remotely Created Check[:]... A check authorized by a consumer… that is not created by the paying bank *and bears a legend on the signature line, such as "Authorized by Drawer,"* is an example of a remotely created check" (emphasis added).

Bonnie Soon Osberger (Mercer) testified:

Q. Following the show, when you were thinking about purchasing an intercom, did there come a time when you saw the terms and conditions?

A. Yes.

Q. What was your reaction to them?

Q. It was very lengthy and I went through all of it.

(TR. at 421-422).

Soleimani (ABJ) testified:

Q. The bottom of the invoice expressly said that you agreed to be bound by the terms and conditions; correct?

A. I did not see that at the time.

Q. That wasn't my question. You've seen it since then; correct?

A. Correct.

Q. And you'd agree with me that that's actually what it says; correct?

A. Yes.

(TR. at 591).

Finally, the evidence was undisputed that the contact number printed on each RCC was the accurate phone number for GateGuard and the combination of GateGuard being indicated as the payee and referring to itself as "us" further underscores that the checks contained no false or fraudulent statements—much less any that are material.

Thus, while Teman clearly lacked the requisite *mens rea* to commit any of the charged crimes, the bottom line is that a judgment of acquittal is warranted regardless of Teman's intent because the checks did not contain any material misrepresentations.

**B.   The Government Did Not Establish Venue by a Preponderance of the Evidence**

"Article III of the United States Constitution states that '[t]he Trial of all Crimes … shall be held in the State where the said Crimes shall have been committed.'" *United States v. Magassouba*, 619 F.3d 202, 204 (2d Cir. 2010) (quoting U.S. Const. art. III, § 2, cl. 3). The Sixth Amendment demands that in "all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Const., amend. VI. As such, the "government *must* prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18 (emphasis added).

"Congress may prescribe specific venue requirements for particular crimes. Where it has not, as is the case here, we must determine the crime's *locus delicti.*" *United States v. Auernheimer*, 748 F.3d 525, 532 (3d Cir. 2014) (internal citation omitted). "[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Id.* (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946)). Accordingly, courts "must [1] initially identify the conduct constituting the offense ... and then [2] discern the location of the commission of the criminal acts." *United States v. Rodriguez–Moreno*, 526 U.S. 275, 279 (1999). Venue is narrowly construed. *See United States v. Johnson*, 323 U.S. 273, 276 (1944).

"In determining whether an offense was committed in a particular district, we look 'to the nature of the crime alleged and the location of the act or acts constituting it.'" *Magassouba*, 619 F.3d at 205 (citing *United States v. Cabrales*, 524 U.S. 1, 5 (1998)). "In making this inquiry," this Court "'must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts.'" *Id*. (quoting *Rodriguez-Moreno*,

526 U.S. at 279). The Second Circuit has emphasized that the focus of this inquiry is on the physical conduct—*i.e.*, the "essential conduct elements"—criminalized by Congress. *See United States v. Ramirez*, 420 F.3d 134, 144 (2d Cir. 2005).

Further, in this Circuit, district courts must also apply the "substantial contacts" test to ensure that "the application of a venue provision in a given prosecution comports with constitutional safeguards[.]"*United States v. Saavedra*, 223 F.3d 85, 92-93 (2d Cir. 2000) (citing *United States v. Reed*, 773 F.2d 447, 481 (2d Cir. 1985)). The *Saavedra* court stated:

> The substantial contacts rule offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial. While it does not represent a formal constitutional test, *Reed* is helpful in determining whether a chosen venue is unfair or prejudicial to a defendant. This test takes into account four main factors: (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding.

*Id*. at 93. To satisfy this test, there must be "more than some activity in the situs district; instead, *there must be substantial contacts*[.]" *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012) (internal quotation marks omitted and emphasis added).

1.     *Miami Beach Deposits (Counts 1 and 3)*

Generally, a criminal offense is committed when the offense has been completed. *See Toussie v. United States*, 397 U.S. 112, 115 (1970).  And, regarding bank fraud and wire fraud, a scheme to defraud is complete when the proceeds have been received. *See United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013); *see also Pereira v. United States*, 347 U.S. 1, 7-9 (1954) (criminal act complete when the proceeds have been received and use of the mail or wires to obtain the proceeds satisfies the jurisdictional element).

In this case, to the extent there was a crime (which Teman adamantly contests), the crime was complete when Teman walked into a Bank of America branch in Miami Beach, Florida, and presented the RCCs and Bank of America credited the GateGuard bank account so that Teman had access to the funds. *Accord United States v. Sindona*, 636 F.2d 792, 802 (2d Cir. 1980) (finding that until the criminal defendant arranged to transfer the funds to his accounts at the Bank of Montreal, the crime was not complete and, therefore, these latter wires were sufficient for jurisdictional purposes); *see also United States v. Feldman*, 647 F.3d 450, 457 (2d Cir. 2011) (affirming sentence where defendant's convictions on "wire fraud counts were based on two wire transfers by the first [victim], two wire transfers by the fourth [victim], and one wire transfer by the fifth [victim], all to [defendant's] bank account"). Accordingly, venue is not appropriate in this district as the crime—if there even was a crime—was completed in Miami Beach, and this Court must grant Teman relief under Rule 29(c).

Furthermore, there were no "substantial contacts" with respect to Counts 1 and 3 in the Southern District of New York as the weight of the four *Reed* factors weighs heavily in favor of a determination that the Southern District of Florida is the proper venue. *First,* the site of the alleged crime as to Counts 1 and 3 was Miami Beach. *Second,* the elements of bank fraud and wire fraud, and their very nature, demonstrate that the alleged crimes were complete when the allegedly counterfeit checks were deposited into GateGuard's Bank of America account. *See Toussie, supra. Third,* the place where the effect of the allegedly criminal conduct occurred was Miami Beach by virtue of Bank of America reflecting that GateGuard had its address in Miami Beach. *Fourth,* the Southern District of New York was less suitable a venue than the Southern District of Florida given the nexus of GateGuard's Bank of America account to Florida. To be clear, the evidence

was undisputed that the criminal acts alleged in the indictment—the depositing of "counterfeit checks"—occurred entirely in the Southern District of Florida, not in the Southern District of New York. While no single factor is controlling, the overall weight of the *Reed* factors militates strongly in favor of concluding that the Southern District of Florida was the appropriate venue for counts 1 and 3.

           2.       *Mobile Deposits (Counts 2 and 4)*

To the extent that there was a crime (again, a point Teman adamantly contests), the crimes were complete upon the execution of the mobile deposits that underlie Counts 2 and 4. *See* discussion *supra* regarding Counts 1 and 3.

At trial, the only evidence linking the mobile deposits to the Southern District of New York was Government Exhibit 113 (a Microsoft Excel spreadsheet file). Indeed, the Bank of America witness testified that Bank of America's internal servers are located in Texas. (TR. at 203:24-25). In Government Exhibit 113, under a tab labeled "Device," there was a column (column P) that reflected locations. A sampling of the locations (rows 1-53) appears as follows:

But no witness testified as to the location of the mobile deposits and Government counsel notably failed to question the Bank of America witness if the mobile deposits actually occurred at a location that would fall within the Southern District of New York.

Notwithstanding the complete absence of any witness testimony as to the location of the mobile deposits, the prosecution argued that "New York" (as used in Government Exhibit 113) means "New York County." (*See* TR. at 704). However, a close inspection of Government Exhibit 113 reveals that the listed locations cannot refer to *county* as the exhibit lists, for example, "Miami Beach, FL" (*not* "Miami-Dade County"), "Brooklyn, NY" (*not* "Kings County"), and "Orlando, FL" (*not* "Orange County").

Thus, the exhibit cannot be used to establish that "New York" meant "New York County." But that is precisely what the prosecution represented. (*See* TR. at 704). Instead, at most, the exhibit could be used to establish "New York City" at large, which, by definition, includes both the Southern District of New York and the Eastern District of New York. (If venue lies exclusively in the Eastern District of New York, venue does *not* lie in the Southern District of New York.) Accordingly, the Government has failed to meet its evidentiary burden with respect to Counts 2 and 4 and a judgment of acquittal must be entered in favor of Teman.

Furthermore, the Government also failed to introduce any evidence whatsoever regarding the accuracy of geolocation techniques that rely on internet protocol (IP) addresses. And especially in the absence of specific, compelling testimony about the accuracy of the geolocation tools used in a particular case, federal courts have been appropriately resistant to relying on IP address geolocation data. *See, e.g., Celestial Inc. v. Swarm Sharing Hash*, Case No. CV 12-00204 DDP (SSx) (C.D.CA. May 1, 2012) (Order dismissing civil case based on information presented to court by the party relying on IP address geolocation that determining "the physical location down to a city or ZIP code, however, is more difficult and less accurate because there is no official source for the information, users sometimes share IP addresses and Internet service providers often base IP addresses in a city where the company is basing operations"). Thus, the Government's blind reliance on an Excel spreadsheet that purports to have IP address geolocation information without any testimony as to its reliability is insufficient to establish venue.

### C.   No Reasonable Jury Could Have Concluded Teman Acted with the Requisite Criminal Intent

Ariel Reinitz's testimony could not have been more clear:

Q. Between January 2nd of 2019 and March 28, 2019, what if any advice did you give Mr. Teman about whether or not it was legal to deposit RCCs against the accounts of Coney, ABJ and Mercer?

A. My advice to Mr. Teman was that it was technically legal. His agreement, GateGuard's terms and payment terms gave GateGuard the explicit authority to deposit the RCCs drawn on the accounts of those entities you mentioned, Coney, ABJ and Mercer, but I was concerned that practically there may be consequences that Mr. Teman may encounter if the dispute from those customers was escalated by them.

TR. at 921.

Reinitz continued, "my advice to Mr. Teman, direct and unambiguous advice, was legally he had the authority to draw the payments, specifically to deposit RCCs drawn on the accounts of the entities we've mentioned [Coney, ABJ, and Mercer]…." (TR. at 921-922). This testimony was plainly undisputed—and the Government's argument that the jury should simply disbelieve this licensed attorney's under-oath testimony was insufficient to survive Teman's valid and timely Rule 29 motion.

Furthermore, the Government introduced into evidence the GateGuard Terms and Conditions, which like virtually every internet-based company's Terms and Conditions, included embedded hyperlinks—in this case, to GateGuard's Payment Terms, which the defense introduced into evidence through the testimony of Ariel Reinitz. The Payment Terms plainly and in simple English authorized the company to draw the RCCs at issue in this case. Thus, as a matter of law, there was no crime—and, at a bare minimum, Teman lacked the requisite *mens rea*. In that vein, if relying on a company's contract constitutes a felony, every CEO is at risk of criminal exposure— and that is clearly not what Congress intended or what the law provides.

As such, this Court should step in and grant a judgment of acquittal pursuant to Rule 29(c).

### III.     In the Alternative, this Court Should Grant Teman a New Trial

Rule 33(a) provides, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." When ruling on a motion for a new trial under Rule 33, this Court has much broader discretion than on a motion for judgment of acquittal under Rule 29. *See United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002). This Court, therefore, *may* "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). "The Court's broad discretion empowers it to grant relief based not only on the sufficiency of the evidence at trial but on any other circumstance that might render the trial 'essentially unfair,' including trial errors." *United States v. D'Amelio,* 636 F.Supp.2d 234, 238 (S.D.N.Y. 2009).

### A.     The Rule of Sequestration was Violated

#### 1.     *Governing Law*

"Rule 615 codified a well-established common law tradition of sequestering witnesses as a means of discouraging and exposing fabrication, inaccuracy, and collusion." *United States v. Jackson*, 60 F.3d 128, 133 (2d Cir. 1995) (citations and quotations omitted). "Rule 615 grants a party the right to request the exclusion of a witness from the courtroom in order to prevent the witness from hearing the testimony of other witnesses. The rule seeks to prevent the 'tailoring' of a witness's testimony to that evidence given earlier in the trial and helps to uncover fabrication." *Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 762 (2d Cir. 1998), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) (internal citation omitted).

"Put differently, sequestration helps to smoke out lying witnesses: It is now well recognized that sequestering witnesses is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice." *United States v. Rhynes*, 218 F.3d 310, 317–18 (4th Cir. 2000) (internal quotation marks and citations omitted); *see also United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) (purpose of broad sequestration rule is "to preclude coaching or the influencing of a witness' testimony by another witness").

"This shaping, or tailoring of testimony, may occur maliciously in that a witness may deliberately change his testimony based upon what another witness says, or it may even occur subconsciously without the witness realizing he has been influenced by another's testimony." EXCLUSION OF JUSTICE: THE NEED FOR A CONSISTENT APPLICATION OF WITNESS SEQUESTRATION UNDER FEDERAL RULE OF EVIDENCE 615, 30 U. Dayton L. Rev. 63, (citing *Queen City Brewing Co. v. Duncan*, 42 F.R.D. 32, 33 (D. Md. 1966) ("[d]efendant's purpose in seeking the [sequestration] order is to secure the independent recollection . . . without that recollection having been influenced, properly or improperly")). "The subconscious influencing is common where one of two witnesses called by the same party may be sympathetic to the cause and may subconsciously mold his testimony into greater consistency with the other, or may unconsciously have his memory refreshed by what he has heard." *Id*.

If a witness is permitted to learn of "the testimony of another witness, he may try to adapt his statements to avoid inconsistencies, avoid the impact of cross-examination, or undercut the testimony of the other witness." *Id*. "If any of this tailoring were to occur, the trier of fact could be prevented from 'receiving the unvarnished truth.'" *Id*.

"While the purpose of the rule is apparent; its purview is not. Circuits have split on the question of whether the scope of Rule 615 extends beyond the courtroom to permit the court to preclude out-of-court communication between witnesses about the case during trial." *United States v. Solorio*, 337 F.3d 580, 592 (6th Cir. 2003) (internal quotation marks and citation omitted).

## 2.    *Violation of Rule 615 Requires a New Trial*

It appears that the Second Circuit has not explicitly weighed in on the matter.[6] This Court should adopt the broad view of Rule 615 and the Rule of Sequestration based on its common law origins and its aid to the truth-finding process. Indeed, some courts have concluded that Rule 615 will be frustrated if a sequestration order does not automatically include an instruction that the witnesses are not to discuss the case outside of the trial. *See United States v. Johnston,* 578 F.2d 1352, 1355 (10th Cir. 1978) (concluding that Rule 615 Rule must be interpreted to extend to communications outside the courtroom because failing to apply the Rule this way allows witnesses to "indirectly defeat its purpose by discussing testimony they have given and events in the courtroom with other witnesses who are to testify"). *See also United States v. Prichard*, 781 F.2d 179, 183 (10th Cir. 1986) ("sequestration order pursuant to Fed. R. Evid. 615 requires not only that witnesses be excluded from the courtroom, but that witnesses also refrain from discussing their testimony outside the courtroom").

While not expressly ruling on the issue, the Fourth, Fifth, and Sixth Circuits have indicated that they prefer the approach Teman advocates here. *See e.g., United States v. Milanovich*, 275 F.2d 716 (4th Cir. 1960), *rev'd in part on other grounds* 365 U.S. 551 (1961); *United States v. McMahon*, 104 F.3d 638 (4th Cir. 1997); *United States v. Womack*, 654 F.2d 1034 (5th Cir. 1981);

---

[6] The undersigned have shepardized Fed. R. Evid. 615, which resulted in 21 Second Circuit cases. None of the cases expressly state the side of the circuit split on which the Second Circuit stands.

*United States v. Green*, 293 F.3d 886 (5th Cir. 2002); *United States v. Rugiero,* 20 F.3d 1387 (6th Cir. 1994); *United States v. Solorio*, 337 F.3d 580 (6th Cir. 2003).

In *McMahon*, the Fourth Circuit reaffirmed its view on Rule 615 where a criminal defendant was charged with criminal contempt for violating a Rule 615 order. *McMahon*, 104 F.3d at 644. McMahon asserted that he was only instructed to stay out of the courtroom during his son's trial and that the Rule 615 order was not violated when he read notes taken by his secretary at the trial. *Id.* The Fourth Circuit rejected this argument and stated that "an instruction that he could not circumvent the sequestration order by reviewing trial transcripts would simply have stated the obvious... The Defendant knew about the sequestration order and understood its scope." *Id.* Accordingly, the *McMahon* court held that the witness willfully violated a Rule 615 order by obtaining communications about the trial, even though the judge had not expressly instructed him on this issue.

Furthermore, the Supreme Court has indicated[7] support for the approach here advocated. In *Perry v. Leeke*, 488 U.S. 272, 281 (1989), the Court stated that it is common for a witness to be told to refrain from discussing his testimony with anyone until after the end of trial. Such orders are viewed as:

> [A] corollary of the broader rule that witnesses may be sequestered to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say, and to increase the likelihood that they will confine themselves to truthful statements based on their own recollections.

*Id.* at 281-82. The Supreme Court cited the Tenth Circuit opinions of *Johnston, supra,* and *United States v. Greschner*, 802 F.2d 373 (10th Cir. 1986), noting that these cases held that Rule 615

---

[7] While Supreme Court dictum is not binding, "it must be given considerable weight and cannot be ignored in the resolution of the close question[s] [courts have] to decide." *United States v. Bell,* 524 F.2d 202, 206 (2d Cir. 1975).

extends beyond the courtroom. *Perry,* 488 U.S. at 281-82. Additionally, the Supreme Court quoted the Fourth Circuit's *Milanovich* decision:

> We wish to indicate our view, however, that ordinarily, when a judge exercises his discretion to exclude witnesses from the courtroom, it would seem proper for him to take the further step of making the exclusion effective to accomplish the desired result of preventing the witnesses from comparing the testimony they are about to give. If witnesses are excluded but not cautioned against communicating during the trial, the benefit of the exclusion may be largely destroyed.

*Id*. (quoting *Milanovich,* 275 F.2d at 720). Accordingly, this Court should adopt the broad approach in construing Rule 615.

There can be no doubt that Rule 615 was violated here. Both counsel for the Government and the Government's case agent who was also a fact witnesses that the Government was potentially calling at trial (*see* TR. at 521), spoke to the Government's witness (Soleimani) about his testimony. Making matters worse, the timing of the Rule 615 violation only exacerbated the problem, as Soleimani's testimony was discussed during the middle of his direct examination on topics of *potential cross-examination* by defense counsel. This violation of 615 was just as egregious (if not more so) than the violation in *McMahon*. And, as in *McMahon*, the fact that Rule 615 had been violated even though the Court failed to instruct Soleimani on this issue, is of no moment.

Moreover, even if this violation of Rule 615 was unintentional (a point Teman in no way concedes), Soleimani's testimony could have been subconsciously shaped without Soleimani realizing he had been influenced by his conversation the Government. *See Queen City Brewing Co.,* 42 F.R.D. at 33. Indeed, the salutary goal of Rule 615 is to minimize the possibility that a witness is "adapt[ing] his statements to avoid inconsistencies, avoid[ing] the impact of cross-examination, or undercut[ing] the testimony of the other witness." EXCLUSION OF JUSTICE,

*supra.* But that is what happened here, as the purported purpose of the telephonic conversation with Soleimani was to discuss "some facts that [the Government] thought might come up in the trial" and to address "possible prior inconsistent statements." (TR. at 538). This, in turn, operated to disarm Teman's cross-examination and to preclude Teman the opportunity to call the NYPD detective who interviewed Soleimani. (*See* TR. at 516).

Furthermore, in the Second Circuit, the "burden to demonstrate lack of prejudice, or harmless error, properly falls on the party that had opposed sequestration." *Jackson*, 60 F.3d at 136. While the Government did not expressly oppose Teman's invocation of Rule 615, under the circumstances it necessarily follows that the Government (as the party violating Rule 615) must be the one to demonstrate the lack of prejudice—but it cannot do so. This case was a close one and could very well have resulted in a complete defense verdict. Under the circumstances of such a hotly contested trial, effective cross-examination of Soleimani and/or being able to call an NYPD detective to impeach Soleimani's testimony could very well have swung the pendulum in Teman's favor. The Government cannot carry its burden and, thus, this Court should enter an order granting Teman a new trial.

### B.      Teman's Expert Should Not Have Been Excluded

Teman's expert witness's testimony was clearly relevant concerning whether the checks at issue were "counterfeit" or were, instead, RCCs (or, at worst, unauthorized RCCs). Indeed, Davis's testimony would have been that the checks were not "counterfeit" as alleged in the indictment. This testimony—which fully complied with Federal Rule of Evidence 702—would have gone to the very core of the allegations that the Government contended were criminal. This testimony fully complied with Federal Rule of Evidence 702. And, this testimony would not have invaded the

province of the jury (as the Government incorrectly argued) as Rule 704(a) expressly provides that an "opinion is not objectionable just because it embraces an ultimate issue." *See also Restivo v. Hessemann,* 846 F.3d 547, 578 (2d Cir. 2017).

Moreover, with respect to bank procedures in general, and RCCs in particular, Davis's "specialized knowledge, [his] testimony [would have] be[en] extremely valuable and probative." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). To that end, Davis's expert testimony would deal with matters not within "the ken of the average juror," *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) and, as such, was improperly excluded.

Furthermore, at the jury instructions conference, this Court expressly explained, "counterfeit in this case means created by the defendant without the authorization of the account holder, meaning the authorization of this particular check or the particular checks in question." (TR. at 887). And this sentiment was conveyed to the jury. However, Davis would have testified that RCCs may be authorized by contract without subsequent authorization for each particular RCC provided the fees were otherwise due and the contractual terms allowed for the company to obtain those funds by using an RCC.

The Due Process Clause requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element

of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Based on the allegations in the indictment and especially in a case where the Government repeatedly described the 29 RCCs at issue as "fake checks," Teman should have been permitted to introduce testimony that the RCCs were not counterfeit checks. *See Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) ("the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense" and "that opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence…when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing") (internal citations omitted).

By preventing Teman from introducing this testimony, Teman was deprived of his opportunity to fully present a defense which, given that this case was such a close one, militates in favor of finding that a new trial is warranted.

## C.      An Alternate Juror Lied During *Voir Dire*

This Court should grant a new trial because an alternate juror lied during *voir dire*, depriving Teman of his constitutional right to a fair trial. Specifically, Juror #13 (as designated by juror number during trial) did not acknowledge knowing Teman or GateGuard when asked under oath, despite this juror's initiating contact with Teman via social media (LinkedIn) *before* trial. Furthermore, Juror #13 appears to be a direct business competitor of Teman/GateGuard—at a minimum requiring further inquiry by the Court on this issue.

"*Voir dire* is an important method of protecting a defendant's right to trial by an impartial jury." *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989) (citing *McDonough*

*Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554 (1984)). The Second Circuit has held "that the defense deserves a full and fair opportunity to expose bias or prejudice on the part of veniremen." *Id.* (internal quotation marks omitted) (quoting *United States v. Barnes,* 604 F.2d 121, 139 (2d Cir.1979); *United States v. Robinson,* 475 F.2d 376, 380–81 (D.C.Cir.1973)). "[T]here must be sufficient information elicited on voir dire to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges, the right to which has been specifically acknowledged by the Supreme Court despite the lack of a constitutional statutory source." *Barnes*, 604 F.2d at 142 (citing *Swain v. Alabama*, 380 U.S. 202 (1965)).

"[D]eliberate concealment or purposefully incorrect responses during *voir dire* suffice to show a prejudicial impairment of the right to the exercise of peremptory challenges." *Colombo*, 869 F.2d at 151 (quoting *McCoy v. Goldston,* 652 F.2d 654, 658 (6th Cir. 1981)). Knowingly lying during the *voir dire* violates, *inter alia,* 18 U.S.C. § 1621, and subjects a juror to possible criminal contempt pursuant to 18 U.S.C. § 401, as well as to possible substantial restitution claims by the government. *See id.* A juror hiding the fact that he knows the defendant exhibits "a personal interest in this particular case that was so powerful as to cause the juror to commit a serious crime. Such an interest not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court." *Id.* at 151-52 (footnote omitted). *See also United States v. Bynum,* 634 F.2d 768, 771 (4th Cir.1980) ("[c]ertainly when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on *voir dire,* the result

is deprivation of the defendant's rights to a fair trial.") (footnote omitted); *see also McCoy,* 652 F.2d at 659 (district judge shall presume bias where juror deliberately concealed information).

"[C]ourts cannot administer justice in circumstances in which a juror can commit a federal crime in order to serve as a juror in a criminal case and do so with no fear of sanction so long as a conviction results." *Columbo*, 869 F.2d at 152. To be clear, it is important for this Court to recognize that a juror's dishonesty during *voir dire* is not subject to harmless error analysis. *See id.* (remanding to determine only if the juror's answer was true or false; if false, Second Circuit determined that was sufficient for the "conviction to be vacated"); *see also United States v. Perkins*, 748 F.2d 1519, 1531-33 (11th Cir. 1984) (refusal to disclose that juror knew defendant gives rise to presumption of actual bias). Had Juror #13 not lied, Teman would have had the ability to strike that juror for cause and/or to exercise a peremptory challenge. While Juror #13 ended up as an alternate, it is impossible for this Court to conclude that this did not impact the overall composition of the panel to which Teman exercised his peremptory challenges.

Because the alternate juror lied, Teman is entitled to a new trial because Teman was denied access to accurate and honest information when exercising his peremptory strikes and when given the opportunity to strike jurors for cause. At a minimum, Teman requests an evidentiary hearing to determine whether the venire panel was influenced by the alternate juror who knew Teman and lied about it.

### D. Teman's Grounds for a Rule 29 Judgment of Acquittal Also Apply with Full Force to Teman's Request for a New Trial

Teman respectfully incorporates herein each argument in support of his motion for a Rule 29 judgment of acquittal as an argument also in support of his motion for a new trial. In the event this Court denies Teman's motion for judgment of acquittal, Teman respectfully requests that this

Court consider those grounds (*e.g.* constructive amendment, venue, etc.) as sufficient grounds to grant Teman a new trial at a minimum.

    **IV.**    **Conclusion**

    Based on the foregoing, Teman respectfully requests that this Court grant him a judgment of acquittal on all counts pursuant to Rule 29(c). In the alternative, this Court should enter an order granting Teman a new trial on all counts.

                    Respectfully submitted,

                    */s/ Justin K. Gelfand*
                    JUSTIN K. GELFAND, #62265
                    8000 Maryland Ave., Ste. 420
                    St. Louis, MO 63105
                    Telephone: (314) 390-0234
                    Facsimile: (314) 485-2264
                    justin@margulisgelfand.com

                            — and —

                    */s/ Joseph A. DiRuzzo, III*
                    Joseph A. DiRuzzo, III
                    NY Bar # 4417853
                    DIRUZZO & COMPANY
                    Joseph A. DiRuzzo, III
                    401 East Las Olas Blvd., Suite 1400 Ft.
                    Lauderdale, FL 33301
                    Telephone: (954) 615-1676
                    Facsimile: (954) 827-0340
                    jd@diruzzolaw.com

                    **Attorneys for Teman**

                    */s/ Alan Dershowitz*
                    ALAN DERSHOWITZ*
                    1575 Massachusetts Avenue
                    Cambridge, MA 02138

                    **Of Counsel**

*Member of the Massachusetts Bar and the
United States Court of Appeals for the
Second Circuit; will seek pro hac vice
admission in this case

**Certificate of Service**

I hereby certify that I filed the foregoing through the Court's CM/ECF system which will provide notice of filing to all counsel of record.

/s/ Justin K. Gelfand
JUSTIN K. GELFAND, #62265
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com
**Attorney for Teman**