UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | S2 19 Cr. 696 (PAE) |
| ARI TEMAN, | |
| Defendant. | |

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ARI TEMAN'S MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Kedar S. Bhatia
Assistant United States Attorney
        *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 1

    A.    The Indictment .................................................................................................. 1

    B.    Pretrial Rulings .................................................................................................. 2

    C.    The Government's Case .................................................................................... 4

    D.    The Defense Case ............................................................................................ 11

    E.    The Verdict ...................................................................................................... 12

LEGAL STANDARD ............................................................................................................ 13

    A.    Rule 29 ............................................................................................................ 13

    B.    Rule 33 ............................................................................................................ 14

ARGUMENT ........................................................................................................................ 14

I.     Teman's Arguments for a Judgement of Acquittal are Meritless ................................... 14

    A.    The Court Did Not Constructively Amend the Indictment.................................. 14

    B.    A Reasonable Jury Could Find that Teman's Scheme Involved Material
         Misrepresentations .......................................................................................... 20

    C.    A Reasonable Jury Could Find Venue by a Preponderance of the Evidence ...... 21

    D.    A Reasonable Jury Could Find that Teman Acted with Criminal Intent ............. 26

II.    Teman's Arguments for a New Trial are Meritless ........................................................ 27

    A.    The Government Did Not Violate Rule 615 ........................................................ 27

    B.    A New Trial Is Not Warranted Based on the Court's Exclusion of Teman's
         Proposed Expert Witness .................................................................................. 29

    C.    The Defendant Is Not Entitled To A New Trial Based on Vague
         Allegations of Misconduct by an Alternate Juror ............................................... 37

CONCLUSION .................................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Baker v. Urban Outfitters, Inc.*,
254 F. Supp. 2d 346 (S.D.N.Y. 2003) ................................................................. 36

*Bourjaily v. United States*,
483 U.S. 171 (1987) ............................................................................................. 30

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ............................................................................................. 30

*F.A.A. v. Landy*,
705 F.2d 624 (2d Cir. 1983) ................................................................................ 34

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .............................................................................. 30, 36, 37

*Kumho Tire Company, Inc. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................................. 30

*Marx & Co. v. Diners' Club, Inc.*,
550 F.2d 505 (2d Cir. 1977) .......................................................................... 31, 33

*Riccardi v. Price, No. 16-cv-7806*,
2019 WL 6570576 (C.D. Cal. Sept. 17, 2019) ................................................... 38

*SEC v. Lipson*,
46 F. Supp. 2d 758 (N.D. Ill. 1998) .................................................................... 30

*United States v. Agrawal*,
726 F.3d 235 (2d Cir. 2013) .......................................................................... 17, 19

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) ................................................................................ 13

*United States v. Bezmalinovic*,
962 F. Supp. 435 (S.D.N.Y. 1997) ...................................................................... 23

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) ..................................................................... 31, 33-34

*United States v. Canova*,
412 F.3d 331 (2d Cir. 2005) ................................................................................ 14

*United States v. Collins*,
581 F. App'x 59 (2d Cir. 2014) ......................................... 30-31, 31, 33, 34, 35

*United States v. Cuthel*,
903 F.2d 1381 (11th Cir. 1990) .......................................................................... 38

*United States v. D'Amelio*,
   683 F.3d 412 (2d Cir. 2012) ........................................................................... 15, 17

*United States v. Danielson*,
   199 F.3d 666 (2d Cir. 1999) ........................................................................... 16, 17

*United States v. Desena*,
   287 F.3d 170 (2d Cir. 2002) ........................................................................... 13, 26

*United States v. Duncan*,
   42 F.3d 97 (2d Cir. 1994) ................................................................................... 36

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006) ............................................................................... 32

*United States v. Engelmann*,
   985 F. Supp. 2d 1042 (S.D. Iowa 2013) ............................................................ 29

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001) ........................................................................... 14, 29

*United States v. Guadagna*,
   183 F.3d 122 (2d Cir. 1999) ............................................................................... 13

*United States v. Jackson*,
   335 F.3d 170 (2d Cir. 2003) ............................................................................... 13

*United States v. James*,
   239 F.3d 120 (2d Cir. 2000) ........................................................................... 13, 26

*United States v. Johnston*,
   578 F.2d 1352 (10th Cir. 1978) ......................................................................... 28

*United States v. Lawrence*,
   477 F. Supp. 2d 864 (S.D. Ohio 2006) .............................................................. 37

*United States v. Lopez-Martinez*,
   543 F.3d 509 (9th Cir. 2008) ............................................................................. 38

*United States v. Magassouba*,
   619 F.3d 202 (2d Cir. 2010) ........................................................................... 23, 24

*United States v. Matthews*,
   20 F.3d 538 (2d Cir. 1994) ................................................................................. 13

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001) ............................................................................... 14

*United States v. McMahon*,
   104 F.3d 638 (4th Cir. 1997) ............................................................................. 28

*United States v. Mollica,*
   849 F.2d 723 (2d Cir. 1988) ........................................................................... 14

*United States v. Morrison,*
   153 F.3d 34 (2d Cir. 1998) ............................................................................. 14

*United States v. Parkes,*
   497 F.3d 220 (2d Cir. 2007) ........................................................................... 14

*United States v. Parse,*
   789 F.3d 83 (2d Cir. 2015) ............................................................................. 37

*United States v. Prichard,*
   781 F.2d 179 (10th Cir. 1986) ........................................................................ 28

*United States v. Resendiz-Ponce,*
   549 U.S. 102 (2007) ................................................................................. 14, 15

*United States v. Rigas,*
   490 F.3d 208 (2d Cir. 2007) ........................................................................... 32

*United States v. Rodriguez,*
   140 F.3d 163 (2d Cir. 1998) ...................................................................... 20, 21

*United States v. Rutigliano,*
   790 F.3d 389, 396 n.3 (2d Cir. 2015) .................................................. 22, 23, 24

*United States v. Saavedra,*
   223 F.3d 85 (2d Cir. 2000) ............................................................................. 24

*United States v. Scop,*
   846 F.2d 135 (2d Cir.) .................................................................................... 31

*United States v. Sindona,*
   636 F.3d 792 (2d Cir. 1980) ........................................................................... 22

*United States v. Solorio,*
   337 F.3d 580 (6th Cir. 2003) .......................................................................... 28

*United States v. Tomasetta,*
   2011 WL 6382562 (S.D.N.Y. Dec. 12, 2011) ................................................. 33

*United States v. Trapilo,*
   130 F.3d 547 (2d Cir. 1997) ........................................................................... 32

*United States v. Walker,*
   191 F.3d 326 (2d Cir. 1999) ........................................................................... 13

*United States v. Williams,*
   458 U.S. 279 (1982) ....................................................................................... 20

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) .................................................................................... 30

**Statutes and Federal Rules**

18 U.S.C. § 1028A ....................................................... 2, 3, 4, 8, 9, 10, 11, 12

18 U.S.C. § 1343 ...................................................................................................... 2

18 U.S.C. § 1344 ...................................................................................................... 2

18 U.S.C. § 3237 .................................................................................................... 22

Fed. R. Crim. P. 16 ............................................................................................... 36

Fed. R. Crim. P. 29 ............................................................................................... 13

Fed. R. Crim. P. 33 ............................................................................................... 14

Fed. R. Evid. 401 .................................................................................................. 29

Fed. R. Evid. 403 .................................................................................................. 29

Fed. R. Evid. 608 .................................................................................................. 29

Fed. R. Evid. 615 ...................................................................................... 27, 28, 29

Fed. R. Evid. 702 ........................................................................ 29, 30, 31, 33, 36

Fed. R. Evid. 704 ............................................................................................ 31, 35

The Government submits this memorandum of law in opposition to defendant Ari Teman's Motion for a Judgment of Acquittal or, in the Alternative, for a New Trial, dated February 26, 2020. *See* ECF No. 111 ("Deft's Motion"). For the reasons set forth below, the defendant's motion should be denied.

## PRELIMINARY STATEMENT

Reiterating many of the arguments he made before and during trial, Teman argues he is entitled to a judgment of acquittal for several reasons, all of which fail based on even a cursory review of the record. First, Teman argues that the Government and the Court constructively amended the Indictment through the proof at trial and the jury charge, respectively. Yet Teman had ample notice of the essential elements of the charges against him, he had ample notice of how the Government would prove those elements, and the Court's jury instructions tracked the basic elements of the charges against him. Teman's other arguments for a judgment of acquittal – the claimed absence of any misrepresentations and absence of proof of venue or criminal intent – are bare arguments about the sufficiency of the evidence that are undermined by the weight of the proof against him.

Teman argues in the alternative for a new trial. Teman argues that the Government violated the "rule of sequestration," which bars witnesses from discussing their testimony, even though no two witnesses communicated. Teman's other arguments for a new trial are no more availing. Teman's motion for a judgment of acquittal or, in the alternative, for a new trial, should be denied.

## STATEMENT OF FACTS

### A.    The Indictment

On January 3, 2020, a grand jury sitting in this District returned Indictment S2 19 Cr. 696 (the "Indictment"), charging defendant Ari Teman with two counts of bank fraud, in violation of

18 U.S.C. § 1344, and two counts of wire fraud, in violation of 18 U.S.C. § 1343.[1]

Count One charges Teman with one count of bank fraud for his scheme to deposit twenty-seven checks in April 2019. Count Three charges Teman with one count of wire fraud for his scheme to deposit the same twenty-seven checks. Count Two charges Teman with one count of bank fraud for his scheme to deposit two checks in March 2019. Count Four charges Teman with one count of wire fraud for his scheme to deposit those two checks.

### B.    Pretrial Rulings

Before trial, the Government and Teman each filed various motions *in limine*. Of note here, on January 8, 2020, the Government moved to preclude testimony by Teman's proposed expert witness, J. Benjamin Davis, Esq. *See* ECF No. 74 ("Govt. Motion To Preclude"). Teman gave notice that Davis would testify regarding two general topics. First, Davis would testify about the nature of "remotely created checks" ("RCCs"), namely that an RCC is a check "drawn on a customer's bank account" and "often is authorized by the customer remotely . . . ." *Id.*, Exh. A at 3-4 ("Expert Disclosure Letter"). Davis would further testify that certain terms and conditions on Teman's website authorized Teman to draw checks on behalf of his customers. *Id.* at 4. Davis would testify that the 29 checks deposited by Teman, unbeknownst to the victims in this case, "were valid RCCs." *Id.* Second, Davis would testify that federal banking regulations and trade organization had specific requirements for labeling a check as a "counterfeit check." Expert Disclosure Letter at 2-3. In Davis's opinion, the twenty-seven checks deposited by Teman without a signature were not "counterfeit checks," and the two checks deposited by Teman with unauthorized signatures "contain features designed to draw attention to the fact that the displayed

---

[1] The Indictment also charged Teman with two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. On January 14, 2020, the Government informed the Court and the defense that it had elected not to proceed on those two counts at trial. *See* ECF No. 79.

signature is not that of an Account holder or authorized signer on file with the paying bank." *Id.*

On January 10, 2020, the Court granted the Government's motion and precluded the proffered testimony of Davis. As to Davis's proposed testimony about RCCs, the Court found that Davis's testimony was irrelevant because "this case does not concern the technical regulatory question of whether the checks meet the Federal Reserve Board's definition of a valid RCC, as interpreted by Davis or otherwise." Conf. Tr. at 33. In addition, the Court found that "Davis' commentary on these points . . . would serve to confuse the jury as to what the issues they must decide are" and "would invade the Court's province to instruct the jury as to the law." *Id.* at 34. As to Davis's testimony about the definition of a "counterfeit check" and whether Teman's checks met that definition, the Court also found that Davis's "technical discussion of how the checks align with his understanding of the word 'counterfeit'" would be irrelevant and "serve only to confuse and distract the jury." *Id.* at 36.

The Court did, however, comment on the use of the word "counterfeit" in the to-wit clauses in the Indictment:

> Although this case is not brought under a federal statute regarding counterfeit checks, but instead, as relevant here under the bank and wire fraud statutes, the government in the "to wit" clauses of Counts One through Four of the indictment has chosen to use the adjective "counterfeit" to describe the checks that Teman deposited. From both the indictment and the government's account in its filings in this case in its theory of liability, it seems clear to the Court that, in context, the term "counterfeit" is being used in the "to wit" clauses in the lay sense to describe the fact of checks that were created without the account holder's authorization. Insofar as the checks purported to have been drawn by the account holder to the payees in the sums indicated, but in fact had not been, they were "counterfeit." There's no indication, in the indictment or otherwise, that by use of that adjective, the grand jury intended some other technical meaning of counterfeit, such as the one that Davis may have in mind, in which he contends that literally every jot and tittle of the check must have been fabricated by the defendant before it may be called counterfeit.

*Id.* at 36-37.

The Court then sought to confirm with counsel for the Government that the use of the

word "counterfeit" was not based on a technical definition given to the grand jury. *Id.* at 37. Government counsel confirmed that the theory of liability presented to the grand jury was that the checks were counterfeit in the lay sense, that is, they were non-genuine or non-authorized. *Id.* at 38.

### C.   The Government's Case

#### 1.   GateGuard, Inc.

On January 22, 2020, trial commenced on Counts One through Four of the Indictment. Evidence at trial showed that Teman owned GateGuard, Inc., a business he used to sell intercom devices for apartment buildings. *E.g.*, Trial Tr. 312-13, 420-21, 489-90. Teman told customers that the intercoms would let residents monitor who was coming in and out of buildings and speak with visitors when they rang the doorbell. *Id*. After hearing the defendant's sales pitch, some customers, including the owners and cooperative boards of certain apartment buildings in Manhattan and the Bronx, agreed to buy the intercoms. *Id.* The charges against Teman and the evidence at trial focused on three of Teman's customers: 518 West 204 LLC, managed by Coney Management; 18 Mercer Equity Inc. ("18 Mercer"), managed by Crystal Real Estate Management; and ABJ Lenox LLC ("ABJ Lenox") and ABJ Milano LLC ("ABJ Milano"), both managed by ABJ Properties LLC ("ABJ Properties").

Elie Gabay, a Managing Director at Coney Management, testified that on January 31, 2018, Coney Management paid $3,600 for one intercom device. Trial Tr. 319, 342; *see also* GX 413 (invoice); GX 146 (check). Bonnie Soon-Osberger, a former board member of the cooperative at 18 Mercer Street, testified that on April 4, 2018, the co-operative board governing the building at 18 Mercer Street paid GateGuard $2,499 for one intercom device, $849 for installation of that device, and $599.88 for one year of service for that intercom device. Trial Tr. 425-26, 459; GX 431 (invoice); GX 143 (check). Joseph Soleimani, a Vice-President at ABJ

Properties, testified that from March 2017 to October 2017, ABJ Properties, through ABJ Lenox and ABJ Milano, paid $499 each for nine intercom devices, $650 each for installation of those nine devices, and $594 for six-months of service for each device. Trial Tr. 494-496; GX 409A, 409B (invoices); GX 130 (ABJ Lenox checks); GX 131 (ABJ Milano checks). Each entity paid Teman with checks from its corporate account. GX 130, 131, 143, 146.

Gabay, Soon-Osberger, and Soleimani each testified that they had never seen any webpage – such as a "payment terms" page – that gave Teman authority to write checks from their corporate bank accounts. Trial Tr. 332, 428, 563. The witnesses testified that they never gave Teman that authority. Trial Tr. 327, 428-29, 441. And the witnesses testified that they never would have given a vendor that authority because they needed to retain control over inflows and outflows from their corporate accounts. Trial Tr. 327-28, 361, 428, 569. The witnesses also testified that, prior to purchasing their devices, Teman never told them he was assuming authority to write checks from their accounts if they did business with him. Trial Tr. 326, 332, 497, 498, 568. The witnesses testified that if Teman had asked for that authority, they each would have said unequivocally no. Trial Tr. 327, 361, 428-29, 568.

Soon after Teman installed the devices, his customers had problems with the intercoms. *See, e.g.*, Trial Tr. 436-37. The intercoms didn't work properly, Teman's customers received complaints from their tenants and those who lived in the buildings, and the customers relayed their concerns to Teman. *E.g.*, Trial Tr. 335, 437, 499-501. In response to these complaints, Teman blamed internet connectivity problems or claimed the customers or tenants did not know how to properly use his devices. *E.g.*, Trial Tr. 437, 501.

Eventually, each of the three customers told Teman that they would stop using his devices or that they would not order any more of his devices for other buildings. Gabay had been

in negotiations with Teman to buy additional intercoms beyond the one in a building at 518 West 204th Street when he told Teman that, "[g]iven all of the issues" with the GateGuard system, others at Coney Management were "very hesitant to move forward with [Teman]" and believed they "need[ed] to put this entire project on hold." GX 416; *see also* Trial Tr. 333-34 ("We were having some challenges with the unit that had been installed, and during the troubleshooting process I communicated with Mr. Teman that until some of these issues were resolved, we'd like to put a hold on any further discussions on the larger order."). Soon-Osberger told Teman that 18 Mercer "need[ed] to move on" by "hav[ing] the system removed." Soleimani installed another company's intercom device in one of his buildings to try it as an alternate to Teman's intercom device. GX 405; Trial Tr. 507.

Teman was furious after hearing that his customers no longer wanted to use his intercom devices. He called one of Gabay's building managers "an idiot," and accused Gabay of wasting his time. GX 417. Teman threatened to place a lien on Gabay's building if he did not pay Teman $18,000 each for 10 devices, and Teman also threatened to sue Gabay. GX 417; GX 418. Teman threatened to place a lien on Soon-Osberger's building and sue members of the building co-op's board of directors. Trial Tr. 440. After Soleimani installed another company's intercom device in one of his buildings, Teman responded with a rambling email accusing Soleimani of lying to him, "wast[ing] months of [his] time," "pretending to be [his] friend." GX 405. Teman also threatened to file liens against Soleimani's buildings, sue Soleimani, and report him to the New York Attorney General. Trial Tr. at 513, 561. Although Teman threatened to sue his customers, place liens on their properties, refer them to collections agencies, and even refer them to law enforcement authorities, at no point did he ever tell his customers that he would withdraw funds from their account or write checks from their accounts to take the money he believed he was

owed. Trial Tr. 361, 568. Throughout late-2018 and early-2019, Teman's relationship with his three customers deteriorated. *See* Trial at Tr. 335, 360, 514, 561.

**2.**     **The Fraudulent Checks**

On March 28, 2019, the defendant deposited two checks, each worth $18,000, into an account at Bank of America, N.A. ("Bank of America") held in the name of "GateGuard, Inc." (the "GateGuard Account"). *See* GX 113. These two checks were signed and made to appear that they had been issued by two entities, 518 West 204 LLC and 18 Mercer. GX 201 (518 West 204 LLC checks); GX 202 (18 Mercer checks).[2] The checks were deposited by Teman via "mobile deposit," meaning Teman took a picture of the check using his mobile device and then uploaded that image to Bank of America's online environment. Trial Tr. 198-99. Government Exhibit 113, a spreadsheet produced by Bank of America, shows that the checks were deposited from IP addresses in New York, New York, while other transactions by Teman were made from IP addresses in the Bronx, New York, and Brooklyn, New York. An IP address is "an internet protocol address" that "gives a distinct location in which an online banking login is being conducted." Trial Tr. 202-03.

Gabay, Soon-Osberger, and Gina Hom, who managed the 18 Mercer bank account, each testified that they had never authorized the two checks Teman deposited into the GateGuard account on March 28. Trial Tr. 357-58, 360-61, 441, 474.

On March 29, 2019, approximately $35,000 was transferred from the GateGuard Account to another account at Bank of America operated by Teman, this time in the name of another company he owned, "Friend or Fraud, Inc." (the "Friend or Fraud Account"). GX 113; *see also*

---

[2] Theses checks and others that he deposited on behalf of customers had various errors. For example, the checks purportedly issued by 518 West 204 LLC actually said they were issued by 518 West 20<u>5</u> LLC. *See* Trial Tr. 358-59.

GX 102, 103, 104. On April 2, 2019, Bank of America issued what it described as a "return item charge back," or "charge-back," in the amount of approximately $36,000 from the GateGuard Account to 518 West 204 LLC's and 18 Mercer's accounts, respectively, both held at Signature Bank, N.A. ("Signature Bank"). GX 113; *see also* GX 102, 142, 145.

A charge-back can occur when the bank sending money, here, Signature Bank, identifies a transaction as fraudulent and seeks to have money returned. Trial Tr. 208-209. Funds are automatically retrieved from the bank to which they were sent, here, Bank of America, and returned to the originating bank. *Id.* The charge-back on April 2, 2019, resulted in $36,000 being automatically pulled out of the GateGuard Account at Bank of America and returned to 518 West 204 LLC's and 18 Mercer's account at Signature Bank. GX 113. However, because most of the funds deposited into the GateGuard Account had already been moved by Teman to the Friend or Fraud Account, after the charge-back the GateGuard Account had a deficit of approximately $29,036.56. GX 113. Accordingly, after this chargeback, Bank of America bore a loss from Teman's fraud because it had to repay Signature Bank from the bank's own funds. Trial Tr. 209-10.

The GateGuard account continued to have a negative balance until, on April 19, 2019, at a branch of Bank of America located in Miami, Florida, Teman deposited approximately twenty-seven fraudulent checks worth $297,000 into the GateGuard Account. GX 113; Trial Tr. 272. The checks were made to appear that they had been issued by three entities: ABJ Lenox and ABJ Milano, two entities operated by the same company; and 518 West 204 LLC, referenced above. GX 203-205. ABJ Lenox's and ABJ Milano's accounts were held at JPMorgan Chase Bank, N.A. ("JPMorgan"). GX 122, 124. Eighteen checks, totaling approximately $198,000, were drawn on ABJ Lenox's account; six checks, totaling approximately $66,000, were drawn on ABJ

Milano's account; and three checks, totaling approximately $33,000, were drawn on 518 West 204 LLC's account. GX 201-205. Prior to Teman depositing these checks into the GateGuard Account, the GateGuard Account had a negative balance of approximately $29,292.88. GX 113.

Soleimani and Gabay testified that they never authorized Teman to deposit any of the twenty-four checks drawn on the ABJ accounts or the three checks drawn on the 518 West 204 LLC account. Trial Tr. 358, 563. In fact, by the date Teman deposited those checks in April 2019, the 518 West 204 LLC account had already been closed due to Teman's attempt to draw funds from the same account in March 2019. Trial Tr. 363, 685-86.

In addition, both Soleimani and Gabay testified that they and others in their respective offices observed Passover, an annual religious holiday that began on April 19, 2019. Trial Tr. 367-69, 564-65. Soleimani and Gabay observed the holiday by, among other things, abstaining from using electronic devices on the first two days of the holiday. *Id.* Accordingly, because Teman deposited twenty-seven checks drawn from Soleimani's and Gabay's accounts on the "eve" of Passover, Trial Tr. 368, Soleimani and Gabay did not have access to their electronic devices for the next two days, which gave Teman a head-start in transferring the money to himself without interference.

On April 24, 2019, Bank of America completed a charge-back of approximately $33,000 from the GateGuard Account to 518 West 204 LLC's account, held at Signature Bank. GX 113. Two days later, or about April 26, 2019, Teman transferred approximately $225,000 in proceeds he had obtained by depositing the fraudulent checks out of the GateGuard Account and into the Friend or Fraud Account. GX 113; *see also* GX 102, 104. He also transferred approximately $3,600 in proceeds he had obtained out of the GateGuard Account and into an account at Bank of America held in the name of "Ari Teman" (the "Teman Account"). GX 113; *see also* GX 102,

108. On April 26, 2019, Teman further dispersed the proceeds of his scheme, transferring approximately $180,000 from the Friend or Fraud Account to an account in the name of "Touchless Labs LLC" (the "Touchless Labs Account"), and transferring approximately $4,500 from the Friend or Fraud Account to the Teman Account. GX 113; *see also* GX 102, 106, 108. On April 29, 2019, Teman transferred approximately $125,400 from the Touchless Labs Account back to the Friend or Fraud Account. GX 113; *see also* GX 104, 106. On the same day, approximately $117,000 was transferred from the Friend or Fraud Account to an account held in China. GX 113; *see also* GX 104; Trial Tr. 291-292. Two days later, on May 1, 2019, approximately $20,000 was transferred from the Friend or Fraud Account to another account held in China. *Id.*

On May 7, 2019, Bank of America completed a charge-back of $264,000 from the GateGuard Account to ABJ Lenox's and ABJ Milano's accounts held at JPMorgan. GX 113. This charge-back was based on the amount of the checks Teman fraudulently deposited on April 19, 2019, that were drawn from ABJ Lenox's and ABJ Milano's accounts. GX 113; Trial Tr. 230-231. Following that charge-back, the GateGuard Account had a negative balance of $260,319.81. GX 113. Thereafter, on May 8, 2019, the defendant entered a branch of Bank of America located in Manhattan, New York and, at a bank teller window, withdrew approximately $4,000 from the Friend or Fraud Account, representing the proceeds he received from depositing the April 2019 checks. Trial Tr. 231; GX 104, 112, 113.

In total, Bank of America suffered a loss of approximately $260,319.81 by repaying Signature Bank and JPMorgan for the losses those entities had sustained when the 29 fraudulent checks deposited on March 28 and April 19, 2019 were drawn against those entities' accounts. Trial Tr. 231.

### D.     The Defense Case

The defense called one witness, Ariel Reinitz, Esq., an attorney for the defendant and GateGuard. Through Reinitz, the defense introduced a page from GateGuard's website titled "Payment Terms" that was purportedly "last revised" on January 27, 2019, after Gabay, Soon-Osberger, and Soleimani had purchased their intercom devices, after the breakdown in their respective relationships with Teman, and two months before Teman would begin writing and depositing checks on his customers' behalf. *See* DX 2. Page 5 of this webpage purportedly gave Teman permission to write checks from his customers' accounts to himself:

> You give us permission to write and sign checks with your checking and/or savings account(s) information to do a bank draw against your entity (or entities) for the amount it (or they) owe(s).
>
> You agree that if you own multiple entities we may draw against one to collect the debt owed by another, and that you and only you are responsible for balancing the moneys owed between the entities. For example, if your Property A owes us $10,000 and we have the checking account information for your Property B, you agree that Property B is acting as a guarantor of Property A (and all your properties and personal accounts are also acting as a guarantor for all other properties and entities you own in full or partially. To put it in plain English: you agree that if anything you own owes us money, or if you owe us money, we may draw that amount from any bank account or savings or investment account you own in full or in part and it's 100% your responsibility to pay that other account back, not us.

*Id.*

Reinitz testified that he had represented GateGuard in trying to collect money from customers, including Gabay and Soleimani. *See* Trial Tr. 758, 761; GX 14, 36. Reinitz testified that Teman first raised the topic of using RCCs to collect money from customers in "March or April or May" or "mid 2018." Trial Tr. 770-71. Reinitz purportedly discussed the use of RCCs with Teman in "detailed discussions . . . over several days or a week or two," and he advised Teman that "the RCC payment method was a legitimate, legal method of payment." Trial Tr. 774-75.

Contradicting Reinitz's testimony was a series of WhatsApp messages between Teman and Reinitz in which Reinitz expressly told Teman *not* to go forward with a plan to write "RCCs" to himself from his customers' accounts. *See* GX 702, 704, 727-29. In one exchange on January 2, 2019, Teman wrote that he has "photos" of "ABJ checks" and that the "contract" allows him to "draw their account." Reinitz responded twice saying Teman's proposal was a "bad idea" and that Teman's customers "are likely to call [the] police." GX 702. Reinitz even added that Teman "will be arrested" and "will have a criminal case to deal with." *Id.* Far from endorsing Teman's behavior, Reinitz told Teman "[m]y opinion is that you are >50% likely to be arrested for the activities you propose. How you proceed is up to you." *Id.*

Reinitz's opinion did not change after Teman put his fraud scheme into action. In a message on April 2, 2019, after Teman deposited checks on behalf of 518 West 204 LLC and 18 Mercer and the funds were subject to a charge-back, Reinitz wrote "[n]ot sure I follow but this sounds bad." GX 704. Contrary to Reinitz's testimony that he had "detailed" discussions with Teman endorsing the use of RCCs, *see* Trial Tr. 774-75, Reinitz wrote "I don't know all the ins and outs of this but sounds like a bad idea." GX 704. Nevertheless, Teman continued to push Reinitz to bless his idea of use RCCs to take his customers' money and Reinitz, clearly frustrated, wrote back on April 10, 2019, that "I've already told you I think it's a bad idea. . . . If you hit their accounts I think 50/50 they call cops. If I was advising them that's probably what I would tell them to do." GX 728; *see also* GX 729 ("This banking stuff is not a joke.").

### E.    The Verdict

On January 29, 2020, after deliberating for approximately one day, the jury returned a verdict finding Teman guilty on all four counts in the Indictment.

On February 26, 2020, Teman filed the instant motion for a judgment of acquittal or, in the alternative, for a new trial. *See* ECF No. 111.

## LEGAL STANDARD

### A.      Rule 29

Rule 29 of the Federal Rules of Criminal Procedure provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Under Rule 29, a defendant challenging the "sufficiency of the evidence to support his conviction 'bears a heavy burden.'" *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)). "The jury's verdict must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Jackson*, 335 F.3d at 180 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original)).

In considering a Rule 29 motion, the Court should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted). The court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

"[T]o avoid usurping the role of the jury," *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted), the court must "resolve all issues of credibility in favor of the jury's verdict," *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002) (internal quotation marks omitted). "[T]he credibility of witnesses is the province of the jury, and [the court] simply cannot replace the jury's credibility determinations with [its] own." *United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000). Moreover, the court must "credit [] every

inference that the jury might have drawn in favor of the government," *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998), because the "task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

### B.      Rule 33

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Given the deference owed to a jury's verdict, however, the Second Circuit has cautioned that district courts should exercise their Rule 33 authority only "'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citations omitted). Thus, a motion for a new trial should not be granted unless, after evaluating "the entire record of the trial," the trial court is left with a "real concern that an innocent person may have been convicted." *Id.* "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Id.*; *accord United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007); *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005).

### ARGUMENT

### I.      <u>Teman's Arguments for a Judgement of Acquittal are Meritless</u>

### A.      The Court Did Not Constructively Amend the Indictment

#### 1.      Applicable Law

Constructive amendment of an indictment occurs when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988). In *United States v. Resendiz-Ponce*, 549 U.S. 102 (2007), the

Supreme Court restated the "two constitutional requirements for an indictment: 'first, [that it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Id.* at 108 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974) While constructive amendment is a *per se* violation of the Grand Jury Clause requiring reversal, the Second Circuit has "'consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial.'" *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007)). The "core of criminality" of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview. *Id.* at 418.

### 2. Discussion

Here, the defendant claims he is entitled to a judgment of acquittal for two reasons based on a theory of constructive amendment. First, he argues that because the "to wit" clauses for Counts One through Four reference "counterfeit" checks, the Court "unconstitutionally broadened the bases for possible conviction" by charging the jury as it did. Deft's Motion at 10. Second, he argues that the Government failed to prove that the checks he deposited were "counterfeit," which he argues the Government was required to do. Both grounds for a judgment of acquittal are unavailing.

### i. The Court Did Not Constructively Amend the Indictment with Its Jury Charge

The defendant's argument that the Court improperly broadened the basis for conviction by charging the jury as it did fails. The Court properly charged the jury on the elements of bank fraud. Tellingly, the defense is vague about how the Court purportedly erred, writing that "in

instructing the jury as it did, the Court shifted the focus away from the language of the indictment itself." Deft's Motion at 10. Yet, the Court instructed the jury on each count of bank fraud and wire fraud, *i.e.*, knowingly and willfully executing a scheme or artifice to defraud. Trial Tr. 1072-83 (bank fraud), 1083-89 (wire fraud). Moreover, as part of its charge, the Court read to the jury the language in the indictment that references "counterfeit" checks. Trial Tr. 1072-73, 1084-85.

The Second Circuit's ruling in *United States v. Danielson*, 199 F.3d 666 (2d Cir. 1999), is instructive. In that case, the indictment charged that the defendant "unlawfully, willfully, and knowingly did possess ammunition in and affecting commerce, and did receive ammunition which had been shipped and transported in interstate and foreign commerce, *to wit, 7 rounds of .45 calibre ammunition*." *Id.* at 668 (internal quotation marks omitted). At trial, the Government's proof showed that certain *shells*, one component part of an ammunition round, had traveled in interstate commerce. *Id.* at 668-69. Over defense counsel's objections, the district court charged the jury using the standard statutory definition of "ammunition," which included "[a]ny ammunition or cartridge cases, primers, bullets or propellent powder designed for use in any firearm." *Id.* at 669. The Second Circuit held that the district court had not impermissibly broadened the indictment by instructing the jury based on the statutory definition of "ammunition," rather than narrowly instructing the jury that it had to find "7 rounds of .45 calibre ammunition" had traveled in interstate commerce: "The essential element of the offense charged was that Danielson possessed ammunition that had traveled in interstate commerce, not the precise nature of that ammunition. Whether the government proved that shells or entire rounds had so traveled, there is no doubt that Danielson had notice of the 'core of criminality' to be proven at trial and that he was convicted of the offense charged in the indictment." *Id.* at 670.

Likewise, in *United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012), the indictment stated in the "to wit" clause that the defendant "used a computer and the internet" to entice a minor, yet the Second Circuit held it was not error for the district court to instruct the jury that use of the telephone or the internet could satisfy the interstate facility requirement. *Id.* The Second Circuit held that instructing the jury that both the telephone or internet could satisfy that element was appropriate because the "'essential element' of the crime was the use of a facility or means of interstate commerce, not the particular means used." *Id.* at 423. "[W]here the indictment charged a single course of conduct and the deviation from the interstate commerce facilities alleged in the 'to wit' clause did not permit conviction for a functionally different crime, it cannot be said that the deviation in evidence broadened the possible basis for conviction beyond that contained in the indictment." *Id.* (internal quotation marks and alterations omitted).

So too here, the Court instructed the jury on the essential elements of the charged offenses. The instructions did not add an element to the charged offenses, or instruct as to "a functionally different crime." *Id.* Rather, the instructions correctly tracked the two offenses charged, bank fraud and wire fraud. *D'Amelio*, 683 F.3d at 423; *Danielson*, 199 F.3d at 670; *see also United States v. Agrawal*, 726 F.3d 235, 259 (2d Cir. 2013). The defense apparently wished the Court to "require the jury to find that Teman 'deposited counterfeit checks,'" Deft's Motion at 10, but the elements of these offenses did not require that level of detail, and case law imposes no such requirement.

Indeed, Teman had ample notice of the Government's theory of liability. Among other things, the Government outlined its theory in several pretrial filings. *See, e.g.*, Government's Memorandum of Law in Opposition to Defendant's Pretrial Motions (Dec. 12, 2019), ECF No. 39 at 2-5 ("These two checks were signed and made to appear that they had been issued by two

entities, "Entity-3" and "Entity-4."); Government's Proposed Examination of Prospective Jurors (Jan. 6, 2020), ECF No. 57 at 2 ("The Government has alleged in the Indictment that, in or about March 2019, the defendant deposited two checks into his bank account that he was not authorized to deposit. The Government has further alleged in the Indictment that, in or about April 2019, the deposited . . . 27 additional checks into his bank account that he was not authorized to deposit."); Government's Memorandum of Law in Opposition to Defendant's Motions *in Limine* (Jan. 8, 2020), ECF No. 73 at 2 ("[T]he central questions for the jury to decide are whether Teman was authorized to issue and deposit the checks and whether he perpetuated schemes to defraud."); Government's Motion to Preclude Testimony by Expert Witness (Jan. 8, 2020), ECF No. 74 at 3 ("The Government need only prove that Teman participated in a scheme to defraud, not whether he counterfeited or forged checks. Teman has not proffered facts showing that he was aware of or following the UCC, and whether the checks were "counterfeit" or "forged" under Davis's definition or the UCC is not relevant to whether Teman acted with criminal intent in his scheme to defraud the bank and his customers."). The Government made similar comments during the arraignment and pretrial conference on October 21, 2019. *See* October 21, 2019 Conference Tr. at 10 ("[W]e understand, from speaking with the companies on behalf of the checks, that these were not authorized or issued by those companies."). Indeed, in the Complaint in this case, the Government noted that the checks in question, labeled as "counterfeit," were issued without authority from Teman's customers. Complaint (June 20, 2019), ECF No. 1 at 4.

Because the Court instructed the jury on the essential elements of the offenses against Teman and Teman was on notice of the Government's theory of liability, the Court did not constructively amend the Indictment through its jury charge.

ii. **The Government Was Not Required To Prove That Teman's Checks To Himself Were Counterfeit Within A Technical Definition**

Teman next argues that he is entitled to a judgment of acquittal because the record "contains no evidence upon which a reasonable jury could possibly conclude that the twenty-nine RCCs at issue were 'counterfeit checks.'" Deft's Motion at 12-13. As set forth above, for the bank fraud and wire fraud charges, the Government was only required to prove a scheme to defraud and Teman's knowing and willful participation in that scheme. The elements themselves do not require a showing that the checks were counterfeit. Nor does a reference to "counterfeit checks" in the "to wit" clause impose such a requirement. *See Agrawal*, 726 F.3d at 261 ("[The defendant] argued that the government should not be allowed to rely on any proscribed means of theft referenced in the indictment other than those expressly stated in the 'to wit' clause. The Grand Jury Clause defeats, rather than supports, such an effort to construe a crime by reference to only part of the indictment returned by the grand jury.").[3]

Rather, the Government was required to prove that Teman deposited the checks in question as part of a scheme to defraud. As set forth above, there is ample evidence in the record that Teman wrote checks from his customers' account without their knowledge, buried a disclaimer deep on his website that would give him a bogus cover story to draw checks from his customers, deposited the checks into a bank account he controlled, and then moved funds out of the account before Bank of America could retrieve the funds. Accordingly, the evidence proves

---

[3] Moreover, Teman adopts a narrow, technical definition of the term "counterfeit" based on the Federal Reserve Board's Federal Register Notice, dated November 21, 2005, Regulation CC, and the Electronic Check Clearing House Organization rules. *See* Deft's Motion at 5. But those definitions are unduly narrow, and he cites no authority for relying on a hyper-technical definition of the term "counterfeit." Nevertheless, based on the record at trial, a reasonable jury could have found that Teman wrote a check on behalf of his clients that he put forward as legitimate when it was not, *i.e.*, a counterfeit.

that Teman created a scheme to defraud and that his conduct met the elements of bank fraud and wire fraud. Because the proof at trial and the Court's instructions match the essential elements of the charged offenses and the core of criminality referenced in the Indictment, there has been no constructive amendment, and Teman's motion for an acquittal on this basis fails.

**B.      A Reasonable Jury Could Find that Teman's Scheme Involved Material Misrepresentations**

Teman next argues that the checks at issue in this case did not contain material misrepresentations. Deft's Motion at 13-16. In support of this argument, he cites to *United States v. Williams*, 458 U.S. 279 (1982), and *United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998). Both of these cases are inapposite, and the record shows that the checks contained material misrepresentations.

In *United States v. Williams*, 458 U.S. 279 (1982), the Supreme Court held that in the context of check kiting, *i.e.*, depositing checks into accounts when there were, in fact, no funds to back up the check, "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 284. The Court held that a check was "simply a draft drawn on a bank and payable on demand" that "contains an unconditional promise or order to pay a sum certain in money." *Id.* at 285 (internal quotation marks and alterations omitted). Likewise, in *United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998), the defendants created a scheme to submit phony invoices to a company that in turn generated checks made payable to the defendants. The Second Court held that the act of depositing a check generated by the company – which was a valid check, albeit earned through fraud – did not, in itself, create "a deceptive course of conduct as to the bank" where the checks were deposited. *Id.* at 168.

By contrast, in this case, a reasonable jury could find that Teman wrote checks he was not authorize to write at all. This distinguishes the instant fraud from the ones in *Williams* and

*Rodriguez*, where the person depositing the checks was entitled to do so. Furthermore, Teman deposited his checks into an account at Bank of America and quickly transferred the funds to a secondary account knowing that the funds would likely be subject to a chargeback. As a result of his scheme – which revolved around depositing checks he was not authorized to deposit – he obtained $330,000 in funds that his customers had not authorized. This distinguishes his fraud from the one in *Rodriguez*, where the Second Circuit held that depositing a valid check "does not *alone* constitute false or fraudulent pretenses or representations." 140 F.3d at 168 (emphasis added).

Moreover, Teman's checks on their face contained material misrepresentations. Teman wrote on the two March 2019 checks, "DRAW PER CONTRACT. NO SIGNATURE REQUIRED," and included an apparent signature where the payor typically writes their signature. GX 201, 202. On the twenty-seven April 2019 checks, Teman wrote:

> <u>DRAW PER CONTRACT. NO SIGNATURE REQUIRED</u>
> NOTE TO BANK: This is a valid check. You are required by law to honor it.
> Contract at gateguard.xyz/legal/terms.php accepted by above client.
> Contact us 212-203-3714 with questions.

GX 203-05.

Based on the record in this case, including the facts establishing criminal intent set forth below, a reasonable jury could find that Teman knowingly misrepresented that there was a "contract" in place and that these were "valid check[s]" that a bank was "required by law to honor." A reasonable jury could find that Teman wrote that "contracts" were "accepted by above client" knowing that was not true. Accordingly, the record supports the fact that Teman's checks included material misrepresentations.

### C.    A Reasonable Jury Could Find Venue by a Preponderance of the Evidence

Teman next argues that the Government failed to prove venue by a preponderance of the

evidence. Because the Government established venue on each count, Teman's venue argument also fails.

### 1.    Applicable Law

Title 18, United States Code, Section 3237(a) provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." The Second Circuit has recognized that both bank fraud and wire fraud are continuing offenses. *See United States v. Rutigliano*, 790 F.3d 389, 396 n.3 (2d Cir. 2015).

A scheme offense is "committed in all of the places that any part of it took place, and venue . . . [is] appropriate in any of them." *Rutigliano*, 790 F.3d at 396 (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 282 (1999)) (referring to a health care fraud scheme in violation of 18 U.S.C. § 1347). In *United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015), the Second Circuit made clear that "a scheme to defraud is not complete until the proceeds have been received." *Id.* at 398 (internal quotation marks omitted). In that case, defendants challenged whether venue lay in this District for mail and wire fraud convictions because, according to the defendants, the relevant wire communications and mailings took place after the scheme was complete. The Second Circuit disagreed, holding that because the wire communications in question allowed the defendant to receive the proceeds of his fraud and the mailings at issue "were sent in order to ensure continued benefits and to prevent the [government agency] from discovering the ongoing fraud," they were part of the charged criminal scheme. *Id.* at 397, 398 (citing cases). In *United States v. Sindona*, 636 F.3d 792, 802 (2d Cir. 1980), the Second Circuit held that an interstate wire communication in which the defendant transferred fraudulently obtained money from one of his own accounts to another of his own accounts was sufficient to

satisfy the interstate nexus requirement for wire fraud.

In another case, *United States v. Magassouba*, 619 F.3d 202 (2d Cir. 2010), the Second Circuit again held that venue in the district of prosecution was appropriate when the defendant withdrew money in that district after a fraudulent transfer. In *Magassouba*, after the defendant fraudulently transferred money from a Bank of America account into a JPMorgan Chase account based in New York, he then withdrew cash at two JPMorgan Chase branches in the Bronx. The Second Circuit noted that it was "[i]t is undisputed that venue was properly laid in the Southern District of New York for [bank fraud], as [the defendant] maintained his JPMorgan Chase Bank account, to which the stolen funds were transferred, in that district and withdrew funds from that account at two different Chase branches in the Bronx." *Id.* at 204.

In some instances, courts in this Circuit also apply the "substantial contacts" test to determine whether venue in a particular district is appropriate. *See, e.g.*, *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997). However, the substantial contacts "inquiry is made only if 'the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial.'" *Rutigliano*, 790 F.3d at 39 (quoting *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)).

### 2. Counts One and Three

Venue is proper in this District for Counts One and Three, which focus on the twenty-seven checks drawn in April 2019 against accounts for ABJ Lenox, ABJ Milano, and 518 West 204 LLC. Indictment at 1-3.

As set forth above, after Teman deposited the April 2019 checks and moved the funds to other accounts he controlled, on or about May 8, 2019, the defendant entered a Bank of America branch located in Manhattan, New York and, at a bank teller window, withdrew approximately $4,000 from the Friend or Fraud Account. GX 112. The defendant's efforts to move the funds he

23

deposited into the GateGuard account and ultimately withdraw those funds was part of his scheme, exposed Bank of America to a greater risk of loss, and support a finding of venue in this District. *See Rutigliano*, 790 F.3d at 398; *Magassouba*, 619 F.3d at 204.

The record also shows that a wire communication in furtherance of the scheme charged in Counts One and Three traveled between this District and another state. After Teman deposited the checks in question at a Bank of America branch in Florida, they were scanned at that branch and then electronic images of those checks were routed to the Federal Reserve. Trial Tr. 219-20. Signature Bank subsequently accessed the Federal Reserve's check images from Signature Bank's office in Manhattan in order to complete the bank's fraud review, which was a part of completing the transfer of customer funds from accounts at Signature Bank to Teman's account at Bank of America. Trial Tr. 674-75. In addition, Soleimani testified that he had phone and text message communications with Teman from Soleimani's office in Manhattan while Teman was, in some instances, in Florida. *Id.* at 569-70.[4]

The record amply supports a finding that venue is proper in this District for Counts One and Three.

### 3.    Counts Two and Four

Venue is also proper in this District for Counts Two and Four, which focus on the two

---

[4] Here, the substantial contacts inquiry need not be applied because the defendant faces no additional hardship by prosecution in this District. *See Rutigliano*, 790 F.3d at 39. To the extent the substantial contacts test is relevant, there are substantial contacts in New York. The substantial contacts test looks at four factors: "(1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding." *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000). All four factors caution in favor of finding substantial contacts with this district. As set forth above, Teman's frauds took place in New York and were targeted at businesses operating in this District. Moreover, the relevant fact witnesses are all based in the Southern District of New York. To the extent the Court applies the substantial contacts test on Counts One through Four, it cuts in favor of finding that venue is proper in this District.

checks drawn in March 2019 against accounts for 518 West 204 LLC and 18 Mercer. Indictment at 2-4. First, GX 113, a Bank of America record showing details for various transactions in Teman's accounts. Relevant here, GX 113 shows the IP address used by Teman when he deposited the two March 2019 checks via mobile deposit. GX 113 also lists the location associated with that IP address as "New York,NY,United States." *See* Deft's Motion at 21. By contrast, for other transactions in Teman's accounts, GX 113 lists "Bronx,NY,United States," "Brooklyn,NY,United States," or other locations throughout the United States. *Id.*[5]

In addition, John Motto, an operations manager at Signature Bank, testified that the checks drawn on the 518 West 204 LLC and the 18 Mercer account were reviewed by his fraud detection team located in Manhattan, New York. Trial Tr. 667-68, 682-83, 684-85. The Signature Bank review process is necessary for the bank to evaluate checks drawn on Signature Bank customer accounts, and the review process screens checks for signs of fraud. *See, e.g.*, Trial Tr. 652-53.

The record also shows that a wire communication in furtherance of the scheme charged in Counts One and Three traveled between this District and another state. After Teman deposited the charged checks via mobile deposit, electronic communications were sent from his mobile device in Manhattan to Texas. Trial Tr. 203-04.

The record amply supports a finding that venue is proper in this District for Counts Two and Four.

---

[5] Other facts in the record support the inference that "New York,NY,United States" refers to Manhattan, New York. Teman did extensive work in Manhattan and the Bronx, GateGuard's office was in a building on West 32nd Street in Manhattan, and Teman's intercom devices were installed in several buildings in Manhattan and the Bronx. *See* GX 104, 106, 108, 201-05, Trial Tr. 310, 314-15, 467.

### D.    A Reasonable Jury Could Find that Teman Acted with Criminal Intent

Finally, Teman argues that no reasonable jury could find that he acted with criminal intent. Deft's Motion at 22-24. In support of this argument, Teman largely relies on testimony from Reinitz that he told Teman it was lawful to draw checks from GateGuard's customers' accounts. *Id.* at 23.

Teman's argument is meritless. Reinitz's testimony was contradicted by WhatsApp communications between him and Teman where Reinitz expressly tells Teman *not* to deposit the checks and that doing so may cause him to be arrest. *See* GX 702, 704, 727, 728, 729. Moreover, the messages show that Teman did *not* consult with Reinitz prior to depositing the first set of checks in March 2019, and that even after the first set, Reinitz still advised him not to continue his scheme. GX 704, 728, 729. The jury was certainly entitled to disregard Reinitz's testimony because it was contradicted by the WhatsApp messages. The jury was also entitled to simply find that Reinitz's testimony was not credible based on his inconsistent statements while testifying, his obvious conflict of interest as an attorney for Teman in this and other matters, his demeanor while testifying, or for any other reason. *See James*, 239 F.3d at 124; *see also Desena*, 287 F.3d at 177.

In fact, not only could a reasonable jury disregard Reinitz's testimony, it could find that the WhatsApp messages were actually proof Teman knew his conduct was criminal. *See, e.g.*, GX 702 (Reinitz telling Teman that "[m]y opinion is that you are >50% likely to be arrested for the activities you propose. How you proceed is up to you.").

Other facts in the record amply support a finding that Teman had criminal intent. Among other things, Teman's customers testified that they never authorized him to deposit the checks in question, *see* Trial Tr. 357-58, 563; Teman tried to draw funds from the 518 West 204 LLC account, but even after the funds were returned as not authorized, he tried again, GX 145, 201, 203; Teman never invoiced his customers for the amounts he ended up drawing from their

accounts; Teman charged purported "fees" well in excess of the value of the intercom devices he sold; Teman knew that he could sue his customers, execute liens, or send their debts to collections, but never did so, *see, e.g.*, Trial Tr. 513, 561; the checks themselves told the banks to call Teman if the banks had questions, not his customers, who would have revealed that the checks were not authorized, GX 203, 204, 205; Teman cashed the April 2019 checks on the eve of Passover, when his customers would not be using their electronic devices for two days, Trial Tr. 367-69, 564-65; and Teman moved money out of his GateGuard account immediately after depositing it so that Bank of America would not return it through a chargeback. Accordingly, because a reasonable jury could find based on the trial evidence, including the facts set forth above, that Teman acted with criminal intent, he is not entitled to a judgment of acquittal on this basis.

## II.    Teman's Arguments for a New Trial are Meritless

Teman argues that if the Court does not grant his a judgment of acquittal, it should grant him a new trial. Teman's arguments for a new trial are that (1) the Government violated Rule 615, *i.e.*, the rule of sequestration, (2) the Court erred in excluding testimony from his proposed expert witness, and (3) an alternate juror purportedly lied during *voir dire*. Each of these grounds is meritless and Teman's request for a new trial should be denied.

### A.    The Government Did Not Violate Rule 615

Teman first argues that the Government violated Rule 615 of the Federal Rules of Evidence. In short, Teman argues that the Government violated Rule 615 when it prosecutors and the case agent spoke with a witness, Joseph Soleimani, after the court day ended of January 23, 2020, during a break in Soleimani's direct examination. Deft's Motion at 28. Prosecutors and the case agent discussed with Soleimani facts surrounding a statement Soleimani had made prior to trial to another law enforcement officer, which the defense claimed was a prior inconsistent statement. *Id.*; *see also* Trial Tr. 538-39. Because the Government did not violate Rule 615 and, in

any event, a violation would not warrant a new trial, this argument fails.

First, by its very terms, Rule 615 does not apply to the conduct at issue. Rule 615 provides that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Here, there is no allegation that Soleimani "hear[d] other witnesses' testimony."[6] The defense alleges that the Government asked Soleimani about his own prior statements while Soleimani himself was testifying. The cases Teman cites refer to contact *between witnesses* about their respective trial testimony, not communications between attorneys or a case agent and a witness. *See, e.g.*, *United States v. McMahon*, 104 F.3d 638, 644 (4th Cir. 1997); *United States v. Prichard*, 781 F.2d 179, 182 (10th Cir. 1986); *United States v. Johnston*, 578 F.2d 1352, 1354 (10th Cir. 1978). Here, Teman alleges nothing more than that the Government asked a witness questions about apparently inconsistent statements reflected in police reports. Trial Tr. 519; Def't's Motion at 28. Such questioning is not improper. More so, such questioning does not violate Rule 615, which is implicated only when there is improper contact between witnesses. No improper contact occurred here.

Second, even if there was a violation of Rule 615, the violation would not warrant a new trial. When defense counsel first notified the Court that it may seek to call a law enforcement officer to elicit testimony about a prior inconsistent statement from Soleimani, the Court noted its "confusion" as to the purpose of such testimony. Trial Tr. 520. Indeed, the defense was apparently looking to call a law enforcement officer to show that Soleimani previously said that Teman took $180,000 that was not authorized but, on the stand, testified that Teman took $196,000 that was

---

[6] Indeed, the defendant argues that Soleimani heard the "testimony" of another witness, an NYPD detective, who would have testified about his conversations with Soleimani. Trial Tr. 519. Asking Soleimani about his communications with the NYPD detective is not the sort of cross-contact that would cause a witness to reshape his testimony. By contrast, in *United States v. Solorio*, 337 F.3d 580 (6th Cir. 2003), a witness who had testified spoke to a witness who had not yet testified about the difficult parts of cross-examination. *Id.* at 591.

not authorized. *Id.* 519-20. As an initial matter, there is a strong argument that testimony from the law enforcement officer would not have been admissible under Rules 401, 403, and 608. In addition, the defense has not shown how that the Government's questions to Soleimani in preparation impaired the defense's ability make its point before the jury. In similar contexts, parties are often permitted ask questions on direct examination to "pull the sting" of inconsistencies that may be exposed by an opposing party on cross-examination – and they may prepare their witnesses for those questions.

Even if the law enforcement officer's testimony were admissible and the Government violated a procedural rule that materially affected the defense's case, the Government's conduct in this case was not so great that evaluating "the entire record of the trial," there is a "real concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134; *see also United States v. Engelmann*, 985 F. Supp. 2d 1042, 1049 (S.D. Iowa 2013) ("If a violation of a sequestration order is established, a defendant must still demonstrate prejudice."). Because there was no violation of Rule 615, no prejudice to the defendant, and no manifest injustice, he is not entitled to a new trial on this ground.

**B.      A New Trial Is Not Warranted Based on the Court's Exclusion of Teman's Proposed Expert Witness**

Teman next argues that he is entitled to a new trial because the Court erred in excluding testimony from his proposed expert witness, J. Benjamin Davis. Because Davis's testimony was properly excluded and, in any event, the exclusion is harmless, no new trial is warranted.

**1.      Applicable Law**

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987). The District Court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

Testimony from a qualified expert is admissible only if the trial court determines that it is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see Kumho Tire Company, Inc. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire Co.*, 526 U.S. 137. That an expert may generally possess "specialized knowledge" does not automatically render his opinions in a case reliable. *See SEC v. Lipson*, 46 F. Supp. 2d 758, 761 (N.D. Ill. 1998) (fact that witness is a certified public accountant, generally possessing the "specialized knowledge" to qualify as an expert witness, does not automatically render his opinions reliable).

"An opinion is unhelpful and therefore may not be received in evidence if . . . the testimony 'would merely tell the jury what result to reach.'" *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (summary order) (quoting *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir.1992)); *accord* Fed. R. Evid. 704 Advisory Committee Note.

Moreover, "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). "Opinion testimony is inadmissible if it is not 'helpful to . . . determining a fact in issue.'" *Collins*, 581 F. App'x at 60 (quoting Fed. R. Evid. 701(b)); *see* Fed. R. Evid. 702(a); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (holding that expert testimony in securities cases "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it."). The Second Circuit has previously disapproved of expert testimony on legal concepts "calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law.'" *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988) (*quoting FAA v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983)).

## 2. Discussion

For the reasons set forth in the Government's motion to preclude Davis's testimony and the Court's subsequent ruling, the Court did not err is precluding Davis's expected testimony about counterfeit checks and RCC. *See* Govt's Motion to Preclude; January 10, 2020, Conference Tr. at 32-37. Davis's testimony was correctly precluded for several reasons.

*First,* Davis's proposed testimony was correctly precluded because it would not have been helpful or relevant to the jury. "An opinion is unhelpful and therefore may not be received in evidence if . . . the testimony 'would merely tell the jury what result to reach.'" *Collins*, 581 F.

App'x at 60 (quoting *Rea*, 958 F.2d at 1215); *accord* Fed. R. Evid. 704 Advisory Committee

Note.

The first subject of Davis's proffered testimony was that the checks drafted and deposited

by Teman unbeknownst to his customers were neither "counterfeit" nor "forged." ECF No. 74,

Exh. A ("Disclosure Letter") at 2-3. Davis purported to define what a "counterfeit" or "forged"

check is. The defense sought to elicit from him the view that the checks at issue do not meet his

definitions and were instead valid under the Uniform Commercial Code. Such testimony was not

relevant and risks confusing the jury. The Government was required to prove only that Teman

participated in a scheme to defraud, not whether he counterfeited or forged checks. Teman did

not proffered any facts showing that he was aware of or following the UCC. Whether the checks

in question were "counterfeit" or "forged" under Davis's definition or the UCC is not relevant to

whether Teman acted with criminal intent in his scheme to defraud the bank and his customers.

Indeed, even if the checks were not at all counterfeit or forged under Davis's definition or the

UCC, they could have still formed the basis for the jury to conclude that Teman engaged in a

scheme to defraud. *See, e.g.*, *United States v. Rigas*, 490 F.3d 208, 221 (2d Cir. 2007) ("Even if

Defendants complied with GAAP, a jury could have found, as the jury did here, that Defendants

intentionally misled investors."); *United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006) ("If

the government proves that a defendant was responsible for financial reports that intentionally

and materially misled investors, the statute is satisfied. The government is not required in

addition to prevail in a battle of expert witnesses over the application of individual GAAP

rules."); *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (interpreting wire fraud

statute) ("The term 'scheme to defraud' is measured by a 'nontechnical standard. It is a reflection

of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and]

business life of members of society. . . . The scheme exists although no misrepresentation of fact is made.'"); *United States v. Tomasetta*, 2011 WL 6382562, at *2 (S.D.N.Y. Dec. 12, 2011) (precluding expert testimony on accounting principles because "[t]he Government does not charge the Defendants with violating GAAP" and such testimony was therefore "not relevant to any element of the charged offense" and would thus "confuse the jury and waste time"). Teman sought to elicit this testimony from Davis merely to suggest to the jury, incorrectly, that if the checks he deposited were not counterfeit or forged under Davis's definition of those terms, they could not serve as the basis for a fraud conviction.

Teman next sought to elicit from Davis that the checks charged in the Indictment were valid "remotely created checks" or "RCCs" based on definitions from the Federal Financial Institutions Examination Council's IT Examination Handbook and the Federal Register. Disclosure Letter at 3-4. Here too, whether the checks were RCCs was not relevant to the inquiry before the jury. Moreover, the defendant proffered no evidence to show that he was aware of the legal requirements for an RCC prior to depositing checks unbeknownst to his victims.

Because Davis's proffered testimony would be irrelevant to the jury and "unhelpful" within the meaning of Rule 702(a), it was correctly precluded.

*Second*, Davis's proffered testimony was correctly excluded because it would have usurped the Court's role in instructing the jury. Davis's testimony would have consisted of opinion about Teman's compliance with various provisions of the UCC and banking regulations. Disclosure Letter at 2-4. "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). "Opinion testimony is inadmissible if it is not 'helpful to . . . determining a fact in issue.'" *Collins*, 581 F. App'x at 60 (quoting Fed. R. Evid. 701(b)); *see* Fed. R. Evid. 702(a); *Bilzerian*,

926 F.2d at 1294 (holding that expert testimony in securities cases "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it."). In *United States v. Collins*, 581 F. App'x 59, the Second Circuit affirmed the district court's ruling precluding opinion testimony from one lay witness and one expert witness that the agreement in question would have been "immaterial" to a lawyer in the defendant's position. *Id.* at 60. The district court precluded this testimony on the basis that it "would not be helpful to the jury" and the opinions regarding immateriality "would be conclusory." *Id.* The district court found that it was appropriate to preclude the testimony in part because the defense could establish its view of materiality through cross examination of government witnesses. *Id.* The Second Circuit affirmed the district court's order precluding the testimony. *Id.*

Likewise, in a recent trial of two defendants on RICO and other charges related to the operation of online payday lending businesses, the defendants similarly attempted to present testimony of attorneys who would testify as experts about legal issues related to payday lending and tribal sovereign immunity and the legality of the defendants' conduct under tribal law. *See United States v. Tucker*, No. 16 Cr. 91 (PKC), Dkt. 190-1 (defense expert disclosure dated March 9, 2017). Judge Castel granted the Government's motion to preclude the expert testimony, explaining during a pretrial conference that the proffered expert testimony was not relevant to whether the defendants acted with criminal intent, and stating, "The judge instructs the jury on the law, not what some expert thinks the law may have been or thinks what the law could have been argued to be." *See* Transcript of Conference of Sept. 6, 2017, at 68-69; *see also, e.g.*, *Landy*, 705 F.2d at 632. Judge Castel concluded that the proffered expert testimony amounted to "an invasion of the role of the judge in a trial." *Id.* at 69.

The same is true here. The proffered testimony was correctly precluded because it was an improper attempt to transmit legal instructions to the jury. The defense made clear it intended to elicit from Davis the requirements for labeling a check as counterfeit or fraudulent under the UCC, and the requirements for establishing a "valid RCC" under the Federal Reserve rules and the UCC. Disclosure Letter at 2-3. This is bald legal instruction. Indeed, the defense requested – and the Court subsequently gave – a legal instruction on the definition of "remotely created check" that mirrors Davis's proffered testimony. *See* ECF No. 59 at 33; Disclosure Letter at 3; Trial Tr. 229-30.

Furthermore, Davis's proffered testimony would have "'merely [told] the jury what result to reach.'" *Collins*, 581 F. App'x at 60 (quoting *Rea*, 958 F.2d at 1215); *accord* Fed. R. Evid. 704 Advisory Committee Note. The defense sought to elicit opinion testimony from Davis that the checks Teman deposited unbeknownst to his customers were not counterfeit or forged checks. The defense further sought to elicit opinion testimony from Davis that (1) the checks Teman deposited were "valid RCCs" and (2) Teman's purported payment terms with his customers permitted him to issue RCCs. The defense sought to establish through this testimony that Teman did not engage in a fraudulent scheme. Davis's testimony was an impermissible call for a directed verdict. Whether Teman issued and deposited checks without authorization and whether he acted with criminal intent were questions for the jury. Expert testimony on the issues proffered by Teman was not admissible because it would have done nothing more than tell the jury what result to reach. "When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making the decision, but rather attempts to substitute the expert's judgement for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to makes its own informed

determination." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). It was the Court's responsibility, not that of Teman's proffered expert, to properly instruct the jury on the legal parameters of the charged offenses.

*Finally*, Davis's proffered testimony was correctly precluded because Teman did not demonstrate that Davis's opinions was the "product of reliable principles and methods." Fed. R. Evid. 702(c). "The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003). Teman did not met that burden here, particularly given that he offered no "bases and reasons," Fed. R. Crim. P. 16(b)(1)(C), supporting the proposed opinions aside from his education and "understanding of banking and financial institution services and operations." Disclosure Letter at 2. But such generalized "bases and reasons" do nothing to show how the opinions drawn from these sources meet *Daubert*'s reliability requirement or how such opinions are "connected to existing data" by anything other than "the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. As an example, Teman proffered that Davis would have defined what a "counterfeit check" or "forged check is." But nothing in the proffered bases and reasons for this opinion provided any foundation supporting the reliability of such an opinion or establish that it was anything more than "the *ipse dixit* of the expert."

To the extent there was any error in excluding Davis's testimony, that error was harmless. At trial, Teman asserted an advice of counsel defense that relied heavily on Reinitz's testimony. Indeed, Reinitz testified extensively about the concept of RCCs and testified that he told Teman RCCs were legal. *See, e.g.*, Trial Tr. 774. Separate testimony from Davis about the technical requirements for RCCs would have been cumulative and perhaps even less persuasive than Reinitz's testimony about communications with Teman about RCCs. The jury rejected the notion

that the fact of an "RCC" somehow legitimizes Teman's fraud scheme. There is no reason to believe that Davis's testimony would have meaningfully affected the relevant facts before the jury, and certainly not to the extent that excluding Davis's testimony was a manifest injustice.

Because Davis's testimony was properly precluded and, in any event, no manifest injustice resulted, Teman is not entitled to a new trial due to the absence of Davis's testimony at trial.

### C.     The Defendant Is Not Entitled To A New Trial Based on Vague Allegations of Misconduct by an Alternate Juror

Finally, Teman argues he is entitled to a new trial "because an alternate juror lied during *voir dire*, depriving [him] of his right to a fair trial." Deft's Motion at 31. As an initial matter, the defendant claims without support that the alternate juror, Juror #13, "initiated contact" with him prior to trial despite denying knowing Teman or GateGuard when asked during *voir dire. Id.* The defense goes further and says that Juror #13 is a direct business competitor of Teman/Gateguard. Without any support or specifics – or an explanation for why the defense did not raise the purported contact at the *voir dire* state, the defendant's allegations do not merit a new trial.[7]

Even if true, the Juror #13's misrepresentations during *voir dire* do not entitle the defendant to a new trial based on a speculative theory that the misrepresentations might have affected the way *voir dire* transpired. *See United States v. Lawrence*, 477 F. Supp. 2d 864, 873-75 (S.D. Ohio 2006), *vac'd on other grounds*, 555 F.3d 254 (6th Cir. 2009) ("Hypothetically, even if the alternate

---

[7] The defendant's brief states that Juror #13 "initiat[ed] contact with Teman via social media (LinkedIn) *before* trial." Deft's Motion at 31. To the extent the defendant or defense counsel knew about this conduct during voir dire or prior to the end of trial, but did not raise the issue with the Court, the defendant is not entitled now to a new trial *See United States v. Parse*, 789 F.3d 83, 109-10 (2d Cir. 2015) ("[I]f the defendant knew prior to the end of trial that a prospective juror had given false voir dire responses and did not then reveal the disqualifying falsehoods or nondisclosures to the court, the "interest of justice," Fed. R. Crim. P. 33(a), generally will not require a new trial.").

had divulged his relationships to law enforcement on the jury questionnaire, had stated that he could not 'conscientiously apply the law and find the facts' and consequently, this Court then had proceeded to grant Defendant's challenge for cause, this chain of hypothetical situations would have not altered the composition of the jury that actually deliberated and reached the verdicts against Defendant in the case."). Courts have consistently held that allegations of bias by an alternate juror are not grounds for a new trial. *See United States v. Lopez-Martinez*, 543 F.3d 509, 517-19 (9th Cir. 2008) (external research by an alternate juror did not warrant a new trial); *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) ("We reject appellant's characterization of the alternate juror as an outsider who influenced the jury: it is impossible for the alternate to have been an 'outsider' until the deliberations started; and, after deliberations did start, the alternate was separated from the rest of the jury."); *Riccardi v. Price*, No. 16-cv-7806, 2019 WL 6570576, at *46 n.43 (C.D. Cal. Sept. 17, 2019) ("Petitioner's challenge as to alternate Juror J.S. fails for yet another reason: petitioner does not allege that alternate Juror J.S. sat on petitioner's jury. Rather, it appears that Juror J.S. was only an alternate juror.").[8]

So too with any misconduct by the alternate juror here. Because he did not participate in jury deliberations, any bias the alternate juror possessed had no impact on the jury deliberations in this matter and thus raises no concern that the verdict was a manifest injustice.

---

[8] Teman additionally argues he is entitled to a new trial for the reasons he cited for a judgment of acquittal. *See* Deft's Motion at 33-34. His arguments for a judgment of acquittal do not entitle him to a new trial. First, as set forth above, his arguments for error are unavailing. Second, even if there were error as he described it, such error does not entitle him to a new trial because it does not raise the specter of manifest injustice.

**CONCLUSION**

For the foregoing reasons, the Court should deny defendant Ari Teman's Motion for a

Judgment of Acquittal or, in the Alternative, for a New Trial.

Dated:  New York, New York
        March 25, 2020

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney for the
                            Southern District of New York

By:     /s/
          Kedar S. Bhatia
          Assistant United States Attorney
          Tel.: (212) 637-2465