UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-CR-696-PAE |
| | ) | |
| ARI TEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR NEW TRIAL BASED ON UNDISCLOSED *BRADY* AND JENCKS ACT EVIDENCE

Defendant Ari Teman ("Teman"), by and through undersigned counsel, Justin Gelfand and Joseph A. DiRuzzo, III, respectfully moves this Court to grant a new trial based on *Brady* and Jencks Act evidence that was not disclosed to the defense.

### I.    Introduction

On January 19, 2020—less than 48 hours before trial—the Government first disclosed the existence of critical impeachment evidence regarding witness Joseph Soleimani ("Soleimani"). This evidence originated from a decision in a New York Housing Court action[1] that found Soleimani's company, ABJ Milano LLC, used dishonest tactics in attempting to evict an elderly, disabled tenant, Stanley Howell ("Howell"), from his apartment.

Recognizing the centrality of Soleimani's testimony—and his credibility—to its case, the Government immediately moved to preclude Teman from cross-examining Soleimani regarding

---

[1] *ABJ Milano LLC v. Stanley Howell*, 2018 NY Slip Op 2833. (Doc. 83-1).

his dealings with Howell. (Doc. 83). The Government represented that "there is nothing in [the Housing Court] Order to suggest that… Soleimani… acted dishonestly…[.]" (*Id.* at 3).

This Court was not yet convinced. On the first day of trial, this Court noted the importance of Soleimani's testimony to this case[2] and observed that the disclosed Housing Court Order "is indistinct if Soleimani is among the people dealing with the tenant." (TR. at 33). This Court directed the Government to "inquire of Soleimani *whether there was evidence in the housing court case that he was among the ABJ personnel who dealt with Howell*. If his answer leaves any doubt in your mind, you need to follow up and do so immediately. Then promptly report back to the Court and the defense." (*Id.* at 29) (emphasis added). This Court further explained that "the issue is whether there was evidence at the [Housing Court] proceeding…that he interacted with the tenant. *If there was evidence that he interacted with the tenant, this is coming in*." (*Id.* at 32) (emphasis added).

But the Government never followed up; instead, the Government continued to maintain that nothing in the Housing Court case was relevant to Soleimani's credibility. At trial, the Government questioned Soleimani about this issue:

> Q.   In 2018, did the housing court find in one case that your company had misled a tenant about whether he could renew his lease?
> A.   Yes.
> Q.   And did you misrepresent anything to the tenant or was it others in your company?
> A.   *It was others*.

(TR. at 502) (emphasis added).

---

[2] "The testimony of these witnesses [(Soleimani and Elie Gabay)] appears likely to be important at trial." (TR. at 24).

However, new evidence that the Government never disclosed to the defense reveals that the Government's representations regarding Soleimani and the evidence in the Housing Court case were false. The full record of the Housing Court case—specifically, Soleimani's under-oath testimony in that case—establishes Soleimani's *personal* involvement in his company's dealings with Howell.[3] And these actions by Soleimani are the very interactions upon which the Housing Court's findings are based.

This evidence cannot be reconciled with the Government's representations regarding Soleimani and his testimony at trial. This Court correctly anticipated the existence of additional impeachment evidence in the Housing Court case and ordered the Government to obtain it and make any necessary disclosures to the defense. But the Government failed to disclose this critical evidence—either because the Government disregarded this Court's order and failed to follow up or because the Government obtained this evidence and failed to disclose it to the defense.

As a result of the prosecution's leading question and Soleimani's responsive perjurious testimony, Teman was precluded from questioning Soleimani about Howell and the Housing Court case.

This is a textbook *Brady* and Jencks Act violation which materially prejudiced Teman's defense. The Government's suppression of this evidence prevented Teman from presenting to the jury critical evidence of Soleimani's credibility: that a court determined he was personally involved in using dishonest tactics to evict a vulnerable tenant, and that he perjured himself in this

---

[3] As discussed further *infra*, the underlying records of Soleimani's Housing Court testimony can only be obtained via written request to the New York County Civil Court Clerk—a process that can take several weeks. Even had Teman immediately sought this evidence upon the Government's disclosure of the Housing Court action (on the eve of trial), he would not have received the underlying evidence of Soleimani's testimony until after trial concluded. In any event, Teman reasonably relied on the Government's representations regarding the scope of this evidence and fully expected Government counsel to comply with this Court's order to seek out and disclose this evidence.

case during the prosecution's direct examination when testifying that only "others" were involved and that he was not.

This outcome—which this Court correctly anticipated in directing the Government to further investigate Soleimani's involvement with Howell—was clearly prejudicial to Teman. Indeed, this Court expressly and appropriately admonished the Government not to rely only on Soleimani's representations:

> I expect that you will not credulously take Mr. Soleimani's point of view on this… Realistically, if he is among the people interacting with the tenant, I think the safer course here is to… permit the line of [impeachment]…, *rather than creating an open appellate issue* about whether you too aggressively took Soleimani's side in…arguing… it was somebody else in his company who made the misrepresentations.

(TR. at 33) (emphasis added).

It also appears this was not the only evidence the Government suppressed. In the same Motion to Preclude (Doc. 83), the Government represented that even though Soleimani and witness Elie Gabay ("Gabay") were landlords with lengthy histories of tenant complaints and lawsuits, "there is *no indication* that *any* landlord-tenant complaints or lawsuits against Soleimani, Gabay, or their companies would be probative of their 'character for truthfulness or untruthfulness.'" (*Id.* at 3) (emphasis added). This important representation by the Government is also false. New evidence never disclosed to the defense reveals numerous actions against both Soleimani and Gabay that encompass dishonest business practices including "false certifications." The Government's motion also misrepresented the significance of Gabay being fined "treble damages," which constitutes a finding of *willful* fraud. Thus, in stark contrast with the Government's representations, this undisclosed evidence *is* probative of Soleimani's and Gabay's credibility and should have been presented to the jury through cross-examination by the defense.

## II.      Relevant Background

Teman proceeded to trial on a second superseding indictment charging him with two counts of bank fraud and two counts of wire fraud. (Doc. 55).

This case was tried before a jury commencing on January 22, 2020. On January 23 and January 24, the Government called Gabay and Soleimani as witnesses in its case-in-chief.

Before trial commenced, on January 19, 2020, the Government filed an under-seal motion[4] seeking an order prohibiting Teman from cross-examining Gabay and Soleimani about "lawsuits and regulatory actions filed against them and their respective companies in landlord-tenant actions." (Doc. 83). Regarding Soleimani, the Government represented to this Court: "The allegations against Soleimani cover a range of topics that plainly do not bear upon his credibility, including, among other things, complaints about 'slip and fall' accidents and the physical condition of housing." (*Id.* at 1-2). The Government then stated there was a single "Housing Court Case" in which the "allegations…center on a tenant who agreed to leave his apartment in exchange for a monetary payment." (*Id.* at 2). The Government couched the action by stating, "because Soleimani initiated negotiations with the tenant, his conduct constituted 'harassment' within the meaning of New York City Administrative Code § 27-2004(48)(f-2)." (*Id.*)

In seeking the prohibition on cross-examination, the Government expressly represented to the defense and this Court: "Here, there is no indication that any landlord-tenant complaints or lawsuits against Soleimani…would be probative of [his] 'character for truthfulness or untruthfulness.'" (*Id.* at 3). The Government continued:

> Neither the Order in the Housing Court Case nor the facts that underlie it is admissible under Rule 608(b). Although the Housing Court Case resulted in the issuance of an Order against Soleimani's business, there is nothing in that Order to

---

[4] This Court subsequently ordered the Government to file the motion on the public record. (*See* TR. at 23).

suggest that either Soleimani or his business acted dishonestly toward the tenant or in the housing proceeding before the housing court. The facts at issue are not probative of Soleimani's character for truthfulness or untruthfulness. At most, Soleimani's business improperly contacted the tenant in violation of New York City administrative code.

(*Id*.).

In advance of Soleimani's testimony, this Court expressly addressed Soleimani's conduct in the Housing Court Case. This Court explained:

> Soleimani's trial testimony here would not be meaningfully discredited merely because of an employee of his misled a tenant. But it is possible that Soleimani was among the employees who personally made that misrepresentation to Howell. If so, although the question under 403 is a close one under which a court could rule either way, I would then permit the defense at this trial, as a means of impeachment, to establish through a single question or two put to Soleimani that a judge found that in 2017, he had misled a tenant to believe wrongly that his lease could not be renewed… [A] targeted leading question that elicits from Soleimani the fact of this discrete finding by a judge that he misled a tenant on this subject would assist the jury to assess Soleimani's credibility without turning this proceeding into a trial within a trial about the episode relating to landlord ABJ and tenant Howell. And so, government, I will ask you to please inquire of Soleimani whether there was evidence in the housing court case that he was among the ABJ personnel who dealt with Howell. If his answer leaves any doubt in your mind, you need to follow up and do so immediately. Then promptly report back to the Court and the defense. I expect that if the answer is yes, that Soleimani was among the ABJ personnel who dealt with Howell, that Soleimani will have no difficulty on the stand here answering yes to a question from defense counsel about whether a judge so found. Obviously the government is at liberty to pull the poison and ask the question on direct as well. Cross-examination will then move on to other issues.

(TR. at 28-30).

This Court then expressly prohibited the defense from referring to these matters in opening statement and directed: "you are not to inquire into them in court unless and until I have given you the affirmative green light to do so." (*Id*. at 30). Government counsel stated: "We'll inquire with Mr. Soleimani and we'll give an update to the Court." (*Id*. at 33).

The Government never provided an update to the Court or to the defense. Instead, during its direct examination, Government counsel asked Soleimani:

> Q.   In 2018, did the housing court find in one case that your company had misled a tenant about whether he could renew his lease?
> A.   Yes.
> Q.   And did you misrepresent anything to the tenant or was it others in your company?
> A.   *It was others*.

(TR. at 502) (emphasis added).

But the Government hid the ball from Teman and the Court. Soleimani himself *was* personally and directly involved in the dealings with Howell which form the basis of the Housing Court's findings. And one need look no further than Soleimani's under-oath testimony in that proceeding—the contents of which were never disclosed to the defense under *Brady* or pursuant to the Jencks Act. Moreover, by only first disclosing the Housing Court decision on the eve of trial, the Government made it impossible for Teman to independently procure this evidence for use at trial.

As documented in the accompanying transcript (attached as Exhibit A), on August 8, 2018, Soleimani testified under oath in Housing Court that:

(a) He went to Howell's apartment and *personally* convinced Howell to sign the agreement on the spot (Housing TR. at 58, 60);

(b) He *personally* showed Howell other apartments to further induce Howell to accept the agreement and vacate the apartment (Housing TR. at 61);

(c) He *personally* signed the agreement (Housing TR. at 57-58);

(d) He was *personally* involved in drafting the agreement which the court found to be predatory (Housing TR. at 56-57); and

(e) He *personally* directed his attorney to evict Howell (Housing TR. at 55).

This evidence flies in the face of the Government's representation that "there is nothing in [the Housing Court] Order to suggest that… Soleimani… acted dishonestly…" (Doc. 83 at 3). And Soleimani's sworn testimony in the Housing Court—which the Government suppressed over this Court's explicit directive—directly contradicts Soleimani's blanket denial under oath in this case. Indeed, the Government represented to the defense and to this Court that the "facts at issue [in the Housing Court Case] are not probative of Soleimani's character for truthfulness or untruthfulness." (Doc. 83 at 3). But as it turns out, these facts are *highly probative* of Soleimani's character for truthfulness and willingness to deceive an elderly, disabled tenant.

The Government's representations to the defense and to this Court, and its failure to disclose impeachment evidence that was also discoverable under the Jencks Act, dramatically prejudiced Teman at trial. As a result of the Government's conduct, Teman was prohibited from cross-examining Soleimani about his dishonesty toward a vulnerable tenant. Teman was further precluded from confronting Soleimani with prior under-oath testimony that directly contradicted his testimony in this case during the Government's direct examination. By misleading this Court and the defense in its disclosures, the Government exploited the suppression of this evidence to its considerable advantage. This Court gave the Government the opportunity to ask a leading question to Soleimani which precluded the defense from cross-examining Soleimani about this topic. As a result, not only did the prosecution elicit perjurious testimony from Soleimani; the prosecution prevented the defense from exposing this perjury in front of this jury through cross-examination.

## III.   This Motion is Timely Pursuant to Federal Rule of Criminal Procedure 33(b)(1)

Pursuant to Rule 33(b)(1), "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Any other motion for

new trial "grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

This motion is grounded entirely on evidence that, to this day, has never been disclosed to Teman and that was only discovered by Teman after the 14-day Rule 33 deadline had passed. As such, this motion is timely as it is being filed before January 29, 2023. *See* Fed. R. Crim. P. 33(b)(1).

### IV.    This Court Should Grant a New Trial Based on the Government's *Brady* Violation

The United States Supreme Court and the Second Circuit have spoken forcefully about the Government's discovery obligations regarding the production of exculpatory and/or impeachment evidence. "The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment. Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (internal citations to *Brady* and *Giglio* omitted). Thus, it is black letter law that "[i]mpeachment evidence…as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

A prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). But, as the Supreme Court made clear in no uncertain terms,

> whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Id*. at 437-38 (internal citation to *Brady* omitted).

Indeed, "the Government's obligations under *Brady* encompass not only information that is admissible in its present form but also material information that could potentially lead to admissible evidence favorable to the defense." *United States v. Meregildo*, 920 F. Supp. 2d 434, 438–39 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015); *see also United States v. Rodriguez,* 496 F.3d 221, 225-26 (2d Cir. 2007) ("This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions").

In *Giglio*, the Supreme Court explained that *Brady* "held that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution." *Giglio v. United States*, 405 U.S. 150, 153 (1972). Courts have universally granted new trials where the Government violates *Brady* and/or *Giglio*. *See, e.g., United States v. Andrews*, 532 F.3d 900, 905 (D.C. Cir. 2008) ("If the undisclosed evidence is material, a new trial is required") (internal citations omitted); *Government of Virgin Islands v. Fahie*, 419 F.3d 249, 252 (3d Cir. 2005) ("the Court has assumed that *Brady* violations that have affected the judgment of a jury normally will be remedied by a new trial . . . ."); *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) ("Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict") (internal citations omitted). "To demonstrate such a deprivation, a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *Coppa*, 267 F.3d at 140.

A.  <u>The Government Suppressed Evidence</u>

In this case, there is no question the Government suppressed evidence the defense would have used to impeach Soleimani. This Court imposed upon the Government an express obligation to "inquire of Soleimani *whether there was evidence in the housing court case that he was among the ABJ personnel who dealt with Howell*. If his answer leaves any doubt in your mind, you need to follow up and do so immediately. Then promptly report back to the Court and the defense." (TR. at 28-30) (emphasis added). The Court further warned the Government "not [to] credulously take Mr. Soleimani's point of view on this." (*Id.*). And Government counsel expressly acknowledged this duty imposed upon the prosecution by this Court: "We'll inquire with Mr. Soleimani and we'll give an update to the Court." (*Id*. at 33).

It is now apparent that the Government either ignored this Court's directive and failed to conduct this inquiry or conducted it and failed to disclose the evidence to the defense.

Rather than upholding its constitutional duty, the Government elicited misleading, if not perjurious, testimony in its direct examination of Soleimani.

> Q.    In 2018, did the housing court find in one case that your company had
>        misled a tenant about whether he could renew his lease?
> A.    Yes.
> Q.    And did you misrepresent anything to the tenant or was it others in your
>        company?
> A.    *It was others*.

(TR. at 502) (emphasis added).

There can be no question a *Brady* violation occurred here because it is immediately apparent from the Housing Court evidence that Soleimani *was* among the ABJ personnel who dealt with Howell. In fact, Soleimani was ABJ's sole witness in the Housing Court Case, and his testimony regarding his personal dealings with Howell forms the basis for the Housing Court's

ruling. This Court ordered the Government to seek out precisely this evidence. But the Government failed to do so.

The Government did not disclose the truth to the defense or to this Court—and, in doing so, prevented the truth from ever being known and considered by the jury.

### B.   The Evidence Is Favorable to the Defendant

This suppressed evidence—namely, Soleimani's personal involvement in a scheme to use dishonest tactics in an attempt to evict an elderly tenant, and his subsequent dishonest testimony in this case about his own involvement—is overwhelmingly favorable to Teman. The Government called Soleimani as a critical witness in its case-in-chief and asked the jury throughout trial to rely on the veracity of his claims.

The evidence personally implicating Soleimani in the Housing Court Case is, alone, profoundly favorable to Teman. But this was even more significant. On direct examination in this case, Soleimani *lied* about his involvement with Howell. He said only "others" in his company made misrepresentations to Howell. (TR. at 502). But the undisclosed *Giglio* material proves otherwise. Soleimani's own testimony in Housing Court establishes he was personally involved in the misrepresentations made to Howell which form the basis for the Housing Court's findings.

Had the Government disclosed this information to Teman—which was Constitutionally required and which this Court expressly ordered the Government to do—Teman would have established through cross-examination that Soleimani deceived Howell and was personally implicated in his company's dishonesty by a Housing Court judge. Teman would have further demonstrated to the jury that the Government's star witness lied under oath when questioned on direct examination in this case. A witness who lies directly to the jury loses all credibility with that

jury. *See United States v. Payne,* 591 F.3d 46, 60 (2d Cir.2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses") (internal quotation marks and citation omitted); *see also United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015) (a Court must defer to "the jury's assessment of witness credibility"); *Wiercinski v. Mangia 57, Inc*., 787 F.3d 106, 112–13 (2d Cir. 2015) (it is the jury's role to determine whether a witness is credible and to decide what weight to give to that witness's testimony).

### C. The Failure to Disclose this Evidence Resulted in Prejudice

Soleimani was the Government's critical witness. He personally made the initial complaint that led the NYPD to initiate a criminal investigation, his statements to law enforcement constituted the entire basis on which the Government obtained a criminal complaint against Teman, and his testimony at trial was critical to the Government's prosecution theory.

The credibility of the Government's witnesses was a key issue. At trial, the evidence clearly established that Coney Realty's Michael Haas swore in an affidavit to Signature Bank that Coney had *no knowledge* of GateGuard—a representation Haas' partner, Gabay, admitted under oath was *false*:

> Q.     Yes. You knew exactly who GateGuard was, as you've previously testified about?
> A.     Correct.
>        …
> Q.     And [in the affidavit] your company is telling the bank that you don't know who GateGuard is; correct?
> A.     That's what it says.

13

(TR. at 399-401). Evidence that another witness—Soleimani—also committed perjury would have been unambiguously favorable to Teman. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (evidence impeaching a witness is material when the witness's testimony is the only evidence linking the defendant to the crime).

And here, this prejudice is magnified because this Court specifically ordered the Government to learn and disclose this evidence to the defense—and to report back to this Court. Regardless of whether the Government disregarded this Court's order, or whether the Government obtained but did not disclose this evidence, the bottom line remains: the defense reasonably relied on the Government's representations and had no choice but to take the Government at its word as the Government first disclosed the Housing Court decision on a holiday weekend 48 hours before trial.

Instead, the Government not only failed to disclose this critical evidence but actually used a leading question to elicit materially false testimony from Soleimani on this precise issue. The concealment of this evidence from the defense—coupled with the false testimony elicited by the prosecution during the Government's direct examination of this witness—unambiguously affected the outcome at trial, especially since the evidence proves that the witness lied to *this jury.*

## V.    The Introduction of Perjured Testimony Alone Requires a New Trial

Where, as here, "the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (internal quotations omitted); *see also Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir. 1988) (question is whether the jury's verdict "might" be altered). If the Government knowingly permitted the

introduction of false testimony, reversal is "virtually automatic." *United States v. Stofsky*, 527 F.2d 237, 243 (2d. Cir. 1975). Indeed, even if the Government did not knowingly permit the introduction of false testimony, "once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might' have acquitted." *Id*. at 246-47.

In this case, there can be no denying that the Government knew—or, at a bare minimum, "should have known"—that Soleimani committed perjury. This Court had already imposed on the Government the specific duty to inquire about whether Soleimani personally dealt with Howell and the Government expressly acknowledged this task. The prosecution then proceeded to ask the leading question, "And did you misrepresent anything to the tenant or was it others in your company?" and Soleimani answered, "It was others." (TR. at 502). When the prosecutor asked this leading question, he, at a minimum, "should have known" the truth because the Government was ordered by this Court to learn the truth. Given that Soleimani was such a key witness in the Government's case-in-chief, the jury—if made aware of Soleimani's perjury—certainly "'might' have acquitted." *Stofsky*, 527 F.2d at 246-47. Indeed, the jury would likely have rejected the prosecution's consistent pleas to believe Soleimani's testimony and would have acquitted.

## VI.    The Government Also Violated the Jencks Act

The Government failed to disclose Soleimani's prior under-oath testimony about a very subject the Government elicited testimony about during its direct examination. By eliciting that testimony, Soleimani's testimony in the Housing Court Case fell within the scope of the Jencks Act. This violation alone necessitates a new trial.

Even if this Court were to determine that the Government's failure to disclose this evidence was inadvertent, the law requires a new trial. "The Supreme Court has stated that, '[s]ince courts cannot speculate whether (Jencks material) could have been utilized effectively at trial, the harmless-error doctrine must be strictly applied in Jencks Act cases.'" *United States v. Jackson*, 345 F.3d 59, 77 (2d Cir. 2003) (quoting *Goldberg v. United States*, 425 U.S. 94, 111 n.21 (1976) (internal quotations omitted)). As explained *supra*, this was far from harmless and the prejudice to Teman was substantial.

Thus, based on the Jencks Act violation alone, this Court should grant Teman a new trial.

**VII.    The Government Suppressed Additional Evidence**

To this day, the Government has also failed to disclose additional evidence—the suppression of which also necessitates a new trial.

A.    The Government Misrepresented the Scope of the Actions Against Soleimani and Gabay Which Encompass Claims of Dishonesty

The Housing Court evidence was not the only evidence the Government suppressed. As discussed *supra*, the Government moved to exclude all evidence concerning the involvement of Soleimani and Gabay in numerous tenant complaints, lawsuits, and regulatory actions. (*See* Doc. 83). In so doing, the Government unequivocally represented to the defense and to this Court that "there is *no indication* that *any* landlord-tenant complaints or lawsuits against Soleimani, Gabay, or their companies would be probative of their 'character for truthfulness or untruthfulness.' Routine landlord-tenant disputes such as complaints or lawsuits about appliances, conditions in a building, and rent charges *are not probative of the witnesses' truthfulness or untruthfulness*." (*Id.* at 3) (emphasis added).

16

At trial, this Court accepted the Government's representations and completely precluded Teman from cross-examining Soleimani and Gabay about these matters. In doing so, this Court explicitly relied on the Government's representations regarding the underlying evidence: "These violations relate to vermin, defective doors, and the perpetuation of hazards. These regulatory violations or alleged violations do not, however, bear on Soleimani's character for truth-telling. They are inadmissible to impeach his trial testimony." (TR. at 26). "As to Gabay, I will exclude the evidence proffered by the government… [The evidence] addressed in the government's letter does not involve false statements or falsehoods." (*Id.* at 30).

However, evidence never disclosed by the Government reveals that the Government's representations regarding these complaints and lawsuits were not true. Specifically, the New York City Department of Housing Preservation and Development ("HPD") has brought numerous claims against both Soleimani and Gabay that encompass "false certification of correction of violations." That is, both Soleimani and Gabay appear to be charged with falsely certifying—*under the penalties of perjury*—that housing violations in their respective buildings had been corrected, when, in fact, they had not.

Attached are reports generated from HPD's data showing violations of New York City's Housing Maintenance Code asserted against properties managed by Soleimani (Exhibit B) and Gabay (Exhibit C). These reports do confirm the Government's representation that Soleimani and Gabay are charged with violations including "vermin, defective doors, and the perpetuation of hazards." However, the Government failed to disclose that both Soleimani and Gabay are not charged merely with these code violations, but with *falsely certifying* such violations had been corrected. *See* HPD's Housing Maintenance Code Violations User Guide (Exhibit D) which

explains that "FALSE CERTIFICATION" status means: "The violation was certified as corrected by the Owner... HPD found that condition had not been properly corrected. The violation is open *and is subject to civil penalties for false certification*." (*Id.*) (emphasis added).

Moreover, the Government failed to disclose that HPD has further initiated litigation against both Soleimani and Gabay for such false certifications. Attached as Exhibits E and F are reports generated from the HPD's data showing both Soleimani and Gabay personally named as defendants in New York Civil Court litigation initiated by HPD.[5] Also attached as Exhibit G is a litigation report 'Glossary' from HPD, demonstrating that the 'False Certification' and 'Comprehensive' cases brought against Soleimani and Gabay pertain to *false certifications* each has submitted.

Thus, contrary to the Government's representations, these are *not* "routine" landlord complaints. Rather, these "false certification" actions demonstrate numerous instances in which government regulators have found both Soleimani and Gabay have engaged in "false" or dishonest business practices. This evidence is *highly* probative of these witnesses' credibility. And here, too, the Government appears to have suppressed this evidence, by representing—both to the defense and to this Court—that these matters were categorically irrelevant to the credibility of Soleimani and Gabay. This is even more concerning because the United States Attorney's Office for the Southern District of New York has a deep understanding of housing violations, including the extent to which landlords in this district may systematically engage in dishonesty by falsely certifying building repairs. *See* Complaint in *United States v. N.Y.C. Housing Authority*, No. 1:18-cv-05213

---

[5] The underlying documents in these cases are not electronically accessible and can only be obtained in person at the New York County Clerk. Due to travel restrictions and closures resulting from the current COVID-19 pandemic, Teman is presently unable to procure the underlying documents.

(WHP) (S.D.N.Y. 2018) (documenting this U.S. Attorney's Office prosecution of claims of dishonest certification of building repairs).

This, too, was a *Brady* violation. There can be no denying that both Soleimani and Gabay were central witnesses in this case. And there were critical "holes" in each witness's respective testimony, specifically regarding documents in this case. For example, Soleimani curiously testified to failing to submit a declaration requested by Chase Bank and acknowledged his financial interest in ensuring the subject RCCs could not be shown to be "authorized." (*See* TR. 617-28). And Gabay testified that Michael Haas, his business partner, falsely signed an affidavit in which their company denied any knowledge of GateGuard to obtain reimbursement from Signature Bank. (TR. 397-403). In this context, it would certainly be relevant for the jury to consider that Soleimani and Gabay have faced numerous claims relating to false certifications each has made to governmental authorities. But here, too, the Government suppressed this evidence and misrepresented the nature and substance of this evidence to the defense and to this Court, thereby successfully (but unconstitutionally) preventing Teman from impeaching Soleimani and Gabay with this evidence at trial. This too necessitates a new trial.

### B.  The Government's Additional Representations Regarding Gabay are Not Credible

As set out *supra*, the bulk of the Government's representations in its eleventh-hour motion filed January 19, 2020 motion (Doc. 83) have proven to be false. By way of further example, in its motion, the Government volunteered that Gabay "is a party to several landlord-tenant actions" and provided an "example" of an action in which his company was fined for improperly overcharging a tenant. (*Id.* at 2-3). The Government's motion notably included a shorthand moniker for this case (the "Rent Charge Case"), but the Government failed to provide any citation, reference, or

underlying documentation.[6] Instead, the Government represented unequivocally that this evidence was not probative of Gabay's credibility.

Here, too, the Government misled this Court and the defense. In its motion *in limine*, the Government acknowledged Gabay was fined "treble damages" for rent overcharges, but in the same breath, the Government maintained he never acted dishonestly. What the Government failed to disclose is that treble damages are only applied in housing cases in which the owner is found to have *willfully* overcharged the tenant. (*See* Exhibit E) (New York State Division of Housing and Community Renewal Office of Rent Administration, Policy Statement 2019-1 (dated October 16, 2019)) (explaining that treble damages indicates a finding that "the overcharge is deemed to be willful"). Though Teman remains unable to locate further documentation on what the Government characterized as the "Rent Charge Case,"[7] the representations made by the Government regarding this case are not credible on their face. Irrespective of the Government's attempts to downplay this evidence, the imposition of treble damages against Gabay constitutes a finding he *willfully* engaged in fraud and deceit. This, too, is undisclosed *Brady*.

### VIII. The Government's *Brady* Violations Do Not Turn on Whether the Defense Could Have Discovered the Undisclosed Evidence

As an initial matter, the evidence suppressed by the Government is not available electronically through a database similar to the federal PACER system. For example, records of Soleimani's Housing Court testimony can only be obtained via written request to the New York

---

[6] In contrast, the Government did provide a copy of the Housing Court's opinion in *ABJ Milano LLC v. Stanley Howell* (despite suppressing critical underlying evidence in that case, as discussed *supra*).

[7] As discussed *supra*, even had the Government provided a citation to its "Rent Charge Case," Teman could not have obtained the underlying Housing Court records in time for use at trial. In any event, the extent of the Government's disclosure—an unnamed "Rent Charge Case"—is plainly insufficient, and to this day, Teman has been unable to identify this case (let alone obtain the underlying records) despite significant efforts.

County Civil Court Clerk—a process that can take several weeks. In processing the request, the Clerk first retrieves archived audio recordings of the requested court proceeding, and then provides the recordings to a court reporter who prepares a certified transcript. Given the timing of the Government's eleventh-hour disclosure of this information just before trial, it was literally impossible for Teman independently to obtain the relevant records from the Housing Court in time to learn the information and to use it at trial.

Nevertheless, as a matter of constitutional law, Teman's ability to independently discover the undisclosed evidence has no bearing on the Government's due process violation under *Brady* that necessitates a new trial.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. And 41 years later, the Supreme Court affirmed that *Brady* is first and foremost a disclosure obligation imposed on the prosecution. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (flatly rejecting the "notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed"). Instead, defendants such as Teman are entitled to presume that "public officials have properly discharged their official duties" when they claim they have. *Id*. at 696.

In the Second Circuit and at least five others (Third, Sixth, Ninth, Tenth, and D.C. Circuits), a defendant's *Brady* claim only fails if the defendant had *actual knowledge* of the information the Government failed to disclose, not "those [facts] that might be unearthed" through an exercise of due diligence. *See Lewis v. Connecticut Commissioner of Correction*, 790 F.3d 109 (2d Cir. 2015) (holding that a state court's imposition of "an affirmative 'due diligence' requirement" was

impermissible because it "plainly violated clearly established federal law under *Brady* and its progeny"). The Second Circuit drew a clear line: "'[e]vidence is not 'suppressed' [under *Brady*] if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" *Id*. at 121. But this requirement "speaks to facts already within the defendant's purview" based on the defendant's *actual knowledge*, not facts "that might be unearthed" through diligence. *Id*.; *see also Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 468 (6th Cir. 2015) (*Brady* requires "the State to turn over *all* material exculpatory and impeachment evidence to the defense," not merely "*some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs"); *Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014) (defendant is entitled to "rely on the prosecutor's obligation to produce that which *Brady* and *Giglio* require him to produce," regardless of whether or not defense "counsel could have found the information himself"); *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995) (whether the defense "knew or should have known" about the information is *irrelevant* to whether the prosecution had an obligation to disclose [the evidence]") (emphasis added); *United States v. Nelson*, 979 F.Supp.2d 133 (D.D.C. 2013) ("*Brady* does not excuse the government's disclosure obligation where reasonable investigation and due diligence by the defense could also lead to discovering exculpatory evidence" (explaining binding Circuit authority in *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887 (D.C. Cir. 1999)); *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 290 (3d Cir. 2016) (en banc) ("*Brady*'s mandate and its progeny are entirely focused on prosecutorial disclosure, not defense counsel's diligence").

In this case, the prosecution had a constitutional duty to disclose the information it hid from the defense. Over and above this duty, this Court gave the Government a direct order requiring

further inquiry and disclosure—an order the prosecution explicitly acknowledged and accepted. As the Supreme Court has made clear, *Brady* is predicated on a view of "the prosecutor as the representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Kyles*, 514 U.S. at 439 (citations and ellipses omitted). Where the prosecution not only fails to disclose impeachment evidence to the defense—but instead elicits perjury from its star witness through a leading question that, by this Court's order, foreclosed any cross-examination on the subject by the defense—"justice" has not been "done." *Id.*

## IX.    Conclusion

Based on the foregoing, it is clear the Government suppressed evidence that was favorable to Teman and the Government's failure to disclose this evidence resulted in prejudice. *See Coppa*, 267 F.3d at 140. Thus, as a matter of law, Teman is entitled to a new trial. Where, as here, the *Brady* violation is coupled with false testimony elicited by the prosecution from the Government's star witness on the very topic of the undisclosed evidence, due process mandates a new trial.

Respectfully submitted,

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND
MO Bar # 62265
MARGULIS GELFAND, LLC
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com

—  and  —

*/s/ Joseph A. DiRuzzo, III*
Joseph A. DiRuzzo, III
NY Bar # 4417853
DIRUZZO & COMPANY
Joseph A. DiRuzzo, III
401 East Las Olas Blvd., Suite 1400 Ft.
Lauderdale, FL 33301
Telephone: (954) 615-1676
Facsimile: (954) 827-0340
jd@diruzzolaw.com

***Attorneys for Teman***

*/s/ Alan Dershowitz*
ALAN DERSHOWITZ*
1575 Massachusetts Avenue
Cambridge, MA 02138

***Of Counsel***

*\*Member of the Massachusetts Bar and the
United States Court of Appeals for the
Second Circuit; will seek pro hac vice
admission in this case*

**<u>Certificate of Service</u>**

I hereby certify that I filed the foregoing through the Court's CM/ECF system which will

provide notice of filing to all counsel of record.


<u>*/s/ Justin K. Gelfand*</u>
JUSTIN K. GELFAND, #62265
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com
***Attorney for Teman***