UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

ARI TEMAN,

Defendant.

19-CR-696 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves post-trial motions filed by defendant Ari Teman.

Beginning January 22, 2020, the Court presided over Teman's jury trial. Teman was charged with two counts of bank fraud, in violation of 18 U.S.C. § 1344, and two of wire fraud, in violation of 18 U.S.C. § 1343. These charges alleged that Teman had created and deposited checks drawn on the accounts of his home-security company's customers, while falsely representing to the depositary and clearing banks that the customers had knowingly authorized those checks. The checks consisted of (1) two checks totaling $36,000 which Teman deposited in March 2019, and (2) 27 checks totaling $297,000 which Teman deposited between April and June 2019. On January 24, 2020, at the close of the Government's case, Trial Tr.[1] at 692–99, and again on January 27, 2020, at the close of the defense case, *id.* at 938–39, Teman moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). The Court denied both motions. *See id.* at 702, 722–27, 939. On January 29, 2020, the jury returned its verdict, convicting Teman on all counts.

---

[1] For the trial transcript, see dockets 99, 101, 103, 105, 107, and 109.

On February 26, 2020, Teman timely moved for a judgment of acquittal under Rule 29(c) or, in the alternative, for a new trial under Rule 33.  Dkt. 111 ("Teman Mem.").  In his Rule 29(c) motion, Teman argues that (1) the Court, through its jury instructions, and the Government, through its proof at trial, constructively amended the Indictment; (2) there was insufficient evidence that Teman made a material misrepresentation to a financial institution; (3) there was insufficient evidence that Teman acted with criminal intent; and (4) there was insufficient evidence of venue.  In his Rule 33 motion, Teman incorporates these arguments and further contends that a new trial is warranted because (1) the Government violated the "rule of sequestration"; (2) the Court improperly excluded a proposed defense expert witness on "remotely created checks"; and (3) an alternate juror lied during *voir dire*.  Teman also moves, under Federal Rule of Criminal Procedure 6(e)(3)(E)(i) and (ii), for disclosure of grand jury transcripts relating to his claim of a constructive amendment.  Dkt. 120 ("Teman GJ Ltr.").

On April 9, 2020, while Teman's motions were being briefed, Teman filed a second Rule 33 motion, Dkt. 118 ("Teman *Brady* Mem."), in which he contends that the Government failed to disclose *Brady* and Jencks Act evidence to the defense.

For the reasons that follow, the Court denies all of Teman's post-trial motions.

## I.   Background

The Court assumes familiarity with the factual background of this case and the evidence adduced at trial.  The discussion that follows presents only the evidence necessary to resolve the motions at hand.[2]

---

[2] The Government's summary in its opposition to Teman's initial round of motions, however, provides a helpful and accurate overview of the trial proof.  Dkt. 112 ("Gov. Mem.") at 4–12.

### A.      Teman's Fraud Scheme

Teman owned GateGuard, Inc. ("GateGuard"), a Florida company that produced and installed intercom devices for apartment buildings.  *See, e.g.*, Trial Tr. at 278, 312–13.  The evidence at trial centered on three of GateGuard's New York City-based customers or sets of customers of Teman's: (1) 518 West 204 LLC, managed by Coney Management; (2) 18 Mercer Equity Inc. ("18 Mercer"), managed by Crystal Real Estate Management; and (3) ABJ Milano LLC and ABJ Lenox LLC (together, "ABJ"), both managed by ABJ Properties LLC (collectively, the "Customers").  Each Customer had agreed to use GateGuard's services, including purchasing the company's intercom devices for use in their buildings, which generally were located in Manhattan or the Bronx.  *See id.* at 310, 312–15 (518 West 204 LLC); *id.* at 415, 420, 434–36 (18 Mercer); *id.* at 486, 489–90 (ABJ).

Viewed in the light most favorable to the verdict, the evidence established that during the first half of 2019, Teman created, and deposited into accounts he controlled, multiple checks on each Customer's account—ostensibly to pay fees owed to GateGuard, but all without the Customers' foreknowledge or authorization.  *See, e.g.*, *id.* at 357–58, 362–63, 367 (518 West 204 LLC) (explaining that checks were not authorized); *id.* at 441, 474–75 (18 Mercer) (same); *id.* at 562–64, 567, 648–49 (ABJ) (same).  The evidence further showed that, to create the illusion of customer assent, Teman had referred in written communications with each Customer at points during their dealings with GateGuard to "Terms and Conditions" that GateGuard had adopted governing customer relationships.[3]  *See id.* at 329–33, 385–87 (518 West 204 LLC); *id.* at 421–22

---

[3] Some of the Customers disputed having agreed to the Terms and Conditions.  *See* Trial Tr. at 329–31, 341–43, 364 (518 West 204 LLC) (discussed T&C in context of negotiations, but did not finally agree to T&C); *id.* at 506–07 (ABJ); *see also* GX 409C (ABJ) (text from Joseph Soleimani, ABJ representative, to Teman observing that he had not signed the T&C).

(18 Mercer); *id.* at 591 (ABJ); *see also* GX[4] 441 ("T&C").  GateGuard's Terms and Conditions

contained within them, on page five, a hyperlink to GateGuard's "Payment Terms."  *See* T&C

at 5; DX 2 ("Payment Terms").  Buried within the Payment Terms, at least in a post-offense

version introduced at trial,[5] was a clause purporting to grant GateGuard the authority to withdraw

funds from the Customers' accounts to pay debts owed to GateGuard by the Customer.  *See*

Payment Terms at 5 ("You give us permission to write and sign checks with your checking

and/or saving account(s) information to do a bank draw against your entity (or entities) for the

amount it (or they) owe(s).").  However, representatives of each Customer testified that they had

never seen the Payment Terms, had never discussed such terms with Teman, and had not granted

GateGuard that authority, and would not have done so had they been given the opportunity.  *See*

Trial Tr. at 326–27, 332, 355–56, 361, 365 (518 West 204 LLC); *id.* at 427–30 (18 Mercer);

*id.* at 497–98, 568–69 (ABJ).

The Customers further disputed owing GateGuard any money for the purported services

and fees to which the outsized checks that Teman had fabricated and negotiated in March and

April 2019 were based.  *See, e.g.*, *id.* at 342, 360–61, 365 (518 West 204 LLC); *id.* at 434, 441

---

[4] "GX" references exhibits the Government introduced at trial, and "DX" references exhibits introduced by the defense.  These exhibits can be found at docket 128.

[5] At trial, the defense offered a version of the Payment Terms which stated that it was last revised on January 27, 2019.  *See* Payment Terms at 1.  The defense did not offer any earlier version of the Payment Terms, or elicit any competent testimony as to the content of any earlier version.  The January 27, 2019 version was received during the testimony of Teman's corporate attorney, Ariel Reinitz, Esq., whom Teman called in support of an attempted advice of counsel defense.  Reinitz, however, was not competent to authenticate this document.  He testified only that Teman, who did not testify, had told him that these terms had been in place (and presumably accessible to the Customers) at the time each Customer had begun its business relationship with GateGuard.  *See* Trial Tr. at 757–78.  Reinitz's testimony was not admissible to establish the truth of that proposition.  Although his testimony as to Teman's representations to him was properly received to assure that the jury received a full portrait of Teman's communications with Reinitz, there was no competent evidence at trial that the relevant aspects of the Payment Terms had been in place at the times any of the Customers contracted with Teman.

(18 Mercer); *id.* at 563, 649 (ABJ). These checks—totaling $51,000 in fees drawn on 518 West

204 LLC's account, $18,000 on 18 Mercer's, and $264,000 on ABJ's, *see* GX 201–05—far

outstripped in value the few thousand dollars each Customer had paid for its GateGuard devices,

*see* GX 413 at 3 (invoice for GateGuard purchase); GX 431 at 3 (same); GX 409A–409B (same).

As context for Teman's decision unilaterally to draw and deposit the 29 checks in 2019,

the evidence showed that, during 2018, the Customers had each told Teman that they were going

to cease using GateGuard devices. *See* Trial Tr. at 335–37 (518 West 204 LLC); 437–38 (18

Mercer); *id.* at 514 (ABJ). They attested to having had numerous problems with the devices,

which Teman had failed to fix. *See, e.g.*, *id.* at 334–35, 339–40, 346 (518 West 204 LLC); *id.*

at 436–47 (18 Mercer); *id.* at 499–501 (ABJ); *see also* GX 402 (email from Joseph Soleimani,

ABJ representative, to Teman cataloguing issues with GateGuard devices); GX 409C (texts from

Soleimani to Teman about same). The evidence showed that Teman had reacted angrily and

sometimes explosively to the Customers' decisions to end their relationships with GateGuard.

*See, e.g.*, GX 417–18 (emails from Teman to Elie Gabay, 518 West 204 LLC representative);

GX 403–05 (emails from Teman to Soleimani). His angry communications included threats to,

among other things, sue the Customers, place liens on their buildings, and refer the Customers to

law enforcement. *See, e.g.*, Trial Tr. at 347, 350–52, 354–55 (518 West 204 LLC); *id.* at 440

(18 Mercer); *id.* at 512–13, 561 (ABJ); *see also* GX 406–08 (emails from Teman to Soleimani

threatening lawsuits, liens, and foreclosure).[6]

The evidence further showed that, as GateGuard lost such business, Teman was facing

financial trouble. *See* Trial Tr. at 807–08; *see also* GX 704 (texts from Teman to his attorney,

---

[6] As to one Customer, whom Teman understood to be an observant Jew, Teman callously sent an email threatening to place a lien on the Customer's assets during Passover, when the Customer would be unreachable. GX 417 at 1 (email from Teman to Gabay).

Ariel Reinitz, Esq.) ("I'm more concerned about getting the cash since we need to operate . . .

we'll survive, but it's not great.  [W]e run so tight.").  Looking for options, he consulted his

attorney, Reinitz, about the possibility of withdrawing funds directly from the Customers'

accounts, purportedly in accordance with the Payment Terms, to fulfill unpaid invoices.  Trial Tr.

at 770–72.  Teman envisioned using remotely created checks ("RCCs") to withdraw funds to pay

the business's debts.[7]  *See id.*  Teman, however, did not show Reinitz the RCCs he planned to

deposit.  *See id.* at 793–94.  Reinitz was not aware of how much the Customers had paid for their

devices, *see id.* at 813, 912–13, nor was there any evidence that Teman had told Reinitz the

amount he was planning to charge them in purported fees via the RCCs.  Teman did not, for

example, disclose to Reinitz that the first two checks that he would create and deposit would be

for $18,000 each.  *See id.* at 823 (Reinitz explaining that he first learned about the two $18,000

March checks in April 2, 2019 messages from Teman, after the deposits had taken place).

Although Reinitz testified that he orally told Teman that depositing RCCs drawn on the

Customers' accounts was "technically legal," and that the Payment Terms gave Teman "explicit

authority" to do so, *id.* at 921, he did not memorialize that purported advice, and there was no

documentary support of any kind that any such communication had occurred.  Reinitz's written

communications with Teman reflected the opposite guidance.  On January 2, 2019, in a series of

---

[7] Consistent with federal banking regulations governing such instruments, the Court instructed
the jury (1) that a remotely created check ("RCC") is a check that is created not by the paying
bank and does not include the signature of the accountholder on whose account the check is
drawn, and (2) that, when authorized by the accountholder, the law permits RCCs to be created
and used.  *See* Trial Tr. at 229–30; *see also* 12 C.F.R. § 229.2(fff) ("Remotely created check
means a check that is not created by the paying bank and that does not bear a signature applied,
or purported to be applied, by the person on whose account the check is drawn.").  The Court
further instructed the jury that the issue at trial was not whether the checks met a technical
definition of an RCC, but whether the Government had proven that the elements of bank fraud
and wire fraud were met.  Trial Tr. at 230.

WhatsApp messages responding to Teman's proposal to draw checks on Customers' accounts, Reinitz wrote, flatly, "No" and "[b]ad idea." GX 702 at 1. In the same string of messages, Reinitz further wrote to Teman that the Customers "are likely to call police. And you will be arrested. And have a criminal case to deal with. And then you can start explaining about your 'contract' and 'not breaking any laws.'" *Id.* at 1–2. Presciently, Reinitz predicted that "you are > 50% likely to be arrested for the activities you propose." *Id.*

On March 28, 2019, Teman nevertheless deposited two checks, each for $18,000, into GateGuard's account at Bank of America, which he had created. *See* Trial Tr. at 200; GX 113 (spreadsheet from Bank of America cataloguing Teman's transactions). One check purported to have been issued by 518 West 204 LLC[8] and the other by 18 Mercer. *See* Trial Tr. at 196–97; GX 201 (518 West 204 LLC check); GX 202 (18 Mercer check). As prepared by Teman, each check stated, "DRAW PER CONTRACT. NO SIGNATURE REQUIRED." Each bore, in the place allocated for a signature, an unintelligible squiggle. *See* GX 201–02. According to the memo lines of the checks, they were ostensibly for "device removal fee[s]." *See id.*

Principals for 518 West 204 LLC and 18 Mercer testified that they had not authorized or been aware in advance of those transactions, that they had not been aware that Teman claimed the businesses owed him these sums, and that they disputed that their businesses owed Teman $18,000 or any such fee. *See* Trial Tr. at 357–58, 360–63 (518 West 204 LLC); *id.* at 421, 434, 441, 474–75 (18 Mercer). The Customers testified that before their relationships with Teman deteriorated, he did not discuss the prospect that they could be subjected to device removal fees, and that they had been unaware of any claim that they owed any such fee. *See, e.g., id.* at 326,

---

[8] The check for 518 West 204 LLC states, incorrectly, that it is to be drawn on the account of 518 West *205* LLC. GX 201; *see also* Trial Tr. at 358–59 (Gabay: "518 West 205 LLC is not an entity that we operate.").

343–44 (518 West 204 LLC); *id.* at 421, 434, 441 (18 Mercer).  Teman did not send either

Customer an invoice cataloguing charges for device removal before he made the deposits, even

though he had sent invoices to the Customers for GateGuard purchases in the past.  *See id.* at 476

(describing lack of invoice); *see also* GX 413 at 3 (invoice for GateGuard purchase); GX 431 at

3 (same).  Representatives of each Customer testified that they had been shocked to see charges

for a device removal fee, both because they owned the devices and believed they should be able

to remove them from their own buildings, and because the amount of the removal fee was

disproportionate to the cost of the intercom or any other amount they had paid GateGuard in the

past.  *See id.* at 343–44 (518 West 204 LLC); *id.* at 439, 475 (18 Mercer).  Specifically, 518

West 204 LLC had paid \$3,600 for its intercom,[9] *see* Trial Tr. at 317–20; GX 413 at 3 (invoice),

and 18 Mercer had paid \$2,499 for its intercom (and, with other services, had paid a total of

\$3,947.88 to GateGuard), *see* Trial Tr. at 435, 439; *see also* GX 431 at 3 (invoice)—far less than

the \$18,000 device removal fee Teman charged.

Bank of America placed a hold on the funds from the two checks.  *See* GX 704 (text from

Teman to Reinitz); GX 727 (same).  On March 29, 2020, Teman transferred \$35,000 from the

GateGuard account to an account for Friend or Fraud LLC ("Friend or Fraud"), another company

he controlled.  *See* GX 113.  On April 1, 2019, Signature Bank, where 518 West 204 LLC and 18

Mercer had their bank accounts, flagged the checks for fraud.  *See* Trial Tr. at 677–84.  On

---

[9] While he did not invoice the Customers before his March 2019 deposits, Teman did invoice
518 West 204 LLC one year earlier—on March 26, 2018, after the purchase of its initial
intercom—for \$18,286, purportedly for a new panel, installation services, and monthly services,
which it had not agreed to purchase.  *See* Trial Tr. at 352–54; *see also* GX 417 at 9 (invoice).

April 2, 2019, Bank of America completed a chargeback from the GateGuard account to the 518 West 204 LLC and 18 Mercer accounts at Signature Bank.[10]  *See* Trial Tr. at 210–11; GX 113.

On April 2, 2019, Teman contacted Reinitz, revealing that—contrary to Reinitz's January guidance—he had drawn money from the Customers' accounts and that Bank of America had placed a hold on his account.  *See* GX 704; GX 727.  Reinitz sent Teman a text message, which stated, "[n]ot sure I follow but this sounds bad," and another, which stated, "I don't know all the ins and outs of this but sounds like a bad idea."  GX 704.  He warned Teman, "[i]f you are hitting their accounts out of the blue, I expect this will become a criminal matter sooner or later."  *Id.*; *see also* GX 728 (April 3, 2019 text from Reinitz to Teman) ("I've already told you I think it's a bad idea . . . .  If you hit their accounts I think 50/50 they call cops.  If I was advising them that's probably what I would tell them to do.").  On April 10, 2019, after further communications with Teman, Reinitz wrote, "[t]he banking stuff is not a joke. . . .  You can't just hit someone's bank account if you know they dispute the charge."  GX 729 at 1; *see also* Trial Tr. at 909–10.  He warned Teman that "[t]here are serious state and fed[eral] regulations on this.  You claim that your contract allows you to debit their accounts even after they explicitly protest.  I'm just not sure it's that simple."  GX 729 at 2.  In the same string of messages, Reinitz went on, "[a]nd it may be (again . . . speaking out of ignorance . . .) a clear violation of some federal banking regulation.  In which case your 'simple, can't miss idea' is now a federal crime."  *Id.*; *see also id.* at 3 ("There are regulations around automatic debit agreements.  Including, if the payer tells you to stop, you must stop.").

---

[10] At trial, Karen Finocchiaro, a senior fraud investigator for Bank of America, testified that a chargeback occurs when "the maker bank has established that for some reason the check is no good, so it could be . . . nonsufficient funds, altered or fictitious, or a counterfeit check."  Trial Tr. at 208.  During a chargeback, the bank to which the check was presented returns the funds to the maker bank.  *See id.* at 208–09.

Despite Reinitz's warnings, Teman, the next month, escalated his practice of drawing and negotiating remote checks on Customer accounts without notice. On April 19, 2019, Teman entered a Bank of America branch in Florida and deposited 27 more checks, totaling $297,000, into the GateGuard account. *See* Trial Tr. at 213–14, 220. These checks were drawn on the accounts of three entities: 518 West 204 LLC, ABJ Milano LLC, and ABJ Lenox LLC.[11] *See* Trial Tr. at 213–19; *see also* GX 203 (518 West 204 LLC checks); GX 204 (ABJ Milano checks); GX 205 (ABJ Lenox checks). Unlike the first two checks, these 27 did not bear a purported signature. Each instead stated:

> DRAW PER CONTRACT. NO SIGNATURE REQUIRED[.] NOTE TO BANK: This is a valid check. You are required by law to honor it. Contract at gateguard.xyz/legal/terms.php accepted by above client. Contact us 212-203-3714 with questions.

*See* GX 203–05. The checks' memo lines stated they were for device removal fees, attorney use fees, collections fees, or chargeback fees. *Id.*

Again, representatives for ABJ and 518 West 204 LLC testified that they had not authorized Teman to remotely create and negotiate the checks or had any notice of the transactions in question, and that they disputed owing the sums reflected. *See* Trial Tr. at 365, 367 (518 West 204 LLC); *id.* at 562–63, 567–68, 648–49 (ABJ). The Customers also had not been aware of the fees for device removal, attorney use, or chargebacks which they purportedly owed.[12] *See id.* at 326, 343–44, 365 (518 West 204 LLC); *id.* at 498, 510–11, 563, 565–66, 649

---

[11] The checks incorrectly identified one of the ABJ entities and 518 West 204 LLC. Although the checks were drawn on the ABJ Lenox and 518 West 204 LLC accounts, they stated that they had been issued by "ABJ *Lennox*" and "518 West *205* LLC." *See* GX 203 (emphasis added); GX 205 (emphasis added); *see also* Trial Tr. at 358–59, 564.

[12] In May 2018, Teman emailed Soleimani, claiming that ABJ owed him for, among other things, device removal fees. When Soleimani responded, "[c]an you please send me the invoices which you are claiming we owe you? Not sure why we owe you money but I'm glad to look into it[,]"

(ABJ).  Again, the fees far outstripped the costs of the devices.  The evidence showed that 518

West 204 LLC had purchased its device for $3,600, *see* Trial Tr. at 317–20; GX 413 at 3

(invoice), and ABJ had paid $1,743 per device for its seven devices, *see* Trial Tr. at 490, 496,

510; GX 409A–409B (invoices).  The checks, however, were for far larger sums.  They totaled

$33,000 drawn on 518 West 204 LLC's account, GX 203, and $264,000 on the ABJ accounts,

GX 204–05.

 After depositing the checks, Teman received a notice that Bank of America was placing a

seven-day hold on the $297,000.  *See* DX 16; *see also* Trial Tr. at 282–84; GX 206 (deposit slip

with note: "holds applied see hold notice deposit").  The purpose of such a hold is to determine

whether the funds at issue should be released to the account.  *See* Trial Tr. at 285.  Both Bank of

America and the drawee banks—JPMorgan for ABJ and Signature Bank for 518 West 204

LLC—then reviewed the checks.[13]  *See* Trial Tr. at 219–20.  Signature Bank conducted its

review and flagged the checks for fraud.  *See id.* at 684–86.  As a result, on April 24, 2019,

before the hold on the funds was lifted, Bank of America completed a chargeback of $33,000

from the GateGuard account to 518 West 204 LLC's account at Signature Bank.  *See id.* at 223;

GX 113.  Teman therefore never received access to those funds.

 On April 26, 2019, the day the hold was lifted on the remaining funds, Teman transferred

approximately $225,000 from the GateGuard account to the Friend or Fraud account, and $3,600

from the GateGuard account to an account in his name.  *See* Trial Tr. at 224–25; GX 113.  He

---

GX 405 at 1, Teman did send an invoice—which claimed that ABJ owed GateGuard more than
$1.13 million, including for device removal, chargeback, and collection fees, GX 409.

[13] The process by which the two banks received and reviewed images of checks differed.
JPMorgan received the checks through an inter-bank process.  Signature Bank, a smaller bank,
received the checks from the Federal Reserve.  Trial Tr. at 186–87.

then transferred $180,000 from the Friend or Fraud account to an account for Touchless Labs

LLC ("Touchless Labs"), and $4,500 from the Friend or Fraud account to his personal account.

*See* Trial Tr. at 226; GX 113.  On April 29, 2019, Teman transferred $125,400 from the

Touchless Labs account back to the Friend or Fraud account.  *See* Trial Tr. at 226–27; GX 113.

On April 29 and May 1, 2019, Teman transferred approximately $143,000 from the Friend or

Fraud account to two Chinese accounts.  *See* Trial Tr. at 227, 291–92; GX 113.

On May 7, 2019, Bank of America completed a second chargeback, for $264,000 from

the GateGuard account to accounts for ABJ Lenox LLC and ABJ Milano LLC at JPMorgan.

Trial Tr. at 231; GX 113.  The next day, Teman, through an in-person transaction with a bank

teller, withdrew $4,000 from the Friend of Fraud account at a Bank of America branch in

Manhattan.  *See* Trial Tr. at 228, 231; GX 112.  After the chargebacks to Signature Bank and

JPMorgan, Bank of America suffered a loss of $260,319.81 as a result of the negotiation of these

27 checks.  *See* Trial Tr. at 231.

### B.     Teman's Prosecution

On July 3, 2019, Teman was arrested in the Southern District of Florida and held in

custody, based on a one-count complaint charging bank fraud in connection with the April 2019

checks.  *See* Dkt. 1.  On July 8, 2019, he was released on bond, and on September 6, 2019,

appeared in this District before a United States Magistrate Judge.  Dkt. 4.

On September 26, 2019, the grand jury returned an Indictment charging Teman with one

count of bank fraud, related to the April 2019 checks.  Dkt. 9.  On November 12, 2019, the grand

jury returned the First Superseding Indictment, charging Teman with two counts of bank fraud,

one in connection with the March 2019 checks and the other in connection with the April 2019

checks, and two counts of aggravated identity theft, relating to the March 2019 checks.  Dkt. 27.

On November 27, 2019, Teman filed pretrial motions. Dkts. 32–34. On December 20, 2019, the Court issued a decision dismissing Count One of the First Superseding Indictment—which charged bank fraud count in connection with the April 2019 checks—without prejudice, for a violation of the Speedy Trial Act. Dkt. 45. The Court issued a separate order denying Teman's other pretrial motions. Dkt. 48.

On January 3, 2020, the grand jury returned the Second Superseding Indictment, in six counts. Dkt. 55 ("S2"). These consisted of two counts apiece of bank fraud and wire fraud (for each, one related to the March 2019 checks and the other to the April 2019 checks) and two counts of aggravated identity theft connected with the March 2019 checks.[14] On January 3 and January 6, 2020, the parties filed motions *in limine*. Dkts. 54, 60–62, 74. On January 10, 2020, in an extended bench ruling, the Court resolved these motions *in limine*. *See* Dkt. 87 ("MIL Tr."). On January 17 and 19, 2020, days before trial was scheduled to begin, the parties both filed additional motions *in limine*. Dkt. 81, 83. On January 21, 2020, the Court resolved these motions in a bench ruling. *See* Trial Tr. at 18–31.

On January 22, 2020, trial began. It lasted for four days. On January 29, 2020, the jury returned a verdict of guilty on all counts.

On February 26, 2020, Teman filed his initial motion pursuant to Rules 29 and 33. *See* Teman Mem. On March 25, 2020, the Government opposed Teman's motion. *See* Gov. Mem. On April 9, 2020, Teman filed a reply. Dkt. 119 ("Teman Reply"). That same day, Teman filed his letter requesting disclosure of grand jury transcripts. *See* Teman GJ Ltr. On April 24, 2020, the Government opposed that request. Dkt. 125 ("Gov. GJ Ltr.").

---

[14] Shortly before trial, the Government moved on consent to dismiss the two aggravated identity theft charges. Dkt. 79. The Court granted that motion. *See* Trial Tr. at 12–13.

On April 9, 2020, Teman filed his second motion for a new trial, based on alleged *Brady* and *Giglio* violations by the Government.  *See* Teman *Brady* Mem.  On April 27, 2020, the Government filed its opposition.  Dkt. 126 ("Gov. *Brady* Mem.").  On May 11, 2020, Teman filed a reply.  Dkt. 133 ("Teman *Brady* Reply").

## II.     Applicable Legal Principles Governing Post-Trial Motions

### A.     Rule 29 Motions for Acquittal

To grant a motion for acquittal under Rule 29, a court must find that the evidence was legally insufficient to establish the defendant's guilt beyond a reasonable doubt.  *See* Fed. R. Crim. P. 29.  "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial 'bears a heavy burden.'"  *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (citation omitted); *see also United States. v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002).  "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (emphasis in original) (internal quotation marks and citations omitted).  In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter."  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation and brackets omitted).  It is not the trial court's role to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)).  Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable

jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (citation omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the Court must view the evidence in the light most favorable to the Government, with all reasonable inferences drawn in its favor. *See Mi Sun Cho*, 713 F.3d at 720; *Hawkins*, 547 F.3d at 70; *see also United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000) ("We . . . resolve all inferences from the evidence and issues of credibility in favor of the verdict."). "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Moreover, the Court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130. *See also United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002) ("[W]e consider the evidence as a whole.").

The credibility of a testifying witness is particularly within the province of the jury, not a reviewing court. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." (internal quotation marks and citation omitted)). For these reasons, the Second Circuit has emphasized that "the proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury, not in an appellate brief.'" *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (quoting *United States v. Friedman*, 854 F.2d 535, 558 (2d Cir. 1988)). It is for the jury to decide how those arguments

bear on "the weight [it] should accord to the evidence." *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012).

**B.       Rule 33 Motions for a New Trial**

Rule 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *See United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In exercising its discretion, however, the court must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." *Id.* at 1414. Ultimately, the court must decide "whether letting a guilty verdict stand would be a manifest injustice." *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* After doing so, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion. *Sanchez*, 969 F.2d at 1414. The court's Rule 33 authority should be used "sparingly" and only "in the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134 (citation omitted).

If based on newly discovered evidence, a Rule 33 motion must be filed within three years of the verdict. Fed. R. Crim. P. 33(b)(1). If based on any other grounds, the motion must be filed within 14 days of the verdict. Fed. R. Crim. P. 33(b)(2).

**III.   Teman's Rule 29 Motion**

In his Rule 29 motion, Teman moves for acquittal on three grounds: that (1) the Court and Government constructively amended the Indictment; (2) there was insufficient evidence that

Teman made material misrepresentations to the financial institutions or had intent to defraud; and (3) there was insufficient evidence of venue.  The Court addresses each in turn.

### A.  Constructive Amendment[15]

#### 1.  Pertinent Background

The Indictment charged Teman with two counts of bank fraud and two counts of wire fraud.  *See* S2 ¶¶ 1–4.  The "to wit" clauses for each of these counts stated, *inter alia*, that Teman had "deposited counterfeit checks."  *See id.*

On January 5, 2020, before trial, Teman gave notice to the Government that he planned to call an expert, J. Benjamin Davis.  *See* Dkt. 74-1 ("Teman Expert Notice").  Davis's anticipated testimony, which largely concerned the concept of remotely created checks, is detailed *infra*.  *See infra* p. 78.  Relevant here, Teman stated that Davis's trial testimony would include this definition of a "counterfeit" check:  "A counterfeit check is a check in which all the features have been fabricated (*i.e.*, it is not from check stock that originally belonged to the account holder), including the signature of an authorized signer on the account."[16]  Teman Expert Notice

---

[15] Although Teman argues that a constructive amendment would warrant entry of a judgment of acquittal under Rule 29, the remedy for such an error is typically a new trial.  *See United States v. Brown*, No. 05 Cr. 857 (LBS), 2006 WL 2930204, at *2 n.1 (S.D.N.Y. Oct. 11, 2006) (noting defendant's recognition that "the remedy for a constructive amendment is a new trial not a judgment of acquittal"); *see also United States v. Milstein*, 401 F.3d 53, 66 (2d Cir. 2005) (finding constructive amendment, vacating conviction, and remanding for new trial); *United States v. Wozniak*, 126 F.3d 105, 111 (2d Cir. 1997) (same); *United States v. Mollica*, 849 F.2d 723, 731 (2d Cir. 1988) (same).

[16] It is not clear there is any authority for this definition, which appears to have been developed by Davis himself.  Indeed, throughout his briefing in this litigation, Teman failed to point the Court to any statutory or regulatory provision articulating this definition.  The defense did not cite any authority for this definition of "counterfeit" in its notice to the Government as to the content of Davis's proposed testimony, in its submissions on the motions *in limine* including the Government's motion to preclude Davis's testimony, or in its post-trial motions.  The closest Teman came was a reference, in his post-trial briefing, to a document purporting to cite the Electronic Check Clearing House Organization's rules governing breach of warranty claim

at 2.  Teman stated that Davis would further opine that the checks at issue were RCCs and were not "counterfeit" as he defined that term.  *See id.* at 2–4; *see also* Dkt. 77 at 3.  On January 8, 2020, the Government moved *in limine* to preclude Davis's testimony, Dkt. 74, which Teman opposed, Dkt. 77.

On January 10, 2020, the Court granted the Government's motion *in limine* and excluded Davis's testimony as to RCCs, because it was inadmissible under Federal Rule of Evidence 403 and would improperly invade the Court's province.  *See* MIL Tr. at 32–37 (bench ruling); *see also infra* pp. 78–83.  Relevant to Teman's present claim of constructive amendment with respect to the adjective "counterfeit" as used in the Indictment's "to wit" clauses, the Court, in the course of its ruling, stated:

> From both the indictment and the government's account in its filings in this case [of] its theory of liability, it seems clear to the Court that, in context, the term "counterfeit" is being used in the "to wit" clauses in the lay sense to describe the fact of checks that were created without the account holder's authorization.  Insofar as the checks purported to have been drawn by the account holder to the payees in the sums indicated, but in fact had not been, they were "counterfeit."  There's no indication in the indictment or otherwise, that by use of that adjective, the grand jury intended some technical meaning of counterfeiting, such as the one that Davis may have in mind, in which he contends that literally every jot and tickle of the check must have been fabricated by the defendant before it may be called counterfeit.

MIL Tr. at 36–37.  The Court proceeded to confirm with the Government that the grand jury had not been presented with a technical definition of "counterfeit," as Teman supposed.  *See id.* at 37–38.  The Government responded by representing that the grand jury had not been given a

---

processes and deadlines.  This states: "Rule 9 claims are for signature items and refer to a forged or *counterfeit* check, where the signature of the drawer is not that of the customer and/or the check is forged or otherwise unauthorized."  *See Understanding "Rule 8" and "Rule 9" Warranty and Claims Processes*, ECCHO (Sept. 2018), https://www.eccho.org/wordpress/wp-content/uploads/Rules89WhitePaper52016final-2018.pdf (emphasis added).  Even this definition suggests, consistent with the Court's instructions to the jury, that an unauthorized check may be "counterfeit."

definition of the term "counterfeit," and that, instead, the theory presented to the grand jury had been one that used "counterfeit" "in the lay sense as sort of non-genuine or non-authorized." *Id.* at 38.

On January 27, 2020, Teman filed a letter motion, objecting to the Court's "charging the jury in a way that permits it to convict Teman without finding that he deposited 'counterfeit['] checks." Dkt. 90 at 1. He argued that his deposits of RCCs—even if unauthorized by the accountholder—did not involve "counterfeit" checks. *Id.* He argued that a jury instruction that did not require a finding that Teman deposited "counterfeit checks" would be a constructive amendment of the Indictment, because the grand jury had charged Teman with depositing "counterfeit" checks, not depositing unauthorized checks or RCCs. *See id.* at 3–4.

At the charge conference the same day, the Court denied Teman's claim of constructive amendment, explaining that "the government did not define 'counterfeit' in the to wit clause in some specialized, stylized, technical way. They have represented—consistent with the common sense use of the term—that counterfeit in this case means created by the defendant without the authorization of the account holder[.]" Trial Tr. at 886–87. The Court further clarified that it had drafted jury instructions to track that meaning of the word "counterfeit." *Id.* at 886. After the Government again confirmed that, before the grand jury, it had used the term "counterfeit" in "the lay sense of being inauthentic or not authorized" to the jury, *id.* at 887, the Court told the defense that if it believed the Government was misrepresenting what happened before the grand jury, it could "invite the Court to review the grand jury transcript to test that proposition" in a post-trial motion. *Id.* at 889.

In charging the jury on January 28, 2020, the Court read aloud the operative Indictment language for each count, including the "to wit" clauses stating that "Teman deposited counterfeit

19

checks." *Id.* at 1072–73 (Count One); *id.* at 1073 (Count Two); *id.* at 1084 (Count Three); *id.* at 1085 (Count Four).  The Court explained, *inter alia*, that, as to each wire and bank fraud count, the scheme with which Teman was charged entailed creating the checks drawn on the Customer accounts and then making "the false pretense and representation to the bank that he had the account holders' authority to deposit these checks." *Id.* at 1072 (Count One); *see also id.* at 1073 (Count Two); *id.* at 1084 (Count Three); *id.* at 1084–85 (Count Four).  The Court instructed the jury on the act and intent elements of bank and wire fraud consistent with this theory. *Id.* at 1075–83 (bank fraud); *id.* at 1085–89 (wire fraud).  The Court further instructed the jury that, to find Teman guilty of each count, the Government had to so establish each element of each crime beyond a reasonable doubt. *Id.* at 1074, 1085–86.

On April 9, 2020, Teman filed a post-trial motion to disclose the grand jury transcripts under Rules 6(e)(3)(E)(i) and (ii) to determine whether the Government had proceeded before the grand jury on a definition of the term "counterfeit" inconsistent with the one pursued at trial. Teman GJ Ltr. at 1.  On April 24, 2020, the Government opposed that request, arguing that Teman had not shown a particularized need for the transcripts.  Gov. GJ Ltr. at 2.  On May 6, 2020, the Court ordered the Government to produce the transcripts *ex parte* for an *in camera* review.  Dkt. 131.  On May 8, 2020, Teman filed a letter requesting that the Court also disclose the transcripts to him.  Dkt. 132 ("Teman GJ Ltr. 2").  On May 20, 2020, the Government opposed that request.  Dkt. 134 ("Gov. GJ Ltr. 2").

### 2.    Applicable Legal Principles

#### a.    *Constructive Amendment*

To establish the constructive amendment of an indictment, a defendant "must show that the trial evidence or jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the

20

grand jury's indictment.'" *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (quoting

*United States v. Rigas*, 490 F.3d 208, 227 (2d Cir. 2007)); *accord United States v. LaSpina*,

299 F.3d 165, 181 (2d Cir. 2002).  Such occurs where the evidence or jury instructions "operate[]

to 'broaden the possible bases for conviction from that which appeared in the indictment.'"

*Milstein*, 401 F.3d at 65 (brackets omitted) (quoting *United States v. Miller*, 471 U.S. 130, 138

(1985)).

 "Not every divergence from the terms of an indictment, however, qualifies as a

constructive amendment." *United States v. Lisyansky*, 806 F.3d 706, 712 (2d Cir. 2015) (quoting

*Bastian*, 770 F.3d at 220).  For example, there is no constructive amendment "where a generally

framed indictment encompasses the specific legal theory or evidence used at trial." *United*

*States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003); *see also United States v. Zingaro*,

858 F.2d 94, 99 (2d Cir. 1988) (general indictment may support conviction on alternative bases,

but more specific indictment cannot).  That is because the Government is "permitted significant

flexibility in proof" at trial, as long as the defendant has been provided notice of the "*core of*

*criminality*" that it will attempt to prove against him.  *Bastian*, 770 F.3d at 220 (emphasis in

original) (quoting *United States v. D'Amelio*, 682 F.3d 412, 417 (2d Cir. 2012)).

 Such a "core of criminality . . . involves the essence of a crime, in general terms," but it

does not involve "the particulars of how a defendant effected the crime." *United States v. Gross*,

No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *20 (S.D.N.Y. Oct. 18, 2017) (alteration in

original) (quoting *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016)), *aff'd sub*

*nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019); *see also Bastian*, 770 F.3d at 220

("[D]iscrepancies in 'the particulars of how a defendant effected the crime' do not constructively

amend the indictment." (quoting *D'Amelio*, 682 F.3d at 418)).  To establish a constructive

amendment, it is not sufficient for a defendant to "show that the facts diverged greatly from those alleged in the indictment"; instead, he must show that he "was convicted for 'behavior *entirely separate* from that identified in the indictment." *Gross*, 2017 WL 4685111, at *21 (emphasis in original) (citation omitted); *see also Bastian*, 770 F.3d at 223 ("A constructive amendment occurs where the government introduces a 'complex of facts distinctly different from that' charged by the grand jury, not where it merely amends details pertaining to a 'single set of discrete facts' set forth in the indictment." (quoting *D'Amelio*, 683 F.3d at 419)).

At root, the constitutional concern with constructive amendment derives from a defendant's rights under the Grand Jury Clause of the Fifth Amendment and specifically his right to prepare a defense and avoid double jeopardy. *See Bastian*, 770 F.2d at 220. But "[a]lthough constructive amendment is viewed as a *per se* violation of the Grand Jury Clause, sufficient to secure relief without any showing of prejudice, [the Second Circuit] has proceeded cautiously in identifying such error, 'consistently permitt[ing] significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial.'" *United States v. Lee*, 833 F.3d 56, 70 (2d Cir. 2016) (emphasis in original) (quoting *United States v. Agrawal*, 726 F.3d 235, 259–60 (2d Cir. 2013)).

### b.    *Disclosure of Grand Jury Transcripts*

"Rule 6(e) of the Federal Rules of Criminal Procedure codifies the traditional rule of grand jury secrecy." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983). There are, however, exceptions to this rule of secrecy. Rule 6(e)(3)(E)(i) allows a court to authorize disclosure of grand jury materials "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). The Second Circuit has applied this rule in connection with a post-trial Rule 33 motion for a new trial. *See United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978). Rule 6(e)(3)(E)(ii) grants the court authority to disclose such materials "at the

request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).  To dismiss an indictment on that basis, the error in the grand jury proceedings must have prejudiced the defendant. *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)).

Courts considering the potential disclosure of grand jury materials apply a balancing test. *In re United States for Material Arrest Warrant*, — F. Supp. 3d —, No. 19 Misc. 447 (LGS), 2020 WL 469625, at *1 (S.D.N.Y. Jan. 29, 2020).  Specifically, they "weigh[] the need for secrecy against the need for disclosure." *Id.*; *see also Douglas Oil Co. of Calif. v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979); *SEC v. Rajaratnam*, 622 F.3d 159, 183 (2d Cir. 2010). Disclosure may be warranted if the party seeking disclosure shows "a particularized need" for the grand jury materials. *See United States v. Ulbricht*, 858 F.3d 71, 107 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018); *see also Sells Eng'g, Inc.*, 463 U.S. at 443 (explaining that, under Rule 6(e)(3)(C)(i), the predecessor to 6(e)(3)(E)(i), the Supreme Court required a finding of particularized need); *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 519 (S.D.N.Y. 2007) (applying particularized need standard in Rule 6(e)(3)(E)(ii)).  The showing required to establish such a need is "substantial." *Frederick v. New York City*, No. 11 Civ. 469 (JPO), 2012 WL 4947806, at *7 (S.D.N.Y. Oct. 11, 2012) (citation omitted).

Courts have "substantial discretion" when determining whether to order the review or release of grand jury transcripts. *Douglas Oil*, 441 U.S. at 223; *see also In re Petition of Craig*, 131 F.3d 99, 104 (2d Cir. 1997) ("[T]he discretion of a trial court in deciding whether to make public the ordinarily secret proceedings of a grand jury investigation is one of the broadest and

most sensitive exercises of careful judgment that a trial judge can make."). Courts in this Circuit are hesitant to order disclosure of such transcripts without evidence of government misconduct. *See Torres*, 901 F.2d at 233. Where a court determines that disclosure is warranted, it "may authorize this disclosure 'at a time, in a manner, and subject to any other conditions that it directs.'" *United States v. Anguiera*, No. 11 Cr. 116 (HBS), 2012 WL 1232096, at *5 (W.D.N.Y. Apr. 12, 2012) (quoting Fed. R. Crim. P. 6(e)(3)(E)). The resulting review may be *in camera*. *See, e.g.*, *Frederick*, 2012 WL 4947806, at *7 (ordering *in camera* review of full grand jury record).

### 3.   Application

The Court rejects Teman's claim of a constructive amendment. The Court first explains why the application of the legal principles above to the Indictment, the trial proof, and the jury instructions require this result. The Court then explains why this finding is fortified by the *in camera* review it elected to make of transcripts of the grand jury proceedings and why Teman is not entitled to review those transcripts.

#### a.   Constructive Amendment

Teman argues that the Government, through its proof at trial, and the Court, through its jury instructions, constructively amended the Indictment. *See* Teman Mem. at 5–13; Teman Reply at 1–8. Teman's argument is that—insofar as the Indictment's to wit clauses described the checks he deposited as "counterfeit"—the Court was obliged to charge the jury to find that Teman deposited "counterfeit" checks, using the distinct and technical (albeit unsourced) definition of a "counterfeit" check embraced by Davis. Teman argues that although the trial evidence permitted the jury to find that he had created and deposited RCCs without customer authorization, the checks he deposited were, technically, not "counterfeit" within that definition of that term. *See* Teman Mem. at 11. And, he argues, the Court's instructions, by not instructing

the jury that it had to find a deposit of "counterfeit" checks falling within his technical definition, enabled the jury to convict based solely on the finding that Teman had deposited unauthorized RCCs while feigning to the banks that he had such authorization. *See id.* at 10–13.

The Government disputes that there was a constructive amendment. It notes that the Court properly instructed the jury as to the elements of the charged crimes. *See* Gov. Mem. at 17. And, it argues, Teman was on notice throughout that the Government's theory of bank and wire fraud liability, before the grand jury and at trial, was that Teman did not have customer authority to create or deposit the unauthorized checks and yet represented such authorization to the banks. *Id.* at 17–18. The offenses in question, the Government argues, required it to prove that Teman's unauthorized deposit of checks he had created on Customer accounts was part of a scheme to defraud, but did not require it to show that those checks met a technical definition of "counterfeit," let alone Davis's. *Id.* at 19–20.

Teman's notion of a constructive amendment is easily put aside. It turns on the premise that the adjective "counterfeit" in the Indictment's to wit clauses carried a term of art meaning drawn from an authoritative legal source—presumably a statute or regulation, although Teman has not identified such—under which a "counterfeit" check is one as to which literally every part has been fabricated. The Indictment, he argues, cannot refer merely to a check whose creation and deposit was unauthorized by the accountholder. *See* Teman Expert Notice at 2 (proposing expert Davis's testimony to this effect).

Teman's premise that "to wit" clauses of the Indictment adopted such a definition is, however, an *ipse dixit*. The technical definition he recites is unconnected to the bank and wire fraud statutes. The Indictment does not indicate its adoption of a regulatory definition of the term "counterfeit." And the Court's instructions—and the trial proof—were fully consistent with

the familiar lay understanding of the word "counterfeit."  In contrast to Teman's notion that the word "counterfeit" as used in the "to wit" clause could have carried only its purported technical meaning and could not have meant "unauthorized by the customer," Black's Law Dictionary defines the verb "counterfeit" to encompass, *inter alia*, "possess[ing] [] an item without authorization and with the intent to deceive or defraud by presenting the item as genuine."  *See* Black's Law Dictionary (11th ed. 2019) (definition of "counterfeit").  Similarly, Black's defines "counterfeit" when used as an adjective as "[m]ade to look genuine in an effort to deceive; produced by fakery, esp. with an intent to defraud."  *Id.*  There is nothing in the Indictment that signifies an intention by the Grand Jury to use the term "counterfeit" in any sense other than this familiar one.

The Government's proof and theory of liability at trial, and the Court's instructions, in turn, tracked this familiar meaning and did not broaden the bases for conviction beyond that announced by the Indictment as reasonably understood.  In its instructions, the Court explained, *inter alia*, that to convict Teman, the jury was required to find that he had falsely represented to banks that he had the accountholder's authority to deposit each check.  *See, e.g.*, Trial Tr. at 1072.  And the Government presented evidence not only that none of the Customers had authorized Teman to create and deposit the checks, *see, e.g., id.* at 357–58, 362–63, 367 (518 West 204 LLC); *id.* at 441, 474–75 (18 Mercer), *id.* at 562–64, 567, 648–49 (ABJ), but that he also attempted to pass off those checks to banks as customer-authorized.  The Government showed that, for example, Teman fashioned the checks so as to contain representations on them that they were drawn per contract and that no signature was required.  *See* GX 201–05.  The Customers in turn denied having seen, or having agreed to, Teman's purported Payment Terms. *See, e.g., id.* at 326–27, 332, 355–56, 361, 365 (518 West 204 LLC); *id.* at 427–30 (18 Mercer);

26

*id.* at 497–98, 566, 568–69 (ABJ).  The Customers also disputed owing Teman's company the

sizable fees reflected on the checks.  *See, e.g.*, *id.* at 360–61, 365 (518 West 204 LLC); *id.*

at 434, 441 (18 Mercer); *id.* at 563, 649 (ABJ).  Further, apparently in response to the

chargebacks imposed by Bank of America in connection with the March checks, Teman included

*more* representations on the checks to convince the banks that he had authority to deposit them.

The April checks included a "note to bank" that the checks were valid and a statement that the

banks were "required by law" to honor them.  *See* GX 203–05.  The April checks also included a

link to GateGuard's Terms and Conditions, a statement that the terms had been "accepted by

above client," and a GateGuard phone number to call with questions.  *Id.*  Drawing all inferences

in favor of the Government, Teman's construct of the checks, which he unilaterally created on

others' accounts for negotiation into his corporate accounts, was designed to deceive the banks

into falsely viewing the checks as customer-authorized and appropriate for deposit.

The proof relating to Teman's scheme, and the Court's instructions on it, thus easily

aligned with the familiar lay understanding of the term "counterfeit."  On the face of the

Indictment, there was no constructive amendment.

In any event, even if the Indictment were taken to reflect *sub silentio* Teman's proposed

definition of "counterfeit," there would still not have been a constructive amendment here.  As

noted, the constructive amendment doctrine exists to assure that the essential elements of a

charge as brought are not modified.  It thereby assures that the defendant has notice of the core

of criminality alleged by the Government, is not taken by surprise at trial, and is not prosecuted

later for the same offense.  *See Bastian*, 770 F.3d at 220.  But the core of criminality does not

include "the particulars of how a defendant effected the crime."  *Id.* (quoting *D'Amelio*, 683 F.3d

at 418).  And the Second Circuit "ha[s] never suggested that a 'to wit' clause binds the

government to prove the exact facts specified in a criminal indictment." *Id.* at 221. Instead, it has repeatedly held "that the *specific means* used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense, and therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment." *D'Amelio*, 683 F.3d at 422 (emphasis in original); *see, e.g.*, *id.* at 416–17, 423 (instructions that jury could convict defendant of attempted enticement of a minor for sexual activity if it found he had used either Internet or telephone as means of interstate commerce—when indictment's to wit clause listed only the Internet—was not constructive amendment); *United States v. Danielson*, 199 F.3d 666, 669–70 (2d Cir. 1999) (government's evidence that ammunition shells—rather than the seven rounds of .45 caliber ammunition identified in the indictment's to wit clause—had traveled in interstate commerce was not constructive amendment).

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006), usefully illustrates this principle. There, the grand jury indicted the defendant for wire fraud. *See id.* at 135. The indictment charged the defendants with a scheme to defraud investors of advance fees, using language that generally tracked the wire fraud statute, followed by a to wit clause that identified a specific wire (from Ohio to New York). *See id.* at 140 n.10. The Government did not prove use of that particular wire at trial. *Id.* at 140. On appeal, the defendants alleged that the Government's trial proof constructively amended the indictment, but the Circuit rejected that claim, explaining that "the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment." *Id.* at 140–41. The indictment, it emphasized, had described a scheme to defraud investors and included the starting and ending dates for the scheme, and this put the defendants on notice that the Government would attempt to prove a wire fraud scheme during that time period at trial. *See id.* at 141.

28

The same is so here, even accepting Teman's notion that the word "counterfeit" as used in the to wit clauses carried the technical meaning he prefers.  The Indictment charges Teman with bank and wire fraud schemes in March 2019 and April through June 2019, with language tracking the text of those statutes.  *See* S2 ¶¶ 1–4.  The to wit clauses of each count identified the conduct at issue and noted Teman's deposit of counterfeit checks, in the names of the Customers, into an account at Bank of America.  *See id.*  That the Court did not require the jury to find that Teman had fabricated every single characteristic of the checks he deposited did not constructively amend those charges.  The jury's verdict, given the Court's instructions and the undisputed proof at trial that Teman was the maker of the checks, necessarily established that Teman had fabricated the core feature of them: that the customer had authorized the checks, in the amounts indicated, to be drawn to Teman's company.  Therefore, even accepting Teman's notion that some other feature or part of the checks he created was in some sense not "fabricated," this deviation at most would have marked a non-prejudicial variance from the Indictment.  Put differently, the Indictment put Teman on ample notice as to the core of the crimes alleged.  And, the evidence at trial supported the core allegations in the Indictment (and later particulars) as to the dates, amounts, and payees of the checks, and that they had been drawn without customer authorization.

This case is thus a far cry from those in which the trial evidence and jury instructions have been found to focus on "behavior *entirely separate* from that identified in the indictment" that affects an essential element of the crime.  *Gross*, 2017 WL 4685111, at *21 (emphasis in original) (quoting *Bastian*, 770 F.3d at 223).  In *Wozniak*, for example, the Circuit considered whether trial evidence—which focused largely on the defendant's *use* of marijuana—and the court's instructions—which allowed conviction based on marijuana evidence—constructively

amended the lengthy indictment.  *See Wozniak*, 126 F.3d at 107, 110, 111 n.6.  The indictment's narcotics count against the defendant had charged him not with a marijuana-related crime, but with conspiracy to possess with intent to distribute cocaine and methamphetamine.  *See id.* at 107.  In finding a constructive amendment, the Circuit noted that the defendant "well may have been surprised by the introduction of evidence of narcotics other than what was alleged in the indictment," in that the indictment did not contain a "single set of operative facts" alerting him to the Government's focus on marijuana evidence.  *See id.* at 111.  "Had [he] been aware that the government would seek conviction mostly based on marijuana evidence, he might have chosen a different trial strategy."  *Id.* at 110.  This was especially true because the Government had pursued separate marijuana-conspiracy indictments against the defendant's co-conspirators.  *See id.* at 111.

Here, in contrast, the trial proof and jury instructions did not depart from the scheme as alleged in the Indictment—including the central fact of the unauthorized nature of the checks—and the Court instructed the jury in familiar form as to the elements of the offenses.  And at all points prior to and during trial, the Government consistently articulated its theory that Teman's crimes had consisted of his deposit of *unauthorized* checks, on the false pretense to banks of customer authorization.  *See, e.g.*, Dkt. 1 ¶ 6(e) (complaint); Dkt. 24 at 10, 17 (transcript of October 21, 2019 conference); Dkt. 35 at 8, 21 (transcript of November 22, 2019 conference); Dkt. 39 at 12 (opposition to Teman's December pretrial motions); Dkt. 57 at 2 (proposed *voir dire*); Dkt. 73 at 2 (opposition to Teman motions *in limine*); Dkt. 74 at 3–5 (motion *in limine* to preclude Teman's expert).

The Court therefore denies Teman's motion.  Teman had sufficient notice, through the Indictment and independently, of the essence of the crime with which he was charged.

b.      *Disclosure of the Grand Jury Transcripts*

In support of his constructive amendment argument, Teman argues that disclosure of the

grand jury transcripts was warranted to identify the theory of fraud presented to the grand jury.

*See* Teman GJ Ltr. at 1.  Teman argues that review of the transcripts has potential to resolve the

parties' disagreement about whether the Government, in pursuing an Indictment containing the

undefined term "counterfeit" in its to wit clauses, advanced the theory that the checks were

merely unauthorized by the accountholder, or whether it went beyond that to pursue the theory

that the checks were in every respect fabricated.  *See id.*  He further argues that it is insufficient

for the Court to conduct an *in camera* review.  *See* Teman GJ Ltr. 2 at 1.  The transcripts, he

contends, must be shown to him too, including because the Government allegedly separately

engaged in misconduct, as ostensibly reflected in his *Brady* motion.  *See id.*; *see infra*

pp. 87–107.

"The extent to which a court . . . may look beyond the language of the indictment to

consider the content of the grand jury proceedings is unclear."  *United States v. Orjuela*,

809 F. Supp. 193, 201 (E.D.N.Y. 1992) (considering constructive amendment argument).

Nevertheless, because Teman here contended that the grand jury used the undefined term

"counterfeit" in the Indictment's "to wit" clauses intending a term-of-art meaning, the Court, in

an excess of caution, ordered an *in camera* review of the grand jury transcripts to permit a

reliable assessment of this claim.  *See id.* (finding no constructive amendment after conducting *in*

*camera* review).

This review, while certainly not required, was not inconsistent with Rule 6(e)(3)(E)(i).  A

defendant demonstrates a particularized need under Rule 6(e)(3)(E)(i) when he shows that "the

material [he] seek[s] is needed to avoid a possible injustice in another judicial proceeding, that

the need for disclosure is greater than the need for continued secrecy, and that [his] request is

31

structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222.  Here, although Teman did not put forward any proof of his claim as to the theory of liability articulated before the grand jury, the theory that the grand jury intended a specialized meaning of the Indictment term "counterfeit" was central to his post-trial motions.  And it had the potential to influence the Court's assessment of those motions.  Had the Government—contrary to its representations to the Court—used the term "counterfeit" in its specialized sense before the grand jury, such would have tended to fortify Teman's challenge; in contrast, had the Government not done so, there would not be even a plausible basis to claim constructive amendment.  The Court accordingly determined that *in camera* inspection of the grand jury minutes would enable a comprehensive assessment of Teman's Rule 29 and 33 post-trial motions (and facilitate appellate review of its ruling on those motions).

At the same time, given that Teman's theory that such an instruction had been given to the grand jury was entirely a product of conjecture, the Court did not find any justification for Teman's bid to gain access for himself and his counsel to review these materials.[17]  The Court's considered and firm judgment was, and following review is, that *in camera* review of these materials properly balanced the interest in testing the Government's representation as to the

---

[17] To the extent Teman contends that the prosecution engaged in misconduct as to its *Brady* obligations, strengthening its bid for defense access to grand jury material, the Court has not found such misconduct.  *See infra* pp. 94–107.

nature of the theory of liability pursued before the grand jury with the important interest in maintaining grand jury secrecy.[18]

Having thoroughly reviewed the transcripts of the proceedings before the grand jury, the Court confirms that the Government's case, as presented to the grand jury, at all times was based on the simple and clear theory of fraud that the Government consistently pursued before and at trial: that Teman had created and deposited the checks at issue without customer authorization and presented them to the banks on the false pretense of such authorization. The Government did not present, or instruct the grand jury as to, any technical definition of the term "counterfeit." Nor did it instruct the grand jury that, to return a true bill, it needed to find that all parts of the checks were fabricated. The Government's theory of liability as pursued at trial is consistent with the theory presented to the grand jury. In contrast, Teman's bid to freight the term "counterfeit" with his proposed technical meaning would unjustifiably modify the Indictment.

Accordingly, the Court finds that the grand jury transcripts confirm its holding that there was no constructive amendment. Teman was convicted of the same crime and conduct that was the basis for the grand jury's Indictment of him.

### B.    Sufficiency of the Evidence of *Actus Reus*

Teman next argues that the evidence was insufficient to establish the *actus reus* of the crimes charged—specifically, that he had made "false or fraudulent pretenses, representations, or promises," as required by the bank and wire fraud statutes, 18 U.S.C. §§ 1343, 1344. *See* Teman Mem. at 13–16; Teman Reply at 8–10. First, relying largely on *Williams v. United States*,

---

[18] In addition to his request to have the grand jury materials released to him, Teman also requested that the Government file these materials under seal in order to ensure a full appellate record. *See* Teman GJ Ltr. 2 at 1–2. The Government does not oppose this request. Gov. GJ Ltr. at 2. The Court thus orders the Government, to file under seal the grand jury materials that it provided to the Court *ex parte* as soon as it is practical to do so consistent with the current public health crisis.

458 U.S. 279 (1982), and *United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998), he argues that

the deposit of the checks did not itself constitute a representation to the banks.  Teman Mem.

at 14.  Second, he argues that the 29 checks did not contain any misrepresentations.  *See id.*

at 14–16.  The Court is unpersuaded by this argument, because *Williams* and *Rodriguez* are

inapposite, and because there was sufficient evidence on which a reasonable jury could find that

the checks as custom-designed by Teman contained false and fraudulent representations.[19]

In *Williams*, the Supreme Court considered a check kiting scheme, in which the

defendant deposited checks knowing that the accounts on which those checks were drawn had

insufficient funds to cover the checks.  *See Williams*, 458 U.S. at 280–82; *see also id.* at 281 n.1

(describing check kiting schemes generally).  The Government had charged this scheme under

18 U.S.C. § 1014, which criminalizes knowingly making a false statement to influence a

federally insured financial institution.  *See id.* at 282.  The Government's theory was that the

---

[19] Teman's argument to the effect that the checks were not representations and did contain false
or fraudulent representations does not, in any event, grapple with the complete text of the bank
fraud statute as charged.  The Indictment charged violations of, and the Court instructed the jury
as to, both § 1344(1), which criminalizes a scheme to defraud a financial institution, and
§ 1344(2), which criminalizes a scheme to obtain money or property under the custody or control
of a financial institution, using false representations, pretenses, or promises.  18 U.S.C.
§ 1344(1)–(2).  "[P]roof that the defendant violated either subsection is sufficient to support a
conviction under the [bank fraud] Act."  *United States v. O'Donnell*, 840 F.3d 15, 18
(1st Cir. 2016) (citing *Loughrin v. United States*, 573 U.S. 351, 355–62 (2014)).  It is only under
§ 1344(2) that the Government's proof must establish any actionable false representation,
pretense, or promise.  *See United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir. 1992);
*cf. United States v. Chandler*, 98 F.3d 711, 714 (2d Cir. 1996) (finding court erred when it
instructed jury that it could only convict the defendant, charged with bank fraud under § 1344(1)
and (2), if it found that she had violated both subsections).  Teman's argument, however, is
addressed only to § 1344(2); he ignores § 1344(1).  Because the Court finds the evidence
sufficient to establish false and fraudulent representations under § 1344(2), it has no occasion to
consider whether the proof established a scheme to defraud in violation of § 1344(1).  Nor, given
the existence of false and fraudulent representations here, need the Court consider whether, had
there not been such representations, Teman's conduct could nevertheless have constituted a
scheme to defraud under the wire fraud statute, which, like the bank fraud statute, is formulated
in the disjunctive.

deposit of such checks was itself a representation that the drawer's account had sufficient funds. *See id.* at 285–86.  The Court rejected that theory, holding that a deposit alone is not a "false statement," because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'"  *Id.* at 284.  The Court noted that the Government's theory, by making any deposit of a check supported by insufficient funds a potential basis for prosecution under § 1014, could "make a surprisingly broad range of unremarkable conduct a violation of federal law."  *Id.* at 286.

In 1984, following *Williams*, Congress enacted § 1344.  In *Rodriguez*, the Second Circuit addressed a bank fraud scheme, prosecuted under 18 U.S.C. § 1344(1) and (2).  *Rodriguez*, 140 F.3d at 167 n.2.  As part of that scheme, the defendants, Elcock and Rodriguez, submitted phony invoices to the company that employed Elcock.  *See id.* at 165.  On the basis of these invoices, the company issued checks to Rodriguez.  *See id.*  Each check included the authorized signature of the company's assistant treasurer.  *Id.*  Rodriguez then endorsed those checks and deposited them into her bank accounts.  *Id.*; *see also id.* at 167.  The Second Circuit, citing *Williams*, stated that "[a] course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to funds does not alone constitute false or fraudulent pretenses or representations."  *Id.* at 168.  While a false representation had been made to the employer, none had been made to the bank.  Accordingly, the Circuit held that Rodriguez's deposit of the company's signed checks, even if the checks themselves had been the product of fraud directed at the company, were insufficient to establish bank fraud.  *See id.*[20]

---

[20] The Circuit in *Rodriguez* "had no occasion to distinguish between § 1344(1) and § 1344(2)." *United States v. Metaxas*, — F. Supp. 3d —, Nos. 14 Cr. 190, 17 Civ. 2708 (BMC), 2020 WL 1472440, at *6 (E.D.N.Y. Mar. 26, 2020).

*Williams* and *Rodriguez* are inapposite here.  And courts considering claims like Teman's have repeatedly emphasized the narrowness of both holdings.  *See, e.g.*, *United States v. Laljie*, 184 F.3d 180, 190 (2d Cir. 1999) ("In sum, we ruled in *Rodriguez* that where there are 'no other facts evincing an intent to victimize the financial institution,' the deposit of facially proper checks, which had no alterations and bore the authentic signature of a person who had authority to sign, and which the bank received as a holder in due course, did not become bank fraud within the meaning of § 1344 merely by reason of the defendant payee's procurement of the checks from its maker by reason of fraud."); *United States v. Hord*, 6 F.3d 276, 286 (5th Cir. 1993) ("[W]e are not alone among the federal circuits in applying *Williams* narrowly to the simple presentation of a check drawn on an account with insufficient funds[.]" (internal quotation marks and citation omitted)) (collecting cases); *United States v. Falcone*, 934 F.2d 1528, 1541 (11th Cir. 1991) ("Most courts . . . have declined to read *Williams* broadly to require the reversal of convictions in situations other than those involving insufficient-funds checks.").  The scheme established here went far beyond the "bare" deposit of checks unsupported by sufficient funds at issue in *Williams*, *see United States v. Burnett*, 10 F.3d 74, 79 (2d Cir. 1993), and was similarly a far cry from the deposit of facially proper and accountholder-authorized and signed checks at issue in *Rodriguez, see Laljie*, 184 F.3d at 190.

The evidence at trial instead amply established a scheme well within the heartland of these two anti-fraud statutes.  It involved misleading conduct—far beyond the deposit of the checks—designed to mislead the depositary and drawee banks that the Customers had authorized Teman to create, negotiate, and deposit the checks drawn upon their accounts.  *See, e.g.*, *United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (finding *Williams* inapposite and finding sufficient evidence to establish bank fraud, where, at point of deposit, the defendant, an

accountant, repeatedly mingled the deposit of legitimate and fabricated checks drawn on his clients' accounts so as create the false impression that the clients had authorized the creation and deposit of all checks); *see also United States v. Nejad*, No. 18 Cr. 224 (AJN), 2019 WL 6702361, at *13 (S.D.N.Y. Dec. 6, 2019) ("[A]n indictment may sufficiently allege a violation of Section 1344(2) where the check or wire transfer order is accompanied by additional circumstances from which an implied misrepresentation may arise." (emphasis omitted)).  Courts in fact have repeatedly upheld bank and wire fraud convictions where the evidence at trial established misrepresentations beyond the deposit itself.[21]  Here, similarly, the evidence established overwhelmingly that Teman had made misrepresentations on the face of the checks to induce the banks to accept them as customer-authorized, a point the Customers all denied.  For this reason, Teman's elaborate scheme far exceeds the "unremarkable" act of merely depositing a check that inspired the Supreme Court's concern in *Williams* about over-criminalization.

First, the checks themselves contained material misrepresentations.  On each of the 29 checks that he prepared, Teman included the notation that the check had been "drawn per contract."  *See* GX 201–05.  The "contract" that purportedly gave him such authority was the

---

[21] *See, e.g.*, *Elliott v. United States*, 332 F.3d 753, 762 (4th Cir. 2003) ("There is a fundamental difference . . . between checks drawn on an account containing insufficient funds, on the one hand, and affirmative misrepresentations made on the check itself, on the other."); *United States v. Briggs*, 939 F.2d 222, 227 (5th Cir. 1991) ("§ 1344(a)(2) would encompass a wire transfer order containing an actual misrepresentation (e.g., a false recitation of the authority for its issuance)." (emphasis omitted)); *Falcone*, 934 F.2d at 1541 ("*Williams* does not govern a situation in which some information on the check . . . is itself a false statement, or in which the maker of an insufficient-funds check engages in behavior, other than the simple presentation of the check, that constitutes a false representation." (internal citations omitted)); *United States v. Worthington*, 822 F.2d 315, 318 (2d Cir. 1987) (finding that "the rationale of *Williams*—that drawing a check unsupported by sufficient funds is neither a statement nor the type of conduct Congress intended to criminalize—is simply inapplicable" where check contained name of fictitious drawee bank).

Payment Terms.[22]  *See* GX 704 (screenshot of Payment Terms sent from Teman to Reinitz).  A

jury, however, could reasonably find that the Payment Terms did not authorize Teman to create

such checks.  The Customers testified that they had never seen, discussed with Teman, or

explicitly approved such terms.  *See, e.g.*, Trial Tr. at 326–27, 332, 355–56, 361, 365 (518 West

204 LLC); *id.* at 427–30 (18 Mercer); *id.* at 497–98, 566, 568–69 (ABJ).  And there was no

evidence that these terms were even in place at the time the Customers had contracted with

Teman.  The three independent sets of Customers, in their testimony, repeatedly refuted Teman's

authority to create and deposit the checks.  *See, e.g.*, *id.* at 357–58, 362–63, 367 (518 West 204

LLC); *id.* at 441, 474–75 (18 Mercer); *id.* at 562–64, 567, 648–49 (ABJ).

Further, even if Teman had had the authority to draw checks on Customer accounts to

pay authentic Customer debts to him, the evidence permitted a jury to find that the Customers

did not owe the sums in question to Teman's company.  The evidence showed that Teman had

included a description of the purpose of the check in each check's memo line.  These

descriptions included "device removal fee," "chargeback fee," "attorney use fee," and

"collections fee."  *See* GX 201–05.  A jury was entitled to regard these statements, which tended

to suggest the existence of a bona fide customer debt that the check was being used to pay, as

false and misleading.  Each Customer at trial disputed owing the fees in question, which far

outstripped the sums the Customer had otherwise paid Teman's company for the devices.  *See,*

*e.g.*, *id.* at 326, 343–44, 365 (518 West 204 LLC); *id.* at 421, 434, 441, 498 (18 Mercer); *id.* at

498, 563, 565–66, 649 (ABJ).  And the evidence corroborated the Customers on this point,

---

[22] On the April checks, Teman included a link to the Terms and Conditions.  The Terms and
Conditions did not themselves state that Teman had the authority to make such withdrawals, but
instead included within them a link to the Payment Terms—a post-offense version of which may
have contained such a clause.  *See* T&C at 5; *see also supra* n.5.

insofar as Teman had provided invoices to the Customers for the devices, *see* GX 413 at 3;

GX 431 at 3; GX 409A–409B, but not for the fees that the checks he created were ostensibly

being used to pay, *see, e.g.*, Trial Tr. at 476.  A reasonable jury could find that the statements on

these checks as to the nature of the fees that the Customer purportedly owed GateGuard were

false and had been included to further the illusion that Customer-authorized checks were being

used to pay Customer-acknowledged debts.

The separate sets of the checks—the two in March and the 27 in April—also contained

distinct notations that a jury could regard as part of a scheme to mislead the bank to assume that

there had been Customer authorization.  On the March checks, Teman included, on the signature

line, an unintelligible squiggle, despite the checks' representation that no signature was required.

GX 201–02.  Although the trial evidence did not affirmatively explain this mysterious

annotation, a jury could reasonably conclude that Teman's inclusion of illegible handwriting in

the area for a signature was intended to fortify the impression of customer approval.

As to the April checks, Teman included additional notations, which a jury reasonably

could infer were aimed at swaying the depositary and drawee banks to clear the checks and thus

to avoid the holds and chargebacks that had tripped up the March checks.  In addition to stating

again that the checks were drawn per contract with no signature required, Teman included on the

27 April checks a separate "NOTE TO BANK," stating that "[t]his is a valid check.  You are

required by law to honor it."  GX 203–05.  He also included a link to the GateGuard Terms and

Conditions, which he wrote had been "accepted by above client."  *Id.*  Yet both 518 West 204

LLC and ABJ, whose ostensible checks were drawn in April, disputed agreeing to the Terms and

Conditions.  *See* Trial Tr. at 329–31, 341–43, 364 (518 West 204 LLC); *id.* at 506–07 (ABJ).

And, as noted, the Terms and Conditions do not themselves authorize Teman to create and

deposit checks drawing directly on clients' accounts.  Further, the Customers disclaimed having

seen the document which purportedly had given Teman such authority, GateGuard's "Payment

Terms."  *See, e.g.*, *id.* at 332 (518 West 204 LLC); *id.* at 568–69 (ABJ).  A jury could therefore

find that Teman's representations on the checks—that these were "valid check[s]" "draw[n] per

[a] contract" that had been "accepted by above client"—to be false and misleading statements,

directed towards the banks, with the goal of inducing them to honor checks and permit Teman to

withdrawn the sums in question from Customer accounts.

    While the face of the checks alone amply permitted the jury to find the *actus reus* of bank

and wire fraud, there was also evidence of other steps taken by Teman to reduce the risk that the

banks would learn that the checks were not Customer-authorized.  As noted, Teman chose not to

send the Customers invoices for the fees in question before withdrawing from their accounts, in

what appeared to be a departure from usual business practice as to bona fide fees, or otherwise

alert any of the Customers of his intention to draw these checks on their accounts.  *See* Trial Tr.

at 476 (describing lack of invoice); *see also* GX 413 at 3 (invoice for GateGuard purchase); GX

431 at 3 (same); GX 409A–409B (same).  This reduced the risk that a Customer would

affirmatively alert its banks not to approve a forthcoming check drawn by Teman.  In declining

to provide the Customers any notice of these matters, Teman ignored the advice of his counsel.

*See* GX 704 at 1.  Further, on the April checks—drawn after the Customers had disputed the

March checks, leading to holds and chargebacks—Teman included a GateGuard phone number

and stated that the bank should "contact us . . . with questions."  GX 203–05; *see also* Trial Tr.

at 618 (testimony that phone number on check was GateGuard's phone number).  A jury

reasonably could find that, by giving his phone number, and not that of the

accountholder-Customer, as the number to call in the event of questions, Teman was seeking to

increase the likelihood that a bank doing diligence on the check would contact him and hence not learn that the Customer disputed the fees and repudiated the check. *See, e.g.*, Trial Tr. at 564, 566 (Soleimani explaining that if banks had contacted him, he would have told them that the checks were unauthorized). Finally, Teman deposited the April checks over the Passover weekend, when his Orthodox Jewish Customers would not access their electronic devices. *See id.* at 367–69, 564–65. These actions could reasonably be read as intended to minimize the likelihood that banks would become alert to Teman's scheme before the checks had cleared.

For all these reasons, the evidence was amply sufficient—indeed overwhelming—to establish that Teman had made false and fraudulent representations to banks in order to cause them to negotiate the checks he deposited.

### C.  Sufficiency of the Evidence of *Mens Rea*

Teman next argues that there was insufficient evidence of *mens rea*—that a reasonable jury could not find that he acted with intent to defraud, as required by the mail and wire fraud statutes. Teman Mem. at 22–23. Teman's argument relies on the claim that GateGuard's Terms and Conditions and Payment Terms authorized him to create and deposit the checks. *See id.* at 23. To strengthen this claim, he points to his attorney Reinitz's testimony—in support of an ostensible advice of counsel defense—that the act of drawing checks on the Customers' accounts was "technically legal" and that the Payment Terms had given Teman "explicit authority" to do so. *See id.*

The Court rejects this argument, too. A reasonable juror could easily conclude beyond a reasonable doubt that Teman had acted with the requisite intent to defraud. As reflected above, the Government presented plentiful evidence of fraudulent intent. *See, e.g.*, Trial Tr. at 980–95 (closing argument, cataloguing this evidence). The Court briefly reviews some of this evidence,

and then addresses the two categories of evidence to which Teman points as ostensibly negating

such intent: namely the Payment Terms and Reinitz's testimony.

Teman's conduct outlined above relating to the construction and negotiation of the

checks, Teman's attempts to delay his Customers' discovery of the checks, and his attempted

transfers of the funds soon after their deposit and clearance all are fairly read to evince fraudulent

intent.  As reviewed above, the checks themselves contain various representations suggesting the

false facts that Customers (1) owed the fees in question and (2) to pay them, had authorized

Teman to draw checks to himself on the Customers' accounts.  The studied design of the checks

to lend these false impressions, alone, would compellingly support a finding of fraudulent intent.

A jury that credited the Customers' testimony that they did not owe and had not discussed with

Teman the large fees in question—*e.g.*, for device removal, collection, chargeback, and attorney

use—could also readily find Teman's suggestion to the contrary as stated or implied in various

ways on the checks' faces to be a badge of fraudulent intent.  *See* Trial Tr. at 326, 343–44, 365

(518 West 204 LLC); *id.* at 421, 434, 441 (18 Mercer); *id.* at 498, 563, 565–66, 649 (ABJ).  The

sum total of the checks (over $51,000 for 518 West 204 LLC, $18,000 for 18 Mercer, and

$264,000 for ABJ) in relation to the sums the Customers had willingly paid for their GateGuard

devices (a few thousand dollars per device) corroborated that the purported fees were disputed

and the checks to pay them were unauthorized.  *See id.* at 439 (direct testimony of Bonnie

Soon-Osberger, representative of 18 Mercer direct testimony) ("The panel is $2,500, which is

what we purchased.  So this $18,000 doesn't make any—doesn't make any sense.").

The circumstances surrounding Teman's deposits of the April checks further could be

viewed as bespeaking fraudulent intent.  Having had chargebacks imposed on the March checks,

Teman doubled down in April, increasing the scale of the checks he wrote on Customer accounts

42

and amplifying the notations made on the checks to convey the illusion of Customer consent.  In

addition, as noted, Teman acted to delay the bank in contacting the Customers and learning that

they disavowed the checks and the debts that they purported to cover.  He did so by depositing

the large checks on the Friday of Passover, when the representatives of 518 West 204 LLC and

ABJ—on whose accounts the checks were drawn—would not be reachable.  *See id.* at 367–69,

564–65.

Finally, the jury could find the rapid manner in which Teman moved and attempted to

move the money he deposited suggestive of criminal intent.  Teman deposited the March checks,

totaling $36,000, into the GateGuard account on March 28, 2019, and the next day he transferred

$35,000 from the GateGuard account to a different account (Friend or Fraud) which he

controlled.  *See* GX 113.  He deposited the April checks on April 19, 2019, and almost

immediately after the lifting of the seven-day hold on his account, transferred nearly all of the

proceeds (net of a chargeback) to other accounts that he controlled.  *See* Trial Tr. at 224–27; GX

113.  The jury could find that these transfers were made in an effort to inhibit the banks' ability,

were they to learn that the Customers disclaimed the checks and the purported debts underlying

them, to deny these funds to Teman through a freeze or additional chargeback.

Teman relies on the Payment Terms as ostensibly negating the evidence of his fraudulent

intent.  But a jury could easily find the contrary.  There was no competent evidence that the

Payment Terms authorizing RCCs were in place as of the time the Customers entered into

agreements with GateGuard.  *See supra* n.5.  And even if there had been, a jury could readily

find that Teman had constructed GateGuard's business documents to make it unlikely that the

Customers would see, let alone consent to, the buried provision purportedly authorizing RCCs to

pay Customer debts.  As the Customers testified, Teman did not provide them with a copy of the

43

Payment Terms or ever discuss the Payment Terms with them.  *See, e.g.*, Trial Tr. at 332, 361 (518 West 204 LLC); *id.* at 428 (18 Mercer); *id.* at 497–98 (ABJ).  Therefore, assuming that Payment Terms that authorized RCCs were in place at the time the Customers contracted with Teman, the only way the Customers could have seen these was to click on a link within the GateGuard Terms and Conditions, which Teman had referenced on invoices and written communications with the Customers.[23]  But that link does not occur until page five of the Terms and Conditions.  *See* T&C at 5.  And the clause that actually purports to provide the requisite authorization for RCCs is several pages into the Payment Terms.  *See* Payment Terms at 5.

Moreover, even if the jury accepted that Teman believed he had the Customers' permission to draw checks on their accounts, the jury could easily conclude that such authority extended only to bona fide debts the Customers owed GateGuard.  The jury could comfortably credit the uniform testimony of the three Customers that they did not owe GateGuard the sums that Teman drew on their accounts in March ($36,000) or in April ($297,000).  Were the jury to find (as the evidence entitled it to do) that Teman feigned Customer authorization of the checks to pay these fees, the Payment Terms' authorization of RCCs as a means to pay bona fide debts, even if binding, would not negate his fraudulent intent as to *these checks*.  In this vein, a jury could further view Teman's decision not to invoice his Customers for fees underlying the March and April checks, or otherwise alert them to his claim that they owed these fees to GateGuard, as telling evidence of his awareness that the fees to which these checks related were not owed—and of his fraudulent intent.

---

[23] Although Teman referenced the Terms and Conditions in writings to the Customers, such as invoices, *see, e.g.*, Trial Tr. at 591, the Customers did not sign the Terms and Conditions and some claimed never to have agreed to them, *see id.* at 329–31, 341–43, 364, 506–07; *see also* GX 409C (text from Soleimani to Teman observing that he had not signed the T&C).

Reinitz's testimony also does not preclude an inference of criminal intent on the part of Teman.  This is so for several reasons.

First, the jury was not required to credit Reinitz's testimony.  *See, e.g.*, *O'Connor*, 650 F.3d at 855.  And the evidence gave the jury good reason to discredit the one part of that testimony on which Teman seizes:  Reinitz's testimony that he orally advised Teman that drawing checks on customer accounts was "technically legal."  Trial Tr. at 921.  Reinitz did not memorialize this advice anywhere.  It was not reflected, for example, in a memorandum to the file, in a letter or memo to Teman, or in Reinitz's extended text exchanges with Teman on this subject.

And the text messages—which the Government introduced on cross-examination—were in considerable tension with Reinitz's claim to have given any such oral advice.[24]  There, in January 2019 before the deposits, and in March and April 2019 in the midst of them, Reinitz repeatedly admonished Teman not to "hit[]" his customers' accounts without notice and their permission and that he risked arrest, imprisonment, and prosecution were he to do so.  *See* GX 704; *see also* GX 728.  In January 2019, Reinitz advised Teman that drawing from the Customers' accounts was a "[b]ad idea."  GX 702 at 1; *see also* GX 728 ("I've already told you I think it's a bad idea.").  After holds were placed on the March checks, Reinitz observed that "this

---

[24] Reinitz's testimony and his text messages with Teman were received during the defense case but are properly considered in assessing the sufficiency of the evidence.  That is because the Court denied Teman's motion for a judgment of acquittal under Rule 29(a) prior to the start of the defense case.  *See United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *2–3 (S.D.N.Y. June 24, 2014) (evidence received during defense case cognizable on Rule 29(c) post-trial sufficiency challenge where Court denies, rather than reserves on, Rule 29(a) motion made at close of the Government's case), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016); *cf. United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) ("Under Rule 29(b), when a district court reserves decision on a defendant's Rule 29 motion at the close of the Government's evidence, 'it must decide the motion on the basis of the evidence at the time the ruling was reserved.'" (quoting Fed. R. Crim. P. 29(b)).

sounds bad," "sounds like a bad idea," and "[t]he banking stuff is not a joke."  GX 704; GX 729.

In text messages from both January and April, Reinitz also warned Teman repeatedly that

choosing to deposit the checks could lead to a criminal prosecution.  *See* GX 702 at 1 ("[T]hey

are likely to call police.  And you will be arrested.  And have a criminal case to deal with."); *id.*

at 2 ("My opinion is that you are > 50% likely to be arrested for the activities you propose.");

GX 704 ("I expect this will become a criminal matter sooner or later."); GX 728 ("If you hit their

accounts I think 50/50 they call cops.").

Reinitz's written communications with Teman, in fact, powerfully reinforced the

Government's case against Teman, as they substantiated his motive (to fortify GateGuard's

flagging finances) and confirmed that Teman knew the Customers would dispute the charges.

GX 728 ("Your 'threats' carry little weight at this point and they have indicated they don't

believe they owe you $."); GX 729 ("There are federal regulations on this stuff.  You can't just

hit someone's bank account if you know they dispute the charge . . . .  You claim that your

contract allows you to debit their accounts even after they explicitly protest.  I'm just not sure it's

that simple. . . .  [I]f the payer tells you to stop, you must stop.").

Particularly in light of these written communications, a jury could reasonably find that

Reinitz, to assist his continuing client Teman, had lied on the witness stand when he claimed to

have orally advised Teman that drawing checks on customer accounts was "technically legal."

Such a finding would draw support from Reinitz's carriage while testifying.  Reinitz visibly

projected as ill at ease and nervous.  His demeanor was markedly defensive and at points evasive

on cross-examination.

Second, even assuming that the jury credited this aspect of Reinitz's testimony, the jury

could easily find that Teman did not have available an advice of counsel defense sufficient to

negate criminal intent.  Consistent with Second Circuit precedent, *see United States v. Scully*, 877 F.3d 464, 477–78 (2d Cir. 2017), the Court instructed the jury that for such a defense to apply, it must find that Teman had "honestly and in good faith sought the advice of a competent lawyer as to what he may lawfully do; . . . fully and honestly laid all the facts before his lawyer; and . . . in good faith . . . honestly followed such advice, relying on it and believing it to be correct."  Trial Tr. at 1093.  The trial evidence gave the jury good to reason to find, at a minimum, that Teman's consultation with Reinitz failed to meet the latter two requirements.  As to laying all the facts before Reinitz, there was no evidence that Reinitz was aware of the large sums that Teman was planning to charge the Customers, or that the fees which these sums represented were disputed as opposed to conceded by the Customers.  *See id.* at 823 (Reinitz was not aware of $18,000 March checks until they had already been deposited).  Reinitz did not know that those sums far exceeded the prices the Customers had paid for their GateGuard devices.  *See id.* at 813, 912.  Teman also did not show Reinitz the checks he wanted to deposit.  *See id.* at 793–94.  This was a particularly gaping hole in Reinitz's awareness of Teman's intended course of conduct towards the banks.  Even if Reinitz conceptually approved Teman's use of RCCs to pay bona fide debts to GateGuard as "technically legal," there was no evidence that he knew in advance of, let alone approved, Teman's representations on the particular checks signifying Customer assent to the payment, by RCCs, of the fees reflected on them.  Reinitz's advice, even if credited, thus was a mismatch for Teman's charged conduct.  And, as to following Reinitz's advice, Teman did not follow it.  As the text exchanges reflect, Reinitz—in strong and memorable language—instructed Teman not to move forward with the deposits, *see, e.g.*, GX 702 (describing the scheme as a "[b]ad idea"); GX 729 (advising that "if the payer tells you to stop, you must stop."), and at minimum to give advance notice to the Customers of the

47

charges before doing so, *see, e.g.*, GX 704 ("I suggest you provide them with advanced, explicit notification of the charge, amount, and specific basis in the agreement for doing so.").

The jury was thus not by any means required to find, on account of Reinitz's testimony, reasonable doubt on the element of criminal intent. Quite the contrary, Teman's disregard of Reinitz's core advice—and his ploughing ahead with more and larger deposits in April in the face of Reinitz's warnings and guidance after the March deposits—could fairly have been read as enhancing the Government's proof on this element.

Accordingly, the Court finds there was sufficient evidence for a reasonable jury to find that Teman acted with the requisite intent.

### D.       Sufficiency of the Evidence as to Venue

Teman next argues that the Government failed to adduce sufficient evidence for a reasonable jury to find venue on any count by a preponderance of the evidence. *See* Teman Mem. at 17–22; Teman Reply at 10–15.

#### 1.       Pertinent Background

On March 28, 2019, Teman deposited the two $18,000 checks to GateGuard's Bank of America account. *See* GX 113. The checks stated that they were drawn per contract and no signature was required, yet Teman included an unintelligible squiggle on the signature line. *See* GX 201–02. The checks were purportedly issued by 518 West 204 LLC and 18 Mercer, which had accounts at Signature Bank. *See id.* The checks included a Manhattan address for Signature Bank. *Id.*

The evidence showed that Teman deposited the checks while he was in Manhattan through a mobile deposit on his phone. *See* Trial Tr. at 198–202. The evidence to this effect consisted of a business record from Bank of America, in the form of a spreadsheet, which reflected that the IP address for the mobile deposit was located at the moment of deposit in "New

York, NY." *See* GX 113 ("Device" tab of spreadsheet); *see also* Trial Tr. at 202–03.  After the mobile deposit was made, the evidence showed that electronic communications were routed to Bank of America servers in Texas.  *See* Trial Tr. at 203–04.

Following the mobile deposit, Bank of America placed a hold on the proceeds from the checks.  *See* GX 704; GX 727.  The evidence showed that, on April 1, 2019, Signature Bank conducted a review on the checks in Manhattan and flagged the checks for fraud.  *See* Trial Tr. at 677–84.  The next day, Bank of America completed a chargeback from the GateGuard account to the Customers' accounts at Signature Bank.  *See* Trial Tr. at 210–11; GX 113.

On April 19, 2019, Teman entered a Bank of America branch in Miami Beach, Florida and deposited 27 checks for $297,000, drawn on the accounts of 518 West 204 LLC and ABJ. *See* GX 113.  Each check stated it was drawn per contract and no signature was required, and each also included a note to the bank that "[t]his is a valid check.  You are required by law to honor it.  Contract at gateguard.xyz/legal/terms.php accepted by above client," and instructed the bank to contact GateGuard with questions.  GX 203–05.  The checks included Manhattan addresses for Signature Bank and JPMorgan, the banks for 518 West 204 LLC and ABJ respectively.  *Id.*

The evidence showed after the deposit, a seven-day hold was placed on the GateGuard account, to allow both Bank of America and the drawee banks to review the checks to determine whether the funds should be released to Teman.  *See* Trial Tr. at 280, 283–85, 289; *see also* DX 16.  At the Florida Bank of America branch, the images of the checks were scanned; from there, they were sent to the Federal Reserve and then reviewed by Signature Bank in Manhattan, for fraud.  *See id.* at 219–20, 684–86.  As a result, on April 24, 2020, before the hold on the GateGuard account was lifted, Bank of America completed a chargeback for $33,000 from the

49

GateGuard account to the 518 West 204 LLC account at Signature Bank.  *See* Trial Tr. at 223;

GX 113.  On April 26, 2019, Bank of America lifted the hold and Teman began transferring the

funds from the GateGuard account to other accounts that he controlled.  *See* Trial Tr. at 224–25

(Friend or Fraud account); *id.* at 226 (Touchless Labs account); *id.* (Teman's personal account);

*see also* GX 113.  The evidence also showed that Teman, on May 8, 2019, withdrew $4,000 from

the Friend or Fraud account from a Bank of America branch in Manhattan.  *See* Trial Tr. at 228,

231; GX 112–13.

### 2.    Applicable Legal Principles

"Both the Sixth Amendment and Fed. R. Crim. P. 18 require that a defendant be tried in

the district where his crime was committed."  *United States v. Rutigliano*, 790 F.3d 389, 395

(2d Cir. 2015) (quoting *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011)).  As the

Second Circuit has observed, "[t]he challenge, of course comes in determining what 'committed'

means for the purposes of a specific crime."  *United States v. Kim*, 246 F.3d 186, 191

(2d Cir. 2001).  To do so, courts look to "the nature of the crime alleged and the location of the

acts or acts constituting it."  *United States v. Magassouba*, 619 F.3d 202, 205 (2d Cir. 2010)

(quoting *United States v. Cabrales*, 524 U.S. 1, 5 (1998)); *see also Kim*, 246 F.3d at 191 ("[T]he

Supreme Court directed courts to . . . identify the conduct constituting the offense and then

determine where that conduct occurred.").

"Venue may lie in more than one place if 'the acts constituting the crime and the nature

of the crime charged implicate more than one location.'"  *United States v. Lange*, 834 F.3d 58,

68–69 (2d Cir. 2016) (quoting *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985)).  For

such "continuing offenses," venue is proper where the offense "was begun, continued, or

completed."  18 U.S.C. § 3237(a); *see also United States v. Ramirez*, 420 F.3d 134, 139

(2d Cir. 2005) (explaining that Congress codified the rule of continuing offenses in 18 U.S.C.

§ 3237(a)).  Wire fraud and bank fraud are both continuing offenses.  *See Rutligliano*, 790 F.3d at 396 & n.3; *see also Magassouba*, 619 F.3d at 207 (bank fraud); *Kim*, 246 F.3d at 191–92 (wire fraud).

At times, courts in this Circuit have also applied the "substantial contacts test."  Under that test, courts determining venue look also to "(1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding."  *Ramirez*, 420 F.3d at 139 (citation omitted).  Not all factors must be met to find venue.  *See United States v. Korolkov*, 870 F. Supp. 60, 62–64 (S.D.N.Y. 1994) (finding venue for bank fraud and wire fraud where first two factors not satisfied).  The Circuit has clarified that the substantial contacts should only be applied when a defendant "argues that his prosecution in the contested district . . . will result in a hardship to him, prejudice him, or undermine the fairness of his trial."  *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012) (brackets omitted) (quoting *Magassouba*, 619 F.3d at 205 n.2).

The Government has the burden of proving venue, but, because venue is not an element of a crime, it must be proven only by a preponderance of the evidence.  *Ramirez*, 420 F.3d at 139.  Where, as here, an indictment charges multiple counts, "venue must be proper with respect to each count."  *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989); *see also United States v. Royer*, 549 F.3d 886, 893 (2d Cir. 2008).  When reviewing each count for sufficiency of the evidence as to venue, the court must view the evidence "in the light most favorable to the government, crediting 'every inference that could have been drawn in its favor.'"  *Ramirez*, 420 F.3d at 139 (quoting *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994)).

3.      **Application**

a.      *Counts Two and Four — March 2019 Checks*

Count Two charges bank fraud and Count Four charges wire fraud in connection with the

two March checks.  *See* S2 ¶¶ 2, 4.  Teman's challenge to venue on these counts principally

consists of a factual dispute.  He argues that the Bank of America spreadsheet did not reliably

establish that the mobile deposit had been made from within this District.  He notes that the

records custodian from Bank of America who authenticated the bank's business records was not

asked, and so did not testify, about the geographic meaning of the reference on the spreadsheet to

"New York, NY."  And, he argues that the spreadsheet's reference to "New York, NY" could

refer to any part of New York City, two of whose five boroughs (Manhattan and the Bronx) are

within this District and three of which (Brooklyn, Queens, and Staten Island) are not.  Teman

notes that other references in the spreadsheet are to cities and not counties, *e.g.*, "Miami Beach,

FL" (not Miami-Dade County, FL).  *See* Teman Mem. at 20–22.

At trial, the Government elicited from the Bank of America record custodian, senior

fraud investigator Finocchiaro, that the Bank of America spreadsheet reflects that the IP address

of the mobile deposits was "New York, NY."  *See* Trial Tr. at 202.  And, Finocchiaro explained,

unimpeached, that an IP address reveals the location of the device that was used to make the

mobile deposit.  *See id.* at 203 (an IP address "gives a distinct location in which an online

banking login is being conducted").  But, because the Government omitted in its inquiry of her

the geographic meaning of "New York, N.Y." as used on this business record, the record as to

this factual issue is less conclusive than it might have been.  Nevertheless, analysis of the

spreadsheets makes circumstantially evident—and certainly clear enough for a factfinder to find

by a preponderance—that "New York, NY" as used therein refers to Manhattan, *i.e.*, within this

District.  That is because the bank's spreadsheet contains numerous explicit by-name references

to other boroughs in New York City (including to "Brooklyn, NY" and to "Bronx, NY"). However, it does not contain any references to "Manhattan, NY."

Viewed in that context, it is circumstantially persuasive, as the Government argues, that the bank used the notation "New York, NY" to refer to Manhattan. *See* Gov. Mem. at 25; *see also* Trial Tr. at 703–08 (argument on Rule 29(a) motion on this point). Applying the preponderance of the evidence standard, a reasonable juror could find that Teman's mobile deposit of the two checks was made via a mobile device then located in Manhattan. This inference was consistent with evidence at trial regarding Teman's business relationships with these Customers, all of whom were located in Manhattan and had GateGuard devices installed on their buildings in Manhattan or the Bronx. *See, e.g.*, Trial Tr. at 310 (518 West 204 LLC); *id.* at 415 (18 Mercer); *id.* at 486 (ABJ); *see also id.* at 314 (518 West 204 LLC representative explaining that he met Teman at trade show in Manhattan).

With that factual question resolved in the Government's favor, the issue then is whether the mobile depositing of these checks supports a finding of venue in this District on Counts Two and Four. For the reasons that follow, the Court holds that it does, as to both counts.[25]

### i.    Count Two: Bank Fraud

As noted, the bank fraud statute criminalizes the knowing execution, or attempted execution, of a scheme "to defraud a financial institution," or a scheme to obtain money or property owned by a financial institution through "fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(1)–(2). Such a scheme "is, at least in most cases, a series of acts designed to obtain money or property fraudulently, not simply . . . one specific act," rendering

---

[25] Because the Court finds that the location of the mobile deposits alone supports venue on these counts, it has no occasion to consider whether other Manhattan activities relating to the March 2019 checks that the Government cites—including Signature Bank's Manhattan-sited fraud review—support finding proper venue.

bank fraud a continuing offense.  *United States v. Bezmalinovic*, 962 F. Supp. 435, 437

(S.D.N.Y. 1997) (quoting *United States v. Washington*, 109 F.3d 459, 466 (8th Cir. 1997)).

Bank fraud thus may be prosecuted in any district where it is begun, continued, or completed.

*See* 18 U.S.C. § 3237(a).

The fact, which the jury was entitled to find, that Teman made his mobile deposits of the

March 2019 fraudulent checks in Manhattan is sufficient to support venue here.  Venue is proper

in any district where the crime was committed.  *See Rutigliano*, 790 F.3d at 395–96.  Bank fraud

is committed when a scheme to defraud or to obtain money or property under false pretenses is

executed.  *See United States v. Kilkenny*, 493 F.3d 122, 128–29 (2d Cir. 2007).  The deposit of

fraudulent checks constitutes such an execution.  *See United States v. Hord*, 6 F.3d 276, 281–82

(5th Cir. 1993).

Here, the jury could reasonably find, by a preponderance of the evidence, both that

Teman did not have authorization to deposit the checks and that the deposit took place in this

District.

As to the former, the trial evidence, viewed in the light most favorable to the verdict,

gave the jury an ample, if not overwhelming, basis to find that Teman lacked authorization to

create and deposit these checks, and that when he when did so, he was attempting to mislead

Bank of America and Signature Bank into believing that he had such authorization.

Representatives of both Customers on whose accounts the March 2019 checks were drawn, 518

West 204 LLC and 18 Mercer, credibly testified that Teman had not discussed such debts, let

alone the creation and deposit by Teman of checks drawn on the Customer accounts to pay them,

with either Customer.  *See, e.g.*, Trial Tr. at 326, 343–44 (518 West 204 LLC); *id.* at 421, 434,

441 (18 Mercer).  Both flatly denied authorizing him to take money from their accounts.  *See,*

*e.g.*, *id.* at 357–58, 361–63 (518 West 204 LLC); *id.* at 428–29, 441, 474–75 (18 Mercer). Teman nevertheless created and deposited the two checks, each bearing language implying that the Customers had consented to his creating and negotiating checks drawn to his company. Thus, the checks stated, "DRAW PER CONTRACT.  NO SIGNATURE REQUIRED[,]" and the illegible signature that Teman placed on them also tended to falsely connote the checks' approval by some person other than Teman.  *See* GX 201–02.  Moreover, documentary evidence—which the Government elicited during Teman's ill-conceived attempt to develop an advice of counsel defense—confirmed Teman's motive to engage in such audacious conduct: to shore up his company's finances.  *See* Trial Tr. at 807–08; *see also* GX 704.  It also established that Teman had been advised in advance by counsel not to withdraw the money, as doing so was a bad idea that could lead to his arrest, imprisonment, and prosecution.  GX 702.

As to the latter, the evidence, as noted, was sufficient for a jury to find that Teman had made the mobile deposits of the fraudulent checks while in Manhattan, as opposed to a part of New York City outside of this District.  On this basis, a reasonable jury could find, by a preponderance, that Teman, incident to his scheme to defraud by creating and depositing checks on the false pretense that he had Customer authority to do so, deposited the March 2019 checks from Manhattan.

ii.     Count Four: Wire Fraud

Wire fraud is committed when a person who has devised a scheme to defraud or to obtain money or property by false or fraudulent pretenses, representations, or promises, transmits an interstate wire or causes such a wire to be transmitted.  18 U.S.C. § 1343.  The Second Circuit "has found that one causes a wire transmission when he 'act[s] with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen.'"  *Kim*, 246 F.3d at 190 (internal quotation marks omitted) (quoting *United States*

*v. Zichettello*, 208 F.3d 72, 106 (2d Cir. 2000)).  Like bank fraud, wire fraud is a continuing

offense.  *Rutigliano*, 790 F.3d at 396.  Therefore, for venue, the evidence must show that part of

the wire fraud was begun, continued, or completed in this District.  *See* 18 U.S.C. § 3237(a).  It is

sufficient to show that "a wire in furtherance of a scheme begins its course, continues or ends" in

this District.  *Rutigliano*, 790 F.3d at 397 (explaining venue lies in such places).

Here, too, for much the same reasons as for the bank fraud count, venue for wire fraud is

supported by the fact, which the evidence empowered the jury to find, that Teman's mobile

deposits occurred in Manhattan.  Moreover, the deposit resulted in electronic communications

being sent from Manhattan to Bank of America servers in Texas as part of the process by which

the checks were negotiated.  *See* Trial Tr. at 203–04.  These electronic communications too

supported venue for the wire fraud count, as it was reasonably foreseeable that a mobile deposit

would result in interstate wire communications from the point of deposit incident to processing

the check.

The Court accordingly finds that there was sufficient evidence to support venue on Count

Four.

### b.  *Counts One and Three — April 2019 Checks*

Count One charges bank fraud and Count Three charges wire fraud in connection with

the April checks.  *See* S2 ¶¶ 1, 3.  Teman argues that his bank and wire offenses with respect to

the April checks were complete when he deposited the checks in Florida or, at the latest, when

Bank of America cleared the hold on his account and the funds became available to him.  *See*

Teman Mem. at 19; Teman Reply at 12.  The Government, emphasizing that bank and wire fraud

are continuing offenses, notes that Teman's scheme lasted beyond those points and was aimed at

securing for himself the fruits of the fraud.  *See* Gov. Mem. at 22–24.  The import of the

Government's argument is that Teman's scheme required deceiving both the depositary *and*

drawee banks as the validity of the checks so as to enable him to withdraw the funds he had

deposited. *See id.* at 24.   On this presentation of the scheme, it argues that venue may be found

based on any of three acts within this District: (i) Teman's withdrawal of $4,000 from the

Manhattan Bank of America branch, which, the Government contends, represented proceeds of

the scheme and exposed Bank of America to greater loss; (ii) the interstate wire that was a

component of Signature Bank's review of the checks in Manhattan; or (iii) undated phone

conversations and text message conversations between ABJ representative Soleimani, from his

Manhattan office, and Teman, from Florida. *See id.* at 23–24.

 The Court finds that, although the venue question as to Count One is close, the evidence

ultimately was sufficient to permit a reasonable jury to find, by a preponderance of the evidence,

venue as to both Count One and Count Three.

### iii. Count One: Bank Fraud

 As noted, bank fraud is a continuing offense. *See Rutigliano*, 790 F.3d at 396 & n.3;

*Magassouba*, 619 F.3d at 207.[26]   Bank fraud therefore may be prosecuted in any district where it

---

[26] Teman disputes this proposition and faults the Government for citing *Rutigliano*, 790 F.3d
at 396 n.3, and *Magassouba*, 619 F.3d at 207, as support for it.   Teman Reply at 11.   Teman's
main argument is that these cases rely on *Duncan*, 42 F.3d at 104, which involved a conspiracy
charge.   Teman is wrong.   *Duncan* considered and sustained both a conspiracy charge and a
substantive bank fraud charge.   *See id.* at 99.   Venue was independently required for each charge.
That is because, "[w]here . . . a defendant is charged with conspiracy as well as substantive
offenses, venue must be laid in a district where all counts may be tried.   Thus, the venue
potential in a conspiracy case for the prosecutor to choose from is narrowed by the substantive
counts the government wishes to prosecute." *United States v. Saavedra*, 223 F.3d 85, 89
(2d Cir. 2000).   The finding of venue in *Duncan* on a continuing offense theory thus applies to
the substantive bank fraud count as well.   In any event, the Second Circuit has squarely held in
favor of the Government on this point.   In *Magassouba*, which involved a predicate substantive
bank fraud offense, the Circuit stated:   "It is well established that bank fraud is a continuing
offense," *Magassouba*, 619 F.3d at 207.   Other circuits have held the same for the purposes of
venue, *see, e.g.*, *United States v. Bankole*, 39 F. App'x 839, 842–43 (4th Cir. 2002); *United
States v. Scott*, 270 F.3d 30, 36 (1st Cir. 2001); *United States v. Najjor*, 255 F.3d 979, 983
(9th Cir. 2001); *United States v. Dupre*, 117 F.3d 810, 822 (5th Cir. 1997); *Washington*, 109 F.3d

is begun, continued, or completed.  *See* 18 U.S.C. § 3237(a).  Consequently, the inquiry here is whether any of the three acts in this District that the Government argues support venue occurred as part of the continuing scheme or whether the scheme had already been completed.  The Court finds that, of the three, only the Signature Bank review is properly characterized as a continuation of the bank fraud scheme, but that it is sufficient to support venue on this count.

It is important at the threshold to clarify the nature and object of Teman's Count One bank fraud scheme.  The evidence, viewed in the light most favorable to the verdict, showed that Teman attempted to mislead both Bank of America and each drawee bank into believing he was authorized to deposit the April checks and that they should therefore honor the checks. Significantly, by mid-April, as a result of the hold and chargebacks that he had experienced in connection with the March checks, Teman was on notice that the depositary and the drawee banks would review checks that he fabricated on the Customers' accounts, and that he could be denied access to the funds by either the depositary bank or the drawee bank on its ensuing review.  He notified his attorney about the holds on the March checks and was advised not to deposit such checks again.  *See* GX 704.  Undeterred, Teman created a new round of RCCs beginning in mid-April.  Like the March checks, these, on their face, stated that the checks were "DRAW[N] PER CONTRACT.  NO SIGNATURE REQUIRED."  GX 203–05.  But the face of Teman's April checks included additional language: a "NOTE TO BANK" that stated "[t]his is a valid check.  You are required by law to honor it."  *Id.*  The April checks also included a link to the GateGuard Terms and Conditions, which in turn included, several pages in, a link in the

---

at 466; *United States v. Hubbard*, 889 F.2d 277, 280 (D.C. Cir. 1989).  The issue here is not therefore the conceptual one of whether bank fraud is a continuing offense.  It is the case-specific one of whether the bank fraud offense charged here was complete or ongoing at the time the contacts in this District occurred, and, if ongoing, whether those contacts were of a nature to support venue.

middle of a paragraph to the Payment Terms. *Id.*; T&C at 5.  As noted, Teman's contention—although uniformly refuted by his Customers—was that they had assented to these Payment Terms and thereby authorized him to draw checks on their accounts for debts due.  A jury could reasonably view the added notations on Teman's April checks as aimed at increasing the chances that the checks would survive review at both the depositary and drawee banks so as to permit Teman to access the deposited funds.[27]  Although the Signature Bank review and the resulting chargeback cabined the size of his withdrawal, Teman—as soon as the hold was lifted from his account and he had access to the funds—transferred most of the balance from the GateGuard account, presumably to lessen his exposure to any later chargebacks.  *See* Trial Tr. at 224–26; GX 113.

The Court now examines, in light of the above understanding of Teman's bank fraud scheme, the Government's three theories of venue.

*Withdrawal of $4,000 on May 8*:  Teman's withdrawal, on May 8, 2019, of $4,000 at a Bank of America branch in Manhattan is insufficient to supply venue.  That is because, even acknowledging the time span of the scheme as presented above, the withdrawal occurred after the bank fraud was complete.  Section 1344 criminalizes "each *execution* of a fraudulent scheme, not each act in furtherance of such a plan," *Kilkenny*, 493 F.3d at 128 (emphasis in original), so the crime is complete after the scheme has been executed.  *See United States v. De La Mata*,

---

[27] In another modification of his March modus operandi, Teman—apparently to reduce the risk that his customers would receive prompt notice of the large checks he had drawn on their accounts and act to void these checks—deposited the checks on the Friday of Passover.  Because the principals of 518 West 204 LLC and ABJ were observant Jews, they would not access their electronics over the weekend.  *See* Trial Tr. at 367–69 (518 West 204 LLC); *id.* at 564–65 (ABJ).  The Government introduced evidence that Teman was aware of the religious practices of these Customers.  *See* GX 417 at 1 (email from Teman threatening to place lien on 518 West 204 LLC's building during Passover); GX 405 at 1 (email from Teman stating that Soleimani, the ABJ representative, said he would invite Teman to a Passover seder).

266 F.3d 1275, 1287 (11th Cir. 2001).  To determine when the scheme was executed, "courts

look to a number of factors, including the overall contours of the fraudulent scheme and—

perhaps most importantly—the point at which the financial institution was put at risk of financial

loss."  *Kilkenny*, 439 F.3d at 128; *see also United States v. Anderson*, 188 F.3d 886, 888

(7th Cir. 1999) ("[T]he crime of bank fraud is complete when the defendant places the bank at a

risk of financial loss, and not necessarily when the loss itself occurs.").

        Here, Teman deposited the 27 checks at a Florida branch of Bank of America and,

following a seven-day hold on the funds, received access to those funds.  *See* Trial Tr. at 280,

283, 289.  Once Bank of America released the hold on the funds, Teman's scheme was complete.

The purpose of the hold was to allow both Bank of America and the drawee banks to conduct

their reviews.  *See id.* at 285.  Under settled case law, once Bank of America granted Teman

access to, and control of, the funds, "the bank put itself at risk for losing the entire amount of the

check[s], and the subsequent withdrawal[] did not create an additional risk."  *United States v.*

*Ajayi*, 808 F.3d 1113, 1124 (7th Cir. 2015); *see also, e.g.*, *Anderson*, 188 F.3d at 891 ("Any

scheme [defendant] may have conceived was completed upon receipt of the funds.  The mere act

of transferring money from one bank account to another was not part of the original scheme to

defraud, nor did it create a new financial risk . . . .  Once [defendant] had control of the money,

the scheme ended."); *United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir. 1999) ("[W]e have

no trouble in deciding that the bank fraud was a completed crime when [defendant] fraudulently

obtained the deposit of the proceeds of the check into his account, with the intent at that time to

eventually withdraw money from that account for his own use."); *Hord*, 6 F.3d at 281 ("It is the

deposits, not [defendant's] withdrawal attempts, that constitute executions of the scheme."); *cf.*

*Rutigliano*, 790 F.3d at 397 (noting, in context of wire fraud, that "a scheme to defraud is not

complete until the proceeds have been received" (quoting *United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013)).  Consequently, Teman's Manhattan withdrawal on May 8 did not represent the beginning, continuation, or completion of the bank fraud.  It thus cannot support venue for Count One.[28]

In support of its position that the May 8 withdrawal supplies venue, the Government cites *Magassouba*.  *See* Gov. Mem. at 23, 24.  There, the Circuit considered whether venue was proper in this District for an aggravated identity theft count predicated on a bank fraud offense.  *See Magassouba*, 619 F.3d at 203.  The Circuit held that because venue was proper for bank fraud, it was also proper for identity theft.  *See id.* at 204–06.  In connection with the bank fraud count, the Circuit stated that it was "undisputed that venue was properly laid in the Southern District of New York."  *Id.* at 204.  That was because the defendant fraudulently caused money to be transferred from a credit card account of a Brooklyn businessman and deposited into the defendant's JPMorgan Chase bank account in this District, and he later twice withdrew money from Bronx Chase branches.  *Id.*; *see also Barrie v. United States*, No. 07 Cr. 158 (RPP), 2012 WL 5464413, at *2 (S.D.N.Y. Nov. 9, 2012) (describing evidence relating to scheme in more detail).  But *Magassouba* is inapposite because the Circuit there did not hold that venue was proper *because* of the defendant's later withdrawal of the fruits of the bank fraud.  Instead, it noted that the defendant did not contest venue as to bank fraud.  Nor could he, as the funds had initially been deposited into his bank account, located in this District.  Analogously, venue on a

---

[28] Teman potentially could have faced other charges for the withdrawal, including for money laundering.  That the withdrawal of funds could have been prosecuted under a different statute does not, however, extend the duration of the bank fraud scheme.  *See, e.g.*, *Gregg*, 179 F.3d at 1315–16 (holding that bank fraud scheme was complete when defendant deposited funds from scheme into his account but that his later withdrawal of those funds supported money laundering charge).

site-of-deposit theory could have existed here had Teman's initial deposit of the unauthorized checks occurred in Manhattan.  The evidence, however, situated the deposit in Florida.

*Signature Bank's fraud review*:  The Government next relies on Signature Bank's fraud review of the checks, which took place in Manhattan.  Signature Bank was the bank for 518 West 204 LLC, one of the entities whose funds Teman attempted fraudulently to obtain via the April checks.  Signature Bank flagged the checks drawn on 518 West 204 LLC's account, *see* Trial Tr. at 684–85, causing Bank of America to issue a $33,000 chargeback to the 518 West 204 LLC account, *see id.* at 221–23; GX 113.

Unlike Teman's withdrawal, Signature Bank's review occurred during the pendency of the scheme.  It took place before the hold on Teman's account was lifted and the funds were released to him, *i.e.*, before the bank fraud was completed.  *See* GX 113 (showing deposit on April 19, 2019; Signature Bank chargeback on April 24, 2019; and transfers to the Friend or Fraud and Teman's personal account on April 26, 2019).  Therefore, the question is whether, for the purposes of § 3237(a), the Signature Bank review was a continuation of the crime.

The Court finds that it was.  It was part of the scheme that the unauthorized checks be constructed so as to clear review by Bank of America and the drawee banks, including Signature Bank, and to enable Teman to gain access to the funds.  To obtain the money he sought, it was necessary for Teman to deceive both banks.  The drawee bank's review is sufficient for venue because "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003).  Here, the second prong is met:  It was foreseeable both that

Signature Bank would conduct a fraud review of the April 19, 2019 checks and that the review would take place in Manhattan.

First, it is foreseeable that a deposit of an unauthorized check could trigger a fraud review. It was particularly foreseeable that Signature Bank would review checks of this nature— it had done so the previous month for similar checks deposited by Teman. The evidence showed that one of the unauthorized checks that Teman deposited on March 28, 2019, was drawn on 518 West 204 LLC's account.[29] *See* GX 147; GX 201. Bank of America had placed a hold on funds from those checks, *see* GX 704; GX 727, and Signature Bank conducted a fraud review of that check and flagged it for fraud, *see* Trial Tr. at 674–81. On April 2, 2019, Bank of America completed a chargeback from the GateGuard account to 518 West 204 LLC's account. *See* GX 113; *see also* Trial Tr. at 681–82; GX 145 at 17 (bank statement for 518 West 204 LLC's account). These reviews took place before April 19, 2019, putting Teman on actual notice of the fact that Signature Bank was apt to review a second set of such checks.

Second, it was foreseeable that the review would take place in Manhattan. Teman had conducted business with 518 West 204 LLC in Manhattan, and knew that 518 West 204 LLC had an account with Signature Bank, also located in Manhattan. The March 28, 2019 check, which Teman claimed was an RCC that he had created, stated on its face that it was from Signature Bank, located at 485 Madison Ave., 11th Floor, New York, NY 10022. *See* GX 147; GX 201; *see also* Trial Tr. at 195. Given Signature Bank's Manhattan location, it was foreseeable that a fraud review would take place in Manhattan. *Cf. Kim*, 246 F.3d at 192–93

---

[29] The second check that Teman deposited on March 28, 2019 was drawn on the account of 18 Mercer, which also had its bank account with Signature Bank. *See* Trial Tr. at 682–83. Signature Bank also flagged that check for fraud, and Bank of America completed a chargeback to the 18 Mercer account. *See id.* at 683–84; *see also* GX 113.

(venue proper for wire fraud where defendant, who was not located in, and did not personally send communications to, this District, "caused communications to be transmitted into and out of the Southern District when he approved fraudulent invoices knowing that [the defrauded entity] paid its vendors from New York banks").  Therefore, Signature Bank's fraud review, a hurdle Teman needed to clear by fraudulent means to gain the money he sought, is sufficient to support venue in this District.

      *Soleimani phone and text messages*:  Finally, the Government relies on phone and text message conversations that Soleimani stated he had with Teman, while Soleimani was located in Manhattan and Teman, at times, was located in Florida.  *See* Trial Tr. at 569–70.  While communications to and from this District are generally sufficient to support venue, *see Kim*, 246 F.3d at 192, these specific communications fall short.  That is because Government has not adduced evidence as to when these communications occurred.  *See* Trial Tr. at 569–70 (Soleimani explaining that he had phone conversations with Teman when Soleimani was in his Manhattan office, where he has been located for "[a]bout two years").  The evidence was thus insufficient evidence for a jury to find by a preponderance that any of these such communications occurred during the time frame charged in Count One, approximately April through June 2019, *see* S2 ¶ 1.  *See Beech-Nut Nutrition Corp.*, 871 F.2d at 1190 (explaining that even for continuing violations, acts that are "merely prior and preparatory to" offense cannot support venue).

      iv.     Count Three: Wire Fraud

      Like bank fraud, wire fraud is a continuing offense, *Rutigliano*, 790 F.3d at 396, and may be prosecuted where it was begun, continued, or completed, *see* 18 U.S.C. § 3237(a).  An integral part of a wire fraud scheme is causing interstate wires to be sent.  As discussed *supra*, a defendant causes a wire to be sent when use of the wire could be reasonably foreseen.  *Kim*,

246 F.3d at 190.  When such a wire begins, continues, or ends in this District, there is venue here.  *See Rutigliano*, 790 F.3d at 397.

As with bank fraud, venue for Count Three of wire fraud is supported by the wire that instigated the Signature Bank fraud review in Manhattan, which Teman's scheme, to succeed, was required to clear.  After Teman deposited the checks at the Bank of America branch in Florida, images of those checks were sent to the Federal Reserve and then to Signature Bank in Manhattan.  *See* Trial Tr. at 219–20, 653, 684–86.  Teman is fairly found to have caused these wire transmissions to be sent, as it was reasonably foreseeable, for the reasons discussed *supra*, that these checks would be subjected to Signature Bank's fraud review in this District.  Signature Bank's reception of the check images in Manhattan is sufficient for venue here.  *See Kim*, 246 F.3d at 191–92 (affirming finding that "wire is 'transmitted' both where it was sent and where it was received," and that venue was proper in this District when defendant caused communications to be sent to and from Manhattan bank); *see also Rutigliano*, 790 F.3d at 398 (although doctrine that "a scheme to defraud is not complete until proceeds have been received" has some limit, "at least the first wiring (and many more) must be deemed in furtherance" of crime).

Accordingly, there was sufficient evidence for a reasonable jury to find by a preponderance of the evidence that venue lay in this District for all counts.

v.      Substantial Contacts Test

In a separate argument apparently aimed at defeating venue on Counts One and Three, Teman argues that the Court should apply the substantial contacts test and find insufficient evidence to demonstrate such contacts.  *See* Teman Mem. at 19–20; Teman Reply at 14.  The Court finds that the substantial contacts test is not applicable here.

As noted, the substantial contacts inquiry is appropriate only where the defendant shows that venue "will result in a hardship to him, prejudice him, or undermine the fairness of his trial." *Coplan*, 703 F.3d at 80 (brackets omitted) (quoting *Magassouba*, 619 F.2d at 205 n.2). "This limitation arises directly out of the purpose of the substantial contacts test: to safeguard against hardship to the defendant that may arise when a continuing offense lays venue in numerous districts, some of which are remote." *Gross*, 2017 WL 4685111, at *37. Teman argues that he suffered a hardship because he lives in Florida and had to travel to New York for his trial, and because he was not judged by a jury of his "peers" as the jurors did not also reside in Florida. Teman Reply at 14. Although perhaps inconvenient, Teman's travel does not rise to the level of hardship or prejudice, given the ease of such travel in today's time. *See United States v. Chait*, No. 17 Cr. 105 (JMF), 2017 WL 6502228, at *1 (S.D.N.Y. Dec. 18, 2017) (holding substantial contacts test was not applicable where defendant resided in California and evidence or witnesses may have existed in California, "given technology and the ease of travel"). Teman failed even to point to any evidence or witnesses in Florida—all of the business relationships and transactions in this case were with New York customers. And insofar as all three groups of Teman's customer victims were situated and banked in Manhattan, Teman's claim of a right not to be tried in this District is frivolous.

Even if the substantial contacts test were applicable, it would support venue in this District. Although the first factor under the substantial contacts test—the site of Teman's actions, *i.e.*, depositing the checks in Florida—does not favor venue in this District on Counts One and Three, the other factors all strongly do. The second factor, which considers the elements and nature of the crime, supports venue because the elements of both offenses include a scheme to defraud, and, as reviewed above, aspects of those schemes occurred in New York. In

addition, wire fraud requires that the defendant use or cause an interstate or foreign wire to be used, and here at least one such wire—the routing of images of the checks from the Florida Bank of America branch, to the Federal Reserve, to Signature Bank in Manhattan for a fraud review—contacted this District.  The third factor, which focuses on the place where the effect of the criminal conduct is felt, emphatically favors this District.  Teman conducted business with entities in this District by providing their residential buildings with his GateGuard devices.  It was from those entities' accounts that Teman attempted to steal funds via fraud.  Teman's business ties to these New York businesses facilitated this bank and wire fraud scheme.  Finally, the fourth factor of the venue's suitability for factfinding also supports venue here.  The main witnesses for these checks—principals of ABJ Lenox LLC, ABJ Milano LLC, and 518 West 204 LLC—are located here, as is evidence related to the businesses and banks of those entities.  In short, while Teman lives in Florida and the Bank of America branch in which he deposited the fraudulent checks is located in Florida, the balance of relevant conduct and personnel were situated here.  As such, there are sufficient contacts with this District to provide for venue.

## IV.   Rule 33 Motion

As an alternative to his Rule 29 motion for judgment of acquittal, Teman argues that this Court should grant him a new trial under Rule 33.  In addition to the grounds reviewed above, he seeks this relief on three grounds: (1) that the Government allegedly violated Federal Rule of Evidence 615, *i.e.*, the rule of sequestration; (2) that the Court erred in excluding testimony from his proposed expert witness; and (3) that an alternate juror purportedly lied during *voir dire*.[30]  The Court addresses these new arguments in turn.

---

[30] Teman also incorporates his Rule 29 arguments in his Rule 33 motion.  For the same reasons reviewed in connection with the Rule 29 motion, the Court denies the Rule 33 motions based on these arguments.

A.      **Rule of Sequestration**

1.      **Pertinent Background**

On January 22, 2020, after the jury was selected, Teman invoked his rights under Federal

Rule of Evidence 615, the rule of sequestration, to exclude witnesses from the courtroom.  Trial

Tr. at 154.  Defense counsel explained that he was requesting that "when a potential witness has

yet to testify, . . . they can't sit in the room to hear other witnesses, or opening statements, or

something of that nature."  *Id.*  The Government made a parallel application as to Teman's

witnesses.  *Id.*  The Court granted the applications.  *See id.*  The Court allowed Detective

Alessandrino, the lead agent on the case and a potential witness, to remain at the Government's

table as a party agent.  *Id.* (citing Rule 615).

On the afternoon of January 23, 2020, the jury was dismissed for the day while Joseph

Soleimani, the ABJ representative, was still on direct examination.  *See id.* at 514–15.  In the

post-trial conference, the Government indicated that it could rest the next morning.  *Id.* at 518.

As a result, the Court sought a non-binding indication whether defense counsel planned to call

any witnesses and invited but did not require defense counsel to respond.  *Id.*  Defense counsel

stated that, depending on Soleimani's responses on cross examination, he would consider calling

two NYPD detectives, including Detective Alessandrino.  *Id.* at 519.  According to defense

counsel, the other NYPD detective had taken statements from Soleimani, as reflected in the

police report, regarding ABJ's total loss resulting from Teman's scheme.  *Id.*  Specifically,

defense counsel represented that Soleimani originally told the NYPD detective that ABJ had not

authorized $180,000 in checks, but the evidence at trial established that ABJ's JPMorgan

account had been credited $196,000.  *Id.*  Defense counsel suggested that based on this

discrepancy between these sums, the jury could infer that some of the checks had, in fact, been

authorized by Soleimani.  *See id.* at 520–21.

68

The next morning, defense counsel alerted the Court to a phone call between the Government, Detective Alessandrino, and Soleimani that had taken place the night before, during which the Government "fronted, disclosed our potential cross-examination" on the discrepancy in loss amounts founded in Soleimani's statement, and "stole[] our thunder" as to that line of questioning. *See id.* at 537–38. Defense counsel alleged that the Government had violated the rule of sequestration by having this conversation with Soleimani while he was still on direct examination. *Id.* at 538. The Government responded that its communications with the witness were appropriate and designed "in part so that [the Government] could give the Court and the parties some more information about possible prior inconsistent statements" on Soleimani's part that might be claimed at trial. *Id.* The Government also disputed the existence of an inconsistent statement in the first instance, noting that Soleimani had never pinned himself down to a number when he initially reported the loss amount to the police and that it was merely a "ballpark estimate." *See id.* at 539. The Court rejected Teman's demand that Soleimani's witness's testimony be stricken in its entirety, finding the Government's interaction with the witness proper, and the defense's proposed area of potential impeachment, while permitted, "tertiary at best." *Id.*

### 2. Applicable Legal Principles

Rule 615 authorizes the trial court, at the request of a party or *sua sponte*, to "order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. The Rule "codified a well-established common law tradition of sequestering witnesses as a means of discouraging and exposing fabrication, inaccuracy, and collusion." *United States v. Jackson*, 60 F.3d 128, 133 (2d Cir. 1995) (internal quotation marks and citation omitted). By restraining witnesses' ability to "'tailor[]' their testimony to that of earlier witnesses," the rule "aids in

69

detecting testimony that is less than candid," thus promoting the truth-seeking function of trial. *See id.* (citing *Geders v. United States*, 425 U.S. 80, 87 (1976)).

Under Rule 615, sequestration is a matter "of right"—when a party requests sequestration, the court must allow for it. *Id.* at 134 (Fed. R. Evid. 615 advisory committee's note to 1972 amendments). "However, this general rule has an exception for a witness who is 'an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney.'" *United States v. Lee*, 834 F.3d 145, 162 (2d Cir. 2016) (citing Fed. R. Evid. 615(b)). The court has discretion, under this exception, "to exempt the government's chief investigative agent from sequestration." *United States v. Rivera*, 971 F.2d 876, 889 (2d Cir. 1992); *see also Jackson*, 60 F.3d at 147 ("[T]he exclusion of a single agent from sequestration does not generally constitute error under Rule 615."); *Rivera*, 971 F.2d at 889 ("[I]t is well settled that such an exemption is proper under Rule 615[(b)], deeming the agent-witness a 'representative' of the government."); *United States v. Pellegrino*, 470 F.2d 1205, 1208 (2d Cir. 1972) ("Since the chief investigating agent may be of significant help to the prosecution during the course of a trial, the trial court has discretion to make an exception to the general rule of sequestration of witnesses in his case.").

"While the purpose of [Rule 615] is apparent, its purview is not." *United States v. Solorio*, 337 F.3d 580, 592 (6th Cir. 2003) (quoting Charles Alan Wright & Victor James Gold, 29 Federal Practice and Procedure § 6243, at 61 (1997)). Some circuits have found or suggested that Rule 615 may preclude out-of-court communication between witnesses during trial revealing developments at trial. *See, e.g.*, *United States v. McMahon*, 104 F.3d 638, 644 (4th Cir. 1997) (district court did not err by finding that defendant's father, knowing that he was barred from the courtroom, had violated sequestration order by having secretary take notes on others' testimony);

*Milanovich v. United States*, 275 F.2d 716, 720 (4th Cir. 1960), *rev'd in part on other grounds*, 365 U.S. 551 (1961) ("We wish to indicate our view, however, that ordinarily, when a judge exercises his discretion to exclude witnesses from the courtroom, it would seem proper for him to take the further step of making the exclusion effective to accomplish the desired result of preventing the witnesses from comparing the testimony they are about to give."); *United States v. Greene*, 293 F.3d 886, 892 (5th Cir. 2002) (district court's failure to instruct government witnesses, who were housed together, not to discuss case violated Rule 615); *United States v. Womack*, 654 F.2d 1034, 1041 (5th Cir. 1981) (assuming, without explicitly deciding, that Rule 615 was violated when parties invoked Rule 615, trial court did not instruct witnesses not to discuss the case, and two government witnesses admitted communicating about testimony while sequestered); *United States v. Prichard*, 781 F.2d 179, 183 (10th Cir. 1986) (district court erred in finding that Rule 615 requires only that witnesses be excluded from courtroom); *United States v. Johnston*, 578 F.2d 1352, 1355 (10th Cir. 1978) (trial court should instruct, upon invocation of Rule 615, that "witnesses are not only excluded from the courtroom but also that they are not to relate to other witnesses what their testimony has been and what occurred in the courtroom"); *United States v. Lattimore*, 902 F.2d 902, 903 (11th Cir. 1990) (parties agreed that sequestration order was violated when government witnesses discussed their testimony).[31]

---

[31] While circuits apply different tests to assess whether the party seeking sequestration was prejudiced, *see Jackson*, 60 F.3d at 136, the circuits have not automatically required that the violating witness's testimony be excluded or that a verdict be overturned, even when there were violative out-of-court communications between witnesses. *See United States v. Cortina*, 73 F.3d 359, 1996 WL 1792, at *4 (4th Cir. 1996) (table) ("When an out-of-court violation is brought to the attention of the trial court, the court's decision to declare a mistrial, to exclude witness testimony, to hold responsible parties in contempt, or to let the trial proceed unabated is reviewed for abuse of discretion."); *see also, e.g.*, *Womack*, 654 F.2d at 1040 ("The determination whether to declare a mistrial or to order a new trial for violation of Rule 615 is a matter within the trial court's sound discretion."); *Prichard*, 781 F.2d at 183–84 (no abuse of

Other circuits have declined to find that Rule 615 prohibits out-of-court communication, while acknowledging that trial judges have substantial discretion to fashion orders that govern witness interactions beyond the walls of the courtroom.  *See, e.g.*, *United States v. Sepulveda*, 15 F.3d 1161, 1175–76 (1st Cir. 1993) (observing that "while the common law supported sequestration beyond the courtroom," "Rule 615 contemplates a smaller reserve; by its terms, courts must 'order witnesses excluded' only from the courtroom proper" (citation omitted)); *United States v. De Jongh*, 937 F.2d 1, 2–3 (1st Cir. 1991) (no error where district court declined to strike witness testimony or declare mistrial when witness met with prosecutor before cross examination, and observing that "the district court possesses considerable discretion to make prophylactic orders designed to curb possible trial abuses, 'includ[ing] broad power to sequester witnesses before, during, and after their testimony'" (quoting *Geders*, 425 U.S. at 87)); *United States v. Solorio*, 337 F.3d 580, 592–94 (6th Cir. 2003) (noting that Sixth Circuit has not explicitly resolved whether Rule 615 precludes witness communication outside of the courtroom, but, even assuming rule was violated by such communications, finding no abuse of discretion where district court declined to exclude or strike witness's testimony); *United States v. Kindle*, 925 F.2d 272, 276 (8th Cir. 1991) (no abuse of discretion in district court declining to declare mistrial where case agents communicated with sequestered witnesses, observing that "[t]he

_____

discretion in denying new trial and declining to conduct evidentiary hearing regarding violating witnesses' discussions); *Johnston*, 578 F.2d at 1355–56 (no abuse of discretion in declining to exclude violating witness's testimony); *Lattimore*, 902 F.2d at 903–04 (observing that "[t]he law in this Circuit is settled, however, that the '[t]he district court's denial of a mistrial for violation of the sequestration rule is . . . a matter of discretion, and reversible only on a showing of prejudice,'" and finding no abuse of discretion in denying mistrial (citation omitted)); *cf. United States v. Holder*, 150 U.S. 91, 92 (1893) ("If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground, merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.").

record does not indicate that the trial court's sequestration order prohibited agent-witness contact and such order need not do so to meet the requirements of Rule 615").

The Second Circuit has not weighed in explicitly on the breadth of Rule 615.[32]  Some courts in this District, however, have held that Rule 615 does not apply more broadly than its plain terms, *i.e.*, to exclude witnesses from the courtroom so they cannot hear the testimony of other witnesses.  *See United States v. Ianniello*, 740 F. Supp. 171, 189–90 (S.D.N.Y. 1990)[33] ("[T]he Court does not believe that Rule 615 F[ed]. R. Evid. should be extended beyond its plain meaning. Obviously[,] any witness can be examined or cross-examined as to his or her credibility as to any transcripts, etc. which may have been read prior to testifying.  Such prior activity at most affects the weight of testimony rather than its admissibility." (internal citation omitted)); *United States v. Feola*, 651 F. Supp. 1068, 1130 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) ("Rule 615 only requires that witnesses be excluded 'so that they cannot hear the testimony of other witnesses[.]'  The witnesses need not be sequestered during pretrial proceedings, or after their testimony; they can speak freely to anybody and if they do so, may be cross-examined with respect thereto insofar as may relate to bias or credibility." (internal citation omitted)).

"The burden to demonstrate lack of prejudice, or harmless error" from a Rule 615 violation "falls on the party that had opposed sequestration."  *Jackson*, 60 F.3d at 136.  In other words, a Rule 615 violation, if found, is presumptively prejudicial, and "a new trial is in order

---

[32] In *United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988), the Circuit observed that witnesses' reading of trial transcripts "*may* violate an order excluding witnesses issued by a district court under Rule 615." *Id.* at 568 (emphasis added).  However, the Circuit there noted that "[t]he decision whether or not to exclude testimony . . . is within the sound discretion of the trial judge," and affirmed the district court's decision refusing to do so.  *Id.* at 568–69.

[33] *Ianniello* has a long and complex subsequent history, none of which is relevant here.

73

unless it is manifestly clear from the record that the error was harmless or unless the prosecution proves harmless error by a preponderance of the evidence." *Id.* at 137 (internal quotation marks and citations omitted).

### 3.    Application

Teman's Rule 615 argument is two-fold.  First, he contends the Government violated Rule 615 by speaking with Soleimani—in a conversation that included its case agent, a potential witness—about potential cross-examination topics while Soleimani remained on direct examination.  Teman Mem. at 28–29; Teman Reply at 15–16.  Second, anticipating a formalistic view of Rule 615 that requires only that prospective witnesses leave the courtroom while others are testifying, Teman invokes, and asks this Court to embrace, a broader interpretation of the rule that restricts witness communication of any kind (including outside of the courtroom) for the duration of trial.  *See* Teman Mem. at 26–28.  He contends that the Government's conduct here warrants a new trial.

Teman's sequestration argument fails for several reasons.  First, as Teman acknowledges, the Second Circuit has not held that Rule 615 extends beyond the courtroom to preclude out-of-court communications between witnesses during trial.  And, as other courts in this District have observed, *see Ianniello*, 740 F. Supp. at 189–90; *Feola*, 651 F. Supp. at 1130, the plain text of Rule 615 provides that witnesses must be sequestered *from the courtroom* so as not to hear the testimony of other witnesses, *see* Fed. R. Evid. 615.  Second, although the Court had the discretion to fashion sequestration orders that sweep more broadly than the Rule's text requires, it did not do so here (nor was it asked to).  Instead, the Court granted defense counsel's one application: to exclude witnesses from the courtroom.  *See* Trial Tr. at 154.  As a result, the conduct here—in which the Government and its agent, outside of court, communicated with

Soleimani while on direct examination—did not violate either the text of the rule or the Court's sequestration order.

For avoidance of doubt, Teman's argument would fail even if this Court had adopted the broader construction of Rule 615 that other circuits have, to varying degrees, embraced. This is so for two reasons.

First, most of the cases that Teman cites concern a different issue: communication between *witnesses*. *See McMahon*, 104 F.3d at 644; *Prichard*, 781 F.2d at 183; *Johnston*, 578 F.2d at 1354–55.[34] But the communications here were between Government counsel and the witness then testifying. Teman therefore urges an expansive construction under which Rule 615 would prohibit a witness from speaking to *anyone* about the case for the duration of the trial. *See* Teman Mem. at 26; Teman Reply at 15. The Court declines to embrace such a broad construction of the rule, and is unaware of any authority supporting such a construction.

Second, Detective Alessandrino's presence on the call does not alter this outcome. It is customary for the Government to have its case agent present for interviews with fact witnesses. Such helps avoid the potential need to call an advocate as a witness where the content of the interview emerges as a trial issue. Here, as the Government explained to the Court, the purpose of the call was the familiar one in which trial counsel alerts a witness to possible inconsistencies in his testimony so as to prepare for cross examination. It was not to facilitate dialogue between

---

[34] Teman also relies heavily on dicta in *Perry v. Leeke*, 488 U.S. 272 (1989), which states that "nondiscussion orders are a corollary of the broader rule that witnesses may be sequestered to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say, and to increase the likelihood that they will confine themselves to truthful statements based on their own recollections." *Id.* at 281–82. That case is also inapposite, as it did not focus on whether Rule 615 forbids out-of-court communications between witnesses. Instead, it held that while a defendant is testifying, he does not have a constitutional right to discuss that testimony with his lawyer. *Id.* at 284. In its explanation, the Court further clarified that it was not holding that trial courts must forbid such consultation between defendants and their counsel. *Id.*

Soleimani and Alessandrino.  And Alessandrino's status as lead case agent, and the Court's explicit ruling that he could remain in the courtroom under Rule 615(b), exempted him from sequestration under the rule.  *See Rivera*, 971 F.2d at 889 (explaining that government's lead agent may be exempted from sequestration requirement at court's discretion); *see also* Fed. R. Evid. 615(b) (exempting from sequestration "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); Notes of Committee on the Judiciary, Senate Report No. 93-1277 (lead case agents fit into this Rule 615 exception).

To the extent that Teman's sequestration concern is related to the testimony that might have occurred had Teman called the second NYPD agent, there was no violation of Rule 615. That detective was not present when the Government inquired of Soleimani about his prior statement.  Teman's regret that the Government in witness preparation alerted Soleimani as to what a potential defense witness (the unnamed NYPD officer) might have said later at trial is not a concern of Rule 615, and the defense did not ask—as a condition of previewing its potential case—that the Government be ordered not to follow up with Soleimani.  This case is thus a far cry from ones in which a party challenges a district court's refusal to grant a timely request to sequester a witness.  *See, e.g.*, *Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 762 (2d Cir. 1998).  Here, Teman's counsel was at liberty not to answer the Court's inquiry as to its anticipated witnesses for the next day or to preview such witnesses' testimony.  Counsel was also at liberty to ask the Court to order the Government not to use the defense's preview as a basis for discussion with Soleimani.  Having not done so, defense counsel cannot claim a violation of any rule or order when the Government, as part of its preparation of Soleimani for cross examination, inquired into this area.

Finally, even assuming *arguendo* that this Court erred by not *sua sponte* precluding communication between the Government and Soleimani on the topic fronted by the defense, the Court was well within its discretion not to exclude Soleimani's testimony. *See Friedman*, 854 F.2d at 568. And any such error surely did not bring about the "manifest injustice" required under Rule 33. *See Ferguson*, 246 F.3d at 134. Examining the entire case and considering all the facts and circumstances, the error falls far from raising a real "concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. As the Court noted when defense counsel raised the issue, the anticipated line of questioning whether $180,000 or $196,000 of the checks drawn by Teman on Soleimani's business's account were unauthorized was of trifling significance. *See, e.g.*, Trial Tr. at 520 (expressing "confusion as to what the purpose is" given that the alleged inconsistency of Soleimani's statement to law enforcement was unclear on its face); *id.* at 539 (finding "the whole area of potential impeachment elusive"); *id.* at 541 (referring to the disputed line of questioning as "exceedingly tangential"). And, as reviewed above, there was broad-ranging evidence that all three Customers disputed having authorized the fees in question, and there was no affirmative evidence (testimony or writings) that any such witness had done so. Teman's argument at trial instead was that GateGuard's Terms and Conditions and Payment Terms authorized him to draw such checks. And nothing prevented the defense, in its case, from calling the NYPD witness to offer testimony if the defense believed it afforded meaningful impeachment value. The Government was within its rights to inquire of Soleimani about this subject during the ensuing part of his testimony by introducing impeaching statements on direct examination. *See United States v. Ewings*, 936 F.2d 903, 909 (7th Cir. 1991) (fronting potential impeachment material on direct examination is a "time-honored trial tactic"); *see also United States v. Livingston*, 816 F.2d 184, 191 (5th Cir.1987) (permitting introduction of

impeaching statements in direct testimony).  Notwithstanding Teman's annoyance that the Government, tipped off by counsel's preview in open court as to a forthcoming line of examination, had "stolen [defense counsel's] thunder," such was neither improper nor by any measure an "extraordinary circumstance" that would warrant a new trial.  *See Ferguson*, 246 F.3d at 134 (citation omitted).

The Court therefore denies Teman's Rule 33 motion on the ground that communication between the Government, Detective Alessandrino, and Soleimani does not warrant a new trial.

### B.    Teman's Proposed Expert Witness

#### 1.    Pertinent Background

On January 5, 2020, Teman notified the Government that he intended to call J. Benjamin Davis, a lawyer in the financial services industry with experience in check negotiation issues, as an expert.  *See* Teman Expert Notice.  Teman forecast that Davis would testify about what constitutes a "remotely created check" and a "counterfeit" check, and to opine that the checks at issue were "valid RCCs" and not counterfeit.  *See id.* at 2–4.  This testimony, he predicted, would include Davis's opinion that the RCCs complied with the Retail Payment Systems Booklet of the Federal Financial Institutions Examination Council's IT Examination Handbook's definition of an RCC and the Federal Reserve Board's regulations governing RCCs, and that the RCCs were properly drawn on the Customers' account pursuant to the Payment Terms.  *Id.* at 3–4.  It also would include the treatment of counterfeit or forged checks by the Uniform Commercial Code.  *See id.* at 2.  On January 8, 2020, the Government moved *in limine* to preclude Davis's testimony.  Dkt. 74.  It argued that his testimony was irrelevant, usurped the Court's role in instructing the jury, and lacked reliability.  *See id.* at 3–5.  Teman opposed that motion.  Dkt. 77.

On January 10, 2020, in an extended bench ruling, the Court excluded Davis's testimony. *See* MIL Tr. at 32–37. First, it found that Davis's testimony was irrelevant, explaining that the crux of the case was whether Teman acted with fraudulent intent in depositing the checks, not whether the checks complied with regulations governing RCCs or failed to meet a technical definition of "counterfeit." *See id.* at 32–35. Second, the Court held that even if the testimony was nominally relevant, its probative value was outweighed by countervailing risks under Federal Rule of Evidence 403, including the risk of confusing the jury. *Id.* at 34, 36. Finally, the Court held that Davis's testimony about the legality of the checks Teman had created would invade the Court's province of instructing the jury. *See id.* at 34.

In its decision on the motion *in limine*, the Court, however, did note the importance, to the defense, of explaining to the jury that a check may lawfully be created remotely by a person other than the accountholder and thereupon negotiated, *i.e.*, that Teman's creation of a check on another person's account was not itself impermissible. *Id.* To that end, the Court invited the parties to file a proposed joint jury instruction on the topic of RCCs. *Id.* On January 15, 2020, the parties, unable to agree on one instruction, each filed their own proposed instructions. Dkt. 80 at 1–2. On January 21, 2020, the Court, having reviewed the parties' proposals, suggested the following instruction, drawing upon the parties' alternative suggestions:

> You have heard reference to something called a remotely created check, also known for short as an RCC. A remotely created check is a check that is not created by the paying bank and that does not bear a signature [to be] applied or purported to be applied by the person on whose account the check is drawn.
>
> I instruct you that the banking laws in this country do permit the use of remotely created checks under certain circumstances, provided, of course, that the customer on whose account the check is drawn has authorized the check. However, this case does not involve whether or not the checks in question here meet the technical definition of a remotely created check, and you should not concern yourself with that.

> The question for you will be whether or not the government has proven beyond a
> reasonable doubt the elements of the offenses charged, which, again, are bank fraud
> and wire fraud.  I will instruct you on the elements of those offenses later in the
> trial, after all of the evidence has been received.

Trial Tr. at 17.  Neither party objected to the instruction.  *Id.* at 18.

On January 22, 2020, during the testimony of Finocchiaro, the senior fraud investigator at

Bank of America, the Court gave that instruction.  *Id.* at 229–30.

## 2.    Discussion

Teman argues that the Court erred in excluding Davis's proposed expert testimony.  *See*

Teman Mem. at 29–31; Teman Reply at 17–18.  He contends that this testimony was relevant to

the issue of whether the checks were counterfeit checks or RCCs, and that Davis's opinion that

RCCs may be authorized by contract without subsequent authorization for each check was

relevant to whether the Customers here had authorized Teman through their contracts with

GateGuard.  Teman Mem. at 29; Teman Reply at 17–18.  Teman also argues that Davis's

testimony would not have usurped the Court's role in instructing the jury, as testimony is not

objectionable simply because it embraces the ultimate issue.  Teman Mem. at 30.  Finally,

Teman contends that exclusion of Davis's testimony violated the Due Process Clause, because he

had a right to present a complete defense—including a defense that the alleged RCCs were not

"counterfeit" checks.  Teman Mem. at 31; Teman Reply at 17–18.  The Court rejects this

argument.

The Court properly excluded Davis's testimony as irrelevant.  The question in this case

was whether the Government had proved beyond a reasonable doubt that Teman was guilty of

bank fraud and wire fraud.  Both crimes involved Teman's scheme to defraud both the drawee

and depository banks, by misleading the banks to believe that he had authority to deposit the

checks at issue, drawn on the Customers' accounts, into an account associated with him.

80

Whether these checks were technically not counterfeit checks by Davis's measure or whether they complied with regulations governing RCCs had no bearing on the jury's charge of determining whether the elements of these offenses, including whether Teman acted with intent to defraud, had been established beyond a reasonable doubt. *Cf., e.g.*, *Rigas*, 490 F.3d at 220–21 (even where indictment referenced Generally Accepted Accounting Principles ("GAAP"), government was not required to present expert testimony on GAAP's requirements because "[e]ven if Defendants complied with GAAP, a jury could have found, as the jury did here, that Defendants intentionally misled investors"). That such testimony was irrelevant is all the clearer given the Court's ruling, *see supra* pp. 17, 24–33, that the term "counterfeit" as used in the Indictment's to wit clauses did not carry a technical meaning including Davis's, but instead referred to unauthorized checks, a subject not requiring expert testimony.

Reinforcing this ruling is Federal Rule of Evidence 702's requirement that the Court exclude expert testimony that is not helpful to the jury. *See* Fed. R. Evid. 702(a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue"). "An opinion is unhelpful and therefore may not be received in evidence if . . . the testimony 'would merely tell the jury what result to reach.'" *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (quoting *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992)). Davis's testimony would have done just that. As previewed by Teman, Davis would have told the jury that these checks were not counterfeit, were valid RCCs, and that the Payment Terms authorized Teman to create and negotiate the RCCs. *See* Teman Expert Notice at 2–4. Such testimony would not have been helpful. As the Court explained in its pretrial ruling, the central question for the jury was whether Teman, as he represented to the banks, was authorized by the accountholder to deposit the checks. *See* MIL Tr. at 33, 35–36. Davis's testimony giving

definitions of RCCs and counterfeit checks had no bearing on this point. *Id.* And his opinion about the import of the Payment Terms had no bearing on Teman's intent and was not a proper area for expert testimony. The Court further held Davis's testimony inadmissible under Rule 403, on the grounds that even if that testimony had some minimal probative value, it was far outweighed by the capacity of Davis's opinions to confuse the jury as to the issues at hand. *See id.* at 34, 36. The Court reaffirms those aspects of its pretrial ruling as clearly correct.

Finally, the Court also properly excluded Davis's testimony as usurping its role in instructing the jury on the law. *See id.* at 34. "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (even in complex securities cases where expert testimony is needed, "[i]ts use must be carefully circumscribed to assure that the expert does not usurp . . . the role of the trial judge in instructing the jury as to the applicable law"); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (excluding expert testimony because it was "calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law'" (quoting *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983)). Davis planned to define both counterfeit checks and RCCs for the jury; to explain the implications under the Uniform Commercial Code for paying counterfeit and forged checks; and to opine about what constitutes a valid RCC under federal regulations. Teman Expert Notice at 2–3. Such testimony about quintessential legal rules would have invaded the Court's role.

Instead, the Court itself instructed the jury on the relevant point about RCCs of importance to the defense—that RCCs are valid where accountholder-authorized. *See* Trial Tr. at 229–30. This instruction, given with defense approval, advised the jury, correctly, that its

assignment was not to focus on technical aspects of RCCs, but instead on whether the elements

of bank and wire fraud had been established.  *Id.*  This practical and informative instruction

guarded against juror confusion and minimized the prejudice Teman might otherwise have

experienced had the jury mistakenly viewed RCCs as inherently impermissible or a red flag of

criminality, or viewed his guilt or innocence as turning on compliance with technical regulations

regarding RCCs.  The instruction fully allowed Teman to put on his defense and advocate to the

jury that he had deposited RCCs with, or believing that he had, the authorization of the

accountholders.  *See, e.g.*, *id.* at 176–77 (defense opening); *id.* at 1013–16 (defense closing).

Accordingly, the Court denies Teman's Rule 33 motion based on the exclusion of

Teman's proposed expert, Davis.

### C.      Alleged Alternate Juror Dishonesty in *Voir Dire*

The Court next considers Teman's Rule 33 motion based on an alternate juror's alleged

failure to disclose certain information during voir dire.

#### 1.      Applicable Legal Principles

"A juror's dishonesty during voir dire undermines a defendant's right to a fair trial."

*United States v. Daugerdas*, 867 F. Supp. 2d 445, 468 (S.D.N.Y. 2012) (citing *Clark v. United

States,* 289 U.S. 1, 11 (1933)), *vacated on other grounds sub nom. United States v. Parse*,

789 F.3d 83 (2d Cir. 2015.  The Supreme Court has articulated a two-part test to determine

whether a defendant's allegation of juror dishonesty during the jury selection process warrants

relief under Rule 33:  "[A] party must first demonstrate that a juror failed to answer honestly a

material question on *voir dire*, and then further show that a correct response would have

provided a valid basis for a challenge for cause."  *McDonough Power Equipment, Inc. v.

Greenwood*, 464 U.S. 548, 556 (1984); *see also United States v. Stewart*, 433 F.3d 273, 303

(2d Cir. 2006).  It further cautioned that while "[t]he motives for concealing information may

vary, . . . only those reasons that affect a juror's impartiality can truly be said to affect the

fairness of a trial." *McDonough*, 464 U.S. at 556.

The Second Circuit has only on rare occasions overturned a verdict or remanded for an

evidentiary hearing based on the alleged failure of a juror—let alone that of an *alternate* juror—

to disclose information. *Stewart*, 433 F.3d at 303; *see Parse*, 789 F.3d at 87–90, 111, 120

(remanding for new trial where juror lied about her personal background, her career as an

attorney, her prior litigation experience, a disciplinary investigation of her by a state licensing

authority, and her criminal history during *voir dire*, and subsequently "confessed that she

purposefully lied and omitted material information in her *voir dire* testimony to make herself

more 'marketable' as a juror"); *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989)

(remanding for evidentiary hearing where a sworn affidavit by an alternate juror reflected that a

juror lied about her brother-in-law's role as a government attorney because she wanted to serve

on the case). A post-trial inquiry into alleged jury misconduct requires that a party come forward

with "clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative

impropriety has occurred[.]" *See United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989)

(alterations in original) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)).

The viability of a Rule 33 motion based on an alleged *voir dire* error is also time-

sensitive: "[I]f the defendant knew prior to the end of trial that a prospective juror had given

false voir dire responses and did not then reveal the disqualifying falsehoods or nondisclosures to

the court, the 'interest of justice,' Fed. R. Crim P. 33(a), generally will not require a new trial."

*Parse*, 789 F.3d at 109–10 (2d Cir. 2015); *see id.* at 109 ("[A] motion for a new trial based on a

claim of newly discovered evidence generally should not be granted unless, *inter alia*, the

evidence was in fact newly discovered after trial, and facts are alleged from which the court can

infer the exercise of due diligence on the part of the movant to obtain the evidence prior to the end of trial.").

### 2.    Application

In his opening memorandum of law, Teman declared that he is entitled to a new trial "because an alternate juror lied during *voir dire*, depriving [him] of his constitutional right to a fair trial." Teman Mem. at 31. Specifically, Teman alleged that Juror #13 (1) initiated contact with Teman via LinkedIn before trial and failed to disclose this contact when asked under oath whether he knew the defendant; and (2) "appears to be a direct business competitor of Teman/GateGuard—at a minimum requiring further inquiry by the Court on this issue." *Id.* Teman abandoned this claim in his reply. To the extent that Teman still means to pursue this claim, the Court finds Teman's allegations regarding the alternate juror insufficient to justify a new trial under Rule 33.

At the outset, Teman provides no support whatsoever for the claim that the alternate juror in question reached out to Teman via social media prior to trial. Notably, the Government, in its opposition, pointed out that Teman's allegation was "[w]ithout any support or specifics." Gov. Mem. at 37. Teman did not fill that void. Despite having the opportunity to provide such support in his reply brief, which he sought leave to file, Teman did not support this contention and abandoned the juror-misconduct argument. Because his "evidence" on this point is limited to allegations in his initial memorandum of law and is not contained within a sworn affidavit, this Court is not at liberty to consider it. *See Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (a "memorandum of law . . . is not evidence at all").

Even if Teman's factual allegations had been substantiated in a sworn affidavit, his Rule 33 motion would still fail for three independent reasons.

85

First, Teman's allegations do not provide a basis for inferring the kind of misconduct that would warrant a new trial. Teman's statement in his memorandum of law about some form of LinkedIn communication does not allege that Juror #13 failed to "answer honestly a material question on *voir dire*" or that "a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.

Second, Juror #13 was an *alternate* juror, not a deliberating juror. Even if the Court found that the alternate had lied in *voir dire* and that a truthful answer would have warranted excusing the juror for-cause, Juror #13's presence had no effect on the verdict. Striking Juror #13 would not have "altered the composition of the jury *that actually deliberated and reached the verdicts* against the Defendant in this case." *United States v. Lawrence*, 477 F. Supp. 2d 864, 875 (S.D. Ohio 2006) (emphasis in original) (considering alternate juror's false statements about relationship with law enforcement during *voir dire* and holding that even if court had struck that juror for cause, defendant's right to impartial jury was not violated because, at most, that juror would have been replaced by another alternate), *vacated in part*, 555 F.3d 254 (6th Cir. 2009), *and aff'd in part*, 735 F.3d 385 (6th Cir. 2013). Teman does not present evidence, or even allege, that Juror #13 in some fashion influenced the deliberating jurors. *Cf. United States v. Hill*, 643 F.3d 807, 836 (11th Cir. 2011) (finding that defendant "[could not] prove that he was prejudiced by the district court's failure to exclude [allegedly biased juror] because [she] was an alternate juror who never participated in the jury's deliberations"); *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) (affirming district court's decision not to investigate alternate juror's potential influence on jury, observing that alternate was separated from jury once deliberations began). Teman's gripe that Juror #13 denied him "access to accurate and honest information when exercising his peremptory strikes and when given the opportunity to

strike jurors for cause," *see* Teman Mem. at 33, does not articulate a concrete injury to him, let alone describe a "miscarriage of justice" meriting a new trial. *Sanchez*, 969 F.2d at 1413.

Third, Teman fails to indicate when or how he became aware of the alternate juror's purported dishonesty. *See* Teman Mem. at 32–33. Absent evidence on this point, the Court cannot find that Teman's allegation about Juror #13 was "new" evidence that could justify a new trial. *See Parse,* 789 F.3d at 109–10. To grant Teman a new trial based on information regarding a juror that may have been available to him prior to the verdict would "transform a tactical decision to withhold the information from the court's attention into a trump card to be played only if . . . expedient." *See United States v. Diaz-Albertini*, 772 F.2d 654, 657 (10th Cir. 1985). This Circuit prohibits such strategic behavior. *See United States v. Ragland*, 375 F.2d 471, 475 (2d Cir. 1967) ("To give an accused a second trial each time he doubts, after an unfavorable verdict, the objectivity of jurors, would seriously impede the process of justice.").

Accordingly, the Court dismisses this potential basis for post-trial relief.

## V.   *Brady* Motion

Finally, the Court addresses Teman's second post-trial motion, seeking a new trial as a result of the Government's alleged withholding of *Brady*, *Giglio*, and Jencks Act evidence.

### A.   Pertinent Background

On January 19, 2020, two days before trial was scheduled to begin, the Government filed a motion *in limine*, seeking to preclude potential lines of cross examination as to two Government witnesses: Joseph Soleimani, an ABJ principal, and Elie Gabay, a 518 West 204 LLC principal. Dkt. 83. Specifically, the Government requested that the Court bar questioning about actions filed against them and their landlord companies by tenants. *Id.* at 1. As to Soleimani, the Government flagged one incident in particular—a fine imposed by the New York City Housing Court for "harassing" a tenant, as defined under New York City Administrative

Code § 27-2004(48)(f-2) ("Housing Court Case"), *see* Dkt. 83-1 ("Housing Court Order")—and noted that he had appeared on the New York City Public Advocate's annual "Worst Landlords Watchlist." Dkt. 83 at 2. As to Gabay, the Government noted that his management company, Coney Management, had been ordered to repay a tenant for an overcharge in rent, along with "treble damages" ("Rent Charge Case"). *Id.* at 2–3. The Government stated that "there is no indication that any landlord-tenant complaints or lawsuits against Soleimani, Gabay, or their companies" bore on their character for truthfulness. *Id.* at 3. Teman opposed the motion.

On January 21, 2020, the Court addressed this motion in a bench ruling. *See* Trial Tr. at 22–31. At the outset, the Court noted that none of the alleged improprieties of Soleimani or Gabay had any relation to their dealings with Teman. Instead, these could be admitted only if they bore on these witnesses' character for truthfulness. *Id.* at 25. The Court excluded, with one exception, all of the evidence as to Soleimani and Gabay, as irrelevant and unduly prejudicial. *See id.* at 26–27, 30–31.

The exception was related to Soleimani's Housing Court Case. *See id.* at 27. In that case, ABJ had been fined for misleading a tenant to believe that his rent-controlled lease might not be renewed if he did not leave his apartment in exchange for monetary payment. *See id.* at 27–28. The Housing Court found that this was an "empty threat," given the tenant's rent stabilized apartment. *See* Housing Court Order at 4. The Housing Court opinion, this Court noted, did not disclose whether Soleimani personally was the ABJ employee who misled the tenant. Trial Tr. at 28. The Court held that if Soleimani was, then it would "permit the defense at this trial, as a means of impeachment, to establish through a single question or two put to Soleimani that a judge found that in 2017, he had misled a tenant to believe wrongly that his lease could not be renewed." *Id.* at 28–29. The Court, however, made clear that it would not

permit a "more extended inquiry into this matter," or "extrinsic evidence" relating to it.  *Id.* at 29.

The Court stated that "a targeted leading question that elicits from Soleimani the fact of this

discrete finding by a judge that he misled a tenant on this subject would assist the jury to assess

Soleimani's credibility without turning this proceeding into a trial within a trial about the

episode."  *Id.*  It concluded:

> The bottom line is that, at most, a single question or two about the housing court
> finding of misleading a tenant may be put to the witness; and then, only upon
> confirmation that [the Housing Court] opinion was referencing ABJ personnel that
> included Soleimani personally.   Otherwise, Soleimani's conduct as a landlord,
> including court actions and complaints and statements by the New York Public
> Advocate, is excluded under Rule 403.

*Id.* at 30.

The Court then instructed the Government to "inquire of Soleimani whether there was

evidence . . . that he was among the ABJ personnel who dealt with [the tenant]."  *Id.* at 29.  It

went on:

> If his answer leaves any doubt in your mind, you need to follow up and do so
> immediately.   Then promptly report back to the Court and the defense.   I expect
> that if the answer is yes, that Soleimani was among the ABJ personnel who dealt
> with [the tenant], that Soleimani will have no difficulty on the stand here answering
> yes to a question from defense counsel about whether a judge so found.  Obviously
> the government is at liberty to pull the poison and ask the question on direct as well.
> Cross-examination will then move onto other matters.

*Id.* at 29–30.  The Court cautioned that defense counsel was not to address the subject "until I

have given you the affirmative green light to do so."  *Id.* at 30.

After the ruling, the Government stated that it would ask Soleimani about the facts of the

Housing Court incident, and asked for the following clarification:  "[I]f Mr. Soleimani was not

involved in making the misrepresentations to [the tenant], then no inquiry would be made of him

on this topic."  *Id.* at 31.  The Court explained that while the precise issue was really whether

there was evidence presented to the Housing Court that Soleimani had interacted with the tenant

as to the issue of his lease renewal, it would be "safer," if Soleimani had interacted with the tenant at all, to permit one or two questions to be put to him at trial about the incident. *Id.* at 32. The Government responded, "Understood.  We'll inquire with Mr. Soleimani and we'll give an update to the Court." *Id.* at 33.

The Government thereafter never provided the Court, or apparently the defense, with an update as to Soleimani's involvement with the tenant.  Nor did the defense follow up on this point.

During Soleimani's direct examination, the Government asked him the following series of questions:

> Q.      In 2018, did the housing court find in one case that your company had misled a tenant about whether he could renew his lease?
> A.      Yes.
> Q.      And did you misrepresent anything to the tenant or was it others in your company?
> A.      It was others.
> Q.      And did you and ABJ resolve that matter?
> A.      Yes.
> Q.      And did that have anything to do with GateGuard or Mr. Teman?
> A.      No.

*Id.* at 502.  The defense did not ask any questions about the topic on cross examination or seek leave to do so.  The Government, in its opposition to Teman's *Brady* motion, explained that it had put these questions to Soleimani "out of an abundance of caution" because Soleimani had told the Government that he had been among the ABJ personnel who had interacted with the tenant.  Gov. *Brady* Mem. at 6.

After trial, Teman obtained, independent of the Government, the transcript from Soleimani's Housing Court proceeding.  *See* Teman *Brady* Mem., Ex. A ("Housing Court Tr."). In that proceeding, Soleimani testified that, among other things, he had interacted with the tenant, that both he and the tenant had signed the agreement whereby the tenant surrendered his

property, and that they were both present at that signing.  *See id.* at 56–58.  The agreement

included a provision that explained that if the tenant did not vacate the premises by a date

certain, he would be subject to eviction proceedings.  *Id.* at 56.  Soleimani further testified there

that a check had been given to the tenant and that he helped the tenant find alternative housing.

*Id.* at 60–61.

### B.  Applicable Legal Principles

#### 1.  *Brady* and *Giglio*

"The government has a duty to disclose evidence favorable to the accused when it is

material to guilt or punishment."  *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005)

(citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  To demonstrate a *Brady* violation, a

defendant must show the following three components: that (1) the evidence is "favorable to the

accused"; (2) the evidence was "suppressed by the State, either willfully or inadvertently"; and

(3) "prejudice . . . ensued" from the lack of disclosure.  *Strickler v. Greene*, 527 U.S. 263,

281–82 (1999); *accord United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).

The first component, favorable evidence, "includes not only evidence that tends to

exculpate the accused, but also evidence that is useful to impeach the credibility of a government

witness," *i.e.*, *Giglio* evidence.  *Coppa*, 267 F.3d at 139 (citing *Giglio v. United States*,

405 U.S. 150, 154 (1972)).

For the second component, a defendant must show that the Government suppressed

evidence, *i.e.*, that the Government violated its "affirmative duty to disclose favorable evidence

known to it."  *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995).  However, "the

government cannot be required to produce that which it does not control and never possessed or

inspected."  *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (quoting *United States

v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975)).  Nevertheless, a prosecutor is "presumed . . . to

have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Such imputation does not extend to all offices of government because "the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Id.* (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995)); *see also United States v. Failla*, No. 93 Cr. 00294 (CPS), 1993 WL 547419, at *4–5 (E.D.N.Y. Dec. 21, 1993) (explaining that imputation occurs where another agency "is so close that the agency in question can be considered 'an arm of the prosecutor'" (quoting *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975)). Further, a finding of suppression is not warranted where the defendant or his attorney "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *Payne*, 63 F.3d at 1208 (alteration in original) (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)). This includes evidence in the public record. *Gotti v. United States*, 622 F. Supp. 2d 87, 96 (S.D.N.Y. 2009).

Third, for a finding that the evidence was prejudicial, or material, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted) (quoting *Kyles*, 514 U.S. at 434); *see also Strickler*,

92

527 U.S. at 281 ("There is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."); *Fuentes v. T. Griffin*, 829 F.3d 233, 245–47 (2d Cir. 2016) ("[T]he *Brady* materiality 'question is *not whether* the defendant would *more likely than not* have received a different verdict with the evidence, *but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence*.'" (emphasis in original) (quoting *Kyles*, 514 U.S. at 434)).

Where impeachment evidence is at issue, such evidence generally is material when "the witness at issue supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *Payne*, 63 F.3d at 1210 (internal quotation marks and citations omitted). "In contrast, a new trial is generally not required when the testimony of the witness is 'corroborated by other testimony' or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.* (internal citations omitted); *accord United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003).

### 2.    Jencks Act

The Jencks Act, 18 U.S.C. § 3500, allows for disclosure of witness statements in criminal cases. *United States v. Shyne*, 617 F.3d 103, 106 (2d Cir. 2010). Pursuant to the Act, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in possession of the United States which relates to the subject matter to which the witness has testified." 18 U.S.C. § 3500(b). Like the *Brady* materiality requirement, the "failure to disclose . . . withheld [Jencks Act] material must be deemed harmless where there is no 'reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *United States v. Rivera*, 153 F. App'x 758, 759 (2d Cir. 2005) (quoting *United States v. Nicolapolous*, 30 F.3d 381, 383 (2d Cir. 1994)). "Reasonable probability" has the same meaning here as in the *Brady* context: It means, in this context, "a probability sufficient to undermine confidence in the outcome." *Nicolapolous*, 30 F.3d at 384 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

### C.    Application

Teman argues that the Government violated its *Brady*, *Giglio*, and Jencks Act obligations by failing to disclose the following: (1) Soleimani's personal involvement in the scheme to mislead the tenant in the Housing Court Case; (2) that the treble damages Gabay was fined in the Rent Charge Case are assigned only for willfully overcharging a tenant rent; and (3) false certification claims against Soleimani and Gabay, brought by the New York City Department of Housing Preservation and Development ("HPD"). *See* Teman *Brady* Mem. at 11–20. The Court finds that none of these warrants a new trial.

### 1.    Soleimani's Housing Court Case

Teman argues that the Government breached its *Brady* obligations with regard to Soleimani's Housing Court case because (1) the transcript of Soleimani's testimony in that case constitutes favorable impeachment evidence going to Soleimani's character for truthfulness; (2) the Government failed to comply satisfactorily with the Court's directive that it inquire into Soleimani's involvement with the tenant and report back to the Court and the defense; and (3) the failure to disclose that Soleimani had engaged with the complainant in that case prejudiced Teman because, were one to conclude that Soleimani had misled the tenant, Soleimani perjured himself at Teman's trial on this point. *See* Teman *Brady* Mem. at 11–15. The Government disagrees on all fronts. *See* Gov. *Brady* Mem. at 9–14.

As to the first *Brady* element, it is clear that the transcript of the Housing Court hearing, at which Soleimani testified, was evidence favorable to Teman.  Evidence that can be used to impeach a Government witness is favorable to the defendant.  *See Coppa*, 267 F.3d at 139.  The Government counters that the transcript lacks impeachment value because Soleimani testified at Teman's trial that "others" at his company had made misrepresentations to the tenant and because the Housing Court transcript does not undermine this testimony.  *See* Gov. *Brady* Mem. at 11–12.  That is true insofar as the transcript on its face does not reflect any misrepresentations made by Soleimani to the tenant.  But the transcript could circumstantially support this conclusion.  It reflects that Soleimani, ABJ's only witness at the Housing Court hearing, had interacted with the tenant, been present at the tenant's home during the signing of the agreement addressing the tenant's vacatur of the apartment, signed the agreement (which included a false statement that the tenant would be evicted if he did not leave by a date certain), paid the tenant, and helped find the tenant another place to live.  *See* Housing Court Tr. at 56–58, 60–61.  These aspects of the transcript, if disclosed, might have inspired the defense to seek leave to inquire more deeply into the Housing Court proceeding than the Court had anticipated allowing, to attempt to build the inference from the transcript that Soleimani had likely been among the ABJ personnel who had misled the tenant.  The Court had stated that, had Soleimani communicated directly with the tenant, it intended to allow the defense to put one or two questions to Soleimani on the subject to be "safe[]."  Trial Tr. at 32.  The Housing Court transcript, if made known to the defense prior to Soleimani's cross-examination, might have led the Court to permit somewhat more questions along these lines, to enable Teman's counsel to develop the range of dealings Soleimani had personally had with the tenant.

The record does not, however, establish the other two requirements of a *Brady* violation.

First, on the Court's post-trial review, it is clear that the Housing Court transcript did not come into the Government's possession until after the Teman trial. As a result, the Government cannot be said to have suppressed, or failed to disclose, favorable evidence in its possession.[35] And, second, it is clear that this evidence was not material—there is no reasonable probability that the trial outcome would have been different had the Housing Court transcript been disclosed.

As to the first point, the Government represents, without refutation, that the Housing Court transcript was not in its possession during trial. *See* Gov. *Brady* Mem. at 10. The Government's *Brady* obligation does not extend to evidence that it does not know of or that it does not have within its possession. *See Failla*, 1993 WL 547419, at *4; *see also Avellino*, 136 F.3d at 255 ("The *Brady* obligation extends only to material evidence . . . that is known to the prosecutor."); *Hutcher*, 622 F.2d at 1088 ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." (citation omitted)).

Nor is the transcript evidence whose possession by another government arm can fairly be imputed to the prosecution. The local court authorities responsible for that transcript were too far removed from the prosecutors here. *See Avellino*, 136 F.3d at 255. *Hutcher* is instructive. The defendant there argued that the Government had violated its *Brady* and Jencks Act obligations by failing to make the affidavits and testimony of a Government witness from a

---

[35] To be sure, the Government's failure to report back to the Court as to its inquiry into Soleimani's dealings with the tenant unhelpfully clouded the Court's and the defense's appreciation of this point during trial. The Court had deliberately ordered the Government to inquire whether Soleimani had had dealings with the tenant and had made misrepresentations to him, and to report back to the Court and defense. Regrettably, the Government did not do so (and the defense did not press for such a report) but instead took the matter up by putting questions on this point to Soleimani. As a result, it was left unclear whether the Government's apparent conclusion that Soleimani had not personally misled the tenant derived solely from Soleimani's say-so, or from its review of the transcript. That the Government had not accessed the transcript during the Teman trial became clear only after trial.

bankruptcy proceeding available to him.  *See Hutcher*, 622 F.2d at 1088.  Before calling the

witness, the Government had sent two investigators to examine the bankruptcy file, including

any affidavits or testimony from that witness.  *Id.*  Neither investigator returned with any

affidavits or transcripts, but one did provide the Government with a docket sheet for the

bankruptcy proceeding—which the Government proceeded to make available to the defendant.

*Id.*  The Second Circuit held that there had not been a violation, because "[t]he simple and

sufficient answer to [the defendant's] claim" was that the witness's affidavits and testimony were

"never in the possession of the prosecution and were therefore not materials which the

prosecution had a Brady or [§] 3500 duty to make available."  *Id.*  The Government had fulfilled

its obligations by turning over the docket sheet that it did possess.  *See id.*  The Circuit rejected

"a notion of 'possession' which is so elastic to embrace materials that the prosecution never had

in its files, never inspected, and never knew about."  *Id.*  The same is true here.  The Government

disclosed the Housing Court order, which was in its possession, to Teman.  The Housing Court

transcript thereafter was equally available to both the parties.  It was not in the Government's

possession.[36]

    As to the second point, Teman has failed to show materiality—either of the Housing

Court transcript or of the fact revealed therein, that Soleimani had had personal dealings with the

misled tenant.  For evidence to be material in the context of an alleged *Brady* violation, there

must be a "reasonable probability" that the suppressed material would have resulted in a different

outcome.  *See Turner*, 137 S. Ct. at 1893.  For impeachment evidence specifically, courts have

---

[36] Although the discussion above principally concerns Teman's *Brady* claim, for much the same reasons, the Housing Court transcript cannot support Teman's claim of a Jencks Act violation.  It appears undisputed that the Government produced all written statements of Soleimani's that were in its possession, including notes from its interviews of Soleimani.  *See* Gov. Mem. at 6 n.2.

held that evidence rises to the level of materiality where the witness being impeached provides the only evidence linking the defendant to a crime or the likely impeachment value would have "undermined a critical element" of the Government's case. *Payne*, 63 F.3d at 1210.  In contrast, evidence has been held not material where the witness's testimony is meaningfully corroborated or the witness has been otherwise impeached. *See id.*

Here, Soleimani was far from the only individual linking Teman to the crimes.  And the impeachment evidence in question, relating to an alleged misleading practice with respect to a tenant, was far afield from the events at issue.  It would not have undermined any element of the bank fraud or wire fraud charges brought here.  Far from there being a reasonable probability of a different outcome, it is not even credible to claim a real possibility that disclosing Soleimani's personal involvement with the tenant would have yielded a different outcome on these charges. That is so for two independent reasons.

First, there was very significant corroboration of the relevant aspect of Soleimani's testimony—that he had not authorized Teman to (in Reinitz's memorable words) "hit" ABJ's account and divert the large sums reflected on the checks in question from that account to Teman's benefit.  "[T]he strength of the independent evidence of [defendant's] guilt increases the degree of significance that would need to be ascribed to the withheld impeachment evidence in order for it reasonably to undermine confidence in the verdict." *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998); *see also Madori*, 419 F.3d at 170 (finding, "in light of the substantial evidence" of defendant's guilt, that "none of these strategies"—relating to potential affirmative defense and impeachment of a witness—were "sufficiently plausible to create the 'reasonable probability that had the evidence been disclosed to the defense, the result would have been different.'" (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987))).

Here, Soleimani testified that he had not authorized Teman to draw on ABJ's account, and that, if Teman had asked him, he never would have agreed. *See* Trial Tr. at 497–98, 566–69; 648–49. This testimony aligned fully with the parallel testimony of the representatives of the other two clients who similarly denied giving such authorization: Gabay from 518 West 204 LLC, Soon-Osberger from 18 Mercer, and Gina Hom from 18 Mercer all testified to the same effect. *See id.* at 326–27, 355–58, 361–63, 365, 367 (518 West 204 LLC); *id.* at 427–30, 441, 474–75 (18 Mercer). And Reinitz's testimony and his text messages with Teman independently established that Teman was well aware that his Customers, and in particular ABJ, would dispute any charges as unauthorized. *See* GX 702; GX 728 ("You've been back and forth with abj several times now . . . they have indicated they don't believe they owe you $."). For this reason, Reinitz advised Teman against creating and depositing the checks. *See* GX 702, 704, 727–29. Teman's knowledge that Soleimani (and the other Customers) would deny authorizing the checks was also apparent from the lengths that Teman had gone in (1) deceptively fabricating the checks while (2) denying the Customers notice (including invoices) of his claim to be owed fees by them. Also supporting Soleimani's denial of authorization was the fact that the checks' total value—$264,000—far outstripped the couple thousand dollars ABJ had paid for each of its seven GateGuard devices. *Compare* GX 204–05 (Teman's ABJ checks), *with* GX 409A–409B (invoices for ABJ's GateGuard purchases); *see also* Trial Tr. at 489–90 (explaining that ABJ purchased seven GateGuard devices). Finally, Teman's deliberate decision to deposit the checks during Passover—which Teman knew Soleimani and Gabay observed—was consistent with an attempt to evade the detection of a non-authorizing customer as long as possible. *See* Trial Tr. at 564–65; *see also* GX 113. Overwhelming evidence thus established that Teman did not have the authorization of Soleimani to create and deposit the checks at issue. Even a jury that found it

99

likely that Soleimani had misled a tenant in an unrelated business venture would have no reason to doubt his central testimony that Teman had "hit" ABJ's accounts without his knowledge or permission.

Second, although counsel's cross examination had not been effective in refuting the lack of customer authorization, defense counsel had—and utilized—other, far more apposite means to attempt to damage Soleimani's credibility on his claim of a lack of authorization.  As such, Soleimani's dishonesty to a tenant—even if found—would have been cumulative and of no moment.  *See Turner*, 173 S. Ct. at 1893; *see also United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008) ("[I]f the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material.").  The defense showed, for example, that Soleimani had earlier received invoices containing a link to the Payment Terms on them, *see* Trial Tr. at 594–95, had a billing dispute with Teman in fall of 2018, *id.* at 602, and when these checks were deposited in 2019, Soleimani, despite prompting from his bank, did not provide additional information about the checks, *see id.* at 617–19, 624–25.  On these bases, the defense sought to imply that Soleimani, contrary to his testimony, had in fact authorized the checks.  The defense also established Soleimani's financial incentive to deny authorization in his dealings with the bank.  The defense developed that, after a chargeback had been issued to ABJ's account, Signature Bank stated that "[w]e may reverse the credit if we receive information that your transactions were authorized."  *Id.* at 627.  In contrast to these attempts to counter Soleimani's denial of authorization, the far-afield fact of Soleimani's alleged deceit of a tenant had limited impeachment value, and lacked the capacity to change the jury's determination on this point.  *Cf. United States v. Gibbons*, 100 F.3d 942, 1996 WL 30784, at *1 (2d Cir. 1996) (table) (finding no

*Brady* violation where undisclosed matter was unrelated to defendant and had been resolved prior to defendant's trial).

Accordingly, there was no *Brady*, *Giglio*, or Jencks Act violation warranting a new trial.

In pursuing a new trial, Teman alternatively claims that Soleimani perjured himself at trial when he testified, in response to the question, "[D]id you misrepresent anything to the tenant or was it others in your company?" that, "It was others." *See* Teman *Brady* Mem. at 15 (quoting Trial Tr. at 502). Teman contends that the undisclosed Housing Court transcript shows that Soleimani's testimony was a lie. *See id.* at 12. But the transcript is not nearly so clear cut. It shows that Soleimani had dealings with the tenant at issue—and with the agreement the tenant signed to vacate his apartment—but it does not show that he made misrepresentations to the tenant. Nor did Soleimani elsewhere admit to making any misrepresentations. Teman's assertion that Soleimani committed perjury is just that—an assertion. The transcript is not, at all, inconsistent with Soleimani's testimony that someone else at ABJ dissembled to the tenant.

In any event, even if the transcript had revealed perjury on this point, that would not supply a basis for a new trial. "If newly discovered evidence indicates that testimony given at trial was perjured, the grant of a new trial depends on 'the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury.'" *United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996) (quoting *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)). This materiality standard is "less exacting" than that imposed by *Brady*. *Spinelli*, 551 F.3d at 166. A court's analysis is more or less strenuous depending on the Government's knowledge of the perjury: If the Government knew of the perjury, "a new trial is warranted if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," whereas, if the Government was unaware of the perjury at trial, "a new

trial is warranted only if the testimony was material and the court [is left] with a firm belief that

but for the perjured testimony, the defendant would most likely not have been convicted."

*Wong*, 78 F.3d at 81 (alteration in original) (internal quotation marks omitted) (quoting *Wallach*,

935 F.3d at 456).

Here, for the reasons set out above, Soleimani's testimony on the point in question was

truly collateral from the issues at hand.  And there is no indication that the Government was

aware of Soleimani's (alleged) perjury.  The Government attests that Soleimani indicated that he

had dealt with the tenant, but that he did not indicate that he had made representations to the

tenant about whether ABJ would renew his lease.  *See* Gov. Mem. at 6.  There is no basis to

disbelieve these representations.  Far from having a "firm belief" that Teman most likely would

not have been convicted without Soleimani's testimony that others had made misrepresentations

to the tenant, the Court is confident, given the overwhelming proof of Teman's guilt, that the

jury would have convicted him regardless.[37]

Accordingly, Teman has not presented a sufficient basis for a new trial based on his claim

of trial perjury by witness Soleimani.

### 2.    Gabay's Rent Charge Case

Next, Teman argues that the Government breached its *Brady* obligations when it

represented that it was "not aware of any action against Gabay or his business in which Gabay

---

[37] "[W]here independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial."  *Wong*, 78 F.3d at 82.  In *Wong*, a paid confidential informant testified that he "always did [his] taxes" and that he had filed his tax returns in 1987 and 1988, which was later determined to be false.  *See id.* at 81.  The Circuit held that a new trial was not warranted based on this perjury because there was "[a]mple evidence" supporting the defendant's conviction of drug charges.  *Id.* at 82.  Further, the Circuit noted that "[t]he additional evidence concerns a collateral issue ([the informant's] taxes) and 'does not refute any of the witness's testimony against' [the defendant]."  *Id.* (brackets omitted) (quoting *United States v. Reyes*, 49 F.3d 63, 68 (2d Cir. 1995)).  This analysis applies with equal if not greater force here.

acted dishonestly or was found not to be credible by a court or regulator." Dkt. 83 at 3. Teman contends that this statement was false because, as the Government acknowledged, Gabay had been fined "treble damages" in the Rent Charge Case. Teman *Brady* Mem. at 20. Teman represents that treble damages are awarded only when an owner *willfully* overcharges a tenant, which bears on that owner's credibility. *See id.*

The Court disagrees, finding that the award of treble damages fails to establish any of the three requirements of a *Brady* violation.

First, that Coney Management, the company for which Gabay worked, was fined treble damages in the Rent Charge case is not necessarily impeachment evidence favorable to Teman. As is evidenced by the public record that Teman attached to his reply—and failed to attach to his initial memorandum of law—treble damages here do not represent a finding by a court or regulator that the company owner acted willfully. *See* Teman *Brady* Reply, Ex. E. Instead, treble damages are imposed where the owner, upon notice that he or she has been found to have collected a rent overcharge, does not submit evidence to the New York State Division of Housing and Community Renewal that those overcharges were not willful. *Id.* As that Division explains, the damages "simply mean[] that where an owner submits no evidence or where the evidence is equally balanced, the overcharge is deemed willful." *Id.* Here, Coney Management and Gabay could simply have decided not to contest the overcharges, resulting in treble damages being imposed. As a result, the treble damages cannot be said to bear on Gabay's credibility.

Second, even if the treble damages could be characterized as impeachment evidence favorable to Teman, there is no indication that the Government knew of the connection between treble damages and willfulness. The Government was not obliged to investigate this point. Instead, it disclosed the evidence in its possession—the Rent Charge Case and the fact of treble

damages—and represented that it was not aware of any action bearing on Gabay's credibility. The defense, at that point, was fully empowered to mount its own investigation into the import of such a damages award.

Finally, the evidence here is immaterial.  Gabay was not the only witness linking Teman to the crime, nor would the evidence of treble damages have destroyed an element of the Government's case, or come anywhere close.  As with Soleimani, Gabay's testimony was corroborated extensively, including through testimony from Soleimani, Soon-Osberger, and Hom; the text messages between Reinitz and Teman; the checks themselves; and the circumstances surrounding the deposit of the checks, including the fact of their deposit on Passover.  In particular as to Gabay and 518 West 204 LLC, Gabay's testimony indicative of Teman's criminal intent was enhanced by the fact that Teman had deposited checks drawn on 518 West 204 LLC's account in April, *after* it had disputed checks that Teman attempted to draw on its account in March.  Teman discussed the relevance of the hold on his account from the March checks with Reinitz, *see* GX 704; GX 727, and Reinitz instructed him that if Customers disputed his charges, as 518 West 204 LLC had already done, he "must stop," *see* GX 729. Teman, however, flouted that advice.  Given the strength and breadth of the evidence of his audacious fraud, the Court is confident that the trial outcome would have been the same even if the jury had taken the treble damages award as reflecting the willfulness of a rent overcharge by Coney Management.

Further, as with Soleimani, the defense had at its disposal, and deployed, more apt tools to try to impeach Gabay's credibility.  The defense showed that a Coney Management affidavit, submitted to Signature Bank by a Coney Management employee with whom Gabay worked closely, disputed the charges and stated that the company did not "know[] the payees on these

checks." *See* Trial Tr. at 401.  Gabay admitted that Coney Management, in fact, was aware of

GateGuard, and that it had been a lie to say that Coney Management did not know what

GateGuard was.  *Id.* at 398.  This line of impeachment bore far more surely on Gabay's character

for truthfulness with regard to Teman's scheme.  As impeachment material, the unrelated treble

damages award here would have been cumulative.  It would not realistically have impacted the

jury's verdict.  This too was no *Brady* violation.

### 3.    False Certifications

As a final basis for claiming a *Brady* violation, Teman points to false certification claims

against Soleimani and Gabay, brought by the HPD, which he contends adversely reflect upon the

witnesses' character for truthfulness.  He faults the Government specifically for representing,

before trial, that there was "no indication that any landlord-tenant complaints or lawsuits against

Soleimani, Gabay, or their companies would be probative of their 'character for truthfulness or

untruthfulness.'"  Teman *Brady* Mem. at 16 (emphasis omitted) (quoting Dkt. 83 at 3).  As

evidence that this Government representation was untrue, Teman attaches spreadsheets from

public HPD records—not disclosed by the Government—which state that HPD has several open

(and one closed) violations for "false certifications" against Soleimani, Gabay, and their

companies.  *See id.*, Exs. B, C, E, F.  The Court does not find that this rises to the level of a

*Brady* violation.

As with Soleimani's Housing Court case, this evidence in theory could be favorable to a

party like Teman whose interests are adverse to those of the witness, because there could be

impeachment value in "false certification" charges.  According to HPD, a "false certification"

occurs when another violation "was certified as corrected by the Owner on time and properly"

but "[a] subsequent re-inspection of the condition by HPD found that the condition had not been

properly corrected."  Teman *Brady* Mem., Ex. D at 31.  The HPD further explains that "[t]he

violation is open and is subject to civil penalties for false certification."  *Id.*  In contrast to "allegations of mismanagement, negligence, or being a rotten landlord" which the Court discounted in its ruling on the motions *in limine* as "irrelevant to credibility," Trial Tr. at 26–27, false certifications could potentially be of some impeachment value, as they may bear on truthfulness.

However, as to this evidence too, there is no basis to contend either that this evidence was not disclosed by the Government, or that it was material.

As to non-disclosure, the record does not support that the Government had the false certification charges in its possession to disclose.  Instead, the Government disclosed what it had—that Soleimani and Gabay had been involved in landlord-tenant disputes, and that these disputes included Soleimani's Housing Court Case and Gabay's Rent Charge Case.  And the link between the city HPD and the federal prosecution here is far too removed to impute HPD's knowledge to the Government.  Moreover, the evidence here was a matter of public record, which Teman himself had the ability to, and ultimately did, locate.[38]

This evidence also would not present a serious possibility, let alone a reasonable probability, of changing the outcome of trial.  Almost all of the violations in question appear to be open (non-established) ones.  They are inadmissible under Federal Rule of Evidence 608(b).  And there is no indication that they could lead to admissible evidence.  *See United States v. Santos*, 486 F. App'x 133, 136 (2d Cir. 2012) (evidence was, among other things, not admissible and would not have led to admissible evidence); *United States v. Polanco*, 510 F. App'x 10, 12

---

[38] The records of the false certifications were available on a public database.  That is how Teman gained access to them for submission to the Court.  *See Gotti*, 622 F. Supp. 2d at 96 ("[D]ocuments that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them due to a lack of diligence in his own investigation.").

(2d Cir. 2013) (same).  And the one closed (established) violation would have limited probative value, even assuming its admissibility.  As reviewed above, the Government had presented compelling and varied evidence of Teman's guilt, and of the lack of customer authorization for Teman to create and negotiate the checks.  And defense counsel had deployed other tools to attempt to impeach both Soleimani and Gabay, to no avail.  There is no basis to conjecture that a false certification by the "Owner" of the property—who may or may not even have been the witness testifying at Teman's trial—would have impeached Soleimani or Gabay at the trial.

Accordingly, Teman has failed to establish, under any theory, a *Brady* violation.  The Court therefore denies this final asserted basis for seeking a new trial.

## CONCLUSION

For the reasons outlined above, the Court denies all of Teman's post-trial motions.  The case will now proceed to sentencing.

For purposes of assuring a full appellate record, the Government is instructed to file the grand jury materials provided *ex parte* to the Court under seal as soon as possible.  These are to be accessible to the Court (and reviewing appellate courts) only.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 111, 118, 120, and 132.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: June 5, 2020
        New York, New York