**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:19-CR-696-PAE** |
| | ) | |
| **ARI TEMAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**</u>

Defendant Ari Teman ("Teman"), by and through undersigned counsel, respectfully submits this memorandum to assist this Court in fashioning a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Teman requests a sentence of time-served or, in the alternative, a sentence which substitutes home confinement for prison.

Teman stands before this Court for the only criminal convictions of his life: bank fraud and wire fraud arising out of allegations concerning the deposit of 29 remotely created checks on two days in March and April of 2019. Teman exercised his constitutional right to a trial and maintains his innocence to the crimes charged. However, Teman accepts that, at this stage in the proceedings, this Court must proceed to sentencing. As this Court crafts the appropriate sentence in this case, it is Teman's lifetime of selfless acts of charity and benevolence and the demonstrable good he has done for others that far outweigh the alleged acts that bring him before this Court for sentencing. As set out *infra*, long before any of the alleged acts giving rise to this prosecution, Teman founded multiple volunteer organizations and dedicated his time and his sweat towards helping others— actions that speak to Teman's true character.

Furthermore, Teman has a documented medical history of respiratory problems and other diagnoses that make a custodial sentence uniquely and disproportionately punitive—generally,

but particularly in the midst of the ongoing COVID-19 pandemic.

To be clear, notwithstanding his anticipated appeal, Teman is working diligently to pay a significant portion, if not the entirety, of restitution before sentencing.

As Congress and the Supreme Court acknowledge, this Court is charged with the responsibility of evaluating Teman as an individual in crafting an appropriate sentence that is particularly tailored to him. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"); *see also* 18 U.S.C. § 3553(a)(1) ("The court…shall consider…the history and characteristics of the defendant").

When faced with the possibility of additional incarceration, it is easy to lose sight of the fact that a sentence of time-served is, by no means, lenient. Indeed, as recently as 2007, the U.S. Supreme Court rejected the idea that even a sentence of probation is nothing but an overly lenient slap on the wrist. *See Gall v. United States*, 552 U.S. 38, 44 and n.4 (2007) ("Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty...[p]robation is not granted out of a spirit of leniency...probation is not merely 'letting an offender off easily'").

## I.      Relevant Procedural Background

Teman was arrested on July 3, 2019 and was jailed until July 8, 2019, when he was released on bond. Since then, Teman has remained on bond without any violations and following his jury trial, Teman's bond was modified to include home detention with electronic monitoring. As such, since January 29, 2020, Teman has remained on home detention with an ankle bracelet strapped

to his leg with significant limitations to his freedom.

On April 23, 2020, the United States Probation Office filed the pending Presentence Investigation Report ("PSR") in this case. In light of the COVID-19 pandemic and consistent with the requests of the parties, this Court has adjourned the sentencing hearing until September 28, 2020 at 10:00 a.m.

## II.    Legal Standard

As this Court is aware, Congress has mandated that the sentence imposed in this case be "sufficient, but not greater than necessary" to achieve the objectives of punishment. 18 U.S.C. § 3553(a). The United States Sentencing Guidelines, while advisory, are no longer mandatory. *See, e.g., United States v. Barrero*, 425 F.3d 154, 156 (2d Cir. 2005); *see also United States v. Booker*, 543 U.S. 220, 224 (2005).

As the United States Court of Appeals for the Second Circuit has established, the methodology this Court should follow post-*Booker* is the following:

> A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range. The Guidelines provide the "starting point and the initial benchmark" for sentencing… and district courts must "remain cognizant of them throughout the sentencing process[.]" It is now, however, emphatically clear that the Guidelines are guidelines—that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range. When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a).

*United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal citations omitted).

## III.    Advisory Sentencing Guidelines

Teman concurs with the Guidelines computations contained within the PSR. Based on a

total offense level of 19 and a criminal history category of I, the advisory imprisonment range is 30 months to 37 months.

## IV.     A Downward Variance is Warranted

As a matter of law, this Court must not presume the Guidelines range reasonable, but must make an individual assessment of the 18 U.S.C. § 3553(a) factors based on all the facts presented. *See Gall*, 552 U.S. at 50. Based upon a consideration of the statutory sentencing factors set out in 18 U.S.C. § 3553(a), a substantial downward variance is warranted in this case.

Section 3553(a) sets forth a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) then lists numerous factors that a sentencing court must consider. Especially relevant to this case, and supportive of this motion for a downward variance, are the following factors:

### A.     The History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)

Teman is a 38-year old man facing sentencing for the first and only convictions of his life. As evidenced by the numerous letters submitted by those who know him best[1], Teman is a good person and a custodial sentence is unwarranted based on his unique characteristics and the facts of this case.

#### 1.     *As a Child, Teman Struggled with Mental Health Diagnoses and Bullying So Serious He Had to Transfer Schools*

Teman grew up in Teaneck, New Jersey—but faced many challenges throughout childhood. He suffered from depression and anxiety and was the victim of serious bullying, so much so that he had to transfer schools on numerous occasions to stay safe. *See, e.g., United States v. Rivera*, 192 F.3d 81, 85 (2d Cir. 1999) (acknowledging pre-*Booker* that childhood trauma

---

[1] *See* Exhibits 1 through 8, 11 through 17 (attached herein).

constitutes grounds for reduced sentence); *United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *2 (E.D.N.Y. Jan. 20, 2004) (same).

> 2.     *As a College Student, Teman Dedicated a Substantial Amount of Time and Energy Towards Helping Others—Contributions His College Rabbi Told the Probation Office are "Still in Place Today"*

After high school, Teman attended Brandeis University, where he dedicated a substantial amount of time and energy toward campus philanthropy. Indeed, Rabbi Peretz, Teman's college rabbi, described Teman to the Probation Office as "compassionate," emphasized that Teman's positive contributions to the on-campus charitable organization "are still in place today," and even corroborated Teman's "post-college good works" based on the continued relationship they have shared for nearly two decades. Teman's college friend, Jonathan Lubin (who is now an attorney), shares his memories of Teman's contributions to his college Chabad House and Teman's contributions to his community to the present.[2]

At trial, the prosecution attempted to paint a picture of Teman as a greedy fraudster. But Teman's lifetime of charity, volunteerism, and benevolence demonstrates just how inaccurate that depiction is.

> 3.     *As an Adult, Teman Founded Volunteer Organizations Which Significantly Helped Those in Need Throughout the World and Donated GateGuard Systems to Chabad Centers After the April 2019 Shabbat-Morning Shooting in California*

In 2006—well before any of the alleged acts giving rise to this prosecution—Teman founded JCorps, a volunteer service network which brought together Jewish young adults to volunteer in their cities. While this began as a selfless idea in New York City, Teman built JCorps into an incredible organization with a presence throughout the United States, Canada, and Israel.

---

[2] *See* Exhibit 14 (Lubin Letter).

Thanks to Teman's hard work, grit, and volunteerism, JCorps was on the ground helping those in need after Hurricane Sandy struck New York and JCorps volunteers put themselves in harm's way to deliver toys and mattresses to children in Israel sheltering in bomb shelters. Teman's charity, for which he received no money, has been recognized by President Obama's administration, former New York City Mayor Michael Bloomberg's Office, and has been discussed by more than 100 media outlets. The concept was simple: make volunteering social and fun. Unlike the lion's share of defendants who find themselves in this courthouse for sentencing, Teman chose to spend his time helping others not only with his hard work and sweat, but by creating and building a volunteer empire that touched more lives than can be counted. Building on JCorps' success, Teman also founded a similar volunteer organization called WeCorps, which provides the same community services but caters to individual volunteers who are not Jewish. For Teman, JCorps became in many ways an unpaid full-time second job.

Helping his community is at the core of Teman's character. In May 2019—after the alleged deposits in this case but before Teman was aware of any investigation—Teman donated his GateGuard system to 100 Chabad centers throughout the country.[3] This significant act of charity and benevolence was prompted by the April 27, 2019 Shabbat-morning shooting at a Chabad religious service in Poway, California. One recipient of Teman's generosity was the Chabad House in Miami, whose rabbi shares that Teman installed the GateGuard system at his own expense and that the system continues to help the organization to this day.[4] During the COVID-19 pandemic, GateGuard is uniquely important because it permits contactless access control, especially in places which are frequented by many people.

---

[3] Some systems are yet to be installed. However, the systems remain set aside and allocated to the respective recipient of the donation.

[4] *See* Exhibit 13 (Lipskar Letter).

Teman also founded 12gurus:Health—a health conference with free online access to TED-style expert talks (https://12gurusHealth.com). As he explained in his letter enclosed for this Court's consideration, Dr. Rami Cohen—a physician and entrepreneur—met Teman in 2012 when Dr. Cohen presented at Teman's conference.[5] Dr. Cohen described the conference Teman created as "like no other"—where leaders from the top medical institutions around the world and startups gathered together "to share ideas that nobody had talked about in the traditional industry-focused, 'siloed' conferences we were used to." Teman did this to better the world—"without any profit in mind."

And, as Dr. Cohen explained, even while on home detention, Teman has joined the fray of thinkers to try to establish FAR UVC-wearable technology to protect people from COVID-19—this time with people he met at medical conferences including leading researchers at MIT, Harvard, and Columbia. Juhan Sonin, a lecturer at MIT, is working with Teman on what Mr. Sonin describes as a "new venture to create a virus-free existence for warehouse staff (for Amazon, UPS, etc) through wearable ultraviolet light (UVC) devices that kill and disinfect against COVID19 (and other pathogens)."[6] Mr. Sonin describes himself as "a strong supporter of Mr. Ari Teman" who sees Teman's "increasing impact on personal technology and safety as an urgent and needed injection into the nation, especially during these sickly times."

Teman also created and curated the 12gurus:Charity conference, which is also available online at  https://12gurusCharity.com, in an effort to improve how nonprofits operate and deliver services to people. Attendees and speakers came from organizations such as the Acumen Fund and the Bill & Melinda Gates Foundation. Those who could not afford a ticket were given one for free.

---

[5] *See* Exhibit 1 (Cohen Letter).
[6] *See* Exhibit 2 (Sonin Letter).

And Teman made dozens of seats available for free to observant Jewish organizations.

As a comedian, Teman regularly donated his time and performances to organizations seeking to fundraise. For example, Rabbi Avi Ganz attested to many instances where Teman donated his time and even refused reimbursement for travel expenses to raise money for Ganz's Observant Jewish year in Israel program for young adults with special needs.[7]

What stands out about Teman is the extent to which he has selflessly, throughout his entire adult life, served others—not only financially but with actual boots on the ground. And he has done so even while on home detention after trial in this case.

4.    *Teman's Record of Charity and Benevolence Warrants a Reduced Sentence*

Federal courts routinely recognize a defendant's record of charity and benevolence as warranting a reduced sentence. *See, e.g., United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) ("While many of Rioux's public acts of charity are not worthy of commendation, he unquestionably has participated to a large degree in legitimate fund raising efforts. Of particular moment are Rioux's efforts to raise money for the Kidney Foundation. It was not an abuse of discretion for the district court to conclude that, in combination, Rioux's medical condition and charitable and civic good deeds warranted a downward departure"); *United States v. Sarlo*, 269 F. App'x 30, 31 (2d Cir. 2008) ("In explaining his sentence, Judge Casey stated that he had considered all of the § 3553(a) factors in reaching his decision to impose a below-Guidelines sentence. He noted Sarlo's age, health problems, charitable acts and involvement with her church").

Perhaps most notably, the United States Court of Appeals for the Seventh Circuit recently affirmed the probation sentence H. Ty Warner, the billionaire creator of Beanie Babies, received

---

[7] *See* Exhibit 11 (Ganz Letter).

for evading $5.6 million in federal taxes by hiding assets in a Swiss bank account. *See United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015). The sentencing court acknowledged Warner's "private acts of kindness, generosity and benevolence" and emphasized that "many of them took place long before Warner knew he was under investigation." *Id*. at 854. Teman's life—as evidenced by acts taken long before this investigation—is one of genuine and sincere kindness, generosity and benevolence. And Teman's charitable acts are of the most commendable kind: hands-on volunteerism that literally touches the lives of those around him.

5.   *The People Who Know Teman Best Paint the Accurate Picture of His Character*

As reflected in the many letters submitted to this Court for consideration, Teman has the support of people who have seen his true character. Jeffrey Katz, who has known Teman since they were undergraduates together at Brandeis University, described Teman's "deep desire to make the world a better place" as "literally who he is."[8] Oliver Josephs, who has known Teman for more than a decade from volunteering in JCorps New York City and running JCorps Washington, D.C., wanted to stress for this Court "how much of a rare and valuable gift Ari is to the Jewish community, to cities around the world, and the many thousands people of all backgrounds we have helped with JCorps over the years."[9] He described JCorps, which Teman ran "unpaid, purely, as a mission-driven project to help others." Mr. Josephs described the moment Hurricane Sandy struck New York when Teman, "who was literally in the hospital that weekend incredibly ill…pulled himself together enough to ensure that 150 JCorps volunteers were the first team to arrive downtown to bring water and food to the elderly in buildings that had lost power for their elevators and water pumps." And to be clear, this is not the story of a man with a big

---

[8] *See* Exhibit 3 (Katz Letter).
[9] *See* Exhibit 4 (Josephs Letter).

9

checkbook writing a check to help others (which itself is commendable); rather, "Ari, shaking and in pain, stood out in the cold with a paper pad and a mobile phone, ensuring building after building, floor after floor was checked and that every senior and disabled person had what they needed and knew what was happening."

Those he worked with speak highly of Teman. Thomas Orosz, who first met Teman when he was recovering from addiction and homelessness, credits Teman with supporting him not only as an employee but as a person: "Ari never quit on me even when I lost hope in myself and had setbacks. He gave me the tools and coaching I needed. He never judged me and always expected more for me and encouraged me to achieve it."[10] David Diwby, who owns and operates New York Mechanic Company, has worked professionally with GateGuard doing installation work—and describes time after time where Teman took care of his customers even at great expense to his business.[11]

Nachum Klar, who has known Teman since high school, describes him as a "kindhearted and generous person that will always go out of his way to help others."[12] And actions speak even louder than words. As Klar described, "When 11 people were shot in the Tree of Life synagogue in Pittsburgh, Ari immediately contacted hundreds of synagogues across the country offering to provide his company's security system free of charge. He has since provided well over 100 of them at his own expense." And Teman hopes to continue being able to service his customers without interruption. For instance, Anthony Zachariadis of TZM Realty has been a client of GateGuard since the Fall of 2019. As he described, "Along with the majority of our tenants, we are very pleased with how the system has been working in our buildings….It is our hope that Mr.

---

[10] *See* Exhibit 5 (Orosz Letter).
[11] *See* Exhibit 6 (Diwby Letter).
[12] *See* Exhibit 7 (Klar Letter).

10

Teman remain available to us to maintain a successful business relationship in the days, weeks, months, and years to come."[13] In that respect, Teman is committed to the many GateGuard customers where systems are live on buildings throughout the country—and he is primarily responsible for conducting technical support and managing the engineering and report teams. Even during the ongoing COVID-19 pandemic and in the midst of the most stressful months of his life, Teman has remained particularly committed to ensuring that GateGuard's systems continue to serve the needs of people who rely on the system now more than ever for online deliveries including medicine, baby formula, and similar necessities—and he has done so even without the resources and staffing GateGuard has had in the past. This speaks to Teman's character.

For his remarkable service to the community beginning more than a decade before the allegations giving rise to this prosecution and continuing to this day, Teman won the Jewish Community Heroes Award in 2009.[14] And he has continued serving his community—currently volunteering his time to work towards medical hardware aiming to protect people from COVID-19 and other viral infections. Whether Teman's collaboration with top researchers ultimately works or not is important (possibly life-saving) but not the point—it is that Teman, even during the most stressful months of his life, is volunteering his time to make the world a better, and safer, place.

Teman has also bettered himself between trial and sentencing through Harvard's Global Health Initiative online education program by successfully completing a course entitled "Lessons From Ebola: Preventing the Next Pandemic."[15]

Teman is an entrepreneur but his actions over the years reflect that money does not drive

---

[13] *See* Exhibit 8 (Zachariadis Letter).

[14] *See* Exhibit 9 (*e*Jewish Philanthrophy) Coverage of Teman's Award.

[15] *See* Exhibit 10 (HarvardX Verified Certificate of Achievement issued May 11, 2020).

his actions. Avi Ganz, the director of Yeshivat Darkaynu, a post-high school program for men and women with special needs, met Teman several years ago and asked Teman to perform as a stand-up comedian at a fundraising event. Teman "insisted on doing the event for free and wouldn't even let us cover the travel costs."[16] Since then, the two became friends, and Mr. Ganz shares, "I see how he has donated his time, money, knowledge and more to so many good causes. His mind is always thinking about the next project and how he can make the world a better place in one way or another."

These testaments, and the many others submitted with this memorandum, speak volumes about Teman's true character.

      B.    <u>The Nature and Circumstances of the Offense and The Need to Protect the Public from Further Crimes of the Defendant – 18 U.S.C. §§ 3553(a)(1) and (a)(2)(C)</u>

As demonstrated by his complete lack of criminal history and the lack of any bond violations both pre- and post-trial, this Court should not be concerned about recidivism. Teman has already suffered greatly as a result of this case, and the shame and humiliation this criminal case has brought him has been profoundly difficult for him to bear.

Teman immediately implemented the additional measures this Court required regarding his businesses when it modified the terms of his release after trial. The 5 days in jail over the Fourth of July holiday weekend in 2019 were the worst 5 days in Teman's life. And, since trial, Teman has remained on home detention—which itself has been punitive. Even if Teman receives the most lenient sentence possible, this Court should not conclude there is any risk of recidivism.

---

[16] *See* Exhibit 11 (Ganz Letter).

C.    The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)

   1.    *A Sentence of Time-Served or, At Most, a Sentence That Substitutes Home Confinement for Prison is Sufficiently Punitive*

In *Gall*, the U.S. Supreme Court observed that even probation, "'rather than an act of leniency,' is a 'substantial restriction of freedom.'" 552 U.S. at 44; *see also Warner*, 792 F.3d at 860 (affirming term of probation as "a sufficiently serious sentence"); *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) (recognizing that "probation can be severe punishment[], hugely restrictive of liberty, highly effective in the determent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished"); *United States v. Brady*, No. 02-CR-1043 (JG), 2004 WL 86414, at *8 (E.D.N.Y. Jan. 20, 2004) (noting that probation is "a punitive measure"). Congress and the Sentencing Commission have similarly recognized that probation, "a sentence in and of itself," may constitute an appropriate alternative to incarceration that meets fully the statutory purposes of sentencing. *See* U.S.S.G., Ch. 5, pt. B, Intro. Cmt. (citing 18 U.S.C. § 3561). Probationers remain subject to "several standard conditions that substantially restrict their liberty," including restraints on their ability to associate freely or to leave the judicial district. *Gall*, 552 U.S. at 48. The Court can also impose a variety of "discretionary conditions" to probation, 18 U.S.C. § 3563(b), and the violation of any condition can be grounds for revocation and the imposition of a term of incarceration.

Nor was probation intended by Congress to be an exceptional kind of punishment. To the contrary, Congress directed, more than three decades ago, that the Guidelines should reflect the "general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j).  This is precisely the position in which Teman finds himself. As reflected in the PSR, Teman has no prior criminal history and has not been convicted of a crime

of violence.

To be clear, the sentence Teman seeks in this case is more than probation. He has already served 5 grueling days in a federal detention center and more than six months on home detention since trial (in addition to his time on pretrial release before trial where his freedom was restricted but did not include home detention).

> 2.   *Teman's Medical History Makes a Prison Sentence Particularly Brutal and Dangerous*

Teman has a documented mental health and physical health medical history that merits serious consideration by this Court.

Teman has a history of respiratory illnesses. Dr. Osterweil, an ear, nose, and throat specialist who has treated Teman for eight years, advised the Probation Office of Teman's decade-long history of breathing issues, requiring multiple non-cosmetic surgeries to his nose and airways—one of which required 11 hours to completely reconstruct Teman's airway. According to his doctor, Teman has a compromised upper respiratory anatomy and physiology that make him a higher risk for COVID-19 complications if infected. This, coupled with Teman's recent diagnoses of degenerative back disease and periodic insomnia, make it frighteningly possible that even a relatively short prison sentence could very soon become a death sentence.

Furthermore, Teman has been prescribed corticosteroids, which the CDC confirms makes people of all ages at an increased risk of severe illness from COVID-19.[17] It is this unfortunate combination of severe respiratory problems, the use of prescribed corticosteroids, an increased BMI, and sleep apnea, among other health conditions, that makes Teman particularly at risk of serious illness or death if he were to contract COVID-19.

---

[17] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed July 7, 2020).

As this Court is well aware, this is not an academic concern. In stark contrast, jails and prisons have singularly become COVID-19 hotspots by their very nature—it is impossible for inmates to practice CDC-recommended social distancing, CDC-recommended alcohol-based hand sanitizers are considered contraband, and inmates do not have access to personal protective equipment necessary to protect themselves. The numbers are daunting. As of the date of this filing, 94 federal inmates and one staff member have died from COVID-19 and the trends of test results are terrifying:



It is well-recognized that people like Teman—with compromised upper respiratory tracts and documented histories of breathing difficulties including sleep disorders—are particularly at-risk for serious complications if infected with COVID-19. Thus, a prison sentence would constitute

the perfect storm: Teman would be at greater risk of exposure to the illness in the first place and, if infected, Teman's medical history makes him particularly vulnerable to serious injury or death. In this unprecedented global pandemic that has claimed the lives of more Americans than World War I, this Court can and should consider that even a short prison sentence would be particularly punitive to Teman.

Furthermore, Teman has a documented history of mental health diagnoses—including anxiety, depression, sleep disorders, and a unique PTSD arising out of an experience with a physician who victimized Teman and who has since been criminally convicted of conduct arising, in part, from his unorthodox medical practice. This doctor institutionally committed Teman against his will and victimized him in other ways. Teman is submitting mental health documentation under seal for this Court's review.

Under these circumstances, Teman submits that a sentence of time-served is sufficient punishment in this case. Indeed, the very existence of this case alone has already hit Teman hard and the collateral consequences are real.

> 3. *Teman's Medical History Warrants a Reduced Sentence or, at a Minimum, a Non-Custodial Sentence*

It is well-settled that sentencing courts should consider a defendant's physical and mental history when crafting an appropriate sentence generally—and certainly in the midst of an unprecedented pandemic. *See, e.g., United States v. Figueroa*, 421 F. App'x 23, 25 (2d Cir. 2011) ("The record, however, clearly demonstrates that the district court conscientiously took Figueroa's health into consideration, resulting in a sentence well below the bottom of the Guidelines range"); *United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1529535, at *2 (S.D.N.Y. Mar. 31, 2020), *reconsideration denied*, No. 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020) ("After concluding that a 'substantial' downward variance from the recommended Guidelines

range of 108 to 135 months' imprisonment was warranted in light of Dr. Nkanga's serious health issues and 'declining condition,' among other things, the Court sentenced Dr. Nkanga to thirty-six months' imprisonment"); *United States v. Burnell*, 367 F. Supp. 3d 12, 16 (E.D.N.Y. 2019) (defendant sentenced to probation, notwithstanding Guidelines range of 12-18 months, based on "what appears to" the Court to be "longstanding—but unrecognized—mental health problems"); *United States v. Alatsas*, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (JBW) (imposing a term of probation, despite Guidelines range of 24-30 months where, *inter alia*, "[d]efendant has multiple complex medical problems, which will be better cared for outside of prison"); *United States v. Burks*, 2010 WL 1221752 at *2 (E.D.N.Y. Mar. 29, 2010) (defendant sentenced to one month incarceration and five years' probation despite a Guidelines range of 57-71 months where, among other things, the defendant suffered from degenerative diabetes).

> 4.   *This Court Can Impose Substantial Community Service as a Condition of Supervised Release as a Sentencing Alternative to Incarceration*

Given Teman's extensive history of volunteerism and service to his community, this Court can impose community service in lieu of prison—which would not only benefit Teman but would also permit Teman to continue to benefit the community. For instance, this Court could institute a plan through an organization such as the Aleph Institute whereby this Court could order Teman to perform specific community service that is real, tangible, and verifiable—all, of course, subject to conditions set by this Court.

> D.   <u>The Need to Avoid Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(6)</u>

A sentence of time-served in this case would satisfy Congress' mandate that sentencing courts should aspire to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(7).

A downward variance in this case is appropriate on the merits—but is also not inconsistent with how similarly-situated defendants are sentenced throughout the country. In 2019, for example, based on data published by the United States Sentencing Commission, 3 out of every 4 defendants received a below-Guidelines sentence.[18] In the Southern District of New York, 58% of defendants received a downward departure (1.8%) or a downward variance (56.8%).[19] For economic offenses nationwide, the majority of defendants received a below-Guidelines sentence.[20] And, in the Southern District of New York, the mean and median sentences (21 and 12 months, respectively) for fraud crimes were both *well below* the advisory Guidelines range in this case.[21]

Further, in light of *Booker* and its progeny, district courts are now free to account for the fact that the Guidelines analysis often results in an advisory sentencing range which bears little relation to a defendant's actual conduct, especially where, as here, the Guidelines are determined mechanically by loss amounts. *See, e.g., United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (FB) (imposing 60 months' imprisonment in stock fraud case despite advisory sentencing range of 360 months to life).

Teman submits that the following examples militate towards the Court's imposition of a non-custodial sentence to avoid unwarranted sentencing disparities.

In *United States v. Davenport,* case no. 1:17-CR-00061 (SDNY, Preska, *J.*), Davenport was indicted for, *inter alia,* honest services wire fraud and money laundering; Davenport

---

[18] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table29.pdf  (last accessed July 7, 2020).
[19] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table30.pdf  (last accessed July 7, 2020).
[20] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/TableE7.pdf  (last accessed July 7, 2020).
[21] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/stats_NYS.pdf  (last accessed July 7, 2020).

proceeded to trial and was convicted.  Davenport was at a level 30 and his guideline range was 97 to 121 months.[22] Davenport requested a non-custodial sentence, the Probation Office's recommendation was 30 months, and the Government sought a below-guidelines sentence, but one that was substantially above the recommendation of the term recommended by Probation.[23] Judge Preska found that notwithstanding the $9.7 million loss and the fact that Davenport used shell companies, a "year and a day" sentence was appropriate under the circumstances.

Teman submits that if Davenport (who also exercised his constitutional right to a trial) received a "year and a day" sentence when at a level 30 based on a $9.7 million loss, the facts of this case are substantially less egregious and would warrant a non-custodial sentence. The need to eliminate unwarranted sentencing disparities militates strongly in finding that a non-custodial sentence is appropriate for Teman.

In *United States v. Dilip Vadlamudi*, case no. 1:16-cr-789 (SDNY, Forrest, *J.*), Vadlamudi pleaded guilty to conspiring to violate the Travel Act in connection with a bribery and kickback scheme that victimized a large nonprofit organization engaged in leukemia and lymphoma research, in violation of 18 U.S.C. § 371. Vadlamudi was at a level 12 and his guidelines range was 10 to 16 months. Vadlamudi requested a non-custodial sentence, the Probation Office's recommendation was a split sentence of five months of imprisonment and three years of supervised release thereafter with a special condition of five months of location monitoring, and the Government sought a guidelines sentence. Judge Forrest imposed a sentence of three years' probation with no incarceration. Admittedly, the loss in this case is greater than in *Vadlamudi,* but this case is much closer to *Vadlamudi* than *Davenport.* Accordingly, this Court should likewise seriously consider a term of supervised

---

[22] This range was driven by the $9.7 million kickback that Davenport received.

[23] Part of the reason that the Government advocated for a substantial sentence was the multimillion-dollar kickback and the use of shell companies (because the amount of the bribe/kickback exceeded $9.5 million but did not exceed 25 million, 20 levels were added, pursuant to U.S.S.G. §§ 2B4.1(b)(1)(B) and 2B1.1(b)(1)(K)).

release with no incarceration.

And in *United States v. Hernandez* (aka Tekashi 6ix 9ine)*,* case no. 1:18-cr-834 (SDNY), Hernandez, an internationally-known rap artist who joined the Nine Trey Gangsta Bloods (a highly violent New York City gang), was charged with a host of crimes including racketeering conspiracy and Violent Crimes in Aid of Racketeering ("VCAR"). Hernandez's criminal acts included helping fund Nine Trey's leadership and operations. Indeed, Hernandez and other members of Nine Trey wreaked havoc in New York City by, among other things, committing multiple acts of violence in public places throughout the city.

Hernandez proceeded to cooperate with the Government and, as a result of this substantial assistance, was able to obtain a motion pursuant to Section 5K1.1 from the Government.  Ultimately, this Court sentenced Hernandez to a term of 24 months' imprisonment. However, when COVID-19 struck the United States, Hernandez subsequently moved, pursuant to 18 U.S.C. § 3582(c) for compassionate release.  This Court noted that "[h]ad the Court known that sentencing Mr. Hernandez to serve the final four months of his term in a federal prison would have exposed him to a heightened health risk, the Court would have directed that these four months be served instead in home confinement."  Further "[t]he Court noted that the sources of authority that courts (including this Court) have recently invoked to release from custody prisoners with heightened health risks from COVID-19 *who have not yet been sentenced* are not available in Mr. Hernandez's case, because he has already been sentenced." (emphasis added).

While the comparison between Teman and Hernandez is not exact, this Court can, and should, draw some comparisons between the two cases. Admittedly, Teman did not testify for the Government, nor did the Government file a Section 5K1.1 motion.  However, Teman did not fund a violent gang and its operations, nor was he charged with VCAR (one of the most serious violent offenses in all of the United States Code). Even taking into account Hernandez's substantial assistance to the

20

Government, one cannot simply ignore the fact that his actions contributed to numerous violent acts (and he did so in order to facilitate his rap career).  As Hernandez was sentenced to a below-guidelines term of 24 months' imprisonment, Teman's sentence should likewise be substantially below the Guidelines.

Further, with respect to Hernandez serving his four remaining months of his sentence (*i.e.* reducing his sentence from 24 months of incarceration by the BOP to 20 months) based on his health conditions that made him particularly vulnerable to COVID-19, Teman's medical conditions are substantially similar to Hernandez's—if not more severe with respect to COVID-19 risk factors—that would result in the same considerations for compassionate release.  *See* discussion *infra.* However, given that this Court has not yet sentenced Teman, this Court has much more flexibility in crafting a sentence to take these considerations into account. As Teman is not a danger to the community, his long-standing and well documented physical ailments justify, as they did for Mr. Hernandez, this Court's taking into account COVID-19 when crafting a sentence sufficient, but no greater than necessary (under the circumstances), while at the same time considering the "history and characteristics of [Teman] " and "the need to provide [Teman] with needed . . . medical care." 18 U.S.C. § 3553(a).

Taking all of the foregoing into consideration, a non-custodial sentence is appropriate given the facts of this case, and given his personal medical history in the context of the on-going pandemic.

       E.      The Need to Provide Restitution – 18 U.S.C. § 3553(a)(7)

Section 3553(a)(7) directs this Court to consider "the need to provide restitution to any victims of the offense." Teman intends to pay a significant portion, if not the entirety, of restitution on the date of sentencing.

Furthermore, Teman's ability to work to pay any remaining restitution will be made more difficult by any custodial sentence.

F.      Other Considerations – Collateral Consequences

Teman brings one important case to the Court's attention: *United States v. Nesbeth*, 188 F. Supp. 3d 179, 2016 WL 3022073 (E.D.N.Y. 2016), *appeal withdrawn* (Sept. 9, 2016). In *Nesbeth*, the defendant was convicted by a jury of "of importation of cocaine and possession of cocaine with intent to distribute. Her advisory guidelines sentencing range was 33-41 months."  *Id*. at *1. In thoughtfully rendering a sentence of one year of probation, Judge Block explained:

> Nonetheless, I rendered a non-incarceratory sentence today in part because of a number of statutory and regulatory collateral consequences she will face as a convicted felon. I have incorporated those consequences in the balancing of the 18 U.S.C. § 3553(a) factors in imposing a one-year probationary sentence.
> I am writing this opinion because from my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers—both prosecutors and defense counsel—as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence.
> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction.
> The effects of these collateral consequences can be devastating. As Professor Michelle Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'"

*Id*. (internal footnotes omitted).

If Judge Block, after over two decades as a district judge, considered varying downward from a Guidelines range of 33-41 months (a level 20, one level *higher* than in the instant case), and imposed a non-custodial sentence, this Court should, at a minimum, consider imposing a "time served" sentence in this case as well. Indeed, the collateral consequences of Teman being a convicted felon will have immediate and long-lasting effects—including, but not limited to, not being able to vote in the upcoming election, not being able to possess a firearm, and not being able

22

to secure business loans. This Court can, and should, take these long-lasting collateral consequences into account when fashioning a sentence sufficient, but no greater than necessary.

## V.      Conclusion

A sentence of time served is not a slap on the wrist—it is, instead, the appropriate sentence in this case taking into account all relevant considerations. For all the reasons set forth in the PSR, in this memorandum, and in the additional documents submitted for this Court's consideration, Teman appeals to this Court's discretion to impose a non-custodial sentence.

Teman respectfully submits that a sentence of time served or, at a minimum, a sentence substituting home confinement and/or community service for prison is "sufficient, but not greater than necessary," and that is what the law requires. 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND
MO Bar # 62265
MARGULIS GELFAND, LLC
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: (314) 390-0234 Facsimile: (314) 485-2264
justin@margulisgelfand.com

— and —

*/s/ Joseph A. DiRuzzo, III*
JOSEPH A. DIRUZZO, III
NY Bar # 4417853
DIRUZZO & COMPANY
Joseph A. DiRuzzo, III
401 East Las Olas Blvd., Suite 1400 Ft. Lauderdale, FL 33301
Telephone: (954) 615-1676  Facsimile: (954) 827-0340
jd@diruzzolaw.com

**Attorneys for Teman**

*/s/ Alan Dershowitz*
ALAN DERSHOWITZ*
1575 Massachusetts Avenue
Cambridge, MA 02138

**Of Counsel**

*\*Member of the Massachusetts Bar and the United States Court of Appeals for the Second Circuit; will seek* pro hac vice *admission in this case*

24

## Certificate of Service

I hereby certify that the foregoing was filed electronically with the Clerk of the Court, and that all parties will receive notice of this filing through this Court's electronic filing system.

> */s/ Joseph A. DiRuzzo, III*
> JOSEPH A. DIRUZZO, III
> NY Bar # 4417853
> DIRUZZO & COMPANY
> Joseph A. DiRuzzo, III
> 401 East Las Olas Blvd., Suite 1400 Ft. Lauderdale, FL 33301
> Telephone: (954) 615-1676  Facsimile: (954) 827-0340
> jd@diruzzolaw.com