



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 14, 2020

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

    Re:    *United States* v. *Ari Teman*, 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

    The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for September 28, 2020, at 10:00 a.m. For the reasons explained below, the Government believes that a sentence within the Guidelines range of 30 to 37 months would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A.  Factual Background**

    This case arises from defendant Ari Teman's brazen scheme to steal money from his customers and Bank of America, which resulted in the bank losing hundreds of thousands of dollars.

    Teman is the owner of GateGuard, Inc., a business he used to sell intercom devices for apartment buildings. *E.g.*, Trial Tr. 312-13, 420-21, 489-90. Teman told customers that the intercoms would let residents monitor who was coming in and out of buildings and speak with visitors when they rang the doorbell. *Id*. After hearing the defendant's sales pitch, some customers, including the owners and cooperative boards of certain apartment buildings in Manhattan and the Bronx, agreed to buy the intercoms. *Id.* Teman's bank and wire fraud schemes focused on three customers: 518 West 204 LLC, managed by Coney Management; 18 Mercer Equity Inc. ("18 Mercer"), managed by Crystal Real Estate Management; and ABJ Lenox LLC ("ABJ Lenox") and ABJ Milano LLC ("ABJ Milano"), both managed by ABJ Properties LLC ("ABJ Properties").

    Each of Teman's customers paid just a few thousand dollars for an intercom and a limited term of service for that intercom. In January 2018, Coney Management paid Teman $3,600 for one intercom device. Trial Tr. 319, 342; *see also* GX 413 (invoice); GX 146 (check). On April 4, 2018, the co-operative board for the building at 18 Mercer Street paid Teman $2,499 for one intercom device, $849 for installation of that device, and $599.88 for one year of service for that intercom device. Trial Tr. 425-26, 459; GX 431 (invoice); GX 143 (check). From March 2017 to October 2017, ABJ Properties paid Teman $499 each for nine intercom devices, $650 each for installation of those nine devices, and $594 for six-months of service for each device. Trial Tr.

494-496; GX 409A, 409B (invoices); GX 130 (ABJ Lenox checks); GX 131 (ABJ Milano checks). Each entity paid Teman with checks from its corporate account. GX 130, 131, 143, 146.

At the time they paid for their devices, the customers who dealt with Teman – Elie Gabay from Coney Management, Bonnie Soon-Osberger from 18 Mercer, and Joseph Soleimani from ABJ Properties – had never seen any webpage that gave Teman authority to write checks from their corporate bank accounts. Trial Tr. 327, 332, 428-29, 441, 563. At trial, those individuals testified that they never would have given a vendor that authority because they needed to retain control over inflows and outflows from their corporate accounts. Trial Tr. 327-28, 361, 428, 569. The witnesses also testified that, prior to purchasing their devices, Teman never told them he was assuming authority to write checks from their accounts simply because they did business with him. Trial Tr. 326, 332, 497, 498, 568. The witnesses testified that if Teman had asked for that authority, they each would have said, unequivocally, no. Trial Tr. 327, 361, 428-29, 568.

Soon after Teman installed the devices, his customers had problems with the intercoms. *See, e.g.*, Trial Tr. 436-37. The intercoms did not work properly, Teman's customers received complaints from their tenants and those who lived in the buildings, and the customers relayed their concerns to Teman. *E.g.*, Trial Tr. 335, 437, 499-501. In response to these complaints, Teman blamed internet connectivity problems or claimed the customers or tenants did not know how to properly use his devices. *E.g.*, Trial Tr. 437, 501.

Eventually, each of the three customers told Teman that they would stop using his devices or that they would not order any more of his devices for other buildings. GX 405, 416; *see also* Trial Tr. 333-34, 438, 507. Teman was furious after hearing that his customers no longer wanted to use his intercom devices, and he responded angrily and by threatening the customers. He called one of Gabay's building managers "an idiot," accused Gabay of wasting his time, threatened to place a lien on Gabay's building if he did not pay Teman $18,000 each for 10 devices, and threatened to sue Gabay. GX 417; GX 418. Teman similarly threatened to place a lien on Soon-Osberger's building, sue members of the building co-op's board of directors, and remove any device the building installed to replace Teman's intercom. Trial Tr. 440, 443. After Soleimani installed another company's intercom device in one of his buildings, Teman responded with a rambling email accusing Soleimani of lying to him, "wast[ing] months of [his] time," "pretending to be [his] friend." GX 405. Teman also threatened to file liens against Soleimani's buildings, sue him, and report him to the New York Attorney General. Trial Tr. 513, 561. Throughout late-2018 and early-2019, Teman's relationship with his three customers deteriorated. *See* Trial at Tr. 335, 360, 514, 561.

As his business relationships fell apart, Teman's financial troubles grew. Trial Tr. 807-08; GX 704. In January 2019, Teman consulted with his attorney, Ariel Reinitz, Esq., about the possibility of withdrawing funds directly from his customers' accounts. Reinitz responded flatly that Teman's proposal was a "bad idea" because his customers "are likely to call the police" and Teman "will be arrested." GX 702. When Teman pushed back and offered his purported payment terms as a justification for his scheme, Reinitz responded that "[m]y opinion is that you are >50% likely to be arrested for the activities you propose. How you choose to proceed is up to you." *Id.*

On March 28, 2019, the defendant deposited two checks, each worth $18,000, via mobile deposit into an account at Bank of America held in the name of "GateGuard, Inc." (the "GateGuard

Account"). *See* GX 113. These two checks were signed and made to appear that they had been issued by two entities, 518 West 204 LLC and 18 Mercer. GX 201, 202. The two checks were not authorized by Coney Management or 18 Mercer, Trial Tr. 357-58, 360-61, 441, 474, and, as set forth above, if Teman had asked for authority, he would have been told flatly "no." Trial Tr. 327, 361, 428-29.

On March 29, 2019, Teman transferred approximately $35,000 from the GateGuard Account to another account at Bank of America that he also controlled in the name of "Friend or Fraud, Inc." (the "Friend or Fraud Account"). GX 113; *see also* GX 102, 103, 104. On April 2, 2019, Teman's customer's bank, Signature Bank, requested a return of the funds Teman's had obtained via check because the checks were not authorized. GX 113; *see also* GX 102, 142, 145. Bank of America agreed to return the funds. This charge-back resulted in $36,000 being automatically pulled out of the GateGuard Account at Bank of America and returned to Coney Management's and 18 Mercer's account at Signature Bank. GX 113. However, because Teman had already moved most of the funds deposited into the GateGuard to the Friend or Fraud Account, after the charge-back the GateGuard Account had a deficit of approximately $29,036.56. GX 113.

On April 2, 2019, Teman messaged Reinitz again to tell him that Bank of America had "put a hold" on the March 2019 checks. GX 727. Reinitz – apparently unaware that Teman had deposited the checks – wrote back "not sure I follow but this sounds bad" and "I don't know all the ins and outs of this but sounds like a bad idea." GX 704. Reinitz went on to say "[i]f you are hitting their accounts out of the blue, I expect this will become a criminal matter sooner or later." *Id.*; *see also* GX 728, 729.

On April 19, 2019, Teman, ignoring Reinitz's warning, deposited twenty-seven fraudulent checks worth $297,000 into the GateGuard Account at Bank of America. GX 113; Trial Tr. 272. The checks were made to appear that they had been authorized by three entities: ABJ Lenox and ABJ Milano, two entities operated by ABJ Properties; and 518 West 204 LLC, operated by Coney Management. GX 203-205. Eighteen checks, totaling approximately $198,000, were drawn on ABJ Lenox's account; six checks, totaling approximately $66,000, were drawn on ABJ Milano's account; and three checks, totaling approximately $33,000, were drawn on 518 West 204 LLC's account. GX 201-205.

Neither ABJ Properties nor Coney Management had ever authorized the issuance of the checks drawn on the ABJ accounts or the 518 West 204 LLC account. Trial Tr. 358, 563. In fact, by the date Teman deposited those checks in April 2019, the 518 West 204 LLC account had already been closed due to Teman's earlier attempt to fraudulently draw funds from the same account in March 2019. Trial Tr. 363, 685-86.

In an effort to get away with his scheme, Teman deposited the 27 checks on the eve of Passover, a religious holiday that representatives at ABJ Properties and Coney Management observed by, among other things, abstaining from using electronic devices on the first two days of the holiday. Trial Tr. 367-69, 564-65. Depositing the checks when he did gave Teman a head-start in transferring the money to himself without interference.

On April 24, 2019, Bank of America completed a charge-back of approximately $33,000 from the GateGuard Account to 518 West 204 LLC's account, held at Signature Bank. GX 113.

Two days later, or about April 26, 2019, Teman transferred approximately $225,000 in proceeds he had obtained by depositing the fraudulent checks out of the GateGuard Account and into the Friend or Fraud Account. GX 113; *see also* GX 102, 104. He then transferred the funds to various accounts he controlled and into overseas accounts. *See* Presentence Investigation Report ("PSR") ¶¶ 18-20; *see also* GX 113.On May 7, 2019, Bank of America completed a charge-back of $264,000 from the GateGuard Account to ABJ Lenox's and ABJ Milano's accounts held at JPMorgan. GX 113. Following that charge-back, the GateGuard Account had a negative balance of $260,319.81. PSR ¶ 20; *see also* GX 113. Because the funds were transferred to bank accounts in the name of other companies, Bank of America could not use the money in those accounts to cover its loss in the GateGuard account. Trial Tr. 235.

On May 8, 2019, the defendant entered a branch of Bank of America located in Manhattan, New York and, at a bank teller window, withdrew approximately $4,000 from the Friend or Fraud Account, representing the proceeds he received from depositing the April 2019 checks. PSR ¶ 20; *see also* Trial Tr. 231; GX 104, 112, 113.

In total, Bank of America suffered a loss of $259,988.17 by repaying the customer accounts at Signature Bank and JPMorgan for the losses sustained when the 29 fraudulent checks deposited on March 28 and April 19, 2019 were drawn against those entities' accounts. PSR ¶¶ 22-23.

**B. Sentencing Guidelines**

The Probation Office filed a Presentence Investigation Report concluding that the applicable Guidelines offense level is nineteen and Teman's Criminal History Category is I. Based on this computation, Teman's Guidelines range is 30 to 37 months' imprisonment. The Government agrees with the Guidelines computation in the PSR.

**C. The Defendant's Submission**

On May 4, 2020, the defendant filed his sentencing submission. ("Deft's Submission"). In it, he agrees with the Probation Office that the applicable Guidelines range is 30 to 37 months' imprisonment, but he requests to be sentenced to a term of time served. *See* Deft's Submission at 1, 3-4.

**D. Discussion**

    **1.    Applicable Law**

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Guidelines Sentence Is Reasonable in This Case

The 18 U.S.C. § 3553(a) factors particularly applicable here include the circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote the rule of law, and to provide adequate specific deterrence. *See* 18 U.S.C. § 3553(a)(1), (2)(A), (2)(B), (2)(C).

#### a. The Circumstances and Seriousness of the Offense

The circumstances and seriousness of the offense warrant a significant term of imprisonment. Teman wrote checks worth a total of hundreds of thousands of dollars in an effort to steal money from his customers. He attempted to steal $333,000, and in fact left stole $259,988.17. This was no one-off incident; rather, it was a calculated, repeated effort to steal money from his customers and his bank. The record is replete with proof that he not only knew he was not authorized to deposit the checks, but he took concerted steps to get away with his scheme. He never invoiced his clients for the amount of the checks; he wrote on the checks that the bank should call him if it had questions about their veracity, rather than calling the customers; he deposited many of the checks on the eve of Passover, when his customers would not have access to their electronic communications; and, after depositing the checks, he immediately moved the fraudulently obtained funds into his other accounts so Bank of America could not recover the funds.

Text message records between Teman and his attorney, Reinitz, show that Teman had not only been contemplating his plan for at least several months, but he had expressly sought his attorney's advice on the matter. His attorney told him, in writing and in no uncertain terms, that

Teman's proposal was a "bad idea" because his customers "are likely to call the police" and Teman "will be arrested." GX 702. Ignoring that advice, Teman deposited checks worth $18,000 each drawn from the accounts of 18 Mercer and Coney Management. When the businesses recovered the funds he tried to steal, Teman went back to his lawyer, who was apparently unaware he had actually carried out his original "bad idea." *See* GX 704 (Reinitz writing "not sure I follow but this sounds bad" and "I don't know all the ins and outs of this but sounds like a bad idea"). This time, Reinitz acknowledged that he did not know "all the ins and outs of this" but reiterated that it was "bad idea" and a "federal crime" that could land Teman in jail. *See* GX 704, 728. Ignoring the explicit and obvious advice that his plan to take customer funds without authorization was a crime, Teman doubled-down, depositing checks totaling $297,000 in April 2019. Put simply, Teman's scheme was planned out and he had ample notice that it could lead to a criminal conviction, but he decided to proceed anyway. After he was caught and charged with a crime, Teman called Reinitz as a witness to falsely claim that he had advised Teman that the conduct was "technically legal," testimony that the Court has already recognized there was good reason to disbelieve. Opinion and Order at 45-46 (June 5, 2020), Dkt. No. 138.

Teman's behavior towards his customers during the course of his business dealings and before and after trial further supports a significant term of imprisonment. When Teman's customers told him they would stop using his intercoms because they did not function properly, he reacted angrily and explosively. For example, Teman called one of Gabay's employee's "an idiot," and accused Soleimani of lying to him, "wast[ing] months of [his] time," and "pretending to be [his] friend." GX 405, 417. One month before trial, Teman posted publicly on social media that Soleimani was a "scumbag slumlord who lied to the police" and was "named the #7 worst landlord in NYC." Dkt. No. 47 at 4. Teman added "#karma" and that he might "sleep better tonight" knowing Soleimani had publicly embarrassed. *Id.* In a note that Teman circulated in December 2019, a copy of which was submitted to the Court on December 11, 2019 (the "December 2019 Note"), Teman labeled Soleimani and his brother as "crooked slumlords" and, in strong and unequivocal terms, directed others in their shared religious community to punish the Soleimanis. Note at 2. In another note Teman wrote, circulated in May 2020, which he emailed to the Court on May 21, 2020 (the "May 2020 Note"), Teman again disparaged the witnesses against him and labeled the Government's case agent "a fat, greasy NYPD officer with a history of disappearing evidence." Note at 1. Teman's post-trial comments show that his anger and threats to the victims in this case was not an aberration. In his sentencing submission, Teman cites to various charitable works as evidence of his "true character," Deft's Submission at 1, 5-9, but his conduct in this case and his conduct prior to trial paint a different picture.

### b. The Need for Specific Deterrence

The need to provide adequate specific deterrence also calls for a significant term of imprisonment. Teman has expressed no remorse for his conduct, and in his sentencing submission he makes clear that he maintains his innocence. Deft's Submission at 1. But Teman's public statements go further and show that he blames nearly everyone else – including the witnesses against him, law enforcement officers, individual members of the prosecution team, and the Court – for his conviction. *See, e.g.*, December 2019 Note; May 2020 Note; Dkt. No. 47. The Court should consider Teman's total lack of remorse in imposing a sentence with a substantial term of imprisonment that will afford adequate deter future behavior of the defendant. *Cf. United States v. Gilkes*, No. 13 Cr. 575 (JBW), 2014 WL 2612071, at *3 (E.D.N.Y. June 11, 2014) (crediting

defendant's remorse in finding that there was a lower need for a sentence to afford specific deterrence).

### c. The Defendant's Arguments

In asking for a term of time served, Teman principally cites a history of good works, a low risk of recidivism, dangers associated with contracting COVID-19, and the need to avoid unwarranted sentencing disparities. Deft's Submission at 4-21. The Government has no basis on which to dispute Teman's charitable history; however, as proof of his "true character," it is at odds with the proof before the Court about his behavior towards his customers, set forth above. Teman's argument that he poses a low risk of recidivism is also undermined by his complete lack of remorse or acceptance of responsibility for his brazen criminal conduct and the nearly $260,000 loss facing his bank..

The defendant's arguments relating to COVID-19 also fall well short of supplying a basis for imposing a term of time served. The COVID-19 pandemic is indisputably serious. It is impossible to know where the Bureau of Prisons will designate Teman to serve any imposed period of incarceration or what the risk will be when the defendant begins his term, which may not be until late 2020, but the facilities in New York currently show a relatively low rate of infection. The BOP generally, and the MCC and the MDC in particular, have demonstrated that they are prepared to handle, and are effectively handling, the risks presented by COVID-19. Since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp. Beginning in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.[1]

As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, BOP created "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.* On March 13, 2020, BOP, after coordination with the Department of Justice, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.*

BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For

---

[1] *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

Case 1:19-cr-00696-PAE   Document 150   Filed 07/14/20   Page 8 of 10

Page 8 of 10

example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, *including for medical treatment*); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* BOP has also implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

These and other measures were outlined in a March 18, 2020 letter from BOP to Chief Judge McMahon in response to questions regarding the MCC's (and Metropolitan Detention Center's) institutional responses to COVID-19. Subsequent Phases of the BOP's response plan have since been implemented. On April 1, 2020, the BOP announced implementation of Phase Five of its response protocols, which involves a mandatory 14-day quarantine lockdown of all inmates across the BOP system.[2] During this time, the BOP is allowing inmates access where practicable to programs and services such as mental health treatment and education.

Based on the latest data, MCC's efforts to mitigate the spread of the virus appear to have been largely successful. From March 13, 2020, to July 9, 2020, there were 14 positive inmate tests at the Brooklyn MDC out of 346 inmates tested, and 10 positive inmate tests at the Manhattan MCC out of 146 inmates tested.[3] Currently, there are 5 inmates with positive tests at the Brooklyn MDC out of more than 1,500 inmates, and 6 inmates with positive tests at the New York MCC out of nearly 700 inmates.[4] It is far from clear that an inmate at MCC or the MDC is actually at any greater risk of contracting the virus than he would be outside the facility. Furthermore, with respect to the inmates at MCC or MDC who have tested positive for COVID-19, the Government understands that the facility has taken appropriate responsive steps, including appropriately quarantining and cleaning the units where those inmates resided, moving the inmates out of the units where they were previously housed, and conducting a medical assessment of all inmates in contact with them, which will be repeated regularly to monitor those inmates and identify those who may require medical attention. The MCC's and MDC's swift action in taking appropriate mitigating measures further undermines the defendant's claim that these facilities are ill-prepared to manage COVID-19.

Teman's final argument regarding the need to avoid unwarranted sentencing disparities also falls flat. Teman cites various statistics regarding the general frequency of below-Guidelines

---

[2] *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (updated Mar. 31, 2020).

[3] *See* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200709_033920.pdf (July 9, 2020).

[4] *See* https://www.bop.gov/coronavirus (last visited July 13, 2020).

sentences, Deft's Submission at 18, but those statistics do not account for unique aggravating factors in his case, like Teman's total lack of remorse or acceptance of responsibility, and his behavior towards witnesses in this case. Teman next argues that specific sentences in three cases warrant a term of time served. First, Teman cites *United States v. Davenport*, No. 17 Cr. 61 (LAP) (S.D.N.Y.), where Judge Preska imposed a term of a year-and-a-day imprisonment. Of course, the sentence imposed by Judge Preska was significantly greater than a term of time served, but that case is also distinguishable from this case because Davenport expressed remorse, took full responsibility for his conduct, and was subject to a massive $9.7 million financial penalty. Sent'g Tr. at 58, *United States v. Davenport*, No. 17 Cr. 61 (LAP) (S.D.N.Y.), Dkt. No. 214. Teman next cites *United States v. Vadlamudi*, No. 16 Cr. 798 (KBF) (S.D.N.Y.), where Judge Forrest imposed a sentence of probation. That case was unique because, as Judge Forrest noted, Vadlamudi never billed the victim-charity in that case for more than the work he performed, which she found to be a significant mitigating factor. Sent'g Tr. at 7, 14-15, *United States v. Vadlamudi*, No. 16 Cr. 798 (KBF) (S.D.N.Y.), Dkt. No. 54. By contrast, here, Teman sought to steal money from his customers and then took steps to ensure that his bank could not recover the funds he had stolen. Vadlamudi, unlike Teman, also took full responsibility for his conduct. *Id.* at 13. Finally, Teman cites *United States v. Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y.), a case involving a defendant who pleaded guilty to several violent crimes pursuant to a cooperation agreement and was then sentenced pursuant to Section 5K1.1 of the Guidelines. Although the Court did grant Hernandez's compassionate release motion, which was unopposed by the Government, that ruling has little bearing on Teman's case. Among other things, Hernandez had already served a significant term of incarceration and had sacrificed tremendously as a cooperator against a violent gang and as a public figure facing threats against his family. To the extent Teman cites his own hardships while released subject to pretrial supervision, those hardships do not undermine the significant need for punishment in this case.

### E. Restitution, Forfeiture, and Fine

The Government agrees with the Probation Office's recommendation in the PSR that the defendant be subject to a restitution order for $259,988.17. The Government also believes the defendant should be subject to a forfeiture order for $259,988.17 pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A).

**F. Conclusion**

      For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines recommended sentence of 30 to 37 months incarceration. Such as sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

                                                    Respectfully submitted,

                                                    AUDREY STRAUSS
                                                  Acting United States Attorney for the
                                                  Southern District of New York

By: _____
                                                  Kedar S. Bhatia
                                                  Jacob H. Gutwillig
                                                  Assistant United States Attorneys
                                                  (212) 637-2465/2215