

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 23, 2021

**BY CM/ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

     Re:    *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

    The Government respectfully writes to address the Court's inquiry about "whether and on what terms restitution and/or forfeiture orders are merited." *See* Dkt. No. 202 at 2. For the reasons set forth below, the Government submits that restitution of $259,340.32 and forfeiture of $330,000 are warranted. A proposed Order of Restitution is attached as Exhibit A, and a proposed Order of Forfeiture is attached as Exhibit B.

    **A.**    **Background**

    On January 3, 2020, the grand jury returned a Second Superseding Indictment (the "Indictment") charging Teman in six counts. *See* Dkt. No. 55. Counts One and Two each charged bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. Counts Three and Four each charged wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Counts Five and Six, which the Government did not proceed on at trial, each charged aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2.

    The Indictment also contained a forfeiture allegation advising the defendant that, as a result of committing the bank fraud offenses in Counts One and Two, he "shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses." *Id.* ¶ 7. Likewise, the Indictment contained a forfeiture allegation advising the defendant that, as a result of committing the wire fraud offenses in Counts Three and Four, he "shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses." *Id.* ¶ 8.

Trial commenced on Counts One through Four on January 22, 2020. The Government's first witness was Karen Finocchiaro, a Vice President and Senior Fraud Investigator at Bank of America, N.A. Finocchiaro testified and introduced bank records reflecting several aspects of Teman's fraud, including the fact that, in March 2019 and April 2019, Teman deposited a total of 29 fraudulent checks worth a total of $330,000 into a Bank of America account belonging to GateGuard, Inc., a company he owned and controlled (the "GateGuard Account"). *See, e.g.*, Trial Tr. 196; GX 113. Immediately after depositing the checks into the GateGuard Account and securing the funds, Teman transferred nearly all of the fraudulently obtained funds into other Bank of America accounts he controlled in the names of other businesses and into a personal account in his own name. *See generally* Government's Memorandum of Law in Opposition to Defendant's Post-Trial Motions at 7-10 (Dkt. No. 112) ("Gov't Post-Trial Brief") (citing testimony and exhibits regarding the transfer of funds between Teman's accounts). Specifically, Teman transferred funds from the GateGuard Account into an account in the name of Friend or Fraud Inc. (the "Friend or Fraud Account"), an account in the name of Touchless Labs LLC (the "Touchless Labs Account"), and an account in his own name (the "Ari Teman Account"). *Id.* at 6-7, 9-10. He later withdrew $4,000 of these proceeds from the Friend or Fraud Account at a Bank of America branch in Manhattan.

After Teman deposited the checks and they were flagged as fraudulent, Bank of America was required to and did return funds from the GateGuard Account – where the checks were deposited – to the originating bank. Trial Tr. 208-09. In this process, sometimes referred to as a "chargeback," Bank of America drew the available funds from the GateGuard Account and then, if none were available, repaid the originating bank using Bank of America's own money. Specifically, Finocchiaro testified that the bank was responsible for paying for a chargeback with its own funds if the customer account had a deficit:

> Q.   What happens if there's only $10 in that account and there's a $50 chargeback?
>
> A.   It's going to leave the account in a deficit of $40.
>
> . . .
>
> Q.   And who would be responsible for those $40?
>
> A.   So it's the responsibility of the customer to make good on the balance in the account; so if the account's in a negative, that it is brought to a positive balance.
>
> Q.   Would the bank pay that $40 first?
>
> A.   It does. It does honor the chargeback, and it recourses the money back to the maker bank.

Trial Tr. 209-10. After chargebacks in the GateGuard Account, that account had a negative balance of approximately $260,000.

However, while Bank of America was required to return the proceeds of the fraudulent checks from the GateGuard Account back to the originating banks, it was not permitted to reverse the transfers from the GateGuard Account to Teman's other accounts. Finocchiaro testified that

2

Bank of America could not use funds from the Friend or Fraud Account, Touchless Labs Account, or the Ari Teman Account to "offset" the negative balance in the GateGuard account because the latter accounts were owned by different entities and had different tax identifier numbers:

> Q.  You mentioned something about -- you mentioned something called an offset. I want to unpack that a little bit. If there is a negative account -- if there is a negative balance when a chargeback happens, does Bank of America try to take some steps to get some of that money so it can pay for the chargeback?
>
> A.  We do. So we look at the events that occurred, so the transactions that were incoming, what was the trail of events after that, so we look to see where the funds were transferred to to see if we can offset to bring those funds back to cover the loss that's being sustained.
>
> Q.  If an individual had three accounts at the bank, for example, and there was a chargeback from one, could the bank try to use the funds in the other account to pay for it?
>
> A.  So we do not have the right to offset when the tax identification number is different from one entity to the other.
>
> Q.  So if it was an individual -- three personal accounts, would the bank typically be able to draw funds from the other accounts?
>
> A.  Yes.
>
> Q.  If it was for three different businesses, for three different tax numbers, would the bank typically be able to use the funds?
>
> A.  We cannot offset our loss when it is a different tax identification number.
>
> Q.  And based on your review of the records admitted into evidence earlier today, do you know if the three accounts that you talked about had different tax ID numbers?
>
> A.  They did.
>
> Q.  So as a general matter, is the bank able to recover funds from those three accounts?
>
> A.  We were not.

Trial Tr. 234-36.

Finocchiaro further testified that following the check deposits and chargebacks discussed above, the positive balances in the Friend or Fraud Account, the Touchless Labs Account, and the Ari Teman Account were set to "hold harmless" status. *Id.* at 233-34. Because the funds in that holding status belong to the account holder, Bank of America mailed checks with the positive balances to the account holder; however, the checks were returned to the bank through the mail. *Id.* at 234 ("Q. What happened with those checks? A. The checks were returned in the mail for the address.").

On January 29, 2020, Teman was found guilty on Counts One through Four. On July 14, 2020, the Government filed its sentencing submission, in which it noted that it was seeking restitution and forfeiture. Dkt. No. 150 at 9.

The initial value for restitution and forfeiture – $259,988.17 – was based on a document that had been produced prior to trial in the Section 3500 material for Finocchiaro. In that document, marked as 3503-19 and attached hereto as Exhibit C,[1] Bank of America identified the loss in the GateGuard Account ($259,988.17), which was also the amount it identified as its total loss. In the same document, Bank of America noted that it had attempted to return the funds in hold harmless status, but the checks had been returned to the bank. *See id.* ("Sent funds to customer, received in return mail, funds are in Hold Harmless").

Because Teman indicated in his sentencing submission that he was "working diligently to pay a significant portion, if not the entirety, of restitution before sentencing," Dkt. No. 145 at 2, the Government contacted Bank of America prior to the sentencing proceeding on December 1, 2020, to determine if its loss amount had changed in any way during the many months between trial and sentencing. In turn, Bank of America notified the Government that it was no longer considering certain fees charged in the GateGuard Account, such as overdraft fees, as part of its loss amount. At the time, the Bank of America representative, Karen Finocchiaro, notified the Government that the bank was able to offset its total loss amount by the value in Hold Harmless in the Ari Teman Account.[2] The Government promptly noted this revised total loss amount in a letter to the Court and the defense on November 30, 2020. On December 1, 2020, prior to sentencing, the Government received and produced to the Court and the defense an updated version of 3503-19, attached hereto as Exhibit D.

Since the initial sentencing proceeding on December 1, 2020, the Government has further communicated with Ms. Finocchiaro to obtain information about the bank's loss. As explained in the Affidavit of Karen Finocchiaro, dated April 2, 2021 (Exh. E) ("Finocchiaro Aff.") and as the Government represented prior to the December 1, 2020 sentencing, Bank of America is no longer considering in its total loss amount certain fees charged in the GateGuard Account, such as overdraft fees. Finocchiaro Aff. ¶ 6. Accordingly, its previous loss amount, $259,988.17, was reduced by the value of the fees in the GateGuard Account, $647.85, for a revised total loss amount of $259,340.32. *Id.* While Finocchiaro previously understood from other bank employees that the loss in the GateGuard Account was offset by $13,477.37 in the Ari Teman Account, that was not correct. Indeed, the Government has learned that, in February 2020, Bank of America sent Teman checks for the funds in the Ari Teman Account ($13,477.37), the two Friend or Fraud Accounts

---

[1] The Government also produced the email from Finocchiario to which 3503-19 was attached. This email is marked in the Section 3500 material as 3503-18. In that email, Finocchiaro noted "Summary of loss and amounts held in hold harmless for potential recovery. We are unable to offset the loss with the funds in hold harmless as they were sent from different TAX ID's. To date there were no requests to have the funds resent based on the returned mail. Bank of America is requesting to have the funds authorized by the judge to offset the loss in this matter." At this time, the Government is not seeking to forfeit the specific property in the Friend or Fraud Account or the Touchless Labs Account.

[2] As set forth below, Bank of America later notified the Government that there had been no offset, and the money in the Ari Teman Account remained Teman's.

($8,413.69), and the Touchless Labs Account ($86,910.71) – all of which Teman received and deposited. An updated version of 3503-19, prepared by Finocchiaro, is attached to her affidavit as Exhibit 1.

### B.     Applicable Law

1.     Restitution

Title 18, United States Code, Section 3663A provides that a sentencing court, for defendants convicted of offenses described in 18 U.S.C. § 3663A(c), "shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense, or if the victim is deceased, to the victim's estate." The offenses set forth in 18 U.S.C. § 3663A(c) include, *inter alia*, "an offense against property under this title . . . including an offense committed by fraud or deceit." A "victim," for purposes of the restitution statute, is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

The Mandatory Victim Restitution Act ("MVRA") provides a formula for calculating a defendant's restitution amount. See 18 U.S.C. § 3663A(b). The "primary and overarching goal of the MVRA is to make victims of crime whole": to "compensate these victims for their losses and to restore the[m] to their original state of well-being." *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks omitted). To fulfill this objective without "award[ing] the victim a windfall, *i.e.*, more in restitution than he actually lost," the MVRA caps the restitution award at the actual "amount of the victim's loss." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (quoting *United States v. Boccagna*, 450 F.3d at 117)); *see also United States v. Coriaty*, 300 F.3d 244, 252 (2d Cir. 2002) ("Unlike loss calculations, a court's power to order restitution is limited to actual loss.") (internal quotation marks omitted). In the case of offenses involving monetary loss, that amount equals "the greater of . . . the value of the property on the date of the damage, loss, or destruction; or . . . the value of the property on the date of sentencing, less . . . the value (as of the date the property is returned) of any part of the property that is returned." *Thompson*, 792 F.3d at 277 (quoting 18 U.S.C. § 3663A(b)(1)(B)). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court . . . ." 18 U.S.C. § 3664(f)(1)(A).

2.     Forfeiture

Forfeiture for a bank fraud violation is provided by 18 U.S.C. § 982(a)(2)(A), which states that "[t]he court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate [18 U.S.C. § 1344], shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." Forfeiture for a wire fraud violation is provided by 18 U.S.C. § 981(a)(1)(C), which states that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is "subject to forfeiture

by the United States."[3] Where a charging instrument gives notice of forfeiture and the defendant is convicted of an offense for which forfeiture is authorized, "the court *shall* order the forfeiture of the property as part of the sentence in the criminal case . . . ." 28 U.S.C. § 2461. For this reason, courts have described criminal forfeiture as "mandatory." *See, e.g.*, *United States v. Bodouva*, 853 F.3d 76, 78, 79 (2d Cir. 2017) ("[f]orfeiture and restitution were mandatory in the present case"); *United States v. Espada*, 128 F. Supp. 3d 555, 559 (E.D.N.Y. 2015) ("For certain statutorily enumerated offenses . . . criminal forfeiture is a mandatory component of the defendant's sentence.").

"Sentencing courts determine forfeiture amounts by a preponderance of the evidence." *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). Where, as here, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). "The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). "The calculation of forfeiture amounts is not an exact science." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011). The Court is only required to "make a reasonable estimate," based on "the available information." *Id.* (quotation marks omitted). Courts may use "general points of reference as a starting point" and "make reasonable extrapolations from the evidence." *Id.*

Further, a defendant is liable for the full amount of proceeds he controlled, without regard to whether he retained them or transferred them to others. *See Rajaratnam v. United States*, 2018 WL 2460337, at *3 (2d Cir. June 1, 2018) (summary order) ("Even if those proceeds subsequently were distributed to investors, with [defendant] personally retaining only a percentage as management fees, he nonetheless had authority over disbursements, and, thus, exercised 'control' over the proceeds 'at some point.'") (internal quotation omitted); *United States v. Ohle*, 441 F. App'x 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "whether or not Uddin shared the cash he received"); *see also* 21 U.S.C. § 853(p)(1)(B) (permitting forfeiture of substitute assets from defendant where he has caused forfeitable property to be "transferred or sold to, or deposited with, a third party.").

"Restitution and forfeiture are authorized by different statutes and serve different purposes—one of remediating a loss, the other of disgorging a gain." *United States v. Torres*, 703 F.3d 194, 196 (2d Cir. 2012). "Criminal forfeiture is a form of punishment. As such, it is distinct from restitution or other remedial actions, which are intended to return the victim and the perpetrator to the status quo that existed before the violation took place." *United States v. Peters*, 732 F.3d 93, 101 (2d Cir. 2013). Indeed, the relevant statutory scheme does not permit a sentencing court to "reduce the mandated criminal forfeiture order because the defendant also had to satisfy her obligation to pay restitution" or had already substantially done so. *United States v. McGinty*, 610 F.3d 1242, 1248 (10th Cir. 2010). In *United States v. Bodouva*, 853 F.3d 76, the Second Circuit

---

[3] Section 1956(c)(7)(A) in turn refers offenses listed in Section 1961(1), which include wire fraud, in violation of 18 U.S.C. § 1343.

rejected an argument that imposition of restitution and forfeiture amounted "to an unfair double disgorgement" in light of the "distinct purposes of forfeiture and restitution." *Id.* at 79. The Second Circuit held that a sentencing court may not reduce the amount of forfeiture to account for a restitution order in the absence of a statutory offset. *Id.* at 79-80; *accord id.* at 78-79 ("Because the statutory schemes authorizing restitution and forfeiture are separate, district courts are bound not to reduce the amount of a mandatory criminal forfeiture order by the amount of past or future restitution payments, in the absence of specific statutory authorization to do so."); *see also United States v. Pescatore*, 637 F.3d 128, 137-38 (2nd Cir. 2011) ("[W]e see nothing in the statutory provisions, DOJ's normal operating procedures, or the Plea Agreement that required the Department to use the forfeited assets to relieve [the defendant] of his restitution obligations.").

Because restitution and forfeiture are authorized by different statutes and defined differently, the Court may order different values for restitution and forfeiture. *See Torres*, 703 F.3d at 203 (noting that restitution and forfeiture amounts "may often be different"); *see, e.g.*, *United States v. Bergstein*, No. 16 Cr. 746 (PKC), 2018 WL 9539768, at *2 (S.D.N.Y. Sept. 20, 2018) (imposing different restitution and forfeiture amounts).

### C.    Restitution

The Government respectfully submits that the Court should enter the proposed Order of Restitution, attached hereto as Exhibit A, as part of Teman's sentence. The proposed order seeks restitution of $259,340.32. As set forth above, this restitution amount reflects: (1) the deficit in the GateGuard Account after Teman fraudulently deposited checks into that account, transferred the bulk of that money to other accounts he controlled, and then left Bank of America to repay the originating banks for his fraud ($259,988.17); and (2) less certain fees charged in the GateGuard Account that Bank of America is no longer seeking to recover ($647.85). *See* Finocchiaro Aff. ¶¶ 3, 6. Accordingly, Bank of America's total loss, $259,340.32, constitutes the "full amount of [the] victim's losses," and the Court should enter the Order of Restitution at sentencing.

### D.    Forfeiture

The Government respectfully submits that the Court should enter the proposed Preliminary Order of Forfeiture, attached hereto as Exhibit B, and include it as part of Teman's sentence. For the reasons set forth above, the amount listed in the forfeiture order, $330,000, represents "property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of [a violation of 18 U.S.C. § 1344]" and "property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [18 U.S.C. § 1343]." 18 U.S.C. §§ 982(a)(2)(A) and 981(a)(1)(C).

Because $330,000 is the amount Teman obtained control over, he is liable for forfeiture in the amount of those proceeds. *See Peters*, 732 F.3d at 104; *Contorinis*, 692 F.3d at 147. The fact that Teman, having obtained control of his crime proceeds, later directed them to other accounts or lost control of the funds in a charge back is immaterial – he remains liable for the full amount he acquired. *See Rajaratnam*, 2018 WL 2460337, at *3; *Ohle*, 441 F. App'x at 803; *Uddin*, 551 F.3d at 181.

Pursuant to 28 U.S.C. § 2461, the Government respectfully submits that forfeiture is mandatory in this case. Furthermore, the Government has identified no offset that applies in this case and that would permit the Court to reduce the value of forfeiture in light of the proposed restitution order. *See, e.g.*, 18 U.S.C. § 981(a)(2)(C) (permitting an offset in cases involving fraud in the process of obtaining a loan). Nor does the Government believe imposing both restitution and forfeiture orders leads to an unjust or inequitable result; the two statutory frameworks speak to separate, important purposes.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:     /s/
Kedar S. Bhatia
Assistant United States Attorney
(212) 637-2465