Andrew J. Frisch
Partner

212-344-5400
afrisch@schlamstone.com

SCHLAM STONE & DOLAN LLP

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

April 28, 2021

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
New York, New York 10007

Re:  *United States v. Ari Teman*, 19 CR 696 (PAE)

Dear Judge Engelmayer:

On behalf of Ari Teman, we submit this letter as a motion to vacate Mr. Teman's conviction or, alternatively, for bail pending appeal.

Mr. Teman was ambushed by the government at trial. Rather than complain precipitously to the Court about the government's apparent misconduct, current counsel brought their aggregate 75 years of professional experience to bear and attempted to discuss the issue described herein in confidential conversations with the government. We respectfully disagree with the Court's characterizations in its Order of April 26, 2021. *See* Docket 217. We worked to vet an issue with the government that calls its integrity into question before raising the issue with the Court. A recent telephone call with the government coupled with the government's filing this past Friday [Docket 215] favor filing this motion now.

Pending Professor Fraher's report, Mr. Teman's conviction should be vacated. For reasons previously stated in prior counsel's submissions incorporated herein by reference and as supplemented below, the government shoehorned a commercial dispute into a federal fraud in part by making arguments that are false and violating an Order of this Court in so doing. In sum, the government elicited legal opinions from a fact witness which had not been noticed, which the Court had specifically prohibited, and which were wrong. The government then used those legal opinions as a springboard for what the government argued in summation was its "most obvious" evidence of criminal intent, but we expect Professor Fraher's report will establish that it was no such thing. The government's disclosure on the eve of Mr. Teman's scheduled sentencing caused defense counsel to begin analyzing this issue, leading them to this motion.

The Court may ultimately agree or disagree with defense counsel's view of the landscape, but we hope that the Court will accept that our approach has been in good faith. We believe that the government's prosecution of Mr. Teman is infirm and should be put out of its misery now. If not, we urge the Court to embrace the second-opinion protocol vested in the Court of Appeals and continue Mr. Teman's bond pending appeal.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 2 of 15 Pages

## Summary of the Case

Over a two-month period in 2019, Mr. Teman deposited 29 "remotely created checks," a legitimate instrument in the banking industry known as "RCC's," by which a payee is permitted to draw on funds from a payor's account if authorized to do so. Mr. Teman's RCC's were drawn on the respective bank accounts of three customers of GateGuard, a company owned and operated by Mr. Teman, which provided video intercom devices to multiple-dwelling buildings in New York City and elsewhere. All of the 29 checks were deposited by Mr. Teman in an account at the Bank of America ("BOA"), where he regularly banked and maintained a total of four accounts: a personal account opened under his social security number, and three other accounts, each in the name of a different corporate entity under which Mr. Teman did business, each of which was opened with a separate tax identification number. Mr. Teman was the sole signatory on all four accounts.

A.  *In violation of this Court's order, the government elicited legal opinions from an unqualified fact witness, which had been prohibited and which was wrong*

On September 28, 2019, more than three months before trial, Mr. Teman's counsel asked the government to provide notice of its intent to offer any expert testimony as required by Rule 16(a)(1)(G). *See* Docket 61 at 1-2. Three months later, on December 30, 2019, with trial a few weeks away, the government advised counsel by email that it intended to call a witness "to discuss the process for conducting a chargeback." Docket 61 at 2. On January 6, 2020, the government wrote to defense counsel (Docket 61-1), identifying the witness as BOA's Karen Finocchiaro, Vice President and Senior Investigator in BOA's Enterprise Fraud Intelligence Team. The government represented that Ms. Finocchiaro's testimony "is most accurately classified as fact testimony rather than expert testimony." In "an abundance of caution," the government disclosed that Ms. Finocchiaro would testify about, among other things,

> Bank of America's records for certain of the defendant's bank accounts. Ms. Finocchiaro will also provide background and explanatory testimony regarding Bank of America's process and procedure associated with charge-backs. This testimony will include background and explanatory information about the bank's procedures for initiating and completing a charge-back and for responding to a charge-back request initiated by another bank.

Based on this disclosure, Mr. Teman's trial counsel moved to preclude Ms. Finocchario from offering expert opinions, arguing that the government had provided only "a broad statement that she will testify about certain categories of topics - without a single disclosure as to what

The Honorable Paul A. Engelmayer
April 28, 2021
Page 3 of 15 Pages

the witness will say about anything at all . . . [nor her] qualifications . . . [nor] the bases and reasons for [her] opinions. Docket 61 at 4, 6. The government opposed preclusion, explaining that it would elicit testimony "about the process and procedure for charge-backs involving Bank of America, which is an issue Finocchiaro is well-suited to testify about as a senior investigator at the bank." Docket 73 at 11. The government assured the Court that it "does not intend to elicit any expert testimony from Finocchiaro's testimony." Docket 73 at 9.

The Court ruled that Ms. Finocchario could testify as a fact witness:

> Based on the government's proffer of [Ms. Finocchiaro's] anticipated testimony, she is characterized properly as a fact witness. The government has represented only that Finocchiaro will testify as to Bank of America's charge-back processes and procedures, and while the government is not explicit on this point, the Court assumes that her personal knowledge of these procedures comes from her experience as a Bank of America senior investigator. Assuming that to be so, her account of the charge-back procedures at her employer constitutes fact testimony for a fact witness. The government has not provided any opinion that she would offer about these procedures.

Docket 87 at 30. In permitting Ms. Finocchiaro to testify, the Court expressly admonished the government that

> this ruling does not authorize and should not embolden the government to elicit expert testimony from Finocchario. The Court suspects that she will testify solely on personal knowledge about relevant practices and procedures at her employer, Bank of America.

Docket 87 at 31. Contrary to the Court's ruling and the government's assurances on which it was based, the government elicited expert legal opinions from Ms. Finocchiaro, which were wrong. The government then used Ms. Finocchiaro's opinions to press incriminating inferences of fraud which were false.

Much of Ms. Finocchiaro's testimony was consistent with the government's representation that she would testify only as a fact witness about BOA's processes and procedures. Her testimony about deposit of RCC's into the GateGuard account and Mr. Teman's subsequent transfers of funds to his other BOA accounts was consistent with Finocchiaro 3503-19. Exhibit A. That document appears to show the respective balances of Mr. Teman's four BOA accounts after deposit of RCC's into the GateGuard account and transfers of deposited funds to other BOA accounts. Thus, the document lists Mr. Teman's four BOA accounts; notes the

The Honorable Paul A. Engelmayer
April 28, 2021
Page 4 of 15 Pages

negative balance of $259,988.17 in the GateGuard account after the transfers; specifies the resulting (positive) balances in Mr. Teman's other three BOA accounts, including a positive balance of $13,477.37 in Mr. Teman's personal account; and indicates that BOA attempted to return the positive balances in these three other accounts to Mr. Teman, but the checks representing those balances were returned to BOA thereafter as undeliverable.  *See* Exhibit A.

The government then changed the subject from charge-backs to the bank's recovery of its losses and elicited the following highlighted legal opinions from Ms. Finocchario, doing so with rhetorical flourish as it concluded her direct examination:

> Q. Did there come a time when the GateGuard account was closed?
>
> A. Yes, there was.
>
> Q. And what the value remaining in the account when it was closed?
>
> A. In the GateGuard account, the total negative balance was $260,319.81.
>
> Q. And you testified about two other accounts, the Friend or Fraud account and the Touchless Labs account?
>
> A. Correct.
>
> Q. Were those accounts closed as well?
>
> A. Yes, they were.
>
> Q. And was there a positive balance or a negative balance in those accounts?
>
> A. [S]o at the time when the [Friend of Fraud] account was closed, it was at a positive balance of $8,386.
>
> . . . .
>
> Q. And what about the account ending in 1046?  That is the Touchless Labs account.
>
> A. We were sitting at a positive balance of $86,558.18.
>
> Q. What did Bank of America do with the money in those accounts?
>
> A. So those funds were immediately sent to hold harmless in regard - it is a holding - it is a holding account that the bank has.  We review the account for offset to see if we're able to utilize the funds from the transfer to offset the loss that was incurred based on the returned item chargeback.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 5 of 15 Pages

> Q. Before that, did there come a time when the bank, or Bank of America, tried to return the deposited balance funds in those accounts?
>
> A. Yes.
>
> Q. What happened?
>
> A. So the funds were - the checks were cut for the individual accounts and the physical check was mailed.
>
> Q. Let's unpack that. So in this [Touchless Labs] account, for example, there is $86,558.18 at the time of closing, is that right?
>
> A. That is correct.
>
> Q. [W]hat did Bank of America do with that $86,000?
>
> A. The funds were placed into an official item and they were mailed to the customer.
>
> Q. A check was mailed to the customer?
>
> A. Correct.
>
> Q. Is the same true of the other account?
>
> A. That is correct.
>
> Q. OK. What happened with those checks?
>
> A. The checks were returned in the mail for the address.
>
> Q. You mentioned something about – you mentioned something called an offset. I want to unpack that a little bit.
>
> If there is a . . . negative balance when a chargeback happens, does Bank of America try to take some steps to get some of that money so it can pay for the chargeback?
>
> A. We do. So we look at the events that occurred, so the transactions that were incoming, what was the trail of events after that, so we look to see where the funds were transferred to see if we can offset to bring those funds back to cover the loss that's being sustained.
>
> Q. *If an individual has three accounts at the bank, for example, and there was a chargeback from one, could the bank try to use the funds in the other account to pay for it?*
>
> A. *So we do not have the right to offset when the tax identification number is different from one entity to the other.*

The Honorable Paul A. Engelmayer
April 28, 2021
Page 6 of 15 Pages

> Q. So if it was an individual - three personal accounts, would the bank typically be able to draw fund from the other accounts?
>
> A. Yes.
>
> Q. *If it was three different businesses, for three different tax numbers, would the bank typically be able to use the funds?*
>
> A. *We cannot offset our loss when it is a different tax identification number.*
>
> Q. And based on your review of the records admitted into evidence earlier today, do you know if the three accounts that you talks about had different tax ID numbers?
>
> A. They did.
>
> Q. *So as a general matter, is the bank able to recover funds from those three accounts?*
>
> A. *We were not.*
>
> MR. BHATIA: Nothing further, your Honor.

T232-36 (emphasis added).

The government elicited these legal opinions without providing the required notice, notwithstanding its assurances to the Court that it "does not intend to elicit any expert testimony from Finocchiaro's testimony," and despite the Court's admonition that the government not be emboldened to elicit expert opinions from her. Absent notice and an opportunity to prepare for Ms. Finocchario as an expert (or seek preclusion), the full import of the above-highlighted testimony was not immediately plain. We expect that Professor Fraher's report will establish that a bank *can* recover funds from a customer's related accounts to cover its losses when the customer has defrauded it or acted in bad faith.

The manner in which Ms. Finocchario's legal opinions were presented, coupled with the government's post-trial disclosures, raises more questions. While Finocchario 3503-19 appeared to establish that BOA had attempted to return the positive balance of $13,477.37 in Mr. Teman's personal account when it had unsuccessfully attempted to return the positive balances in all of Mr. Teman's accounts, her above-quoted testimony was, in fact, silent as to the status of that $13,477.37 at the time of trial. The testimony focused on "those three accounts," a reference to the three *corporate* accounts, each with different tax identification numbers, not Mr. Teman's three BOA accounts including Mr. Teman's personal account apart from GateGuard. Only multiple readings of this testimony by undersigned counsel, triggered by the post-trial disclosure described below, makes clear in retrospect that the government

The Honorable Paul A. Engelmayer
April 28, 2021
Page 7 of 15 Pages

never asked Ms. Finocchario about the then-status of the $13,477.27 in Mr. Teman's personal account.

> B.  *The disclosure on the eve of Mr. Teman's scheduled sentencing about BOA's keeping the balance in Mr. Teman's personal account*

On November 30, 2020, the eve of Mr. Teman's scheduled sentencing, the government advised the Court by letter (Docket 174) that it had learned that day that "*certain money* held in a hold-harmless account had been applied to the bank's losses, and that the bank eliminated certain fees from its loss calculations." Docket 174 at 1 (emphasis added). According to the government, BOA's loss was not $259,988.17 as apparently initially reported, but $245,862.95. The government did not identify the nature of the "certain money" or otherwise explain the delta of $14,125.22 (the difference between $259,988.17 and $245,862.95). A proposed Preliminary Order of Forfeiture/Money Judgment" for $245,862.95 [Docket 174-1] was enclosed with the government's letter with Finocchiaro 3503-19 [Docket 174-2] attached to the proposed order.

Also on November 30, 2020, the literal eve of sentencing, the government disclosed for the first time, via email to the Court and defense counsel, an apparently updated version of Finocchiaro 3503-19 (Exhibit B), which contained the following new data points:

1.  Corresponding to the document's reference to Mr. Teman's personal account, it says:"$13,477.37 - Amount offset with funds from Hold Harmless;"

2.  Corresponding to the document's reference to Mr. Teman's GateGuard account, it refers to a "credit-Misc adjustment" of $359,85;

3.  Corresponding to the document's reference to Mr. Teman's GateGuard account, it refers to two balances, one of $259,988.17, and one of $259.700.17. The difference between those two numbers is $288.

The updated version of Finocchiaro 3503-19 did not indicate when these updates were added to Finocchiaro 3503-19, or whether someone at BOA had decided to offset its loss with Mr. Teman's $13,477.37 by the time of trial.

Upon receiving the updated version of the document, Mr. Teman's then-counsel Noam Biale emailed the government and inquired about the new numbers:

> **Mr. Biale:** I'm confused about this. The attachment indicates there is $108,801.77 in the hold harmless account, so why isn't the net number $151,186.40? Also, if that's the case, it potentially affects the Sentencing Guidelines, so I am confused why we are

The Honorable Paul A. Engelmayer
April 28, 2021
Page 8 of 15 Pages

just learning about this now.  Can you please provide ASAP whatever underlying documents you have from the bank that account for the numbers in your attachment?

Exhibit C.  AUSA Bhatia responded as follows:

**Mr. Bhatia**:  As you know, after Mr. Teman deposited fraudulent checks into the GateGuard account, he promptly transferred that money into other accounts he controlled at BOA (and then transferred some of that money outside the bank). When BOA froze his various accounts, they were not able to offset losses in the GateGuard account using the money from those other accounts, since the other accounts are held by different corporate entities.  Because that money cannot be used to offset the bank's losses, they do not minimize the forfeiture/restitution amount.  My understanding is that at some point prior to trial, the bank tried to return to Mr. Teman the money in the hold-harmless accounts but the checks were returned undeliverable. There was testimony at trial about funds left in hold-harmless account.

This has no bearing on the Guidelines, since the Guidelines loss was driven by the total value of the checks he created and deposited into his accounts – $330,000.  *See* PSR ¶ 32. You are not just learning about this now – as you can see from the stamp in the bottom left corner of the document, the document was produced in § 3500 material and reflects transactions in the bank statements introduced (and at the heart of) the trial.

Exhibit C.

In March 2021, Mr. Teman's current counsel revisited this issue with the government.  During a telephone conversation, the government told Ms. Kellman that BOA had subtracted bank fees from its calculation of loss.  Ms. Kellman and the government then had the following email exchange:

**Ms. Kellman**:  Thanks for the update -- so if I understand correctly -- is this the updated document that was turned over on the "sentencing" date?  Will check in later with more questions -- am trying to get a handle on the chronology of banking events. BTW, do you know when the check with the funds from BOA to [Mr. Teman] was sent? and returned?  And do we know why -- why sent? and why returned?  I didn't get the impression from our conversation yesterday that there was much clarity on those points . . . would appreciate whatever direction/info you've got on those points.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 9 of 15 Pages

> **Mr. Bhatia**: Hi Susan, we disclosed the reduced restitution in our filings that you've seen, and then we produced this record listing the same reduced amount on the morning of sentencing (we sent it to defense counsel first, and then later to the court as well). The trial testimony regarding the hold harmless status and offsets is in the transcript at 233-236. I think this testimony makes the situation quite clear – the funds were held in different corporate accounts so they could not be used to offset losses in the GateGuard account. They were returned to the account holder as physical checks but the physical checks were returned in the mail. Has Mr. Teman tried to get the funds back from the bank?

Exhibit D. Ms. Kellman next communicated with the government in an email on March 12, 2021, as follows:

> **Ms. Kellman**: I very much appreciated your time the other day — and am wondering if I can ask a follow up question. You mentioned that during your conversation with the bank the day before sentencing, that the bank explained that it attributed the discrepancy in the loss numbers to removing its fees from the total loss. I'm wondering if you wouldn't mind send[ing] me a copy of the fee breakdown. [My co-counsel] Andy & I are still struggling to wrap our arms around all of the moving pieces here.

Exhibit E. Despite the government's position that Ms. Finocchario's "testimony makes the situation quite clear," the government never responded to this email before its filing on April 23, 2021 [Docket 215], nor provided the requested breakdown of the bank's purported fees.

Thereafter, as undersigned counsel continued to analyze the updated version of Finocchario 3503-19, they determined, completely on their own, that the delta of $14,125.22 ($259,988.17 - $245,862.95) appears to be comprised of the following components, including the bank's offset of its loss from Mr. Teman's personal account:

| | |
|---|---|
| Mr. Teman's personal account: | $13,477.37 |
| The "credit-Misc adjustment:" | $   359.85 |
| The $288 described above: | $   288.00 |
| | $14,125.22 |

This determination, which undersigned counsel only reached by trying to back into the $14,125.22, was the first time in this case that it appeared indisputable that BOA at some point had decided to keep the money in Mr. Teman's personal account.

C. *The irreparable prejudice to Mr. Teman from the manner and timing of the disclosure*

Upon realizing that BOA had apparently used Mr. Teman's personal account to recovery a portion of its loss, undersigned counsel each re-read Ms. Finocchiaro's testimony at least a dozen times. Armed with the updated version of Ms. Finocchiaro 3503-19, undersigned counsel realized after continuing analysis and multiple conversations with each other that Ms. Finocchiaro's above-quoted testimony at trial did not address the use of Mr. Teman's personal account to offset the bank's loss. Whether or not the money had been first used by BOA as an offset before or after trial, the government's disclosure raised questions about the accuracy of Ms. Finocchario's testimony.

Undersigned counsel thereafter spoke to multiple highly-credentialed experts in banking law, ultimately including Professor Fraher. Counsel knew that it would take time to retain Professor Fraher and for him to review relevant documents and prepare a report. Rather than wait for Professor Fraher to conclude his work and cause undue delay, on April 2, 2021, counsel emailed a twelve-page letter to the government, on which this letter to the Court is based. We did so in part as a matter of professional courtesy to permit the assigned prosecutor to address his apparent violation of the command of Rule 16(a)(1)(G) and this Court's associated order and what appeared to be his calculated refusal to shed light on BOA's use of Mr. Teman's personal account to recover its losses. The prosecutor did not shed light on what appeared to be his apparent hiding the ball about BOA's use of the personal account as a partial recovery. Instead, while defense counsel were awaiting Professor Fraher's report, and despite our request that the government join us in a request for a further adjournment of the Court's briefing schedule, the government filed a letter with a supplemental affidavit of Ms. Finocchiaro. *See* Docket 215.

As we advised the government in our letter of April 2, 2021, we expect Professor Fraher to opine, in substance, at least as follows: While the contractual concept of mutuality of obligation might prevent a bank from seeking redress from a customer's other accounts to offset a loss caused by a mere overdraft, fraud or bad faith changes the landscape. Where a bank is defrauded (or even disadvantaged by malfeasance that does not constitute fraud), banks can use a customer's other personal and corporate accounts to recover its loss on the equitable theory of unjust enrichment: a customer should not be permitted unjustly to enrich himself at the bank's expense. Where a bank invokes the equitable remedy of unjust enrichment, however, it is vulnerable to equitable defenses such as unclean hands.

Ms. Finocchario's opinion that BOA could not offset a loss from Mr. Teman's other accounts does not apply to this case because Mr. Teman is charged with defrauding BOA. The government nonetheless made Ms. Finocchario's improper opinion a centerpiece of its

The Honorable Paul A. Engelmayer
April 28, 2021
Page 11 of 15 Pages

arguments: the government argued that BOA was left "holding the bag" because Mr. Teman knew that the money would be beyond BOA's reach if he transferred the deposited RCC's out of his GateGuard account. As Mr. Bhatia argued to the jury in summation:

> *And I submit that perhaps the most obvious proof here of criminal intent in that there's a $260,000 hole right now at Bank of America.* There's $260,000 - more than a quarter million dollars - missing. Someone else had to pay for that, Bank of America had to pay for that . . . The defendant stole from his own customers and he left Bank of America holding the bag.

T1042-43 (emphasis added).

> [I]t's a simple case, and the proof is overwhelming. Ari Teman created fake checks worth hundreds of thousands of dollars, lied about having permission from his customers, and then deposited those checks into this account. *Then he moved that money into another [Bank of America] account before Bank of America could get it back.*

T1009 (emphasis added); *see* T993 (BOA "couldn't get it back from Mr. Teman because he had already transferred it into other [BOA] accounts . . . *[Mr. Teman] knew the moment he deposited these checks on March 28 and the moment he moved the money out of his account on March 29 that Bank of America couldn't get it back . . . That's fraudulent intent"*) (emphasis added). *See also* Govt's Memo of Law in Opposition to Mr. Teman's Motion for a Judgment of Acquittal, Docket 112 at 20-21, 23 (Mr. Teman "moved the funds to other accounts he controlled") and 27 ("Teman moved money out of his GateGuard account immediately after depositing it so that Bank of America would not return it through a chargeback").

The government's arguments were false. If it was fair to impute knowledge of the law of offset to Mr. Teman, the inference was exculpatory: it is precisely when a customer defrauds a bank or acts in bad faith that corporate formalities attendant intra-bank transfers are rendered meaningless. Mr. Teman's transfers were, in fact, evidence of a regular course of business: he transferred some funds to his other businesses, and other funds to a GateGuard supplier in China. The government nonetheless argued to the jury that the transfers constituted "*the most obvious proof here of criminal intent*," but it was nothing of the sort.

In a footnote to the government's letter to the Court of April 23, 2021, it quoted a portion of Finocchiaro 3503-19 in an apparent attempt to set the stage for a later argument that it had been incumbent on Mr. Teman's trial counsel to engage the issue when Ms. Finocchiaro

testified or otherwise object. Any such argument would blame the defense for not recognizing the consequences of the government's ambush and calling it out sooner. It took Mr. Teman's current counsel virtually daily conversations with each other and a number of experts over a period of weeks, together with multiple reviews of the relevant potions of the record, to figure out what the government had done. Current counsel had the luxury of reviewing the record from the respective comfort of their home offices and the unfettered ability to confer and research the underlying legal issues. Upon reaching out to Mr. Biale and Ms. Harris (the lawyers from Sher Tremonte who appeared with Mr. Teman at his scheduled sentencing), current counsel learned that they had not figured out what the government had done even after specifically questioning the government about its filing on November 30, 2020. Upon reaching out to Mr. Teman's trial counsel, current counsel likewise learned they had not figured it out. The government cannot persuasively claim that this issue is much ado about nothing especially when it continued to hide the ball in response to separate specific inquiries from Mr. Biale and Ms. Kellman as described above. It was the government's submission on November 30, 2020, that caused Sher Tremonte and current counsel to start the digging that unearthed what had previously been buried. The government attempted damage control only on April 23, 2021, three weeks after it was provided with an earlier iteration of this letter.

### D.     *BOA was not defrauded*

While the government argued in summation that Mr. Teman's fraud was "blatant" and "brazen" [T977], it was not sufficiently blatant or brazen – or fraudulent at all – to convince BOA to invoke its equitable remedies. Its failure to do so helps explain why, even after a jury found that Mr. Teman had defrauded BOA, and notwithstanding BOA's right to offset its loss, it returned the positive balances in all of Mr. Teman's other accounts. Exhibit F. This fact alone requires dismissal of the case. It is no longer only that Ms. Finocchiaro testified at trial that "it was looked at as a dispute between the customer, the maker and the depositor, and at that point it is not – it's not within out decision to rectify the matter." Trial Transcript at 232. We now know that BOA returned the positive balances in Mr. Teman's accounts *after a jury found him guilty of defrauding BOA*. If that fact alone does not establish the legal insufficiency of the case against Mr. Teman, it is at least an exculpating fact which Mr. Teman should have been permitted to present to the jury in the context of the truth about a bank's rights to recover losses from a customer's other accounts.

The government advised the Court on November 30, 2020, that BOA had offset its loss with $14,125.22, including the $13,477.27, the positive balance in Mr. Teman's personal account. Ms. Finocchario's recent affidavit states that she was "notified by another Bank of America employee that the bank was able to offset its loss in the GateGuard Account with the funds in

The Honorable Paul A. Engelmayer
April 28, 2021
Page 13 of 15 Pages

the Ari Teman Account totaling $13,477.37." That statement contradicts the implication of her testimony at trial that BOA could not reach Mr. Teman's other accounts, but more, contradicts that prosecutor's sweeping arguments in summation. BOA's internal back and forth about what it could or should do only adds to the problems with this case. By November 30, 2020, when the government was advising the Court that BOA had kept the $13,477.27, BOA *had already returned the $13,477.27 to Mr. Teman* just as it had apparently done so in 2019 when it returned to BOA with the other checks as undeliverable. If BOA with its expertise could not figure out what to do with the $13,477.27, Mr. Teman could not have been expected to figure it out or know that BOA did not have the right to keep the positive balances in all of his accounts. The government's purported "$260,000 hole" at BOA was neither "the most obvious proof here of criminal intent," nor any proof of criminal intent at all.

### E. The Case Should Be Dismissed or a New Trial Should be Ordered

We expect that Professor Fraher's report will contribute to the quantum of arguments that the government's evidence did not establish fraud and that Ms. Finocchario in fact provided expert opinions which she was not qualified to give, were not properly noticed, and were wrong. At the very least, the verdict should be vacated, and a new trial ordered. "It is the duty of the government to present its case against the defendant fairly. Little can be added to Justice Traynor's statement – 'A defendant has hardly had a fair trial if he has been denied the opportunity to discover evidence or information crucial to his defense.'" *United States v. Baum*, 482 F.2d 1325, 1332 (2d Cir. 1973), *quoting* Traynor, Ground Lost and Found in Criminal Discovery, 39 N.Y.U.L. Rev. 228, 242 (1964). On facts less compelling than those presented here, the Court of Appeals in Baum ordered a new trial because the government had failed to provide advance notice of a prospective witness's identity: "[W]e would rather give the defendant the benefit of the doubt than let the Government reap even a slight possibility of benefit from what we regard as a lack of candor unworthy of a prosecutor." In another case, where the government failed to provide timely disclosure of expert evidence, the Court of Appeals ordered a new trial, finding that "[t]he course of the government smacks too much of a trial by ambush, in violation of the spirit of the rules." *United States v. Kelly*, 420 F.2d 26, 29 (2d Cir. 1969).

The Advisory Committee Notes to the 1993 Amendment to Rule 16 provide, and it is the general consensus, that the expanded disclosure requirements related to expert opinion testimony are intended to "minimize surprise that often results from unexpected expert testimony" and "to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." The Advisory Committee aptly notes that "one of counsel's most basic discovery needs is to learn that an expert is expected to testify." "To keep faith with the letter and spirit of Rule 16(a)(1)(G), '[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions.'" *United States v. Baker*, No. 14-cr-356 (ENV), 2016 U.S.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 14 of 15 Pages

Dist. LEXIS 170089, at *4 (E.D.N.Y. Dec. 6, 2016) (internal citations omitted).  "[A]s a salutary adjunct, [Rule 16(a)(1)(G)] 'creates an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure." *Id. quoting United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2002).

Thus, the government does not have "carte blanche [] to spring a surprise expert witness [or expert testimony] on an unsuspecting defendant[]." *United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007).  "For no defense counsel, no matter how experienced, can fairly be asked to cross-examine on a moment's notice a witness who comes clothed with all the impressive credentials and specialized training of an expert and whose opinions and methods with respect to the case at hand have been subject to no prior scrutiny." *Id*.  Although a new trial is not required when the prejudice caused by the government's failure to provide adequate notice of expert testimony has been cured, *see, e.g., Tin Yat Chin*, 476 F.3d at 146, it certainly was not here; to the contrary, the government's summation made the prejudice irreparable.

The government avoided its statutory duty by representing that Ms. Finocchiaro would not provide expert opinions in direct contravention of your Honor's prohibition on any such testimony.  The government elicited from Ms. Finocchiaro that the bank *could not* use the funds in other accounts controlled by Mr. Teman.  It then used that erroneous expert testimony, which had been barred by the Court, to advance *what the government acknowledged* was central to its theory of the case.

A new trial may be granted if "the interest of justice so requires," Fed. R. Crim. P. 33(a), and the motion is based on newly discovered evidence. Fed. R. Crim. P. 33(b)(1).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  A motion for a new trial may be predicated on numerous grounds "including prosecutorial misconduct and late disclosure of material evidence." *United States v. Washington*, 263 F. Supp. 2d 413, 420 (D. Conn. 2003), *citing* 3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice and Procedure § 555-56 (2d ed. 1982 & Supp. 2003).  *See, e.g. United States v. Valentine*, 820 F.2d 565, 570-571 (2d Cir. 1987) ("when a prosecutor's tactics cause substantial prejudice to the defendant and thereby serve to deprive him of his right to a fair trial, reversal is mandated); *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015) (granting new trial based on newly discovery evidence of prosecutorial misconduct).  A new trial may also be predicated on newly discovered evidence that discredits testimony that the prosecution relied heavily upon. *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) (new evidence impeaching the government's central witness was powerful enough to require a new trial).  Denial of a motion for a new trial is an abuse of discretion where the defendant was not

The Honorable Paul A. Engelmayer
April 28, 2021
Page 15 of 15 Pages

afforded reasonable time" to do a "thorough review" of a potential source of new evidence. *United States v. Djibo*, 730 F. App'x 52, 56 (2d Cir. 2018).

    F.   Mr. Teman Should Be Granted Bail Pending Appeal

The issue described herein adds to earlier arguments made in support of Mr. Teman's post-verdict motions (incorporated by reference herein) that establish that Mr. Teman should be granted bail pending appeal. Before Mr. Teman is required to surrender to serve any custodial sentence or pay any monetary penalty, the Court of Appeals should have an opportunity to determine whether the facts of this case establish a federal fraud or sufficient evidence thereof. It should also be afforded an opportunity to determine whether the government's violation of the command of Rule 16(a)(1)(G) and this Court's associated order, and the government's false arguments flowing therefrom, served to deny Mr. Teman a fair trial. *See United States v. Randell*, 761 F.2d 122, 124 (2d Cir. 1985) (the Bail Reform Act does not require a trial judge to assess the odds that a panel of appellate judges will disagree with him, but requires instead issues that are real, substantial, at least fairly debatable, and not frivolous). If Mr. Teman is required to surrender for any imprisonment that might be imposed, he will likely have served his sentence, or most of it, by the time the Court of Appeals issues its ruling. Meanwhile, Mr. Teman has complied with the terms of his release and poses neither a risk of flight nor a danger to the community.

Upon receipt of Professor Fraher's report, we will provide it to the government and submit further briefing pursuant to the Court's Order

                                          Respectfully submitted,

                                          *s/ Andrew J. Frisch*
                                          Andrew J. Frisch

                                          *s/ Susan G. Kellman*
                                          Susan G. Kellman
                                          25 Eighth Avenue
                                          Brooklyn, New York 11217

Attachments

cc: AUSA Kedar Bhatia