IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ARI TEMAN.

No. 19-CR-696 (PAE)

DECLARATION OF RICHARD M. FRAHER

I, RICHARD M. FRAHER, declare the following under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1. My name is Richard M. Fraher.

2. My current address is 1434 Brookcliff Drive, Marietta, Georgia 30062.

3. I have received the following undergraduate and graduate degrees, all in history: Bachelor of Arts, Wright State University; Master of Arts, University of Wisconsin-Milwaukee; Doctor of Philosophy, Cornell University. I received the degree of Juris Doctor magna cum laude from Harvard University School of Law. I have been admitted to the practice of law in Pennsylvania, attorney ID number 61913, since 1991.

4. I started my career in financial services law in 1991 at the Federal Deposit Insurance Corporation ("FDIC"), in the Atlanta Regional Office, where I supported the Division of Supervision's bank examination and enforcement functions and litigated administrative enforcement actions on behalf of the FDIC. I became an FDIC expert on the provisions of the Federal Reserve Act that regulate affiliate transactions, providing training to other FDIC attorneys and providing legal memoranda on that topic at the request of the chair of the FDIC. At the time of my departure from the FDIC in 1998, I was a Senior Attorney.

5. I joined the Legal Department of the Federal Reserve Bank of Atlanta in June, 1998, when the Federal Reserve System (the "Fed") moved the Retail Payments Office to Atlanta. The

1

Retail Payments Office managed all of the retail payments services provided by the twelve Federal Reserve Banks, specifically, check collection and return services and the Federal Reserve's automated clearing house services. I served as legal counsel to the Retail Payments Office until I retired from the Federal Reserve in 2019. At that time, my title was Vice President & Counsel to the Retail Payments Office at the Federal Reserve Bank of Atlanta.

6. As counsel to the Retail Payments Office, I was responsible for coordinating legal support for payments services across the legal departments of the twelve Federal Reserve Banks and the Legal Division of the Board of Governors. To carry out that function, in 2000, I organized and, until I retired, chaired the Fed's Payments Advisory Group, which met monthly to identify and brainstorm emergent issues related to all Federal Reserve payments related services to depository institutions. As the primary legal counsel for the Fed's check and automated clearing house ("ACH") services, I bore primary responsibility for Federal Reserve Operating Circular Number 3, Check Collection and Return, Federal Reserve Operating Circular Number 4, FedACH Service, the documentation of the Fed's procedures for the adjustments service, and all of the service agreements that the Reserve Banks used as a provider of the check service and the ACH service. I also advised and represented the Retail Payments Office in disputes involving checks, adjustments, and ACH items.

7. After Congress enacted the Check 21 Act, I was the lead attorney in drafting the Fed's rules and agreements for image-based check collection. I created the rules and agreements for the Fed's same day ACH service. When the Fed expanded its ACH service to an international service, I was one of the primary architects of the resultant FedGlobal service, participating in the design, drafting the rules and service agreements and negotiating the Fed's agreements with foreign gateway banks. I designed the initial policies and procedures for the FedGlobal service's compliance with the United States sanctions regime administered by the Office of Foreign Assets Control ("OFAC") and with the Bank Secrecy Act's anti money laundering ("AML") requirements. For several years, I was the Fed's representative on the Global Payments Forum run by Nacha, the organization that administers the rules and formats used in the ACH. I served as special advisor to the

steering committee that created the International Payments Framework Association, for which I designed the initial rule set for cross border credit transfers. I authored and delivered several training programs for Federal Reserve attorneys. I presented on payments law issues at industry conferences, typically several times each year.

8. Currently, I am an Adjunct Professor at the Emory University School of Law, where I teach Law of Payment Systems. I am also the Founder and Principal of Payment Innovation & Regulation LLC, through which I offer expert advice to financial institutions and fintechs at the intersection between innovative financial services and law, regulation, and public policy. These consulting services relate to the provision of traditional banking services, emerging financial services, disputes arising from payment transactions, and the regulation of fintech. I currently serve on the Board of Regents of The Payments Institute, where I teach courses each year on payments law and emergent issues in payments. I continue to present at industry conferences on topics related to payments law and public policy.

9. In preparing this declaration, I reviewed case materials including the following: portions of the transcript of Mr. Teman's trial, trial exhibits, and the government's submission to the Court on April 23, 2021.

10. Legal Counsel for Ari Teman have engaged me to provide a declaration with respect to the following situation:

An individual ("Mr. Smith") opens four accounts at a banking institution in the United States. Three of the accounts are in the names of separate corporate entities, 1corp, 2corp, and 3corp, through which Mr. Smith does business, and each of these accounts is identified by the Tax ID number of the corporate account owner. The fourth account is Mr. Smith's personal account opened with Mr. Smith's individual social security number. Mr. Smith is the sole signatory on all four accounts.

In March 2019 two deposits of remotely created checks are made into the account of 1corp. In April 2019, Mr. Smith visits a branch of the bank to deposit remotely created checks into the business account of 1corp. Mr. Smith engages in conversation with the teller and the teller's supervisor, at the end of which the bank accepts the deposit, subject to a seven day hold on the proceeds. Mr. Smith's bank thereby becomes the bank of first deposit with respect to the remotely created checks. As soon as the hold expires and the funds become available, Mr. Smith, acting as signatory for the 1corp account into which the checks were

3

deposited, transfers funds into other accounts at the same bank for which Mr. Smith is the sole signatory

The remotely created checks are presented to the banks on which they were drawn. The banks on which the remotely created checks were drawn return or request chargebacks from the bank of first deposit. The bases for the chargeback requests are that the remotely created checks were fraudulent or were not authorized, a claim which gives the paying banks a warranty claim against the bank of first deposit under Regulation CC, 12 CFR section 229.34(b). The bank of first deposit honors the chargeback requests and repays the paying banks the amount of the allegedly unauthorized remotely created checks. In turn, the bank of first deposit debits the 1corp account into which the remotely created checks were deposited, causing a negative balance in that account. Positive balances remain in the other accounts on which Mr. Smith is the signatory, into which the proceeds of the deposit of the remotely created checks have been transferred.

The question presented is: what standard industry practices could the bank of first deposit follow to recover the proceeds from the remotely created checks?

11. My declaration with respect to the question presented is as follows.
12. It is standard banking practice as well as a legal requirement that when a customer deposits a check into a bank account, the bank of first deposit makes the proceeds of the deposited check available to the customer in accordance with the funds availability schedule set forth in Regulation CC subpart B, 12 C.F.R. Part 229 subpart B. Typically the proceeds must be made available to the depositor not later than two banking days after the day on which the check was deposited. Many banks make the proceeds of check deposits available immediately. Alternatively, Regulation CC permits the bank of first deposit to place a hold on funds availability for a large dollar check deposit, a check that raises doubts regarding collectability, or a check deposited into a new account or into an account that has been overdrawn frequently. In the present case, the bank of first deposit placed a seven day hold on the deposits made in April 2019.
13. Under standard banking practices, a bank of first deposit has the right to recover from its customer the amount of any check that the bank has accepted for deposit if the check is returned or charged back to the bank. The Uniform Commercial Code gives this right to the bank as the transferee of a negotiable instrument from the customer whenever the customer deposits a check that turns out to be "bad" and results in a return or a chargeback resulting from the breach of a transfer warranty that the customer made to the bank. The

amount of a returned or charged back check is a debt of the customer to the bank, a debt that is immediately due and payable.

14. If the account into which the "bad" check was originally deposited no longer has a balance sufficient to pay the debt that the customer incurs to the bank when the "bad" check is returned or charged back, and the customer has multiple accounts at the bank, the bank may be able to recover its loss by means of a set off. The right to set off is limited by the principle that a bank may use set off only to the extent that there is mutuality of obligation between the bank and the indebted customer. The bank may recover the customer's debt by set off against only that customer's interest in other accounts or assets held at the bank.

15. In the present instance, the remotely created checks were deposited into an account owned by 1corp, a business entity controlled by Mr. Smith. When the checks were charged back, the bank had the right to debit only the account of the business entity into which the checks had been deposited. The bank did not have the right to set off against the other accounts controlled by Mr. Smith.

16. As applied to the facts in the Teman case, the foregoing analysis of set off accords with Ms. Finocchiaro's testimony specifically about Bank of America's inability to recover funds by set off from other accounts. (Finocchiaro testimony pp. 235-236.) In fact, Bank of America's right to set off extended no further than the account of GateGuard.

17. In contrast, Ms. Finocchiaro's explicit statement that the bank as a general matter lacked the ability to recover funds from Mr. Teman's other accounts was incorrect, and so was the government's argument to the jury that the bank's alleged lack of remedies was evidence of criminal intent on the part of Mr. Teman.

18. Ms. Finocchiaro's testimony in direct examination ended as follows:

> Q. So as a general matter, is the bank able to recover funds from those other three accounts?
> A. We were not. (Transcript p. 236, lines 2-6)

19. In fact, as a general matter, under applicable law and generally accepted banking practices, Bank of America had means to recover funds from the other accounts even if it had no right of set off. Therefore, Ms. Finocchiaro's testimony amounted to a misleading legal conclusion.

20. Based on Ms. Finocchiaro's statement that the bank was not able to recover funds from the other accounts, Mr. Bhatia told the jury, among other similar things: "But of course they couldn't get it back from Mr. Teman because he had already transferred it into other accounts." (Transcript p. 993, 22-24)

21. Mr. Bhatia further told the jury, "That's important for two reasons. First, that sort of explains to you how Bank of America suffered the loss. He transferred the money out of the account so they couldn't return it." (Transcript p. 993-994) And further, "He knew the moment he deposited these checks on March 28 and the moment he moved the money out of his account on March 29 so that Bank of America couldn't get it back..... That's fraudulent intent." (Transcript p. 994, 6-10)

22. In effect, Mr. Bhatia told the jury that by transferring the funds out of the GateGuard account into the other accounts, Mr. Teman moved the money beyond the bank's ability to recover it when the checks were charged back. Mr. Bhatia argued that Mr. Teman knew that transferring the money would prevent Bank of America from recovering the funds, and that this was evidence of fraudulent intent.

23. In fact, the bank had different means to recover funds from the other accounts available to it other than set off. And as a result, Mr. Bhatia's argument that transferring the funds into the other accounts deprived the bank of any means of recovery was based on a false premise.

24. When a bank suffers a loss because it accepted a check for deposit and that check was subsequently returned or charged back as an unauthorized item, generally accepted banking practices extend to a range of practical and equitable remedies beyond just set off. Normal banking practice includes the possibility of sequestering or freezing not only the assets of the depositor but also the assets of the depositor's related interests if the related interests were used in furtherance of the depositor's bad conduct. Specifically, a bank is well within its rights to decide either to remove the proceeds of the "bad" check into a separate account held by the bank or even to freeze the accounts into which the proceeds of the "bad" check have been moved. Funds that are sequestered or frozen by the bank are "held harmless" until the bank, the account holders, and possibly other claimants to the funds have had an opportunity to present and resolve their claims.

25. In the situation presented for the present discussion, the bank had the right to freeze all of the accounts of the individual and the businesses into which the proceeds of the "bad" checks were transferred. Alternatively, the bank had the right to sequester the proceeds of the "bad" checks by debiting each of the accounts for an amount equal to the lesser of the amount of the check proceeds that had been transferred into that account or the remaining balance of funds in the account, and putting those funds into a segregated "hold harmless" account pending the resolution of the bank's and the depositors' claims to ownership.

26. If, after sequestering or freezing the funds, the bank was unable to resolve the customer's debt, the bank could initiate a legal action seeking to retain the funds. More simply, the bank could have simply seized and kept the funds and risked that the negatively impacted accountholders might take legal action to recover the funds from the bank. The bank's actions in these situations would not be limited by the principle of mutuality of obligation that limits the scope of the bank's right to set off.

27. In taking the legal action described in the preceding paragraph, the bank would be seeking an equitable remedy, and might have to respond to equitable defenses. Here, defenses might arise from the very fact that the "bad" checks were remotely created checks.

28. A remotely created check is a check that is not signed by an authorized signatory on the account against which the item is drawn. Legally a remotely created check means "a check that is not created by the paying bank and that does not bear a signature applied, or purported to be applied, by the person on whose account the check is drawn." Federal Reserve Regulation CC, 12 CFR 229.2(fff). Historically, remotely created checks have been used legitimately by certain businesses such as bill payment services, credit card companies, utilities, and telemarketers, which obtained authorization from an accountholder to issue a remotely created check rather than incur the delay involved in having the accountholder write and sign a check that would then need to be delivered to the payee by mail or by some other means of physical delivery.

29. Remotely created checks are generally understood among bankers to be high risk instruments, subject to their own unique set of rules. The rules that uniquely apply to remotely created checks impose significant risk on a bank that accepts such a check for deposit. In the case under discussion, when the bank accepted the remotely created checks for deposit, the bank accepted a higher than normal level of risk.

30. In response to the perceived risks associated with remotely created checks, two fairly recent legal changes have shifted the risk related to unauthorized remotely created checks. Historically and typically, the paying bank and not the bank of first deposit is liable if the paying bank takes presentment of and honors a check that was not authorized by the account holder. With respect specifically to remotely created checks, recent changes in the law have shifted this risk from the paying bank to the bank of first deposit. For example, an amendment to Uniform Commercial Code Section 4-208 was the first effort to reallocate to the bank of first deposit the risk that a remotely created check was not authorized by the accountholder.

31. Because of the perceived failure of the Uniform Commercial Code to create a uniform mechanism for allocating the risk of unauthorized remotely created checks to banks of first deposit, the Federal Reserve Board created a uniform national rule regarding these instruments by amending Regulation CC effective July 1, 2006, to reallocate the risk of loss. The Federal Reserve added a new provision to Regulation CC, 12 CFR 229.34(b), under which any financial institution that transfers or presents a remotely created check warrants to every bank that subsequently handles the check, that the person on whose account the check is drawn authorized the issuance of the check in the amount and to the payee stated on the remotely created check. Unlike UCC Section 4-208, the warranty set forth in section 229.34(b) of Regulation CC extends to remotely created checks drawn against business accounts. The Regulation CC provision regarding remotely created checks thus applies to the remotely created checks in the present discussion, which were drawn against corporate accounts.

32. Because Regulation CC applies to all checks collected or returned between banks in the United States, Regulation CC's rule regarding remotely created checks effectively supersedes the narrower provision in UCC 4-208. Since the 2006 amendment to Regulation CC, banks in the United States have generally understood the risk that a bank of first deposit takes on when it accepts remotely created checks as deposits and transfers or presents a remotely created check to another bank. In response to that risk, some banks refuse to take remotely created checks as deposits. Banks that do accept remotely created checks for deposit typically take additional steps to manage the resulting risk.

33. In recent years, it has become standard practice in the banking and payments processing industry to operate under agreements with depositors that either completely prohibit a customer from depositing a remotely created check, or impose additional risk mitigating limitations or conditions on deposits of remotely created checks. Such additional risk mitigants typically include restrictions on the dollar volume of remotely created check deposits, and provisions that require the depositor of remotely created checks to provide the bank with collateral and/or to maintain clearing balances at the bank in amounts sufficient to protect the bank against returns or warranty claims that the remotely created checks were not authorized. Typically, before a bank accepts remotely created checks as deposits from its customer, the bank requires the customer to agree to terms that protect the bank from the unique risks that the bank faces when it transfers a remotely created check to another bank for collection or presentment.

34. Based on the facts of this case, the defendants in an action by the bank seeking ownership of the sequestered or frozen funds might claim that the bank acquiesced in the depositor's conduct when the depositor and the bank's employees spoke before the bank agreed to accept the remotely created checks for deposit. If the bank failed to obtain any of the contractual protections that a bank typically requires before accepting deposits of remotely created checks, the bank may have failed to protect itself against the known risks involved in sending remotely created checks forward for collection.

35. These types of potential defenses may or may not have prevailed had the bank invoked an equitable remedy to recover the proceeds of the remotely created checks. But practical, legal, and equitable remedies were available to the bank, contrary to Ms. Finocchiaro's misleading conclusion at trial and the government's argument that the bank had no remedies after the funds were transferred into the other accounts, that Mr. Teman supposedly knew that the bank had no remedies other than set off, and that the supposed lack of remedies together with Mr. Teman's supposed knowledge that the bank had no remedies was evidence of criminal intent.

Executed on May 11, 2021.

_____
Richard M. Fraher, Ph.D, J.D.