Andrew J. Frisch
Partner

212-344-5400
afrisch@schlamstone.com

**SCHLAM STONE & DOLAN LLP**

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

May 14, 2021

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
New York, New York 10007

Re:  *United States v. Ari Teman*, 19 CR 696 (PAE)

Dear Judge Engelmayer:

On behalf of Ari Teman in the above-referenced case, we respectfully submit this letter to supplement our previous submission [Docket No. 219] in support of vacatur of Mr. Teman's conviction. We have previously provided Professor Fraher's report to the Court and the government and rely on it herein.

The government' case against Mr. Teman was significantly predicated on a false premise. As the government put it to the jury, among other similar arguments, "*perhaps the most obvious proof here of criminal intent* is that there's a $260,000 hole right now at Bank of America [T1042-43 (emphasis added)] . . . [Mr. Teman] knew the moment he deposited these checks . . . and the moment he moved the money out of his account . . . that Bank of America couldn't get it back." T993. The government's arguments were false and misleading: if it were fair to impute the arcana of retail banking to Mr. Teman, the fairer inference was exculpatory.

Professor Fraher's credentials as a preeminent national expert in retail banking and payment systems are indisputable. *See* Fraher Declaration at ¶¶ 4-8. As Professor Fraher explains, Ms. Finocchiaro's testimony created the false impression that a bank's ability to recover losses from a client's other accounts at the same bank is limited by mutuality of obligation. *See* T235:11-22 ("So we do not have the right to offset when the tax identification number is different from one entity to the other . . . We cannot offset our loss when it is a different tax identification number"). In fact, a bank's ability to recover loss from a "bad" check is not limited by mutuality of obligation. Its remedies include initiating civil litigation or keeping money from a customer's other accounts and risking litigation initiated by the customer. *See* Fraher Declaration at ¶¶ 19, 23-26. Professor Fraher's declaration shows that the jury was misled and that the Court should reconsider whether the government's proof was legally sufficient. If the true protocols of retail banking could fairly be imputed to Mr. Teman, he knew that transfer of funds between his accounts at Bank of America ("BOA") did not bar BOA from recovering its loss.

The Honorable Paul A. Engelmayer
May 14, 2021
Page 2 of 8 Pages

The case against Mr. Teman cannot be salvaged.  Unlike a bouquet of roses which might retain its essential character when one decaying bud is removed, the bouquet of inferences in this case exist within the mind of one person.  One inference cannot be readily excised from the rest any more than a strand of linguine from a dinner plate:  they exist and are properly digested in context and in relation to each other.

The government asked the jury to accept two buckets of diametrically opposed inferences about Mr. Teman's state of mind.  On one hand, the government argued that Mr. Teman was sneaky and treacherous, depositing checks just before Passover in 2019 to avoid his customers' scrutiny and transferring the proceeds to his other accounts to put them out of BOA's reach.  On the other hand, the government argued that Mr. Teman's deposit of the checks in person without disguise at the BOA branch across from his office showed that Mr. Teman was "brazen" and "blatant."  T977.  For the government, it was heads-I-win, tails-you-lose.  The government's advocacy evokes the infamous boast of Lavrentiy Beria:  "Show me the man, and I'll show you the crime."

Professor Fraher's declaration proves the truth about the inference of bad intent touted by the government as "the most obvious."  That truth harmonizes with Mr. Teman's exculpatory view of the evidence.  For example, in pressing the inference that Mr. Teman deliberately deposited checks just before the beginning of Passover in 2019 to frustrate his customers' discovery of them, it presented no evidence that Mr. Teman ever articulated such treachery.  Instead, the government based its argument solely on the Jewish calendar and the common religious affiliation of Mr. Teman, Mr. Gabay, and Mr. Soleimani.  In fact, in proper context, the fairer inference was exculpatory.  The observance of Passover in 2019 began at sundown on April 19, a Friday, but only prevented observant Jews from work until sundown on April 21, 2019.[1]  Meanwhile, Mr. Teman knew on April 19, 2019, that BOA had placed a seven-day hold on the checks [*see* T284], theoretically affording even his observant customers a full four or five days to learn of them.  The government's false argument about Mr. Teman's transfer of the deposited funds could only have served to poison the jury's assessment of the inference pressed by the government based on the timing of the deposits.

Likewise, Professor Fraher's declaration establishes an exculpatory context for the government's inference that Mr. Teman intended to defraud by advising BOA that the checks were issued pursuant to contract.  Mr. Teman did not say that the contract's counter-parties had authorized the checks, but that his contract permitted them.  BOA well understood the exculpating import of Mr. Teman's words, concluding that "it was looked at as a dispute

---

[1] *See https://www.myjewishlearning.com/article/rules-for-passover/* ("During the first two and last two days of Passover, many traditionally observant Jews will abstain from most of the same activities they avoid on the Sabbath - no driving, working, using electricity, lighting fires or spending money.  On the intermediary days of the holiday - known as *hol hamoed* - those restrictions do not apply.").

The Honorable Paul A. Engelmayer
May 14, 2021
Page 3 of 8 Pages

between the customer, the maker and the depositor, at that point it is not - it's not within our decision to rectify the matter." T232.  Stripped of the inference of Mr. Teman transferring funds to deceive BOA, Mr. Teman's reference to a contract with his customer rather than the customer's expressed authority takes on an exculpatory hue.

The government was permitted to impute knowledge of Ms. Finocchiaro's misleading view of banking procedure to Mr. Teman to press its "most obvious" inference of fraud.  Mr. Teman was and is entitled to the benefit of contrary inferences.  Thus, when Mr. Teman transferred the funds to his other BOA accounts, he knew that BOA had remedies to recover transferred funds.  Mr. Teman also theoretically knew that using remotely created checks puts banks on high alert and makes implementation of such checks in a successful fraud particularly difficult.  While the government was not necessarily required to show that BOA relied on Mr. Teman's purported deceit, the *absence* of BOA's reliance is relevant to whether Mr. Teman intended to defraud.  What's good for the goose, is good for the gander.

As Professor Fraher explains,

> Remotely created checks are generally understood among bankers to be high risk instruments, subject to their own unique set of rules.  The rules that uniquely apply to remotely created checks impose significant risks on a bank that accepts such a check for deposit.  In the case under discussion, when the bank accepted the remotely created checks for deposit, the bank accepted a higher than normal level of risk.

Fraher Declaration at ¶ 29.  Banks take precautions to address this risk.  Some banks refuse to accept remotely created checks, limit the amount of such checks, or require pre-existing balances to absorb any consequent loss from accepting their deposit.  Fraher Declaration at ¶¶ 32-33.

Unbeknownst to Mr. Teman at the time of trial, the government's "most obvious" inference was not obvious to BOA.  We now know that BOA itself could not figure out whether and to what extent it should seek to recover its loss.  Upon apparently concluding that Mr. Teman's deposits were part of "a dispute" between Mr. Teman and his customers [T232], BOA in 2019 mailed checks representing the positive balances in Mr. Teman's accounts to him; used the positive balance in Mr. Teman's personal account as partial recovery of its loss after the checks were returned as undeliverable; and then changed its mind and again refunded the balance of the personal account.  If it was fair for the government to impute an incriminating inference about Mr. Teman from Ms. Finocchiaro's misleading view of retail banking, it would have been fair for Mr. Teman to press exculpatory inferences from the truth.

BOA's refund of Mr. Teman's positive balances even after a verdict finding that Mr. Teman defrauded BOA raises a slightly different issue.  BOA's post-verdict refund of the positive balances cannot fairly be considered in a vacuum.  BOA's refund of the positive balances in

The Honorable Paul A. Engelmayer
May 14, 2021
Page 4 of 8 Pages

2020 followed a previous attempt to return all the positive balances in 2019 and BOA's subsequent indecision about whether to keep or return the positive balance in Mr. Teman's personal account. BOA is not an individual investor for whom the expense of prospective litigation might inhibit self-help: BOA is a multi-national banking behemoth not bashful about protecting its interests. More, BOA is in the business of money. It is not reasonable on the record of this case to conclude that BOA surrendered possession of money in hand in anticipation of an order of restitution that might never result in any actual recovery or would at least likely delay recovery possibly for years. The reasonable inference on the full record of this case is that Mr. Teman did not commit fraud.

Stripped of the government's "most obvious" incriminating inference, and considering the government's other inferences in context, its case against Mr. Teman is reduced to a claim that he knew that he was not entitled to the deposited funds. Such a claim does not establish bank fraud. "A course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to the funds does not alone constitute false or fraudulent pretenses or representations." *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998), *citing United States v. Briggs*, 939 F.2d 222, 226 (5th Cir. 1991), and *Williams v. United States*, 458 U.S. 279, 284-85 (1982). "Nor does it suffice under § 1344 for the government to show simply that the defendant has deposited in her account a check that she has fraudulently caused her victim to make payable to her." *United States v. Laljie*, 184 F.3d 180, 190 (2d Cir. 1999). Section 1344 was not "meant to establish a federal bad check law." *United States v. Orr*, 932 F.2d 330, 332 (4th Cir. 1991). The legislative history of the statute "makes it abundantly clear that Congress did not intend the bank fraud statute to cover ordinary state law offenses, where [] the fraud victim [is] not a federally insured bank." *United States v. Blackmon*, 839 F.2d 900, 905 (2d Cir. 1988).

Nor can the charges of wire fraud be salvaged. The government made the same arguments of fraudulent intent for all charges in this case, specifically including its incriminating inferences from Mr. Teman's intra-bank transfer of funds in its climactic summaries of its entire case. It used its evidence of bank fraud to prove wire fraud:

> It's a simple case, and the proof is overwhelming. Ari Teman created fake checks worth hundreds of thousands of dollars, lied about having permission from his customers, and then deposited those checks into his account. Then he moved that money into another account before Bank of America could get it back.

T1009.

> Now, ultimately what this case comes down to, as defense counsel acknowledges, is criminal intent. The proof of criminal intent here is overwhelming . . . .

> And I submit that perhaps the most obvious proof here of criminal intent is that there's a $260,000 hole right now at Bank of America. There's $260,000 - more than a quarter million dollars - missing. Someone else had to pay for that. Bank of America had to pay for that.

T1043; *see also* T980 ("What is in dispute here [regarding all the charges in the case] is whether the defendant acted with criminal intent when he cut and deposited those checks"); T985-86 ("So you know that the defendant had fraudulent intent, that he had criminal intent, because he tried once [with remotely created checks in March 2019], knew the customer didn't want it, and then he tried again [with remotely created checks in April 2019]"); T993-94 ("The defendant moved the money around his accounts. I should say you should follow the money. Look at the way he moved the money around his Bank of America accounts before the bank would freeze it . . . He knew the moment he deposited these checks on March 28 and the moment he moved the money out of his account on March 29 so that the Bank of America couldn't get it back, so that his customers couldn't get it back. That's fraudulent intent").

While the insufficiency of the evidence requires dismissal of this case, Mr. Teman is also entitled to relief because the record suggests deliberate prosecutorial misconduct. It is too late now for the government to argue no-harm, no-foul: it was the government which elicited Ms. Finocchiaro's misleading testimony in violation of Rule(a)(1)(G) and used it to trumpet a purportedly "most obvious" inference of fraudulent intent that it knew or should have known was fallacious.

When the government on November 30, 2020, first disclosed that restitution should be reduced by $14,125.22, the government did not disclose that the reduction included the balance of $13,477.37 in Mr. Teman's personal account. Undersigned counsel first realized that the $14,125.22 included $13,477.37 completely on their own upon trying to back into the $14,125.22. Before undersigned counsel figured it out, the government seems to have studiously avoided addressing the status of Mr. Teman's personal account.

For example, the government responded to Mr. Biale's inquiry on November 30, 2020, by explaining that Mr. Teman had "promptly transferred [proceeds from the remotely created checks deposited into the GateGuard account] into *other accounts he controlled at BOA* . . . [which was] not able to offset losses in the GateGuard account using money from those other accounts, since the other accounts are held by different *corporate* entities." Docket No. 219-3 (emphasis added). Similarly, after telling Ms. Kellman in a telephone conversation that the delta between the $14,125.22 and the $13,477.37 consisted of bank fees, the government emailed Ms. Kellman that Ms. Finocchiaro's testimony "makes the situation quite clear - the funds were held in *different corporate accounts* so they could not be used to offset losses in the GateGuard account." Docket No. 219-4 (emphasis added). The government ignored Ms. Kellman's subsequent email requesting a fee breakdown. Only after re-reading Ms.

The Honorable Paul A. Engelmayer
May 14, 2021
Page 6 of 8 Pages

Finocchiaro's testimony at least a dozen times in the context of the government's disclosure on November 30, 2020, did undersigned counsel realize that Ms. Finocchiaro never actually addressed the status of the money in Mr. Teman's personal account at the time of her testimony at trial.

In our confidential twelve-page letter to the government of April 2, 2021, Ms. Kellman and I detailed our concerns that the government may have hid the ball about the status of the money in Mr. Teman's personal account at the time of trial. While the government was not obliged to address our concerns, we expected that the government would want to refute such an inference at its earliest opportunity: it did not and has not. Further, while the government presumably has had access to BOA's legal counsel all along, it did not refute the view of banking practice which we previewed in our letter to the government of April 2, 2021, which we advised the government was based on conversations with multiple well-credentialed banking experts.

Instead, on April 23, 2021, the government filed an affidavit of Ms. Finocchiaro stating that in November 2020 she had been "notified by another Bank of America employee that the bank was able to offset its loss in the GateGuard account with the funds in the Ari Teman Account totaling $13,477.37." Docket 215-5 at ¶ 7. But Ms. Finocchiaro's affidavit and the government's accompanying submission *are silent* as to the status of the $13,477.37 *at the time of trial*. The government's submission is also *silent* as to the state of *the government's knowledge at trial* about the status of the personal account when it was urging the jury to convict Mr. Teman because he knew that BOA could not recover transferred funds. We are left with a discomforting inference that the government deliberately elicited misleading testimony from Ms. Finocchiaro and exploited her misleading testimony and an exculpating fact in summation.

This case is not salvageable even if the government at trial did not suppress the true status of Mr. Teman's personal account. The sovereign acts at its own peril when it crosses or walks too close to the line. At a minimum, the government must honor duties imposed by Congress to promote reliable fact-finding, such as Rule 16(a)(1)(G). That duty was not lost on the government here: the government, in what *it* described as "an abundance of caution," previewed Ms. Finocchiaro's testimony [Dockets 61-1, 73 at 11], but omitted notice of its intention to elicit her understanding of a bank's right to recover losses. Despite the Court's subsequent admonition that the government not be emboldened to elicit expert testimony from Ms. Finocchiaro [Docket 87 at 31], the government presented Ms. Finocchiaro's misleading opinion of a bank's right to recovery and did so in a carefully-worded way that disguised its import. It did so with rhetorical flourish at the very end of her direct examination just as defense counsel was preparing to stand up to begin cross-examination. Trial counsel cannot be faulted for not spotting the Ms. Finocchiaro's unnoticed legal opinion and its consequences: it appears that the government continued to hide the ball in its post-verdict exchanges with Mr. Biale and Ms. Kellman. The professional standards of this Circuit should

The Honorable Paul A. Engelmayer
May 14, 2021
Page 7 of 8 Pages

inhibit the government from responding to this motion by shifting the blame for its own treachery to trial counsel, SherTremonte, undersigned counsel, or anyone else. Nor on the record of this case should the government in response to this motion feel emboldened to invent unicorns.

We regret that the Court inferred our disrespect when we sought a further adjournment of the briefing schedule on April 23, 2021. We neither wanted to be precipitous in alleging prosecutorial misconduct in the public square nor too hasty in denying the government an opportunity to fashion relief. We realize today as we did then that our professional obligations run first to the Court and our client, not the government. But we were reluctant publicly to call out apparent prosecutorial misconduct unless there was no other choice.

At a minimum, this Court should convene a hearing and require the testimony of a BOA lawyer and/or BOA employee with full knowledge of the circumstances of this case who can explain why BOA elected not to invoke its remedies, and what BOA has told the government about the status of the positive balance in Mr. Teman's personal account. Defense counsel should be permitted the right to develop the record with cross-examination rather than be forced again to parse another studiously-tailored explanation of the facts.

If the Court does not vacate Mr. Teman's conviction, the Court should require BOA to testify on the issue of restitution. While Professor Fraher's declaration does not specifically address restitution, it establishes that BOA may have waived its remedies to recover at least so much of its loss which remained in Mr. Teman's other accounts and which it refunded even after the jury's verdict. If so, that waiver may apply to any restitution. If BOA declines to appear subject to cross-examination to assert its right to any restitution notwithstanding its return of Mr. Teman's money, BOA should be deemed to have waived restitution. *See, e.g., United States v. South*, 2013 U.S. Dist. LEXIS 116656, at *9 (D. Mont. July 12, 2013) (declining to order restitution to a bank which elected not to appear at a restitution hearing to confirm bank's entitlement thereto).

As to the Court's disclosure of May 5, 2021 [Docket No. 220], we do not disagree with the Court's reading of *United States v. Ravitch*, 421 F.2d 1196, 1205 (2d Cir. 1970). At the same time, we have found no similar case in which a bank as here has equivocated about invoking

The Honorable Paul A. Engelmayer
May 14, 2021
Page 8 of 8 Pages

its remedies to recover loss, thereby contributing to questions about its status as a victim. We rely on the Court's good judgment to assess any resulting appearance of conflict as the Court charts the way forward.

                                      Respectfully submitted,

                                      *s/ Andrew J. Frisch*
                                      Andrew J. Frisch

                                      *s/ Susan G. Kellman*
                                      Susan G. Kellman
                                      25 Eighth Avenue
                                      Brooklyn, New York 11217

Enclosure

cc:  AUSA Kedar Bhatia