Andrew J. Frisch
Partner

212-344-5400
afrisch@schlamstone.com

SCHLAM STONE & DOLAN LLP

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

June 21, 2021

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
New York, New York 10007

*Re: United States v. Ari Teman, 19-CR-696 (PAE)*

Dear Judge Engelmayer:

On behalf of Ari Teman, we submit this letter, pursuant to the Court's order of June 15, 2021 [Docket No. 231], as a motion for the Court's recusal and in reply to the government's opposition [Docket No. 225] to Mr. Teman's motion to vacate his conviction and dismiss this case.

    A.   *This Case Should Be Referred to the Clerk of the Court for Reassignment*

While the Bank of America ("BOA") is not a party to this case, it can no longer be considered a typical alleged victim.  The government's response to Mr. Teman's motion to vacate and dismiss puts BOA in a light that distinguishes *United States v. Ravich*, 421 F.2d 1196 (2d Cir. 1970), the case cited by the Court in its Order of May 5, 2021.  *See* Docket No. 220. Wittingly or unwittingly, BOA's role in this case is intertwined with the government's apparent violation of the principles of *Brady v. Maryland*, 373 U.S. 83 (1963).  BOA is not a bystander where "[t]he result could make no difference to the bank or its shareholders." *Ravich*, 421 F.2d at 1205.  It could make a significant difference to BOA, reputationally and financially, if it has been or continues to be complicit in hiding the truth in a federal criminal case in which it is alleged to be a victim; has followed the government's lead despite concluding that it is not a victim; or deliberately provided the government with a witness (Ms. Finocchario) to testify at Mr. Teman's trial who appears not to have been aware of BOA's equivocation about whether it could or should use Mr. Teman's personal account as an offset.  The resulting appearance of conflict favors the Court's recusal.

While a Judge's modest indirect financial interest in a non-party does not require recusal, atypical circumstances can create an appearance of conflict favoring it.  *See, e.g., Stansell v. Revolutionary Armed Forces of Colombia*, 16-MC-405 (S.D.N.Y. Feb. 17, 2021) (Hon. Andrew L. Carter citing appearance of conflict created by writs of execution to non-party JPMorgan Chase withdrawn by the issuer precisely to avoid the appearance of conflict); *United States v. Wolff,* 263 Fed. Appx. 612, 2008 U.S. App. LEXIS 2023 (9th Cir. 2008) (recusal appropriate where rulings could potentially impact a corporate intermediary in which the judge owned stock); *Hartman v. State Farm Mut. Auto. Ins. Co.*, 817 F. Supp 1566 (S.D.

Fla. 1993), *aff'd*, 77 F.3d 496 (11th Cir. 1996) (insurance agent's action seeking declaration that insurer's policies and procedures were unlawful favored recusal where the judge held a policy in a named defendant). *See also United States v. Nobel*, 696 F.2d 231, 235 (3d Cir. 1982) (disagreeing with *Ravich*'s holding that even a judge's modest indirect financial interest in a victim does not require disqualification).

The government's opposition to Mr. Teman's motion to dismiss does not refute the inference that, before trial, BOA decided to use Mr. Teman's personal account to offset or recover part of BOA's loss and so advised the government. In the post-trial affidavit signed (but almost certainly not drafted) by Ms. Finocchiaro, she expressly addressed the status of Mr. Teman's personal account, an issue which the government assiduously avoided when she testified at trial. The affidavit awkwardly stated that BOA *"is"* unable to use Mr. Teman's *personal* account to offset its loss [paragraph 4], not that BOA believed it had been unable to do so at the time of trial. The affidavit also stated that Ms. Finocchario had been notified after trial by "another Bank of America employee" that BOA had in fact previously used Mr. Teman's personal account to offset its loss [paragraph 7]. The affidavit was conspicuously silent as to whether BOA was using (or believed it could use) Mr. Teman's personal account when she testified at trial.

Meanwhile, BOA has flip-flopped as to whether to use Mr. Teman's personal account to recover its loss. In addition, despite a verdict finding Mr. Teman guilty of defrauding BOA, it returned all the remaining positive balances in Mr. Teman's BOA accounts rather than invoke its available remedies. While BOA is not a party to this case (which would mandate the Court's recusal), it is front and center on issues raised by Mr. Teman's motion, including its role in the government's *Brady* violation, and whether BOA is a reluctant victim following the government's script despite concluding that it was not defrauded. Rather than provide an affidavit from BOA's legal counsel or some other BOA employee fully informed about this case to explain actions apparently at odds with BOA's status as a victim, the government proffers an affidavit from the plainly uninformed Ms. Finocchario. Proper resolution of Mr. Teman's motion requires scrutiny of (and conclusions about) BOA's conduct and status in this case, which creates an appearance of conflict favoring recusal.

### B. Mr. Teman's Motion for Vacatur and Dismissal Should be Granted

On December 1, 2020, the Court questioned the government about its obligations under recently-enacted Rule 5(f) of the Federal Rules of Criminal Procedure. Docket No. 182 at 15-17. The Court reminded the government that it is obligated to disclose "all information, whether admissible or not, that is 'favorable to' the defendant, 'material either to guilty or to punishment,' and known to the government:"

> The government must make good-faith efforts to disclose such information to the defense as soon as reasonably possible after its existence becomes known to the government. The government must also disclose information that can be used to impeach the trial testimony of a government witness, and must do so sufficiently in advance of trial in order for the defendant to make effective use of it at trial.

2

Docket No. 182 at 16.  The Court advised the government that judicial remedies for a violation of *Brady* and its progeny include vacating a conviction after trial and imposing sanctions on the government lawyer responsible for the violation.  Upon the Court's inquiry, the government assured the Court as follows:  "Yes, I understand our obligations.  And we have fulfilled and will fulfill our obligations."  Docket No. 182 at 17.

Rule 5(f) is the latest in a litany of judicial pronouncements and prophylactic efforts over the decades to command fealty to the indispensable principle that prosecutors may strike hard blows, but not foul ones.  *Berger v. United States*, 295 U.S. 78 (1935).  These efforts include *Brady* itself and its many subsequent judicial re-affirmations, a smorgasbord of internal memoranda periodically issued within the Department of Justice to legal staff, and oft renewed efforts to "train" prosecutors about this ostensibly self-evident obligation rooted in fundamental fairness and due process.

Eighteen months since trial, seven months since Mr. Teman's scheduled sentencing, and notwithstanding the government's ten-page letter in opposition to Mr. Teman's motion, the government *still* refuses to say whether BOA told the government before trial that it was using and/or believed it could use Mr. Teman's personal account as an offset or to recover part of its loss.

Prosecutors make mistakes and are perhaps no more or less infallible than others.  But the government in this case has had multiple opportunities to address its fallibility.  Rather than avail itself of those opportunities, the government has double-downed on its violation, attempting what might charitably be described as an effort to power through it.  Less charitably, the government has resorted to a cover-up, which makes its initial gamesmanship all the more unforgiveable.

It is now indisputable that the government's disclosure to the Court on November 30, 2020, the literal eve of Mr. Teman's then-scheduled sentencing, was deliberately misleading.  The government wrote to the Court in a studiously-worded sentence that it had just "learned from a Bank of America representative that *certain money* held in a hold-harmless account had been applied to the bank's losses, and that the bank eliminated certain fees from its loss calculation."  Docket No. 174 (emphasis added).  The government did not write the Court that the "certain money" was the positive balance in Mr. Teman's personal account.  When Mr. Biale and Ms. Kellman thereafter separately inquired of the government (*after* the government had expressly assured this Court that it understood its *Brady* obligations), the government continued to hide the ball.  The government *volunteered* to a different question posed by Mr. Biale that BOA had been unable to offset its losses "since [Mr. Teman's] other accounts are held by different corporate entities."  *See* Docket No. 219 at 8.  The government thereafter continued to obscure the truth, telling Ms. Kellman, in substance, that the "certain money" referenced in its letter to the Court consisted of bank fees.  The government wrote in a subsequent email to Ms. Kellman that "the funds were held in different corporate accounts so they could not be used to offset losses."  Docket No. 219 at 8-9.  Thus, according to the government's representations to this Court and defense counsel, its eleventh-hour disclosure on November 30, 2020, represented a mere ministerial adjustment.  So much for the

government's express assurance to this Court that it understood its *Brady* obligations.  *See* Docket No. 182 at 17.

It appears inescapable that the timing of the government's disclosure was calculated to disadvantage Mr. Teman, a violation of the independent requirement that the government disclose favorable evidence as soon as known to the government so the defendant can make effective use of it, such as impeach a witness like Ms. Finocchario at trial.  The government waited until the literal eve of Mr. Teman's scheduled sentencing to make its disclosure, realizing (correctly) that figuring out the truth would take significant time.  As previously explained to the Court [Docket No. 219 at 10-12], it took Mr. Teman's current counsel virtually daily conversations with each other and multiple experts over a period of weeks, together with the benefit of multiple reviews of the relevant portions of the record, to figure out what the government had done.  The inference of deliberately-timed latest-possible-moment disclosure is supported by the government's dissembling in response to the subsequent inquiries of Mr. Biale and Ms. Kellman.  That inference is also supported by the way that the government elicited the misleading testimony of Ms. Finocchario at the very end of her direct examination to maximize unfair strategic advantage.  The government cannot fairly obscure the truth at so many points in this case and persuasively claim [*see* Docket No. 225 at 5] that Mr. Teman is now out of luck because his lawyers trusted that the government had complied with its *Brady* obligations, as it expressly assured this Court.  *See* Docket No. 182 at 17.

But there's more.  Defense counsel's confidential and comprehensive twelve-page letter to the government of April 2, 2021, explained their reasons for believing that the government had deliberately suppressed an exculpating fact.  Even now, the government has not (and cannot) refute that inference.  Instead, on April 23, 2021, the government filed an affidavit of Ms. Finocchiaro [Docket No. 215-5] that, for the first time, made reference to BOA's inability to use Mr. Teman's *personal* account to offset BOA's loss [at paragraph 4], as if it was obvious that she had previously so testified, though the government's questioning at trial had danced around its understanding of the then-status of Mr. Teman's personal account.  The same Finocchario affidavit claimed that BOA *"is"* unable to offset losses using different corporate *or* personal accounts [paragraph 4 (emphasis added], but the affidavit also stated that BOA had previously done so [paragraph 7], without disclosing whether there was reason to believe that BOA had been using Mr. Teman's personal account as an offset *during trial*.

The government attempts to deride this issue as much ado about nothing.  To the contrary, it is much to do about the government telling a Judge one thing about honoring Rule 5(f) while doing another.  This issue does not live in the margins of this case.  As the Second Circuit has explained:

> Our Court and others have long recognized that *Brady* violations obscure a trial's truth-seeking function and, in so doing, place criminal defendants at an unfair disadvantage.  When the government impermissibly withholds *Brady* material, "its case [i]s much stronger, and the defense case much weaker, than the full facts would . . . suggest[]." *Kyles*, 514 U.S. at 429.  Where, as here, "the government suppressed evidence in its possession which was both exculpatory and impeaching, . . . there is a

4

> reasonable probability that if the evidence had been disclosed, the outcome of the proceeding would have been different." *Triumph Capital*, 544 F.3d at 164.  Even if "[i]t is by no means certain that" arguments based on wrongfully withheld evidence "would have swayed the jury, . . . it is a real enough possibility to undermine confidence in the verdict." *Id.* at 163.

*United States v. Mahaffy*, 693 F.3d 113, 134 (2d Cir. 2012).

The government's hypothesizing about whether the status of Mr. Teman's personal account at trial was important should not be indulged.  The government repeatedly hid the truth *precisely because* the government *itself* realized its importance; knew or should have known that Ms. Finocchario's testimony about the bank's rights was misleading and erroneous; and knew or should have known that its inference of Mr. Teman's intent from intra-account transfers was bogus.  Fair inferences of materiality drawn from deceit should apply with equal force to people prosecuted by the Department of Justice as well as those in its employ.

It is as unseemly for the government now to rehash its eight-pointed summation arguments [Docket No. 225 at 9; T980-93] in the context of this motion as it is unavailing.  The government's eight points fall into two categories:  (1) inferences drawn from Mr. Teman's dealings with his customers, which are an inadequate basis for bank fraud [*see* Docket No. 222 at 4]; and (2) inferences drawn from Mr. Teman's purported intent to defraud BOA, used by the government to prove both bank and wire fraud.  Without the government's use of inferences of bank fraud to prove wire fraud, the jury would likely have seen the government's case as a pedagogical civil dispute:  Mr. Teman's customers lost no money.  The government's repeated arguments about intra-account transfer to prove all the charges in the case, on top of its deliberate non-disclosure of  BOA's use of an account for offset [Finocchario post-trial affidavit at Paragraph 7], disabled the jury from fairly considering all the charges and made the case for conviction seem "much stronger, and the defense case much weaker, than the full facts would . . . suggest[]." *Kyles*, 514 U.S. at 429.

If Professor Fraher's declaration is truly worthy of the government's critique [*see* Docket No. 225 at 8], the government could have submitted an opposing declaration from one of BOA's experienced banking lawyers.  The caliber of BOA's in-house legal office is reflected in the credentials of its current general counsel.  He graduated first in his class from the University of Virginia School Law, clerked for Chief Justice William H. Rehnquist and Circuit Judge J. Harve Wilkinson III, and served as deputy counsel to President George W. Bush and general counsel to Ford Motor Company.[1]  If this case is too off the radar of BOA's most senior lawyers despite BOA's purported status as the victim of a federal crime, the government could have obtained an opposing declaration from another qualified banking expert at BOA or elsewhere.  The government did not do so because Professor Fraher is as well-credentialed an authority in this area as exists, and there is no true basis for legitimate quarrel.  The government's parsing of Professor Fraher's explanation of the semantic distinction between a bank's rights to set off and recovery [Docket No. 225 at 8] is as misleading as the testimony it elicited from Ms. Finocchiaro and the bogus argument it urged the jury to accept.

---

[1] *See https://newsroom.bankofamerica.com/david-leitch.*

5

Nor on this record, as the government claims, did Ms. Finocchario's testimony constitute an appropriate lay opinion. In none of the cases cited by the government [*see* Docket No. 225 at 6] did a prosecutor, as here, fail to disclose an exculpating fact contradicting the witness's lay opinion. Nor, as here, did the government in the cited cases preview the witness's testimony "in an abundance of caution" [Docket No. 61-1], but omit the lay opinion. Ms. Finocchario's opinion was an erroneous and misleading statement of the law which she was not qualified to provide, and which was contradicted by the post-trial affidavit she herself later signed. Only the government's curious disclosure to the Court on November 30, 2020, and its head-scratching responses to Mr. Biale and Ms. Kellman thereafter provided a clue that something was amiss.

In early 2020, as the government was preparing for and trying Mr. Teman, another team of prosecutors a few floors away was failing timely to disclose exculpatory information, attempting to "bury" the information when it was ultimately disclosed, and dissembling about one such untimely disclosure. *See United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020) (Nathan, J.). On September 16, 2020, Judge Nathan ordered all of this District's prosecutors to read her opinion castigating the conduct of the prosecutors in her case. She suggested that the issue was broader than just *Nejad* and directed that it be resolved:

> It is possible that the issues articulated above, as well as the precipitating factors the Court identifies, are not unique to this case. Indeed, in the last criminal case tried before the Undersigned, the Government also seriously breached its *Brady* obligations. *See United States v. Robert Pizarro*, No. 17-cr-151 (AJN). Following that revelation, the Court was repeatedly assured by the leadership of the USAO that the matter was being taken seriously, would be systemically addressed through training, and would not reoccur. No. 17-cr-151 (AJN), Dkt. No. 135 at 8:11–10:10, 58:2–15. The record before the Court in this case belies those assurances.

*Id.* at 214. Within months of Judge Nathan's strongly-worded opinion, the government in Mr. Teman's case represented to the Court and defense counsel that its eleventh-hour adjustment of restitution was purely ministerial. *See* Docket No. 219 at 9.

Judicial finger-wagging is mostly effective for prosecutors who understand their obligations in the first place. More judicial words about *Brady* would be an especially incongruous response in a case where the government expressly assured the Court that it understood its obligations and presumably read Judge Nathan's ruling in *Nejad*, as her Honor directed. The rationale of concrete consequences to deter misconduct does not suspend because the actors to be deterred are within the Department of Justice.

Despite a confidential opportunity to address its error, the government has resorted to a studiously-worded attempted cover-up. The time for more warnings and training about the

government's obligations has passed.  Without the violation in this case, the evidence would have been insufficient.  The conviction should be vacated and the case dismissed.

                                              Respectfully submitted,

                                              /s/ Andrew J. Frisch
                                              /s/ Jolene LaVigne-Albert
                                              Schlam Stone & Dolan LLP

                                              /s/ Susan G. Kellman
                                              25 Eighth Avenue
                                              Brooklyn, New York 11217

                                              *Counsel to Ari Teman*

cc:  United States Attorney's Office