B"H

# Ari B. Teman

Mon, 14 April 2023
23rd of Nisan, 5783

The Honorable Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**Response to Government response.**
**and**
**Motion to sanction and suspend  Mr. Bhatia in accordance with Grievance Committee for the Southern District of New York v. Simels, 48 F.3d 640 (2d Cir. 1995) or in the alternative a Motion for independent hearing before a Judge who is not Mr. Biale's mentor and close family friend to Mr. Biale and Ms. Graham**

Your Honor,

1. Mr. Bhatia is again making misrepresentations to the court.

2. In fact, Officer Ozoria said to me:

   "And I've always treated you with respect. And you have.  I want to I want to say this the opposite as well. You've always been very, very cordial, courteous to me."

3. An audio recording of the conversation Mr. Bhatia references is available at

   https://www.dropbox.com/s/gub4rolp8k23pbs/ozoria.mp3?dl=0

4. Your Honor and anyone who wishes to listen can hear that the conversation is, as Officer Ozoria states, cordial and even has laughter and joking.

   A transcript generated by Otter.ai today is attached, below. (Of course this was rapidly generated and may have some inaccuracies, so the audio is presented via link.)

5. Mr. Bhatia perhaps figured he could misrepresent the nature and tone of the conversation because he did not think there might be a recording of the conversation.

6. Here the transcript proves that my sole concern was that, without waiving any privilege, I and my appellate counsel, Mr. Quainton, were wary of a document Officer Ozoria asked me to sign because why would anyone be asked to sign a document that had already been signed more than a year ago? Officer Ozoria replied: "`Yeah, I made a mistake. where I said, I'll fix it.`"

7. Officer Ozoria had accidentally sent a very old version of the bond conditions which still had harsh restrictions.


8. Given Mr. Bhatia's attempt again, herein, to dupe the court into caging me in response to a request to visit my mother, it should be no surprise that I record all conversations with law enforcement where possible and lawful, and that I and my counsel are wary of any documents sent to be signed.

9. I was not at all argumentative, but was explaining exactly why we were very concerned about being asked to sign an outdated bond condition document. As Your Honor and anyone who wishes to can hear, the conversation was cordial and friendly and was in the spirit of reaching understanding, not arguing or fighting.

10. There was no anger, and in-fact there is considerable joy. I like Officer Ozria a  lot, and he and I get along very well, as he notes in that conversation, and I am sure would confirm to the Court.

**Notably, Officer Ozoria says in the transcript that he does not oppose me going to Israel**

11. Notably, Officer Ozoria says in the transcript that he supported me going to Australia, and also mentions the same for Israel:

```
Officer Ozoria  12:48
Yeah, no, they put it on pre-trial in New York sometimes. And when they
reach out, most of the time when I say I don't have an issue with this or
that,

Ari Teman  12:54
but if you say you don't have an issue, then they let me do it.

Officer Ozoria  12:57
That was the same thing with the location monitor. That was the same thing
with the travel to Australia.

Ari Teman  13:04
It's a year ago this week.
```

1

```
Officer Ozoria  13:05
That was the same thing with a travel to Israel. Yeah. Never have I
objected any
```

## Mr. Bhatia is lying about what occurred in Miami Beach and even what the accusations are

12. Mr. Bhatia fabricates that I got "angry" in Miami Beach. Not even the State witnesses or the police suggest I was angry at any time, at least from the BWC footage I have reviewed, transcribed, and provided to the City, State, and Mr. Bhatia, Mr. Bostic, and Mr. Ozoria.

13. Dan Maza wrote in his statement, which the Court has, as does Mr. Bhatia:

```
"Ari did not touch anyone at any time" ,

"Instead, the runners ran directly into him, grabbed him and the chairs,

and a man in a gray t-shirt pushed him out of the way forcefully."

"I then saw a man in red shorts, no shirt, and with tattoos, charge into

Ari just by the Pura Vida. It was a very forceful body slam."
```

14. Eduardo, barista at the Cafe, on Video provided to the State and the Court, says about me, "he did not touch anybody":

15. Furthermore, the Motion to Compel Production and links to the BWC footage, as well as the witness Statements of Dan Maza, Eduardo the barista at the cafe, and the two woman working at the nearby restaurant all confirm that I was attacked unprovoked, that I did not touch anyone.

16. The statements are clear that the defendant stood and pointed with his arms out at a group of crossfit runners to run on a sidewalk instead of through a crowded cafe where elderly people, small children, and puppies were, and have been hit before by the runners.

17. **There is no** accusation **I got angry or even initiated any conflict.**

18. Here is the transcript of the BWC footage where the officer admits it's dangerous what the runners we doing, and a Cafe Barista, Dean, tells them I was "asking them to stop" and that the cafe has also "asked them to stop":

```
Officer Rodrigues: "Why do they run through here?"
Dean: "We've asked them to stop"
Dean "They run through here…we bring stuff out… it's always a big problem."
Officer Rodrigues: "That's not right, bro"
```

```
Dean: "They always run through here and it's always an issue…
Officer Rodrigues: "Yeah, I don't think that's right"
Dean: "old people out here…with dogs and sh*t… it's always a big problem"
Officer Rodrigues: "I go to a CrossFit… that's not right to run in the
middle."
Dean: "Peple have their dogs out here on a leash"
Dean: "Well he [Teman] was asking them to stop… they run though here
multiple times a day…"
```

19.     The statement is that I moved some chairs before the corner of the cafe, so the runners moving
at high speed would not turn sharply and hit the elderly people going out of the cafe door, often not
looking to the right or expecting a large group of runners to come storming through.

20. One women, Isa (Isabel?) Siblesz, says she saw me standing there by the chairs, ran towards me, and
picked up a  chair and threw it. That is *her* admission on BWC footage.

21. She did not want to press charges, and was pressured into doing so because the CrossFitters and
Police thought that I would press charges against Mr. Kats. [1] For example, the following transcript
segments speak volumes about the credibility of those accusing Mr. Teman:

```
12:09 MBPD OFFICER RODRIGUES: You made it an issue today

12:15: RODRIGUES: But the law isn't fair and you know…

12:20 WITNESS KATS: I just don't want to be put into a position where I'm
going to be charged with something

RODRIGUES: I know. But unfortunately, and I mean, we're talking on camera,
but you know, it's like… I don't think it will turn into… I mean I'm
hoping right

KATS: Me either. But I'm afraid he's [Teman] going to find something.

RODRIGUES: But he [Teman] won't speak to us…. And that community…the Jewish
community. They have their own.

[The BWC clip is suddenly and abruptly ended without any explanation.]
```

22. Another choice segment, of many:

---

[1]  It was not my intention to do so. I was going to file a police report and seek compensation for any medical
bills from the gym or Mr. Kats via civil litigation or an attorney.

==KATS: I charged him [Teman] and they [Kats' necklaces] broke==

…

**MBPD OFFICER RODRIGUES   (13:03): It would help if she wanted to press charges. You know what I'm saying?**

KATS: We'll see what's going to happen

KATS: Isa, do you want to press charges?

SIBLESZ: It will help you? [Siblesz pointing to Katz (13:16)]

**2nd MALE CROSSFITTER: Because he's [Teman is] going to.**

KATS: If something rolls around, you know…

2nd Male CrossFitter (to Pasquale the Caffe Umbria Owner): "You're the owner, you know our position… **but we have to protect him (pointing to Kats) because you know.**

Cafe Owner: Yeah, yeah, yeah, no, no, no.

2nd Male CrossFitter: "That's a lot of people not coming to the coffee shop anymore."

**MBPD OFFICER REISGO: It doesn't show him [Ari] pushing…** but the story… as long as the story is consistent

23. Notably one of the CrossFitters says on BWC that she's been friends with Officer Reisgo a long time, and we also hear on the BWC that Officer Rodriges is a fellow CrossFitter.

24. What happened in Miami Beach is a conspiracy to violate the Civil Rights of Mr. Teman.  It is officers coaching witnesses *who had already told them on BWC that they did not want to press charges and were not injured,* to issue false statements, given to them *verbatim* so that Teman would be arrested before he could recover from the hospital and press charges against them.

25. TEMAN ***WAS IN THE AMBULANCE WHILE THIS DISCUSSION WAS GOING ON!***

26. The **witnesses make clear in their statements: Teman did not initiate and contact with anyone, did not touch anyone -- four independent witnesses with no relationship to Teman say Teman**

4

**simply stood and asked the runners to run on the sidewalk, and moved some chairs to slow down their turn around a corner, because they'd almost ran through an elderly man just minutes before on their prior lap.**

27. Mr. Bhatia knows this, but he is, according to  mental health epxerts who have reviewed Mr. Bhtias's words and statements, a sociopath (If the Court wants to dispute the opinion of these experts and individuals experienced in the field, let Mr. Bhatia be ordered to be tested by a forensic psychologist), who feeds on torturing people -- innocent people, and lying to the Court, the jury, and anyone who will listen.

28. In fact, Ms. Kellman and Mr. Frisch, whom Your Honor respects, also called Mr. Bhatia a sociopath.

29. For this reason, the Defendant motions for Mr. Bhatia and the Government to be sanctioned for the lies and misrepresentations in their reply brief, for the Government to be ordered to replace him as counsel in this matter, and for Mr. Bhatia to be ordered to take a full forensic psychological evaluation.

30. Mr. Teman is not angry, but this is not the first time or case Mr. Bhatia has used trickery to try to cage people who do not deserve to be caged.  It is time that he be examined and that he be suspended from practicing law.

**Mr. Bhatia's pattern of lying to courts and falsifying information warrants him suspended**

31. For example, in 17 CV 6651 (LAP) (Dkt. No. 21), STEPHEN WALSH v the United States of America, Mr. Bhatia attempted to have Mr. Walsh, then approximately 68 years old, sentenced for 20 years to prison for causing $400,000,000 in losses to investors. However, Mr. Bhatia surely knew, as Mr. Walsh's new attorney was able to quickly find out, that Mr. Walsh's firm had not lost money, and in-fact returned a small profit. While a member of the investment firm, as it was explained to me by Mr. Walsh's new counsel, had misappropriated funds, Mr. Walsh, a salesman of sorts for the firm, was not involved in that. Upon his new attorney's argument, Mr. Walsh's sentence was lowered from 20 years to time-served. Mr. Bhatia would have had Mr. Walsh die in prison for losses he did not cause, losses that did not exist. Just as Mr. Bhatia would have me sent to prison for crimes I did not commit.

32.     Who was Mr. Walsh's new attorney who uncovered the error and proved that his old firm had not done the work or even bothered to review the documents that would be needed to do so? Susan Kellman.

33. It was in this context that Ms. Kellman said about Mr. Bhatia, "Yeah, he's a sociopath."

34. Who was the previous defense firm who volunteered themselves to help Mr. Walsh, but who then immediately pushed him into being sentenced for $400M of damages that didn't exist? Sher Tremonte. Mr. Noam Biale's firm.

35. Your Honor and Your Honor's Mentee have already confined me excessively.

36. Mr. Biale actively sabotaged my defense and lied to my corporate counsel, me, and others about pursuing evidence which he did not.

37. Should the need arise, I will present the affidavit from corporate counsel, Mr. Ron Coleman, to prove this, but not to Your Honor who is Mr. Biale's mentor and close personal friend.

38. Had Mr. Biale not lied, we would have had other counsel reach out to Ms. Pecot before sentencing, and the evidence Ms. Pecot supplied would have destroyed the testimony of Ms. Soon-Osberger and Ms. Hom, as it does, because it shows they conspired to hide emails where their board president, who had reviewed and voted on the GateGuard Terms emailed Soon-Osberger, Hom, and all the shareholders of 18 Mercer together and told Soon-Osberger she was "legally liable" for the fees for tampering with GateGuard because she'd had construction workers move the device and disable it in the process.

39. Mr. Bhatia knows that Soon-Osberger and Hom were fired long before they filed their perjurious chargeback affidavit to Signature Bank.

40. Mr. Bhatia knows that Soon-Osberger and Hom were emailed by their Board President and told Soon-Osberger was legally liable for the fees.

41. Mr. Bhatia knows that those emails to Soon-Osberger and Hom, from their Board President, outline the specific dates and amounts I warned the 18 Mercer building they would incur if they tampered with or destroyed a GateGuard device.

42. In short, Mr. Bhatia knows that his witnesses conspired to hide exculpatory evidence, were not even lawful representatives of 18 Mercer when they filed the chargebacks because they'd been fired *under accusations of multiple frauds*, and that if those charges are dismissed, the entire case is gone.

43. Mr. Bhatia also knows that Mr. Soleimani conspired with defendants in Federal Civil cases filed before this trial in *GateGuard v Goldmont* and *GateGuard v MVI Systems*, parties which Mr. Bhatia spoke to either their officers or their attorney or both, to hide evidence. Mr. Bhatia and Mr. Guttwillig hid the paper trail of documents shared by Mr. Soleimani to the Government and that those documents were gotten by Mr. Abi Goldenberg of Goldmont and Mr. Samuel Taub of MVI.

44. That is, Mr. Bhatia committed Obstruction of Justice and Conspiracy to Interfere with Civil Rights.

45. Your Honor knows this. Your honor has known this since, Fri, Aug 20, 2021, 8:01 PM, when Chambers was emailed the sworn and witnessed statement of Ms. Pecot and the attachments she shared (Dkt. No. 284 P. 7 onward) and also Docket Number 295.

46. It is a violation of Equal Protection to excerpt all this effort examining a Miami Beach case, but for Your Honor to spend zero effort examining Mr. Bhatia's obstruction of justice or Your Honor's mentee's willful and intentional sabotage of my defense -- and that it is a pattern by his firm.

47. Your honor can attack me for being conspiratorial, but the above facts are proven by exhibits and statements provided by others. Mr. Bhatia attempted to cheat a 68 year old man into prison for 20 years over non-existent damages. Mr. Bhatia helped Mr. Soleimani hide that he was conspiring with Mr. Taub and Mr. Goldenberg and Mr. Schonfeld to hide evidence which may be exculpatory or impeachment evidence (such as that Mr. Soleimani was using the same excuses to not pay another intercom vendor, and that he had discussed terms with Mr. Taub which show that he was concerned about termination fees, and the like, long before this matter came to be).

48. Mr. Bhatia has violated the bounds of ethics far too often, including republishing your honor's completely fabricated statement about me depositing checks on or before passover to swindle fellow jews. I never said that statement, and it does not appear in the evidence.

49. Mr. Bhatia has even used Your Honor's fabrication in his appeal to the Second Circuit, which means we need to show the Second Circuit the letter from 25 Rabbis (Dkt. No 326) that not only invalidates the argument that Jews cannot use their phones throughout Passover (they can, and Mr. Soleimani did and it is in evidence that he used Whatsapp with me during the Intermediary Days of Passover the prior year), but that 25 Rabbis have publicly asked Your Honor to resign for fabricating evidence while at the

time time ignoring exculpatory evidence. (24 signatures appear on the letter, but Rabbi Yaakov Florens of Yehudi joined after). The letter speaks for itself.

50. More than two dozen Rabbis, some of whom are attorneys, have asked Your Honor to resign for unethical behavior in concert with Mr. Bhatia and his team.

51. **Your Honor denying my trip to Israel, and certainly remanding me, would be seen as a clear revenge for the Rabbis' letter. I should remain free until the Second Circuit rules on my case and, if needed, any Rule 33 motions and 2255 motions are filed.**


## Case Law Supports Sanctioning and Suspending Mr. Bhatia

52.     Grievance Committee for the Southern District of New York v. Simels, 48 F.3d 640 (2d Cir. 1995): In this case, the Second Circuit affirmed the SDNY Grievance Committee's decision to suspend an attorney for three months for multiple instances of misconduct, including failing to comply with court orders and rules, making false statements to the court, and engaging in dilatory tactics.

53.     Mr. Bhatia has made false statements to this court and in the Second Circuit, and in US v Walsh, as explained below. In that case, he nearly caused a man to die in prison instead of being released for time served.

54.     Mr. Bhatia again completely misrepresented the nature of my relationship with Officer Ozoria, as the transcript and audio recording provided herein demonstrates. Officer Ozoria stated that our relationship is always cordial, and that I am always cordial. Our conversation was friendly and ended with laughter and well wishes. Office Ozoria also stated that he did not object to be traveling to Israel.

55. Mr. Bhatia is allowed to lie repeatedly, and perhaps he feels he's able to get away with it because this case is being overseen by Mr. Biale's mentor, who was even willing to go so far as to completely fabricate a quote I never said about Passover.

56. If Your Honor were to deny or delay my visit to my ailing mother, that would be huge injustice, especially knowing how much exculpatory evidence was hidden and is on the docket post-sentencing that Your Honor has chosen to ignore, as has Mr. Bhatia.

**57. I am eager to be heard before the Second Circuit, and more specifically for Mr. Quainton to be heard before the Second Circuit. We will win. I am innocent.**

**58.** As Harvard Law Professor Lessig has explained entirely *pro bono*, together with others, what I am accused of is not a crime.

**59.**  They explain that  it is not a crime to bill clients according to online terms just because years later they claim they chose to not read the Payment Terms subpage.

**60.** They explain that the terms are *identical in nature to Airbnb's terms, as Harvard Law School Professor Lessig pointed out, and they are identical because our corporate attorneys copied Airbnb's structure.*

**61.** *I'm literally being accused of structuring terms that I didn't structure and that even my attorneys copied from a far larger company's attorney-drafted terms.*

**62.** Your Honor chooses to ignore this. The entire theory that I "buried" terms is absurd because I did not even structure the Terms and the structure predates the existence of my company because it was copied from Airbnb by a major international law firm!

**63.** I do not deserve to be caged for this. The 19 months of 20 hours a day confinement was already a major injustice unwarranted even were the accusations true, especially for an alleged first-time offense.

64. Mr. Bhatia cheated, hid evidence, lied to the jury, held ex parte calls with the Court, helped witnesses hide evidence, and he continues to lie and misrepresent facts.

65. The Defendant is not angry. The defendant is adamant, but not at all angry.

66. However, anyone would be outraged at the injustices in this case.

67. <any are outraged (see: JusticeForAri.org) the behavior of the Court and the US Attorney's Office.

68. Many legal experts have said that under any other Judge I "would have been free years ago,"

69. But I am still not angry.

70. There is only One True Judge, God, and the Defendant is at peace knowing that God will ensure he is freed at the right time. It is all in God's hands.

71. There is no reason for anger. It will not suit anyone.

72. I was not angry in Miami Beach.

73. I am not angry now.

74. I will not get angry no matter what Your Honor decides.

75. I will use the law and legal means, as always, just as I did when I had my attorney at the time Mr. Reinitz email and warn the customers over and over and over again for a period of months, as shown in emails in evidence. Just as when I gave Mr. Soleimani a detailed and itemized list of fees totalling approximately $264K, in an email *dictated to me by Mr. Reinitz*. (If I'd written it it might have been "angrier" -- angry emails are not a crime.), which is in evidence. Just as I warnd the Mercer shareholders (Dkt. No. 284. Page 7 onward).

76. **What we have above are <u>facts, provided by third parties, which are on the docket</u>.**

77. **The Court will likely try to call me a conspiracy theorist, but all of those facts are true.**

78. **25 Rabbis, some of whom were also seasoned attorneys, have publicly called for Your Honor to <u>resign (Dkt. 326)</u> -- they are not conspiracy theorists but leaders and experts in the law and Judaeo values.**

79. **Accusing the Defendant falsely will not change these facts**

80. The facts support that I am innocent of all accusations in SDNY.

81. The judge and prosecutor in MIami Beach already agree I should be allowed to travel and should not be confined.

82.  I am sure, as God is my witness, that I will prevail.

83. For those reasons and others, I am not a flight risk.

84. I am eager to return and be vindicated in court.

85. Then I'm going to sue a lot of people who were involved in this case, including Your Honor's mentee, Mr. Biale, as Your Honor surely knows.

86. And I'm going to win.

87. I am going to win in Miami Beach, too.

88. I'm not going anywhere. I'm staying alive to file those lawsuits and win.

**<u>Angry emails are not a crime and using them as an argument to detain someone is a violation of the First Amendment</u>**

89. This country still has a First Amendment, and a vendor is allowed to send angry emails to clients.

90. While I have hopefully matured, and used these past few years to practice and get into the habit of Transcendental Medication, Ice Plunges, and other forms of relaxation, and I do not send angry emails (or at least I hope I am much better at refraining and expressing myself more calmly), there is still a First Amendment right to express anger at someone who is not paying their bills.

91. Angry emails to a landlord not paying their bills is not grounds to cage anyone.

92. In fact, it would be a gross violation of the First Amendment to do so.

93. This is another reason Mr. Bhatia should be suspended from the practice of law. Trying to use *speech* as an argument for caging a human when that speech is non-threatening, other than to literally threaten litigation (the legal process!) is a misuse of Federal funds and resources and a gross violation of the First Amendment.

94. Recusing me or convicting me based on the argument that I sent angry emails to clients who were not paying their bills, and then referred them to my lawyer for him to email and call them (as the evidence shows I did, and the emails between Mr. Reinitz and them are in evidence) would also serve to cause a "Chilling Effect" on Free Speech. If vendors cannot express outrage or upset at a landlord who is not paying their bills for fear that one day they will be remanded for expressing anger at someone stealing from them, they will not express their feelings, and this would be a chilling effect.

95. Therefore, remanding me based on Mr. Bhatia's arguments that I send angry emails would be a violation of the First Amendment.

96. As there is no accusation of me being angry at all in Miami Beach, and all witnesses say I was asking the runners to stop lest they hit an elderly person or child, the "anger" argument falls solely on prior emails and again would be a violation of the First Amendment.

97. While my discussions with Officer Ozoria are very pleasant and friendly, cordial, to use his word, to suggest that having an argument over an outdated document is grounds for remand would also be a violation of the First Amendment.

98. For these and other reasons it would be a violation to remand me, and a gross injustice to deny my right to travel to visit my ailing mother.

**Even the Miami Beach Prosecutors and Judge Agree I am not a threat**

99. The prosecutors have no objection to me traveling to Israel, are not seeking jail, and will likely dismiss the charges when they have time to review the BWC footage in full, and the many quotes like the ones shared above from the BWC footage.

100.    Judge Nunez has no objection to me traveling to Israel, and issued an order of "No jail".


## Detaining or Remanding Me Would Only Serve to Make it Impossible to Defend Myself in Miami Beach

101.    Perhaps Mr. Biale's real goal in attempting to remand me is to deny my ability to gather evidence and interview witnesses before my trial in Miami Beach in June.

102.    As I have been denied counsel in Miami Beach, in violation of *Padilla v Kentucky* (and Mr. Bhatia's attempt to remand me proves that a "no jail" stipulation still carries the risk of confinement and thus that *Padilla* applies to all misdemeanor defendants and all misdemeanor defendants must be appointed counsel), I must gather all evidence myself, which includes interviewing witnesses, filing documents, and the like. I could not do this from Federal Prison, and Mr. Bhatia knows this.

103.    Detaining me would help an unjust process where police conspired and coached witnesses to issue false statements verbatim *on BWC* (Body Worn Camera), as Your Honor and Mr. Bhatia are now aware, become even more unjust.

104.    Therefore, remanding me over the very accusations I need to be free to defend myself against and to prepare my defense, would be a sure violation of my rights to defend myself against criminal charges.


## Innocent Until Proven Guilty

105.    If Your Honor uses the false accusations of a group of CrossFittter who were clearly, as shown on the BWC footage and in the transcripts above, lying to protect one of their own from being arrested, to revoke my bond, Your Honor will be violating the most sacred value of our Justice System, which is that I am innocent until proven guilty in a court of law. I am innocent of the accusations in the Miami Beach case, as a matter of law.

## Summary

106.    Sundown is approaching and I must wrap this up. I do not have time to edit it further. I lack counsel to represent me, which is surely a violation of *Padilla v Kentucky*, because Mr. Bhatia is seeking remand. I should be immediately appointed a Federal Defender in this court.

107.    Given the new evidence, cited above, and that I'm out on Bond Pending Appeal, my trip to my mother should not be denied, and doing so would be a major violation of my rights and incredibly cruel to my mother and father.

108.    Defendant trusts that Your Honor will allow him to travel to Israel.

109.    Your Honor should allow the Defendant to leave at any date from April 17, 2023 and return by or on May 9, 2023. (Mr. Teman intends to be in NYC for the Second Circuit hearing, if permitted, on May 11th, 2023 and will take a night to adjust and sleep there in advance if permitted.)

110.    As to the motion for sanctioning  and suspending Mr. Bhatia, the Defendant asks that that be delayed until after his return from Israel. As well, because the allegations are explicitly that Mr. Biale lied and actively sabotaged my defense, and that his firm has repeatedly sabotaged defendants to aide Mr. Biale's wife's team, the Defendant motions for this issue to be heard in a hearing before a Judge who does not identify as the mentor and close family friend of Mr. Biale and his wife AUSA Graham.

13

Respectfully submitted. With zero anger. (But imagine what all this energy could be used for if it didn't have to be wasted responding to Mr. Bhatia's lies and misrepresentations!!!)

Wishing Your Honor a Shabbat Shalom, and praying Your Honor will allow me to hug my mother a week from now in Israel.

Thank you,

Ari Teman
Defendant,
*Pro Se (not by choice)*

**Transcript of Conversation between Officer Ozoria and Ari Teman**

Ari Teman  0:00
How you doing?

Officer Ozoria  0:01
 good

So, what is going on with you? Because I send you an email that is all you had to reply with simply.

Let me finish because, uh, you know, I always like communication. It's I like for things to be clear. Do you feel like, since you started supervision, do you feel at all that I pressured you?

That you use the word the rest to an email communicating to me. I want you to be honest, though don't be don't be this guy that is always hanging on technicalities, because then I can't I can't communicate with you appropriately, if that's the case. And at that point, it's an issue.

Ari Teman  0:43
And so that itself the way you just said that is, that's coercive.

Officer Ozoria  0:49
How is that course? Because

Ari Teman  0:50
what is what happens if it's an issue, I get assigned another officer or you lock me in a cage?

Officer Ozoria  0:54
 I don't have that kind of power in New York.

Ari Teman  0:55
Right? But then you go, I can't manage this guy. And they go, Oh, I guess he goes in a cage. That's coercive

Officer Ozoria  1:00
No, no, it's not for so because when I when I explained to you, I told you very clearly when you came into my office, right, I told you very clearly, you sign it is an acknowledgement that I reviewed the condition, not that you agree with that, you know how I know that because I write my chronos.

Ari Teman  1:13
 But that's that may have been what was in in the office. My, my, my concern, my lawyers concern is that the whole case hinges on this idea,

Officer Ozoria  1:25
But you have to remember that probation has nothing to do with your case.

15

Ari Teman  1:27
It's still the court and the court is going to say, "look, this guy agrees that
you have to sign a contract over and over and over again, every time." Which
is, look, if you if you sign a lease on a car, right? You don't get to go a
year later and go, "Oh, I didn't sign it again this year. So I'm not paying the
rest." You're bound by the

Officer Ozoria  1:42
We're not in the car business, though. We're in the subdivision

Ari Teman  1:46
A contract's a contract. No, I get it.

Officer Ozoria  1:47
But once you sign this not a contract, you see the confusion?

Ari Teman  1:51
But either a signatures a signature,

Officer Ozoria  1:54
a signature. You I can easily just put refuse to sign

Ari Teman  1:57
No but if it says signing that I reviewed the terms and specifically what I'm
signing for

Officer Ozoria  2:03
The thing again, it goes back to what I said when you said okay, wrong thing. I
said no. My mistake. I said that. Right.

Ari Teman  2:08
Right. But again, that's I have to be on edge in this topic, because that's the
government's argument that all of these guys read the terms but they decided
not to read this part

Officer Ozoria  2:15
No you can can be on

Ari Teman  2:16
 or I didn't remind them

Officer Ozoria  2:17
what you're confusing is that you can be on edge and you can protect yourself.
I don't think I've ever had that discussion with you about anything else. I've
been nothing but cordial. What?

Ari Teman  2:25
I'm not addressing you personally.

Officer Ozoria  2:26
No, no, but when you communicate and use words like "duress", right, when I
have never used any coercive language with you.

Ari Teman  2:32
Would I be interacting with any pretrial supervision officer at all, if there
wasn't the gun of the state pointed at me? No, I wouldn't. That's duress.

Officer Ozoria  2:41
but again, that's but that is not

Ari Teman  2:43
But the nature. The nature of your job

Officer Ozoria  2:46
Supervision in South Florida is doing New York a favor by saying you resigned
in South Florida your case does not belong in South Florida. It belongs to New
York.

Ari Teman  2:53
Well, we argue that it belongs right here in Florida but Yeah,

Officer Ozoria  2:56
well I again

The RCCs were right here on Lincoln Road.

But again, who picked it up?

Ari Teman  3:02
Yeah, no. That's on appeal. I get it. We understand the law.

Officer Ozoria  3:05
 Right. But you also you also had a company in New York right?

Ari Teman  3:07
No, I'm not gonna answer those. I'm not going to address this. Those are lawyer
questions.

 Okay. So again,

Officer Ozoria  3:12
I was here. So here's what I'll do that if you want, we're gonna we're gonna
cut all that out. Right, we're gonna cut off, I am going to let you go on with
your business. I am going to email New York not about anything bad.

I am going to email New York, and let them know what your concern is. And you
can email them to okay. But again, when you when I'm communicating

Ari Teman  3:31
My only concern is  to say sign up sign a piece of paper, that first the bond
conditions. If I signed the previous one, then all of the freedoms that I was
given, the judge could say, oh, no, we took away your ability to go to work. We
took them because the original 2019 terms were me locked in an apartment 20
hours a day,

Officer Ozoria  3:48
but but again, right? And then what was my response?

Ari Teman  3:51
So okay. Now I'll get the new doc. But it's fair to be nice to be on edge about
that

Officer Ozoria  3:57
when you when you will be concerned. Right? If I don't acknowledge that I made
a mistake.

Ari Teman  4:02
 Right. But you work for the court? I do. And our argument  in our appeal

How many times. How many times how many times have you attempted to have a
dialogue with me? And I say Ari stop  talking?

I get  that.

Why do you think that is? I want you I want you to

I understand, but by the same reason, anything that resembles a contract or a
signature, right, that's already signed, It's gonna raise questions as to is
there a trick going on? Again, and you're  allowed to lie to me?

Officer Ozoria  4:32
 I'm not

Ari Teman  4:32
Yeah  you are

Officer Ozoria  4:33
No, no, I'm not. I am not because again, I do my job. So I don't concern myself
with what your experience has been with somebody else outside of me, but I do
my job very ethically. So my job being done ethically requires me to be
truthful. And again, which is why I use words like "I made a mistake", or "Yes,
correct. That was wrong." The reason I do that is because

Ari Teman  4:53
Was it a mistake to have me have to pee in front of another man for months on a
case with no

```
Officer Ozoria  5:03
but you're convoluting.

Ari Teman  5:05
But that's that was your decision. No,

Officer Ozoria  5:07
that wasn't it wasn't. That was part of New York's conditions, whether they
were clear with you or not, that has nothing to do with me, I have never you
understand how a condition gets added, I have to write to that district on a
noncompliance and specifically request that a condition be added with the
agreement of the person. Did you and I do that? We did not. So I have never,
now,

I have never written to the court about you ever, ever. So again, because most
of the things that we have is issues of, hey, the monthly report, hey, the
progress report, and I email you and I send you a message and I communicate
with you effectively when I need to see you I tell you very clearly that you
know, the deal was just to see you in person make sure you're in South Florida
Yeah, so there's nothing complicated.

Now, here's what I'm gonna do, I'm going to understand that you have to guard
yourself, and you have to protect yourself.

 But what I will tell you is that I've always correct. I will always challenge
anything that is not accurate when it comes to how I do my job. And I do not
put anybody under durres. I communicate to them what is expected.

Now, if I say, "correct, and let me fix these conditions," which I will do. And
I will tell you, "I need to review them." And when I review them, I can tell
you, "you can either choose to sign it or not." But I have to acknowledge that
I review them with you

Ari Teman  6:21
youRight. But putting up putting the word saying "we reviewed together on the
date, signed"  is very different than "I am agreeing"

Officer Ozoria  6:26
Yeah but  you understand that

Ari Teman  6:27
By the way, there's a totally different. There's a line that says  "We reviewed
on this date. And it's an old terms here, we reviewed it. "

Officer Ozoria  6:34
We talked about it when I met you the first time I said, Listen, you don't have
to
```

Ari Teman  6:37
Yeah, but it has to be in writing. In other words, what happens is what's
written, but that's the contract.

THis is the whole case. And again, this is why I have to be careful.

Officer Ozoria  6:44
This is why I don't get into your case,

Ari Teman  6:46
No, but a contract's a contract in the United States of America.

Officer Ozoria  6:48
But you and I

Ari Teman  6:49
Which Florida is still a part of

Officer Ozoria  6:51
I want you to understand this, you and I never have a contract ever.

Ari Teman  6:55
Right. But you're the federal government

Officer Ozoria  6:56
you and I don't have I don't have the authority to enter into any contract.

Ari Teman  7:01
Now I understand that. But that piece of paper is not something that you draft.
Okay, I just have to be careful of anything

Officer Ozoria  7:06
 I can testify.

Ari Teman  7:08
If you were in my shoes, you would also say "one second, what am I being asked
to sign? Let me check with my attorney"

Officer Ozoria  7:14
Said  that I'm going to understand what it is. And I also have to clarify.

Ari Teman  7:17
Right.

Officer Ozoria  7:18
You get what I'm saying? So my job is to clarify any confusion. And right now,
that's the clarification that I want to make. So that's what I want you to
understand. Yes, I am an officer of the court. There's no confusing, which is

why I always tell people, I don't need to identify myself as anything else. Because I am an officer of the court.

You and I understand the nature of the relationship.

 And I've always treated you with respect. And you have.  I want to I want to say this the opposite as well. You've always been very, very cordial, courteous to me.

So what I want to do is make sure that we don't lose track.

Ari Teman  7:44
Not just because you have a gun (laughter)

Officer Ozoria  7:45
(Laughs)

 But you see, those are the things right there. Those are the things. That's what makes it

Ari Teman  7:52
But okay, here's the thing, right? Like you, you go on a date, but you choose to go on the date, and you can say, "hey, I'm done. I'm paying for my drinks, and I'm leaving. "

Officer Ozoria  7:59
Okay,

Ari Teman  8:00
right. You're not under duress, right?

 But the government is saying no, you have to be on this date.

Officer Ozoria  8:06
I ... I.... apples to oranges, ... that makes no sense.

Ari Teman  8:09
No, no, it does. Right?

Officer Ozoria  8:10
It doesn't

Ari Teman  8:10
 Meaning it goes if not for this case, would I be here would I be? Why would I not charge my clients for what they signed up for?

Officer Ozoria  8:19
But remember, but that's like you blaming the person across the table with you on the date for your circumstances,

21

Ari Teman  8:24
Right, so in this case,

Officer Ozoria  8:25
Im, the date. (Laughter)

Ari Teman  8:27
No, in this case, let's use let's use, if we're going to stay on a romantic
relationship

Officer Ozoria  8:30
But you get what I'm saying.

Ari Teman  8:31
So in this case, the judge is raping me, but he's telling you to hold me down
on the ground and you're going "No, I just work for the court"

Officer Ozoria  8:36
Not it went to rape.

Ari Teman  8:37
 this is a nonconcentual relationship.

Officer Ozoria  8:42
In that sense it is, for you.

For me it is consensual, because I volunteered  to do a job now.

Ari Teman  8:47
I appreciate that

Officer Ozoria  8:48
so now, So here's what we'll do. We'll cut the semantics. I don't need any more
comparisons. I need actual. So what I'm gonna do is, I'm going to make sure
that I review every single condition.

Ari Teman  8:59
Yeah,

Officer Ozoria  9:00
I'm going to review them with you.

Ari Teman  9:01
Yeah,

Officer Ozoria  9:01
review is the key word.

Ari Teman  9:03
So long as the paper says we're reviewing. I just want specificity to what I'm signing.

Officer Ozoria  9:07
We can agree though,

Ari Teman  9:08
right. You're not going to sign a home lease or a mortgage without specificity

Officer Ozoria  9:16
review is a key word.

Ari Teman  9:17
Yes.

Officer Ozoria  9:17
 So that's what I'm gonna do.

Ari Teman  9:18
Right  And you'd be OK if I write, you'd be okay. If I write my signature. "Yes, we reviewed on this date".

Officer Ozoria  9:23
I don't care what you write. You can write whatever you want.

I wanted to make sure that it was accurate because what you actually replied to was correct. I was sending out different ones, not just you.

Because again, you're one person out of many that I supervise. Yeah, so what I said it was like, okay, yeah, I made a mistake. where I said, I'll fix it.

Ari Teman  9:44
Well, we're all one.

Officer Ozoria  9:45
Yeah, no, we're not.

Ari Teman  9:45
No? (Inaudible) on your spiritual journey.

Officer Ozoria  9:50
 No, I listen, I want you to understand this. This job is not personal. I don't know you from ha hole in the wall other than. so what I want you to do is I want you to get your fair and due process. I really do,

 But what I don't like is confusion about when the way I do my job isn't question in any way, shape or form. So I clarify, and no I don't use regardless

23

of what you think origin is or what the definition is. And again, I don't want
to go that route. Because I don't like veering off of  the one topic.

What I want is a positive relationship between myself

Ari Teman  10:20
It's been great

Officer Ozoria  10:21
 with myself, or any person that I supervised, because their circumstances
again, I don't have any legal authority over their circumstances as it relates
to the things, and to pretend that I do is narcissistic. And it's not what I do

Ari Teman  10:33
I understand, although, I guess this is New York decision, but we get our
clients all the time saying, "How come I can't just pay, you know, $50 a month
on my debit or credit card for a cloud based intercom?"

See Those are things that you're attorney because the judge...

Officer Ozoria  10:50
Yeah yeah,

Ari Teman  10:51
Meaning, I go and I and pretrial says no, we're against this. It's like a $50 a
month credit card charge. Where's where's fraud coming? You call up? You call
up visa? And you say "I want to stop this card."  And that's it. It's not even
FDIC, it's not Federal

Officer Ozoria  11:04
when it comes to those finances and everything else. I'm great at my personal
finances. I really, am. But when it comes to finances a managing a business

Ari Teman  11:11
of nobody. This is a this is a big point of stress.

Officer Ozoria  11:14
It's been since the beginning.

Ari Teman  11:16
Right

Officer Ozoria  11:16
Since the beginning.

Ari Teman  11:17
Right. And then there's there's only so much so many loans I can take from
people and whatever. And so Okay, now three years in,

Officer Ozoria  11:23
I won't even pretend to understand.

Ari Teman  11:25
 Right.

Officer Ozoria  11:26
 That's That's how much I want it. I want you to understand that. Like, I won't
even pretend that I understand.

Ari Teman  11:31
But so good. Would it be helpful in that you could probably do and say, look, I
think if you know, and you paper it to the court, and you say I think if we're
going to get very strict limits and say that this company can charge the
clients that want to pay by credit card up to 100 bucks a month, and they have
to stop it if asked and switch to annual invoicing. I think that's safe. I
don't think that this guy's gonna run a massive scheme on people. He's only got
a few hundred customers

Officer Ozoria  11:56
again, I don't know the nature of the case. Right. I know the nature, but I'm
saying I don't

Ari Teman  12:01
There was  nothing to do with credit cards in the case.

Officer Ozoria  12:03
Yeah,

Ari Teman  12:04
 No, this is just this is just for them to kill my ability to support myself
and cause stress. Which is a very New York thing.

Officer Ozoria  12:11
Okay. So listen, I don't have that to do, right. i We don't that's not what
probation and pretrial does.

Ari Teman  12:18
But your role and insight in terms of stress...

Look, would you be would you oppose a condition where I'm allowed to charge?
Let's say, 100, up to $100 a month? For somebody who has my intercom by credit
card? If they choose to do that?

Officer Ozoria  12:41
What I would tell you to do this to the court first, because remember me when

Ari Teman  12:46
I have a they are blaming pre-trial?

Officer Ozoria   12:48
Yeah, no, they put it on pre-trial in New York sometimes. And when they reach
out, most of the time when I say I don't have an issue with this or that,

Ari Teman   12:54
but if you say you don't have an issue, then they let me do it.

Officer Ozoria   12:57
That was the same thing with the location monitor. That was the same thing with
the travel to Australia.

Ari Teman   13:04
It's a year ago this week.

Officer Ozoria   13:05
That was the same thing with a travel to Israel. Yeah. Never have I objected
any

Ari Teman   13:10
 No, no, no, I get it. But my thing is, is again, it has to go through the

But this got reject by  pretrial. And I was like, I don't understand why you
would object.

Officer Ozoria   13:18
I think that the way that that works is dependent on the way

Ari Teman   13:21
They probably just went to the US attorney and asked,

Officer Ozoria   13:23
yeah, so it's a matter of where the case stands. And your case, I have no clue
where your case stands right now.

Ari Teman   13:30
My Appeal is May 11

Officer Ozoria   13:30
Yeah. Hopefully everything works out. I hope everything works out.

 So again, I want you and I to get into this review.

Ari Teman   13:40
Right.

Officer Ozoria   13:41
 We can't agree on review we can. Because what happens is when may 11, you
said?

Ari Teman  13:46
 Yeah

Officer Ozoria  13:46
 I gotta write that down. Because I gotta fix that I got April 11. Okay, so

Ari Teman  13:53
It's the day after my birthday,

Officer Ozoria  13:54
It's the day after your birthday?

Ari Teman  13:55
I don't know if that's a coincidence.

Officer Ozoria  13:57
If your look for conspiracies you're gonna find it

Ari Teman  14:00
listen you have a (inaudible) party the day before.

Officer Ozoria  14:03
You understand (laughing), If you look for conspiracies, you're gonna find out

Ari Teman  14:06
No, (laughing) I think it's just, it's just that, you know, a quirk

Officer Ozoria  14:09
is ironic, I'll say that

Ari Teman  14:11
Yeah, yeah. But uh, hey, I'll go I have a party in New York, I guess because it's gonna be Southern District is Second circuit.

Officer Ozoria  14:18
I'm glad I work in South Florida. I can say that.

The pupper , how's the pupper doing?

Ari Teman  14:23
She's doing well. She doesn't enjoy her harness. She says she's under duress.

Officer Ozoria  14:29
Apparently. But you're at-fault on that one?

Ari Teman  14:31
 Yeah.

Officer Ozoria  14:31
 Meanwhile, you get all the benefits you get all the love and affection.

Ari Teman  14:34
Yeah, I'll tell you when I was (laughter) first arrested every time I put on
the leash on her, I felt bad. I was like, "Now I could relate."

Officer Ozoria  14:42
Nah, that's to protect her.

Ari Teman  14:43
 Yeah, well, that's that's what they tell us. (laughter)

Officer Ozoria  14:45
Yours I can't speak for (lauhter)

Ari Teman  14:47
all right. Thank you.

Hey!

Transcribed by https://otter.ai