B"H

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**
CRIMINAL DIVISION

CASE NO. B23004803

Miami Beach

vs.

Ari Teman, Defendant, pro se[1]

_____/

**EMERGENCY MOTION TO DISMISS CRIMINAL MISDEMEANOR CASE FOR FAILURE TO ASSIGN COUNSEL WHERE DEFENDANT FACES INCARCERATION, AND ON GROUNDS OF "STAND YOUR GROUND" IMMUNITY, AND TAMPERED EVIDENCE**

COMES NOW the Defendant, Ari Teman, proceeding pro se (against his objections), and respectfully moves this Court for an Emergency Order to Dismiss the Criminal Misdemeanor Case against him for failure to assign counsel in violation of *Padilla v. Kentucky, 559 U.S. 356 (2010)*, Florida's "Stand Your Ground" laws, and the tampering of evidence.

In support thereof, the Defendant states as follows:

1. The Defendant is charged with a criminal misdemeanor, and despite a "no jail" stipulation by the City of Miami Beach Attorney's Office and a "no jail" order by the Court, prosecutors in the Southern District of New York (SDNY) are seeking remand in a separate federal white-collar case against the Defendant. (United States v. Teman (1:19-cr-00696), Dkt. No. 348)

---

[1] The Defendant is pro-se against his will, despite asking for counsel, and maintains that denying a public defender regardless of "no jail" stipulations is a violation of the 6th and 14th Amendments, and in violation of SCOTUS' logic *Padilla v Kentucky*. Severe consequences and irrevocable harm can be caused to any defendant without counsel, including immigration, funding, child custody, bond conditions, parole conditions, and the like, regardless of no-jail stipulations.

2. The Court failed to assign counsel to the Defendant in the instant case, violating his rights under *Padilla v. Kentucky*, which held that the Sixth Amendment guarantees the right to effective assistance of counsel in criminal cases where extreme harm, such as deportation or confinement, are possible, as has been the case from the outset of this matter.  See Gideon v. Wainwright, 372 U.S. 335 (1963) (holding that states must provide counsel to indigent defendants facing the risk of incarceration).

3. Florida Rules of Criminal Procedure ("FRCP") state, "A person entitled to appointment of counsel as provided herein shall have counsel appointed when the person is formally charged with an offense, or as soon as feasible after custodial restraint, or at the first appearance before a committing judge, whichever occurs earliest." (3.1111)

4. FRCP continues, "Counsel shall be provided to indigent persons in all prosecutions for offenses punishable by incarceration including appeals from the conviction thereof. In the discretion of the court, counsel does not have to be provided to an indigent person in a prosecution for a misdemeanor or violation of a municipal ordinance if the judge, at least 15 days prior to trial, files in the cause a written order of no incarceration certifying that the defendant will not be incarcerated in the case pending trial **or probation violation hearing,** or as part of a sentence after trial, guilty or nolo contendere plea**, or probation revocation.** This 15-day requirement may be waived by the defendant or defense counsel."

5. The Court could not and cannot possibly certify whether the Defendant will be subject to probation revocation, because that is in the hands of another court (SDNY), and the Defendant did not and does not and will never waive the requirement. Furthermore, any such certification was obviously false and (surely inadvertently) a fraudulent representation to the Defendant because the Court failed to ascertain or inquire as to any potential incarceration or deportation of the defendant.

6. The Court and State makes such inquiries of Spanish-speaking Defendants, as it did on 4/14/2023 (State v Daniella Castillo), but not with fluent English speakers, which is another violation of the Defendant's Equal Protection rights, and could only be due to the Defendant's ethnicity and background, as there were no questions to ascertain immigration status or citizenship. Such a brazen failure to protect the rights of the Defendant is a clear violation of Teman's Rights to Due Process and Equal Protection, which also warrants immediate dismissal.

7. As a result of the violation of these rights and denial of counsel, the Defendant has been irreparably harmed in his ability to gather evidence, interview witnesses, and make informed motions without the advice of counsel. Weeks have gone by and some witnesses, according to the BWC footage, do not even live in the area and were staying at a hotel. The Government has ignored repeated requests to identify this individual, the woman who holds a restraining order against this individual and who asked the police to have him arrested for violating said restraining order. Delaying the identification of a witness the Government knows is from out of town and staying in a hotel is evidence suppression in violation of *Brady.*

## The Government's Evidence Suppression and Tampering with BWC Footage Cannot be Cured and Requires Immediate Dismissal

8. The City-provided and hosted BWC footage mysteriously cuts-out after Miami Beach Police Officer Rodrigues makes conspiratorial statements to City witness Jesse Kats about "the Jewish Community":

    [2]12:09 RODRIGUES: You made it an issue today

    12:15: RODRIGUES: But the law isn't fair and you know…

---

[2] Video at https://bit.ly/MBTemanKatsBodySlamsJewish
Note:  To spare the Court and others from typing very long URLS, Defendant is using a url shortener service. The links should redirect directly to city's OneDrive of the videos. Defendant has no edit control of these video files as he is linking to the City's hosted copy.

> **12:20 KATS: I just don't want to be put into a position where I'm going to be charged with something**
>
> RODRIGUES: I know. **But unfortunately, and I mean, we're talking on camera, but you know, it's like… I don't think it will turn into… I mean I'm hoping right**
>
> KATS: Me either. But I'm afraid he's [Teman] going to find something.
>
> RODRIGUES: But he [Teman] won't speak to us…. **And that community…<u>the Jewish community.</u> <u>They have their own.</u>**

9. The BWC clip is suddenly and abruptly ended. Obviously this is very suspicious. The next set of footage does not have the continuation of this clip. The Defendant has been unable to find the rest of Officer Rodriges statements to Mr. Kats continuing that statement in the BWC footage. The City has ignored repeated requests to provide the remainder of Officer Rodrigues' statement on BWC footage.

10. Whether the Government or an agent of their edited or turned-off the BWC or otherwise cut that conversation to keep it from the Defense, it is a violation of *Brady*.

**The Conspiring by the Police to Coach Witnesses to Press Charges and Issue False Statements is incurable and the Government will not be able to meet its burden of "proof beyond a reasonable doubt"**

11. Furthermore, a Police Officer using conspiratorial, anti semitic about "the Jewish Community" followed (immediately after the mysterious cut in the BWC footage) by Officers Reisgo and Rodrigues openly coaching witnesses Siblesz and Kats to change their position and press charges to "protect" Kats from Teman pressing charges, is an incurable flaw in the prosecution which renders all the State's key witnesses (Officer Reisgo, Officer Rodrigues, Jesse Kats, Isabel Siblez) beyond the pale of believability. In fact, the footage on video amounts to clear Conspiracy to Obstruct Justice, Obstruction of Justice, and Conspiracy to Interferere with Civil Rights by the four individuals, together with an associate

identified herein as "2nd CrossFit Male":

KATS: We'll see what's going to happen

KATS: Isa, do you want to press charges?

**SIBLESZ: "It will help you?" (Pointing to Katz) (13:16)**

**2nd CrossFit Male: Because he's [Teman's] going to.**

**KATS: "If something rolls around, you know…"**

2nd Male: "You're the owner, you know our position… **but we have to protect him (pointing to Kats) because you know**

Cafe Owner: Yeah, yeah, yeah, **no, no, no.**

2nd CrossFit Male: **"That's a lot of people not coming to the coffee shop anymore."**

REISGO: **It doesn't show him [Teman] pushing**… but the story… as long as the story is consistent

SILBLESZ: In the camera you see me running, and then you see a bunch of people, and then you see him.

Cafe Owner (inaudible):

…

RODGIGUES: The way the law works the issue with that person… just because he did that to you **doesn't give you the right to do to him**…

…

16:18: RIESGO: What this is about getting your stuff fixed, your chain…

**REISGO: Now if you say "I shoved him because I was protecting somebody or coming to somebody's defense.. Then yes, he's liable to fix that [the chain]"...**



12. Such feeding of a statement by Officer Reisgo, who identifies in the BWC as a longtime friend of a member of the CrossFit group, and Officer Rodrigues who identifies as a CrossFitter, cannot be overcome. A jury will see plainly that the police tell Kats he did not have the right to body-slam Teman and that Teman could press charges. It will see that the police and Kats and "2nd CrossFit Male" pressure Isabel Siblesz to issue a false statement, and that the police coach Kats on changing his statement, after Kats already admitted on BWC footage that he did not see Teman hit anyone:

> Kats: He [Teman] turned around and I ran for four seconds and (shows body slam) **I ran and jammed him.**
>
> **Reisgo: You saw him hit a person?**
>
> **Kats: No**



**[Caption: Kats acts-out Teman falling back after Kats "jammed" him]**

13. The Government's main witness, Kats, admits on BWC footage to the Police that:

    a.  Teman was merely "standing" and

    b.  using his camera to film (really, photograph) the individuals

    c.  who *admit* they threw a chair and pushed him,

    d.  Kats was too far to hear anything Teman or the "Gray T-Shirt Man" might have said,

    e.  The Kats ran and blody slammed ("I ran and jammed him") Teman despite not seeing Teman hit anyone ("You saw him hit a person?" "No"):

    KATS: So this traffic barricade. He [Teman] was **standing** here. So this is how it played out. Our guys are running. He started chasing after them like this [SEE SCREENSHOT: KATS MIMICS TEMAN HOLDING UP A PHONE CAMERA]. (8:52)

    KATS: And **he turns around and shoves his camera in our face.**

    RODRIGUES: And says what? **Does he say anything?**

    KATS: **I was back there**

14. Kats points a far distance. Note the photo Teman took does not even show Kats who must have been VERY far back) (8:59)

15. This case must be dismissed because it is not a crime for the victim of assault to "stand"and "point a camera" at a group of people who *admit* she "grabbed a chair and threw it" and then "pushed" Teman after she ran at Teman and "grabbed a chair and threw it" and then "pushed him".

16. Multiple independent witnesses deny her claim that Teman pushed her back, and state that Teman "did not touch anyone". The City and Court are in possession of those sworn statements (Dan M., Eduardo [Last names redacted for privacy]), however based on her own statements that she ran at Teman and grabbed a chair he was standing by and *threw it*, it would obviously be self defense to push someone away so they could not continue to throw a chair at you! It is protect by Stand Your Ground.

17. Because Teman was assaulted by multiple individuals, Siblesz and the "Gray T-Shirt Man" who struck Teman forcefully in the chest, Teman was in his right to run ahead of the group and, as Kats says, "stand" and "shove his camera in our face".

18. Teman took this photo, so he could later get the identify of the individuals who assaulted him:



19. Teman has asked the State and City to identify the individual since March 27, 2023, and the city has refused to do so.

20. It should be noted that:

    a. Kats is seen nowhere in this photo and must have been very far back (even his admission of *running* for four-seconds would place him almost down at the end of the block) and there is no way he could have seen anyone push anyone.

    b. "Gray T-Shirt Man" is clealy not in a defensive position, and in fact is smiling and giving Mr. Teman "the bird", aka "the middle finger", so the claim that Mr. Teman had pushed this individual or others is absurd and not supported by the demeanor -- this is not how someone would hold their arms or face if they'd just been attacked. It is, however, the face of a crazy person who is friendly with the police and knows they'll cover for him attacking someone standing and taking a picture or asking runners to stop barreling through a cafe.

    c. The woman in purple, who is identified by Dan M. in his statement has having grabbed and attacked Teman, causing the following bruise (see photo), continues running towards Teman. If Teman had attacked her, she would not be running towards him! As multiple witnesses state, *she attacked Teman!*

    d. 

e.  It is clear that Teman's goal was to take a photograph so as to identify "Gray T-Shirt Man" who assaulted him for the purpose of filing a police report and lawsuit. These are lawful acts and immune from prosecution.

**Stand Your Ground Law Requires Immediate Dismissal**

21. The Defendant is immune from prosecution under Florida's "Stand Your Ground" laws, Fla. Stat. § 776.012. Witnesses and the police report confirm that the Defendant acted to slow runners who posed a serious risk of injury to others in a crowded cafe.

22. The Police also admit, and the Cafe staff confirm, both on BWC that the runners pose a danger to others, and that the Cafe and Teman and others have asked the runners to stop running through the crowded cafe patio:

> Officer Rodrigues: "Why do they run through here?"
>
> **Dean: "We've asked them to stop"**
>
> Dean: "They run through here…we bring stuff out… **it's always a big problem."**
>
> Officer Rodrigues: "That's not right, bro"
>
> Dean: "They always run through here and **it's always an issue**…
>
> Officer Rodrigues: "Yeah, I don't think that's right"
>
> **Dean: "old people out here…with dogs and sh\*t… it's always a big problem"**
>
> ==Officer Rodrigues: "I go to a CrossFit… that's not right to run in the middle."==
>
> Dean: "People have their dogs out here on a leash"
>
> ==Dean: "Well he was asking them to stop…== they run though here multiple times a day…"

23. Asking runners to stop and placing chairs in the way to stop them from running into the elderly people are actions protected under Florida's Stand Your Ground laws.

24. Defending yourself against a runner who admits she ran at you from a distance, "grabbed and threw a chair" is also protected by Stand Your Ground, and is clear self-defense. (And there are multiple witnesses who state that Teman did not touch Siblesz!).

25. Witness "Siblesz" admits to running up to the Defendant and throwing a chair, which would permit the Defendant to use force under the "Stand Your Ground" law to defend himself and others.

26. Furthermore, because independent witnesses confirm that the Defendant did not touch Ms. Siblesz or anyone, and the Police admit the surveillance footage does not show the Defendant push anyone, the State cannot prosecute the Defendant.

27. The defendant is clearly immune for the above reasons under "Stand Your Ground" laws.

28. Witness "Kats" admits on Body Worn Camera (BWC) footage that he did not see the Defendant push anyone and that he charged at the Defendant while the Defendant was turned away with his camera out.

29. The police on the footage tell Kats that his actions are not allowed by law, and the Police then (together with Kats and CrossFit Male 2) encourage Siblesz to press charges against the Defendant. The State's witnesses would be impeached because of this interaction, because they explicitly state they are asking Siblesz to press charges to "protect" Kats because "[Teman] is going to" press charges, and because "the Jewish community has their own" (video cuts out mysteriously) , and the State must dismiss the case as a matter of ethics and law.

30. The State cannot produce missing segments of BWC footage after Police Officer Rodrigues makes conspiratorial statements about "the Jewish Community" to Kats. This footage constitutes impeachment evidence, and the State must dismiss the case. See, e.g., Brady v.

Maryland, 373 U.S. 83 (1963) (holding that the prosecution's suppression of evidence favorable to the accused violates due process).

31. The State has locked the Defendant out of the BWC footage immediately preceding a bond hearing in SDNY over this matter, obstructing justice and denying the Defendant the ability to prepare for a hearing and defend himself. This folder was previously accessible, but the City has locked it and Mr. Teman can no longer access it. The delay caused by this tactic prevents Teman from being able to prepare a defense in a possible forthcoming bond hearing in SDNY which could result in Teman's remand.

32. The city obstructing Teman's ability to defend himself and withdrawing access to BWC footage is a violation of Due Process, and the 6th and 14th Amendments, as well as *Brady*.

33. The City tampering with the BWC footage after his has been uploaded is a violation of *Brady*, and is incurable. It lends further suspicion towards the city's claims and further impeaches their credibility.

34. The Court cannot tolerate any instance of the City denying access to evidence to a defendant. The Court should and must immediately dismiss the case for this and the above mentioned reasons.



35. The Court and the City erred in denying the Defendant counsel in violation of the Florida Rules of Criminal Proceedure, *Padilla v Kentucky,* and the 4th, 6th, and 14th Amendements to the United States Constitution. These are incurrable errors.

36. The City and the City's Police Department have willfully violated the Defendant's rights to a fair trial, obstructed justice, tampered with and blocked access to BWC footage, fed witnesses statements verbatim which the Police knew to be untrue, and used the Defendant's religion and made brazen antisemetic conspiratorial comments about "the Jewish Community" to scare Kats and Siblez into pressing charges to "protect" Kats, who they said did not have "the right" to "run and jam" Teman (to use Kats' own incriminating words).

37. In the interest of Justice, the Court may dismiss a case where there is no possibility for the City to meet its burden of Proof Beyond a Reasonable Down.

38. In the interest of Justice, the Court may dismiss a case where there is clear evidence of witness tampering and manipulation of BWC footage to hide impeachment or exculpatory evidence, and in-fact this is required under *Brady*, and as a matter of Due Process and Equal Protection.

39. In the interest of justice, the Court may and must dismiss a case where a Defendant was wrongfully denied counsel for over a month, when the Defendant faces a very real and immediate threat of incarceration.

40. Because the city has repeatedly ignored Discovery Requests, to the point the Defendant was compelled to file a Motion to Compel Disclosure, while unrepresented, and because the City has presented a knowingly false Arrest Report to the Federal Government in violation of the Federal False Claims Act, which is now resulting in a demand for a bond hearing and request to remand Teman, this Court has violated *Padilla*, and the violation is incurable. This case must be dismissed immediately and with prejudice.

41. In the interest of justice, and to avoid the appearance of impartiality, the Defendant respectfully requests that the Court cite any and all case law applicable to its ruling, issue a written ruling, and disclose any relationships to law enforcement, including but not limited to: political endorsements, membership in law enforcement-led communal or religious organizations, social media posts promoting the Court's appearance(s) and work with law enforcement, and any and all social media posts related to the Court's appearance with, support-for, work-with, training, or appreciation of Law Enforcement which might cause a reasonable observer to doubt the Court's impartiality in the event the court rules against dismissing this case.

**Mr. Teman's life and health are in danger if he is remanded**

42. MDC, where SDNY is most-likely to seek to have Teman remanded first if this case is not dismissed, is notoriously dangerous and unhealthy, as are many Federal facilities. Mr. Teman was sick and in pain for months following just a 5 day stay in FDC Miami following his arrest. It may have been an early COVID strain, but was certainly some sort of infection which caused

inflammation and pain across the spine and severe sleep deprivation, and which doctors at the time struggled to diagnose and treat for months, all of which is documented Therefore, there is a very high probability that Mr. Teman's life and health is in in severe danger should he be remanded. This case does not warrant such a risk, and for the reasons above, and in the interest of justice, must be immediately dismissed.

WHEREFORE, the Defendant, Teman, respectfully requests that this Court grant the Emergency Motion to Dismiss the Criminal Misdemeanor Case against him, and grant any other relief the Court deems just and proper.

Respectfully submitted,
APRIL 15, 2023
(See attached note re: defending one's self or others on Shabbat)

s/Ari Teman/
Defendant Pro Se

April 14, 2023

**A note on the Defendant working today, Shabbat, to defend himself:**

For anyone who might care or wonder, the Defendant notes that he is working on Shabbat, because *Pidyon Shvuyim,* the freeing of captives or the unjustly accused facing incarceration, is considered a life-and-death rescue, and takes precedence over Shabbat. Mr. Teman is facing a demand for remand in SDNY as a result of this injustice and must act without delay, because, as noted above, Federal facilities are unclean and unsafe and caused Teman months of severe illness and pain from just a five-day stay after his arrest.

The Rambam (Maimondes) in Mishneh Torah Hilchot Tzedaka (8:10)[3] writes:

> "The redemption of captives receives priority over sustaining the poor and providing them with clothing. [Indeed,] there is no greater mitzvah than the redemption of captives.
>
> For all of the different aspects of charitable gifts are included in the redemption of captives (Bava Batra 8b). For a captive is among those who are hungry, thirsty, and unclothed and he is in mortal peril.[31] For at any time, his captors may take his life.[4]
>
> If someone pays no attention to his redemption, he violates the negative commandments:
>
> 1. "Do not harden your heart or close your hand" (Deuteronomy 15:7 ,
> 2. "Do not stand by when the blood of your neighbor is in danger" (Leviticus 19:16 , and
> 3. "He shall not oppress him with exhausting work in your presence" (*ibid.* 25:53).
>
> And he has negated the observance of the positive commandments:
>
> 4. "You shall certainly open up your hand to him" (Deuteronomy 15:8 ,
> 5. "And your brother shall live with you" (*ibid.* 19:18),
> 6. "Love your neighbor as yourself" (Leviticus 19:18 ,
> 7. "Save those who are taken for death" (Proverbs 24:11 , and many other decrees of this nature.
>
> There is no mitzvah as great as the redemption of captives."

Such is the urgency of this matter that the Court must in the interest of justice end this unjust and baseless prosection, for which the Government has no reliable or honest witnesses, dismiss this case with prejudice to eliminate the possibility of remand in SDNY.

---

[3] https://www.sefaria.org/Mishneh_Torah%2C_Gifts_to_the_Poor.8.10?lang=bi&with=Topics&lang2=en
[4]