**Southern District of New York**  
**Federal District Court**

B"H

*United States*  
*v.*  
*Ari Teman*

1:19-cr-00696

**RULE 33 motion to vacate conviction for newly discovered evidence of sabotage by defense attorney Noam Biale, to benefit his wife AUSA Graham and her colleagues. Defendant learned Biale lied to defendant and counsel about contacting 18 Mercer shareholders for exculpatory evidence.**

---

1. COMES NOW, Ari Teman, Defendant *pro se*, to motion for dismissal with prejudice under Rule 33 due to new evidence post-sentencing of sabotage of the defense by defense attorney Noam Biale of Sher Tremonte, who was retained exclusively to investigate and motion-upon prosecutorial misconduct but committed joint prosecutorial misconduct by intentionally choosing to not disclose that he was married to Assistant US Attorney Graham and that she was the woman behind him in frequent "Zoom" meetings during COVID-19 lockdowns who was visible to Defendant Teman and clearly able to overhead attorney-client conversations.

2. After sentencing the Defense discovered two critical facts: (1) that key witnesses had exculpatory evidence going to the heart of the Government's case and (2) that contrary to representations by Noam Biale and his firm, Teman's post-conviction counsel, those attorneys did not contact the witnesses with the critical exculpatory evidence as they had maintained. [1]

3. A sworn affidavit from Attorney Ronald Coleman attests that Biale and his firm represented during their engagement that they would contact 18 Mercer shareholders Teman believed had exculpatory evidence, notably about GateGuard's right to use RCC's and 18 Mercer's acceptance of this right. See Exhibit 1. Teman had repeatedly emailed Biale and his firm regarding evidence held by shareholders of 18 Mercer, specifically including Board Member Shelly Pecot.

4. After sentencing, believing he had been wrongly convicted and sentenced, Teman contacted Ms. Pecot, who stated that she had never spoken with Noam Biale or any attorney representing that he or she was involved in Teman's defense. Ms. Pecot was immediately forthcoming and stated that she was well aware of the GateGuard Terms and Conditions and knew and accepted that they authorized the use of RCC's to collect termination fees of $18,000 per device. Ms.

---

[1] Eden P. Quainton, who represented Mr. Teman on appeal, assisted with the drafting of points 2-5 above and 30 below and provided a number of other stylistic suggestions, including substantially shortening a prior draft Mr. Teman had circulated to the Government. Mr. Quainton intends to make a limited appearance in further support of a ruling on Mr. Teman's Rule 33 motion prior to surrender.

Pecot offered to, and did, provide an affidavit to this effect. Dkt. 352-3. She also provided multiple emails which trial witnesses Hom and Soon-Osberger did not provide to the defense despite trial subpoenas  (352 4-5) and that the Government also never produced to Teman.

5. These two points -- the existence of critical exculpatory evidence going to Teman's guilt or innocence and his attorney's misrepresentation of their pursuit of such evidence -- must be ruled on immediately, before surrender, as a matter of fundamental fairness.

6. Ms. Pecot's affidavit is excerpted below:

>
> Shelly Jenkins Pecot
> 18 Mercer St. New York NY 10013
> shelly.pecot@gmail.com (917) 561-6505
>
> Judge Paul Engelmayer
> District Judge
> Southern District of New York
> 40 Foley Square
> New York, NY 10008
>
> August 21, 2021
>
> Your Honor,
>
> My name is Shelly Jenkins Pecot. I am a shareholder at 18 Mercer. I was out of the country when I was subpoenaed to testify.
>
> With regard to 18 Mercer, **I do not believe Ari Teman should go to prison.**
>
> Ari Teman did warn myself and other shareholders of what he said were the following terms in the contract he signed with our then board Vice President via an online document.
>
> 1. There was an $18,000 fee for removing the device
> 2. There was a $10,000 fee for collections
> 3. There would be attorney fees
> 4. There was binding arbitration
> 5. **That he believed he had the right to draft owed monies from our bank account**
>
> I confirm that I did text with Mr. Teman and that the texts he has shown to me are accurate and match those on my phone.
>
> **I also confirm that I did forward the two attached emails to Mr. Teman on Aug 19th.**

7. Biale and the Assistant US Attorneys assigned to this case <u>admitted</u> they knew Biale and his firm had a conflict of interest, which Judge Engelmayer said is significant and required a Curcio

hearing, and knew they were required to disclose it, but *instead hid the conflict for the 5.5 months Biale represented Teman.*

> JUDGE ENGELMAYER:    Let me ask you, Mr. Bhatia, were you aware that Mr. Biale is married to one of your colleagues?
> MR. BHATIA: Yes, I was. (**EXHIBIT 6**)

8. While Biale was retained (Engagement Letter is EXHIBIT 8) **exclusively to uncover and motion-upon prosecutorial misconduct and exculpatory evidence, and *not at all* to handle sentencing ,** Biale refused to pursue multiple reasonable strategies (though case law states explicitly that, "the foregone strategy need not be measured by a reasonableness standard", United States v. Schwarz, 283 F. 3d 76 ( 2d Cir. 2002)), including motioning upon new evidence and pursuing witnesses who were suspected to hold new evidence. A list of six such strategies is provided below in paragraph 22.

9. The attached documents, attained by FOIA show that Biale's firm and SDNY knew this to be a significant issue, which may warrant dismissal of "many SDNY cases" where Biale was a defense attorney and both SDNY and Biale *chose* to not disclose the conflict. See Exhibits 3 and 4.

10. As a result of these lies by Biale, replacement counsel did not reach out to 18 Mercer shareholders (as they told Teman that Biale told them his firm had so they could not ask again or it could be considered harassment) and therefore the emails and sworn statement by 18 Mercer Shareholder Shelly Jenkins Pecot (DOC 384, 1-3) did not get into the record until after sentencing when Mr. Teman called her out of desperation himself.

11. Biale caused exculpatory evidence be entered into the docket until after the case was already in appeals. This cost Mr. Teman two years of his life, and delayed Teman's ability to file a Rule 33 on the New Evidence for more 2 years, twice the length of the actual sentence!

12. Evidence will show that Judge Engelmayer was a guest of Biale and AUSA Graham's at-least once during this time, and that they had frequent meals, mentoring sessions, and conversations. Judge Engelmayer admitted to these things in his discussion on December 1, 2021. Biale therefore had multiple occasions to disclose the conflict. See Exhibit 7.

**The Second Circuit could not consider Curio evidence which revealed Biale's sabotage because it was not in the pre-sentencing docket**

13. The Second Circuit in its appeal ruling on *US v Teman* did not make any ruling on Biale's alleged sabotage of the defense, and could not have done so, because all the material regarding it was post-sentencing.

14. Now, we come to allege that Biale permanently, irreparably, and intentionally damaged the defense during the 5.5-months he represented Teman, through the activities outlined for the first time above and below.

15. Therefore, this issue, the intentional sabotage of the collection of exculpatory evidence, has not been adjudicated by the Second Circuit or even the District Court and warrants this motion practice and a hearing before a Court that was not part of the conflict.

**Teman could not make this motion until now because Judge Engelmayer stated explicitly he would not consider motions while the case was under appeal**

16. Judge Engelmayer explicitly said he would not entertain motions while the case was under appeal (DOC 304), "ORDER as to Ari Teman. The Court's intention is to defer addressing Mr. Teman's pro se applications pending the disposition of his direct appeal." Therefore, Teman could only bring this motion and the evidence of Biale's sabotage after appeal, now. As a result, the evidence gotten after sentencing, including Ron Coleman's affidavit, could not be filed. (Note that upon information and belief, Ron Coleman provided the affidavit on November 22, 2022 and not November 22, 2021 and that is a typographical error.)

**CASE LAW:**

17. The case law is clear that the Second Circuit requires dismissal **when defense counsel refuses to pursue a strategy, and we learned AFTER SENTENCING that Biale refused to and lied about pursuing a number of strategies** *which would have harmed his wife and her team and proven they were willfully violating orders by Judge Alison Nathan (copied via email and ECF)* who promised them sanctions if they re-violated their disclosure obligations. At the very least, things could have become extreme awkward at home were Biale to cause AUSA Graham's colleagues to even be accused of Brady violations -- especially because AUSA Emil Bove *also* lived in the same building as Biale and AUSA Graham and he was under Judge Nathan's spotlight for frequent violations.

18. These were material incentives for Biale to cover-up his wife's team's disclosure violations. However, even more so, because Biale's firm has failed to disclose his

conflict in *every case before this*, according to the emails obtained via FOIA, the consequences Biale would face, civil and criminal, mean his refusal to pursue strategies requested by the defendant must as a matter of law in the Second Circuit result in dismissal. Notably:

A. "the Second Circuit requires that the defendant show only '"that some plausible alternative defense strategy or tactic **might** have been pursued,' and that the 'alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. ' "[2]

B. In Schwarz, the Second Circuit stated that **the foregone strategy need not be measured by a reasonableness standard**. United States v. Schwarz, 283 F. 3d 76 ( 2d Cir. 2002)

C. The defendant **does not need to prove that this alternative strategy would have affected the outcome of the case.** The defendant need show only that this strategy was not pursued because of the lawyer's conflict. ( United States v. Malpiedi, 62  F. 3d 465, 469 ( 2d Cir. 1 995) ) . )

D. Although a trial court's deviation from these procedures is permitted in unusual circumstances, **failure to conduct a Curcio hearing normally constitutes grounds for the reversal of a conviction.**[3]

E. The Supreme Court emphasized that the **appearance of fairness** in a legal proceeding is important to both the accused and the **observing public as well**. (Wheat v. United States, 486 U.S. 153 (1988) at 1 60.)

F. The Supreme Court expanded a trial court's ability to override a defendant's waiver by authorizing disqualification in situations where the defense counsel's conflict remained **merely potential.**[4]  (Wheat, 486 U. S. at 1 60.)

G. The Second Circuit found that the **defense attorney' s conflict should have been classified as a per se denial of the effective assistance of counsel, thus obviating the " need to prove that the conflict adversely affected the lawyer ' s performance as required by Cuyler."** ( United States v. Fulton, 5 F. 3d 605, 611 ( 2d Cir. 1 993) . ) Ordinarily, in order to obtain a reversal, a defendant must show that a constitutional error was not harmless but that it prejudiced the defendant in some manner. However, " some Constitutional violations . . . by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never

---

[2] United States v. Levy, 25 F. 3d 1 46, 1 57 ( 2d Cir. 1 994) ( quoting Winkler v. Keane, 7 F. 3d 304, 309 ( 2d Cir. 1 993) ) . The standard for finding "adverse effect" varies among circuits. For example, in Schwarz, the Second Circuit stated that the foregone strategy need not be measured by a reasonableness standard. United States v. Schwarz, 283 F. 3d 76 ( 2d Cir. 2002) ( citing Malpiedi, 62  F. 3d 465, 469 ( 2d Cir. 1 995) ) .
[3] United States v. Kliti, 1 56 F. 3d 1 50, 1 56–57 ( 2d Cir. 1 998) ( reversing defendant' s conviction because the trial court failed to question the defendant in accordance with Curcio) ; United States v. Levy, 25 F. 3d 1 46, 1 59 ( 2d Cir. 1 994) ( reversing conviction because the trial court did not follow "this circuit' s strict waiver requirements") ; United States v. Friedman, 854 F. 2d 535, 574 ( 2d Cir. 1988) .
[4] We will apply this to the Judge's conflict being even merely potential (human nature to protect his friend's team.

be considered harmless."[5] In such instances, prejudice exists per se and reversal is required *without any inquiry into the specific harm that a defendant may have suffered.* [6]

- a. Structural defects occur when there is a denial of constitutional rights that are so basic to a fair trial that the trial can no longer be considered fair. Such rights include: **the right to an impartial judge**[7]

- b. Deprivation of counsel of choice is a structural error that **makes harmless-error analysis irrelevant** ( Bland v. Cal. Dep' t of Corr. , 20F. 3d 1 469, 1 478 ( 9th Cir. 1 995))

H. Supreme Court on per se errors: "Automatic reversal upon finding of these errors . . . occurs not so much because of the fundamentality of the right that was violated, but instead because prejudice is **simultaneously so likely to occur *and so difficult to prove.*"** (HERTZ & LIEBMAN, supra note 1 0, § 31 . 3, at 1 380.)

I. The Second Circuit determined that this was reversible error because **in allowing the defense counsel to proceed,** the trial judge had completely undermined the "federal court' s independent interest in the integrity of a legal proceeding and the assurance of a just verdict." ( Fulton, 5 F. 3d at 612 ( citing United States v. Wheat, 486 U. S. 1 53, 1 60 ( 1 988) )

- a. "**the counsel' s fear of, and desire to avoid, criminal charges** . . . will affect virtually every aspect of his or her representation of the defendant. . . . Given the breadth and depth of this kind of conflict, we are unable to see how a meaningful waiver can be obtained." (Fulton, 5 F. 3d at 613)

  (Note: **Biale has failed to disclose his relationship with Graham in every case to-date, it seems.**)

- b. "As we held above, the conflict in this case resulted in inadequate representation of Fulton per se. It thus undermined both the defendant' s Sixth Amendment right to effective assistance of counsel, and **the federal court' s independent interest in the integrity of a legal proceeding and the assurance of a just verdict**"

J. In United States v. Schwarz, the Second Circuit, whether intentionally or not, broadened the scope of unwaivable conflicts. In Schwarz, the appellate court held for the first time that **a conflict was unwaivable even though it was not a conflict that created a per se adverse effect.**

---

[5] Satterwhite v. Texas, 486 U. S. 249, 256 ( 1 988) ; accord Sullivan v. Louisiana, 508 U. S. 275, 279 ( 1 993) ; United States v. Olano, 507 U. S. 725, 735 ( 1 993) ; Rose v. Clark, 478 U. S. 570, 577–78 ( 1 986) ; Chapman, 386 U. S. at 23. )

[6] 5. Brecht, 507 U. S. at 629

[7] ( See, e. g. , Edwards v. Balisok, 520 U. S. 641 , 647–48 ( 1 997) ; Sullivan v. Louisiana, 508 U. S. 275, 279 ( 1 993) ; Rose v. Clark, 478 U. S. 570, 578 ( 1 986) .

    a. Furthermore, the court found that these duty of loyalty and self-interest conflicts manifested themselves when Worth abandoned the plausible alternative defense strategy of a look-a-like defense. For this reason, the court found that Schwarz had satisfied the requirement, set forth in Cuyler v. Sullivan, that a defendant show both actual conflict and adverse effect in making out an ineffective assistance of counsel claim due to a conflict of interest. (Schwarz, 283 F. 3d at 91,92)

**US v TEMAN must be vacated**

19. Mr. Teman hired Noam Biale's firm, Sher Tremonte, based on a recommendation of Justine Harris by attorney David Markus, not knowing of Mr. Biale's existence. Shortly after, Mr. Biale volunteered himself on Mr. Teman's case and became highly active, taking over much of the decision making and work as Ms. Harris was dealing with a sick child. Mr. Teman had no idea of Mr. Biale's personal life, marriage, friendships, resume, or anything other than he was someone assisting and then taking over for Justine Harris frequently.

20. Mr. Teman hired Sher Tremonte for two clear purposes: One, to show that SDNY willfully violated Brady obligations and other disclosure obligations, and that there was further evidence outstanding which SDNY knew about and had not provided. Two, to file new, exculpatory evidence which became available and known after trial.

21. New exculpatory evidence, of actual innocence and of witness perjury and obstruction, was remarkable and would likely change the verdict. However, case law, cited below, will prove the Court must vacate the conviction *regardless of the likelihood of success or even reasonableness of Mr. Teman's strategy* simply because the conflicted counsel chose to not pursue it and it must be assumed they did so to aide the other side*.*

**Biale did not pursue multiple strategies requested by Teman and his family:**

22. The evidence & strategies Mr. Teman wished for Biale to submit and motion-upon included:

1. Newly admissible under the updated Rule 807[8], text messages and emails from a shareholder of 18 Mercer, Shelly Jenkins Pecot (This evidence was gotten and filed after sentencing, **DOC** 284 Page 7 onward, also at DOC 384 **EXHIBITS** 1-3), proving that Bonnie Soon Osberger and Gina Hom (two of the governments' four client witnesses) were (A) aware of GateGuard's Payment Terms including the acceleration clause, collections fees, attorney use fees, and the like, and (B) that a shareholder had her lawyer warn Soon Osberger and Hom to not breach the GateGuard term lest they face these fees, (C) that Soon Osberger has a long history of defrauding others to avoid bills, (D) that multiple shareholders had accused Soon Osberger of "sabotaging" the GateGuard intercom (disconnecting wiring from the door's electronic strike so that the intercom could not cause it to unlock the door) "to avoid the bill", (E) that Soon Osberger and Hom were fired, voted out of the board and as the management company, respectively, because of this and similar fraudulent behavior, and (F) perhaps most-strikingly that Teman had messaged Mercer shareholders and the management and told them by phone, email, and in person that they would incur the fees and penalties in the Payment Terms and Teman even made clear in writing *that they could draft the accounts by RCC (telecheck) without invoicing*.

2. On the eve of sentencing SDNY revealed information it had *before trial began*, which is that Bank of America and Teman had an agreement where Mr. Teman's other funds served as **a personal guarantee against the transaction.**

   That also means Bank of America's witness perjured about this on the stand testifying against Teman. Thus, this Brady violation is yet another example where SDNY hid exculpatory evidence in their possession and prevented Teman's counsel from impeaching the witness. (Bank of America's witness testified that they were unable to recover **any** funds and that Mr. Teman's accounts could not serve as a guarantee against transactions, but in-fact SDNY disclosed Nov 30, less than one hour before the close of business, that the Bank had informed them they could use Mr. Teman's personal funds against the transaction.

---

[8] Rule 807 was updated December 2019, weeks before US v Teman began, it is is unlikely Teman's attorneys were aware as they were heads-down preparing for trial. Effectively it means that when a defendant can show they made significant attempts to bring a witness to court via subpoena and the witnesses refused to appear, the messages with that fleeing witnesses are now admissible (and not considered hearsay) without the Defendant being required to testify. In Mr. Teman's case two witnesses subpoenaed by Teman's counsel fled the country or otherwise failed to show up to testify despite being served and their being proof of service. (There is no dispute the witnesses were served and chose to violate the subpoenas.)

**The amount of this personal guarantee was significant, representing 25%-33% of the average annual American male income, and actually what Teman needed to buy food and healthcare for the next 6 months.**

A jury knowing that Mr. Teman had put up **all** his personal funds against a transaction for a business he ran but which has multiple investors, would more-likely believe Teman believed the transaction was lawful and authorized by his clients' contracts as was stated on every single RCC. SDNY hid this evidence, or Bank of America did, but it's surely exculpatory -- and damning to Bank of America's testimony.

Biale was asked to motion on this but instead pushed Teman to be sentenced, which was in the interest of AUSA Graham (his wife)'s team and not Teman.

3. Mr. Teman also found **new evidence showing Soleimani was in business and had a revenue sharing agreement with MVI Systems, a competitor that GateGuard had sued** for trade secret theft months before Teman deposited the RCCs and long before the arrest, based on documents submitted by MVI in *GateGuard v MVI Systems (SDNY)*. The evidence shows that Soleimani not only stood to save over $5.4 million by reneging on his agreement with GateGuard, but stood to profit in his role as a "Certified Dealer" (listed by MVI as such on the website until Teman's company sued MVI) with a 5% revenue sharing agreement as MVI was able to grow through him crippling GateGuard's ability to operate by having Teman falsely arrested and convicted. This **evidence** was filed after sentencing, and thus could not be considered by the Second Circuit, and is provided to the Court at DKT 295.

4. That that **SDNY knew of Soleimani's relationship with MVI Systems (and his financial incentives to destroy GateGuard and Teman) and had even interviewed MVI's attorney before trial, where the GateGuard contract (online terms) was even discussed, and failed to disclose the interview and the exculpatory comments made during it** to Teman's defense before trial (or ever). In fact, the interview was only revealed to Mr. Teman by luck because MVI's attorney mentioned in in a collections case GateGuard filed (GateGuard v Goldmont), where that same attorney serves the defendants.

This evidence was gotten in a conference in that civil case and the transcript is attached as EXHIBIT 12. One email (of many) to Biale and his firm show that the defendant and

GateGuard's corporate counsel made them aware of this alleged Brady violation and asked them to act upon it, and is attached as **EXHIBITS 10 & 11.**

It is clear from conversations between counsel in the civil matter that these communications would show that not only did Soleimani know of the contract he told Teman's jury he had never seen before, but that he discussed it, and made significant attempts to hide from Mr. Teman that he was breaching the contract (including even asking MVI to hide their company name from the device and apps of their knockoff device!).

5. **AUSA Graham's law enforcement partners at the NYPD/Federal drug/gang taskforce were using GateGuard to track drug dens and *praised* GateGuard, at the *same time* AUSA Graham's office was telling the jury in this case that GateGuard did not work.** Biale refused to argue that this was a Brady violation, or that this was grounds to be sentenced to a shorter term, because it would expose his wife and/or her teammates for yet another Brady violation while they were in the spotlight for similar violations before Judge Alison Nathan (*US v Pizzaro, US v Ahuja, US v Nejad, etc.*). (Proof of GateGuard's use-by and assistance of this taskforce, and their praise of GateGuard ("awesome looks great") is at **DOC 384 Page 15** and provided below)





23. **While these strategies are reasonable and likely to prevail, the Second Circuit does not require either, stating that the foregone strategy need not be measured by a reasonableness standard**. (United States v. Schwarz, 283 F. 3d 76 ( 2d Cir. 2002) ( citing United States v. Malpiedi, 62  F. 3d 465, 469 ( 2d Cir. 1 995) ))

24. Thus, the question is simply whether *it is possible* Attorney Biale *may have* pushed back against Mr. Teman's request to show that SDNY had once again "systematically cheated a defendant out of a fair trial by burying or hiding evidence", out of a natural desire to protect his wife, Margaret Graham and/or her team from being caught yet again in such cheating.

25. Alternatively, is it *possible* that Biale did not pursue any one of these strategies because it would expose him and his firm for never once disclosing their conflicts? Obviously, yes.

26. Alternatively, is it *possible* that Biale did not pursue any one of these strategies because it would upset his mentor and close friend, Judge Engelmayer, who doggedly sought to convict Mr. Teman and has poured so much vitriol out at Mr. Teman, and so many ad hominem attacks in written rulings and oral statements from the bench that experts have asked Teman, "Why does the judge hate you?" Obviously the answer is yes.

27. Alternatively, is it *possible* that Biale did not pursue any one of these strategies to maintain "Shalom Bayit", peace in the home, which would be disrupted were he to accuse his wife's team of systematically cheating, *especially* because she and her team had recently been warned by Judge Nathan not to do so again. In a marriage or relationship, doing the "right thing" does not mean the spouse will not be upset with you or more distant -- and Biale ratting out his wife's colleagues and friends would more than likely cause some awkwardness. This passes the test for dismissal under a Curcio violation. Furthermore, new evidence gotten after trial shows that AUSA Emil Bove was also a neighbor of Mr. Biale, and it is possible, too, that Biale did not want to cause trouble for his neighbor, literally in the same building.

28. It is indisputable that Mr. Teman sought to use these strategies and that Biale strangely pushed back and encouraged Mr. Teman to rush into sentencing despite a shocking, last-minute disclosure of exculpatory evidence by SDNY. In fact, Teman need not waive privilege to prove this because he'd complained to multiple parties about it in emails a day before sentencing and before that.

29. In light of the recent revelations, Biale's odd behavior, his refusal to make strong arguments and present new evidence to defend his client, cannot reasonably be understood as anything other than him putting his wife and her team's career safety far ahead of his own client's best interests.

30. In fact, the Court can and should vacate the conviction based on this new evidence under Rule 29, not only Rule 33.

31. For example, given the evidence that clients were all made aware the online terms exist, *Meyer v Kalanick (2nd Circuit)* applies (as does this Court's *Porcelli v Jetsmarter*). But even more so, given the new evidence showing that Mr. Teman notified his clients of the exact fees, penalties and remedies, including RCCs, that were allowed by the online terms, and that the clients not only did not dispute these provisions, but openly discussed their liability, and even, in the case of Ms. Pecot, affirmatively stated she believed they were bound by them*, Teman's conviction was improper and should be vacated.*

32. *There is certainly* no *mens rea -- Teman literally texted the client Pecot that the RCCs were allowed by the terms!* Biale's refusal to submit this evidence under the updated Rule 807 must, under Curcio-related case law, result in vacating the conviction.

33. There is only one reasonable explanation for Biale's refusal to file such motions and present the new evidence to the judge: His allegiance was to his wife and Judge Engelmayer, not Teman. Moreover, under the law, this only need be a *possible* explanation to warrant dismissal, and the Judge involved in the conflict who is close friends of them cannot be the one to decide that.

34. More alarmingly, because Attorney Noam Biale allowed his wife SDNY AUSA Margaret Graham to eavesdrop on his Zoom meetings and phone calls with Teman, and perhaps to even glance at paperwork and computer screens in their tiny two bedroom apartment, Mr. Teman's strategies are now irrevocably harmed. Secret plans are no longer secret, and "gotcha questions" lost all power.

35. We have no idea the extent to which Graham and Bhatia went back to witnesses and guide them, but there is no question that they took the opportunity to eavesdrop on Teman's privileged strategy sessions rather than alert the Court and stop the potential conflict before they heard things they could not unhear. This is no different than putting a pole camera over Biale's work area -- and, in fact, it's worse, because Graham could hear and retell confidential strategy

discussions without creating any paper trail or needing a physical recording device! Her and Biale's *willful* choice to hide this ability must therefore result in dismissal.

36. It is now clear that with the help of Graham's eavesdropping SDNY was going back to their witnesses and warning them to not disclose damning information that would destroy the conviction in this case and uncover their Brady violations.

37. We also know that Bhatia would use information he was not supposed to hear to "cheat to win". In fact in US v Teman Bhatia called Soleimani in the middle of the night in the middle of his testimony to coach him to correct the numbers he was testifying about because Teman's counsel had pointed out to the judge *in a closed, non-public hearing* that the numbers were incorrect.[9] Teman maintains for appeal this is an issue, but now perhaps the District Court will reconsider in light of Bhatia's brazen failure to disclose this conflict (and instead keep the potential eavesdropping available) and dismiss.

38. One example where SDNY knowing of secret plans irrevocably killed Teman's ability to gain exculpatory evidence: MVI Systems had promised to provide GateGuard with all documents and communications between them and Soleimani to GateGuard's attorney in discovery. However, shortly after Biale learned of this strategy, MVI suddenly reneged on the agreement. There was no explanation for the sudden change until now: It's clear Biale tipped off his wife or she overheard that this evidence would not only destroy the conviction of *US v Teman,* but it would get her team in hot water *again* for Brady violations. Now it seems Teman will not be able to get these communications without a court order for Google and other ISPs to provide them, and the evidence may have been entirely destroyed.

39. *Teman will never be able to know* what *was destroyed because AUSA Graham brazenly cheated once more.* At the very least a hearing before an *independent* court and a full investigation into the devices, messages, GPS history, and similar data from Biale, Graham, and Bove is required.

40. Another example: It is clear that AUSA Graham warned AUSA Bhatia not to give a simple yes or no answer to the question: Did Bhatia obey the judge's order to question Soleimani about his

---

[9] It's worth noting that in light of this new revelation of failed disclosure by AUSA Bhatia of a significant risk of eavesdropping by Graham, a habitual cheater working for SDNY, that Bhatia's past sneaky behavior should be reconsidered and ruled to vacate the verdict for violation of the Rule of Sequestration (Rule 615). It is not unreasonable to conclude that Bhatia's actions in this case were anything other than the "Cheat to Win" strategies SDNY employed under the since-Terminated Geoffrey Berman.

personal involvement in defrauding Stanley Howell an elderly disabled black man out of Section 8 housing?

41. *To this day, because Biale sabotaged the defense and did not do even what he was hired to do,* we still do not know whether Bhatia intentionally disobeyed the Court's order, or if he followed it and Mr. Soleimani lied, or if Mr. Soleimani told the truth and Mr. Bhatia advised him to perjure. Now we never will because surely Graham went back and coached Bhatia to not answer that rather simple question. And further, multiple questions that Teman asked Biale to include were not, for no good reason, and now the Court has forbidden Teman from asking any further questions of Bhatia (which is a violation because it protects the Court from inquiry into its own Curcio violation).

## Appearance of fairness warrants vacating the conviction

42. **The Supreme Court emphasized that the appearance of fairness in a legal proceeding is important to both the accused and the observing public as well. (6. Wheat, 486 U. S. at 1 60.)** Thus, the public reaction is relevant, with many observers on social media, including licensed attorneys, expressing shock and disbelief. See EXHIBIT 9

43. They have gone so far as to ask the White House to pardon Mr. Teman (or for the Attorney General to dismiss) because they do not believe SDNY or the District Court will "do the right thing" and that the case has been irreparable harmed by Biale.

44. The appearance of fairness cannot be repaired in this case without a new trial.

## The Court's interest in "efficiency" (DOC 387) and fundamental fairness warrants immediate consideration

45. The court's recently stated interest in prioritizing "efficiency" (DOC 387) means that an immediate ruling on this motion is required.

46. As well, because this motion seeks sanctions against the parties who violated Curcio and Mr. Teman's 4th and 6th Amendment rights, there is no reason to delay this hearing until after a 2255.

**Prayer for Relief**

The defendant respectfully motions the Court to:

1. Immediately vacate the conviction in *United States v Teman*, as required by case law.

2. Sanction the US Attorney's office for the full amount of Teman's legal expenses including and following Biale's firm being retained, plus a significant penalty for failing to disclose the Curcio conflict, plus damages caused to Teman and his companies.

3. Sanctions against Sher Tremonte for the full amount of Teman's legal expenses including and following Biale's firm being retained, plus a significant penalty for failing to disclose the Curcio conflict, plus damages caused to Teman and his companies.

4. Sanctions against Justine Harris for the full amount of Teman's legal expenses including and following Biale's firm being retained, plus a significant penalty for failing to disclose the Curcio conflict, plus damages caused to Teman and his companies.

5. Sanctions against Noam Biale for the full amount of Teman's legal expenses including and following Biale's firm being retained, plus a significant penalty for failing to disclose the Curcio conflict, plus damages caused to Teman and his companies.

6. Sanctions against AUSA Graham for the full amount of Teman's legal expenses including and following Biale's firm being retained, plus a significant penalty for failing to disclose the Curcio conflict, plus damages caused to Teman and his companies.

7. An order directing the DOJ and US Attorney's Office to disclose the full, unredacted content of the FOIA documents attached as EXHIBITS 3,4) to Mr. Teman, plus any and all related emails.

**The defendant preserves all issues in this document, as well as DOCS 384, 386, and 295 for appeal.**

Respectfully submitted,

    s/Ari Teman/

    Defendant, Pro Se
    Wed, 21 Sept 2023 (6th of Tishrei, 5784)

**EXHIBITS:**

1. EXHIBIT 1 - Affidavit of Attorney Ron Coleman that Biale's firm lied about pursuing evidence for 18 Mercer

2. [removed]

3. EXHIBIT 3 - Email from Justine Harris about how this conflict affects "many SDNY cases" (obtained via FOIA)

4. EXHIBIT 4 - Emails gotten via FOIA where Harris (Sher Tremonte) and the US Attorneys Office discuss, essentially, covering-up / spinning their conflicts in all these cases

5. [removed]

6. EXHIBIT 6 - Transcript regarding Curcio violation

7. EXHIBIT 7 - Transcript regarding Judge Engelmayers close, intimate friendship with Biale and AUSA Graham

8. EXHIBIT 6 - Sher Tremonte Engagement Letter -- which was 100% for work on prosecutorial misconduct, not sentencing

9. EXHIBIT 9 - Select pundit reactions to Curcio violations

10. EXHIBIT 10 & 11 - Emails to SherTremonte documenting SDNY hid interview with MVI & Goldmont Attorney Schonfeld

11. EXHIBIT 12 - Transcript of Schonfeld telling Judge that SDNY contacted him (this interview was hidden by SDNY despite being Brady)