## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:19-CR-0696 (PAE)** |
| | ) | |
| **ARI TEMAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |


## DEFENDANT'S MOTION TO EXTEND HIS SURRENDER DATE
## UNTIL A RULING ON RULE 33 NEW EVIDENCE CLAIMS



Eden P. Quainton
**QUAINTON LAW, PLLC**
2 Park Ave., 20th Fl.
New York, NY 10016
Tel: 212-419-0575
eden.quainton@quaintonlaw.net

## PRELIMINARY STATEMENT

Defendant Ari Teman ("Teman" or "Defendant") respectfully moves for an order extending his scheduled date of surrender until the Court has resolved certain evidentiary issues in Teman's pending Rule 33 motion that support vacating his conviction and ordering a new trial.[1]

On August 20, 2021, over two years ago, Teman wrote to the Court that he had discovered new evidence of his innocence and that he believed the case against him should be dismissed. *See* Declaration of Ari Teman, dated September 26, 2023 (the "Teman Decl.") at ¶¶ 3, 8 and Ex. A, Ex. B. The new evidence consisted of a sworn letter from a Board member of 18 Mercer Equity, Inc. ("18 Mercer"), one of the three entities against whom GateGuard, Inc. ("GateGuard" or the "Company") had drawn remotely created checks ("RCC's") to satisfy unpaid fees, Teman Decl., Ex. C (the "Pecot Letter"), together with previously undisclosed email correspondence between a key Government witness, Bonnie Soon-Osberger, and another 18 Mercer Board member, Margaret Crimmins. Teman Decl., ¶¶ 6, 7, Ex. D (the "Crimmins Emails").

The Pecot Letter affirmed that Ms. Pecot knew 18 Mercer was subject to an $18,000 device removal fee and that GateGuard believed it could draw against 18 Mercer's account to cover this fee. The Court acknowledged receipt of the correspondence from Teman and understood he was seeking a new trial. Dkt. 265. On February 18, 2022, Teman notified the court

---

[1] Counsel Eden P. Quainton, of Quainton Law, PLLC, is entering a limited appearance for purpose of filing the present motion and addressing any related questions the Court may have. Teman's financial situation has not changed and his Court-appointed attorney, Karloff Comissiong, remains in charge of Teman's post-sentencing representation. Counsel has consulted with Mr. Comissiong, who does not object to the filing of the present motion. Declaration of Eden P. Quainton, dated September 26, 2023 (the "Quainton Decl.") at ¶ 1. Mr. Teman's parents have been able to obtain a modest amount of additional funds to cover the attorney's fees incurred in preparing, filing and, if necessary, arguing this motion. Quainton Decl. at ¶ 2. Counsel has consulted with the Government, which opposes the present motion.

of his intention to file a Rule 33 motion based on newly discovered evidence. Dkt. 303. The same day this motion was filed, the Court responded that its intention was to defer ruling on any *pro se* motions until after the resolution of Teman's appeal. Dkt. 304 at 1.

On May 11, 2023, Teman's appeal was heard by the Court of Appeals for the Second Circuit. *USA v. Teman*, 21-1920, Dkt. 148. On June 8, 2023, the Court of Appeals affirmed the judgment of this Court. Dkt. 150. The Court then set a surrender date of October 10, 2023. Dkt. 377. Teman timely filed a motion for reconsideration, Dkt. 171, which was denied on August 11, 2023. On August 18, 2023, a mandate of the Court of Appeals affirming the judgment of the District Court was transferred to this Court. Dkt. 380. The Court denied a subsequent request by Teman to modify his surrender date. Dkt. 383. On September 15, Teman filed a Rule 33 motion, Dkt. 386, based in part on the new evidence addressed in this motion, which the Court ruled should be considered simultaneously with any Rule 2255 motion being prepared by Mr. Commissiong. Dkt. 387.

However, before Teman surrenders for incarceration, fundamental fairness requires consideration and analysis of the new evidence contained in the sworn Pecot Letter and the Crimmins Emails, which bears on Teman's innocence, the truthfulness of key witnesses against him, and the Government's compliance with its disclosure obligations. The Court could have acted on this evidence earlier under principles set forth by the Second Circuit *in United States v. Camacho*, 302 F.3d 35, 36–37 (2d Cir. 2002) (authorizing denial of motion to vacate or request for remand while a case is pending on appeal), but the Court chose to defer action on Teman's *pro se* motions, even those asking for a new trial. Thus, although material new evidence has been before the Court for over two years, Teman has not benefitted from a decision that would have resulted in his conviction being vacated or the possibility of appellate review. Although the Court was certainly entitled to defer consideration of the motions until after resolution of the appeal,

this deferral should not operate to harm Teman in a way that would not have occurred had there been immediate action.

Yet, absent extension of surrender until Teman's pending motion has been addressed, this is exactly the result Teman faces: had there been prompt action with respect to his motions, he would have been guaranteed a ruling before incarceration, whereas without an extension of the surrender date, the Court has, in effect, determined that assessment of his guilt or innocence based on newly discovered evidence will only be considered after incarceration. This is an unfair result the present motion seeks to avoid.

## **FACTUAL BACKGROUND – THE NEW EVIDENCE**

The core theory at trial was that Teman's customers did not know about and had never approved GateGuard's right to draw remotely created checks ("RCC's") against his customers' account for fees and services contemplated in the GateGuard Terms and Conditions. The evidence for this theory in the trial record was questionable. *See USA v. Teman*, 21-1920, Dkt.90, 6-23. After sentencing, believing that the Government had failed to produce evidence that would undermine its core theory, Teman contacted Ms. Shelly Pecot, a Board member from 18 Mercer, one of the three entities against whose accounts RCCs were drawn by Teman. In response, as noted above, Pecot provided a sworn letter stating that Teman had warned her and other shareholders that the GateGuard Terms and Conditions contemplated an $18,000 device removal fee and the use of RCC's to collect amounts owed.

Apparently aware that she was, in effect, kicking a hornet's nest, Ms. Pecot also provided two emails to Teman, with the following caveat:

> Ari, I have to send this to you because it is the right thing to do. Please don't make me sorry I did it. I wish you all the best. I appreciate very much that you explained and apologized for your prior actions.

Crimmins Emails at 1; Dkt. 284 at 11; Dkt. 352-5; Dkt. 386-1.

The first email provided by Ms. Pecot was one dated October 28, 2018, from "Margaret," whom Teman knew to be Margaret Crimmins, an 18 Mercer shareholder and Board member, Teman Decl. at ¶ 7, to the Government's star 18 Mercer witness, Bonnie Soon-Osberger, which stated:

> We know who moved it [the GateGuard Intercom]. You told the men working on the lobby to move it. (they told me) So I guess you're legally liable.

Crimmins Emails at 1; Dkt. 284 at 11; Dkt. 352-5; Dkt. 386-1.

This email was never provided to Teman by the Government or Ms. Soon-Osberger, who had been subpoenaed by Teman's defense team. It constitutes material impeachment evidence because Ms. Osberger had testified at trial that she was "shocked" three months *later*, when Teman reminded her, Ms. Pecot and Jackie Monzon, the President of Mercer's management company, that device removal would incur an $18,000 fee. Trial Transcript at 439; GX 443, Dkt. 128-57. The Crimmins email indicates that Ms. Soon-Osberger had *already been warned* months earlier that she would incur "legal liability" by removing the GateGuard device.

Even more importantly, Crimmins pointed statement that Ms. Soon-Osberger was "legally liable" for her conduct in removing the GateGuard underscores that Ms. Soon-Osberger had been expressly told, not just by Teman, but by a fellow Board member, that there was "legal," which in this case can only mean "contractual," basis for liability. This contractual liability can only stem from the GateGuard Terms and Conditions, the operative terms of which Ms. Soon-Osberger feigned not to know or remember at trial. The Crimmins email thus undermines the Government's core theory: that Teman's commercial counterparts did not know about and thus could not have authorized GateGuard's enforcement of its contractual rights. The removal fees charged against the ABJ entities operated by Joseph Soleiman would have appeared in a much different light if the jury had heard testimony or seen documents showing or even tending to show that an $18,000 device removal fee was something that GateGuard customers

4

knew about and for which they believed they had contractual legal liability. Convincing the jury

Teman had the *mens rea* to commit a crime in this context would have been a daunting, well-

nigh impossible, task.

The second email sent by Ms. Pecot provides additional evidence tending to undermine the

Government's core theory and establish Teman's innocence. In this email, on December 3, 2018

– again long before the email that allegedly "shocked" Ms. Soon Osberger – Ms. Crimmins writes:

> By 'the board' so you mean Bonnie and Stephanie? I'm a board member
> and I have no idea where things stand with the intercom.
> **The last communications from Ari Teman:**
> 10/5 An e-mail from Ari stated that there was a 10-year contract and he
> would put a lien on the building.
> 10/22 The next e-mail from Ari stating that it would cost $18,000 to
> disable the device and $10,000 in collections if he wasn't paid in full.
> **The last communication from Bonnie.**
> 10/22 An e-mail to Ari stating that he would hear from our attorney that week.
> And that's the only information the shareholders have. Are we involved in
> a lawsuit? Are we working on getting another intercom? Is there some
> reason the shareholders can't have this information?

Crimmins Emails at 3; Dkt. 284 at 9-10; Dkt. 352-4; Dkt. 386-2.

This email would have been of great importance to the defense. First, the email stresses

that the Board members who were involved in the dispute with GateGuard included not only

Soon-Osberger, but Stephanie Phipps, who had not been called as a witness by the Government,

and others, such as Ms. Crimmins, who knew of the contractual issues surrounding the

GateGuard device removal and had apparently not been kept fully informed. Second, Soon-

Osberger knew there was a contractual issue and potential litigation, not because of threat from

Teman, but because of a demand for information from a fellow Board member, who cannot have

been alone in wanting answers—many months before GateGuard exercised its right to draw 18

Mercer's account with an RCC.

Second, Ms. Crimmins copied Gina Hom of 18 Mercer's management company, Crystal

Real Estate Management Inc. ("Crystal Management") on her email. Yet Ms. Hom testified at

trial that she was unaware that 18 Mercer had a contract with GateGuard and that she believed the extent of the relationship between GateGuard and 18 Mercer was that 18 Mercer had hired GateGuard to install a new intercom system. Trial Transcript 478-79. [2] The second Crimmins email proves that Ms. Hom was not being truthful. The email establishes that Ms. Hom knew the relationship with GateGuard involved an alleged 10-year contract, an $18,000 device removal fee and potential litigation—far more than a simple agreement to install an intercom. Moreover, it is simply not plausible that the representative of 18 Mercer's management company would have ignored an email as important as this one from a visibly angry shareholder. Ms. Hom must have engaged in further conversations and exchanges about the $18,000 device removal fee and GateGuard's remedies, destroying her testimony, central to the Government's theory, that GateGuard's RCC to enforce the $18,000 fee came out of the blue, without any warning, "shocking" her into requesting a chargeback. Trial Testimony at 475.

The email makes clear that there are almost certainly additional undisclosed emails between the Board members and Crytsal Management concerning the GateGuard Intercom, the

---

[2] The relevant exchange between Teman's counsel and Ms. Hom on cross-examination was as follows:

> Q. Ma'am, you were aware that Mercer had a contract with
> GateGuard; correct?
> A. No.
> Q. You weren't aware of that?
> A. I was not aware they had a contract. I know that they had
> an agreement with them.
> Q. Okay.
> A. As far as I know.
> Q. Well, what's your understanding of the agreement that you believed Mercer had
> with GateGuard?
> A. That they hired -- 18 Mercer hired GateGuard to install the
> new intercom system.
> Q. Okay. But that was the extent of your understanding of the
> business relationship between Mercer and GateGuard?
> A. Correct.

device removal fees and the remedies contemplated in the GateGuard Terms and Conditions. Ms. Crimmins sharply raises a host of questions ("Are we involved in a lawsuit? Are we working on getting another intercom? Is there some reason the shareholders can't have this information?"). It is not plausible that these questions simply went unanswered.

Perhaps most importantly, the back and forth about the provisions of the GateGuard contract, combined with the acknowledgement and awareness that 18 Mercer was "legally liable" for a device removal fee under the GateGuard Terms and Conditions underscores the fundamentally *commercial*, if acrimonious, nature of this entire matter. There was a contract, there were fees and remedies, there was a dispute – the lifeblood of the commercial practice in New York Supreme Court – not a crime to be punished with forfeiture, restitution, and incarceration. This fundamental challenge to the Government case was undermined by the Government's limited production of material information and the defense's lack of critical evidence.[3]

## LEGAL ARGUMENT

I.   **The Court Should Rule on Teman's Rule 33 Motion Before His Surrender as A Matter of Due Process to Consider Issues of Guilt or Innocence and Possible *Brady-Giglio* Violations**

The Pecot-Crimmins evidence has been before the Court informally since August 2021 when Teman appealed to the Court to consider this new evidence and formally on the docket

---

[3] Indeed, had this case been brought as a civil complaint, it is likely the plaintiffs would have *lost* under the established jurisprudence governing online contracts: the Second Circuit's decision *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017) makes clear not simply that browse-wrap and click-wrap contracts are valid in general, but that a reasonably conspicuous placement of a hyperlink to key terms – such as the link to the payment terms at issue in this case, which was prominently placed on the first page of the GateGuard Terms and Conditions – puts the user on "inquiry notice" and creates a binding contract. It is fundamentally wrong that conduct that would be vindicated in a civil court should lead to incarceration by a criminal court.

since October 2021, when Teman made his first *pro se* motion. Although it has been somewhat buried in the swirl of other issues – sanctions, recusal, sabotage – Teman has raised as a *pro se* litigant, the evidence has been a constant theme running through Teman's complaints: there was material evidence going to central issues of credibility and *mens rea* that had been withheld and only discovered after Teman's sentencing that cries out for review and, ultimately, reversal of Teman's conviction.

The Court believed its hands were tied in the face of Teman's motions, asserting as early as August 19, 2021, that following the filing of an appeal, the district court had limited jurisdiction. *See* Dkt. 265 at 1-2, *citing Berman v. United States*, 302 U.S. 211, 214 (1937), *United States v. Ransom*,866 F.2d 574, 575 (2d Cir. 1989) and *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). These cases, however, do not address the Court's power to hear Rule 33 motions based on new evidence during the pendency of an appeal. *Berman* says that the Court is without power to "resentence" during the pendency of an appeal, but this decision predates the important 1979 amendments to the Federal Rules of Civil Procedure. *Griggs*, rather than denying a district court's jurisdiction while an appeal is pending, held the opposite: under the 1979 amendments to the Federal Rules of Civil Procedure, "the district court was given express authority to entertain a timely motion to alter or amend the judgment under Rule 59, even after a notice of appeal had been filed." *Griggs* 459 U.S. at 59. Thus, the Court had the power to entertain a Rule 33 motion based on new evidence at any time following sentencing. The Second Circuit has clearly articulated the procedures to be followed in the event a Rule 33 motion is filed during the pendency of an appeal:

> While the filing of a notice of appeal normally divests the district court of [jurisdiction] over those aspects of the case involved in the appeal, Rule 33 specifically states that if an appeal is pending, the court may *grant* the motion only on remand of the case. By implication, Rule 33 leaves the

district court free to *entertain* a Rule 33 motion after a notice of appeal has been filed. Accordingly, the district court retains jurisdiction to deny a Rule 33 motion during the pendency of an appeal, even though it may not grant such motion unless the Court of Appeals first remands the case to the district court. If the district court decides to grant the Rule 33 motion, the district court may then signal its intention to this Court. Only when presented with evidence of the district court's willingness to grant a Rule 33 motion will we remand the case.

*United States v. Camacho*, 302 F.3d 35, 36–37 (2d Cir. 2002) (emphasis in original; internal quotations and citations omitted).

Although Teman's *pro se* motions were admittedly non-linear and often couched in unhelpful language, it was clear that Teman believed there was new evidence warranting a new trial and that he believed he was making a Rule 33 motion for a new trial. In addressing several of Teman's motions, the Court acknowledged that Teman was seeking a "new trial" but nonetheless stated its intention "to defer consideration of Teman's *pro se* applications pending the disposition of his direct appeal." Dkt. 304 at 1. In reaching this decision, the Court cited its earlier decision set forth at Dkt. 365 above. As discussed, the cases referenced in the Court's decision do <u>not</u> stand for the proposition the Court cannot entertain a motion for a new trial. Rather, the Court could have denied a Rule 33 motion, permitting an appeal of this decision, or could have signaled its intention to grant the motion, and sought remand of the case for purposes of entering an appropriate order. *United States v. Brodwin*, 292 F. Supp. 2d 484, 498 (S.D.N.Y. 2003) (signaling intention to grant new trial based on newly discovered evidence to the Second Circuit).

Having thus elected to defer consideration of material new evidence for over two years, the Court's unwillingness to review and assess this evidence before incarceration is fundamentally unfair and violates Teman's due process rights. *See United States v. Beckham*, No. 4:16CR300 RLW, 2019 WL 7116349, at *1 (E.D. Mo. May 22, 2019) (extending surrender date to permit decision on motion); *United States v. Baras*, No. CR 11-00523-YGR, 2014 WL

4728992, at *7 (N.D. Cal. Sept. 18, 2014) (finding good cause to extend the date of surrender for 30 days after district court ruling on pending motion); *cf. Einaugler v. Dowling*, 862 F. Supp. 793, 799–800 (E.D.N.Y. 1994) (citing cases in which delay between sentencing and appellate decision violated due process).

The importance of a pre-surrender decision is heightened by the materiality of the new evidence, which raises genuine issues of guilt or innocence relating to Teman's *mens rea* and witnesses' knowledge of key contractual provisions in GateGuard's Terms and Condition. The new evidence also raises substantial questions under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), as the new evidence is both exculpatory and relevant for impeachment purposes. Moreover, it is not credible that the Government was unaware of the relevant emails of its own witnesses, or if it was, it abdicated its basic duties to conduct a proper pre-trial investigation of the facts. *See, e.g.*, *Cooper v. Graham*, No. 10-CV-6467 MAT, 2011 WL 5597356, at *7 and Note 2 (W.D.N.Y. Nov. 17, 2011) (failure to make appropriate inquiry runs afoul of defendants' due process rights).

The Government presented Soon-Osberger as one of its key witnesses and could easily have obtained her relevant emails. And even if Ms. Pecot was unavailable for trial, her communications, as well as Ms. Hom's, could readily have been obtained and reviewed by the Government once it became clear from Soon-Osberger's emails that there was material correspondence with Ms. Pecot and Ms. Hom relevant to the Government's core theory. The failure to obtain and produce such evidence comes within *Brady*. *See Valentin v. City of Rochester*, No. 11-CV-6238 CJS, 2018 WL 5281799, at *3 (W.D.N.Y. Oct. 24, 2018), *aff'd*, 783 F. App'x 97 (2d Cir. 2019) (prosecutor suppressed information within the meaning of *Brady*, because such information was "readily available"). *See also United States v. Quinn*, 537 F. Supp. 2d 99, 110 (D.D.C. 2008) (government cannot turn "a blind eye to the evidence" or make a

"conscious decision that information need not be pursued further or disclosed" to defendant);

*United States v. Risha*, 445 F.3d 298, 307 (3d Cir. 2006) (the prosecutor may still be considered

to have suppressed evidence if he has not sought out information readily available to him)

(Nygaad, J. dissenting); *United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) (U.S.

Attorney's office ordered to review files that may contain material exculpatory information);

*United States v. Osorio*, 929 F.2d 753, 761 (1st Cir. 1991) (prosecutor cannot avoid finding out

what "the government" knows simply by declining to make reasonable inquiry of those in a

position to have relevant knowledge).[4]

For the foregoing reasons, Teman has a meritorious argument that the new evidence

discussed entitles him to a new trial.[5] In general, to vacate a conviction on the grounds of newly

discovered evidence, the defendant must show that the evidence could not with due diligence

have been discovered before or during trial, that the evidence is material, not cumulative, and

that admission of the evidence would probably lead to an acquittal. *United States v. Alessi*, 638

F.2d 466, 479 (2d Cir. 1980). Here, as discussed, Teman could not have discovered the

Crimmins-Soon-Osberger emails because Soon-Osberger had failed to comply with her

subpoena and Teman had no means of knowing how other Board members had interacted with

Soon-Osberger. The Crimmins emails are material because they show that Soon-Osberger and

Gina Hom – the Government's only 18 Mercer witnesses – were alerted that 18 Mercer was

legally liable for device removal fees, which directly undercuts the Government's core theory

---

[4] Although information is not considered "suppressed" if the defendant could have discovered the evidence on its own, exercising due diligence," *Hughes v. Phillips*, 457 F. Supp. 2d 343, 360 (S.D.N.Y. 2006), Ms. Soon-Osberger refused to comply with the defense subpoena and Ms. Pecot was out of the country at the time of the trial. *See* Dkt. 284 at 7. The defense also did not know that Ms. Hom had been copied on material emails between Board members.

[5] Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. Fed. R. Crim. P. 33(b)(1). Regardless of when Teman's motion is considered to have been made, it is plainly timely.

that GateGuard's enforcement of its Terms and Condition was a total "shock" to the witnesses

who had no knowledge or recollection of the applicable provisions of the Terms and Conditions.

*See also supra* at 3-7. This evidence was clearly not merely cumulative as there was nothing

similar that had been offered by either prosecution or defense during the trial. As a result, with

respect to Counts II and IV, evidence that Soon-Osberger and Ms. Hom had been warned of legal

liability under a 10-year contract for the device removal fee – not only by Teman, but by one of

the 18 Mercer Board members – would very probably have led to a determination that Teman not

only actually believed he was entitled to issue RCCs to enforce a contractual provision, but also

that he was contractually justified in doing so—directly negating both his *mens rea* and the core

factual predicates for the Government's case. [6]

      As to newly discovered evidence of perjured testimony, the standard for granting a new

trial under Rule 33 is less stringent than the general rule discussed above. The critical factor in

assessing the impact of allegedly perjured testimony is whether the Government knew or should

have known of the perjury. As this Court has stated:

> Courts in the Second Circuit apply two different standards when determining whether to
> grant a new trial based on newly discovered evidence that a Government witness likely
> perjured himself: If the prosecution knew or should have known of the perjury prior to

---

[6] The test for Rule 33 motions often includes a requirement that the evidence be not "*merely*
*cumulative or impeaching*." *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007) (emphasis
added). This does not mean that newly discovered impeachment evidence can never justify a
new trial, only that impeachment evidence cannot be "merely" impeaching. *United States v.*
*Wong*, 78 F.3d 73, 79 (2d Cir. 1996) (no new trial where evidence merely furnishes "an
additional basis" for impeachment of already questionably credible witnesses). Impeachment
evidence *would be material* if the witness whose testimony is attacked "supplied the only
evidence linking the defendant(s) to the crime." *United States v. Petrillo,* 821 F.2d 85 (2d
Cir.1987). Soon-Osberger and Hom were the only witness who testified as to the nature of the
GateGuard Terms and Conditions and the issuance of the GateGuard RCC. Thus, "the likely
impact on the witness[es]'s credibility [of the new evidence] would have undermined a critical
element of the prosecution's case." *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995).

the conclusion of the trial, the conviction must be set aside where there is any reasonable
likelihood that the false testimony could have affected the judgment of the jury. On the
other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new
trial only where the false testimony leads to a firm belief that but for the perjured
testimony, the defendant would most likely not have been convicted.

*United States v. Walker*, 289 F. Supp. 3d 560, 566 (S.D.N.Y. 2018) (internal quotations and
citations omitted).

 For the reasons discussed above, the Government should have known that Ms. Hom's
testimony that she knew nothing about a GateGuard contract and that she believed GateGuard
was a mere intercom installer was false. Ms. Hom was copied on an email in which the
GateGuard contract, an $18,000 device removal fee, and potential litigation with GateGuard over
its Terms and Conditions were expressly discussed and in which a Board member pointedly
demanded follow-up information—plainly not the type of situation a management company
would have simply ignored or that the Government would not have known about had it merely
reviewed relevant emails to its own star witness. In this situation, there is a reasonable likelihood
the jury would have reached a different judgment as to Counts II and IV – those involving 18
Mercer – and that its judgment as to Counts I and III would have been affected: if a key
government witness for 18 Mercer was lying, why should the jury credit the testimony of
witnesses for GateGuard's other commercial counterparts?

 Finally, the newly discovered evidence of *Brady-Giglio* violations provides an
independent basis for a new trial. "When the defendant, as in this case, asserts that the newly
discovered *Brady* evidence is exculpatory, the defendant will be entitled to a new trial if he
shows that the favorable evidence at issue was 'material.' *Schledwitz v. United States*, 169 F.3d
1003, 1011 (6th Cir. 1999). The Supreme Court has elaborated on the meaning of "materiality"
in this context:

  A defendant need not demonstrate that after discounting the inculpatory
  evidence in light of the undisclosed evidence, there would not have been

> enough left to convict. The possibility of an acquittal on a criminal charge
> does not imply an insufficient evidentiary basis to convict. One does not
> show a *Brady* violation by demonstrating that some of the inculpatory
> evidence should have been excluded, but by showing that the favorable
> evidence could reasonably be taken to put the whole case in such a different
> light as to undermine confidence in the verdict.

*Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995).

Here, the undisclosed evidence on its face not only raises substantial questions as to the existence of Teman's *mens rea* in the context of a contract dispute, but also suggests the presence of additional relevant emails further discussing the basis for contractual liability under GateGuard's Terms and Conditions. This would reasonably put the matter "in such a different light as to undermine confidence in the verdict" with respect to Counts II and IV, and, likely, by "ricochet" with respect to Counts I and III.

To the extent the undisclosed evidence would undermine the credibility of Soon-Osberger and Hom, that, too, would affect confidence in the verdict. "*Giglio* stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial." *United States v. Madori*, 419 F.3d 159, 170 (2d Cir. 2005). Whether Teman defrauded 18 Mercer turned exclusively on Soon-Osberger's claimed ignorance of the relevant portions of the GateGuard Terms and Conditions and Gina Hom's claimed ignorance of virtually everything about GateGuard and Teman. The Crimmins Emails undermine the credibility of both Soon-Osberger and Hom on these points and are thus determinative on the question of guilt or innocence as to 18 Mercer, as, without their reliable testimony, there was *no* basis to convict. Because the jury instructions made it possible for the jury to convict on a given count based on a unanimous determination as to any one customer and because the absence of a special verdict form or special interrogatories made it impossible to know which particular customer relationship underpinned the guilty determination, a lack of confidence in the 18 Mercer outcome

14

undermines confidence in the jury's verdict in Counts II and IV as a whole (which included 18 Mercer and Coney Realty). And if the 18 Mercer witnesses were willing to lie, so too would have been other witnesses caught up in potential litigation with GateGuard.

At this point, with Teman's surrender date set more than two years after his appeal was filed, there would be little or no prejudice to the Government and an important protection of Teman's due process rights in extending Teman's surrender date until the Court has had a chance to review the new evidence on which Teman has sought action since August 2021. Conceptually, this new evidence does not raise issues that overlap with those to be raised by Mr. Commissiong, which will almost certainly focus on questions of ineffective assistance of counsel. Teman's *pro se* Rule 33 Motion does contain some issues that may overlap with ineffective assistance issues that may be best addressed by Mr. Comissiong. But the issues discussed in the present motion are discrete matters that can and should be addressed independently of questions of ineffective assistance of counsel.[7]

There is no gain in efficiency in deferring consideration of the Pecot-Soon Osberger-Hom issues until the filing of Teman's contemplated Rule 2255 motion. On the contrary, to the extent that consideration of these issues could, and in Teman's view should, obviate any further proceedings by requiring a new trial, it would be by far the best use of judicial and carceral resources to determine whether Teman's conviction should be vacated *<u>before</u>* he is incarcerated, at the cost of what would likely be only a modest extension of his surrender date.

---

[7] Teman's pending motion also discusses new evidence relating to another key Government witness, Joseph Soleimani. The present motion is without prejudice to Teman's right to pursue these claims. But in the interest of clarity in a somewhat bewildering post-trial context, this motion has chosen to focus on the Pecot-Crimmins-Soon-Osberger-Hom evidence rather than elaborating on the Soleimani issues. Counsel would be happy to address these issues as well if the Court believes further briefing pre-surrender would be useful.

## **CONCLUSION**

For the foregoing reasons, the Court should extend Teman's surrender date until the

Court has ruled on the impact of the new evidence identified by Teman relating to Bonnie Soon-

Osberger, Margaret Crimmins, Shelly Pecot, and Gina Hom.

Dated: New York, New York
       September 26, 2023

                                        Respectfully submitted,

                                        QUAINTON LAW, PLLC

                                        By: _Eden Quainton_____

                                            Eden P. Quainton
                                            2 Park Ave., 20th Floor
                                            New York, New York 10016
                                            Telephone: 212-419-00575
                                            Email: eden.quainton@quaintonlaw.net
                                            *Attorneys for Defendant Ari Teman*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that on September 26, 2023 the foregoing document was filed through the CM/ECF system and thereby served electronically on counsel for the United States.

*/s/ Eden Quainton*
EDEN P. QUAINTON, ESQ.

2 Park Ave., 20th Fl.
New York, New York 10018
Telephone: (212) 419-0575
Email: eden.quainton@quaintonlaw.net
*Attorneys for Defendant Ari Teman*
