UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

19 Cr. 696 (PAE)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by defendant Ari Teman to adjourn his surrender date of October 10, 2023, pending resolution of one of Teman's two recent *pro se* motions for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons that follow, the Court denies the motion to adjourn the surrender date.

I. **Background**

On January 29, 2020, following a four-day trial, a jury convicted Teman on two counts apiece of bank fraud and wire fraud. Dkt. 92. These charges arose from Teman's having drawn and deposited checks on the accounts of three of his home-security company's customers, while falsely representing to the depository and clearing banks that the customers had knowingly authorized these checks. The checks consisted of (1) two checks totaling $36,000 which Teman drew and deposited on March 28, 2019, one on the account of customer 518 West 204 LLC ("518 West 204") and the other on the account of customer 18 Mercer Equity Inc. ("18 Mercer"); and (2) 27 checks totaling $297,000, which Teman drew and deposited on April 19, 2019, on the accounts of 518 West 204 and of another customer, the affiliated entities ABJ Milano LLC and ABJ Lennox LLC (together, "ABJ").

On June 5, 2020, the Court, in a 107-page decision, rejected Teman's numerous post-trial motions, under Rules 29 and 33. Dkt. 138 ("Rule 29/33 Decision").

On July 28, 2021, following Teman's terminations first of his trial counsel and later of his initial team of sentencing and appellate counsel, the Court sentenced Teman principally to a sentence of 12 months and one day's imprisonment, below the applicable Guidelines range of 30 to 37 months' imprisonment, to be followed by a three-year term of supervised release. The Court imposed the same sentence on each count with the sentences to run concurrently. The Court, over objection, granted Teman release on bail pending appeal. Dkt. 253.

On September 2, 2021, Teman terminated Susan G. Kellman, Esq., and Andrew J. Frisch, Esq., the retained counsel who had effectively represented him at sentencing and who had been retained to handle Teman's appeal. Dkt. 275. Teman was thereafter represented on appeal by retained counsel, Eden Quainton, Esq. Teman elected, however, to proceed *pro se* in this Court, and represented to the Court that he did not intend to file any motions and would leave any motions to his appellate counsel. *Id*.

On June 8, 2023, a unanimous panel of the United States Court of Appeals for the Second Circuit affirmed Teman's convictions. The Circuit rejected Teman's claims, which included improper venue, constructive amendment, instructional error, a defective verdict form, judicial misconduct, and prosecutorial misconduct. As to one claim, of ineffective assistance of counsel, the Circuit held that it should be pursued under 28 U.S.C. § 2255, to enable development of a factual record, in particular, to enable Teman's trial counsel to explain their decision to call Teman's business lawyer, Ariel Reinitz, Esq., in support of an attempted advice of counsel defense. On August 18, 2023, the Circuit's mandate issued. Dkt. 380.

On June 15, 2023, the Court, crediting Teman's claim to have run out of funds, appointed Karloff C. Commissiong, Esq., of the District's Criminal Justice Act panel, to represent Teman in connection with the anticipated § 2255 petition and matters preliminary to surrender. Dkt. 367. The Court advised Teman to order his affairs consistent with a surrender date set eight weeks after issuance of the Second Circuit's mandate. *Id.* The Court has since set a surrender date of October 10, 2023.[1] Dkt. 377. That date honored Teman's request for an extension of the surrender date as originally contemplated, to enable him to observe religious holidays. *See* Dkts. 374–75.

Teman has recently submitted two *pro se* motions under Rule 33. The first pursues a theory of new evidence. Filed September 15, 2023, it claims that an August 2021 letter to the Court from Shelly J. Pecot, a shareholder of 18 Mercer, a cooperative building, and board emails furnished to him by Pecot, undermine the trial testimony of 18 Mercer's treasurer and outside real estate manager that 18 Mercer had not authorized Teman to create and deposit the $18,000 check on 18 Mercer's account that he deposited on March 28, 2019. *See* Dkt. 386 & Exs. 1–8.

The second motion pursues a theory of misconduct. Filed September 21, 2023 and styled an "emergency letter motion," it claims that Teman's initial sentencing and appellate counsel colluded with the United States Attorney's Office to withhold the above purportedly exculpatory evidence relating to 18 Mercer. Dkt. 388.

In light of the subject-matter overlap between these two motions and Teman's anticipated § 2255 motion, the Court has directed the Government to file a consolidated response to the three

---

[1] The Bureau of Prisons, heeding a recommendation by the Court made at Teman's request, *see* Dkt. 378, has designated Teman to the FCI-Miami facility.

motions. The Court has stated that it will set the deadline for the Government's filing of its consolidated response after Teman files the § 2255 motion. Dkt. 387, 389.

On September 26, 2023, Teman's appellate counsel appeared in this Court, stating that Teman had retained him for the limited purpose of moving for an extension of the October 10 surrender date. Counsel's motion argued that the Rule 33 motion that Teman filed on September 15 should be resolved before Teman's surrender. Dkt. 394.

On September 27, 2023, the Court directed the Government to respond, within one week, to the motion seeking an extension of the surrender date, while stating that the surrender date remained in place and advising Teman to order his affairs in the expectation that the date would remain as set. Dkt. 397. On October 4, 2023, the Government submitted its response. Dkt. 399 ("Gov't Opp."). On October 5, 2023, Teman, through his appellate counsel, filed a reply. Dkt. 400.

## II.   Discussion

As of this order, Teman has been released on bail for more than 44 months since the jury's verdict, for more than 26 months since sentencing, and for almost four months since affirmance of his conviction. The issue at hand is whether the *pro se* Rule 33 motion regarding 18 Mercer that he filed on September 15 has a sufficient prospect of invalidating his four counts of conviction to warrant deferring further the service of his sentence.

In this decision, the Court does not definitively resolve the Rule 33 motion. The Court's judgment is that that motion is best resolved alongside Teman's forthcoming § 2255 motion, and after the Government's submission of a consolidated response to Teman's post-conviction challenges, pending and promised. But, the Court, having closely examined Teman's Rule 33 motion and measured it against the evidence at trial and the purported "new evidence" offered by

Teman, can confidently assess that motion's prospects of success as exceedingly low, so as to be, at best, asymptotic to zero. The Court accordingly denies Teman's motion to further put off his surrender.[2]

Rule 33 provides that, upon motion, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed R. Crim. P. 33(b)(1). "The defendant bears the burden of proving that he is

---

[2] In a series of *pro se* filings in late 2021 and early 2022, Teman made sweeping and largely dyspeptic allegations of misconduct. These took aim at his trial attorneys, his sentencing and appellate attorneys, Government counsel, the trial witnesses from his three customers, the trial witness from the bank that incurred the approximately $260,000 net loss from his frauds, and the Court. Teman also demanded sanctions from the prosecutors on this matter; demanded the Court's recusal; and, relevant here, stated that he intended to move for a new trial based on the new evidence relating to 18 Mercer. *See* Dkt. 303; *see also* Dkts. 265, 295, 301; *cf.* Dkt. 271. Teman stated that he had asked his "appellate team" to pursue a stay of the pending appeal until his anticipated Rule 33 motion had been made and resolved in the District Court. *See* Dkt. 303. In an order issued on February 18, 2022, the Court stated that its assessment was that none of Teman's grievances were meritorious—a conclusion later validated by the Second Circuit's affirmance, which rejected Teman's claims of prosecutorial and judicial misconduct and of a prejudicial conflict affecting his initial sentencing and appellate counsel. The Court stated that its intention was to defer addressing such claims pending the disposition of Teman's then-pending direct appeal. Dkt. 304.

In his limited-purpose appearance last week in which he moved to put off the surrender date, Teman's appellate counsel faults the Court for not resolving Teman's ostensible new evidence motion earlier. Dkt. 394. For multiple reasons, that argument is not well taken. As counsel acknowledges, Teman's filings in this Court were "admittedly non-linear and often couched in unhelpful language." *Id.* at 9–10. The Court, beyond reviewing Teman's screeds sufficiently to confirm that they lacked merit, did not have any duty to produce an opinion addressing such grievances as could be discerned within these filings while Teman's counseled appeal was pending. Further, Teman, who in electing to proceed *pro se* in this Court, had committed *not* to file any uncounseled motions before this Court, Dkt. 275, in fact never filed such a Rule 33 motion before the disposition of his appeal. He did not do so through Kellman and Frisch before he terminated them. He did not do so through his appellate counsel, Quainton—notwithstanding Teman's representation that he had instructed his "appellate team" to seek a stay of appeal in deference to a Rule 33 motion to be filed in this Court. Even now, Teman's appellate counsel has left the Rule 33 motion for Teman to make *pro se*, surfacing only to contest the surrender date.

entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 474 (2d Cir. 2009).

The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In exercising its discretion, the court must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." *Id.* at 1414. Ultimately, the court must decide "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* After doing so, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion. *Sanchez*, 969 F.2d at 1414. The court's Rule 33 authority should be used "sparingly" and only in "the most extraordinary circumstances." *Id.*; *see also United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020).

For at least the following three independent reasons, the "new evidence" Teman musters relating to 18 Mercer does not come close to meeting Rule 33's standards.[3]

**A.  Teman's "New Evidence" is Not Exculpatory—or New**

---

[3] Apart from being meritless, Teman's motion may also be time-barred. A Rule 33 motion for a new trial based on newly discovered evidence "must be filed within 3 years after the verdict." Fed. R. Crim. P. 33(b)(1). The jury rendered its verdict on January 29, 2020, *see* Dkt. 92, but Teman, despite stating an intention to file a Rule 33 motion based on Pecot's materials, did not do so until September 15, 2023, *see* Dkt. 386, more than three years and seven months after the verdict. For the purposes of this decision resolving Teman's motion to adjourn his surrender date, the Court assumes *arguendo* that the Rule 33 motion is timely. The Court will take up the question of timeliness later, in the course of definitively resolving the Rule 33 motion.

6

Only one check among the 29 on which Teman's fraud convictions were based involved 18 Mercer and thus even potentially could be implicated by Teman's purported "new evidence." Even as to that check, this evidence does not undermine the overwhelming trial evidence that 18 Mercer—contrary to Teman's representation to the banks—had not authorized him to draw or negotiate that check on its account.

The trial testimony on that point came from two witnesses. The first was Bonnie Soon-Osberger, 18 Mercer's treasurer. *See generally* Trial Transcript ("Tr.") 415–69.[4] She testified that she had met Teman in October 2017 at a convention at which he was promoting the "smart technology" intercom product of his company, GateGuard, Inc.; that after discussions with Teman, 18 Mercer, in early April 2018, purchased the intercom for $2,499, plus an $849 installation fee and a $49.99 monitoring plan; that Teman did not state anything about a possible cancellation or device removal fee; and that the contractual terms and conditions in place at the time of the purchase, which 18 Mercer's board had approved, did not say anything about such fees or authorize Teman to draw checks on 18 Mercer's account for any purpose. *See* Tr. 419–441; *see also* GX 431 (Teman invoice); GX 441 (GateGuard terms and conditions, downloaded March 23, 2018). Soon-Osberger also testified about an email exchange in which Teman assured her that he would not enforce certain provisions of his terms and conditions against 18 Mercer, including one relating to whether the intercom was being licensed to (as opposed to being purchased by) 18 Mercer. GX 442 (April 2, 2018 emails). Soon-Osberger testified that 18 Mercer could not have entered into an agreement delegating to a vendor the ability to write checks on its account, including because its real estate management company alone had authority to sign checks on its behalf. Tr. at 429–30, 451–52, 461. Soon-Osberger testified that she

---

[4] For the trial transcript, *see* dockets 99, 101, 103, 105, 107, and 109.

7

received an invoice from Teman, for the intercom, at the time of its purchase, which 18 Mercer paid by check. Tr. 434–36.

However, Soon-Osberger testified, 18 Mercer had problems with Teman's device which Teman proved unable to correct. After a lengthy period, Soon-Osberger told Teman that 18 Mercer needed to "move on" because the device "just didn't work." Tr. 437–38. Teman responded by threatening that, if 18 Mercer removed the device, he would charge it an $18,000 fee, put a lien on its building, and sue the members of its board; these statements shocked Soon-Osberger. Tr. 438–41, 467–68; *see also* GX 443 at 5–6 (January 7, 2019 from Teman). Shown a copy of the $18,000 check to "GateGuard, Inc." that Teman drew and negotiated on 18 Mercer's account on March 28, 2019, and which bore the notation "device removal fee," Soon-Osberger emphatically denied authorizing Teman or anyone else to create or deposit that check. Tr. 441; *see also* GX 202 (photocopy of disputed check).

The second witness was Gina Hom, vice president of Crystal Real Estate Management ("Crystal Management"). *See generally* Tr. 469–83. She testified that Crystal Management oversaw day-to-day operations at 18 Mercer, including paying expenses, and that she and a colleague alone had authority to approve or sign checks on its account. Tr. 470–71. She testified that, before paying a check on 18 Mercer's account, Crystal Management was required to receive an invoice and obtain board approval. Tr. 473–74. She testified that upon discovering the $18,000 check Teman had drawn and negotiated on 18 Mercer's account on March 28, 2019, she had been "shocked," and that she called the bank to put a stop payment on the check, which had overdrawn 28 Mercer's account, as unauthorized. Tr. 475–76. Hom testified that despite having earlier received an invoice for the installation of GateGuard's intercom, Teman never sent her an

8

invoice for an $18,000 device removal fee. She, too, emphatically denied that 18 Mercer's board had authorized payment of that sum. Tr. 474–76.

There was also compelling circumstantial evidence corroborating that Teman had knowingly acted without authority in making and negotiating the 18 Mercer check (and the 28 checks he drew on the accounts of 518 West 204 and ABJ) and had dissembled in representing to the banks that he had such authorization. Teman's unilateral conduct markedly deviated from his ordinary practice of invoicing the customer and awaiting payment by check. This conduct also occurred after an angry business dispute with the customers in which Teman had made retaliatory threats. The evidence also showed that Teman was facing financial trouble at the time he commenced drawing checks on customers' accounts. The checks, including the $18,000 one drawn on 18 Mercer's account, also far outstripped in value the several thousand dollars each customer had paid for its device. *See* Rule 29/33 Decision at 4–6. Finally, as to 518 West 204 and ABJ, whose principals were Orthodox Jews, Teman deposited the April checks on the Passover weekend, when they could not access their electronic devices, an action that could reasonably be read to bespeak Teman's awareness that the customers had not assented to and would contest the checks. *See id*. at 40–41. Indeed, as the Second Circuit noted in its affirmance, Teman had threatened one of the customers, "I will . . . place a lien on your building on Pessach." GX 380 at 8 (citation omitted).

Teman also negotiated the March 2019 checks in the face of advice from his counsel, Reinitz. In text messages preceding Teman's drawing the $18,000 check, Reinitz responded to Teman's proposal to draw checks on customers' accounts, writing, flatly, "No" and "[b]ad idea." GX 702 at 1. In the same messages, Reinitz wrote to Teman that customers "are likely to call police. And you will be arrested. And have a criminal case to deal with. And then you can start

9

explaining about your 'contract' and 'not breaking any laws.'" *Id.* Presciently, Reinitz predicted that "you are >50% likely to be arrested for the activities you propose." *Id*. at 2.

The purported "new evidence" to which Teman points does not, in the least, undermine Soon-Osberger's or Hom's central testimony: that 18 Mercer *never* authorized Teman to draw the $18,000 check on its account. That evidence consists of an August 21, 2021 letter from shareholder Pecot to the Court, and several emails among the board, or with Teman, that Pecot supplied to Teman. *See* Dkt. 386, Exs. 1–8. In the part of Pecot's letter on which Teman's motion relies, she states that Teman had warned her and other shareholders of fees, including a possible $18,000 device removal fee, and that Teman had stated that he believed he had the right to "draft owed monies from our bank account." Dkt. 386, Ex. 3 at 1.

Critically, Pecot's letter does not situate Teman's statements about an $18,000 fee in time. And, critically, Pecot does not state that Teman made statements to this effect at the time 18 Mercer entered into its agreement with GateGuard to purchase the $2,499 intercom, let alone that 18 Mercer had ever agreed to such improbable terms. Tellingly, Pecot does not claim to have been a participant in or percipient witness to the process by which the agreement between 18 Mercer and GateGuard was entered into. She admits the contrary. *See id.* ("I have no direct knowledge of Mr. Teman's interactions with the board or management."). And she does not point to any writing or other interaction in which 18 Mercer's board or representative agreed to cede authority to outside vendor Teman to draw checks on the cooperative's bank account, in general or for an $18,000 device removal fee.

The emails that Pecot supplied as supporting that Teman at some point warned 18 Mercer that he might draw an $18,000 check are instead wholly consistent with Soon-Osberger's trial testimony. These emails begin in late 2018, *after* 18 Mercer sought to "move on" from Teman's

device and *after* Teman, angered, began threatening retaliation. *See, e.g.,* Dkt. 386, Ex. 2 at 1 (December 3, 2018 email from an 18 Mercer board member, noting October 5 and 22 Teman emails stating that it would cost $18,000 to disable the device and threatening a lien on the building and a lawsuit). Soon-Osberger testified to that very effect: that, in the period leading up to his deposit of the $18,000 check, Teman threatened to impose an $18,000 device-removal fee. She testified about emails from Teman so threatening, including one that was received at trial. *See* Tr. 439; GX 443 (email string including January 7, 2019 email from Teman to Soon-Osberger, Pecot, and other shareholders, stating, "As a reminder, you are not allowed to touch or move our device and there's an $18,000 fine for removing it.").

Pecot's letter, and the emails she supplied Teman, indicating that Teman had threatened 18 Mercer with an $18,000 charge, therefore do not qualify as new evidence.[5]

And these emails are not, at all, exculpatory. To state the obvious, that Teman, angry about 18 Mercer's repudiation of his device, preceded his drawing the $18,000 check with a threat to do so does not demonstrate that 18 Mercer, at the time of contracting or any time

---

[5] Indeed, as the Government demonstrates, the defense before trial was aware of the substance of Pecot's account, including that she had had extensive emails with Teman in the run-up to his deposit of the $18,000 check and that Teman had threatened 18 Mercer with an $18,000 removal fee. *See* Gov't Opp. at 5–6, 8. The defense possessed Pecot's emails with Teman between October 2018 and January 2019 in which he sought to maintain the GateGuard intercom system at 18 Mercer and in which Pecot sought to broker a resolution. After attempting shortly before trial to subpoena Pecot for testimony, and, upon learning that she was out of the country, the defense identified Teman's email communications with Pecot as a potential defense trial exhibit, although it ultimately did not offer these. *Id.* at 4 & Ex. A.

The March 29, 2018 email exchange that Teman attaches between himself and Soon-Osberger is also not new evidence. It concerns GateGuard's terms and conditions. *See* Dkt. 386, Exs. 4–5. Soon-Osberger testified about this exchange at trial. *See* Tr. 431–32. A fuller email string including the same exchange was admitted during her direct testimony. *See* GX 442. The email and the terms and conditions it addresses do not grant Teman authority to draw checks on 18 Mercer's account or to impose an $18,000 device removal fee. The remaining emails from within 18 Mercer that Teman cites also do not address these subjects. *See* Dkts. 386, Exs. 6–7.

11

thereafter, had ever authorized him to impose such a charge or to draw a check for such charge upon the cooperative's bank account.

For much the same reasons that Pecot's letter and these emails are not exculpatory and do not establish any consequential inaccuracy in Soon-Osberger's or Hom's testimony, they do not reflect the witness misconduct that Teman's Rule 33 motion intemperately alleges, to wit, "obstruction of justice by Hom and Soon-Osberger" and "bank fraud" by Hom in instructing Signature Bank to execute a chargeback on the $18,000 check. Dkt. 386 at 5.

Finally a non-event is Soon-Osberger's email to shareholders that "I believe that anyone [who] has direct contact with him before or moving without going through our management will have legal liability." Dkt. 386, Ex. 1 at 5. Teman suggests that this email concedes that 18 Mercer was legally liable to Teman. That is wrong. In context, the email warned shareholders to steer clear of Teman. *See id*. ("It is unfortunately [sic] that he has [a] very bad reputation and it aligns with his behavior to make repeat legal threats."). As the Government explains, the full email chain on which Teman's Rule 33 motion relies for this point reflects that the discussion within 18 Mercer of legal liability referred to Teman's threat of legal action, not a determination that 18 Mercer was, in fact, liable. *See* Gov't Opp. at 7.[6]

### B. Teman's "New Evidence" Does Not Support His Trial Theory of Defense

Teman's purported "new evidence" also does not nothing to fortify his theory at trial as to how 18 Mercer—and his other customers—ostensibly authorized him to draw checks on their

---

[6] For the above reasons, and those recited in the Government's opposition, Teman's related claim of a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, in connection with the evidence from 18 Mercer on which he relies, is baseless. *See* Gov't Opp. at 5–6, 8. Teman earlier made a *Brady* claim after trial relating to the other two customers, 504 West 120 and ABJ, which the Court denied. *See* Rule 29/30 Decision at 87–107.

bank accounts and for device removal and other fees. That theory, which was unsupported by the trial evidence, remains unsupported.

Teman's trial defense was based upon the fact that his company's contractual terms and conditions stated that they were subject to additional "Payment Terms" and identified a URL. The defense elicited from Soon-Osberger on cross-examination that she had not clicked on the URL. Tr. 449–50.

Teman, however, failed at trial to adduce any evidence supporting the premise of this line of defense: that the Payment Terms in place at the time GateGuard had contracted with the three customers had given GateGuard authority to draw checks on customer accounts and to charge fees such as the $18,000 device removal fee. No witness from 18 Mercer, 518 West 204, or ABJ so testified. Nor did any other witness called by the Government.

On the defense case, Teman called his lawyer, Reinitz, in support of an attempted advice of counsel defense, to recount conversations with Teman in late 2018 and early 2019. But the sole version of the Payment Terms that Reinitz could authenticate was one that stated that it had been revised on January 27, 2019. *See* DX 2. That was long after each customer had contracted with GateGuard—and, importantly, after Teman's ire at each customer had been provoked by its attempts to end the relationship with GateGuard. Although Reinitz testified that Teman had told him these Payment Terms had been in place earlier, this testimony was hearsay; the Court therefore instructed the jury that it could not consider Teman's statement for the truth of the matter asserted. Teman did not testify. Nor did Teman attempt by any other means at trial to establish the Payment Terms in place when the customers had contracted. *See* Rule 29/33 Decision at 4 n.5 (citations omitted).

Accordingly, as the Court recapped in denying Teman's post-trial motions, "there was no competent evidence at trial that the relevant aspects of the Payment Terms had been in place at the times any of the Customers contracted with Teman." *Id.*

Had there been any truth to Teman's claim that the linked Payment Terms at the time of contracting had authorized his offense conduct, Teman had every incentive to come forward with this after trial. Strikingly, in the 44 months since trial and the 40 months since the Court called out that deficiency, Teman has not done so—or even tried. Teman's present round of Rule 33 motions remains devoid of such evidence.[7] And Pecot's August 2021 letter to the Court and the associated emails do not speak to the Payment Terms at all, let alone the content of these terms at the pertinent point, when 18 Mercer contracted with GateGuard.

For this reason, Teman's attempts to characterize his disagreements with his customers over the 29 checks as mere civil payment disputes regarding the effect of online or clickwrap contract terms, and thus as ill-befitting a federal fraud prosecution, *see, e.g.*, Dkt. 394 at 7 n.3, cannot be taken seriously. Teman failed completely to offer any evidence that the Payment Terms on which his trial defense rested were in place at the time of contracting. The assembled evidence instead overwhelmingly established that Teman acted with intent to defraud. He was well aware that his customers had not consented to the comically outsized fees and charges reflected in the 29 checks to GateGuard, including the $18,000 check drawn on 18 Mercer's account. He was also well aware that his customers had not consented to his drawing and

---

[7] Insofar as evidence about the Payment Terms at the relevant times almost certainly would have been in GateGuard's custody and control, such evidence likely could not have qualified as new evidence under Rule 33. *See, e.g.*, *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980) (only evidence that "could not with due diligence have been discovered before or during trial" is cognizable on a Rule 33 motion). Regardless, Teman's sustained inability to muster any such evidence is telling.

14

negotiating checks on their accounts.  He nonetheless represented to the depository and clearing banks that 18 Mercer (and 504 West 204 and ABJ) had authorized the checks that he presented for deposit.

### C. Teman's "New Evidence" Does Not Bear Upon 28 of the 29 Fraudulent Checks and Cannot Affect the Convictions on Counts One and Three

Even assuming—incorrectly—that Pecot's letter and emails called into question whether 18 Mercer's board had authorized Teman to draw the March 28, 2019 check for $18,000 on its account, those materials have no bearing on whether Teman had authorization to draw the remaining 28 checks that he negotiated to enrich himself.  These totaled $315,000 and were drawn on the accounts of the other customers, 518 West 204 and ABJ.

Critically, too, the 18 Mercer check was the subject (along with the other $18,000 check Teman negotiated on March 28, 2019, on the account of 518 West 204) of only two of the four counts: Counts Two and Four.  The remaining two counts, Counts One and Three, charged Teman with bank fraud and wire fraud, respectively, in connection with the 27 checks he deposited on April 19, 2019.  Because none of those 27 checks was drawn on 18 Mercer's account, any new evidence relating to 18 Mercer could not disturb Teman's convictions on those two counts.  And because the Court imposed the same concurrent sentence on all four counts, Counts One and Three independently support Teman's prison sentence.

Moreover, for various reasons canvassed in the decision resolving Teman's post-trial motions, the proof of Teman's fraudulent intent was even stronger as to the second round of checks.  *See* Rule 29/33 Decision at 8–11.

For one, in between the two rounds, Bank of America had placed a hold on the first two checks, and, on April 2, 2019, completed chargebacks from the GateGuard accounts.  That drove home the absence of customer authorization.  For another, Teman had a new round of texts with

Reinitz, between April 2 and 10, 2019.  Alerted to Teman's deposit of the first two checks, Reinitz wrote: (1) "Not sure I follow but this sounds bad"; (2) "I don't know all the ins and outs of this but sounds like a bad idea"; (3) "If you are hitting their accounts out of the blue, I expect this will become a criminal matter sooner or later"; (4) "I've already told you I think it's a bad idea . . . . If you hit their accounts I think 50/50 they call cops.  If I was advising them that's probably what I would tell them to do"; (5) "The banking stuff is not a joke . . . . You can't just hit someone's bank account if you know they dispute the charge"; and (6) "[I]f the payer tells you to stop, you must stop."  *Id*. at 9 (citations omitted).  Reinitz's memorable warnings put Teman on yet further notice that his actions were unauthorized.  Despite these warnings, Teman—without notifying Reinitz that he would do so—escalated his practice of "hit[ting]" customer accounts more than 10-fold, by depositing, on April 19, 2019, an additional 27 customer checks into the GateGuard account.

For all these reasons, it is not a manifest injustice to let the jury's guilty verdict stand.  Far from it: that verdict was supported by overwhelming evidence.  And the ostensible "new evidence" on which Teman relies does not, at all, call that verdict into question.  There is no basis to adjourn Teman's surrender any longer.

## CONCLUSION

For the reasons above, Court denies Teman's motion to extend his surrender date.  That date remains October 10, 2023.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 394.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 6, 2023
       New York, New York