**UNITED STATES DISTRIC COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                  **Case No.19-cr-696-PAE**

**ARI TEMAN,**

       **Defendant.**


**<u>REPLY TO OPPOSITION TO MOTION RECONSIDERATION</u>**


QUAINTON LAW, PLLC
2 Park Avenue, 20th Fl.
New York, NY 10016
212-419-0575
eden.quainton@quaintonlaw.net

## <u>TABLE OF CONTENTS</u>

PRELIINARY STATEMENT ................................................................................................. 1

PROCEDURAL AND FACTUAL BACKGROUND ........................................................... 2

LEGAL ARGUMENT ....................................................................................................... 6

   I.   The Seifan Letters Provide a Sufficient Basis for Compassionate Release ........................ 6

   II.   Teman's Aggregate and Worsening Medical Conditions Since the Date of the January 24, 2024 Order Support Compassionate Release ...................................................................... 8

     A.   "Holistic" Evaluation is Appropriate ........................................................................ 8

       i.   Testicular Pain/Orchialgia ................................................................................... 9

       ii.   Extreme sleep disorder ....................................................................................... 12

       iii.   Food allergies and dietary concerns ................................................................... 12

       iv.   Short Time Remaining on Teman's sentence ....................................................... 13

CONCLUSION .............................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*United States v. Campagna*,
  612 F. Supp. 3d 365 (S.D.N.Y. 2020) ..................................................................... 7, 8

*United States v. Burke*,
  No. 4:17-CR-3089, 2020 WL 3000330 (D. Neb. June 4, 2020) ............................... 14

*United States v. Fader*,
  No. 1:12-CR-00007-JAW-01, 2020 WL 5807959 (D. Me. Sept. 29, 2020)............................ 14

*United States v. Hussain*,
  No. 19-CR-40 (PKC), 2023 WL 4529625 (S.D.N.Y. July 12, 2023) ........................................ 8

*United States v. McNish*,
  No. CR 10-524, 2020 WL 5646443 (E.D. Pa. Sept. 22, 2020) ................................. 14

*United States v. Oshinski*,
  No. 214CR00284GMNDJA, 2021 WL 2518981 (D. Nev. June 17, 2021) ....................... 12, 13

*United States v. Perez*,
  451 F. Supp. 3d 288 (S.D.N.Y. 2020) ..................................................................... 14

*United States v. Powell*,
  468 F. Supp. 3d 398 (D.D.C. 2020) ........................................................................... 7

*United States v. Slater*,
  547 F. Supp. 3d 58 (D. Me. 2021) ............................................................................. 7

*United States v. Trenkler*,
  47 F.4th 42 (1st Cir. 2022) ........................................................................................ 8

*United States v. Quiros-Morales*,
  83 F.4th 79 (1st Cir. 2023) ........................................................................................ 8

*United States v. Williams*,
  No. 09 CR 558 (CM), 2023 WL 4785286, at *6 (S.D.N.Y. July 27, 2023) ............................ 11

*United States v. Young*,

    No. 14-CR-30024-2, 2020 WL 3605025, at *1 (C.D. Ill. July 2, 2020) .................................. 14

## **Guidelines**

U.S.S.G. §  1Bl.13(b)(l)(C) ......................................................................................................... 4

## **Statutes**

18 U.S.C § 3553(a) ........................................................................................... 5, 7, 8, 13, 14

18 U.S. § 3582 ............................................................................................................................. 8

## **Other Authorities**

https://steinbergurology.com/procedure/spermatic-cord-

    block/#:~:text=A%20spermatic%20cord%20block%20is%20used%20for%20patients,testicula

    r%2Fepididymal%20pain%20prior%20to%20any%20more%20invasive%20procedures. ....... 9

https://www.corrections1.com/contraband/articles/drugs-shanks-and-phones-contraband-grows-

    in-south-fla-federal-prison-g1FYEenQn7OvSzTS/ .................................................................. 15

https://www.mayoclinic.org/diseases-conditions/wheat-allergy/symptoms-causes/syc-20378897.

    ............................................................................................................................................. 13

https://www.mayoclinic.org/medical-professionals/urology/news/idiopathic-chronic-scrotal-

    content-pain-q-and-a-with-matt-ziegelmann-md/mqc-20468223 ............................................. 9

https://www.miaminewtimes.com/news/fci-miami-federal-prison-cited-for-mold-violations-

    11370418. .............................................................................................................................. 15

https://www.nbcmiami.com/news /local/video-shows-prison-riot-that-led-to-lockdown-at-

    federal-correctional-institution-in-miami/3019711/ ................................................................. 15

https://www.nbcmiami.com/news/local/families-of-inmates-stabbed-during-fci-miami-prison-

    riot-demand-answers/3029060/ ................................................................................................. 15

https://www.ncbi.nlm.nih.gov/books/NBK482481/ .................................................................. 11

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4294852/ ......................................................... 10

https://www.ninds.nih.gov/health-
    information/disorders/syncope#:~:text=Syncope%20can%20also%20be%20a%20symptom%2
    0of%20heart,higher%20risk%20for%20some%20neurological%20conditions%20like%20neur
    opathy. .................................................................................................................................... 6

## PRELIINARY STATEMENT

The Government's opposition (the "Opp.") to Teman's Motion for Reconsideration of the Denial of Compassionate Release (the "Mot.") lacks any hint of compassion and, for this reason, fails to evaluate properly the facts and the law. Teman is experiencing severe pain and suffering, and is afflicted with a range of medical conditions, some potentially fatal, that he is attempting to address in the context of a carceral environment the Court never intended to apply to Teman. Indeed, the Court expressly recommended that Teman serve his sentence at the FCI Camp adjacent to the "low" security prison to which Teman was instead assigned. Dkt. 374. The Court also recommended that Teman have access to an appropriate mental health program. Dkt.253. Neither recommendation has been followed, leaving Teman, a first-time, non-violent offender, serving his sentence under conditions substantially harsher than the careful balance the Court sought to implement at sentencing. The specific neurological condition highlighted by Dr. Seifan in a letter that was not available to the Court at the time of its initial decision on Teman's motion for reconsideration on January 24, 2024, Dkt. 414 (the "Order") calls out for reconsideration. But even beyond this specific medical issue, the cumulative effect of numerous other conditions that have manifested or been heightened since the date of the Order – severely painful testicular orchialgia, a compromised immune system, long standing food allergies, dietary restrictions, and a debilitating sleep disorder – also militate in favor of immediate compassionate release, with home confinement if necessary, so that Teman can receive necessary specialized medical care and treatment that cannot be provided at FCI Miami.

A little over two weeks ago, the Court expressed its "strongly held view" that it was "justified and reasonable" for Teman to be "temporarily released . . . to obtain urgent specialized medical care in an outside medical facility." Dkt. 425. As detailed below, however, the BOP has not followed the express instructions of the outside medical facility directing follow-up care with

a private physician within 5-6 days of Teman's initial examination, and has taken no meaningful action to address his ongoing, extreme testicular pain. Given the short period of time until Teman's scheduled release to a half-way house, Teman's ongoing urgent need for medical care and pain treatment, and the Court's assessment that Teman is not a risk of flight or danger to the community, *id.*, Teman respectfully submits that the Court should order his compassionate release immediately.

## PROCEDURAL AND FACTUAL BACKGROUND

Teman was convicted of two counts of bank fraud and two counts of mail fraud on January 29, 2020. Sixteen months later, he was sentenced to a year and a day of incarceration. Dkt. 253. Following an unsuccessful appeal, Teman was ordered to report to the Federal Correctional Institute in Miami on October 10, 2023. Dkt. 377. The Court recommended that Teman serve his term at the Federal Prison Camp in Miami, and have access to mental health services. Dkt. 374, 253. Just before he reported to prison, Teman filed an emergency motion anticipatorily seeking compassionate release or home confinement. Dkt. 403. The Court declined to rule on Teman's motion for anticipatory compassionate release, directing Teman to exhaust his administrative remedies and, in the event of a denial of compassionate release by the Bureau of Prisons ("BOP"), to file an application for compassionate release with the Court. Dkt. 404. Teman then reported to prison on his scheduled surrender date. Almost immediately, it became apparent that Teman was not receiving adequate medical care. On October 18, 2023 Teman's father, David Teman, submitted a letter from Teman to the Court, which was then filed on the docket. Dkt. 405-1. In his letter Teman complained of fever, nausea, body tremors, weakness, and pain in his spine and arms, among other symptoms. *Id.* The Court deemed Teman's letter to be an application for compassionate release, triggering the administrative exhaustion requirements. *Id.* The Court also directed the United States Attorney's Office for the Southern

2

District (the "USASD") to inquire into the status of Teman's medical care and to report back to the court. *Id.* On October 20, 2023, the USASD reported back to Judge Englemayer by providing copies of Teman's BOP medical records, which were filed under seal. Dkt. 406. The USASD further confirmed that it had routed Teman's October 18, 203 so that it could be processed as a request for compassionate release. *Id.* On December 5, 2023, the BOP denied Teman's request for compassionate release. Dkt. 408-1. The Court directed Teman to provide any supplemental materials in support of his motion on or before December 20, 2023 and directed the Government to file a response by January 10, 2024. Dkt. 409. Teman's counsel submitted a supplemental motion in support of Teman's application for compassionate release as directed. Dkt. 411. The Government filed its opposition to Teman's motion on January 10, 2024, stating that Teman had been subject to cardiological and pulmonary tests with normal results. Dkt. 411. Teman then filed a short one-page reply, attaching a letter (the "Initial Seifan Letter") from Dr. Alon Seifan, a Board-certified neurologist ("Dr. Seifan"), that stated, in pertinent part:

> Ari meets diagnostic criteria for several, co-morbid Neuropsychiatric diagnoses most of which are exacerbated by sleep deprivation, psychosocial stressors, medical symptoms such as allergic and gastrointestinal and respiratory distress, and neurological symptoms including numbness and pain . . . His condition has progressively worsened, having already started from a seriously at-risk level that required ready access to medical care and appropriate diet . . . He has vomited and required transport by stretcher to the prison medical office. His diet has included less than 900 calories per day very often, which is partially related to his inability to eat dairy or wheat, and his limited kosher protein options . . . The level of deterioration most likely has induced the fainting, falling, vomiting, headache, and numbness. Given that Ari already suffers from severe depression, all of these symptoms concern me as potentially threatening to his survival.

Dkt. 413 at 2.

On January 24, 2024, the Court denied Teman's application for compassionate release. Dkt. 414. The Court noted Dr. Seifan's letter but did not reference Dr. Seifan's conclusions that Teman's "survival" was threatened by his conditions of confinement. *Id.* Rather, the Court

followed the Government and stressed the results of Teman's normal cardiological and pulmonary results. *Id*. at 7, 13, 14. The Court concluded that Teman had not met any of the tests for compassionate release, including the one under U.S.S.G. § 1Bl.13(b)(l)(C), which provides that compassionate release is available if the prisoner is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." Order at 15-16. On February 7, 2024, Teman filed a motion for reconsideration, arguing that the Court had not given appropriate weight to the Initial Seifan Letter and, more importantly, that an additional letter from Dr. Seifan (the "Second Seifan Letter"), submitted after the Court had rendered its decision, constituted new evidence forming the basis for reconsideration of the Order. Dkt.417. Notably, the Second Seifan Letter stated:

> I am writing to re-iterate that Mr. Teman's health and life are in danger of permanent injury or death. The Government presented an argument regarding Mr. Teman's cardiopulmonary health which is not relevant to Mr. Teman's health problems . . . The medical record on the docket, and the records in the possession of the BOP, make clear that Mr. Teman's issues are neurological and inflammatory, not heart or lung related. This includes the swelling in Mr. Teman's brain following the spike protein infection (CT scan at Baptist), swelling in his spinal cord (Dr. Brusavonik), sudden loss of control of his limbs, and swollen turbinates requiring surgery (Dr. Grobman). It's possible that these conditions were caused by a viral infection . . . Due to Mr. Teman's repeated episodes of syncope, Mr. Teman is at risk of death from head trauma . . . Given that he had documented, severe neuro-immune reactions to a viral exposure in the past, he is at risk of this occurring again. Importantly, Mr. Teman is experiencing symptoms similar to those that were the presenting signs of his previous, serious neurological condition. At this point, Mr. Teman is at grave, imminent risk of injury or death from a fall, and/or from exacerbation of his previously documented neuroimmune condition.

Dkt. 417-1.

On February 21, 2024, the Government requested a two-week extension to respond to the Mot.

Dkt. 420. The request was granted the following day, over Teman's objection. Dkt. 422.

While the Government's response was pending, Teman's condition took a sharp new downward turn, with Teman reporting that he was suffering testicular pain at a 9/10 level that was not being addressed, leading to the filing of an emergency motion for Teman to be treated by an outside specialist. Dkt. 425. The Court granted Teman's motion. Dkt. 426. Teman was taken for evaluation to Larkin Community Hospital ("Larkin"), where an ultrasound was performed "with unremarkable results." Dkt. 426 at 2. However, the reports of Teman's medical examination, filed under seal at Dkts. 426-1 and 426-2, do not indicate that other diagnostic procedures necessary for specialized medical care were performed, while Teman's lab results indicated several red flags.[1] Most likely as a result of the foregoing, Larkin provided explicit instructions for Teman to be seen by a private physician for follow-up, within 5-6 days. Dkt. 426-1 at 3. This has not yet occurred, 18 days after the instructions were issued.

On March 7, the Government responded to Teman's motion in perfunctory terms, dismissing Dr. Seifan's letters with a single adverb, "notwithstanding," Dkt. 426 at 3, and arguing, in conclusory fashion, that compassionate release would upset the "careful balancing of the § 3553(a) factors the Court undertook at sentencing and applied in the Order." Dkt. 426 at 4. Contrary to the Government's arguments and as discussed in detail below, Teman has already confronted far more pain and suffering than was ever contemplated when the Court balanced competing concerns and sentenced Teman in July of 2021. Moreover, he has not received "the specialized medical care" needed to treat his serious medical conditions and "without which Teman is at risk of serious deterioration in health or death." *See supra* at 4-5. Teman deserves compassionate release, with home confinement if necessary, so he can obtain access to the specialized medical providers needed to treat his conditions.

---

[1] *See infra* at 9 and Note 4.

## LEGAL ARGUMENT

I.    **The Seifan Letters Provide a Sufficient Basis for Compassionate Release**.

The Government attempts to brush aside the Seifan Letters (not even admitting there are two separate letters that require analysis) for an obvious reason: the letters upset the Government's case and provide a sufficient basis for Teman's compassionate release. Dr. Seifan is a board-certified neurologist and neuro-psychiatrist, Dkt. 417-1, two areas of specialization that are not available at all at FCI Miami. Dr. Seifan references other medical specialists who diagnosed Teman with swelling in his brain, spinal cord and turbinates—extremely serious neuro-immune conditions likely resulting from viral exposure. *Id.* Dr. Brusavonik is a Board-certified orthopedic surgeon. https://spinedoctormiami.com/the-doctor/. Dr. Grobman is a Board-certified otolaryngologist. https://www.greatermiamients.com/Doctor/ariel-grobman/. According to Dr. Seifan, Teman's reported instances of syncope are potential indicators of a viral infection that could have a life-threatening impact. Dkt. 417-1. While syncope is commonly viewed as a cardiac issue, it can also be symptomatic of an underlying neurological illness that requires specialized care.[2] The BOP records do not indicate that Teman has been evaluated by a neurologist or that a neurologist is on staff at FCI Miami. It appears virtually certain that there is no specialized neurological care at FCI Miami or even any practitioners in an adjacent field who could provide Teman with ongoing treatment for a documented neurological disorder affecting his auto-immune system and creating a substantial risk of serious injury or death. The "careful balancing" referenced by the Government should not involve playing Russian roulette.

---

[2] https://www.ninds.nih.gov/health-information/disorders/syncope#:~:text=Syncope%20can%20also%20be%20a%20symptom%20of%20heart,higher%20risk%20for%20some%20neurological%20conditions%20like%20neuropathy.

Rather, the documented risks should be balanced against other carceral goals. *Compare United States v. Powell*, 468 F. Supp. 3d 398, 404-405 (D.D.C. 2020) (degenerative neurological condition combined with time served warrant conclusion that there is no "legitimate purpose" to keep inmate in prison) *with United States v. Slater*, 547 F. Supp. 3d 58, 64, 86 (D. Me. 2021) (principles of "just punishment," including dangerousness of defendant and physical harm inflicted on victims outweigh severe neurological and other conditions).

The conclusion of the D.C. District Court in *Powell* is precisely the result that a Southern District Court has recently reached in a situation analogous to Teman's. *See United States v. Campagna*, 612 F. Supp. 3d 365, 369 (S.D.N.Y. 2020) (granting motion to substitute home incarceration for the remaining four months of defendant's sentence where combination of defendant's immunocompromised condition, which diminished his ability to provide self-care, and the circulation of the Covid-19 virus constituted extraordinary and compelling reasons to modify defendant's sentence). Teman poses no danger to the community or any risk of flight, as the Court has recently confirmed, *see supra* at 1, and as he has demonstrated after receiving permission several times to travel, including overseas to visit his parents in Israel, without any resulting incidents. Dkts. 78 (travel to Missouri), 299 (travel to Australia), 333 (travel to New Jersey for hurricane relief efforts), 362 (travel to Israel). While in prison, he has shown a remarkable commitment to helping other inmates, which further underscores that Teman poses no danger to others. Dkt. 418-2. Moreover, in confining him at FCI Miami Low, rather than the adjacent prison camp as the Court had recommended,[3] the BOP has already given greater sting to the factors of "just punishment" and "adequate deterrence," warranting a reduction in the duration of Teman's sentence. The foregoing considerations satisfy the relevant 18 U.S.C. §

---

[3] *See infra* at 15 and Note 9.

3553(a) factors, making a modification of Teman's remaining sentence consistent with statutory policy, *see U.S. v. Campagna*, 612 F. Supp. at 369, and rendering compassionate release all the more fitting now.

## II.   Teman's Aggregate and Worsening Medical Conditions Since the Date of the January 24, 2024 Order Support Compassionate Release.

### A.   "Holistic" Evaluation is Appropriate.

Beyond the proper weight to be given to the Seifan Letters, the Court should also take a "holistic" approach and consider Teman's aggregate and worsening conditions since the time of the Order. *See, e.g.*, *United States v. Trenkler*, 47 F.4th 42, 47 (1st Cir. 2022) (district courts enjoy broad discretion, and may conduct a holistic review to determine whether the individualized circumstances, taken in the aggregate, present an "extraordinary and compelling" reason to grant compassionate release); *United States v. Quiros-Morales*, 83 F.4th 79, 85 (1st Cir. 2023) ("any complex of circumstances" identified by a prisoner, subject to constraints imposed by Congress or the courts, may be considered by the district court as a basis for compassionate release). Although counsel has not identified any Second Circuit case explicitly adopting the *Trenkler/Qurios-Morales* approach, analytically it comports with the structure of 18 18 U.S.C. § 3582 and §3553(a) in recognizing the broad discretion of the District Courts to balance their concern for the health of inmates suffering from several medical conditions with the goals of criminal justice. *See United States v. Hussain*, No. 19-CR-40 (PKC), 2023 WL 4529625, at *11 (S.D.N.Y. July 12, 2023) (holding that converting defendant's remaining term of imprisonment to a term of 18 months of supervised release, with the added condition of home detention, and with all other terms and conditions of his sentence remaining in place, is sufficient, but not greater than necessary, to accomplish the goals of original sentence).

i.      <u>Testicular Pain/Orchialgia</u>. A number of additional medical considerations, of which the Government is aware, but to which it gave short shrift in its opposition, weigh in favor of compassionate release so that Teman can receive appropriate care. First, as the Court is well aware, Teman has been suffering from extreme testicular pain, at a level of 9/10. *See* Dkt. 424. The Court clearly understood the emergency nature of the reported condition and ordered Teman released for "urgent specialized medical care in an outside medical facility." Dkt. 425. In response to this order, Teman was taken for a one-day examination at Larkin Community Hospital.  Dkt. 426. On its face this examination does not appear consistent with the Court's order for "specialized medical care in an outside medical facility." Dkt. 425. "Care" implies ongoing treatment, rather than a one-time examination.

According to the reports of that visit, reported by the Government to the Court, "an ultrasound was performed on the testicles with unremarkable results" Dkt. 426. However, these reports, filed under seal at Dkts. 426-1 and 426-2, do not indicate that other diagnostic procedures necessary for specialized medical care – such as a CT scan, an MRI, X-ray imaging, or a "spermatic cord block"[4]– were performed. In addition, an ultrasound of the testes is reported as still pending, Dkt. 426-2 at 61, and Teman's labs reported abnormal neutrophil, lymphocyte and red cell distribution width (RDW). Dkt. 426-2 at 76.

---

[4] According to the Mayo Clinic: "One of the most important diagnostic tools [for chronic testicular pain] is the spermatic cord block [an 'SCB'], used to localize the source of the pain to the scrotal contents (the distribution of pain fibers from the spermatic cord). A spermatic cord block is indicated in the absence of an obvious alternative source for the pain .. . . It can be done easily in the office at the time of the consultation if so desired." https://www.mayoclinic.org/medical-professionals/urology/news/idiopathic-chronic-scrotal-content-pain-q-and-a-with-matt-ziegelmann-md/mqc-20468223. As its name indicates, the SCB "blocks" the transmission of pain from through nerves in the scrotal cord to the testicles. https://steinbergurology.com/procedure/spermatic-cord-block/#:~:text=A%20spermatic%20cord%20block%20is%20used%20for%20patients,testicular%2Fepididymal%20pain%20prior%20to%20any%20more%20invasive%20procedures.

Even, more troublingly, Teman reports that a urologist who does not figure in the reports provided by Larkin and submitted to the Court gave Teman an oral diagnosis which Teman understood as "orchadia" and subsequently learned was "orchialgia." Declaration of Eden P. Quainton, dated March 18 (the "Quainton Decl.") at ¶ 2, ¶ 3 and Exhibit A, ¶ 4 and Exhibit B. The medical literature indicates that chronic orchialgia is "idiopathic," meaning that its etiology is not well understood and may arise from a number of underlying conditions.[5] The literature does note that one underlying cause may be nerve damage.[6] This would suggest that Teman's testicular pain is related to the neuro-inflammatory issues that Dr. Seifan identified as posing an imminent risk of injury or death. *See supra* at 4.

The Government omits from the Opp. the critical instructions of Larkin that Teman be re-evaluated by a private physician for follow-up care within 5-6 days. Dkt. 426-1 at 3. These instructions have not been followed by the BOP more than 18 days after Teman was seen at Larkin, despite Teman's continued reports of constant and excruciating pain. Quainton Decl. ¶ 5 (March 1: "pain to the testicle is much worse going the long route [to the dining hall]"; March 2: "impossible to sleep through the night, waking from pain, and my GI system is messed up"; March 6: "Woke at 3:13am in pain (checked watch), couldn't get back to sleep, no position was comfortable. Pain still ongoing"; March 7: "Another night of 2am, 3am, etc wake ups from the pain and difficulty falling asleep"; March 9: "I did not sleep at all, and am shaking and in tremendous pain in my neck, back, and genitals and the pain there is radiating up and to my right . it's worse than ever"; March 15: "in excruciating pain and could not even fully bow when praying today b/c my spine is all jammed up"; March 17: "pain was nearly constant and unbearable at times last night and this morning").

---

[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4294852/
[6] *Id*.

The failure to provide the indicated follow-up is all the more disturbing because orchialgia is a complex condition for which self-care in the carceral context is impossible and that requires a multi-disciplinary approach for proper evaluation and treatment. https://www.ncbi.nlm.nih.gov/books/NBK482481/ ("Chronic orchialgia is likely to remain a challenging condition for an interprofessional team of nurses, nurse practitioners, physician assistants, and physicians to evaluate and treat due to multiple possible etiologies, limited tools for diagnostic evaluation and the multitude of treatment options."). There are no board-certified specialists at FCI Miami, and it can take months to schedule necessary tests or provide needed treatment—even after an express Court order. *See supra* at 9-10. FCI Miami does not have the equipment necessary to perform MRI's on site, let alone to conduct more specialized, but medically indicated, procedures such as a spermatic cord block.

Given the likely relationship of orchialgia to Teman's documented high-risk neuro-inflammatory condition, the BOP's failure to follow Larkin's guidance for follow-up treatment, which not only violates clearly indicated medical protocol, but appears inconsistent with the Court's February 27, 2024 Order, and Teman's obvious inability to provide the necessary self-care for a condition that requires an "interprofessional team," Teman submits that his testicular pain and the need for proper treatment unavailable in the prison context, warrant a reconsideration of the Court's January 24 Order and Teman's immediate compassionate release. Moreover, Teman suffered extreme fear of possible cancer or life-threatening torsion during the time it took for him to receive an examination. Quainton Decl. ¶ 6. This constitutes a further and unnecessary increase in the harshness of Teman's conditions of confinement. *See United States v. Williams*, No. 09 CR 558 (CM), 2023 WL 4785286, at *6 (S.D.N.Y. July 27, 2023) (undue harshness of sentence can qualify as extraordinary and compelling factor justifying compassionate release).

      ii.    <u>Extreme sleep disorder</u>. Teman suffers from chronic sleep issues that have required surgical intervention in the past. Dkts. 287, 290, 403. In the absence of treatment, Teman's sleep issues have triggered major psychological problems, and earlier caused the Court to hold an "emergency telephone conference." Dkts. 87, 317. Teman reports that he is not suicidal, but cannot be properly treated because inappropriate sleep medication can induce a "psychotic reaction." Quainton Decl. ¶ 7. The BOP's response to Teman's description of his symptoms and response to sleep medication is to threaten to place him in its extreme "suicide watch" protocol under which he would be placed naked under a blanket below a spotlight shining on him around the clock. *Id.* While this protocol may be necessary in extraordinary cases to protect the life of an inmate, it would appear wildly out of proportion to any reasonable carceral goals and entirely unnecessary in the case of a non-violent, first-time offender incarcerated in conditions far harsher than those recommended by the Court. *See supra* at 2, *infra* at 15 and Note 9. In addition, there is no evidence that Teman has been provided with the mental health programs recommended by the Court, *see supra* at 2, further underscoring the urgency of providing Teman with psychological or psychiatric care.

      iii.    <u>Food allergies and dietary concerns</u>. While allergies and dietary issues generally do not rise to the level of extraordinary circumstances, the impact of dietary limitations on Teman's severe neuro-inflammatory condition, its apparent manifestation in extreme testicular pain, and Teman's increasingly debilitating insomnia should be taken into account by the Court in reconsidering its initial denial of compassionate release. *See United States v. Oshinski*, No. 214CR00284GMNDJA, 2021 WL 2518981, at *2 (D. Nev. June 17, 2021) (inability to obtain nutrition following broken jaw held sufficient for compassionate release where the need for defendant to "continue serving the sentence imposed is minimal . . . he does

not present a danger to the community, and the extreme hardship he has experienced while incarcerated is enough of a deterrent from future criminal activity").

Here, Dr. Seifan has expressly highlighted that Teman has suffered neuro-immune problems that have caused swelling in his brain and spine. *See supra* at 4. Teman has documented wheat and dairy intolerances. *See supra* at 4. For an at-risk person such as Teman, wheat ingestion can lead to headaches, cramps, gastrointestinal issues and, in extreme situations, anaphylaxis, which is a potentially life-threatening emergency.[7] The BOP has been unable or unwilling to remove inflammatory allergens from Teman's diet, heightening the risk of serious neuro-immune injury underscored by Dr. Seifan. Teman has been unable to provide self-care, as his parents' requests to ship and pay for non-inflammatory foods have been rejected. Quainton Decl. ¶ 8.[8]

      iv.  <u>Short Time Remaining on Teman's sentence</u>.  According to the Government, "Teman is scheduled to be released to a residential reentry center in approximately mid-May, 2024, and from there to home confinement on or about June 27, 2024." Dkt. 426 at 4. The relatively short time remaining on Teman's sentence, in the Government's view, argues against compassionate release, because any shortening of the sentence would not comport with the Court's balancing of the § 3553(a) factors. *Id*.

In fact, however, the opposite is true. Teman is only 57 days away from his scheduled release to a half-way house and three months from his scheduled release to home confinement. Courts routinely consider the short time remaining on a sentence as a factor in granting compassionate release, particularly where the defendant has been subjected to unusually harsh conditions of

---

[7] https://www.mayoclinic.org/diseases-conditions/wheat-allergy/symptoms-causes/syc-20378897'
[8] Rather than receiving an appropriate dietary treatment, Teman has been injected with steroids, which he has had severe difficulty tolerating and do not appear indicated for food allergies. Quainton Decl. ¶ 9.

confinement and is unable to administer self-care in the prison environment. *See U.S. v. Oshinski*, 2021 WL 2518981, at *2 (compassionate release granted with approximately three months remaining on sentence); *United States v. Perez*, 451 F. Supp. 3d 288, 293 (S.D.N.Y. 2020) (granting compassionate release  motion where only a few weeks remained on original sentence); *United States v. Burke*, No. 4:17-CR-3089, 2020 WL 3000330, at *2 (D. Neb. June 4, 2020) ("just as important, however, is the fact that [the Defendant] has relatively little time left to serve"); *United States v. Fader*, No. 1:12-CR-00007-JAW-01, 2020 WL 5807959, at *2 (D. Me. Sept. 29, 2020) (taking into account "the short time remaining" on sentence in granting compassionate release); *United States v. Young*, No. 14-CR-30024-2, 2020 WL 3605025, at *1 (C.D. Ill. July 2, 2020) (ordering "immediate" compassionate release given the seriousness of underlying condition and the "relatively short" period of two years before the defendant's scheduled release dated based on good behavior);  *United States v. McNish*, No. CR 10-524, 2020 WL 5646443, at *4 (E.D. Pa. Sept. 22, 2020) (granting compassionate release where deterrent effect of continued incarceration is of limited "efficacy" given the prisoner's forthcoming scheduled release date).

The Government applies the § 3553(a) factors in wooden style, Dkt. 426 at 4, but in reality, these factors are dynamic and weigh differently at different stages in a defendant's incarceration and in the face of different conditions of confinement. When a defendant has already served the majority of his or her term, as Teman will have if he is released to home confinement now rather than in June, the deterrent effect of incarceration has already largely served its purpose. The punitive aspect of a criminal sentence necessarily reflects a prisoner's conditions of confinement, with non-violent, first-time offenders generally qualifying for the lowest level, least restrictive carceral environments. Teman's placement for more than five months in a low-security prison (one closer in reality to a medium security prison with

14

particularly harsh conditions of confinement),[9] rather than the originally contemplated prison camp, has heightened the punitive nature of his sentence, thus more than adequately reflecting the seriousness of the crime for which he was convicted. The need for societal protection from Teman has always been a minor concern, given his zero-point status and his respect for Court injunctions on multiple occasions when he has been permitted to travel abroad. *See supra* at 1, 7.

Thus, all the relevant factors taken together – the undoubted severity of Teman's underlying neuro-inflammatory condition, its apparent recent manifestation in testicular orchialgia, the ongoing debilitating challenges with sleep and diet, Teman's positive contribution to the prison environment, the relatively short time remaining on Teman's sentence, the absence of any danger to the community or risk of flight, and the heightened punitive and deterrent effect of Teman's incarceration at FCI Miami Low rather than the FCI Miami Prison Camp – decisively tip the scales on reconsideration towards a granting of the present motion for compassionate release and permitting Teman to obtain the medical treatment he so clearly needs.

## CONCLUSION

For the reasons set forth above, the Court should reconsider its January 24, 2024 Order and, on reconsideration, order Teman's immediate compassionate release, with home confinement if necessary, so that he can obtain specialized medical care unavailable under his current conditions of confinement.

---

[9] *See* https://www.nbcmiami.com/news /local/video-shows-prison-riot-that-led-to-lockdown-at-federal-correctional-institution-in-miami/3019711/ (100 prisoner riot at FCI Miami in which more than 100 weapons were found); https://www.nbcmiami.com/news/local/families-of-inmates-stabbed-during-fci-miami-prison-riot-demand-answers/3029060/ (parents in "panic mode" after incarcerated son stabbed in the back of the head); https://www.corrections1.com/contraband/articles/drugs-shanks-and-phones-contraband-grows-in-south-fla-federal-prison-g1FYEenQn7OvSzTS/; https://www.miaminewtimes.com/news/fci-miami-federal-prison-cited-for-mold-violations-11370418.

March 18, 2024
New York, NY

Respectfully submitted,

QUAINTON LAW, PLLC

By: _Eden Quainton_____
Eden P. Quainton
2 Park Ave., 20th Fl.
New York, New Yok 10016
(212) 419-0575
*Attorneys for Ari Teman*

16