UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

---

19 Cr. 696 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

On January 24, 2024, the Court denied defendant Ari Teman's motion for compassionate release from Federal Correctional Institution ("FCI") Miami. Dkt. 414 ("CR Decision"). Teman now moves for reconsideration of that decision. Dkt. 417 ("Reconsideration Mtn."). For the reasons that follow, the Court denies the motion.

## I.      Background

The Court incorporates by reference the CR Decision in its entirety, including its account of the factual background to and procedural posture of the motion for compassionate release and the standards governing it. CR Decision at 1–7.[1] The following summary recaps that decision and reviews the events following it.

Following affirmance of his conviction on two counts apiece of bank and wire fraud based on a scheme to fraudulently create and negotiate $333,000 in bogus checks, Teman, on

---

[1] As the CR Decision noted, in other decisions, the Court has reviewed in detail Teman's offense conduct and legal challenges to his conviction. CR Decision at 1 n.1. These include a June 5, 2020 decision denying Teman's post-trial motions, *see* Dkt. 138 ("Rule 29/33 Decision"), and an October 6, 2023 decision denying Teman's motion to extend his surrender date, *see* Dkt. 402 ("Surrender Date Decision"). The Second Circuit has affirmed Teman's convictions. *See United States v. Teman*, No. 21 Cr. 1920, 2023 WL 3882974 (2d Cir. June 8, 2023).

October 10, 2023, began serving his sentence of 12 months and one day of imprisonment.  Two days earlier, Teman, *pro se*, had moved anticipatorily for compassionate release.  Dkt. 405, Ex. 1.  That motion was later supported by a supplemental motion from Teman's retained counsel.  Dkt. 411 ("Initial Mtn.").  After the Government opposed the motion, attaching Teman's Bureau of Prisons ("BOP") medical records and a declaration from an FCI Miami unit manager, Dkt. 412 & Exs. A–D, Teman's counsel submitted a letter from Dr. Alon Seifan, who had evaluated Teman the month before his surrender, opining that, based on Teman's account, his time in custody had induced a "progressively worsened" condition that entailed fainting, falling, vomiting, and numbness.  Dr. Seifan urged Teman's release to gain him access to better medical care.  Dkt. 413.

The Court denied Teman's motion on two independent grounds.  First, based on a close review of the BOP's voluminous medical records, Teman failed to establish "extraordinary and compelling reasons" warranting release, as required by 18 U.S.C. § 3582(c)(1)(A).  Teman's medical conditions, the Court found, fell well short of satisfying any of the alternative standards under which release can be merited under the Sentencing Commission's regulations, *see* CR Decision at 12–16, as illuminated by the case law, *see id.* at 16–18.  Second, even had Teman established extraordinary and compelling reasons, his release would not be consistent with the 18 U.S.C. § 3553(a) factors, considered together.  In the Court's judgment, the sentence imposed— which was well below the Guidelines range of 30–37 months—was necessary to respect these factors.  *See id.* at 18–22.

On February 7, 2024, Teman filed the instant motion for reconsideration.  Teman argued that (1) the decision to deny compassionate release overlooked certain of his medical conditions, and (2) since entering FCI Miami, he has taken "positive steps" towards rehabilitation.

Reconsideration Mtn. at 2–7. The motion, made by a newly appearing retained counsel, Eden P. Quainton, Esq., was accompanied by a declaration that attached new exhibits in support of release. Dkt. 418 ("Quainton Decl.").

Late on February 26, 2024, while the Government's response was pending, Teman filed an emergency motion for immediate release, stating that he was experiencing severe testicular pain to which BOP medical personnel had failed to adequately attend. Dkt. 424 ("Emergency Mtn."). Early the morning of February 27, 2024, and promptly upon receiving Teman's motion, the Court issued an order expressing in strong and urgent terms its view that Teman should be allowed temporarily to leave FCI Miami to obtain specialized medical care. The Court directed the United States Attorney's Office for this District forthwith to contact the BOP and furnish a responsible official with the order. The Court also personally contacted the BOP's regional counsel for the northeast region to ensure that FCI Miami take urgent action. Dkt. 425 ("Feb. 27, 2024 Order"). Presumably as a result of this intervention, Teman, escorted by BOP personnel, was thereupon taken that day to the Larkin Community Hospital, a non-prison facility. There, doctors examined Teman and did not find abnormalities or a need for urgent care, such that Teman was returned later that day to FCI Miami. Dkt. 426, Ex. A.

On March 7, 2024, the Government filed an opposition to Teman's motion for reconsideration. Dkt. 426 ("Gov't Br."). It attached two sealed exhibits. The first consisted of records from Teman's recent evaluation by the physicians at Larkin Community Hospital. *Id.*, Ex. A ("Feb. 27, 2024 Records"). The second consisted of Teman's BOP medical records. *Id.*, Ex. B ("BOP Records").

On March 8, 2024, the Court received an email from Teman's parents, attaching letters from Teman describing his conditions. The Court issued an order stating that it would file such

3

letters under seal and consider them in resolving the motion for reconsideration (as it has). Dkt. 427. On March 18, 2024, Teman, counseled, filed a reply, Dkt. 431 ("Reconsideration Reply Br."), and a declaration with attachments, Dkt. 432 ("Quainton Reply Decl."), in support of reconsideration.

Teman's current release date is August 1, 2024. He is scheduled to be transferred to a residential reentry center on May 14, 2024. *See* CR Decision at 6–7; Gov't Br. at 4.

## II.    Discussion

Teman moves for reconsideration under Local Criminal Rule 49.1(d). The rule authorizes such motions as a means to bring to the Court's attention "matters or controlling decisions which counsel believes the Court . . . overlooked" in its initial decision. Local Crim. R. 49.1(d). "The standards governing criminal reconsideration motions are 'largely the same' as those governing civil reconsideration motions." *Simon v. United States*, No. 07 Cr. 474 (ER), 2021 WL 242360, at *2 (S.D.N.Y. Jan. 25, 2021) (quoting *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 1331955, at *1 (S.D.N.Y. Mar. 23, 2020)); *see also, e.g., United States v. Smith*, 105 F. Supp. 3d 255, 258 (W.D.N.Y. 2015) (applying Local Rule 6.3); *see also, e.g., United States v. Yannotti*, 457 F. Supp. 2d 385, 389 & n.16 (S.D.N.Y. 2006) (same); *United States v. Kerik*, 615 F. Supp. 2d 256, 276 n.27 (S.D.N.Y. 2009) (same).

"[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *United States v. Naranjo*, No. 13 Cr. 351 (JSR), 2015 WL 2381322, at *1 (S.D.N.Y. May 13, 2015) (citation omitted). "The Court should not revisit a prior order unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest

4

injustice.'" *United States v. Gambardella*, No. 10 Cr. 674 (KBF), 2011 WL 6314198, at *1 (S.D.N.Y. Dec. 15, 2011) (citation omitted). "For evidence to be considered 'newly available,' it must be 'evidence that was truly newly discovered or could not have been found by due diligence.'" *United States v. Posada*, 206 F. Supp. 3d 866, 868 (S.D.N.Y. 2016) (citation omitted). A motion for reconsideration does not afford a defendant the "opportunity to put forward evidence that he could have, but failed, to provide the Court when the Court initially considered the motion." *Muyet v. United States*, No. 03 Civ. 4247 (PKL), 2009 WL 2568430, at *3 (S.D.N.Y. Aug. 19, 2009); *see also, e.g.*, *United States v. Alvarez-Estevez*, No. 13 Cr. 380 (JFK), 2014 WL 12681364, at *1 (S.D.N.Y. Nov. 6, 2014) (denying motion for reconsideration where defendant failed to demonstrate "that the new evidence" adduced to support his motion "was previously unavailable"); *cf. United States v. Garcia*, 648 F. Supp. 3d 480, 484–85 (S.D.N.Y. 2022) (granting motion for reconsideration where defendant adduced new evidence that had been unavailable at the time of the initial motion).

At the threshold, Teman fails to apply, or address, these settled standards governing motions for reconsideration. Teman's motion relies heavily on a range of newly submitted materials, as follows.

In moving for reconsideration, new counsel Quainton attached:

- a January 28, 2024 letter from Dr. Seifan, opining on the medical risks to Teman at FCI Miami, Quainton Decl., Ex. 1;

- a January 26, 2024 emailed "letter of recommendation" for Teman from the director of education at FCI Miami, describing educational initiatives Teman has undertaken to benefit other prisoners, *id.*, Ex. 2;

- a 16-page compilation of vignettes and essays Teman has authored while at FCI Miami, at least one of which is dated November 1, 2023, *id.*, Ex. 3; and

- an undated letter from Teman, apologizing for the "inappropriate and hurtful" things he had written and said during the case, attesting to ways in which he has

grown during his incarceration, and proposing a "solution" under which, during the balance of his prison term, he would live at his home in Miami Beach but "drive or Uber" to FCI Miami each morning, and spend the day teaching and tutoring in the prison's education department, *id.*, Ex. 4.

Counsel's brief in support of reconsideration drew heavily on these materials. *See generally* Dkt. 417.

With his reply memorandum, Teman's counsel again submitted and cited new material. *See* Dkt. 431. These included:

- a declaration from counsel dated March 18, 2024, recounting Teman's medical examination at Larkin Community Hospital on February 27, 2024, and various challenges Teman claims to currently face at FCI Miami, including an inability to sleep and an inability to obtain food that meets his dietary needs;

- a February 28, 2024 email from Teman, describing in detail his examination at Larkin Community Hospital and his subsequent care, Quainton Reply Decl., Ex. 1; and

- a second email from Teman, the same day, reporting that the hospital's urologist diagnosed him with orchialgia, the urologist's statements to him about that condition, and the medical research Teman had received from his father about this condition, *id.*, Ex. 2.

Some of this material qualifies as newly available. Most obviously, that is so of the materials arising from Teman's February 26, 2024 visit to the Larkin Community Hospital. But much of the newly submitted materials—such as the supplemental letter from Dr. Seifan, the compilation of essays composed by Teman, and Teman's essay reflecting on his growth in prison and proposing to be incarcerated only during daytime hours—could have been submitted as part of his initial compassionate release motion. To this extent, Teman's motion is improper, as a motion for reconsideration is not a vehicle for a defendant "to put forward evidence that he could have, but failed, to provide the Court when the Court initially considered the motion." *Muyet*, 2009 WL 2568430, at *3.

6

In light of the above, the Court's analysis will proceed in two steps. The Court will first consider Teman's motion for reconsideration of the CR Decision, based on the information furnished to the Court as of that decision. Then, in recognition of an inmate's right to move serially for compassionate release based on new circumstances—and out of respect for the discomfort expressed by Teman—the Court then will assess *de novo* whether Teman's present circumstances, as elucidated by the full range of evidence he has offered and the updated medical records supplied by the Government in response, meet the standards for compassionate release set by the Sentencing Commission.

## A.   Evidence Available as of the Court's Initial Decision

Teman advances two related arguments to the effect that the Court, in rendering the CR Decision, overlooked evidence.

He first argues that the CR Decision overlooked evidence of "neurological and auto-immune disorders that place him at grave risk of bodily harm and death." Reconsideration Mtn. at 1–4. That is wrong. In that decision, the Court acknowledged Teman's multiple health issues, which the Court took pains not to minimize. CR Decision at 12. The Court reviewed the symptoms identified in Teman's motion for reconsideration, including "a sore throat, dizziness, congestion, . . . GI issues," "sleep disorders, acute sinusitis, . . . fainting spells, . . . dietary issues," "fever, . . . nausea, . . . headaches, tremors, . . . and nasal drip." *Id.* at 4, 12–13. Teman has not pointed to any medical condition discussed in either his initial anticipatory *pro se* motion for compassionate release, or in his counseled filings in support of that motion, that the Court did not reference in the CR Decision.

To be sure, the Court did not adopt Teman's parlous characterization of his health. But that was because the Court placed weight on the BOP's extensive medical records as to Teman,

7

which Teman and his counsel had, strikingly, not appended to their motion or commented upon. These records supplied important context and undermined Teman's claim that his medical conditions qualified him for release.[2] As the Court explained, the records "support the BOP's determination[] that Teman's conditions are insufficiently serious to meet" the Sentencing Commission's compassionate release criteria. *Id.* at 13. In reaching this conclusion, the Court reviewed chronologically the various evaluations Teman had received—or forewent—from medical professionals at FCI Miami. *See id.* at 13–14.

Teman faults the Court in this discussion for characterizing him as having "respiratory, inflammatory, and digestive issues," *id.* at 12, but Teman's motion emphasized and so labeled those same purported conditions. *See* Initial Mtn. at 3 (stating that Teman "presents extraordinary and compelling circumstances in that he suffers from respiratory, inflammatory, and dietary issues" related to COVID-19). Teman has not explained why the Court's labeling of his conditions in that manner (as opposed to terming his conditions "neurological" or "auto-immune disorders," as he now urges) undermines its considered resolution, in the negative, of the operative question: whether Teman "is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C).

Second, Teman claims that the Court "overlooked" the conclusion reached in Dr. Alon Seifan's initial letter that "Teman's 'survival' was threatened" by his continued incarceration.

---

[2] In his motion for reconsideration, Teman declares that the BOP's records "do not reflect his 'obvious pain,' 'constant illness,' and 'medical emergencies.'" Reconsideration Mtn. at 4 n.1. The Court declines to credit Teman's premise that the medical professionals at the BOP who clinically evaluated Teman systematically misreported his medical condition. And contrary to Teman's accusation, the BOP's later records do reflect Teman's subjective claims of discomfort or pain. *See, e.g.,* BOP Records at 9 (noting Teman's "complaint of 10/10 scrotal pain"), 12 (noting Teman's complaint of testicular pain which "comes and goes and sometimes [is] more excruciating than other times"), 20 (noting Teman's complaint of an "[a]llergic reaction affecting the throat").

Reconsideration Mtn. at 4. That too is wrong. The Court expressly acknowledged Dr. Seifan's letter. But, as it explained, his opinion merited limited weight, given his limited knowledge of Teman's current medical condition. CR Decision at 14 n.7 (noting that Dr. Seifan's evaluation of Teman dates to September 2023 and that Dr. Seifan "notably does not state that he has reviewed any of the BOP medical records"). Teman is entitled to disagree with that assessment, but his claim that the Court overlooked this—or other evidence—in rendering the CR Decision is without foundation.

**B.**   **Teman's New Evidence**

Teman's motion for reconsideration centers on two areas of new evidence: Dr. Seifan's letter of January 28, 2024; and submissions relating to Teman's recent testicular pain and visit on February 26, 2024 to Larkin Community Hospital. The Court has measured this evidence against the regulations of the Sentencing Commission governing when "extraordinary and compelling reasons" warrant release under § 3582(c)(1)(A). As relevant here, these require a medical condition requiring care "that is not being provided and without which" the defendant is at "risk of serious deterioration in health or death," U.S.S.G. § 1B1.13(b)(1)(C), or one that places the defendant at an "increased risk of suffering severe medical complications" due to COVID-19 that "cannot be adequately mitigated in a timely manner," *id.* § 1B1.13(b)(1)(D). This evidence, considered singly or together, falls far short of these formulations.

***Dr. Seifan's supplemental letter***: This letter does not supply a convincing basis for the Court to revisit its determination assigning his opinion limited weight. Dr. Seifan's letter states that he has now reviewed "[t]he medical record on the docket, and the records in possession of the BOP," and reiterates his opinion that Teman "is at grave, imminent risk of injury or death." Quianton Decl., Ex. 1. But that letter does not engage with the BOP's voluminous medical

9

records, now covering more than five months of medical examinations and visits. It does not explain why the risk that Dr. Seifan identifies is apparent from those records, why Teman's experience over the past five months in custody as chronicled in these records corroborates his opinion that Teman is at grave risk, or, alternatively, why the examinations reflected in these records would not be expected to reveal such a risk. As the Court explained in the CR Decision, the objective evidence—namely, the medical records—simply "do[es] not support" a finding either that Teman "requires long-term or specialized medical care that he has been unable to access in custody" or that Teman has "experienced any COVID-related (or respiratory) issues" in custody. CR Decision at 16. In the end, the most the Court can derive from Dr. Seifan's letter is that Teman's preexisting conditions have the potential to take a significant turn for the worse in prison custody. That, however, does not distinguish Teman from the many inmates who have been denied compassionate release based on conjectural forecasts of future danger, or support that, were his condition to dramatically worsen, the BOP would lack access to medical facilities and personnel equipped to address Teman's needs. *See, e.g.*, *United States v. Geraldo*, No. 11 Cr. 1032 (PAE), 2023 WL 2584196, at *4 (S.D.N.Y. Mar. 21, 2023) (defendant's "concern[s] about the dire consequences to him from what would be a second bout of COVID-19" were "speculative" given defendant's access in prison to vaccination and medical care); *United States v. Little*, No. 20 Cr. 57 (GBD), 2023 WL 3570965, at *2 (S.D.N.Y. May 18, 2023) (defendant's concern that his "renal and gastrointestinal conditions" may worsen if he contracted COVID-19 insufficient to justify compassionate release given that such conditions were "stable" and that the BOP was "monitoring and managing" defendant's "conditions in an adequate manner"); *United States v. Binday*, No. 12 Cr. 152 (CM), 2020 WL 4017822, at *6 (S.D.N.Y. July 16, 2020) (defendant's concern that his medical conditions could "cause kidney damage" in the near future

insufficient to justify compassionate release given that such conditions were being actively "monitored" and that the BOP was "capable of providing . . . adequate medical care" if his conditions worsened).

**Teman's recent medical experiences**: Teman's recent examinations and treatment, and the supplemental medical records chronicling these which the Government has supplied, also do not establish Teman's eligibility for compassionate release. On the contrary, they reinforce that Teman is ineligible.

Teman argues that his "aggregate and worsening conditions"—specifically, his testicular pain, chronic sleep issues, and food allergies—establish that he merits release. Reconsideration Reply Br. at 8–13. The objective evidence before the Court does not support this claim, as a review of recent events reflects.

On February 27, 2024, Teman was transported to the Larkin Community Hospital to attend to his report of severe testicular pain. BOP Records at 52–76 (records from visit); *see also* Feb. 27, 2024 Order at 1 (stating "strongly held view" that Teman receive "urgent specialized medical care" outside FCI Miami). That was one of numerous medical exams Teman had that month, the rest occurring within FCI Miami, where Teman was seen by medical professionals on February 6, February 14, February 15, February 16, February 25, February 27, February 28, and February 29. *See* BOP Records at 3, 5, 9, 12, 15, 18, 20, 25, 30. Teman also apparently would have been seen on February 22 and for a second time on February 29, had he not declined care. *See id.* at 2, 17. Teman's medical evaluations concluded that his physical condition was "within normal limits"; he was often given painkillers to address discomfort. *See, e.g., id.* at 12.

Viewed in totality, these medical records support that the staff at FCI Miami are ready, willing, and able to address Teman's medical needs to the extent such may arise during the seven

and a half weeks that remain before Teman's scheduled transfer to a residential reentry center.

As Teman's recent visit to the Larkin Community Hospital further reinforces, the Court, the

Government, and the BOP stand ready to assist Teman to secure outside care in the event of a

well-founded claim to need emergency treatment outside the capabilities of medical staff at FCI

Miami.[3]

      Teman's medical records, read in full, accord with the Court's earlier determination that

his conditions are insufficiently serious to satisfy the standards for compassionate release. CR

Decision at 13–14. As to the condition that took him to Larkin Community Hospital, the

emergency room physicians there evaluated Teman based on a full battery of tests. BOP

Records at 52–76. They concluded that the results of these tests were "unremarkable," that

---

[3] Teman claims that the BOP has not complied with the Court's recommendation that FCI Miami provide him with "specialized medical care" in connection with his claim of testicular pain. That is wrong. The Court's February 27, 2024 order, although noting its lack of authority to order the BOP to temporarily release an inmate to receive medical treatment, urged the BOP in strong terms to enable Teman to be examined by an outside specialist that day. Feb. 27, 2024 Order at 1–2. The BOP did so, transporting Teman that day to a nearby medical facility to receive appropriate medical treatment, as the medical records chronicle. *See generally* Feb. 27, 2024 Records. Contrary to Teman's suggestion, the Court's order did not urge that Teman thereafter be afforded "ongoing treatment" outside FCI Miami. Reconsideration Reply Br. at 9. It would not have made sense to do so, with Teman not yet having been examined by a doctor outside FCI Miami.

Also off the mark is Teman's assertion that FCI Miami disobeyed the recommendation of a doctor at Larkin Community Hospital when it did not send him for evaluation "by a private physician for follow-up care within 5–6 days." Reconsideration Reply Br. at 10 (citing medical records from Larkin Community Hospital). The BOP's medical records reflect that Teman was given a follow-up examination by a physician at FCI Miami two days after his discharge, on February 29, 2024. They record that Teman "[a]t this time denies pain" and has the prescribed "scrotal support item." *See* BOP Medical Records at 3 (notes of Dr. Martha Chipi, M.D.). Contrary to Teman's reading, the term "private physician" as used in the Larkin Community Hospital records, although not defined, does not clearly refer to a physician outside the employ of the Government. It is at least as viably read to refer to a physician outside the hospital. In all events, given that Teman was examined by a FCI Miami doctor two days after his discharge, and disclaimed being in pain, the implication that FCI Miami lapsed in not sending him for an outside evaluation several days thereafter is, without more, unpersuasive.

Teman could safely be "discharged with [s]crotal support," and that the "[p]ain reported [by Teman was] out of proportion to the findings" from their physical examination. *Id.* at 67. These findings track the reports of the BOP's medical professionals, one of whom similarly reported on February 16, 2024 that Teman was "[c]onstantly reporting to medical for illnesses that are not evident upon exam and diagnostics." *Id.* at 19.

As the Court acknowledged in its initial opinion, there is no doubt that Teman "has found incarceration at FCI Miami arduous and unhappy." CR Decision at 12. The medical records reflect that Teman told the BOP official who escorted him to Larkin Community Hospital that "all he really wants is a [h]ome [c]onfinement." BOP Records at 9. But compassionate release requires more. Even assuming Teman has conditions that "require[] long-term or specialized medical care," there is no evidence that such care "is not being provided" by FCI Miami, or, decisively, that Teman "is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C). Similarly, even assuming Teman were "at increased risk of suffering severe medical complications or death as a result of exposure to" COVID-19, there is no evidence that "such risk cannot be adequately mitigated in a timely manner" by the staff at FCI Miami. *Id.* § 1B1.13(b)(1)(D).

The Court thus finds, again, that Teman's current demonstrated medical needs do not satisfy the Sentencing Commission's standards.[4] On this ground alone, the Court denies his bid for compassionate release.

---

[4] In arguing the contrary, Teman cites *United States v. Powell*, 468 F. Supp. 3d 398 (D.D.C. 2020) and *United States v. Campagna*, 612 F. Supp. 3d 365 (S.D.N.Y. 2020). Each is inapposite. Reconsideration Reply Br. at 7–8. Each involved a prisoner urgently seeking compassionate release in the pre-vaccine phase of the COVID-19 pandemic; each prisoner had demonstrated medical conditions, including respiratory conditions, that put him at grave risk of death from COVID-19. *See Powell*, 468 F. Supp. 3d at 403–04 (granting release for defendant with

### C.    18 U.S.C. § 3553(a) Sentencing Factors

Even where extraordinary and compelling reasons are found, the Court must also assure itself that release is consistent with the § 3553(a) factors "to the extent that they are applicable." U.S.S.G. § 1Bl.13(a) (citing 18 U.S.C. § 3582(c)(l)(A)).   In its initial decision, the Court found that, even if extraordinary and compelling reasons existed that qualified Teman for early release, his release would not be consistent with the § 3553(a) factors.  CR Decision at 18–22.  Teman makes two arguments in response.  Neither is persuasive.

First, Teman argues that his "positive contribution to the prison environment" counsels a reevaluation of the § 3553(a) factors.  Reconsideration Mtn. at 5–7; Reconsideration Reply Br. at 14.  He points to a January 26, 2024 "letter of recommendation" he received from the director of education at FCI Miami, describing educational initiatives Teman has undertaken to benefit other prisons; a 16-page compilation of introspective vignettes and essays he has authored while at FCI Miami; and a personal letter in which he apologizes for the "inappropriate and hurtful" things he has written and said during the case.  Quainton Decl., Exs. 2–4.

---

"degenerative neurological disease and other comorbidities" who had served 15 years of his 17-year sentence); *Campagna*, 612 F. Supp. 3d at 367 (granting release for defendant with "a compromised immune system" who had served 36 months of his 40-month sentence).  To the extent that Teman means to argue for his release based on risks presented by COVID-19, the availability of vaccines since early 2021, and the consequent ability of a prisoner to protect himself against extreme outcomes, has significantly reduced the force of a compassionate release application based on COVID-19.  *See United States v. Sadleir*, No. 20 Cr. 320 (PAE), 2023 WL 6497727, at *4 n.3 (S.D.N.Y. Oct. 5, 2023) (collecting cases).  In addition, both *Powell* and *Campagna* were decided before the Sentencing Commission amended the Guidelines to cover defendant-initiated petitions.  *See* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023).  A defendant relying on COVID-19 today must establish "increased risk of suffering severe medical complications" due to COVID-19 in that his correctional facility is "at imminent risk of being affected by" the pandemic and such risk "cannot be adequately mitigated in a timely manner."  U.S.S.G. § 1B1.13(b)(1)(D).  As discussed in text, even assuming Teman "is at increased risk of suffering severe medical complications or death as a result of exposure to" COVID-19, there is no evidence that "such risk cannot be adequately mitigated in a timely manner" by the staff at FCI Miami. *Id.*

Teman's assistance to other inmates at FCI Miami is undeniably laudable. But it does not disturb the Court's carefully considered judgment that a prison term of 12 months and 1 day is the minimum necessary to respect the § 3553(a) factors. As the Court summarized in the CR Decision, just punishment weighed heavily in that determination, "because Teman had schemed to defraud banks of a third of million dollars; because the scheme took time, planning, and effort, and consisted of two waves of fraudulent checks; because Teman carried out the scheme with eyes open and warned by counsel as to its illegal nature; because the scheme exposed not only the banks, but Teman's customers, who were a small co-op board and two landlords, to a meaningful loss; and because Teman's conduct towards these customers had shown 'venom, hate and zeal' and had a 'distressing' retributive quality." CR Decision at 19. That factor, and the others the Court cited in its extended assessment at sentencing, continues to demand the sentence imposed.[5] And in fashioning the sentence in light of the § 3553(a) factors, the Court already credited Teman for his philanthropic deeds and impulses. In varying far below the 30 to 37-month Guidelines range and the sentences recommended by the Government and the Probation Department, the Court emphasized Teman's demonstrated and commendable history of good works, as well as his medical challenges that the Court recognized would make prison more arduous for him. *See* Dkt. 276 ("Sent. Tr.") at 66, 82–83, 89–92. Also incompatible with the Court's assessment of the § 3553(a) factors is Teman's proposed "solution" under which, in lieu of incarceration, he would spend daytime hours until his release date tutoring inmates at FCI

---

[5] In denying release, the Court also noted Teman's failure to "accept responsibility for his offense, as reflected in his disingenuous post-sentencing bids to blame his conviction on improprieties by his customers, the banks that handled their checks, the prosecution, the Court, and various of his own counsel." CR Decision at 20. Teman seeks credit for now apologizing for "[t]he way he spoke to and about" the Government, the Court, and "some clients and others" during the pendency of this case, Quainton Decl., Ex. 4 at 1, but he revealingly has not accepted responsibility for his offense.

Miami, while living at, and commuting from and to, his Miami Beach home. To state the obvious, this arrangement would sap the remainder of Teman's assigned prison term of its intended punitive force, and thus would unsettle the balance of § 3553(a) factors that the Court found to require the sentence imposed.

Second, Teman argues that the short time remaining on his sentence counsels in favor of release now, because, he represents, "the deterrent effect of incarceration has already largely served its purpose." Reconsideration Reply Br. at 14. That representation is self-serving and that argument is a nonstarter. In fashioning the sentence, the Court already factored in its assessment of the § 3553(a) factors, including the interests in general and specific deterrence. *See* Sent. Tr. at 74–78; CR Decision at 19–20. That assessment has not changed.

The Court's assessment thus remains that the § 3553(a) factors, viewed in combination, require the sentence imposed. That supplies an independent bar to Teman's motion for compassionate release.

## CONCLUSION

For the reasons above, the Court denies Teman's motion for reconsideration. The Clerk of Court is respectfully requested to terminate the motion at Docket 417.

SO ORDERED.

Paul A. Engelmayer
PAUL A. ENGELMAYER
United States District Judge

Dated: March 22, 2024
New York, New York

16