**Eden P. Quainton**

**Quainton Law, PLLC**

2 Park Ave., 20ᵗʰ Fl.
New York, NY 10016

245 Nassau St.
Princeton, NJ 08540

---

Telephone (212) 419-0575, (609) 356-0526
Cell: (202) 360-6296
Eden.quainton@quaintonlaw.net

April 29, 2024

**VIA ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

Re: <u>United States v. Ari Teman, 19-cr-0696 (PAE) –
Response to Opposition to Motion for Release to Home Detention</u>

Dear Judge Englemayer,

I represent the Defendant, Ari Teman (the "Defendant" or "Mr. Teman") in the above-referenced matter.

I write to respond briefly to the opposition filed by the Government, Dkt. 446 (the "Opp."), to the motion for immediate release to home detention filed on behalf of Mr. Teman on April 19, 2024, Dkt. 444 (the "Mot.").

Although the Government attacks Mr. Teman's credibility on numerous points, it engages in misleading selective disclosure in its Opp. Most importantly, the Government does not address the various communications it received from counsel and Mr. Teman's parents. *See* Ex. B and Ex. D hereto.[1] In these communications, counsel for Mr. Teman and Mr. Teman's

---

[1] The Government is also misleading in its account of Mr. Teman's dietary issues. Mr. Teman's medical records record that he had an allergic reaction to a wheat-containing meal on February 14, 2024, when Mr. Teman's red throat and inflammation were documented. *See* Dkt. 446-1 at 47 (pharynx: inflammation, erythema). Mr. Teman's symptoms were considered serious enough that he was injected with 50 mg of diphenhydramine (used in injected form to treat severe allergies) and 40 mg of methylprednisolone (a steroid). Mr. Teman's lactose intolerance has not been disputed. To the extent any medical records from outside facilities are unavailable, Mr. Teman should not be penalized. In fact, the absence of outside records can be a factor weighing in favor of compassionate release. *See United States v. Smith*, No. CR 9-187, 2020 WL 4047485, at *5 (W.D. Pa. July 20, 2020) (lack of medical records to establish severity of condition supported finding of extraordinary and compelling circumstances).

parents notified the Government and the Court that on the night of April 22, 2023, Mr. Teman had suffered a fall and had lost consciousness. As counsel wrote to Mr. Gutwillig:

> Sorry to intrude on you tonight, but an alarming incident occurred last night that I feel I must bring to your attention. At approximately 11:00 p.m. last night, during "stand-up count," Mr. Teman suddenly fainted and fell to the floor. He apparently lost consciousness for 2-3 minutes and was trembling as the lieutenants on duty checked on him. Although he was woozy when he came too, Mr. Teman remembers ***one of the lieutenants asking Mr. Teman's cellmate whether Ari took drugs, the answer to which was no***. Either that lieutenant or another said that there were no medical personnel on duty. Mr. Teman's Id was taken and then returned at approximately 5:30 a.m. ***He did not receive any medical care or attention at any time last night***. I understand he did not see a doctor all day. At approximately 4:30 p.m. he was directed to report to the departure area for a trip to Jackson hospital. However, the officers on duty insisted on shackling Mr. Teman with the "black box" chains that are referenced in my motion to the Court of last Friday and Mr. Teman remains concerned that transportation with these chains could cause severe damage to his spine. ***However, the main, and truly, alarming issue is that there do not appear to be any medical personnel on staff at FCO Miami from 11:00 p.m. to 6:00 a.m.***

See Ex. B at 1 (emphasis added).[2]

Mr. Gutwillig responded that he had forwarded the information that I had brought to his attention for FCI Miami "so that they can address any issues and, if necessary, take further action." Ex C. Mr. Gutwillig did not respond further to my email and the only reference to this incident in the Opp. was the summary thereof prepared by RN Miles. Notably, Mr. Gutwillig does not deny, and does not present any FCI Miami denial of, the absence of night medical staff at the facility, which Mr. Teman had noted on two prior occasions and was confirmed by FCI staff. See Ex. B; Opp. 2 and Note 2. Rather, the Government states that Mr. Teman was evaluated the following morning, ***nearly 9 hours after the fall***. It appears that because Mr. Teman's cellmate indicated that Mr. Teman does not do drugs, no emergency call was made during the night. *Id.* Had an emergency call been made, the Government would have been sure to note this fact, but the Government studiously avoids making any such assertion, indicating only that Mr. Teman was seen the following morning. Mr. Teman's emergency medical needs were thus left to the evaluation of non-medical personnel apparently focused on drug-related emergencies, perhaps explained by what appears to be a crisis of drug use at FCI Miami. See https://www.justice.gov/usao-sdfl/pr/inmate-fci-miami-pleads-guilty-possession-intent-distribute-cocaine-inside-federal. The severity of the risk to a non-drug using inmate with a documented history of neurological issues that pose a risk of severe injury or death, *see* Dkt. 418-1, cannot be overstated and, of itself, constitutes extraordinary and compelling circumstances warranting immediate release to home detention. *See United States v. Oquendo*, No. 13 CR. 357-1 (KPF), 2023 WL 199609, at *5 (S.D.N.Y. Jan. 17, 2023) (inability on the part

---

[2] Mr. Teman's parents recounted the same facts in their letter to the Court, dated April 24, 2024. *See* Ex. D.

of BOP staff to care for inmate credited by Court in granting sentence reduction). In addition, the Government filed Mr. Teman's medical records under seal, but then cited from these records on the public docket for the self-serving assertion that Mr. Teman is a "poor historian" because he does not remember the circumstances surrounding his loss of consciousness. *See* Opp. at 2. This is almost Kafkaesque. It is common for a person suffering a sudden loss of consciousness not to remember the loss of consciousness. *See, e.g.*, https://academic.oup.com/europace/article/13/7/1040/446773 (amnesia for loss of consciousness is common in vasovagal syncope). *See also* Dkt. 418-1 (highlighting severe risks of syncope for Mr. Teman).[3]

Rather than addressing the failure of the facility to evaluate or cause the evaluation of Mr. Teman in real time, the Government and the facility focus on Mr. Teman's unwillingness to consent to the use of "martin" or "black box" chains. Opp. at 2. The Government dismisses Mr. Teman's reasonable fears and asserts that "BOP policy ***requires*** the use of such restraints." *Id.* (emphasis added). But this statement of policy cuts against the Government. Mr. Teman's spine care specialist, Dr. Brusavonik, has highlighted the risks the use of "martin" or "black box" chains for Mr. Teman, advising unambiguously against the use of such chains for Mr. Teman:

> Respectfully, ***Mr. Teman is correct to avoid such chains and transport as these constraints can cause added injury and persistent suffering*** to his already documented degenerative disc disease, lumbar and testicular pains. These constraints place strain on the spine and neck, immobilize the hands, and precludes adjustments ***such that it increases stresses, counters physical therapies, and causes more injury***.

*See* Ex. A (emphasis added).

Because BOP policy at FCI Miami (Low) is both affirmatively harmful and apparently inflexible, Mr. Teman ***cannot*** safely be treated under his current conditions of confinement, which are themselves far harsher than the originally contemplated placement in the satellite camp. This is precisely the type of situation in which courts grant compassionate release. *See United States v. Reyes*, No. 19-CR-66-LTS, 2021 WL 22717, at *2 (S.D.N.Y. Jan. 4, 2021) (unavailability of mental health and drug abuse treatment constituted extraordinary and compelling circumstance warranting compassionate release); *United States v. Hatcher*, No. 18-CR-454-10 (KPF), 2021 WL 1535310 at *4, 2021 U.S. Dist. LEXIS 74760 at *12 (S.D.N.Y. Apr. 19, 2021) (same). *See also United States v. Atwi*, 455 F. Supp. 3d 426, 431 (E.D. Mich. 2020) (uncertainty surrounding availability of treatment to prevent latent tuberculosis from

---

[3] The Government also appears to cast doubt on the assertion in the Mot that Mr. Teman had been approved for camp transfer subject to receipt of the necessary signatures from representatives of FCI Miami and BOP regional and central offices. Mot. at 3; Opp at 3. The Mot. represented what counsel understood in circumstances in which communication with Mr. Teman have been difficult, namely that Mr. Teman's unit manager had approved Mr. Teman for a camp transfer and Mr. Teman's case manager had prepared a Form 409 and submitted it up the chain for further processing. Quainton Decl. ¶¶ 6, 7. The Mot. did not represent that all necessary approvals had been obtained and, indeed, stressed any transfer would require numerous additional signatures. Mot. at 3. To the extent the drafting of Mr. Teman's letter suggested that Mr. Teman had received all necessary approvals for the transfer, any drafting infelicity is the responsibility of counsel alone and should not reflect negatively on Mr. Teman.

3

developing into active tuberculosis, combined with short time remaining on sentence and lack of danger presented by inmate warranted compassionate release to home confinement); *United States v. Herring*, No. 614CR00008GFVTCJS, 2020 WL 6886256, at *6 (E.D. Ky. Nov. 24, 2020) (untreated high blood pressure factor contributing consideration in grant of compassionate release); *United States v. Gorai*, 2020 WL 1975372 (D. Nev. Apr. 24, 2020) (granting compassionate release where asthmatic inmate was not able to receive breathing treatment despite request); *United States v. Tran*, 2020 WL 1820520 at * 1 (C.D. Cal. Apr. 10, 2020) (defendant had not been receiving inhaler from BOP and was "in dire need of his medication"). Mr. Teman is a first-time, non-violent, zero-point offender who does not pose a danger to the community or any flight risk, as your Honor has held on multiple occasions. Dkt. 425 ("the Court's assessment is that Teman is not a risk of flight or danger to the community"); Dkt 259 ("by common consent [Mr. Teman] does not present a danger to the community"); Dkt. 297 (endorsing Mr. Teman's request to travel to Australia for three-week comedy festival). Moreover, given that Mr. Teman suffers from multiple conditions that require outside hospital care he cannot currently receive without risk of suffering further injury, it is evident he cannot provide self-care in the prison environment, a further factor supporting compassionate release. *See, e.g.*, *United States v. Colvin*, 451 F. Supp. 3d 237, 241 (D. Conn. 2020); *United States v. Yellin*, No. 3:15-CR-3181-BTM-1, 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020). Finally, Mr. Teman is scheduled to be released to a residential reentry center in mid-May, where it is contemplated he will remain until the end of June. Dkt. 426 at 4. The short time remaining on Mr. Teman's sentence also supports compassionate release to home confinement now. *United States v. Barajas*, No. 18-CR-736-04 (NSR), 2020 WL 3976991, at *12 (S.D.N.Y. July 13, 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 606 (E.D.N.Y. 2020).

In light of all the above factors – the absence of night medical staff to address dangerous, non-drug related syncopes, Mr. Teman's urgent need for treatment he cannot receive as a result of BOP policy relating to "martin" or "black box" shackling, the absence of any danger to the community or any risk of flight posed by early release, Mr. Teman's inability to provide self-care, and the short time remaining until the conclusion of Mr. Teman's sentence – extraordinary and compelling circumstances warrant Mr. Teman's immediate release to home confinement for the remainder of his sentence.

Accordingly, Defendant respectfully requests that the Court order the BOP to release Mr. Teman immediately to home detention for the remainder of his sentence.

Respectfully submitted,

*Eden Quainton*

Eden P. Quainton

cc: All counsel of record (via ECF)