UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:19-cr-00696-PAE-1

-----------------------------------------------X
ARI TEMAN,                                    :
                                              :
                    Petitioner,               :
                                              :
v.                                            :
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
                    Respondent.               :
_____X

## MEMORANDUM IN SUPPORT OF DEFENDANT ARI TEMAN'S MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENT AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

Defendant Ari Teman (or "Teman") is entitled to an acquittal pursuant to 18 U.S.C. § 2255 because he received ineffective assistance of counsel and in the alternative a new trial. In note, Teman is filing a corresponding letter/motion to rely on the Appendices that were filed in his direct appeal, which are being uploaded to this docket and will be cited to herein.

## BACKGROUND

In pages 6-7 of its Opinion dated June 8, 2023, the United States

Second Circuit, stated in relevant part:

Teman next argues that his trial attorneys were ineffective because they called as a defense witness Teman's and GateGuard's corporate counsel, Ariel Reinitz, opening the door to damaging text messages between Teman and Reinitz. This claim is premature. "[I]n most cases

a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance" because the trial record "in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis." *Massaro v. United States*, 538 U.S. 500, 504 (2003). That is true here, since the record is not sufficiently developed to allow for appellate review. In the district court, the claim was raised only orally, at a post-sentencing hearing. Teman's trial counsel thus did not have a chance to explain the strategy behind the decision to call Reinitz, and a court facing an ineffective assistance claim "should, except in highly unusual circumstances, offer the assertedly Case 21-1920, Document 150-1, 06/08/2023, 3526449, Page6 of 9 7 ineffective attorney an opportunity to be heard and to present evidence." *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998). Teman may present this claim in a § 2255 motion.

## I.        FACTS

Teman is the founder of JCorps and GateGuard, Inc. (or "GateGuard").  JCorps is a seven-city international volunteer organization that has led thousands of young Jewish adults to volunteer in children's hospitals, senior centers, soup kitchens, animal shelters, parks, and more.  A-2319[1]. GateGuard, for its part, is a "cutting edge" technology company that provides intercom devices for multi-tenant properties and related services to both the tenants that live in those apartment buildings and the landlords and owners of the properties. A-716:24; A-870:8-11.  The GateGuard system includes a face-recognition entry panel, an intercom, and an artificial intelligence "virtual doorman" + camera system.  A-1856.

---

[1] Teman is contemporaneously filing a Motion for Leave to Rely on Appendix.  References to the Appendix shall be referred to as "A", followed by the pertinent page number.

The GateGuard intercom is connected to a website panel that enables visual tracking of entrances into a customer's building, permitting the customer to see time-stamped logs and photographs of who was entering the building at a given time, thus providing value to the company far beyond a standard intercom.   A-511:2-9.  The website homepage contains a form through which the customer provides its contact information and information regarding its properties and also, as is customary for on-line businesses, contains a link to GateGuard's Terms and Conditions the customer must check to signify its agreement with the terms and place an order for desired products and services.   A-872:21-25, A-873:1-9. Teman includes a link to this web landing page, at Gateguard.xyz, on official correspondence with clients.  A-1856.  The Terms and Conditions expressly provide that the customer agrees to updates to the terms and other documents incorporated by reference without any requirement for express agreement to these updates.   A-1809.   The Terms and Conditions also contain a link to payment terms authorizing the use of "remotely created checks" – or RCC's – in the event of customer defaults or to secure payment of a device removal fee. A-1884 (Permission to Make Bank Draws and Other Account Draws).  See Id.

Teman's conviction(s) revolved around three distinct RCC narratives involving three different customers: Elie Gabay (or "Gabay"), BonnieSoonOsberger (or "Soon-Osberger") and Joseph Soleimani (or "Soleimani"). In note, Teman had hundreds of customers. (A-871) The different narratives were incoherently combined in single counts based not on any similarity in the relationships but the timing of Teman's deposit of RCC's to collect what he believed were contractually enforceable customer debts. Thus, Counts I and III involved the deposit of 27 checks on April 19, 2019 against the accounts of entities related to Gabay and Soleimani and Counts II and IV involved the deposit of two checks against the accounts of entities related to Gabay and Soon-Osberger in March 18, 2019. Thus, the Gabay relationship was included in each count.

## A. **Elie Gabay**

In 2016 or 2017, Gabay, managing director of a property management company, Coney Management ("Coney"), met Teman at a trade show. A-446:2, A-445:25, A-449:4-6. Coney manages a Manhattan property located at 518 West 204, owned by an LLC identified by the building's address, 518 West 204 LLC. A-447:16-19, A-447:25-A-448:1-3. Teman first marketed to Gabay a product called SubletSpy that helped property owners and managers detect illegal uses of their properties. A-449:11-14. Gabay then subscribed

for the GateGuard intercom system, with the idea that Coney would use GateGuard's existing intercom suite at a single location and roll out an upgraded 2.0 version out across the company's property portfolio.    A-451:21-25, A-452:1-5.

On January 19, 2018, Teman sent Gabay an email indicating that Coney would be invoiced $3,600 for the initial invoice installation, to be credited against monthly fees from the 2.0 roll-out, together with a security deposit of $849.  A-1789.  Gabay took issue with the $849 and requested a copy of the invoice, which had not been attached to the initial email.  A-1788.

Teman clarified in response that the $849 would be reflected as "0" (*i.e.*, not charged) and attached the requested invoice.  See Id.  The cover email expressly requested payment through GateGuard's website portal and the invoice reminded Coney that the order was subject to GateGuard's Terms and Conditions, a link for which was provided to the left of the amount due.  A-1790.  The Terms and Conditions expressly reference GateGuard's Payment Terms, which provide for the use of RCC's to recover unpaid debts.  A-1884.

The invoice also expressly noted the limitations of the initial version of the Intercom suite and the buyer's acceptance of the online Terms and

5

Conditions.[2]  Gabay testified that he did not recall whether he clicked on the Terms and Conditions link as requested in connection with the initial invoice.  A-456:17-18.  On January 28, 2018, Michael Haas ("Haas"), one of the other owners of the 518 W. 204 LLC, paid in full the $3,600 invoice, which states that "Buyer accepts the Terms and Conditions at gateguard.xyz."    A-549: 19-20, A-1725, A-1790, A-1790.2.    The Government did not obtain Haas' testimony at trial, but rather produced an affidavit in which Haas swore he was not familiar with GateGuard.  A-1727, A- 327, A-1157-58.  In addition, the introductory paragraph to Section 5 of the Terms and Conditions contained the link to specific payment terms, including the use of RCC's, to which neither Gabay nor Haas objected, and immediately below Section 5 of the Terms and Conditions, which Gabay had requested the addition of the word "reasonably."  A-1801.

The Version 1.0 of the Gateguard Intercom encountered connection problems.  A-471:11-16.  Gabay relayed his concerns to Teman over the

---

[2] The invoice contained, on the bottom left, opposite the price, the following language:

We are installing Version 1.0 ahead of 2.0 being available (~90 days). Client understands 1.0 device does not have 4G, IR, battery, etc.
 https://gateguard.xyz.

**Terms**
Buyer accepts terms & conditions at https://gateguard.xyz.  A-1790.

next six weeks and many of the problems were resolved.   A-477: 2-9. Indeed, as of March 13, 2018, Coney was considering an investment into GateGuard.  A-1795. On this date, Teman emailed Gabay and stated he was providing a template for an order of twenty intercom panels, a proposed convertible note for a $40,000 investment into GateGuard, and his banking details for payment of the note.  See Id.  The Government did not offer the attachments to the email into evidence and there was no questioning from the Court as to the status of the attachments.

In response, on March 25, 2018, Gabay provided comments on the GateGuard Terms and Conditions, but not on the Payment Terms.  A-1797-A1814.  Teman responded that these changes appeared "mostly workable," but explained the reasoning behind certain provisions that were important to GateGuard, including the need for a 10-year contract. A-1816.   Teman followed up with an email stating "Updated with tracking.  Most changes made as requested."  A-1822.

Gabay did not respond to Teman's explanation or updated Terms and Conditions but shared "the general feedback he was getting" that the entire GateGuard project should be placed on hold.  A-473:8-9, A-1815. Teman countered that there was an unpaid invoice relating to an intercom panel that had been installed on January 19, 2018, stating he would "place a

lien on your building on Pesach [Passover]."  A-1820 at 1. GateGuard's unpaid invoice referenced the "full price" of the installed intercom panel, installation fees, and one year of service fees. A1828.  The total amount invoiced for the initial panel, again with a reference to GateGuard's Terms and Conditions, was $18,286.  A-1828.

The Government presented the foregoing facts in a manner that made logical narrative flow extremely difficult.  The prosecution sought to elicit testimony that Gabay had not "signed" the online Terms and Conditions (which were not designed to be signed, but affirmatively assented to by a checkbox); that he believed he did not have an "agreement" about the Terms and Conditions (where assent was provided by a click-through mechanism customary in on-line contracts); that Teman had not sent him a copy of the "website" with the Payment Terms (when the link to the Payment Terms was immediately above a line on which he had commented); and that he "never saw" the device removal language in the Payment Terms and Conditions.  A-465:12-13, A-478:12-15, A-469:15-16.  However, despite the Government's leading questions, Gabay testified that he did not "recall" whether he clicked on the Payment Terms. A-469:2-5.

For the remainder of 2018, relations between Teman and Coney deteriorated. A-493:14. Teman repeatedly warned customers, including Coney, that if they removed the GateGuard device, they would be subject to a device removal fee, which even the Government conceded. A-497:13-18, A-865:4-5.

On March 28, 2019 Teman deposited a check for $18,000 drawn on Coney's account at Signature Bank ("Signature") for the property in question, identified as 518 W. 205 LLC[3], A-1728, together with a separate check, A-1729, drawn on the account of 18 Mercer Equity, Inc., a different customer described below, *via* mobile deposit to his BOA account. A-335:21-24. Some days later, Gabay was contacted by Signature and asked whether he had authorized the $18,000 check deposited by Teman. A-494:12-4. Gabay responded that he had not. A-495:3-4. Haas, as noted, submitted a false affidavit stating he did not even know who GateGuard was. *See supra* at 8 and Note 2. At that point, Signature initiated a "chargeback," leaving Teman's account with a negative balance. A-345:16-22, A-347:10-11, A-348:5-9.

---

[3] The check contained a typo because the property was actually located at 518 W. 204, held by 518 W. 204 LLC. The Government made much of this typo, highlighting the check in red next to a "good" check for maximum visual effectiveness. A-1726.

According to Karen Finocchiaro, a BOA vice-president and senior fraud investigator ("Finocchiaro"), the Internet Protocol (or IP) address associated with a mobile device corresponding to Teman's deposit, 74.203.64.198, was linked to a physical address in New York, New York. A-338:11-16, 20-21, A-339:7-12. However, no expert testimony was provided connecting this IP address to the physical location of Teman's phone and publicly available information shows that the IP address was monitored by a company called Level 3 that exclusively monitors fixed line devices.

Approximately a month after the chargeback of the $18,000 check, Teman attempted to cash three additional checks drawn on 518 W. 205 LLC for a total amount of $33,000,5 but the account had been closed and the checks were returned uncashed. A-504:13-16. Neither Gabay, Signature nor BOA suffered any loss from the attempted deposit of the three returned checks.

### B. Bonnie Soon-Osberger

Like Gabay, Soon-Osberger met Teman at a trade show. A-556:19-24. Soon-Osberger was a member of the Board of Directors and Treasurer of a condominium cooperative corporation, 18 Mercer Equity. Inc. that owned a cooperative condominium located at 18 Mercer St. ("18 Mercer")

in Manhattan.  A-552:21-25, A-553:1-8, A-554:9-13.  Among her duties, Soon-Osberger was responsible for soliciting bids and obtaining devices for 18 Mercer.  A-554:21-23.  In October, 2017, Soon-Osberger attended a condominium trade show at which she was looking for vendors to supply a new intercom system for 18 Mercer.  A-556:21-24, A-557:1-5. GateGuard had a booth at the trade show and Soon-Osberger, attending the trade show with her husband and also the President of Mercer, was attracted to the GateGuard Intercom panel because of its "smart" features.  TR A-557:6-8, 14-16, 19-21.

According to Soon-Osberger, Teman discussed a "price point" for the GateGuard panel of $2,500.  A-558:1-2.  After the trade show, Soon-Osberger contacted Teman, indicated she was interested in the GateGuard intercom, and requested information on the product.  A-561:8-10.  Teman directed Soon-Osberger to the GateGuard website, where he told her she could sign up and order the product.  A-561:10-15.  Soon-Osberger testified that she "went through all" of GateGuard's Terms and Conditions.  A-559:5. Teman expressly told her that the contract for the GateGuard Intercom panel was created through the company's on-line Terms and Conditions.  A-561:20-24.  Soon-Osberger testified that it was likely she likely downloaded the Terms and Conditions on March 23, 2018.  A-560-561:1-5, A-1834-55,

GX-441.  However, Soon-Osberger testified that she did not click on the Payment Terms in Section 5.  A-565:1-5.

Notwithstanding the Terms and Conditions, which expressly state that the customer is simply paying for rights to use the panel and its associated intellectual property, Soon-Osberger testified that her "recollection" was that she would purchase the panel outright because Teman gave her a "price." A-562:21-25. This does not explain why Soon-Ostberger would go through and then download the entire Terms and Conditions, but not read the Payment Terms.  Soon-Osberger testified that she had previously only executed agreements with a physical signature, implying that she was unfamiliar with customary online terms and conditions.  A:563:19-24.  The Court can take judicial notice that online "clickwrap" and "browsewrap" agreements are customary.  See Meyer v. Uber Techs., Inc., 868 F.3d 66 (2d Cir. 2017).

Soon-Osberger also provided the Terms and Conditions to the other members of the 18 Mercer Board and to Stephanie Phillips, the President of 18 Mercer, who, according to Soon-Osberger "looked at" the document.  A-684:24-25, A-585:1-11.  Soon-Osberger emailed Teman with specific questions on the GateGuard Terms and Conditions. A-1860.  She did not, however, provide any comments on the Payment Terms, despite the

prominent placement of the link to the terms in Section 5 of the Terms and Conditions. In response, Teman agreed to limit price increases, but otherwise explained the reasoning behind the clauses without modifying the language. A-1859. After receiving Teman's response, Soon-Osberger stated that Teman had addressed 18 Mercer's concerns. A-1858. Appellant provided an invoice for a total of $3,947 that included a "cooperator show price" for the GateGuard intercom panel, installation and one-year's prepaid services. A-1833.

The invoice expressly stated that "Buyer accepts terms and conditions at gateguard.xyz." The Terms and Conditions notice was on the same line as the amount to be paid and clearly visible. The invoice, with its express limitation to the Terms and Conditions on GateGuard's website, was reviewed by 18 Mercer's management and, on April 4, 2018, sent to 18 Mercer's property management company, Crystal Real Estate Management, Inc. ("Crystal Management"), who paid the invoice in full. TR A-572:23-25, 573:1-7, A-1831-32, A-1838. Following payment, GateGuard installed the panel at the Mercer St. condominium. A-573:10-12.

According to Soon-Osterberger, 18 Mercer encountered difficulties with the GateGuard intercom, which Teman explained resulted from the

building's poor Internet connection. A-574:2-10. For the remainder of the year, 18 Mercer and GateGuard attempted to resolve the connectivity issues. A-574:11-22. In January 2019, 18 Mercer decided to "move on" from GateGuard. A-574:23-25. In early January, 2019, Soon-Osterberger sent an email informing Teman that 18 Mercer intended to remove the GateGuard intercom, to which Teman responded that GateGuard would enforce its rights to a removal fee. A-1866. Soon-Osberger recalled several additional emails in which Teman threatened to enforce GateGuard's rights. A-577:24-25, A-578:1.

In light of Teman's position, Soon-Osberger provided the GateGuard Terms and Conditions, referred to as the "contract," to Jacqueline Monzon ("Monzon") at Crystal Management, who in turn forwarded the contract to the entity that would replace GateGuard, Academy Intercom, Inc. ("Academy"). A-1862-A-1865. Academy reviewed the Terms and Conditions and refused to proceed with removing the intercom because of legal liability. A-1863-A1864. After receiving the contract, Crystal Management requested indemnification for itself and Academy if the removal work were to be authorized. A-1862. The Government did not produce evidence of any indemnification agreement and did not produce

evidence as to when or under what circumstances the GateGuard device was removed.

However, after GateGuard had put 18 Mercer on notice that it intended to enforce its right to an $18,000 device removal fee; after Academy had refused to effect the removal; and after Crystal Management had demanded indemnification if the device were removed, on or about January 10, 2019, 18 Mercer removed the device.  A-602:12, A-603:21.  On March 28, 2019, Teman deposited an RCC for the device removal fee in the amount of $18,000, which Soon-Osberger testified was "unauthorized."  A-578:4-11. Meanwhile, Crystal Management had terminated its management contract with 18 Mercer on or about March 15, 2019. A-612:1-3. At the end of the month, Gina Hom ("Hom"), who, together with Monzon, was one of the two authorized signatories for Crystal Management, noticed the GateGuard RCC, which she claimed not to recognize, and called Signature to place a hold on the check.  A-611:18-19, A-612:13. Hom testified she did not ask anyone on the 18 Mercer Board whether the check was authorized. A-612:22-25.

Signature then processed a "chargeback" to BOA, leaving Teman's account with a negative balance.  A-345:16-22, A-347:10-11, A-348: 5-11. The "chargeback" was combined with the chargeback for the $18,000 check

drawn on Coney's account.  A-348:6-9.  BOA honored both chargebacks, leaving Teman's BOA account overdrawn by a total of $29,036.56.  A-348:15. This negative balance was subsumed by the RCC deposits involving the last customer discussed below. As a result, neither Signature nor BOA suffered any independent loss in connection with the Soon-Osberger or Gabay checks.

### C. Joseph Soleimani

In late 2016, Soleimani, one of the owners of ABJ Properties ("ABJ"), a property management company that managed two real estate companies, ABJ Lennox, LLC ("ABJ Lennox") and ABJ Milano LLC ("ABJ Milano"), reached out to Teman to discuss his SubletSpy product.  A-624:8-14, 21-22; A-626:3-8.  Shortly after meeting Teman, ABJ subscribed for Teman's SubletSpy service. A-626: 9-12.  Soleimani then asked Teman to give him a "demo" of the GateGuard Intercom system at Soleimani's office.  A-723:6-9, 724:13-23.

At the office "demo," Soleimani had an opportunity to review not only the physical Intercom system but also GateGuard's "online interface." A-725:5.  GateGuard's only interface includes a landing page with references to its Terms and Conditions.  After the office demo, Soleimani agreed to have seven GateGuard intercoms installed at ABJ properties.  A-

726:15-20.  Soleimani testified that he "did not recall" whether he signed up for the GateGuard products and services through GateGuard's online platform.  A-726:8-13.  However, he acknowledged using the online platform, which requires acceptance of the online terms to sign in.  A-727:5-6.

After Soleimani signed up for the seven GateGuard intercoms, ABJ used the system for "quite some time," during which ABJ had continuous access to the GateGuard online interface.  A-726:21, A-727:2-6.  In March, 2017, Soleimani received invoices for the seven intercoms and related services.  A-728:2-9; A-1777-A-1784.  The invoices contemplated delivery of the intercoms for a heavily discounted up-front cost of $499,[9] an installation fee of $650, a six-month service charge of $594 and a three-year contractual commitment.  A-1777-A1784.  This is in reference to a discounted up-front initial price for a temporary device of $3,600 and a reference to a discounted up-front price of $2,500 for installation of an initial device.  The particularly heavy discounting for Soleimani must be seen in the context of the parties' negotiation of a separate, much larger, order covering 60 buildings.

As with the invoices for Gabay and Soon-Osberger, all seven invoices expressly stated that they were subject to the GateGuard online Terms and

Conditions available at https://gateguard.xyz/legal/terms/.php. However, Soleimani stated that "he did not see" the reference to the online Terms and Conditions. A-728:12.

After the system went live, there were several problems with the GateGuard system, which Teman attributed to connectivity issues, and, apparently, an unwillingness of ABJ to pay certain invoices. A-733:4-17, A-1928. In frustration, on March 9, 2018, Teman sent ABJ an email stating that in light of client's nonpayment, he "was done" and GateGuard would be "shutting down" in part because of ABJ's dangling of "fake orders" and "fake investments." A-1928-A-1929. Benjamin Soleimani, Soleimani's brother and the other owner of ABJ, responded by entreating GateGuard not to shut down and imploring GateGuard to work together with ABJ to resolve any issues they were having. A-1928, A-715:2-3. Specifically, Benjamin Soleimani pleaded with Teman to come to dinner and

discuss matters, stating: "Please don't do anything yet with the system. Let's keep it going how it was before the update. And let's discuss next week what we can do together to improve it." A-739:3-6.

For much of the rest of the year, relations between Soleimani and Teman oscillated between mutual recriminations and an attempt to patch things up and seek common ground for the installation of the GateGuard

18

2.0devices.   On the one hand, billing disputes continued to plague the parties' relationship.   On September 6, 2018, Ariel Reinitz (or "Reinitz"), Teman's corporate attorney, contacted Soleimani to obtain payment of outstanding fees.   A-1887.   In response, ABJ requested that GateGuard discontinue service.   See Id.   Reinitz responded by reminding Soleimani of the GateGuard Terms and Conditions, referenced in the initial GateGuard invoices and attached to Reinitz's email.   See Id.   However, during the Soleimani cross-examination, the defense did not have a copy of the invoice and the Court did not permit cross-examination of Soleimani on the email, which drew Soleimani's attention to the specific online terms, identified in Reinitz' email with the hyperlinks "here" and "here."   A-745:6-25.   These specific online terms expressly referenced both the Terms and Conditions and the Payment Terms that authorized the use of remotely created checks for payment of outstanding fees.

On the other hand, at the same time, ABJ was considering installing an upgraded, second generation, version of the GateGuard system across 60 Buildings in the ABJ portfolio.   A-748:14-24, A-750:12-14.   As part of its purchase, ABJ sought a general release as to fees claimed by GateGuard up to that time, which it discussed with Reinitz.   A-1889.   Soleimani also

testified that he continued to receive multiple emails from Teman during this time period, but these were not produced by the Government.  A-751:4-10.

The negative aspect of the Soleimani/Teman relationship eventually came to dominate.  In early January, 2019 Teman began discussions with Reinitz about using RCC's to recover amounts owed from ABJ.  A-1872. At that time, Reinitz discouraged Teman from using RCC's to recover debts from ABJ without warning, saying he thought this would be a "bad idea." See Id.  After an extended back and forth over several months, Reinitz concluded, "ok invoicing and then collections is fine."  A-1876.  Following this exchange with Reinitz, Teman sent ABJ an invoice for, among other things, the device removal fee for seven devices, past due fees for the seven devices under the terms of the initial invoices, an attorney collections fee, and a device reinstallation fee. A-1775. The invoice also included amounts allegedly owed for 60 devices, apparently relating to the additional intercom panels the parties had been negotiating since October 2018.10 The prosecution did not introduce any evidence of Soleimani disputing this invoice.

Two weeks later on April 19, 2019, at the BOA Lincoln Rd. Branch in Miami Beach, Florida, Teman deposited a total of 24 checks drawn on ABJ's bank, JP Morgan Chase ("JP Morgan") against amounts invoiced for

a total of $264,000.  A-1733-A-1756. Teman also deposited three additional

checks drawn on Coney's 518 W. 205 LLC account with Signature,  A-

1730, A-1731, A-1732,12 but the account had been closed and these checks

were not processed for payment.  With these three checks, the total amount

deposited on April 19, 2019 was $297,000, A 357:19-20, and the ending

balance on that date in the GateGuard account was $271,803.12.  A-358: 9-

10.

On April 16, 2019, once the seven-day hold was lifted, Teman

transferred $225,000 to GateGuard's parent company, Friend or Fraud, Inc.

A-361:4-8.  Friend or Fraud then transferred $4,500 to Teman's personal

account.  A-363:6-13.  $180,000 was transferred to an account ending in

1046, identified as the account for Touchless Labs, LLC.  A-363:18-20, A-

344:4-7.  On April 29, 2019, $125,000 was transferred back to the Friend or

Fraud account. A-363:23-25.   Two wire transfers were then made to

suppliers in China.  A-364:12-18.  On May 8, 2019, Teman withdrew $4,000

in cash from BOA at 1 Penn Plaza in Manhattan.   A-365:3-7.   The

Government did not provide testimony as to how this $4,000 related to any

of the RCC's at issue.  Teman had deposited a check for $4,096 unrelated to

the RCC's on April 19, 2022.  See GX113, A-1657.1, at 483067038085.

According to Finocchiaro, all of the $297,000 checks were subject to a chargeback.    A-367:17-20.  However, this was not quite correct. Finnocchiaro separately testified that only the ABJ (Soleimani) checks totaling $264,000 were subject to a chargeback. A-368:3-4.  Gabay's 514 W 208 LLC account had been closed and the checks could not be credited to this account.    The testimony was exceedingly confusing because Finnochiario testified that the $264,000 chargebacks covered all 27 checks (with a total value of $297,000), which only works arithmetically if the three Gabay/West 205 checks totally $33,000 were not subject to a chargeback. Teman's GateGuard account was then closed, with a negative balance of $260,319.81.    A-368:18.    The Friend or Fraud account, which had a positive balance of $8,386, and the Touchless account, which had a positive balance of $86,558.18, were also closed.    A-370:4-19.    An additional account with a positive balance of $13,447.37 was not discussed at trial but was disclosed on the eve of sentencing, when it appeared that, instead of using these funds, which were available for offset to reduce the amount of its loss, BOA returned the funds to Teman in February 2021.  A-2261.  The Friend or Fraud and Touchless balances were sent to Teman who returned them to BOA.  A371:20-21.  Once returned to BOA, the positive balances were sent to a BOA "hold harmless" account.    A-370:22-25.

Finocchario then testified that BOA was unable to offset the Friend or Fraud and Touchless positive balances against the GateGuard negative balances because the corporate entities all had different tax identification numbers. A-372:21-25, A-373:1-4. The Government did not provide any correspondence between BOA and Teman relating to the various positive balances.

Ultimately, because only BOA suffered any losses in connection with the three customer relationships involved in the Government's prosecution of Teman, *USA v. Teman* resolves into *Bank of America v. Teman*, a case that should have been brought in a civil proceeding based on the application of Meyer, 868 F.3d at 66.

### D. **Judge Engelmeyer's comments to Teman's trial counsel**

Judge Engemeyer and Teman's defense counsel engaged in the following discourse, in relevant part:

JUDGE ENGELMEYER:    All right. Well, let's get me all the evidence on that.

Are you preparing to – you haven't given prior notice of an advice of counsel defense. I take it you're not proposing to open on that.

MR. GELFAND[4]: Your Honor, to be clear, there is no notice requirement as a matter of constitutional law.

JUDGE ENGELMEYER:      But you didn't even include it in your requests to charge; in other words, you misled me.  The point is, you know, requests to charge are supposed to anticipate the issues that might come up.  You've been sitting on this as a possibility.

How the Government missed this issue and didn't raise it with me before is beyond me.  But any first-year law student reading the Rule 16 disclosures can see that the case – that the defense is going to hint at an advice of counsel defense here.  Whether or not it makes it or not, I don't know.  I don't know how you didn't disclose that.  It looks as if you're hiding the ball.

MR. GELFAND:  Your Honor, we're not hiding the ball per se…

THE COURT:      I agree with you.  I'm troubled by what looks to be this strategic excision of it from your requests to charge here.  It looks as if you were trying to avoid a motion in limine being raised by not including it in your requests to charge…

MR. GELFRAND:      Your Honor, I appreciate what the Court is saying.

---

[4] One of Teman's defense counsel.

JUDGE ENGELMEYER:      It's a sharp practice. You're not from the Southern District of Florida.  You're not from the Southern District of New York.  I can tell you in the Southern District of New York a lawyer who leaves out something like that that they are considering would be regarded as significantly below the standards of ethics that we anticipate from lawyers here.  I'm going to be blunt with you.  That's not good.

(A-175-77)

JUDGE ENGELMEYER:      …I mean, you know, you've got to elevate your game here.  That's sleazy.

(A-179)

## II.  <u>PROCEDURAL HISTORY</u>

On June 20, 2019, Magistrate Judge Sarah Netburn issued an arrest warrant based on a complaint charging bank fraud.  <u>See</u> <u>United States v. Teman</u>, Case No. 19-MAG-5858.  A-46.2.  On July 3, 2019, Teman was arrested pursuant to the warrant.  <u>See</u> <u>United States v. Teman</u>, Case No. 1:19-mj-03082-JJO-1 (S.D. FL).

On September 26, 2019, a grand jury returned a one-count indictment for bank fraud.  A-49-A-52.  On November 12, 2019, a grand jury returned a superseding indictment against Teman charging two counts of bank fraud

and two counts of aggravated identity theft.  A-96.1.  Count 1 of the superseding indictment was dismissed by the trial court on December 20, 2019.  A-97-A-120.  On January 3, 2020, the Government filed a six-count superseding indictment charging two counts of bank fraud, two counts of wire fraud, and two counts of aggravated identity theft.  A-121-A-128.  On January 10, 2020, the district court held a pre-trial hearing where various motions *in limine* were addressed.  A-137.1-137.95.

On January 14, 2020, the Government informed the trial court that it would not pursue counts 5 and 6 at trial.  A-136.96.  Following a five-day trial, on January 29, 2020 Teman was convicted on all counts.  A-1298.1-1298.2.  The district court granted Teman bail pending appeal.  A-1287-1294.

On February 26, 2020, Teman moved for an acquittal or, in the alternative, a new trial under Rule 29 and Rule 33.  A-1437-1472.  While the motion was pending, Teman filed a motion for a new trial on the basis of undisclosed *Brady* and *Jencks Act* material.  A-1473-1497.

On June 5, 2020, the district court entered an order denying all of Appellant's posttrial motions and setting the case for sentencing.  A-1937-2043. Sentencing was deferred on multiple occasions.  A-2044, A-2107-2108, A-2111-2112.  On April 28, 2021, Teman then filed a Motion to

Dismiss and a Motion for Vacatur and Bail Pending Appeal.  A-2196-A-2222.

On May 12, 2021, Teman filed the Declaration of Richard M. Fraher (the "Fraher Dec'l").  A-2226-2235.  Fraher opined that, contrary to Finnocchiaro's sworn testimony at trial, BOA had remedies that would enable it to reach the funds in Teman's personal, Friend or Fraud, or Touchless accounts.  A-2232. Teman also moved for Judge Englemayer's recusal.  DE230.  On July 9, 2021, the district court denied Teman's motions and set sentencing for July 28, 2021.  A-2247-2315. At sentencing, Teman was ordered to pay restitution to BOA of $259,340.32, incur a forfeiture penalty of $330,000, and serve a year and a day in prison.  A-2425-2430.

On September 15, 2023, Teman filed a motion to vacate judgment and for new trial under Rule 33.  (DE386)  Also, on September 21, 2023, Teman filed a motion for new trial under Rule 33 to vacate his convictions based on newly discovered evidence.  (DE388)

On January 25, 2024, the district court entered an order denying Teman's Rule 33 motions at (DE303, DE386 and DE388).  (DE415)  On February 7, 2024, Teman filed a notice of appeal of the denial of his Rule 33 motions.  (DE416)

## ARGUMENT

Teman respectfully adopts and incorporates each argument herein.

**I.     Teman is Entitled to a New Trial Because He Was Denied Effective Assistance of Counsel and There is a Reasonable Probability That, But for Ineffective Assistance, Teman Would Not Have Been Convicted of All Counts at Trial.**

The Sixth Amendment of the U.S. Constitution guarantees defendants the right to effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668 (1984).  The laws of the United States also confer upon a defendant the right to receive "adequate representation."  See 18 U.S.C. § 3006A(a).  Not only were the convictions obtained in violation of Teman's Sixth Amendment rights, but also, contrary to the laws of the United States. Strickland sets out the test for a claim of ineffective assistance of counsel, requiring that a petitioner show "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant a fair trial."  See Id. at 669.  "[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."  See Massaro v. United States, 538 U.S. 500, 504 (2003).

An attorney's performance is judged against "that of reasonably effective assistance."  See Strickland, at 669.  Prejudice is determined by a showing "that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome."  See Id., at 669.  Here, Teman received ineffective assistance of counsel.  The errors fell below a reasonable standard of effective representation and there is a reasonable probability that, but for these errors, the result at trial would have been different.  For these reasons, Teman is entitled to a new trial.

## I.    Teman's Trial Counsel Failed to Act Reasonably When They Called Reinitz As a Defense Witness.

Trial's counsel decision to call Ariel Reinitz (or "Reinitz") as a defense witness was catastrophic and virtually guaranteed a conviction in a case where the jury could easily have voted to acquit.  Reinitz was the only defense witness.  In note, Judge Engelmeyer had indicated in relevant part "[i]f you eliminate the counsel testimony and the defense case, in effect, from the trial, there is nothing left there.'  (A-2448)  However, this memorandum shows that there was a lot more left than what defense counsel utilized and the defense counsel were ineffective for not utilizing the evidence that is outlined in this memorandum and which prejudiced Teman's defense.

By calling Reinitz, which decision was apparently made at the last moment and as seen by the Court chastising defense counsel for the surprise

announcement, counsel waived attorney-client privilege with respect to Teman's oral and written communications at issue, including the text messages discussed below. Also, the calling of Reinitz opened up a flurry of discovery documents being furnished to the Government, which opened doors and a pandora's box for the defense that the Government used to convict Teman. (A-144-48, A-173-89) The Government used the Reintiz documents out of context and ignored, which the defense counsel failed to clarify, that the advice was strictly not to draft out of the blue, and that Teman and Reinitz spent three (3) months after that comment in notifying the clients and attempting to collect the amount owed.

For example, at the beginning of the jury trial, Judge Engelmayer told defense counsel they were acting below the standards of Ethics advice of counsel charge to him and indicated that is 'sleazy'. (A-177) Further, at the beginning of jury trial, Judge Engelmayer informed the Government to serve the defense with subpoenas that day and indicated that the attorney-client privilege is waived. (A-182-85) Judge Engelmayer even indicated that the defense appears to be representing that a lawyer told Teman on the full presentation of the facts that he had the legal right to do what he did. (A-189, A-218-21) Teman's defense counsel even informed Judge Engelmayer that Reinitz was known by Teman to have knowledge of all the material

facts and gave Teman an unambiguous green light to engage in the conduct that the Government claims is unlawful.  (A-219-221)

On direct examination, Reinitz testified that he had expressly advised Teman orally that his use of RCC's to collect payments due from Coney, 18 Mercer and ABJ was legal.  (A-1058)  On April 2, Reinitz wrote that "hitting" ABJ's account "out of the blue" would create "50/50" risk ABJ would "call the cops."[5]  (A-1876; GX728)  Reinitz warned Teman in a text message, "you will be arrested."  (A-1872, GX702)  Further, Reinitz informed Teman "[i]f you are hitting their accounts out of the blue, I expect this will be a criminal matter sooner or later".  (A-1874, GX704)  As noted above, Teman in fact invoiced ABJ for amounts due well in advance of  his deposit of the RCC's.

Any reasonably competent attorney would have known that Reinitz' text messages – none of which would have been available to the Government but for counsel's decision to advance the advice of counsel defense and which were not necessary to establish Teman's good faith – would deal a death blow to the defense.  The text messages placed Reinitz'

---

[5] A text message from Reinitz to Teman states: "I've already told you I think it's a bad idea.  You've been back and forth with abj several times now.  Your 'threats' carry little weight at this point and they have indicated they don't believe they owe you $.  If you hit their accounts I think 50/50 they call cops.  If I was advising them that's probably what I would tell them to do. See Government Exhibit 728, A-1433.

explosive and unforgettable language front and center of an otherwise weak prosecution case, in which the Government did not present any evidence of contract terms that would have prohibited the use of RCC's to collect customer debts and key witnesses did not know or could not recall whether they had reviewed payment terms authorizing the use of RCC's of which they were on at the very least constructive notice.

Calling Reinitz completely undermined Teman's defense. Whatever arguments Teman had intended to make were destroyed by Reinitiz' text messages, in an inevitable cross-examination slaughter. The prosecution had to do no more than put up on the screen for the jury the simple exchanges between Teman and Reinitz – language that stood in stark contrast to the Government's confusing and in spots incomprehensible case, such as its use of the BOA account spreadsheet – and get Reinitz to confirm the words he used.

> MR. BHATIA (prosecutor): I would like to go back to the Elmo device.
>
> Q. This is Government Exhibit 704 up here.
>
> You wrote that: "If you are hitting their accounts
>
> Out of the blue, ***I expect this will become a criminal matter*** sooner or later."[6] That's what you told Mr. Teman, right?

---

[6] A text message from Reinitz to Teman states: "Understood. I don't know all the ins and outs of this but sounds like a bad idea. I suggest you provide

A. That's what I wrote, yes.

(A-963, A-1875, GX727)

Then:

MR. BHATTIA: He's referencing a contract when he's talking to you?

A: Yes.

Q: Any you say, a few lines down, *because they are likely to call the police*.

Q: Those are your words, right?

A: Yup.

Q: You told him you thought customers were likely to call the police?

A: Yes.

Q: *And you said: And you will be arrested*. Right?

A: Mm-hmm. Yes.

(A-1032:13-24; A-1872)

    The case was effectively over.  Teman was relying on someone who told him he would likely be arrested and face criminal charges.  A first-year law student could have seen that the defense would not be able to overcome

---

them with advanced, explicit notification of the charge, amount[n]t, and specific basis in the agreement for doing so.  If you are hitting their accounts out of the blue, I expect this will become a criminal mater sooner or later[.]" <u>See</u> Government Exhibit 704, A-1432.

the toxic effect of the text messages. It is hard to imagine how counsel could have called Reinitz without recognizing that the jury would view the texts as proof-positive of criminal intent. Reinitz's testimony largely relied on oral advice he stated he had given Teman and there was no clear written legal opinion the defense could walk through Reinitz. To the contrary, disaster was inevitable, as the documents sounded a shrill alarm that the police would likely come and arrest Teman for depositing the RCC's. Counsel could have done no worse had he introduced his client's confessional.

Even during closing argument, the Government focused on Reinitz, as follows:

> Now let's talk about the advice of counsel. The defendant may also argue that he didn't have the necessary criminal intent because he consulted with a lawyer and he relied in good faith on the advice of that lawyer. Now, Judge Engelmayer will instruct you on the law and the elements of the so-called advice of counsel defense.

> Here, the defendant's advice of counsel defense fails for three reasons: First, he did not seek his attorney's advice in good faith; second, he did not present all the facts to his attorney; and three, he did not follow his attorney's advice before he took action. So, he didn't seek the advice in good faith; he didn't present all the facts to his attorney; and he didn't follow his attorney's advice before he took action.

> Now, Mr. Reinitz – that was the attorney who testified – got up on the stand and told you supposedly that Mr. Teman – Mr. Reinitz told Mr. Teman that he had authorization to issue the checks. But you've also seen the chats. You have seen the WhatsApp chats where

Mr. Teman and Mr. Reinitz are actually talking about the device, where Mr. Reinitz is really telling him what is going on, where he really tells him whether  this is a good idea.  We introduced those chats on cross-examination.  They undermine everything Mr. Reinitz told you, and there is not a shred of evidence to support the story.

Let's take a look.  So this is a chat exchange that took place on January 2, 2019.  Mr. Teman told Mr. Reinitz, "I have ABJ checks (photos).  Our contract allows me to draw their account.  I should just deposit checks for them" – and this is Mr. Teman's words – "(totally legal I think)."

[W]hat does Mr. Reinitz say?  Not what he said on the stand, not that this is OK, not that this is authorized.  He says "No."  Mr. Teman says question mark.  Mr. Reinitz responds "Bad idea."  Bad Idea.  You remember he keeps using the same phrase over and over, it's a bad idea.

When Mr. Teman was going to deposit the checks from his customers without telling them, Mr. Reinitz again told him, no, bad idea.

So, what do these chats show?  What's the punch line?  Contrary to what Mr. Reinitz and defense counsel want you to believe, a lawyer never sanctioned Mr. Teman's plans.  A lawyer never said it was legal and didn't say it was a good idea; he said bad idea; he said no.

When Mr. Teman tells Mr. Reinitz that the customers entered into a contract, he said that the contract allows him to draw from their accounts.  And Mr. Teman says on the stand that he is [] breaking any law – I'm sorry – Mr. Teman says in the chats he is not breaking any law.  And how did Mr. Reinitz respond?  He said "Because they're likely to call the police and you will be arrested.  And you have a criminal case to deal with.  And then you can start explaining about your contract and not breaking any laws."

So here is the chat.  You can see Mr. Teman asking Ryan. "why?  They entered into a contract allowing us to draw from their accounts.  So we're not breaking any law."  What does his attorney

say when he asked him about this?  "Because they are likely to call police and you will be arrested and have a criminal case to deal with. And then you can start explaining about your contact and 'not breaking any laws'".[7]

That's the advice he got from his lawyer.  That's what his lawyer told him.  His lawyer didn't say this is OK.  His lawyer didn't say go ahead and do it.  I think Mr. Reinitz actually said that he had said you can do this from any customer accounts.  That's not what he is saying in these chats.  In these chats he is saying because they're likely to call the police and you will be arrested.

That was Mr. Reinitz's advice to Mr. Teman.  He didn't say great idea.  He didn't say it was totally lawful.  He didn't even say it's lawful.  He said you will be arrested.

Then Mr. Teman keeps pushing.  He tells the lawyer, "I don't think they will, they owe the money."  He says he will put in the memo line of the check "payment drawn per contract" and the link to his terms and conditions.

Ladies and gentlemen, the defendant kept pushing.  You will see in these chats – they are in evidence – they are in the 700 series – that Mr. Teman kept pushing.  He kept pushing and kept pushing.  He wanted his lawyer to bless this idea.  He wanted his lawyer to sanction this idea.  And of course Mr. Reinitz said no.

These chats are crystal clear.  Mr. Reinitz told him: "You asked me opinion, I have it.  Maybe you're right."  Then he said on the stand, he sarcastically said maybe they'll just throw up their hands up and say, oh, well, we tried to stiff Teman but he outsmarted us.  Too bad.  Have fun, Ari, don't spend it all in one place.  Mr. Reinitz is making fun of Mr. Teman's idea.  He's being sarcastic.  He's saying I think your customers are going to be upset, I think they're going to call the police, I think you're going to be arrested.

---

[7] See Text message from Reinitz to Teman, at Government Exhibit 702.  A-1430.

Mr. Reinitz also told him in the same conversation "My opinion is that you are greater than 50 percent likely to be arrested for the activities you propose. How you choose to proceed is up to you." That's how Mr. Teman's attorney leaves the conversation in January 2019. In January 2019 – before Mr. Teman ever deposits the check – his lawyer tells him "My opinion is that you are greater than 50 percent likely to be arrested for the activities you propose." Greater than 50 percent.[8]

So these were the communications before the March 2019 checks. The checks were then deposited – as you've now heard a million times – on March 28, 2019. Mr. Teman sought his attorney's advice, gave misleading advice, pushed back on the advice, and then ultimately did not follow what his lawyer told him to do. That's not much of an advice of counsel defense, and it fails here.

Now let's go to April 2019. This is after those initial two checks that were drawn on the 18 Mercer account and the Coney Realty account. The government also introduced into evidence those chat exchanges . They took place after those checks. Let's take a look at the first one.

In this chat, Mr. Teman had just told Mr. Renitz what happened. He told him about the two $18,000 chargebacks. How does Mr. Reinitz respond? "Not sure I follow but this sounds bad." Mr. Teman then pushes, he says, "Our contract lets me do it." Again he references a contract, by the way. Mr. Teman here is completely misrepresenting to his attorney the status of this relationship. There is no contract. You've seen it. There is no piece of paper signed buy the two parties; there are terms and conditions on the website. But Mr. Teman tells his attorney when he is seeking advice "Our contract states explicitly". And what does Mr. Reinitz say in response? "Understood. I don't know all the ins and outs of this but it sounds like a bad idea."

---

[8] A text message from Reinitz to Teman states "My opinion is that you are >50% likely to be arrested for the activities you propose. How you choose to proceed is up to you[.] See Government Exhibit 702, A-1431.

Mr. Reinitz in this chat is telling you two things: First, he wasn't consulted before these checks were filed. He doesn't know all the ins and outs. But he also tells you Mr. Reinitz didn't give him solid legal advice; he is still trying to figure out the ins and outs. And Mr. Reinitz is also telling you – and you can see this from the chat – that even after these first two checks are deposited, it sounds like a bad idea. Sounds like a bad idea.

He later told him "After hitting their accounts out of the blue, I expect this to become a criminal matter sooner or later." That's not much of an advice of counsel defense, and it fails.

Now, there are further conversations on the same day. There is a similar conversation that took place also in April 2019. Mr. Reinitz says "I've already told you I think it's a bad idea. You've been back and forth with ABJ several times now. Your threats carry little weight at this point and they have indicated they don't believe they owe you money. If you hit their accounts I think 50/50 they call cops. If I was advising them that's probably what I would tell them to do."

Ladies and gentlemen, it's more proof that Mr. Reinitz did not sanction this idea. He did not bless this idea. He didn't say it's lawful if you go out and draw checks from anyone's accounts. He say's it's a bad idea, and he says that 50/50 they're going to call the cops, and he is specifically referencing ABJ. There's Mr. Soleimani. Those are the checks he went and deposited in April 2019.

He goes on.   Mr. Reinitz says, "Honestly, I don't know anything about this stuff.   But there are serious state and fed regulations on this. You claim" – that's Mr. Teman claiming – "that your contract allows you to debit their accounts even after they explicitly protest. I'm just not sure it's that simple."

Again, Mr. Reinitz is saying I don't know anything about this stuff. That's his lawyer – after he has already deposited two fake checks and gotten chargebacks – sating I don't know anything about this stuff. That's not an advice of counsel defense, ladies and gentlemen. That's his lawyer saying I don't know anything about this. And then his lawyer says, look, maybe if I did know something, there are serious state and federal regulations on this.

Mr. Reinitz goes on "And it also may be (again… speaking out of ignorance) a clear violation of some federal backing regulation. In which case your "simple can't miss idea: is now a federal crime." That's not Mr. Reinitz saying it's OK. That's Mr. Reinitz saying, I don't know much, I'm speaking out of ignorance, but my hunch it it's a federal crime.[9]  And again Mr. Reinitz is mocking Mr. Teman's "simple can't miss idea".

Ladies and gentlemen, we talked all about these chats, so I will just tell you this: The advice of counsel defense fails absolutely. In fact, these chats with Mr. Reinitz also show you that the defendant had fraudulent intent. The defendant consulted his attorney. His attorney told him you're going to be arrested; it's a federal crime; if I was representing your customers I would tell them to call the police. That's what his attorney says. And that's after he does two of the checks and before he does 27 more checks. Ladies and gentlemen, this is fraudulent intent. This is proof that the defendant knew this was wrong, knew he didn't have permission to do it.

(A-1136-43)

Even at the sentencing hearing, the Government admitted that "the most incriminating evidence that we saw might have, in fact, come from the defense. It was the text messages at play where Mr. Teman checked with his lawyer." (A-2347)  "So what do you think about this? And his lawyer said, "Bad idea. It is a federal crime. You'll be arrested for this." (A-2347)

## A. Trial Counsel's Decisions Were Outside the Range of

---

[9] A text message from Reinitz to Teman states: "Honestly, I don't know anything about this stuff. But there are serious state and fed. Regulations on this. You claim that your contract allows you to debit their accounts even after they explicitly protest. I'm just not sure it's that simple[,]  And it also may be (again… speaking out of ignorance…) a clear violation of some federal banking regulation. I which case your 'simple can't miss idea' is now a federal crime[.]  See Government Exhibit 729, A-1434.

**Professionally Competent Assistance.**

Counsel's unjustifiable decision to call Reinitz as a defense witness, when there were stronger alternatives available as highlighted in this Memorandum, enumerated as but not limited to the GKH email, the 2016 Terms and Conditions, the missing Ms. Pecot and other witnesses, the timeline of collection efforts, the number of notifications of the terms to the customers, the redlining by Gabay, and thereby cause the introduction of harmful evidence that would otherwise been shielded from the jury is a classic form of ineffectiveness that has led courts to overturn convictions. See Wilson v. Mazzuca, 570 F.3d 490, 505 (2nd Cit. 2009)(finding counsel ineffective for calling witness that opened the door to the inevitable introduction of devastating evidence); Rickman v. Bell, 131 F.3d 1150, 1159 (6th Cir. 1997)(granting habeas where "the most damaging images of Rickman came from his own attorney," who effectively functioned as a "second prosecutor"); Swaby v. People, Case No. 06-CV-3845, 2014 U.S. Dist. LEXIS 47101 (E.D.N.Y. Mar. 31, 2014)(Counsel's "inquiry of [his own witness] cannot be seen as anything other than a significant blunder" where it opened the door to damning evidence); State v. Saunders, 958 P.2d 364, 367 (Wash. Ct. App. 1998)(Finding ineffectiveness on direct appeal where counsel elicited otherwise inadmissible and damaging testimony).

Moreover, the Court knew that Teman was suffering from a grave mental illness, which prevented a meaningful allocution as to whether Teman understood the consequences of calling Reinitz as a witness. <u>See</u> A137.2-137.4.

In sum, the trial record firmly established that "the acts . . . of trial counsel were outside the wide range of professionally competent assistance," (<u>See</u> <u>United States v. Nolan</u>, 956 F.3d 71, 79 (2d Cir. 2020)) and thus counsel here denied Teman his constitutional right to effective representation. In granting bail pending appeal, the Court necessarily found that Teman had raised a substantial question on <u>Strickland's</u> performance prong. Although the Court signaled that it might be disinclined to vacate the conviction, it recognized that "*another judge* could look at the decision to call a lawyer, knowing that those text messages would sail in, as beneath a standard of professional competence and producing error." (A-2449)

## B. Counsel's Ineffectiveness Prejudiced Teman

### 1. Reinitz' testimony was toxic evidence virtually assuring a conviction.

Given the evidence of Teman's good faith that counsel had established in cross-examining the Government's witnesses, the fundamentally commercial and civil nature of the dispute between Teman and his customers, the Government's reliance on witnesses who "could not recall" or deliberately

chose not to review payment terms that expressly authorized the RCC's at issue, and the Government's confused, meandering case that was virtually impossible to follow in key spots, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  See Nolan, 956 F.3d 71 at 79.

Until counsel called Reinitz to testify, the jury could have found reasonable doubt that Teman was guilty of fraud based on, among other things, evidence (i) Teman was transparent in his dealings with Bank of America (or "BOA"), using his regular branch and accounts; (ii) the RCC's provided sufficient information to allow both the depository and payor banks to confirm that they were authorized; (iii) Teman repeatedly directed his clients to review GateGuard's Terms and Conditions, which, in fact, they commented on and even negotiated by red-lining; (iv) Teman attempted to resolve fee disputes before he deposited the RCC's; (v) the customers had a strong incentive to deny authorization so they could claw back the funds from their banks; (vi) relatedly, one of the customers who paid a GateGuard invoice failed to appear at trial and provided a false affidavit stating he was unfamiliar with GateGuard; (vii) Teman invoiced his clients for amounts due before using RCCs; (viii) Teman repeatedly warned his customers about their liability for fees; and (ix) the Government produced no evidence that

contradicted Teman's authorization of his right to use RCC's to collect customer debts.

Reinitz's testimony gutted the defense case. As Judge Engelmayer aptly noted, Reinitz was "an extremely important witness." A-969. Not surprisingly, the Government was on-board with that characterization, and exploited Reinitz's testimony to its full advantage. In his initial summation, the prosecutor referenced Reinitz 24 times—on eight of the 34 transcript pages, hammering away at Reinitz' damaging text messages. *See, e.g.*, (A-1137-1143). To sear the Reinitz text messages into the jury's minds, the PowerPoint presentation that accompanied the summation concluded with six consecutive slides displaying Reinitz's explosive text messages blown up on the screen for dramatic effect. (A-1429-1434).

In its rebuttal summation, the Government went all-in. The Government referred to Reinitz on *every page* of the transcript and it did not mention any other witness. The Government also told the jury that Reinitz was "by far[] the least credible witness you heard from during this trial"; a witness who "got paid from the defendant's fraud scheme" and who was "essentially a member of the defense" team. Finally, the jury requested a readback of Reinitz's entire testimony (it only asked for a readback of one other witness's testimony and, as noted, it decided not to review BOA's

more complicated numbers). Evidently, it, too, viewed Reinitz's testimony as critical, if not dispositive.

Counsel's decision to call Reinitz as a defense witness transcended unsound strategy—it was inexplicably misconceived and disastrously executed. Had the defense stopped when the Government rested, the jury may well have acquitted. By calling Reinitz, however, counsel all but assured a conviction. For that reason, counsel was ineffective, and the conviction(s) should be set aside.

### 2. Teman's Trial Counsel Failed to Admit the Valid 2016 Terms, conversations and Emails and Failed to Motion for a Judgment of Acquittal Under Fed. R. Crim. P. 29 for Which the Evidence Was Insufficient to Sustain the Convictions.

Not only were Teman's trial counsel ineffective based on calling Renitz on a purported advice of counsel defense, but, in addition, Teman's trial counsel failed to admit the valid 2016 terms (See attached Exhibit 1)[10], which permitted Teman to make the deposits. Instead, Teman's trial counsel attempted to admit the 2019 terms, which Judge Engelmayer ruled inadmissible because it was dated subsequent to the underlying charges. (A-881-886). For example, Judge Engelmayer indicated "The problem is that I'm not going to permit this document. You had loads of time to prepare for

---

[10] In 2016, GateGuard was Subletspy as noted within Whatsapp chat(s) with Soleimani. GateGuard was then broken off into a separate company later. The Dispute Terms have not changed since 2016.

an advice-of-counsel defense.  Get the document in evidence that bound these customers.  They did not buy into payment terms that were revised on January 27, 2019.  This is lawyering 101."  (A-884).

Furthermore, Teman's trial counsel were also ineffective by not admitting the below emails, which are attached as Exhibit 2.  For example, Teman had sent BOA an email dated May 28, 2019, which cited specific sections of GateGuard's terms and attached invoices and supporting documents.  Also, Reinitz had notified BOA several other times in writing and via phone that the deposits were authorized and that this was a civil dispute between GateGuard and the customer(s).

Emails dated May 13, 15 and 17, 2019 to Vivica Portis, who was a unit manager for the check fraud claims at BOA indicated that the deposits were authorized pursuant to GateGuard's standard customer agreement and that GareGuard was resolving a dispute with a customer.  Then during a phone call dated May 17, 2019 between Reinitz and Cheryl P. Harrison of BOA.  Ms. Harrison indicated that deposits were reported as unauthorized by JPMorgan/Signature Bank.

Reinitz explained to Ms. Harrison that GateGuard's customers authorized the deposits per GateGuard's terms of service.  Ms. Harrison asked Teman why the deposits were not broken down into smaller amounts

and why they were not drafted as one large deposit. Reinitz informed Ms. Harrison that GateGuard's services involve multiple fees due at different times, as, each check represents a specific and distinct charge as itemized in GateGuard's terms of service.

Reinitz noted to Ms. Harrison that GateGuard's arrangement such as a payment via a check draft (deposit) when a payment is late or when a primary payment method is declined was a common practice and Ms. Harrison agreed. On May 24, 2019, Reinitz participated in a second call with Ms. Harrison. Reinitz informed Ms. Harrison that GateGuard could resolve any overdrafts. Ms. Harrison told Reinitz that BOA's attorneys needed to review GateGuard's terms and other documentation from charged customers to confirm the name(s) on the check lines (deposits) with the invoices.

Reinitz also informed Ms. Harrison that the terms were publicly available on GareGuard's website, and offered to send the terms to her via email with an explanatory note. The key dates in the communications with Ms. Harrison are set forth below:

<u>May 28, 2019</u> - email to **Harrison** re: GG terms and supporting documentation (attached).

<u>June 3, 2019</u> – follow up email to **Harrison** (attached).

<u>June 3, 2019</u> – brief call with **Harrison**. Harrison: 'legal' reviewed all documentation, will be communicating (in writing) a decision re: accounts shortly.

<u>June 10, 2019</u> – letter from **Harrison** confirming account closure (attached).

Furthermore, not only were Teman's trial Counsel ineffective for failure to admit the proper valid 2016 terms (Exhibit 1) and the above referenced emails (Exhibit 2), but, they were also ineffective for not motioning for a judgment of acquittal under Fed. R. Crim. P. 29 on the basis that the evidence was insufficient to sustain Teman's convictions. (DE111) Even if Teman's defense counsel had motioned for a judgment of acquittal based on insufficient evidence, they would still have been ineffective because their failure to admit the 2016 Terms (Exhibit 1) and the emails (Exhibit 2) would have furnished Teman with the grounds to dismiss all the charges. Alternatively, even if the Court had denied a motion for judgment of acquittal, Teman was prejudiced because the jury was not apprised of the above-referenced Exhibits 1-2, which would independently have resulted in Teman's acquittal.

> **i.**     **Teman's Trial Counsel Failed to Act Reasonably When They Failed to Admit the Correct Payment Terms and Conditions and Motion for a Judgment of Acquittal Based on the Lack of Evidence Because Teman Was Permitted to Make the Deposits Under the Contract.**

During Reinitz's direct exam, Teman's trial counsel attempted to admit payment terms dated March and April 2019 and question the witness about this.   (A-882)   However, the Government objected and Judge Engelmeyer indicated the proposed exhibit took effect in January 27, 2019 and the provision in ¶ 5 would make that applicable only in the event of an additional purchase or renewal after that date and was therefore is out of time and would not be admitted.  Judge Engelmeyer even informed Teman's trial counsel that were "at liberty to put the payment terms in that were in place at the time of purchases or renewals…"  (A-882)

Teman's trial Counsel admitted to the Court that none of the three (3) customers purchased or renewed anything after January 27, 2019.  (A-883) In note, trial Counsel were incorrect and did not ask Teman about this.  ABJ users had logged in April 2019, and they were and still are hosting their data and tenant information on GateGuard's cloud service and did not execute a termination procedure as specified in the Terms.   Judge Engelmeyer informed Teman's trial counsel "The problem is that I'm not going to permit this document.  You had loads of time to prepare for an advice-of-counsel defense.  Get the document in evidence that bound these customers.  They did not buy into payment terms that were revised on January 27, 2019.  This is lawyering 101."  (A-884)   Teman's defense trial counsel ineffectively

informed the Court "Your Honor, we don't have the original payment terms, not for lack of trying, or for lack of availability, we haven't been able to actually obtain them."  (A-885)

Teman's trial counsel not only did not need to raise the ineffective calling of Reinitz for the purpose of an ineffective advice of counsel defense, but also, Teman's trial counsel instead failed to admit the correct payment terms, which are attached as Exhibit 1.  These payment terms would clearly show that Teman was entitled to make the deposits.  In note, in 2016, GateGuard was SubletSpy and then GateGuard broke off into a separate company.  The dispute terms remained the same and had been authored by the law firm GKH who informed Teman he was authorized to draft the deposits.  Teman's trial Counsel utterly failed to show that the applicable 2016 Terms gave Teman the contractual right to take the action for which he was subsequently convicted.

For example, Teman's trial counsel did not admit an email with attachments (See Exhibit 4) from Ran Hammer, Esq., who is from the GKH law firm and who emailed Teman on May 10, 2016 as to drafts for the General Terms of Service, Payment Terms, Governing Law and Dispute Resolution Terms and Privacy Policy.  See Exhibit 4.  This all comes against the backdrop of Judge Engelmeyer indicating in relevant part in the Order

denying Teman's motion for judgment of acquittal and in the alternative, a motion for a new trial (DE111) – "…there was no evidence that these terms were even in place at the time the Customers had contracted with Teman." (DE138:38)  As shown here, Teman's defense counsel failed to admit the correct Terms and Conditions, which permitted Teman to make the deposits and which ineffective counsel prejudiced Teman.

Based on the foregoing, not only were Teman's trial counsel ineffective for not admitting the correct payment terms and the May 10, 2016 email from the GKH law firm, who worked on the contract terms that permitted Teman to make the deposits and would have shown that the terms were not 'buried'[11], Teman's trial counsel was also ineffective in failing to motion for judgment of acquittal under Fed. R. Crim. P. 29 on all the counts based on the 2016 payment terms permitting Teman to make the deposits. Further, the May 10, 2016 GKH email to Teman would have shown the jury that Teman did not bury the Terms and Conditions as alleged, but instead, the Terms and Conditions were drafted by a law firm, which eliminates the allegation of mens rea by Teman.

---

[11]Gabay was even in direct communication with the GKH lawyer, whom both he and Teman directly cc'd on Gabay's emails and red-lining of the Terms and Conditions, which further undermines the allegation that Teman was less than forthcoming with the customers.  (A-1795-1814, GX-415)

As indicated in Footnote 11, Gabay was in the dialogue not only with Teman about the Terms and Conditions dated November 2017, but also, directly with the GKH law firm that drafted them. Teman shared the contact and Gabay used it in his response. The exchange belies the idea that Teman did not inform the customers of the Terms and Conditions. Teman even opened the door to direct communication with the law firm (GKH) and Gabay used that door. That is not someone (Teman) who intended to 'bury' the Terms and Conditions.

Moreover, the first paragraph of GX 415 (A-1795-1814), which includes the link to the Payment Terms, Gabay heavily red-lines the document. This is under the heading Orders and Fees ("Pricing"). This is key for a couple of reasons. First, it disproves the accusation that the link was buried. Second, Gabay denied authorizing the checks, (A-492-93), however, but he actually had the Payment Terms link under his editor when he red-lined the same paragraph. These are the same Terms drafted by the GKH law firm and identified in the email in Footnote 11, which Teman's trial Counsel failed to utilize.

### C. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Move in Limine Under Fed. R. Evid. 403 And By Failed to Request An Instruction.

Teman adopts and incorporates the above arguments herein. Even further, Teman's trial counsel not only failed to act reasonably when they called Reinitz, but also, Teman's Counsel also committed prejudicial error when they failed to move in limine under Fed. R. Evid. 403 to seek a limiting instruction on Reinitz's testimony as to Teman being arrested and facing criminal charges if he made the deposits at issue. Fed. R. Evid. 403, states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The Advisory Committee Notes define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

Here, Teman's trial Counsel were ineffective when they failed to move to exclude Reinitz's testimony as to Teman being arrested and facing criminal charges if he made the deposits because any probative value of such evidence was substantially and obviously outweighed by the danger of unfair prejudice, confusing the issues and misleading the jury. Teman's trial counsel also failed to request an instruction to inform the jury that an arrest

is based on a much lower standard of probable cause instead of a much higher burden of beyond a reasonable doubt in order to prove the convictions.    See Sullivan v. Louisiana, 508 U.S. 275 (1993)(Sixth Amendment guarantee of trial by jury required a jury verdict beyond a reasonable doubt).

Instead, without any request to prohibit Reinitz's testimony regarding the possibility of an arrest or facing criminal charges and also by failing to request an instruction, the jury was left on its own to consider an arrest and the filing of criminal charges as evidence in proving the criminal charges beyond a reasonable doubt.    These errors were clearly prejudicial.    See Bruton v. United States, 391 U.S. 123, 132 (1968)(Limiting instructions to a jury may not in fact erase prejudice.).

Instead, trial counsel permitted a barrage of evidence and arguments indicating that Teman's counsel Reinitz had informed him he could be arrested (meanwhile Reinitz and Teman made collection efforts for three (3) months) and face criminal charges during the defense case and during closing arguments without any objections.    The probative value of such evidence clearly substantially outweighed the danger of unfair prejudice, confusing the issues and misleading the jury, and the failure of Teman's Counsel to request a limiting instruction only exacerbated their

53

ineffectiveness.  Teman's trial counsel's actions were not supported by a reasonable strategy and the errors were clearly prejudicial.  <u>See</u> <u>United States v. Mercado</u>, 573 F.3d 138, 142 (2d Cir. 2009)(Affirming decision to admit potentially prejudicial evidence where the district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence"); <u>United States v. Snype</u>, 441 F.3d 119 (2d Cir. 2006)("[T]he law recognizes a strong presumption that juries follow limiting instructions.").  No instructions were requested by Teman's trial counsel and as above noted it was Teman's trial counsel who were ineffective for calling Reinitz as a witness on a purported advice-of-counsel defense.

### D. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Request a Competency Evaluation and or to Request a Continuance.

Not only did Teman's trial Counsel fail to act reasonably based on the above, but also, Teman's trial Counsel also failed to act reasonably when they failed to request a competency evaluation and or to request a continuance.  For example, at a pre-trial hearing dated October 21, 2019 (DE24), Judge Engelmayer addressed Teman's mental health where Teman expressed his unsteady health at (DE24, pp. 5-7), and where Judge Engelmayer states: "So I'm pushing you, just so I understand, whether there's any ongoing condition."  Teman: "I appreciate that, your Honor.  I

see a mental health provider, and I get somewhat regular ketamine IV."…
Judge Engelmayer: "Let me ask you: Are you currently under the care of a
doctor or psychiatrist for any condition?"  Teman: "I see a psychologist on a
regular basis.  It's also a requirement of the bond."  Also, at (DE265, p. 5),
Teman indicated "I was too sleep deprived and mentally unfit (Your Honor
knows I was in the mental hospital within weeks of trial) to point my
attorneys to the lapses in evidence or to take the stand."

Also, for example, Alon Seifan, MD, MS, a Board Certified
Neurologist  (DE384-1), who reviewed Teman's medical records from
October 2019 through February 2020, opined that Teman in the period
leading to and during jury trial, was extremely mentally unfit to prepare, to
make legal decisions and or to stand trial due to but not limited to meeting
diagnostic criteria for several, co-morbid Neuropsychiatric diagnoses that
cause significant disability in work, education and personal life.  Dr. Seifan
also opined that Teman has been diagnosed with Bipolar Disorder, type 2
(F31.0); Migrane with Aura (G43.109), Attention Deficit Disorder,
Combined Type (F90.2), Chronic Pain Syndrome (G89.4).  Dr. Seifan and
other Doctors at Mt. Sinai Hospital on Miami Beach noted Teman was also
diagnosed with Narcolepsy (G47.41).   Additional medical and or mental

health records indicate that Teman was unfit to prepare and to stand trial at

(DE384-1 – 384-6).

"It is well established that the due process clause prohibits the criminal prosecution of a defendant who is not competent to stand trial." See Medina v. California, 505 U.S. 437, 439 (1992).  This due process right "spans the duration of a criminal proceeding," including sentencing. See United States v. Arenburg, 605 F.3d 164, 168-69 (2d Cir. 2010).  18 U.S.C. § 4241, states in relevant part:

> **(a) Motion to determine competency of defendant.** At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Further, 18 U.S.C. § 4241 contains the procedures necessary when a defendant's competency is raised.  However, Teman's defense counsel failed to address any of these procedures even when Teman was suffering from mental competency that precluded him from understanding the nature and

consequences of the proceedings, making legal decisions and or to assist his Counsel who knew Teman was suffering from mental competency.

A 'competency hearing must take place, either upon motion or sua sponte, "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.'" See Cohn v. United States, Case No. 1:19-CR-00279, 2023 U.S. Dist. LEXIS 129163 *20 (N.D.N.Y. July 10, 2023).

The foregoing failures were compounded when Teman's trial counsel waived Teman's attorney-client privilege as to Teman's counsel Reinitz because if Teman was not mentally competent then he was not mentally competent to waive his attorney-client privilege. A-137.2-137.4. Further, Teman's trial counsel also failed to request that Judge Engelmayer colloquy Teman as to the waiver of such privilege especially when Teman was not mentally competent to do so and even if Teman was colloquied then he was not mentally competent to waive the privilege.

### E. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Call Defense Witnesses Regarding the Online Dispute Terms, Which Allow RCCs.

Teman's trial counsel also failed to call critical defense witnesses to show that customers had knowledge of the online dispute terms, which allow the deposit of RCCs.    The witnesses are Jamie Schreiber, Russell Pearlmutter, who was employed for Coney Realty and who documented that Coney Realty regularly does chargebacks as a matter of business practice and that Signature Bank approves the chargebacks without any due diligence and Yoss Gold, who is employed by 170 Tillary Street and who indicated the RCCs were approved and drafted for a repair and which consisted of the same terms as the three (3) customers in this case.

### F. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Admit Into Evidence Emails From Reinitz to Bank of America Stating the Contract Allowed the Withdrawals.

Teman's trial counsel also failed to admit into evidence emails from Reinitz to BOA stating the contract allowed the withdrawals.    The defense counsel could have simply utilized these instead of raising the above purported advice of counsel defense.    The emails are attached hereto as Exhibit 3.

Teman's trial counsel could have cross-examined BOA's witness to show that Reinitz believed the deposits were authorized by the Terms and

Conditions and that BOA should have reversed the chargebacks under the contractual obligations between GateGuard and the customers.  This would have left BOA with no damages and the customers would then have been able to litigate the matter in civil court if they thought they were entitled to the monies, which they were not under the contractual terms.

### G. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Call Shelly Pecot as a Defense Witness.

Teman's trial counsel also failed to call Shelly Pecot (or "Pecot") as a defense witness who was subpoenaed, but said subpoena was not enforced by trial counsel.  If Teman's trial counsel had enforced the subpoena on Ms. Pecot then they would have been able to utilize her as a witness based on the following.

On August 20, 2021, Teman wrote to the district court that he had discovered new evidence of his innocence and that he believed the case against him should be dismiss.  (DE395)  The new evidence consisted of a sworn letter from a Board member of 18 Mercer, one of the three entities against whom GateGuard had drawn remotely created checks (or "RCC's") to satisfy unpaid fees (DE395), together with previously undisclosed email correspondence between a key Government witness, Soon-Oseberger, and another 18 Mercer Board member, Margaret Crimmins (or "Crimmins"). (DE395)

Shelly Pecot's sworn letter, which is attached as Exhibit C to DE395 affirmed that she knew that 18 Mercer was subject to an $18,000 device removal fee and that GateGuard believed it could draw against 18 Mercer's account to cover this fee.

On September 15, 2023, Teman filed a Rule 33 motion (DE386), based in part on the new evidence. Teman's Rule 33 motion concerns a sworn letter executed by Ms. Pecot and the Ms. Crimmins's emails, which bear on Teman's innocence, the truthfulness of key Government witnesses and the Government's compliance with disclosure obligations. The core theory at trial was that Teman's customers did not know about and had never approved GateGuard's right to draw RCC's against his customers' accounts for fees and services that were agreed to within GateGuard's Terms and Conditions.

The evidence for this theory in the trial record was questionable. After sentencing, believing the Government had failed to produce evidence that would undermine its core theory, Teman contacted Ms. Pecot, a Board member from 18 Mercer, which as noted was one of the three entities against whose accounts RCCs were drawn by Teman. In response, Ms. Pecot provided a sworn letter stating that Teman had warned her and other

shareholders that the GateGuard Terms and Conditions contemplated an $18,000 device removal fee and the use of RCCs to collect amounts owed.

Ms. Pecot provided two emails to Teman, with the following caveat:

Ari, I have to send this to you because it is the right thing to do. Please don't make me sorry I did it. I wish you all the best. I appreciate very much that you explained and apologized for your prior actions.

(DE284:11, DE352-5, DE386-1)

The first email provided by Ms. Pecot was one dated October 28, 2018, from "Margaret," whom Teman knew to be Ms. Crimmins, an 18 Mercer shareholder and Board member. (DE395) This email was never provided to Teman by the Government or Soon-Osberger, who had been subpoenaed by Teman's defense team. Soon-Osberger had testified at trial that she was "shocked" three months later when Teman reminded her, Ms Pecot and Jackie Monzon, who was the President of 18 Mercer's management company, that the device removal would incur an $18,000 fee. (Trial Trans., at 439, GX443, DE128-57). The Crimmins email indicates that Soon-Osberger had already been warned months earlier that she would incur "legal liability" by removing the GateGuard device.

Even more importantly, Ms. Crimmins statement that Soon-Osberger was "legally liable" for her conduct in removing the GateGuard underscores that Soon-Osberger had been expressly told, not just by Teman, but also by a

fellow Board member, that there was "legal," which in this case can only mean "contractual," basis for liability. This contractual liability can only stem from the GateGuard Terms and Conditions under the 2016 contract, which as noted, was not admitted by defense counsel.

The Crimmins email thus undermines the Government's core theory: that Teman's commercial counterparts did not know about and thus could not have authorized GateGuard's enforcement of its contractual rights. The removal fees charged against the ABJ entities operated by Solemani would have appeared in a much different light if the jury had heard testimony or seen documents showing or even tending to show that an $18,000 device removal fee was something that GateGuard customers knew about and for which they believed they had contractual legal liability. Convincing the jury that Teman had the mens rea to commit a crime in this context would have been a daunting, well-nigh impossible, task.

The second email sent by Ms. Pecot provides additional evidence tending to undermine the Government's core theory and establish Teman's innocence. In this email, on December 3, 2018, again long before the email that allegedly "shocked" Soon-Osberger, Ms. Crimmins wrote:

> By 'the board' so you mean Bonnie and Stephanie?  I'm a board member and I have no idea where things stand with the intercom. **The last communications from Ari Teman:**

10/5 An e-mail from Ari stated that there was a 10-year contract and he would put a lien on the building.

10/22 The next e-mail from Ari stating that it would cost $18,000 to disable the device and $10,000 in collections if he wasn't paid in full.

**The last communication from Bonnie.**

10/22 An e-mail to Ari stating that he would hear from our attorney that week.

And that's the only information the shareholders have.  Are we involved in a lawsuit?  Are we working on getting another intercom?  Is there some reason the shareholders can't have this information?

(DE284:9-10, DE352-4, DE386-2)

This email would have been of great importance to the defense.  First, the email stresses that the Board members who were involved in the dispute with GateGuard included not only Soon-Osberger, but also Stephanie Phipps, who knew of the contractual issues surrounding the GateGuard device removal and had apparently not been kept fully informed.  Second, Soon-Osberger knew there was a contractual issue and potential litigation, not because of the threat from Teman, but because of a demand for information from a fellow Board member, who cannot have been alone in wanting answers – many months before GateGuard exercised its right to draw on 18 Mercer's account with an RCC.  This also shows that Soon-Osberger who was a board member knew of the Terms and, demonstrates that the terms had been communicated to the Board.

Second, Ms Crimmins copied Ms. Hom of 18 Mercer's management company, Crystal Management on her email.  Yet, Ms. Hom testified at trial

63

that she was unaware that 18 Mercer had a contract with GateGuard and that she believed the extent of the relationship between GateGuard and 18 Mercer was that 18 Mercer had hired GateGuard to install a new intercom system. (A-615-16). The relevant exchange between Teman's counsel and Ms. Hom on cross-examination was as follows:

Q.    Ma'am, you were aware that Mercer had a contract with GateGuard, correct?

A.    No.

Q.    You weren't aware of that?

A.    I was not aware they had a contract. I know that they had an agreement on them.

Q.    Okay.

A.    As far as I know.

Q.    Well, what's your understanding of the agreement that you believed Mercer had with GateGuard?

A.    That they hired – 19 Mercer hired GateGuard to install the new intercom system.

Q.    Okay. But that was the extent of your understanding of the business relationship between Mercer and GateGuard?

A.    Correct.

The second Crimmins email proves that Ms. Hom was not being truthful. The email establishes that Ms. Hom knew the relationship with GateGuard involved an alleged 10-year contract, an $18,000 device removal fee and potential litigation – far more than a simple agreement to install an intercom. Moreover, it is simply not plausible that the representative of 18 Mercer's management company would have ignored an email as important as this one from a visibly angry shareholder. Ms. Hom must have engaged in further conversations and exchanges about the $18,000 device removal fee and GateGuard's remedies, destroying her testimony, central to the Government's theory, that GateGuard's RCC to enforce the $18,000 fee came out of the blue, without any warning, "shocking" her into requesting a chargeback. (A-612).

The email makes clear that there are almost certainly additional undisclosed emails between the Board members and Crystal Management concerning the GateGuard Intercom, the device removal fees and the remedies contemplated in the GateGuard Terms and Conditions. Ms. Crimmins sharply raises a host of questions ("Are we involved in a lawsuit? Are we working on getting another intercom? Is there some reason the shareholders can't have this information?"). It is not plausible that these questions simply went unanswered.

Perhaps, most importantly, the back and forth about the provisions of the GateGuard contract, combined with the acknowledgement and awareness that 18 Mercer was "legally liable" for a device removal fee under the GateGuard Terms and Conditions underscores the fundamentally commercial, if acrimonious, nature of this entire matter. This also underscores that the clients were informed of the fees - countering the unsubstantiated and false allegation that Teman buried the terms and that the witnesses were not aware of the Terms and Conditions. There was a contract, there were fees and remedies, there was a dispute – the lifeblood of the commercial practice in New York Supreme Court – not a crime to be punished with forfeiture, restitution and incarceration.

### H. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Request a Copy of the Housing Court Transcript.

In the Opinion and Order dated June 5, 2020 (DE138:91-102), Judge Engelmeyer found that the Government did not violate Brady, Giglio and its Jencks Act obligations by failing to disclose Soleimani's personal involvement in a scheme to mislead a tenant in the Housing Court case. On the first day of trial, Judge Engelmeyer Ordered the Government to inquire whether Soleimani had dealings with Stanley Howell (or "Howell") and had made misrepresentations to him and to report back to the Court and the defense. (See Transcript, pp. 24-35) On January 19, 2020, not less than 48

hours before trial, the Government first disclosed the existence of critical impeachment evidence regarding Soleimani, which evidence originated from a decision in a New York Housing Court action, ABJ Milano LLC v. Stanley Howell, 2018 NY Slip Op 2822 (DE83-1), finding that Soleimani's company, AMJ Milano LLC, used dishonest tactics in attempting to evict an elderly, disabled tenant, Howell, from his apartment.  (DE118)

On the first day of trial, Judge Engelmeyer noted the importance of Soleimani's testimony and observed that the disclosed housing court order "is indistinct if Soleimani is among the people dealing with the tenant." (Tr., p. 33)   Judge Engelmeyer directed the Government to "inquire of Soleimani whether there was evidence in the housing court case that he was among the ABJ personnel who dealt with Howell.  If his answer leaves any doubt in your mind, you need to follow up and do so immediately.  Then promptly report back to the Court and the defense." (See Id. at p. 29)  Judge Engelmeyer further explained that "the issue is whether there was evidence at the [Housing Court] proceeding…that he [Soleimani] interacted with the tenant.  If there was evidence that he interacted with the tenant, this is coming in." (See Id., p. 32)

After trial, the defense moved for a new trial under Rule 33.  (DE 119) The defense asserted that the Government had continued to maintain during

trial that nothing in the housing court case was relevant to Soleimani's credibility and at trial, the Government questioned Soleimani about this:

Q.    In 2018, did the housing court find in one case that your company had misled a tenant about whether he could renew his lease?

A.    Yes.

Q.    And did you misrepresent anything to the tenant or was it others in your company?

A.    It was others.

(See Id., p. 502)

However, the new evidence that the defense did not obtain reveals that the Government's misrepresentations regarding Soleimani and the evidence in the housing court case were false. The full record of the housing court case would show that Soleimani's under oath testimony in that case establishes his personal involvement in his company's dealing(s) with Howell and that the actions by Soleimani are the very interactions upon which the housing court's findings are based. (DE118:3) For example, as documented in the transcript (attached as Exhibit A to DE118), on August 8, 2018, Soleimani testified under oath in the housing court that:

(a) He went to Howell's apartment and personally convinced Howell to sign the agreement on the spot (DE118-1, pp. 58-60);

(b) He personally showed Howell other apartments to further induce Howell to accept the agreement and vacate the apartment (DE118-1, pp. 61);

(c) He personally signed the agreement (DE118-1, pp. 57-58);

(d) He was personally involved in drafting the agreement which the court found to be predatory (DE118-1, pp. 56-57);

(e) He personally directed his attorney to evict Howell (DE118-1, p. 55).

Even the Government's response (DE126:10) to Teman's motion for new trial, states: "Teman did not ask for additional information about the housing court matter prior to Soleimani's testimony, object to the Government's questioning in this regard during trial, or question Soleimani about the Housing Court Order on cross-examination."

In the Opinion and Order, Judge Engelmeyer indicated "[r]regrettably, the Government did not do so (and the defense did not press for such a report) but instead took the matter up by putting questions on this point to Soleimani." (DE138:96)  Teman asserts that if defense counsel had pressed for the actual transcript and by requesting a continuance of the trial, then it would have shown that Soleimani lied under oath in this underlying trial and that he was directly involved with Howell, which would have aided Teman in attacking Soleimani's credibility.  Furthermore, it would have shown Soleimani to be a liar about his interactions with Howell; it would have

69

opened the door to allow the defense to show the jury that Soleimani was in the TOP TEN worst landlords in New York City according to the ombudsman, with a history of avarice and deceit to customers and others.

Judge Engelmeyer in the Opinion and Order (DE138:97-102) found that Teman did not show materiality in his motion for a new trial based on the lack of corroboration for Soleimani's testimony.    However, this argument is being made in conjunction with all the other arguments made in this memorandum.  Because defense counsel made the failures shown within the entirety of this memorandum, then there is materiality for the defense failure to obtain the impeachment material from the housing court case.  For example, there is materiality here because not only did Teman's trial counsel fail to press for the housing court transcript and request a continuance, but also, as shown above, defense counsel also failed to enforce the subpoena on Ms. Pecot, which would also show that the Government's other witnesses – Soon-Osberger and Hom were also untruthful and that Teman was convicted by the testimony of these customers who are shown to be perjurers.  Given that Judge Engelmeyer had made this a prerequisite to challenge Soleimani's business dealings, the defense counsel forfeited Teman's right to confront Soleimani's credibility before the jury.  Teman's trial Counsel also forfeited Teman that right not only by failing to obtain the transcript, but also by

allowing the prosecutor to switch the inquiry from whether Soleimani was a participant to a question of whether he made the misrepresentation to Howell himself. That was never the prerequisite of the Court necessary to confront Soleimani's dishonesty.

A witness who lies loses credibility with the jury. See United States v. Payne, 591 F.3d 56, 60 (2d Cir. 2010)("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses"); United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015)(a Court must defer to "the jury's assessment of witness credibility"); Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 112-13 (2d Cir. 2015)(it is the jury's role to determine whether a witness is credible and to decides what weight to give to that witnesser's testimony).

### (I)    Teman's Trial Counsel Failed to Act Reasonably When They Failed to Alert the Court to Juror Misconduct.

On February 26, 2020, Teman's defense counsel raised the issue of misconduct as to an alternative juror # 13 within pages 31-33 of a motion for judgment of acquittal or in the alternative, motion for new trial. (DE111) In said motion, the defense indicated juror # 13 did not acknowledge knowing Teman or GateGuard when asked under oath, despite the juror's initiating

contact with Teman via social media (LinkedIn) before trial.  Said motion also indicated that juror #13 appeared to be a direct business competitor of Teman/GateGuard-at a minimum requiring further inquiry by the Court on this issue.  (DE111:31)

On June 5, 2020, the Court entered an Order denying the motion and pages 84-87 of the Order address this issue.  (DE138:84-87)  In denying the motion, the Court indicated that an alleged *voir dire* error is time-sensitive. (DE138:84)

This issue is being raised here because Teman had immediately informed trial counsel during trial that Juror # 13 was making dirty looks at him and whispering to other jurors, and had even, on December 2, 2018 made a LinkedIn request to Teman.  In note, the trial in this matter commenced in January 2019.  A-137.6.  Teman requested his defense counsel during trial to alert the Court of this issue, however, defense trial counsel did not alert the Court.  See Exhibit 5 (Redacted LinkedIn request to Teman dated December 2, 2018; 0045; Exhibit 6 (Sworn Declaration of Teman).  If defense counsel had listened to Teman to alert the Court about this issue then the Court could have spoken with the jurors to remedy the prejudice of juror # 13.  Since Teman's counsel did not alert the Court then

Teman's defense counsel were ineffective and prejudiced Teman by permitting a hostile and dishonest juror to sit and interact with the jury.

**(J) Teman's Trial and Sentencing Counsel Failed to Act Reasonably When They Failed to call a Witness to Testify about the Violation of Teman's Religious Faith and/or Whether there was any Violation of Jewish Law and also for Counsel to Object and Argue a Violation of Teman's Religious Faith Under the Establishment Clause of The First Amendment and to Move to Recuse Judge Engelmeyer in this Case.**

The Court had indicated and the Government had argued through trial that drafting accounts on the Friday before Passover is a sign of intent to defraud. (A-701, A-1129, A-1423, A-1977-79, A-1995, A-2035, A-2040, A-2404) However, the first two days of the calendar year fell on a Saturday and Sunday, days in which banks are officially closed. On August 11, 2022, twenty-four (24) Rabbis filed a letter with the Court addressing this issue. (DE326)

The letter (DE326:3-4) indicated in relevant part:

> The Government and Court knew full well that Mr. Soleimani, for example, had WhatsApp messaged with Mr. Teman during the Intermediary Days ("Chol Hamoed") of Passover the year prior, and they knew full well that Judaism allows work, travel, and use of electronics on the Intermediary Days, and that Mr. Soleimani would be free to address any billing issues on Monday following the Passover weekend when banks were closed.

Furthermore, the defense was ineffective for failing to motion to recuse Judge Engelmeyer in this case for making findings in violation of

Teman's religious Jewish faith. In <u>Klagsbrun v. Va'ad Harabonim</u>, 53 F.

Supp. 2d 732 (S.D.N.J. 1999), the Southern District of New Jersey granted

the defendant's motion to dismiss the plaintiff's defamation complaint and

held that the Establishment Clause of the First Amendment prohibited it

from hearing ecclesiastical matters and that the complaint raised issues that

were religious in nature.

Further, in <u>Klagsburn</u>, 53 F. Supp. at 737, the court stated:

In the seminal case of <u>Watson v. Jones, 80 U.S. 679, 728-29, 20 L. Ed. 666 (1871)</u>, the Supreme Court cogently stated as follows:

The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions [**14] could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

In this vein, ***HN1*** the <u>Establishment Clause</u> requires, among other things, that a law or regulation not foster excessive governmental entanglement with religion. Excessive entanglement may occur when judicial review of a claim requires "a searching . . . inquiry into church doctrine." <u>Serbian Eastern Orthodox Diocese for the United</u>

States and Canada v. Milivojevich, 426 U.S. 696, 723, 49 L. Ed. 2d 151, 96 S. Ct. 2372 (1976). While the First Amendment prohibits excessive entanglement with religion, it by no means prohibits courts from *any* involvement in religious disputes. The Establishment Clause merely prohibits courts from determining underlying questions of religious doctrine and practice. See Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449, 21 L. Ed. 2d [**15] 658, 89 S. Ct. 601 (1969). Accordingly, the question to be resolved in this case is where to draw the line between the constitutional right to preserve the autonomy of religious organizations, on the one hand, and the individual's interest in vindicating secular rights.

Based on the foregoing, Teman's trial and sentencing Counsel failed to act reasonably when they failed to call a witness to testify about the violation of Teman's religious faith and/or whether there was any violation of Jewish law and also for Counsel to object and argue a violation of Teman's religious faith under the Establishment Clause of the First Amendment and to move to recuse Judge Engelmeyer in this case.

## CONCLUSION

Based on the foregoing, Teman respectfully requests this Honorable Court to grant the motion to vacate, set aside or correct his judgment and sentence, then set an evidentiary hearing and to find actual innocence and in the alternative for a new trial.

Respectfully Submitted,

*/s/* Thomas Butler_____
Thomas J. Butler, Esq.
New York Bar Number: 4192340

75

Florida Bar Number: 569178
P.O. Box 665
Melville, New York 11747
Phone: 877-847-1896
appellatelaw@bellsouth.net
Counsel for Ari Teman

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was electronically filed and served this 30th day of October, 2024, to the following counsel of record:

Jacob Harris Gutwillig, Esq.
United States Attorney's Office, SDNY
jacob.gutwillig@usdoj.gov

Kedar Sanjay Bhatia, Esq.
United States Attorney's Office, SDNY
Kedar.bhatia@usdoj.gov

/s/ Thomas Butler
Thomas J. Butler, Esq.