# 21-1920-cr

## United States Court of Appeals

### *for the*

## Second Circuit

---

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 11 (Pages A-129 to A-240)

---

KEDAR S. BHATIA
WON S. SHIN
  *Assistant U.S. Attorney*
UNITED STATES ATTORNEY'S OFFICE
  SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
One Saint Andrew's Plaza
New York, New York 10007
(212) 637-2200

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed June 20, 2019.................................. A-46.2

Notice of Appearance, dated August 27, 2019.......... A-47

Indictment, filed September 26, 2019....................... A-49

Waiver of Appearance for Arraignment, dated
    October 14, 2019 ................................... A-53

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated
    October 21, 2019 .................................. A-55

Supeseding Indictment, filed November 12, 2019 .... A-96.1

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated November
    21, 2019 .................................. A-96.7

Opinion and Order of the Honorable Paul A.
    Engelmayer, dated December 20, 2019 ................ A-97

Second Superseding Indictment, filed
    January 3, 2020.................................... A-121

Defendant Teman's Requested Voir Dire Questions,
    filed January 6, 2020............................. A-129

Excerpts of Transcript of Conference Proceedings
    held before the Honorable Paul A. Engelmayer,
    dated January 10, 2020 ......................... A-137.1

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    January 10, 2020.................................. A-137.6

Letter from Kedar S. Bhatia to the Honorable Paul
    A. Engelmayer, dated January 14, 2020 ............... A-137.96

ii

**Page**

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 21, 2020 .................................................... A-138

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 22, 2020 .................................................... A-265

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 23, 2020 .................................................... A-398

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 24, 2020 .................................................... A-672

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 27, 2020 .................................................... A-998

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 28, 2020 .................................................... A-1187

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 29, 2020 .................................................... A-1264

Verdict Sheet, dated January 29, 2020 ...................... A-1298.1

Order of the Honorable Paul A. Engelmayer, dated
    January 29, 2020 .................................................... A-1299

Defendant's Motion for Judgment of Acquittal or in
  the Alternative, Motion for New Trial, filed
    February 26, 2020 ................................................. A-1437

Motion for New Trial Based on Undisclosed Brady
  and Jencks Act Evidence, filed April 9, 2020 ....... A-1473

iii

**Page**

Exhibit A to Motion -
Excerpts of Transcript of Proceedings, dated
August 9, 2018..................................................... A-1498

Exhibit B to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................ A-1512

Exhibit C to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................ A-1513

Exhibit D to Motion -
HPD's Housing Maintenance Code Violations
User Guide ............................................................ A-1514

Exhibit E to Motion -
Report re: New York Civil Litigation – Joseph
Soleimani .............................................................. A-1548

Exhibit F to Motion -
Report re: New York Civil Litigation – Elie
Gabay .................................................................... A-1549

Exhibit G to Motion -
Glossary of Terms for Litigation Status Report
from HPD.............................................................. A-1550

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated April 9, 2020............... A-1552

Letter from Kedar S. Bhatia, Assistant United States
Attorney to the Honorable Paul A. Engelmayer,
dated May 1, 2020 re: Trial Exhibits ..................... A-1554

Government's Exhibits:

GX 101-
GateGuard Account Opening Documents ............. A-1555

GX 102 -
GateGuard Bank Statements.................................. A-1559

iv

**Page**

GX 103-
Friend or Fraud Account Opening Documents ...... A-1581

GX 104-
Friend or Fraud Bank Statements .......................... A-1585

GX 105-
Touchless Labs Account Opening Documents ...... A-1609

GX 106-
Touchless Labs Bank Statements........................... A-1613

GX 107 -
Ari Teman Account Opening Document................ A-1629

GX 108-
Ari Teman Bank Statements .................................. A-1631

GX 110-
April 19, 2019 2:37 PM Surveillance
Photographs ........................................................... A-1649

GX 111-
April 19, 2019 6:00 PM Surveillance
Photographs ........................................................... A-1652

GX 112-
May 8, 2019 3_04 PM Surveillance
Photographs ........................................................... A-1655

GX 113-
Bank Records Spreadsheet
(CD-Rom)*........................................................... A-1657.1

GX 114 -
Returned Check Records ....................................... A-1658

GX 121 -
ABJ Lenox Account Opening Document .............. A-1660

_____

* GX 113 is a Microsoft Excel file. CD-Rom with the Excel
spreadsheet provided to Court and Service parties.

v

**Page**

GX 122 -
ABJ Lenox Bank Statements ................................... A-1661

GX 123 -
ABJ Milano Account Opening Documents ........... A-1669

GX 124 -
ABJ Milano Bank Statements................................. A-1670

GX 127 -
May 2, 2019 Letter - ABJ Lenox ........................... A-1678

GX 129 -
May 2, 2019 Letter - ABJ Milano......................... A-1679

GX 130 -
ABJ Lenox Checks .................................................. A-1680

GX 131 -
ABJ Milano Checks................................................. A-1682

GX 141 -
18 Mercer Account Opening Documents .............. A-1685

GX 142 -
18 Mercer Bank Statements................................... A-1694

GX 143 -
April 4, 2018 Check from 18 Mercer Equity to
GateGuard.............................................................. A-1699

GX 144 -
518 W 204 Account Opening Documents ............. A-1700

GX 145 -
518 W 204 Bank Statements.................................. A-1707

GX 146 -
January 31, 2018 Check from 518 W 204 to
GateGuard.............................................................. A-1725

vi

**Page**

GX 147 -
March 28, 2019 Check from 518 West 205 to
GateGuard ................................................................ A-1726

GX 150 -
Affidavit .................................................................. A-1727

GX 201 -
March 28, 2019 Check from Coney Realty to
GateGuard ................................................................ A-1728

GX 202 -
March 28, 2019 Check from 18 Mercer Equity to
GateGuard ................................................................ A-1729

GX 203 -
April 19, 2019 Check from 518 West 205 to
GateGuard ................................................................ A-1730

GX 204 -
April 19, 2019 Check from ABJ Milano to
GateGuard ................................................................ A-1733

GX 205 -
April 19, 2019 Check from ABJ Lennox to
GateGuard ................................................................ A-1739

GX 206 -
April 19, 2019 GateGuard Counter Deposit .......... A-1757

GX 401 -
September 9, 2017 E-mail - 'We're Live' ............. A-1758

GX 402 -
November 6, 2017 E-mail - 'Current Issues'......... A-1760

GX 403 -
March 9, 2018 E-mail - 'Ending GateGuard' ........ A-1761

GX 404 -
May 7, 2018 E-mail - 'All Communication in
Writing'.................................................................... A-1762

vii

**Page**

GX 405 -
May 22, 2018 E-mail - 'GateGuard' ...................... A-1763

GX 406 -
August 26, 2018 E-mail - 'Dispute on Charge...' .. A-1765

GX 407 -
September 18, 2018 E-mail - 'Sublet Spy Hits...' . A-1767

GX 408 -
December 14, 2018 E-mail - 'Notice of Intent' ..... A-1773

GX 409 -
June 14, 2019 GateGuard Invoice ......................... A-1775

GX 409A -
Invoices (1) .............................................. A-1777

GX 409B -
Invoices (2) .............................................. A-1785

GX 409C -
Conversation between Teman and Soleimani ........ A-1786

GX 412 -
January 1, 2018 E-mail - 'Tenant Ana Esterg' ....... A-1787

GX 413 -
January 19, 2018 E-mail - 'Invoice Sent' .............. A-1788

GX 414 -
January 24, 2018 E-mail - 'Form for the 10
Buildings' .............................................. A-1791

GX 415 -
March 25, 2018 E-mail - 'Invoice for 20
Buildings' .............................................. A-1795

GX 416 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (1) ....................................... A-1815

viii

**Page**

GX 417 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (2) ........................................................ A-1820

GX 418 -
March 27, 2018 E-mail - 'Proof it's Your...' .......... A-1829

GX 431 -
April 4, 2018 E-mail - 'Invoice' ........................... A-1831

GX 441 -
GateGuard Terms and Conditions.......................... A-1834

GX 442 -
April 2, 2018 E-mail - 'References' ...................... A-1856

GX 443 -
January 7, 2019 E-mail - 'Contract' ...................... A-1862

GX 501 -
Bank Records Stipulation ...................................... A-1868

GX 702 -
January 2, 2019 WhatsApp Messages ................... A-1872

GX 704 -
April 2, 2019 WhatsApp Messages ....................... A-1874

GX 727 -
April 2, 2019 Whatsapp Messages (2)................... A-1875

GX 728 -
April 3, 2019 Whatsapp Messages ........................ A-1876

GX 729 -
April 10, 2019 WhatsApp Messages ..................... A-1877

Defense Exhibits:

DX 2 -
Payment Terms (1/27/2019)................................... A-1880

DX 14 -
October 11, 2018 E-mail – 'ABJ Properties'.......... A-1887

ix

**Page**

DX 15 -
October 22, 2018 E-mail - 'SubletSpy hits' .......... A-1889

DX 16 -
'Notice of Hold' ....................................................... A-1892

DX 29 -
Affidavit ................................................................. A-1893

DX 36 -
March 28, 2018 E-mail – 'Invoice for 20
Buildings' ............................................................... A-1894

DX 49 -
Declaration ............................................................. A-1902

DX 51 -
Chase Information Request ..................................... A-1903

DX 52 -
Chase Information Request ..................................... A-1904

DC 62 -
March 9, 2018 E-mail Correspondence ................. A-1928

DX 70 -
GateGuard Logs ...................................................... A-1930

DX 71 -
May 22, 2018 E-mail – 'Re: Gateguard' ............... A-1932

Order of the Honorable Paul A. Engelmayer, dated
May 6, 2020 ........................................................... A-1933

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated May 8, 2020 ............... A-1935

Opinion and Order of the Honorable Paul A.
Engelmayer, dated June 5, 2020 ............................ A-1937

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated June 29, 2020 ............. A-2044

x

**Page**

Sentencing Memorandum and Motion for
   Downward Variance, filed July 7, 2020................. A-2045

Exhibit 1 to Sentencing Memorandum -
   Letter from Dr. Rami Cohen, M.D to the
   Honorable Paul A. Engelmayer, dated
   June 29, 2020........................................................ A-2070

Exhibit 2 to Sentencing Memorandum -
   Letter from Juhan Sonin to the Honorable Paul A.
   Engelmayer, dated July 6, 2020............................. A-2074

Exhibit 3 to Sentencing Memorandum -
   Letter from Jeffrey Katz to the Honorable Paul A.
   Engelmayer ............................................................ A-2076

Exhibit 4 to Sentencing Memorandum -
   Letter from Oliver Josephs t to the Honorable
   Paul A. Engelmayer, dated June 6, 2020 ............... A-2077

Exhibit 5 to Sentencing Memorandum -
   Letter from Thomas Orosz to the Honorable Paul
   A. Engelmayer ....................................................... A-2079

Exhibit 6 to Sentencing Memorandum -
   Letter from David Diwby to the Honorable Paul
   A. Engelmayer ....................................................... A-2080

Exhibit 7 to Sentencing Memorandum -
   Letter from Nachum Klar to the Honorable Paul
   A. Engelmayer, dated July 6, 2020........................ A-2082

Exhibit 8 to Sentencing Memorandum -
   Letter from Anthony Zachariadis to the
   Honorable Paul A. Engelmayer, dated
   July 6, 2020............................................................ A-2084

Exhibit 9 to Sentencing Memorandum -
   eJewish Philanthrophy- Coverage of Teman's
   Award..................................................................... A-2085

xi

**Page**

Exhibit 10 to Sentencing Memorandum -
HarvardX Verified Certificate of Achievement,
issued May 11, 2020 ............................................... A-2094

Exhibit 11 to Sentencing Memorandum -
Letter from Avi Ganz to the Honorable Paul A.
Engelmayer, dated July 7, 2020 ............................. A-2095

Exhibit 12 to Sentencing Memorandum -
Letter from Steven Oved to the Honorable Paul
A. Engelmayer, dated June 15, 2020 ..................... A-2098

Exhibit 13 to Sentencing Memorandum -
Letter from Rabbi Chaim Lipskar to the
Honorable Paul A. Engelmayer, dated
July 7, 2020 ............................................................. A-2099

Exhibit 14 to Sentencing Memorandum -
Letter from Jonathan Lubin to the Honorable
Paul A. Engelmayer ................................................ A-2101

Exhibit 15 to Sentencing Memorandum -
Letter from Talia Reiss to the Honorable Paul A.
Engelmayer .............................................................. A-2103

Exhibit 16 to Sentencing Memorandum -
Letter from Rivka Korf to the Honorable Paul A.
Engelmayer .............................................................. A-2104

Exhibit 17 to Sentencing Memorandum -
Letter from Russell DiBona to the Honorable
Paul A. Engelmayer ................................................ A-2105

Letter from Justin K. Gelfand to the Honorable Paul
A. Engelmayer, dated September 8, 2020 .............. A-2107

Appearance of Counsel, dated November 2, 2020 .... A-2108.1

Letter from Justin Harris to the Honorable Paul
Engelmayer, dated November 2, 2020 ................... A-2108.2

xii

**Page**

Exhibit B to Letter -
Letter from Justine A. Harris to Kedar Bhatia and
Edward A. Imperatore, dated October 23, 2020 .... A-2108.6

Exhibit C to Letter -
Letter from Kedar S. Bhatia to Justine A. Harris,
dated October 29, 2020......................................... A-2108.9

Order of the Honorable Paul A. Engelmayer, dated
November 19, 2020 ............................................... A-2109

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 20, 2020................. A-2111

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 30, 2020 ................ A-2113

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated November 30, 2020............ A-2114

Transcript of Remote Conference Proceedings held
before the Honorable Paul A. Engelmayer, dated
December 1, 2020.................................................. A-2116

Order of the Honorable Paul A. Engelmayer, dated
January 28, 2021 ................................................... A-2170

Letter Motion from Audrey Strauss to the
Honorable Paul A. Engelmayer, dated
April 23, 2021 ....................................................... A-2173

Exhibit A to Letter -
Proposed Order of Restitution ............................... A-2181

Exhibit B to Letter -
Proposed Preliminary Order of Forfeiture/Money
Judgment................................................................ A-2185

Exhibit C to Letter -
Document - Finocchiaro 3503-19 .......................... A-2189

Exhibit D to Letter -
Revised Document - Finocchiaro 3503-19 ............. A-2190

xiii

**Page**

Exhibit E to Letter -
Affidavit of Karen Finocchiaro, dated
April 2, 2021 ......................................................... A-2191

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated April 23, 2021 .................... A-2195.1

Attachment to Letter -
*Curriculum Vitae* of Richard M. Fraher................. A-2195.3

Letter Motion to Vacate Conviction from Andrew J.
Frisch to the Honorable Paul A. Engelmayer,
dated April 28, 2021 ............................................... A-2196

Exhibit A to Letter Motion -
Document - Finocchiaro 3503-19 .......................... A-2211

Exhibit B to Letter Motion -
Revised Document - Finocchiaro 3503-19 ............. A-2213

Exhibit C to Letter Motion -
E-mail Correspondence, dated
November 30, 2020 ................................................ A-2215

Exhibit D to Letter Motion -
E-mail Correspondence, dated March 10, 2021 .... A-2217

Exhibit E to Letter Motion -
E-mail Correspondence, dated March 12, 2021 .... A-2219

Exhibit F to Letter Motion -
Copies of Various Cashier's Checks ...................... A-2221

Order of the Honorable Paul A. Engelmayer, dated
May 5, 2021 ........................................................... A-2223

Letter from Andrew J. Frisch to Kedar Bhatia, dated
May 12, 2021 ......................................................... A-2225

Annexed to Letter -
Declaration of Richard M. Fraher, executed
May 11, 2021 ......................................................... A-2226

xiv

**Page**

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated June 9, 2021 ....................... A-2236

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated June 14, 2021 .................... A-2246.1

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated June 29, 2021 .................... A-2246.4

Transcript of Conference Proceedings held before
the Honorable Paul A. Engelmayer, dated
July 9, 2021........................................................... A-2247

Sentencing Submission Letter from Susan G.
Kellman to the Honorable Paul A. Engelmayer,
dated July 16, 2021 ................................................ A-2315

Transcript of Sentencing Proceedings held before
the Honorable Paul A. Engelmayer, dated
July 28, 2021......................................................... A-2333

Notice of Appeal, dated August 2, 2021 .................... A-2458

Letter Motion from Ari Teman to the Honorable
Paul A. Engelmayer, dated March 3, 2022 ............ A-2459

Letter Motion from Ari Teman to the Honorable
Paul A. Engelmayer, dated April 12, 2022............. A-2462

Order of the Honorable Paul A. Engelmayer, dated
April 13, 2022....................................................... A-2463

Letter Motion from Ari Teman to the Honorable
Paul A. Engelmayer, dated April 13, 2022............. A-2465

Letter from Eden P. Quainton to the Honorable Paul
A. Engelmayer, dated April 13, 2022 .................... A-2467

Notice of Appearance, filed April 13, 2022 ............... A-2469

Letter Motion from Ari B. Teman to the Honorable
Paul A. Engelmayer, dated April 14, 2022............. A-2470

xv

**Page**

Order of the Honorable Paul A. Engelmayer, dated
    April 15, 2022......................................................... A-2473

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ...................................................................... A-2476

Order of the Honorable Paul A. Engelmayer, dated
    April 20, 2022......................................................... A-2479

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ...................................................................... A-2481

Letter from Kedar S. Bhatia, Asst. United States
    Attorney to the Honorable Paul A. Engelmayer,
    dated April 21, 2022 ............................................. A-2482

Order of the Honorable Paul A. Engelmayer, dated
    April 21, 2022......................................................... A-2483

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-CR-696-PAE |
| | ) | |
| ARI TEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT TEMAN'S REQUESTED VOIR DIRE QUESTIONS</u>

Defendant Ari Teman ("Teman"), by and through his undersigned counsel and pursuant to Rule 24(a) of the Federal Rules of Criminal Procedure and this Court's Order, respectfully requests that this Court include the following questions (or substantially similar questions) in its examination of prospective jurors.

<u>Duty as Jurors</u>

1. In federal court, each member of the jury is charged with the duty of determining whether the Government proved, or failed to prove, the defendant guilty beyond a reasonable doubt. Does any member of the panel have any problem with this duty?

2. The members of this panel selected as members of the jury in the case today will be the judges of the facts and must accept the law as the Court explains it in its jury instructions. Is there any member of the panel who could not accept this duty?

3. This is a criminal case. In our system of justice, the burden of proof is on the Government to prove the allegations beyond a reasonable doubt. The defendant is presumed innocent unless or until the Government meets its burden. In the United States, no person is ever

required to prove his innocence; the Government is required to prove his guilt—and to do so beyond a reasonable doubt.  Is there anybody who does not believe in these ideals?  Is there anybody who will not hold the Government to its burden of proof?

4.  Has anybody here ever been a juror in a criminal case before?  If so, (a) What kind of criminal case? (b) Was the jury able to reach a verdict? (c) Were you the foreperson?

5.  Has anybody here ever served on a grand jury?  If so, (a) Were you the foreperson? (b) Do you understand that the burden of proof in a grand jury or in a civil case is lower than what the prosecution must prove in a criminal case?

<u>Knowledge of Persons and Parties Involved in the Case</u>

6.  Do you or any members of your family or friends know the Honorable Paul Engelmayer? If so, how do you know him?  Would that relationship or acquaintance influence your judgment in this case?

7.  Do you or any members of your family or friends know any of the prosecutors or anyone who works in the U.S. Attorney's Office here in the Southern District of New York?

8.  Have you, a family member, or a close friend ever been employed by the U.S. Department of Justice, the NYPD, or the U.S. Attorney's Office for the Southern District of New York?

9.  This case was investigated by the NYPD, specifically by Detective Daniel Alessandrino. Does any member of the panel know NYPD Detective Alessandrino? Does anyone know anyone who currently works for a law enforcement agency?

10. The defendant is Ari Teman. Does anybody know Mr. Teman?

11. Mr. Teman is represented by Justin Gelfand and Joseph DiRuzzo. Does anyone know either of these two attorneys? Mr. Gelfand was previously a federal prosecutor with the U.S.

Department of Justice in Washington, D.C. Did anyone have any interactions with Mr. Gelfand in his capacity as a federal prosecutor?

12. Has any member of the panel, a family member, or a close friend ever been employed by the United States Government?  If so, who and how?

13. Has anybody seen, heard, or read anything about this case?  If so, what have you seen, heard or read? (At sidebar so as not to prejudice other members of the panel.)  Have you formed any opinions about this case based on what you saw, heard, or read?

14. Has anybody discussed any aspect of this case with anybody who claimed to have some knowledge about what may have happened?  If so, what have you heard (at sidebar) and have you formed some opinion based on what this person told you?

15. Does anybody know any other member of the jury panel?  If so, who are you acquainted with, and how do you know that person?  Would that relationship or acquaintance influence your judgment in this case?

16. Does any member of the panel have any legal education or training, or has anyone ever worked in any capacity in a law firm or a law office?

17. Does anybody know any of the following people who may testify in this trial (Court asked to read list of possible witnesses including the names of the entities involved)?

<u>Victims of Crime</u>

18. Have any of you ever been victims of crimes or have you had a relative or close friend who was the victim of a crime?  If so:

    1.      Was anyone apprehended as a result of that crime?

    2.      Did you testify in that case?

3.    Were you satisfied with the outcome of that case?  (Why or why not?)

4.    Did you feel justice was done?  (Why or why not?)

5.    Is there anything about that experience that you believe could influence your judgment in this case?

Witnesses

19. Have any of you ever been witnesses in a trial?  If so:

1.    Was it a criminal or civil trial?

2.    What kind of case was it?

3.    Was there anything about that experience that you found unpleasant?

4.    Was there anything about that experience that could influence your judgment in this case?

20. Would anybody be influenced by the sheer number of witnesses who may testify for the prosecution or for the defense?  Does anybody think that if the defendant calls no witnesses, he/she would be unable to make a decision as to whether the prosecution proved the defendant guilty beyond a reasonable doubt?

21. Would any of you give greater weight or credibility no matter how slight to the testimony of a law enforcement officer?

1.    Is there anyone who believes he/she would be unable to judge the credibility of a law enforcement officer's testimony just like everyone else?

2.    Is there anyone here who would tend to give a law enforcement officer's testimony greater weight or credibility, or lesser weight or credibility, just because that person is a law enforcement officer?  For example, if two people have different

recollections about an occurrence and one is a police officer, would you tend to believe the police officer over the civilian just because that person is a police officer?

22. Would any of you give the testimony of a Government witness greater weight or credibility over that of the testimony of witnesses on Mr. Teman's behalf, just because that person was testifying for the Government?

23. Do any of you believe that you would have any difficulty being asked to judge the honesty and credibility of a witness?

24. If you are selected as a juror in this case, you may be instructed later on that when considering the credibility of a witness, you can consider any biases or prejudices that the witness may have or any motives the witness may have for telling the truth or not telling the truth; do you all understand that concept?  Does anybody have a problem considering that a witness may not be telling the truth even if that witness takes an oath in this courtroom and promises to tell the truth?

<u>Instructions</u>

25. Does anybody here think that because Mr. Teman has been charged with a crime, he must have committed the crime?

26. Does anybody here have any opinion at all about whether Mr. Teman is guilty or not guilty in this case before hearing the evidence?

27. Does everybody understand that Mr. Teman is by law presumed innocent?

28. Does anybody here feel that Mr. Teman must have done something illegal or he would not have been charged with a crime?

29. Does anybody here feel that, in criminal cases, the Government is usually right?

30. Does anybody here have any difficulty with the concept of passing judgement on another? In other words, there are some people who for moral, ethical or religious reasons, believe that it is not proper to pass judgment on the conduct of others. Do any of you hold such beliefs?

31. If you are selected to sit on the jury in this case you will have one of twelve votes. Will you agree to independently decide whether the Government has proven Mr. Teman guilty beyond a reasonable doubt even if other members of the jury disagree with you?

32. Does anybody feel like defendants in a criminal trial should have to prove that they are innocent?

33. Is there anyone here who does not understand that an indictment is not evidence that the crime charged was committed, and it may not be considered as evidence by you in deliberating?

34. Do you understand that Mr. Teman has pled not guilty and that he has a Constitutional right to a presumption of innocence—that is, he is innocent unless the Government is able to prove otherwise and to do so beyond a reasonable doubt?

35. Do any of you have any difficulty presuming that Mr. Teman, as he sits here before you, is innocent?

36. Does the panel understand that the Government is required by law to prove Mr. Teman guilty beyond a reasonable doubt, if they are able to?

    1.    Is there anybody here who does not agree with that? In other words, is there anyone here who believes it is Mr. Teman's duty to prove himself innocent?

      2.      Do you all understand that "beyond a reasonable doubt" is the highest burden of proof required by the law?

37. If the Government fails to meet that high burden of proving Mr. Teman guilty beyond a reasonable doubt, is there anyone who does not understand that you must find Mr. Teman not guilty?

38. Is there anyone who would feel that by not returning a guilty verdict, your job as a juror is incomplete or a failure?

39. Do you all understand that Mr. Teman may or may not testify in this case, but that he does not have to testify in this trial, and that nothing can be inferred from him not testifying?

<u>Banks and Financial Institutions</u>

40. Is there anybody who holds any strong personal or philosophical feelings about the banking system of the United States?  If so, what are your feelings?

41. Does any member of the panel have any ownership (for example, stock) in any bank or financial institution such as Bank of America?

42. Has any member of the panel every worked at any bank or financial institution?

43. Does anyone have a close friend or family member that has worked at a bank or financial institution?

44. Has anyone ever worked at a financial regulator such as the FDIC or the OCC? Does anyone have any close friends or family members who have held such jobs?

45. Has anyone ever worked at a real estate company such as a REIT or a property management company? Does anyone have any close friends or family members who have worked at a real estate or property management company?

46. Does anyone have any strong feelings about landlords in New York City?

Respectfully submitted,

*Margulis Gelfand, LLC*

/s/ Justin K. Gelfand
JUSTIN K. GELFAND, #62265
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com

— and —

/s/ Joseph A. DiRuzzo, III
Joseph A. DiRuzzo, III
NY Bar # 4417853
DIRUZZO & COMPANY
Joseph A. DiRuzzo, III
401 East Las Olas Blvd., Suite 1400 Ft.
Lauderdale, FL 33301
Telephone: (954) 615-1676
Facsimile: (954) 827-0340
jd@diruzzolaw.com

*Attorneys for Teman*

**Certificate of Service**

I hereby certify that I filed the foregoing through the Court's CM/ECF system which will provide notice of filing to all counsel of record.

/s/ Justin K. Gelfand
JUSTIN K. GELFAND, #62265
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com
**Attorney for Teman**

XK1AHTEM                          SEALED                                    1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                              19 Cr. 696 (PAE)

ARI TEMAN,

                                            Conference
                  Defendant.

------------------------------x

                                            New York, N.Y.
                                            January 10, 2020
                                            10:45 a.m.

Before:

                  HON. PAUL A. ENGELMAYER,

                                            District Judge

                          APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
KEDAR SANJAH BHATIA
EDWARD IMPERATORE
      Assistant United States Attorneys

JOSEPH ANDREW DiRUZZO III
JUSTIN GELFAND
      Attorneys for Defendant

Also Present:   William Magliocco, Paralegal Specialist USAO

XK1AHTEM                    SEALED                              2

(In the robing room)

1          THE COURT:  All right.  Good morning, everyone.  I'm

2   here in my robing room with counsel for both sides,

3   specifically Mr. Imperatore and Mr. Bhatia.  Good morning to

4   both of you.  Happy New Year.

5          MR. IMPERATORE:  Good morning, your Honor.

6          THE COURT:  For the defense, Mr. DiRuzzo?

7          MR. DIRUZZO:  Yes.

8          THE COURT:  And Mr. Gelfand?

9          MR. GELFAND:  Good morning.

10          THE COURT:  And the defendant, Mr. Teman, good

11   morning.

12          THE DEFENDANT:  Good morning, your Honor.

13          THE COURT:  The initial part of this conference, very

14   briefly, will be maintained under seal.  I have a court

15   reporter here, but the transcript of what is to be said in the

16   robing room here is to be accessible to counsel in this case

17   only.  The transcript itself is, not without permission of the

18   Court, to be publicly filed.

19          I want to follow up on a phone conference we had in

20   December prompted by Mr. Teman's note to me that was in

21   considerable distress.  I'm really just concerned about how

22   Mr. Teman is doing.  Can counsel give me an update as to how

23   he's doing.

24          MR. DIRUZZO:  Your Honor, my understanding is

25

A-137.3

1    Mr. Teman is doing fine.  No further instances have happened,

2    nothing that required hospitalization or the like, so --

3           THE COURT:  Have you been personally keeping tabs on

4    the state of whatever treatment he is receiving?

5           MR. GELFAND:  Your Honor, this is Justin Gelfand for

6    the record.  I have been speaking regularly with Mr. Teman, and

7    it's my understanding that he's been under the care of multiple

8    healthcare providers, including a mental health care provider,

9    and a sleep specialist.  There was a diagnosis, as I understand

10   it.  Maybe that's too strong of a word, but Mr. Teman has

11   managed to get his sleep situation better under control, and he

12   has expressed to me that he's noticed a considerable difference

13   based on that and following that care.

14          So, as a practical matter, I think that under the

15   circumstances, obviously, the case is inevitably very

16   stressful, but he's doing well under the circumstances and

17   certainly much better than when we had our other telephone

18   conference.

19          THE COURT:  I'm glad to hear that.  I had remembered

20   that it had been expressed on the call that sleep problems may

21   have been at the heart of some of the anguish in the note.  I'm

22   glad to hear that's being addressed.

23          MR. GELFAND:  Yes, your Honor.

24          THE COURT:  May I address your client.  I don't want

25   to pry, but I want to make sure.

XK1AHTEM                              SEALED                              4

1              MR. GELFAND:  Sure.

2              THE COURT:  Mr. Teman, I want to take stock on how

3      you're doing.

4              THE DEFENDANT:  It's not the best six months of my

5      life, but I went to an ENT and then a sleep specialist.  The

6      ENT said walk three miles a day, which is just looping around

7      South Beach.  I did that, then I went to the sleep specialist.

8      He said you're under federal indictment.  I'm going to give you

9      this drug, and it's going to get you five hours of sleep.

10     Still do the walking and swimming, but the drug is winning.  I

11     wasn't getting REM sleep.  So I have a tracker.  I was getting

12     5 to 6 percent REM.  I'm getting 20 to 25 percent REM now.

13             THE COURT:  Here's the important thing.  The emotions

14     that you expressed in that letter, to the extent that they were

15     an impulse to hurt yourself, have those gone away?

16             THE DEFENDANT:  Yes.

17             THE COURT:  You're confident that you are in a better

18     place.  I realize being under indictment is not a good place,

19     but your suicidal state of mind is all gone; you have no

20     impulses like that at all?

21             THE DEFENDANT:  None.

22             THE COURT:  Will you promise me if you have any

23     impulse at all like that, you'll immediately notify both your

24     counsel in this case, the specialist or specialists whom you

25     are seeing?

XK1AHTEM                                                            5

SEALED

1

2           THE DEFENDANT: Yes, your Honor.

3           THE COURT: Very good. Anything further I need to
    raise as to any of those things?

4

5           MR. BHATIA: Nothing from the government.

6           THE COURT: Most of all, I want to wish you well. I
    realize I'm here in a role presiding over a prosecution of you.

7   I'm also a human being, and I read a note from a person in

8   anguish and pain. And I empathize with you, and I just wanted

9   you to know that.

10          All right. Look, the other thing I just want to put

11  on the record is as follows, which is after the last court

12  conference in the case, I made a phone call to the chief of the

13  general crimes unit, the supervisor of the AUSA that's assigned

14  to the case, asking him to take a look at the transcript of the

15  previous conferences and to make sure that there was adequate

16  supervision of the case. I do that from time to time when I

17  have a concern that there may or may not be adequate

18  supervision. I didn't want that conversation to have been

19  unrecorded. I'm putting that on the record here.

20          MR. GELFAND: Thank you.

21          THE COURT: Very good. I'll see you out in the

22  courtroom. Thank you.

23          (Adjourned)

24

25

K1AHTEMC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                         19 Cr. 696 (PAE)

ARI TEMAN,

                                         Conference
              Defendant.

------------------------------x

                                         New York, N.Y.
                                         January 10, 2020
                                         11:00 a.m.


Before:

                    HON. PAUL A. ENGELMAYER,


                                         District Judge


                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
KEDAR SANJAH BHATIA
EDWARD IMPERATORE
     Assistant United States Attorneys

JOSEPH ANDREW DiRUZZO III
JUSTIN GELFAND
     Attorneys for Defendant

Also Present:  William Magliocco, Paralegal Specialist USAO

K1AHTEMC

1           (Case called)

2           MR. BHATIA:  Good morning, your Honor.  Kedar Bhatia

3    and Edward Imperatore, for the United States.  We're joined at

4    counsel table by Will Magliocco, a paralegal specialist in the

5    U.S. Attorney's Office.

6           THE COURT:  Good morning, Mr. Bhatia.

7           Good morning, Mr. Bhatia.

8           And good morning to you, Mr. Magliocco.

9           MR. DIRUZZO:  Good morning, your Honor.  Joseph

10   DiRuzzo, on behalf of Mr. Ari Teman.

11          THE COURT:  Good morning.

12          MR. GELFAND:  Good morning, your Honor.  Joseph

13   Gelfand on behalf of Ari Teman, who is present and on bond.

14          THE COURT:  Good morning to both of you.

15          Good morning to you, Mr. Teman.

16          All right.  We have a formidable agenda before us

17   today, and I want to, before marching through it, identify by

18   topic header the sequence of topics I intend to go through.

19   And of course, if I have missed anything, there will be an

20   opportunity at the end for you to raise other issues.

21          Step one will involve arraigning Mr. Teman on the S2

22   indictment.  I then will take up with the government Rule 16

23   discovery, what, if any, Rule 16 discovery has been produced

24   since the last conference and whether anything, improbable as

25   it might seem, is outstanding.  I will then resolve all of the

K1AHTEMC

1     motions *in limine* that are pending in a bench ruling.  That

2     will take some time.

3              The next module I will discuss with you is the length

4     of trial and my sitting schedule during the course of the

5     trial, the daily schedule that we have here, just so we're all

6     on the same page.  I think of all of you, Mr. Imperatore is the

7     only one who been on trial before me, so I want to make sure

8     all aware of that.

9              I will then have an extensive discussion about aspects

10    of voir dire, including the method that I use for voir dire and

11    including a summary of the case that I intend to present to the

12    venire which I want to run by counsel for their comments.  I

13    will then take up issues of courtroom technology with you.

14    Then there will be some mechanical issues about where witnesses

15    are to be questioned from and jury addresses, and the like.  I

16    will take up then issues with you about materials I need to be

17    provided to my chambers, whether in the context of 3,500

18    material, exhibit binders, a daily exhibit list, that sort of

19    thing.  I want to raise a question about the verdict form.  I

20    need to put on the record any plea offers that have been made

21    to the defendant, as far as this is our final pretrial

22    conference, and then there's a final grand jury matter that I

23    have a word or two about.

24              All right.  That's the agenda.  So that's the sequence

25    in which you can expect me to proceed.  Let's begin with the

K1AHTEMC

1    arraignment of Mr. Teman.

2           Defense counsel, who will be taking the lead at this

3    conference?

4           MR. GELFAND:  I will, your Honor, Justin Gelfand.

5           THE COURT:  Very good.  Thank you, Mr. Gelfand.

6           Have you had an opportunity to review with your client

7    the questions that I am apt to put to him by way of arraigning

8    him on the S2 indictment?

9           MR. GELFAND:  Yes, your Honor.

10          THE COURT:  All right.  Mr. Teman, I'm going to have

11   Mr. Smallman administer the oath to you; and then I'll ask you

12   several questions to make sure you're of clear mind; that

13   you've read the S2 indictment; and I will receive your plea,

14   which I expect, from counsel's preview, will be a not guilty

15   plea.

16          Mr. Smallman, will you swear the defendant.

17          (Defendant sworn)

18          THE COURT:  Thank you.

19          Mr. Teman, you may be seated.  What is your full name?

20          THE DEFENDANT:  Ari Baruch Teman.

21          THE COURT:  How old are you?

22          THE DEFENDANT:  37.

23          THE COURT:  How far did you go in school?

24          THE DEFENDANT:  College and some additional

25   coursework.

K1AHTEMC

1              THE COURT:  All right.  I know the answer to this

2    question, but are you able to speak and read English?

3              THE DEFENDANT:  Yes.

4              THE COURT:  I understand that you are presently under

5    the care of a medical professional?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  All right.  Apart from what we covered in

8    the robing room, are you under the care of any other medical

9    professional?

10             THE DEFENDANT:  Not on any ongoing basis, your Honor.

11             THE COURT:  All right.  In the past 24 hours, apart

12   from sleep medication, have you taken any drugs, medicine, or

13   pills, or drunk any alcoholic beverages?

14             THE DEFENDANT:  No, nothing unrelated to sleep.

15             THE COURT:  Does the sleep medication impair your

16   ability to understand what people are saying to you?

17             THE DEFENDANT:  I don't believe so.

18             THE COURT:  Does it impair your ability to

19   communicate?

20             THE DEFENDANT:  No, I don't think so.

21             THE COURT:  Does it impair your reasoning ability?

22             THE DEFENDANT:  I don't think so.

23             THE COURT:  Is your mind clear today?

24             THE DEFENDANT:  Feels like it is, your Honor.

25             THE COURT:  Is there any reason to think that it is

K1AHTEMC

1      not?

2                  THE DEFENDANT:  No, your Honor.

3                  THE COURT:  Do you understand what's happening in this

4      proceeding?

5                  THE DEFENDANT:  Yes.

6                  THE COURT:  Mr. Gelfand, are you confident that your

7      client understands what's happening in this proceeding and is

8      capable of making an informed plea as to the charges in the S2?

9                  MR. GELFAND:  Yes, your Honor.  For the record, I've

10     spent approximately an hour and a half with him this morning as

11     well.

12                 THE COURT:  And that confirms your confidence that his

13     mind is totally clear?

14                 MR. GELFAND:  It does, your Honor.

15                 THE COURT:  All right.  Mr. Teman, have you received a

16     copy of the most recent indictment, the S2 indictment, returned

17     on January 3?

18                 THE DEFENDANT:  Yes, your Honor.

19                 THE COURT:  Have you had an opportunity to -- have you

20     read it?

21                 THE DEFENDANT:  Yes, your Honor.

22                 THE COURT:  Have you had an opportunity to consult

23     with your attorneys about it?

24                 THE DEFENDANT:  Yes, your Honor.

25                 THE COURT:   Do you want me to read it out loud, or do

K1AHTEMC

1      you waive its public reading?

2                 THE DEFENDANT:  I waive the reading, your Honor.

3                 THE COURT:  Thank you.

4                 How do you plead to the charges?

5                 THE DEFENDANT:  Not guilty.

6                 THE COURT:  Having taken care of the arraignment, I

7      think I need to formally ask defense counsel the following:

8      The new indictment does not appear to add new events so much as

9      add charges relating to existing events.  Nevertheless, just as

10     an excess of caution, it appears to me that everyone's fully

11     prepared to go to trial on the date indicated, but I want to

12     ask you just to confirm that.

13                MR. GELFAND:  Yes, your Honor.

14                THE COURT:  Very good.  All right.  Government, same?

15                MR. BHATIA:  Yes, your Honor.

16                THE COURT:  Anything else that anyone believes I need

17     to take up by way of arraignment or related events?

18                MR. BHATIA:  Nothing from the government.

19                MR. GELFAND:  No, your Honor.

20                THE COURT:  OK.  Let's turn to Rule 16 discovery.

21     Mr. Bhatia, I realize you are a newcomer to the case, and I

22     appreciate your taking it over.  Since the last conference, has

23     there been any Rule 16 discovery that the government has come

24     into possession of and/or that has been produced to the

25     defense?

K1AHTEMC

 1          MR. BHATIA:  Yes, your Honor.  We've been producing --

 2     we made at least two or three productions since then on a

 3     rolling basis as we've received documents.  Those documents

 4     have principally consisted of bank records and email

 5     correspondence that we've received from particular witnesses in

 6     the case.  I think that's sort of the substance of it.

 7          THE COURT:  What's the scale of the new material?

 8          MR. BHATIA:  Not too voluminous.  I think, for the

 9     emails, they were maybe in the 100 to 200 range.

10          THE COURT:  100 to 200 emails?

11          MR. BHATIA:  Emails, yes.  I don't think it's been

12     particularly voluminous, and we don't expect any voluminous

13     discovery in the future.  But, of course, we don't know, but I

14     don't expect any.

15          THE COURT:  Is there any outstanding Rule 16 discovery

16     that is in your possession, custody, or control that has not

17     been produced to the defendant?

18          MR. BHATIA:  Yes, your Honor.  As we get closer to

19     trial, we're producing on a rolling basis, so I think we might

20     have received documents yesterday or maybe the day before that

21     we're planning to produce today, but nothing that we're waiting

22     to produce.

23          THE COURT:  Do I have your commitment that, to the

24     extent you come into possession of Rule 16 discovery, you will

25     quite properly turn it around for the defense?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1AHTEMC

 1          MR. BHATIA:  Yes, your Honor.

 2          THE COURT:  All right.  Defense, anything with respect

 3     to ongoing discovery?

 4          MR. GELFAND:  No, your Honor.  We received discovery,

 5     as government counsel indicated, on a rolling basis.  The most

 6     recent production of that was electronically produced

 7     yesterday.  Because we were traveling, we haven't yet had a

 8     chance to review it, but I accept the government's

 9     representations as to the nature of it.

10          THE COURT:  So far, to the extent you've gotten new

11     discovery, I take it none of it is on a scale that inhibits

12     your trial preparation?

13          MR. GELFAND:  No, your Honor.  The other thing I would

14     note for the record is that we too, on behalf of the defense,

15     have disclosed Rule 16 discovery to the prosecution in several

16     disclosures, also on a rolling basis, much like the prosecutor.

17     We did have a couple of requests for documents outstanding.

18     Obviously, to the extent that we receive those documents and to

19     the extent that it falls under Rule 16, we'll that provide that

20     forthwith to the government.

21          THE COURT:  There's nothing along those line for me to

22     resolve, but I appreciate your giving me a heads-up about that.

23          Nothing further vis-a-vis discovery?

24          MR. BHATIA:  Nothing.

25          MR. GELFAND:  Correct.

K1AHTEMC

1          THE COURT:  I'm going to turn now to a bench ruling

2     that I have on the *in limine*.  All right.  Here goes.

3          Defendant, Ari Teman, has been charged with bank

4     fraud, wire fraud, and aggravated identity theft.  His trial is

5     set to begin on January 21, 2020.  The Court has received *in*

6     *limine* from Teman and the government and has also received

7     opposition papers from each.

8          The following bench decision resolves all these

9     motions.  I will not be issuing a written decision.  Instead, I

10    will simply issue an order reflecting the fact that the motions

11    were resolved for the reasons set forth on the record today.

12    So if the content of what I say today is important to you, you

13    will need to order the transcript of this conference, as I

14    expect you would be anyway.

15         All right.  I will first going to address the

16    government's motion in limine that relates to Detective Daniel

17    Alessandrino.  Alessandrino is a member of the New York Police

18    Department who was present at Teman's arrest in Florida.  The

19    defense has subpoenaed Alessandrino for potential testimony but

20    has not indicated the subject matter of this testimony.

21         The government moves that, if called to testify by the

22    defense, Alessandrino's direct examination be limited to

23    relevant, nonhearsay topics.  Teman responds that he may not

24    call Alessandrino at all, but if he does so, he will not

25    solicit hearsay testimony.

K1AHTEMC

1           On its face, the government's motion does no more than

2     ask the Court to enforce the Rules of Evidence.  For whatever

3     value that may have, I can certainly grant that relief, which

4     is completely unobjectionable, insofar as the government's

5     motion does no more than ask the Court to do its job.  For

6     future reference, it's not clear what purpose a motion like

7     this serves, but there it is.  I remind counsel that any

8     testimony from any witness, whether Alessandrino or anyone

9     else, must comply with the Federal Rules of Evidence, it must

10    be relevant, it must comply with the hearsay rules, and it must

11    satisfy 403.

12           As to Alessandrino's testimony specifically, however,

13    there's nothing concrete at this point for the Court to

14    resolve.  I am certainly not going to require the defense,

15    prior to trial, to disclose the subjects of any testimony that

16    Detective Alessandrino might be asked to give.  The defense is

17    entitled to keep its strategy to itself.  It is not apparent

18    whether Alessandrino would be in a position to offer admissible

19    testimony.  The government suggests not, but it is premature to

20    decide.  That may turn on developments during the trial.  If

21    the defense does decide to call Alessandrino, the Court will

22    ask for a specific offer of proof from the defense so that the

23    Court can determine before he is called to the stand whether

24    there are proper bases for calling him to testify.

25           So, defense counsel, if you are going to go this

K1AHTEMC

1    route, please be prepared to give me, outside the presence of

2    the jury, a detailed proffer as to the purpose or purposes for

3    which you would be calling Alessandrino.

4            I'm now going to turn to the government's motion in

5    limine seeking to exclude evidence of specific, noncriminal

6    acts on Teman's part.  The government asks that the Court

7    exclude any evidence of noncriminal acts or arguments by Teman

8    to the same effect, to suggest that because Teman complied with

9    the law or treated customers fairly on other occasions, he is

10   not guilty with respect to the crimes charged.  As an example,

11   the government envisions that Teman might offer evidence that

12   he did not defraud customers other than Entities 1 through 4,

13   whose checks are at issue here.  The government envisions that

14   Teman might argue that this makes it more likely that he did

15   not defraud Entities 1 through 4 either.  In response, Teman

16   asks the Court to reserve judgment because the government's

17   motion is addressed to an abstraction, as the government has

18   not pointed to any specific evidence that it is seeking to

19   exclude.  Teman promises that, to the extent he seeks to elicit

20   evidence of his law-abiding behavior, he would comply with the

21   Rules of Evidence governing character evidence.

22           Given the general level at which this issue has thus

23   far been briefed, Teman is right that there is nothing concrete

24   to resolve.  The Court can do no more at this point than

25   identify the governing legal principles with which I expect

K1AHTEMC

1    counsel are already familiar.  At a general level, the

2    government's characterization in its contention is right.  It

3    is black letter law that "a defendant may not seek to establish

4    his innocence ... through proof of the absence of criminal acts

5    on specific occasions." Citing *United States v. Scarpa*, 897

6    F.2d 63, 70 (2d Cir. 1990); *accord United States v. Williams*,

7    205 F.3d 23, 34 (2d Cir. 2002).  Although a criminal defendant

8    may introduce reputation or opinion testimony of a particular

9    character trait, under Federal Rule of Evidence 404(a)(2), such

10   character evidence may not take the form of evidence of

11   specific good acts or the lack of other bad acts.  To allow

12   evidence of these specific noncriminal acts could "cause the

13   jury to make a forbidden propensity inference"; i.e., that a

14   defendant's prior good, honest acts suggest that he has a good,

15   honest character, therefore proving that he acted in accordance

16   with such character during the charged incidents.  *See Jones v.*

17   *Stinson*, 229 F.3d 112, 120 (2d Cir. 2000).  That inference is

18   prohibited by Rule 404(a)(1).

19          Consistent with this, the Second Circuit has time and

20   again upheld the exclusion of evidence of a defendant's lawful

21   acts when offered for this purpose.  For example, in the United

22   States v. Walker, 191 F.3d 326, 336 (2d Cir. 1999), the circuit

23   upheld the exclusion of evidence that a defendant who was

24   charged with preparing false asylum applications had prepared

25   proper asylum applications in the past, because such evidence

K1AHTEMC

1     was being offered to disprove that he had acted with fraudulent

2     intent in the case at hand.  Similarly, considering a defendant

3     charged with bribery in the *United States v. O'Connor*, 580 F.2d

4     38, 43 (2d Cir. 1978), the circuit held that evidence that the

5     defendant had not received bribes in the past should have been

6     excluded as improper character evidence.

7            That said, there are limited exceptions.  Under

8     Rule 405(b), where the defendant's character is an essential

9     element of a charge or defense, such evidence may be admitted.

10    *See United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997).

11    That principle does not appear to be implicated in this case.

12    There are other cases that allow specific incidents of lawful

13    conduct to be received under a defensive application of

14    Rule 404(b), for example, to show that the conduct at issue was

15    part of a common scheme or plan.  *See Jones*, 229 F.3d at 120;

16    *see also United States v. Aboumoussallem*, 726 F.2d 906, 911–12

17    (2d Cir. 1984).

18           I cannot do more here than recite those background

19    standards.  Teman has not stated an intention to offer evidence

20    along these lines, and he well may not.  In the event that

21    Teman intends to elicit proof of noncriminal acts on his part,

22    whether during the examination of government witnesses or as

23    part of a defense case, the Court will require beforehand an

24    offer of proof outside the presence of the jury.  The

25    government will then be at liberty to exclude such evidence

K1AHTEMC

1     based on the lines of authority that I've just reviewed.  I

2     therefore deny the government's motion as premature, without

3     prejudice to the government's right to move anew once a

4     situation involving concrete evidence implicating these

5     principles has crystallized.

6           I will next address the government's *in limine* seeking

7     a ruling permitting it to admit into evidence, pursuant to

8     Rule 404(b), the check stock seized from the defendant's office

9     space on July 3, 2019.  I will also address at this point

10    Teman's related motion in limine to preclude the government

11    from offering as yet unnoticed Rule 404(b) evidence.

12          On July 3, 2019, Teman was arrested at his office in

13    Miami Beach, Florida.  In connection with the arrest, law

14    enforcement offers seized a ream of "check stock" in plain view

15    in Teman's office.  Check stock is specialty paper that an

16    individual can use to print checks.  According to the

17    government, each page of check stock looks like an 8.5" x 11"

18    sheet of paper, except the top third is the outline of a check

19    and certain security features, such as a string of text

20    printed in the border of the check frame.  The check stock

21    seized from Teman's office space contains security features

22    that appear to be different from the ones on the checks

23    deposited on March 28, 2019, and April 19, 2019, which are the

24    subject of the charges in this case.  On December 31, 2019, the

25    government provided notice of its intent to introduce at trial,

K1AHTEMC

1    under Rule 404(b), the check stock that was seized from Teman's

2    office on July 3, 2019.

3            Rule 404(b)(1), of course, prohibits evidence of a

4    crime, wrong, or other act being used to show propensity, that

5    on a particular occasion the person acted in accordance with a

6    particular character trait.  But Rule 404(b)(2) provides that

7    such evidence "may be admissible" for other purposes, such as

8    to prove "motive, opportunity, intent, preparation, plan,

9    knowledge, identity, absence of mistake, or lack of accident,"

10   provided the probative value of such evidence is not outweighed

11   by the risk of unfair prejudice.  *See United States v. Ortiz*,

12   857 F.2d 900, 903 (2d Cir. 1988).  Under Rule 404(b)(2), on

13   request by a defendant in a criminal case, the prosecutor must

14   provide reasonable notice of the general nature of any

15   Rule 404(b) evidence that the prosecutor intends to offer at

16   trial and "do so before trial -- or during trial if the court,

17   for good cause, excuses lack of pretrial notice."

18           The Second Circuit takes a "inclusionary approach" to

19   Rule 404(b) under which evidence of crimes, wrongs, and other

20   acts may be received "for any purpose other than to show a

21   defendant's criminal propensity, as long as the evidence is

22   relevant and satisfies the probative-prejudice balancing test

23   of Rule 403."  *See, e.g., United States v. Carboni*, 204 F.3d

24   39, 44 (2d Cir. 2000); *see also United States v. Teague*, 93

25   F.3d 81, 84 (2d Cir. 1996), in which the circuit held that the

K1AHTEMC

 1   state of mind required for the offense is a "proper purpose"

 2   for admission of other crimes evidence under Rule 404(b).

 3   Evidence offered for a permissible purpose, however, is

 4   nevertheless inadmissible "if the other act or acts are not

 5   sufficiently similar to the conduct at issue."  United States

 6   v. Gordon, 987 F.2d 902, 909 (2d Cir. 1993).  Finally, for

 7   evidence to be received under Rule 404(b), it must relate to an

 8   issue in dispute.  For example, in United States v. Scott, 677

 9   F.3d 72, 83 (2d Cir. 2012), the circuit found an abuse in

10   discretion in admitting evidence under Rule 404(b) to show

11   identity where identity was not in dispute.

12          So turning to the check stock, the government moves

13   for a ruling permitting it to admit into evidence the check

14   stock seized from Teman's office on July 3, 2019, subject, of

15   course, to the check stock's authentication as such at trial.

16   The government argues that such evidence is admissible under

17   Rule 404(b) as evidence of Teman's motive, intent, plan,

18   identity, modus operandi, and the absence of mistake or lack of

19   accident with respect to the charged offenses.

20          The Court agrees and will receive such evidence at

21   trial, subject to its authentication.  The blank check stock

22   seized at Teman's office is germane for reasons apart from

23   propensity.  It shows his knowledge and familiarity with the

24   process of creating checks and in turn is germane to the

25   government's claim that he did so here by fabricating the

K1AHTEMC

1    allegedly unauthorized checks at issue.  The average person may

2    not have blank check stock lying around his or her home or

3    office.  Teman's possession of check stock, even if it is not

4    identical to the check stock allegedly used in this case, tends

5    to establish his facility and familiarity with material similar

6    to that used in the alleged crimes.  The recovery of check

7    stock in Teman's office makes it more likely that Teman, as

8    opposed to someone else, created the specific checks charged in

9    the indictment.  It also makes it more likely that Teman knew

10   what he was doing when, using such stock, he created allegedly

11   unauthorized checks with the features and terms those checks

12   contained.  And once the check's probative value is recognized,

13   there is no offsetting basis to exclude them.  Possession of

14   check stock is not inherently a bad act at all.  It is just an

15   act.  It does not inherently reflect ill or well on a person's

16   character.  And Teman has not made any argument that

17   countervailing factors identified in Rule 403 favor exclusion

18   of the check stock.  He's not identified any unfair prejudice,

19   confusion, or delay that may flow from receiving this check

20   stock into evidence.

21          Teman does offer two arguments in opposition to the

22   motion in limine.

23          First, he notes that the check stock was seized from

24   his office in July 2019, after the check deposits at issue,

25   which occurred in late March 2019 and mid-April 2019.  But the

K1AHTEMC

1    gap between these events is just a few short months.  Teman

2    offers no reason why this small passage of time would make his

3    possession of check stock in July 2019 completely nonprobative

4    of his familiarity with the use of check stock just a few

5    months earlier.  Nor does he identify any supportive case law.

6    In the Court's judgment, Teman's possession of blank check

7    stock soon after the events at issue may fairly be argued by

8    the government as evidence of Teman's capacity to commit the

9    acts charged in the indictment.  *See, for example, United*

10   *States v. DeFiore*, 720 F.2d 757, 764 (2d Cir. 1983), which held

11   other acts admissible under Rule 404(b) "even though they

12   antedated the limitations period."  The passage of time instead

13   goes to the weight of the evidence.  Defense counsel are free

14   to argue before the jury that the checks found in Teman's

15   office in July 2019 do not speak to his check-creation

16   capabilities three to four months earlier, and the government

17   is free to argue the opposite.  That's why we have jurors.

18        Second, Teman argues that the possession of check

19   stock at an office is not inherently incriminating.  Under

20   Rule 404(b), that point is a nonstarter.  Under the rules,

21   prior acts need not be "bad acts" or inherently incriminating

22   acts to be admissible.  They need not be *malum in se*.  They

23   need only be relevant, offered for a proper purpose, and more

24   probative than unfairly prejudicial.  And prior act evidence

25   that is on its face benign is frequently admitted at trial.

K1AHTEMC

```
1    For example, a defendant's access on a different date to the

2    scene of a crime, such as an office or an apartment or a car,

3    is frequently admitted under Rule 404(b) as proof of

4    opportunity or knowledge.  Such evidence takes on an

5    incriminating quality only in conjunction with the other

6    evidence in the case, such as the case here.  This point, too,

7    goes to the weight, not the admissibility, of the evidence.

8    Teman's counsel is at liberty to argue that possession of check

9    stock is no big deal and should not be treated as such here.

10          The Court therefore grants the government's motion to

11   receive the check stock seized from Teman's office on July 3,

12   2019, provided that the check stock is properly authenticated

13   at trial as having been seen there.

14          The Court does, however, request letters from counsel

15   as to a proper limiting instruction regarding the purposes for

16   which the jury may and may not consider the check stock seized

17   from Teman's office on July 3, 2019.  Counsel are to confer

18   promptly on this point and to submit a joint letter by next

19   Wednesday, January 15, setting out what I expect will be their

20   agreement on the text of such an instruction or, failing that,

21   their separate views as to the text of such an instruction.

22          I turn now to Teman's motion in limine to preclude the

23   government from offering Rule 404(b) evidence at trial

24   concerning any matter not included in the government's notice

25   provided to Teman on December 31, 2019.
```

K1AHTEMC

```
 1              As background, on December 31, 2019, the government

 2      gave notice of its intent to introduce, under Rule 404(b), the

 3      check stock I've just addressed.  On January 2, 2020, counsel

 4      for Teman emailed government counsel and requested notice of

 5      any other Rule 404(b) evidence the government intends to

 6      introduce at trial.

 7              As noted, Rule 404(b) requires, on request, that a

 8      prosecutor offering such evidence give reasonable notice of the

 9      general nature of any such evidence and do so before trial --

10      or during trial if the Court, for good cause, excuses lack of

11      pretrial notice.  The advisory committee notes to Rule 404(b)

12      state that "no specific time limits are stated in recognition

13      that what constitutes a reasonable request or disclosure will

14      depend largely on the circumstances of each case."

15              In seeking to exclude any as yet unnoticed 404(b)

16      evidence, Teman cites a 2011 decision in which my colleague,

17      Judge Pauley, excluded other act evidence disclosed

18      approximately one month before trial on the ground that the

19      government had failed to provide defendants with reasonable

20      notice.  That is United States v. Daugerdas, 2011 WL 573587, at

21      page 2 (S.D.N.Y. Feb. 16, 2011).  But that case is readily

22      distinguishable.  It involves an unusually complicated

23      conspiracy by numerous defendants over the course of nearly a

24      decade to repeatedly commit complex tax fraud, largely through

25      the use of sophisticated fraudulent tax shelters.  And prior to
```

K1AHTEMC

1    the ruling cited by Teman, Judge Pauley had warned the

2    government "repeatedly about the need to cabin its proof and to

3    provide advance disclosure of the transactions to be offered at

4    trial." Id., in light of the massive universe of complex

5    business transactions spanning a decade that the defendants

6    otherwise would have had to prepare to defend at trial.  Those

7    factors are not present here.  It's not clear to the Court that

8    were the government to unearth additional 404(b) evidence,

9    Teman would, to anything like the degree presented in

10   *Daugerdas*, be hamstrung in preparing to meet it.

11        To be sure, the government's December 31, 2019, and

12   January 2, 2020, letters imply that the government does not

13   have any present intention to offer further Rule 404(b)

14   evidence beyond the check stock, but it's axiomatic that the

15   government's investigation is ongoing up to and through trial.

16   It is therefore possible that additional Rule 404(b) evidence

17   will come to light or take on new relevance before or during

18   trial.  And Rule 404(b) allows the prosecution to disclose

19   other act evidence even as late as "during trial if the court,

20   for good cause, excuses lack of pretrial notice."  Citing the

21   text of Rule 404(b).

22        The Court therefore denies defendant's motion to

23   preclude unnoticed 404(b) evidence categorically as premature.

24   If there is such an application, Teman will be at liberty to

25   seek to bar such evidence as untimely, and the Court would then

K1AHTEMC

 1    determine, in the context of a particularized controversy,

 2    whether the lack of prior notice was justified by good cause.

 3    Without a concrete scenario before it, however, the government

 4    cannot make an informed ruling.  The Court expects the

 5    government to provide prompt notice to defense counsel and the

 6    Court of any additional 404(b) evidence, if any, as soon as it

 7    develops an intention to offer such, so as to assure that the

 8    issue of admissibility is thoughtfully and thoroughly

 9    litigated.

10            Next, Teman has moved *in limine* to admit the Federal

11    Reserve Board's Federal Register Notice dated November 21,

12    2005.  The notice relates to amendments to the fed's Regulation

13    CC that define "remotely created checks." Teman's position is

14    that the checks at issue in this case were valid "remotely

15    created checks (or RCCs) under the regulation.  He seeks to

16    admit the Federal Register Notice as Defense Exhibit A to

17    assist the jury in concluding that that is so.

18            The Court denies the motion to receive the Federal

19    Register Notice for two independent reasons.

20            For one, Defense Exhibit A spectacularly fails the

21    test for admissibility under Rule 403.  Under Rule 403, the

22    Court may exclude relevant evidence if its probative value is

23    substantially outweighed by a danger of confusing the issues or

24    misleading the jury.  The Federal Register Notice has, at best,

25    limited probative value.  The key factual issue the government

K1AHTEMC

1    seeks to prove at trial is not whether the checks Teman

2    deposited technically qualify or not as "remotely created

3    checks," that term does not appear in the superseding

4    indictment or, for that matter, the earlier indictment.  It is

5    Teman, not the indictment, who seeks to inject the concept of

6    "remotely created checks" into the case.  The indictment

7    alleges instead that Teman deposited the checks while

8    pretending to have authorization from the account holders to do

9    so, whereas in fact he had created and negotiated the checks

10   without such permission.  The Federal Register Notice does not

11   tend to prove or disprove any fact of consequence to these

12   charges.  The notice says nothing about whether the account

13   holders, the alleged -- who along with the banks were alleged

14   victims in this case, authorized the creation and negotiation

15   of the checks, and the notice says nothing whatsoever about

16   Teman's state of mind.

17          The Federal Register Notice is germane only insofar as

18   it might serve to educate the jury about the background fact

19   that there is such a thing as a remotely created check and that

20   the remote creation and presentation of such checks are not

21   itself unlawful acts.  There may be value to the jury's being

22   informed of that.  An old-fashioned juror may not know about

23   that, but that legal concept can easily be communicated to the

24   jury by other means, in particular by an instruction from the

25   Court, as I will explain in a few moments.

K1AHTEMC

1           On the flip side of the Rule 403 balance, the Federal

2     Register Notice would create unimaginable jury confusion.  The

3     notice is an 18-page, single-spaced regulatory document.  It

4     purports to define the term "remotely created check," and then

5     it discusses in expansive detail, among other things, the

6     regulation's administrative history.  It also sets out in

7     numbing detail the fed's section-by-section legal analysis of

8     the regulation.  Teman's notion that the search for truth in

9     this case would be furthered by inviting the 12 deliberating

10    jurors to wade through this technical, abstruse, academic, and

11    legalistic discussion in this document regarding RCCs is

12    ill-conceived.  Such an exercise would promote extreme

13    confusion.  It could easily lead the jury to think, wrongly,

14    that to reach a just verdict they are obliged to grasp the fine

15    points of this ponderous regulatory document.  The capacity of

16    this document to produce confusion vastly outweighs any

17    marginal probative value that it might contain.

18          Second, Exhibit A is a legal document.  It represents

19    and explains a point of federal law, a federal regulation.  The

20    defense admits this in its motion.  It notes that the exhibit

21    "remains federal law."  I'm citing docket 60 at page 2.  As

22    such, for the defense to thrust the Federal Register notice's

23    long text before the jury would be grossly to invade the

24    Court's province as the entity responsible for explicating law

25    for the jury.  It is black letter law that "it is not for

K1AHTEMC

1    witnesses to instruct the jury as to applicable principles of

2    law, but rather for the judge." *See F.H. Krear and Co. v.*

3    *Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir. 1987).

4    Teman's proposal to put before the jury the Federal Register

5    Notice, a legal document setting out and explicating in

6    tendentious detail a federal banking regulation, breaches this

7    foundational principle, whether the notice would be

8    authenticated by a witness or stipulation.

9            The Court therefore, under Rule 403, denies Teman's

10   motion to admit Defense Exhibit A.

11           However, the Court can imagine a circumstance in which

12   there would be good reason to educate the jury about the

13   central point that the defense presumably seeks to extract from

14   the Federal Reserve Notice, to wit, that a remotely created

15   check, created by a payee with the authorization of the payor

16   is a recognized and lawful instrument.  The Court's present

17   instinct is that the best and proper way to convey this point

18   to the jury is by means of a brief instruction from the Court

19   to be given at an appropriate point during the trial.  The

20   Court does not rule out, however, that an alternative

21   acceptable way to educate the jury about this background fact

22   would be by means of a brief stipulation.  The Court directs

23   counsel to meet and confer forthwith on this issue with an eye

24   towards agreeing on the text of a jury instruction and/or a

25   joint stipulation.

K1AHTEMC

1           The Court directs the parties to submit by the close

2    of business Wednesday, January 15, a joint letter containing a

3    proposed jury instruction on this topic.  If the parties cannot

4    agree on the terms of such a jury instruction, the letter is to

5    contain the parties' respective proposed instructions.  Should

6    the parties agree on a factual stipulation to convey the

7    necessary information, the letter is to include that too.

8           The Court next addresses Teman's motion to exclude an

9    anguished typewritten note that Teman wrote to, *inter alia*, the

10   United States Attorney's Office.  The note, which expresses

11   rage at numerous persons, was the subject of a telephone call

12   among the Court, counsel, and Teman on December 12, 2019, the

13   transcript of which the Court has ordered sealed.  Teman argues

14   that the note is irrelevant and/or that any probative value it

15   has is outweighed by countervailing factors under Rule 403,

16   including the risk of unfair prejudice and confusion.  The

17   government asks the Court to reserve ruling -- reserve on this

18   issue pending trial.

19          At this juncture, the Court is prepared only to say

20   that the vast majority of the note is plainly both irrelevant

21   and unfairly prejudicial.  However, the government is correct

22   to observe that at points in the note Teman does address facts

23   and circumstances potentially relevant to the charges in this

24   case.  These include reference to persons whose checks he is

25   alleged to have deposited without their authorization.  Under

K1AHTEMC

1    these circumstances, the proper course is for the Court to

2    reserve judgment on Teman's motion, because it is conceivable

3    that a snippet or snippets within the letter could be properly

4    admitted or used during cross-examination of Teman, should he

5    testify.  For avoidance of doubt, however, the government is

6    not to attempt to use any part of the note in any way without

7    the explicit prior approval of the Court.  Should the

8    government determine that it wishes to pursue use of any

9    portion of the note for any purpose at trial, it is to notify

10   the Court and the defense forthwith, outside the presence of

11   the jury.

12           Next, I will address Teman's motion in limine to

13   preclude testimony from a person whom Teman depicts as a

14   government expert witness.  The witness in question is Bank of

15   America vice president and senior investigator Karen

16   Finocchiaro.  On January 6, 2020, the government gave notice to

17   the defense that it intended to call Finocchiaro to testify

18   about Bank of America's charge-back processes, as well as

19   information related to some of Teman's accounts at the bank.

20   Docket 61-1 at 1.  As described by the government, a

21   charge-back is a process that occurs when a bank, having sent

22   money to another entity, seeks to have that money returned

23   because the bank suspects a fraudulent transaction.  See docket

24   54 at 2.  After the charge-back is initiated, the Federal

25   Reserve automatically transfers the money from the receiving

K1AHTEMC

1   entity back to the original bank.  Id.  The government expects

2   Finocchiaro to testify about Bank of America's procedures for

3   initiating and completing a charge-back and for responding to

4   charge-back requests from other banks.  Docket 61-1 at 1.

5           Teman seeks to preclude Finocchiaro's testimony,

6   arguing that she is an expert and that the government failed to

7   provide the notice required for expert witnesses under Federal

8   Rule of Criminal Procedure 16(a)(1)(G).  The government

9   responds that Finocchiaro's testimony is not that of an expert

10  and that it has no intention to elicit expert testimony from

11  her.  It depicts her testimony as that of a lay fact witness

12  describing the operations of a component of her workplace.  It

13  states that it provided notice to the defense about the content

14  of Finocchiaro's testimony "in an abundance of caution."

15  Docket 61-1.  At the most, Finocchiaro -- the government argues

16  Finocchiaro's testimony could be categorized as lay opinion

17  testimony.

18          Under Federal Rule of Evidence 602, a witness' factual

19  testimony is admissible as long as the witness has personal

20  knowledge, subject, of course, to other rules like Rule 403.

21  *See United States v. Cuti,* 720 F.3d 453, 457 (2d Cir. 2013).

22  Opinion testimony of a lay witness is also admissible, but it

23  is limited under Rule 701 to opinions that are (1) rationally

24  based on the witness' perception; (2) helpful to understanding

25  the witness' testimony or a fact at issue; and (3) not based on

K1AHTEMC

1     scientific, technical, or other specialized knowledge.  Expert

2     witnesses must meet additional requirements for their opinion

3     testimony to be admissible.  Under Rule 702, such witnesses

4     must be qualified as a result of their knowledge, skill,

5     experience, training, or education, and their opinions must be

6     (1) helpful to the jury in understanding evidence or

7     determining a fact at issue, (2) be based on sufficient facts

8     or data, (3) be the product of reliable principles and methods,

9     and (4) reliably apply the principles and methods to the facts

10    of the case at hand.  In short, expert opinion testimony must

11    be both relevant and reliable.  See Daubert v. Merrill Dow

12    Pharmaceuticals, 509 U.S. 579, 590-91 (1993).

13          The first-order question here is whether Finocchiaro

14    is a fact witness or an opinion witness.  Based on the

15    government's proffer of her anticipated testimony, she is

16    characterized properly as a fact witness.  The government has

17    represented only that Finocchiaro will testify as to Bank of

18    America's charge-back processes and procedures, and while the

19    government is not explicit on this point, the Court assumes

20    that her personal knowledge of these procedures comes from her

21    experience as a Bank of America senior investigator.  Assuming

22    that to be so, her account of the charge-back procedures at her

23    employer constitutes fact testimony from a fact witness.  The

24    government has not provided any opinion that she would offer

25    about these procedures.

K1AHTEMC

1          The Second Circuit's decision in *United States v.*

2    *Marsh*, 568 F.App'x 15 (2d Cir. 2014), is apposite authority on

3    this point.  There, a law enforcement agent who was trained in

4    retrieving text messages and data from cell phones testified in

5    a criminal trial during which he explained his training,

6    described how he extracted messages from phones in that case,

7    and conveyed the contents of the extracted messages.  Id. At

8    17.  The Second Circuit rejected a challenge that the agent's

9    testimony was improper expert opinion testimony from a

10   nonexpert.  It explained that the agent "did not purport to

11   render an opinion based on the application of specialized

12   knowledge to a particular set of facts." Id.  The same is true

13   here.  The government's proffer does not foreshadow any opinion

14   testimony based on application of specialized knowledge to

15   facts.

16          Accordingly, assuming the government lays the proper

17   foundation as to why Finocchiaro has personal knowledge of the

18   matters about which she will testify, her testimony as

19   proffered is admissible fact testimony of a lay witness.

20   Teman's motion to exclude such testimony is therefore denied.

21          For avoidance of doubt, this ruling does not authorize

22   and should not embolden the government to elicit expert

23   testimony from Finocchiaro.  The Court suspects that she will

24   testify solely based on personal knowledge about relevant

25   practices and procedures at her employer, Bank of America.

K1AHTEMC

1          Finally, I will turn to the government's most recent

2     motion, which asks the Court to preclude expert opinion

3     testimony that Teman proposes to offer.  Teman's proposed

4     expert is J. Benjamin Davis.  Davis is a lawyer whose practice

5     focuses on the financial services industry and who, according

6     to Teman, has had extensive experience with check negotiation

7     issues.  See docket 74-1 at 1.  On January 5, 2020, Teman gave

8     the government notice of Davis' anticipated testimony.  See Id.

9     Teman states that Davis' testimony would include, inter alia,

10    descriptions of what constitutes a "remotely created check" and

11    what constitutes a "counterfeit check" and his opinions that

12    the checks were "valid RCC" and thus not counterfeit.  See Id.

13    At 2-4.

14          The government seeks to preclude Davis' testimony for

15    three reasons:  First, that it is irrelevant and will not be

16    helpful to the jury; second, that it improperly intrudes on the

17    province of the Court to give legal instruction to the jury;

18    and third, that his opinions are not the product of reliable

19    principles and methods, as required under Rule 702.  Teman

20    disagrees on all fronts.

21          I will first address Davis' testimony related to RCCs,

22    followed by his testimony related to counterfeit checks.

23          First, as to whether Teman's checks constitute valid

24    RCCs, the Court will exclude this testimony.  Davis' testimony

25    about RCCs is simply irrelevant.  This issue mirrors the issue

K1AHTEMC

1    raised by the Federal Register Notice discussed earlier, and

2    which I am also excluding.  As I reviewed in connection with

3    that notice, this case does not concern the technical

4    regulatory question of whether the checks meet the Federal

5    Reserve Board's definition of a valid RCC, as interpreted by

6    Davis or otherwise.  This is a criminal case, and the issue on

7    Counts One through Four is whether the government has

8    established beyond a reasonable doubt that Teman is guilty of

9    bank fraud or wire fraud.  On those counts, the government

10   alleges that Teman's fraudulent scheme consisted of

11   representing to the bank or banks at which he deposited the

12   checks that he had authorization from the owner of the account

13   on which the checks purported to be drawn to create those

14   checks and to deposit them into his own accounts.  The

15   indictment alleges that Teman, in fact, lacked such

16   authorization.  And as to Teman's fraudulent intent, the

17   indictment alleges that Teman acted with intent to defraud when

18   he pretended to have such authorization.

19           Davis' testimony about technical compliance with RCC

20   regulations has no bearing on either the act or the intent

21   requirement of these criminal statutes.  If Teman had the

22   customer's authorization to create and deposit the checks, it

23   does not matter whether he did or did not technically comply

24   with the Federal Reserve requirements for an RCC.

25   Contrariwise, if Teman otherwise complied with the technical

K1AHTEMC

1    requirements for an RCC but did not have the customer's

2    authorization to create and deposit into his account a check

3    drawn on the customer's account, and yet intended to do so and

4    did so with the intent to defraud, no amount of compliance with

5    other technical regulatory specifications will serve as a

6    defense.  Davis is not a fact witness.  He is thus unqualified

7    and incompetent to discuss whether Teman's customers authorized

8    the checks in question, whether Teman knew or did not know

9    about such authorization or lack of authorization, and what

10   Teman's state of mind was when he negotiated the checks.

11   Davis' discussions of whether the checks are "valid" in some

12   technical sense does not bear on any issue at hand in this

13   criminal trial.  Further, on the other side of the Rule 403

14   balance, Davis' commentary on these points, like the Federal

15   Reserve Notice, would serve to confuse the jury as to what the

16   issues they must decide are.

17           Finally, any testimony in this area by lawyer Davis

18   would invade the Court's province to instruct the jury as to

19   the law.  As I have discussed with regard to the Federal

20   Reserve Notice, to the extent there is a value in explaining to

21   the jury that checks can lawfully be remotely created and

22   negotiated, the Court is open to doing so through an

23   instruction, and I've invited the parties to propose such an

24   instruction to the Court by Wednesday, January 15.

25           Second, as to whether Teman's checks qualify by some

K1AHTEMC

1     technical standard as "counterfeit," Davis' testimony is also

2     irrelevant.  Davis proposes to testify that "a counterfeit

3     check is a check in which all features have been fabricated

4     (i.e., it is not from check stock that originally belonged to

5     the account holder), including the signature of an authorized

6     signer on the account." Docket 74-1 at 2.  Davis would then

7     testify that, in his opinion, the checks do not meet this

8     definition and are thus not counterfeit.  I will also exclude

9     this testimony.  It is not relevant to any issue presented in

10    this criminal case.  The allegation here, again, is that Teman

11    falsely represented that he had customer authorization to

12    create and negotiate the checks made out to him.  Teman's guilt

13    or innocence here does not turn on whether every last feature

14    of a particular check was fabricated or only some parts.

15    Again, the allegation here is that Teman falsified and falsely

16    represented the fact of the account holder's authorization for

17    Teman to create and negotiate a check.  If so, and if Teman

18    acted with intent to defraud in doing so, subject to the

19    jurisdictional elements, the elements of bank and wire fraud

20    will have been established.  That is so even if hypothetically

21    some feature of the check stock was not fabricated by Teman.

22            Here's an illustration.  If Teman, for example, had

23    taken preexisting, preprinted but blank checks of the account

24    holder and then, without authorization, filled out these checks

25    to himself and negotiated them, with intent to defraud, and if

K1AHTEMC

1    the jurisdictional elements were established, he would be

2    guilty of the offenses charged, notwithstanding the fact that,

3    say, the account holder's preprinted address appeared on the

4    checks.  Davis' technical discussion of how the checks align

5    with his understanding of the word "counterfeit" does not

6    assist the jury in evaluating whether any element of bank or

7    wire fraud has been established.  As with Davis' proposed

8    testimony about RCCs, his pontificating on this subject, too,

9    would serve only to confuse and distract the jury.

10            I will therefore preclude Davis from testifying on

11   this subject too.

12            There is, however, one caveat.  Although this case is

13   not brought under a federal statute regarding counterfeit

14   checks, but instead, as relevant here under the bank and wire

15   fraud statutes, the government in the "to wit" clauses of

16   Counts One through Four of the indictment has chosen to use the

17   adjective "counterfeit" to describe the checks that Teman

18   deposited.  From both the indictment and the government's

19   account in its filings in this case in its theory of liability,

20   it seems clear to the Court that, in context, the term

21   "counterfeit" is being used in the "to wit" clauses in the lay

22   sense to describe the fact of checks that were created without

23   the account holder's authorization.  Insofar as the checks

24   purported to have been drawn by the account holder to the

25   payees in the sums indicated, but in fact had not been, they

K1AHTEMC

1    were "counterfeit."  There's no indication, in the indictment

2    or otherwise, that by use of that adjective, the grand jury

3    intended some other technical meaning of counterfeit, such as

4    the one that Davis may have in mind, in which he contends that

5    literally every jot and tittle of the check must have been

6    fabricated by the defendant before it may be called

7    counterfeit.

8              I will, however, confirm with the government that the

9    use of the term "counterfeit" in the "to wit" clause of the

10   indictment was not based on the grand jury's having been

11   presented with a technical definition of the concept of

12   counterfeit along the lines that Davis proposes to use.  If it

13   were unexpectedly to turn out that the indictment was returned

14   pursuant to such an instruction, I would then, of course, have

15   to reassess this ruling.

16             I'll also say this to defense counsel.  I do not

17   expect this case to take an unexpected turn that would make

18   expert testimony in any of these technical points relevant.

19   But trials sometimes take unexpected courses.  You are at

20   liberty, outside the presence of the jury, to make the argument

21   that some development at trial has created a justification for

22   expert testimony along the lines proffered.

23             And that concludes my ruling.

24             So, Mr. Bhatia, let's just go to that last point.  I'm

25   not asking you to disclose the transcript of the grand jury,

K1AHTEMC

1    but I am trying to understand what was meant by the term

2    "counterfeit."  Was the grand jury given a definition of the

3    term "counterfeit"?

4            MR. BHATIA:  No, your Honor.  I think what you

5    described in your ruling --

6            THE COURT:  Speak into the mic a little bit more.

7            MR. BHATIA:  When you described in your ruling the use

8    of counterfeit in the lay sense as sort of non-genuine or

9    non-authorized, I think that was the intended --

10           THE COURT:  That was theory presented to the jury?

11           MR. BHATIA:  That's right.

12           THE COURT:  That's certainly consistent with the text

13   of the indictment in this case.

14           All right.  That concludes, then, my ruling.  We'll

15   take a ten-minute recess, and when we come back we'll continue.

16           (Recess)

17           THE COURT:  Continuing on with the issues before us,

18   trial length, particularly given the rulings that I've made,

19   that may inform something about the length of the trial.

20           Government, do you have an estimate of the number --

21   how long the trial will be?

22           MR. BHATIA:  Your Honor, I think in the three- to

23   four-day range, that will include cross.

24           THE COURT:  When you make that estimate, are you

25   taking into account jury selection and jury arguments?

K1AHTEMC

1              MR. BHATIA:  I think the government can close by the

2       end of the fourth day.

3              THE COURT:  What assumption, if any, are you making

4       about a defense case when you make that estimate?

5              MR. BHATIA:  That's just based on the government's

6       case.

7              THE COURT:  That assumes no defense case?

8              MR. BHATIA:  Yes.

9              THE COURT:  Three to four days.

10             Defense, anything you want to share?  I'm just trying

11      to think about this from a planning perspective, including what

12      to say to the venire.

13             MR. GELFAND:  Obviously, without waiving any rights,

14      your Honor, I would anticipate an approximately one-day defense

15      case, if any.

16             THE COURT:  So that's helpful.  Putting all that

17      together, we're going to be starting on Tuesday, January 21.  I

18      will sit that Friday.  So that gives us four days the first

19      week.  I suppose what I ought to say is the parties expect the

20      trial to be over between one and two weeks.  Does that sound

21      like a fair estimate?  Probably erring on the lower side, but

22      I'll find words to the venire along those lines.  That sound

23      right?

24             MR. GELFAND:  With us, your Honor.

25             MR. BHATIA:  That sounds appropriate.

K1AHTEMC

1              THE COURT:  All right.  I don't think this will

2      matter, but I'm wide open the last week, save that if this is

3      still ongoing on Thursday, the 30th, I have a long-scheduled

4      speaking engagement in Midtown which would knock out an extra

5      long lunch period, but otherwise I have no blocks on my time,

6      at least through that day.

7              Mr. Smallman points out that I have a multi-defendant

8      case on Wednesday morning at 9 o'clock, but based on the

9      estimates I'm getting, it sounds as if there's a good chance

10     the jury will be out by then deliberating, in which case we can

11     accommodate both.  We'll see.  In any event, my chambers will

12     take stock of how this case is going with you late in the first

13     week and decide what, if any, implications it has for this

14     conference, but this takes precedence.

15             All right.  As to my daily schedule, I expect counsel

16     and the defendant to be in their seats and ready to go at

17     9:00 a.m. sharp each day of the trial.  Set aside for a moment

18     the very first day of the trial where the same will apply, the

19     ordinary schedule that I use when we have a jury is as follows:

20     Counsel are expected to be in their seats at 9:00 a.m.  I tell

21     the jury they need to be ready to go and ready to be brought

22     out at 9:30, but we invite them to come as early as 8:45 when

23     we have breakfast available to them in the jury room, and that

24     often has the result of getting jurors here early.

25             Between 9:00 and 9:30 we use the time to work through

K1AHTEMC

1    issues that may come up during the trial day or, for that

2    matter, later in the trial.  But at 9:30, as soon as the last

3    juror has arrived, we bring the jury out, and we sit till

4    5:00 p.m.  I try to sit a full day to project to the jury that

5    we're respecting their time.  We'll take a break in midmorning

6    and midafternoon, a comfort break, of ten to 15 minutes, and

7    we'll take a lunch break in the middle of the day.  But

8    otherwise, we're going to work relentlessly from 9:30 to 5:00

9    with the jury.

10            After 5:00 p.m., you should expect to be here to the

11   extent that there may be issues for the next day or for a jury

12   charge, or whatnot, that I need to take up with you.  While, if

13   necessary, of course, I will take sidebars, I prefer to avoid

14   doing so when I -- as much as possible.  I prefer instead to

15   take up issues with you at the start of the day, at the end of

16   the day, and so I very much value getting letters or getting

17   previews from counsel at those points, either before the day

18   starts or afterwards, so that I can ideally resolve issues, not

19   in the crucible at the sidebar but with a little more

20   forethought and deliberation.  It's already clear to me from

21   the extensive motion in limine briefing that both sides have

22   that sensibility.  I was glad to see it, but I want to

23   encourage you to keep doing that, to keep raising issues so I

24   can have an opportunity to think on them and not be forced to

25   think fast.  Avoiding sidebars also keeps us moving quickly.

K1AHTEMC

1    Juries hate it when we take long breaks doing that.  I will if
2    necessary, but I'd like to minimize it.
3         On January 21 we will start at 9:00 a.m.  Fair
4    warning, though, is that it will take some time to get us a
5    panel in all likelihood.  The jury will need to -- the video
6    will need to get -- assuming the people who are sitting are
7    there for their first week, will need to get trained on jury
8    service.  They'll need to watch the video, and they'll need to
9    be brought across the street.  And I have it on good authority
10   that there's a high-profile case that might take precedence
11   over ours in terms of completing questionnaires, and whatnot.
12   So we will get started, but there might be some need for some
13   sort of break.  I just don't know.  Just fair warning.  In any
14   event, because I won't see you between now and the 21st,
15   there's every chance a variety of housekeeping issues will pop
16   up, so be in your seats at 9:00 a.m. on the 21st.
17        I'm about to turn to voir dire.  Any questions about
18   the schedule, though?
19        MR. BHATIA:  No, your Honor.
20        MR. GELFAND:  No, your Honor.  One question, just
21   housekeeping question.  To the extent that any evidentiary
22   objections do require more detail, would the Court like us to
23   request sidebar or just make the objection?
24        THE COURT:  Try to make the objection in the first
25   instance just by reference to the --

K1AHTEMC

```
 1              MR. GELFAND:  Rules.
 2              THE COURT:  -- the rule of evidence, and I may prompt
 3     you for elaboration if I need help.  If there's something
 4     fundamental, I'm open to your requesting a sidebar, but choose
 5     wisely.
 6              MR. GELFAND:  Appreciate it.  Thank you.
 7              THE COURT:  Very good.  I should say -- this is
 8     particularly relevant for the government since you go first --
 9     you need to always have your next witness handy.  The threat I
10     always make is if it's 4:45 and the last witness is done and
11     you don't have somebody else in the witness room, you'll be
12     taken as resting.  So be sure there's always someone on the
13     on-deck circle.
14              MR. BHATIA:  Understood.
15              THE COURT:  Let's turn to voir dire.  You've given me
16     the length of the trial that I will use, and I'll find words to
17     capture that.  Given the length of the trial, I think we're OK
18     just going with two alternates.  Anyone think otherwise?  Seems
19     like a short enough trial that I don't need more.
20              MR. DIRUZZO:  That's fine, Judge.
21              MR. BHATIA:  That's fine.
22              THE COURT:  All right.  So as to jury selection -- and
23     Mr. Imperatore knows this, but for everyone's benefit -- I use
24     the struck panel method.  That means what I will be doing is
25     having Mr. Smallman, in the first instance, identify 32
```

K1AHTEMC

1    prospective jurors numbered 1 through 32, and they will be --

2    the first eight will be in the first row of the jury box, nine

3    through 16 will be in the second row, and then 17 through 32

4    will be in the first few rows of the pews out here.  Each juror

5    will retain their number.  So if Juror 17 gets removed, the

6    successor juror will take the spot of No. 17 as opposed to

7    re-calibrating the rows.  That makes your housekeeping and your

8    paperwork in mind easier.

9              I will direct a lengthy series of questions at them

10   aimed at determining whether there is any valid basis for a

11   for-cause challenge.  And eventually, at the end of that

12   process, we'll have 32 people who have cleared for-cause

13   challenges.  At that point we have a short one-page

14   biographical questionnaire -- I use the same one in every

15   case -- that elicits information about employment, family

16   members' employment, education, hobbies, reading habits, and so

17   forth.  The final question, which counsel constantly tell me is

18   in some respects more revealing than many of the ones that come

19   before, asks if there's a famous person the juror admires and

20   briefly why.  Sometimes that smokes out latent interests,

21   biases, and so forth.

22              In any event, you'll have the benefit of all that

23   information.  I will then give you a very short break, but a

24   very short one, to determine how you intend to use your

25   strikes, and I'll then bring counsel into the robing room for

K1AHTEMC

1    the purpose of exercising your strikes.

2              This is important.  This just gets to the mechanics.

3    Under the rules, with respect to the jury as opposed to

4    alternates, the defense has ten strikes and the government has

5    six.  Those initial strikes are all to be directed to Nos.  1

6    through 28 of the 32.  Those are the people eligible to be our

7    regular jurors.  We will go, as per usual, in six rounds.  The

8    first four of which the defense will have two strikes and then

9    the government will have one, and the last two that each side

10   will have one strike.  The 12 People that remain will be our

11   jurors.

12             You need not go in sequence.  You can strike No. 27

13   and then in the next round strike No. 1.  There's no sequencing

14   requirement here.  But if you waive a strike in a particular

15   round, you can't use it again.  You can go back and use other

16   ones, but you can't use that one again.  So, defense, in round

17   two, if you say we waive our two strikes, you can't get those

18   back even though your round three strikes remain.

19             You should not, though, direct those first strikes,

20   ten the defense, six for the government, at the alternate

21   candidates, No. 29 through 32.  At the end of the exercise of

22   the strikes, as I said, the first 12 will be our jurors, if

23   somebody has waived a strike, the effect of that is, in effect,

24   to strike No. 28.  So after we have figured out who the 12

25   jurors are, each of you will then have one strike to be used as

K1AHTEMC

1     against Nos. 29 through 32, and the two that survive that

2     process, or the first two that do, will be our alternates.

3               As is commonly the case in federal court, but just to

4     make the point clear, the Court alone does the questioning of

5     the jurors.  There are no counsel questions.

6               Any questions about the mechanics of voir dire?

7               MR. BHATIA:  No, your Honor.

8               MR. DIRUZZO:  No, your Honor.

9               THE COURT:  Who will be at each table during the

10    trial?  Will it be the three people at each table who are here

11    now?

12              MR. BHATIA:  From the government, yes, your Honor.

13    One moment.

14              (Counsel confer)

15              MR. BHATIA:  Your Honor, we also have a case agent.

16    We have not made a decision yet about whether he will testify

17    as a witness at trial, but we may request that he sit at

18    counsel table.

19              THE COURT:  I think, under the rule, he is

20    permitted to sit here whether or not he is -- I think it's

21    Rule 615.  He's allowed to sit at the table as the embodiment

22    of the government's case, the government's corporate

23    representative.  Just let Mr. Smallman -- or, rather, let my

24    law clerks know beforehand, because they're going to be

25    preparing a script for voir dire, and I need to know who's

K1AHTEMC

1    going to be there.

2              MR. BHATIA:  We will.

3              MR. GELFAND:  It will be --

4              THE COURT:  Defense?

5              MR. GELFAND:  It will be exactly as you say, your

6    Honor.

7              THE COURT:  There's a point in voir dire where one by

8    one I ask you both each of you to rise and look at the jury,

9    look here and at the venire in the back.  Listen closely to my

10   command for when you should get up.  I don't want all three of

11   you getting up.  I want it one by one, and I will choreograph

12   it that way.

13             Please -- and Mr. Smallman points out he will need to

14   know who's here for the appearance sheet, so tell him too.

15   Fair enough.

16             Do not say "hello" to the jury, please.  It annoys

17   them to have people sucking up in that sort of a way, and I'm

18   asking you just to simply get up and let them see you.  But

19   it's not an opportunity to wish them all well.

20             All right.  For voir dire, I will need an alphabetical

21   list of all names that may come up in the case.  These are not

22   just witnesses, but names that may come up.  What I appreciate

23   is one list of human being names and one list of corporate

24   names, but make those separate and make them alphabetic.  You

25   should get rid of the people who are named and present at the

K1AHTEMC

1    trial table.  There's no need to include the lawyers or

2    Mr. Teman on that list.  I'll ask the government to get that to

3    me after consultation with the defense.  If you have other

4    names, please just add that.

5            All right.  Let me briefly read to you just a very

6    short statement that I intend to give to the venire, as I do in

7    all cases, just so they have a general understanding of what

8    the case is about.  I try to make this very stripped down.

9    It's not an opportunity to figure out what all the curlicues

10   are in the case, but really just to smoke out issues of bias in

11   case somebody has had a life experience that looks like this

12   case.

13           This is what I propose to read to the venire.  When

14   I'm done reading this to you, I'll ask you if there are any

15   inaccuracies or any necessary edits:

16           "So you can understand the reason for the questions I

17   will be asking you shortly, I will now tell you briefly about

18   this case.  I want you to understand that nothing I say today

19   regarding the description of the case is evidence.  The

20   evidence that you will consider, if selected as a juror, will

21   come only from the trial testimony of witnesses, from the

22   reading of" -- sorry -- "from the trial testimony of witnesses

23   and from exhibits that are entered into evidence.

24           "As I have explained, this is a criminal case.  It is

25   entitled United States of America v. Ari Teman.  Mr. Teman has

K1AHTEMC

1    been charged with committing federal crimes in an indictment

2    returned by a grand jury sitting in this district.  I will now

3    summarize the charges in this case in order to determine

4    whether anything about this case may make it inappropriate for

5    any of you to sit on the jury.

6         "In summary, the indictment charges Mr. Teman with

7    committing fraud by depositing into bank accounts that he

8    controlled checks drawn on other people's accounts but which

9    Mr. Teman was not authorized to deposit.  It alleges that

10   Mr. Teman did this with two checks in approximately March 2019.

11   It alleges that Mr. Teman did this again between April and

12   June 2019, this time with 27 checks.  In each instance, the

13   indictment alleges that Mr. Teman later used money that he had

14   and deposited for his personal benefit.

15        "In connection with each set of deposits, the

16   indictment charges Mr. Teman with three crimes: Bank fraud,

17   wire fraud, and aggravated identity theft.  Mr. Teman denies

18   these charges.

19        "Now, let me stress that an indictment is not

20   evidence.  It simply contains the charges against the

21   defendant, and no inference may be drawn against the defendant

22   from the existence of the indictment.  You must always keep in

23   mind that the defendant is presumed innocent, that he has

24   entered a plea of not guilty to the charges against him, and

25   that the government must prove the charges in the indictment

K1AHTEMC

1    beyond a reasonable doubt."

2              So, counsel, tell me, any issues with that summary?

3              MR. DIRUZZO:  Judge, I would just ask that there --

4    there are two things:  One, the description of evidence, I

5    think it also needs to have an inclusion for stipulation of the

6    parties.

7              THE COURT:  From trial testimony stipulations of the

8    parties?

9              MR. DIRUZZO:  And documentary evidence.

10             THE COURT:  It says exhibits, so that's fine.

11   Stipulation, good catch, yes.

12             MR. DIRUZZO:  Then I believe you said Mr. Teman

13   deposited checks belonging to people, and I believe the alleged

14   victims are all entities.

15             THE COURT:  OK.  In other words, I should change

16   "people" to "companies" or "entities"?  What's the right word?

17             MR. DIRUZZO:  Companies, businesses.

18             MR. GELFAND:  Companies or businesses.  I don't know.

19   There's one other thing, your Honor, I may have misheard.

20             THE COURT:  Sorry, one second.  It says:  "In summary,

21   the indictment charges Mr. Teman with committing fraud by

22   depositing into bank accounts that he controlled checks drawn

23   on other people's accounts ..." and you want "people" changed

24   to "businesses."  I'm not sure, in the context here, people is

25   a shorthand for meaning other than Mr. Teman.  But what would

K1AHTEMC

1    you propose I change?

2              MR. GELFAND:  Companies.

3              MR. DIRUZZO:  Companies.

4              THE COURT:  On the accounts of -- I just want to make

5    sure it's clear these are companies, of course, that are not

6    his.

7              MR. DIRUZZO:  Yes.

8              MR. GELFAND:  "Customers of Mr. Teman's company"?

9              THE COURT:  The business relationship, that's for you

10   all to litigate.

11             Government, what's your view?

12             MR. BHATIA:  Your Honor, I think it may be fair to say

13   "on the accounts of others" to keep it most neutral, "checks of

14   others."

15             THE COURT:  "On the accounts of others," that's fine.

16   I can say "checks drawn on the accounts of others."  All right.

17   I'm not going to commit that I will use that language, but

18   that's certainly adequate.  I may play with it a bit, but I

19   take the defense point not to use the word "people" when it's

20   actually corporate accounts.

21             MR. GELFAND:  On an unrelated note, I might have

22   misheard this, your Honor, but the aggravated identity theft

23   counts are actually only associated with the March checks, and

24   I think the summary might have conflated that they were

25   associated with the --

K1AHTEMC

1            THE COURT:  Yes, right.

2            MR. GELFAND:  I don't remember the exact language, but

3      I just wanted to flag that for the Court.

4            THE COURT:  Right.  I have written "in connection with

5      each set of deposits, it charges him with three crimes," and

6      that's not correct.  Why don't I say "in connection with these

7      deposits," that way it doesn't specify how the aggravated

8      identity --

9            MR. GELFAND:  That's fine, your Honor.

10           THE COURT:  Very good.  With three -- it's irrelevant

11     to the jury in jury selection whether there are multiple

12     instances of separate crimes.  I think it's enough to say three

13     crimes or sets of crimes, bank fraud, wire fraud, and

14     aggravated identity theft.

15           Are we OK with the description as edited?

16           MR. BHATIA:  Yes, your Honor, I think with the change

17     for aggravated identity theft, it all sounds good.

18           THE COURT:  Good.

19           MR. DIRUZZO:  We're fine, Judge.

20           THE COURT:  Thank you, counsel.

21           All right.  Next issue is courtroom technology.  I

22     know you're going to be meeting with Mr. Smallman for a

23     walk-through, but just so I understand, government, you're

24     going to be starting off.  How are you going to be -- how

25     voluminous are the exhibits in this case, and how do you intend

K1AHTEMC

1     to make them known to the jury?

2              MR. BHATIA:  Your Honor, I don't think the exhibits

3     are too voluminous in this case.  What do you mean by how --

4              THE COURT:  Are you going to use the ELMO?  Are you

5     going to hand out hard copies?  Are you going to --

6              MR. BHATIA:  I think we're intending to use the

7     courtroom --

8              THE COURT:  Computer system?

9              MR. BHATIA:  -- computer system.

10             THE COURT:  Not the ELMO at the podium?

11             MR. BHATIA:  That's right.

12             THE COURT:  All the more important, because it's a

13     balky courtroom and important that -- I guess this is probably

14     more for Mr. Magliocco than anyone in the courtroom -- you be

15     ready for prime time, so work with Mr. Smallman and be ready

16     beforehand.

17             MR. BHATIA:  Yes.

18             THE COURT:  Mr. Smallman points out that Mr. Magliocco

19     has ably assisted me, I think, in the Rivera trial?  Rivera --

20     Polanco?

21             MR. MAGLIOCCO:  Polanco trial.

22             THE COURT:  Quite right.  Defense, what about you?

23     What are your thoughts as to technology?

24             MR. GELFAND:  Your Honor, our instinct, as of now, is

25     to rely primarily on the ELMO, as far as documentary exhibits.

K1AHTEMC

1    We also are going to make sure that we're fully situated with

2    the court's AV equipment so we can electronically display, as

3    well, using common software.

4              THE COURT:  The issue would be for you, for example,

5    if there was something produced in discovery that you want to

6    show to the witness, just make sure that you have tested your

7    ability to use that.  The jurors can't stand fumbling around

8    and long delays.  So you will benefit as much as anyone by your

9    being crisp in the use of that.

10             MR. GELFAND:  Absolutely, your Honor.

11             THE COURT:  Very good.  Anything else on courtroom

12   technology?

13             MR. BHATIA:  Nothing, your Honor.

14             THE COURT:  OK.  Jury addresses.  We have a -- it's

15   not present here right now, but we have a portable podium that

16   will be before the jury.  Not that, but a portable one.  It

17   will be right in front of the jury box.  The important thing is

18   that it does not contain a microphone, so Mr. Smallman has a

19   handheld wireless mic which we usually lie down on the bar

20   before the jury right next to the podium, and that will pick up

21   everyone's voice.  What it means is, though, you shouldn't be

22   straying far from the podium because you'll lose the mic.  So

23   just as an FYI.

24             With respect to questioning of witnesses, you're to

25   question the witnesses from the podium back here.  Please,

K1AHTEMC

1    except for presenting documents to the witness, you shouldn't

2    be questioning from the well of the courtroom.  It's an

3    ancient, old courtroom.  If you're far from the mic, it's hard

4    to be heard.  You'll surely hear me from time to time asking

5    people to keep their voices up.

6              All right.  3,500 material.  Has the government

7    provided 3,500 to the defense; if so, when does it intend to do

8    so?

9              MR. BHATIA:  Your Honor, we have not produced 3,500,

10   but we plan to do it in the first half of next week.

11             THE COURT:  All right.  I can't order you to do it on

12   a particular date, but can you commit to a specific date so the

13   defense knows?

14             MR. BHATIA:  We can produce it by Wednesday of next

15   week.

16             THE COURT:  How voluminous is the 3,500 material?

17             MR. BHATIA:  I don't expect it to be very voluminous,

18   certainly not beyond what has already been produced as

19   discovery.

20             THE COURT:  Not beyond what?

21             MR. BHATIA:  Not beyond what has been produced in

22   discovery.

23             THE COURT:  I don't know what that means.

24             MR. BHATIA:  Some of the 3,500 has already been

25   produced as Rule 16 discovery.

K1AHTEMC

1          THE COURT:  Right.

2          MR. BHATIA:  It may not be new.  I don't expect it to

3    be voluminous, though.

4          THE COURT:  All right.  Please, when you get the

5    binders -- or binder or binders, please get two sets of that to

6    my chambers as well.  I will often flip through it beforehand

7    just to get a sense of what's coming, and it's important for me

8    and my law clerk each to have a set of that.

9          MR. BHATIA:  We will.

10         THE COURT:  All right.  Government, also, just in the

11   interest of enabling the defense to prepare, it is my practice

12   to ask you each day who the next witnesses are likely to be.

13   Obviously, in the event there's a good reason, you may need to

14   shake it up, but nobody benefits by mystification.  So I will

15   expect you to give the defense a sense of who your next

16   witnesses are at the end of each day.

17         MR. BHATIA:  Understood.

18         THE COURT:  Obviously, you can do so beforehand,

19   before even that, all the better.  That also allows me to

20   prepare for the next day's testimony.

21         To the extent that you're updating 3,500 material, per

22   usual, I expect that I would get hand delivered to us whatever

23   additional three-hole punched supplements there are as they get

24   generated.  Usually counsel tend to give it to my chambers at

25   the end of the court day or at the beginning of the next court

K1AHTEMC

1    day.

2              Government, I would welcome a pair of exhibit binders

3    as well.  Obviously, you're at liberty to update those.  I

4    assume that you can get those to me the Friday before trial,

5    the 17th.

6              MR. BHATIA:  We will.

7              THE COURT:  And, obviously, the same to the defense.

8              All right.  I have benefited by the government's

9    preparation of an exhibit list and your updating it on a daily

10   basis to annotate what has been received in evidence, that way

11   it makes sure that both tables in the court are on the same

12   page and have no doubt of what's been received in evidence.  I

13   ask you to kindly prepare that.  I'm rather sure we did that in

14   the Polanco trial.

15             Verdict form.  This is about as straightforward as it

16   gets, but, defense, do you have any issues with -- I may make

17   some nonsubstantive changes, but any issues with the verdict

18   form as provided by the government?

19             MR. GELFAND:  Not at first glance.  The only question,

20   depending on what ultimately turns on disputes at trial, is

21   whether we would request any special interrogatories.

22             THE COURT:  Right.  There's no sentencing factor here.

23             MR. GELFAND:  Correct.

24             THE COURT:  What would the purpose be of a special

25   interrogatory?

K1AHTEMC

1              MR. GELFAND:  I don't anticipate there will be any.  I

2     just wanted to get a carve-out theoretical exception.

3              THE COURT:  If you come up with some issue with the

4     verdict form, let me know as soon as possible.

5              MR. GELFAND:  Absolutely.

6              THE COURT:  Almost done here.  Plea offers.  This

7     being our last conference, I need to put on the table and raise

8     whether any plea offers have been made to the defendant and to

9     confirm that they were communicated to him.  For the benefit,

10     in particular, of Mr. Teman, the reason courts do this is not

11     to pry but, rather, because from time to time one gets

12     post-trial complaints by defendants that plea offers were never

13     communicated to them.  Sometimes these happen years after the

14     fact.  It's important that a Court inquire at this stage

15     whether there was any such thing, just so that there's a clear

16     understanding from everybody about what happened as to the plea

17     process.

18              Government, can you put on the table what, if any,

19     plea offers have been made in this case.

20              MR. BHATIA:  Your Honor, no formal plea offers have

21     been made in this case.

22              THE COURT:  I take it there must have been some

23     informal discussion, or not even that?

24              MR. BHATIA:  We have had informal discussion at

25     different stages of the case, but there hasn't been a formal

K1AHTEMC

1    offer.

2              THE COURT:  All right.  Mr. Gelfand, is that correct?

3              MR. GELFAND:  Yes, your Honor, it is.  What I would

4    note, for the record, is that Mr. Teman has consistently

5    expressed his intention to proceed to trial and his lack of

6    interest in any sort of plea.  As a practical matter,

7    government counsel being government counsel and defense counsel

8    being defense counsel, we have engaged in just some very

9    general dialogue over the course of this case, nothing that has

10   materialized in an offer, either by the government or a request

11   by the defense.

12             THE COURT:  I'm going to ask Mr. Teman just to confirm

13   that's his understanding.

14             Mr. Teman, is it correct that you are unaware of any

15   plea offer, any formal plea offer, having been made to you?

16             THE DEFENDANT:  Correct, your Honor.

17             THE COURT:  Any counsel believe I need to inquire

18   further about this subject?

19             MR. BHATIA:  No, your Honor.

20             MR. GELFAND:  No, your Honor.

21             THE COURT:  All right.  There's a final matter

22   relating to the grand jury which I'll take up in a moment, but

23   before that, does anyone have anything else relating to the

24   trial that they want to raise?

25             MR. BHATIA:  No, your Honor.

K1AHTEMC

1          MR. DIRUZZO:  Your Honor, before we get into the grand

2     jury portion, early this morning, earlier this morning, counsel

3     for the government provided us with a letter indicating they

4     have effectively changed the alleged victims for the aggravated

5     identity counts.  We view this, given the government's past

6     representations -- and I'm sorry I don't have a copy, but I

7     literally got the email with the letter while we were in the

8     courthouse, your Honor, so I don't have a copy to provide the

9     Court -- but as a result of the government's total change in

10    its position as to who the alleged victims of the agg. ID

11    counts are, we're taking the view that the government now has

12    to have *Brady* information because the government has made

13    representations in the past that are now totally inconsistent.

14    And we believe that, at a minimum, the information and the

15    testimony before the grand jury that resulted in the previous

16    indictment and previous superseding indictment will be *Brady*,

17    some form of *Brady* material.

18          THE COURT:  Let's unpack this.  Who are you told is

19    the victim of -- is Entity 3, the -- Count Five charges

20    aggravated identity theft for March 2019.  It says that Teman

21    deposited a check using the personal identifying information of

22    an individual associated with Entity 3.  Who's Entity 3?

23          MR. DIRUZZO:  Your Honor, unfortunately, given that it

24    just came to me via email, the only way I'd be able to answer

25    that would be to look on my phone, which I have turned off, and

K1AHTEMC

1        I don't want to offend the Court.

2                THE COURT:  You're not offending the Court.  I'm just

3        trying -- you're telling me there's been a switch, so I'm

4        trying to figure out who it was earlier and who it is now.

5                MR. GELFAND:  Your Honor, I think this may help.  The

6        government, by letter this morning, indicated that the entity

7        referenced in Count Five is Mercer, whatever the formal name

8        is.

9                THE COURT:  Right.

10               MR. GELFAND:  And then the entity referenced in Count

11       Six is Coney.

12               THE COURT:  Count Six refers to Entity 4.

13               MR. GELFAND:  Correct.

14               THE COURT:  Spell Coney.

15               MR. GELFAND:  Coney, C-o-n-e-y.

16               THE COURT:  And those same counts appeared in the

17       preceding indictment, correct?

18               MR. GELFAND:  Correct, your Honor.

19               THE COURT:  Are you saying that you were told that

20       either Entity 3 or 4 were different than Mercer and Coney,

21       respectively, earlier?

22               MR. GELFAND:  No, the entities were not different.

23       What was different -- I can -- just for the Court's benefit, by

24       email dated November 12 of 2019, government counsel,

25       Mr. Gutwillig, in an email to me, cc'ing Mr. DiRuzzo, stated --

K1AHTEMC

1    I don't know if the Court's OK with me naming the alleged

2    victims.

3              THE COURT:  Sorry?

4              MR. GELFAND:  Is the Court OK with me naming the

5    alleged victims?

6              THE COURT:  Sure.  There is a *Brady* issue here.

7              MR. GELFAND:  Stating "the victims are, one, for Count

8    Three, which was the prior enumeration, Peter Rebenwurvel,

9    R-e-b-e-n-w-u-r-v-e-l, and for Count Four, Gina, G-i-n-a, Hom,

10   H-o-m, and then --

11             THE COURT:  Meaning that Rebenwurvel was associated

12   with Mercer, and Hom was associated with Coney?

13             MR. GELFAND:  Rebenwurvel actually related to how

14   Count Three was charged previously as Coney and Hom was Mercer.

15             THE COURT:  I'm confused.

16             MR. GELFAND:  Rebenwurvel is associated --

17             THE COURT:  Sorry, the original Count Three, is that

18   the current Count Five, or is it the current --

19             MR. GELFAND:  The original Count Three is the current

20   Count Six.

21             THE COURT:  So the original Count Three --

22             MR. BHATIA:  Your Honor, if I might offer some

23   clarity?

24             THE COURT:  That would be great.

25             MR. BHATIA:  The original Count Three -- sorry, the

K1AHTEMC

1    first superseding Count Three is now Count Five.  And for Count

2    Three previously and now Count Five, the corporate entity is

3    Coney Realty.

4            THE COURT:  Count Three and Five.  So what defense

5    counsel said was wrong earlier that Mercer is --

6            MR. BHATIA:  I think they just flipped.

7            THE COURT:  I'm sorry.  You need to speak up.

8            MR. BHATIA:  Yes, your Honor.  It was incorrect.

9            THE COURT:  Let me see if I've got this right.  I'm

10   going to ask you, Mr. Gelfand, just to listen closely to what

11   my colloquy with government counsel is.  This may clear things

12   up.  It may be that it's utterly unnecessary to involve me

13   because there hasn't apparently been a dialogue with counsel,

14   but let's see if we can work this out.

15           Count Five, government counsel, identifies Entity 3.

16   Who is Entity 3?

17           MR. BHATIA:  Entity 3 is Five -- well, it's 518

18   West 204th LLC, which is operated by -- I say "operated" in the

19   lay sense -- associated with or operated by Coney Realty.

20           THE COURT:  All right.  So Count Five, Entity 3, is

21   Coney in the vernacular, and Count Six, Entity 4, is who?

22           MR. BHATIA:  It's Crystal Real Estate.  It's actually

23   18 Mercer Equity, but it's really sort of operated by Crystal

24   Real Estate.

25           THE COURT:  Is there a Mercer involved?  So that's

K1AHTEMC

1    Mercer in that sense?

2              MR. BHATIA:  The corporate entity is 18 Mercer Equity,

3    I think, Inc. Or LLC, and it's operated by Crystal Real Estate.

4              THE COURT:  All right.  What was the predecessor count

5    to the current Count Five?

6              MR. BHATIA:  Count Three.

7              THE COURT:  What was the predecessor count to the

8    current Count Six?

9              MR. BHATIA:  Count Four.

10             THE COURT:  All right.  So focusing on the current

11   Count Five where it's this 518 West 204th LLC operated by

12   Coney, was that the same entity that Mr. Gutwillig indicated

13   was the victim of count -- of the earlier Count Three?

14             MR. BHATIA:  I can clarify the victim question.  The

15   corporate entities for the checks that were drawn were the

16   same.

17             THE COURT:  Right.

18             MR. BHATIA:  Previously Coney, now Coney.

19             THE COURT:  Right.

20             MR. BHATIA:  Previously, the government had agreed

21   that the victim of identity theft, the individual, the person,

22   was Peter Rebenwurvel.  The government disclosed this morning

23   in a letter providing particulars that the victim -- the

24   victim, persons whose means of identification have been taken,

25   are three individuals:  Peter Rebenwurvel -- let me make sure I

K1AHTEMC

1      say it right from my letter -- Michael Haas.

2              THE COURT:  Michael, spell the last name.

3              MR. BHATIA:  H-a-a-s.

4              THE COURT:  Right.

5              MR. BHATIA:  And Ephraim Nuremberg.  Actually, your

6      Honor, I now realize the source of confusion here.  In the

7      indictment, what I described was correct.  I believe in the

8      bill of particulars today, we flipped the entities.  That's the

9      source of confusion.

10             THE COURT:  The source of confusion is that your

11     letter today is wrong?

12             MR. BHATIA:  The letter flips Count Five and Count

13     Six.  We'll give them a new letter.

14             THE COURT:  All right.  Once you correct your

15     letter --

16             MR. BHATIA:  That's right.

17             THE COURT:  -- will there be symmetry between your

18     disclosures as to the earlier Count Three and the current Count

19     Five?

20             MR. BHATIA:  No.

21             THE COURT:  What's changed?

22             MR. BHATIA:  Previously the government had agreed with

23     defense counsel -- the government and defense counsel had

24     agreed to file a stipulation providing the particulars.  I

25     think we've now had a sense that a letter providing those

K1AHTEMC

1     particulars is sufficient.  But previously we had agreed that

2     the victim of the identity theft count for Coney was Peter

3     Rebenwurvel.

4               THE COURT:  Right.

5               MR. BHATIA:  We now believe that the victims were

6     three individuals.  So the first one was relating to the first

7     superseding indictment, and as to the second superseding

8     indictment, we're alleging that it's these three individuals.

9               THE COURT:  That's all fine and good, but the

10    indictment doesn't say that.  Count Five of the superseder uses

11    singular.  It says an individual associated with Entity 3.  Who

12    did the grand jury -- what was the charge to the grand jury as

13    to who that individual was?  We can't have a shifting target.

14    That reflects a charge by the grand jury.  That's what the

15    defendant will be tried on.  Who's that individual?

16              MR. BHATIA:  Your Honor --

17              THE COURT:  Can't just say three people if you say "an

18    individual."

19              MR. BHATIA:  I just want to tread lightly, knowing

20    that I'm in the domain of the grand jury.

21              THE COURT:  But, look, sorry, but the grand jury

22    formulates the charges.  The government doesn't add content to

23    and change the charges.  And for better or worse, you went to

24    the grand jury and said "an individual."  Who is that

25    individual?

K1AHTEMC

```
 1                MR. BHATIA:  May I have a moment, your Honor?

 2                THE COURT:  Yes.

 3                (Counsel confer)

 4                MR. BHATIA:  Thank you, your Honor.

 5           The grand jury was presented with the fact that

 6   individuals associated with the company had not authorized the

 7   check, and signers on the account had not authorized the check.

 8                THE COURT:  Right.

 9                MR. BHATIA:  The government has learned that the three

10   signers on the account, the signers on the two victim accounts,

11   were the people identified in the particulars here.

12                THE COURT:  Right.  I'm not stating you don't have a

13   factual basis.  The question is what was to be presented to the

14   jury here?  It needs to track the indictment returned by the

15   grand jury.  So the question is what is meant when you say "an

16   individual"?  Was that a somewhat inexact way of saying three

17   individuals?

18                MR. BHATIA:  I think it was an inexact way of saying

19   three individuals.

20                THE COURT:  What was presented to the grand jury?  Was

21   the grand jury presented with the evidence substantiating that

22   the personal identification of three individuals was --

23                MR. BHATIA:  My recollection is that the grand jury

24   was not presented with a single name.  It was not presented

25   with a victim.  It was presented with --
```

K1AHTEMC

1              THE COURT:  All three?

2              MR. BHATIA:  It was -- I shouldn't say it was even

3     presented all three.  I believe it was presented with testimony

4     that no one associated with the company, as far as the

5     investigation has revealed, authorized the checks.

6              THE COURT:  Right.  But that goes to the fraud counts.

7     Here the issue is the personal identifying information of an

8     individual.  The challenge for you here is that presumably

9     there was something before the grand jury that substantiates

10    that allegation.  It doesn't sound as if there was an attempt

11    made to challenge the grand jury to any particular individual.

12    It sounds as if you're representing to me that the grand jury

13    had a basis for concluding that three separate people's

14    personal identification information was used on the check that

15    Teman deposited.  Is that correct?

16             MR. BHATIA:  The grand jury was not given a number of

17    authorized signers on the account.  So the grand jury was not

18    presented with a name or two names or three names.  But the

19    fact that, based on the investigation, whoever the persons may

20    be, person or persons may be, did not authorize the account --

21    or did not authorize the checks.  So the grand jury was not

22    presented with one name or two names or three names.

23             THE COURT:  All right.  They were presented, rather,

24    with the idea that the identifying information of people

25    associated with the entity was used?

K1AHTEMC

1          MR. BHATIA:  That's correct.

2          THE COURT:  Not the specifics of that?

3          MR. BHATIA:  I think that's a more succinct way of

4    saying that.

5          THE COURT:  Be that as it may, there's no obligation

6    that that's the means by which you present the case to the

7    grand jury.  The issue is suppose the jury here, six of them

8    think that Rebenwurvel's personal identifying information was

9    used and six of them think that it's Hom or Haas and six think

10   it's Nuremberg, and there's no 12 that agree on any one person.

11   What do you do then?

12         MR. BHATIA:  Your Honor, we are in tune to the

13   unanimity issues here.  And, actually, I think we are intending

14   to submit an instruction regarding other parts of unanimity

15   involved in this case.  Here, as I understand it, in terms of

16   the offense, the means of identification needs to identify

17   people.  So I believe as the -- I believe there's not going to

18   be a unanimity requirement here, as long as the jury finds that

19   the means of identification were capable of identifying

20   specific people.

21         THE COURT:  Well, let me ask you, just to make this

22   easier, did all these rise or fall together?  I mean, is it the

23   same check that uses all three people's names?

24         MR. BHATIA:  It's a check with sort of a squiggle

25   mark, and that is -- that's using the identification of one of

K1AHTEMC

1    these three people.

2         THE COURT:  Here's the sentence in the indictment:

3    "Teman deposited a check using the personal identifying

4    information of an individual associated with Entity 3."  I

5    think you're saying to me that that check, therefore, must have

6    the personal identifying information of all three of the people

7    you are mentioning.  Is that what you're saying?

8         MR. BHATIA:  The check, yes, could identify those

9    three people, but it does not have the personal identification

10   information of each person.

11        THE COURT:  I'm totally confused.

12        (Counsel confer)

13        MR. BHATIA:  Your Honor, I can maybe provide some

14   clarity.  Let me take Count Five, for example.  The government

15   is alleging that the defendant deposited a check designed to

16   look as if it came from Coney Realty, and on that check has the

17   name of Coney Realty at the top, has the corporate entity and

18   then Coney entity, and it has the routing number associated

19   with a particular bank account, the account number, and it has

20   a sign, a signature, on it.  The government has learned that

21   there are three authorized signers for that Coney Realty

22   account, and so the government's alleging that the defendant

23   used the means of identification of one of those three people

24   on the check.

25        THE COURT:  I see.  I'm sorry.  So when you say he

K1AHTEMC

1    deposited a check, the locution isn't clear to me whether that

2    means that the personal identifying information is literally

3    physically on the check or it was used in connection with a

4    deposit by some means other than writing it on the check.  Just

5    help me with that.  What does he do?

6              MR. BHATIA:  What I mean is that by including the

7    signature there, along with the routing number and the name of

8    the account, the defendant is essentially seeking to mimic one

9    of those people to demonstrate, as the government believes,

10   fraudulently, that he had authorization to deposit the checks.

11   So the signature is co-opting the means of identification of

12   those three people.

13             THE COURT:  Let me get this right.  You're not saying

14   that he, separate from what appears on the check, does

15   something with someone's identifying information.  He doesn't

16   hold up a fake driver's license or something like that.  The

17   entirety of the allegation about the personally identifying

18   information of this individual is physically contained on the

19   physical check itself, is that correct?

20             MR. BHATIA:  That's right.

21             THE COURT:  All right.  Does it have the name of any

22   of these people on that check in any place?

23             MR. BHATIA:  The check does not.

24             THE COURT:  Does it have the signature or purported

25   signature of any of those people on the check?

K1AHTEMC

1          MR. BHATIA:  It has a purported signature on that.

2          THE COURT:  To the extent it's legible, what does it

3     say?

4          MR. BHATIA:  It doesn't -- the signature at least -- I

5     don't think it appears to be one of those three people.

6          THE COURT:  All right.  Is there any other identifying

7     information -- name, rank, serial number, social security

8     number, date of birth, DNA?  Is there something about addresses

9     or something about any of those people that appears on the

10    check?

11         MR. BHATIA:  No, your Honor.

12         THE COURT:  So you have a signature.  If you read

13    aloud the word on the signature, is the signature the name of

14    the corporate entity or the name of the individual?

15         MR. BHATIA:  I don't think you could read aloud the

16    signature.

17         THE COURT:  So how does this count get to the jury?

18    In other words, what's the means of identification of another

19    person here?  I understand that you're saying that he pretends

20    to be the corporate entity or pretends to be a representative

21    of the corporate entity, and that's all good and fine as a mean

22    and method of the wire and bank fraud.  Got you loud and clear

23    on that.  But aggravated identity theft, I'm struggling with

24    that a bit.  Walk me through that.

25         MR. BHATIA:  Your Honor, I believe under the statute

K1AHTEMC

1    it's the means of identification that together -- or I think

2    it's something to the effect of together or in combination with

3    can identify another person.  Here, using the corporate account

4    and the account number and the name plus the signature could

5    lead someone at the bank to conclude, for example, Peter

6    Rebenwurvel must have signed this check.  So we believe that

7    that is the valid basis for an aggravated identity theft count.

8            THE COURT:  Whose identity is being misused?  Is it

9    Peter's?  Is it the company?  Whose identity is being stolen

10   here?  Is it the individual associated with the corporate

11   entity or is it the corporate entity?

12           MR. BHATIA:  It's the authorized signers for that

13   account.

14           THE COURT:  Let's go to the elements.  Let's put aside

15   the "to wit" clause for a moment.

16           He knowingly transferred, possessed, and used,

17   according to the indictment, without lawful authority a means

18   of identification of another person.  What means of

19   identification are connoted by Count Five?

20           MR. BHATIA:  The signature is the -- I believe that

21   the signature taken in combination with the account number and

22   the name is the means of identification of another person.

23           THE COURT:  So any defendant who forges a check on

24   somebody else's account is committing aggravated identity

25   theft, even if they don't present any evidence/statement saying

K1AHTEMC

1    I'm that person?  It follows, right, just if you sign as

2    somebody, you are using a means of identification, right?

3          MR. BHATIA:  I believe it's right, your Honor, that --

4    check fraud is sort of the prototypical example of aggravated

5    identity theft when we've taken a look at the legislative

6    history on this point.  So for that reason, we think --

7          THE COURT:  Right, check fraud is usually -- in the

8    classic aggravated identity theft.  It's more than simply

9    boldly going into a bank and depositing it into Judge

10   Engelmayer's account a check written out to Judge Judy.  It's

11   more that I would present -- it's usually the identification

12   substantiating the other identity that would be used, and

13   that's usually -- not that that's the only way, but that's

14   usually the way in which those cases manifest.  What you're

15   saying is the deposit into person A's account of a check made

16   out to person B, something like that is in and of itself,

17   without more, aggravated identity theft.

18          I can't resolve that here and now, but it does seem to

19   me this is not so much a *Brady* issue, as it's been explicating,

20   it's an issue of whether or not the evidence that you are

21   committing to me is really the only evidence of aggravated

22   identity theft, what's contained on the check, meets the legal

23   requirements for that count.  I don't think -- defense counsel,

24   you've raised a valid issue, but I think you've mispackaged it.

25   It's not a Brady issue.  The government's explained to me now

A-137.80

K1AHTEMC

1     that, in effect, whereas they said one, they're saying three

2     now because it could have been any of those people who are

3     authorized signers; and therefore, the presentation of the

4     check, in the government's theory, is a form of theft of any

5     authorized signer.  I don't think that's a Brady issue.  It's

6     really a sufficiency issue of whether or not the means of

7     commission here satisfied aggravated identity theft.

8             I think the right way to go here is by your taking a

9     close internal look at this question.  There's no value in our

10    going to the jury -- if, ultimately, the conduct you've

11    described can't get to the jury, there's no point in starting

12    there.  So why don't you dig into it and get me a letter by

13    Wednesday that explains what evidence will be used to show the

14    crime of aggravated identity theft and what the law is as to

15    whether or not it can get to a jury.

16            MR. BHATIA:  Your Honor, we'll put in that letter, and

17    I'll make two -- I'll just say two things:  One, we have

18    conferred internally within the office, including with our

19    appeals unit, about this issue.  It's something that we spoke

20    to them about.  Of course we'll put in the letter.

21            The second is, of course, the caveat that I have to

22    make, which is that our investigation continues, and we'll

23    continue our investigation up until and through trial.

24            THE COURT:  That's all fine and good, but you've got

25    charges here right now.  And I understand that if you can

K1AHTEMC

1    develop evidence that he walked into the bank and presented the

2    social security card for Peter Rebenwurvel, the case looks

3    different.  But on the assumption that this crime is over and

4    done and is limited -- the evidence is limited to the check

5    itself on which, I take it, handwriting that is not legible as

6    any particular person's but is treated by the bank as some

7    authorized signatory of the corporate account holder, the

8    question is whether that alone is aggravated identity --

9              MR. BHATIA:  Understood.

10             THE COURT:  -- and what we do with (a) the inability

11   to argue that it's any particular person's identity, but (b)

12   even if it was just one signatory, whether simply the

13   presentation of a check, as much as that might be bank fraud

14   and wire fraud, is also aggravated identity theft without more?

15   I think I need a letter along those lines.  Why don't I give

16   you till Wednesday.

17             Defense, if you want to respond, you've got till

18   Friday.  When I meet with you on Tuesday morning, assuming the

19   government is still pursuing that count and assuming the

20   defense is still arguing that the claim is unsustainable, I'll

21   hear from you then.  I would very rarely dismiss a count before

22   we started the trial, but the law does permit, where the

23   government gives what it acknowledges to be a thorough going

24   proffer of all the evidence, it does give the Court authority

25   to do that.  I'm reluctant to do it other than that, but if

K1AHTEMC

1   you're literally committing to me that the only relevant

2   evidence is going to be the check itself, there is a basis on

3   which the Court can legally make that determination.  So

4   please, please take a close look at it.

5          But, look, Mr. DiRuzzo, I think you're the one who

6   raised this issue.  I don't think it's really a Brady issue.

7   You now understand why the government said what it said.

8          MR. DIRUZZO:  I do.  But, obviously, I don't have the

9   benefit of what was said before the grand jury.  I could very

10  well imagine if someone testified initially that it was Peter

11  Rebenwurvel and then now someone's testifying that it's not

12  Peter but it's Peter and maybe other people but we're not

13  entirely sure, the shifting testimony before the grand jury

14  could very well be Brady.

15         THE COURT:  Let me ask the government counsel, without

16  telling me the content of what came before the grand jury, are

17  you aware of any witness who has changed their testimony as to

18  any of the events that we're talking about or their version of

19  events, as opposed to the government's understanding of who the

20  signers of -- the eligible signers were that has changed?

21         MR. BHATIA:  I'll give, first, the caveat that I have

22  to give.  I wasn't in the grand jury the first time.

23         THE COURT:  You have assuredly reviewed the

24  transcript.

25         MR. BHATIA:  I have.  I believe it's the former of

K1AHTEMC

1    what you said -- or it's the latter, I should say.  It's new

2    evidence and continuing investigation.  But we'll go back and

3    confirm that there's nothing we need to disclose that's Brady.

4              THE COURT:  If there was somebody at the bank who

5    originally said he said he's Peter Rebenwurvel and then later

6    said the defendant said he's one of the following three people

7    or he's not Peter Rebenwurvel, then you're in potential

8    Brady-land.  If instead what happens hand is the government has

9    developed a more sophisticated understanding of who the

10   authorized signatories are, it's not a Brady issue.  The

11   government is entitled to refine its charges as it understands

12   the facts.  That's not Brady.

13             The issue, though, is a different one that your

14   question raises which is, is the conduct described aggravated

15   identity theft?  I've never had occasion to look into it.

16   Perhaps Mr. Bhatia is right.  It's certainly not the paradigm

17   of the way we think of the offense, but that's not to say it's

18   not the offense.  So a letter is the way to smoke that out.

19             Anything further about the trial before we return to

20   the grand jury issue?

21             MR. GELFAND:  Trial, no, but one other pending letter

22   motion.  We'd filed a request permitting Mr. Teman to travel to

23   St. Louis where my office is based.

24             THE COURT:  Does the government object to Mr. Teman's

25   traveling to St. Louis where, I take it, one of his lawyers is

K1AHTEMC

1    based?

2            MR. BHATIA:  No objection.

3            THE COURT:  Has Mr. Teman been in any way out of

4    compliance with the terms of his pretrial release?

5            MR. BHATIA:  I haven't spoken with the Pretrial

6    Services officer recently.  I do understand from a

7    representation from defense counsel that they did -- am I right

8    -- that they did speak to the Pretrial Services officer who had

9    no objection.

10           MR. GELFAND:  Your Honor, for the record, I spoke with

11   the New York pretrial officer and with the Southern District of

12   Florida pretrial officer, both have expressed no objection to

13   that.

14           THE COURT:  I'm going to trust, as an officer of the

15   court, your representation of that.

16           What is the state of Mr. Teman's travel documents?

17   Does he have -- I mean, he doesn't need a passport to travel

18   with, correct, to travel to St. Louis with?

19           MR. GELFAND:  No, he just as a Florida driver's

20   license.

21           THE COURT:  Who's got his passport?

22           THE DEFENDANT:  Your Honor, I believe the Florida

23   probation or court.

24           THE COURT:  Pretrial.  Look, Mr. Gelfand, given the

25   government's consent and your representation that pretrial

K1AHTEMC

1    consents, I'm fine with it, but I don't want this to be an

2    occasion for him to get his hands on a passport that was taken

3    away as part of the bail package.  I assume he, like the rest

4    of us, can travel domestically without a passport.

5              MR. GELFAND:  Yes, your Honor.  He wouldn't travel the

6    same way he traveled up here from Florida for court.

7              THE COURT:  In that case, I will authorize it.  Please

8    get me an agreed order today.  I'm out next week.  Get me an

9    agreed order today.  It doesn't need to be agreed.  It can be

10   from the defense along the lines that I described.  I'll be

11   happy to authorize it.

12             MR. GELFAND:  Thank you.

13             THE COURT:  Very good.  Anything further besides the

14   grand jury matter?

15             MR. BHATIA:  Nothing, your Honor.

16             THE COURT:  All right.  Let me then briefly take up

17   that last matter.

18             All right.  I have this morning spoken with Judge

19   Kevin Castel.  He is the Part 1 judge, and --

20             MR. GELFAND:  Your Honor, I'm sorry to interrupt you.

21   I just wanted to note for the record, just so I'm on the right

22   side of where I need to be, obviously, I represent Mr. Teman

23   admitted pro hac vice.  I am not entered on the grand jury

24   matter, and I wanted to raise that with the Court.  I'm not

25   sure that --

A-137.86

K1AHTEMC

1           THE COURT:  Sorry.  Who represents the -- it's

2    Mr. DiRuzzo?

3           MR. DIRUZZO:  Correct, your Honor.

4           THE COURT:  Given the highly general statement I'm

5    about to make, I don't think there's any problem with your

6    presence.

7           MR. GELFAND:  OK.

8           THE COURT:  But thank you for your candor about that.

9           MR. GELFAND:  Thank you.

10           THE COURT:  I've spoken with Judge Castel.  He is the

11    judge sitting in Part 1.  He is the judge to which, in the

12    first instance, grand jury matters are properly addressed.  He

13    has referred the matter to me in an order that assigns the

14    grand jury dispute to me, given its obvious connection to this

15    current proceeding, will issue today.  So, briefly, I have

16    received from Judge Castel this morning the defense petition to

17    quash three grand jury subpoenas dated December 18 directed at

18    three entities associated or said to be associated with

19    Mr. Teman, and I have received on Wednesday night from the

20    government as, I guess, a courtesy copy its opposition.  I also

21    received, I guess, as a courtesy copy as well, an *ex parte*

22    letter from the government addressing these matters.

23           I will note that I think the letter was actually

24    addressed to me as the trial judge in the case, even though

25    this is a grand jury matter.  Until I spoke to Judge Castel

K1AHTEMC

1   this morning, this was not my matter.  You really have to be

2   faithful about addressing these things to the judge responsible

3   for them, Judge Castel.

4        That said, there was ample good reason for it to be

5   transferred to me.  The issues that are litigated by the

6   defense, in particular, involve this case insofar as the

7   defense is claiming that the grand jury subpoena either was

8   intended to or could function as a way of getting trial

9   evidence.  So it's quite proper that it winds up with me, but

10  as a formal matter, in the initial -- in the first instance, it

11  was for the Part 1 judge.

12       In any event, now that the matter is in my court, I've

13  reviewed these materials.  I will state for the record that the

14  government's *ex parte* letter was appropriately submitted *ex*

15  *parte*.  It concerns core grand jury matters as to which grand

16  jury secrecy applies.  Mr. Teman and these companies have

17  absolutely no right to any notice of the matters that are

18  reflected in that letter.

19       Here's how I intend to proceed.  I'm going to give the

20  defense until Friday, January 17, to respond to the

21  government's public submission, that is to say, the non-ex

22  parte submission.  I'm not going to invite argument on these

23  matters at this time, and that's for a couple of reasons.

24       First of all, I haven't adequately studied the issues

25  presented.  I just spoke with Judge Castel this morning and

K1AHTEMC

1    have arranged the reassignment to myself with his consent, and

2    I am interested in getting Mr. Teman's reply before I do so.

3            Second of all, the purpose of this conference is the

4    upcoming trial, not a separate grand jury proceeding.  So I'm

5    not inviting argument or discussion today on the defense

6    application to quash the subpoena.

7            For avoidance of doubt, I note that Mr. Teman is

8    arguing really two things.  One is there's a Fifth Amendment

9    privilege that protects against the production that's requested

10   here.  Second, he's arguing that the grand jury subpoena is

11   being used by the government predominantly for an improper

12   purpose, that is to say, as a means of gaining evidence for use

13   in the upcoming trial.  Now, the government properly notes that

14   at the time the subpoenas were issued on December 18, the grand

15   jury had not yet been asked to return and hadn't returned the

16   S2 superseding indictment.  The accusation that the defense

17   makes is a bit out of time in the sense that at the time the

18   subpoena was returned, we know for a fact that the government

19   was in the superseding process.  So there was an open grand

20   jury matter relating to this case, putting aside whatever else

21   the grand jury might or might not be investigating.  So there's

22   assuredly at the time a valid grand jury purpose for the

23   subpoena.

24           Even if I need to say this, the date, December 18, on

25   which the subpoenas were issued, called into significant

K1AHTEMC

1    question whether it was at all realistic that there would be a

2    production in response that would come in before the date the

3    government had to get to the grand jury to supersede as it had

4    promised to in this case.  Be that as it may, there was an open

5    grand jury proceeding.

6        At this point, however, the fact for all of us is that

7    the grand jury has returned its superseding indictment.  It did

8    so on January 3, and so whatever else the grand jury may or may

9    not be investigating as to the charges that Mr. Teman will face

10   in the trial beginning January 21, those charges are set.  They

11   may be reduced if there's a basis for a voluntary dismissal or

12   dismissal by the Court of some charge, but there's not going to

13   be an expansion.  Those charges are set.  In other words, there

14   won't be any further superseders prior to the date of trial as

15   to what Mr. Teman is being tried on beginning January 21.

16       So Mr. Teman's concern at this point is that whatever

17   the government's intentions had been as of December 18 when it

18   had an ongoing grand jury proceeding relating to this trial, to

19   the extent that the government might be pursuing compliance

20   with a subpoena so that they could be -- the return could be

21   used in connection with this case, that purpose would not be

22   proper because the indictment is already in place and can't be

23   superseded.

24       So here's the easy way to resolve this issue.  My

25   intention is going to be to resolve the grand jury privilege

K1AHTEMC

 1    dispute shortly after the completion of the trial.  That way,

 2    by definition, that will be in a few short weeks.  That will

 3    moot any possible claim that the grand jury subpoena, even if

 4    issued with pure purposes, is at this point being pursued for

 5    the purpose of bolstering the government's trial proof in an

 6    already indicted case.  I will resolve the issue promptly after

 7    the trial is resolved, assuming that there is a verdict as

 8    opposed to a hung jury.  There can't be any claim at that point

 9    that the government's insistence on continued compliance with a

10    grand jury subpoena is aimed at bolstering its trial proof.

11    That's the clean and easy way to resolve the issue here.

12              Any objection to that?

13              MR. DIRUZZO:  No, your Honor.

14              MR. BHATIA:  No, your Honor.

15              THE COURT:  All right.  So we'll go that route.

16              Anything further from anyone?

17              MR. GELFAND:  Just two quick questions, your Honor.

18    One, does the Court have a preference as to whatever numbering

19    convention the defense uses for exhibits?  I know some courts

20    do.

21              THE COURT:  Sequential would be great.

22              MR. GELFAND:  A, B, doesn't make a difference?

23              THE COURT:  Prime numbers.  Right, you can use letters

24    or numbers, no.  But, look, I would ask you, to the extent

25    there are defense exhibits that are offered during the course

A-137.91

K1AHTEMC

1    of the trial, make sure that you've -- I expect the

2    government's daily log of what's been received will include

3    defense exhibits.  I'm looking for a one-stop shop.  You should

4    look at that to make sure that they're accurately tabulating

5    any defense exhibits that have been received.

6          MR. GELFAND:  Absolutely.  Just one other quick

7    housekeeping question.  It sounds like, based on the

8    government's representation, there's virtually no chance that

9    if we have any defense witnesses, that they're going to have to

10   be here before Thursday.  Is that fair?  I don't want to -- if

11   I don't need to, I don't want to inconvenience anyone more than

12   I have to by telling them --

13         THE COURT:  Mr. Bhatia, what is the earliest

14   conceivable date on which the government could rest?

15         MR. BHATIA:  Your Honor, I think, of course, we always

16   give a conservative estimate for what we think will be the

17   trial, but on the earliest that we could conceivably close, I

18   believe it's probably sometime Wednesday.  Then, of course,

19   that depends on the length of cross and how the evidence comes

20   in, but it could be sometime Wednesday.

21         THE COURT:  There you have it.

22         MR. GELFAND:  We can work with that.

23         THE COURT:   Look, I appreciate that the witnesses in

24   question may be coming from other states, or maybe not?

25         MR. GELFAND:  I don't believe so, your Honor.

K1AHTEMC

1               THE COURT:  Well, then --

2               MR. GELFAND:  We'll make it work.

3               THE COURT:  The legal principle of no big deal

4     probably applies here, right?  If it's in the same state, you

5     can take stock at the end of the day Wednesday of how things

6     are going.  I'm happy to ask Mr. Bhatia, at your request,

7     whether at that point it's clear that the government will fill

8     the day on Wednesday.  But if, in fact, there's a scenario

9     under which the government's going to rest and there's enough

10    time to have the usual Rule 29 colloquy and then you might be

11    on the clock, I think you will need to have that person there.

12    I really am serious about using all of our time.

13              MR. GELFAND:  No problem, your Honor.  Thank you.

14              THE COURT:  Very good.  Yes.

15              MR. DIRUZZO:  Judge, my experience trying cases, I

16    find that judges kind of have three different buckets for

17    openings for exhibits.  Some judges will say if it's not

18    admitted, you can't publish it, you can't refer to it, you

19    can't show it to the jury in opening.  You can refer to it in

20    the abstract.  There are other judges, if everyone agrees it's

21    coming in, you can refer to it, maybe put up on the ELMO in

22    opening.  I just want to get your take because I don't want to

23    get an objection.

24              THE COURT:  I'm not going to answer an abstract

25    question.  I've had the occasional civil case where it's clear

K1AHTEMC

1    that the copyright infringing video's coming in, and it's an

2    incoherent opening without it.  This is not that case.

3            What do you have in mind?

4            MR. DIRUZZO:  Like the contracts, in particular.

5            THE COURT:  The government?

6            MR. BHATIA:  Your Honor, I think it might be helpful

7    for us to confer with the defense on this.  Right now I'm not

8    sure what contracts in particular they're referencing.  I'm not

9    really aware of any contracts, but I don't know what contracts

10   in particular, so it's hard for us to answer that question.

11           THE COURT:  Let me ask the question.  Mr. DiRuzzo, I

12   can't remember a criminal case in which, other than something

13   like a map, I've allowed counsel to use exhibits during the

14   opening.  It's just a little too fraught because we don't know,

15   in a criminal case, what's going to come in and what's not.

16           MR. DIRUZZO:  I understand, Judge.

17           THE COURT:  So absent explicit authorization of the

18   Court, you are not to use exhibits in the opening statement.

19           MR. DIRUZZO:  OK.

20           THE COURT:  That's easier.  If you confer with the

21   government and everyone agrees that something's clearly coming

22   in, I will reconsider, but even then, unless I've affirmatively

23   authorized it, no exhibits in the opening, and you should

24   prepare accordingly.

25           MR. DIRUZZO:  OK.  Thanks, Judge.

K1AHTEMC

1              THE COURT:  Anything further from anyone?

2              MR. BHATIA:  Nothing, your Honor.

3              MR. GELFAND:  Can we just confer with Mr. Teman for a

4    moment?

5              (Counsel confer)

6              MR. GELFAND:  We have nothing further, your Honor.

7    Thank you.

8              THE COURT:  All right.  Before we adjourn, I want to

9    just take a moment and compliment and thank everyone for the

10   level of attention to detail that went into all of the motions

11   that preceded the conference.  That helps me.  As a result of

12   your raising those issues early, you've come out of this

13   conference with a pretty good sense of what the ground rules at

14   trial will be and what's in and what's out.  Keep doing that.

15   Although I will be away teaching next week, I will be getting

16   things from chambers.  If there's some other dispute that

17   arises, to the extent I can helpfully resolve it beforehand or

18   at least answer it on Tuesday morning, I'm happy to do so, but

19   we all benefit by clarity of ground rules, so keep it up.

20   That's very valuable to me.

21              Government, with respect to Counts Five and Six, I'm

22   not telling you what to do.  You'll make your own judgment

23   about whether or not the law permits you to get to a jury on

24   the theory of aggravated identity theft that you have here.  I

25   would urge the government to reflect on what that theory, those

K1AHTEMC

1      counts, add to the four preceding counts.  In other words, if

2      the theory is a lack of authorization, it's not obvious to me

3      that there's a scenario under which Counts Five or Six come out

4      in your favor and Counts One through Four do not.  I could be

5      wrong about that.  Maybe I'm missing something, but you ought

6      to be having a thoughtful conversation whether it adds more

7      heat than light to add on to those counts if there aren't more

8      facts than the ones you have proffered to me in support of

9      those claims.  Your choice.  Just saying.

10              MR. BHATIA:  Thank you, your Honor.

11              THE COURT:  All right.  Thank you.  We stand

12     adjourned.

13              (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

A-137.96



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 14, 2020

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:   <u>United States v. Ari Teman</u>,
                S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

      The Government writes to inform the Court that it has elected not to proceed at trial on Counts Five and Six contained in the Second Superseding Indictment, returned January 3, 2020 (ECF No. 55).

                         Respectfully submitted,

                         GEOFFREY S. BERMAN
                         United States Attorney for the
                         Southern District of New York

        By:   /s/
             Kedar S. Bhatia
             Assistant United States Attorneys
             (212) 637-2465

cc: Justin Gelfand, Esq.
    Joseph DiRuzzo, Esq.

1

K1LVTEM1 corrected

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              19 CR 696 (PAE)

5   ARI TEMAN,

6              Defendant.                      JURY TRIAL

7   ------------------------------x

8                                             New York, N.Y.
                                              January 21, 2020
9                                             9:00 a.m.

10

11  Before:

12                  HON. PAUL A. ENGELMAYER,

                                              District Judge
13

14                        APPEARANCES

15

    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  KEDAR S. BHATIA
    EDWARD A. IMPERATORE
18       Assistant United States Attorneys

19  JOSEPH A. DIRUZZO, III
    JUSTIN GELFAND
20       Attorneys for Defendant

21  ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                   WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25

K1LVTEM1 corrected

1            (Case called)

2            MR. BHATIA:  Good morning, your Honor.

3            Kedar Bhatia and Edward Imperatore, for the United

4    States.

5            We're joined at counsel table by Detective Daniel

6    Alessandrino of the New York Police Department, and Paralegal

7    Specialist William Magliocco of the U.S. Attorney's Office.

8            THE COURT:  All right.  Very good.

9            Good morning Mr. Bhatia; good morning, Mr. Imperatore;

10   good morning, Mr. Magliocco; and good morning, Detective

11   Alessandrino.

12           Did I get everyone's pronunciation correct?

13           Very good.

14           And for the defense.

15           MR. GELFAND:  Good morning, your Honor.

16           Joseph DiRuzzo and Justin Gelfand on behalf of Mr.

17   Teman, who is on bond and present in the courtroom.

18           THE COURT:  All right.  Very good.

19           Good morning, Mr. DiRuzzo; good morning, Mr. Gelfand;

20   and good morning to you, Mr. Teman.

21           You may all be seated.

22           All right.  I have a number of matters to take up

23   before we have jury selection this morning.  You should know

24   that while I had anticipated that we might have a delay in jury

25   selection because another case, a large case, was going to be

K1LVTEM1 corrected

1    picking a jury today, due to reasons specific to that case,

2    that case apparently is not going forward today.  So my

3    expectation is that we are batting first, if you will, in terms

4    of what the jury clerk will do.

5              So it will be a little while.  The jurors have to show

6    up; they need to be inculcated in the process of being a juror.

7              But once they are ready to dispense jurors to a court,

8    I think we come first.  So hopefully we'll be making productive

9    use of time today.

10             All right.  There are quite a number of things to take

11   up this morning.  And I have a bench ruling which will address

12   both the proposed instructions that you gave me on the check

13   stub and the RCC issues; and will also resolve what are now two

14   additional, effectively, sets of motions *in limine* that I have

15   had letter briefed over the course of the week.  I then have a

16   number of other issues I want to raise with you.

17             Before I embark on the bench ruling, let me just take

18   stock with counsel if there's anything that I need to be

19   attentive to today.  Any issue you want to raise?

20             (Counsel conferred)

21             MR. BHATIA:  Your Honor, you may have noticed in the

22   briefing on the motion to quash there is reference to a

23   subpoena to the defendant -- if-as-or-when subpoena to the

24   defendant.  Previously we have --

25             THE COURT:  This is a motion to quash the grand jury

4

K1LVTEM1 corrected

1    subpoena?

2           MR. BHATIA:  That's right.

3           THE COURT:  I'm ignoring that until after the trial.

4           MR. BHATIA:  So what I wanted to say is I wanted to --

5    with leave of the Court, I'd like to give the defendant the

6    if-as-or-when subpoena that we were intending to serve on him

7    previously.

8           THE COURT:  With respect to this trial.

9           MR. BHATIA:  With respect to this trial.

10          THE COURT:  You're welcome to do so, of course.

11          And to be clear, defense, while the grand jury

12   subpoena is something I will reserve resolution on until after

13   the trial, so that there's no doubt, the if-and-and-when

14   subpoena, if I've got that right, is a separate beast.  That's

15   not being suspended.  The obligations that attach to a

16   defendant's production of documents, when and if he testifies,

17   are not suspended merely because there's a separate grand jury

18   controversy afoot.

19          So take a look at that subpoena.  I don't know whether

20   or not there are any issues I need to deal with; but understand

21   that it is a completely separate issue from the grand jury

22   matter that's been tabled.

23          MR. GELFAND:  Your Honor, we appreciate that.

24          We do anticipate that there are completely separate

25   issues, in particular regarding the nature of the subpoena and

5

K1LVTEM1 corrected

1    what it requires of Mr. Teman, the defendant in this case.

2             With the permission of the Court, we'll do our best by

3    the end of today -- obviously not the court day, but by

4    midnight tonight -- to file anything that we believe is

5    appropriate.  But I just wanted to raise that with the Court.

6             THE COURT:  That's fine.  I'm not going to resolve

7    anything without hearing your response.  If you can get me

8    something tonight, that would be great.

9             I will need a copy, of course, of the subpoena that

10   was just hand-delivered by the AUSA to the defense.  So why

11   don't you attach it to your letter.

12            MR. GELFAND:  Yes, your Honor.  Thank you.

13            THE COURT:  All right.  Very good.

14            Anything else to raise?

15            MR. BHATIA:  Yes, your Honor.

16            Just regarding that subpoena, we'll provide a copy of

17   it to the Court today.

18            And in addition, I wanted to just note for the record

19   that we sent it electronically to defense counsel on January

20   12th to ask if they would accept service.  We didn't hear

21   anything back.  And then we saw on our -- their motion to quash

22   on Friday.

23            THE COURT:  All right.  Look, defense, just so that we

24   don't have any delays, while I appreciate that there may be

25   colorable objections to aspects of the subpoena, maybe the

K1LVTEM1 corrected

1   whole thing, be prepared, nevertheless, to produce in response

2   to it, so that if I disagree with whatever arguments you are

3   going to be making, we don't have a situation where we are

4   then -- only then engaged in document collection.  Okay?

5           MR. GELFAND:  Yes, your Honor.

6           THE COURT:  All right.

7           Anything else to raise?

8           MR. BHATIA:  Nothing else from the government.

9           MR. GELFAND:  Not for the defense, your Honor.

10          THE COURT:  All right.

11          Let me just quickly take care of a few discrete things

12  before getting into the bench decision.

13          First of all, I just want to make sure, I believe we

14  covered this at a prior conference, but the defense is not

15  making an advice of counsel defense in this case; correct?

16  There's been no notice of that and I haven't seen anything to

17  that effect.

18          (Counsel conferred)

19          MR. DiRUZZO:  Your Honor, we are.  And although --

20          THE COURT:  When did you give notice of that?

21          MR. DiRUZZO:  I don't believe that Rule 12.1, 2, or 3

22  requires advanced notice of an advice of counsel defense.

23          THE COURT:  Tell me what the advice of counsel defense

24  consists of; in other words, who and what.  I want to make sure

25  that there's -- I read through the government exhibit binder.

K1LVTEM1 corrected

1   There are a lot of documents where Mr. Teman has threatened

2   lawsuits and the like.  I didn't see any reference to counsel.

3   I wasn't aware that there was an advice of counsel defense

4   here.  Go ahead, tell me about it.

5            MR. DiRUZZO:  Your Honor, in the documents the

6   government has produced in discovery, there's been emails from

7   a Mr. Ariel Reinitz, who works for the law firm -- is a partner

8   of the law firm of FisherBroyles.  Mr. Reinitz is Mr. Teman's

9   attorney.  And Mr. Reinitz is and has been intimately involved

10  with, among other things, the collection efforts of GateGuard's

11  to GateGuard's customers, including some of the customers that

12  are at issue in this case.

13           Does that answer your Honor's question?

14           THE COURT:  And did you give notice to the government

15  that there was a potential advice of counsel defense here?

16           MR. DiRUZZO:  No, your Honor.  We didn't believe the

17  rules contemplate that.  We believe that constitutionally we

18  are not required to do so.

19           THE COURT:  All right.

20           And it's your expectation that Mr. -- give me the

21  spelling of that person's name?

22           MR. DiRUZZO:  R-E-I-N-I-T-Z.

23           THE COURT:  And is it your expectation that he may be

24  called as a witness on the defense case?

25           MR. GELFAND:  Yes, your Honor.  We anticipate calling

A-145

8

K1LVTEM1    corrected

1    him as a witness.  I would also note that he was included on

2    the joint proposed witness list for the voir dire that was

3    submitted by the parties.

4                THE COURT:  Okay.  Government?

5                (Counsel conferred)

6                MR. BHATIA:  Your Honor, we haven't received any

7    notice of an advice of counsel defense.  I'll also note that I

8    don't believe there's any joint witness list in this case.  We

9    submitted a list of the names and entities that might come up

10   during the course of trial.  So we certainly haven't had notice

11   of calling an attorney as a defendant -- as a witness.

12               THE COURT:  Was the defense obligated to do so?

13               (Counsel conferred)

14               MR. BHATIA:  Your Honor, as an affirmative defense, we

15   do believe they are required to do so and they haven't provided

16   any notice of it.  In addition, we've received Rule 16

17   discovery, but we haven't received any discovery involving

18   attorney-client communications between Mr. Teman and

19   Mr. Reinitz.

20               THE COURT:  All right.

21               Look, obviously this is something that requires letter

22   briefing; so I would welcome a letter tonight from the

23   government with its views about the advice of counsel defense:

24               A, whether or not there was required notice; B, what,

25   if any, discovery at this stage is required of the defense; C,

9

K1LVTEM1 corrected

1    assuming that the witness is to go forward, what, if any,

2    discovery would later be provided.

3            I don't think I saw, defense, in your proposed jury

4    charge an instruction on the advice of counsel defense.

5            Was there one?

6            MR. GELFAND:  There wasn't one.

7            THE COURT:  Why was there not one?

8            MR. GELFAND:  Because when the jury instructions were

9    due, we were, candidly, still receiving discovery from the

10   government.  Within the past week, your Honor, we received

11   5,000 new pages from the government, and we were still making

12   strategic decisions.

13           THE COURT:  I appreciate that.

14           But as you well know, when you submit proposed

15   charges, you are supposed to be inclusive, not exclusive.  It

16   looks like that's an act of hiding the ball, when apparently

17   you were considering it all along and didn't include it in the

18   proposed jury charges.

19           MR. GELFAND:  Your Honor, our intention certainly

20   wasn't to hide the ball.

21           The other thing I would note, and I would point the

22   Court's attention to a Second Circuit case called *Scully,* which

23   clearly and accurately states that advice of counsel is not an

24   affirmative defense in the criminal context; it's a way to

25   defeat or otherwise challenge the *mens rea.*

10

K1LVTEM1 corrected

1        THE COURT:  I understand that.  And I didn't take

2   Mr. Bhatia's characterization as an affirmative defense as

3   changing that fundamental principle.  The issue is always

4   whether or not the government can establish beyond a reasonable

5   doubt the *mens rea* requirement of the statute.  That's not the

6   point.

7        The issue here is whether notice was required of the

8   intention to call a -- to invoke that defense; and what, if

9   any, implications there are from the failure of the defense to

10  include an instruction along those lines in its request to

11  charge.

12        You were, I take it, at least considering such a

13  defense at the time you submitted the request to charge?

14        MR. GELFAND:  Considering, yes.  But given that that

15  obviously -- it comes with the possible arguments of waiver and

16  implied waiver, etc.  We did not include an instruction.  We

17  will submit a supplemental instruction for the Court's

18  consideration.

19        THE COURT:  Yes, please do so tonight.

20        Look, I will wait for the government's letter as to

21  addressing this point, and I'll give you a brief opportunity to

22  respond.  But as you can see, I, reading through the Rule 16

23  materials, immediately recognized that this case had at least

24  the potential to implicate advice of counsel issues, because

25  your client is repeatedly threatening legal action.  I couldn't

A-148

11

K1LVTEM1 corrected

1    tell whether he's doing that on his own dime or with the advice

2    of counsel, but it leapt off the page as an obvious issue.

3         Government, have you asked the defense in writing or

4    orally whether it would be pursuing an advice of counsel

5    defense?  I mean, it leaps off the page from the discovery you

6    have provided as a subject that a court would be curious about.

7    I assume you must have thought about this.

8         MR. BHATIA:  No, your Honor, I don't believe -- I know

9    in our initial discovery letter we make certain requests.  I

10   don't recall -- I don't believe that the advice of counsel was

11   one of those.

12        THE COURT:  In your letter to me tonight, you should

13   concretely address whether or not the government explicitly or

14   implicitly has asked the defense about that subject.  It may

15   well be that any obligation the defense had may have been only

16   in response to a question by the government.  I don't know the

17   law in the area enough to opine confidently, but I expect a

18   comprehensive letter on this point.

19        I would also welcome each of your submitting the

20   proposed instruction as to advice of counsel along with your

21   letter.

22        So, government, get me a letter tonight.

23        Defense, get me a letter as quickly as possible

24   thereafter, but no later than tomorrow night.  Okay?

25        MR. GELFAND:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

K1LVTEM1 corrected

1          THE COURT:  All right.

2          Next.  Just raising issues here.

3          It appears to me that Count One embraces checks from

4    three entities:  Entities 1, 2, and 3.

5          Count Two embraces checks from two entities:  Entities

6    3 and 4.

7          It strikes me as entirely likely that, at a minimum,

8    there will need to be an instruction with respect to unanimity,

9    lest there be a risk that six jurors convict as to Entity 1,

10   and six convict as a Entity 2, and there's no unanimity as to

11   any of them.

12         Beyond that, though, there is a substantial question

13   of whether or not the verdict form, which, as submitted by the

14   government and acquiesced then by the defense, simply answers

15   yes or no, guilty or not guilty, for each count, ought to take

16   account of the fact that the counts bundle together multiple

17   victims that may have multiple entities that may have different

18   narratives associated with them.

19         It seems to me there's a substantial argument here

20   that the verdict form ought to inquire more specifically of the

21   jury with respect to particular entities.  I'd welcome each

22   side giving thought to that.  I don't need to decide that now;

23   but, again, in preparing for today, that leapt out at me as a

24   relevant question.

25         All right.  Government, you have moved to dismiss

A-150

13

K1LVTEM1 corrected

1    Counts Five and Six; is that correct?

2              MR. BHATIA:  That's correct.

3              THE COURT:  All right.

4              Defense, I take it, no objection?

5              MR. GELFAND:  No objection.

6              THE COURT:  All right.  Then I will dismiss Counts

7    Five and Six on the government's motion.

8              All right.  With that, I want to read aloud some bench

9    rulings to you.

10             All right.  As before, there's not going to be a

11   written opinion.  The rulings I'm about to make will be

12   reflected in the transcript here.  And so if you need the text

13   of the ruling, you'll need to order the transcript.

14             I should ask, counsel, I assume you've ordered or plan

15   to order daily copy?

16             MR. BHATIA:  That's right.

17             THE COURT:  All right.  Very good.

18             I will need that, because obviously it's likely to be

19   a relatively short trial.  And when the jury goes out, if they

20   ask for excerpts of testimony, I want to make sure that we all

21   have the transcript handy so that you can very promptly search

22   the transcripts for responsive material.

23             All right.  I have received, counsel, your joint

24   letter dated January 15th, docketed at Docket 80.  That letter

25   sets out the parties' views as to potential instructions as to

14

K1LVTEM1 corrected

1   two discrete points.  I had asked for your input as to these in

2   my bench ruling on January 10, resolving the various motions *in*

3   *limine*.  Here is how I presently intend to address each

4   subject:

5         First, as to the check stock found in Teman's

6   possession at the time of his arrest, I asked counsel for "a

7   proper limiting instruction regarding the purposes for which

8   the jury may and may not consider the check stock seized from

9   Mr. Teman's office on July 3rd, 2019."  That is a direct quote

10  from my bench opinion.

11        Counsel, what you submitted is not at all responsive

12  to what I asked you to do.  You have, instead, agreed upon a

13  completely generic proposed instruction setting forth legal

14  principles governing similar act evidence in general which does

15  not refer at all to the check stock.  With all respect, the

16  instruction you gave me is unhelpful for that purpose, it is

17  useless; indeed, it is arguably worse than unhelpful, because

18  it states to the jury at the outset, before setting out these

19  general generic principles, and I quote:  "The government has

20  offered evidence tending to show that on another occasion, the

21  defendant engaged in conduct similar to the charges in the

22  indictment.

23        That statement is, to my knowledge, factually false.

24  I cannot imagine what the two of you were thinking or all four

25  of you were thinking about in asking me to tell the jury that.

A-152

15

K1LVTEM1 corrected

1          The government has not given Rule 404(b) notice, and

2     the Court has not been informed of any evidence that might be

3     offered at trial that Teman ever deposited or tried to deposit

4     unauthorized checks other than those charged.  I do not know

5     what counsel were thinking in proposing that I tell the jury

6     that effectively there is such evidence.

7          To defense counsel in particular, I note that the

8     statement in the joint proposed instruction could affirmatively

9     harm your client in inaccurately implying that there has been

10    evidence at trial of his deposit of unauthorized checks other

11    than those charged in the indictment, or that the check stock

12    found in his office had been used to create other unauthorized

13    checks.

14         I have taken it upon myself to draft an alternative

15    instruction which I will read to you for your views.  But,

16    counsel, I expect better of you and you need to do better when

17    the Court asks you for a proposed instruction.  The instruction

18    you proposed was both nonresponsive and misleading.

19         With that, here goes as to the proposed instruction.

20         "You have heard testimony that at the time of the

21    defendant's arrest on July 3rd, 2019, blank check stock was

22    seized from his office.  It is for you to decide whether or not

23    to credit this testimony.  If you do, I want to instruct you as

24    to the strictly limited purposes for which you may consider

25    this check stock.

K1LVTEM1 corrected

1              "Specifically, you may consider this evidence to the

2    extent, if any, that you concluded it bears on the defendant's

3    knowledge; in particular, whether he had the knowledge and

4    capability to create the checks at issue in this case.  You may

5    also consider this evidence to the extent, if any, that you

6    conclude that it bears on the defendant's intentions in

7    connection with respect to the use of the checks at issue in

8    this case.

9              "However, you may not consider the check stock found

10   in the defendant's office for any other purpose.  Specifically,

11   you may not consider it as indicating that the defendant

12   engaged in any unlawful conduct other than that alleged in the

13   indictment.  You may not consider this evidence as indicating

14   that the defendant had a criminal personality or a bad

15   character.  This evidence instead was admitted for much more

16   limited purposes and you may consider it only for these

17   purposes."

18             Are there any objections to that instruction?

19             MR. DiRUZZO:  No, your Honor.

20             MR. BHATIA:  No, your Honor.

21             THE COURT:  All right.

22             I will ask counsel to alert me when counsel believes

23   it is an appropriate time for me to give that instruction.

24             Now, as to the instruction as to remotely created

25   checks, or RCCs, I propose to give the following instruction to

17

K1LVTEM1 corrected

1   the jury: As you will see, it draws on both sides' proposed

2   instructions on this point. The main point I want to leave the

3   jury with is that RCCs are a lawful thing, while making clear

4   that the issues in this case do not involve technical

5   compliance with the regulatory definition of RCCs.

6           Here goes:

7           "You have heard reference to something called a

8   remotely created check, also known for short as an RCC.  A

9   remotely created check is a check that is not created by the

10  paying bank and that does not bear a signature applied or

11  purported to be applied by the person on whose account the

12  check is drawn.

13          "I instruct you that the banking laws in this country

14  do permit the use of remotely created checks under certain

15  circumstances, provided, of course, that the customer on whose

16  account the check is drawn has authorized the check.  However,

17  this case does not involve whether or not the checks in

18  question here meet the technical definition of a remotely

19  created check, and you should not concern yourself with that.

20          "The question for you will be whether or not the

21  government has proven beyond a reasonable doubt the elements of

22  the offenses charged, which, again, are bank fraud and wire

23  fraud.  I will instruct you on the elements of those offenses

24  later in the trial, after all of the evidence has been

25  received."

K1LVTEM1 corrected

1          Are there any objections to that instruction?

2          MR. BHATIA:  No objection.

3          MR. GELFAND:  No objection.

4          THE COURT:  All right.

5          Then here, too, I'll ask counsel to alert me when

6     counsel believe it's an appropriate time for me to give that

7     instruction.

8          MR. DiRUZZO:  Judge, I already know.  I'd ask that

9     instruction be given directly after openings.

10          THE COURT:  No, there won't be -- my instruction, as

11     you just heard me say is -- it's going to be triggered by

12     evidence.  Once there's some evidence in the case, I'll be glad

13     to give that instruction.

14          MR. DiRUZZO:  Oh, okay.

15          THE COURT:  In other words, I don't know who the first

16     witness is going to be, but I will wait until there's a factual

17     basis for it.

18          MR. DiRUZZO:  Okay.  Understood, your Honor.

19          THE COURT:  It just seems to me otherwise it's sitting

20     out there in the air unconnected to specific evidence.  But

21     given the nature of the case, I expect we'll get there soon.

22          All right.  I'm next going to turn to Teman's motion

23     to preclude the government from calling as a witness Karen

24     Finocchiaro of Bank of America.  I previously denied Teman's

25     motion to preclude her from being called, which was based on

K1LVTEM1 corrected

1    the incorrect claim that her testimony would be that of an

2    expert witness.  In my January 10th bench ruling, I held that

3    she is a pure fact witness who would testify based on her job

4    experience as a senior investigator at the bank on Bank of

5    America's handling of chargebacks and the like.

6         Teman now moves, see Docket 81, to preclude

7    Ms. Finocchiaro's testimony on a separate ground.  Teman

8    contends that the government has violated its *Giglio*

9    obligations by failing to turn over records relating to

10   approximately seven different lawsuits in which Bank of America

11   has been sued either by federal regulators like the SEC or FTC

12   or CFPB, or in civil litigation.  The government opposes this

13   motion.  It notes that it has provided *Jencks* Act material for

14   Ms. Finocchiaro and has conducted a full *Giglio* inquiry as to

15   her.  See Docket 82.

16        I deny Teman's motion.  I regard it, frankly, as

17   frivolous.  The defense has not indicated that the lawsuits

18   have any connection or anything whatsoever to do with

19   Ms. Finocchiaro.  The defense has not represented that she was

20   a party or a witness to any of these matters.  The defense has

21   not represented that she has personal knowledge of any of them.

22   The defense has not articulated any theory under which she

23   received some form of benefit from the resolution, if any, of

24   any of these cases.

25        Teman's motion appears to proceed from the premise

K1LVTEM1 corrected

1    that because Ms. Finocchiaro works at Bank of America and is in

2    position from her employment there to offer testimony as a fact

3    witness, the door is therefore open to impeach her based on

4    unrelated business practices and unrelated litigations and

5    investigations regarding Bank of America.  Teman's motion may

6    also proceed from the premise that ostensible impeachment

7    material that might attach to other persons at Bank of America

8    may be used to impeach Ms. Finocchiaro in this unrelated

9    matter.

10         Teman does not recite any evidence supporting either

11    of these remarkable propositions.  Taken to its logical

12    extreme, Teman's theory would open the floodgates to vast

13    productions relating to wholly unrelated controversies under

14    the ostensible rubric of *Giglio* for any bank witness called by

15    the government in a criminal case in which a bank was a victim,

16    even, say, the bank teller who identifies the bank robber.

17    Again, there's no legal authority for that.  Teman does not

18    offer any reason for the Court to doubt the government's

19    representation that it has fully searched for and produced all

20    *Jencks* material and *Giglio* material, if any, for

21    Ms. Finocchiaro.

22         As an aside, I would note that conceptually, if Bank

23    of America, as one of the alleged fraud victims here, had

24    received a benefit from the government in connection with this

25    case, for example, as a condition of producing documents or

K1LVTEM1 corrected

1    making a witness available for testimony, the government would

2    have a possible -- if not likely -- constitutional disclosure

3    obligation with respect to that.  Whether that would be

4    conceived of as *Giglio* or *Brady* would depend on the specific

5    facts, as would whether it would rise in connection with

6    Ms. Finocchiaro's testimony as a fact witness as opposed to in

7    some other context.

8         But there has been no suggestion whatsoever that

9    anything like that happened here.  The lawsuits that the

10   defense cites have nothing -- zero -- to do with Teman or the

11   landlords whose checks he allegedly created and deposited with

12   the authorization he allegedly pretended to have.  Whatever the

13   circumstances are under which a benefit to Bank of America

14   might be disclosable as *Giglio* for one of its fact witnesses,

15   those circumstances are not present here.

16        And for much the same reasons, under Rules of Evidence

17   402 and 403, I would not permit the defense to cross-examine

18   Ms. Finocchiaro about unrelated disputes or litigations or

19   investigations involving Bank of America, if that is the use to

20   which the defense had in mind in seeking such materials.  Such

21   matters are irrelevant to the issues to be tried here.  And

22   even if they were glancingly relevant, which they are not, any

23   probative value to such inquiries would be vastly outweighed by

24   the potential for confusion created by inquiries at this

25   criminal trial into other unrelated areas in which Bank of

K1LVTEM1 corrected

1    America has had business controversies.  Bank of America is not

2    on trial here; Mr. Teman is.  And he is on trial on specific

3    charges that do not implicate Bank of America's unrelated

4    regulatory and litigation history.

5            Finally, as a separate basis for denying the *Giglio*

6    motion here, I note that the *Giglio* obligation extends only to

7    the prosecution team.  There is no basis to believe that the

8    U.S. Attorney's Office here has any knowledge or records of the

9    lawsuits cited by the defense.  Thus, even if *Giglio* applied --

10   and it does not -- there would be nothing that the government

11   here would be obliged to produce.

12           Turning next to the final issue.

13           The government moves to limit the defense's

14   cross-examination of two witnesses:  Joseph Soleimani and Elie

15   Gabay.  Each was a landlord or a representative of a landlord

16   and, as such, each was a customer of Teman's.  The parties have

17   filed letters as to this issue; the government's is dated

18   January 19th, the defense's is dated January 20th.  Neither

19   party's letter has been filed on the public docket of this

20   case.

21           At the outset, I direct both parties to file these

22   letters publicly on the docket of this case by tonight.  On the

23   face of the parties' letter, there is no apparent justification

24   for this motion to be litigated outside of public view.  The

25   matters discussed in the letters are in the nature of lawsuits

A-160

23

K1LVTEM1 corrected

1    and publicly disclosed complaints.  The allegations in these

2    lawsuits and complaints may be unflattering to witnesses or

3    perhaps to Teman, but there is no basis to override the

4    public's right to access litigation on this motion *in limine.*

5            In the event counsel believe there are discrete facts

6    contained in these letters that are properly redacted, I will

7    authorize you to publicly file the letters with narrow

8    redactions keyed to genuinely confidential matters.  I will

9    then determine whether there is a basis for such redactions.

10   Because the request for filing under seal originated with the

11   government, I will direct that the government make its public

12   filing first.  The defense should then follow with its

13   redactions until the Court has ruled respecting the areas, if

14   any, in which the government continues to assert a basis for

15   filing under seal.

16           Now, as to the content of the government's motion,

17   Soleimani is a principal of ABJ Properties.  Teman allegedly

18   deposited into accounts he controlled 24 checks of ABJ's,

19   totaling $264,000, allegedly without ABJ's authorization.

20   Gabay is a managing director of Coney Management LLC, which

21   manages properties in the New York area.

22           Teman is alleged to have deposited into accounts he

23   controlled a check for $18,000, and later three checks totaling

24   $33,000, each drawn on the account of a company managed by

25   Coney, again, without Coney's authorization.

K1LVTEM1 corrected

1            The testimony of these witnesses appears likely to be

2    important at trial.  The government's core allegation as to

3    each set of checks is that Teman pretended he had authorization

4    to deposit checks drawn on the customer's account into his bank

5    account, whereas, in fact, he did not.  A key factual issue,

6    therefore, appears to be whether Teman had been authorized or

7    believed he had been authorized by ABJ and/or Coney to create

8    and deposit checks drawn on their accounts.

9            Fulsome cross-examination is therefore in order as to

10   the course of dealings that Teman had with these companies,

11   including these two witnesses, to enable the jury to take into

12   account the full measure of the relationships that Teman had

13   with these customers, which may shed light on whether to credit

14   the government's claim of a lack of authorization or Teman's

15   defense of authorization.  The Court will permit searching and

16   thorough cross-examination as to Teman's dealings with these

17   customers.

18           To its credit, the government's letter is not seeking

19   to restrict cross-examination about communications or dealings

20   between these customers and Teman.  Instead, the government

21   seeks to preclude inquiry into extrinsic matters involving

22   these companies which did not involve Teman, such as complaints

23   or lawsuits brought by or on behalf of tenants.  The government

24   disclosed these matters to the defense and what the Court takes

25   to be an appropriate excess of caution.

K1LVTEM1 corrected

1          The government does not represent -- and nor does

2     Teman -- that the claims of improprieties made against these

3     two customers have any direct bearing on the customers'

4     dealings with Teman.  Teman does not allege, for example, that

5     the tenants' grievances towards these customers bears on

6     whether the customers gave Teman permission to create and

7     deposit the checks in question.  Instead, Teman's theory of

8     relevance is instead solely that Soleimani's and Gabay's

9     conduct towards tenants bears on their character for

10    truthfulness.

11          I will begin with Soleimani.

12          With one narrow exception, I will exclude all the

13    evidence that the government's letter puts at issue with

14    respect to him.

15          Specifically, the government seeks to preclude

16    examination of him as to lawsuits and tenant complaints largely

17    about the physical conditions of housing his company provided

18    or that caused slip-and-falls and the like.  These complaints

19    are inadmissible.  Whether or not Soleimani is a punctilious

20    landlord or a negligent or cruel or thoughtless landlord does

21    not bear on his credibility.

22          Relatedly the New York Public Advocate last month

23    included Soleimani on its list of the city's worst landlords

24    based on the number of open violations with the city's

25    Department of Housing Preservation and Development, or HPD.

K1LVTEM1 corrected

1    These violations relate to vermin, defective doors, and the

2    perpetuation of hazards.  These regulatory violations or

3    alleged violations do not, however, bear on Soleimani's

4    character for truth-telling.  They are inadmissible to impeach

5    his trial testimony.

6            Notably, Federal Rule of Evidence 609 addresses the

7    limited circumstances under which a much more serious bad

8    act -- a criminal conviction -- can be used to impeach a

9    witness.  Where the conviction is not one like perjury that

10   intrinsically goes to credibility, it is inadmissible as a tool

11   of impeachment, unless the offense was a felony committed

12   within the last ten years.  The regulatory violations that are

13   pending or open against Soleimani do not rise or come close to

14   this level.

15           The government, in fact, represents that it has

16   confirmed that neither Soleimani nor Gabay has a criminal

17   record.  The Court will therefore exclude all evidence of

18   violations or alleged violations of housing codes such as those

19   tracked by HPD and all evidence of tenant complaints against

20   these landlords.

21           And for avoidance of doubt, obviously that means,

22   defense, there should not be a peep about this in your

23   addresses to the jury.

24           I do so for two independent reasons under the rules of

25   evidence:  First, allegations of mismanagement, negligence, or

K1LVTEM1 corrected

1    being a rotten landlord are irrelevant to credibility under

2    Rule 402.  Second, even if such allegations had some bearing on

3    Soleimani's credibility, their probative value would be vastly

4    outweighed by various countervailing factors under Rule 403.

5    Inquiry into these alleged housing code-type violations would

6    tend to confuse the jury, prolong the trial, and invite a trial

7    within a trial as to these separate incidents.  Such evidence

8    would also create a grave risk of unfair prejudice to the

9    government and the public insofar as the jury might be led to

10   exonerate Teman of frauds of which the evidence might otherwise

11   establish his guilt because they were swayed by such testimony

12   to loathe the landlords whose checks Teman deposited.

13           There is, however, one allegation that is different in

14   nature.  The government's letter discloses that Soleimani's

15   company, ABJ Housing, was fined by the New York Housing Court

16   in connection with a tenant, Stanley Howell, who refused to

17   leave his apartment in exchange for monetary payment.

18           In the housing court case involving ABJ and Howell,

19   the Court found in an October 2018 decision, that because ABJ

20   initiated negotiations with the tenant, ABJ's conduct

21   constituted harassment within the meaning of the New York City

22   Administrative Code.  This conduct too, to the extent I've

23   addressed it so far, is also not a proper ground for

24   impeachment.  Harassment is distinct from lying.

25           However, as Teman points out in his response, the

K1LVTEM1 corrected

1    housing court judge, Jack Stoller, found in his written

2    decision the following:  Referring to ABJ Housing as the

3    petitioner and Howell as the respondent, Stoller wrote:

4            "Petitioner did not dispute respondent's testimony

5    that petitioner's employees stated that petitioner would not

6    renew respondent's lease if respondent did not surrender the

7    subject premises, an empty threat against a rent-stabilized

8    tenant who is entitled to a lease renewal by operation of law.

9    Misleading a tenant into believing that the tenant has no other

10   option but to vacate a rent-stabilized apartment voids an

11   out-of-court surrender."  See Exhibit A to the government's

12   letter, at 4.  And I have eliminated the case law citations in

13   Judge Stoller's opinion.

14           Judge Stoller's opinion does not disclose whether

15   Soleimani personally was one of the ABJ employees who

16   misleadingly told Howell that his lease would not be renewed if

17   he did not surrender the premises.  If not, there is no basis

18   to use another employee's misleading statement as a means at

19   this trial to impeach Soleimani.  Soleimani's trial testimony

20   here would not be meaningfully discredited merely because of an

21   employee of his misled a tenant.

22           But it is possible that Soleimani was among the

23   employees who personally made that misrepresentation to Howell.

24   If so, although the question under 403 is a close one under

25   which a court could rule either way, I would then permit the

K1LVTEM1 corrected

1    defense at this trial, as a means of impeachment, to establish

2    through a single question or two put to Soleimani that a judge

3    found that in 2017, he had misled a tenant to believe wrongly

4    that his lease could not be renewed.  To be sure, I would not

5    permit under Rule 403 more extended inquiry into this matter,

6    nor would I permit extrinsic evidence of this incident to be

7    received, for example, testimony by Howell or examination of

8    Soleimani regarding what happened and whether he agrees or not

9    with Judge Stoller's finding.

10          But a targeted leading question that elicits from

11   Soleimani the fact of this discrete finding by a judge that he

12   misled a tenant on this subject would assist the jury to assess

13   Soleimani's credibility without turning this proceeding into a

14   trial within a trial about the episode relating to landlord ABJ

15   and tenant Howell.

16          And so, government, I will ask you to please inquire

17   of Soleimani whether there was evidence in the housing court

18   case that he was among the ABJ personnel who dealt with Howell.

19   If his answer leaves any doubt in your mind, you need to follow

20   up and do so immediately.  Then promptly report back to the

21   Court and the defense.  I expect that if the answer is yes,

22   that Soleimani was among the ABJ personnel who dealt with

23   Howell, that Soleimani will have no difficulty on the stand

24   here answering yes to a question from defense counsel about

25   whether a judge so found.  Obviously the government is at

K1LVTEM1 corrected

1    liberty to pull the poison and ask the question on direct as

2    well.  Cross-examination will then move on to other issues.

3            For a voidance of doubt, though, defense counsel, in

4    your opening statement, you are not to refer to such matters,

5    and you are not to inquire into them in court unless and until

6    I have given you the affirmative green light to do so.

7            That ends my ruling as to Soleimani.

8            The bottom line is that, at most, a single question or

9    two about the housing court finding of misleading a tenant may

10   be put to the witness; and then, only upon confirmation that

11   Judge Stoller's opinion was referencing ABJ personnel that

12   included Soleimani personally.  Otherwise, Soleimani's conduct

13   as a landlord, including court actions and complaints and

14   statements by the New York Public Advocate, is excluded under

15   Rule 403.

16           As to Gabay, I will exclude the evidence proffered by

17   the government.  There is much less of it as to Gabay than as

18   to Soleimani.  But that which is addressed in the government's

19   letter does not involve false statements or falsehoods.

20   Significantly, too, unlike the incident involving ABJ and

21   Howell, addressed by Judge Stoller, there is no indication that

22   any finding of dishonesty or untruthfulness has ever been made

23   as to Gabay.

24           In questioning Gabay, Teman would therefore be trying

25   to prove up heretofore unestablished claims of sharp business

K1LVTEM1 corrected

1  practices such as rent overcharges that on their own terms have

2  nothing to do with the bank and wire fraud charges here.  Rule

3  403 clearly precludes such an inquiry, which would be in the

4  nature of a trial within a trial, into extrinsic acts of

5  possible bad behavior.  Whatever slight probative value might

6  be yielded by this exercise is vastly overcome by the risks of

7  confusion, delay, distraction, and unfair prejudice.

8          Finally, I reject as frivolous Teman's claim that

9  precluding this evidence somehow violates his Confrontation

10  Clause constitutional rights.  Teman does not have a

11  constitutional right to probe into unrelated business practices

12  of the witnesses against him, even if such inquiry might tend

13  to dirty up the witness by making them look like a careless or

14  callus landlord.  Teman notably does not cite any authority

15  supporting that proposition.

16          All right.  Therein ends the ruling.

17          Government counsel, I saw a lot of ferment at your

18  table.  Is there something you need to bring to my attention?

19          (Counsel conferred)

20          MR. BHATIA:  Your Honor, we will inquire with

21  Mr. Soleimani about more of the facts surrounding this

22  incident.  But we wanted to clarify that if Mr. Soleimani was

23  not involved in making the misrepresentations to Mr. Howell,

24  then no inquiry would be made of him on the topic.

25          THE COURT:  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

K1LVTEM1 corrected

1          The issue is whether because the judge's opinion

2     refers to people at ABJ, personnel without name, it's left

3     unclear to me whether Soleimani was among those people.  To be

4     sure, the issue is not whether what Mr. Soleimani tells you

5     now, the issue is whether there was evidence at the proceeding

6     before Judge Stoller that he interacted with the tenant.  If

7     there was evidence that he interacted with the tenant, this is

8     coming in.

9          MR. BHATIA:  Evidence that he interacted with the

10    tenant in any --

11         THE COURT:  Okay.  More precisely, that he interacted

12    with the tenant with respect to the issue of renewal.  I expect

13    that you will not credulously take Mr. Soleimani's point of

14    view on this.  Mr. Soleimani may or may not have denied in

15    front of Judge Stoller that he personally made those

16    statements.  Realistically, if he is among the people

17    interacting with the tenant, I think the safer course here is

18    to -- would be for the Court to permit the line of -- that

19    single question or two, rather than creating an open appellate

20    issue about whether you too aggressively took Soleimani's side

21    in denying -- in perhaps arguing that although he dealt with a

22    tenant, it was somebody else in his company who made the

23    misrepresentations.  The judge's opinion is indistinct if

24    Soleimani is among the people dealing with the tenant, given

25    his role at ABJ.  It seems to me the safer course here is to

K1LVTEM1 corrected

1    permit that line of impeachment which will be over and done

2    within the context of this proceeding in a matter of a few

3    seconds.

4          MR. BHATIA:  Understood.

5          We'll inquire with Mr. Soleimani and we'll give an

6    update to the Court.

7          THE COURT:  Very good.  Thank you.

8          All right.  Anything further from the government as to

9    the range of rulings I've just made?

10          MR. BHATIA:  Your Honor, nothing regarding the oral

11    ruling you made.  But we do have another point regarding the

12    advice of counsel defense.

13          THE COURT:  Yes.

14          MR. BHATIA:  Do you want to hear that now or --

15          THE COURT:  Let me just tidy up the ruling here.

16          Defense, anything about the range of rulings I've just

17    made?

18          MR. GELFAND:  No, your Honor.

19          Just to make sure we're on the same page, we will not

20    address the issue regarding Soleimani in any way, shape, or

21    form until the Court gives us the green light.

22          THE COURT:  Bingo.

23          MR. GELFAND:  The Court will only give us the green

24    light if Mr. Soleimani was involved with these interactions.

25          THE COURT:  Right.  If there is evidence that he was

34

K1LVTEM1 corrected

1    interacting personally with a tenant, I think the factual

2    predicate for the limited inquiry exists.  But, to be clear,

3    until I've given the green light, let's not go there.

4            MR. GELFAND:  Understood.  Thank you, Judge.

5            THE COURT:  All right.

6        So with that, yes, Mr. Bhatia, you had something about

7    advice of counsel.

8            MR. BHATIA:  Yes, your Honor.

9        As we understand it, the advice of counsel defense

10    requires several elements to be met.  Among them, that the

11    defendant sought the legal advice relevant to the conduct at

12    issue in the trial; whether he provided all the relevant facts

13    to his counsel; whether his counsel considered those facts and

14    then relayed relevant advice; then whether the client took the

15    advice; and then, of course, that he consulted prior to taking

16    action.  The Court's familiar with those elements.

17            THE COURT:  I am.

18            MR. BHATIA:  Here, there's nothing that appears to be

19    relevant to the conduct at issue in this trial.  If the lawyer

20    was involved in assisting with collection efforts, then it

21    might not be relevant at all to the conduct at issue in this

22    trial, which is whether the defendant had authorization to file

23    the checks in question.

24        And so at this point we'd ask for a proffer from the

25    defense about what facts might establish that defense.  That

A-172

35

K1LVTEM1 corrected

1    will help the government, sort of, think about --

2           THE COURT:  Well, listen -- thank you.  You may be

3    seated.

4           It goes without saying that the mere involvement of a

5    lawyer in a situation does not establish the advice of counsel

6    defense.  I think in generic terms, Mr. Bhatia's description

7    broadly captures the essence of the advice of counsel defense,

8    which requires that all material facts be disclosed and that

9    the attorney's advice then cover essentially the conduct at

10   issue here.  The actual terms of the advice of counsel defense

11   are familiar ones.

12          Whether an advice of counsel instruction is given to

13   the jury obviously will depend on whether the facts permit

14   that.  The defense is obviously running a grave risk if it

15   tries to suggest an advice of counsel and ultimately the advice

16   of counsel elements are not made out here.  In that case you

17   are running a risk of an instruction to the jury that you can't

18   possibly meet on the facts, which, if anything, could prove

19   unhelpful to the defense.

20          So I'm assuming that all the defense is doing at this

21   point is exploring the possibility of an advice of counsel

22   defense and is not committed to give one.

23          MR. GELFAND:  Your Honor, I don't know if this

24   addresses the Court's inquiry, but we're well aware of what in

25   the Second Circuit is required for an advice of counsel

K1LVTEM1 corrected

1    instruction as far as foundation on an evidentiary basis.  We

2    anticipate that the evidence will establish that.

3         THE COURT:  You're saying that Mr.  -- the evidence is

4    going to show that Mr. Teman disclosed to Mr. Reinitz all

5    relevant dealings with respect to each of the customers in

6    question before he created and negotiated each of the checks?

7         MR. GELFAND:  Yes, your Honor.

8         THE COURT:  And did he do that in writing?

9         MR. GELFAND:  No, your Honor.

10        THE COURT:  Is there any memorialization that he did

11   that?

12        MR. GELFAND:  Your Honor, I apologize.  There was

13   frequent communication by email and other channels.

14        THE COURT:  I want that produced to me tonight.  We'll

15   see about it being produced to the government, but I want all

16   of that documentation produced to me tonight.

17        Surely if you've been planning all along to consider

18   this defense, you've got it.  I want all that documentation

19   from lawyer and client produced; because I do not want to have

20   a situation where because the issue was raised late in the day,

21   we need to take an adjournment of the trial where I work

22   through these issues.  So I want that produced to me in full

23   tonight.

24        MR. GELFAND:  Yes, your Honor.

25        THE COURT:  But you're saying that Mr. Teman -- and I

K1LVTEM1 corrected

1    don't pretend to know the range of dealings with the relevant

2    customers that precedes Mr. Teman's creating and negotiating

3    checks, if he, in fact, is the person who did that in each

4    case.  I don't pretend to know what all those were.

5        But you're telling me that you have checked with the

6    lawyer, and the lawyer is prepared to testify that as to the

7    narrative -- the relevant parts of the narrative with each

8    customer, Mr. Teman made a full disclosure?

9        MR. GELFAND:  Yes, your Honor.

10        THE COURT:  So if the customer, for example, disputed

11    that a debt was owed, Mr. Teman faithfully disclosed that in

12    advance to his counsel?

13        MR. GELFAND:  Yes, your Honor.

14        And to even take that one step further, this lawyer

15    was the corporate counsel -- I'm using that term loosely, was

16    Mr. Teman's lawyer with respect to these matters for over a

17    year prior to the alleged criminal conduct.  And to be clear,

18    we have disclosed to the government in discovery written

19    communications from the lawyer on Mr. Teman's behalf to two of

20    the three entities, to Coney and ABJ.

21        THE COURT:  Right.  Sorry.

22        But the involvement of the lawyer, a lawyer can be a

23    collection agent, a lawyer may or may not have access to oral

24    communications between Teman and the customer, a lawyer may or

25    may not have access to email communications between Teman and

K1LVTEM1 corrected

1    the customer; and yet those may be quite material to an advice

2    of counsel defense.  If the question is put at one level, does

3    the contract allow the creation of remotely created checks,

4    that's one thing.  Another issue is does the -- am I allowed to

5    unilaterally go and cut a check for a debt that the customer

6    denies owing.

7            And the question is going to be whether the full range

8    of communications, for example, was showcased to the lawyer,

9    and the lawyer's advice specifically addressed that, and

10   whether the lawyer under oath is going to come here and say

11   that.

12           MR. GELFAND:  Yes, your Honor.  And what I'm

13   proffering --

14           THE COURT:  Is he going to do that?

15           MR. GELFAND:  Yes, your Honor.

16           THE COURT:  All right.  Well, let's get me all the

17   evidence on that.

18           Are you preparing to -- you haven't given prior notice

19   of an advice of counsel defense.  I take it you're not

20   proposing to open on that.

21           MR. GELFAND:  Your Honor, to be clear, there is no

22   notice requirement as a matter of constitutional law.

23           THE COURT:  But you didn't even include it in your

24   requests to charge; in other words, you misled me.  The point

25   is, you know, requests to charge are supposed to anticipate the

K1LVTEM1 corrected

1    issues that might come up.  You've been sitting on this as a

2    possibility.

3            How the government missed this issue and didn't raise

4    it with me before is beyond me.  But any first-year law student

5    reading the Rule 16 disclosures can see that the case -- that

6    the defense is going to hint at an advice of counsel defense

7    here.  Whether or not it makes it or not, I don't know.  I

8    don't know how you didn't disclose that.  It looks as if you're

9    hiding the ball.

10           MR. GELFAND:  Your Honor, we're not hiding the ball

11   per se.  As a practical matter, Rule 12 lists three specific

12   defenses that have to be disclosed; this isn't one of them.

13   There's case law that expressly says that we don't have to

14   provide advanced notice of this defense in advance of trial.

15   There is some cases where the -- I'm sorry, where the

16   prosecution has actually affirmatively moved *in limine* or

17   otherwise raised with the court aspects of this defense.  And

18   courts have ruled in different ways on that.  But that didn't

19   happen here.

20           And so as a practical matter, we're entitled to put on

21   a defense.

22           THE COURT:  I agree with you.  I'm troubled by what

23   looks to be this strategic excision of it from your requests to

24   charge here.  It looks as if you were trying to avoid a motion

25   *in limine* being raised by not including it in your requests to

K1LVTEM1 corrected

1  charge.  When I asked for requests to charge, I don't want you

2  to hide the ball and leave out the ones that would suggest

3  motions *in limine*.  And the problem is that presumably, had you

4  included that in your requests to charge, the government would

5  have been sensitized to the fact that this issue was there and

6  we could have ventilated whether this is a case in which advice

7  of counsel is viable or not pretrial.  And because you didn't

8  include it in the requests to charge, we can't do that.

9           MR. GELFAND:  Your Honor, I appreciate what the Court

10  is saying.

11           THE COURT:  It's a sharp practice.  You're not from

12  the Southern District of New York.  I can tell you in the

13  Southern District of New York a lawyer who leaves out something

14  like that that they are considering would be regarded as

15  significantly below the standards of ethics that we anticipate

16  from lawyers here.  I'm going to be very blunt with you.

17  That's not good.

18           MR. GELFAND:  Your Honor, I can represent that that is

19  certainly not our intention.

20           THE COURT:  Let me ask you this:  Did you think about

21  including an advice of counsel instruction in your requests to

22  charge to me?  Was that something that crossed your mind?

23           MR. GELFAND:  In an academic way, yes, but we hadn't

24  fully --

25           THE COURT:  So when you, in an academic way, thought

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-178

41

K1LVTEM1 corrected

1    about it, tell me what your academic thinking was in deciding

2    not to include it, when you included the other things, like

3    unanimity.  In other words, what was your thinking academically

4    in not including that?

5              MR. GELFAND:  First of all, not yet having the

6    totality of discovery.  Second of all --

7              THE COURT:  Sorry.  Wait a minute.

8              You're an officer of the Court.

9              MR. GELFAND:  Yes, your Honor.

10             THE COURT:  You know what the allegations are here.

11   The discovery as to an advice of counsel defense is uniquely

12   within the defendant's custody and control; it involves your

13   client's communications with his lawyer.  Whether or not there

14   is a defense to the allegations in the indictment does not bear

15   on whether or not there is a potential advice of counsel

16   defense that you are reserving the right to make.

17             I understand that if the government's discovery

18   teaches you that there's something blatant that your client

19   didn't disclose to his lawyer you may think twice about going

20   for that defense, I get that.  But it was clearly very much a

21   plausible possibility at the time in an academic way you

22   decided not to tell me that this might be a defense.

23             I've drafted the proposed jury charge in this case

24   already, subject to editing it depending on how the case comes

25   in.  I don't have an advice of counsel defense because you had

K1LVTEM1 corrected

1    not indicated you want one.

2          Thank you.

3          I mean, you know, you've got to elevate your game

4    here.  That's sleazy.

5          MR. GELFAND:  Your Honor, what I can say is that's

6    certainly not my intention.  That's not how I practice.

7          THE COURT:  That's all great and good, but it looks

8    like it was.  Just because you say that doesn't mean it's true.

9    You thought about it in an academic way; you decided not to

10   include it.

11         I want the full scope of documentary evidence from

12   Mr. Teman and his lawyer.  I want it produced to me tonight.

13   And I want you ready to produce it to the government the moment

14   that I so authorize so that there's no delay.

15         Understood?

16         MR. GELFAND:  Yes, your Honor.

17         THE COURT:  So I want you to have -- in addition to

18   being produced to me, have a full pair of hard copies in court

19   tomorrow morning so that if I conclude it needs to be produced,

20   you can hand it over to the government table.

21         MR. GELFAND:  Yes, your Honor.

22         THE COURT:  All right.

23         Government, anything?

24         MR. BHATIA:  Your Honor, we note that at this point

25   the defendant still has not waived privilege over these topics,

43

K1LVTEM1 corrected

1    so we couldn't request discovery.  These are documents we'd

2    request, but even as of today of jury selection, there's been

3    no waiver of privilege.

4            THE COURT:  Sorry.  Did you ask for documents relating

5    to communications between Mr. Teman and his counsel?

6            MR. BHATIA:  So that was actually the next topic I was

7    just about to get into.

8            We served grand jury subpoenas, as you know, in

9    December.  And for those subpoenas, we requested the basis for

10   any believed authority to deposit these checks, among other

11   things.

12           THE COURT:  Right.  Sorry.

13           But that was a grand jury subpoena that you submitted

14   a few weeks before the trial was scheduled.  And I have

15   determined that, given the date on which you submitted them,

16   right before Christmas, weeks before the trial, I respect that

17   you represent there's a *bona fide* basis for seeking a

18   superseder and will assess that for sure after the end of the

19   trial.  That's a grand jury subpoena; that's not about the

20   charges brought here.  Bottom line is it wasn't realistic to

21   get that material in time.

22           MR. BHATIA:  Your Honor, I think it goes to the idea

23   they knew we were asking about the perceived authority.  And I

24   think to get to this trial, immediately after your Honor's

25   ruling, I believe it was January 10th, we served trial

K1LVTEM1 corrected

1    subpoenas.

2         THE COURT:  Right.

3         MR. BHATIA:  We served them electronically to defense

4    counsel, who had accepted them electronically in the past.

5    This time they just never got back to us on whether they were

6    accepting service.  And we found out Friday that they weren't

7    accepting service.

8         THE COURT:  Defense counsel, is that true?

9         Sit down.  One moment.

10         Is that true?

11         MR. DiRUZZO:  Yes.  But I just want to make sure --

12         THE COURT:  Are you telling me that on January 10th,

13    having previously accepted service of subpoenas, you declined

14    to accept service?

15         MR. DiRUZZO:  Your Honor, I don't believe we've ever

16    accepted service previously on a grand jury subpoena.

17         THE COURT:  I'm not talking about the grand jury

18    subpoena, and you know that.  Mr. Bhatia has said they served

19    you trial subpoenas, after I made it clear that the grand jury

20    subpoena wouldn't be resolved until after this trial is over.

21         Yes or no, did you receive trial subpoenas from the

22    government on or after January 10th?

23         MR. DiRUZZO:  Yes, we received --

24         THE COURT:  Did you accept service of those trial

25    subpoenas, as I gather counsel had been accepting service

K1LVTEM1 corrected

1    throughout, yes or no?

2                MR. DiRUZZO:  No, we did not accept service.

3                THE COURT:  All right.

4                Government, please serve Mr. Teman with those

5    subpoenas right now.  Defense, those are to be responded to by

6    5:01 p.m. today.

7                Defense counsel, you are in the process of blowing

8    your credibility with the Court.  Did you tell government

9    counsel -- when did you tell government counsel that you would

10   not accept service of the subpoenas that were served?

11               MR. DiRUZZO:  Your Honor, I don't want to make a

12   misrepresentation to the Court.

13               THE COURT:  Good.

14               MR. DiRUZZO:  We had numerous phone calls between the

15   four attorneys before you.  I can't say for sure when exactly

16   the conversation was, but I know for sure that we never made

17   representations that we had the authority on behalf of our

18   client to accept service.

19               THE COURT:  Look, do you dispute that on or about

20   January 10th, Mr. Bhatia emailed you trial subpoenas?

21               MR. DiRUZZO:  That I do not dispute.

22               THE COURT:  And did you say anything to him indicating

23   that you were not accepting service of those?

24               MR. DiRUZZO:  I believe that we had email

25   correspondence, and we indicated that we were not authorized to

K1LVTEM1 corrected

1     accept service.

2              THE COURT:  What day was that?

3              MR. DiRUZZO:  Your Honor, I would have to check my

4     emails.  I can't say for sure.

5              THE COURT:  Mr. Bhatia?

6              MR. BHATIA:  Your Honor, my recollection of the

7     timeline is this:  On January 10th, which was the day of the

8     Court's conference, I think now maybe a little over a week ago,

9     we served the subpoenas.  Your Honor, at that conference, had

10    requested the defense to respond to the grand jury subpoena

11    petition to quash by last Friday.  So that was the 17th.

12             THE COURT:  I understand.  That relates to the grand

13    jury.  I'm focused on this trial here.

14             MR. BHATIA:  So, your Honor, it's relevant because

15    that was the first time we had heard in their filing that they

16    weren't accepting service.

17             THE COURT:  When was that, on what day?

18             MR. BHATIA:  I believe January 18th, this last Friday.

19    So we saw in a filing that defense counsel said we had

20    attempted to serve subpoenas.  And so that prompted in our

21    mind, maybe for the first time defense counsel may not be

22    serving these subpoenas.  At that point we emailed defense

23    counsel to say, Do you accept service?  Please let us know

24    promptly.

25             THE COURT:  All right.

K1LVTEM1 corrected

1         MR. BHATIA:  And we heard at that point --

2         THE COURT:  Mr. Gelfand, is government's factual

3  representation correct that it wasn't until the -- what did you

4  say, the 18th or the 17th?

5         MR. BHATIA:  The 18th, your Honor.

6         THE COURT:  -- it wasn't until the 18th that you

7  expressly conveyed you weren't accepting service?

8         MR. DiRUZZO:  I have no reason to doubt or contest the

9  government's representation at this point, Judge.  I don't have

10  the emails in front of me.  I just -- I can't say no.  I have

11  to say --

12         THE COURT:  Government, please, I'm going to take a

13  two-minute recess.  Government, serve the defendant right now.

14         (Recess)

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K1L7TEM2

1           THE COURT:  Government, have you now served the trial

2      subpoenas on the defendant?

3           MR. BHATIA:  Your Honor, to be clear, at the beginning

4      of the conference when I asked to serve a subpoena, that's when

5      I served the if-as-when subpoena, and at the second break I

6      served the three trial subpoenas on the corporate entities,

7      which we had sent --

8           THE COURT:  Very good.  And that's separate.

9           MR. BHATIA:  All four of them have now been served --

10     and we can give you a copy, your Honor -- three trial

11     subpoenas, three corporate entities, and one if-as-when

12     subpoena to the defendant.

13          THE COURT:  Defense counsel, Mr. Gelfand, you are

14     telling me now that the defendant is going to be defending on

15     grounds of advice of counsel, correct?

16          MR. DIRUZZO:  Yes, your Honor, that's what we intend.

17          THE COURT:  All right.  You are, I take it, therefore

18     waiving the privilege as it relates to communications with his

19     counsel on this subject.

20          MR. DIRUZZO:  I believe we have to.  I believe that's

21     the nature --

22          THE COURT:  There is no attorney/client privilege now

23     that survives as it relates to the defendant's communications

24     with his counsel Mr. Reinitz with respect to the issues in this

25     litigation -- in this case.

K1L7TEM2

1          MR. DIRUZZO:  With that important caveat, the issues

2     in this litigation, because obviously my client has extensive

3     dealings with other litigations, other simple stuff.

4          THE COURT:  Attorney/client privilege is a subject

5     matter concept.  The subject matter here involves Mr. Teman's

6     dealings with the customers who were denominated as entities 1,

7     2, 3 and 4.  I take it that's the scope of the waiver.

8          MR. DIRUZZO:  Right.

9          THE COURT:  And obviously therefore the checks

10    purportedly drawn on the accounts of those entities that are at

11    issue in this case, you agree that too is within the scope of

12    the waiver.

13         MR. DIRUZZO:  Right.

14         THE COURT:  All right.  Here is what I would like to

15    do.  It's 10 o'clock.  I think we are safe, Mr. Smallman tells

16    me, for a half hour just while the jury gets acclimated.  If no

17    one has anything else to raise, I will be back here at, let us

18    say, at 10:25.  I invite counsel to do whatever research you

19    can in the interim with respect to the advice of counsel

20    defense.

21         One of the immediate issues for me involves the

22    defense's opening statement.  It is not crystal clear to me

23    whether the government has done anything to date that has

24    created an obligation on the defense to disclose the potential

25    advice of counsel defense here.  It's not clear to me either

A-187

50

K1L7TEM2

1    what if any free-standing obligation the defense might have had

2    with respect to that point.  A natural issue is under the

3    circumstances here where the defense did not volunteer the

4    advice of counsel defense or include a proposed instruction to

5    that effect, whether the defense should be permitted to open on

6    that point.  I'm not expressing a view one way or the other,

7    but I would welcome some legal guidance on that point.  I will

8    see you in 25 minutes.

9            MR. BHATIA:  Your Honor, I just want to say on the

10   topic of timing of when the advice of counsel could present

11   itself, the government expects that it could close -- I should

12   say it could rest its case as early as tomorrow afternoon.  So,

13   I think nothing you have said about timing, briefings and

14   discovery would get in the way of that, but we just wanted to

15   give your Honor some notice that it could be as early as --

16           THE COURT:  Well, I appreciate that, and that's good

17   to know, and obviously the defense needs to have its witnesses

18   here at the close of the government's case.

19           The immediate issue, given the emergence of a possible

20   or apparently committed advice of counsel defense is whether

21   there has been some breach with respect to notice and what if

22   any implications there are for the defense opening.

23           I want to reserve on that.  One possible outcome here

24   is that we defer openings until tomorrow morning just to make

25   sure that I get this right.  It has somehow gone unaddressed by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1L7TEM2

1    all counsel.

2         Again I will see you at 10:30, and please be prepared

3    to give me guidance on that then.  Thank you.

4         Mr. Imperatore?

5         MR. IMPERATORE:  I just want to raise an issue with

6    respect to notice on advice of counsel.  It's still not crystal

7    clear to the government from what defense has said -- even

8    assuming that what they've disclosed on the record today

9    constitutes notice -- whether the advice that was sought really

10   goes to the central issue in this case, which is whether Mr.

11   Teman had authorization to deposit the checks, as opposed to

12   some collateral issue that the lawyer could have been involved

13   in, for example, collection efforts with respect to Bank of

14   America.

15        So we're asking for whether, in connection with notice

16   here, did the defendant actually seek before acting a lawyer's

17   advice with respect to depositing the checks at issue in this

18   case.  It's not clear to us from what has been said whether

19   that actually took place.

20        THE COURT:  That is what I understood to be the

21   central issue here.  The central dispute is whether or not Mr.

22   Teman had the authority to create and deposit these customer

23   checks, and the intent to defraud element, that is, the mens

24   rea with respect to essentially both bank and wire fraud

25   centrally turns on that issue.

52

K1L7TEM2

1      The defense appears to be representing that a lawyer

2   told Mr. Teman on a full presentation of the facts that he had

3   the legal right to do what he did. And, defense counsel,

4   that's the question I am putting to you. The documents you

5   will be producing to me at the close of the trial today I

6   expect will shed more light on whether that really happened. I

7   will see you at 10:30.

8      (Recess)

9      THE COURT: All right. Back on the record. It's

10  10:40. I am told that the jury venire will be here at about

11  10:45, so we will be getting going with jury selection shortly.

12  Let me just ask if in the short interim period if counsel have

13  found any apposite legal authority that bears on whether there

14  was either in general or on the facts here a notice obligation

15  on the part of the defense. Yes?

16      MR. DIRUZZO: Your Honor, moments ago we e-mailed your

17  chambers, cc'ing counsel for the government, the case United

18  States v. Wilkerson, 388 F.Supp. 3rd 969, a 2019 case out of

19  the Eastern District of Tennessee that addressed a government

20  motion in limine in a healthcare fraud case where the

21  government attempted to move in limine to require the defendant

22  to disclose an advice of counsel defense in advance of trial.

23  Your Honor, that case we submit is well reasoned, with

24  citations not only to the Second Circuit case of Scully but

25  also to the Supreme Court's decision in Wardius v. Oregon, 412

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1L7TEM2

1    U.S. 470 at 476, a 1973 case.  We believe this case stands for

2    the proposition that an advice of counsel defense, one, is not

3    an affirmative defense, as that concept is known under the

4    civil rules, under Federal Civil Procedure 8, and that it would

5    be unconstitutional to require a defendant to affirmatively

6    require him to provide this information in advance of trial to

7    the government, and that in particular Rule 16, Rule 12.1.2.3

8    do not provide or impose that obligation upon a criminal

9    defendant.

10           The court in that case further notes that a criminal

11   defendant might make up their minds and tell everyone ahead of

12   trial.  On the other hand, the defendant could wait and decide

13   what defenses if any to raise once they see what evidence the

14   government presents.

15           So we submit that this case the Court should adopt and

16   it stands for the proposition that what happened here,

17   especially given that the government did not affirmatively move

18   in limine, even though the Court in the Wilkerson case

19   addressed in that context and denied the government's motion in

20   limine, that it just adds to we believe this Court will be

21   settled position to allow us to not only raise an advice of

22   counsel defense but what happened here was appropriate under

23   the circumstances.

24           THE COURT:  May I ask you if Wilkerson identifies any

25   contrary authority?

54

K1L7TEM2

1          MR. DIRUZZO:  Yes.  Wilkerson did say that this issue

2     was not without different views, and Wilkerson at the bottom of

3     page 4 of the West.Law pdf does cite to a D.C. District Court

4     case, U.S. v. Crowder, 325 F.Supp. third 131.  It's a 2018

5     case.  And it cites to also United States v. Meredith, a

6     Western District of Kentucky case.

7          THE COURT:  Very good.  Thank you.

8          All right.  Government, anything?

9          MR. BHATIA:  Your Honor, I think at least upon a quick

10    review Wilkerson might be different in the sense that here the

11    government --

12         THE COURT:  I will ask you if you found any authority

13    supporting an application to preclude the defense from pursuing

14    an advice of counsel defense either in general or in their

15    opening.

16         MR. BHATIA:  No, your Honor.

17         THE COURT:  Are you asking me to preclude that?

18         MR. BHATIA:  At this point we're not asking your Honor

19    to preclude it, but we do have a different specific request

20    related to the advice of counsel defense.

21         The government, of course, has conferred with people

22    in the office and thought about this issue.  At this point the

23    government doesn't have a lot of facts about it.  As you know,

24    we just learned about it.  The government is therefore

25    requesting an adjournment of jury selection for 24 hours.  The

55

K1L7TEM2

1    purpose of that is that we're concerned about swearing in a

2    jury and having jeopardy attach prior to really knowing

3    anything about this defense and what the trial might look like,

4    what the scope of discovery is.  I don't know if -- we're

5    prepared it take on a heavy lift, your Honor, of course, to

6    review this and ensure that the Court and the parties'

7    schedules are not interrupted unduly, but at the same time it

8    does raise some concern about having a panel sworn while at the

9    same time there might be dozens or hundreds of thousands of

10   pages of discovery out there.  There might be obligations that

11   we have to put on a case in which we're responding to this

12   advice of counsel defense, which itself could -- we just don't

13   know a lot, your Honor, and so for that reason we would request

14   an adjournment for 24 hours to select a jury, and that will

15   allow the Court and the government to evaluate whether there

16   might be a need for a further adjournment or whether there is a

17   need for motion practice.  It will give us those options, and

18   we believe that swearing in a jury now is going to preclude a

19   lot of those options.

20            THE COURT:  Defense?

21            MR. DIRUZZO:  Your Honor, we don't believe that's

22   called for under the circumstances, given that the defense

23   doesn't have an obligation to front this information under the

24   rules, and given that the government just last week produced

25   over 5,000 pages of documents.

A-193

K1L7TEM2

1          THE COURT:  I'm sorry.  Wait a minute.  Maybe you're
2     right and maybe you're wrong.  And let's assume even that
3     you're more likely right than wrong that there is no
4     obligation.  What is the harm in waiting 24 hours?  In other
5     words, I could have had more opportunity to reflect on this
6     issue had, for example, you included this in your request to
7     charge.  The only reason this issue came up was because when I
8     read the Rule 16 binder it leapt out at me as something that
9     had gone unaddressed but I thought it's obvious that the
10    defense must be considering such a motion.  Had I not raised
11    it, we would have been off to the races.  What is the practical
12    harm in waiting 24 hours?  I mean your client is way within his
13    speedy trial rights.  The trial has been -- the indictment was
14    of relatively recent vintage.  My job is to get things right.
15    What's the harm in a 24 hour delay?
16          MR. DIRUZZO:  Your Honor, may I have one minute?
17          THE COURT:  Yes.  Your client is not in custody.
18          MR. DIRUZZO:  Your Honor, we would defer to the Court.
19          THE COURT:  I mean, look, I'm listening, as you can
20    tell, but on the one side of the equation is the incremental
21    inconvenience and extra night in a hotel room for counsel, the
22    trial starting a day late.  On the flip side -- but there is
23    not a lot else -- on the flip side this is a consequential
24    issue, and the risk of picking a jury now -- if there is
25    perhaps going to be a longer adjournment for some reason

K1L7TEM2

1    unexpected, if the jury has been impaneled we have all sorts of

2    double jeopardy issues.

3            Mr. Bhatia is right if I pick a jury and swear a jury

4    that in practice puts us on a time gun.  I still expect the

5    trial will begin tomorrow, but this gives us a chance this

6    afternoon to work through the issues, the volume of materials

7    in question, to determine whether or not you have an obligation

8    to produce those materials in response to the subpoenas.  It

9    seems to me that better to make those decisions without the

10   artificial urgency of an impaneled jury.

11           Do you have a counter argument?

12           MR. DIRUZZO:  No.

13           THE COURT:  Counsel, I think what I'm going to do is

14   as follows:  I think we will adjourn jury selection to 9:30

15   tomorrow, but I want to see you this afternoon.  May I suggest

16   that we reconvene at 2 p.m.?  I know you're free.  And I really

17   want to work through the full range of issues here.  I want to

18   understand -- off the record.

19           I will see you at 2 p.m. but I want to work through

20   the range of issues.  I was about to, Mr. Gelfand, go through

21   those -- Mr. DiRuzzo.

22           MR. DIRUZZO:  Your Honor, given the Court's ruling

23   regarding the production of documents at 5 o'clock, just after

24   5 o'clock today, we are going to have our client dilligently

25   work on that and pull the stuff together to comply.

A-195

K1L7TEM2

1    Obviously -- well, not obviously -- it's going to take a little

2    bit of time and we're concerned about meeting the Court's

3    deadline.  So, we would like the Court to consider if Mr. Teman

4    could be excused from the 2 o'clock hearing.  That way he can

5    get right on it and there won't be any delay in meeting the

6    Court's deadline.  I just want to bring that to the Court's

7    tension.

8             THE COURT:  I'm sorry.  Don't you have a legal

9    assistant at one of your offices who could do that?  This is

10   important.  This involves the attorney/client advice.  Mr.

11   Teman is -- counsel, when I speak to you please don't speak to

12   somebody else.

13            Mr. Teman ought to be part of the brain trust here

14   that considers what I am going to be raising at 2 o'clock.

15   There will be issues about whether or not there is anything in

16   the rules or your correspondence that precludes this issue from

17   being raised in opening or pursued at trial.  Thus far I'm not

18   seeing anything that precludes that, but I want to be careful

19   about it.  I want to be sure that I'm making a thoughtful

20   judgment about the production of documents, if any, that is

21   required here.  And it seems to me that the discussion we have

22   may be informative to Mr. Teman as to the risks and rewards of

23   pursuing this line of defense.

24            I am certainly aware of cases in which defendants have

25   regretted running up the flag pole advice of counsel defenses

59

K1L7TEM2

1    only to find that the facts did not bear out the predicates for

2    that.  That's a risk that a defendant who pursues this route

3    runs.  There may be a real value for Mr. Teman as I gather a

4    nonlawyer to hear counsel's colloquy with the Court.

5         MR. DIRUZZO:  OK.  How about this, your Honor, for

6    your consideration?  We believe that we will be able to produce

7    to the government some documents by the Court's deadline.  I

8    want to build in a little bit of slack so that we could produce

9    a couple hours later just to make sure we have all the

10   documents that the government wants and that way alleviate my

11   concern that if we don't have strict compliance with the

12   Court's order by 5:01 that we might subject my client to some

13   type of contempt proceeding or what have you.

14        THE COURT:  Mr. DiRuzzo, you are prepared to produce

15   to the court pursuant to my request, and to the government

16   pursuant to its subpoena, at 5:01 a good amount of the

17   responsive materials, but given just the press of business you

18   would ask for leave to continue the rolling production into the

19   evening.

20        MR. DIRUZZO:  Yes.  And we anticipate the production

21   would come to the government via like a Drop Box type vehicle

22   manner.

23        THE COURT:  OK.  But the concept here is that the

24   government will receive the full production this evening; it's

25   just that it may come in several tranches beginning at 5

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1L7TEM2

1    o'clock.

2             MR. DIRUZZO:  Exactly.

3             THE COURT:  But what you're not going to be doing is

4    objecting to the obligation to produce.

5             MR. DIRUZZO:  Correct.

6             THE COURT:  OK.  Can you estimate for me what the

7    volume of the communications of the documents here looks like?

8             MR. DIRUZZO:  May I inquire with my client?

9             THE COURT:  Yes, of course.

10             MR. DIRUZZO:  Your Honor, it's my understanding that

11    it's hundreds of e-mails spread over a timeframe of multiple

12    years, and it would not surprise me that multiple of these

13    e-mails have embedded attachments in them.  We believe that a

14    good majority of these e-mails are already in the possession of

15    the government because these e-mails were directed to ABJ,

16    Coney and DiRuzzo.

17             THE COURT:  And who were the parties to these e-mails?

18    These are e-mails that would, you say, be privileged but for

19    the waiver of the privilege, or not?

20             MR. DIRUZZO:  No, I'm referring to the subpoena

21    directed at the corporations, where the Court ordered for us to

22    produce those corporate documents, records that are subpoena to

23    subpoena duces tecum by 5:01.  Those responsive documents would

24    be e-mails between Mr. Teman and individuals at GateGuard,

25    mainly Mr. Teman, Mr. Teman attorney Mr. Reinitz and the

61

K1L7TEM2

1    individuals associated with ABJ, Coney and Mercer.

2            THE COURT:  Let me break this down.  There are really

3    two distinct document issues here.  There is likely

4    considerable overlap among them, but just to be precise one

5    issue involves the government's trial subpoenas which they

6    thought they had effectively served on you on January 10 and

7    which you notified them on the 18th or so you were not

8    accepting service of and therefore I ordered be served today

9    and be responded to today, given the disappointing gamesmanship

10   at the back table about those subpoenas.

11           MR. DIRUZZO:  That's what I was referring to, correct.

12           THE COURT:  Right.  As to those, will those materials

13   contain attorney/client communications with the attorney at

14   issue here Mr. Reinitz?

15           MR. DIRUZZO:  No.  We have Mr. Reinitz -- during the

16   break I was on the phone with him -- that being Mr. Reinitz --

17   letting him know he needs to pull together all of the e-mails

18   between Mr. Reinitz and Mr. Teman, and he is working on that.

19   That was not what I was referring to.  Because I believe your

20   Honor said that we had produced those to you tonight and be

21   prepared to produce those.

22           THE COURT:  OK.  But are those responsive?  Because

23   they're coming from Reinitz, you're saying they are not

24   responsive to the government's subpoenas to the company?  I

25   mean Reinitz is an agent of the company, right?  He is an

K1L7TEM2

1   employee.  So if the subject matter of the government's trial

2   subpoena includes employees or agents of the company,

3   presumably it covers Reinitz.  Is he outside lawyer or is he an

4   employee of the company?

5          MR. DIRUZZO:  Outside lawyer.

6          THE COURT:  But he is an agent of the company?  He is

7   a client?  The principal is the company; he is their agent?

8          MR. DIRUZZO:  Mr. Reinitz would be Mr. Teman's and

9   Gate Guard's agent, yes.

10         THE COURT:  And does the subpoena from the government

11  require the production materials in the company's custody,

12  possession and control?

13         MR. DIRUZZO:  With the Court's indulgence.  Yes, your

14  Honor, paragraph 3.

15         THE COURT:  All right.  By definition, the agent is

16  controlled by the principal.  It seems to me that you can't

17  claim that Reinitz is outside the company's control.  He is

18  their lawyer.  If the client says give me your reports, the

19  lawyer has to produce those.

20             So, with the benefit of this colloquy and you're now

21  having focused a little more on the subpoena, is it your still

22  your view that materials physically possessed by Reinitz are

23  outside the scope of the government subpoena?

24         MR. DIRUZZO:  No, your Honor.  But if I may clarify, I

25  was looking for a little bit more time for my client Mr. Teman

K1L7TEM2

1    to provide the documents to the government that are responsive

2    to the trial subpoena served on the entities.  Separate and

3    apart, Mr. Reinitz is working as --

4         THE COURT:  But it's not separate and apart, Mr.

5    DiRuzzo.  If Reinitz is an agent of the company and the

6    government subpoena to the company picks up documents possessed

7    in the company's control.  That includes the agents that the

8    company controls; that includes Reinitz.

9         And you're not disagreeing with that.  You're nodding.

10        MR. DIRUZZO:  No, I agree there is a substantial

11   overlap.

12        THE COURT:  So let's put aside my request for advice

13   of counsel related documents.  Let's focus simply on the

14   government subpoena.  In terms of the content of that subpoena

15   does -- any reason to think it doesn't reach communications

16   between Reinitz and the company, including its Officer Teman

17   relating to the matters at issue in this case.  I assume it

18   must reach that.  I haven't seen the subpoena.

19        MR. DIRUZZO:  I would agree.  There may be some

20   exceptions but for the most part I agree.

21        THE COURT:  If that's really the case, we are really

22   talking about attorney/client communications I take it that

23   are -- or communications relating to advice of counsel that are

24   both responsive to the government's trial subpoena and to my

25   oral court order.

K1L7TEM2

1          MR. DIRUZZO:  Exactly.

2          THE COURT:  So, let's focus on government subpoena

3    here.  You with waived privilege with respect to the

4    attorney/client communications bounded by the subject matter of

5    this case.

6          MR. DIRUZZO:  Correct.

7          THE COURT:  You have agreed to produce materials

8    responsive to the subpoena to the government today beginning at

9    5 o'clock and then rolling in the evening, correct?

10         MR. DIRUZZO:  Correct.

11         THE COURT:  So QED, to the extent that attorney/client

12   communications are responsive to the subpoena, those will be

13   produced today whether from the servers of the company directly

14   or from its agent Reinitz, correct?

15         MR. DIRUZZO:  Correct.

16         THE COURT:  OK.  And so your application is simply for

17   grace on my part to relieve you from the obligation to produce

18   all that at 501.  You are prepared to produce as much as you

19   can by 5:01 and the balance rolling in the evening as fast as

20   you can.

21         MR. DIRUZZO:  Exactly.

22         THE COURT:  But to be clear, in effect that is going

23   to discharge, it sounds like, the production obligation of my

24   separate oral order about advice of counsel, because it doesn't

25   sound like there are advice of counsel documents other than

A-202

K1L7TEM2

1    that are possessed by the company or its legal agent Reinitz,

2    correct?

3              MR. DIRUZZO:  Correct.

4              THE COURT:  OK.  So I think we're dealing with one

5    issue, not two, and I would welcome then receiving on the same

6    schedule as the government the documents that you are producing

7    to the government.

8              MR. DIRUZZO:  OK.

9              THE COURT:  I am just trying to make this easy, but I

10   think working through this, given the privilege waiver, given

11   that the attorney is an agent of the company, and given that

12   the government's subpoena is broad enough to pick up the

13   attorney/client communications here, it seems to me all this

14   stuff gets produced tonight pursuant to the subpoena.  You are

15   not disagreeing with that, are you?

16             MR. DIRUZZO:  No.  My concern I want to make sure my

17   client is not held in contempt because we couldn't get

18   everything out at 5:01.

19             THE COURT:  Before I bless what sounds like a

20   reasonable proposal, let me hear from the government.  Mr.

21   Bhatia?

22             MR. BHATIA:  May we have just a moment?

23             THE COURT:  Yes.

24             MR. BHATIA:  So, to be clear, we understand that the

25   subpoenas will cover records sufficient to establish the advice

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1L7TEM2

1    of counsel defense, the one at trial, but we do reserve --

2            THE COURT:  Does your subpoena -- without perhaps

3    literally saying those words, because it sounds like you

4    haven't given thought to the advice of counsel defense until I

5    raised it -- does the subpoena nevertheless in its verbal

6    formulation, is it broad enough to pick up materials that are

7    responsive to the advice of counsel defense?

8            MR. BHATIA:  The subpoena could pick up some records

9    that are responsive -- that would implicate the advice of

10   counsel defense -- but it may not encompass all of them.

11           THE COURT:  Look, you may sit down.  I just want to be

12   able to look at Mr. DiRuzzo.

13           Counsel, I am trying to be a force for clarity and

14   good here.  It seems to me that given the privilege waiver here

15   what I don't want to have happen is that because the

16   government's formulation in its January 10 subpoena may have

17   not picked up the words "advice of counsel" the defense winds

18   up making an incomplete production.

19           Mr. Bhatia, if it is your intention to broaden the

20   subpoena that you wrote on January 10 and served today to pick

21   that up, may I suggest you take the subpoena back, handwrite in

22   "sufficient" to pick up the balance of those documents, so

23   there is no technical issue here under which the defense is

24   able to claim that certain documents fell outside of the

25   subpoena calls.

67

K1L7TEM2

1          Mr. DiRuzzo is helping you here because he is

2     acknowledging his expectation on a first read that the subpoena

3     already picks that stuff up, but just so we don't have any

4     verbal gamesmanship here, the better course -- and I will take

5     a five minute recess now -- is to modify the subpoena to

6     explicitly pick up communications bearing on advice of counsel

7     with respect to the matters at issue in this case.

8          MR. BHATIA:  We will.

9          THE COURT:  I think that solves our -- that closes

10    that gap, correct?

11         MR. BHATIA:  That's right.

12         THE COURT:  Mr. DiRuzzo?

13         MR. DIRUZZO:  Your Honor, we would be amenable to

14    counsel for the government amending the e-mail because it's an

15    e-mail, and that way it's documented.

16         THE COURT:  Why don't we do this:  We will take a five

17    minute recess.  Government counsel will write out what it

18    purposes.  They will run it by you.  I am sure you will

19    agree -- because you have been agreeable to the idea of

20    proposing this -- and we will put it on the transcript of the

21    hearing when we resume in five minutes.  That way you've got it

22    in writing too.

23         Look, in the meantime when I come back in five minutes

24    let's talk through about what is happening at 2 o'clock.  I

25    just want to make sure collectively we're issue spotting.  It

K1L7TEM2

1    doesn't sound like the volume of documents here -- although it

2    will give a late night to government counsel -- is so

3    foreboding as to require further adjournment, but we will see.

4    But there obviously is going to be an issue about whether there

5    is something that precludes the defense from proceeding as to

6    advice of counsel.  I am not hearing it yet.  I'm not seeing

7    anything on first read anything in the Federal Rules or the

8    parties' back-and-forth that in any way precludes it.  It looks

9    as if it's a tool in the defense tool box.  They can choose to

10   use it with all the risks and rewards that doing so entails.  I

11   am not finally resolving that, but it's my first initial

12   instinct, but I will want to make sure that we take that up so

13   there is complete clarity beginning this afternoon at to

14   whether or not that's in play.  I want you all to know what is

15   fairly in play in terms of opening statements.  I will see you

16   in five minutes.

17           (Recess)

18           THE COURT:  All right.  Be seated.

19           Government counsel, have you worked up an annotation

20   to your trial subpoena that is sufficient to comfortably

21   embrace the advice of counsel documentation that you are

22   seeking and that Mr. DiRuzzo is said it's prepared to produce

23   today?

24           MR. BHATIA:  Your Honor, we actually just finished

25   formulating the proposal.  We have not talked about it with

K1L7TEM2

1   defense counsel.

2           THE COURT:  I will stay on the bench.  Take a moment

3   with the defense.

4           MR. GELFAND:  Your Honor, we're fine.

5           THE COURT:  So, defense, Mr. Gelfand, you are fine

6   with what the government is articulating as its addition to the

7   terms of the subpoena that was served in person today?

8           MR. GELFAND:  Yes.

9           THE COURT:  Great.

10          Mr. Bhatia, would you kindly slowly for the benefit of

11  the court reporter put that language on the record.

12          MR. BHATIA:  Yes, your Honor.  So we propose to put at

13  the end of the subpoena a phrase that states "For avoidance of

14  doubt, this subpoena calls for the production of any and all

15  documents relating to communications with attorneys and

16  documents reviewed by attorneys relating to the allegations in

17  the indictment, business dealings with the entities listed in

18  the indictment, contracts, terms and conditions and payment

19  terms, the checks listed herein, including but not limited to

20  any communications with Mr. Teman about, or documents provided

21  by Mr. Teman, and any documents that could support an advice of

22  counsel defense.

23          THE COURT:  Very good.  And we all agree -- I think

24  defense counsel has -- that the subpoena runs to employees and

25  agents of Mr. Teman's companies which specifically includes at

70

K1L7TEM2

1    least the agents part attorney Reinitz, right?

2              MR. GELFAND:  Yes.

3              THE COURT:  I think we're then at peace with respect

4    to the scope of the document production obligation.  And, Mr.

5    DiRuzzo, I appreciate your proposal essentially to make a first

6    production at five and then rolling productions thereafter.

7              If you're able to make a first production before five,

8    I know that all concerned -- the government as well as the

9    Court -- would appreciate it.

10             MR. DIRUZZO:  Understood, your Honor.

11             THE COURT:  I will ask that -- I don't know how

12   voluminous this will be.  In the end I will need this in a

13   binder form.  I don't know what sort of a legal support network

14   you have here in New York.  That will help me.  I will give you

15   a little bit of leave on that, but ultimately it's hard for me

16   on the bench to consult something electronic.  I proceed more

17   the old fashioned way, as the government has in its Rule 16

18   binder, so please get to that.

19             MR. DIRUZZO:  Understood.

20             THE COURT:  OK.  So I think this leaves us then with

21   what we're taking up at 2 o'clock.  This has all happened all

22   of a sudden.  I raised this at the very outset of the

23   conference, and it turns out that I awoke a sleeping giant of

24   an issue here, and so I want to make sure that together we have

25   covered all the angles at 2 o'clock so that there aren't any

K1L7TEM2

1     surprises.

2               One potential issue is whether, as I said, the defense

3     is -- is there something that precludes the defense from

4     opening on advice of counsel.  I'm not seeing it, but I want to

5     make sure I have the parties' respective views on that.  I

6     would like each of you to commit to whether there is any legal

7     basis for the defense to be precluded from doing that.  Again,

8     I'm not seeing it, but I think it's responsible for me to ask

9     for your views.

10              A second question -- and I offer this really for the

11    benefit of Mr. Teman -- is what happens, the defense opens on

12    advice of counsel, then ultimately the facts at trial do not

13    make out the prerequisites of that.  I have a memory that what

14    winds up happening in effect is that there is an instruction by

15    the jury that advises them that advice of counsel is not

16    available here, in effect that you have heard references to it,

17    that a requirement is that all material facts be disclosed.  If

18    there isn't a factual basis on which the jury could so find,

19    there might be a basis for me to instruct the jury explicitly

20    that it doesn't apply here, although the jury may consider the

21    communications with counsel for what they're worth in

22    evaluating the broader issue of intent.  But the issue here is

23    in effect what happens and how it could redound to Mr. Teman's

24    detriment if he opens on advice of counsel and ultimately can't

25    keep the promise.  And I want to make sure that your client --

72

K1L7TEM2

1    who has obviously been a consumer of legal talent over the

2    years, as the discovery reflects, is mindful of the risks and

3    rewards of going to this place.

4              In other words, it's not at all surprising to me would

5    have thought about an advice of counsel defense -- it leaps off

6    the page reading the Rule 16 material -- but it's another story

7    when you decide to go there.  I just want to make sure that we

8    have a discussion about what happens if Mr. Teman can't keep

9    the promise that you are perhaps proposing to make in opening.

10   I want him either out of solicitude for him to be aware of what

11   the consequences might be.  So, I welcome counsel's opining on

12   that.  Again, I will make a final decision as to any

13   instructions later in the case when there is a factual

14   predicate, but I think given the apparent importance of the

15   issue I want to make sure we have covered this.

16             I will also want a clear statement from the defense

17   that the only advice of counsel that we are talking about comes

18   from Reinitz and not from somebody else.  I don't want this to

19   be an Oh Henry story where there is another surprise ending on

20   the last page and it turns out there is another mystery lawyer.

21             I am understanding from what you have proffered that

22   the advice of counsel turns defense, such as it is, turns

23   solely on an advice from Reinitz.  I want to make sure that

24   there is clarity about that.

25             Government, are there any other issues that you think

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1L7TEM2

1    are profitably addressed at 2 o'clock?

2            MR. BHATIA:  Your Honor, nothing else for 2 o'clock.

3    I will say we would ask to the extent the defense has any

4    documents already marked as exhibits that might be relevant to

5    the attorney/client defense, that they produce those now.  It

6    might help all of us to sort of get started on this.

7            THE COURT:  I agree.  Defense counsel, as you can

8    tell, I'm disappointed to say the least at the way the trial

9    subpoena was in my view sandbagged.  Under those circumstances

10   I think it's absolutely right for me to ride you to produce

11   everything you can as soon as you can, and so to the extent

12   you've got materials now or before 2 o'clock and before 5

13   o'clock, these should be produced forthwith.

14           To be sure, the government could have raised this

15   issue and been explicit about advice of counsel earlier.  It's

16   obvious from the Rule 16 material that Mr. Teman has had

17   lawyers drafting legal documents, and he is referencing

18   lawsuits.  This was a spottable issue to say the least.  I'm

19   certainly not inclined to put over the trial further on account

20   of the production of documents that may be coming today, but

21   I'm also not inclined to give you any incentive or interest in

22   delaying the production.

23           At least some of these materials were -- should have

24   been produced shortly after the January 10 subpoenas -- trial

25   subpoenas that the government served, and only because of what

74

K1L7TEM2

1    I regard as described to me as sharp practice were those

2    productions not made earlier. So, I want you to jam on that

3    and get it going promptly.

4            MR. GELFAND: I would just represent for the

5    government's benefit is that I am 99.9 percent sure -- and will

6    be 100 percent sure after we break for this morning -- that

7    anything that is premarked as a defense exhibit has been

8    disclosed to the government. Obviously -- including, by the

9    way, documents, for example, e-mail correspondence, from

10   Mr. Reinitz to various people, which were disclosed early on in

11   this case. So, we will double check to Mr. Bhatia's request

12   and make sure that that's the case, and if something fell by

13   the wayside, we will certainly follow up with that.

14           THE COURT: So when you say predisclosed, does that

15   mean materials that are not in the government's exhibit binder

16   but which have been produced by the defense?

17           MR. GELFAND: Yes, your Honor.

18           THE COURT: And what's the volume of that?

19           MR. GELFAND: The amount of documents that we have

20   disclosed --

21           THE COURT: Disclosed meaning produced, right?

22           MR. GELFAND: -- produced in discovery -- fall into

23   thousands of pages, are anticipated potential exhibits which

24   will obviously depend on what the government does in its case

25   --

K1L7TEM2

```
 1              THE COURT:  Of course.

 2              MR. GELFAND:  -- is a much smaller sub set.

 3              THE COURT:  Right.  But, in other words, you've

 4     produced thousands of pages already to the government.  Have

 5     you within that universe done anything to tag the documents

 6     that are apt to be and if not certain to be defense exhibits?

 7              MR. GELFAND:  In the context of some discussions that

 8     we had with stipulations, we e-mailed them plus or minus about

 9     ten or so premarked defense exhibits -- the earliest possible

10     defense exhibits -- that were marked as exhibits.  And as

11     hopefully the Court can appreciate, some of what we have marked

12     as exhibits are actually duplicative of government marked

13     exhibits.

14              THE COURT:  Sure.  When I read through the

15     government's exhibit binder I can't say that I remember.  I had

16     no idea who Reinitz specifically was, but I can say I remember

17     seeing communications with him.

18              Presumably if you are going to pursue an advice of

19     counsel defense and are claiming that there was comprehensive

20     disclosure of all material issues, some of that I guess you

21     would contend is memorialized in documents.  And I take it

22     those would be among the documents that you would be also

23     intending to offer at trial if you go that route?

24              MR. GELFAND:  Your Honor, to be clear, our intention

25     with the advice of counsel defense at trial is to elicit it
```

A-213

76

K1L7TEM2

1  primarily through testimony and through e-mail correspondence

2  that is not privileged that has been disclosed to the

3  government and in some cases disclosed by the government.

4          THE COURT:  The testimony would be of Reinitz and/or

5  Teman.  Are there other people who are privy to the alleged

6  advice of counsel?

7          MR. GELFAND:  No, your Honor.

8          THE COURT:  All right.  So it's ultimately Mr. Teman's

9  decision whether to call a witness and whether to testify

10  himself, but what you're saying is if you're committing to an

11  advice of counsel defense, since there is presumably nobody

12  else who can authenticate written communications -- let alone

13  oral communications -- between Reinitz and Teman, one or both

14  of them needs to testify in order for you to get that out there

15  before the jury.

16          MR. GELFAND:  Yes, your Honor.  But to be clear, we

17  don't have an intention at least at this point of introducing

18  any documents that are communications between Mr. Reinitz and

19  Mr. Teman.  The communications at issue are written

20  communications as opposed to testimonial -- anticipated

21  testimony of Mr. Rinitz are communications between Mr. Rinitz

22  and, for example, Elie Gabay and Jospeh Saleimani.

23          THE COURT:  And those would -- would those be relevant

24  to advice of counsel or something else?

25          MR. GELFAND:  Only in a very circumstantial way.  It's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-214**

K1L7TEM2

1   not the core of the advice of counsel defense, but they clearly

2   establish that prior to the dates at issue Mr. Teman had legal

3   counsel in connection with this issue.  So I would say

4   circumstantially it's relevant.

5        THE COURT:  Well, they're relevant, you are saying,

6   insofar as they show the existence of a counsel relationship.

7   That may not ultimately be in dispute.  But the substance of

8   the communications that Reinitz allegedly had with, let's say,

9   @Mr. Gabay, does the content of that bear on an advice of

10  counsel defense?

11       MR. GELFAND:  It does, because the content of that --

12  but circumstantially -- the content of that is Mr. Reinitz

13  explaining to Mr. Gabay and Mr. Soleimani -- and I am

14  paraphrasing -- that they were contractually bound by the same

15  contracts that form the basis of what we anticipate is the

16  authority to issue the RCCs.

17       THE COURT:  All right.  And so to the extent it bears

18  on the advice of counsel defense, it documented communication

19  between Reinitz, let's say, and Gabay -- I will just use Gabay

20  as an example -- would tend to corroborate that if Reinitz was

21  speaking with Gabay about contractual authority, it stands to

22  reason he was speaking with his client about contractual

23  authority to create an RCC.

24       MR. GELFAND:  Yes, your Honor.  If that's all we had,

25  there is no advice of counsel defense.  I said if that's all we

K1L7TEM2

1    had, then there is no advice of counsel defense, but I think

2    it's relevant in that it corroborates --

3           THE COURT:  Just explain to me -- because you

4    understand the facts of the case better than I -- what would it

5    take then -- without limiting you to it -- what more would it

6    take in your view for there to be a viable advice of counsel

7    defense here?  What would need to be disclosed?

8           MR. GELFAND:  Testimony -- or other events, but I

9    anticipate it would be testimony -- that Mr. Reinitz had all of

10   the relevant material information to give advice.

11          THE COURT:  Right.  I mean just again because you

12   understand the back story and I don't, but in general what

13   might that be beyond the existence of a contract that says what

14   it says?

15          MR. GELFAND:  First of all, Mr. Reinitz was the

16   counsel for the company for a substantial amount of time prior

17   to this.

18          THE COURT:  Right.

19          MR. GELFAND:  And so he personally had access to the

20   records of Gate Guard.  He who was involved in some capacity in

21   various instances of revising or editing them.  He personally

22   communicated with two of the three customers -- in particular

23   Mr. Soleimani and Mr. Gabay -- that are at issue of the three

24   entities listed in this indictment, with respect to their

25   obligations for the money, the fees if you will, that were

K1L7TEM2

1    ultimately deposited into Bank of America through the RCCs that

2    are at issue in this case.  He had communications with Mr.

3    Teman, in particular oral communications that I anticipate he

4    would testify to.  He had further communications subsequent to

5    the act -- which I don't think would be relevant at all -- with

6    a lawyer for Mr. Soleimani, when Mr. Soleimani retained

7    counsel.  I think the Court can obviously address the relevance

8    of that and the admissibility of that later.

9              As a practical matter --

10             THE COURT:  Yeah.  I mean I'm not sure -- it's not

11   obvious to me what the communications between outside counsel

12   and outside counsel are.  The issue is really what is

13   communicated to the defendant as it informs the defendant's

14   state of mind, because in the end the issue is whether the

15   defendant did or didn't have the mens rea called for by the

16   bank and wire fraud statutes.

17             MR. GELFAND:  And to be clear, I agree generally

18   speaking -- obviously we can take up specific language from the

19   jury instruction standpoint -- with what Mr. Bhatia represented

20   to the Court are the elements in essence of reliance of

21   counsel.  It's set out pretty clearly in the Scully case.  In

22   any event, we believe that Mr. Reinitz's testimony will

23   establish an evidentiary foundation for the jury to conclude,

24   if it wants to, sufficient grounds --

25             THE COURT:  Will Mr. Reinitz's testimony be able to

K1L7TEM2

1    place in time the communications he had with Mr. Teman?

2            MR. GELFAND:  Yes, I believe it will.  These were

3    ongoing communications for over a year.

4            THE COURT:  Sure.  But the question is at some point

5    is something left out before Mr. Teman creates and deposits the

6    check?  In other words, I have read through the exhibit binder.

7    In at least one of the contracts there appears to be a written

8    provision authorizing the creation of RCCs.  There is a

9    separate issue of under what circumstances.  Let's suppose a

10   customer disputes that they owe money and conveys that to Teman

11   such that there is a clear dispute between the customer and

12   Teman as to whether or not a debt is owed.  Right?  The

13   question is whether -- where it's not an undisputed debt but

14   it's a disputed one -- whether Teman has conveyed to his lawyer

15   the customer's denial of a legal -- of an obligation to pay the

16   debt and the customer's factual basis for same.

17           Again, I don't know whether that's all that's going on

18   there, but that at least was -- on the face of the government's

19   exhibits, it seems to me apparent that at least to some of the

20   asserted debts here the customer -- it's not like it's an

21   undisputed debt that Mr. Teman is using his asserted

22   contractual authority to cause to be paid.  There appear to be

23   disputes with the customers, and even statements by Teman that

24   his company is shutting down, and then at some point afterwards

25   I gather Mr. Teman uses that purported contractual authority.

K1L7TEM2

1    The question with respect to advice of counsel is did counsel

2    know before Mr. Teman did that all of that which the customer

3    said, including denying the existence of the debt, and in the

4    face of that did the counsel then say you may nevertheless

5    create a check to pay yourself a debt that the customer denies

6    having.

7         MR. GELFAND:  Yes, your Honor.  I anticipate that the

8    testimony would be that he did have all of that relevant

9    information.

10        THE COURT:  That the lawyer knew exactly what the

11   customer was saying and denying, and in the face of that told

12   Mr. Teman go ahead and write a check on the customer's account

13   without notice to the customer?

14        MR. GELFAND:  Yes, your Honor.  I don't want to -- I

15   mean the specificity of the words may be a little different but

16   in substance yes.

17        THE COURT:  OK.  Well, we'll see.  That's helpful.

18   But, in other words, I take it that you are acknowledging that

19   it isn't merely the face of the words of the contract but the

20   course of dealings between Teman and the customer that inform

21   what needed to be disclosed before an advice of counsel defense

22   could get to a jury.

23        MR. GELFAND:  Yes, your Honor, for the advice of

24   counsel issue.  I think separate and apart from the advice of

25   counsel issue there is just a general lack of mens rea defense

K1L7TEM2

1    on the contract itself which doesn't require --

2              THE COURT:  Sure.  And you are at liberty to argue

3    that even if there is never a lawyer involved, that Mr. Teman

4    read the contract to empower him to do all sorts of things and

5    that those documents are not consistent with finding intent to

6    defraud beyond a reasonable doubt.  You are at liberty to make

7    that argument, and I fully anticipated that from the review of

8    the discovery materials.  What was unclear to me from them was

9    whether you intended to add to it the advice of counsel defense

10   with all that it requires.  And I now know that the answer is

11   barring a change of heart, yes.

12             MR. GELFAND:  Yes, your Honor.  And I think this might

13   help, because I gather what the Court is asking in substance is

14   did Mr. Reinitz have more than just the documents, more than

15   just the contracts.  And the answer is abundantly yes.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

K1LVTEM3

1    THE COURT:  But more than that, there is a narrative

2    presumably that exists with each of these customer

3    relationships.  I'm ill-positioned at this point to define what

4    parts of that narrative are material as opposed to background

5    noise.  But there are -- whatever the material components of

6    the business disputes or business relationship are, you're

7    representing to me that Reinitz knew them, knew that -- that

8    Teman had made sure Reinitz knew them before asking Reinitz for

9    his advice on whether he could create/negotiate the checks.

10    MR. GELFAND:  Yes.  Or just to be even more precise,

11    that Mr. Reinitz's source of knowledge in some instances was

12    from his own personal interactions.  In other words, he's a

13    fact witness as well.

14    THE COURT:  Sure.  But Mr. Teman needs to know that

15    Mr. Reinitz knew those facts for the advice of counsel defense

16    to apply.

17    MR. GELFAND:  Of course.

18    So, for example, there's instances where Mr. Reinitz,

19    at Mr. Teman's request, communicates directly with, for

20    example, Joseph Soleimani about the contractual obligations.

21    So obviously Mr. Teman directs Mr. Reinitz to do that.  I think

22    that he obviously knows that Mr. Reinitz did it.

23    And Mr. Reinitz, I anticipate, would testify to

24    those -- within the rules of evidence, but to those

25    interactions and how that, you know, was communicated to

84

K1LVTEM3

1    Mr. Teman.  Because obviously -- and I want to be clear.  Our

2    intention is not to elicit testimony directly about what

3    Mr. Reinitz believed, other than as it was communicated to

4    Mr. Teman.

5                THE COURT:  The advice of counsel defense requires the

6    attorney -- the client to have ensured that the material

7    information was communicated to the lawyer.  I'm not aware that

8    there's any means of communication that's needed.  So whether

9    it's, Read these documents, or, Hear my story, or, here, Speak

10   to the counterparty and report back to me, I can imagine any

11   number of different ways, but the central ingredient here is

12   that the client, Teman, assured that his lawyer knows the

13   material facts before asking for legal advice on them.  And

14   you've charted out a confident position that, presumably with

15   respect to each set of entities, the attorney was known by

16   Mr. Teman to know all of the material facts and nevertheless

17   gave him an unambiguous green light to engage in the conduct

18   that the government says was unlawful.

19               MR. GELFAND:  That's what I anticipate the testimony

20   would be, your Honor.

21               THE COURT:  What is Reinitz's legal expertise?

22               MR. GELFAND:  He's a partner at a law firm called

23   FisherBroyles.  He is a, kind of, general corporate lawyer who

24   also, as I understand it, has somewhat of a subspecialty in

25   intellectual property, but doesn't limit his practice to that.

A-222

K1LVTEM3

1          And he served as corporate -- I at the very least use

2     the word corporate counsel, meaning counsel to Mr. Teman and

3     some of the entities at issue, not limited to GateGuard, going

4     all the way back to, I believe it was, 2014 or 2015.  GateGuard

5     didn't even exist until 2016, and that was at a prior firm that

6     he was at.  And then he became GateGuard's counsel over -- I'll

7     get the exact date, but over a year before the alleged

8     allegations.

9          THE COURT:  And the conduct at issue is in 2019.  From

10    the Rule 16 -- excuse me, from the government exhibit binder,

11    it looked as if there was some issue with respect to GateGuard,

12    I suppose, in 2018?  You don't have to answer, but if you're

13    able, since we're talking about it, I'm just curious what --

14    does GateGuard have business issues?  Does it go under?  What

15    happens with it?

16          MR. GELFAND:  No, your Honor.  There's a single email

17    that we actually intended to introduce the response to the

18    email, if the Court is referring to an email from Mr. Teman to

19    Ben Soleimani and Joseph Soleimani, the principals of ABJ.

20          THE COURT:  I think that this is referenced actually

21    in one of the government's letters on a motion *in limine*, that

22    there had been some business reversal or Mr. Teman had

23    represented to one or more of the customers that his company

24    was having issues in 2018, I thought.  I may be misrecalling.

25          MR. GELFAND:  Your Honor, I don't believe that you're

A-223

K1LVTEM3

1    misrecalling. I think there is a dispute within -- as to what

2    that factual narrative actually is between the parties and what

3    the documents bear out. But, no, GateGuard continued to

4    operate to this day.

5            THE COURT: Were there ever any civil litigations that

6    actually were brought with respect to any of the victims in

7    this -- not victims, the customer, the alleged victims -- the

8    alleged nonbank victims in this case?

9            MR. GELFAND: To my knowledge, your Honor, none of the

10   victims initiated -- the alleged victims, initiated any civil

11   litigation, and GateGuard did not initiate --

12           THE COURT: Mr. Teman repeatedly threatens legal

13   action in the documents. Did he or his companies ever initiate

14   any with respect to any of the customers at issue here?

15           MR. GELFAND: May I confer about that?

16           THE COURT: Yes, of course.

17           (Counsel and defendant conferred)

18           MR. GELFAND: Your Honor, no litigation was actually

19   filed.

20           THE COURT: May I ask you, before I just turn to the

21   government, and then I'll give you a break so that you can all

22   think about these issues before 2, today you have articulated

23   very confidently the existence of what you contend to be a

24   checkmate advice of counsel defense here.

25           Accepting, for argument's sake, that that is so, with

K1LVTEM3

1   all the time that there was had between the complaint and the

2   indictment and then after the indictment, why would you put

3   Mr. Teman through the rigors of going to trial if you thought

4   that there was a winning advice of counsel argument here?

5           One of the reasons I'm a little surprised at this turn

6   of events is that while it seemed to be clear that there must

7   be a counsel in the picture here, if the advice of counsel

8   defense was as clear as it is, the government has a history of

9   nolle'ing cases when they are persuaded that, unbeknownst to

10  what they thought when they charged it, they were wrong, why

11  not take a whack at that.  I don't want to get into plea

12  discussions or anything like that, but that would seem to me,

13  if you're right, would have been a natural course for counsel

14  to at least raise.

15          MR. GELFAND:  Your Honor, without obviously getting

16  into any privileged communications between our clients and us,

17  what I can represent is that over the course of this case --

18  and I understand that to some extent there's just a natural

19  evolution of this happening, the government's entire theory of

20  prosecution has consistently changed.

21          And for example -- and I think this will perhaps shed

22  some light on some of the strategic decisions, if you will --

23  as a practical matter, the government initially arrested

24  Mr. Teman literally without looking at -- much less reviewing

25  or knowing -- the existence of the contracts that are at issue.

A-225

88

K1LVTEM3

1    And they arrested him on a bank fraud allegation on a criminal

2    complaint out of state.  That's a fairly unusual set of

3    circumstances.  No federal agency involved in the

4    investigation.  I'm not saying there's anything improper with

5    that, but I'm just saying it is unusual.

6        When we brought the existence of the contracts to the

7    attention of the U.S. Attorney's Office, the theory of

8    prosecution just kept changing, where it was basically no

9    matter what the defense brings to us, we'll just basically

10   draft a narrative that isn't -- I'm not saying maliciously, but

11   that essentially isn't, You're right, we should have looked at

12   these contracts in advance; we should have understood these

13   contracts in advance.

14       And furthermore, we weren't fully confident that we

15   were intending to proceed on an advice of counsel defense until

16   very recently.  And one of the reasons why is because the

17   government announced that they were intending to supersede,

18   which they have the right to do.  They ultimately superseded on

19   January 2nd.  They told us in broad strokes that there would be

20   additional counts by our fraud counts, etc.

21       At that point we knew there was going to be a new

22   operative charging document.  And we didn't even have the

23   charging document and these specific allegations in the

24   indictment, which, of course, would inform the decision of what

25   to raise and when to raise with the prosecutors.  To state the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1    obvious, we need to know what the charges are before any

2    defenses are committed to.

3          That, to be clear, was January 2nd, approximately

4    three weeks ago.  And so it's been a moving train.  We believe

5    that Mr. Teman obviously has announced to this Court that, you

6    know, he is exercising his right to a trial.  And, you know,

7    we've prepared accordingly.

8          THE COURT:  Fair enough.

9          I was eager to understand the context for not

10   attempting to get the government to drop the charges.  For

11   better or worse, you've explained what the series of events

12   was, and I appreciate it.

13         MR. GELFAND:  Thank you, your Honor.

14         THE COURT:  All right.

15         Is there anything we need to take up before I see you

16   at 2 o'clock?

17         MR. BHATIA:  Nothing.

18         THE COURT:  All right.

19         MR. DiRUZZO:  Just one thing, your Honor.

20         I assume that we can leave our stuff here in the

21   courtroom; it will be locked.

22         THE COURT:  Mr. Smallman?

23         THE DEPUTY CLERK:  It won't be locked.

24         THE COURT:  It won't be locked.  I think it's

25   historically proven a safe place, but I think you'll need a

A-227

90

K1LVTEM3

1    GateGuard or something to protect it.  I can't give you

2    lock-solid assurance, but I think it's pretty safe.

3            MR. DiRUZZO:  Okay.  Thank you your Honor.

4            THE COURT:  Very good.  I'll see you at 2 o'clock.

5            Thank you.

6            But, look, do, everybody, issue a spot here.  I want

7    to make sure that once we proceed to trial, we don't have

8    unexpected surprises.  I want counsel always to know what the

9    ground rules are.

10           See you at 2 o'clock.  Thank you.

11           (Luncheon recess)

12                 A F T E R N O O N   S E S S I O N

13                          2:07 P.M.

14           THE COURT:  All right.

15           Be seated, counsel.  Welcome back.

16           Thank you for gathering this afternoon just to follow

17   up on the colloquy that we began to have about the emergence of

18   advice of counsel as a potential issue in the case.

19           I should note that having reviewed some of the case

20   law during the break, I am reminded that the shorthand locution

21   that we all tend to use in an advice of counsel defense is, in

22   fact, not correct; and as *Scully* makes clear, the proper

23   formulation relates to advice of -- to evidence of advice of

24   counsel as bearing on the government's burden in establishing

25   the intent requirement.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1          In any event, to the extent that I -- and presumably

2     everybody else here -- slips into using the locution "advice of

3     counsel defense," I will take it as mutually understood that

4     that's just a shorthand, and what we all mean to say,

5     consistent with *Scully*, is advice of counsel as a component of

6     the jury's analysis as to intent.

7          All right.  Before we broke, I identified at least

8     three issues that I thought would be worth raising with you.

9     Let me go through the issues I have in my mind -- I've come up

10    with a fourth -- and then see what else you all have.

11         The first issue is whether there is any application by

12    the government or any basis to preclude or limit what the

13    defense can do in opening with respect to advice of counsel.

14         MR. BHATIA:  No, your Honor, there's no application

15    from the government at this point to preclude any opening on

16    advice of counsel.

17         THE COURT:  Very good.

18         I didn't think there would be, but I wanted to give

19    you the opportunity.

20         MR. BHATIA:  Thank you.

21         THE COURT:  All right.

22         Defense, is there anything you want to bring to my

23    attention *vis-à-vis* opening statements with respect to this

24    issue?  You're not required to do so, but I'm always eager

25    to -- nobody wants to get a sustained objection.  If there's

K1LVTEM3

1    something you feel you need to or would benefit by alerting me

2    to, I'm happy to consider it.

3            MR. DiRUZZO:  Sure, your Honor.

4            Just conceptually, I think advice of counsel,

5    self-defense, defense of others, duress, all of those are

6    appropriately made to the jury in opening.

7            THE COURT:  You're not going to be making a

8    self-defense --

9            MR. DiRUZZO:  No, no, no.

10           THE COURT:  I'm sorry.

11           MR. DiRUZZO:  But just those -- what we typically

12   think of as reasons why they call it an affirmative defense,

13   why you call it as bearing on the jury's consideration of

14   intent or *mens rea* is appropriately -- appropriate for defense

15   counsel to raise it at opening; and then, you know, it becomes

16   part of the case.  But there is nothing that, from my view,

17   precludes a defense counsel from doing that before the jury.

18           THE COURT:  And I'm in agreement.

19           I think the case law that I have seen, based on an

20   early peek, does suggest that there are sometimes situations in

21   which there's been a government motion *in limine* and in which

22   one can reliably make a judgment beforehand whether there is a

23   basis or not for such a defense.  And in the case in which one

24   could actually get to clarity before the opening, that might

25   have implications.  We're not in that case.

A-230

93

K1LVTEM3

1          Quite to the contrary, defense counsel has proffered

2     that they have evidence that will check all the boxes with

3     respect to an advice of counsel instruction, we'll see.  But

4     there's certainly no basis for precluding your referencing it

5     in opening.

6          All right.  The second issue involves -- and again,

7     this is entirely conjectural, but I like to plan.  One scenario

8     is that there will be sufficient evidence for the jury to find

9     that all the ingredients of an advice of counsel defense are

10    met.  If that is the case, *Scully* certainly provides a very

11    useful template for what an advice of counsel instruction might

12    look like.

13         The alternative scenario though involves one where the

14    Court can determine essentially as a matter of law that

15    material facts were not shared with counsel.  Again, no reason

16    to assume one way or the other whether that will be true here.

17    But just for the purposes of making sure that the Court is

18    prepared, I am interested in your judgment about what happens

19    if the defense opens, in effect, on advice of counsel, and the

20    evidence then doesn't permit a jury to find all the

21    ingredients, for example, material disclosure, disclosure of

22    all material information to the lawyer are met; or that, for

23    example, the client didn't abide by the lawyer's guidance as to

24    how to proceed in the face of those disclosures.

25         I'd welcome counsel's judgment as to what the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-231

94

K1LVTEM3

1    instruction looks like to the Court under that situation.

2        MR. BHATIA:  Your Honor, it's something we would have

3    to give more thought to on the wording of an instruction.  But

4    we do believe that it is within the Court's discretion to give

5    an instruction to the kind that you referenced before, saying

6    it's not for the jury to consider the advice of counsel, and

7    then elaborate on that.  I think there are different ways to

8    give that type of instruction; but we do think it's within the

9    Court's discretion to give that.

10        THE COURT:  My memory is that even where an advice of

11    counsel instruction is inappropriate, the conversations with

12    the lawyer, nevertheless, are received and may be considered as

13    they bear on the defendant's intent.  The issue is really how

14    to package that for the jury in a situation where there have

15    been noises made about an advice of counsel defense.  And I

16    would want to make sure that the jury was well-instructed that

17    that defense doesn't apply.

18        So, look, it's premature to solicit an instruction for

19    a fact pattern that has not been factually triggered, but I

20    want each of you to do your homework on that so that when and

21    if we get there, and there's a scenario under which the trial

22    moves quickly, I immediately get something in writing from you.

23    So both sides are charged with being prepared in the event that

24    we wind up in that place to be able to give me your written

25    guidance.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1              Yes.

2              MR. GELFAND:  And we'll certainly do so, your Honor.

3              Just as, kind of, food for thought, for lack of a

4    better way of putting it, I think that there's a basis to

5    include additional language in a general good-faith

6    instruction, which was submitted by both parties outside of

7    advice of counsel, that would basically draw the jury's

8    attention as to what they can and can't consider.

9              THE COURT:  Right.  The issue is you are making a --

10   you are going out not on a limb, but you are making a

11   judgment -- you are essentially putting advice of counsel out

12   there in a way that may or may not require some commentary for

13   the Court, if ultimately the evidence doesn't permit that form

14   of a defense.  That's a choice.  We'll see.  And you'll guide

15   Mr. Teman as to how far it makes sense strategically for the

16   defense to go in an opening on this point.

17             My concern is that with you going there, I want to

18   make sure that I am ready to instruct the jury in a way that

19   corrects any misapprehension, if needed.  And I agree with you

20   that one forum in which to do that might be under the

21   good-faith header or it might not.  But there is a scenario

22   under which I need to say something, and I want you all to be

23   at work on what that would be on that scenario.

24             MR. GELFAND:  Absolutely, your Honor.

25             The other thing I just wanted to just offer for the

K1LVTEM3

1    benefit of the Court and the record is that we have discussed

2    this issue with our client.  And I believe that he understands

3    the ramifications of anticipating that we will lay a sufficient

4    evidentiary foundation for an instruction; and that the Court

5    could theoretically conclude otherwise based on what actually

6    happens at trial.

7         THE COURT:  The ramifications being what?  Without

8    probing into attorney-client communications, if you could

9    proffer what the ramifications, as you refer to them, are, I

10    would welcome that.

11         MR. GELFAND:  Yes, your Honor.

12         First of all, that the Court -- that there is -- just

13    to back up 30,000 feet, that there is such a thing as an advice

14    of counsel instruction within the Second Circuit.  That the

15    language is obviously subject to the Court, but generally

16    includes pretty well-settled ingredients.

17         That there is a possibility that, first of all, the

18    Court would not give that instruction based on the evidence

19    that actually comes out at trial, regardless of what we

20    anticipate the evidence is going to be.  And that in the event

21    that the Court does not give that instruction, there's also

22    certainly a possibility, if not a probability, that the Court

23    would instruct the jury so as not to permit the jury to

24    essentially go down a road that the law doesn't permit them to

25    go down.

A-234

97

K1LVTEM3

1          THE COURT:  And depending on what counsel have said in

2     their opening, there may be a need to be more pointed in

3     instructing them why the advice of counsel defense doesn't

4     apply.

5          MR. GELFAND:  Yes, your Honor.

6          THE COURT:  I mean, again, we're dealing with

7     possibilities.

8          All right.  May I take a moment and just inquire of

9     your client?

10          MR. GELFAND:  Yes, your Honor.

11          THE COURT:  Mr. Teman, good afternoon.

12          THE DEFENDANT:  Good afternoon, your Honor.

13          THE COURT:  You've been obviously listening

14     attentively to this.  I want to make sure though that you are

15     well-informed, so as in conjunction with your lawyers, to guide

16     how they choose to defend you in their jury addresses in

17     particular.

18          Have you had an opportunity to discuss so far at

19     length with your counsel the pros and cons of anchoring your

20     articulation of the case to the jury at trial heavily on an

21     advice of counsel "defense"?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  All right.  Very good.

24          And without getting into the detail, have counsel

25     advised you of what, in their judgment, the pros and cons of a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-235

K1LVTEM3

1    trial defense along those lines would be?

2              THE DEFENDANT:  In great detail, your Honor.

3              THE COURT:  Okay.  Very good.  I'm glad to hear it.

4         I don't have anything further to inquire about that.

5         Again, just, counsel, be prepared.

6         I'm not sure, Mr. DiRuzzo, if you're the right one to

7    ask, but I'll turn the floor to you and you let me know.

8         I just want to confirm that the only lawyer relevant

9    to the advice of counsel instruction is, in fact, Mr. Reinitz;

10   there's no other lawyer as to whom this instruction pertains.

11             MR. DiRUZZO:  Correct.

12             THE COURT:  Okay.

13        Final question for me, and then I'll open the floor if

14   there's anything else worthy of consideration, involves jury

15   selection tomorrow.  I don't think the existence of a potential

16   advice of counsel issue in the case changes anything I would

17   say to the venire about the case or any questions I would ask.

18        The description of the case, which I've lightly

19   modified, but not in consequential ways, I don't think is

20   changed by the potential of a "defense" along these lines.  I

21   already was going to be asking the jury about, you know,

22   lawyers in their family and friend group and legal knowledge on

23   their part.  I don't think it's necessary to start probing

24   further their views generically of lawyers.

25        But since the case has taken this turn, let me just

A-236

K1LVTEM3

1    ask counsel if anyone thinks there's anything I ought to be

2    sensitive to in voir dire, now that we know that this is part

3    of the case?

4              MR. BHATIA:  Nothing, your Honor.

5              I think the questions prior remain the same.  Maybe

6    the weight and the way we think about them as far as cause

7    challenges might change, but I think the questions should

8    remain the same.

9              THE COURT:  Defense?

10             MR. GELFAND:  Your Honor, I agree.

11             And the one thing -- and I think this would be

12   included in the Court's voir dire anyway is we had included

13   Ariel Reinitz's name as a name that they --

14             THE COURT:  Right.

15             MR. GELFAND:  Obviously we just want to make sure no

16   one has been represented by Mr. Reinitz or --

17             THE COURT:  Yes.  His name will be on the list and

18   I'll leave it at that.

19             He's a New York lawyer, right?

20             MR. GELFAND:  He is.  He's with a firm called

21   FisherBroyles, which has --

22             THE COURT:  Fisher, last name?

23             MR. GELFAND:  Broyles, B-R-O-Y-L-E-S.

24             THE COURT:  Is that on the list of entities?

25             MR. GELFAND:  It is not on the list.

A-237

K1LVTEM3

1          THE COURT:  Okay.  Then let me add it to the list

2    alphabetically.  Fisher, spelled B-R-O-Y-L-E-S?

3          MR. GELFAND:  Correct.

4          THE COURT:  How big a firm is that?  It's not one

5    that's familiar to me.

6          MR. GELFAND:  He had said a couple hundred lawyers --

7          THE COURT:  Oh, wow.

8          MR. GELFAND:  -- based around the country.

9          He was previously -- I don't know if the Court cares

10   about this, he was previously with Lowenstein Sandler.

11         THE COURT:  Is that name going to come up?

12         MR. GELFAND:  Only if he was going to say, I

13   previously worked here, in a very background way.

14         THE COURT:  But he wasn't at Lowenstein when he

15   advised Teman in connection with this case?

16         MR. GELFAND:  His relationship with Mr. Teman began

17   when he was at Lowenstein.  However, with respect to the very

18   concrete advice relevant to this case, he was at FisherBroyles.

19         THE COURT:  Anyone want me to ask about Lowenstein

20   Sandler?  It sounds like it will come up only as part of his

21   professional background.  Sounds unnecessary.

22         MR. BHATIA:  I don't think we need to reference it.

23         MR. GELFAND:  I would agree with the Court.  I just

24   wanted to raise that.

25         THE COURT:  Fine.

K1LVTEM3

1          Look, then I'll just say the FisherBroyles law firm,

2   just so that they have some idea what type of entity we are

3   talking about.

4          Okay.  And I take it there's nothing, defense counsel,

5   you know -- there's nothing about Mr. Reinitz's practice or

6   something that's going to come out that would be

7   attention-getting or the kind of thing that either side would

8   want to know with respect to the jury's reaction to?  His

9   practice sounds pretty meat-and-potatoes.

10         MR. DiRUZZO:  For example, it's not like he represents

11  Mr. Avenatti or some other famous --

12         THE COURT:  Just to choose a random person on the 13th

13  floor of this courthouse.

14         MR. DiRUZZO:  Right, right.  Something along those

15  lines.  He doesn't represent, as far as we're aware, any person

16  of public fame or anything like that that would generate some

17  type of feelings one way or the other from the jury.

18         THE COURT:  All right.  Very good.

19         All right.  So those are all the questions I have for

20  you.  And you've got your homework assignment about both the

21  instruction and the instruction in the event the elements

22  aren't met.

23         Let me just go around the horn and, beginning with the

24  government, ask if there's anything else, given all the ferment

25  this morning, that you wanted to raise.

102

K1LVTEM3

1       MR. BHATIA:  No, your Honor.  I think once we get to

2   take a look at the documents, we might have more thoughts to

3   provide; but for right now, we'll take a look and then we'll

4   see where we go from there.

5       THE COURT:  Great.  Look, I'm happy for you to give

6   more thoughts at that point.  Given the preview that

7   Mr. Gelfand gave though, it sounds as if the way in which they

8   intend to establish the elements of advice of counsel relies

9   substantially more on oral testimony than the documents.  So

10  the documents may give you some insight, but it sounds like

11  they're really not going to allow you to answer the question

12  whether there will or won't be evidence allowing all the

13  pillars of an advice of counsel instruction to be met.

14      MR. BHATIA:  Understood.

15      THE COURT:  All right.

16      Defense, anything from you?

17      MR. DiRUZZO:  No, your Honor.  Although I did want to

18  provide, with my opposing counsel, a flash drive with our first

19  tranche of document production.

20      THE COURT:  Great.  I'll let you give my copy to my

21  law clerk, and the government's to it.

22      MR. DiRUZZO:  Sure.

23      THE COURT:  Let me ask, we're going to have the jury

24  come in at 9:30 tomorrow or as soon thereafter as the jury

25  assembly -- jury clerk is able to pull names and bring them

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1    over here.  I expect that will be in short order.

2            So the question is does anybody expect -- what is the

3    likelihood that we'll have business to take up tomorrow morning

4    that will last more than a half hour?  You are obliged to be

5    here, per my usual practice, at 9.  The question is ought you

6    be here earlier?

7            MR. DiRUZZO:  Your Honor, from Mr. Teman's behalf, I

8    don't believe that we're going to have much; although, as a

9    matter of full disclosure, we're still -- "we" being the

10   attorneys writ large, still working on some stipulations

11   regarding bank documents and the like.

12           THE COURT:  Does it make sense to, just in an excess

13   of caution, have you here at 8:30 tomorrow?  And I say that not

14   wanting to punish you, but given that the government is going

15   to be reviewing a bunch of documents into the evening, heaven

16   knows what might get stirred up with that.  Once the jury

17   venire is here, we're going to get started with them.

18           I have a little voice here -- not literally -- that is

19   saying to me it's prudent for us to have an extra bit of time

20   together in case something else comes up.

21           MR. DiRUZZO:  We have no problem with that, Judge.

22   Half an hour is not going to move the needle.

23           THE COURT:  All right.  Then why don't we plan on

24   being here at 8:30 in the morning.

25           Counsel, if there's anything of consequence you intend