# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 10 of 11 (Pages A-1921 to A-2200)

KEDAR S. BHATIA
WON S. SHIN
  *Assistant U.S. Attorney*
UNITED STATES ATTORNEY'S OFFICE
  SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
One Saint Andrew's Plaza
New York, New York 10007
(212) 637-2200

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ................................... A-1

Complaint, filed June 20, 2019................................. A-46.2

Notice of Appearance, dated August 27, 2019.......... A-47

Indictment, filed September 26, 2019....................... A-49

Waiver of Appearance for Arraignment, dated
    October 14, 2019 ................................... A-53

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated
    October 21, 2019 .................................. A-55

Supeseding Indictment, filed November 12, 2019 .... A-96.1

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated November
    21, 2019 .................................. A-96.7

Opinion and Order of the Honorable Paul A.
    Engelmayer, dated December 20, 2019 ................ A-97

Second Superseding Indictment, filed
    January 3, 2020...................................... A-121

Defendant Teman's Requested Voir Dire Questions,
    filed January 6, 2020.............................. A-129

Excerpts of Transcript of Conference Proceedings
    held before the Honorable Paul A. Engelmayer,
    dated January 10, 2020 .......................... A-137.1

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    January 10, 2020.................................. A-137.6

Letter from Kedar S. Bhatia to the Honorable Paul
    A. Engelmayer, dated January 14, 2020 ............... A-137.96

ii

**Page**

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 21, 2020 ................................................... A-138

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 22, 2020 ................................................... A-265

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 23, 2020 ................................................... A-398

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 24, 2020 ................................................... A-672

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 27, 2020 ................................................... A-998

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 28, 2020 ................................................... A-1187

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 29, 2020 ................................................... A-1264

Verdict Sheet, dated January 29, 2020 ...................... A-1298.1

Order of the Honorable Paul A. Engelmayer, dated
    January 29, 2020 ................................................... A-1299

Defendant's Motion for Judgment of Acquittal or in
    the Alternative, Motion for New Trial, filed
    February 26, 2020 ................................................ A-1437

Motion for New Trial Based on Undisclosed Brady
    and Jencks Act Evidence, filed April 9, 2020 ....... A-1473

iii

**Page**

Exhibit A to Motion -
Excerpts of Transcript of Proceedings, dated
August 9, 2018.............................................  A-1498

Exhibit B to Motion -
Report of Violations of New York City's Housing
Maintenance Code ....................................  A-1512

Exhibit C to Motion -
Report of Violations of New York City's Housing
Maintenance Code ....................................  A-1513

Exhibit D to Motion -
HPD's Housing Maintenance Code Violations
User Guide ..............................................  A-1514

Exhibit E to Motion -
Report re: New York Civil Litigation – Joseph
Soleimani ...............................................  A-1548

Exhibit F to Motion -
Report re: New York Civil Litigation – Elie
Gabay ...................................................  A-1549

Exhibit G to Motion -
Glossary of Terms for Litigation Status Report
from HPD................................................  A-1550

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated April 9, 2020..............  A-1552

Letter from Kedar S. Bhatia, Assistant United States
Attorney to the Honorable Paul A. Engelmayer,
dated May 1, 2020 re: Trial Exhibits ...................  A-1554

Government's Exhibits:

GX 101-
GateGuard Account Opening Documents .............  A-1555

GX 102 -
GateGuard Bank Statements..................................  A-1559

iv

**Page**

GX 103-
Friend or Fraud Account Opening Documents ...... A-1581

GX 104-
Friend or Fraud Bank Statements .......................... A-1585

GX 105-
Touchless Labs Account Opening Documents ...... A-1609

GX 106-
Touchless Labs Bank Statements........................... A-1613

GX 107 -
Ari Teman Account Opening Document................ A-1629

GX 108-
Ari Teman Bank Statements .................................. A-1631

GX 110-
April 19, 2019 2:37 PM Surveillance
Photographs ............................................................ A-1649

GX 111-
April 19, 2019 6:00 PM Surveillance
Photographs ............................................................ A-1652

GX 112-
May 8, 2019 3_04 PM Surveillance
Photographs ............................................................ A-1655

GX 113-
Bank Records Spreadsheet
(CD-Rom)*............................................................. A-1657.1

GX 114 -
Returned Check Records ....................................... A-1658

GX 121 -
ABJ Lenox Account Opening Document .............. A-1660

---

* GX 113 is a Microsoft Excel file. CD-Rom with the Excel
spreadsheet provided to Court and Service parties.

v

**Page**

GX 122 -
ABJ Lenox Bank Statements .................................  A-1661

GX 123 -
ABJ Milano Account Opening Documents ...........  A-1669

GX 124 -
ABJ Milano Bank Statements................................  A-1670

GX 127 -
May 2, 2019 Letter - ABJ Lenox ...........................  A-1678

GX 129 -
May 2, 2019 Letter - ABJ Milano.........................  A-1679

GX 130 -
ABJ Lenox Checks ...............................................  A-1680

GX 131 -
ABJ Milano Checks...............................................  A-1682

GX 141 -
18 Mercer Account Opening Documents ..............  A-1685

GX 142 -
18 Mercer Bank Statements..................................  A-1694

GX 143 -
April 4, 2018 Check from 18 Mercer Equity to
GateGuard..............................................................  A-1699

GX 144 -
518 W 204 Account Opening Documents .............  A-1700

GX 145 -
518 W 204 Bank Statements..................................  A-1707

GX 146 -
January 31, 2018 Check from 518 W 204 to
GateGuard..............................................................  A-1725

vi

**Page**

GX 147 -
March 28, 2019 Check from 518 West 205 to
GateGuard.............................................................. A-1726

GX 150 -
Affidavit................................................................. A-1727

GX 201 -
March 28, 2019 Check from Coney Realty to
GateGuard.............................................................. A-1728

GX 202 -
March 28, 2019 Check from 18 Mercer Equity to
GateGuard.............................................................. A-1729

GX 203 -
April 19, 2019 Check from 518 West 205 to
GateGuard.............................................................. A-1730

GX 204 -
April 19, 2019 Check from ABJ Milano to
GateGuard.............................................................. A-1733

GX 205 -
April 19, 2019 Check from ABJ Lennox to
GateGuard.............................................................. A-1739

GX 206 -
April 19, 2019 GateGuard Counter Deposit .......... A-1757

GX 401 -
September 9, 2017 E-mail - 'We're Live' ............. A-1758

GX 402 -
November 6, 2017 E-mail - 'Current Issues'......... A-1760

GX 403 -
March 9, 2018 E-mail - 'Ending GateGuard' ........ A-1761

GX 404 -
May 7, 2018 E-mail - 'All Communication in
Writing'.................................................................. A-1762

vii

**Page**

GX 405 -
May 22, 2018 E-mail - 'GateGuard' ...................... A-1763

GX 406 -
August 26, 2018 E-mail - 'Dispute on Charge...' .. A-1765

GX 407 -
September 18, 2018 E-mail - 'Sublet Spy Hits...' . A-1767

GX 408 -
December 14, 2018 E-mail - 'Notice of Intent' ..... A-1773

GX 409 -
June 14, 2019 GateGuard Invoice ......................... A-1775

GX 409A -
Invoices (1) ............................................... A-1777

GX 409B -
Invoices (2) ............................................... A-1785

GX 409C -
Conversation between Teman and Soleimani ........ A-1786

GX 412 -
January 1, 2018 E-mail - 'Tenant Ana Esterg' ....... A-1787

GX 413 -
January 19, 2018 E-mail - 'Invoice Sent' .............. A-1788

GX 414 -
January 24, 2018 E-mail - 'Form for the 10
Buildings' ............................................... A-1791

GX 415 -
March 25, 2018 E-mail - 'Invoice for 20
Buildings' ............................................... A-1795

GX 416 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (1) ........................................... A-1815

viii

**Page**

GX 417 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (2) .......................................................  A-1820

GX 418 -
March 27, 2018 E-mail - 'Proof it's Your...' ..........  A-1829

GX 431 -
April 4, 2018 E-mail - 'Invoice' ............................  A-1831

GX 441 -
GateGuard Terms and Conditions..........................  A-1834

GX 442 -
April 2, 2018 E-mail - 'References' ......................  A-1856

GX 443 -
January 7, 2019 E-mail - 'Contract' ......................  A-1862

GX 501 -
Bank Records Stipulation ......................................  A-1868

GX 702 -
January 2, 2019 WhatsApp Messages ...................  A-1872

GX 704 -
April 2, 2019 WhatsApp Messages ......................  A-1874

GX 727 -
April 2, 2019 Whatsapp Messages (2)...................  A-1875

GX 728 -
April 3, 2019 Whatsapp Messages ........................  A-1876

GX 729 -
April 10, 2019 WhatsApp Messages .....................  A-1877

Defense Exhibits:

DX 2 -
Payment Terms (1/27/2019)...................................  A-1880

DX 14 -
October 11, 2018 E-mail – 'ABJ Properties'.........  A-1887

ix

Page

DX 15 -
October 22, 2018 E-mail - 'SubletSpy hits' .......... A-1889

DX 16 -
'Notice of Hold' ..................................................... A-1892

DX 29 -
Affidavit ................................................................ A-1893

DX 36 -
March 28, 2018 E-mail – 'Invoice for 20
Buildings' ............................................................. A-1894

DX 49 -
Declaration ........................................................... A-1902

DX 51 -
Chase Information Request ................................... A-1903

DX 52 -
Chase Information Request ................................... A-1904

DC 62 -
March 9, 2018 E-mail Correspondence ................. A-1928

DX 70 -
GateGuard Logs ................................................... A-1930

DX 71 -
May 22, 2018 E-mail – 'Re: Gateguard' ............... A-1932

Order of the Honorable Paul A. Engelmayer, dated
May 6, 2020 ......................................................... A-1933

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated May 8, 2020 ............... A-1935

Opinion and Order of the Honorable Paul A.
Engelmayer, dated June 5, 2020 ........................... A-1937

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated June 29, 2020 ............. A-2044

x

|  | Page |
|---|---|
| Sentencing Memorandum and Motion for Downward Variance, filed July 7, 2020 | A-2045 |
| Exhibit 1 to Sentencing Memorandum - Letter from Dr. Rami Cohen, M.D to the Honorable Paul A. Engelmayer, dated June 29, 2020 | A-2070 |
| Exhibit 2 to Sentencing Memorandum - Letter from Juhan Sonin to the Honorable Paul A. Engelmayer, dated July 6, 2020 | A-2074 |
| Exhibit 3 to Sentencing Memorandum - Letter from Jeffrey Katz to the Honorable Paul A. Engelmayer | A-2076 |
| Exhibit 4 to Sentencing Memorandum - Letter from Oliver Josephs t to the Honorable Paul A. Engelmayer, dated June 6, 2020 | A-2077 |
| Exhibit 5 to Sentencing Memorandum - Letter from Thomas Orosz to the Honorable Paul A. Engelmayer | A-2079 |
| Exhibit 6 to Sentencing Memorandum - Letter from David Diwby to the Honorable Paul A. Engelmayer | A-2080 |
| Exhibit 7 to Sentencing Memorandum - Letter from Nachum Klar to the Honorable Paul A. Engelmayer, dated July 6, 2020 | A-2082 |
| Exhibit 8 to Sentencing Memorandum - Letter from Anthony Zachariadis to the Honorable Paul A. Engelmayer, dated July 6, 2020 | A-2084 |
| Exhibit 9 to Sentencing Memorandum - eJewish Philanthrophy- Coverage of Teman's Award | A-2085 |

xi

                                                                      **Page**

Exhibit 10 to Sentencing Memorandum -
HarvardX Verified Certificate of Achievement,
issued May 11, 2020 .............................................. A-2094

Exhibit 11 to Sentencing Memorandum -
Letter from Avi Ganz to the Honorable Paul A.
Engelmayer, dated July 7, 2020............................. A-2095

Exhibit 12 to Sentencing Memorandum -
Letter from Steven Oved to the Honorable Paul
A. Engelmayer, dated June 15, 2020 ..................... A-2098

Exhibit 13 to Sentencing Memorandum -
Letter from Rabbi Chaim Lipskar to the
Honorable Paul A. Engelmayer, dated
July 7, 2020................................................. A-2099

Exhibit 14 to Sentencing Memorandum -
Letter from Jonathan Lubin to the Honorable
Paul A. Engelmayer .................................... A-2101

Exhibit 15 to Sentencing Memorandum -
Letter from Talia Reiss to the Honorable Paul A.
Engelmayer ............................................. A-2103

Exhibit 16 to Sentencing Memorandum -
Letter from Rivka Korf to the Honorable Paul A.
Engelmayer ............................................. A-2104

Exhibit 17 to Sentencing Memorandum -
Letter from Russell DiBona to the Honorable
Paul A. Engelmayer ................................... A-2105

Letter from Justin K. Gelfand to the Honorable Paul
A. Engelmayer, dated September 8, 2020............. A-2107

Appearance of Counsel, dated November 2, 2020 .... A-2108.1

Letter from Justin Harris to the Honorable Paul
Engelmayer, dated November 2, 2020.................. A-2108.2

xii

Page

Exhibit B to Letter -
Letter from Justine A. Harris to Kedar Bhatia and
Edward A. Imperatore, dated October 23, 2020 .... A-2108.6

Exhibit C to Letter -
Letter from Kedar S. Bhatia to Justine A. Harris,
dated October 29, 2020 ......................................... A-2108.9

Order of the Honorable Paul A. Engelmayer, dated
November 19, 2020 ................................................ A-2109

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 20, 2020................. A-2111

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 30, 2020 ................ A-2113

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated November 30, 2020............ A-2114

Transcript of Remote Conference Proceedings held
before the Honorable Paul A. Engelmayer, dated
December 1, 2020 ................................................... A-2116

Order of the Honorable Paul A. Engelmayer, dated
January 28, 2021 .................................................... A-2170

Letter Motion from Audrey Strauss to the
Honorable Paul A. Engelmayer, dated
April 23, 2021 ........................................................ A-2173

Exhibit A to Letter -
Proposed Order of Restitution ............................... A-2181

Exhibit B to Letter -
Proposed Preliminary Order of Forfeiture/Money
Judgment................................................................. A-2185

Exhibit C to Letter -
Document - Finocchiaro 3503-19 .......................... A-2189

Exhibit D to Letter -
Revised Document - Finocchiaro 3503-19 ............ A-2190

xiii

Page

Exhibit E to Letter -
Affidavit of Karen Finocchiaro, dated
April 2, 2021 .......................................................  A-2191

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated April 23, 2021 ................... A-2195.1

Attachment to Letter -
*Curriculum Vitae* of Richard M. Fraher................ A-2195.3

Letter Motion to Vacate Conviction from Andrew J.
Frisch to the Honorable Paul A. Engelmayer,
dated April 28, 2021 ............................................  A-2196

Exhibit A to Letter Motion -
Document - Finocchiaro 3503-19 ........................  A-2211

Exhibit B to Letter Motion -
Revised Document - Finocchiaro 3503-19 ............  A-2213

Exhibit C to Letter Motion -
E-mail Correspondence, dated
November 30, 2020 ...............................................  A-2215

Exhibit D to Letter Motion -
E-mail Correspondence, dated March 10, 2021 ....  A-2217

Exhibit E to Letter Motion -
E-mail Correspondence, dated March 12, 2021 ....  A-2219

Exhibit F to Letter Motion -
Copies of Various Cashier's Checks ......................  A-2221

Order of the Honorable Paul A. Engelmayer, dated
May 5, 2021 ..........................................................  A-2223

Letter from Andrew J. Frisch to Kedar Bhatia, dated
May 12, 2021 ........................................................  A-2225

Annexed to Letter -
Declaration of Richard M. Fraher, executed
May 11, 2021 ........................................................  A-2226

xiv

                                                          **Page**

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 9, 2021 ...................... A-2236

Letter from Andrew J. Frisch to the Honorable Paul
    A. Engelmayer, dated June 14, 2021 .................... A-2246.1

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 29, 2021 .................... A-2246.4

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 9, 2021............................................... A-2247

Sentencing Submission Letter from Susan G.
    Kellman to the Honorable Paul A. Engelmayer,
    dated July 16, 2021 ................................. A-2315

Transcript of Sentencing Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 28, 2021............................................ A-2333

Notice of Appeal, dated August 2, 2021 ................... A-2458

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated March 3, 2022 ........... A-2459

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 12, 2022............ A-2462

Order of the Honorable Paul A. Engelmayer, dated
    April 13, 2022...................................... A-2463

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 13, 2022............ A-2465

Letter from Eden P. Quainton to the Honorable Paul
    A. Engelmayer, dated April 13, 2022 .................. A-2467

Notice of Appearance, filed April 13, 2022 .............. A-2469

Letter Motion from Ari B. Teman to the Honorable
    Paul A. Engelmayer, dated April 14, 2022............. A-2470

xv

**Page**

Order of the Honorable Paul A. Engelmayer, dated
April 15, 2022........................................................ A-2473

Emergency Letter Motion from Ari B. Teman to the
Honorable Paul A. Engelmayer, dated April 20,
2022 ...................................................................... A-2476

Order of the Honorable Paul A. Engelmayer, dated
April 20, 2022........................................................ A-2479

Emergency Letter Motion from Ari B. Teman to the
Honorable Paul A. Engelmayer, dated April 20,
2022 ...................................................................... A-2481

Letter from Kedar S. Bhatia, Asst. United States
Attorney to the Honorable Paul A. Engelmayer,
dated April 21, 2022 .............................................. A-2482

Order of the Honorable Paul A. Engelmayer, dated
April 21, 2022........................................................ A-2483



**RCC BREACH**

*111012822*
05/07/2019
2190934241

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

*19350001*
*6111*
*17*
*09585*

FOR SECURITY PURPOSES, THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND AND MICROPRINTING IN THE BORDER

**ABJ Milano LLC**
New York, NY

JP Morgan Chase Bank
349 Fifth Ave
New York, NY 10016

Date **4/19/19**

Pay to
order of      **GateGuard INC**

This amount:***Eighteen Thousand and 00/100 dollars.        $18000

MEMO:   DEVICE REMOVAL FEE
        66 W 127

DRAW PER CONTRACT. NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law it
Contract at gateguard.xyz/legal/terms.php accepted by above client.
Contact us 212-203-3714 with questions.

⑆SECURITY FEATURES INCLUDED. DETAILS ON BACK⑆

"041901"   4:021000021:   7B2121672"

"041901"   4:021000021:      7B2121672"   "0001800000"

**RCC BREACH**

*111012822*
05/07/2019
2190934247

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

*19350001*
*6111*
*18*
*09587*

FOR SECURITY PURPOSES, THE FACE OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND AND MICROPRINTING IN THE BORDER

**ABJ Lennox LLC**
New York, NY

JP Morgan Chase Bank
349 Fifth Ave
New York, NY 10016

Date **4/19/19**

Pay to
order of      **GateGuard INC**

This amount:***Eighteen Thousand and 00/100 dollars.        $18000

MEMO:   DEVICE REMOVAL FEE
        342 Lennox Ave [Door]

DRAW PER CONTRACT. NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law it
Contract at gateguard.xyz/legal/terms.php accepted by above client.
Contact us 212-203-3714 with questions.

⑆SECURITY FEATURES INCLUDED. DETAILS ON BACK⑆

"041910"   4:021000021:   833579100"



"041910"   4:021000021:      833579100"   "0001800000"





111012822 05/07/2019
2035062214 RR - 4
111900057 04/19/2019
2190934256 RR - 4

↓Do not endorse or write below this line↓

ENDORSE CHECK HERE
X
PAY BANK OF AMERICA
FOR DEPOSIT ONLY
GATEGUARD INC
021000322
DO NOT WRITE / SIGN / STAMP BELOW THIS LINE
DEPOSITORY BANK ENDORSEMENT

Seq: 30
Batch: 393741
Date: 04/19/19

Seq:00030 04/19/19
BAT:393741 CC:[illegible]
WT:01 LFPS Jacksonville
BC:Lincoln Road Mall BC FL7-998

>021000322< 05/06/2019
777777777

Listed below are the security features provided on this document which meet and/or exceed industry guidelines.

| Security Features: | Results of check alteration: |
| --- | --- |
| • Micro Printing | • Small type in border of check and endorsement area appears blurred if copied or scanned |
| • Watermark | • Artificial watermark on back. Hold at an angle to view. |
| • Colored Background | • Void copy prevention |

111012822 05/07/2019
2035062215 RR - 4
111900057 04/19/2019
2190934255 RR - 4

↓Do not endorse or write below this line↓

ENDORSE CHECK HERE
X
PAY BANK OF AMERICA
FOR DEPOSIT ONLY
GATEGUARD INC.
021000322
DO NOT WRITE / SIGN / STAMP BELOW THIS LINE
DEPOSITORY BANK ENDORSEMENT

Seq: 29
Batch: 393741
Date: 04/19/19

Seq:00029 04/19/19
BAT:393741 CC:[illegible]
WT:01 LFPS Jacksonville
BC:Lincoln Road Mall BC FL7-998

>021000322< 05/06/2019
777777777

Listed below are the security features provided on this document which meet and/or exceed industry guidelines.

| Security Features: | Results of check alteration: |
| --- | --- |
| • MicroPrinting | • Small type in border of check and endorsement area appears blurred if copied or scanned |
| • Watermark | • Artificial watermark on back. Hold at an angle to view. |
| • Colored Background | • Void copy [illegible] |

A-1923





*111012822*
05/07/2019
2190934256

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

*19350001*
*6111*
*15*
*09581*

## RCC BREACH

ABJ Lennox LLC
New York, NY

Pay to
order of        GateGuard INC

JP Morgan Chase Bank
349 Fifth Ave
New York, NY 10018

Date: 4/19/19

This amount:***Ten Thousand and 00/100 dollars.        $10000

MEMO:   COLLECTIONS FEE
192 W. 138th Street [Gate]

DRAW PER CONTRACT, NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law It
Contract at gateguard.xyz/legal/terms.php accepted by above client.
Contact us 212-203-3714 with questions.

⑈041921⑈    ⑆021000021⑊    833579100⑈



*111012822*
05/07/2019
2190934255

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

*19350001*
*6111*
*16*
*09583*

## RCC BREACH

ABJ Lennox LLC
New York, NY

Pay to
order of        GateGuard INC

JP Morgan Chase Bank
349 Fifth Ave
New York, NY 10016

Date: 4/19/19

This amount:***Ten Thousand and 00/100 dollars.        $10000

MEMO:   COLLECTIONS FEE
539 Lenox Avenue [Gate]

DRAW PER CONTRACT, NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law It
Contract at gateguard.xyz/legal/terms.php accepted by above client.
Contact us 212-203-3714 with questions.

⑈041924⑈    ⑆021000021⑊    833579100⑈







A-1924

111012822 05/07/2019
2035062207 RR - 4
111900057 04/19/2019
2190934237 RR - 4

↓Do not endorse or write below this line↓

ENDORSE CHECK HERE

X

PAY BANK OF AMERICA
FOR DEPOSIT ONLY
GATEGUARD INC
021000322

DO NOT WRITE / SIGN / STAMP BELOW THIS LINE
DEPOSITORY BANK ENDORSEMENT

Seq: 11
Batch: 393741
Date: 04/19/19

>021000322< 05/06/2019
777777777777

Seq:00011 04/19/19
BC:Lincoln Road Mall BC FL7-998

Listed below are the security features provided on this document which meet and/or exceed industry guidelines.

Security Features: Results of check alteration:
• Micro-Printing • Small type in border of check and endorsement area appears blurred, fuzzed or scrabbled.
• Watermark • Artificial watermark on back. Hold at an angle to view
• Colored Background • Void copy protection

111012822 05/07/2019
2035062213 RR - 4
111900057 04/19/2019
2190934257 RR - 4

↓Do not endorse or write below this line↓

ENDORSE CHECK HERE

X

PAY BANK OF AMERICA
FOR DEPOSIT ONLY
GATEGUARD INC
021000322

DO NOT WRITE / SIGN / STAMP BELOW THIS LINE
DEPOSITORY BANK ENDORSEMENT

Seq: 31
Batch: 393741
Date: 04/19/19

>021000322< 05/06/2019
777777777777

Seq:00031 04/19/19
BC:Lincoln Road Mall BC FL7-998

Listed below are the security features provided on this document which meet and/or exceed industry guidelines.

Security Features: Results of check alteration:
• MicroPrinting • Small type in border of check and endorsement area appears blurred, fuzzed or scrabbled.
• Watermark • Artificial watermark on back. Hold at an angle to view
• Colored Background • Void copy protection

\*111012822\*
05/07/2019
2190934237

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

\*19350001\*
\*6111\*
\*13\*
\*09577\*

## RCC BREACH

**ABJ Milano LLC**
New York, NY

**JP Morgan Chase Bank**
349 Fifth Ave
New York, NY 10016

Date: 4/19/19

Pay to
order of        GateGuard INC

This amount:***Ten Thousand and 00/100 dollars.            $10000

MEMO:   COLLECTIONS FEE
        2041 Adam Clayton

DRAW PER CONTRACT, NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law it
Contract at gateguard.xyz/legal/terms.php accepted by above client.
Contact us 212-203-3714 with questions.

⑆041906⑆   ⑈021000021⑈      78212l672⑈

⑆041906⑆   ⑈021000021⑈      78212l672⑈  ⑈0001000000⑈

\*111012822\*
05/07/2019
2190934257

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

\*19350001\*
\*6111\*
\*14\*
\*09579\*

## RCC BREACH

**ABJ Lennox LLC**
New York, NY

**JP Morgan Chase Bank**
349 Fifth Ave
New York, NY 10016

Date: 4/19/19

Pay to      GateGuard INC
order of

This amount:***Ten Thousand and 00/100 dollars.            $10000

MEMO:   COLLECTIONS FEE
        900 W. 138th Street [Gate]

DRAW PER CONTRACT, NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law it
Contract at gateguard.xyz/legal/terms.php accepted by above client.
Contact us 212-203-3714 with questions.

⑆041918⑆   ⑈021000021⑈      833579100⑈

⑆041918⑆   ⑈021000021⑈      833579100⑈  ⑈0001000000⑈

A-1926

1110122822 05/07/2019
2035062203 RR - 4
111900057 04/19/2019
2190934259 RR - 4

↓Do not endorse or write below this line↓

ENDORSE CHECK HERE

X

PAY BANK OF AMERICA
FOR DEPOSIT ONLY
GATEGUARD INC
021000322

DO NOT WRITE / SIGN / STAMP BELOW THIS LINE
DEPOSITORY BANK ENDORSEMENT

Seq: 33
Batch: 393741
Date: 04/19/19

>021000322< 05/06/2019
7777777777

Seq:00033 04/19/19
BAT:393741
WT:01 LTPS Jacksonville
BC:Lincoln Road Mall BC FL7-998

Listed below are the security features provided on this document which meet and/or exceed industry guidelines.

| Security Features: | Results of check alteration: |
|---|---|
| • Micro-Printing | • Small type in border of check and endorsement area appears blurred, dissolved or scarred |
| • Watermark | • Artificial watermark on back. Hold at an angle to view. |
| • Colored Background | • Void copy protection |

1110122822 05/07/2019
2035062204 RR - 4
111900057 04/19/2019
2190934260 RR - 4

↓Do not endorse or write below this line↓

ENDORSE CHECK HERE

X

PAY BANK OF AMERICA
FOR DEPOSIT ONLY
GATEGUARD INC
021000322

DO NOT WRITE / SIGN / STAMP BELOW THIS LINE
DEPOSITORY BANK ENDORSEMENT

Seq: 34
Batch: 393741
Date: 04/19/19

>021000322< 05/06/2019
7777777777

Seq:00034 04/19/19
BAT:393741
WT:01 LTPS Jacksonville
BC:Lincoln Road Mall BC FL7-998

Listed below are the security features provided on this document which meet and/or exceed industry guidelines.

| Security Features: | Results of check alteration: |
|---|---|
| • Micro-Printing | • Small type in border of check and endorsement area appears blurred, dissolved or scarred |
| • Watermark | • Artificial watermark on back. Hold at an angle to view. |
| • Colored Background | • Void copy protection |





A-1927



```
*111012822*
05/07/2019
2190934259
```

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

```
*19350001*
*6111*
*11*
*09573*
```



## RCC BREACH

ABJ Lennox LLC
New York, NY

JP Morgan Chase Bank
349 Fifth Ave
New York, NY 10016

Date: 4/19/19

Pay to
order of    GateGuard INC

This amount:***Ten Thousand and 00/100 dollars.    $10000

MEMO:  COLLECTIONS FEE
342 Lenox Ave (Door)

DRAW PER CONTRACT, NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law it
Contract at gateguard.xyz/legalterms.php accepted by above client..
Contact us 212-203-3714 with questions.

```
"041912"  ":021000021:"  833579100"
```

```
"041912"  4:021000021:"    833579100"  ."0001000000,"
```

```
*111012822*
05/07/2019
2190934260
```

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-4
RCC WARRANTY
BREACH

```
*19350001*
*6111*
*12*
*09575*
```



## RCC BREACH

ABJ Lennox LLC
New York, NY

JP Morgan Chase Bank
349 Fifth Ave
New York, NY 10016

Date: 4/19/19

Pay to
order of    GateGuard INC

This amount:***Ten Thousand and 00/100 dollars.    $10000

MEMO:  COLLECTIONS FEE
342-346 Lenox Ave (Gate)

DRAW PER CONTRACT, NO SIGNATURE REQUIRED
NOTE TO BANK: This is a valid check. You are required by law it
Contract at gateguard.xyz/legalterms.php accepted by above client..
Contact us 212-203-3714 with questions.

```
"041909"  ":021000021:"  833579100"
```

```
"041909"  4:021000021:"    833579100"  ."0001000000,"
```

A-1928

**EXHIBIT**

D-62

**Subject:**          FW: Ending GateGuard

---------- Forwarded message ---------
From: **Benjamin Soleimani** <bsoleimani@abjny.com>
Date: Fri, Mar 9, 2018, 8:21 AM
Subject: Re: Ending GateGuard
To: Ari Teman <ari@teman.com>
Cc: Joseph Soleimani <Joe@abjny.com>

Ari,

I'm not too involved here but I understand we have a dinner scheduled for next week that Joe and I wanted to discuss certain things with you.
Please don't do anything yet with the system, let's keep it going how it was before the update and let's discuss next week what we can do together to improve it.

Thank you,
Ben

**Error! Filename not specified.**

**Benjamin Soleimani**
**ABJ Properties, Inc.**
347 Pleasant Avenue
New York, NY  10035
T. 212.860.5560
F. 212.860.5570

On Mar 9, 2018, at 7:46 AM, Ari Teman <ari@teman.com> wrote:

> Hi guys,
>
> As of today GateGuard Inc is shut down and we will not be supporting any requests. In two weeks the servers will be done.
>
> Landlords, including you, pay months late, haggle, put in fake orders, and I'm tired of it. There's not been a single day we've had our time or effort respected.
>
> With SubletSpy we get an online order and we work, sometimes we have to chase a success fee, but it's not GateGuard where you drag me to meetings and never pay or pay peanuts. The dangling of fake orders and fake investment was even worse, and you guys claim to be frum, but that's the #1 sin in Judaism and I can tell you I agree.
>
> I hate this job, I hate working with you, I hate that you treat me like I'm another plumber you can haggle to peanuts. There is zero respect for my time, or my livelihood -- forget the technical innovation. You

1

A-1929

have no calculation that I might be suffering and be unable to continue. You do not care, you may say you so, but you don't.

Well, we are done.

My decision is final. I've lost over $350,000 and incredible opportunity on this and I'm not going to lose another penny. More importantly I'm tired of waking up dreading the day. I hate every day I'm running an unfunded hardware startup with no team and no help. I hate being in NYC in the cold. I hate everything about chasing assholes to pay.

If you want innovation and results, pay for them, but you don't really care. You could have had an amazing tool, and an incredibly creative and talented partner but you treated me like absolute shit and I'm done.

Ari

A-1930





A-1931

GateGuard Logs|PropertyPanel × PP.XYZ Back Office × +

propertypanel.xyz/dashboard/tenants/log?f=1&building_id=42&from=&to=&unit=&user_id=-

teman propertypanel

Analytics dash

Address, BBL, Person

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 342 Lenox Ave. | 2A | Idair | Melendez | Enrolled Has App | visitor buzz | 2017-10-03 21:41:44 |  |
| | 342 Lenox Ave. | 2A | Idair | Melendez | Enrolled Has App | visitor buzz | 2017-10-03 21:41:19 |  |
| | 342 Lenox Ave. | 5A | D. Soh/Jean Pierre | Yao | Not enrolled No App | visitor buzz | 2017-10-03 21:23:40 |  |
| | 342 Lenox Ave. | ALL | Ari | Teman | Enrolled Has App | requested door unlock | 2017-10-03 16:09:32 | |
| | 342 Lenox Ave. | ALL | Ari | Teman | Enrolled Has App | visitor buzz | 2017-10-03 16:09:14 |  |
| | 342 Lenox Ave. | ALL | Ari | Teman | Enrolled | requested door | 2017-10-03 | |



12gurus LLC Mail - Gateguard         Case 1:19-cr-00696-PAE     Documen

| GateGuard | Face-recognition entry panel, intercom, virtual doorman + camera system |
| LookLock | Smart Lock w/Video Doorbell + Security Camera + Concierge (Opens with: Fingerprint, Code, NFC, Card, Fob, App, Key) |
| PropertyPanel | NYC's #1 property platform: Find, Analyze, Comply, News, more. |
| **SubletSpy** | Catch & Evict Illegal Airbnb-type sublets |

Featured in:
The Real Deal, Cooperator, BISNOW, ABC, NBC, PIX, FOX, Pando, Curbed, Observer

Visit us for a demo:
NYC: Herald Square
Miami: Lincoln Road

All conversations are off-the-record. Social Media, too.
Terms apply to each service. Each service is a different entity.
Terms cannot be changed via email or oral agreement.

---------- Forwarded message ----------
From: **Ari Teman** <ari@teman.com (mailto:ari@teman.com)>
Date: Tue, May 22, 2018 at 5:37 PM
Subject: Re: Gateguard
To: Joseph Soleimani <joe@abjny.com (mailto:joe@abjny.com)>

Joe,

When you signed up for GateGuard you signed a contract that includes steep fines for removing or disabling devices ($18,000 per device) and includes a multi-year contract to pay for service. There are no cancellations or early terminations. Monthly bills past-due incur a major collection fee.  The bill per device is the 10 years of service minus the 6 months paid upfront, (6 months*$99+$149*9 years*12 months), and the $18,000 fee for removing power from the devices disabling their use. **The amount we sent to collections last week is $268,116 (44,686/device).**

**GateGuard was working fine, to the point that you and your brother (Benjamin) begged me and encouraged me to keep it running** *(in writing)*.

You said, <u>on a recorded line,</u> that our "technology was great", that "Latch sucks", and that you would be "ordering 60 more devices" from me if I added a feature "forcing a selfie", which we did. You again said you'd order 60 devices.

You perhaps changed your mind likely when offered something free (which you also told me on a recorded line), but we delivered on the agreement (and we have since switched the order and there are no complaints). You need to hold up your end.

This is a bit personal because  I trusted you because it's a lonely game and I needed a friend, you abused that trust, to the point you told me you'd invite me to a seder and you loved me **at the same time** you asked Dan Enfield, one of my *real* friends, to lie to me.

However, there is more than that. In the contract you agree explicitly to not enter into access control business, not to divulge our interface or IP to others, not to use a similar device. You then went into business with a competitor and helped promote their work. You display their device at your HQ. This is a massive violation of our contract, and incredibly damaging. Should we go to court (you don't want to fight me in court -- I've *never* not made it cost 5x of what I want)

You wasted months of my time. You lied to me. You did it while pretending to be my friend.

You owe us **$268,116** for the devices, and I believe we will win when we take you to court on the 60 building order, the IP theft, fraud, and unfair trade practices. You do not have the option to use or do business with MVI, and we will sue them for fraud and you. The attorneys are already retained, and you will pay for that, too.

Now, decide if you want to fight me or pay, but if you fight, you will pay more.

Your alternative is to keep your agreement and act in good faith.

Ari
[Quoted text hidden]



A-1933

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                            :
UNITED STATES OF AMERICA,           :
                            :
         -v-                :         19-CR-696 (PAE)
                            :
ARI TEMAN,                  :         <u>ORDER</u>
                            :
            Defendant.        :
                            :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, United States District Judge:

       The Court is currently reviewing defendant Ari Teman's post-trial motions, including his

claim that the Indictment was constructively amended at trial insofar as it described certain

checks as "counterfeit." The Court has determined, in the interest of due care, to review itself

the transcripts of the grand jury proceedings in this case, to enable the Court independently to

assess Teman's contention that the theory of liability with respect to these checks pursued at trial

departed from that presented to the grand jury. For avoidance of doubt, the Court's review of the

grand jury transcripts will be *in camera* and *ex parte*. The grand jury transcripts are not to be

supplied to the defense, which has not provided sufficient justification for defense access to these

materials. The Court's decision resolving Teman's motion will address these matters further.

       The Government is therefore directed to provide the Court with the grand jury transcripts

by May 8, 2020. In light of the current public health crisis, the Government, in lieu of supplying

hard copies of these transcripts, is to email them to the Court's Chambers email address.

A-1934

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: May 6, 2020
       New York, New York



DiRuzzo & Company

Joseph A. DiRuzzo, III, Esq., CPA
954.615.1676
jd@diruzzolaw.com

May 8, 2020

**Via ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

     Re:    *United States v. Teman*, case no. 1:19-cr-696

Dear Judge Engelmayer:

Defendant Ari Teman ("Teman") appreciates the Court's Order requiring disclosure of the grand jury transcripts for in camera review (Dkt. 131). By this letter, Teman respectfully requests partial reconsideration of the Order, inasmuch as the Order precludes Teman from independently assessing the Government's representations regarding the charges it presented to the Grand Jury.

As this Court knows, Teman's pending post-trial motion (Dkt. 126) raises deep concerns regarding the Government's candor. Specifically, Teman has identified several instances in which the Government suppressed critical evidence, made significant misrepresentations to the Court and the defense, and presented misleading evidence to the jury. Teman submits these unique circumstances constitute a "particularized need" warranting disclosure of the Grand Jury materials to Teman as a matter of due process. *See Anilao v. Spota*, 918 F. Supp. 2d 157 (E.D.N.Y. 2013) (finding disclosure of Grand Jury materials necessary to avoid injustice under circumstances of Government misconduct).

As Teman is mindful of the importance of Grand Jury secrecy, Teman further limits his request to portions of the Grand Jury materials pertinent to the indictment's allegations that Teman deposited "counterfeit" checks. Teman submits this narrowly-tailored request is "structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979). Teman would also be willing for the Court to enter an "attorney's eyes only" limitation on the Grand Jury transcripts to alleviate any concerns the Court may have regarding dissemination of Grand Jury material to third parties.

Finally, in an abundance of caution, and to minimize appellate issues, in all events Teman would request that the Grand Jury materials be made part of the record in this case (i.e. by filing the grand

A-1936

jury transcripts under seal) so that the transcripts will be part of the record on appeal under Fed. R. App. P. 10(a).

Kind Regards,

/s/ Joseph A. DiRuzzo, III    Digitally signed by /s/ Joseph A. DiRuzzo, III
Date: 2020.05.08 17:24:20 -04'00'

Page | 2

Joseph A. DiRuzzo, III

JAD/

cc: AUSA K. Bhatia, via ECF; AUSA E. Imperatore, via ECF; J. Gelfand, via ECF

A-1937

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                    19-CR-696 (PAE)

ARI TEMAN,                                            OPINION & ORDER

Defendant.

PAUL A. ENGELMAYER, District Judge:

This decision resolves post-trial motions filed by defendant Ari Teman.

Beginning January 22, 2020, the Court presided over Teman's jury trial. Teman was

charged with two counts of bank fraud, in violation of 18 U.S.C. § 1344, and two of wire fraud,

in violation of 18 U.S.C. § 1343. These charges alleged that Teman had created and deposited

checks drawn on the accounts of his home-security company's customers, while falsely

representing to the depositary and clearing banks that the customers had knowingly authorized

those checks. The checks consisted of (1) two checks totaling $36,000 which Teman deposited

in March 2019, and (2) 27 checks totaling $297,000 which Teman deposited between April and

June 2019. On January 24, 2020, at the close of the Government's case, Trial Tr.[1] at 692–99,

and again on January 27, 2020, at the close of the defense case, *id.* at 938–39, Teman moved for

a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). The Court denied both

motions. *See id.* at 702, 722–27, 939. On January 29, 2020, the jury returned its verdict,

convicting Teman on all counts.

_____

[1] For the trial transcript, see dockets 99, 101, 103, 105, 107, and 109.

A-1938

On February 26, 2020, Teman timely moved for a judgment of acquittal under Rule 29(c) or, in the alternative, for a new trial under Rule 33. Dkt. 111 ("Teman Mem."). In his Rule 29(c) motion, Teman argues that (1) the Court, through its jury instructions, and the Government, through its proof at trial, constructively amended the Indictment; (2) there was insufficient evidence that Teman made a material misrepresentation to a financial institution; (3) there was insufficient evidence that Teman acted with criminal intent; and (4) there was insufficient evidence of venue. In his Rule 33 motion, Teman incorporates these arguments and further contends that a new trial is warranted because (1) the Government violated the "rule of sequestration"; (2) the Court improperly excluded a proposed defense expert witness on "remotely created checks"; and (3) an alternate juror lied during *voir dire*. Teman also moves, under Federal Rule of Criminal Procedure 6(e)(3)(E)(i) and (ii), for disclosure of grand jury transcripts relating to his claim of a constructive amendment. Dkt. 120 ("Teman GJ Ltr.").

On April 9, 2020, while Teman's motions were being briefed, Teman filed a second Rule 33 motion, Dkt. 118 ("Teman *Brady* Mem."), in which he contends that the Government failed to disclose *Brady* and Jencks Act evidence to the defense.

For the reasons that follow, the Court denies all of Teman's post-trial motions.

## I.    Background

The Court assumes familiarity with the factual background of this case and the evidence adduced at trial. The discussion that follows presents only the evidence necessary to resolve the motions at hand.[2]

---

[2] The Government's summary in its opposition to Teman's initial round of motions, however, provides a helpful and accurate overview of the trial proof. Dkt. 112 ("Gov. Mem.") at 4–12.

A-1939

A.      **Teman's Fraud Scheme**

Teman owned GateGuard, Inc. ("GateGuard"), a Florida company that produced and

installed intercom devices for apartment buildings. *See, e.g.*, Trial Tr. at 278, 312–13. The

evidence at trial centered on three of GateGuard's New York City-based customers or sets of

customers of Teman's: (1) 518 West 204 LLC, managed by Coney Management; (2) 18 Mercer

Equity Inc. ("18 Mercer"), managed by Crystal Real Estate Management; and (3) ABJ Milano

LLC and ABJ Lenox LLC (together, "ABJ"), both managed by ABJ Properties LLC

(collectively, the "Customers"). Each Customer had agreed to use GateGuard's services,

including purchasing the company's intercom devices for use in their buildings, which generally

were located in Manhattan or the Bronx. *See id.* at 310, 312–15 (518 West 204 LLC); *id.* at 415,

420, 434–36 (18 Mercer); *id.* at 486, 489–90 (ABJ).

Viewed in the light most favorable to the verdict, the evidence established that during the

first half of 2019, Teman created, and deposited into accounts he controlled, multiple checks on

each Customer's account—ostensibly to pay fees owed to GateGuard, but all without the

Customers' foreknowledge or authorization. *See, e.g., id.* at 357–58, 362–63, 367 (518 West 204

LLC) (explaining that checks were not authorized); *id.* at 441, 474–75 (18 Mercer) (same); *id.*

at 562–64, 567, 648–49 (ABJ) (same). The evidence further showed that, to create the illusion of

customer assent, Teman had referred in written communications with each Customer at points

during their dealings with GateGuard to "Terms and Conditions" that GateGuard had adopted

governing customer relationships.[3] *See id.* at 329–33, 385–87 (518 West 204 LLC); *id.* at 421–22

---

[3] Some of the Customers disputed having agreed to the Terms and Conditions. *See* Trial Tr.
at 329–31, 341–43, 364 (518 West 204 LLC) (discussed T&C in context of negotiations, but did
not finally agree to T&C); *id.* at 506–07 (ABJ); *see also* GX 409C (ABJ) (text from Joseph
Soleimani, ABJ representative, to Teman observing that he had not signed the T&C).

3

A-1940

(18 Mercer); *id.* at 591 (ABJ); *see also* GX[4] 441 ("T&C"). GateGuard's Terms and Conditions

contained within them, on page five, a hyperlink to GateGuard's "Payment Terms." *See* T&C

at 5; DX 2 ("Payment Terms"). Buried within the Payment Terms, at least in a post-offense

version introduced at trial,[5] was a clause purporting to grant GateGuard the authority to withdraw

funds from the Customers' accounts to pay debts owed to GateGuard by the Customer. *See*

Payment Terms at 5 ("You give us permission to write and sign checks with your checking

and/or saving account(s) information to do a bank draw against your entity (or entities) for the

amount it (or they) owe(s)."). However, representatives of each Customer testified that they had

never seen the Payment Terms, had never discussed such terms with Teman, and had not granted

GateGuard that authority, and would not have done so had they been given the opportunity. *See*

Trial Tr. at 326–27, 332, 355–56, 361, 365 (518 West 204 LLC); *id.* at 427–30 (18 Mercer);

*id.* at 497–98, 568–69 (ABJ).

The Customers further disputed owing GateGuard any money for the purported services

and fees to which the outsized checks that Teman had fabricated and negotiated in March and

April 2019 were based. *See, e.g.*, *id.* at 342, 360–61, 365 (518 West 204 LLC); *id.* at 434, 441

---

[4] "GX" references exhibits the Government introduced at trial, and "DX" references exhibits introduced by the defense. These exhibits can be found at docket 128.

[5] At trial, the defense offered a version of the Payment Terms which stated that it was last revised on January 27, 2019. *See* Payment Terms at 1. The defense did not offer any earlier version of the Payment Terms, or elicit any competent testimony as to the content of any earlier version. The January 27, 2019 version was received during the testimony of Teman's corporate attorney, Ariel Reinitz, Esq., whom Teman called in support of an attempted advice of counsel defense. Reinitz, however, was not competent to authenticate this document. He testified only that Teman, who did not testify, had told him that these terms had been in place (and presumably accessible to the Customers) at the time each Customer had begun its business relationship with GateGuard. *See* Trial Tr. at 757–78. Reinitz's testimony was not admissible to establish the truth of that proposition. Although his testimony as to Teman's representations to him was properly received to assure that the jury received a full portrait of Teman's communications with Reinitz, there was no competent evidence at trial that the relevant aspects of the Payment Terms had been in place at the times any of the Customers contracted with Teman.

4

A-1941

(18 Mercer); *id.* at 563, 649 (ABJ). These checks—totaling $51,000 in fees drawn on 518 West

204 LLC's account, $18,000 on 18 Mercer's, and $264,000 on ABJ's, *see* GX 201–05—far

outstripped in value the few thousand dollars each Customer had paid for its GateGuard devices,

*see* GX 413 at 3 (invoice for GateGuard purchase); GX 431 at 3 (same); GX 409A–409B (same).

As context for Teman's decision unilaterally to draw and deposit the 29 checks in 2019,

the evidence showed that, during 2018, the Customers had each told Teman that they were going

to cease using GateGuard devices. *See* Trial Tr. at 335–37 (518 West 204 LLC); 437–38 (18

Mercer); *id.* at 514 (ABJ). They attested to having had numerous problems with the devices,

which Teman had failed to fix. *See, e.g., id.* at 334–35, 339–40, 346 (518 West 204 LLC); *id.*

at 436–47 (18 Mercer); *id.* at 499–501 (ABJ); *see also* GX 402 (email from Joseph Soleimani,

ABJ representative, to Teman cataloguing issues with GateGuard devices); GX 409C (texts from

Soleimani to Teman about same). The evidence showed that Teman had reacted angrily and

sometimes explosively to the Customers' decisions to end their relationships with GateGuard.

*See, e.g.,* GX 417–18 (emails from Teman to Elie Gabay, 518 West 204 LLC representative);

GX 403–05 (emails from Teman to Soleimani). His angry communications included threats to,

among other things, sue the Customers, place liens on their buildings, and refer the Customers to

law enforcement. *See, e.g.,* Trial Tr. at 347, 350–52, 354–55 (518 West 204 LLC); *id.* at 440

(18 Mercer); *id.* at 512–13, 561 (ABJ); *see also* GX 406–08 (emails from Teman to Soleimani

threatening lawsuits, liens, and foreclosure).[6]

The evidence further showed that, as GateGuard lost such business, Teman was facing

financial trouble. *See* Trial Tr. at 807–08; *see also* GX 704 (texts from Teman to his attorney,

---

[6] As to one Customer, whom Teman understood to be an observant Jew, Teman callously sent an
email threatening to place a lien on the Customer's assets during Passover, when the Customer
would be unreachable. GX 417 at 1 (email from Teman to Gabay).

5

Ariel Reinitz, Esq.) ("I'm more concerned about getting the cash since we need to operate . . .

we'll survive, but it's not great. [W]e run so tight."). Looking for options, he consulted his

attorney, Reinitz, about the possibility of withdrawing funds directly from the Customers'

accounts, purportedly in accordance with the Payment Terms, to fulfill unpaid invoices. Trial Tr.

at 770–72. Teman envisioned using remotely created checks ("RCCs") to withdraw funds to pay

the business's debts.[7] *See id.* Teman, however, did not show Reinitz the RCCs he planned to

deposit. *See id.* at 793–94. Reinitz was not aware of how much the Customers had paid for their

devices, *see id.* at 813, 912–13, nor was there any evidence that Teman had told Reinitz the

amount he was planning to charge them in purported fees via the RCCs. Teman did not, for

example, disclose to Reinitz that the first two checks that he would create and deposit would be

for $18,000 each. *See id.* at 823 (Reinitz explaining that he first learned about the two $18,000

March checks in April 2, 2019 messages from Teman, after the deposits had taken place).

      Although Reinitz testified that he orally told Teman that depositing RCCs drawn on the

Customers' accounts was "technically legal," and that the Payment Terms gave Teman "explicit

authority" to do so, *id.* at 921, he did not memorialize that purported advice, and there was no

documentary support of any kind that any such communication had occurred. Reinitz's written

communications with Teman reflected the opposite guidance. On January 2, 2019, in a series of

---

[7] Consistent with federal banking regulations governing such instruments, the Court instructed
the jury (1) that a remotely created check ("RCC") is a check that is created not by the paying
bank and does not include the signature of the accountholder on whose account the check is
drawn, and (2) that, when authorized by the accountholder, the law permits RCCs to be created
and used. *See* Trial Tr. at 229–30; *see also* 12 C.F.R. § 229.2(fff) ("Remotely created check
means a check that is not created by the paying bank and that does not bear a signature applied,
or purported to be applied, by the person on whose account the check is drawn."). The Court
further instructed the jury that the issue at trial was not whether the checks met a technical
definition of an RCC, but whether the Government had proven that the elements of bank fraud
and wire fraud were met. Trial Tr. at 230.

A-1943

WhatsApp messages responding to Teman's proposal to draw checks on Customers' accounts, Reinitz wrote, flatly, "No" and "[b]ad idea." GX 702 at 1.  In the same string of messages, Reinitz further wrote to Teman that the Customers "are likely to call police.  And you will be arrested.  And have a criminal case to deal with.  And then you can start explaining about your 'contract' and 'not breaking any laws.'" *Id.* at 1–2.  Presciently, Reinitz predicted that "you are > 50% likely to be arrested for the activities you propose." *Id.*

On March 28, 2019, Teman nevertheless deposited two checks, each for $18,000, into GateGuard's account at Bank of America, which he had created.  *See* Trial Tr. at 200; GX 113 (spreadsheet from Bank of America cataloguing Teman's transactions).  One check purported to have been issued by 518 West 204 LLC[8] and the other by 18 Mercer.  *See* Trial Tr. at 196–97; GX 201 (518 West 204 LLC check); GX 202 (18 Mercer check).  As prepared by Teman, each check stated, "DRAW PER CONTRACT.  NO SIGNATURE REQUIRED."  Each bore, in the place allocated for a signature, an unintelligible squiggle.  *See* GX 201–02.  According to the memo lines of the checks, they were ostensibly for "device removal fee[s]."  *See id.*

Principals for 518 West 204 LLC and 18 Mercer testified that they had not authorized or been aware in advance of those transactions, that they had not been aware that Teman claimed the businesses owed him these sums, and that they disputed that their businesses owed Teman $18,000 or any such fee.  *See* Trial Tr. at 357–58, 360–63 (518 West 204 LLC); *id.* at 421, 434, 441, 474–75 (18 Mercer).  The Customers testified that before their relationships with Teman deteriorated, he did not discuss the prospect that they could be subjected to device removal fees, and that they had been unaware of any claim that they owed any such fee.  *See, e.g., id.* at 326,

---

[8] The check for 518 West 204 LLC states, incorrectly, that it is to be drawn on the account of 518 West *205* LLC.  GX 201; *see also* Trial Tr. at 358–59 (Gabay:  "518 West 205 LLC is not an entity that we operate.").

A-1944

343–44 (518 West 204 LLC); *id.* at 421, 434, 441 (18 Mercer). Teman did not send either

Customer an invoice cataloguing charges for device removal before he made the deposits, even

though he had sent invoices to the Customers for GateGuard purchases in the past. *See id.* at 476

(describing lack of invoice); *see also* GX 413 at 3 (invoice for GateGuard purchase); GX 431 at

3 (same). Representatives of each Customer testified that they had been shocked to see charges

for a device removal fee, both because they owned the devices and believed they should be able

to remove them from their own buildings, and because the amount of the removal fee was

disproportionate to the cost of the intercom or any other amount they had paid GateGuard in the

past. *See id.* at 343–44 (518 West 204 LLC); *id.* at 439, 475 (18 Mercer). Specifically, 518

West 204 LLC had paid \$3,600 for its intercom,[9] *see* Trial Tr. at 317–20; GX 413 at 3 (invoice),

and 18 Mercer had paid \$2,499 for its intercom (and, with other services, had paid a total of

\$3,947.88 to GateGuard), *see* Trial Tr. at 435, 439; *see also* GX 431 at 3 (invoice)—far less than

the \$18,000 device removal fee Teman charged.

Bank of America placed a hold on the funds from the two checks. *See* GX 704 (text from

Teman to Reinitz); GX 727 (same). On March 29, 2020, Teman transferred \$35,000 from the

GateGuard account to an account for Friend or Fraud LLC ("Friend or Fraud"), another company

he controlled. *See* GX 113. On April 1, 2019, Signature Bank, where 518 West 204 LLC and 18

Mercer had their bank accounts, flagged the checks for fraud. *See* Trial Tr. at 677–84. On

---

[9] While he did not invoice the Customers before his March 2019 deposits, Teman did invoice
518 West 204 LLC one year earlier—on March 26, 2018, after the purchase of its initial
intercom—for \$18,286, purportedly for a new panel, installation services, and monthly services,
which it had not agreed to purchase. *See* Trial Tr. at 352–54; *see also* GX 417 at 9 (invoice).

A-1945

April 2, 2019, Bank of America completed a chargeback from the GateGuard account to the 518 West 204 LLC and 18 Mercer accounts at Signature Bank.[10]  *See* Trial Tr. at 210–11; GX 113.

On April 2, 2019, Teman contacted Reinitz, revealing that—contrary to Reinitz's January guidance—he had drawn money from the Customers' accounts and that Bank of America had placed a hold on his account.  *See* GX 704; GX 727.  Reinitz sent Teman a text message, which stated, "[n]ot sure I follow but this sounds bad," and another, which stated, "I don't know all the ins and outs of this but sounds like a bad idea." GX 704.  He warned Teman, "[i]f you are hitting their accounts out of the blue, I expect this will become a criminal matter sooner or later."  *Id.*; *see also* GX 728 (April 3, 2019 text from Reinitz to Teman) ("I've already told you I think it's a bad idea . . . .  If you hit their accounts I think 50/50 they call cops.  If I was advising them that's probably what I would tell them to do.").  On April 10, 2019, after further communications with Teman, Reinitz wrote, "[t]he banking stuff is not a joke. . . .  You can't just hit someone's bank account if you know they dispute the charge." GX 729 at 1; *see also* Trial Tr. at 909–10.  He warned Teman that "[t]here are serious state and fed[eral] regulations on this.  You claim that your contract allows you to debit their accounts even after they explicitly protest.  I'm just not sure it's that simple." GX 729 at 2.  In the same string of messages, Reinitz went on, "[a]nd it may be (again . . . speaking out of ignorance . . .) a clear violation of some federal banking regulation.  In which case your 'simple, can't miss idea' is now a federal crime."  *Id.*; *see also id.* at 3 ("There are regulations around automatic debit agreements.  Including, if the payer tells you to stop, you must stop.").

---

[10] At trial, Karen Finocchiaro, a senior fraud investigator for Bank of America, testified that a chargeback occurs when "the maker bank has established that for some reason the check is no good, so it could be . . . nonsufficient funds, altered or fictitious, or a counterfeit check." Trial Tr. at 208.  During a chargeback, the bank to which the check was presented returns the funds to the maker bank. *See id.* at 208–09.

Despite Reinitz's warnings, Teman, the next month, escalated his practice of drawing and negotiating remote checks on Customer accounts without notice. On April 19, 2019, Teman entered a Bank of America branch in Florida and deposited 27 more checks, totaling $297,000, into the GateGuard account. *See* Trial Tr. at 213–14, 220. These checks were drawn on the accounts of three entities: 518 West 204 LLC, ABJ Milano LLC, and ABJ Lenox LLC.[11] *See* Trial Tr. at 213–19; *see also* GX 203 (518 West 204 LLC checks); GX 204 (ABJ Milano checks); GX 205 (ABJ Lenox checks). Unlike the first two checks, these 27 did not bear a purported signature. Each instead stated:

> DRAW PER CONTRACT. NO SIGNATURE REQUIRED[.] NOTE TO BANK: This is a valid check. You are required by law to honor it. Contract at gateguard.xyz/legal/terms.php accepted by above client. Contact us 212-203-3714 with questions.

*See* GX 203–05. The checks' memo lines stated they were for device removal fees, attorney use fees, collections fees, or chargeback fees. *Id.*

Again, representatives for ABJ and 518 West 204 LLC testified that they had not authorized Teman to remotely create and negotiate the checks or had any notice of the transactions in question, and that they disputed owing the sums reflected. *See* Trial Tr. at 365, 367 (518 West 204 LLC); *id.* at 562–63, 567–68, 648–49 (ABJ). The Customers also had not been aware of the fees for device removal, attorney use, or chargebacks which they purportedly owed.[12] *See id.* at 326, 343–44, 365 (518 West 204 LLC); *id.* at 498, 510–11, 563, 565–66, 649

---

[11] The checks incorrectly identified one of the ABJ entities and 518 West 204 LLC. Although the checks were drawn on the ABJ Lenox and 518 West 204 LLC accounts, they stated that they had been issued by "ABJ *Lennox*" and "518 West *205* LLC." *See* GX 203 (emphasis added); GX 205 (emphasis added); *see also* Trial Tr. at 358–59, 564.

[12] In May 2018, Teman emailed Soleimani, claiming that ABJ owed him for, among other things, device removal fees. When Soleimani responded, "[c]an you please send me the invoices which you are claiming we owe you? Not sure why we owe you money but I'm glad to look into it[,]"

A-1947

(ABJ).  Again, the fees far outstripped the costs of the devices.  The evidence showed that 518

West 204 LLC had purchased its device for $3,600, *see* Trial Tr. at 317–20; GX 413 at 3

(invoice), and ABJ had paid $1,743 per device for its seven devices, *see* Trial Tr. at 490, 496,

510; GX 409A–409B (invoices).  The checks, however, were for far larger sums.  They totaled

$33,000 drawn on 518 West 204 LLC's account, GX 203, and $264,000 on the ABJ accounts,

GX 204–05.

   After depositing the checks, Teman received a notice that Bank of America was placing a

seven-day hold on the $297,000.  *See* DX 16; *see also* Trial Tr. at 282–84; GX 206 (deposit slip

with note: "holds applied see hold notice deposit").  The purpose of such a hold is to determine

whether the funds at issue should be released to the account.  *See* Trial Tr. at 285.  Both Bank of

America and the drawee banks—JPMorgan for ABJ and Signature Bank for 518 West 204

LLC—then reviewed the checks.[13]  *See* Trial Tr. at 219–20.  Signature Bank conducted its

review and flagged the checks for fraud.  *See id.* at 684–86.  As a result, on April 24, 2019,

before the hold on the funds was lifted, Bank of America completed a chargeback of $33,000

from the GateGuard account to 518 West 204 LLC's account at Signature Bank.  *See id.* at 223;

GX 113.  Teman therefore never received access to those funds.

   On April 26, 2019, the day the hold was lifted on the remaining funds, Teman transferred

approximately $225,000 from the GateGuard account to the Friend or Fraud account, and $3,600

from the GateGuard account to an account in his name.  *See* Trial Tr. at 224–25; GX 113.  He

---

GX 405 at 1, Teman did send an invoice—which claimed that ABJ owed GateGuard more than
$1.13 million, including for device removal, chargeback, and collection fees, GX 409.

[13] The process by which the two banks received and reviewed images of checks differed.
JPMorgan received the checks through an inter-bank process.  Signature Bank, a smaller bank,
received the checks from the Federal Reserve.  Trial Tr. at 186–87.

A-1948

then transferred $180,000 from the Friend or Fraud account to an account for Touchless Labs LLC ("Touchless Labs"), and $4,500 from the Friend or Fraud account to his personal account. *See* Trial Tr. at 226; GX 113. On April 29, 2019, Teman transferred $125,400 from the Touchless Labs account back to the Friend or Fraud account. *See* Trial Tr. at 226–27; GX 113. On April 29 and May 1, 2019, Teman transferred approximately $143,000 from the Friend or Fraud account to two Chinese accounts. *See* Trial Tr. at 227, 291–92; GX 113.

On May 7, 2019, Bank of America completed a second chargeback, for $264,000 from the GateGuard account to accounts for ABJ Lenox LLC and ABJ Milano LLC at JPMorgan. Trial Tr. at 231; GX 113. The next day, Teman, through an in-person transaction with a bank teller, withdrew $4,000 from the Friend of Fraud account at a Bank of America branch in Manhattan. *See* Trial Tr. at 228, 231; GX 112. After the chargebacks to Signature Bank and JPMorgan, Bank of America suffered a loss of $260,319.81 as a result of the negotiation of these 27 checks. *See* Trial Tr. at 231.

### B.    Teman's Prosecution

On July 3, 2019, Teman was arrested in the Southern District of Florida and held in custody, based on a one-count complaint charging bank fraud in connection with the April 2019 checks. *See* Dkt. 1. On July 8, 2019, he was released on bond, and on September 6, 2019, appeared in this District before a United States Magistrate Judge. Dkt. 4.

On September 26, 2019, the grand jury returned an Indictment charging Teman with one count of bank fraud, related to the April 2019 checks. Dkt. 9. On November 12, 2019, the grand jury returned the First Superseding Indictment, charging Teman with two counts of bank fraud, one in connection with the March 2019 checks and the other in connection with the April 2019 checks, and two counts of aggravated identity theft, relating to the March 2019 checks. Dkt. 27.

12

A-1949

On November 27, 2019, Teman filed pretrial motions. Dkts. 32–34. On December 20, 2019, the Court issued a decision dismissing Count One of the First Superseding Indictment— which charged bank fraud count in connection with the April 2019 checks—without prejudice, for a violation of the Speedy Trial Act. Dkt. 45. The Court issued a separate order denying Teman's other pretrial motions. Dkt. 48.

On January 3, 2020, the grand jury returned the Second Superseding Indictment, in six counts. Dkt. 55 ("S2"). These consisted of two counts apiece of bank fraud and wire fraud (for each, one related to the March 2019 checks and the other to the April 2019 checks) and two counts of aggravated identity theft connected with the March 2019 checks.[14] On January 3 and January 6, 2020, the parties filed motions *in limine*. Dkts. 54, 60–62, 74. On January 10, 2020, in an extended bench ruling, the Court resolved these motions *in limine*. *See* Dkt. 87 ("MIL Tr."). On January 17 and 19, 2020, days before trial was scheduled to begin, the parties both filed additional motions *in limine.* Dkt. 81, 83. On January 21, 2020, the Court resolved these motions in a bench ruling. *See* Trial Tr. at 18–31.

On January 22, 2020, trial began. It lasted for four days. On January 29, 2020, the jury returned a verdict of guilty on all counts.

On February 26, 2020, Teman filed his initial motion pursuant to Rules 29 and 33. *See* Teman Mem. On March 25, 2020, the Government opposed Teman's motion. *See* Gov. Mem. On April 9, 2020, Teman filed a reply. Dkt. 119 ("Teman Reply"). That same day, Teman filed his letter requesting disclosure of grand jury transcripts. *See* Teman GJ Ltr. On April 24, 2020, the Government opposed that request. Dkt. 125 ("Gov. GJ Ltr.").

---

[14] Shortly before trial, the Government moved on consent to dismiss the two aggravated identity theft charges. Dkt. 79. The Court granted that motion. *See* Trial Tr. at 12–13.

A-1950

On April 9, 2020, Teman filed his second motion for a new trial, based on alleged *Brady*

and *Giglio* violations by the Government. *See* Teman *Brady* Mem. On April 27, 2020, the

Government filed its opposition. Dkt. 126 ("Gov. *Brady* Mem."). On May 11, 2020, Teman

filed a reply. Dkt. 133 ("Teman *Brady* Reply").

## II.     Applicable Legal Principles Governing Post-Trial Motions

### A.     Rule 29 Motions for Acquittal

To grant a motion for acquittal under Rule 29, a court must find that the evidence was

legally insufficient to establish the defendant's guilt beyond a reasonable doubt. *See* Fed. R.

Crim. P. 29. "A defendant challenging the sufficiency of the evidence that was the basis of his

conviction at trial 'bears a heavy burden.'" *United States v. Hawkins*, 547 F.3d 66, 70

(2d Cir. 2008) (citation omitted); *see also United States. v. Desena*, 287 F.3d 170, 177

(2d Cir. 2002). "The question is not whether this Court believes that the evidence at trial

established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mi*

*Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (emphasis in original) (internal

quotation marks and citations omitted). In a close case, where "either of the two results, a

reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the

matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation and brackets

omitted). It is not the trial court's role to "substitute its own determination of . . . the weight of

the evidence and the reasonable inferences to be drawn for that of the jury." *United States v.*

*Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232

(D.C. Cir. 1947)). Accordingly, a "court may enter a judgment of acquittal only if the evidence

that the defendant committed the crime alleged is nonexistent or so meager that no reasonable

A-1951

jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (citation omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the Court must view the evidence in the light most favorable to the Government, with all reasonable inferences drawn in its favor. *See Mi Sun Cho*, 713 F.3d at 720; *Hawkins*, 547 F.3d at 70; *see also United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000) ("We . . . resolve all inferences from the evidence and issues of credibility in favor of the verdict."). "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Moreover, the Court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130. *See also United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002) ("[W]e consider the evidence as a whole.").

The credibility of a testifying witness is particularly within the province of the jury, not a reviewing court. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." (internal quotation marks and citation omitted)). For these reasons, the Second Circuit has emphasized that "the proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury, not in an appellate brief.'" *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (quoting *United States v. Friedman*, 854 F.2d 535, 558 (2d Cir. 1988)). It is for the jury to decide how those arguments

15

A-1952

bear on "the weight [it] should accord to the evidence." *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012).

### B.    Rule 33 Motions for a New Trial

Rule 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *See United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In exercising its discretion, however, the court must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." *Id.* at 1414. Ultimately, the court must decide "whether letting a guilty verdict stand would be a manifest injustice." *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* After doing so, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion. *Sanchez*, 969 F.2d at 1414. The court's Rule 33 authority should be used "sparingly" and only "in the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134 (citation omitted).

If based on newly discovered evidence, a Rule 33 motion must be filed within three years of the verdict. Fed. R. Crim. P. 33(b)(1). If based on any other grounds, the motion must be filed within 14 days of the verdict. Fed. R. Crim. P. 33(b)(2).

### III.    Teman's Rule 29 Motion

In his Rule 29 motion, Teman moves for acquittal on three grounds: that (1) the Court and Government constructively amended the Indictment; (2) there was insufficient evidence that

Teman made material misrepresentations to the financial institutions or had intent to defraud;

and (3) there was insufficient evidence of venue.  The Court addresses each in turn.

### A.    Constructive Amendment[15]

#### 1.    Pertinent Background

The Indictment charged Teman with two counts of bank fraud and two counts of wire

fraud.  *See* S2 ¶¶ 1–4.  The "to wit" clauses for each of these counts stated, *inter alia*, that Teman

had "deposited counterfeit checks."  *See id.*

On January 5, 2020, before trial, Teman gave notice to the Government that he planned to

call an expert, J. Benjamin Davis.  *See* Dkt. 74-1 ("Teman Expert Notice").  Davis's anticipated

testimony, which largely concerned the concept of remotely created checks, is detailed *infra*.

*See infra* p. 78.  Relevant here, Teman stated that Davis's trial testimony would include this

definition of a "counterfeit" check:  "A counterfeit check is a check in which all the features

have been fabricated (*i.e.*, it is not from check stock that originally belonged to the account

holder), including the signature of an authorized signer on the account."[16]  Teman Expert Notice

---

[15] Although Teman argues that a constructive amendment would warrant entry of a judgment of
acquittal under Rule 29, the remedy for such an error is typically a new trial.  *See United States
v. Brown*, No. 05 Cr. 857 (LBS), 2006 WL 2930204, at *2 n.1 (S.D.N.Y. Oct. 11, 2006) (noting
defendant's recognition that "the remedy for a constructive amendment is a new trial not a
judgment of acquittal"); *see also United States v. Milstein*, 401 F.3d 53, 66 (2d Cir. 2005)
(finding constructive amendment, vacating conviction, and remanding for new trial); *United
States v. Wozniak*, 126 F.3d 105, 111 (2d Cir. 1997) (same); *United States v. Mollica*,
849 F.2d 723, 731 (2d Cir. 1988) (same).

[16] It is not clear there is any authority for this definition, which appears to have been developed
by Davis himself.  Indeed, throughout his briefing in this litigation, Teman failed to point the
Court to any statutory or regulatory provision articulating this definition.  The defense did not
cite any authority for this definition of "counterfeit" in its notice to the Government as to the
content of Davis's proposed testimony, in its submissions on the motions *in limine* including the
Government's motion to preclude Davis's testimony, or in its post-trial motions.  The closest
Teman came was a reference, in his post-trial briefing, to a document purporting to cite the
Electronic Check Clearing House Organization's rules governing breach of warranty claim

A-1954

at 2. Teman stated that Davis would further opine that the checks at issue were RCCs and were not "counterfeit" as he defined that term. *See id.* at 2–4; *see also* Dkt. 77 at 3. On January 8, 2020, the Government moved *in limine* to preclude Davis's testimony, Dkt. 74, which Teman opposed, Dkt. 77.

On January 10, 2020, the Court granted the Government's motion *in limine* and excluded Davis's testimony as to RCCs, because it was inadmissible under Federal Rule of Evidence 403 and would improperly invade the Court's province. *See* MIL Tr. at 32–37 (bench ruling); *see also infra* pp. 78–83. Relevant to Teman's present claim of constructive amendment with respect to the adjective "counterfeit" as used in the Indictment's "to wit" clauses, the Court, in the course of its ruling, stated:

> From both the indictment and the government's account in its filings in this case [of] its theory of liability, it seems clear to the Court that, in context, the term "counterfeit" is being used in the "to wit" clauses in the lay sense to describe the fact of checks that were created without the account holder's authorization. Insofar as the checks purported to have been drawn by the account holder to the payees in the sums indicated, but in fact had not been, they were "counterfeit." There's no indication in the indictment or otherwise, that by use of that adjective, the grand jury intended some technical meaning of counterfeiting, such as the one that Davis may have in mind, in which he contends that literally every jot and tickle of the check must have been fabricated by the defendant before it may be called counterfeit.

MIL Tr. at 36–37. The Court proceeded to confirm with the Government that the grand jury had not been presented with a technical definition of "counterfeit," as Teman supposed. *See id.* at 37–38. The Government responded by representing that the grand jury had not been given a

---

processes and deadlines. This states: "Rule 9 claims are for signature items and refer to a forged or *counterfeit* check, where the signature of the drawer is not that of the customer and/or the check is forged or otherwise unauthorized." *See Understanding "Rule 8" and "Rule 9" Warranty and Claims Processes*, ECCHO (Sept. 2018), https://www.eccho.org/wordpress/wp-content/uploads/Rules89WhitePaper52016final-2018.pdf (emphasis added). Even this definition suggests, consistent with the Court's instructions to the jury, that an unauthorized check may be "counterfeit."

A-1955

definition of the term "counterfeit," and that, instead, the theory presented to the grand jury had been one that used "counterfeit" "in the lay sense as sort of non-genuine or non-authorized." *Id.* at 38.

On January 27, 2020, Teman filed a letter motion, objecting to the Court's "charging the jury in a way that permits it to convict Teman without finding that he deposited 'counterfeit['] checks." Dkt. 90 at 1. He argued that his deposits of RCCs—even if unauthorized by the accountholder—did not involve "counterfeit" checks. *Id.* He argued that a jury instruction that did not require a finding that Teman deposited "counterfeit checks" would be a constructive amendment of the Indictment, because the grand jury had charged Teman with depositing "counterfeit" checks, not depositing unauthorized checks or RCCs. *See id.* at 3–4.

At the charge conference the same day, the Court denied Teman's claim of constructive amendment, explaining that "the government did not define 'counterfeit' in the to wit clause in some specialized, stylized, technical way. They have represented—consistent with the common sense use of the term—that counterfeit in this case means created by the defendant without the authorization of the account holder[.]" Trial Tr. at 886–87. The Court further clarified that it had drafted jury instructions to track that meaning of the word "counterfeit." *Id.* at 886. After the Government again confirmed that, before the grand jury, it had used the term "counterfeit" in "the lay sense of being inauthentic or not authorized" to the jury, *id.* at 887, the Court told the defense that if it believed the Government was misrepresenting what happened before the grand jury, it could "invite the Court to review the grand jury transcript to test that proposition" in a post-trial motion. *Id.* at 889.

In charging the jury on January 28, 2020, the Court read aloud the operative Indictment language for each count, including the "to wit" clauses stating that "Teman deposited counterfeit

19

A-1956

checks." *Id.* at 1072–73 (Count One); *id.* at 1073 (Count Two); *id.* at 1084 (Count Three); *id.* at 1085 (Count Four). The Court explained, *inter alia*, that, as to each wire and bank fraud count, the scheme with which Teman was charged entailed creating the checks drawn on the Customer accounts and then making "the false pretense and representation to the bank that he had the account holders' authority to deposit these checks." *Id.* at 1072 (Count One); *see also id.* at 1073 (Count Two); *id.* at 1084 (Count Three); *id.* at 1084–85 (Count Four). The Court instructed the jury on the act and intent elements of bank and wire fraud consistent with this theory. *Id.* at 1075–83 (bank fraud); *id.* at 1085–89 (wire fraud). The Court further instructed the jury that, to find Teman guilty of each count, the Government had to so establish each element of each crime beyond a reasonable doubt. *Id.* at 1074, 1085–86.

On April 9, 2020, Teman filed a post-trial motion to disclose the grand jury transcripts under Rules 6(e)(3)(E)(i) and (ii) to determine whether the Government had proceeded before the grand jury on a definition of the term "counterfeit" inconsistent with the one pursued at trial. Teman GJ Ltr. at 1. On April 24, 2020, the Government opposed that request, arguing that Teman had not shown a particularized need for the transcripts. Gov. GJ Ltr. at 2. On May 6, 2020, the Court ordered the Government to produce the transcripts *ex parte* for an *in camera* review. Dkt. 131. On May 8, 2020, Teman filed a letter requesting that the Court also disclose the transcripts to him. Dkt. 132 ("Teman GJ Ltr. 2"). On May 20, 2020, the Government opposed that request. Dkt. 134 ("Gov. GJ Ltr. 2").

### 2.    Applicable Legal Principles

#### *a.    Constructive Amendment*

To establish the constructive amendment of an indictment, a defendant "must show that the trial evidence or jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the

A-1957

grand jury's indictment.'" *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (quoting

*United States v. Rigas*, 490 F.3d 208, 227 (2d Cir. 2007)); *accord United States v. LaSpina*,

299 F.3d 165, 181 (2d Cir. 2002). Such occurs where the evidence or jury instructions "operate[]

to 'broaden the possible bases for conviction from that which appeared in the indictment.'"

*Milstein*, 401 F.3d at 65 (brackets omitted) (quoting *United States v. Miller*, 471 U.S. 130, 138

(1985)).

    "Not every divergence from the terms of an indictment, however, qualifies as a

constructive amendment." *United States v. Lisyansky*, 806 F.3d 706, 712 (2d Cir. 2015) (quoting

*Bastian*, 770 F.3d at 220). For example, there is no constructive amendment "where a generally

framed indictment encompasses the specific legal theory or evidence used at trial." *United

States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003); *see also United States v. Zingaro*,

858 F.2d 94, 99 (2d Cir. 1988) (general indictment may support conviction on alternative bases,

but more specific indictment cannot). That is because the Government is "permitted significant

flexibility in proof" at trial, as long as the defendant has been provided notice of the "*core of

criminality*" that it will attempt to prove against him. *Bastian*, 770 F.3d at 220 (emphasis in

original) (quoting *United States v. D'Amelio*, 682 F.3d 412, 417 (2d Cir. 2012)).

    Such a "core of criminality . . . involves the essence of a crime, in general terms," but it

does not involve "the particulars of how a defendant effected the crime." *United States v. Gross*,

No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *20 (S.D.N.Y. Oct. 18, 2017) (alteration in

original) (quoting *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016)), *aff'd sub

nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019); *see also Bastian*, 770 F.3d at 220

("[D]iscrepancies in 'the particulars of how a defendant effected the crime' do not constructively

amend the indictment." (quoting *D'Amelio*, 682 F.3d at 418)). To establish a constructive

amendment, it is not sufficient for a defendant to "show that the facts diverged greatly from those alleged in the indictment"; instead, he must show that he "was convicted for 'behavior *entirely separate* from that identified in the indictment." *Gross*, 2017 WL 4685111, at *21 (emphasis in original) (citation omitted); *see also Bastian*, 770 F.3d at 223 ("A constructive amendment occurs where the government introduces a 'complex of facts distinctly different from that' charged by the grand jury, not where it merely amends details pertaining to a 'single set of discrete facts' set forth in the indictment." (quoting *D'Amelio*, 683 F.3d at 419)).

At root, the constitutional concern with constructive amendment derives from a defendant's rights under the Grand Jury Clause of the Fifth Amendment and specifically his right to prepare a defense and avoid double jeopardy. *See Bastian*, 770 F.2d at 220. But "[a]lthough constructive amendment is viewed as a *per se* violation of the Grand Jury Clause, sufficient to secure relief without any showing of prejudice, [the Second Circuit] has proceeded cautiously in identifying such error, 'consistently permitt[ing] significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial.'" *United States v. Lee*, 833 F.3d 56, 70 (2d Cir. 2016) (emphasis in original) (quoting *United States v. Agrawal*, 726 F.3d 235, 259–60 (2d Cir. 2013)).

                    *b.     Disclosure of Grand Jury Transcripts*

"Rule 6(e) of the Federal Rules of Criminal Procedure codifies the traditional rule of grand jury secrecy." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983). There are, however, exceptions to this rule of secrecy. Rule 6(e)(3)(E)(i) allows a court to authorize disclosure of grand jury materials "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). The Second Circuit has applied this rule in connection with a post-trial Rule 33 motion for a new trial. *See United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978). Rule 6(e)(3)(E)(ii) grants the court authority to disclose such materials "at the

22

A-1959

request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).  To dismiss an indictment on that basis, the error in the grand jury proceedings must have prejudiced the defendant.  *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)).

Courts considering the potential disclosure of grand jury materials apply a balancing test. *In re United States for Material Arrest Warrant*, — F. Supp. 3d —, No. 19 Misc. 447 (LGS), 2020 WL 469625, at *1 (S.D.N.Y. Jan. 29, 2020).  Specifically, they "weigh[] the need for secrecy against the need for disclosure."  *Id.*; *see also Douglas Oil Co. of Cal.f. v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979); *SEC v. Rajaratnam*, 622 F.3d 159, 183 (2d Cir. 2010). Disclosure may be warranted if the party seeking disclosure shows "a particularized need" for the grand jury materials.  *See United States v. Ulbricht*, 858 F.3d 71, 107 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018); *see also Sells Eng'g, Inc.*, 463 U.S. at 443 (explaining that, under Rule 6(e)(3)(C)(i), the predecessor to 6(e)(3)(E)(i), the Supreme Court required a finding of particularized need); *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 519 (S.D.N.Y. 2007) (applying particularized need standard in Rule 6(e)(3)(E)(ii)).  The showing required to establish such a need is "substantial."  *Frederick v. New York City*, No. 11 Civ. 469 (JPO), 2012 WL 4947806, at *7 (S.D.N.Y. Oct. 11, 2012) (citation omitted).

Courts have "substantial discretion" when determining whether to order the review or release of grand jury transcripts.  *Douglas Oil*, 441 U.S. at 223; *see also In re Petition of Craig*, 131 F.3d 99, 104 (2d Cir. 1997) ("[T]he discretion of a trial court in deciding whether to make public the ordinarily secret proceedings of a grand jury investigation is one of the broadest and

A-1960

most sensitive exercises of careful judgment that a trial judge can make."). Courts in this Circuit

are hesitant to order disclosure of such transcripts without evidence of government misconduct.

*See Torres*, 901 F.2d at 233. Where a court determines that disclosure is warranted, it "may

authorize this disclosure 'at a time, in a manner, and subject to any other conditions that it

directs.'" *United States v. Anguiera*, No. 11 Cr. 116 (HBS), 2012 WL 1232096, at *5

(W.D.N.Y. Apr. 12, 2012) (quoting Fed. R. Crim. P. 6(e)(3)(E)). The resulting review may be *in

camera*. *See, e.g.*, *Frederick*, 2012 WL 4947806, at *7 (ordering *in camera* review of full grand

jury record).

      **3.**    **Application**

      The Court rejects Teman's claim of a constructive amendment. The Court first explains

why the application of the legal principles above to the Indictment, the trial proof, and the jury

instructions require this result. The Court then explains why this finding is fortified by the *in

camera* review it elected to make of transcripts of the grand jury proceedings and why Teman is

not entitled to review those transcripts.

      *a.*    *Constructive Amendment*

      Teman argues that the Government, through its proof at trial, and the Court, through its

jury instructions, constructively amended the Indictment. *See* Teman Mem. at 5–13; Teman

Reply at 1–8. Teman's argument is that—insofar as the Indictment's to wit clauses described the

checks he deposited as "counterfeit"—the Court was obliged to charge the jury to find that

Teman deposited "counterfeit" checks, using the distinct and technical (albeit unsourced)

definition of a "counterfeit" check embraced by Davis. Teman argues that although the trial

evidence permitted the jury to find that he had created and deposited RCCs without customer

authorization, the checks he deposited were, technically, not "counterfeit" within that definition

of that term. *See* Teman Mem. at 11. And, he argues, the Court's instructions, by not instructing

A-1961

the jury that it had to find a deposit of "counterfeit" checks falling within his technical definition, enabled the jury to convict based solely on the finding that Teman had deposited unauthorized RCCs while feigning to the banks that he had such authorization. *See id.* at 10–13.

The Government disputes that there was a constructive amendment. It notes that the Court properly instructed the jury as to the elements of the charged crimes. *See* Gov. Mem. at 17. And, it argues, Teman was on notice throughout that the Government's theory of bank and wire fraud liability, before the grand jury and at trial, was that Teman did not have customer authority to create or deposit the unauthorized checks and yet represented such authorization to the banks. *Id.* at 17–18. The offenses in question, the Government argues, required it to prove that Teman's unauthorized deposit of checks he had created on Customer accounts was part of a scheme to defraud, but did not require it to show that those checks met a technical definition of "counterfeit," let alone Davis's. *Id.* at 19–20.

Teman's notion of a constructive amendment is easily put aside. It turns on the premise that the adjective "counterfeit" in the Indictment's to wit clauses carried a term of art meaning drawn from an authoritative legal source—presumably a statute or regulation, although Teman has not identified such—under which a "counterfeit" check is one as to which literally every part has been fabricated. The Indictment, he argues, cannot refer merely to a check whose creation and deposit was unauthorized by the accountholder. *See* Teman Expert Notice at 2 (proposing expert Davis's testimony to this effect).

Teman's premise that "to wit" clauses of the Indictment adopted such a definition is, however, an *ipse dixit*. The technical definition he recites is unconnected to the bank and wire fraud statutes. The Indictment does not indicate its adoption of a regulatory definition of the term "counterfeit." And the Court's instructions—and the trial proof—were fully consistent with

the familiar lay understanding of the word "counterfeit." In contrast to Teman's notion that the word "counterfeit" as used in the "to wit" clause could have carried only its purported technical meaning and could not have meant "unauthorized by the customer," Black's Law Dictionary defines the verb "counterfeit" to encompass, *inter alia*, "possess[ing] [] an item without authorization and with the intent to deceive or defraud by presenting the item as genuine." *See* Black's Law Dictionary (11th ed. 2019) (definition of "counterfeit"). Similarly, Black's defines "counterfeit" when used as an adjective as "[m]ade to look genuine in an effort to deceive; produced by fakery, esp. with an intent to defraud." *Id.* There is nothing in the Indictment that signifies an intention by the Grand Jury to use the term "counterfeit" in any sense other than this familiar one.

The Government's proof and theory of liability at trial, and the Court's instructions, in turn, tracked this familiar meaning and did not broaden the bases for conviction beyond that announced by the Indictment as reasonably understood. In its instructions, the Court explained, *inter alia*, that to convict Teman, the jury was required to find that he had falsely represented to banks that he had the accountholder's authority to deposit each check. *See, e.g.*, Trial Tr. at 1072. And the Government presented evidence not only that none of the Customers had authorized Teman to create and deposit the checks, *see, e.g., id.* at 357–58, 362–63, 367 (518 West 204 LLC); *id.* at 441, 474–75 (18 Mercer), *id.* at 562–64, 567, 648–49 (ABJ), but that he also attempted to pass off those checks to banks as customer-authorized. The Government showed that, for example, Teman fashioned the checks so as to contain representations on them that they were drawn per contract and that no signature was required. *See* GX 201–05. The Customers in turn denied having seen, or having agreed to, Teman's purported Payment Terms. *See, e.g., id.* at 326–27, 332, 355–56, 361, 365 (518 West 204 LLC); *id.* at 427–30 (18 Mercer);

A-1963

*id.* at 497–98, 566, 568–69 (ABJ). The Customers also disputed owing Teman's company the

sizable fees reflected on the checks. *See, e.g.*, *id.* at 360–61, 365 (518 West 204 LLC); *id.*

at 434, 441 (18 Mercer); *id.* at 563, 649 (ABJ). Further, apparently in response to the

chargebacks imposed by Bank of America in connection with the March checks, Teman included

*more* representations on the checks to convince the banks that he had authority to deposit them.

The April checks included a "note to bank" that the checks were valid and a statement that the

banks were "required by law" to honor them. *See* GX 203–05. The April checks also included a

link to GateGuard's Terms and Conditions, a statement that the terms had been "accepted by

above client," and a GateGuard phone number to call with questions. *Id.* Drawing all inferences

in favor of the Government, Teman's construct of the checks, which he unilaterally created on

others' accounts for negotiation into his corporate accounts, was designed to deceive the banks

into falsely viewing the checks as customer-authorized and appropriate for deposit.

        The proof relating to Teman's scheme, and the Court's instructions on it, thus easily

aligned with the familiar lay understanding of the term "counterfeit." On the face of the

Indictment, there was no constructive amendment.

        In any event, even if the Indictment were taken to reflect *sub silentio* Teman's proposed

definition of "counterfeit," there would still not have been a constructive amendment here. As

noted, the constructive amendment doctrine exists to assure that the essential elements of a

charge as brought are not modified. It thereby assures that the defendant has notice of the core

of criminality alleged by the Government, is not taken by surprise at trial, and is not prosecuted

later for the same offense. *See Bastian*, 770 F.3d at 220. But the core of criminality does not

include "the particulars of how a defendant effected the crime." *Id.* (quoting *D'Amelio*, 683 F.3d

at 418). And the Second Circuit "ha[s] never suggested that a 'to wit' clause binds the

27

A-1964

government to prove the exact facts specified in a criminal indictment." *Id.* at 221. Instead, it has repeatedly held "that the *specific means* used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense, and therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment." *D'Amelio*, 683 F.3d at 422 (emphasis in original); *see, e.g., id.* at 416–17, 423 (instructions that jury could convict defendant of attempted enticement of a minor for sexual activity if it found he had used either Internet or telephone as means of interstate commerce—when indictment's to wit clause listed only the Internet—was not constructive amendment); *United States v. Danielson*, 199 F.3d 666, 669–70 (2d Cir. 1999) (government's evidence that ammunition shells—rather than the seven rounds of .45 caliber ammunition identified in the indictment's to wit clause—had traveled in interstate commerce was not constructive amendment).

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006), usefully illustrates this principle. There, the grand jury indicted the defendant for wire fraud. *See id.* at 135. The indictment charged the defendants with a scheme to defraud investors of advance fees, using language that generally tracked the wire fraud statute, followed by a to wit clause that identified a specific wire (from Ohio to New York). *See id.* at 140 n.10. The Government did not prove use of that particular wire at trial. *Id.* at 140. On appeal, the defendants alleged that the Government's trial proof constructively amended the indictment, but the Circuit rejected that claim, explaining that "the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment." *Id.* at 140–41. The indictment, it emphasized, had described a scheme to defraud investors and included the starting and ending dates for the scheme, and this put the defendants on notice that the Government would attempt to prove a wire fraud scheme during that time period at trial. *See id.* at 141.

28

The same is so here, even accepting Teman's notion that the word "counterfeit" as used in the to wit clauses carried the technical meaning he prefers. The Indictment charges Teman with bank and wire fraud schemes in March 2019 and April through June 2019, with language tracking the text of those statutes. *See* S2 ¶¶ 1–4. The to wit clauses of each count identified the conduct at issue and noted Teman's deposit of counterfeit checks, in the names of the Customers, into an account at Bank of America. *See id.* That the Court did not require the jury to find that Teman had fabricated every single characteristic of the checks he deposited did not constructively amend those charges. The jury's verdict, given the Court's instructions and the undisputed proof at trial that Teman was the maker of the checks, necessarily established that Teman had fabricated the core feature of them: that the customer had authorized the checks, in the amounts indicated, to be drawn to Teman's company. Therefore, even accepting Teman's notion that some other feature or part of the checks he created was in some sense not "fabricated," this deviation at most would have marked a non-prejudicial variance from the Indictment. Put differently, the Indictment put Teman on ample notice as to the core of the crimes alleged. And, the evidence at trial supported the core allegations in the Indictment (and later particulars) as to the dates, amounts, and payees of the checks, and that they had been drawn without customer authorization.

This case is thus a far cry from those in which the trial evidence and jury instructions have been found to focus on "behavior *entirely separate* from that identified in the indictment" that affects an essential element of the crime. *Gross*, 2017 WL 4685111, at *21 (emphasis in original) (quoting *Bastian*, 770 F.3d at 223). In *Wozniak*, for example, the Circuit considered whether trial evidence—which focused largely on the defendant's *use* of marijuana—and the court's instructions—which allowed conviction based on marijuana evidence—constructively

amended the lengthy indictment. *See Wozniak*, 126 F.3d at 107, 110, 111 n.6. The indictment's narcotics count against the defendant had charged him not with a marijuana-related crime, but with conspiracy to possess with intent to distribute cocaine and methamphetamine. *See id.* at 107. In finding a constructive amendment, the Circuit noted that the defendant "well may have been surprised by the introduction of evidence of narcotics other than what was alleged in the indictment," in that the indictment did not contain a "single set of operative facts" alerting him to the Government's focus on marijuana evidence. *See id.* at 111. "Had [he] been aware that the government would seek conviction mostly based on marijuana evidence, he might have chosen a different trial strategy." *Id.* at 110. This was especially true because the Government had pursued separate marijuana-conspiracy indictments against the defendant's co-conspirators. *See id.* at 111.

Here, in contrast, the trial proof and jury instructions did not depart from the scheme as alleged in the Indictment—including the central fact of the unauthorized nature of the checks—and the Court instructed the jury in familiar form as to the elements of the offenses. And at all points prior to and during trial, the Government consistently articulated its theory that Teman's crimes had consisted of his deposit of *unauthorized* checks, on the false pretense to banks of customer authorization. *See, e.g.*, Dkt. 1 ¶ 6(e) (complaint); Dkt. 24 at 10, 17 (transcript of October 21, 2019 conference); Dkt. 35 at 8, 21 (transcript of November 22, 2019 conference); Dkt. 39 at 12 (opposition to Teman's December pretrial motions); Dkt. 57 at 2 (proposed *voir dire*); Dkt. 73 at 2 (opposition to Teman motions *in limine*); Dkt. 74 at 3–5 (motion *in limine* to preclude Teman's expert).

The Court therefore denies Teman's motion. Teman had sufficient notice, through the Indictment and independently, of the essence of the crime with which he was charged.

b.    *Disclosure of the Grand Jury Transcripts*

In support of his constructive amendment argument, Teman argues that disclosure of the

grand jury transcripts was warranted to identify the theory of fraud presented to the grand jury.

*See* Teman GJ Ltr. at 1.  Teman argues that review of the transcripts has potential to resolve the

parties' disagreement about whether the Government, in pursuing an Indictment containing the

undefined term "counterfeit" in its to wit clauses, advanced the theory that the checks were

merely unauthorized by the accountholder, or whether it went beyond that to pursue the theory

that the checks were in every respect fabricated.  *See id.*  He further argues that it is insufficient

for the Court to conduct an *in camera* review.  *See* Teman GJ Ltr. 2 at 1.  The transcripts, he

contends, must be shown to him too, including because the Government allegedly separately

engaged in misconduct, as ostensibly reflected in his *Brady* motion.  *See id.*; *see infra*

pp. 87–107.

"The extent to which a court . . . may look beyond the language of the indictment to

consider the content of the grand jury proceedings is unclear."  *United States v. Orjuela*,

809 F. Supp. 193, 201 (E.D.N.Y. 1992) (considering constructive amendment argument).

Nevertheless, because Teman here contended that the grand jury used the undefined term

"counterfeit" in the Indictment's "to wit" clauses intending a term-of-art meaning, the Court, in

an excess of caution, ordered an *in camera* review of the grand jury transcripts to permit a

reliable assessment of this claim.  *See id.* (finding no constructive amendment after conducting *in*

*camera* review).

This review, while certainly not required, was not inconsistent with Rule 6(e)(3)(E)(i).  A

defendant demonstrates a particularized need under Rule 6(e)(3)(E)(i) when he shows that "the

material [he] seek[s] is needed to avoid a possible injustice in another judicial proceeding, that

the need for disclosure is greater than the need for continued secrecy, and that [his] request is

31

A-1968

structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222. Here, although Teman did not put forward any proof of his claim as to the theory of liability articulated before the grand jury, the theory that the grand jury intended a specialized meaning of the Indictment term "counterfeit" was central to his post-trial motions. And it had the potential to influence the Court's assessment of those motions. Had the Government—contrary to its representations to the Court—used the term "counterfeit" in its specialized sense before the grand jury, such would have tended to fortify Teman's challenge; in contrast, had the Government not done so, there would not be even a plausible basis to claim constructive amendment. The Court accordingly determined that *in camera* inspection of the grand jury minutes would enable a comprehensive assessment of Teman's Rule 29 and 33 post-trial motions (and facilitate appellate review of its ruling on those motions).

At the same time, given that Teman's theory that such an instruction had been given to the grand jury was entirely a product of conjecture, the Court did not find any justification for Teman's bid to gain access for himself and his counsel to review these materials.[17] The Court's considered and firm judgment was, and following review is, that *in camera* review of these materials properly balanced the interest in testing the Government's representation as to the

_____

[17] To the extent Teman contends that the prosecution engaged in misconduct as to its *Brady* obligations, strengthening its bid for defense access to grand jury material, the Court has not found such misconduct. *See infra* pp. 94–107.

32

A-1969

nature of the theory of liability pursued before the grand jury with the important interest in maintaining grand jury secrecy.[18]

Having thoroughly reviewed the transcripts of the proceedings before the grand jury, the Court confirms that the Government's case, as presented to the grand jury, at all times was based on the simple and clear theory of fraud that the Government consistently pursued before and at trial: that Teman had created and deposited the checks at issue without customer authorization and presented them to the banks on the false pretense of such authorization. The Government did not present, or instruct the grand jury as to, any technical definition of the term "counterfeit." Nor did it instruct the grand jury that, to return a true bill, it needed to find that all parts of the checks were fabricated. The Government's theory of liability as pursued at trial is consistent with the theory presented to the grand jury. In contrast, Teman's bid to freight the term "counterfeit" with his proposed technical meaning would unjustifiably modify the Indictment.

Accordingly, the Court finds that the grand jury transcripts confirm its holding that there was no constructive amendment. Teman was convicted of the same crime and conduct that was the basis for the grand jury's Indictment of him.

### B.    Sufficiency of the Evidence of *Actus Reus*

Teman next argues that the evidence was insufficient to establish the *actus reus* of the crimes charged—specifically, that he had made "false or fraudulent pretenses, representations, or promises," as required by the bank and wire fraud statutes, 18 U.S.C. §§ 1343, 1344. *See* Teman Mem. at 13–16; Teman Reply at 8–10. First, relying largely on *Williams v. United States*,

---

[18] In addition to his request to have the grand jury materials released to him, Teman also requested that the Government file these materials under seal in order to ensure a full appellate record. *See* Teman GJ Ltr. 2 at 1–2. The Government does not oppose this request. Gov. GJ Ltr. at 2. The Court thus orders the Government, to file under seal the grand jury materials that it provided to the Court *ex parte* as soon as it is practical to do so consistent with the current public health crisis.

A-1970

458 U.S. 279 (1982), and *United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998), he argues that

the deposit of the checks did not itself constitute a representation to the banks. Teman Mem.

at 14. Second, he argues that the 29 checks did not contain any misrepresentations. *See id.*

at 14–16. The Court is unpersuaded by this argument, because *Williams* and *Rodriguez* are

inapposite, and because there was sufficient evidence on which a reasonable jury could find that

the checks as custom-designed by Teman contained false and fraudulent representations.[19]

In *Williams*, the Supreme Court considered a check kiting scheme, in which the

defendant deposited checks knowing that the accounts on which those checks were drawn had

insufficient funds to cover the checks. *See Williams*, 458 U.S. at 280–82; *see also id.* at 281 n.1

(describing check kiting schemes generally). The Government had charged this scheme under

18 U.S.C. § 1014, which criminalizes knowingly making a false statement to influence a

federally insured financial institution. *See id.* at 282. The Government's theory was that the

---

[19] Teman's argument to the effect that the checks were not representations and did contain false
or fraudulent representations does not, in any event, grapple with the complete text of the bank
fraud statute as charged. The Indictment charged violations of, and the Court instructed the jury
as to, both § 1344(1), which criminalizes a scheme to defraud a financial institution, and
§ 1344(2), which criminalizes a scheme to obtain money or property under the custody or control
of a financial institution, using false representations, pretenses, or promises. 18 U.S.C.
§ 1344(1)–(2). "[P]roof that the defendant violated either subsection is sufficient to support a
conviction under the [bank fraud] Act." *United States v. O'Donnell*, 840 F.3d 15, 18
(1st Cir. 2016) (citing *Loughrin v. United States*, 573 U.S. 351, 355–62 (2014)). It is only under
§ 1344(2) that the Government's proof must establish any actionable false representation,
pretense, or promise. *See United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir. 1992);
*cf. United States v. Chandler*, 98 F.3d 711, 714 (2d Cir. 1996) (finding court erred when it
instructed jury that it could only convict the defendant, charged with bank fraud under § 1344(1)
and (2), if it found that she had violated both subsections). Teman's argument, however, is
addressed only to § 1344(2); he ignores § 1344(1). Because the Court finds the evidence
sufficient to establish false and fraudulent representations under § 1344(2), it has no occasion to
consider whether the proof established a scheme to defraud in violation of § 1344(1). Nor, given
the existence of false and fraudulent representations here, need the Court consider whether, had
there not been such representations, Teman's conduct could nevertheless have constituted a
scheme to defraud under the wire fraud statute, which, like the bank fraud statute, is formulated
in the disjunctive.

A-1971

deposit of such checks was itself a representation that the drawer's account had sufficient funds. *See id.* at 285–86. The Court rejected that theory, holding that a deposit alone is not a "false statement," because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 284. The Court noted that the Government's theory, by making any deposit of a check supported by insufficient funds a potential basis for prosecution under § 1014, could "make a surprisingly broad range of unremarkable conduct a violation of federal law." *Id.* at 286.

In 1984, following *Williams*, Congress enacted § 1344. In *Rodriguez*, the Second Circuit addressed a bank fraud scheme, prosecuted under 18 U.S.C. § 1344(1) and (2). *Rodriguez*, 140 F.3d at 167 n.2. As part of that scheme, the defendants, Elcock and Rodriguez, submitted phony invoices to the company that employed Elcock. *See id.* at 165. On the basis of these invoices, the company issued checks to Rodriguez. *See id.* Each check included the authorized signature of the company's assistant treasurer. *Id.* Rodriguez then endorsed those checks and deposited them into her bank accounts. *Id.*; *see also id.* at 167. The Second Circuit, citing *Williams*, stated that "[a] course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to funds does not alone constitute false or fraudulent pretenses or representations." *Id.* at 168. While a false representation had been made to the employer, none had been made to the bank. Accordingly, the Circuit held that Rodriguez's deposit of the company's signed checks, even if the checks themselves had been the product of fraud directed at the company, were insufficient to establish bank fraud. *See id.*[20]

---

[20] The Circuit in *Rodriguez* "had no occasion to distinguish between § 1344(1) and § 1344(2)." *United States v. Metaxas*, — F. Supp. 3d —, Nos. 14 Cr. 190, 17 Civ. 2708 (BMC), 2020 WL 1472440, at *6 (E.D.N.Y. Mar. 26, 2020).

A-1972

*Williams* and *Rodriguez* are inapposite here.  And courts considering claims like Teman's

have repeatedly emphasized the narrowness of both holdings.  *See, e.g.*, *United States v. La'jie*,

184 F.3d 180, 190 (2d Cir. 1999) ("In sum, we ruled in *Rodriguez* that where there are 'no other

facts evincing an intent to victimize the financial institution,' the deposit of facially proper

checks, which had no alterations and bore the authentic signature of a person who had authority

to sign, and which the bank received as a holder in due course, did not become bank fraud within

the meaning of § 1344 merely by reason of the defendant payee's procurement of the checks

from its maker by reason of fraud."); *United States v. Hord*, 6 F.3d 276, 286 (5th Cir. 1993)

("[W]e are not alone among the federal circuits in applying *Williams* narrowly to the simple

presentation of a check drawn on an account with insufficient funds[.]" (internal quotation marks

and citation omitted)) (collecting cases); *United States v. Falcone*, 934 F.2d 1528, 1541

(11th Cir. 1991) ("Most courts . . . have declined to read *Williams* broadly to require the reversal

of convictions in situations other than those involving insufficient-funds checks.").  The scheme

established here went far beyond the "bare" deposit of checks unsupported by sufficient funds at

issue in *Williams*, *see United States v. Burnett*, 10 F.3d 74, 79 (2d Cir. 1993), and was similarly a

far cry from the deposit of facially proper and accountholder-authorized and signed checks at

issue in *Rodriguez, see La'jie*, 184 F.3d at 190.

The evidence at trial instead amply established a scheme well within the heartland of

these two anti-fraud statutes.  It involved misleading conduct—far beyond the deposit of the

checks—designed to mislead the depositary and drawee banks that the Customers had authorized

Teman to create, negotiate, and deposit the checks drawn upon their accounts.  *See, e.g.*, *United*

*States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (finding *Williams* inapposite and

finding sufficient evidence to establish bank fraud, where, at point of deposit, the defendant, an

36

accountant, repeatedly mingled the deposit of legitimate and fabricated checks drawn on his clients' accounts so as create the false impression that the clients had authorized the creation and deposit of all checks); *see also United States v. Nejad*, No. 18 Cr. 224 (AJN), 2019 WL 6702361, at *13 (S.D.N.Y. Dec. 6, 2019) ("[A]n indictment may sufficiently allege a violation of Section 1344(2) where the check or wire transfer order is accompanied by additional circumstances from which an implied misrepresentation may arise." (emphasis omitted)). Courts in fact have repeatedly upheld bank and wire fraud convictions where the evidence at trial established misrepresentations beyond the deposit itself.[21] Here, similarly, the evidence established overwhelmingly that Teman had made misrepresentations on the face of the checks to induce the banks to accept them as customer-authorized, a point the Customers all denied. For this reason, Teman's elaborate scheme far exceeds the "unremarkable" act of merely depositing a check that inspired the Supreme Court's concern in *Williams* about over-criminalization.

First, the checks themselves contained material misrepresentations. On each of the 29 checks that he prepared, Teman included the notation that the check had been "drawn per contract." *See* GX 201–05. The "contract" that purportedly gave him such authority was the

---

[21] *See, e.g., Elliott v. United States*, 332 F.3d 753, 762 (4th Cir. 2003) ("There is a fundamental difference . . . between checks drawn on an account containing insufficient funds, on the one hand, and affirmative misrepresentations made on the check itself, on the other."); *United States v. Briggs*, 939 F.2d 222, 227 (5th Cir. 1991) ("§ 1344(a)(2) would encompass a wire transfer order containing an actual misrepresentation (e.g., a false recitation of the authority for its issuance)." (emphasis omitted)); *Falcone*, 934 F.2d at 1541 ("*Williams* does not govern a situation in which some information on the check . . . is itself a false statement, or in which the maker of an insufficient-funds check engages in behavior, other than the simple presentation of the check, that constitutes a false representation." (internal citations omitted)); *United States v. Worthington*, 822 F.2d 315, 318 (2d Cir. 1987) (finding that "the rationale of *Williams*—that drawing a check unsupported by sufficient funds is neither a statement nor the type of conduct Congress intended to criminalize—is simply inapplicable" where check contained name of fictitious drawee bank).

Payment Terms.[22]  *See* GX 704 (screenshot of Payment Terms sent from Teman to Reinitz).  A jury, however, could reasonably find that the Payment Terms did not authorize Teman to create such checks.  The Customers testified that they had never seen, discussed with Teman, or explicitly approved such terms.  *See, e.g.*, Trial Tr. at 326–27, 332, 355–56, 361, 365 (518 West 204 LLC); *id.* at 427–30 (18 Mercer); *id.* at 497–98, 566, 568–69 (ABJ).  And there was no evidence that these terms were even in place at the time the Customers had contracted with Teman.  The three independent sets of Customers, in their testimony, repeatedly refuted Teman's authority to create and deposit the checks.  *See, e.g., id.* at 357–58, 362–63, 367 (518 West 204 LLC); *id.* at 441, 474–75 (18 Mercer); *id.* at 562–64, 567, 648–49 (ABJ).

Further, even if Teman had had the authority to draw checks on Customer accounts to pay authentic Customer debts to him, the evidence permitted a jury to find that the Customers did not owe the sums in question to Teman's company.  The evidence showed that Teman had included a description of the purpose of the check in each check's memo line.  These descriptions included "device removal fee," "chargeback fee," "attorney use fee," and "collections fee."  *See* GX 201–05.  A jury was entitled to regard these statements, which tended to suggest the existence of a bona fide customer debt that the check was being used to pay, as false and misleading.  Each Customer at trial disputed owing the fees in question, which far outstripped the sums the Customer had otherwise paid Teman's company for the devices.  *See, e.g., id.* at 326, 343–44, 365 (518 West 204 LLC); *id.* at 421, 434, 441, 498 (18 Mercer); *id.* at 498, 563, 565–66, 649 (ABJ).  And the evidence corroborated the Customers on this point,

---

[22] On the April checks, Teman included a link to the Terms and Conditions.  The Terms and Conditions did not themselves state that Teman had the authority to make such withdrawals, but instead included within them a link to the Payment Terms—a post-offense version of which may have contained such a clause.  *See* T&C at 5; *see also supra* n.5.

insofar as Teman had provided invoices to the Customers for the devices, *see* GX 413 at 3;

GX 431 at 3; GX 409A–409B, but not for the fees that the checks he created were ostensibly

being used to pay, *see, e.g.*, Trial Tr. at 476.  A reasonable jury could find that the statements on

these checks as to the nature of the fees that the Customer purportedly owed GateGuard were

false and had been included to further the illusion that Customer-authorized checks were being

used to pay Customer-acknowledged debts.

The separate sets of the checks—the two in March and the 27 in April—also contained

distinct notations that a jury could regard as part of a scheme to mislead the bank to assume that

there had been Customer authorization.  On the March checks, Teman included, on the signature

line, an unintelligible squiggle, despite the checks' representation that no signature was required.

GX 201–02.  Although the trial evidence did not affirmatively explain this mysterious

annotation, a jury could reasonably conclude that Teman's inclusion of illegible handwriting in

the area for a signature was intended to fortify the impression of customer approval.

As to the April checks, Teman included additional notations, which a jury reasonably

could infer were aimed at swaying the depositary and drawee banks to clear the checks and thus

to avoid the holds and chargebacks that had tripped up the March checks.  In addition to stating

again that the checks were drawn per contract with no signature required, Teman included on the

27 April checks a separate "NOTE TO BANK," stating that "[t]his is a valid check.  You are

required by law to honor it."  GX 203–05.  He also included a link to the GateGuard Terms and

Conditions, which he wrote had been "accepted by above client."  *Id.*  Yet both 518 West 204

LLC and ABJ, whose ostensible checks were drawn in April, disputed agreeing to the Terms and

Conditions.  *See* Trial Tr. at 329–31, 341–43, 364 (518 West 204 LLC); *id.* at 506–07 (ABJ).

And, as noted, the Terms and Conditions do not themselves authorize Teman to create and

A-1976

deposit checks drawing directly on clients' accounts. Further, the Customers disclaimed having seen the document which purportedly had given Teman such authority, GateGuard's "Payment Terms." *See, e.g.*, *id.* at 332 (518 West 204 LLC); *id.* at 568–69 (ABJ). A jury could therefore find that Teman's representations on the checks—that these were "valid check[s]" "draw[n] per [a] contract" that had been "accepted by above client"—to be false and misleading statements, directed towards the banks, with the goal of inducing them to honor checks and permit Teman to withdrawn the sums in question from Customer accounts.

While the face of the checks alone amply permitted the jury to find the *actus reus* of bank and wire fraud, there was also evidence of other steps taken by Teman to reduce the risk that the banks would learn that the checks were not Customer-authorized. As noted, Teman chose not to send the Customers invoices for the fees in question before withdrawing from their accounts, in what appeared to be a departure from usual business practice as to bona fide fees, or otherwise alert any of the Customers of his intention to draw these checks on their accounts. *See* Trial Tr. at 476 (describing lack of invoice); *see also* GX 413 at 3 (invoice for GateGuard purchase); GX 431 at 3 (same); GX 409A–409B (same). This reduced the risk that a Customer would affirmatively alert its banks not to approve a forthcoming check drawn by Teman. In declining to provide the Customers any notice of these matters, Teman ignored the advice of his counsel. *See* GX 704 at 1. Further, on the April checks—drawn after the Customers had disputed the March checks, leading to holds and chargebacks—Teman included a GateGuard phone number and stated that the bank should "contact us . . . with questions." GX 203–05; *see also* Trial Tr. at 618 (testimony that phone number on check was GateGuard's phone number). A jury reasonably could find that, by giving his phone number, and not that of the accountholder-Customer, as the number to call in the event of questions, Teman was seeking to

40

A-1977

increase the likelihood that a bank doing diligence on the check would contact him and hence not

learn that the Customer disputed the fees and repudiated the check. *See, e.g.*, Trial Tr. at 564,

566 (Soleimani explaining that if banks had contacted him, he would have told them that the

checks were unauthorized). Finally, Teman deposited the April checks over the Passover

weekend, when his Orthodox Jewish Customers would not access their electronic devices. *See

id.* at 367–69, 564–65. These actions could reasonably be read as intended to minimize the

likelihood that banks would become alert to Teman's scheme before the checks had cleared.

For all these reasons, the evidence was amply sufficient—indeed overwhelming—to

establish that Teman had made false and fraudulent representations to banks in order to cause

them to negotiate the checks he deposited.

### C.    Sufficiency of the Evidence of *Mens Rea*

Teman next argues that there was insufficient evidence of *mens rea*—that a reasonable

jury could not find that he acted with intent to defraud, as required by the mail and wire fraud

statutes. Teman Mem. at 22–23. Teman's argument relies on the claim that GateGuard's Terms

and Conditions and Payment Terms authorized him to create and deposit the checks. *See id.*

at 23. To strengthen this claim, he points to his attorney Reinitz's testimony—in support of an

ostensible advice of counsel defense—that the act of drawing checks on the Customers' accounts

was "technically legal" and that the Payment Terms had given Teman "explicit authority" to do

so. *See id.*

The Court rejects this argument, too. A reasonable juror could easily conclude beyond a

reasonable doubt that Teman had acted with the requisite intent to defraud. As reflected above,

the Government presented plentiful evidence of fraudulent intent. *See, e.g.*, Trial Tr. at 980–95

(closing argument, cataloguing this evidence). The Court briefly reviews some of this evidence,

A-1978

and then addresses the two categories of evidence to which Teman points as ostensibly negating

such intent: namely the Payment Terms and Reinitz's testimony.

Teman's conduct outlined above relating to the construction and negotiation of the

checks, Teman's attempts to delay his Customers' discovery of the checks, and his attempted

transfers of the funds soon after their deposit and clearance all are fairly read to evince fraudulent

intent. As reviewed above, the checks themselves contain various representations suggesting the

false facts that Customers (1) owed the fees in question and (2) to pay them, had authorized

Teman to draw checks to himself on the Customers' accounts. The studied design of the checks

to lend these false impressions, alone, would compellingly support a finding of fraudulent intent.

A jury that credited the Customers' testimony that they did not owe and had not discussed with

Teman the large fees in question—*e.g.*, for device removal, collection, chargeback, and attorney

use—could also readily find Teman's suggestion to the contrary as stated or implied in various

ways on the checks' faces to be a badge of fraudulent intent. *See* Trial Tr. at 326, 343–44, 365

(518 West 204 LLC); *id.* at 421, 434, 441 (18 Mercer); *id.* at 498, 563, 565–66, 649 (ABJ). The

sum total of the checks (over $51,000 for 518 West 204 LLC, $18,000 for 18 Mercer, and

$264,000 for ABJ) in relation to the sums the Customers had willingly paid for their GateGuard

devices (a few thousand dollars per device) corroborated that the purported fees were disputed

and the checks to pay them were unauthorized. *See id.* at 439 (direct testimony of Bonnie

Soon-Osberger, representative of 18 Mercer direct testimony) ("The panel is $2,500, which is

what we purchased. So this $18,000 doesn't make any—doesn't make any sense.").

The circumstances surrounding Teman's deposits of the April checks further could be

viewed as bespeaking fraudulent intent. Having had chargebacks imposed on the March checks,

Teman doubled down in April, increasing the scale of the checks he wrote on Customer accounts

and amplifying the notations made on the checks to convey the illusion of Customer consent.  In addition, as noted, Teman acted to delay the bank in contacting the Customers and learning that they disavowed the checks and the debts that they purported to cover.  He did so by depositing the large checks on the Friday of Passover, when the representatives of 518 West 204 LLC and ABJ—on whose accounts the checks were drawn—would not be reachable.  *See id.* at 367–69, 564–65.

Finally, the jury could find the rapid manner in which Teman moved and attempted to move the money he deposited suggestive of criminal intent.  Teman deposited the March checks, totaling $36,000, into the GateGuard account on March 28, 2019, and the next day he transferred $35,000 from the GateGuard account to a different account (Friend or Fraud) which he controlled.  *See* GX 113.  He deposited the April checks on April 19, 2019, and almost immediately after the lifting of the seven-day hold on his account, transferred nearly all of the proceeds (net of a chargeback) to other accounts that he controlled.  *See* Trial Tr. at 224–27; GX 113.  The jury could find that these transfers were made in an effort to inhibit the banks' ability, were they to learn that the Customers disclaimed the checks and the purported debts underlying them, to deny these funds to Teman through a freeze or additional chargeback.

Teman relies on the Payment Terms as ostensibly negating the evidence of his fraudulent intent.  But a jury could easily find the contrary.  There was no competent evidence that the Payment Terms authorizing RCCs were in place as of the time the Customers entered into agreements with GateGuard.  *See supra* n.5.  And even if there had been, a jury could readily find that Teman had constructed GateGuard's business documents to make it unlikely that the Customers would see, let alone consent to, the buried provision purportedly authorizing RCCs to pay Customer debts.  As the Customers testified, Teman did not provide them with a copy of the

43

A-1980

Payment Terms or ever discuss the Payment Terms with them. *See, e.g.*, Trial Tr. at 332, 361 (518 West 204 LLC); *id.* at 428 (18 Mercer); *id.* at 497–98 (ABJ).  Therefore, assuming that Payment Terms that authorized RCCs were in place at the time the Customers contracted with Teman, the only way the Customers could have seen these was to click on a link within the GateGuard Terms and Conditions, which Teman had referenced on invoices and written communications with the Customers.[23]  But that link does not occur until page five of the Terms and Conditions.  *See* T&C at 5.  And the clause that actually purports to provide the requisite authorization for RCCs is several pages into the Payment Terms.  *See* Payment Terms at 5.

Moreover, even if the jury accepted that Teman believed he had the Customers' permission to draw checks on their accounts, the jury could easily conclude that such authority extended only to bona fide debts the Customers owed GateGuard.  The jury could comfortably credit the uniform testimony of the three Customers that they did not owe GateGuard the sums that Teman drew on their accounts in March ($36,000) or in April ($297,000).  Were the jury to find (as the evidence entitled it to do) that Teman feigned Customer authorization of the checks to pay these fees, the Payment Terms' authorization of RCCs as a means to pay bona fide debts, even if binding, would not negate his fraudulent intent as to *these checks*.  In this vein, a jury could further view Teman's decision not to invoice his Customers for fees underlying the March and April checks, or otherwise alert them to his claim that they owed these fees to GateGuard, as telling evidence of his awareness that the fees to which these checks related were not owed—and of his fraudulent intent.

---

[23] Although Teman referenced the Terms and Conditions in writings to the Customers, such as invoices, *see, e.g.*, Trial Tr. at 591, the Customers did not sign the Terms and Conditions and some claimed never to have agreed to them, *see id.* at 329–31, 341–43, 364, 506–07; *see also* GX 409C (text from Soleimani to Teman observing that he had not signed the T&C).

Reinitz's testimony also does not preclude an inference of criminal intent on the part of
Teman.  This is so for several reasons.

First, the jury was not required to credit Reinitz's testimony.  *See, e.g., O'Connor*,
650 F.3d at 855.  And the evidence gave the jury good reason to discredit the one part of that
testimony on which Teman seizes:  Reinitz's testimony that he orally advised Teman that
drawing checks on customer accounts was "technically legal."  Trial Tr. at 921.  Reinitz did not
memorialize this advice anywhere.  It was not reflected, for example, in a memorandum to the
file, in a letter or memo to Teman, or in Reinitz's extended text exchanges with Teman on this
subject.

And the text messages—which the Government introduced on cross-examination—were
in considerable tension with Reinitz's claim to have given any such oral advice.[24]  There, in
January 2019 before the deposits, and in March and April 2019 in the midst of them, Reinitz
repeatedly admonished Teman not to "hit[]" his customers' accounts without notice and their
permission and that he risked arrest, imprisonment, and prosecution were he to do so.  *See*
GX 704; *see also* GX 728.  In January 2019, Reinitz advised Teman that drawing from the
Customers' accounts was a "[b]ad idea."  GX 702 at 1; *see also* GX 728 ("I've already told you I
think it's a bad idea.").  After holds were placed on the March checks, Reinitz observed that "this

---

[24] Reinitz's testimony and his text messages with Teman were received during the defense case
but are properly considered in assessing the sufficiency of the evidence.  That is because the
Court denied Teman's motion for a judgment of acquittal under Rule 29(a) prior to the start of
the defense case.  *See United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at
*2–3 (S.D.N.Y. June 24, 2014) (evidence received during defense case cognizable on Rule 29(c)
post-trial sufficiency challenge where Court denies, rather than reserves on, Rule 29(a) motion
made at close of the Government's case), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016); *cf.
United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) ("Under Rule 29(b), when a district
court reserves decision on a defendant's Rule 29 motion at the close of the Government's
evidence, 'it must decide the motion on the basis of the evidence at the time the ruling was
reserved.'" (quoting Fed. R. Crim. P. 29(b)).

A-1982

sounds bad," "sounds like a bad idea," and "[t]he banking stuff is not a joke." GX 704; GX 729. In text messages from both January and April, Reinitz also warned Teman repeatedly that choosing to deposit the checks could lead to a criminal prosecution. *See* GX 702 at 1 ("[T]hey are likely to call police. And you will be arrested. And have a criminal case to deal with."); *id.* at 2 ("My opinion is that you are > 50% likely to be arrested for the activities you propose."); GX 704 ("I expect this will become a criminal matter sooner or later."); GX 728 ("If you hit their accounts I think 50/50 they call cops.").

Reinitz's written communications with Teman, in fact, powerfully reinforced the Government's case against Teman, as they substantiated his motive (to fortify GateGuard's flagging finances) and confirmed that Teman knew the Customers would dispute the charges. GX 728 ("Your 'threats' carry little weight at this point and they have indicated they don't believe they owe you $."); GX 729 ("There are federal regulations on this stuff. You can't just hit someone's bank account if you know they dispute the charge . . . . You claim that your contract allows you to debit their accounts even after they explicitly protest. I'm just not sure it's that simple. . . . [I]f the payer tells you to stop, you must stop.").

Particularly in light of these written communications, a jury could reasonably find that Reinitz, to assist his continuing client Teman, had lied on the witness stand when he claimed to have orally advised Teman that drawing checks on customer accounts was "technically legal." Such a finding would draw support from Reinitz's carriage while testifying. Reinitz visibly projected as ill at ease and nervous. His demeanor was markedly defensive and at points evasive on cross-examination.

Second, even assuming that the jury credited this aspect of Reinitz's testimony, the jury could easily find that Teman did not have available an advice of counsel defense sufficient to

A-1983

negate criminal intent. Consistent with Second Circuit precedent, *see United States v. Scully*, 877 F.3d 464, 477–78 (2d Cir. 2017), the Court instructed the jury that for such a defense to apply, it must find that Teman had "honestly and in good faith sought the advice of a competent lawyer as to what he may lawfully do; . . . fully and honestly laid all the facts before his lawyer; and . . . in good faith . . . honestly followed such advice, relying on it and believing it to be correct." Trial Tr. at 1093. The trial evidence gave the jury good to reason to find, at a minimum, that Teman's consultation with Reinitz failed to meet the latter two requirements. As to laying all the facts before Reinitz, there was no evidence that Reinitz was aware of the large sums that Teman was planning to charge the Customers, or that the fees which these sums represented were disputed as opposed to conceded by the Customers. *See id.* at 823 (Reinitz was not aware of $18,000 March checks until they had already been deposited). Reinitz did not know that those sums far exceeded the prices the Customers had paid for their GateGuard devices. *See id.* at 813, 912. Teman also did not show Reinitz the checks he wanted to deposit. *See id.* at 793–94. This was a particularly gaping hole in Reinitz's awareness of Teman's intended course of conduct towards the banks. Even if Reinitz conceptually approved Teman's use of RCCs to pay bona fide debts to GateGuard as "technically legal," there was no evidence that he knew in advance of, let alone approved, Teman's representations on the particular checks signifying Customer assent to the payment, by RCCs, of the fees reflected on them. Reinitz's advice, even if credited, thus was a mismatch for Teman's charged conduct. And, as to following Reinitz's advice, Teman did not follow it. As the text exchanges reflect, Reinitz—in strong and memorable language—instructed Teman not to move forward with the deposits, *see, e.g.*, GX 702 (describing the scheme as a "[b]ad idea"); GX 729 (advising that "if the payer tells you to stop, you must stop."), and at minimum to give advance notice to the Customers of the

47

charges before doing so, *see, e.g.*, GX 704 ("I suggest you provide them with advanced, explicit notification of the charge, amount, and specific basis in the agreement for doing so.").

The jury was thus not by any means required to find, on account of Reinitz's testimony, reasonable doubt on the element of criminal intent. Quite the contrary, Teman's disregard of Reinitz's core advice—and his ploughing ahead with more and larger deposits in April in the face of Reinitz's warnings and guidance after the March deposits—could fairly have been read as enhancing the Government's proof on this element.

Accordingly, the Court finds there was sufficient evidence for a reasonable jury to find that Teman acted with the requisite intent.

**D.      Sufficiency of the Evidence as to Venue**

Teman next argues that the Government failed to adduce sufficient evidence for a reasonable jury to find venue on any count by a preponderance of the evidence. *See* Teman Mem. at 17–22; Teman Reply at 10–15.

**1.      Pertinent Background**

On March 28, 2019, Teman deposited the two $18,000 checks to GateGuard's Bank of America account. *See* GX 113. The checks stated that they were drawn per contract and no signature was required, yet Teman included an unintelligible squiggle on the signature line. *See* GX 201–02. The checks were purportedly issued by 518 West 204 LLC and 18 Mercer, which had accounts at Signature Bank. *See id.* The checks included a Manhattan address for Signature Bank. *Id.*

The evidence showed that Teman deposited the checks while he was in Manhattan through a mobile deposit on his phone. *See* Trial Tr. at 198–202. The evidence to this effect consisted of a business record from Bank of America, in the form of a spreadsheet, which reflected that the IP address for the mobile deposit was located at the moment of deposit in "New

A-1985

York, NY." *See* GX 113 ("Device" tab of spreadsheet); *see also* Trial Tr. at 202–03.  After the

mobile deposit was made, the evidence showed that electronic communications were routed to

Bank of America servers in Texas.  *See* Trial Tr. at 203–04.

Following the mobile deposit, Bank of America placed a hold on the proceeds from the

checks.  *See* GX 704; GX 727.  The evidence showed that, on April 1, 2019, Signature Bank

conducted a review on the checks in Manhattan and flagged the checks for fraud.  *See* Trial Tr.

at 677–84.  The next day, Bank of America completed a chargeback from the GateGuard account

to the Customers' accounts at Signature Bank.  *See* Trial Tr. at 210–11; GX 113.

On April 19, 2019, Teman entered a Bank of America branch in Miami Beach, Florida

and deposited 27 checks for $297,000, drawn on the accounts of 518 West 204 LLC and ABJ.

*See* GX 113.  Each check stated it was drawn per contract and no signature was required, and

each also included a note to the bank that "[t]his is a valid check.  You are required by law to

honor it.  Contract at gateguard.xyz/legal/terms.php accepted by above client," and instructed the

bank to contact GateGuard with questions.  GX 203–05.  The checks included Manhattan

addresses for Signature Bank and JPMorgan, the banks for 518 West 204 LLC and ABJ

respectively.  *Id.*

The evidence showed after the deposit, a seven-day hold was placed on the GateGuard

account, to allow both Bank of America and the drawee banks to review the checks to determine

whether the funds should be released to Teman.  *See* Trial Tr. at 280, 283–85, 289; *see also*

DX 16.  At the Florida Bank of America branch, the images of the checks were scanned; from

there, they were sent to the Federal Reserve and then reviewed by Signature Bank in Manhattan,

for fraud.  *See id.* at 219–20, 684–86.  As a result, on April 24, 2020, before the hold on the

GateGuard account was lifted, Bank of America completed a chargeback for $33,000 from the

A-1986

GateGuard account to the 518 West 204 LLC account at Signature Bank. *See* Trial Tr. at 223;

GX 113. On April 26, 2019, Bank of America lifted the hold and Teman began transferring the

funds from the GateGuard account to other accounts that he controlled. *See* Trial Tr. at 224–25

(Friend or Fraud account); *id.* at 226 (Touchless Labs account); *id.* (Teman's personal account);

*see also* GX 113. The evidence also showed that Teman, on May 8, 2019, withdrew $4,000 from

the Friend or Fraud account from a Bank of America branch in Manhattan. *See* Trial Tr. at 228,

231; GX 112–13.

### 2.    Applicable Legal Principles

"Both the Sixth Amendment and Fed. R. Crim. P. 18 require that a defendant be tried in

the district where his crime was committed." *United States v. Rutigliano*, 790 F.3d 389, 395

(2d Cir. 2015) (quoting *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011)). As the

Second Circuit has observed, "[t]he challenge, of course comes in determining what 'committed'

means for the purposes of a specific crime." *United States v. Kim*, 246 F.3d 186, 191

(2d Cir. 2001). To do so, courts look to "the nature of the crime alleged and the location of the

acts or acts constituting it." *United States v. Magassouba*, 619 F.3d 202, 205 (2d Cir. 2010)

(quoting *United States v. Cabrales*, 524 U.S. 1, 5 (1998)); *see also Kim*, 246 F.3d at 191 ("[T]he

Supreme Court directed courts to . . . identify the conduct constituting the offense and then

determine where that conduct occurred.").

"Venue may lie in more than one place if 'the acts constituting the crime and the nature

of the crime charged implicate more than one location.'" *United States v. Lange*, 834 F.3d 58,

68–69 (2d Cir. 2016) (quoting *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985)). For

such "continuing offenses," venue is proper where the offense "was begun, continued, or

completed." 18 U.S.C. § 3237(a); *see also United States v. Ramirez*, 420 F.3d 134, 139

(2d Cir. 2005) (explaining that Congress codified the rule of continuing offenses in 18 U.S.C.

§ 3237(a)).  Wire fraud and bank fraud are both continuing offenses.  *See Rutigliano*, 790 F.3d

at 396 & n.3; *see also Magassouba*, 619 F.3d at 207 (bank fraud); *Kim*, 246 F.3d at 191–92 (wire

fraud).

At times, courts in this Circuit have also applied the "substantial contacts test."  Under

that test, courts determining venue look also to "(1) the site of the crime, (2) its elements and

nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the

venue chosen for accurate factfinding."  *Ramirez*, 420 F.3d at 139 (citation omitted).  Not all

factors must be met to find venue.  *See United States v. Korolkov*, 870 F. Supp. 60, 62–64

(S.D.N.Y. 1994) (finding venue for bank fraud and wire fraud where first two factors not

satisfied).  The Circuit has clarified that the substantial contacts should only be applied when a

defendant "argues that his prosecution in the contested district . . . will result in a hardship to

him, prejudice him, or undermine the fairness of his trial."  *United States v. Ceplan*, 703 F.3d 46,

80 (2d Cir. 2012) (brackets omitted) (quoting *Magassouba*, 619 F.3d at 205 n.2).

The Government has the burden of proving venue, but, because venue is not an element

of a crime, it must be proven only by a preponderance of the evidence.  *Ramirez*, 420 F.3d

at 139.  Where, as here, an indictment charges multiple counts, "venue must be proper with

respect to each count."  *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188

(2d Cir. 1989); *see also United States v. Royer*, 549 F.3d 886, 893 (2d Cir. 2008).  When

reviewing each count for sufficiency of the evidence as to venue, the court must view the

evidence "in the light most favorable to the government, crediting 'every inference that could

have been drawn in its favor.'"  *Ramirez*, 420 F.3d at 139 (quoting *United States v. Rosa*,

17 F.3d 1531, 1542 (2d Cir. 1994)).

A-1988

> **3.    Application**
>
> *a.    Counts Two and Four — March 2019 Checks*

Count Two charges bank fraud and Count Four charges wire fraud in connection with the

two March checks. *See* S2 ¶¶ 2, 4. Teman's challenge to venue on these counts principally

consists of a factual dispute. He argues that the Bank of America spreadsheet did not reliably

establish that the mobile deposit had been made from within this District. He notes that the

records custodian from Bank of America who authenticated the bank's business records was not

asked, and so did not testify, about the geographic meaning of the reference on the spreadsheet to

"New York, NY." And, he argues that the spreadsheet's reference to "New York, NY" could

refer to any part of New York City, two of whose five boroughs (Manhattan and the Bronx) are

within this District and three of which (Brooklyn, Queens, and Staten Island) are not. Teman

notes that other references in the spreadsheet are to cities and not counties, *e.g.*, "Miami Beach,

FL" (not Miami-Dade County, FL). *See* Teman Mem. at 20–22.

At trial, the Government elicited from the Bank of America record custodian, senior

fraud investigator Finocchiaro, that the Bank of America spreadsheet reflects that the IP address

of the mobile deposits was "New York, NY." *See* Trial Tr. at 202. And, Finocchiaro explained,

unimpeached, that an IP address reveals the location of the device that was used to make the

mobile deposit. *See id.* at 203 (an IP address "gives a distinct location in which an online

banking login is being conducted"). But, because the Government omitted in its inquiry of her

the geographic meaning of "New York, N.Y." as used on this business record, the record as to

this factual issue is less conclusive than it might have been. Nevertheless, analysis of the

spreadsheets makes circumstantially evident—and certainly clear enough for a factfinder to find

by a preponderance—that "New York, NY" as used therein refers to Manhattan, *i.e.*, within this

District. That is because the bank's spreadsheet contains numerous explicit by-name references

to other boroughs in New York City (including to "Brooklyn, NY" and to "Bronx, NY").
However, it does not contain any references to "Manhattan, NY."

Viewed in that context, it is circumstantially persuasive, as the Government argues, that
the bank used the notation "New York, NY" to refer to Manhattan. *See* Gov. Mem. at 25; *see
also* Trial Tr. at 703–08 (argument on Rule 29(a) motion on this point). Applying the
preponderance of the evidence standard, a reasonable juror could find that Teman's mobile
deposit of the two checks was made via a mobile device then located in Manhattan. This
inference was consistent with evidence at trial regarding Teman's business relationships with
these Customers, all of whom were located in Manhattan and had GateGuard devices installed on
their buildings in Manhattan or the Bronx. *See, e.g.*, Trial Tr. at 310 (518 West 204 LLC); *id.*
at 415 (18 Mercer); *id.* at 486 (ABJ); *see also id.* at 314 (518 West 204 LLC representative
explaining that he met Teman at trade show in Manhattan).

With that factual question resolved in the Government's favor, the issue then is whether
the mobile depositing of these checks supports a finding of venue in this District on Counts Two
and Four. For the reasons that follow, the Court holds that it does, as to both counts.[25]

i.    Count Two: Bank Fraud

As noted, the bank fraud statute criminalizes the knowing execution, or attempted
execution, of a scheme "to defraud a financial institution," or a scheme to obtain money or
property owned by a financial institution through "fraudulent pretenses, representations, or
promises." 18 U.S.C. § 1344(1)–(2). Such a scheme "is, at least in most cases, a series of acts
designed to obtain money or property fraudulently, not simply . . . one specific act," rendering

---

[25] Because the Court finds that the location of the mobile deposits alone supports venue on these
counts, it has no occasion to consider whether other Manhattan activities relating to the March
2019 checks that the Government cites—including Signature Bank's Manhattan-sited fraud
review—support finding proper venue.

A-1990

bank fraud a continuing offense. *United States v. Bezmalinovic*, 962 F. Supp. 435, 437

(S.D.N.Y. 1997) (quoting *United States v. Washington*, 109 F.3d 459, 466 (8th Cir. 1997)).

Bank fraud thus may be prosecuted in any district where it is begun, continued, or completed.

*See* 18 U.S.C. § 3237(a).

        The fact, which the jury was entitled to find, that Teman made his mobile deposits of the

March 2019 fraudulent checks in Manhattan is sufficient to support venue here.  Venue is proper

in any district where the crime was committed.  *See Rutigliano*, 790 F.3d at 395–96.  Bank fraud

is committed when a scheme to defraud or to obtain money or property under false pretenses is

executed.  *See United States v. Kilkenny*, 493 F.3d 122, 128–29 (2d Cir. 2007).  The deposit of

fraudulent checks constitutes such an execution.  *See United States v. Hord*, 6 F.3d 276, 281–82

(5th Cir. 1993).

        Here, the jury could reasonably find, by a preponderance of the evidence, both that

Teman did not have authorization to deposit the checks and that the deposit took place in this

District.

        As to the former, the trial evidence, viewed in the light most favorable to the verdict,

gave the jury an ample, if not overwhelming, basis to find that Teman lacked authorization to

create and deposit these checks, and that when he when did so, he was attempting to mislead

Bank of America and Signature Bank into believing that he had such authorization.

Representatives of both Customers on whose accounts the March 2019 checks were drawn, 518

West 204 LLC and 18 Mercer, credibly testified that Teman had not discussed such debts, let

alone the creation and deposit by Teman of checks drawn on the Customer accounts to pay them,

with either Customer.  *See, e.g.*, Trial Tr. at 326, 343–44 (518 West 204 LLC); *id.* at 421, 434,

441 (18 Mercer).  Both flatly denied authorizing him to take money from their accounts.  *See,*

*e.g.*, *id.* at 357–58, 361–63 (518 West 204 LLC); *id.* at 428–29, 441, 474–75 (18 Mercer).

Teman nevertheless created and deposited the two checks, each bearing language implying that

the Customers had consented to his creating and negotiating checks drawn to his company.

Thus, the checks stated, "DRAW PER CONTRACT. NO SIGNATURE REQUIRED[,]" and the

illegible signature that Teman placed on them also tended to falsely connote the checks' approval

by some person other than Teman. *See* GX 201–02. Moreover, documentary evidence—which

the Government elicited during Teman's ill-conceived attempt to develop an advice of counsel

defense—confirmed Teman's motive to engage in such audacious conduct: to shore up his

company's finances. *See* Trial Tr. at 807–08; *see also* GX 704. It also established that Teman

had been advised in advance by counsel not to withdraw the money, as doing so was a bad idea

that could lead to his arrest, imprisonment, and prosecution. GX 702.

      As to the latter, the evidence, as noted, was sufficient for a jury to find that Teman had

made the mobile deposits of the fraudulent checks while in Manhattan, as opposed to a part of

New York City outside of this District. On this basis, a reasonable jury could find, by a

preponderance, that Teman, incident to his scheme to defraud by creating and depositing checks

on the false pretense that he had Customer authority to do so, deposited the March 2019 checks

from Manhattan.

<div align="center">ii.    Count Four: Wire Fraud</div>

      Wire fraud is committed when a person who has devised a scheme to defraud or to obtain

money or property by false or fraudulent pretenses, representations, or promises, transmits an

interstate wire or causes such a wire to be transmitted. 18 U.S.C. § 1343. The Second Circuit

"has found that one causes a wire transmission when he 'act[s] with knowledge that the use of

the wires would follow in the ordinary course of business, or if such use could reasonably have

been foreseen.'" *Kim*, 246 F.3d at 190 (internal quotation marks omitted) (quoting *United States*

A-1992

*v. Zichettello*, 208 F.3d 72, 106 (2d Cir. 2000)).  Like bank fraud, wire fraud is a continuing offense.  *Rutigliano*, 790 F.3d at 396.  Therefore, for venue, the evidence must show that part of the wire fraud was begun, continued, or completed in this District.  *See* 18 U.S.C. § 3237(a).  It is sufficient to show that "a wire in furtherance of a scheme begins its course, continues or ends" in this District.  *Rutigliano*, 790 F.3d at 397 (explaining venue lies in such places).

Here, too, for much the same reasons as for the bank fraud count, venue for wire fraud is supported by the fact, which the evidence empowered the jury to find, that Teman's mobile deposits occurred in Manhattan.  Moreover, the deposit resulted in electronic communications being sent from Manhattan to Bank of America servers in Texas as part of the process by which the checks were negotiated.  *See* Trial Tr. at 203–04.  These electronic communications too supported venue for the wire fraud count, as it was reasonably foreseeable that a mobile deposit would result in interstate wire communications from the point of deposit incident to processing the check.

The Court accordingly finds that there was sufficient evidence to support venue on Count Four.

> *b.*     *Counts One and Three — April 2019 Checks*

Count One charges bank fraud and Count Three charges wire fraud in connection with the April checks.  *See* S2 ¶¶ 1, 3.  Teman argues that his bank and wire offenses with respect to the April checks were complete when he deposited the checks in Florida or, at the latest, when Bank of America cleared the hold on his account and the funds became available to him.  *See* Teman Mem. at 19; Teman Reply at 12.  The Government, emphasizing that bank and wire fraud are continuing offenses, notes that Teman's scheme lasted beyond those points and was aimed at securing for himself the fruits of the fraud.  *See* Gov. Mem. at 22–24.  The import of the Government's argument is that Teman's scheme required deceiving both the depositary *and*

56

drawee banks as the validity of the checks so as to enable him to withdraw the funds he had

deposited. *See id.* at 24.  On this presentation of the scheme, it argues that venue may be found

based on any of three acts within this District: (i) Teman's withdrawal of $4,000 from the

Manhattan Bank of America branch, which, the Government contends, represented proceeds of

the scheme and exposed Bank of America to greater loss; (ii) the interstate wire that was a

component of Signature Bank's review of the checks in Manhattan; or (iii) undated phone

conversations and text message conversations between ABJ representative Soleimani, from his

Manhattan office, and Teman, from Florida. *See id.* at 23–24.

 The Court finds that, although the venue question as to Count One is close, the evidence

ultimately was sufficient to permit a reasonable jury to find, by a preponderance of the evidence,

venue as to both Count One and Count Three.

### iii. Count One: Bank Fraud

 As noted, bank fraud is a continuing offense. *See Rutigliano*, 790 F.3d at 396 & n.3;

*Magassouba*, 619 F.3d at 207.[26]  Bank fraud therefore may be prosecuted in any district where it

---

[26] Teman disputes this proposition and faults the Government for citing *Rutigliano*, 790 F.3d
at 396 n.3, and *Magassouba*, 619 F.3d at 207, as support for it. Teman Reply at 11.  Teman's
main argument is that these cases rely on *Duncan*, 42 F.3d at 104, which involved a conspiracy
charge.  Teman is wrong.  *Duncan* considered and sustained both a conspiracy charge and a
substantive bank fraud charge. *See id.* at 99.  Venue was independently required for each charge.
That is because, "[w]here . . . a defendant is charged with conspiracy as well as substantive
offenses, venue must be laid in a district where all counts may be tried.  Thus, the venue
potential in a conspiracy case for the prosecutor to choose from is narrowed by the substantive
counts the government wishes to prosecute." *United States v. Saavedra*, 223 F.3d 85, 89
(2d Cir. 2000).  The finding of venue in *Duncan* on a continuing offense theory thus applies to
the substantive bank fraud count as well.  In any event, the Second Circuit has squarely held in
favor of the Government on this point.  In *Magassouba*, which involved a predicate substantive
bank fraud offense, the Circuit stated: "It is well established that bank fraud is a continuing
offense," *Magassouba*, 619 F.3d at 207.  Other circuits have held the same for the purposes of
venue, *see, e.g.*, *United States v. Bankole*, 39 F. App'x 839, 842–43 (4th Cir. 2002); *United
States v. Scott*, 270 F.3d 30, 36 (1st Cir. 2001); *United States v. Naajor*, 255 F.3d 979, 983
(9th Cir. 2001); *United States v. Dupre*, 117 F.3d 810, 822 (5th Cir. 1997); *Washington*, 109 F.3d

A-1994

is begun, continued, or completed. *See* 18 U.S.C. § 3237(a). Consequently, the inquiry here is

whether any of the three acts in this District that the Government argues support venue occurred

as part of the continuing scheme or whether the scheme had already been completed. The Court

finds that, of the three, only the Signature Bank review is properly characterized as a

continuation of the bank fraud scheme, but that it is sufficient to support venue on this count.

It is important at the threshold to clarify the nature and object of Teman's Count One

bank fraud scheme. The evidence, viewed in the light most favorable to the verdict, showed that

Teman attempted to mislead both Bank of America and each drawee bank into believing he was

authorized to deposit the April checks and that they should therefore honor the checks.

Significantly, by mid-April, as a result of the hold and chargebacks that he had experienced in

connection with the March checks, Teman was on notice that the depositary and the drawee

banks would review checks that he fabricated on the Customers' accounts, and that he could be

denied access to the funds by either the depositary bank or the drawee bank on its ensuing

review. He notified his attorney about the holds on the March checks and was advised not to

deposit such checks again. *See* GX 704. Undeterred, Teman created a new round of RCCs

beginning in mid-April. Like the March checks, these, on their face, stated that the checks were

"DRAW[N] PER CONTRACT. NO SIGNATURE REQUIRED." GX 203–05. But the face of

Teman's April checks included additional language: a "NOTE TO BANK" that stated "[t]his is a

valid check. You are required by law to honor it." *Id.* The April checks also included a link to

the GateGuard Terms and Conditions, which in turn included, several pages in, a link in the

---

at 466; *United States v. Hubbard*, 889 F.2d 277, 280 (D.C. Cir. 1989). The issue here is not
therefore the conceptual one of whether bank fraud is a continuing offense. It is the case-specific
one of whether the bank fraud offense charged here was complete or ongoing at the time the
contacts in this District occurred, and, if ongoing, whether those contacts were of a nature to
support venue.

A-1995

middle of a paragraph to the Payment Terms. *Id.*; T&C at 5.  As noted, Teman's contention—although uniformly refuted by his Customers—was that they had assented to these Payment Terms and thereby authorized him to draw checks on their accounts for debts due.  A jury could reasonably view the added notations on Teman's April checks as aimed at increasing the chances that the checks would survive review at both the depositary and drawee banks so as to permit Teman to access the deposited funds.[27]  Although the Signature Bank review and the resulting chargeback cabined the size of his withdrawal, Teman—as soon as the hold was lifted from his account and he had access to the funds—transferred most of the balance from the GateGuard account, presumably to lessen his exposure to any later chargebacks.  *See* Trial Tr. at 224–26; GX 113.

        The Court now examines, in light of the above understanding of Teman's bank fraud scheme, the Government's three theories of venue.

        *Withdrawal of $4,000 on May 8*:  Teman's withdrawal, on May 8, 2019, of $4,000 at a Bank of America branch in Manhattan is insufficient to supply venue.  That is because, even acknowledging the time span of the scheme as presented above, the withdrawal occurred after the bank fraud was complete.  Section 1344 criminalizes "each *execution* of a fraudulent scheme, not each act in furtherance of such a plan," *Kilkenny*, 493 F.3d at 128 (emphasis in original), so the crime is complete after the scheme has been executed.  *See United States v. De La Mata*,

---

[27] In another modification of his March modus operandi, Teman—apparently to reduce the risk that his customers would receive prompt notice of the large checks he had drawn on their accounts and act to void these checks—deposited the checks on the Friday of Passover.  Because the principals of 518 West 204 LLC and ABJ were observant Jews, they would not access their electronics over the weekend.  *See* Trial Tr. at 367–69 (518 West 204 LLC); *id.* at 564–65 (ABJ).  The Government introduced evidence that Teman was aware of the religious practices of these Customers.  *See* GX 417 at 1 (email from Teman threatening to place lien on 518 West 204 LLC's building during Passover); GX 405 at 1 (email from Teman stating that Soleimani, the ABJ representative, said he would invite Teman to a Passover seder).

A-1996

266 F.3d 1275, 1287 (11th Cir. 2001). To determine when the scheme was executed, "courts look to a number of factors, including the overall contours of the fraudulent scheme and—perhaps most importantly—the point at which the financial institution was put at risk of financial loss." *Kilkenny*, 439 F.3d at 128; *see also United States v. Anderson*, 188 F.3d 886, 888 (7th Cir. 1999) ("[T]he crime of bank fraud is complete when the defendant places the bank at a risk of financial loss, and not necessarily when the loss itself occurs.").

Here, Teman deposited the 27 checks at a Florida branch of Bank of America and, following a seven-day hold on the funds, received access to those funds. *See* Trial Tr. at 280, 283, 289. Once Bank of America released the hold on the funds, Teman's scheme was complete. The purpose of the hold was to allow both Bank of America and the drawee banks to conduct their reviews. *See id.* at 285. Under settled case law, once Bank of America granted Teman access to, and control of, the funds, "the bank put itself at risk for losing the entire amount of the check[s], and the subsequent withdrawal[] did not create an additional risk." *United States v. Ajayi*, 808 F.3d 1113, 1124 (7th Cir. 2015); *see also, e.g.*, *Anderson*, 188 F.3d at 891 ("Any scheme [defendant] may have conceived was completed upon receipt of the funds. The mere act of transferring money from one bank account to another was not part of the original scheme to defraud, nor did it create a new financial risk . . . . Once [defendant] had control of the money, the scheme ended."); *United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir. 1999) ("[W]e have no trouble in deciding that the bank fraud was a completed crime when [defendant] fraudulently obtained the deposit of the proceeds of the check into his account, with the intent at that time to eventually withdraw money from that account for his own use."); *Hord*, 6 F.3d at 281 ("It is the deposits, not [defendant's] withdrawal attempts, that constitute executions of the scheme."); *cf. Rutigliano*, 790 F.3d at 397 (noting, in context of wire fraud, that "a scheme to defraud is not

A-1997

complete until the proceeds have been received" (quoting *United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013)). Consequently, Teman's Manhattan withdrawal on May 8 did not represent the beginning, continuation, or completion of the bank fraud. It thus cannot support venue for Count One.[28]

In support of its position that the May 8 withdrawal supplies venue, the Government cites *Magassouba*. *See* Gov. Mem. at 23, 24. There, the Circuit considered whether venue was proper in this District for an aggravated identity theft count predicated on a bank fraud offense. *See Magassouba*, 619 F.3d at 203. The Circuit held that because venue was proper for bank fraud, it was also proper for identity theft. *See id.* at 204–06. In connection with the bank fraud count, the Circuit stated that it was "undisputed that venue was properly laid in the Southern District of New York." *Id.* at 204. That was because the defendant fraudulently caused money to be transferred from a credit card account of a Brooklyn businessman and deposited into the defendant's JPMorgan Chase bank account in this District, and he later twice withdrew money from Bronx Chase branches. *Id.*; *see also Barrie v. United States*, No. 07 Cr. 158 (RPP), 2012 WL 5464413, at *2 (S.D.N.Y. Nov. 9, 2012) (describing evidence relating to scheme in more detail). But *Magassouba* is inapposite because the Circuit there did not hold that venue was proper *because* of the defendant's later withdrawal of the fruits of the bank fraud. Instead, it noted that the defendant did not contest venue as to bank fraud. Nor could he, as the funds had initially been deposited into his bank account, located in this District. Analogously, venue on a

---

[28] Teman potentially could have faced other charges for the withdrawal, including for money laundering. That the withdrawal of funds could have been prosecuted under a different statute does not, however, extend the duration of the bank fraud scheme. *See, e.g.*, *Gregg*, 179 F.3d at 1315–16 (holding that bank fraud scheme was complete when defendant deposited funds from scheme into his account but that his later withdrawal of those funds supported money laundering charge).

A-1998

site-of-deposit theory could have existed here had Teman's initial deposit of the unauthorized

checks occurred in Manhattan.  The evidence, however, situated the deposit in Florida.

*Signature Bank's fraud review*:  The Government next relies on Signature Bank's fraud

review of the checks, which took place in Manhattan.  Signature Bank was the bank for 518

West 204 LLC, one of the entities whose funds Teman attempted fraudulently to obtain via the

April checks.  Signature Bank flagged the checks drawn on 518 West 204 LLC's account, *see*

Trial Tr. at 684–85, causing Bank of America to issue a $33,000 chargeback to the 518 West 204

LLC account, *see id.* at 221–23; GX 113.

Unlike Teman's withdrawal, Signature Bank's review occurred during the pendency of

the scheme.  It took place before the hold on Teman's account was lifted and the funds were

released to him, *i.e.*, before the bank fraud was completed.  *See* GX 113 (showing deposit on

April 19, 2019; Signature Bank chargeback on April 24, 2019; and transfers to the Friend or

Fraud and Teman's personal account on April 26, 2019).  Therefore, the question is whether, for

the purposes of § 3237(a), the Signature Bank review was a continuation of the crime.

The Court finds that it was.  It was part of the scheme that the unauthorized checks be

constructed so as to clear review by Bank of America and the drawee banks, including Signature

Bank, and to enable Teman to gain access to the funds.  To obtain the money he sought, it was

necessary for Teman to deceive both banks.  The drawee bank's review is sufficient for venue

because "venue is proper in a district where (1) the defendant intentionally or knowingly causes

an act in furtherance of the charged offense to occur in the district of venue or (2) it is

foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*,

347 F.3d 471, 483 (2d Cir. 2003).  Here, the second prong is met:  It was foreseeable both that

A-1999

Signature Bank would conduct a fraud review of the April 19, 2019 checks and that the review would take place in Manhattan.

First, it is foreseeable that a deposit of an unauthorized check could trigger a fraud review. It was particularly foreseeable that Signature Bank would review checks of this nature—it had done so the previous month for similar checks deposited by Teman. The evidence showed that one of the unauthorized checks that Teman deposited on March 28, 2019, was drawn on 518 West 204 LLC's account.[29] *See* GX 147; GX 201. Bank of America had placed a hold on funds from those checks, *see* GX 704; GX 727, and Signature Bank conducted a fraud review of that check and flagged it for fraud, *see* Trial Tr. at 674–81. On April 2, 2019, Bank of America completed a chargeback from the GateGuard account to 518 West 204 LLC's account. *See* GX 113; *see also* Trial Tr. at 681–82; GX 145 at 17 (bank statement for 518 West 204 LLC's account). These reviews took place before April 19, 2019, putting Teman on actual notice of the fact that Signature Bank was apt to review a second set of such checks.

Second, it was foreseeable that the review would take place in Manhattan. Teman had conducted business with 518 West 204 LLC in Manhattan, and knew that 518 West 204 LLC had an account with Signature Bank, also located in Manhattan. The March 28, 2019 check, which Teman claimed was an RCC that he had created, stated on its face that it was from Signature Bank, located at 485 Madison Ave., 11th Floor, New York, NY 10022. *See* GX 147; GX 201; *see also* Trial Tr. at 195. Given Signature Bank's Manhattan location, it was foreseeable that a fraud review would take place in Manhattan. *Cf. Kim*, 246 F.3d at 192–93

---

[29] The second check that Teman deposited on March 28, 2019 was drawn on the account of 18 Mercer, which also had its bank account with Signature Bank. *See* Trial Tr. at 682–83. Signature Bank also flagged that check for fraud, and Bank of America completed a chargeback to the 18 Mercer account. *See id.* at 683–84; *see also* GX 113.

(venue proper for wire fraud where defendant, who was not located in, and did not personally send communications to, this District, "caused communications to be transmitted into and out of the Southern District when he approved fraudulent invoices knowing that [the defrauded entity] paid its vendors from New York banks"). Therefore, Signature Bank's fraud review, a hurdle Teman needed to clear by fraudulent means to gain the money he sought, is sufficient to support venue in this District.

*Soleimani phone and text messages*:  Finally, the Government relies on phone and text message conversations that Soleimani stated he had with Teman, while Soleimani was located in Manhattan and Teman, at times, was located in Florida. *See* Trial Tr. at 569–70. While communications to and from this District are generally sufficient to support venue, *see Kim*, 246 F.3d at 192, these specific communications fall short. That is because Government has not adduced evidence as to when these communications occurred. *See* Trial Tr. at 569–70 (Soleimani explaining that he had phone conversations with Teman when Soleimani was in his Manhattan office, where he has been located for "[a]bout two years"). The evidence was thus insufficient evidence for a jury to find by a preponderance that any of these such communications occurred during the time frame charged in Count One, approximately April through June 2019, *see* S2 ¶ 1. *See Beech-Nut Nutrition Corp.*, 871 F.2d at 1190 (explaining that even for continuing violations, acts that are "merely prior and preparatory to" offense cannot support venue).

           iv.       Count Three: Wire Fraud

Like bank fraud, wire fraud is a continuing offense, *Rutigliano*, 790 F.3d at 396, and may be prosecuted where it was begun, continued, or completed, *see* 18 U.S.C. § 3237(a). An integral part of a wire fraud scheme is causing interstate wires to be sent. As discussed *supra*, a defendant causes a wire to be sent when use of the wire could be reasonably foreseen. *Kim*,

A-2001

246 F.3d at 190.  When such a wire begins, continues, or ends in this District, there is venue

here.  *See Rutigliano*, 790 F.3d at 397.

     As with bank fraud, venue for Count Three of wire fraud is supported by the wire that

instigated the Signature Bank fraud review in Manhattan, which Teman's scheme, to succeed,

was required to clear.  After Teman deposited the checks at the Bank of America branch in

Florida, images of those checks were sent to the Federal Reserve and then to Signature Bank in

Manhattan.  *See* Trial Tr. at 219–20, 653, 684–86.  Teman is fairly found to have caused these

wire transmissions to be sent, as it was reasonably foreseeable, for the reasons discussed *supra*,

that these checks would be subjected to Signature Bank's fraud review in this District.  Signature

Bank's reception of the check images in Manhattan is sufficient for venue here.  *See Kim*,

246 F.3d at 191–92 (affirming finding that "wire is 'transmitted' both where it was sent and

where it was received," and that venue was proper in this District when defendant caused

communications to be sent to and from Manhattan bank); *see also Rutigliano*, 790 F.3d at 398

(although doctrine that "a scheme to defraud is not complete until proceeds have been received"

has some limit, "at least the first wiring (and many more) must be deemed in furtherance" of

crime).

     Accordingly, there was sufficient evidence for a reasonable jury to find by a

preponderance of the evidence that venue lay in this District for all counts.

<div align="center">v.     Substantial Contacts Test</div>

     In a separate argument apparently aimed at defeating venue on Counts One and Three,

Teman argues that the Court should apply the substantial contacts test and find insufficient

evidence to demonstrate such contacts.  *See* Teman Mem. at 19–20; Teman Reply at 14.  The

Court finds that the substantial contacts test is not applicable here.

<div align="center">65</div>

A-2002

As noted, the substantial contacts inquiry is appropriate only where the defendant shows that venue "will result in a hardship to him, prejudice him, or undermine the fairness of his trial." *Coplan*, 703 F.3d at 80 (brackets omitted) (quoting *Magassouba*, 619 F.2d at 205 n.2). "This limitation arises directly out of the purpose of the substantial contacts test: to safeguard against hardship to the defendant that may arise when a continuing offense lays venue in numerous districts, some of which are remote." *Gross*, 2017 WL 4685111, at *37. Teman argues that he suffered a hardship because he lives in Florida and had to travel to New York for his trial, and because he was not judged by a jury of his "peers" as the jurors did not also reside in Florida. Teman Reply at 14. Although perhaps inconvenient, Teman's travel does not rise to the level of hardship or prejudice, given the ease of such travel in today's time. *See United States v. Chait*, No. 17 Cr. 105 (JMF), 2017 WL 6502228, at *1 (S.D.N.Y. Dec. 18, 2017) (holding substantial contacts test was not applicable where defendant resided in California and evidence or witnesses may have existed in California, "given technology and the ease of travel"). Teman failed even to point to any evidence or witnesses in Florida—all of the business relationships and transactions in this case were with New York customers. And insofar as all three groups of Teman's customer victims were situated and banked in Manhattan, Teman's claim of a right not to be tried in this District is frivolous.

Even if the substantial contacts test were applicable, it would support venue in this District. Although the first factor under the substantial contacts test—the site of Teman's actions, *i.e.*, depositing the checks in Florida—does not favor venue in this District on Counts One and Three, the other factors all strongly do. The second factor, which considers the elements and nature of the crime, supports venue because the elements of both offenses include a scheme to defraud, and, as reviewed above, aspects of those schemes occurred in New York. In

66

addition, wire fraud requires that the defendant use or cause an interstate or foreign wire to be used, and here at least one such wire—the routing of images of the checks from the Florida Bank of America branch, to the Federal Reserve, to Signature Bank in Manhattan for a fraud review—contacted this District. The third factor, which focuses on the place where the effect of the criminal conduct is felt, emphatically favors this District. Teman conducted business with entities in this District by providing their residential buildings with his GateGuard devices. It was from those entities' accounts that Teman attempted to steal funds via fraud. Teman's business ties to these New York businesses facilitated this bank and wire fraud scheme. Finally, the fourth factor of the venue's suitability for factfinding also supports venue here. The main witnesses for these checks—principals of ABJ Lenox LLC, ABJ Milano LLC, and 518 West 204 LLC—are located here, as is evidence related to the businesses and banks of those entities. In short, while Teman lives in Florida and the Bank of America branch in which he deposited the fraudulent checks is located in Florida, the balance of relevant conduct and personnel were situated here. As such, there are sufficient contacts with this District to provide for venue.

## IV.    Rule 33 Motion

As an alternative to his Rule 29 motion for judgment of acquittal, Teman argues that this Court should grant him a new trial under Rule 33. In addition to the grounds reviewed above, he seeks this relief on three grounds: (1) that the Government allegedly violated Federal Rule of Evidence 615, *i.e.*, the rule of sequestration; (2) that the Court erred in excluding testimony from his proposed expert witness; and (3) that an alternate juror purportedly lied during *voir dire*.[30] The Court addresses these new arguments in turn.

---

[30] Teman also incorporates his Rule 29 arguments in his Rule 33 motion. For the same reasons reviewed in connection with the Rule 29 motion, the Court denies the Rule 33 motions based on these arguments.

A.      **Rule of Sequestration**

    1.      **Pertinent Background**

On January 22, 2020, after the jury was selected, Teman invoked his rights under Federal

Rule of Evidence 615, the rule of sequestration, to exclude witnesses from the courtroom.  Trial

Tr. at 154.  Defense counsel explained that he was requesting that "when a potential witness has

yet to testify, . . . they can't sit in the room to hear other witnesses, or opening statements, or

something of that nature."  *Id.*  The Government made a parallel application as to Teman's

witnesses.  *Id.*  The Court granted the applications.  *See id.*  The Court allowed Detective

Alessandrino, the lead agent on the case and a potential witness, to remain at the Government's

table as a party agent.  *Id.* (citing Rule 615).

On the afternoon of January 23, 2020, the jury was dismissed for the day while Joseph

Soleimani, the ABJ representative, was still on direct examination.  *See id.* at 514–15.  In the

post-trial conference, the Government indicated that it could rest the next morning.  *Id.* at 518.

As a result, the Court sought a non-binding indication whether defense counsel planned to call

any witnesses and invited but did not require defense counsel to respond.  *Id.*  Defense counsel

stated that, depending on Soleimani's responses on cross examination, he would consider calling

two NYPD detectives, including Detective Alessandrino.  *Id.* at 519.  According to defense

counsel, the other NYPD detective had taken statements from Soleimani, as reflected in the

police report, regarding ABJ's total loss resulting from Teman's scheme.  *Id.*  Specifically,

defense counsel represented that Soleimani originally told the NYPD detective that ABJ had not

authorized $180,000 in checks, but the evidence at trial established that ABJ's JPMorgan

account had been credited $196,000.  *Id.*  Defense counsel suggested that based on this

discrepancy between these sums, the jury could infer that some of the checks had, in fact, been

authorized by Soleimani.  *See id.* at 520–21.

68

The next morning, defense counsel alerted the Court to a phone call between the Government, Detective Alessandrino, and Soleimani that had taken place the night before, during which the Government "fronted, disclosed our potential cross-examination" on the discrepancy in loss amounts founded in Soleimani's statement, and "stole[] our thunder" as to that line of questioning. *See id.* at 537–38. Defense counsel alleged that the Government had violated the rule of sequestration by having this conversation with Soleimani while he was still on direct examination. *Id.* at 538. The Government responded that its communications with the witness were appropriate and designed "in part so that [the Government] could give the Court and the parties some more information about possible prior inconsistent statements" on Soleimani's part that might be claimed at trial. *Id.* The Government also disputed the existence of an inconsistent statement in the first instance, noting that Soleimani had never pinned himself down to a number when he initially reported the loss amount to the police and that it was merely a "ballpark estimate." *See id.* at 539. The Court rejected Teman's demand that Soleimani's witness's testimony be stricken in its entirety, finding the Government's interaction with the witness proper, and the defense's proposed area of potential impeachment, while permitted, "tertiary at best." *Id.*

    2.    **Applicable Legal Principles**

    Rule 615 authorizes the trial court, at the request of a party or *sua sponte*, to "order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. The Rule "codified a well-established common law tradition of sequestering witnesses as a means of discouraging and exposing fabrication, inaccuracy, and collusion." *United States v. Jackson*, 60 F.3d 128, 133 (2d Cir. 1995) (internal quotation marks and citation omitted). By restraining witnesses' ability to "'tailor[]' their testimony to that of earlier witnesses," the rule "aids in

detecting testimony that is less than candid," thus promoting the truth-seeking function of trial. *See id.* (citing *Geders v. United States*, 425 U.S. 80, 87 (1976)).

Under Rule 615, sequestration is a matter "of right"—when a party requests sequestration, the court must allow for it. *Id.* at 134 (Fed. R. Evid. 615 advisory committee's note to 1972 amendments). "However, this general rule has an exception for a witness who is 'an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney.'" *United States v. Lee*, 834 F.3d 145, 162 (2d Cir. 2016) (citing Fed. R. Evid. 615(b)). The court has discretion, under this exception, "to exempt the government's chief investigative agent from sequestration." *United States v. Rivera*, 971 F.2d 876, 889 (2d Cir. 1992); *see also Jackson*, 60 F.3d at 147 ("[T]he exclusion of a single agent from sequestration does not generally constitute error under Rule 615."); *Rivera*, 971 F.2d at 889 ("[I]t is well settled that such an exemption is proper under Rule 615[(b)], deeming the agent-witness a 'representative' of the government."); *United States v. Pellegrino*, 470 F.2d 1205, 1208 (2d Cir. 1972) ("Since the chief investigating agent may be of significant help to the prosecution during the course of a trial, the trial court has discretion to make an exception to the general rule of sequestration of witnesses in his case.").

"While the purpose of [Rule 615] is apparent, its purview is not." *United States v. Solorio*, 337 F.3d 580, 592 (6th Cir. 2003) (quoting Charles Alan Wright & Victor James Gold, 29 Federal Practice and Procedure § 6243, at 61 (1997)). Some circuits have found or suggested that Rule 615 may preclude out-of-court communication between witnesses during trial revealing developments at trial. *See, e.g., United States v. McMahon*, 104 F.3d 638, 644 (4th Cir. 1997) (district court did not err by finding that defendant's father, knowing that he was barred from the courtroom, had violated sequestration order by having secretary take notes on others' testimony);

A-2007

*Milanovich v. United States*, 275 F.2d 716, 720 (4th Cir. 1960), *rev'd in part on other grounds*,

365 U.S. 551 (1961) ("We wish to indicate our view, however, that ordinarily, when a judge

exercises his discretion to exclude witnesses from the courtroom, it would seem proper for him

to take the further step of making the exclusion effective to accomplish the desired result of

preventing the witnesses from comparing the testimony they are about to give."); *United States v.*

*Greene*, 293 F.3d 886, 892 (5th Cir. 2002) (district court's failure to instruct government

witnesses, who were housed together, not to discuss case violated Rule 615); *United States v.*

*Womack*, 654 F.2d 1034, 1041 (5th Cir. 1981) (assuming, without explicitly deciding, that Rule

615 was violated when parties invoked Rule 615, trial court did not instruct witnesses not to

discuss the case, and two government witnesses admitted communicating about testimony while

sequestered); *United States v. Prichard*, 781 F.2d 179, 183 (10th Cir. 1986) (district court erred

in finding that Rule 615 requires only that witnesses be excluded from courtroom); *United States*

*v. Johnston*, 578 F.2d 1352, 1355 (10th Cir. 1978) (trial court should instruct, upon invocation of

Rule 615, that "witnesses are not only excluded from the courtroom but also that they are not to

relate to other witnesses what their testimony has been and what occurred in the courtroom");

*United States v. Lattimore*, 902 F.2d 902, 903 (11th Cir. 1990) (parties agreed that sequestration

order was violated when government witnesses discussed their testimony).[31]

---

[31] While circuits apply different tests to assess whether the party seeking sequestration was
prejudiced, *see Jackson*, 60 F.3d at 136, the circuits have not automatically required that the
violating witness's testimony be excluded or that a verdict be overturned, even when there were
violative out-of-court communications between witnesses. *See United States v. Cortina*,
73 F.3d 359, 1996 WL 1792, at *4 (4th Cir. 1996) (table) ("When an out-of-court violation is
brought to the attention of the trial court, the court's decision to declare a mistrial, to exclude
witness testimony, to hold responsible parties in contempt, or to let the trial proceed unabated is
reviewed for abuse of discretion."); *see also, e.g., Womack*, 654 F.2d at 1040 ("The
determination whether to declare a mistrial or to order a new trial for violation of Rule 615 is a
matter within the trial court's sound discretion."); *Prichard*, 781 F.2d at 183–84 (no abuse of

A-2008

Other circuits have declined to find that Rule 615 prohibits out-of-court communication, while acknowledging that trial judges have substantial discretion to fashion orders that govern witness interactions beyond the walls of the courtroom. *See, e.g.*, *United States v. Sepulveda*, 15 F.3d 1161, 1175–76 (1st Cir. 1993) (observing that "while the common law supported sequestration beyond the courtroom," "Rule 615 contemplates a smaller reserve; by its terms, courts must 'order witnesses excluded' only from the courtroom proper" (citation omitted)); *United States v. De Jongh*, 937 F.2d 1, 2–3 (1st Cir. 1991) (no error where district court declined to strike witness testimony or declare mistrial when witness met with prosecutor before cross examination, and observing that "the district court possesses considerable discretion to make prophylactic orders designed to curb possible trial abuses, 'includ[ing] broad power to sequester witnesses before, during, and after their testimony'" (quoting *Geders*, 425 U.S. at 87)); *United States v. Solorio*, 337 F.3d 580, 592–94 (6th Cir. 2003) (noting that Sixth Circuit has not explicitly resolved whether Rule 615 precludes witness communication outside of the courtroom, but, even assuming rule was violated by such communications, finding no abuse of discretion where district court declined to exclude or strike witness's testimony); *United States v. Kindle*, 925 F.2d 272, 276 (8th Cir. 1991) (no abuse of discretion in district court declining to declare mistrial where case agents communicated with sequestered witnesses, observing that "[t]he

---

discretion in denying new trial and declining to conduct evidentiary hearing regarding violating witnesses' discussions); *Johnston*, 578 F.2d at 1355–56 (no abuse of discretion in declining to exclude violating witness's testimony); *Lattimore*, 902 F.2d at 903–04 (observing that "[t]he law in this Circuit is settled, however, that the '[t]he district court's denial of a mistrial for violation of the sequestration rule is . . . a matter of discretion, and reversible only on a showing of prejudice,'" and finding no abuse of discretion in denying mistrial (citation omitted)); *cf. United States v. Holder*, 150 U.S. 91, 92 (1893) ("If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground, merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court.").

record does not indicate that the trial court's sequestration order prohibited agent-witness contact and such order need not do so to meet the requirements of Rule 615").

The Second Circuit has not weighed in explicitly on the breadth of Rule 615.[32]  Some courts in this District, however, have held that Rule 615 does not apply more broadly than its plain terms, *i.e.*, to exclude witnesses from the courtroom so they cannot hear the testimony of other witnesses.  *See United States v. Ianniello*, 740 F. Supp. 171, 189–90 (S.D.N.Y. 1990)[33] ("[T]he Court does not believe that Rule 615 F[ed]. R. Evid. should be extended beyond its plain meaning. Obviously[,] any witness can be examined or cross-examined as to his or her credibility as to any transcripts, etc. which may have been read prior to testifying.  Such prior activity at most affects the weight of testimony rather than its admissibility." (internal citation omitted)); *United States v. Feola*, 651 F. Supp. 1068, 1130 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) ("Rule 615 only requires that witnesses be excluded 'so that they cannot hear the testimony of other witnesses[.]'  The witnesses need not be sequestered during pretrial proceedings, or after their testimony; they can speak freely to anybody and if they do so, may be cross-examined with respect thereto insofar as may relate to bias or credibility." (internal citation omitted)).

"The burden to demonstrate lack of prejudice, or harmless error" from a Rule 615 violation "falls on the party that had opposed sequestration." *Jackson*, 60 F.3d at 136.  In other words, a Rule 615 violation, if found, is presumptively prejudicial, and "a new trial is in order

---

[32] In *United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988), the Circuit observed that witnesses' reading of trial transcripts "*may* violate an order excluding witnesses issued by a district court under Rule 615." *Id.* at 568 (emphasis added).  However, the Circuit there noted that "[t]he decision whether or not to exclude testimony . . . is within the sound discretion of the trial judge," and affirmed the district court's decision refusing to do so.  *Id.* at 568–69.

[33] *Ianniello* has a long and complex subsequent history, none of which is relevant here.

A-2010

unless it is manifestly clear from the record that the error was harmless or unless the prosecution proves harmless error by a preponderance of the evidence." *Id.* at 137 (internal quotation marks and citations omitted).

### 3.    Application

Teman's Rule 615 argument is two-fold.  First, he contends the Government violated Rule 615 by speaking with Soleimani—in a conversation that included its case agent, a potential witness—about potential cross-examination topics while Soleimani remained on direct examination.  Teman Mem. at 28–29; Teman Reply at 15–16.  Second, anticipating a formalistic view of Rule 615 that requires only that prospective witnesses leave the courtroom while others are testifying, Teman invokes, and asks this Court to embrace, a broader interpretation of the rule that restricts witness communication of any kind (including outside of the courtroom) for the duration of trial.  *See* Teman Mem. at 26–28.  He contends that the Government's conduct here warrants a new trial.

Teman's sequestration argument fails for several reasons.  First, as Teman acknowledges, the Second Circuit has not held that Rule 615 extends beyond the courtroom to preclude out-of-court communications between witnesses during trial.  And, as other courts in this District have observed, *see Ianniello*, 740 F. Supp. at 189–90; *Feola*, 651 F. Supp. at 1130, the plain text of Rule 615 provides that witnesses must be sequestered *from the courtroom* so as not to hear the testimony of other witnesses, *see* Fed. R. Evid. 615.  Second, although the Court had the discretion to fashion sequestration orders that sweep more broadly than the Rule's text requires, it did not do so here (nor was it asked to).  Instead, the Court granted defense counsel's one application: to exclude witnesses from the courtroom.  *See* Trial Tr. at 154.  As a result, the conduct here—in which the Government and its agent, outside of court, communicated with

A-2011

Soleimani while on direct examination—did not violate either the text of the rule or the Court's sequestration order.

For avoidance of doubt, Teman's argument would fail even if this Court had adopted the broader construction of Rule 615 that other circuits have, to varying degrees, embraced. This is so for two reasons.

First, most of the cases that Teman cites concern a different issue: communication between *witnesses*. *See McMahon*, 104 F.3d at 644; *Prichard*, 781 F.2d at 183; *Johnston*, 578 F.2d at 1354–55.[34]  But the communications here were between Government counsel and the witness then testifying.  Teman therefore urges an expansive construction under which Rule 615 would prohibit a witness from speaking to *anyone* about the case for the duration of the trial.  *See* Teman Mem. at 26; Teman Reply at 15.  The Court declines to embrace such a broad construction of the rule, and is unaware of any authority supporting such a construction.

Second, Detective Alessandrino's presence on the call does not alter this outcome.  It is customary for the Government to have its case agent present for interviews with fact witnesses. Such helps avoid the potential need to call an advocate as a witness where the content of the interview emerges as a trial issue.  Here, as the Government explained to the Court, the purpose of the call was the familiar one in which trial counsel alerts a witness to possible inconsistencies in his testimony so as to prepare for cross examination.  It was not to facilitate dialogue between

---

[34] Teman also relies heavily on dicta in *Perry v. Leeke*, 488 U.S. 272 (1989), which states that "nondiscussion orders are a corollary of the broader rule that witnesses may be sequestered to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say, and to increase the likelihood that they will confine themselves to truthful statements based on their own recollections." *Id.* at 281–82.  That case is also inapposite, as it did not focus on whether Rule 615 forbids out-of-court communications between witnesses.  Instead, it held that while a defendant is testifying, he does not have a constitutional right to discuss that testimony with his lawyer. *Id.* at 284.  In its explanation, the Court further clarified that it was not holding that trial courts must forbid such consultation between defendants and their counsel. *Id.*

Soleimani and Alessandrino.  And Alessandrino's status as lead case agent, and the Court's explicit ruling that he could remain in the courtroom under Rule 615(b), exempted him from sequestration under the rule.  *See Rivera*, 971 F.2d at 889 (explaining that government's lead agent may be exempted from sequestration requirement at court's discretion); *see also* Fed. R. Evid. 615(b) (exempting from sequestration "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); Notes of Committee on the Judiciary, Senate Report No. 93-1277 (lead case agents fit into this Rule 615 exception).

To the extent that Teman's sequestration concern is related to the testimony that might have occurred had Teman called the second NYPD agent, there was no violation of Rule 615. That detective was not present when the Government inquired of Soleimani about his prior statement.  Teman's regret that the Government in witness preparation alerted Soleimani as to what a potential defense witness (the unnamed NYPD officer) might have said later at trial is not a concern of Rule 615, and the defense did not ask—as a condition of previewing its potential case—that the Government be ordered not to follow up with Soleimani.  This case is thus a far cry from ones in which a party challenges a district court's refusal to grant a timely request to sequester a witness.  *See, e.g.*, *Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 762 (2d Cir. 1998).  Here, Teman's counsel was at liberty not to answer the Court's inquiry as to its anticipated witnesses for the next day or to preview such witnesses' testimony.  Counsel was also at liberty to ask the Court to order the Government not to use the defense's preview as a basis for discussion with Soleimani.  Having not done so, defense counsel cannot claim a violation of any rule or order when the Government, as part of its preparation of Soleimani for cross examination, inquired into this area.

A-2013

Finally, even assuming *arguendo* that this Court erred by not *sua sponte* precluding communication between the Government and Soleimani on the topic fronted by the defense, the Court was well within its discretion not to exclude Soleimani's testimony. *See Friedman*, 854 F.2d at 568. And any such error surely did not bring about the "manifest injustice" required under Rule 33. *See Ferguson*, 246 F.3d at 134. Examining the entire case and considering all the facts and circumstances, the error falls far from raising a real "concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. As the Court noted when defense counsel raised the issue, the anticipated line of questioning whether $180,000 or $196,000 of the checks drawn by Teman on Soleimani's business's account were unauthorized was of trifling significance. *See, e.g.*, Trial Tr. at 520 (expressing "confusion as to what the purpose is" given that the alleged inconsistency of Soleimani's statement to law enforcement was unclear on its face); *id.* at 539 (finding "the whole area of potential impeachment elusive"); *id.* at 541 (referring to the disputed line of questioning as "exceedingly tangential"). And, as reviewed above, there was broad-ranging evidence that all three Customers disputed having authorized the fees in question, and there was no affirmative evidence (testimony or writings) that any such witness had done so. Teman's argument at trial instead was that GateGuard's Terms and Conditions and Payment Terms authorized him to draw such checks. And nothing prevented the defense, in its case, from calling the NYPD witness to offer testimony if the defense believed it afforded meaningful impeachment value. The Government was within its rights to inquire of Soleimani about this subject during the ensuing part of his testimony by introducing impeaching statements on direct examination. *See United States v. Ewings*, 936 F.2d 903, 909 (7th Cir. 1991) (fronting potential impeachment material on direct examination is a "time-honored trial tactic"); *see also United States v. Livingston*, 816 F.2d 184, 191 (5th Cir.1987) (permitting introduction of

A-2014

impeaching statements in direct testimony). Notwithstanding Teman's annoyance that the Government, tipped off by counsel's preview in open court as to a forthcoming line of examination, had "stolen [defense counsel's] thunder," such was neither improper nor by any measure an "extraordinary circumstance" that would warrant a new trial. *See Ferguson*, 246 F.3d at 134 (citation omitted).

The Court therefore denies Teman's Rule 33 motion on the ground that communication between the Government, Detective Alessandrino, and Soleimani does not warrant a new trial.

**B.    Teman's Proposed Expert Witness**

**1.    Pertinent Background**

On January 5, 2020, Teman notified the Government that he intended to call J. Benjamin Davis, a lawyer in the financial services industry with experience in check negotiation issues, as an expert. *See* Teman Expert Notice. Teman forecast that Davis would testify about what constitutes a "remotely created check" and a "counterfeit" check, and to opine that the checks at issue were "valid RCCs" and not counterfeit. *See id.* at 2–4. This testimony, he predicted, would include Davis's opinion that the RCCs complied with the Retail Payment Systems Booklet of the Federal Financial Institutions Examination Council's IT Examination Handbook's definition of an RCC and the Federal Reserve Board's regulations governing RCCs, and that the RCCs were properly drawn on the Customers' account pursuant to the Payment Terms. *Id.* at 3–4. It also would include the treatment of counterfeit or forged checks by the Uniform Commercial Code. *See id.* at 2. On January 8, 2020, the Government moved *in limine* to preclude Davis's testimony. Dkt. 74. It argued that his testimony was irrelevant, usurped the Court's role in instructing the jury, and lacked reliability. *See id.* at 3–5. Teman opposed that motion. Dkt. 77.

A-2015

On January 10, 2020, in an extended bench ruling, the Court excluded Davis's testimony. *See* MIL Tr. at 32–37.  First, it found that Davis's testimony was irrelevant, explaining that the crux of the case was whether Teman acted with fraudulent intent in depositing the checks, not whether the checks complied with regulations governing RCCs or failed to meet a technical definition of "counterfeit." *See id.* at 32–35.  Second, the Court held that even if the testimony was nominally relevant, its probative value was outweighed by countervailing risks under Federal Rule of Evidence 403, including the risk of confusing the jury. *Id.* at 34, 36.  Finally, the Court held that Davis's testimony about the legality of the checks Teman had created would invade the Court's province of instructing the jury. *See id.* at 34.

In its decision on the motion *in limine*, the Court, however, did note the importance, to the defense, of explaining to the jury that a check may lawfully be created remotely by a person other than the accountholder and thereupon negotiated, *i.e.*, that Teman's creation of a check on another person's account was not itself impermissible. *Id.*  To that end, the Court invited the parties to file a proposed joint jury instruction on the topic of RCCs. *Id.*  On January 15, 2020, the parties, unable to agree on one instruction, each filed their own proposed instructions. Dkt. 80 at 1–2.  On January 21, 2020, the Court, having reviewed the parties' proposals, suggested the following instruction, drawing upon the parties' alternative suggestions:

> You have heard reference to something called a remotely created check, also known for short as an RCC.  A remotely created check is a check that is not created by the paying bank and that does not bear a signature [to be] applied or purported to be applied by the person on whose account the check is drawn.
>
> I instruct you that the banking laws in this country do permit the use of remotely created checks under certain circumstances, provided, of course, that the customer on whose account the check is drawn has authorized the check.  However, this case does not involve whether or not the checks in question here meet the technical definition of a remotely created check, and you should not concern yourself with that.

A-2016

The question for you will be whether or not the government has proven beyond a reasonable doubt the elements of the offenses charged, which, again, are bank fraud and wire fraud. I will instruct you on the elements of those offenses later in the trial, after all of the evidence has been received.

Trial Tr. at 17. Neither party objected to the instruction. *Id.* at 18.

On January 22, 2020, during the testimony of Finocchiaro, the senior fraud investigator at Bank of America, the Court gave that instruction. *Id.* at 229–30.

### 2.    Discussion

Teman argues that the Court erred in excluding Davis's proposed expert testimony. *See* Teman Mem. at 29–31; Teman Reply at 17–18. He contends that this testimony was relevant to the issue of whether the checks were counterfeit checks or RCCs, and that Davis's opinion that RCCs may be authorized by contract without subsequent authorization for each check was relevant to whether the Customers here had authorized Teman through their contracts with GateGuard. Teman Mem. at 29; Teman Reply at 17–18. Teman also argues that Davis's testimony would not have usurped the Court's role in instructing the jury, as testimony is not objectionable simply because it embraces the ultimate issue. Teman Mem. at 30. Finally, Teman contends that exclusion of Davis's testimony violated the Due Process Clause, because he had a right to present a complete defense—including a defense that the alleged RCCs were not "counterfeit" checks. Teman Mem. at 31; Teman Reply at 17–18. The Court rejects this argument.

The Court properly excluded Davis's testimony as irrelevant. The question in this case was whether the Government had proved beyond a reasonable doubt that Teman was guilty of bank fraud and wire fraud. Both crimes involved Teman's scheme to defraud both the drawee and depositary banks, by misleading the banks to believe that he had authority to deposit the checks at issue, drawn on the Customers' accounts, into an account associated with him.

Whether these checks were technically not counterfeit checks by Davis's measure or whether they complied with regulations governing RCCs had no bearing on the jury's charge of determining whether the elements of these offenses, including whether Teman acted with intent to defraud, had been established beyond a reasonable doubt. *Cf., e.g., Rigas*, 490 F.3d at 220–21 (even where indictment referenced Generally Accepted Accounting Principles ("GAAP"), government was not required to present expert testimony on GAAP's requirements because "[e]ven if Defendants complied with GAAP, a jury could have found, as the jury did here, that Defendants intentionally misled investors"). That such testimony was irrelevant is all the clearer given the Court's ruling, *see supra* pp. 17, 24–33, that the term "counterfeit" as used in the Indictment's to wit clauses did not carry a technical meaning including Davis's, but instead referred to unauthorized checks, a subject not requiring expert testimony.

Reinforcing this ruling is Federal Rule of Evidence 702's requirement that the Court exclude expert testimony that is not helpful to the jury. *See* Fed. R. Evid. 702(a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue"). "An opinion is unhelpful and therefore may not be received in evidence if . . . the testimony 'would merely tell the jury what result to reach.'" *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (quoting *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992)). Davis's testimony would have done just that. As previewed by Teman, Davis would have told the jury that these checks were not counterfeit, were valid RCCs, and that the Payment Terms authorized Teman to create and negotiate the RCCs. *See* Teman Expert Notice at 2–4. Such testimony would not have been helpful. As the Court explained in its pretrial ruling, the central question for the jury was whether Teman, as he represented to the banks, was authorized by the accountholder to deposit the checks. *See* MIL Tr. at 33, 35–36. Davis's testimony giving

A-2018

definitions of RCCs and counterfeit checks had no bearing on this point. *Id.* And his opinion about the import of the Payment Terms had no bearing on Teman's intent and was not a proper area for expert testimony. The Court further held Davis's testimony inadmissible under Rule 403, on the grounds that even if that testimony had some minimal probative value, it was far outweighed by the capacity of Davis's opinions to confuse the jury as to the issues at hand. *See id.* at 34, 36. The Court reaffirms those aspects of its pretrial ruling as clearly correct.

Finally, the Court also properly excluded Davis's testimony as usurping its role in instructing the jury on the law. *See id.* at 34. "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (even in complex securities cases where expert testimony is needed, "[i]ts use must be carefully circumscribed to assure that the expert does not usurp . . . the role of the trial judge in instructing the jury as to the applicable law"); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (excluding expert testimony because it was "calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law'" (quoting *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983)). Davis planned to define both counterfeit checks and RCCs for the jury; to explain the implications under the Uniform Commercial Code for paying counterfeit and forged checks; and to opine about what constitutes a valid RCC under federal regulations. Teman Expert Notice at 2–3. Such testimony about quintessential legal rules would have invaded the Court's role.

Instead, the Court itself instructed the jury on the relevant point about RCCs of importance to the defense—that RCCs are valid where accountholder-authorized. *See* Trial Tr. at 229–30. This instruction, given with defense approval, advised the jury, correctly, that its

A-2019

assignment was not to focus on technical aspects of RCCs, but instead on whether the elements of bank and wire fraud had been established. *Id.* This practical and informative instruction guarded against juror confusion and minimized the prejudice Teman might otherwise have experienced had the jury mistakenly viewed RCCs as inherently impermissible or a red flag of criminality, or viewed his guilt or innocence as turning on compliance with technical regulations regarding RCCs. The instruction fully allowed Teman to put on his defense and advocate to the jury that he had deposited RCCs with, or believing that he had, the authorization of the accountholders. *See, e.g., id.* at 176–77 (defense opening); *id.* at 1013–16 (defense closing).

Accordingly, the Court denies Teman's Rule 33 motion based on the exclusion of Teman's proposed expert, Davis.

### C.    Alleged Alternate Juror Dishonesty in *Voir Dire*

The Court next considers Teman's Rule 33 motion based on an alternate juror's alleged failure to disclose certain information during voir dire.

#### 1.    Applicable Legal Principles

"A juror's dishonesty during voir dire undermines a defendant's right to a fair trial." *United States v. Daugerdas*, 867 F. Supp. 2d 445, 468 (S.D.N.Y. 2012) (citing *Clark v. United States*, 289 U.S. 1, 11 (1933)), *vacated on other grounds sub nom. United States v. Parse*, 789 F.3d 83 (2d Cir. 2015). The Supreme Court has articulated a two-part test to determine whether a defendant's allegation of juror dishonesty during the jury selection process warrants relief under Rule 33: "[A] party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *see also United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006). It further cautioned that while "[t]he motives for concealing information may

83

vary, . . . only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556.

The Second Circuit has only on rare occasions overturned a verdict or remanded for an evidentiary hearing based on the alleged failure of a juror—let alone that of an *alternate* juror—to disclose information. *Stewart*, 433 F.3d at 303; *see Parse*, 789 F.3d at 87–90, 111, 120 (remanding for new trial where juror lied about her personal background, her career as an attorney, her prior litigation experience, a disciplinary investigation of her by a state licensing authority, and her criminal history during *voir dire*, and subsequently "confessed that she purposefully lied and omitted material information in her *voir dire* testimony to make herself more 'marketable' as a juror"); *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989) (remanding for evidentiary hearing where a sworn affidavit by an alternate juror reflected that a juror lied about her brother-in-law's role as a government attorney because she wanted to serve on the case). A post-trial inquiry into alleged jury misconduct requires that a party come forward with "clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred[.]" *See United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (alterations in original) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)).

The viability of a Rule 33 motion based on an alleged *voir dire* error is also time-sensitive: "[I]f the defendant knew prior to the end of trial that a prospective juror had given false voir dire responses and did not then reveal the disqualifying falsehoods or nondisclosures to the court, the 'interest of justice,' Fed. R. Crim P. 33(a), generally will not require a new trial." *Parse*, 789 F.3d at 109–10 (2d Cir. 2015); *see id.* at 109 ("[A] motion for a new trial based on a claim of newly discovered evidence generally should not be granted unless, *inter alia*, the evidence was in fact newly discovered after trial, and facts are alleged from which the court can

infer the exercise of due diligence on the part of the movant to obtain the evidence prior to the end of trial.").

### 2.    Application

In his opening memorandum of law, Teman declared that he is entitled to a new trial "because an alternate juror lied during *voir dire*, depriving [him] of his constitutional right to a fair trial." Teman Mem. at 31. Specifically, Teman alleged that Juror #13 (1) initiated contact with Teman via LinkedIn before trial and failed to disclose this contact when asked under oath whether he knew the defendant; and (2) "appears to be a direct business competitor of Teman/GateGuard—at a minimum requiring further inquiry by the Court on this issue." *Id.* Teman abandoned this claim in his reply. To the extent that Teman still means to pursue this claim, the Court finds Teman's allegations regarding the alternate juror insufficient to justify a new trial under Rule 33.

At the outset, Teman provides no support whatsoever for the claim that the alternate juror in question reached out to Teman via social media prior to trial. Notably, the Government, in its opposition, pointed out that Teman's allegation was "[w]ithout any support or specifics." Gov. Mem. at 37. Teman did not fill that void. Despite having the opportunity to provide such support in his reply brief, which he sought leave to file, Teman did not support this contention and abandoned the juror-misconduct argument. Because his "evidence" on this point is limited to allegations in his initial memorandum of law and is not contained within a sworn affidavit, this Court is not at liberty to consider it. *See Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (a "memorandum of law . . . is not evidence at all").

Even if Teman's factual allegations had been substantiated in a sworn affidavit, his Rule 33 motion would still fail for three independent reasons.

First, Teman's allegations do not provide a basis for inferring the kind of misconduct that would warrant a new trial. Teman's statement in his memorandum of law about some form of LinkedIn communication does not allege that Juror #13 failed to "answer honestly a material question on *voir dire*" or that "a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.

Second, Juror #13 was an *alternate* juror, not a deliberating juror. Even if the Court found that the alternate had lied in *voir dire* and that a truthful answer would have warranted excusing the juror for-cause, Juror #13's presence had no effect on the verdict. Striking Juror #13 would not have "altered the composition of the jury *that actually deliberated and reached the verdicts* against the Defendant in this case." *United States v. Lawrence*, 477 F. Supp. 2d 864, 875 (S.D. Ohio 2006) (emphasis in original) (considering alternate juror's false statements about relationship with law enforcement during *voir dire* and holding that even if court had struck that juror for cause, defendant's right to impartial jury was not violated because, at most, that juror would have been replaced by another alternate), *vacated in part*, 555 F.3d 254 (6th Cir. 2009), *and c¡f'd in part*, 735 F.3d 385 (6th Cir. 2013). Teman does not present evidence, or even allege, that Juror #13 in some fashion influenced the deliberating jurors. *Cf. United States v. Hill*, 643 F.3d 807, 836 (11th Cir. 2011) (finding that defendant "[could not] prove that he was prejudiced by the district court's failure to exclude [allegedly biased juror] because [she] was an alternate juror who never participated in the jury's deliberations"); *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) (affirming district court's decision not to investigate alternate juror's potential influence on jury, observing that alternate was separated from jury once deliberations began). Teman's gripe that Juror #13 denied him "access to accurate and honest information when exercising his peremptory strikes and when given the opportunity to

A-2023

strike jurors for cause," *see* Teman Mem. at 33, does not articulate a concrete injury to him, let alone describe a "miscarriage of justice" meriting a new trial. *Sanchez*, 969 F.2d at 1413.

Third, Teman fails to indicate when or how he became aware of the alternate juror's purported dishonesty. *See* Teman Mem. at 32–33. Absent evidence on this point, the Court cannot find that Teman's allegation about Juror #13 was "new" evidence that could justify a new trial. *See Parse,* 789 F.3d at 109–10. To grant Teman a new trial based on information regarding a juror that may have been available to him prior to the verdict would "transform a tactical decision to withhold the information from the court's attention into a trump card to be played only if . . . expedient." *See United States v. Diaz-Albertini*, 772 F.2d 654, 657 (10th Cir. 1985). This Circuit prohibits such strategic behavior. *See United States v. Ragland*, 375 F.2d 471, 475 (2d Cir. 1967) ("To give an accused a second trial each time he doubts, after an unfavorable verdict, the objectivity of jurors, would seriously impede the process of justice.").

Accordingly, the Court dismisses this potential basis for post-trial relief.

## V.    *Brady* **Motion**

Finally, the Court addresses Teman's second post-trial motion, seeking a new trial as a result of the Government's alleged withholding of *Brady*, *Giglio*, and Jencks Act evidence.

### A.    **Pertinent Background**

On January 19, 2020, two days before trial was scheduled to begin, the Government filed a motion *in limine*, seeking to preclude potential lines of cross examination as to two Government witnesses: Joseph Soleimani, an ABJ principal, and Elie Gabay, a 518 West 204 LLC principal. Dkt. 83. Specifically, the Government requested that the Court bar questioning about actions filed against them and their landlord companies by tenants. *Id.* at 1. As to Soleimani, the Government flagged one incident in particular—a fine imposed by the New York City Housing Court for "harassing" a tenant, as defined under New York City Administrative

Code § 27-2004(48)(f-2) ("Housing Court Case"), *see* Dkt. 83-1 ("Housing Court Order")—and noted that he had appeared on the New York City Public Advocate's annual "Worst Landlords Watchlist." Dkt. 83 at 2. As to Gabay, the Government noted that his management company, Coney Management, had been ordered to repay a tenant for an overcharge in rent, along with "treble damages" ("Rent Charge Case"). *Id.* at 2–3. The Government stated that "there is no indication that any landlord-tenant complaints or lawsuits against Soleimani, Gabay, or their companies" bore on their character for truthfulness. *Id.* at 3. Teman opposed the motion.

On January 21, 2020, the Court addressed this motion in a bench ruling. *See* Trial Tr. at 22–31. At the outset, the Court noted that none of the alleged improprieties of Soleimani or Gabay had any relation to their dealings with Teman. Instead, these could be admitted only if they bore on these witnesses' character for truthfulness. *Id.* at 25. The Court excluded, with one exception, all of the evidence as to Soleimani and Gabay, as irrelevant and unduly prejudicial. *See id.* at 26–27, 30–31.

The exception was related to Soleimani's Housing Court Case. *See id.* at 27. In that case, ABJ had been fined for misleading a tenant to believe that his rent-controlled lease might not be renewed if he did not leave his apartment in exchange for monetary payment. *See id.* at 27–28. The Housing Court found that this was an "empty threat," given the tenant's rent stabilized apartment. *See* Housing Court Order at 4. The Housing Court opinion, this Court noted, did not disclose whether Soleimani personally was the ABJ employee who misled the tenant. Trial Tr. at 28. The Court held that if Soleimani was, then it would "permit the defense at this trial, as a means of impeachment, to establish through a single question or two put to Soleimani that a judge found that in 2017, he had misled a tenant to believe wrongly that his lease could not be renewed." *Id.* at 28–29. The Court, however, made clear that it would not

88

A-2025

permit a "more extended inquiry into this matter," or "extrinsic evidence" relating to it. *Id.* at 29.

The Court stated that "a targeted leading question that elicits from Soleimani the fact of this

discrete finding by a judge that he misled a tenant on this subject would assist the jury to assess

Soleimani's credibility without turning this proceeding into a trial within a trial about the

episode." *Id.* It concluded:

> The bottom line is that, at most, a single question or two about the housing court
> finding of misleading a tenant may be put to the witness; and then, only upon
> confirmation that [the Housing Court] opinion was referencing ABJ personnel that
> included Soleimani personally. Otherwise, Soleimani's conduct as a landlord,
> including court actions and complaints and statements by the New York Public
> Advocate, is excluded under Rule 403.

*Id.* at 30.

The Court then instructed the Government to "inquire of Soleimani whether there was

evidence . . . that he was among the ABJ personnel who dealt with [the tenant]." *Id.* at 29. It

went on:

> If his answer leaves any doubt in your mind, you need to follow up and do so
> immediately. Then promptly report back to the Court and the defense. I expect
> that if the answer is yes, that Soleimani was among the ABJ personnel who dealt
> with [the tenant], that Soleimani will have no difficulty on the stand here answering
> yes to a question from defense counsel about whether a judge so found. Obviously
> the government is at liberty to pull the poison and ask the question on direct as well.
> Cross-examination will then move onto other matters.

*Id.* at 29–30. The Court cautioned that defense counsel was not to address the subject "until I

have given you the affirmative green light to do so." *Id.* at 30.

After the ruling, the Government stated that it would ask Soleimani about the facts of the

Housing Court incident, and asked for the following clarification: "[I]f Mr. Soleimani was not

involved in making the misrepresentations to [the tenant], then no inquiry would be made of him

on this topic." *Id.* at 31. The Court explained that while the precise issue was really whether

there was evidence presented to the Housing Court that Soleimani had interacted with the tenant

as to the issue of his lease renewal, it would be "safer," if Soleimani had interacted with the tenant at all, to permit one or two questions to be put to him at trial about the incident. *Id.* at 32. The Government responded, "Understood. We'll inquire with Mr. Soleimani and we'll give an update to the Court." *Id.* at 33.

The Government thereafter never provided the Court, or apparently the defense, with an update as to Soleimani's involvement with the tenant. Nor did the defense follow up on this point.

During Soleimani's direct examination, the Government asked him the following series of questions:

> Q.    In 2018, did the housing court find in one case that your company had misled a tenant about whether he could renew his lease?
> A.    Yes.
> Q.    And did you misrepresent anything to the tenant or was it others in your company?
> A.    It was others.
> Q.    And did you and ABJ resolve that matter?
> A.    Yes.
> Q.    And did that have anything to do with GateGuard or Mr. Teman?
> A.    No.

*Id.* at 502. The defense did not ask any questions about the topic on cross examination or seek leave to do so. The Government, in its opposition to Teman's *Brady* motion, explained that it had put these questions to Soleimani "out of an abundance of caution" because Soleimani had told the Government that he had been among the ABJ personnel who had interacted with the tenant. Gov. *Brady* Mem. at 6.

After trial, Teman obtained, independent of the Government, the transcript from Soleimani's Housing Court proceeding. *See* Teman *Brady* Mem., Ex. A ("Housing Court Tr."). In that proceeding, Soleimani testified that, among other things, he had interacted with the tenant, that both he and the tenant had signed the agreement whereby the tenant surrendered his

property, and that they were both present at that signing. *See id.* at 56–58. The agreement

included a provision that explained that if the tenant did not vacate the premises by a date

certain, he would be subject to eviction proceedings. *Id.* at 56. Soleimani further testified there

that a check had been given to the tenant and that he helped the tenant find alternative housing.

*Id.* at 60–61.

        **B.**     **Applicable Legal Principles**

           **1.**     ***Brady* and *Giglio***

     "The government has a duty to disclose evidence favorable to the accused when it is

material to guilt or punishment." *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005)

(citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). To demonstrate a *Brady* violation, a

defendant must show the following three components: that (1) the evidence is "favorable to the

accused"; (2) the evidence was "suppressed by the State, either willfully or inadvertently"; and

(3) "prejudice . . . ensued" from the lack of disclosure. *Strickler v. Greene*, 527 U.S. 263,

281–82 (1999); *accord United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).

     The first component, favorable evidence, "includes not only evidence that tends to

exculpate the accused, but also evidence that is useful to impeach the credibility of a government

witness," *i.e.*, *Giglio* evidence. *Coppa*, 267 F.3d at 139 (citing *Giglio v. United States*,

405 U.S. 150, 154 (1972)).

     For the second component, a defendant must show that the Government suppressed

evidence, *i.e.*, that the Government violated its "affirmative duty to disclose favorable evidence

known to it." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). However, "the

government cannot be required to produce that which it does not control and never possessed or

inspected." *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (quoting *United States

v. Cannof*, 521 F.2d 565, 573 (2d Cir. 1975)). Nevertheless, a prosecutor is "presumed . . . to

have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Such imputation does not extend to all offices of government because "the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Id.* (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995)); *see also United States v. Failla*, No. 93 Cr. 00294 (CPS), 1993 WL 547419, at *4–5 (E.D.N.Y. Dec. 21, 1993) (explaining that imputation occurs where another agency "is so close that the agency in question can be considered 'an arm of the prosecutor'" (quoting *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975)). Further, a finding of suppression is not warranted where the defendant or his attorney "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *Payne*, 63 F.3d at 1208 (alteration in original) (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)). This includes evidence in the public record. *Gotti v. United States*, 622 F. Supp. 2d 87, 96 (S.D.N.Y. 2009).

Third, for a finding that the evidence was prejudicial, or material, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted) (quoting *Kyles*, 514 U.S. at 434); *see also Strickler*,

527 U.S. at 281 ("There is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."); *Fuentes v. T. Gr<sub>u</sub>fin*, 829 F.3d 233, 245–47 (2d Cir. 2016) ("[T]he *Brady* materiality 'question is *not whether* the defendant would *more likely than not* have received a different verdict with the evidence, *but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.*'" (emphasis in original) (quoting *Kyles*, 514 U.S. at 434)).

Where impeachment evidence is at issue, such evidence generally is material when "the witness at issue supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *Payne*, 63 F.3d at 1210 (internal quotation marks and citations omitted). "In contrast, a new trial is generally not required when the testimony of the witness is 'corroborated by other testimony' or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.* (internal citations omitted); *accord United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003).

### 2.    Jencks Act

The Jencks Act, 18 U.S.C. § 3500, allows for disclosure of witness statements in criminal cases. *United States v. Shyne*, 617 F.3d 103, 106 (2d Cir. 2010). Pursuant to the Act, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in possession of the United States which relates to the subject matter to which the witness has testified." 18 U.S.C. § 3500(b). Like the *Brady* materiality requirement, the "failure to disclose . . . withheld [Jencks Act] material must be deemed harmless where there is no 'reasonable

93

A-2030

probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *United States v. Rivera*, 153 F. App'x 758, 759 (2d Cir. 2005) (quoting *United States v. Nicolapolous*, 30 F.3d 381, 383 (2d Cir. 1994)). "Reasonable probability" has the same meaning here as in the *Brady* context: It means, in this context, "a probability sufficient to undermine confidence in the outcome." *Nicolapolous*, 30 F.3d at 384 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

### C.    Application

Teman argues that the Government violated its *Brady*, *Giglio*, and Jencks Act obligations by failing to disclose the following: (1) Soleimani's personal involvement in the scheme to mislead the tenant in the Housing Court Case; (2) that the treble damages Gabay was fined in the Rent Charge Case are assigned only for willfully overcharging a tenant rent; and (3) false certification claims against Soleimani and Gabay, brought by the New York City Department of Housing Preservation and Development ("HPD"). *See* Teman *Brady* Mem. at 11–20. The Court finds that none of these warrants a new trial.

#### 1.    Soleimani's Housing Court Case

Teman argues that the Government breached its *Brady* obligations with regard to Soleimani's Housing Court case because (1) the transcript of Soleimani's testimony in that case constitutes favorable impeachment evidence going to Soleimani's character for truthfulness; (2) the Government failed to comply satisfactorily with the Court's directive that it inquire into Soleimani's involvement with the tenant and report back to the Court and the defense; and (3) the failure to disclose that Soleimani had engaged with the complainant in that case prejudiced Teman because, were one to conclude that Soleimani had misled the tenant, Soleimani perjured himself at Teman's trial on this point. *See* Teman *Brady* Mem. at 11–15. The Government disagrees on all fronts. *See* Gov. *Brady* Mem. at 9–14.

94

A-2031

As to the first *Brady* element, it is clear that the transcript of the Housing Court hearing, at which Soleimani testified, was evidence favorable to Teman. Evidence that can be used to impeach a Government witness is favorable to the defendant. *See Coppa*, 267 F.3d at 139. The Government counters that the transcript lacks impeachment value because Soleimani testified at Teman's trial that "others" at his company had made misrepresentations to the tenant and because the Housing Court transcript does not undermine this testimony. *See* Gov. *Brady* Mem. at 11–12. That is true insofar as the transcript on its face does not reflect any misrepresentations made by Soleimani to the tenant. But the transcript could circumstantially support this conclusion. It reflects that Soleimani, ABJ's only witness at the Housing Court hearing, had interacted with the tenant, been present at the tenant's home during the signing of the agreement addressing the tenant's vacatur of the apartment, signed the agreement (which included a false statement that the tenant would be evicted if he did not leave by a date certain), paid the tenant, and helped find the tenant another place to live. *See* Housing Court Tr. at 56–58, 60–61. These aspects of the transcript, if disclosed, might have inspired the defense to seek leave to inquire more deeply into the Housing Court proceeding than the Court had anticipated allowing, to attempt to build the inference from the transcript that Soleimani had likely been among the ABJ personnel who had misled the tenant. The Court had stated that, had Soleimani communicated directly with the tenant, it intended to allow the defense to put one or two questions to Soleimani on the subject to be "safe[]." Trial Tr. at 32. The Housing Court transcript, if made known to the defense prior to Soleimani's cross-examination, might have led the Court to permit somewhat more questions along these lines, to enable Teman's counsel to develop the range of dealings Soleimani had personally had with the tenant.

The record does not, however, establish the other two requirements of a *Brady* violation.

A-2032

First, on the Court's post-trial review, it is clear that the Housing Court transcript did not come into the Government's possession until after the Teman trial. As a result, the Government cannot be said to have suppressed, or failed to disclose, favorable evidence in its possession.[35] And, second, it is clear that this evidence was not material—there is no reasonable probability that the trial outcome would have been different had the Housing Court transcript been disclosed.

As to the first point, the Government represents, without refutation, that the Housing Court transcript was not in its possession during trial. *See* Gov. *Brady* Mem. at 10. The Government's *Brady* obligation does not extend to evidence that it does not know of or that it does not have within its possession. *See Failla*, 1993 WL 547419, at *4; *see also Avellino*, 136 F.3d at 255 ("The *Brady* obligation extends only to material evidence . . . that is known to the prosecutor."); *Hutcher*, 622 F.2d at 1088 ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." (citation omitted)).

Nor is the transcript evidence whose possession by another government arm can fairly be imputed to the prosecution. The local court authorities responsible for that transcript were too far removed from the prosecutors here. *See Avellino*, 136 F.3d at 255. *Hutcher* is instructive. The defendant there argued that the Government had violated its *Brady* and Jencks Act obligations by failing to make the affidavits and testimony of a Government witness from a

---

[35] To be sure, the Government's failure to report back to the Court as to its inquiry into Soleimani's dealings with the tenant unhelpfully clouded the Court's and the defense's appreciation of this point during trial. The Court had deliberately ordered the Government to inquire whether Soleimani had had dealings with the tenant and had made misrepresentations to him, and to report back to the Court and defense. Regrettably, the Government did not do so (and the defense did not press for such a report) but instead took the matter up by putting questions on this point to Soleimani. As a result, it was left unclear whether the Government's apparent conclusion that Soleimani had not personally misled the tenant derived solely from Soleimani's say-so, or from its review of the transcript. That the Government had not accessed the transcript during the Teman trial became clear only after trial.

96

A-2033

bankruptcy proceeding available to him. *See Hutcher*, 622 F.2d at 1088. Before calling the

witness, the Government had sent two investigators to examine the bankruptcy file, including

any affidavits or testimony from that witness. *Id.* Neither investigator returned with any

affidavits or transcripts, but one did provide the Government with a docket sheet for the

bankruptcy proceeding—which the Government proceeded to make available to the defendant.

*Id.* The Second Circuit held that there had not been a violation, because "[t]he simple and

sufficient answer to [the defendant's] claim" was that the witness's affidavits and testimony were

"never in the possession of the prosecution and were therefore not materials which the

prosecution had a Brady or [§] 3500 duty to make available." *Id.* The Government had fulfilled

its obligations by turning over the docket sheet that it did possess. *See id.* The Circuit rejected

"a notion of 'possession' which is so elastic to embrace materials that the prosecution never had

in its files, never inspected, and never knew about." *Id.* The same is true here. The Government

disclosed the Housing Court order, which was in its possession, to Teman. The Housing Court

transcript thereafter was equally available to both the parties. It was not in the Government's

possession.[36]

    As to the second point, Teman has failed to show materiality—either of the Housing

Court transcript or of the fact revealed therein, that Soleimani had had personal dealings with the

misled tenant. For evidence to be material in the context of an alleged *Brady* violation, there

must be a "reasonable probability" that the suppressed material would have resulted in a different

outcome. *See Turner*, 137 S. Ct. at 1893. For impeachment evidence specifically, courts have

---

[36] Although the discussion above principally concerns Teman's *Brady* claim, for much the same
reasons, the Housing Court transcript cannot support Teman's claim of a Jencks Act violation. It
appears undisputed that the Government produced all written statements of Soleimani's that were
in its possession, including notes from its interviews of Soleimani. *See* Gov. Mem. at 6 n.2.

97

held that evidence rises to the level of materiality where the witness being impeached provides the only evidence linking the defendant to a crime or the likely impeachment value would have "undermined a critical element" of the Government's case. *Payne*, 63 F.3d at 1210. In contrast, evidence has been held not material where the witness's testimony is meaningfully corroborated or the witness has been otherwise impeached. *See id.*

Here, Soleimani was far from the only individual linking Teman to the crimes. And the impeachment evidence in question, relating to an alleged misleading practice with respect to a tenant, was far afield from the events at issue. It would not have undermined any element of the bank fraud or wire fraud charges brought here. Far from there being a reasonable probability of a different outcome, it is not even credible to claim a real possibility that disclosing Soleimani's personal involvement with the tenant would have yielded a different outcome on these charges. That is so for two independent reasons.

First, there was very significant corroboration of the relevant aspect of Soleimani's testimony—that he had not authorized Teman to (in Reinitz's memorable words) "hit" ABJ's account and divert the large sums reflected on the checks in question from that account to Teman's benefit. "[T]he strength of the independent evidence of [defendant's] guilt increases the degree of significance that would need to be ascribed to the withheld impeachment evidence in order for it reasonably to undermine confidence in the verdict." *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998); *see also Madori*, 419 F.3d at 170 (finding, "in light of the substantial evidence" of defendant's guilt, that "none of these strategies"—relating to potential affirmative defense and impeachment of a witness—were "sufficiently plausible to create the 'reasonable probability that had the evidence been disclosed to the defense, the result would have been different.'" (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987))).

A-2035

Here, Soleimani testified that he had not authorized Teman to draw on ABJ's account,

and that, if Teman had asked him, he never would have agreed. *See* Trial Tr. at 497–98, 566–69;

648–49. This testimony aligned fully with the parallel testimony of the representatives of the

other two clients who similarly denied giving such authorization: Gabay from 518 West 204

LLC, Soon-Osberger from 18 Mercer, and Gina Hom from 18 Mercer all testified to the same

effect. *See id.* at 326–27, 355–58, 361–63, 365, 367 (518 West 204 LLC); *id.* at 427–30, 441,

474–75 (18 Mercer). And Reinitz's testimony and his text messages with Teman independently

established that Teman was well aware that his Customers, and in particular ABJ, would dispute

any charges as unauthorized. *See* GX 702; GX 728 ("You've been back and forth with abj

several times now . . . they have indicated they don't believe they owe you $."). For this reason,

Reinitz advised Teman against creating and depositing the checks. *See* GX 702, 704, 727–29.

Teman's knowledge that Soleimani (and the other Customers) would deny authorizing the

checks was also apparent from the lengths that Teman had gone in (1) deceptively fabricating the

checks while (2) denying the Customers notice (including invoices) of his claim to be owed fees

by them. Also supporting Soleimani's denial of authorization was the fact that the checks' total

value—$264,000—far outstripped the couple thousand dollars ABJ had paid for each of its seven

GateGuard devices. *Compare* GX 204–05 (Teman's ABJ checks), *with* GX 409A–409B

(invoices for ABJ's GateGuard purchases); *see also* Trial Tr. at 489–90 (explaining that ABJ

purchased seven GateGuard devices). Finally, Teman's deliberate decision to deposit the checks

during Passover—which Teman knew Soleimani and Gabay observed—was consistent with an

attempt to evade the detection of a non-authorizing customer as long as possible. *See* Trial Tr.

at 564–65; *see also* GX 113. Overwhelming evidence thus established that Teman did not have

the authorization of Soleimani to create and deposit the checks at issue. Even a jury that found it

likely that Soleimani had misled a tenant in an unrelated business venture would have no reason to doubt his central testimony that Teman had "hit" ABJ's accounts without his knowledge or permission.

Second, although counsel's cross examination had not been effective in refuting the lack of customer authorization, defense counsel had—and utilized—other, far more apposite means to attempt to damage Soleimani's credibility on his claim of a lack of authorization. As such, Soleimani's dishonesty to a tenant—even if found—would have been cumulative and of no moment. *See Turner*, 173 S. Ct. at 1893; *see also United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008) ("[I]f the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material."). The defense showed, for example, that Soleimani had earlier received invoices containing a link to the Payment Terms on them, *see* Trial Tr. at 594–95, had a billing dispute with Teman in fall of 2018, *id.* at 602, and when these checks were deposited in 2019, Soleimani, despite prompting from his bank, did not provide additional information about the checks, *see id.* at 617–19, 624–25. On these bases, the defense sought to imply that Soleimani, contrary to his testimony, had in fact authorized the checks. The defense also established Soleimani's financial incentive to deny authorization in his dealings with the bank. The defense developed that, after a chargeback had been issued to ABJ's account, Signature Bank stated that "[w]e may reverse the credit if we receive information that your transactions were authorized." *Id.* at 627. In contrast to these attempts to counter Soleimani's denial of authorization, the far-afield fact of Soleimani's alleged deceit of a tenant had limited impeachment value, and lacked the capacity to change the jury's determination on this point. *Cf. United States v. Gibbons*, 100 F.3d 942, 1996 WL 30784, at *1 (2d Cir. 1996) (table) (finding no

*Brady* violation where undisclosed matter was unrelated to defendant and had been resolved prior to defendant's trial).

Accordingly, there was no *Brady*, *Giglio*, or Jencks Act violation warranting a new trial.

In pursuing a new trial, Teman alternatively claims that Soleimani perjured himself at trial when he testified, in response to the question, "[D]id you misrepresent anything to the tenant or was it others in your company?" that, "It was others." *See* Teman *Brady* Mem. at 15 (quoting Trial Tr. at 502). Teman contends that the undisclosed Housing Court transcript shows that Soleimani's testimony was a lie. *See id.* at 12. But the transcript is not nearly so clear cut. It shows that Soleimani had dealings with the tenant at issue—and with the agreement the tenant signed to vacate his apartment—but it does not show that he made misrepresentations to the tenant. Nor did Soleimani elsewhere admit to making any misrepresentations. Teman's assertion that Soleimani committed perjury is just that—an assertion. The transcript is not, at all, inconsistent with Soleimani's testimony that someone else at ABJ dissembled to the tenant.

In any event, even if the transcript had revealed perjury on this point, that would not supply a basis for a new trial. "If newly discovered evidence indicates that testimony given at trial was perjured, the grant of a new trial depends on 'the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury.'" *United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996) (quoting *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)). This materiality standard is "less exacting" than that imposed by *Brady*. *Spinelli*, 551 F.3d at 166. A court's analysis is more or less strenuous depending on the Government's knowledge of the perjury: If the Government knew of the perjury, "a new trial is warranted if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," whereas, if the Government was unaware of the perjury at trial, "a new

trial is warranted only if the testimony was material and the court [is left] with a firm belief that

but for the perjured testimony, the defendant would most likely not have been convicted."

*Wong*, 78 F.3d at 81 (alteration in original) (internal quotation marks omitted) (quoting *Wallach*,

935 F.3d at 456).

Here, for the reasons set out above, Soleimani's testimony on the point in question was

truly collateral from the issues at hand.  And there is no indication that the Government was

aware of Soleimani's (alleged) perjury.  The Government attests that Soleimani indicated that he

had dealt with the tenant, but that he did not indicate that he had made representations to the

tenant about whether ABJ would renew his lease.  *See* Gov. Mem. at 6.  There is no basis to

disbelieve these representations.  Far from having a "firm belief" that Teman most likely would

not have been convicted without Soleimani's testimony that others had made misrepresentations

to the tenant, the Court is confident, given the overwhelming proof of Teman's guilt, that the

jury would have convicted him regardless.[37]

Accordingly, Teman has not presented a sufficient basis for a new trial based on his claim

of trial perjury by witness Soleimani.

### 2.    Gabay's Rent Charge Case

Next, Teman argues that the Government breached its *Brady* obligations when it

represented that it was "not aware of any action against Gabay or his business in which Gabay

---

[37] "[W]here independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." *Wong*, 78 F.3d at 82.  In *Wong*, a paid confidential informant testified that he "always did [his] taxes" and that he had filed his tax returns in 1987 and 1988, which was later determined to be false.  *See id.* at 81.  The Circuit held that a new trial was not warranted based on this perjury because there was "[a]mple evidence" supporting the defendant's conviction of drug charges.  *Id.* at 82.  Further, the Circuit noted that "[t]he additional evidence concerns a collateral issue ([the informant's] taxes) and 'does not refute any of the witness's testimony against' [the defendant]." *Id.* (brackets omitted) (quoting *United States v. Reyes*, 49 F.3d 63, 68 (2d Cir. 1995)).  This analysis applies with equal if not greater force here.

acted dishonestly or was found not to be credible by a court or regulator." Dkt. 83 at 3. Teman

contends that this statement was false because, as the Government acknowledged, Gabay had

been fined "treble damages" in the Rent Charge Case. Teman *Brady* Mem. at 20. Teman

represents that treble damages are awarded only when an owner *wilfully* overcharges a tenant,

which bears on that owner's credibility. *See id.*

The Court disagrees, finding that the award of treble damages fails to establish any of the

three requirements of a *Brady* violation.

First, that Coney Management, the company for which Gabay worked, was fined treble

damages in the Rent Charge case is not necessarily impeachment evidence favorable to Teman.

As is evidenced by the public record that Teman attached to his reply—and failed to attach to his

initial memorandum of law—treble damages here do not represent a finding by a court or

regulator that the company owner acted willfully. *See* Teman *Brady* Reply, Ex. E. Instead,

treble damages are imposed where the owner, upon notice that he or she has been found to have

collected a rent overcharge, does not submit evidence to the New York State Division of

Housing and Community Renewal that those overcharges were not willful. *Id.* As that Division

explains, the damages "simply mean[] that where an owner submits no evidence or where the

evidence is equally balanced, the overcharge is deemed willful." *Id.* Here, Coney Management

and Gabay could simply have decided not to contest the overcharges, resulting in treble damages

being imposed. As a result, the treble damages cannot be said to bear on Gabay's credibility.

Second, even if the treble damages could be characterized as impeachment evidence

favorable to Teman, there is no indication that the Government knew of the connection between

treble damages and willfulness. The Government was not obliged to investigate this point.

Instead, it disclosed the evidence in its possession—the Rent Charge Case and the fact of treble

A-2040

damages—and represented that it was not aware of any action bearing on Gabay's credibility. The defense, at that point, was fully empowered to mount its own investigation into the import of such a damages award.

Finally, the evidence here is immaterial. Gabay was not the only witness linking Teman to the crime, nor would the evidence of treble damages have destroyed an element of the Government's case, or come anywhere close. As with Soleimani, Gabay's testimony was corroborated extensively, including through testimony from Soleimani, Soon-Osberger, and Hom; the text messages between Reinitz and Teman; the checks themselves; and the circumstances surrounding the deposit of the checks, including the fact of their deposit on Passover. In particular as to Gabay and 518 West 204 LLC, Gabay's testimony indicative of Teman's criminal intent was enhanced by the fact that Teman had deposited checks drawn on 518 West 204 LLC's account in April, *after* it had disputed checks that Teman attempted to draw on its account in March. Teman discussed the relevance of the hold on his account from the March checks with Reinitz, *see* GX 704; GX 727, and Reinitz instructed him that if Customers disputed his charges, as 518 West 204 LLC had already done, he "must stop," *see* GX 729. Teman, however, flouted that advice. Given the strength and breadth of the evidence of his audacious fraud, the Court is confident that the trial outcome would have been the same even if the jury had taken the treble damages award as reflecting the willfulness of a rent overcharge by Coney Management.

Further, as with Soleimani, the defense had at its disposal, and deployed, more apt tools to try to impeach Gabay's credibility. The defense showed that a Coney Management affidavit, submitted to Signature Bank by a Coney Management employee with whom Gabay worked closely, disputed the charges and stated that the company did not "know[] the payees on these

104

A-2041

checks." *See* Trial Tr. at 401. Gabay admitted that Coney Management, in fact, was aware of GateGuard, and that it had been a lie to say that Coney Management did not know what GateGuard was. *Id.* at 398. This line of impeachment bore far more surely on Gabay's character for truthfulness with regard to Teman's scheme. As impeachment material, the unrelated treble damages award here would have been cumulative. It would not realistically have impacted the jury's verdict. This too was no *Brady* violation.

### 3. False Certifications

As a final basis for claiming a *Brady* violation, Teman points to false certification claims against Soleimani and Gabay, brought by the HPD, which he contends adversely reflect upon the witnesses' character for truthfulness. He faults the Government specifically for representing, before trial, that there was "no indication that any landlord-tenant complaints or lawsuits against Soleimani, Gabay, or their companies would be probative of their 'character for truthfulness or untruthfulness.'" Teman *Brady* Mem. at 16 (emphasis omitted) (quoting Dkt. 83 at 3). As evidence that this Government representation was untrue, Teman attaches spreadsheets from public HPD records—not disclosed by the Government—which state that HPD has several open (and one closed) violations for "false certifications" against Soleimani, Gabay, and their companies. *See id.*, Exs. B, C, E, F. The Court does not find that this rises to the level of a *Brady* violation.

As with Soleimani's Housing Court case, this evidence in theory could be favorable to a party like Teman whose interests are adverse to those of the witness, because there could be impeachment value in "false certification" charges. According to HPD, a "false certification" occurs when another violation "was certified as corrected by the Owner on time and properly" but "[a] subsequent re-inspection of the condition by HPD found that the condition had not been properly corrected." Teman *Brady* Mem., Ex. D at 31. The HPD further explains that "[t]he

105

A-2042

violation is open and is subject to civil penalties for false certification." *Id.* In contrast to "allegations of mismanagement, negligence, or being a rotten landlord" which the Court discounted in its ruling on the motions *in limine* as "irrelevant to credibility," Trial Tr. at 26–27, false certifications could potentially be of some impeachment value, as they may bear on truthfulness.

However, as to this evidence too, there is no basis to contend either that this evidence was not disclosed by the Government, or that it was material.

As to non-disclosure, the record does not support that the Government had the false certification charges in its possession to disclose. Instead, the Government disclosed what it had—that Soleimani and Gabay had been involved in landlord-tenant disputes, and that these disputes included Soleimani's Housing Court Case and Gabay's Rent Charge Case. And the link between the city HPD and the federal prosecution here is far too removed to impute HPD's knowledge to the Government. Moreover, the evidence here was a matter of public record, which Teman himself had the ability to, and ultimately did, locate.[38]

This evidence also would not present a serious possibility, let alone a reasonable probability, of changing the outcome of trial. Almost all of the violations in question appear to be open (non-established) ones. They are inadmissible under Federal Rule of Evidence 608(b). And there is no indication that they could lead to admissible evidence. *See United States v. Santos*, 486 F. App'x 133, 136 (2d Cir. 2012) (evidence was, among other things, not admissible and would not have led to admissible evidence); *United States v. Polanco*, 510 F. App'x 10, 12

---

[38] The records of the false certifications were available on a public database. That is how Teman gained access to them for submission to the Court. *See Gotti*, 622 F. Supp. 2d at 96 ("[D]ocuments that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them due to a lack of diligence in his own investigation.").

A-2043

(2d Cir. 2013) (same). And the one closed (established) violation would have limited probative value, even assuming its admissibility. As reviewed above, the Government had presented compelling and varied evidence of Teman's guilt, and of the lack of customer authorization for Teman to create and negotiate the checks. And defense counsel had deployed other tools to attempt to impeach both Soleimani and Gabay, to no avail. There is no basis to conjecture that a false certification by the "Owner" of the property—who may or may not even have been the witness testifying at Teman's trial—would have impeached Soleimani or Gabay at the trial.

Accordingly, Teman has failed to establish, under any theory, a *Brady* violation. The Court therefore denies this final asserted basis for seeking a new trial.

## CONCLUSION

For the reasons outlined above, the Court denies all of Teman's post-trial motions. The case will now proceed to sentencing.

For purposes of assuring a full appellate record, the Government is instructed to file the grand jury materials provided *ex parte* to the Court under seal as soon as possible. These are to be accessible to the Court (and reviewing appellate courts) only.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 111, 118, 120, and 132.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 5, 2020
New York, New York

107

A-2044



Joseph A. DiRuzzo, III, Esq., CPA
954.615.1676
jd@diruzzolaw.com

June 29, 2020

**Via ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

   Re: *United States v. Teman,* case no. 1:19-cr-696

Dear Judge Engelmayer:

Pursuant to your "individual rules of practice in criminal cases," this letter serves as the Defendant Ari Teman's request to adjourn sentencing for 60 days. Assistant United States Attorney Khedar Bhatia notified undersigned counsel that the Government does not oppose this request.

As this Court is aware, the nation is in the midst of the COVID-19 pandemic. Teman currently resides in Florida, his undersigned counsel currently resides in Florida, and his other undersigned counsel Justin Gelfand currently resides in Missouri. As such, proceeding with sentencing at the currently-scheduled date would require both members of the defense team and Teman to travel to New York City at a time when public health officials are discouraging travel unless absolutely necessary. Furthermore, as COVID-19 cases spike throughout the country, New York has implemented quarantine restrictions on travelers arriving in New York. See Executive Order No. 205 (June 24, 2020).

Based on these unusual circumstances, Teman seeks an adjournment so that the parties and this Court can take the necessary safety precautions before physically reconvening for sentencing.

Kind Regards,

/s/ Joseph A. DiRuzzo, III  <small>Digitally signed by /s/ Joseph A. DiRuzzo, III
Date: 2020.06.29 16:55:17 -04'00'</small>

Joseph A. DiRuzzo, III

JAD/
cc: AUSA K. Bhatia, via ECF
AUSA E. Imperatore, via ECF
J. Gelfand, via ECF

401 East Las Olas Blvd., Suite 1400, Ft. Lauderdale, FL 33301
FAX/ 954.827.0340 WEB/ WWW.DIRUZZOLAW.COM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19-CR-696-PAE |
| | ) | |
| ARI TEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**</u>

Defendant Ari Teman ("Teman"), by and through undersigned counsel, respectfully submits this memorandum to assist this Court in fashioning a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Teman requests a sentence of time-served or, in the alternative, a sentence which substitutes home confinement for prison.

Teman stands before this Court for the only criminal convictions of his life: bank fraud and wire fraud arising out of allegations concerning the deposit of 29 remotely created checks on two days in March and April of 2019. Teman exercised his constitutional right to a trial and maintains his innocence to the crimes charged. However, Teman accepts that, at this stage in the proceedings, this Court must proceed to sentencing. As this Court crafts the appropriate sentence in this case, it is Teman's lifetime of selfless acts of charity and benevolence and the demonstrable good he has done for others that far outweigh the alleged acts that bring him before this Court for sentencing. As set out *infra*, long before any of the alleged acts giving rise to this prosecution, Teman founded multiple volunteer organizations and dedicated his time and his sweat towards helping others—actions that speak to Teman's true character.

Furthermore, Teman has a documented medical history of respiratory problems and other diagnoses that make a custodial sentence uniquely and disproportionately punitive—generally,

but particularly in the midst of the ongoing COVID-19 pandemic.

To be clear, notwithstanding his anticipated appeal, Teman is working diligently to pay a significant portion, if not the entirety, of restitution before sentencing.

As Congress and the Supreme Court acknowledge, this Court is charged with the responsibility of evaluating Teman as an individual in crafting an appropriate sentence that is particularly tailored to him. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"); *see also* 18 U.S.C. § 3553(a)(1) ("The court...shall consider...the history and characteristics of the defendant").

When faced with the possibility of additional incarceration, it is easy to lose sight of the fact that a sentence of time-served is, by no means, lenient. Indeed, as recently as 2007, the U.S. Supreme Court rejected the idea that even a sentence of probation is nothing but an overly lenient slap on the wrist. *See Gall v. United States*, 552 U.S. 38, 44 and n.4 (2007) ("Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty...[p]robation is not granted out of a spirit of leniency...probation is not merely 'letting an offender off easily'").

I.     **Relevant Procedural Background**

Teman was arrested on July 3, 2019 and was jailed until July 8, 2019, when he was released on bond. Since then, Teman has remained on bond without any violations and following his jury trial, Teman's bond was modified to include home detention with electronic monitoring. As such, since January 29, 2020, Teman has remained on home detention with an ankle bracelet strapped

A-2047

to his leg with significant limitations to his freedom.

On April 23, 2020, the United States Probation Office filed the pending Presentence Investigation Report ("PSR") in this case. In light of the COVID-19 pandemic and consistent with the requests of the parties, this Court has adjourned the sentencing hearing until September 28, 2020 at 10:00 a.m.

## II.    Legal Standard

As this Court is aware, Congress has mandated that the sentence imposed in this case be "sufficient, but not greater than necessary" to achieve the objectives of punishment. 18 U.S.C. § 3553(a). The United States Sentencing Guidelines, while advisory, are no longer mandatory. *See, e.g., United States v. Barrero*, 425 F.3d 154, 156 (2d Cir. 2005); *see also United States v. Booker*, 543 U.S. 220, 224 (2005).

As the United States Court of Appeals for the Second Circuit has established, the methodology this Court should follow post-*Booker* is the following:

> A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range. The Guidelines provide the "starting point and the initial benchmark" for sentencing… and district courts must "remain cognizant of them throughout the sentencing process[.]" It is now, however, emphatically clear that the Guidelines are guidelines—that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range. When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a).

*United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal citations omitted).

## III.    Advisory Sentencing Guidelines

Teman concurs with the Guidelines computations contained within the PSR. Based on a

3

total offense level of 19 and a criminal history category of I, the advisory imprisonment range is 30 months to 37 months.

## IV.    A Downward Variance is Warranted

As a matter of law, this Court must not presume the Guidelines range reasonable, but must make an individual assessment of the 18 U.S.C. § 3553(a) factors based on all the facts presented. *See Gall*, 552 U.S. at 50. Based upon a consideration of the statutory sentencing factors set out in 18 U.S.C. § 3553(a), a substantial downward variance is warranted in this case.

Section 3553(a) sets forth a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) then lists numerous factors that a sentencing court must consider. Especially relevant to this case, and supportive of this motion for a downward variance, are the following factors:

### A.    The History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)

Teman is a 38-year old man facing sentencing for the first and only convictions of his life. As evidenced by the numerous letters submitted by those who know him best[1], Teman is a good person and a custodial sentence is unwarranted based on his unique characteristics and the facts of this case.

#### 1.    *As a Child, Teman Struggled with Mental Health Diagnoses and Bullying So Serious He Had to Transfer Schools*

Teman grew up in Teaneck, New Jersey—but faced many challenges throughout childhood. He suffered from depression and anxiety and was the victim of serious bullying, so much so that he had to transfer schools on numerous occasions to stay safe. *See, e.g., United States v. Rivera*, 192 F.3d 81, 85 (2d Cir. 1999) (acknowledging pre-*Booker* that childhood trauma

---

[1] *See* Exhibits 1 through 8, 11 through 17 (attached herein).

4

constitutes grounds for reduced sentence); *United States v. Brady*, No. 02 CR 1043(JG), 2004 WL

86414, at *2 (E.D.N.Y. Jan. 20, 2004) (same).

>      2.    *As a College Student, Teman Dedicated a Substantial Amount of*
>            *Time and Energy Towards Helping Others—Contributions His*
>            *College Rabbi Told the Probation Office are "Still in Place Today"*

After high school, Teman attended Brandeis University, where he dedicated a substantial

amount of time and energy toward campus philanthropy. Indeed, Rabbi Peretz, Teman's college

rabbi, described Teman to the Probation Office as "compassionate," emphasized that Teman's

positive contributions to the on-campus charitable organization "are still in place today," and even

corroborated Teman's "post-college good works" based on the continued relationship they have

shared for nearly two decades. Teman's college friend, Jonathan Lubin (who is now an attorney),

shares his memories of Teman's contributions to his college Chabad House and Teman's

contributions to his community to the present.[2]

At trial, the prosecution attempted to paint a picture of Teman as a greedy fraudster. But

Teman's lifetime of charity, volunteerism, and benevolence demonstrates just how inaccurate that

depiction is.

>      3.    *As an Adult, Teman Founded Volunteer Organizations Which*
>            *Significantly Helped Those in Need Throughout the World and*
>            *Donated GateGuard Systems to Chabad Centers After the April*
>            *2019 Shabbat-Morning Shooting in California*

In 2006—well before any of the alleged acts giving rise to this prosecution—Teman

founded JCorps, a volunteer service network which brought together Jewish young adults to

volunteer in their cities. While this began as a selfless idea in New York City, Teman built JCorps

into an incredible organization with a presence throughout the United States, Canada, and Israel.

---

[2] *See* Exhibit 14 (Lubin Letter).

5

Thanks to Teman's hard work, grit, and volunteerism, JCorps was on the ground helping those in need after Hurricane Sandy struck New York and JCorps volunteers put themselves in harm's way to deliver toys and mattresses to children in Israel sheltering in bomb shelters. Teman's charity, for which he received no money, has been recognized by President Obama's administration, former New York City Mayor Michael Bloomberg's Office, and has been discussed by more than 100 media outlets. The concept was simple: make volunteering social and fun. Unlike the lion's share of defendants who find themselves in this courthouse for sentencing, Teman chose to spend his time helping others not only with his hard work and sweat, but by creating and building a volunteer empire that touched more lives than can be counted. Building on JCorps' success, Teman also founded a similar volunteer organization called WeCorps, which provides the same community services but caters to individual volunteers who are not Jewish. For Teman, JCorps became in many ways an unpaid full-time second job.

Helping his community is at the core of Teman's character. In May 2019—after the alleged deposits in this case but before Teman was aware of any investigation—Teman donated his GateGuard system to 100 Chabad centers throughout the country.[3] This significant act of charity and benevolence was prompted by the April 27, 2019 Shabbat-morning shooting at a Chabad religious service in Poway, California. One recipient of Teman's generosity was the Chabad House in Miami, whose rabbi shares that Teman installed the GateGuard system at his own expense and that the system continues to help the organization to this day.[4] During the COVID-19 pandemic, GateGuard is uniquely important because it permits contactless access control, especially in places which are frequented by many people.

---

[3] Some systems are yet to be installed. However, the systems remain set aside and allocated to the respective recipient of the donation.
[4] *See* Exhibit 13 (Lipskar Letter).

6

Teman also founded 12gurus:Health—a health conference with free online access to TED-style expert talks (https://12gurusHealth.com). As he explained in his letter enclosed for this Court's consideration, Dr. Rami Cohen—a physician and entrepreneur—met Teman in 2012 when Dr. Cohen presented at Teman's conference.[5] Dr. Cohen described the conference Teman created as "like no other"—where leaders from the top medical institutions around the world and startups gathered together "to share ideas that nobody had talked about in the traditional industry-focused, 'siloed' conferences we were used to." Teman did this to better the world—"without any profit in mind."

And, as Dr. Cohen explained, even while on home detention, Teman has joined the fray of thinkers to try to establish FAR UVC-wearable technology to protect people from COVID-19—this time with people he met at medical conferences including leading researchers at MIT, Harvard, and Columbia. Juhan Sonin, a lecturer at MIT, is working with Teman on what Mr. Sonin describes as a "new venture to create a virus-free existence for warehouse staff (for Amazon, UPS, etc) through wearable ultraviolet light (UVC) devices that kill and disinfect against COVID19 (and other pathogens)."[6] Mr. Sonin describes himself as "a strong supporter of Mr. Ari Teman" who sees Teman's "increasing impact on personal technology and safety as an urgent and needed injection into the nation, especially during these sickly times."

Teman also created and curated the 12gurus:Charity conference, which is also available online at https://12gurusCharity.com, in an effort to improve how nonprofits operate and deliver services to people. Attendees and speakers came from organizations such as the Acumen Fund and the Bill & Melinda Gates Foundation. Those who could not afford a ticket were given one for free.

---

[5] *See* Exhibit 1 (Cohen Letter).
[6] *See* Exhibit 2 (Sonin Letter).

And Teman made dozens of seats available for free to observant Jewish organizations.

As a comedian, Teman regularly donated his time and performances to organizations seeking to fundraise. For example, Rabbi Avi Ganz attested to many instances where Teman donated his time and even refused reimbursement for travel expenses to raise money for Ganz's Observant Jewish year in Israel program for young adults with special needs.[7]

What stands out about Teman is the extent to which he has selflessly, throughout his entire adult life, served others—not only financially but with actual boots on the ground. And he has done so even while on home detention after trial in this case.

> 4.    *Teman's Record of Charity and Benevolence Warrants a Reduced Sentence*

Federal courts routinely recognize a defendant's record of charity and benevolence as warranting a reduced sentence. *See, e.g., United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) ("While many of Rioux's public acts of charity are not worthy of commendation, he unquestionably has participated to a large degree in legitimate fund raising efforts. Of particular moment are Rioux's efforts to raise money for the Kidney Foundation. It was not an abuse of discretion for the district court to conclude that, in combination, Rioux's medical condition and charitable and civic good deeds warranted a downward departure"); *United States v. Sarlo*, 269 F. App'x 30, 31 (2d Cir. 2008) ("In explaining his sentence, Judge Casey stated that he had considered all of the § 3553(a) factors in reaching his decision to impose a below-Guidelines sentence. He noted Sarlo's age, health problems, charitable acts and involvement with her church").

Perhaps most notably, the United States Court of Appeals for the Seventh Circuit recently affirmed the probation sentence H. Ty Warner, the billionaire creator of Beanie Babies, received

---

[7] *See* Exhibit 11 (Ganz Letter).

for evading $5.6 million in federal taxes by hiding assets in a Swiss bank account. *See United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015). The sentencing court acknowledged Warner's "private acts of kindness, generosity and benevolence" and emphasized that "many of them took place long before Warner knew he was under investigation." *Id*. at 854. Teman's life—as evidenced by acts taken long before this investigation—is one of genuine and sincere kindness, generosity and benevolence. And Teman's charitable acts are of the most commendable kind: hands-on volunteerism that literally touches the lives of those around him.

5.    *The People Who Know Teman Best Paint the Accurate Picture of His Character*

As reflected in the many letters submitted to this Court for consideration, Teman has the support of people who have seen his true character. Jeffrey Katz, who has known Teman since they were undergraduates together at Brandeis University, described Teman's "deep desire to make the world a better place" as "literally who he is."[8] Oliver Josephs, who has known Teman for more than a decade from volunteering in JCorps New York City and running JCorps Washington, D.C., wanted to stress for this Court "how much of a rare and valuable gift Ari is to the Jewish community, to cities around the world, and the many thousands people of all backgrounds we have helped with JCorps over the years."[9] He described JCorps, which Teman ran "unpaid, purely, as a mission-driven project to help others." Mr. Josephs described the moment Hurricane Sandy struck New York when Teman, "who was literally in the hospital that weekend incredibly ill…pulled himself together enough to ensure that 150 JCorps volunteers were the first team to arrive downtown to bring water and food to the elderly in buildings that had lost power for their elevators and water pumps." And to be clear, this is not the story of a man with a big

---

[8] *See* Exhibit 3 (Katz Letter).
[9] *See* Exhibit 4 (Josephs Letter).

checkbook writing a check to help others (which itself is commendable); rather, "Ari, shaking and in pain, stood out in the cold with a paper pad and a mobile phone, ensuring building after building, floor after floor was checked and that every senior and disabled person had what they needed and knew what was happening."

Those he worked with speak highly of Teman. Thomas Orosz, who first met Teman when he was recovering from addiction and homelessness, credits Teman with supporting him not only as an employee but as a person: "Ari never quit on me even when I lost hope in myself and had setbacks. He gave me the tools and coaching I needed. He never judged me and always expected more for me and encouraged me to achieve it."[10] David Diwby, who owns and operates New York Mechanic Company, has worked professionally with GateGuard doing installation work—and describes time after time where Teman took care of his customers even at great expense to his business.[11]

Nachum Klar, who has known Teman since high school, describes him as a "kindhearted and generous person that will always go out of his way to help others."[12] And actions speak even louder than words. As Klar described, "When 11 people were shot in the Tree of Life synagogue in Pittsburgh, Ari immediately contacted hundreds of synagogues across the country offering to provide his company's security system free of charge. He has since provided well over 100 of them at his own expense." And Teman hopes to continue being able to service his customers without interruption. For instance, Anthony Zachariadis of TZM Realty has been a client of GateGuard since the Fall of 2019. As he described, "Along with the majority of our tenants, we are very pleased with how the system has been working in our buildings….It is our hope that Mr.

---

[10] *See* Exhibit 5 (Orosz Letter).
[11] *See* Exhibit 6 (Diwby Letter).
[12] *See* Exhibit 7 (Klar Letter).

Teman remain available to us to maintain a successful business relationship in the days, weeks, months, and years to come."[13] In that respect, Teman is committed to the many GateGuard customers where systems are live on buildings throughout the country—and he is primarily responsible for conducting technical support and managing the engineering and report teams. Even during the ongoing COVID-19 pandemic and in the midst of the most stressful months of his life, Teman has remained particularly committed to ensuring that GateGuard's systems continue to serve the needs of people who rely on the system now more than ever for online deliveries including medicine, baby formula, and similar necessities—and he has done so even without the resources and staffing GateGuard has had in the past. This speaks to Teman's character.

For his remarkable service to the community beginning more than a decade before the allegations giving rise to this prosecution and continuing to this day, Teman won the Jewish Community Heroes Award in 2009.[14] And he has continued serving his community—currently volunteering his time to work towards medical hardware aiming to protect people from COVID-19 and other viral infections. Whether Teman's collaboration with top researchers ultimately works or not is important (possibly life-saving) but not the point—it is that Teman, even during the most stressful months of his life, is volunteering his time to make the world a better, and safer, place.

Teman has also bettered himself between trial and sentencing through Harvard's Global Health Initiative online education program by successfully completing a course entitled "Lessons From Ebola: Preventing the Next Pandemic."[15]

Teman is an entrepreneur but his actions over the years reflect that money does not drive

---

[13] *See* Exhibit 8 (Zachariadis Letter).
[14] *See* Exhibit 9 (eJewish Philanthrophy) Coverage of Teman's Award.
[15] *See* Exhibit 10 (HarvardX Verified Certificate of Achievement issued May 11, 2020).

11

A-2056

his actions. Avi Ganz, the director of Yeshivat Darkaynu, a post-high school program for men and women with special needs, met Teman several years ago and asked Teman to perform as a stand-up comedian at a fundraising event. Teman "insisted on doing the event for free and wouldn't even let us cover the travel costs."[16] Since then, the two became friends, and Mr. Ganz shares, "I see how he has donated his time, money, knowledge and more to so many good causes. His mind is always thinking about the next project and how he can make the world a better place in one way or another."

These testaments, and the many others submitted with this memorandum, speak volumes about Teman's true character.

> B.  The Nature and Circumstances of the Offense and The Need to Protect the Public from Further Crimes of the Defendant – 18 U.S.C. §§ 3553(a)(1) and (a)(2)(C)

As demonstrated by his complete lack of criminal history and the lack of any bond violations both pre- and post-trial, this Court should not be concerned about recidivism. Teman has already suffered greatly as a result of this case, and the shame and humiliation this criminal case has brought him has been profoundly difficult for him to bear.

Teman immediately implemented the additional measures this Court required regarding his businesses when it modified the terms of his release after trial. The 5 days in jail over the Fourth of July holiday weekend in 2019 were the worst 5 days in Teman's life. And, since trial, Teman has remained on home detention—which itself has been punitive. Even if Teman receives the most lenient sentence possible, this Court should not conclude there is any risk of recidivism.

---

[16] *See* Exhibit 11 (Ganz Letter).

12

C.      The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)

       *1.*      *A Sentence of Time-Served or, At Most, a Sentence That Substitutes Home Confinement for Prison is Sufficiently Punitive*

In *Gall*, the U.S. Supreme Court observed that even probation, "'rather than an act of leniency,' is a 'substantial restriction of freedom.'" 552 U.S. at 44; *see also Warner*, 792 F.3d at 860 (affirming term of probation as "a sufficiently serious sentence"); *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) (recognizing that "probation can be severe punishment[], hugely restrictive of liberty, highly effective in the deterrent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished"); *United States v. Brady*, No. 02-CR-1043 (JG), 2004 WL 86414, at *8 (E.D.N.Y. Jan. 20, 2004) (noting that probation is "a punitive measure"). Congress and the Sentencing Commission have similarly recognized that probation, "a sentence in and of itself," may constitute an appropriate alternative to incarceration that meets fully the statutory purposes of sentencing. *See* U.S.S.G., Ch. 5, pt. B, Intro. Cmt. (citing 18 U.S.C. § 3561). Probationers remain subject to "several standard conditions that substantially restrict their liberty," including restraints on their ability to associate freely or to leave the judicial district. *Gall*, 552 U.S. at 48. The Court can also impose a variety of "discretionary conditions" to probation, 18 U.S.C. § 3563(b), and the violation of any condition can be grounds for revocation and the imposition of a term of incarceration.

Nor was probation intended by Congress to be an exceptional kind of punishment. To the contrary, Congress directed, more than three decades ago, that the Guidelines should reflect the "general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). This is precisely the position in which Teman finds himself. As reflected in the PSR, Teman has no prior criminal history and has not been convicted of a crime

13

of violence.

To be clear, the sentence Teman seeks in this case is more than probation. He has already served 5 grueling days in a federal detention center and more than six months on home detention since trial (in addition to his time on pretrial release before trial where his freedom was restricted but did not include home detention).

         2.    *Teman's Medical History Makes a Prison Sentence Particularly Brutal and Dangerous*

Teman has a documented mental health and physical health medical history that merits serious consideration by this Court.

Teman has a history of respiratory illnesses. Dr. Osterweil, an ear, nose, and throat specialist who has treated Teman for eight years, advised the Probation Office of Teman's decade-long history of breathing issues, requiring multiple non-cosmetic surgeries to his nose and airways—one of which required 11 hours to completely reconstruct Teman's airway. According to his doctor, Teman has a compromised upper respiratory anatomy and physiology that make him a higher risk for COVID-19 complications if infected. This, coupled with Teman's recent diagnoses of degenerative back disease and periodic insomnia, make it frighteningly possible that even a relatively short prison sentence could very soon become a death sentence.

Furthermore, Teman has been prescribed corticosteroids, which the CDC confirms makes people of all ages at an increased risk of severe illness from COVID-19.[17] It is this unfortunate combination of severe respiratory problems, the use of prescribed corticosteroids, an increased BMI, and sleep apnea, among other health conditions, that makes Teman particularly at risk of serious illness or death if he were to contract COVID-19.

---

[17] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed July 7, 2020).

14

As this Court is well aware, this is not an academic concern. In stark contrast, jails and prisons have singularly become COVID-19 hotspots by their very nature—it is impossible for inmates to practice CDC-recommended social distancing, CDC-recommended alcohol-based hand sanitizers are considered contraband, and inmates do not have access to personal protective equipment necessary to protect themselves. The numbers are daunting. As of the date of this filing, 94 federal inmates and one staff member have died from COVID-19 and the trends of test results are terrifying:



It is well-recognized that people like Teman—with compromised upper respiratory tracts and documented histories of breathing difficulties including sleep disorders—are particularly at-risk for serious complications if infected with COVID-19. Thus, a prison sentence would constitute

the perfect storm: Teman would be at greater risk of exposure to the illness in the first place and, if infected, Teman's medical history makes him particularly vulnerable to serious injury or death. In this unprecedented global pandemic that has claimed the lives of more Americans than World War I, this Court can and should consider that even a short prison sentence would be particularly punitive to Teman.

Furthermore, Teman has a documented history of mental health diagnoses—including anxiety, depression, sleep disorders, and a unique PTSD arising out of an experience with a physician who victimized Teman and who has since been criminally convicted of conduct arising, in part, from his unorthodox medical practice. This doctor institutionally committed Teman against his will and victimized him in other ways. Teman is submitting mental health documentation under seal for this Court's review.

Under these circumstances, Teman submits that a sentence of time-served is sufficient punishment in this case. Indeed, the very existence of this case alone has already hit Teman hard and the collateral consequences are real.

>   3.   *Teman's Medical History Warrants a Reduced Sentence or, at a Minimum, a Non-Custodial Sentence*

It is well-settled that sentencing courts should consider a defendant's physical and mental history when crafting an appropriate sentence generally—and certainly in the midst of an unprecedented pandemic. *See, e.g., United States v. Figueroa*, 421 F. App'x 23, 25 (2d Cir. 2011) ("The record, however, clearly demonstrates that the district court conscientiously took Figueroa's health into consideration, resulting in a sentence well below the bottom of the Guidelines range"); *United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1529535, at *2 (S.D.N.Y. Mar. 31, 2020), *reconsideration denied*, No. 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020) ("After concluding that a 'substantial' downward variance from the recommended Guidelines

16

range of 108 to 135 months' imprisonment was warranted in light of Dr. Nkanga's serious health issues and 'declining condition,' among other things, the Court sentenced Dr. Nkanga to thirty-six months' imprisonment"); *United States v. Burnell*, 367 F. Supp. 3d 12, 16 (E.D.N.Y. 2019) (defendant sentenced to probation, notwithstanding Guidelines range of 12-18 months, based on "what appears to" the Court to be "longstanding—but unrecognized—mental health problems"); *United States v. Alatsas*, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (JBW) (imposing a term of probation, despite Guidelines range of 24-30 months where, *inter alia*, "[d]efendant has multiple complex medical problems, which will be better cared for outside of prison"); *United States v. Burks*, 2010 WL 1221752 at *2 (E.D.N.Y. Mar. 29, 2010) (defendant sentenced to one month incarceration and five years' probation despite a Guidelines range of 57-71 months where, among other things, the defendant suffered from degenerative diabetes).

        *4.    This Court Can Impose Substantial Community Service as a Condition of Supervised Release as a Sentencing Alternative to Incarceration*

Given Teman's extensive history of volunteerism and service to his community, this Court can impose community service in lieu of prison—which would not only benefit Teman but would also permit Teman to continue to benefit the community. For instance, this Court could institute a plan through an organization such as the Aleph Institute whereby this Court could order Teman to perform specific community service that is real, tangible, and verifiable—all, of course, subject to conditions set by this Court.

    D.    <u>The Need to Avoid Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(6)</u>

A sentence of time-served in this case would satisfy Congress' mandate that sentencing courts should aspire to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(7).

17

A downward variance in this case is appropriate on the merits—but is also not inconsistent with how similarly-situated defendants are sentenced throughout the country. In 2019, for example, based on data published by the United States Sentencing Commission, 3 out of every 4 defendants received a below-Guidelines sentence.[18] In the Southern District of New York, 58% of defendants received a downward departure (1.8%) or a downward variance (56.8%).[19] For economic offenses nationwide, the majority of defendants received a below-Guidelines sentence.[20] And, in the Southern District of New York, the mean and median sentences (21 and 12 months, respectively) for fraud crimes were both *well below* the advisory Guidelines range in this case.[21]

Further, in light of *Booker* and its progeny, district courts are now free to account for the fact that the Guidelines analysis often results in an advisory sentencing range which bears little relation to a defendant's actual conduct, especially where, as here, the Guidelines are determined mechanically by loss amounts. *See, e.g., United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (FB) (imposing 60 months' imprisonment in stock fraud case despite advisory sentencing range of 360 months to life).

Teman submits that the following examples militate towards the Court's imposition of a non-custodial sentence to avoid unwarranted sentencing disparities.

In *United States v. Davenport,* case no. 1:17-CR-00061 (SDNY, Preska, *J.*), Davenport was indicted for, *inter alia,* honest services wire fraud and money laundering; Davenport

---

[18] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table29.pdf (last accessed July 7, 2020).
[19] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table30.pdf (last accessed July 7, 2020).
[20] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/TableE7.pdf (last accessed July 7, 2020).
[21] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/stats_NYS.pdf (last accessed July 7, 2020).

proceeded to trial and was convicted. Davenport was at a level 30 and his guideline range was 97 to 121 months.[22] Davenport requested a non-custodial sentence, the Probation Office's recommendation was 30 months, and the Government sought a below-guidelines sentence, but one that was substantially above the recommendation of the term recommended by Probation.[23] Judge Preska found that notwithstanding the $9.7 million loss and the fact that Davenport used shell companies, a "year and a day" sentence was appropriate under the circumstances.

Teman submits that if Davenport (who also exercised his constitutional right to a trial) received a "year and a day" sentence when at a level 30 based on a $9.7 million loss, the facts of this case are substantially less egregious and would warrant a non-custodial sentence. The need to eliminate unwarranted sentencing disparities militates strongly in finding that a non-custodial sentence is appropriate for Teman.

In *United States v. Dilip Vadlamudi*, case no. 1:16-cr-789 (SDNY, Forrest, *J.*), Vadlamudi pleaded guilty to conspiring to violate the Travel Act in connection with a bribery and kickback scheme that victimized a large nonprofit organization engaged in leukemia and lymphoma research, in violation of 18 U.S.C. § 371. Vadlamudi was at a level 12 and his guidelines range was 10 to 16 months. Vadlamudi requested a non-custodial sentence, the Probation Office's recommendation was a split sentence of five months of imprisonment and three years of supervised release thereafter with a special condition of five months of location monitoring, and the Government sought a guidelines sentence. Judge Forrest imposed a sentence of three years' probation with no incarceration. Admittedly, the loss in this case is greater than in *Vadlamudi*, but this case is much closer to *Vadlamudi* than *Davenport*. Accordingly, this Court should likewise seriously consider a term of supervised

---

[22] This range was driven by the $9.7 million kickback that Davenport received.

[23] Part of the reason that the Government advocated for a substantial sentence was the multimillion-dollar kickback and the use of shell companies (because the amount of the bribe/kickback exceeded $9.5 million but did not exceed 25 million, 20 levels were added, pursuant to U.S.S.G. §§ 2B4.1(b)(1)(B) and 2B1.1(b)(1)(K)).

release with no incarceration.

And in *United States v. Hernandez* (aka Tekashi 6ix 9ine)*, case no. 1:18-cr-834 (SDNY), Hernandez, an internationally-known rap artist who joined the Nine Trey Gangsta Bloods (a highly violent New York City gang), was charged with a host of crimes including racketeering conspiracy and Violent Crimes in Aid of Racketeering ("VCAR"). Hernandez's criminal acts included helping fund Nine Trey's leadership and operations. Indeed, Hernandez and other members of Nine Trey wreaked havoc in New York City by, among other things, committing multiple acts of violence in public places throughout the city.

Hernandez proceeded to cooperate with the Government and, as a result of this substantial assistance, was able to obtain a motion pursuant to Section 5K1.1 from the Government. Ultimately, this Court sentenced Hernandez to a term of 24 months' imprisonment. However, when COVID-19 struck the United States, Hernandez subsequently moved, pursuant to 18 U.S.C. § 3582(c) for compassionate release. This Court noted that "[h]ad the Court known that sentencing Mr. Hernandez to serve the final four months of his term in a federal prison would have exposed him to a heightened health risk, the Court would have directed that these four months be served instead in home confinement." Further "[t]he Court noted that the sources of authority that courts (including this Court) have recently invoked to release from custody prisoners with heightened health risks from COVID-19 *who have not yet been sentenced* are not available in Mr. Hernandez's case, because he has already been sentenced." (emphasis added).

While the comparison between Teman and Hernandez is not exact, this Court can, and should, draw some comparisons between the two cases. Admittedly, Teman did not testify for the Government, nor did the Government file a Section 5K1.1 motion. However, Teman did not fund a violent gang and its operations, nor was he charged with VCAR (one of the most serious violent offenses in all of the United States Code). Even taking into account Hernandez's substantial assistance to the

Government, one cannot simply ignore the fact that his actions contributed to numerous violent acts (and he did so in order to facilitate his rap career). As Hernandez was sentenced to a below-guidelines term of 24 months' imprisonment, Teman's sentence should likewise be substantially below the Guidelines.

Further, with respect to Hernandez serving his four remaining months of his sentence (*i.e.* reducing his sentence from 24 months of incarceration by the BOP to 20 months) based on his health conditions that made him particularly vulnerable to COVID-19, Teman's medical conditions are substantially similar to Hernandez's—if not more severe with respect to COVID-19 risk factors—that would result in the same considerations for compassionate release. *See* discussion *infra*. However, given that this Court has not yet sentenced Teman, this Court has much more flexibility in crafting a sentence to take these considerations into account. As Teman is not a danger to the community, his long-standing and well documented physical ailments justify, as they did for Mr. Hernandez, this Court's taking into account COVID-19 when crafting a sentence sufficient, but no greater than necessary (under the circumstances), while at the same time considering the "history and characteristics of [Teman] " and "the need to provide [Teman] with needed . . . medical care." 18 U.S.C. § 3553(a).

Taking all of the foregoing into consideration, a non-custodial sentence is appropriate given the facts of this case, and given his personal medical history in the context of the on-going pandemic.

E.    The Need to Provide Restitution – 18 U.S.C. § 3553(a)(7)

Section 3553(a)(7) directs this Court to consider "the need to provide restitution to any victims of the offense." Teman intends to pay a significant portion, if not the entirety, of restitution on the date of sentencing.

Furthermore, Teman's ability to work to pay any remaining restitution will be made more difficult by any custodial sentence.

A-2066

F.    Other Considerations – Collateral Consequences

Teman brings one important case to the Court's attention: *United States v. Nesbeth*, 188 F. Supp. 3d 179, 2016 WL 3022073 (E.D.N.Y. 2016), *appeal withdrawn* (Sept. 9, 2016). In *Nesbeth*, the defendant was convicted by a jury of "of importation of cocaine and possession of cocaine with intent to distribute. Her advisory guidelines sentencing range was 33-41 months." *Id*. at *1. In thoughtfully rendering a sentence of one year of probation, Judge Block explained:

> Nonetheless, I rendered a non-incarceratory sentence today in part because of a number of statutory and regulatory collateral consequences she will face as a convicted felon. I have incorporated those consequences in the balancing of the 18 U.S.C. § 3553(a) factors in imposing a one-year probationary sentence.
>
> I am writing this opinion because from my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers—both prosecutors and defense counsel—as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence.
>
> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction.
>
> The effects of these collateral consequences can be devastating. As Professor Michelle Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'"

*Id*. (internal footnotes omitted).

If Judge Block, after over two decades as a district judge, considered varying downward from a Guidelines range of 33-41 months (a level 20, one level *higher* than in the instant case), and imposed a non-custodial sentence, this Court should, at a minimum, consider imposing a "time served" sentence in this case as well. Indeed, the collateral consequences of Teman being a convicted felon will have immediate and long-lasting effects—including, but not limited to, not being able to vote in the upcoming election, not being able to possess a firearm, and not being able

22

to secure business loans. This Court can, and should, take these long-lasting collateral consequences into account when fashioning a sentence sufficient, but no greater than necessary.

### V.    Conclusion

A sentence of time served is not a slap on the wrist—it is, instead, the appropriate sentence in this case taking into account all relevant considerations. For all the reasons set forth in the PSR, in this memorandum, and in the additional documents submitted for this Court's consideration, Teman appeals to this Court's discretion to impose a non-custodial sentence.

Teman respectfully submits that a sentence of time served or, at a minimum, a sentence substituting home confinement and/or community service for prison is "sufficient, but not greater than necessary," and that is what the law requires. 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND
MO Bar # 62265
MARGULIS GELFAND, LLC
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: (314) 390-0234 Facsimile:
(314) 485-2264
justin@margulisgelfand.com

— and —

*/s/ Joseph A. DiRuzzo, III*
JOSEPH A. DIRUZZO, III
NY Bar # 4417853
DIRUZZO & COMPANY
Joseph A. DiRuzzo, III
401 East Las Olas Blvd., Suite 1400 Ft.
Lauderdale, FL 33301
Telephone: (954) 615-1676 Facsimile:
(954) 827-0340
jd@diruzzolaw.com

**Attorneys for Teman**

*/s/ Alan Dershowitz*
ALAN DERSHOWITZ*
1575 Massachusetts Avenue
Cambridge, MA 02138

**Of Counsel**

*\*Member of the Massachusetts Bar and the
United States Court of Appeals for the
Second Circuit; will seek pro hac vice
admission in this case*

A-2069

## Certificate of Service

I hereby certify that the foregoing was filed electronically with the Clerk of the Court, and

that all parties will receive notice of this filing through this Court's electronic filing system.

*/s/ Joseph A. DiRuzzo, III*
JOSEPH A. DIRUZZO, III
NY Bar # 4417853
DIRUZZO & COMPANY
Joseph A. DiRuzzo, III
401 East Las Olas Blvd., Suite 1400 Ft.
Lauderdale, FL 33301
Telephone: (954) 615-1676  Facsimile:
(954) 827-0340
jd@diruzzolaw.com

25

A-2070

Dr. Rami Cohen, MD
4 Arie Baron
Petach Tikva, Israel
Rami.cohen@gmail.com                                              6/29/2020

Dear Judge Engelmayer,

My name is Dr. Rami Cohen, I'm a physician and an entrepreneur living in Israel. I have known Ari
Teman for years and would like to share my impression of him, hoping it will allow you to see a bigger
picture prior to sentencing.

I met Ari, back in March, 2012, when I participated at the 12gurus:Health conference he founded.
While it started as a business relationship (as I presented in that conference), it quickly became a true
friendship. Every time I visited NYC, few times a year, we tried, an often succeeded, to meet and
chat. When Ari visited Israel, we met several times. In between, we kept regular connection via online
chat and phone calls. During those meetings we shared the ups and downs of life, personal and
professional, and I witnessed his character & behavior in a variety of situations.

Ari is a big thinker, driven to innovate, sometimes for the sake of making the world a better place, and
sometimes just for the sake of the innovation itself. He is also a helper, who jumps to assist without
being asked, and who is always available to friends and fellow entrepreneurs. He is full of love and
kindness.

The conference Ari created was like no other. Ari brought together leaders from Mayo Clinic, Harvard,
MIT, UNC, NYU, Columbia, and so many startups, to share ideas that nobody had talked about in the
traditional industry-focused, "siloed" conferences we were used to. Everyone I met was excited and
invigorated to help others from Ari's work. He convinced the best thinkers to give their time and ideas,
delivered exceptional content, and then gave it free online, and even gave free or discount tickets to
students and entrepreneurs who could not afford the regular ticket. He ran around introducing people
and facilitating business relationships without asking for anything in return. As far as I know, although
the conference was extremely successful, there was no profit in it. This is very unusual for healthcare
conferences, and evident to the fact that Ari is not a money driven person.

A-2071

Ari continues to bring some of the smartest people together to help others, even during house arrest, suffering personally an unimaginable stress, and with the whole world on lockdown. In example, he recently brought together Dr. John Ratey from Harvard Medical School with Dr. Russel Foster from Oxford to discuss healthy approaches to quarantine on a web video chat. Again, without any profit in mind.

I have remained close friends with Ari over the years, frequently getting late night dinners or tea and discussing business, family, and ideas. Over the years I have seen Ari struggle with various obstacles in life, both personal and professional. Ari was always positive and very creative in resolving problems and overcoming challenges. As an entrepreneur, he always kept looking at the macro level of an issue, trying to solve big problems and thinking about the large scale. With grand visions he often forgot to take care of himself, working long hours, last to get paid, etc. When his business was doing well, instead of pocketing some money for a rainy day, he would rather pay developers to improve a feature or hire technicians to offer his clients better service.

Ari loves ideas, loves creating things, loves helping others achieve their goals. These are his passions and he's almost always active in them. He says at the bottom of every email, and in conversations, "Please let me know how I can be helpful," and he acts it. Ari does not only respond to requests for help, he looks to help.

In the technology area, as often mentioned in the press, GateGuard is very respected, and it is used by top landlords and management companies. It is very difficult to make any hardware product, and even more difficult to make one used outdoors in often-violent areas, but GateGuard serve thousands of people every day as a means of entering their buildings and admitting guests. The hardware, software, and business sides of this are very difficult to do, especially as a "bootstrapped" company relying on customers to pay their bills instead of outsized investor funds. Ari worked very hard, always if you called him he was in the office working, and up early with engineers or late with the factory, or in a basement of a building helping his installers learn their skills.

In the last couple of years, I've had several conversations with Ari regarding GateGuard. I have seen his frustrations dealing with landlords as clients. Too often they did whatever it takes not to pay on time or no to pay at all. I have seen him go trough many stages from surprise, hope, disappointment, anger, caution to almost paranoid. For me, he seemed like a fish out of the water. Seeing the bad effect on his wellbeing, I encouraged him several times to quit, sell the business or pivot to a

A-2072

"healthier" industry. Ari, even in moments of true despair, felt obligated to run the service for his customers and the tenants.  On the night of the verdict, I happened to be in NYC. We were shocked he was found guilty, trying to understand what it means for his life. Ari was busy trying to figure out a way to keep the servers up and running to prevent a lock out of the many tenants using his devices. He is driven by creating, by serving people and good doing. I wish, and I'm certain Ari wishes too, He would take my advice few years ago and stopped dealing with the real estate sharks.

As someone who has started several businesses, I can tell you that building any company or organization is exceedingly difficult and also messy. Founders rely on advice, sometimes wrong, they rely on customers and investors who often make false promises, and so they make choices and guesses under extreme pressure, sometimes wrong. If Ari made a mistake here, it is a factor of that, and not a character issue. I am sure he has learned his lesson and can tell you with 100% certainty that he wishes he did things differently! While Ari may have made a mistake, he is no thief. The prime mistake was having a too good man trying to disrupt an industry filled with greedy, shady, infamous landlords.

Even under house arrest, Ari invented a device that may safely utilize Far UVC light to filter-out Coronavirus, and then recruited some of the smartest experts -- people who met Ari at his medical conference and elsewhere, from MIT, Harvard Medical School, Columbia University -- to work on "Far UVC" wearable technology which will kill viruses & superbugs as they approach the wearer. Millions of people could be saved via his leadership and his team, and the next pandemic could be ended more quickly.  I hope you will allow Ari to continue his good work. It would be a major harm to society to put him in prison and stop this work.

I can also tell you as a friend who knows Ari well, that he is much happier and more excited working with healthcare innovators than real estate people -- and the Court can be sure that Ari has learned his lesson, that he is not a fit for that industry and is working to leave it while ensuring his customers and investors are taken care-of. In fact, we have talked and are working to find a replacement CEO who will be better suited for those personalities, so Ari does not have to interact them or handle business matters.

A-2073

As a physician and friend who has known Ari for years, I urge you please do not put him into a prison or camp, which would almost-certainly cause him severe mental damage. Ari's mind is healthy when it's busy creating, but solitude and stillness are hell for anyone with such personality. Even now, hurting from this payment dispute turned criminal prosecution, he has begun to turn this hard-learned lesson into more good for the world.

Please do the world the kindness of freeing Ari to do good. Please do not torture him by putting him in prison.

Thank you,

Dr. Rami Cohen, MD

July 6, 2020

The Honorable Paul A. Engelmayer
United States District Court
Souther District of New York
40 Centre Street, New York, NY 10007

Judge Paul Engelmayer,

Ari Teman and I are colleagues and friends. Our healthcare technology lives first intertwined a decade ago at Ari's 12Gurus Healthcare Conference in New York. He put together an excellent line-up of storytellers in medicine, health tech infrastructure, and patient-centric care and provided a thought-provoking and community-building experience. Held on the Broadway show Avenue Q's stage (during the daylight hours as to not interfere with the box office hit), Ari designed an intimate experience for the audience, vendors, and speakers... and it worked beautifully.

Since 2012, Ari and I have corresponded regularly on health and healthcare policy. And as of earlier this year, I joined his new venture to create a virus-free existence for warehouse staff (for Amazon, UPS, etc) through wearable ultraviolet light (UVC) devices that kill and disinfect against COVID19 (and other pathogens). He's a straight shooter, funny, sharp, and motivated. His concern for his fellow humans, regardless of political or emotional bias, is clear through his work to protect apartment residents via his GateGuard services, through putting the patient in the driver's seat of healthcare (a major vector of his 12Gurus conference theme), and his newest venture to eradicate COVID19 from front-line workers (of which I'm a proud partner).

I hope you find his small error excusable and instantly recoverable. I'm a strong supporter of Mr Ari Teman and see his increasing impact on personal technology and safety as an urgent and needed injection into the nation, especially during these sickly times.

Sincerely yours,

A-2075

Juhan Sonin

Lecturer, Massachusetts Institute of Technology (MIT.edu),
Owner, GoInvo, an open source healthcare studio (GoInvo.com)
617.504.3390, juhan@mit.edu
Boston, MA

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street
New York, NY 10007

Dear Judge Engelmayer

I met Ari as undergraduates at Brandeis University.  He is always the first one to try to make someone
smile with some humor or solve a problem that someone (or the world) is having big or small.  He is also
always honest, even to a fault sometimes.  It's just who he is.

My wife (who also knows Ari from Brandeis University) and I were thrilled to host Ari one weekend a few
years back at our house in Maryland.  We enjoyed catching up with him over meals and watching as he
entertained our kids to no end.  Ari and I frequently text each other and chat on the phone and he has
always been honest with me, respectful, and kind.

I've always felt that Ari will one day stumble upon some kind of innovation or concept that he will build that
will truly make the world a better place on a large scale.  In the meantime, he already has built many
successful initiatives and products.  For example, he created an organization called JCorps that got quite
popular, getting young jewish people to volunteer for good causes.  He even published some kind of
futuristic vision for how sustainable cities could look and operate, incorporating innovative design
concepts to alleviate traffic, conserve energy, and make life more fun and in harmony with nature.  Ari has
also founded a number of exciting startups including Friend or Fraud, Gateguard, and Sublet Spy, each
finding unique and novel ways to solve both painful and persistent problems.

Through all of these tremendous contributions to society, he has always been true to his self, with his
combination of humor, ingenuity, brutal honesty, and deep desire to make the world a better place (I don't
mean this as a cliche, this is literally who he is).

Please know that as his friend, I cannot imagine Ari intentionally doing anything outside the bounds of
law.  Ari prides himself on using his smarts to to innovate and problem solve within the framework of
whatever industry he is in.

I truly hope he is able to continue bringing his passion for problem solving and making the world a better
place every day of his life.  Lately, I have been seeing the incredible paintings, he has been posting to
social media, yet another contribution that he has to offer.

Sincerely,

Jeffrey Katz

A-2077

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street
New York, NY 10007

June 6, 2020

Your Honor,

My name is Oliver Josephs and I've known Ari Teman for over a decade from running JCorps Washington, DC, and before that as a volunteer in JCorps NYC. I want to stress how much of rare and valuable gift Ari is to the Jewish community, to cities around the world, and the many thousands people of all backgrounds we have helped with JCorps over the years. I want to show you how he is always careful with his word, how honesty and trust are important to him, and how generous and kind he is to so many. I hope you will show mercy to him and allow him the freedom to continue to do good for so many.

Ari built and ran JCorps unpaid, purely, as a mission-driven project to help others. He inspired thousands of young adults of all backgrounds to give their limited free time to serve others. Ari may have done it for free, but he did it with the full professionalism and effort you'd expect from a major organization. He worked tirelessly, day, night, weekends. He traveled to cities to help chapter directors launch, as he did with me when I moved from NYC to Washington DC and was inspired to open JCorps.

Ari was and remains always available to help and encourage and cheer on his volunteers. He still to this day helps volunteers with jobs, with connections, he roots them on and coaches them in their relationships and marriages. The couples who met because of him and their kids know he's an easy sale for girl scout cookies, which he proudly helps them advertise online. There are countless families and friendships that exist because of Ari's relentless kindness in building JCorps.

JCorps fed thousands of meals to the homeless, visited hundreds of seniors, did crafts with children in hospitals, children with special needs, and inner city youth. JCorps helped build homes, took shelter animals for walks, and helped clean and build parks and playgrounds around the world.

When Hurricane Sandy struck NYC, Ari -- who was literally in the hospital that weekend incredibly ill -- pulled himself together enough to ensure that 150 JCorps volunteers were the first team to arrive downtown to bring water and food to the elderly in buildings that had lost power for their elevators and water pumps. Ari, shaking and in pain, stood out in the cold with a paper pad and a mobile phone, ensuring building after building, floor after floor was checked and that every senior and disabled person had what they needed and knew what was happening.

After that weekend, Ari climbed back into bed, where he fought illness, a horrible sleep disorder, for months more until surgery repaired his breathing. He then, without hesitation set back on building his life. While he was severely ill, he never stopped being there for JCorps volunteers -- even bedridden, he was often our most-vocal cheerleader and friend.

A-2078

In Your Honor's New York City, and around the world in the USA, Israel, and Canada, thousands of young professionals and students got their first experience volunteering because of Ari. Ari was the ultimate recruiter for good deeds, he made it cool, and he ran things professionally.

Ari put in every email a paragraph to us who'd applied to volunteer and been accepted titled "Your Word". He explained that "JCorps existed as a conversation". We gave our word to soup kitchens and children's hospitals that we'd show up, and to do that volunteers needed to keep their word. JCorps was perhaps the most reliable volunteer network for this reason. If JCorps said 20 volunteers were coming, they came. Ari built systems to text and email reminders so that even hungover millennials would wake up and show up on time. He built a database to track reliability, and he constantly improved the system.

Ari didn't just build JCorps, but seeing that other nonprofits were not running efficiently, he created "12gurus:Charity" a TED-style conference to share best practices for nonprofits. He had leaders from some of the best charities in the word getting together and sharing ideas. When a doctor friend said they needed it for healthcare, he created 12gurus:Health. Ari gave the videos away free to the world on the websites, and also let JCorps volunteers, students, and local leaders attend free if they couldn't afford a ticket.

Ari kept his word. He taught thousands of our young adults the value and power of keeping theirs. We helped countless people because of it, and became better people by giving. Many volunteers dedicated their lives to a career in helping or their weekends to volunteering because of Ari.

Over the years, I watched Ari work tirelessly to rebuild his life. He was always working, online, at conferences, at trade shows. You could see photos and videos of him and his team at all hours of the day and even weekends working to install their systems. Ari never took a shortcut. He built a business with hard work, and then he built another.

Your Honor has found that Ari did something wrong. I hope Your Honor will look at this as an exceptionally kind, honest, and well-intentioned person who made a mistake but that at his core Ari cares about the truth, and about giving his life to helping others.

**I ask that you have mercy on the thousands of people whom Ari helped & inspired by having mercy on Ari.** Please let Ari, who has no prior offenses and is a uniquely good person, serve his sentence through service and volunteering by running JCorps or other volunteering. Thank you,

Oliver Josephs

A-2079

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Center Street, New York, NY 10007

Dear Judge Engelmayer,

I am writing this letter on behalf of Ari Teman. I have known him over the course of two years. When I had first met him I was going through major hardships in my life, recovering from addiction and homeless, and from the very beginning of our relationship he had always looked passed my troubled past, giving me the opportunity to excel in the field and truly build my self esteem. During the time I worked for Mr. Teman I had the privilege of getting to know the man. He was never anything but helpful when it came to helping me get back on track in my life.

On many occasions I also was a part of the conversations that he had with new customers as well as old when it came to installations and maintenance. Not once did he not do his best to accommodate the customers preferences.

Because of Ari's help I have a full time job and am back in good relations with my family members. Ari never quit on me even when I lost hope in myself and had setbacks. He gave me the tools and coaching I needed. He never judged me and always expected more for me and encouraged me to achieve it.

I am no one of remarkable consideration to have any more credibility than the next Person. I only speak on my personal experience with Mr Teman and this is my testament to his character.


Thomas Orosz
tomjorosz@gmail.com

A-2080

The Honorable Paul A. Engelmayer

United States District Judge

United States District Court

Southern District of New York

Thurgood Marshall Courthouse

40 Centre Street

New York, NY 10007


Dear Judge Engelmayer


My name is David R Diwby and I own and operate New York Mechanic Company. I am a small business located in Bronx County New York and service the five boroughs of New York City as well as small parts of Upstate New York and all of Long Island in commercial and residential locksmith, door, window ,C.C.T.V and intercom installation and repair. I am writing on behalf of one of my customers Ari Teman, owner of Gate Guard (Teman Intercoms).

I met Ari over a year ago through an ad looking for qualified and available intercom installer's who would be able to do the installations of his intercom systems. Normally I would not have answered such an ad. When I install an intercom for a customer, I (At the time) have a list of other intercom systems I would push for the customer to purchase. But something caught my eye in his ad. The intercom system he was selling to his customers and that I would be installing was a completely independent system. This meaning other than hooking it up to the customers electrically controlled doors it ran completely independent of any of the buildings other system's (IE Internet, wifi ECT). It runs off of Cellular service and is in no need of an outside information port. After a lot of research on the system and Ari himself I found out that he designed this system and I found it to be an advancement in the field. As a small business owner I would have been foolish not to at least try to get involved in being in business with a company like this. Eventually I reached out to Ari, scheduled a meeting, went through a training session and as of now I have either serviced or installed well over 100 of his systems.

Most people associate service with repair. I would like to clarify with the exception of vandalism to a buildings unit the service I provide for Gate Guard is not solely for breakdowns (Which are few and far in-between). Over the past year I have seen the system improved upon several times in the form of redesign and software improvements. And they are the ONLY intercom company I know of that when a unit is not performing in a manner that is comparable to an updated model the customer gets a brand new fully revised model installed at no expense to the customer.

I have in the past year been involved in many new installs. Sometimes a customer thinks that when they are buying an intercom system they are getting everything they need to allow a tenant to open and close the door at there will (Electric controlled door strikes, wiring for the strikes, door closers ECT.).

A-2081

With any intercom company a customer must have this installed prior to the installation of any intercom system. But I have seen Gate Guard and Ari in particular go above and beyond this. I have been at customers that have purchase his system with no other door control hardware and when this becomes know he has footed the bill to get the customer what he needs to get his building running the way it needs to be. He has covered my cost of parts and labor (On more than one occasion) just so the customer can get his system installed and building running in a proper manner and compliant with NYC Code.

I have asked him on more than one occasion if this is the smart business thing to do and his reply is always the same. Let's just get them going.

As far as Ari the man himself I have come to consider him a friend. His advice in business ventures has been a great help to me personally. Through this hard time in his life he has not only shown me his strength of character by continuing to run his business in an honorable manner but also to make sure no matter what, the customers that have his equipment are continuing to be serviced. Even through this trial and his having to remain at home I still get calls asking me to service or update a system that is in need. I am aware of his current situation and even though this hard time when I offer to wave an invoice or tell him to take his time in paying a bill payment is always received next day. He has never been late on an invoice and he has never let this situation deter him from keeping his customers here in NY in need. I am happy that I answered his ad and proud to be working with a company (As well as the individual himself) that puts so much emphasis on customer service and good business and good business partnerships. I hope that one day soon I will see him back in NY and back to giving this good product to the building owners of NY City. If I can be of any assistance please do not hesitate to contact me at any time. I am greatly appreciative of you allowing me to write on Aria Behalf. Thank you for your time and consideration and I hope you and your family are staying safe in this hard time in our country.


David Diwby

NY Mechanical Company

347-531-3265

info@ny-mechanical.company.com

A-2082

DocuSign Envelope ID: AA66859C-1AEB-4A76-B8B6-31387D28B1A9

# Nachum Klar

josephklar@gmail.com / (973) 580-6078 / 300 East 85th Street Apt 1703 New York, NY 10028

To the Honorable Paul A. Engelmayer

Your Honor,

I met Ari close to 20 years ago when we were in high school and we have since become very close friends. My family considers him part of our family and we celebrate birthdays, Holiday dinners and most milestones together.  I've known Ari to be a kindhearted and generous person that will always go out of his way to help others out.

For example, several months ago when I was apartment hunting and having a challenging time, he reached out to all of his contacts via phone and email over a four week span in order to help me.

Ari has a love and passion for bringing diverse people together so that they can become friends, date and not feel alone in a city where many people often do. While attending many of his events I've always been impressed by how much effort he makes to ensure that everyone feels welcome and at home.

He Created Jcorp, an Organization that arranges for young people in the community to come together to volunteer in soup kitchens, senior centers, hospitals and the like. Jcorp grew into an international organization due to Ari's passion and determination to bring people together in order to help others and make the community a better place.

He hosts Friday night Sabbath meals for Jewish and non-Jewish people alike in order to foster understanding and friendship between people of various faiths and backgrounds.

A-2083

DocuSign Envelope ID: AA66859C-1AE8-4A76-B8B6-3138D278B1A9

When 11 people were shot in the Tree of Life synagogue in Pittsburgh, Ari immediately contacted hundreds of Synagogues across the country offering to provide his company's security system free of charge. He has since provided well over 100 of them at his own expense.

This is yet another example of many in which Ari has demonstrated strong character and a rare level of generosity. After knowing Ari for all these years I can confidently say that money has never been the driving force behind anything that he does. I believe that whether in business or in his personal life building strong and meaningful relationships as well as making a positive impact in the community is what gives Ari his sense of purpose.

Even during this difficul     t time, Ari has consistently reached out to me as well as his friends asking about our wellbeing and sending daily jokes to get people to smile and lift them up.

I sincerely hope that this letter serves to share with you what a special person Ari is and that you kindly keep this in mind when determining his fate.

Thank you,

Nachum Joseph Klar

DocuSigned by:

*Nachum Klar*

1ACF75950D88414...

7/6/2020

.

A-2084



Monday July 6ᵗʰ 2020.

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Centre Street,  New York, NY 10007

Your Honor,

My family and I own and operate a Real Estate management office in midtown Manhattan.

Since the fall of 2019 we have been clients of GateGuard. Along with the majority of our tenants, we are very pleased with how the system has been working in our buildings.

From the initial signing on up until present day, Mr Teman has been cooperative in making sure the machines in all the buildings are maintained and are operating in a timely fashion.

It is a remarkable technology that is far better than anything to come before it and provides enormous value to us. Ari works very hard, and he continues to help long after he makes a sale. He picks up the phone and answers email promptly.

It is our hope that Mr. Teman remain available to us to maintain a successful business relationship in the days, weeks, months, and years to come.

Thank you,

-Anthony Zachariadis
TZM Realty

**TZM**
**REALTY INC.**
**346 EAST 59ᵀᴴ ST. SUITE #1 NEW YORK NY 10022**
**PHONE: 212-750-2209   FAX: 212-750-2947  Email: TZM@TZMREALTY.com**



HOME     ABOUT     SUBMISSIONS     CONTACT     DONATE

Learn. Lead. Inspire. | Spertus Institute MA in Jewish Professional Studies
For the leaders of tomorrow's Jewish community



NEWS BITS     JEWISH EDUCATION     READERS FORUM     RESEARCH

You are here: Home / The American Jewish Scene / And The Winner Is...

# And The Winner Is...

*November 10, 2009 By eJP*

—



The Jewish Community Heroes Award contest has concluded – and Ari Teman, founder of JCorps, is the recipient of the Community Hero Award for 2009 and the accompanying $25,000 prize. Congratulations to Ari.

Ari was one of five finalists and over 400 nominees who were nominated during this initiative that was designed to recognize, and honor, individuals who are bettering their communities through service and

A-2086

outreach. Each and everyone, along with countless others, deserve our thanks every day.

Ari was also a participant in the 2009 ROI Summit, a multi-day annual gathering of 120 young Jewish innovators who come together [in Israel] to network, build skills and most important, be inspired by both their peers and the community members who come to lend support to those building our future.

*Here's what The Jewish Week had to say about Ari last year when they named him to 36 Under 36:*

Ari Teman was tired of meeting the same group of people at parties. So he founded JCorps, the largest non-denominational Jewish volunteer organization on the continent, open exclusively to 18- to 28-year-olds. The only restriction? That they be single. (But they're not singles events, he stresses. "We discourage that air of desperation.")

JCorps volunteers meet, typically on Sundays, to feed the hungry at soup kitchens and food banks and entertain senior citizens at old-age homes and hospitals. Each volunteer receives a custom-designed JCorps shirt, free of charge. "People come for selfish reasons," he says.

"You meet other people, make business connections and get something out of it."

It's Charity 2.0 at its best; call it "social volunteering." After signing up for an event on JCorps.org, Teman and his volunteer team will "friend" you

on Facebook or ask that you send a picture. "We want to make sure that you're not a 40-year-old man," he says. JCorps uses the same technology that powers Gmail, so the second time you come back to the site to volunteer again, the form will be filled out for you.

Only a year old, JCorps has thousands of volunteers from more than 115 colleges and 300 companies, and is active in almost every state (and more than 20 countries). Teman markets JCorps by posting pictures from past events on Facebook. "More than 30 percent of volunteers show up because they saw a friend's picture."

Teman, who owns a consulting firm called 12gurus, regularly puts into practice the Website design, technology savvy and problem-solving skills he gains on the job. Last May, he and his firm raised nearly $500,000 for Meir Panim with an online art auction and wine sale at www.sensi6.org.

He's a comedian, too. Seriously. Teman is a regular at Broadway Comedy Club and Stand-Up New York. He's organized several comedy nights to raise money for charity. Mailbox Full? Teman invented the patent-pending PhoneLobby, which connects supporter's real phones via the Internet to their governmental representative. The "Calls for Jerusalem" campaign used his technology to direct more than 10,000 calls to the White House in support of Israel. It was so successful, the White House's call center kept dropping calls.

**SHARE THIS:**

  

*Filed Under: The American Jewish Scene*

*Tagged With: GA2009, Jewish Federations of NA/formerly UJC, ROI Community / Schusterman, Tikkun Olam*

Click here to  Email This Post to friends or colleagues!

## JOIN THE CONVERSATION

What's the best way to follow important issues affecting the Jewish philanthropic world? Our Daily Update keeps you on top of the latest news, trends and opinions shaping the landscape, providing an invaluable source for inspiration and learning.

SIGN UP NOW

For Email Marketing you can trust.

## CONTINUE THE CONVERSATION



A-2090

MOST READ RECENT POSTS

White Jews – Wake Up. We're Part of the Problem.

Ilia Salita, z"l

Not Free to Desist: An open letter from Black Jews, Non-Black Jews of Color, and our allies to Jewish Federations, Foundations, Organizations, and Initiatives

What White Jewish-led Institutions Can Do For Racial Justice Now

The Greatest Challenge to Israel Education is Just Around the Corner



CATEGORIES

A-2091

Select Category

THE WAY BACK MACHINE

Select Month

WHAT WE DO

*eJewish Philanthropy* highlights news, resources and thought pieces on issues facing our Jewish philanthropic world in order to create dialogue and advance the conversation. Learn more.



Top 40 Philanthropy Blogs, Websites & Influencers in 2020

## eJewish Philanthropy

○ **$36**    double Chai

○ **$50**    donor

○ **$100**    friend

○ **$250**    supporter

○ **Other**   $  Amount

☐ Recurring monthly donation

**DONATE**

Powered by ⛰ mightycause

RECENT COMMENTS

Rachel Wasserman on Want to Be a Good Boss During Coronavirus? Support Your Employees

Shelli Aderman on Want to Be a Good Boss During Coronavirus? Support Your Employees

Amanda Shechter on Want to Be a Good Boss During Coronavirus? Support Your Employees

Richard Hirsh on The Masked Rider

paul volosov on Making Lemonade with No Lemons: A Teacher's Perspective on the Return to School

A-2093

COPYRIGHT © 2020 · EJEWISH PHILANTHROPY · ALL RIGHTS RESERVED

# Harvard X

# VERIFIED
## CERTIFICATE of ACHIEVEMENT

This is to certify that

## Ari Teman

successfully completed and received a passing grade in

## PH557x: Lessons From Ebola: Preventing the Next Pandemic

a course of study offered by HarvardX, an online learning initiative of Harvard University.

Ashish Jha
Director
Harvard Global Health Institute

**VERIFIED CERTIFICATE**
Issued May 11, 2020

**VALID CERTIFICATE ID**
56bcb93a26104ce99380c1795d0f26ba

A-2095

Avi Ganz

820 Madison ave

Scranton, PA

18510

July 7th, 2020

The Honorable Paul A. Engelmayer

United States District Judge

United States District Court

Southern District of New York

Thurgood Marshall Courthouse

40 Centre StreetNew York, NY 10007

Re: Ari Teman

Dear Judge Engelmayer,

My name is Avi Ganz. I am the director of Yeshivat Darkaynu, a post-highschool program for young men and women with special needs. Ari and I met years ago after his first cousin, a young man with autism, spent a year at our program. I started reading about Ari's philanthropy and was overwhelmed by the way he used his entrepreneurial streak for philanthropic work. Several months later, in advance of a fund raiser for our nonprofit, I reached out to Ari to ask if he would perform (Ari is, among other things, a stand-up comic) at our event, and he was very quick to say yes. He insisted on doing the event for free and wouldn't even let us cover the travel costs. Before and after the event, Ari was lavish in his praise of our work and generously shared on social media encouraging his network to contribute to the cause. Since then, Ari has been a personal friend. I see how he has donated his time, money, knowledge and more to so many good causes. His mind is always thinking about the next project and how he can make the world a better place in one way or another.

About a year and a half ago, I suddenly got a text from Ari: it was his cousin's birthday and he needed my help.......to get a pony delivered to her house in Israel! For years, the two had shared a running joke about sending a pony for the birthday and Ari had decided that December 2018 was the time. Together, we found a local pony owner, arranged the

A-2096

surprise, executed the delivery and accompanying photo-shoot.....kooky, for sure – but just another example of Ari's big heart and concern for others.  Anything for them to feel remembered and appreciated. Ari had given his word, and he wouldn't let up until he delivered.  I do hope that he will be able to weather this case and return to the very good work he has done and plans to do.

Ari has a very big heart – one that is certainly aching now - and I respectfully ask that you take this into account in his sentencing.  It hurts me to think that a friend, a man who has given so much to so many, has this nightmare to live through.

I appreciate your honor's consideration of this matter.

Very sincerely,

Avi Ganz



 **Ari Teman** is with **Bayla Balk Haskel** and **2 others**.  •••

December 21, 2018 at 9:43 AM · 🌐

My Bubbeh taught us the importance of keeping your word, so when my cousin responded to a joke on her birthday that I'd promised her a pony before and not delivered, I decided to fix that.

Needless to say this is nuts, so I have to point out that Avi Ganz is a great man. Sure, he was a finalist on Israel's The Voice, and yes, he runs a year in Israel program for young adults with special needs, but all of that is nothing compared to the passion with which he worked to get a pony to the daughter of an old friend, one of our favorite people, whose sense of humor and kind heart she's inherited. 🙂

Happy birthday.



A-2098

Steven Oved
138 E 31st Street C1
New York, NY 10016

June 15, 2020

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street
New York, NY 10007

Dear Judge Engelmayer:

I am writing this letter at the request of Ari Teman. I was originally acquainted with Ari when I responded to an advertisement in *The Real Deal* regarding his Gate Guard product. I had been searching for a product similar to this one for some time but was unable to find one that fit into my company's budget. Shortly after reaching out, Ari came to my office to meet with me at which time we decided to try this product on a trial basis. I immediately sensed that Ari was a unique individual, but his enthusiasm for his work was plainly evident. After a few weeks we were quickly impressed with Gate Guard and slowly expanded our implementation amongst other assets. When occasional issues arose, as are expected with any new technology, I found Ari to be accessible and thoughtful in his attempts to resolve issues. There were some delays in response time, but these seemed like anticipated growing pains related to cash flow as we knew that this was a start up business. That being said, Ari seemed to be cognizant of these issues and remained very hands on from an ownership standpoint. Over the roughly 2 years that I have been working with Ari, our working relationship has grown into a friendship. My description of Ari's demeanor in relation to his business would be that he is extremely passionate. In our dealings it seemed that this passion extended beyond the borders of his business and included the satisfaction of his customers.

Admittedly, I have no knowledge of the legal matter for which you are determining sentencing and thus I will remain silent on this. However, I did want to take this opportunity to offer my opinions on Ari as an individual.

Sincerely,

Steven Oved





בס"ד

# The Rok Family Shul
## Chabad Downtown Jewish Center

Boruch Hashem

July 7, 2020

Tammuz 15, 5780

From: Rabbi Chaim Lipskar

The Rok Family Shul

35 SE 9th St

Miami, FL 33131

To: The Honorable Paul A.

 United States District Judge

 United States District Court

 Southern District of New York

 Thurgood Marshall Courthouse

 40 Centre Street

 New York, NY 10007

Dear Judge Engelmayer,

I hope all is well with you and your family. I write this letter on behalf of Ari Teman a good friend of mine and member of our community since he moved to Florida.  From the day that Ari moved to Miami he contacted me to see how he can help out our community. It started with his Jcorps which he founded in NY and wanted to bring to Miami. As our primary work is with young professionals the idea of getting to serve in a volunteer program was something of interest and though I didn't follow up on Ari's idea he still kept on coming back to our programs and events. Ari has always sent us new people when they moved to Miami and made it his way to greet people at our Shul. When Ari launched his Teman security guard he right away came to us to donate us the technology and when I shared with him I didn't have the budget for the installation which at the time was hard wired he made his point o bring his guys here and have it installed and runs till today without asking for a single dollar. Ari is sometimes misunderstood as he is a comedian by nature though those who get to know him knows he has a heart of gold and will always help anyone in need however he can.

A-2100



# The Rok Family Shul
## Chabad Downtown Jewish Center

In April of last year when the terrible shooting at Chabad Poway happened Ari reached out to me about expanding his help to many Chabad house around and then offered up to 100 Teman door devices for free around the country.

In closing I hope you will consider that Ari will do much better helping society then being confined, he has extraordinary talents in bringing people together and as an alternative sentence to restart expand his volunteer with Jcorps would be a great service to our community.


Thank you and stay healthy and safe,


Rabbi Chaim Lipskar
The Rok Family Shul
Chabad Downtown Jewish Center

A-2101

## JONATHAN LUBIN

8800 Bronx Ave., Suite 100H ♦ Skokie, IL 60077 ♦ (773) 954-2608 ♦ Jonathan@lubinlegal.com

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court - Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street
New York, NY 10007

Dear Judge Engelmayer:

I am writing to you regarding my long-time friend, Ari Teman. I don't remember exactly when I met Ari, but I attended Brandeis from 2001 to when I graduated in 2004. Ari was a good friend of mine, and we spent a good deal of time together when I attended Brandeis. He was one of the first people to reach out to me when my father died in 2003, and he was by my side for hours upon hours when I sat shiva for my father, on campus, for the seven days after his funeral.

When I became a solo practitioner with a law office in Chicago, Illinois, Ari helped me build my first website. I still get my hosting through the very same registrar that Ari helped me with over a decade ago.

I want to tell you a story about Ari that I think will do more to illustrate the kind of person I know him to be than for me offer a list of adjectives. One evening, Ari came to my dorm room and informed me (as in, it was not a request) that I was going to be helping him build a sink with 4 separate inserts for the Chabad House. A Chabad House is a Jewish institution, typically run by a Rabbi affiliated with the Chabad Chassidic movement, that does in-reach into the Jewish community. It typically is supported entirely through donations. The Chabad House at Brandeis University was no exception to this rule.

On Friday night, the Chabad House hosts a large Shabbat meal. When I was there, it would host anywhere between 50 and 80 people on a Friday night. The meal begins when everybody washes their hands and the Rabbi presiding over the meal makes the HaMotzi blessing over bread. That means that everybody has to wash their hands. Typically, there is no talking between when one washes their hands and when one hears the HaMotzi blessing. That's a lot of silence for young and excitable college students!! The double sink at the Chabad House was, in Ari's eyes, not up to this task. It would typically take a long time for everyone to go through the ritual. So Ari decided that we were going to be making a sink with 4 separate inserts (functionally 4 sinks) for the Chabad House.

This sink could potentially be described as rudimentary, but the thing is that I didn't (and still don't) know how to make a sink. Ari did most of the work. My job mostly consisted of helping him carry things around, holding tools, and otherwise being a cheerleader. Ari needed no cheerleaders. The whole project was his idea, and within a couple of days, it went from planning to complete execution.

We arrived at the Chabad House to install the sink (if I recall correctly) a day after we set out to build it after several trips to the hardware store. To call the Rabbi overwhelmed (in a good way, but definitely overwhelmed) is an understatement. We arrived in the evening, and – typical for Ari – he presented the matter as a fait accompli. There was nothing that the Chabad rabbi could say, one way

A-2102

**JONATHAN LUBIN**

8800 Bronx Ave., Suite 100H ♦ Skokie, IL 60077 ♦ (773) 954-2608 ♦ Jonathan@lubinlegal.com

or the other, that would dissuade Ari from installing the sink right then and there, hooking it up to a hose, and creating a drainage system for it, that very minute.

It remained there for as long as I was on campus. It fast-tracked the washing ritual in a major way, allowing more people to be accommodated faster. In the subsequent retelling of the story, Ari always refers to it as the time when he and I built a sink – despite the fact that I was basically just along for the ride.

This is the Ari Teman that I know. He's an entrepreneur, always trying new things, and he's typically very good at them. He's hands-on. He likes bringing joy and happiness to others (as evidenced by his side-gig as a comedian – his comedy is exceptionally funny). He gives credit to everyone around him before himself.

Another story about Ari Teman that comes to mind is the last time he visited Chicago. We asked him to come to our house for a Shabbat meal. He came on Friday night. We reminisced about Brandeis, about the crazy sink, and about life. At that time, Ari was not Orthodox Jewish. I have no idea what his observance level is today, nor do I care. It is not my business. I only mention it because when it was time to call it a night, Ari excused himself to use the bathroom and called a cab. I only realized what he'd done afterwards because the cab showed up several minutes after he excused himself to use the bathroom. It would not have made me uncomfortable in the least for Ari to have called the cab right there in my dining room. But Ari is always considerate of others. He did not want to openly violate the Sabbath in front of me or my family. This is a small gesture – and an unnecessary one, at that – of his respect for me.

This, too, is Ari Teman. He is considerate, even when it is not necessary. He always thinks of others. The idea of making me feel even slightly uncomfortable was an anathema to him.

I'll offer one more story about Ari: one of my favorite days of the year is Purim, the holiday that celebrates the victory of the Jewish people over the Persian King Ahasuerus. Brandeis's Orthodox Organization (lovingly called BOO) always puts on a joyous Purim program. One Purim, Ari stood up and offered an impromptu stand-up routine in which he said something funny about nearly everyone in the room. I consider myself pretty outgoing, but I wouldn't have been able to conjure something to say – that was personalized – to everyone in that room. Even as a young college student, he elevated empathy to an art form. He later wrote a book/pamphlet entitled *Effective Gratitude: For Organizations and Individuals*, in which he discussed some of his ideas about empathy and gratitude in an organized and systematic way. But it was something he'd been practicing for years by then.

I am sure that Your Honor is receiving a plethora of letters from people whose lives have been enriched by Ari. Most likely, some have come from people impacted by the worldwide community service organization that he established. I knew him before any of that, but I was not at all shocked to find out that, after college, he'd done amazing things and helped countless people.

Very Truly Yours,


s/Jonathan Lubin

www.lubinlegal.com

A-2103

Dear Judge Engelmayer:

I met Ari Teman through the New York City comedy scene in 2016. We are both comics, and we met at a comedy club through a mutual friend who is a well-known comedian. We hit it off and I invited Ari to perform on a show that I was running at the time. He came, and that's when we became friends. He was so funny and even helpful, that I told him he had an open invitation to come and perform every week if he wanted to. Since he lived near the club where I produced the show, he took me up on the offer and would attend often.

I always enjoyed having Ari around since he was kind, supportive to me and the other comics, and was genuinely interested in comedy and life in general. We have hilarious conversations! The comedy world can be pretty cut throat, so I am very happy to have Ari as a friend.

When he learned that I was an orthodox Jewish mom, he introduced me to a writer at the New York Post who later did a story on me. Ari is always making introductions, as he is very generous.

Over the years, we have gotten together for dinners, referred each other for comedy shows and celebrated birthdays.

I have found Ari to be a compassionate person who I enjoy spending time with, and he is always respectful. I have invited him for Shabbat dinners many times, but he has yet to take me up on it! Ari is a true "mentch" and I feel terrible that he is in this unfortunate situation.

Best regards,

Talia Reiss, Esq
Stage Name: Talia Reese

TaliaReese.com
(516) 423-9396

A-2104

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Thurgood Marshall Courthouse
40 Centre Street
New York, NY 10007

Dear Judge Engelmayer,
I have been a friend of Ari Teman for a few years as a fellow designer. He was active in a
support group for designers called Jewish Designers Lounge.  He was very supportive and
encouraged designers to value themselves and how to grow in their careers.

He is a friend I can count on and he is always looking out for others' best interest. He truly cares
about other people doing well.
Ari invited me and my husband into his house, and often asked about the wellbeing of our kids
and our careers. He would make sure to have Kosher food that we could eat whenever he had us
over for events.

I believe he truly values honesty and doing things the right way.

Sincerely,
Rivka Korf

A-2105

To:
The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street
New York, NY 10007

From:
Russell DiBona
29 Dick Street
Bergenfield, NJ 07621

Dear Judge Engelmayer,

Thank you for your time taken to consider this letter. My name is Russell
DiBona and have known Ari Teman from his middle school years through
current years. I was his private music educator through his middle and high
school years and will attest to his excellent study habits and responsibility.
He was a pleasure to teach and it has been a pleasure to follow him into
adulthood to see his excellent successes.

I predicted his succes in three areas 1) music, 2) comedy, and 3) computers
or computer related business. TWO of these came true. His music career I
believe, sadly, got sidelined.

I have come to know the adult Ari Teman as a beautiful, funny, kind,  and
thoughtful human being.

Sincerely,


Russell DiBona
Musician/Educator
Drums and Percussion

A-2106

B.A. Berklee College of Music
29 Dick Street
Bergenfield, NJ 07621

A-2107



September 8, 2020

**VIA ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    <u>United States v. Ari Teman</u> (S1 19 Cr. 696 (PAE))
             Consent Motion for a 60-day Adjournment of Sentencing Hearing

Dear Judge Engelmayer:

      We are writing on behalf of our client, Ari Teman ("Teman"), whose sentencing is currently scheduled for September 28, 2020. Due to the ongoing COVID-19 pandemic, this Court has previously adjourned Teman's sentencing. We write to request another adjournment of the sentencing date for approximately sixty (60) days or longer.[1] The Government does not object to this motion.

      As it stands, Teman remains under home confinement in Florida. Undersigned counsel are based in Missouri and Florida, respectively.

      On June 24, 2020, Governor Cuomo issued Executive Order 205 ("EO-205"), which requires all travelers to New York from states with COVID-19 infection rates above a certain threshold to quarantine for 14 days upon arriving in New York. Specifically, EO-205 requires "[a]ll travelers entering New York from a state with a [COVID-19] positive test rate higher than 10 per 100,000 residents, or higher than a 10% positivity rate, over a seven-day rolling average" to quarantine for 14 days. On July 13, 2020, the New York Department of Health issued an Order requiring all travelers to New York subject to EO-205 to complete a State Traveler Health Form to ensure compliance with EO-205.

      Both Florida and Missouri remain on New York's travel advisory.[2] Thus, as matters currently stand, Teman and undersigned counsel would be required to travel to New York and quarantine for 14 days before a sentencing hearing in this case. This would place an unnecessary

---

[1] The current date also happens to fall on Yom Kippur, a significant Jewish holiday observed by Teman and others who may support him at the sentencing hearing.

[2] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-two-states-added-travel-advisory-requiring-14-day-quarantines (last accessed September 8, 2020).

8000 Maryland Avenue                               p. 314.390.0234
Suite 420                                          f. 314.485.2264
St. Louis, MO 63105                             margulisgelfand.com

burden on undersigned counsel,[3] Teman,[4] and any attendees from the 33 states for which these restrictions currently apply.

Furthermore, while it is certainly not guaranteed, an effective vaccine against COVID-19 may emerge in the coming months as scientific development in this regard is progressing at an unprecedented rate. As it stands, 9 vaccines are in Phase 3 efficacy trials and 3 vaccines have been approved for early or limited use.[5] The emergence of an effective vaccine would obviously alleviate the concerns addressed in this motion.

The parties have already submitted their respective sentencing submissions and, therefore, seek no relief in this motion other than to adjourn the in-person sentencing hearing due to the ongoing COVID-19 pandemic.

Assistant United States Attorney Kedar Bhatia indicated that the Government does not object to this request.

Thank you in advance for the Court's consideration.

Respectfully submitted,

**Margulis Gelfand, LLC**

/s/ Justin K. Gelfand
JUSTIN K. GELFAND
8000 Maryland Ave., Ste. 420
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
*Counsel for Defendant*

Cc:    AUSA Kedar Bhatia
       Joseph A. DiRuzzo

---

[3] On a related note, undersigned counsel (Gelfand) has a child with a congenital heart defect. As such, undersigned counsel and his family have taken all necessary precautions during the COVID-19 pandemic consistent with medical advice. Undersigned counsel would prefer not to have to take risks inherent in air travel and staying in a hotel in New York to the extent possible.

[4] Teman also has underlying medical conditions for which COVID-19 causes great concern. These medical conditions are set out in greater detail in the sentencing submission provided to this Court. (*See* Doc. 145).

[5] *See* https://www.nytimes.com/interactive/2020/science/coronavirus-vaccine-tracker.html (last accessed September 8, 2020).

A-2108.1

AO 458 (Rev. 06/09)  Appearance of Counsel

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Case No.   19-cr-696 (PAE) |
| Ari Teman | ) | |
| *Defendant* | ) | |

## APPEARANCE OF COUNSEL

To:    The clerk of court and all parties of record

   I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Ari Teman                                                                                                     .

Date:    11/02/2020

/s/ Noam K. Biale
*Attorney's signature*

Noam K. Biale; 5055694
*Printed name and bar number*

Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004

*Address*

nbiale@shertremonte.com
*E-mail address*

(212) 202-2600
*Telephone number*

(212) 202-4156
*FAX number*

# SHER TREMONTE LLP

November 2, 2020

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:   *United States v. Ari Teman*
             Case No. 19-cr-696 (PAE)

Dear Judge Engelmayer:

Our firm has been retained to represent Ari Teman in connection with certain post-conviction proceedings. We write regarding ongoing *Brady* investigation in this case and mindful of the Court's October 30, 2020 Order relating to newly-enacted Federal Rule of Criminal Procedure 5(f). Specifically, we write to respectfully request that the Court specifically direct that the Government make additional disclosures relating to Joseph Soleimani's statements concerning his role in *ABJ Milano LLC v. Stanley Howell*, 61 Misc.3d 1037, Index. No. 65131/2017 (N.Y. Civ. Ct. 2018) (the "housing court proceeding"), or the facts underlying that proceeding. We make this request because, based on our review of the record, as well as the 3500 material produced by the Government before and during trial, there remain questions as to whether the Government complied with its *Brady* and *Giglio* obligations, as well as its duty of candor to this Court.

In ruling that subsequently discovered evidence relating to the housing court proceeding – specifically the transcript of the proceeding – did not merit a new trial, the Court appeared to assume that the Government had disclosed all of Soleimani's statements concerning the matter *prior* to his direct testimony at trial. Specifically, the Court: (1) relied on the Government's assertion that it had produced "all written statements of Soleimani's that were in its possession, including notes from its interviews of Soleimani," *see* June 5, 2020 Opinion & Order ("Opinion & Order") at 97 n.36; and (2) relied on the Government's "attest[ation]" that "Soleimani indicated that he had dealt with the tenant, but that he *did not indicate* that he had made representations to the tenant about whether ABJ would renew his lease," *id.* at 102 (emphasis added).

However, although the Court directed the Government on January 21 to inquire of Soleimani regarding the housing court proceeding and to "promptly report back to the Court and the defense" the results of that inquiry (Trial Transcript ("Trial Tr.") at 29),

A-2108.3

The Honorable Paul Engelmayer
November 2, 2020
Page 2 of 4

*none* of the notes relating to the Government's January 21, January 22, and January 23 meetings with Soleimani reflects any statements concerning the housing court matter. *See* U.S. Attorney's Manual § 9-5.002 ("Although not required by law, generally speaking, witness interviews should be memorialized by the agent. . . . Material variances in a witness's statements should be memorialized[.]").  Nor did the government orally disclose any statements made by Soleimani concerning the housing court matter following the Court's colloquy.  In fact, the only notation reflecting a conversation with Soleimani relating to the housing court matter are notes from January 7, 2020 (well before the January 21 colloquy with the Court).  *See* Notes of January 7, 2020 Meeting, attached as Exhibit A.[1]  At that meeting, various topics were discussed, including Soleimani's decision to replace ABJ's GateGuard intercoms with those from MVI Systems, Inc., a GateGuard competitor.  *Id.*  The last line of notes from this January 7, 2020 meeting reads: ███████████████████████████████████████  *Id.* The notes did not reference a housing court proceeding, or a court order.[2]

       The absence of any disclosure before or during trial concerning the nature of Soleimani's dealings with the tenant is troubling given not only the Court's order directing that the Government make such inquiry, but also the Government's acknowledgement in its *post*-trial brief that it questioned Soleimani at trial on this issue "based on Soleimani's *representations* suggesting that '*he* was among the ABJ personnel who *dealt* with [the tenant].'"  Gov't Apr. 27, 2020 Mem. of Law ("Gov. Mem.") at 6 (emphasis added).

---

[1] Because the notes are subject to the Protective Order, Exhibit A is filed under seal.

[2] The Government's brief in opposition to Mr. Teman's post-trial motions misleadingly suggests that its 3500 production did disclose Soleimani's statements relating to the nature of his dealings with the tenant. Immediately following its claim that Soleimani had made representations suggesting that "he was among the ABJ personnel who dealt with [the tenant]," the Government inserted the following footnote:

> Before and during trial, the Government produced to the defense notes from a number of phone calls and meetings with Soleimani. Notes from these interviews, which were disclosed to the defense, show that on January 7, 2020, Soleimani disclosed the fact of a housing court dispute with Stanley Howell. Notes from this meeting were produced to the defense on January 15, 2020, when the Government produced the bulk of its Jencks Act material. The Government met or spoke with Soleimani several times prior to and during trial, including on January 11, January 14, January 19, January 21, January 22, and January 23.

Gov. Mem at 6, n.2.  However, as just indicated, the notes of the January 7 interview did not, in fact, disclose the housing court dispute, and the notes of the remaining interviews contain nothing about that dispute.

The Honorable Paul Engelmayer
November 2, 2020
Page 3 of 4

        As reiterated in the Court's October 30, 2020 order, "the Government must
disclose any information that can be used to impeach the trial testimony of a Government
witness within the meaning of *Giglio v. United States*, 405 U.S. 150 (1972)." *In Re: Fed.
R. of Crim. Proc. 5()*, No. 19-Cr-696-PAE (Oct. 30, 2020), ECF No. 153.  Importantly,
"*[s]uch information must be disclosed sufficiently in advance of trial in order for the
defendant to make effective use of it at trial.*"  *Id.* (emphasis added).  Soleimani's
statements to the Government as to his dealings with the tenant – the precise content of
which is still unclear – fall within the purview of *Giglio* and *Brady*, yet were not
disclosed in advance of Soleimani's testimony.  Evidence that Soleimani engaged in
misleading conduct and lied to a vulnerable tenant in order to make more money for ABJ
could certainly have been the basis of effective cross-examination (had it been disclosed
in advance), given that Soleimani had filed the complaint with the police and was the
only witness at trial to claim that he did not recall reviewing GateGuard's "terms and
conditions."  *See* Trial Tr. at 812.  In its opinion denying post-trial motions, the Court
noted that the "defense did not ask any questions about this topic on cross-examination or
seek leave to do so."  Opinion & Order at 90.  But deprived of the information that would
form the basis for cross-examination, the defense had no opportunity to do so.

        Prior to filing this letter, we sought clarification from the Government as to what
statements Soleimani had made concerning his dealings with the tenant – first by
telephone and then by letter dated October 23, 2020.  *See* October 23, 2020 Letter of
Justine A. Harris, attached as Exhibit B.  The Government has refused to provide any
further disclosures.  It noted that it had provided notes of Soleimani's pre-trial statements
in its 3500 production, as well as information about his statements in post-trial briefs.
The Government reiterated that it "is aware of its disclosure obligations, has made
appropriate disclosures, and believes that no further disclosures are required at this time."
*See* Government Letter dated October 29, 2020, attached as Exhibit C.

        Taking the Government's letter together with its post-trial representations, the
Government appears to concede that Soleimani made statements concerning his dealings
with the tenant before he testified on the subject.  Yet the Government has made no
disclosures as to this issue, despite its continuing obligation to do so.  Accordingly, we
respectfully request that the Court direct the Government to:

        (1) disclose any statements made by Soleimani (and the date of such statements)
            concerning his dealings with the tenant at any time, whether or not such
            statements were memorialized in writing;
        (2) explain why any such statements were not disclosed prior to Soleimani's
            testimony; and
        (3) produce any internal memoranda, correspondence or communication relating
            to the failure to disclose such statements.

        While the lack of notes suggests that there may be no written record of
Soleimani's statements, that, of course, does not relieve the Government of its disclosure
obligations.  While the Government has no legal duty under the Constitution or the

A-2108.5

The Honorable Paul Engelmayer
November 2, 2020
Page 4 of 4

Jencks Act to take notes during meetings with witnesses, courts have emphatically called the failure to do so in order to avoid disclosing favorable statements to the defense to be "quite inconsistent with the obligations of a law enforcement officer representing the United States Government," and tantamount to "[p]laying games with evidence."  *United States v. Bernard*, 625 F.2d 854, 859 (9th Cir. 1980); *see also* U.S. Attorney's Manual § 9-5.002 ("Although not required by law, generally speaking, witness interviews should be memorialized by the agent. . . .  Material variances in a witness's statements should be memorialized.").  And of course, a failure to take notes does not relieve the Government of its "obligation to inform the accused of information that materially impeaches its witness."  *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007).  "This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions."  *Id.*

> We appreciate the Court's consideration.

Respectfully submitted,

/s/
Justine Harris
Noam Biale

cc:    All Counsel of Record

A-2108.6

# EXHIBIT B

A-2108.7

# SHER TREMONTE LLP

October 23, 2020

**BY EMAIL**

Kedar Bhatia
Edward A. Imperatore
Assistant United States Attorneys
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

    Re:   *United States v. Ari Teman*
       Case No. 19 Crim. 696 (PAE)

Dear Mr. Bhatia and Mr. Imperatore:

    I write to follow up on my October 15, 2020 conversation with Mr. Bhatia.  As I advised him at the time, my firm has been retained to represent Mr. Teman in connection with post-trial proceedings.  In reviewing the record, we are concerned that the Government's disclosures pursuant to *Brady*, *Giglio*, and 18 U.S.C. § 3500 may not have been complete, as no disclosures were made relating to any conversations you or your agents (including Detective Alessandrino) had with Joseph Soleimani following the Court's January 21, 2020 colloquy concerning Mr. Soleimani's role in *ABJ Milano LLC v. Stanley Howell*, 61 Misc.3d 1037, Index. No. 65131/2017 (N.Y. Civ. Ct. 2018) (hereinafter "the housing court matter").

    In denying Mr. Teman's motion for a new trial, the Court relied on the government's "attest[ation]" that "Soleimani indicated that he had dealt with the tenant, but that he *did not indicate* that *he* had made representations to the tenant about whether ABJ would renew his lease," Order at 102 (emphasis added; citing Government's April 24, 2020 Memorandum of Law ("Gov. Mem.") at 6).  Yet, although the Court on January 21, 2020 directed the Government to inquire of Mr. Soleimani and to "promptly report back" the results of that inquiry (Trial Transcript ("Trial Tr.") at 29), none of the notes relating to the Government's January 21, January 22, and January 23 meetings with Mr. Soleimani reflects any statements concerning the housing court matter.  *See* U.S. Attorney's Manual § 9-5.002 ("Although not required by law, generally speaking, witness interviews should be memorialized by the agent. . . . Material variances in a witness's statements should be memorialized[.]").  This is so even though the Government acknowledged that it questioned Mr. Soleimani at trial on this issue "based on Soleimani's *representations* suggesting that '*he* was among the ABJ personnel who *dealt* with [the tenant].'"  Gov. Mem. at 6 (emphasis added).  To the extent there

AUSA Kedar Bhatia
AUSA Edward A. Imperatore
October 22, 2020
Page 2 of 2

was a failure to take notes, such failure of course does not relieve the government of its "obligation to inform the accused of information that materially impeaches its witness." *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007).

In light of our concerns, and given that Mr. Bhatia has not to date responded to our inquiry, we ask that the Government disclose and/or produce any statements, whether recorded or not, that Mr. Soleimani made concerning the housing court matter, or the facts underlying that proceeding, to any agent, employee or representative of the Government *at any time*.

Because we have additional concerns relating to Mr. Soleimani, we further ask that the Government produce any documents or information reflecting or relating to communications or transactions between Mr. Soleimani or any other ABJ representative and Samuel Taub, or any other representative of Gateguard's competitor, MVI Systems (MVI), including, but not limited to, any information relating to business relationship(s) between Mr. Soleimani or ABJ and MVI.[1]

We appreciate your consideration and are available to discuss at your convenience.

Very truly yours,

/s/

Justine A. Harris
Noam Biale

---

[1] We note that any responsive documents and information are also potentially relevant to Mr. Teman's sentencing. Given that there is no information as to which of the entities the jury's verdict relates, *any* information undermining Mr. Soleimani's trial testimony could also undermine the government's ability to establish that portion of the loss amount attributable to the RCCs relating to ABJ, and should therefore be produced now. *See* U.S. Attorney's Manual, § 9-5.001(D)(3) ("Exculpatory and impeachment information that casts doubt upon proof of an aggravating factor at sentencing, but that does not relate to proof of guilt, must be disclosed no later than the court's initial presentence investigation"). *See also Brady v. Maryland*, 373 U.S. 83, 87 (1963) (exculpatory evidence includes information that tends to mitigate punishment as well as guilt).

A-2108.9

# EXHIBIT C

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 29, 2020

**BY EMAIL**

Justine A. Harris
Noam Biale
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

Re:    *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Ms. Harris and Mr. Biale:

We write in response to your letter, dated October 23, 2020, requesting additional disclosures pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), *Giglio* v. *United States*, 405 U.S. 150, 154 (1972), and their progeny, and 18 U.S.C. § 3500. The Government disclosed notes concerning its communications with Joseph Soleimani during trial, and provided additional information regarding its communications with Soleimani in post-trial briefing. The Government is aware of its disclosure obligations, has made appropriate disclosures, and believes that no further disclosures are required at this time.

Sincerely,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By: _____
Kedar S. Bhatia
Edward A. Imperatore
Assistant United States Attorneys
(212) 637-2465/2327

A-2109

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
─────────────────────────────────────────
UNITED STATES OF AMERICA,
                                                19-CR-696 (PAE)
                      -v-
                                                ORDER
ARI TEMAN,

                               Defendant.
─────────────────────────────────────────
```

PAUL A. ENGELMAYER, District Judge:

      The Court has reviewed counsels' submissions on the recent letter by defendant Ari

Teman regarding his claims of violations of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio*

*v. United States*, 405 U.S. 150, 154 (1972), and the Jencks Act, 18 U.S.C. § 3500.  *See* Dkts. 156

(Teman letter), 158 (Government response), 159 (Teman reply), 163 (court order seeking

declaration from Government), 164 (Government letter and declaration).

      The Court declines to reconsider its June 5, 2020 decision denying Teman's post-trial

motion with respect to those claims.  *See* Dkt. 138 at 87–101.  Teman has not identified any new

information justifying reconsideration of that ruling.  *See* Dkts. 156, 163.  And the Court is

satisfied from the Government's response, Dkt. 158, and declaration, Dkt. 164, that the

Government (1) has produced all writings in its possession containing statements by Joseph

Soleimani regarding the Housing Court Case and the Housing Court Order; and (2) is unaware of

any oral statements made by Soleimani that contradict any aspect of his trial testimony, including

with respect to those subjects.  There is, therefore, no non-speculative basis on which to assert a

violation of *Brady*, *Giglio*, or § 3500.

Teman's request that the Court direct additional disclosures from the Government is therefore denied.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 156.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: November 19, 2020
      New York, New York

A-2111

# SHER TREMONTE LLP

November 20, 2020

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

> Re:  *United States v. Ari Teman*
> Case No. 19-cr-696 (PAE)

Dear Judge Engelmayer:

We write on behalf of our client, Ari Teman, in response to the Court's order dated November 19, 2020 concerning the scheduling of sentencing. In light of the ongoing public health crisis and particular considerations regarding the welfare of Mr. Teman, we respectfully request that the Court maintain the December 1, 2020 sentencing date but order that the sentencing be conducted remotely pursuant to the CARES Act.

As Your Honor knows, Mr. Teman was convicted in January of this year and has been on home detention since that time. Since Mr. Teman's conviction, the world has experienced a once-in-a-century global pandemic that has made all but essential travel inadvisable from a public health standpoint. *See* Mike Stobbe & Heather Hollingsworth, *CDC pleads with Americans to avoid Thanksgiving travel*, Associated Press, Nov. 20, 2020, https://apnews.com/article/cdc-guidelines-thanksgiving-holidays-597a53e6cd8a7565c8f1433e6a3e2efd. As discussed in Mr. Teman's sentencing submission, Mr. Teman is especially vulnerable to COVID-19 due to longstanding respiratory issues. *See generally* Ltr. of Zvi M. Osterweil, M.D., Dkt. # 149, Ex. 1. Nevertheless, while the Court in its November 19, 2020 order invited a request to adjourn sentencing, Mr. Teman's countervailing mental health concerns compel us to request that sentencing proceed on the current schedule. We plan to provide the Court with additional material regarding Mr. Teman's mental health early next week, but it suffices to say now that the ongoing pendency of the case has significantly exacerbated ongoing struggles to such a degree that we believe it is important for Mr. Teman not to delay resolution of this matter further. We have advised Mr. Teman of his option to adjourn sentencing and appear in person, and he consents to proceeding on the current schedule remotely.

We have discussed the foregoing with Assistant U.S. Attorney Kedar Bhatia, and he has advised that, in light of these issues, the government is considering its position but cannot give its consent at this time. However, in light of the Court's request that we

A-2112

The Honorable Paul Engelmayer
November 20, 2020
Page 2 of 2

respond promptly, we wanted to file this request even as the government considers its
position. We note that under the CARES Act, the Court may order remote sentencing
even in the absence of the government's consent, based on a finding that sentencing
should not be further delayed in the interest of justice. *See* CARES Act
§ 15002(b)(2)(A). Accordingly, we respectfully request that the Court maintain the
December 1, 2020 sentencing date and order that sentencing be conducted remotely.[1]

We appreciate the Court's consideration.

Respectfully submitted,

/s/
Justine Harris
Noam Biale


cc:    All Counsel of Record

---

[1]    If the Court wishes to have the lawyers appear in person, Ms. Harris is available
to do so.

A-2113

# SHER TREMONTE LLP

November 30, 2020

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    ***United States v. Ari Teman***
             **Case No. 19-cr-696 (PAE)**

Dear Judge Engelmayer:

      We write on behalf of our client, Ari Teman, to advise the Court regarding restitution in advance tomorrow's sentencing proceeding. As the Court is aware, the Probation Department has calculated a restitution award of $259,988.17 in this case. Mr. Teman has gathered his own funds and borrowed money in order to obtain that amount and, as of today, has arranged for all such funds to be transferred to our firm's IOLTA account. Mr. Teman has authorized us to pay restitution from our IOLTA account at the appropriate time.

      We note, however, that earlier today the government filed a letter suggesting a lesser restitution amount[1] based on information provided to the government by Bank of America. We have written to the government with questions regarding the government's new calculation and for discovery of the documents underlying this information, and we hope to obtain an answer in advance of sentencing. In any event, Mr. Teman is prepared to make a restitution payment up to the original amount calculated by the Probation Department following entry of the judgment.

                           Respectfully submitted,

                           /s/
                           Justine Harris
                           Noam Biale

cc:      All Counsel of Record

---

[1]      The government has provided its calculation as a "forfeiture" amount, but because it did not present the forfeiture count to the jury and Mr. Teman did not waive his right to such presentation, *see* Trial Tr. 877, the government may not seek forfeiture.

A-2114

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 30, 2020

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

    Re:    *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

    The Government writes in response to the defendant's letter – filed on the eve of sentencing – contesting the imposition of forfeiture in this case. *See* Dkt. No. 176. As set forth below, the Government is entitled to seek forfeiture in this matter and was not required to put the question of forfeiture before the jury.

    At the charge conference in this case, the Court recognized that neither party had submitted jury instructions regarding forfeiture. Trial Tr. 873. Teman requested that the question of forfeiture go to the jury. *See* Trial Tr. 877. The Government argued that under Rule 32.2(b)(5) of the Federal Rules of Criminal Procedure, only the issue of forfeiture of specific property is appropriate for the jury and, here, the Government was not seeking forfeiture of specific property. Trial Tr. 939-40. Defense counsel agreed that there was no right to a jury determination of forfeiture except where the Government seeks to forfeit specific property. Trial Tr. 941-42 ("MR. BHATIA: [W]e're not seeking specific property here. . . . THE COURT: Defense, given that, is there a basis for a jury determination here as to forfeiture? MR. DiRUZZO: I don't think so, Judge."). Based in part on the Government's position that there was no right to jury determination of a general forfeiture allegation, the Court did not submit the question to the jury. Trial Tr. 942.

    The law clearly supports the Court's determination at trial. Rule 32.2(b)(5)(A) provides that "[i]n any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." Courts have made clear that "Rule 32.2(b)(5)(A) applies only when the Government pursues forfeiture of specific property, not when it seeks a money judgment." *See United States v. Reese*, 36 F. Supp. 2d 354, 365-66 (S.D.N.Y. 2014); *see Christie v. United States*, Nos. 08 Cr. 1244, 13 Cv. 7780 (RWS), 2014 WL 2158432, at *9 (S.D.N.Y. May 23, 2014) ("Under Rule 32.2 of the Federal Rules of Criminal Procedure, if the Government seeks to forfeit specific property after trial, the defendant and the Government each have the option of requesting that the jury determine whether the specific property is subject to forfeiture. If the Government seeks a

money judgment, however, the Court alone determines the forfeiture amount at sentencing.") (internal citation omitted). "[I]f the government does not seek specific property, but rather a personal money judgment, the court itself determines the amount of money that the defendant will be ordered to pay. The defendant is not entitled to have the jury decide the amount of the forfeiture." *United States v. Roberts*, 631 F. Supp. 2d 223, 225 (E.D.N.Y. 2009) (internal quotation marks and citations omitted).[1]

The Government provided both Rule 16 discovery material and § 3500 material relating to the loss suffered by Bank of America in connection with the offenses of conviction. The Government provided records to the Probation Office substantiating the need for restitution and forfeiture in the amount of $259,988.17. Today, the Government learned that Bank of America was able to offset certain losses it suffered, and the Government promptly notified the Court and the defense that it was seeking a lower amount of forfeiture and restitution – more favorable to the defendant – based on updated information from the victim of Teman's fraud scheme. *See* Dkt. No. 174.

For the reasons set forth herein, the Government intends to seek forfeiture and restitution in the amount of $245,862.95.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:    /s/
Kedar S. Bhatia
Assistant United States Attorney
(212) 637-2465

---

[1] Title 18, United States Code, Section 982(a)(2) provides that the Court shall, in imposing sentence for a conviction for wire fraud, order that a defendant "forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of the bank fraud statute.

A-2116

KC1VTEMC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 CR 696 (PAE)

5    ARI TEMAN,

6              Defendant.                  REMOTE TELECONFERENCE

7    ------------------------------x

8                                          New York, N.Y.
                                           December 1, 2020
9                                          10:37 a.m.

10

11   Before:

12              HON. PAUL A. ENGELMAYER,

13                                         District Judge

14                       APPEARANCES

15

16   AUDREY STRAUSS,
          Acting United States Attorney for the
          Southern District of New York
17   KEDAR S. BHATIA
     JACOB GUTWILLIG
18        Assistant United States Attorneys

19   JOSEPH A. DIRUZZO, III
     JUSTIN GELFAND
20   JUSTINE A. HARRIS
     NOAM K. BIALE
21        Attorneys for Defendant

22

     ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
23

24

25

KC1VTEMC

1              (Remote teleconference)

2              THE COURT:  I'm calling the case of *United States v.*

3    *Teman*, 19 CR 696.

4              Let me just begin by taking the roll.

5              Who do I have for the government?

6              MR. BHATIA:  Your Honor, Kedar Bhatia, for the United

7    States.  I'll be speaking today.  And I'm joined on the line by

8    Jacob Gutwillig, Assistant U.S. Attorney; as well as the case

9    agent, Detective Daniel Alessandrino.

10             THE COURT:  All right.  Very good.

11             Mr. Bhatia, for whatever reason, your voice is

12   projecting as faint.  So I will ask you, when you speak, to

13   speak up.  Thank you.

14             Who do I have for the defense?

15             MR. BIALE:  Good morning, your Honor.

16             This is Noam Biale, on behalf of Ari Teman.

17             Mr. Teman and I are present on the video link.  And on

18   the phone we have my colleague Justine Harris; and we also have

19   trial counsel, Justin Gelfand and Joseph DiRuzzo, also joining

20   us by phone.

21             THE COURT:  Very good.  All right.  Good morning to

22   all of you.

23             And Mr. Teman, just to confirm for the record that you

24   are present on the video and can hear and see what's being

25   said; you can hear and see us all.

A-2118

3

KC1VTEMC

1              THE DEFENDANT:  I believe so, your Honor.

2              THE COURT:  Well, I just need to make sure.

3              THE DEFENDANT:  I hear you.  I don't know if I'm not

4    hearing somebody else.  But right now everybody who has spoken

5    I've heard.

6              THE COURT:  Very good.  All right.  Terrific.

7              And is our court reporter there?

8              THE COURT REPORTER:  Yes, your Honor.  Good morning.

9              THE COURT:  All right.  Good morning.

10             I'm going to ask everyone to speak up.  For whatever

11   reason, Skype today is giving me a low volume for just about

12   everybody, even though I've got the volume on max.  It's

13   considerably less loud than the court hearing we had just a few

14   minutes ago in another matter, who knows why.

15             All right.  Let me begin just by welcoming back trial

16   counsel, Mr. Gelfand, Mr. DiRuzzo and Mr. Bhatia; and welcoming

17   to the case new counsel, Mr. Biale and Mr. Harris and, of

18   course, welcoming you, Mr. Teman.

19             There have been lots and lots of filings on the docket

20   of this case since trial, but I'm acutely mindful that our last

21   conference in this case was on the last day of trial, on

22   January 29th.  And boy does that feel like a lifetime ago, with

23   the intervening public health crisis.

24             Counsel and Mr. Teman, I just want to say I hope you

25   and your families and those close to you have been able to stay

4

KC1VTEMC

1  safe and healthy during these extraordinary eight last months

2  since the pandemic hit.  And with another wave upon us, you

3  have my wishes as well for continuing good health and safety

4  for you and yours.

5          I also want to welcome anyone who's auditing this by

6  telephone.  I'm glad at this time, when remote hearings are

7  requested for good and sound reasons and health and safety, as

8  Mr. Teman has done so here, that the public is able to attend

9  our conferences telephonically.

10          Unfortunately, it's not possible for members of the

11  public to watch by video.  Experience has shown that the

12  platforms used for video access grow more unstable with a

13  larger number of video participants, even those who just are

14  watching on the video and not themselves appearing.

15          My fellow judges and I regrettably have had a number

16  of conferences by video which got scuttled or interrupted by

17  technology problems.  And so our IT staff has advised us not to

18  overload the number of video attendees.

19          I do need to remind everyone listening that you are

20  not permitted to record these proceedings.  In an in-person

21  courtroom, that goes without saying, because spectators are not

22  permitted to bring recording devices into court.  But in a

23  remote proceeding, it's necessary for me to say that, so I just

24  did.  The court reporter is transcribing these proceedings; and

25  so if anyone would like a copy of the transcript to reconstruct

KC1VTEMC

1    what was said here, you're at liberty to order it.

2            All right.  We are here today for the sentencing

3    hearing in the case of *United States v. Ari Teman*, or at least

4    to begin the sentencing process in Mr. Teman's case.  I say

5    that because for reasons that I will be taking up with counsel

6    shortly, I have determined that I don't believe it will be

7    possible to complete that process today; instead, I think we

8    will only be able to cover but so much ground.

9            By sheer coincidence, about two minutes before I

10   jumped on this call, my chambers got an email from Mr. Biale

11   reaching the same outcome, I think, for a different reason,

12   having to do with a recent flurry of communications relating to

13   forfeiture.

14           Mr. Biale, I'm with you.  I have no intention of

15   reaching that issue today.  Indeed, I have a homework

16   assignment for counsel to reflect on involving that very issue.

17   So what I propose to do is take care of a number of

18   preliminaries, including one very important one which is going

19   to occupy counsel, and we will adjourn short of making any

20   decisions in the case.

21           MR. BIALE:  Understood, your Honor.

22           THE COURT:  All right.  Very good.

23           So before we turn to the substance of the hearing,

24   which, again, I don't think we're going to get to, there are a

25   number of preliminary matters I need to take up, so please bear

KC1VTEMC

1    with me.

2            The first involves the remote nature of this

3    proceeding.

4            We're in the midst of the COVID-19 pandemic.  I'm

5    conducting this proceeding pursuant to the authority granted by

6    Section 15002 of the CARES Act, and the standing orders issued

7    by our chief judge pursuant to that act.

8            I'm participating in this conference from the

9    courthouse in my chambers.  Counsel and Mr. Teman are

10   participating remotely.  Mr. Teman and lead counsel for each

11   side are participating by videoconference.  The remaining

12   counsel are participating by telephone.

13           I will ask everybody to please let me know immediately

14   if you are having any difficulty hearing the speaker, whether

15   it's me or an attorney or the defendant when they are speaking;

16   and as to the video participants, whether you are having any

17   difficulty seeing the other video participants.

18           I will, even in the truncated nature of this

19   proceeding, be calling on multiple people during the course of

20   this proceeding.  When I do call on you, I will try to do so

21   clearly by name.  If I haven't done so for some reason or you

22   otherwise have occasion to speak, including to let us know that

23   you can't hear or see something adequately, please identify

24   yourself by name for clarity of the record.

25           And please don't interrupt each other or me during

KC1VTEMC

1    this conference.  If we interrupt each other, it becomes

2    difficult for the court reporter to create an accurate

3    transcript of these proceedings.  I will give counsel obviously

4    a full opportunity, item-by-item or issue-by-issue, to be

5    heard.

6              All right.  I've been advised that the defendant,

7    Mr. Teman, cannot participate in person in the usual way today,

8    that is, by his being physically present in the courtroom,

9    without incremental risk to himself.  And that is as a result

10   of the COVID pandemic which is surging right now, including in

11   New York state, where we are; and Florida, where Mr. Teman

12   resides, and where I understand he is participating from

13   remotely.

14             Counsel in their submissions have put medical

15   information before the Court indicating that Mr. Teman has

16   heightened vulnerability to COVID-19 on account of a

17   respiratory history.  It is also not knowable when the COVID

18   pandemic will ease up, but there is good reason to doubt that

19   it will significantly abate in the next month or two.

20             Defense counsel, Mr. Biale, do you agree that for the

21   Court to conduct this proceeding in person at this time,

22   requiring Mr. Teman to travel to New York would present

23   heightened risks to his health?

24             MR. BIALE:  Yes, your Honor, I do.

25             THE COURT:  Government counsel, do you agree that that

8

KC1VTEMC

1    is so?

2           MR. BHATIA:  Yes.

3           THE COURT:  All right.

4           I find that conducting this proceeding in person is

5    not now -- that is to say in court the usual way, is not

6    reasonably available.  I do find that videoconferencing in the

7    manner that we are proceeding now, and teleconferencing for the

8    nonlead counsel participants, is reasonably available; and I

9    find that the defendant is able to participate in this

10   proceeding by videoconferencing means.

11          I have received a written waiver of right to be

12   present in court proceedings.  It was filed on Sunday.  It has

13   been docketed at docket 173.  I want to confirm with you,

14   Mr. Biale, that the defendant was advised of his right to

15   appear in person at this proceeding, that he understood those

16   rights, and that he voluntarily gave up those rights.

17          MR. BIALE:  Yes, your Honor.  We fully discussed that

18   matter with Mr. Teman.  And he's voluntarily giving up his

19   right to be present in person at the proceeding.

20          THE COURT:  Okay.

21          And just to make sure that I can make a legally

22   adequate finding, Mr. Biale, briefly describe how you came to

23   provide the document to Mr. Teman, and the circumstances under

24   which you discussed his rights with him.

25          MR. BIALE:  Sure, your Honor.

A-2124

9

KC1VTEMC

1          So the discussion has been an ongoing one based on

2     both Mr. Teman's strong interest in having this case conclude

3     efficiently and soon, based on the amount of time that he has

4     been on home detention.  At the same time we've discussed with

5     Mr. Teman his countervailing concern about his health and what

6     it would mean for him to travel from Florida to New York.

7          Based on all of those considerations, Mr. Teman

8     expressed to us that he felt it was not safe for him to travel

9     and he would prefer to participate in sentencing remotely.

10          As a result, we made an application to the Court to do

11     that.  As your Honor knows, there was some back and forth

12     between the defense and the government about that issue.  The

13     Court ultimately granted our request to proceed remotely.  We

14     sent a copy of the Court's order to Mr. Teman, along with the

15     waiver of rights; and explained that in order to proceed

16     remotely, he would need to sign the waiver of rights, and one

17     of us as his counsel would do so, and that we would file it on

18     the docket.  He returned a signed copy of it to us, I signed

19     it, and then filed it.

20          THE COURT:  All right.  Thank you.

21          That's very comprehensive and helpful.

22          And that leads me to my next question, which is the

23     handwriting alongside both signatures leaves something to be

24     desired.

25          Mr. Biale, is that Mr. Teman's signature on the

A-2125

10

KC1VTEMC

1    document?

2            MR. BIALE:  Yes, your Honor.

3            THE COURT:  And is it yours?

4            MR. BIALE:  It's an electronic signature that I pasted

5    onto the document.

6            THE COURT:  All right.  Very good.

7            Mr. Teman, is that indeed your signature on the

8    document?

9            THE DEFENDANT:  Yes, your Honor, that is my signature.

10            THE COURT:  I suffer from handwriting deficiencies as

11    well.

12            Okay.  Mr. Teman, did you hear what Mr. Biale just

13    said to me about the process by which you were informed of your

14    right to have the sentence proceed in person?

15            THE DEFENDANT:  Yes, I did, your Honor.

16            THE COURT:  And you did indeed sign a document giving

17    up your right to be present in person?

18            THE DEFENDANT:  Yes, I did, your Honor.

19            THE COURT:  Do you understand that you have a right to

20    have this hearing proceed in person, meaning you and the

21    lawyers and me, government, we'd all be in person in my

22    courtroom?

23            THE DEFENDANT:  Yes, I do, your Honor.

24            THE COURT:  And do you understand that the public

25    health emergency created by this pandemic has heightened the

A-2126

KC1VTEMC

1   risks associated with travel and court appearance; and

2   particularly for persons traveling out of state, you might be

3   subject to heightened risks, as well as quarantines and the

4   need for testing and a variety of other inconveniences were

5   this to occur in person?

6          THE DEFENDANT:  Yes, your Honor.  And multiple doctors

7   of mine have made that clear.  I think we've --

8          THE COURT:  Have you fully discussed these issues and

9   your rights with Mr. Biale and your other lawyers?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Okay.

12          Do you understand that if we proceed, as we are about

13   to, by videoconferencing, you and your counsel would still be

14   able to fully participate in this proceeding; you'd both be

15   able to fully address the Court.  In the event there came a

16   need for a breakout where you and your counsel -- without being

17   overheard by anybody else -- could speak privately, we could

18   make the technology work, even if it means hitting the pause

19   button and logging back on; but we'd be able to find a way for

20   you to confer privately with your lawyer or lawyers.

21          Do you understand that?

22          THE DEFENDANT:  Yes.  Thank you, your Honor.

23          THE COURT:  And just to be clear, do you wish to give

24   up your right to be sentenced in person with your lawyer by

25   your side?

KC1VTEMC

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  All right.  I find a knowing and voluntary

3   waiver of Mr. Teman's rights to be present in person for this

4   sentencing.

5          Finally, as to this issue, for us to proceed today,

6   even if it means just undertaking some of the sentencing

7   process, I'm required to make a finding that this proceeding

8   can't be delayed without harm to the interests of justice.

9          Defense counsel, in your letter of November 20th,

10  docketed at docket 167, you told me that Mr. Teman's mental

11  health would be benefited by moving the case forward.  You

12  wrote:  "while the Court in its November 19, 2020 order invited

13  a request to adjourn sentencing, Mr. Teman's countervailing

14  mental health concerns compel us to request that sentencing

15  proceed on the current schedule.  We plan to provide the Court

16  with additional material regarding Mr. Teman's mental health

17  early next week.  But it suffices to say for now that the

18  ongoing pendency of the case has significantly exacerbated

19  ongoing struggles to such a degree that we believe it is

20  important for Mr. Teman not to delay resolution of this matter

21  further."

22          Purely in the interest of a clear record, Mr. Biale,

23  can you just elaborate a little bit.

24          MR. BIALE:  Yes, your Honor.

25          So we've had extensive discussions with Mr. Teman

A-2128

13

KC1VTEMC

1    since Ms. Harris and I joined the case.  And before that, his

2    trial counsel had extensive discussions with him.

3            As your Honor knows, Mr. Teman has been on home

4    detention since the trial verdict in January.  He has

5    essentially been solitary for that time, because his partner

6    had to leave the country.  So he is alone there.  He has his

7    dog who provides a great deal of comfort.

8            But the isolation that we are all experiencing due to

9    the COVID pandemic, for Mr. Teman has been significantly

10   harder.  The various mental health issues that have been raised

11   before the Court -- both in the sealed submissions with trial

12   counsels' sentencing submission that was submitted in July, as

13   well as the letter from Mr. Teman's parents, which we submitted

14   last week in connection with our request for remote

15   sentencing -- I think speak to the particular difficulties that

16   Mr. Teman has with coping with the ongoing uncertainty

17   regarding this case.

18           I can speak just personally based on my conversations

19   with him that I have seen him struggle to a degree that is

20   quite profound and sets him apart from most of the clients I

21   have.  No doubt, having a sentencing hanging over their heads

22   is a difficult process.  For Mr. Teman it's really been

23   harrowing.  And I don't think that it serves his interests or

24   the public interest to delay further.

25           Now, I stand by all that, in spite of the discussion

KC1VTEMC

1   that we're going to have in a moment about a brief adjournment.

2   But I think that all of that stands as a reason to proceed with

3   sentencing as soon as practicable, and to do so remotely given

4   that we cannot convene in person safely.

5          THE COURT:  And I take it, Mr. Biale, that extends to

6   accomplishing what little we can here before an adjournment.

7          MR. BIALE:  Yes, your Honor.

8          THE COURT:  All right.  Very good.

9          Look, I'm fully persuaded by that.  Let me just

10  confirm that the government is too.

11         MR. BHATIA:  Yes, your Honor.

12         I mean, I think we take a different view,

13  respectfully; but if your Honor were to make the CARES Act

14  findings, I think you --

15         THE COURT:  All right.  Look, I make the finding --

16  Mr. Biale, thank you.  That was a very persuasive and clear

17  articulation.

18         I find that the sentencing proceeding cannot be

19  further delayed without harm to the interests of justice.  I

20  fully accept counsel's proffer -- which is supported, among

21  other things, by the letter from Mr. Teman's parents -- that

22  Mr. Teman is struggling with the pendency of this matter, and

23  he would like to put this case behind him.  I credit that.  I

24  credit that forward progress will be good for his state of

25  mind.  I hope that commencing the sentencing process today,

A-2130

15

KC1VTEMC

1    even if we can't finish it or won't be able to finish it, will

2    give you, Mr. Teman, some additional peace of mind that at

3    least we are moving forward.

4          All right.  The next preliminary matter I need to take

5    up involves new Federal Rule of Criminal Procedure 5(f).

6          As counsel are aware, in late October, the President

7    signed the Due Process Protections Act.  It put Rule 5(f) in

8    place.  It requires the Court at the initial scheduled

9    conference in a criminal case to advise the prosecution of its

10   obligations under *Brady v. Maryland* and its progeny, and to

11   issue a written order to the same effect.

12         Like most other judges in this district, I've taken

13   the view that the best practice is to treat Rule 5(f) to apply

14   to existing cases and not merely new ones.  So I've docketed

15   the written Rule 5(f) order in all my pending criminal cases,

16   including this one.  I did so in this case on October 30th.

17   The order is docketed at docket 153.

18         And now I'm going to make the companion oral

19   notification that's also required by Rule 5(f).

20         And, Mr. Bhatia, fair warning, at the end of this I'm

21   going to ask you whether the government understands its *Brady*

22   obligations and whether it has complied with them.

23         All right.  Here it goes.

24         Pursuant to Federal Rule of Criminal Procedure 5(f), I

25   remind the government of its obligation under *Brady v. Maryland*

16

KC1VTEMC

1    and its progeny to disclose to the defense all information,

2    whether admissible or not, that is "favorable to" the

3    defendant, "material either to guilt or to punishment," and

4    known to the government.

5            The government must make good-faith efforts to

6    disclose such information to the defense as soon as reasonably

7    possible after its existence becomes known to the government.

8    The government must also disclose information that can be used

9    to impeach the trial testimony of a government witness, and

10   must do so sufficiently in advance of trial in order for the

11   defendant to make effective use of it at trial.

12           I remind you that these obligations are continuing

13   ones, and that they apply to information whether or not you

14   credit it.

15           I further remind you that for these purposes, "the

16   government" includes any federal, state, and local law

17   enforcement officers and other officials who have participated

18   in the investigation and prosecution of the charged offenses;

19   and that you have an obligation to seek from these sources all

20   information subject to disclosure.

21           And finally, I caution the government that if it fails

22   to comply with this order, any number of consequences may

23   follow:

24           One, I may order production of the information and

25   specify the terms and conditions of such production.

KC1VTEMC

1          Two, I may grant a continuance.

2          Three, I may impose evidentiary sanctions.

3          Four, I may impose sanctions on any responsible lawyer

4     for the government.

5          Five, I may dismiss charges before trial or vacate a

6     conviction after trial or a guilty plea.

7          Or six, I may enter any other order that is just under

8     the circumstances.

9          Government, do you understand these obligations and

10    will you confirm that you have fulfilled and will fulfill them?

11          MR. BHATIA:  Yes, I understand our obligations.  And

12    we have fulfilled and will fulfill our obligations.

13          THE COURT:  All right.  Very good.

14          All right.  The next preliminary matter that I need to

15    take up involves a disclosure I need to make that is occasioned

16    by the appearance of Mr. Biale as new counsel for Mr. Teman.

17    And the disclosure is that I am acquainted with Mr. Biale.

18          Mr. Biale's wife, Margaret Graham, worked for a summer

19    at the law firm at which I used to work, and we worked together

20    closely on a criminal appeal.  Ms. Graham and I have kept in

21    touch over the years, and we have had lunch or coffee several

22    times since she joined the U.S. Attorney's Office for the

23    Southern District of New York.

24          Through Ms. Graham I have gotten to know Mr. Biale.  I

25    recall spending an hour or so alone in my chambers with

18

KC1VTEMC

1   Mr. Biale several years ago discussing his professional options

2   before he joined the Sher Tremonte firm.  I have also

3   personally appointed Mr. Biale and the Sher Tremonte firm to

4   represent a *pro se* plaintiff in a case before me in which the

5   plaintiff sued his lawyer from an earlier matter for allegedly

6   misappropriating a $100,000 retainer.  Mr. Biale did an

7   absolutely superb job in that case.  I think very highly of

8   Mr. Biale, and regard myself as something of a mentor of his

9   and also as a friend.

10          In the interest of full disclosure, I must also put on

11  the record the sad fact that I attended shiva at Mr. Biale's

12  apartment in Brooklyn in the summer of 2019.  And most

13  recently, about six weeks ago, on October 10th, I was a

14  recipient of a group email that Mr. Biale sent to friends and

15  family announcing the joyous news of the arrival of a new son,

16  Abraham Ewing Graham Biale; and for which, Mr. Biale, a huge

17  *mazel tov* to you and Ms. Graham from the Court.

18          All that said, I have absolutely no doubt that

19  notwithstanding that I am acquainted with Mr. Biale in the

20  various ways that I have reviewed, these will not in any way,

21  shape, or form compromise my ability to preside over this case

22  dispassionately and neutrally and with fairness to all.

23  Nevertheless, I did need to make this disclosure, as I do in

24  all cases where I've had a friendship with counsel.

25          Mr. Biale, did you disclose to the government the sum

A-2134

19

KC1VTEMC

1    and substance of the facts that I've just reviewed?

2          MR. BIALE:  Your Honor, in candor, I did not.  But I

3    appreciate that your Honor has now put that on the record, and

4    I appreciate what you said.

5          THE COURT:  All right.

6          Mr. Bhatia, regardless, you are now on notice of the

7    information that I have just reported to you.  I trust that the

8    government does not have any issue with regard to the Court's

9    continuing to preside over this case.

10          MR. BHATIA:  No issue whatsoever.

11          THE COURT:  All right.

12          And Mr. Biale, just in the interest of full

13    disclosure, did you disclose to your client the fact that you

14    and I are acquainted in the ways that I've just reviewed?

15          MR. BIALE:  Yes, your Honor.

16          THE COURT:  All right.

17          And did Mr. Teman have any concerns about your

18    representing him in light of all of that?

19          MR. BIALE:  He did not.

20          THE COURT:  All right.

21          And Mr. Teman, is that correct?

22          THE DEFENDANT:  That's correct, your Honor.

23          THE COURT:  Prior to this hearing, had you been made

24    aware of the facts that I have just reviewed with Mr. Biale?

25          THE DEFENDANT:  Except that he's owed a *mazel tov*, he

KC1VTEMC

1    was rather candid and helpful to me by sharing his struggles as

2    encouraging and very helpful in a dark moment for me.

3        THE COURT:  I'm not surprised to hear that.  I'm glad

4    to hear that.

5        All right.  And it goes without saying, but you are

6    comfortable proceeding then with Mr. Biale as one of your

7    counsel?

8        THE DEFENDANT:  Yes, your Honor.

9        THE COURT:  All right.

10       That leads me then to a related issue, and this is

11   going to -- this is the principal reason that I was going to be

12   unable for us to proceed today.

13       And this issue also involves Mr. Biale, but it

14   implicates the case of *United States v. Curcio*.  And I

15   apologize in advance for the need to pursue these matters, but

16   circuit law requires that the Court be attentive to facts that

17   raise even potential conflicts.

18       Mr. Biale, for the record, am I correct that your

19   wife, Ms. Graham, is today employed as an Assistant United

20   States Attorney by the U.S. Attorney's Office for the Southern

21   District of New York, which is prosecuting your client,

22   Mr. Teman, in this case?

23       MR. BIALE:  That's correct, your Honor.

24       THE COURT:  All right.  And am I correct that

25   Ms. Graham has been an employee of the U.S. Attorney's Office

KC1VTEMC

1    at all times since Mr. Teman was indicted in September 2019?

2           MR. BIALE:  Yes.

3           THE COURT:  All right.

4           Mr. Biale, I need to confirm for the record that

5    before --

6           UNIDENTIFIED SPEAKER:  Your Honor, I just want to make

7    very clear --

8           THE COURT REPORTER:  I'm sorry.  Who is speaking?  Who

9    is speaking?  Who is speaking?  Hello?  I'm sorry, who is

10    speaking?  Your Honor?  This is the court reporter.  Hello?

11           THE DEPUTY CLERK:  Judge, it's A.J.  I think Martha is

12    trying to get your attention.

13           THE COURT:  Hold on.  Somebody is interrupting.

14           THE COURT REPORTER:  I'm sorry.  I'm not getting any

15    of this.  I don't know who was speaking.

16           (Indiscernible crosstalk)

17           THE COURT:  But right now, whoever was cutting in,

18    please be respectful of the ongoing conversation.

19           THE DEPUTY CLERK:  Judge, it's A.J.

20           Martha is unable to hear what you folks are hearing.

21    Martha is trying to cut in.  She is unable to hear you folks.

22           THE COURT:  Martha, are you able to hear me right now?

23           THE COURT REPORTER:  I'm able to hear you.  What I

24    didn't know is who was speaking, which attorney, when he

25    started speaking.  I did not get any of that.

KC1VTEMC

1           THE COURT:  Okay.  Thank you.

2           We'll back up a moment.

3           Martha, I put several questions to Mr. Biale about his

4    wife's employment at the U.S. Attorney's Office, to which he

5    answered yes.  Did you catch that, Martha?

6           THE COURT REPORTER:  Yes, your Honor.  It's when the

7    attorneys --

8           THE COURT:  Mr. Teman interjected.  And I think the

9    challenge there -- no fault here, I think Mr. Teman did not put

10   his name to his remarks, and that's probably, Martha, why you

11   didn't know who was speaking.  That was Mr. Teman.

12          Were you able to capture the words that were said?

13          THE COURT REPORTER:  No, because I was busy trying to

14   interrupt to see who was speaking.

15          THE COURT:  Okay.  So, Mr. Teman, just so we can

16   reprise that, after I said what I said to Mr. Biale and he

17   confirmed the facts about his wife's employment, what did you

18   say?

19          THE DEFENDANT:  I spoke up to clarify that I did not

20   know anything about Mr. Biale's wife and her profession or

21   anything, other than the loss of a child that he had shared.

22          THE COURT:  Okay.  That is my recollection of what

23   Mr. Teman just said.

24          And then in response to that, I said, in substance

25   Thank you, Mr. Teman.  That is exactly why I'm undertaking this

KC1VTEMC

1    necessary conversation.

2         Thank you, Martha.  I apologize.  I didn't realize it

3    was you who was cutting in.

4         And A.J., I apologize to you.  I thought that was

5    somebody else.

6         All right.  So, Mr. Biale, let me just pursue that

7    with you.  Before you took on this representation, was

8    Mr. Teman notified by you of the fact that your wife is

9    presently employed by the office that is prosecuting Mr. Teman,

10   and that she has been employed there during the entire course

11   of this prosecution?

12        MR. BIALE:  Your Honor, I apologize.  I don't recall

13   having a conversation about that with Mr. Teman.  And it sounds

14   like I did not.  Perhaps what makes sense is for -- I think

15   where your Honor is headed, that we should break and have a

16   discussion with Mr. Teman about this.

17        THE COURT:  Well, we're going to do a little more than

18   that.  But, yes, you and I are on the same page.

19        But, look, to be very blunt -- and this is something

20   that -- this is obviously pivotally important.  Mr. Biale's

21   wife status as an employee of the United States Attorney's

22   Office for the Southern District of New York -- Mr. Teman's

23   adversary in this case -- presents a potential conflict.

24        It is, in my judgment, based on my knowledge of the

25   case law, I believe it to be a completely waivable conflict.  I

A-2139

KC1VTEMC

1    have seen, in fact, at least one instance in which a defendant,

2    following careful *Curcio* proceedings, resulting in questioning

3    under oath of the defendant by the Court, knowingly waived the

4    conflict presented by one of his lawyers being married to an

5    AUSA in the office that is prosecuting him.

6         Nevertheless, the Second Circuit, as I think all

7    counsel on the call are aware, has insisted on rigorous

8    compliance, with a series of steps and procedures that a

9    district court must use to establish that a defendant wishes to

10   waive his right to conflict-free counsel.

11        In particular, *Curcio* requires that the Court:

12        One, advise the defendant of the dangers arising from

13   the particular conflict.

14        Two, determine through questions that are likely to be

15   answered in narrative form whether the defendant understands

16   those risks and freely chooses to run them.

17        And three, give the defendant time to digest and

18   contemplate the risks, after encouraging him or her to seek

19   advice from independent counsel.

20        And I'm citing the case of *United States v. Curcio*,

21   680 F.2d 881, 888-890 (2d Cir. 1982).

22        The purpose of those careful procedures is to protect

23   the defendant and his constitutional right to be free from

24   conflict-free counsel; and to protect the integrity of the

25   court proceedings.

KC1VTEMC

1          Absent a properly conducted *Curcio* proceeding

2    resulting in a knowing waiver by Mr. Teman of the potential

3    conflict here -- and it needs to be a waiver that I find

4    knowing and intelligent -- we simply cannot proceed further

5    with Mr. Biale representing Mr. Teman.

6          I confess that I did not spot this issue that defense

7    counsel is married to a prosecutor at the office that is

8    prosecuting Mr. Teman until yesterday, after having extensively

9    prepared for the sentencing.  And I spotted it only as I was in

10   the process of writing up my own narrative about how I know

11   Mr. Biale; and suddenly it dawned on me that I know him through

12   his wife, and his wife -- whom I melt through a private law

13   firm -- now happens to be working at the Southern District U.S.

14   Attorney's Office.  And perhaps counsel may have overlooked

15   this, too.

16          Let me ask you, Mr. Bhatia, were you aware that

17   Mr. Biale is married to one of your colleagues?

18          MR. BHATIA:  Yes, I was.

19          THE COURT:  Is there a reason you didn't alert me to

20   the potential conflict?

21          MR. BHATIA:  I apologize, your Honor.  I wasn't aware

22   this is one of the situations that triggers a *Curcio* hearing;

23   although now that you mention it, we are happy to proceed and

24   conduct one.

25          THE COURT:  Mr. Biale, are you also of the view that

A-2141

26

KC1VTEMC

1  you didn't think this might be a potential conflict, or it just

2  didn't -- just sort of blipped on it and didn't think about it?

3          MR. BIALE:  So, your Honor, I will say that -- so

4  Mr. Teman retained Ms. Harris in the summer.  And I was brought

5  into the case a little bit later to assist her.  I've obviously

6  been working closely with her.  I am not saying that to suggest

7  that it was her responsibility to disclose it, but I was not

8  part of the initial conversations.

9          I certainly understand that this is something that,

10 had we discussed it before, we wouldn't be addressing it for

11 the first time with your Honor now.

12         I will say to your Honor that I do not -- I have not

13 had a situation like this before where a court has conducted a

14 *Curcio* hearing based on the fact that I'm married to an AUSA in

15 the Southern District of New York.  It may be a best practice.

16 And, you know, I certainly will consider that going forward.

17         I think what I would propose -- and I don't want to --

18         THE COURT:  Sorry.  I'm not looking for a proposal,

19 because I've got a proposal.

20         I'm trying to understand how it can be that both

21 counsel in this case who knew that you, Mr. Biale, are married

22 to somebody who works for the office that is prosecuting

23 Mr. Teman and trying to put him in prison, didn't think to

24 raise -- in the case of Mr. Biale with Mr. Teman, in the case

25 of either of you -- with the Court the potential conflict.

KC1VTEMC

1        I will tell you, based on my knowledge of the case
2   law, that while this is a waivable conflict, it's unthinkable
3   that this is not something that merits a *Curcio* hearing.
4   People raise *Curcio* hearings for me when an associate in a
5   defense law firm is applying to the U.S. Attorney's Office for
6   employment.  This is way closer than that.
7        Look, in any event, lecture notwithstanding, here's
8   the point:  This is exactly the sort of conflict that needs to
9   be addressed at the threshold before we move forward.  Under
10  Second Circuit law, before a criminal defendant can waive such
11  a conflict so as to allow the case to move forward, there has
12  to be the carefully handled set of proceedings that *Curcio*
13  dictates.
14       Ordinarily, counsel bring this to my attention by
15  letter beforehand; they alert me to the fact of the potential
16  conflict.  And that can expedite the *Curcio* proceeding by
17  enabling the Court at the next conference to have the first of
18  the required two *Curcio* hearings, the first of which the Court
19  alerts the defendant to the potential dangers presented by the
20  conflict; at the second in which the defendant, after getting
21  the opportunity to consult with independent counsel, is
22  questioned by the Court to establish his awareness of the
23  problem or the conflict and his willingness to proceed.
24       So here's what I propose:  I would be inviting error
25  to proceed forward here making any substantive determinations

KC1VTEMC

1    in the case with a potential conflict left unresolved.

2            What I want to have happen is as follows:  I want

3    defense counsel first to review the issue carefully with

4    Mr. Teman.  And Mr. Teman's look of shock was obvious to me,

5    even from 1,000 miles away on video, when he learned that one

6    of his lawyers works -- is a colleague of Mr. Bhatia's.

7            Insofar as this conflict implicates the representation

8    by the firm of Sher Tremonte, I would urge that Mr. Gelfand and

9    Mr. DiRuzzo perhaps take the lead in inviting those

10   discussions, insofar as they are not subject to any such

11   conflict.

12           I then expect defense counsel to reach out to the

13   government.  And, government, I expect that you will consult

14   with the appeals unit in the U.S. Attorney's Office to make

15   sure that any submission that the Court receives on this point

16   in substance has been approved by the appeals unit, insofar as

17   it appears that trial counsel missed the *Curcio* issue, too.

18           Two weeks from today, December 15, I would like to

19   receive a joint letter from the parties.  It should notify the

20   Court whether Mr. Teman, after careful consideration, wishes to

21   proceed with Sher Tremonte on his team.  The letter should also

22   set out the parties' views -- supported by case law -- whether

23   the conflict here is waivable.  I am virtually certain that it

24   is waivable; but in the interest of due care, I would benefit

25   from case authority.

KC1VTEMC

1          Assuming that counsel agree that the conflict is

2    waivable, and that Mr. Teman does agree to waive it and to

3    proceed with Sher Tremonte, the letter should set out counsels'

4    proposed procedure, consistent with *Curcio*, for obtaining the

5    appropriate knowing and voluntary waiver.  As I said, *Curcio*

6    typically envisions a two-hearing procedure.  I would welcome

7    counsel setting out for me in writing the particular questions

8    that counsel propose that the Court put to Mr. Teman at each

9    hearing.

10          I hope and expect that counsel -- the government and

11   defense -- will be able to agree on the proposed procedure in

12   question.  We each have an equal interest here in the integrity

13   of this aspect of the proceeding.  If not, I still want a joint

14   letter; it should just set out the parties' various agreement

15   and disagreement.

16          The two weeks, in my estimation, should be enough time

17   to give Mr. Teman -- in consultation with counsel -- to digest

18   this news flash, and to reach a thoughtful and informed

19   conclusion as to whether to proceed with Sher Tremonte on his

20   team.  It should also give counsel enough time thereafter to

21   meet and confer and make a joint proposal to the Court,

22   consistent with *Curcio*.  However, needless to say, if counsel

23   on either side -- particularly the defense, but either side --

24   needs more time than two weeks to consider and work through

25   these important issues, obviously I'll accommodate that.  Just

KC1VTEMC

1    submit a letter seeking such an extension.

2          Upon receiving counsel's letter, if indeed Mr. Teman

3    wishes to waive his right to conflict-free counsel, I will

4    schedule a *Curcio* hearing.  Mr. Teman, I see -- I think I see

5    the long face.  I understand your frustration and surprise.

6    Let me just finish.

7          Please understand, I'm protecting your rights, as well

8    as everyone's right to the integrity of the proceeding.  And I

9    hope you appreciate that while I haven't always ruled for you,

10   I have tried throughout this proceeding to be attentive to your

11   rights.  You'll recall the dismissal of a count due to speedy

12   trial issues and the probing questions I put to the government

13   that resulted in their unilateral dismissal of Counts Five and

14   Six.  This is of the same nature.

15         There is an issue here that adversely affected your

16   rights.  I want to spot it, and I want to give time to make

17   sure your interests are protected, your rights here at stake.

18   Because you have a constitutional right to conflict-free

19   representation.  With limited -- one moment, sir.

20         With limited exceptions, a defendant can waive that

21   right; but under the law, the waiver has to be obtained

22   pursuant to a careful set of procedures that enables the Court

23   to assure itself that the waiver was knowing and intelligent,

24   and received after a period of deliberation.  When a conflict

25   surfaces, it is important that the Court and counsel turn

KC1VTEMC

1    square corners.

2           Mr. Teman, I wasn't intending to call on you at this

3    point, but just simply to explain myself because I regret this.

4    But if there's something you need to say, I'll let you do so.

5           But let me just say this:  I know your lawyers will be

6    tensing up each time you offer to say something to the Court

7    unguided by them.  So please, think carefully before you speak,

8    because your lawyers assuredly would want to confer with you

9    before you do so.

10          THE DEFENDANT:  Your Honor, I appreciate that, and

11   I'll keep it limited.

12          I don't mean to flatter, but it's impressive that you

13   can see facial expressions in such a small -- I have a very

14   small box here on the screen.

15          I'm concerned about an even larger issue, which is,

16   without going into the details that your Honor is undoubtedly

17   aware -- and a lot of paper has been exchanged electronically

18   back and forth, the questions -- the core questions we have

19   raised about this trial in two words would be prosecutorial

20   misconduct.

21          And I have just learned that the attorneys

22   representing me are literally married to the prosecution.  I

23   think that raises a much larger question about the entire case

24   and privileged communications and strategy and advice I've

25   gotten throughout this trial.

KC1VTEMC

1          I want to be candid that I am intending to seek

2     additional outside -- and I don't know how I'm going to afford

3     it; I've put all my money and taken loans to pay full

4     restitution.  And I want to note, your Honor, I showed up today

5     virtually with all the money to pay, coming here to beg you for

6     mercy to put an end to this.  And now I'm learning that -- and

7     your Honor is aware that we've had very esteemed controversial

8     attorneys like Professor Dershowitz helping us, you may not be

9     aware that Professor Lessig from Harvard Law School has also

10    stepped in to help.  Ron Coleman has stepped in to help.  Molly

11    McCann, who was just counsel for General Flynn, has stepped in.

12          I've had very helpful feedback.  And now I'm learning

13    that I basically might have had -- even inadvertently, and I

14    believe Mr. Biale is a very good man -- slips of the tongue

15    when you -- you know, I discuss my work with my girlfriend.

16    And it's surprising, given this case, she's still my

17    girlfriend, given the topic.

18          But I think there's a much bigger concern here, which

19    is we will never, never be able to know what I gave that was

20    privileged to my counsel that was just funneled to people we've

21    accused over and over of cheating.  And not only have we

22    accused them of cheating, Professor Dershowitz has accused them

23    of cheating, Ron Coleman has accused them of cheating, Molly

24    McCann has accused them of cheating.  They've been accused of

25    cheating.  The Southern District of New York has been accused

KC1VTEMC

1    of burying evidence in *U.S. v. Najad*, *U.S. v. Ahuja*.  You can

2    go up and down the halls of the Southern District of New York

3    and they will talk about these attorneys -- one of whom he's

4    married to -- emailing each other about "burying evidence."

5    Professor Outlaw from Vanderbilt and from Howard University

6    wrote a letter to Judge Nathan, who in full -- I want to have

7    full --

8                    (Court reporter disconnected from call)

9                    THE COURT REPORTER:  I'm sorry, your Honor?  Your

10   Honor, I was thrown off the call.  I just called back.  I'm

11   sorry.  The last thing I have --

12                   THE COURT:  Who is that, the court reporter?

13                   THE COURT REPORTER:  Yes.

14                   THE COURT:  How long ago did you drop off the call?

15                   THE COURT REPORTER:  The last thing I have was the

16   defendant was saying:  Professor Outlaw from Vanderbilt and

17   from Howard University wrote a letter to Judge Nathan, who

18   fully wanted to have --

19                   THE COURT:  One moment.

20                   Mr. Teman, because if something is said without the

21   court reporter, it's as if it didn't happen.

22                   THE DEFENDANT:  I can repeat it.

23                   THE COURT:  One moment.  Please don't interrupt, just

24   for the court reporter's benefit, that's all.

25                   I will invite you to pick up where you referred to

KC1VTEMC

1    those people.

2           But before you do, I get the gist of what you're

3    saying.  I'm happy for you to complete the thought.

4           There will be time enough to take this up.  So

5    complete the thought as you wish.

6           (Indiscernible crosstalk)

7           THE COURT:  Sorry, sir.  Please.

8           This is not a day in which I'm resolving anything.

9    I'm simply putting in place a procedure for communication

10   within the defense team, between the defense and the

11   government, and ultimately to the Court.  I am deciding nothing

12   except setting a procedure.

13          So I will ask you, Mr. Teman, understand that this is

14   not a moment for advocacy.  I'm happy to hear what you have to

15   say.  But at the end of all this, all I'm going to be doing is

16   putting in place a process.

17          Go ahead, Mr. Teman.

18          THE DEFENDANT:  Your Honor, I appreciate that.  I will

19   be concise.  And I invite the court reporter to shout out if

20   anything is unclear.

21          She mentioned that I left off on Professor Outlaw --

22   which is a fantastic name for a professor writing about

23   criminal trials -- who wrote to Judge -- I'd like to note for

24   the record the judge cracked up.  But anyway -- I am the

25   comedian sometimes.

KC1VTEMC

1          But this is a very serious topic, which is that

2     Professor Outlaw of Howard University and Vanderbilt, wrote to

3     Judge Nathan and said that quite a sizable percentage of the

4     Southern District of New York -- I believe the count was

5     something like 14 members of the staff, multiple supervisors,

6     and that's just in one trial, *U.S. v. Najad*.  And then there's

7     another trial before Judge Failla, *U.S. v. Ahuja*.  And there's

8     also, I believe, a case before Judge Hellerstein where S.D.N.Y.

9     coincidentally dumped six terabytes of data right before trial.

10          And I'll point out that what hasn't been brought up,

11     but last night, 4 p.m., 9 p.m., somewhere between there,

12     Southern District of New York disclosed that Bank of America

13     and they had information pertaining to a $14,000 transaction or

14     money that was held, effectively a personal guarantee if the

15     transaction they allege was illegal.  And they go, Oh, we just

16     got this information November 30th.

17          Sentencing was supposed to be September 29th.  And

18     your Honor can correct me, but I think it was also supposed to

19     be sometime in June.  And this trial was in January, and the

20     arrest was in July.

21          I'm going to sum this up very clearly in bullet

22     points, which is, I agree, your Honor, I believe a statement

23     you made once in trial is you tried to be a source of truth and

24     light.  I don't think anybody can look at the behaviors of the

25     Southern District of New York in this case and across, and the

**A-2151**

36

KC1VTEMC

1   fact that they were married to my defense counsel and failed to

2   disclose that, combined with all of the facts relating to

3   magically late and -- excuse me, late disclosure is actually

4   not accurate, because I think your Honor will agree, sentencing

5   was supposed to happen half a year ago.  And magically, they

6   discovered a $14,000 drawdown, effectively changing the case,

7   effectively now it's not going -- it went to the bank, and I

8   said, I'm going to take this money.

9           They said, Well, you're not entitled to this money.

10          Basically, the whole case changes to, I went to the

11  bank and said I believe we're contractually obligated, I'm

12  putting that right here on the document; I'm chatting with you

13  for an hour.  And in addition to that, I understand that if I'm

14  wrong or, in the government's view, I'm dishonest, I personally

15  stand to lose $14,000.

16          I've got -- and I'm not waiving privilege here --

17  tremendous pushback on strategy and ideas.  And if I knew that

18  my defense counsel was married to the opposing team, I wouldn't

19  have hired them.

20          And right now, I think what can be clear -- and

21  everybody from the outside can admit -- and I'm going to end on

22  this, I don't think any defendant should have to learn this now

23  at this stage and believe that all the post-trial motions and

24  God knows what else Southern District of New York hasn't yet

25  disclosed and refused to disclose to us.

KC1VTEMC

1          Mr. Biale implicitly admitted that they haven't

2     disclose all information.  Mr. Biale, I believe, was on his

3     second trial in this case.  He's a young man.  He didn't choose

4     to lie to your Honor's face over and over as he did.  He was

5     coached by a supervisor at the Southern District of New York.

6     And now you're asking me to be tried because someone was

7     married.

8          I am sure when we come back, we're going to be asking

9     for at least a different venue.  Thank you, your Honor.

10         THE COURT:  All right.

11         Look, thank you, Mr. Teman.  You covered a lot of

12    ground there, and I don't propose to address everything you

13    covered.  My focus here is this case, not other matters.

14         You said a moment ago that your counsel -- I think you

15    used the plural -- were married to an AUSA.  To be clear, I am

16    unaware that Mr. DiRuzzo or Mr. Gelfand, your trial counsel, or

17    Ms. Harris, your other post-trial counsel, have any such

18    relationship with anyone at the Southern District of New York.

19         The potential conflict issues that I flagged, as I

20    understand it, is limited to Mr. Biale.  You're at liberty to

21    examine with the other lawyers whether their spouses or

22    partners are employees of the Southern District, but my guess

23    is the answer will prove no.

24         And so while I appreciate what you have said, the

25    issue that I raised is a tight and narrow one that involves

KC1VTEMC

1    Mr. Biale's ability -- and, therefore, that of his law firm --

2    to represent you without a knowing and intelligent waiver.  It

3    does not in any way, shape, or form potentially implicate

4    anything that occurred in this matter before Mr. Biale joined

5    the defense team.

6            I will be, a little later on, raising with counsel

7    some questions I have about the forfeiture and restitution

8    filings that I received in the last few hours.  I hadn't

9    thought about whether the issue had been that the government

10   had had them all along and just produced them, so much as just

11   the rudeness of their coming in in the last 24 hours, which is

12   necessitating everybody recognizing the need for an

13   adjournment.  I hadn't thought of that as any form of a late

14   disclosure issue.  I'm happy for counsel to confer about that

15   and to receive a submission on that point.

16           But for now, the issue that I flagged is simply

17   presented by the fact that since the Sher Tremonte firm has

18   been part of the case -- or at least since Mr. Biale has been

19   part of the team -- there is this *Curcio* issue that arises.

20   And so for that reason, I need to hit the pause button on all

21   this to run that to ground.

22           In the fullness of time, Mr. Teman, you should speak

23   with, in particular, your independent lawyers, Mr. Gelfand and

24   Mr. DiRuzzo, who I also esteem very --

25           THE DEPUTY CLERK:  Your Honor, I apologize.  I don't

A-2154

39

KC1VTEMC

1    know if anybody else -- you've frozen completely.

2          I'm going to reach out to Judge Engelmayer very

3    quickly.  Hold on one moment.

4          (Pause)

5          THE COURT:  All right.

6          Just simply, yes or no, Mr. Teman, can you hear me?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Mr. Bhatia, can you hear me?

9          MR. BHATIA:  Yes.

10         THE COURT:  Mr. Biale, can you hear me?

11         MR. BIALE:  Yes, your Honor.

12         THE COURT:  Court reporter, can you hear me?

13         THE COURT REPORTER:  Yes, your Honor.

14         THE COURT:  Okay.

15         And court reporter, did you lose any -- did you at any

16   point lose the audio or were you able to hear everything?

17         THE COURT REPORTER:  I heard you up until you froze.

18         THE COURT:  Okay.  I don't know when that was.  What

19   was the last thing that you recorded my saying?

20         THE COURT REPORTER:  Let me just look at it.  Hold on

21   one minute please.

22         THE COURT:  Keep your voice up.  I'm having difficulty

23   hearing you from a volume perspective.

24         THE COURT REPORTER:  Okay.  I'm just looking at it.

25         "In the fullness of time, Mr. Teman, you should speak

A-2155

40

KC1VTEMC

1    with your independent lawyers, Mr. Gelfand and Mr. DiRuzzo, who

2    I also esteem very," and that was it.

3          THE COURT:  Very highly.

4          I have no doubt that they have your best interests at

5    heart and are independent of the potential conflict I

6    identified.  You should speak with them about your best

7    interests, whether to use one of the other lawyers who is

8    assisting you, whether to waive the conflict and go with the

9    Sher Tremonte firm, or do something else.  And I don't weigh in

10   on that, I just am trying to police the conflict process here

11   to make sure that your right to conflict-free counsel is

12   respected.

13         I do though need to say this, which is that your very

14   estimable trial counsel, who are unaffected by any conflict,

15   have thoroughly raised the issues that you had flagged under

16   *Brady v. Maryland* in this case.  And as the lengthy post-trial

17   decision that I rendered reflects, I found those claims of

18   misconduct to be meritless.

19         I do not preclude your exploring with your counsel the

20   thesis -- if you think it worth exploring -- that some

21   sentencing materials on account of the relationship here were

22   shared in some way from Mr. Biale to Ms. Graham to Mr. Bhatia,

23   I have zero reason to think that that happened, but you're at

24   liberty to make inquiry about that through independent counsel,

25   but this call is not the time to do that.

SOUTHERN DISTRICT REPORTERS, P.C.•••••••
(212) 805-0300

41

KC1VTEMC

1              Mr. Teman, hold on.

2              This is also not a time for speech-making.

3              I am here to protect your rights.  And your right

4    principally involves at this point going offline, speaking with

5    your independent lawyers, and deciding how you want to proceed

6    as to representation.  And I will be happy to hear from the

7    counsel who emerge ultimately from that process if there's some

8    new issue presented by the Sher Tremonte firm's role in the

9    case that needs to be explored.

10              But, once again, I just want to emphasize, just to

11   lend some reality to this, that that firm has been post-trial

12   counsel only.  There's no reason I have to think that the jury

13   trial that resulted in a conviction on all counts was in some

14   way compromised by the fact that Ms. Biale happens to be --

15   Mr. Biale happens to represent -- married to Ms. Graham.

16              In any event, the point is that I've now put in place

17   a procedure.  Counsel are to write me a joint letter in 14

18   days.  In the event the determination is not to seek to waive

19   the conflict -- and that's your right -- let me know how

20   counsel propose jointly to proceed.

21              And, Mr. Teman, it may be that for financial reasons

22   or just due diligence reasons or needing to take a deep breath,

23   you need more time.  I'll be happy to give that to you.  As

24   you're going to hear in a few moments, I think there are very

25   good reasons sounding in public health and safety why you might

A-2157

42

KC1VTEMC

1    want to slow this process down.  We'll see.

2         But the bottom line is this is between you and your

3    counsel.  I do not want anymore speeches made.  It only runs

4    the risk that something you would say would be something that

5    your eventual counsel will regret that you said.

6         Okay.  So having taken care, then, of the *Curcio*

7    issue, I want to give counsel a heads-up that once we resolve

8    that representation issue -- whether it turns out to be a

9    *Curcio* waiver or a substitution of counsel or a reversion just

10   to using estimable trial counsel, however it works out -- I am

11   likely to commission letter submissions from counsel on two

12   areas relating to sentencing.  And I'm going to set a schedule

13   for all this once the dust settles on the representation

14   issues.  Affirmatively, I do not want any submissions from

15   anybody on these issues until the representation issue is

16   settled.

17        The first involves forfeiture and restitution.

18        For reasons that are completely puzzling to me, at the

19   very last minute yesterday, as Mr. Teman said, after sentencing

20   had been scheduled and rescheduled and pending for months, I

21   received a flurry of three letters, initiated by one from the

22   government, debating forfeiture and restitution.  And then less

23   than an hour before sentencing, I received a chart with some

24   data, I gather, from the bank victim in this case.

25        Needless to say, given the last-minute nature of the

43

KC1VTEMC

1    submissions, I have not had a full opportunity to study the

2    issue.  And in subject of best practices, this is not the way

3    to go, government, to start teeing that stuff up the day before

4    sentencing.

5            At this point I am simply uncertain as to the legal

6    and factual bases for an award of forfeiture here, on top of an

7    award of restitution.  I just haven't looked into it or

8    explored it; and the rather threadbare letters I've gotten

9    don't give me enough to go on.

10           It's also frankly unclear to me from the letters

11   whether the government is, in fact, seeking separate awards of

12   forfeiture and restitution, how they relate to each other, if

13   there is a legal basis for compounding both here, and

14   whether -- if the government is seeking both, whether the Court

15   has the legal authority or the discretion to decline to order

16   the forfeiture on the grounds that on the circumstances here

17   it's essentially a replica of restitution.

18           I'm still formulating the full range of (inaudible) on

19   which I will eventually need guidance from counsel.  But I

20   expect that once the Curcio or representation issue is done, I

21   will commission letter briefing on this issue that was

22   belatedly exposed to me in the last 24 hours.  And I will

23   certainly insist that the briefing be complete materially in

24   advance of the eventual sentencing date.

25           All right.  The second area in which I'm likely to

44

KC1VTEMC

1    solicit presentencing briefing involves whether Mr. Teman is

2    going to qualify for bail pending appeal.  And the reason is

3    that it may be important to the Court in determining the just

4    and reasonable sentence to know whether Mr. Teman is likely to

5    serve some of the prison sentence during a time when prison

6    conditions are more restrictive than usual as a result of the

7    pandemic, or whether any such sentence would first begin to be

8    served after the appellate process has run its course and when,

9    God willing, the pandemic has also hopefully run its course.

10          As counsel may be aware, I believe that the pandemic

11   is an important factor that a just court must take account of

12   at sentencing, just as it must in evaluating relevant in the

13   last number of months petitions for compassionate release.  As

14   counsel are probably aware, I personally granted a large number

15   of compassionate release applications during the pandemic.  In

16   imposing sentences during the pandemic, I have imposed sentence

17   in a number of cases in which the defendant had been in custody

18   since the pandemic walloped New York beginning in mid March.

19          As you are all aware, the conditions in federal

20   prisons have been uncommonly hard during the pandemic.  At the

21   MCC and the MDC, the local jails, where in-custody defendants

22   awaiting sentence in this district are typically held, such

23   conditions have been particularly onerous and, on several

24   occasions, have resulted in lengthy lockdowns.  To prevent the

25   spread of COVID, there have been restrictions on inmate

KC1VTEMC

1    movement, and on visits from family and counsel.  There have

2    also been restrictions to aimed at safeguarding health in

3    various FCIs, federal correction institutions, in which

4    defendants are generally designated after sentencing.

5        I have repeatedly taken those harsh conditions into

6    account in imposing sentence.  I have repeatedly said in

7    sentences over the last eight months that time spent in custody

8    during the lockdown conditions necessitated by a pandemic is

9    necessarily harder time than Congress or anyone ever envisioned

10   or intended prison time to be.

11       And so in deciding on the just sentence, I have taken

12   the view the defendants who have endured custody in such

13   circumstances are entitled -- all else equal -- to lower

14   overall sentences than would otherwise be the case.  In other

15   words, in calculating the sentence, I have informally given

16   defendants credit for more than one day for each day spent in

17   custody.  And the same logic applies to a defendant whose term

18   of prison custody has not yet begun, but is likely to begin

19   while the pandemic is still ongoing.

20       So it will be an important data point for me, in

21   calculating the just and reasonable sentence, to factor in

22   whether Mr. Teman does or does not satisfy the requirements for

23   bail pending appeal.  If he does satisfy those standards, given

24   the typical life cycle of a criminal appeal in the Second

25   Circuit, his prison term is less likely to be spent during

KC1VTEMC

1   pandemic lockdown conditions than if he does not satisfy those
2   standards.

3          For obvious reasons, I do not want to receive any such
4   submissions from counsel until the representation issue has
5   been squarely resolved.  But I'm giving all of you -- including
6   potentially counsel yet to be retained -- a heads-up that once
7   the representation issue is resolved, I am likely to set a
8   schedule for such submissions.  And I will, in the order that I
9   issue, likely try to put a sharp point on any particular issues
10  that would be of assistance to me for counsel to address.

11         And I want to ask defense counsel -- I'm here
12  addressing myself not just to the present defense counsel, but
13  to anyone who may later join Team Teman of the following one
14  issue that is important and relates to sentencing.  And again,
15  Mr. Teman, I'm looking out for you.

16         The issue is whether it makes sense and it is in
17  Mr. Teman's best interest to hold sentencing soon after the
18  conflict issue, the representation issue, is resolved, or
19  whether it makes better sense to put sentencing off, and here's
20  why:

21         I am acutely aware that the COVID pandemic is
22  currently at a peak.  I'm aware that Mr. Teman has heightened
23  exposure to COVID, given his history of respiratory issues.

24         Before sentencing takes place, the standards governing
25  Mr. Teman's release are set by Title 18, United States Code,

KC1VTEMC

1    Section 3143(a).  And I found that Mr. Teman meets those

2    standards, which allows him to stay at home where he and

3    probably the rest of the country are likely most safe during

4    COVID.

5            Once sentencing occurs, however, for Mr. Teman to

6    remain at liberty -- barring the time spent between sentencing

7    and surrender date -- all that will require him to satisfy a

8    different statute, Title 18, United States Code, Section

9    3143(b).  And that statute, the bail pending appeal statute,

10   requires Mr. Teman to identify substantial questions on appeal

11   that would likely lead to reversal or a new trial as that

12   standard has been articulated by the Second Circuit in the

13   foundational case of *United States v. Randell*, 761 F.2d 122,

14   (2d Cir. 1981).

15           I am not prejudging that question.  I will be eager to

16   hear what counsel have to say about that.  But, in the interest

17   of candor, I will say that I am familiar with the issues in

18   this case.  I resolved the extensive post-trial motions

19   litigated by Mr. Gelfand and Mr. DiRuzzo.  And I denied all

20   those motions in a 27-page decision I issued on June 5th

21   docketed at docket 138.

22           Based on the issues that have been put to me so far,

23   at present, I'm not seeing a question or legal issue that rises

24   to the *Randell* standard.  Again, I could be wrong.  I'm happy

25   to be briefed.  But I'm quite well familiar with the issues

A-2163

48

KC1VTEMC

1    (inaudible) --

2            THE COURT REPORTER:  I'm sorry.  I'm sorry, your

3    Honor?  Your Honor?  Okay.

4            THE COURT:  -- Section 3145(c) of Title 18, which

5    permits release where "exceptional reasons exist," which this

6    Court has cited in allowing the pretrial release of various

7    prisoners during COVID, alas, does not eliminate the

8    requirement that a defendant who is between sentencing and

9    appeal establish the existence of a substantial question under

10   3143(b).

11           So I would ask the defense, present and future, to

12   consider thoughtfully whether it really is in Mr. Teman's best

13   interest to proceed to sentencing now.  The pandemic right now

14   is surging across the country.  It may continue to surge for

15   some time.  I am open to putting off the sentencing date, and

16   hopefully this dreadful public health situation will begin to

17   abate before long.

18           And during the period between before sentencing, that

19   requires -- that, rather, enables Mr. Teman to remain out of

20   custody, provided only that he continues to comply with the

21   existing conditions of release that have been set, which he has

22   shown an inability to comply with.

23           A number of my colleagues have handled this very

24   situation in this very way, by adjourning the sentencing dates

25   of defendants who are currently released on conditions of bail.

KC1VTEMC

1   I'm willing to do that here.  I'm open to an adjournment.

2           So I ask defense counsel to reflect, in consultation

3   with Mr. Teman, and take that up with Mr. Teman.  And after the

4   completion of the representation determination, if you will, I

5   expect to issue an order confirming that, after thoughtful

6   consultation between defendant and counsel, I would like to

7   understand what Mr. Teman's judgment is as to whether to

8   proceed or seek an adjournment until hopefully that the

9   pandemic is in (inaudible).

10          So with that, I have nothing further for now.  But

11  those are important issues that I want counsel to consider.

12          With that, I'm going to go around the horn to see if

13  there's anything else that needs to be addressed.  But if there

14  is nothing else, I will expect a joint submission on December

15  15th, whether relating to the *Curcio* issue or, if that is

16  mooted, whether as to the next step in progress in the case.

17          Mr. Teman, I'm mindful that if you wind up in the hunt

18  for new counsel, two weeks may not be enough.  Rest easy.  I'm

19  not forcing your hand here.  If you need the time, you'll get

20  it.

21          With that, let me just go around the horn, beginning

22  with you, Mr. Biale.  I Appreciate that all of this appears to

23  have come as a surprise to you, notwithstanding my comment

24  earlier that it ought to have been flagged for me earlier.

25  Knowing you well, as I do, I have 100 percent confidence in

A-2165

50

KC1VTEMC

1    your integrity and have no doubt -- despite what was said by

2    Mr. Teman -- of your good faith, independence, integrity, and

3    commitment to him.  Nevertheless, the nature of conflicts is

4    that potential conflicts need to be run through this process.

5              Is there anything else you want to put on the record

6    or say at this point?

7              MR. BIALE:  Understood, your Honor.

8              Not at this time.  Thank you.

9              THE COURT:  Mr. Bhatia, anything from you?

10             MR. BHATIA:  Obviously we'll take all the comments

11   from today into account and speak with counsel, whoever that

12   may be.

13             One thing to flag for your Honor is there was some

14   question about adequate notice for forfeiture.  To the extent

15   sentencing is now adjourned, we may want to give that notice

16   sooner rather than later.  The issue is a notice one.

17             So I'm just flagging for the Court and for the defense

18   that we may do that; but it's not with the intention of

19   catching anyone in a period of transition.  But if the question

20   is notice, we hope to give that -- make sure that everyone is

21   on notice now.

22             THE COURT:  Mr. Bhatia, I've already directed that.

23   Essentially, I said that once we've sorted out the

24   representation issue, one of the areas in which I need

25   considerably more input from both sides -- but in the first

51

KC1VTEMC

1    instance, the government -- involves restitution and

2    forfeiture.  It follows that on the schedule I set, you will

3    have your opportunity to say your piece, and Mr. Teman's

4    counsel will have their opportunity to.

5           And all those will be submitted with finality

6    sufficiently in advance of sentencing so that each side isn't

7    dealing with movable parts here, and they know what the sum and

8    substance of the submissions are, and I, in turn, will be able

9    to get the answer right.

10          But it's no way to promote accuracy and

11   decision-making to dump stuff on a court in the way that

12   happened in the last 24 hours.  And so this time, by court

13   order, I will insist that everything be submitted meaningfully

14   enough in advance so that I can do my job right.

15          MR. BHATIA:  Obviously we will comply with the Court's

16   schedule.  I wasn't sure if the Court wanted us to write extra

17   notice under 32.2, sort of, as soon as possible.  We'll stick

18   with the schedule that you've laid out.

19          THE COURT:  All right.

20          I thought I was crystal clear.  I do not want any

21   substantive submissions in the case until the representation

22   issue is sorted out.  It's a lot easier to sort this out and to

23   not compound any issue if you are communicating or sending

24   stuff to Mr. Biale while he is subject to an as yet unwaived

25   conflict.  So I would much sooner just hit the power save

KC1VTEMC

1    button on anything of substance until the representation game

2    of musical chairs has come to a close.  Okay?

3              MR. BHATIA:  That makes perfect sense.  Thank you.

4              THE COURT:  All right.

5              Mr. Teman, I strongly discourage you from saying

6    anything further; nonetheless, this concerns you.  If there's

7    something you feel must be said, mindful that your counsel are

8    no doubt channeling me in saying, Don't say it, I give you the

9    floor.

10             THE DEFENDANT:  Your Honor, thank you.

11             I want to just put on the record that I retained

12   Justine Harris.  I didn't know -- know them.  But I retained

13   Sher Tremonte specifically to deal with the topic of *Brady*

14   violations and other related S.D.N.Y. cheating as I've

15   addressed, having nothing to do with sentencing.  In fact, they

16   have made clear that they just volunteered out of the goodness

17   of their heart to show up to sentencing.

18             And what a surprise party it has been.

19             Second, I can't speak to technicalities and

20   legalities, but this idea that now S.D.N.Y. gets additional

21   time to correct an error of disclosure, I'll note that their

22   disclosure where they say they got information from Bank of

23   America, said they got it December 30th of 2020.  So we're

24   still on Skype, but they have time travel.

25             It just seems like every single time in this case

KC1VTEMC

1   S.D.N.Y. messes up and then they cheat to get it in anyway,

2   witnesses have fled the country, etc.  I just want to note that

3   for the record.

4           I very much expect to show up with new counsel.  And I

5   don't know of the technical means of doing this, but I very

6   much expect to ask for some sort of outside independent

7   hearing, whether it's an ablit (ph) court.  You have a personal

8   relationship with this guy.  He does a major significant thing.

9   And, your Honor, it may be all accidental, you know?  Like

10  hiring the wrong person at a company who leaks information to a

11  competitor, that might be all accidental, but it's still a spy

12  on the team.  And this is shocking.

13          So that's all I'm going to say.  Thank you.

14          THE COURT:  All right.  Look, Mr. Teman, we have a

15  process for the resolution of claims.  It's called litigation

16  before the district court.  If either party is dissatisfied

17  with the resolution that I reach, we have a process called

18  appeal.  That's what we will do here.

19          You are at liberty to pursue with counsel or successor

20  counsel any grievances you have.  Counsel, binded by their

21  obligations not to bring privilege claims before the Court, are

22  at liberty to pursue claims.  And if you have a good-faith

23  basis to think that this is other than appears to the Court,

24  which is simply a failure to raise with the Court the issue of

25  a marital relationship, and if you really believe that there's

A-2169

54

KC1VTEMC

1    a basis for believing that you have a spy in your kip, you're

2    at liberty to pursue that through independent counsel, they are

3    empowered to make motions before me, and we'll litigate that in

4    the proper way.  I can't foresee the means by which any such

5    issue will be litigated until something is before me.

6          But there's a process for that.  I hope, if nothing

7    else is clear to you, I hope it's obvious from you today that I

8    am trying to protect your rights in this process, and I will

9    continue to do so, including in the context of any claim you,

10   through counsel, should choose to raise.

11         With that, I look forward to hearing from everybody in

12   two weeks.  I want to wish everybody continued good health for

13   you and your families.

14         And Mr. Teman, I regret that, you know, the challenge

15   of being a criminal defendant at this time has been compounded

16   by the challenge of being, you know, cooped up in a worldwide

17   pandemic with all the concerns that must be on your mind.  So

18   you're in my thoughts.

19         In any event, we stand adjourned.

20         I look forward to a joint submission two weeks from

21   now.  In case I haven't made it clear enough though, no

22   substantive submissions until we've sorted out the counsel

23   issue.  I will issue a bottom-line, one or two-sentence order

24   reflecting the bottom-line outcome here.

25         We stand adjourned.  Thank you.          (Adjourned)

A-2170

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-                                                    19-CR-696 (PAE)

ARI TEMAN,                                             ORDER

                        Defendant.

---

PAUL A. ENGELMAYER, District Judge:

The sentencing hearing for defendant Ari Teman was scheduled for December 1, 2020, but was terminated shortly after it began after the Court identified the need for a *Curcio* hearing in order to permit Sher Tremonte LLP, which had recently appeared on Mr. Teman's behalf, to represent him alongside trial counsel. The Court has since granted a series of adjournments to enable Mr. Teman to secure alternative post-trial counsel. Yesterday, notices of appearance for Mr. Teman were filed by Susan G. Kellman, Esq., and Andrew J. Frisch, Esq. *See* Dkts. 199, 200. The Court welcomes new counsel, for whom the Court has great esteem.

Although the sentencing record otherwise appears complete, the Court, before setting a new sentencing date, would benefit from receiving letter submissions from counsel addressing the following discrete points:

1.      *Bail pending appeal*: The Court wishes to reach a determination, before imposing sentence, on whether it will grant bail pending appeal. That is because the Court regards it as relevant to the reasonable and proper sentence under 18 U.S.C. § 3553(a) whether Mr. Teman is likely to be incarcerated at a time when the restrictive and difficult conditions attendant to the COVID-19 pandemic remain in place. In numerous cases involving defendants who either have been in custody since March 2020 and/or who have been about to enter custody, the Court has

imposed a shorter sentence than it otherwise would have, in recognition of the heightened rigors

of custody during the pandemic.[1]  That factor would be present were Mr. Teman to commence

serving his sentence not long after the upcoming sentencing, but would not clearly be so were the

Court to grant bail pending appeal.  The Court therefore solicits counsels' views on whether Mr.

Teman qualifies for bail pending appeal.  *See* 18 U.S.C. § 3143(b); *United States v. Randell*,

761 F.2d 122 (1985).

      2.    *Restitution and forfeiture*:  On the eve of the December 1, 2020 sentencing, the

Government submitted evidentiary materials in support of a proposed forfeiture order that, had

Mr. Teman's representation issue not arisen, independently would have required an adjournment.

The Court wishes to resolve, in an orderly fashion, what the appropriate restitution order is, and

whether—and if so, on what terms—a forfeiture order is also warranted, as the Government has

urged.  The Court therefore solicits counsels' views as to whether and on what terms restitution

and/or forfeiture orders are merited.

      The Court accordingly sets the following schedule:

---

[1] The pre-pandemic case law, although arising in the context of pre-sentence conditions of custody, is in accord.  *See, e.g.*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures"); *United States v. Torres*, No. 01 Cr. 1078 (LMM), 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").  For the same reason, the Court has recognized a defendant's prolonged custody during COVID-19 as a factor favoring early release pursuant to the compassionate release statute.  *See, e.g.*, *United States v. Carter*, 18 Cr. 390-10 (PAE), Dkt. 528 at 2 (S.D.N.Y. Jan. 25, 2021) ("unexpected hardship presented by the COVID-19 pandemic . . . would make a sentence below the one imposed compatible with the § 3553(a) factors"); *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) (remaining time in prison "significantly offset by the unexpected rigors that Mcrae has experienced during the more than 10 months he has spent in prison during COVID-19" because "incarceration in such circumstances is, unavoidably, experienced as more punishing").

By Friday, February 12, 2021, the defense is to submit a memorandum setting out its

views on bail pending appeal, and the Government is to submit a memorandum setting out its

views on restitution and forfeiture, attaching proposed such orders and evidentiary material

supporting the monetary calculations in those orders.

By Friday, February 26, 2021, the Government is to respond to the defense's

memorandum as to bail pending appeal, and the defense is to respond to the Government's

memorandum as to forfeiture and restitution.

The Court does not invite replies to these submissions.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: January 28, 2021
      New York, New York

3

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 23, 2021

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

      The Government respectfully writes to address the Court's inquiry about "whether and on what terms restitution and/or forfeiture orders are merited." *See* Dkt. No. 202 at 2. For the reasons set forth below, the Government submits that restitution of $259,340.32 and forfeiture of $330,000 are warranted. A proposed Order of Restitution is attached as Exhibit A, and a proposed Order of Forfeiture is attached as Exhibit B.

      **A.**     **Background**

      On January 3, 2020, the grand jury returned a Second Superseding Indictment (the "Indictment") charging Teman in six counts. *See* Dkt. No. 55. Counts One and Two each charged bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. Counts Three and Four each charged wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Counts Five and Six, which the Government did not proceed on at trial, each charged aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2.

      The Indictment also contained a forfeiture allegation advising the defendant that, as a result of committing the bank fraud offenses in Counts One and Two, he "shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses." *Id.* ¶ 7. Likewise, the Indictment contained a forfeiture allegation advising the defendant that, as a result of committing the wire fraud offenses in Counts Three and Four, he "shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses." *Id.* ¶ 8.

Trial commenced on Counts One through Four on January 22, 2020. The Government's first witness was Karen Finocchiaro, a Vice President and Senior Fraud Investigator at Bank of America, N.A. Finocchiaro testified and introduced bank records reflecting several aspects of Teman's fraud, including the fact that, in March 2019 and April 2019, Teman deposited a total of 29 fraudulent checks worth a total of $330,000 into a Bank of America account belonging to GateGuard, Inc., a company he owned and controlled (the "GateGuard Account"). *See, e.g.*, Trial Tr. 196; GX 113. Immediately after depositing the checks into the GateGuard Account and securing the funds, Teman transferred nearly all of the fraudulently obtained funds into other Bank of America accounts he controlled in the names of other businesses and into a personal account in his own name. *See generally* Government's Memorandum of Law in Opposition to Defendant's Post-Trial Motions at 7-10 (Dkt. No. 112) ("Gov't Post-Trial Brief") (citing testimony and exhibits regarding the transfer of funds between Teman's accounts). Specifically, Teman transferred funds from the GateGuard Account into an account in the name of Friend or Fraud Inc. (the "Friend or Fraud Account"), an account in the name of Touchless Labs LLC (the "Touchless Labs Account"), and an account in his own name (the "Ari Teman Account"). *Id.* at 6-7, 9-10. He later withdrew $4,000 of these proceeds from the Friend or Fraud Account at a Bank of America branch in Manhattan.

After Teman deposited the checks and they were flagged as fraudulent, Bank of America was required to and did return funds from the GateGuard Account – where the checks were deposited – to the originating bank. Trial Tr. 208-09. In this process, sometimes referred to as a "chargeback," Bank of America drew the available funds from the GateGuard Account and then, if none were available, repaid the originating bank using Bank of America's own money. Specifically, Finocchiaro testified that the bank was responsible for paying for a chargeback with its own funds if the customer account had a deficit:

Q.    What happens if there's only $10 in that account and there's a $50 chargeback?

A.    It's going to leave the account in a deficit of $40.

. . .

Q.    And who would be responsible for those $40?

A.    So it's the responsibility of the customer to make good on the balance in the account; so if the account's in a negative, that it is brought to a positive balance.

Q.    Would the bank pay that $40 first?

A.    It does. It does honor the chargeback, and it recourses the money back to the maker bank.

Trial Tr. 209-10. After chargebacks in the GateGuard Account, that account had a negative balance of approximately $260,000.

However, while Bank of America was required to return the proceeds of the fraudulent checks from the GateGuard Account back to the originating banks, it was not permitted to reverse the transfers from the GateGuard Account to Teman's other accounts. Finocchiaro testified that

Bank of America could not use funds from the Friend or Fraud Account, Touchless Labs Account, or the Ari Teman Account to "offset" the negative balance in the GateGuard account because the latter accounts were owned by different entities and had different tax identifier numbers:

> Q. You mentioned something about -- you mentioned something called an offset. I want to unpack that a little bit. If there is a negative account -- if there is a negative balance when a chargeback happens, does Bank of America try to take some steps to get some of that money so it can pay for the chargeback?
>
> A. We do. So we look at the events that occurred, so the transactions that were incoming, what was the trail of events after that, so we look to see where the funds were transferred to to see if we can offset to bring those funds back to cover the loss that's being sustained.
>
> Q. If an individual had three accounts at the bank, for example, and there was a chargeback from one, could the bank try to use the funds in the other account to pay for it?
>
> A. So we do not have the right to offset when the tax identification number is different from one entity to the other.
>
> Q. So if it was an individual -- three personal accounts, would the bank typically be able to draw funds from the other accounts?
>
> A. Yes.
>
> Q. If it was for three different businesses, for three different tax numbers, would the bank typically be able to use the funds?
>
> A. We cannot offset our loss when it is a different tax identification number.
>
> Q. And based on your review of the records admitted into evidence earlier today, do you know if the three accounts that you talked about had different tax ID numbers?
>
> A. They did.
>
> Q. So as a general matter, is the bank able to recover funds from those three accounts?
>
> A. We were not.

Trial Tr. 234-36.

Finocchiaro further testified that following the check deposits and chargebacks discussed above, the positive balances in the Friend or Fraud Account, the Touchless Labs Account, and the Ari Teman Account were set to "hold harmless" status. *Id.* at 233-34. Because the funds in that holding status belong to the account holder, Bank of America mailed checks with the positive balances to the account holder; however, the checks were returned to the bank through the mail. *Id.* at 234 ("Q. What happened with those checks? A. The checks were returned in the mail for the address.").

On January 29, 2020, Teman was found guilty on Counts One through Four. On July 14, 2020, the Government filed its sentencing submission, in which it noted that it was seeking restitution and forfeiture. Dkt. No. 150 at 9.

The initial value for restitution and forfeiture – $259,988.17 – was based on a document that had been produced prior to trial in the Section 3500 material for Finocchiaro. In that document, marked as 3503-19 and attached hereto as Exhibit C,[1] Bank of America identified the loss in the GateGuard Account ($259,988.17), which was also the amount it identified as its total loss. In the same document, Bank of America noted that it had attempted to return the funds in hold harmless status, but the checks had been returned to the bank. *See id.* ("Sent funds to customer, received in return mail, funds are in Hold Harmless").

Because Teman indicated in his sentencing submission that he was "working diligently to pay a significant portion, if not the entirety, of restitution before sentencing," Dkt. No. 145 at 2, the Government contacted Bank of America prior to the sentencing proceeding on December 1, 2020, to determine if its loss amount had changed in any way during the many months between trial and sentencing. In turn, Bank of America notified the Government that it was no longer considering certain fees charged in the GateGuard Account, such as overdraft fees, as part of its loss amount. At the time, the Bank of America representative, Karen Finocchiaro, notified the Government that the bank was able to offset its total loss amount by the value in Hold Harmless in the Ari Teman Account.[2] The Government promptly noted this revised total loss amount in a letter to the Court and the defense on November 30, 2020. On December 1, 2020, prior to sentencing, the Government received and produced to the Court and the defense an updated version of 3503-19, attached hereto as Exhibit D.

Since the initial sentencing proceeding on December 1, 2020, the Government has further communicated with Ms. Finocchiaro to obtain information about the bank's loss. As explained in the Affidavit of Karen Finocchiaro, dated April 2, 2021 (Exh. E) ("Finocchiaro Aff."), and as the Government represented prior to the December 1, 2020 sentencing, Bank of America is no longer considering in its total loss amount certain fees charged in the GateGuard Account, such as overdraft fees. Finocchiaro Aff. ¶ 6. Accordingly, its previous loss amount, $259,988.17, was reduced by the value of the fees in the GateGuard Account, $647.85, for a revised total loss amount of $259,340.32. *Id.* While Finocchiaro previously understood from other bank employees that the loss in the GateGuard Account was offset by $13,477.37 in the Ari Teman Account, that was not correct. Indeed, the Government has learned that, in February 2020, Bank of America sent Teman checks for the funds in the Ari Teman Account ($13,477.37), the two Friend or Fraud Accounts

---

[1] The Government also produced the email from Finocchiario to which 3503-19 was attached. This email is marked in the Section 3500 material as 3503-18. In that email, Finocchiaro noted "Summary of loss and amounts held in hold harmless for potential recovery. We are unable to offset the loss with the funds in hold harmless as they were sent from different TAX ID's. To date there were no requests to have the funds resent based on the returned mail. Bank of America is requesting to have the funds authorized by the judge to offset the loss in this matter." At this time, the Government is not seeking to forfeit the specific property in the Friend or Fraud Account or the Touchless Labs Account.

[2] As set forth below, Bank of America later notified the Government that there had been no offset, and the money in the Ari Teman Account remained Teman's.

A-2177

($8,413.69), and the Touchless Labs Account ($86,910.71) – all of which Teman received and deposited. An updated version of 3503-19, prepared by Finocchiaro, is attached to her affidavit as Exhibit 1.

**B.    Applicable Law**

1.    <u>Restitution</u>

Title 18, United States Code, Section 3663A provides that a sentencing court, for defendants convicted of offenses described in 18 U.S.C. § 3663A(c), "shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense, or if the victim is deceased, to the victim's estate." The offenses set forth in 18 U.S.C. § 3663A(c) include, *inter alia*, "an offense against property under this title . . . including an offense committed by fraud or deceit." A "victim," for purposes of the restitution statute, is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

The Mandatory Victim Restitution Act ("MVRA") provides a formula for calculating a defendant's restitution amount. See 18 U.S.C. § 3663A(b). The "primary and overarching goal of the MVRA is to make victims of crime whole": to "compensate these victims for their losses and to restore the[m] to their original state of well-being." *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks omitted). To fulfill this objective without "award[ing] the victim a windfall, *i.e.*, more in restitution than he actually lost," the MVRA caps the restitution award at the actual "amount of the victim's loss." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (quoting *United States v. Boccagna*, 450 F.3d at 117)); *see also United States v. Coriaty*, 300 F.3d 244, 252 (2d Cir. 2002) ("Unlike loss calculations, a court's power to order restitution is limited to actual loss.") (internal quotation marks omitted). In the case of offenses involving monetary loss, that amount equals "the greater of . . . the value of the property on the date of the damage, loss, or destruction; or . . . the value of the property on the date of sentencing, less . . . the value (as of the date the property is returned) of any part of the property that is returned." *Thompson*, 792 F.3d at 277 (quoting 18 U.S.C. § 3663A(b)(1)(B)). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court . . . ." 18 U.S.C. § 3664(f)(1)(A).

2.    <u>Forfeiture</u>

Forfeiture for a bank fraud violation is provided by 18 U.S.C. § 982(a)(2)(A), which states that "[t]he court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate [18 U.S.C. § 1344], shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." Forfeiture for a wire fraud violation is provided by 18 U.S.C. § 981(a)(1)(C), which states that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is "subject to forfeiture

by the United States."[3] Where a charging instrument gives notice of forfeiture and the defendant is convicted of an offense for which forfeiture is authorized, "the court *shall* order the forfeiture of the property as part of the sentence in the criminal case . . . ." 28 U.S.C. § 2461. For this reason, courts have described criminal forfeiture as "mandatory." *See, e.g., United States v. Bodouva*, 853 F.3d 76, 78, 79 (2d Cir. 2017) ("[f]orfeiture and restitution were mandatory in the present case"); *United States v. Espada*, 128 F. Supp. 3d 555, 559 (E.D.N.Y. 2015) ("For certain statutorily enumerated offenses . . . criminal forfeiture is a mandatory component of the defendant's sentence.").

"Sentencing courts determine forfeiture amounts by a preponderance of the evidence." *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). Where, as here, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). "The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). "The calculation of forfeiture amounts is not an exact science." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011). The Court is only required to "make a reasonable estimate," based on "the available information." *Id.* (quotation marks omitted). Courts may use "general points of reference as a starting point" and "make reasonable extrapolations from the evidence." *Id.*

Further, a defendant is liable for the full amount of proceeds he controlled, without regard to whether he retained them or transferred them to others. *See Rajaratnam v. United States*, 2018 WL 2460337, at *3 (2d Cir. June 1, 2018) (summary order) ("Even if those proceeds subsequently were distributed to investors, with [defendant] personally retaining only a percentage as management fees, he nonetheless had authority over disbursements, and, thus, exercised 'control' over the proceeds 'at some point.'") (internal quotation omitted); *United States v. Ohle*, 441 F. App'x 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "whether or not Uddin shared the cash he received"); *see also* 21 U.S.C. § 853(p)(1)(B) (permitting forfeiture of substitute assets from defendant where he has caused forfeitable property to be "transferred or sold to, or deposited with, a third party.").

"Restitution and forfeiture are authorized by different statutes and serve different purposes—one of remediating a loss, the other of disgorging a gain." *United States v. Torres*, 703 F.3d 194, 196 (2d Cir. 2012). "Criminal forfeiture is a form of punishment. As such, it is distinct from restitution or other remedial actions, which are intended to return the victim and the perpetrator to the status quo that existed before the violation took place." *United States v. Peters*, 732 F.3d 93, 101 (2d Cir. 2013). Indeed, the relevant statutory scheme does not permit a sentencing court to "reduce the mandated criminal forfeiture order because the defendant also had to satisfy her obligation to pay restitution" or had already substantially done so. *United States v. McGinty*, 610 F.3d 1242, 1248 (10th Cir. 2010). In *United States v. Bodouva*, 853 F.3d 76, the Second Circuit

---

[3] Section 1956(c)(7)(A) in turn refers offenses listed in Section 1961(1), which include wire fraud, in violation of 18 U.S.C. § 1343.

rejected an argument that imposition of restitution and forfeiture amounted "to an unfair double disgorgement" in light of the "distinct purposes of forfeiture and restitution." *Id.* at 79. The Second Circuit held that a sentencing court may not reduce the amount of forfeiture to account for a restitution order in the absence of a statutory offset. *Id.* at 79-80; *accord id.* at 78-79 ("Because the statutory schemes authorizing restitution and forfeiture are separate, district courts are bound not to reduce the amount of a mandatory criminal forfeiture order by the amount of past or future restitution payments, in the absence of specific statutory authorization to do so."); *see also United States v. Pescatore*, 637 F.3d 128, 137-38 (2nd Cir. 2011) ("[W]e see nothing in the statutory provisions, DOJ's normal operating procedures, or the Plea Agreement that required the Department to use the forfeited assets to relieve [the defendant] of his restitution obligations.").

Because restitution and forfeiture are authorized by different statutes and defined differently, the Court may order different values for restitution and forfeiture. *See Torres*, 703 F.3d at 203 (noting that restitution and forfeiture amounts "may often be different"); *see, e.g., United States v. Bergstein*, No. 16 Cr. 746 (PKC), 2018 WL 9539768, at *2 (S.D.N.Y. Sept. 20, 2018) (imposing different restitution and forfeiture amounts).

### C.    Restitution

The Government respectfully submits that the Court should enter the proposed Order of Restitution, attached hereto as Exhibit A, as part of Teman's sentence. The proposed order seeks restitution of $259,340.32. As set forth above, this restitution amount reflects: (1) the deficit in the GateGuard Account after Teman fraudulently deposited checks into that account, transferred the bulk of that money to other accounts he controlled, and then left Bank of America to repay the originating banks for his fraud ($259,988.17); and (2) less certain fees charged in the GateGuard Account that Bank of America is no longer seeking to recover ($647.85). *See* Finocchiaro Aff. ¶¶ 3, 6. Accordingly, Bank of America's total loss, $259,340.32, constitutes the "full amount of [the] victim's losses," and the Court should enter the Order of Restitution at sentencing.

### D.    Forfeiture

The Government respectfully submits that the Court should enter the proposed Preliminary Order of Forfeiture, attached hereto as Exhibit B, and include it as part of Teman's sentence. For the reasons set forth above, the amount listed in the forfeiture order, $330,000, represents "property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of [a violation of 18 U.S.C. § 1344]" and "property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [18 U.S.C. § 1343]." 18 U.S.C. §§ 982(a)(2)(A) and 981(a)(1)(C).

Because $330,000 is the amount Teman obtained control over, he is liable for forfeiture in the amount of those proceeds. *See Peters*, 732 F.3d at 104; *Contorinis*, 692 F.3d at 147. The fact that Teman, having obtained control of his crime proceeds, later directed them to other accounts or lost control of the funds in a charge back is immaterial – he remains liable for the full amount he acquired. *See Rajaratnam*, 2018 WL 2460337, at *3; *Ohle*, 441 F. App'x at 803; *Uddin*, 551 F.3d at 181.

A-2180

Pursuant to 28 U.S.C. § 2461, the Government respectfully submits that forfeiture is mandatory in this case. Furthermore, the Government has identified no offset that applies in this case and that would permit the Court to reduce the value of forfeiture in light of the proposed restitution order. *See, e.g.*, 18 U.S.C. § 981(a)(2)(C) (permitting an offset in cases involving fraud in the process of obtaining a loan). Nor does the Government believe imposing both restitution and forfeiture orders leads to an unjust or inequitable result; the two statutory frameworks speak to separate, important purposes.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
     Kedar S. Bhatia
     Assistant United States Attorney
     (212) 637-2465

A-2181

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA | **Order of Restitution** |
| v. | S2 19 Cr. 696 (PAE) |
| ARI TEMAN, | |
| Defendant. | |

Upon the application of the United States of America, by its attorney, Audrey Strauss,

United States Attorney for the Southern District of New York, Kedar S. Bhatia, Assistant United

States Attorney, of counsel; the presentence report; the Defendant's conviction on Counts One

through Four of the above Superseding Indictment; and all other proceedings in this case, it is

hereby ORDERED that:

1.    **Amount of Restitution**

Ari Teman, the Defendant, shall pay restitution in the total amount of $259,340.32,

pursuant to 18 U.S.C. § 3663A (MVRA), to the victim of the offenses charged in Counts One

through Four.  The name, address, and specific amount owed to the victim are set forth in the

Schedule of Victims, attached hereto as Schedule A.  Upon advice by the United States Attorney's

Office of a change of address of the victim, the Clerk of the Court is authorized to send payments

to the new address without further order of this Court.

A.    **Joint and Several Liability**

Restitution is not joint and several with other defendants or with others not named herein.

B.    **Victim**

Restitution shall be paid to the victim identified in the Schedule of Victims, attached hereto

as Schedule A.

2020.01.09

2.    **Schedule of Payments**

Pursuant to 18 U.S.C. § 3664(f)(2), in consideration of the financial resources and other assets of the Defendant, including whether any of these assets are jointly controlled; projected earnings and other income of the Defendant; and any financial obligations of the Defendant; including obligations to dependents, the Defendant shall pay restitution in the manner and according to the schedule that follows:

The total amount of restitution is due and payable immediately pursuant to 18 U.S.C. § 3572(d)(1) upon entry of this judgment.

3.    **Payment Instructions**

The Defendant shall make restitution payments by certified check, bank check, money order, wire transfer, credit card or cash.  Checks and money orders shall be made payable to the "SDNY Clerk of the Court" and mailed or hand-delivered to: United States Courthouse, 500 Pearl Street, New York, New York 10007 - Attention: Cashier, as required by 18 U.S.C. § 3611. The Defendant shall write his/her name and the docket number of this case on each check or money order.   Credit card payments must be made in person at the Clerk's Office.  Any cash payments shall be hand delivered to the Clerk's Office using exact change, and shall not be mailed.  For payments by wire, the Defendant shall contact the Clerk's Office for wiring instructions.

4.    **Additional Provisions**

The Defendant shall notify, within 30 days, the Clerk of Court, the United States Probation Office (during any period of probation or supervised release), and the United States Attorney's Office, 86 Chambers Street, 3rd Floor, New York, New York 10007 (Attn: Financial Litigation Unit) of (1) any change of the Defendant's name, residence, or mailing address or (2) any material change in the Defendant's financial resources that affects the Defendant's ability to pay restitution

in accordance with 18 U.S.C. § 3664(k). If the Defendant discloses, or the Government otherwise learns of, additional assets not known to the Government at the time of the execution of this order, the Government may seek a Court order modifying the payment schedule consistent with the discovery of new or additional assets.

5.    **Restitution Liability**

The Defendant's liability to pay restitution shall terminate on the date that is the later of 20 years from the entry of judgment or 20 years after the Defendant's release from imprisonment, as provided in 18 U.S.C. § 3613(b). Subject to the time limitations in the preceding sentence, in the event of the death of the Defendant, the Defendant's estate will be held responsible for any unpaid balance of the restitution amount, and any lien filed pursuant to 18 U.S.C. § 3613(c) shall continue until the estate receives a written release of that liability.

6.    **Sealing**

Consistent with 18 U.S.C. §§ 3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of the victim, the Schedule of Victims, attached hereto as Schedule A, shall be filed under seal, except that copies may be retained and used or disclosed by the Government, the Clerk's Office, and the Probation Department, as need be to effect and enforce this Order, without further order of this Court.


SO ORDERED:


_____        _____
THE HONORABLE PAUL A. ENGELMAYER        DATE
UNITED STATES DISTRICT JUDGE

A-2184

## Schedule A

| Victim Name | Address | Specific Amount Owed |
|---|---|---|
| Bank of America, N.A. | 100 North Tryon Street<br>Charlotte, North Carolina 28255 | $259,340.32 |

A-2185

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

UNITED STATES OF AMERICA            

                            :    PRELIMINARY ORDER OF
       - v. -                   FORFEITURE/
                            :    MONEY JUDGMENT

ARI TEMAN,

                            :    S2 19 Cr. 696 (PAE)
          Defendant.

                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WHEREAS, on or about January 3, 2020, ARI TEMAN (the "Defendant") was charged in a six-count Superseding Indictment, S2 19 Cr. 696 (PAE) (the "Indictment"), with bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts One and Two); wire fraud, in violation of Title 18, United States Code, Sections 1343 (Counts Three and Four); and aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A (a)(1), 1028A(b) and 2 (Counts Five and Six);

WHEREAS, the Indictment included a forfeiture allegation as to Counts One and Two of the Indictment, seeking forfeiture to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), of any and all property constituting, or derived from, proceeds the Defendant obtained directly or indirectly, as a result of the commission of the offenses charged in Counts One and Two if the Indictment, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offenses charged in Counts One and Two of the Indictment;

WHEREAS, the Indictment included a second forfeiture allegation as to Counts Three and Four of the Indictment, seeking forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), of any and all property, real and personal, that constitutes or is derived from proceeds traceable to the

A-2186

commission of the offenses charged in Counts Three and Four of the Indictment, including but not limited a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offenses charged in Counts Three and Four of the Indictment;

WHEREAS, on or about January 29, 2020, the Defendant was found guilty, following a jury trial, of Counts One through Four of the Indictment;

WHEREAS, the Government asserts that $333,000.00 in United States currency represents any and all property, real and personal, that constitutes or is derived from proceeds the Defendant obtained, directly or indirectly as a result of the commission of the offenses charged in Counts One and Two, and any and property, real and personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the offenses charged in Counts Three and Four of the Indictment, that the Defendant personally obtained;

WHEREAS, the Government seeks a money judgment in the amount of $333,000.00 in United States currency, pursuant to Title 18, United States Code, Section 982(a)(2)(A), of any and all property, real and personal, that constitutes or is derived from proceeds the Defendant obtained, directly or indirectly as a result of the commission of the offenses charged in Counts One and Two of the Indictment, and pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of all property, real and personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the offenses charged in Counts Three and Four of the Indictment;

WHEREAS, the Court finds that as a result of acts and/or omissions of the Defendant, the proceeds traceable to the offenses charged in Counts One through Four of the Indictment that the Defendant personally obtained cannot be located upon the exercise of due diligence.

A-2187

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.      As a result of the offenses charged in Counts One through Four of the Indictment, to which the Defendant was found guilty following a jury trial, a money judgment in the amount of $333,000.00 in United States currency (the "Money Judgment"), representing the amount of proceeds traceable to the offenses charged in Counts One through Four of the Indictment that the Defendant personally obtained, shall be entered against the Defendant.

2.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture/Money Judgment is final as to the Defendant, ARI TEMAN, and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

3.      All payments on the outstanding money judgment shall be made by postal money order, bank or certified check, made payable, in this instance, to the United States Marshals Service, and delivered by mail to the United States Attorney's Office, Southern District of New York, Attn: Money Laundering and Transnational Criminal Enterprises Unit, One St. Andrew's Plaza, New York, New York 10007 and shall indicate the defendant's name and case number.

4.      The United States Marshals Service is authorized to deposit the payments on the Money Judgment in the Assets Forfeiture Fund, and the United States shall have clear title to such forfeited property.

5.      Pursuant to Title 21, United States Code, Section 853(p), the United States is authorized to seek forfeiture of substitute assets of the defendant up to the uncollected amount of the Money Judgment.

6.      Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate

A-2188

or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas.

    7.  The Court shall retain jurisdiction to enforce this Preliminary Order of Forfeiture/Money Judgment, and to amend it as necessary, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

    8.  The Clerk of the Court shall forward three certified copies of this Preliminary Order of Forfeiture/Money Judgment to Assistant United States Attorney Alexander J. Wilson, Co-Chief of the Money Laundering and Transnational Criminal Enterprises Unit, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007.

Dated: New York, New York
    _____ ___, 2021

             SO ORDERED:


             _____
             HONORABLE PAUL A. ENGELMAYER
             UNITED STATES DISTRICT JUDGE

A-2189

GATEGUARD, INC
Party ID: 10012245094
483067038085
$-259,988.17
Loss incurred

Ari Teman
Party ID: 35024831102
483066615580
$13,477.37
Sent funds to customer, received in return mail, funds are in Hold Harmless (funds were transferred
from account 8085 & 0351)

Friend or Fraud
Party ID: 10010097658
483056100351
$8,411.00
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred
from account 8085)

Friend or Fraud
Party ID: 10010097658
483063787673
$2.69
Sent funds to customer, received in return mail, funds are in Hold Harmless

TOUCHLESS LABS LLC
Party ID: 10010031003
483056101046
$86,910.71
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred
from account 0351)

**Total loss: $259,988.17**
**Total in Hold Harmless/Potential seizure: $108,801.77**

**FINOCCHIARO**
**3503-19**

A-2190

GATEGUARD, INC
Party ID: 10012245094
483067038085
$-259,988.17
$-259,700.17 C/O
Loss incurred
$- 259,340.32 (359.85 credit-Misc adjustment)

Ari Teman
Party ID: 35024831102
483066615580
$13,477.37
Sent funds to customer, received in return mail, funds are in Hold Harmless (funds were transferred from account 8085 & 0351)
$13,477.37-Amount offset with funds from Hold Harmless

Friend or Fraud
Party ID: 10010097658
483056100351
$8,411.00
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred from account 8085)

Friend or Fraud
Party ID: 10010097658
483063787673
$2.69
Sent funds to customer, received in return mail, funds are in Hold Harmless

TOUCHLESS LABS LLC
Party ID: 10010031003
483056101046
$86,910.71
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred from account 0351)

**Total loss: $259,988.17**
**Total in Hold Harmless/Potential seizure: $108,801.77**
Total loss: $245,862.95

A-2191

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | S1 19 Cr. 696 (PAE) |
| v. | |
| ARI TEMAN, | |
| Defendant. | |

## AFFIDAVIT

I, KAREN FINOCCHIARO, herby declare under the penalties of perjury and pursuant to 28 U.S.C. § 1746:

1.    I am a Vice-President and Senior Fraud Investigator at Bank of America, N.A ("Bank of America"). I base this affidavit on my experience and observations working at Bank of America, my review of Bank of America records, and my communications with other employees of Bank of America. I have prepared a document reflecting the bank account names and dollars amounts discussed in this Affidavit, and I attach that document as Exhibit 1.

2.    On or about August 6, 2019, Bank of America closed the following bank accounts:

a.    An account held in the name of "GateGuard, Inc.," with account number ending in 8085 (the "GateGuard Account");

b.    An account held in the name of "Ari Teman," with account number ending in 5580 (the "Ari Teman Account");

c.    An account held in the name of "Friend or Fraud Inc." with account number ending in 0351 ("Friend or Fraud Account-1");

d.    An account held in the name of "Friend or Fraud Inc." with account number ending in 7673 ("Friend or Fraud Account-2"); and

e.    An account held in the name of "Touchless Labs LLC" with account number 1003 (the "Touchless Labs Account" and, together with the aforementioned accounts, the "Teman Bank Accounts").

3.    At the time the accounts were closed, the GateGuard account had a negative balance of $259,988.17; the Ari Teman Account had funds equaling $13,477.37; Friend or Fraud Account-1 had funds equaling $8,411.00; Friend or Fraud Account-2 had funds equaling $2.69; and the Touchless Labs Account had funds equaling $86,910.71. The positive balances in the Ari Teman Account, Friend or Fraud Account-1, Friend or Fraud Account-2, and the Touchless Labs Account were held in Hold Harmless. Funds in Hold Harmless are maintained in an effort to remediate fraud and claims pending events.  Bank of America initially disbursed funds from the Hold Harmless account back to the aforementioned customer and the checks were returned undeliverable.

4.    Although the GateGuard account had a negative balance and the other Teman Bank Accounts had a positive balance, Bank of America is unable to offset losses in one account (*i.e.*, the GateGuard Account) with positive balances on other accounts held by different corporate entities or personal accounts (*i.e.*, the other Teman Bank Accounts).

5.    On or about February 25, 2020, Bank of America sought to return funds from the Ari Teman Account, Friend or Fraud Account-1, Friend or Fraud Account-2, and the Touchless Labs Account. Bank of America mailed physical checks to the owner of those accounts.

6.    In or about November 2020, I communicated with other bank officials, who instructed me that Bank of America had identified certain fees charged in the GateGuard account and that the bank was not seeking recovery of those funds. The removal of these fees was reflected

2

when Bank of America reduced the loss amount by $647.85, resulting in a total loss of $259,340.32 in the GateGuard Account.

7.      In or about November 2020, I was notified by another Bank of America employee that the bank was able to offset its loss in the GateGuard Account with the funds in the Ari Teman Account totaling $13,477.37. However, it has since been confirmed an official item was created and sent to Mr. Teman totaling $13,477.37 and these funds are not available for offset.

Dated:  April 2, 2021
        New York, New York

*Karen M. Finocchiaro*
Karen Finocchiaro
Vice-President and Senior Fraud Investigator
Bank of America, N.A.

**Exhibit A**

A-2195

GATEGUARD, INC
Party ID: 10012245094
483067038085
$-259,988.17
$-259,700.17 C/O
Loss incurred
$- 259,340.32 (359.85 credit-Misc adjustment)

Ari Teman
Party ID: 35024831102
483066615580
$13,477.37
Sent funds to customer (funds were transferred from account 8085 & 0351)
$13,477.37

Friend or Fraud
Party ID: 10010097658
483056100351
$8,411.00
Sent funds to customer (Funds were transferred from account 8085)

Friend or Fraud
Party ID: 10010097658
483063787673
$2.69
Sent funds to customer

TOUCHLESS LABS LLC
Party ID: 10010031003
483056101046
$86,910.71
Sent funds to customer (Funds were transferred from account 0351)

Total loss: $259,340.32

A-2195.1

Andrew J. Frisch
Partner

# SCHLAM STONE & DOLAN LLP

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

April 23, 2021

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:    *United States v. Ari Teman, Criminal Docket No. 19-696 (PAE)*

Dear Judge Engelmayer:

On behalf of Ari Teman, Ms. Kellman and I submit this letter as a request that the Court
further adjourn the deadline for Mr. Teman's submissions in the above-referenced case until
May 14, 2021.  The government has advised us that it takes no position on this application.

On April 2, 2021, Ms. Kellman and I emailed a single-spaced twelve-page letter to the
government summarizing an issue, not previously on the Court's radar, which Ms. Kellman
and I believe requires dismissal of this case.  We did so mindful of best practice to vet new
issues with the government before seeking judicial redress; so that the assigned prosecutor
could readily review the issue with his Office; and out of professional courtesy as the record
appears to raise serious questions about the government's conduct of this case.  We advised
the government that we intended to supplement our letter with a written report from an expert,
who had not then been formally retained, whom we did not then identify, and who had not
then reviewed relevant portions of the record.  The expert is Richard M. Fraher, who teaches
the law of payment systems at Emory University School of Law and previously served as
Vice President and Counsel to the Retail Payments Office of the Federal Reserve Bank of
Atlanta.  His *curriculum vitae* is submitted herewith.

Yesterday, Ms. Kellman and I advised the government via email that that we expected the
expert's report to be complete next week.  We proposed that the parties work together to
advise the Court that Ms. Kellman and I are vetting an issue with the government before
raising it with the Court.  We proposed to the government that we do so in a way so as not to
suggest that the government has yet formalized any opinion on the issue and is acting
responsibly in permitting Ms. Kellman and me to be fully heard.  The government rejected
our request and instead submitted a letter late this afternoon which seeks to front the issue
raised in our letter to the government of April 2, 2021, and put a positive spin on some of the
relevant underlying facts.  The government's rush to be first to the Courthouse door to try to
preempt the issue rather than continue an informal vetting is unfortunate as a matter of
protocol and also substance:  the government did so without waiting for the expert's report
which it knew was imminent.

A-2195.2

Ms. Kellman and I anticipate that this letter may pique some measure of judicial curiosity about the subject matter of our letter of April 2, 2021, especially in the context of the government's submission of this afternoon. We nonetheless ask that the Court accommodate a request for a further extension of time for at least the following three reasons. *First*, we cannot effectively present the issue to the Court without the expert's report. While we expected the report to be complete early next week, we now need to provide him with the government's submission of this afternoon for his review. *Second*, apart from establishing why the case should be dismissed, we believe that the expert's opinion may establish that the Bank of America is not entitled to any restitution at all, one of the issues on which the Court has requested briefing. *Third*, even if this case is not dismissed, this new issue will significantly add to the quantum of issues warranting bail pending appeal, another issue on which the Court has requested briefing. If this case is not dismissed, we believe that the Court of Appeals will want to hear Mr. Teman's appeal before requiring him to surrender to serve any imprisonment that may be imposed.

Before trial, the Court criticized Mr. Teman's trial counsel for not fronting a prospective defense with the government. Transcript of Jan. 21, 2020 at 87. Ms. Kellman and I agree that best practice is to vet an issue with the government before submitting it for judicial review and would do so again if presented with a similar situation. While the government did not see fit to reciprocate our professional courtesies, Ms. Kellman and I ask the Court to indulge a further three-week extension of time so that we can provide Professor Fraher with the government's most recent submission and obtain his final report. We are mindful of the Court's accommodations to date, but believe that the Court is best served by permitting us additional time so that we may address the government's submission and present the bases for dismissal comprehensively and completely.

Respectfully submitted,

*/s/ Andrew J. Frisch*
Andrew J. Frisch

*/s/ Susan G. Kellman*
Susan G. Kellman


cc: AUSA Kedar Bhatia

Enclosure

A-2195.3

Richard M. Fraher

1434 Brookcliff Drive

Marietta GA 30062

rmf@piandr.com

Payments lawyer, consultant, and expert witness at the intersection between innovative financial services and law, regulation, and public policy.

Deeply versed in laws, regulations, compliance concerns, consumer protection, banking agency supervisory issues, private sector rules, public policy issues, risk identification and risk management tools across domestic and global payment systems and financial services, checks and check fraud, electronic payments, automated clearinghouse, wires, international payments, instant payments, open banking, fintech, security procedures, authentication, distributed ledger technology (blockchain), Bitcoin, cryptocurrencies, and central bank digital currencies.

Founder and Principal, Payments Innovation & Regulation LLC, www.piandr.com

Adjunct Professor, Emory University School of Law, teaching Law of Payment Systems

**Previous Experience**

Vice President & Counsel to the Retail Payments Office, Federal Reserve Bank of Atlanta. National leader in payments law. Primary legal counsel for the Fed's check and ACH services. Lead attorney in creating the Fed's rules and agreements for image based check collection, same day ACH service, and the FedGlobal international payments service. Fed's Payments Advisory Group. Designed the initial rules of the International Payments Framework. Frequent presenter at payments conferences.

Senior attorney, Compliance and Enforcement, Federal Deposit Insurance Corporation. Supported FDIC supervision and compliance oversight of state nonmember banks. Litigated administrative enforcement actions seeking cease and desist orders, civil money penalties, and removal and prohibition cases.

Educator. Adjunct professor, Emory University School of Law. Professor of Law, Indiana University. Assistant professor of history, Harvard University.

**Education**

Harvard Law School, juris doctor, magna cum laude.

Cornell University, Ph. D. in history.

University of Wisconsin-Milwaukee, M.A. in history

A-2195.4

Wright State University, B.A. in history

**Honors and Awards**

National Endowment for the Humanities Fellowship

Visiting Scholar, St. John's College, Cambridge University

Pre-doctoral visiting scholar, St. Edmund's College, Cambridge University

A-2196

Andrew J. Frisch
Partner

212-344-5400
afrisch@schlamstone.com

SCHLAM STONE & DOLAN LLP

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

April 28, 2021

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
New York, New York 10007

Re:  *United States v. Ari Teman, 19 CR 696 (PAE)*

Dear Judge Engelmayer:

On behalf of Ari Teman, we submit this letter as a motion to vacate Mr. Teman's conviction or, alternatively, for bail pending appeal.

Mr. Teman was ambushed by the government at trial. Rather than complain precipitously to the Court about the government's apparent misconduct, current counsel brought their aggregate 75 years of professional experience to bear and attempted to discuss the issue described herein in confidential conversations with the government. We respectfully disagree with the Court's characterizations in its Order of April 26, 2021. *See* Docket 217. We worked to vet an issue with the government that calls its integrity into question before raising the issue with the Court. A recent telephone call with the government coupled with the government's filing this past Friday [Docket 215] favor filing this motion now.

Pending Professor Fraher's report, Mr. Teman's conviction should be vacated. For reasons previously stated in prior counsel's submissions incorporated herein by reference and as supplemented below, the government shoehorned a commercial dispute into a federal fraud in part by making arguments that are false and violating an Order of this Court in so doing. In sum, the government elicited legal opinions from a fact witness which had not been noticed, which the Court had specifically prohibited, and which were wrong. The government then used those legal opinions as a springboard for what the government argued in summation was its "most obvious" evidence of criminal intent, but we expect Professor Fraher's report will establish that it was no such thing. The government's disclosure on the eve of Mr. Teman's scheduled sentencing caused defense counsel to begin analyzing this issue, leading them to this motion.

The Court may ultimately agree or disagree with defense counsel's view of the landscape, but we hope that the Court will accept that our approach has been in good faith. We believe that the government's prosecution of Mr. Teman is infirm and should be put out of its misery now. If not, we urge the Court to embrace the second-opinion protocol vested in the Court of Appeals and continue Mr. Teman's bond pending appeal.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 2 of 15 Pages

<u>Summary of the Case</u>

Over a two-month period in 2019, Mr. Teman deposited 29 "remotely created checks," a
legitimate instrument in the banking industry known as "RCC's," by which a payee is
permitted to draw on funds from a payor's account if authorized to do so. Mr. Teman's
RCC's were drawn on the respective bank accounts of three customers of GateGuard, a
company owned and operated by Mr. Teman, which provided video intercom devices to
multiple-dwelling buildings in New York City and elsewhere. All of the 29 checks were
deposited by Mr. Teman in an account at the Bank of America ("BOA"), where he regularly
banked and maintained a total of four accounts: a personal account opened under his social
security number, and three other accounts, each in the name of a different corporate entity
under which Mr. Teman did business, each of which was opened with a separate tax
identification number. Mr. Teman was the sole signatory on all four accounts.

A.    *In violation of this Court's order, the government elicited legal opinions from an
       unqualified fact witness, which had been prohibited and which was wrong*

On September 28, 2019, more than three months before trial, Mr. Teman's counsel asked the
government to provide notice of its intent to offer any expert testimony as required by Rule
16(a)(1)(G). *See* Docket 61 at 1-2. Three months later, on December 30, 2019, with trial a
few weeks away, the government advised counsel by email that it intended to call a witness
"to discuss the process for conducting a chargeback." Docket 61 at 2. On January 6, 2020,
the government wrote to defense counsel (Docket 61-1), identifying the witness as BOA's
Karen Finocchiaro, Vice President and Senior Investigator in BOA's Enterprise Fraud
Intelligence Team. The government represented that Ms. Finocchiaro's testimony "is most
accurately classified as fact testimony rather than expert testimony." In "an abundance of
caution," the government disclosed that Ms. Finocchiaro would testify about, among other
things,

> Bank of America's records for certain of the defendant's bank accounts. Ms.
> Finocchiaro will also provide background and explanatory testimony regarding Bank
> of America's process and procedure associated with charge-backs. This testimony
> will include background and explanatory information about the bank's procedures for
> initiating and completing a charge-back and for responding to a charge-back request
> initiated by another bank.

Based on this disclosure, Mr. Teman's trial counsel moved to preclude Ms. Finocchario from
offering expert opinions, arguing that the government had provided only "a broad statement
that she will testify about certain categories of topics - without a single disclosure as to what

A-2198

The Honorable Paul A. Engelmayer
April 28, 2021
Page 3 of 15 Pages

the witness will say about anything at all . . . [nor her] qualifications . . . [nor] the bases and
reasons for [her] opinions. Docket 61 at 4, 6. The government opposed preclusion,
explaining that it would elicit testimony "about the process and procedure for charge-backs
involving Bank of America, which is an issue Finocchiaro is well-suited to testify about as a
senior investigator at the bank." Docket 73 at 11. The government assured the Court that it
"does not intend to elicit any expert testimony from Finocchiaro's testimony." Docket 73 at
9.

The Court ruled that Ms. Finocchario could testify as a fact witness:

> Based on the government's proffer of [Ms. Finocchiaro's] anticipated testimony, she is
> characterized properly as a fact witness. The government has represented only that
> Finocchiaro will testify as to Bank of America's charge-back processes and
> procedures, and while the government is not explicit on this point, the Court assumes
> that her personal knowledge of these procedures comes from her experience as a Bank
> of America senior investigator. Assuming that to be so, her account of the charge-
> back procedures at her employer constitutes fact testimony for a fact witness. The
> government has not provided any opinion that she would offer about these procedures.

Docket 87 at 30. In permitting Ms. Finocchiaro to testify, the Court expressly admonished the
government that

> this ruling does not authorize and should not embolden the government to elicit expert
> testimony from Finocchario. The Court suspects that she will testify solely on
> personal knowledge about relevant practices and procedures at her employer, Bank of
> America.

Docket 87 at 31. Contrary to the Court's ruling and the government's assurances on which it
was based, the government elicited expert legal opinions from Ms. Finocchiaro, which were
wrong. The government then used Ms. Finocchiaro's opinions to press incriminating
inferences of fraud which were false.

Much of Ms. Finocchiaro's testimony was consistent with the government's representation
that she would testify only as a fact witness about BOA's processes and procedures. Her
testimony about deposit of RCC's into the GateGuard account and Mr. Teman's subsequent
transfers of funds to his other BOA accounts was consistent with Finocchiaro 3503-19.
Exhibit A. That document appears to show the respective balances of Mr. Teman's four BOA
accounts after deposit of RCC's into the GateGuard account and transfers of deposited funds
to other BOA accounts. Thus, the document lists Mr. Teman's four BOA accounts; notes the

A-2199

The Honorable Paul A. Engelmayer
April 28, 2021
Page 4 of 15 Pages

negative balance of $259,988.17 in the GateGuard account after the transfers; specifies the resulting (positive) balances in Mr. Teman's other three BOA accounts, including a positive balance of $13,477.37 in Mr. Teman's personal account; and indicates that BOA attempted to return the positive balances in these three other accounts to Mr. Teman, but the checks representing those balances were returned to BOA thereafter as undeliverable. *See* Exhibit A.

The government then changed the subject from charge-backs to the bank's recovery of its losses and elicited the following highlighted legal opinions from Ms. Finocchario, doing so with rhetorical flourish as it concluded her direct examination:

> Q. Did there come a time when the GateGuard account was closed?
>
> A. Yes, there was.
>
> Q. And what the value remaining in the account when it was closed?
>
> A. In the GateGuard account, the total negative balance was $260,319.81.
>
> Q. And you testified about two other accounts, the Friend or Fraud account and the Touchless Labs account?
>
> A. Correct.
>
> Q. Were those accounts closed as well?
>
> A. Yes, they were.
>
> Q. And was there a positive balance or a negative balance in those accounts?
>
> A. [S]o at the time when the [Friend of Fraud] account was closed, it was at a positive balance of $8,386.
>
> . . . .
>
> Q. And what about the account ending in 1046? That is the Touchless Labs account.
>
> A. We were sitting at a positive balance of $86,558.18.
>
> Q. What did Bank of America do with the money in those accounts?
>
> A. So those funds were immediately sent to hold harmless in regard - it is a holding - it is a holding account that the bank has. We review the account for offset to see if we're able to utilize the funds from the transfer to offset the loss that was incurred based on the returned item chargeback.

A-2200

The Honorable Paul A. Engelmayer
April 28, 2021
Page 5 of 15 Pages

Q. Before that, did there come a time when the bank, or Bank of America, tried to return the deposited balance funds in those accounts?

A. Yes.

Q. What happened?

A. So the funds were - the checks were cut for the individual accounts and the physical check was mailed.

Q. Let's unpack that. So in this [Touchless Labs] account, for example, there is $86,558.18 at the time of closing, is that right?

A. That is correct.

Q. [W]hat did Bank of America do with that $86,000?

A. The funds were placed into an official item and they were mailed to the customer.

Q. A check was mailed to the customer?

A. Correct.

Q. Is the same true of the other account?

A. That is correct.

Q. OK. What happened with those checks?

A. The checks were returned in the mail for the address.

Q. You mentioned something about – you mentioned something called an offset. I want to unpack that a little bit.

If there is a . . . negative balance when a chargeback happens, does Bank of America try to take some steps to get some of that money so it can pay for the chargeback?

A. We do. So we look at the events that occurred, so the transactions that were incoming, what was the trail of events after that, so we look to see where the funds were transferred to see if we can offset to bring those funds back to cover the loss that's being sustained.

Q. *If an individual has three accounts at the bank, for example, and there was a chargeback from one, could the bank try to use the funds in the other account to pay for it?*

A. *So we do not have the right to offset when the tax identification number is different from one entity to the other.*