Justin K. Gelfand does hereby swear to and attest to the following:

1.      I am over the age of 18 and of sound mind.

2.      I was an attorney of record for the Defendant, Ari Teman, in the above-styled case.

3.      I drafted and am filing this declaration only because I am required to do so by this Court's November 26, 2024 Order and consistent with Mr. Teman's independent decision to knowingly and voluntarily waive his attorney-client privilege with respect to the allegations in his petition.

4.      By way of background, I am a practicing attorney licensed and in good standing in the State of Missouri and Washington D.C. I graduated in the top 5% of my class at Washington University School of Law in 2009. In law school, I was inducted into the Order of the Coif, was a Senior Editor of the *Washington University Law Review*, was President of the Criminal Justice Society, and competed on the law school's National Moot Court Team. In 2009, I began my legal career as a federal prosecutor with the U.S. Department of Justice's Tax Division in Washington, D.C., focusing on cases alleging tax crimes and financial fraud. In 2014, I left the U.S. Department of Justice and moved back to St. Louis, Missouri, where I was employed as Counsel and subsequently as a Shareholder at Capes, Sokol, Goodman & Sarachan. In 2018, I co-founded Margulis Gelfand with my law partner, William S. Margulis. The firm is now commonly known as Margulis, Gelfand, DiRuzzo & Lambson with offices in St. Louis (MO), Washington, D.C., and Fort Lauderdale (FL).

5.      Throughout my entire career as an attorney, my practice has focused primarily on federal criminal law—first as a federal prosecutor and then as a defense attorney. In both capacities, I have frequently tried criminal cases before juries and handled cases (some of which proceeded to trial) in approximately 20 federal judicial districts. For the last three years, I have taught as an adjunct faculty member at Harvard Law School's Trial Advocacy Workshop.

6.      Well before I was retained by Mr. Teman in connection with the *United States v. Teman*, I have been proud to serve as a member of the Criminal Justice Act (CJA) Panel in the United States District Court for the Eastern District of Missouri, through which I represent indigent defendants charged with federal crimes.

7.      In addition to my legal practice, I regularly present continuing legal education seminars to attorneys throughout the United States. While at the U.S. Department of Justice, I taught several courses at the National Advocacy Center in Columbia, South Carolina. And throughout my entire career in private practice, I have presented at local and national conferences including the American Bar Association's National Institute on Criminal Tax Fraud in Las Vegas, Nevada, and the American Bar Association's Section of Taxation's May Meeting in Washington, D.C. I have also published on issues involving the law in various publications including *The Champion* (the national publication of the National Association of Criminal Defense Lawyers), the *United States Attorneys' Bulletin*, the *Wall Street Journal*, and the *St. Louis Post-Dispatch*.

8.      Pursuant to this Court's November 26, 2024 Order, this affidavit is intended to address the issues Mr. Teman raised in his Motion in connection with my representation of Mr. Teman in this

1

matter. To be clear, it does not constitute the totality of information known to me regarding Mr. Teman or *United States v. Teman.*

9. I have personally known Ari Teman since we were undergraduate students at Brandeis University in Waltham, Massachusetts.

10. After he was arrested in connection with this case, Mr. Teman contacted me about representing him in *United States v. Teman.* I immediately advised Mr. Teman I was not licensed in the United States District Court for the Southern District of New York but that I could represent him if he retained co-counsel licensed to practice in this Court and if the Court granted my motion to appear *pro hac vice*. As such, Mr. Teman retained Joseph DiRuzzo and I to represent him in this case. Mr. DiRuzzo and I represented Mr. Teman in this matter during pre-trial proceedings, at trial, and post-trial until he ultimately terminated our representation and retained subsequent counsel. In addition to Mr. DiRuzzo and myself, it is my understanding that Mr. Teman independently retained the following attorneys to represent him at various points in time during these proceedings: Alan Dershowitz (who to the best of my knowledge did not file an entry of appearance); Justine Harris and Noam Biale of Sher Tremonte, LLP (whose representation of Mr. Teman overlapped with ours post-trial and until an initial sentencing hearing); Susan Kellman and Andrew Frisch; and a number of other lawyers whom I do not recall personally reaching out to me including Edoardo Maffia, Eden Quainton, Karloff Commissiong, and Thomas Butler.

11. At the outset of Mr. DiRuzzo's and my representation of Mr. Teman, we conducted a thorough investigation of the allegations, identified a violation of the Speedy Trial Act (leading to the dismissal without prejudice of a portion of this case which this Court granted), identified a number of other legal issues in the case, requested all relevant documentation from Mr. Teman, reviewed the entirety of discovery and requested supplemental discovery from the prosecution, obtained documentation from third-parties including by subpoena, interviewed all possible witnesses identified by Mr. Teman who were not represented by counsel and who were willing to speak with us, maintained an open dialogue in the ordinary course with the U.S. Attorney's Office, and interviewed Ariel Reinitz (both by phone and in person), whom Mr. Teman initially identified as a possible witness based on a possible reliance on counsel defense. (We also regularly communicated with Mr. Reinitz in his capacity as corporate legal counsel for Mr. Teman and his entities throughout the entirety of our representation of Mr. Teman as it related to ongoing civil litigation and other matters he handled for Mr. Teman.)

12. Well before trial in Mr. Teman's case, we had several discussions with Mr. Teman about his constitutional right to proceed to trial and expressly advised Mr. Teman he also had the right to have us explore the possibility of a resolution by guilty plea through negotiations with the prosecution. Additionally, while we were fully aware that it is often a proverbial long shot, we strongly encouraged Mr. Teman to *at least* permit us to explore the possibility of a corporate guilty plea in lieu of any personal criminal exposure. In each of my discussions with Mr. Teman about these issues, Mr. Teman was adamant that he intended to exercise his constitutional right to a jury trial and expressly prohibited us from engaging in any plea negotiations with the prosecution including even the possibility of a corporate plea. After explaining all of the possible risks inherent in his decision, we respected his decision and prepared for trial by working with him to identify

relevant witnesses, to file motions *in limine*, to retain an expert witness, and to develop our trial strategies. We also successfully litigated aggravated identity theft allegations in advance of trial and the prosecution ultimately dismissed those counts prior to the beginning of trial.

13. In advance of trial, Mr. Teman spent several days at my office in St. Louis preparing for trial. This included identifying possible exhibits, addressing anticipated prosecution theories and preparing for them, and extensively preparing for his possible testimony in the event he chose to testify in his own defense.

14. Early on during my representation of Mr. Teman, Mr. Teman informed us that neither he nor his businesses had filed federal income tax returns for many years. Based on my training and experience with federal criminal tax investigations, I advised Mr. Teman that his failure to file income tax returns (as he was legally obligated to) raised serious concerns that he would have substantial criminal exposure for uncharged federal tax crimes. Therefore, I advised Mr. Teman that it would be prudent to assume that the prosecution would obtain his tax records in this financial fraud case before trial either by bringing in IRS-CI or by obtaining a court order, for example, pursuant to Title 26, United States Code, Section 6103(i). I offered to help Mr. Teman become compliant with his federal tax obligations, but throughout our representation of him in this matter, Mr. Teman did not ask us to assist in that manner.

15. As to Mr. Teman's claim that I failed to act reasonably by calling Ariel Reinitz as a defense witness in our case-in-chief at trial—a decision he vocally encouraged and supported—there is no merit to that contention. Prior to trial, Mr. DiRuzzo and I interviewed Mr. Reinitz extensively—by phone and in person in New York. We also requested and obtained documents and correspondence between Mr. Reinitz and Mr. Teman, Mr. Reinitz and other individuals including Mr. Teman's customers and financial institutions, and other information in response to certain questions we asked during the course of our representation. We discussed with Mr. Teman the legal parameters of a "reliance on counsel" defense and the possible downsides of pursuing such a defense. We expressed our concern with Mr. Teman that a jury may very well be inclined to convict him based on some of the warnings Mr. Reinitz gave to Mr. Teman in advance of Mr. Teman's alleged criminal conduct at issue in this case, and we also collectively concluded strategically that a reliance of counsel defense was one of the only viable factual defenses and that Mr. Reinitz was the *only* witness who could authenticate a document that was at the heart of Mr. Teman's defense throughout these proceedings: the document with the RCC terms. To be clear, we went to great lengths for Mr. Teman to identify any witness other than himself (if he chose to testify) or Mr. Reinitz who could authenticate the operative business document that purported to give Mr. Teman the right to use an RCC for an outstanding debt. We also went to great lengths for Mr. Teman to provide any documents with reliable date stamps and/or metadata that established that the operative terms with RCC language were *actually* selected by the customers testifying against him at trial. Despite our repeated requests for this information and despite the fact Mr. Teman's company was a technology company at its core, we were left with only two ways to introduce the critical document that was at the core of Mr. Teman's only viable defense at trial: through Mr. Teman's testimony (if he chose to testify) or through Mr. Reinitz. Thus, while Mr. Teman's new legal counsel characterizes the decision to call Mr. Reinitz as a witness as one that "virtually

3

guaranteed a conviction," that assertion is misguided. Indeed, the opposite is true: given that Mr. Teman decided not to testify in his own defense, not calling Mr. Reinitz would have definitively guaranteed a conviction—because it would have left Mr. Teman with literally no viable defense at all.

16.     To be clear, any suggestion that the decision to call Mr. Reinitz was not strategic and was "made at the last moment" without strategy is baseless. Mr. Teman made a choice: he elected not to testify in his own defense, and therefore the only viable option to even a stand chance of an acquittal at trial was to call Mr. Reinitz. Mr. Teman's new counsel now claims that calling Mr. Reinitz "completely undermined Teman's defense." But with all due respect, that analysis overlooks basic rules of evidence and criminal procedure. Mr. Reinitz's testimony was needed because it was the only way the document with RCC language could be authenticated at trial. In other words, Mr. DiRuzzo and I were faced with the difficult strategic decision: call Mr. Reinitz with the risks inherent in his testimony and the other evidence that would inevitably then be admitted, or not call Mr. Reinitz and have literally no viable defense for a client who was unwilling to consider a guilty plea and who was exercising his constitutional right to a trial. To that extent, even though the prosecution never entirely connected certain dots during trial, we were concerned that some of the RCC's Mr. Teman created were for specific purposes and amounts that had no connection to the contractual terms. Mr. Reinitz's testimony—at a bare minimum—enabled us to introduce his testimony that he told Mr. Teman what he did was *legal*, even if it was a terrible idea that would likely lead to real problems for Mr. Teman. In other words, his testimony gave the defense the reliance of counsel defense. He enabled us to argue to the jury that a big firm New York lawyer, licensed and in good standing, who was Mr. Teman's long-term attorney led Mr. Teman to believe the use of RCC's was *legal*.

17.     Furthermore, it is important to understand our strategic decisions as to the timing of when we called Mr. Reinitz. By that point in the trial, each of the alleged victims had testified in no uncertain terms that Mr. Teman effectively attempted to steal their money without their consent by creating RCC's and depositing them, the contract that at least arguably permitted the use of RCC's under certain circumstances was not in evidence, Mr. Teman was exercising his constitutional right not to testify in his own defense and to subject himself to cross-examination, and Mr. Teman had failed to identify for us a single other witness who could authenticate the contract and the fact that particular contract was in existence at the time the alleged victims at this trial purportedly agreed to be bound by the RCC terms. As to this last aspect, there was a difference between the three customers of Mr. Teman's company as we introduced evidence during the Government's case-in-chief that some of them had corresponded about certain aspects of the terms and conditions GateGuard used.

18.     With respect to the possibility of Mr. Teman testifying, every lawyer that participated in preparing for his possible testimony at trial and evaluating it felt strongly that he should not testify in his own defense. To be clear, we expressly and repeatedly advised Mr. Teman of his right to testify and that the decision was his and his alone—a point this Court reiterated outside the presence of the jury at trial to Mr. Teman directly. But based on my individual trial experience, I advised Mr. Teman that the jury would not find his testimony credible, would not develop positive

4

feelings for him based on how his affect and personality may come across to certain jurors, and that they would likely convict him as a result. I also advised that he could be asked questions on cross-examination that would expose him to other criminal conduct and that, while not a substantial consideration, there was a risk the Court could conclude he committed perjury and would impose an enhancement under the advisory Sentencing Guidelines range in the event of a conviction (but that would only apply in the event the Court concluded he intentionally testified falsely as opposed to simply denied his guilt). It is my understanding Mr. DiRuzzo independently came to the same conclusion as did my law partner, Mr. Margulis, who observed Mr. Teman give mock testimony before trial in my office. Mr. Margulis is a seasoned criminal defense attorney with decades of experience and qualified as learned counsel in death penalty cases and is highly regarded for his jury trial work. Mr. Teman independently elected to exercise his constitutional right to remain silent, not to testify, and that meant that the only person who could establish the reliance of counsel defense and/or authenticate the operative contract at issue was Mr. Reinitz.

19. As trial counsel faced with the factual and legal backdrop we were in, we did consider the significant possible downside with calling Mr. Reinitz and, with Mr. Teman's full agreement, we collectively made the tactical decision to call Mr. Reinitz in large part because it was the only card we had to play.

20. As to Mr. Teman's claim that I failed to admit what he now characterizes as the "valid" 2016 terms, conversations, and emails, and that we failed to move for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, Mr. Teman's claims are wrong and factually belied by the record. After the Government rested its case-in-chief, Mr. DiRuzzo expressly stated: "The defense moves for a judgment of acquittal under Rule 29(a)." *See* Transcript. We then made a comprehensive argument for judgment of acquittal based on venue, Second Circuit precedent establishing a check by itself does not constitute a factual assertion as charged, and that "the government has put insufficient evidence into the record to allow this case to proceed and be submitted to the jury." *See id.* Thus, Teman's representation to this Court that we did not move for judgment of acquittal is plainly not true as reflected in the official certified transcript of the trial proceedings.

22. With respect to the purported 2016 iteration of the company's terms, Mr. Teman never provided documentary evidence that helped his case. To be clear, we expressly asked for the metadata from this technology company that supported Mr. Teman's contention that these customers accepted the various iterations of the terms and conditions he sought to introduce. But not a single witness or reliable document provided in advance of trial supported that contention—and our requests for metadata were met with silence. Mr. Reinitz was the *only* person who claimed to have personal knowledge of the particular terms at issue—and this was the only path toward admission. At various times throughout our representation, Mr. Teman provided certain documents prepared for a separate entity by an Israeli law firm—but perhaps inadvertently, Mr. Teman consistently conflated documents and entities when we made clear we had to introduce evidence relevant to the claims in the indictment. As we represented to the Court at sidebar, the only reason we did not have the original payment terms was "not for lack of trying, or for lack of availability, we haven't been able to actually obtain them." In other words, Mr. Teman and his technology

5

company did not provide a credible road to admissibility of the document he now claims we should have introduced into evidence. Mr. Teman's position that these GateGuard customers agreed to these terms because a different company had them drafted by a law firm in Israel was not a viable defense.

23. With respect to the Bank of America emails, we reviewed each document provided to us in advance of trial by Mr. Teman and the entirety of the discovery provided by the Government (in addition to documents we obtained during our own defense investigation of the case prior to trial), and made the tactical decision not to seek to introduce the correspondence Mr. Teman's new counsel claims we could have introduced. I respectfully disagree. First, there is a very real argument that, in the event this was bank fraud and/or wire fraud (as the prosecution alleged), Mr. Teman's statements to Bank of America could be alleged to have constituted a continuation of that fraud. While in theory these emails supported Mr. Teman's lack of *mens rea*, even assuming the Court would permit the admission of self-serving hearsay (which is unlikely), the argument is circular and did not advance the ball. Second, and most importantly, a closer analysis of the RCC's at issue—including the purported bases for the charges and the amounts (and, as I recall, in some cases, the addresses)—raised more questions than answers. To be clear, introduction of these emails, even if admissible, would not have provided "grounds to dismiss all the charges," as Mr. Teman's new counsel now asserts.

24. As to Mr. Teman's contention that I failed to act reasonably by not seeking exclusion or a limiting instruction under Federal Rule of Evidence 403, I respectfully disagree. By placing "reliance on counsel" into play—a strategy Mr. Teman not only agreed with but insisted on—there was no good faith basis in seeking to exclude the negative statements from Mr. Reinitz to Mr. Teman. And in my view as a trial lawyer, a limiting instruction often draws attention to a fact to the jury that would not otherwise be emphasized.

25. As to Mr. Teman's contention that I failed to act reasonably by failing to request a competency evaluation and/or to request a continuance, I respectfully disagree. From the moment I agreed to represent Mr. Teman in this case throughout the end of trial, I personally spent a substantial amount of time with him—both by phone and in person. Unlike most clients, I also had the benefit of knowing Mr. Teman prior to our attorney-client relationship, as I knew him when we were both undergraduate students at Brandeis University. While we were not particularly close friends in college, I communicated and interacted with him. Mr. Teman was the same person.

26. Without question, Mr. Teman did not lack competence during his criminal case. Mr. Teman was always fully engaged during our attorney-client relationship and was very involved with the defense team as we worked on his case, regularly communicating with his lawyers in a way that reflected he understood the proceedings and the ramifications of certain decisions assisting with his own defense. In the weeks leading up to trial, Mr. Teman and I spent several days together in person in St. Louis—and we had the opportunity to interact both in the office and in out-of-office settings. I never questioned Mr. Teman's competency. Furthermore, consistent with the conditions of his release, Mr. Teman saw a mental health professional. To be clear, like many clients I have who are charged with criminal offenses, Mr. Teman has sadly struggled with certain mental health conditions—at times throughout our representation including to this Court, he purported to have

suicidal thoughts. On a personal level, I found (and find) Mr. Teman's mental health struggles to be incredibly sad and unfortunate, but again, there was absolutely no reason why I would question Mr. Teman's competency.

27. With respect to seeking a delay in trial, we expressly communicated with Mr. Teman that we could seek an adjournment of the trial date and that doing so would likely continue the proceedings. Mr. Teman was adamantly opposed to a continuance, convinced he would be acquitted notwithstanding the risks and determined not to be under the conditions of release any longer. However, we also expressly advised Mr. Teman that, based on what we knew, we were concerned that the prosecution would expand the scope of its investigation—especially if the prosecution had taken the routine step of requesting (with a court order) Mr. Teman's federal tax returns for the prior tax years. Had the prosecution done so, the Government would have found that Mr. Teman had failed to timely file any federal tax returns, subjecting him to possible criminal exposure for uncharged tax crimes. As a former federal prosecutor with the U.S. Department of Justice's Tax Division and a defense attorney with a substantial criminal tax practice, I was concerned that Mr. Teman was adamant about proceeding to trial and would then face allegations that he committed tax crimes—to be clear, allegations that could be defended but allegations for which he was not facing charges. Mr. DiRuzzo, a CPA who also has a substantial criminal tax defense practice, expressed to me that he shared these concerns.

28. With respect to Mr. Teman's contention that I failed to act reasonably by not calling certain witnesses at trial, I respectfully disagree. We attempted to speak with literally every possible witness Mr. Teman asked us to reach out to (directly or through counsel) and we interviewed a number of possible witnesses. Based on what those witnesses shared with us, their testimony would not have been favorable to Mr. Teman's defense, so we made the strategic decision not to call them.

29. With respect to Mr. Teman's contention that I failed to act reasonably by not introducing email correspondence from Mr. Reinitz to Bank of America in lieu of Mr. Reinitz's testimony, once again, this assertion fails to consider the rules of evidence and criminal procedure. Putting aside possible hearsay and foundation issues, the email correspondence would not have been a magical end-run around the "advice of counsel" defense. Mr. Teman's new counsel states introducing email correspondence stating Mr. Reinitz's opinion "would have left BOA with no damages and the customers would then have been able to litigate the matter in civil court if they thought they were entitled to the monies, which they were not under the contractual terms" is inaccurate and misguided.

30. With respect to Mr. Teman's contention that I failed to act reasonably by not calling Shelly Pecot as a witness, I respectfully disagree. To be clear, we did attempt to subpoena Ms. Pecot *as a possible witness*—but it was also clear that Mr. Teman's contacts at this property (Mercer) were Jackie Monzon and Bonnie Soon Osberger. Our diligence in advance of trial revealed correspondence between Mr. Teman and Ms. Pecot that painted Mr. Teman unfavorably: Mr. Teman repeatedly threatened Ms. Pecot. For example, when she said she intended to consult with their attorney with respect to the intercom dispute, Mr. Teman insisted on a check for $18,000 and made statements threatening to put a lien on every unit of the building, to file a lawsuit seeking

treble damages, and calling her "two faced." It was clear she would be a hostile, adverse witness and one that would paint Mr. Teman in a bad light. We expressly communicated our intention not to seek the Court's involvement to attempt to secure her presence at trial and Mr. Teman agreed.

31.     With respect to Mr. Teman's contention that I failed to act reasonably by failing to request a copy of a housing court transcript, this assertion is baseless. To be clear, based on this Court's order at trial—directing *the prosecution* to disclose exculpatory and/or impeachment evidence that Mr. Soleimani interacted with the tenant at issue—the Government should have made a disclosure it did not make. Perhaps creatively, Mr. Teman's new counsel is attempting to shoehorn a discovery violation by the Government into an argument that his defense counsel was ineffective for not ordering a housing court transcript that had no direct link to Mr. Teman or the allegations in the case. To be clear, at trial, we made the strategic decision on cross-examination to elicit favorable testimony from Mr. Soleimani instead of outright attacking him in a *carte blanche* manner while simultaneously impeaching his credibility where appropriate and tactical.

32.     With respect to Mr. Teman's contention that I failed to act reasonably by failing to alert the court to juror misconduct, I respectfully disagree. To be clear, as best as I can recall, Mr. Teman did not express any concern about this juror's purported "dirty looks" during the jury selection portion of trial. But Mr. Teman's after-the-fact narrative of what transpired does not accurately reflect what happened during *voir dire* or what was learned about this juror after trial while I continued to represent Mr. Teman. While we advocated zealously for our client in post-trial motions and raised this issue for this Court's consideration, there was no reasonable basis brought to the attention of us at the time of trial to raise an issue with respect to this juror with the Court. And after trial, the information known about this juror was reflected in our post-trial pleadings. During the process of drafting those pleadings, Mr. Teman expressly suggested, "I know what to do. A friend can call the FBI from a burner phone or anonymously email and say they know that juror 13 lied to the judge, knows Teman, is a direct competitor and in fact made an effort to influence the jury," to which I immediately responded, "No. No. and no."

33.     Mr. Teman blames us as trial counsel and the four lawyers who represented him at various times at sentencing for not calling a witness to testify about certain aspects of Judaism. While I cannot speak for sentencing counsel, there was no basis for such testimony at trial.

34.     Mr. Teman blames us as trial counsel and the four lawyers who represented him at various times at sentencing for not seeking to recuse Judge Engelmeyer in this case "for making findings in violation of Teman's religious Jewish faith." While I cannot speak for sentencing counsel, I believe such a motion would have been frivolous and not in Mr. Teman's best interest. I stand behind that decision and would make the same decision today.

35.     Throughout the entirety of our representation, I sincerely fought zealously to protect Mr. Teman's constitutional rights in this case. While the Court did not see eye to eye with some of our legal arguments, I aggressively defended this case—raising important legal issues before trial (*e.g.* a Speedy Trial Act violation, preserving our inability to call an expert witness on banking law and RCC's, advocating for the dismissal of aggravated identity theft allegations that had no legal basis and were ultimately dismissed in Mr. Teman's favor), at trial (*e.g.* a constructive amendment

8

argument with respect to the use of the word "counterfeit" in the indictment, venue insufficiencies, and other issues), and in post-trial motions (which this Court resolved in a very lengthy and detailed opinion). To this day, we agree to disagree with the Court on certain legal issues such as whether the grand jury's use of the word "counterfeit" in the indictment was significant; but the bottom line remains: we zealously advocated on Mr. Teman's behalf and fought for an acquittal within the legal and ethical parameters that apply to all of us as officers of the Court.

36.   I appreciate, understand, and respect that Mr. Teman lost his direct appeal and respect his right to pursue this last possible recourse by alleging ineffective assistance of counsel. But given the hand we were dealt, I am confident we made reasonable strategic decisions. I have always wanted only the best for Mr. Teman and believe that is reflected by how we approached the defense of his case at all times that we were counsel of record.

**Margulis, Gelfand, DiRuzzo & Lambson**

_/s/ Justin K. Gelfand_
Justin K. Gelfand
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: (314) 390-0230
Facsimile: (314) 485-2264
justin@margulisgelfand.com

Subscribed and sworn to before more this 31st day of January, 2025.

_Notary Public_

My Commission Expires: 2.20.25