UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ARI TEMAN,

　　　　　　　　Defendant.

**S2 19 Cr. 696 (PAE)**

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE
PURSUANT TO 28 U.S.C. § 2255**

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Jacob H. Gutwillig
Assistant United States Attorney
　　*Of Counsel*

## **TABLE OF CONTENTS**

FACTUAL BACKGROUND ....................................................................................................... 3

    I. Indictment and Charges ................................................................................................. 3

    II. Trial Preparation ......................................................................................................... 4

    III. The Government's Case .............................................................................................. 10

    IV. Reinitz's Testimony ................................................................................................... 11

    V. The Rule 29 Motions .................................................................................................. 13

    VI. The Verdict .............................................................................................................. 14

    VII. The Post-Trial Motions ............................................................................................ 14

    VIII. The Sentencing and the Ruling Granting Teman Bail Pending Appeal ......................... 15

    IX. Teman's Direct Appeal .............................................................................................. 17

    X. The Petition ............................................................................................................... 17

ARGUMENT ........................................................................................................................ 18

    I. Applicable Law ........................................................................................................... 18

        A. Ineffective Assistance of Counsel ........................................................................... 18

        B. Limitations on Section 2255 Petitions ..................................................................... 20

        C. Procedures for Adjudicating Section 2255 Petitions .................................................. 21

    II. Teman's Ineffective Assistance Claims Are Meritless .................................................... 21

        A. Trial Counsel's Performance Was Not Deficient ....................................................... 22

        B. Teman Suffered No Prejudice from Trial Counsel's Performance ................................ 38

    III. An Evidentiary Hearing is Not Necessary .................................................................... 39

CONCLUSION ...................................................................................................................... 42

The Government respectfully submits this memorandum of law in opposition to the motion filed by Ari Teman for relief pursuant to Title 28, United States Code, Section 2255. (Dkt. 458, the "Petition"). In the more than five years since Teman's conviction at the conclusion of trial in January 2020, he has filed a parade of meritless—and at times objectively false and arguably bad-faith—motions. The Petition is yet another in that long line. Teman advances a series of arguments that his trial counsel were constitutionally ineffective. His core argument, that trial counsel acted unreasonably in calling Ariel Reinitz ("Reinitz") as a defense witness, has been thoroughly debunked, including by this Court and the sworn affidavits of his trial counsel. (*See* Dkts. 489 ("Gelfand Aff."), 490 ("DiRuzzo Aff.")). His other arguments range from faulting trial counsel in not seeking certain (unreasonable) rulings or to admit (clearly inadmissible) evidence, to not requesting a competency evaluation or continuance, to increasingly absurd claims relating to Teman's faith and the Court's recusal. (*See* Dkt. 459, "Def. Brief").

The Court anticipated and rejected Teman's then-contemplated ineffective assistance of counsel arguments at his sentencing hearing, ruling that, under the relevant legal standard, "I find clearly that this is, in my opinion, a loser of an argument of ineffective assistance." (Dkt. 276, "Sent. Tr." at 114).[1] Even then, in the more immediate aftermath of trial, it was clear that Teman's ineffective assistance claims were meritless; that is even more true now, in light of the Gelfand and DiRuzzo Affidavits, which flatly contradict Teman's assertions. In a particularly vivid example of this, the Gelfand Affidavit describes how, after trial, Teman sought to challenge the

---

[1] The Government recognizes that the Petition cites to the appendix from Teman's (first) direct appeal. However, for ease of reference, the Government's citations are to the District Court docket and the trial transcript ("Tr.").

integrity of the proceedings through subterfuge.  In connection with a perceived possible juror issue, "Teman expressly suggested, 'I know what to do.  A friend can call the FBI from a burner phone or anonymously email and say they know that juror 13 lied to the judge, knows Teman, is a direct competitor and in fact made an effort to influence the jury[.]'" (Gelfand Aff. ¶ 32).  Trial counsel, consistent with his ethical obligations—and in keeping with his professionalism in defending this challenging case, which the Court observed was "a between-the-eyes bank and wire fraud" with "very few options" to defend it (Sent. Tr. at 115)—refused Teman's outrageous entreaty.  Trial counsel prevented Teman from committing *another* crime, in addition to ably defending the fraud charges in this case and, as the Gelfand Affidavit makes clear, protecting Teman from possible additional, tax-related criminal exposure.  This episode is emblematic of Teman's present motion and his overarching approach to post-trial litigation: he will do, or say, anything to evade responsibility for his crimes and seek to blame others.

For the reasons set forth below, as well as in other court proceedings, filings, and opinions, Teman's contentions regarding his trial counsel's alleged ineffectiveness are entirely contradicted by the record below and counsel's affidavits, and Teman cannot meet the high burden of *Strickland*.  Teman's allegations that he was deprived of a fair trial are unfounded in fact, law, and reason.  Accordingly, the Government respectfully submits that the Petition is meritless and should be summarily denied without a hearing.[2]

_____

[2] The Government notes that the Petition is but one of Teman's pending, meritless motions, both in this Court and in the Court of Appeals. *E.g.*, Dkt. 416 (appealing this Court's denial at Dkt. 415 of Teman's Rule 33 motions); Dkt. 491 (appealing this Court's Order at Dkt. 484 regarding Teman's return from Israel); Dkt. 504 (appealing this Court's Order at Dkt. 498 denying—again— another unfounded motion by Teman for the Court's refusal); and Dkt. 517 (appealing the Court's Order at Dkt. 514 regarding Teman's return from Israel).  The Court has previously advised Teman

## FACTUAL BACKGROUND

The procedural and substantive background of this case has been detailed in prior rulings and filings, most thoroughly in the Court's 107 page-long Opinion & Order denying Teman's initial Rule 33 and 29 motions. (Dkt. 138, "Rule 29/33 Decision"). Accordingly, this submission focuses on the background directly relevant to Teman's present motion and includes in the context of the Argument other factual background.

### I. Indictment and Charges

On June 20, 2019, the Honorable Sarah Netburn authorized the filing of a criminal complaint charging Teman with one count of bank fraud, in violation of 18 U.S.C. § 1344. (Dkt. 1, the "Complaint"). On July 3, 2019, the defendant was arrested in the Southern District of Florida; subsequently, on July 7, 2019, the defendant was presented in the United States District Court for the Southern District of Florida, and released from custody subject to certain conditions of bail. On September 6, 2019, the defendant was presented in the Southern District of New York before Judge Netburn, and, thereafter, remained on pretrial release subject to certain bail conditions. On September 26, 2019, a grand jury sitting in this District returned Indictment 19 Cr.

---

that it will "treat any future motion for recusal or sanctions based on his representation by [Noam] Biale or [Justine] Harris as frivolous and vexatious and as itself a basis for the possible imposition of sanctions." (Dkt. 488 at 4). The Petition does not raise this specific issue, but rehashes others that have previously been raised in other motions and forms, such as (1) the defense's failure to call Shelly Pecot, (2) its ostensible failure to seek to recuse this Court, and (3) an unhinged theory about Teman's prosecution based on his faith. Teman has raised these issues, and others, as part of "a clear pattern of abusing the litigation process" by raising "vexatious and frivolous arguments." *Woodhouse v. Meta Platforms Inc.*, 704 F. Supp. 3d 502, 517 (S.D.N.Y. 2023), *aff'd*, 23-7973-cv, 2024 WL 4297471 (2d Cir. Sept. 26, 2024).

696 (PAE), alleging the same charges contained in the Complaint.  (Dkt. 9).  Subsequently, on

November 12, 2019, a grand jury returned Superseding Indictment S1 19 Cr. 696 (PAE), charging

Teman with two counts of bank fraud, in violation of 18 U.S.C. § 1344, and two counts of

aggravated identity theft, in violation of 18 U.S.C. § 1028A.  (Dkt. 27).

Thereafter, Teman's trial counsel filed pre-trial motions, including to dismiss Indictment

S1 19 Cr. 696 (PAE) on Speedy Trial Act and venue grounds and to suppress certain evidence (*see*

Dkts. 33, 34).  The Court granted Teman's motion to dismiss Count One of Indictment S1 19 Cr.

696 (PAE), but without prejudice, finding that the 85-day period between Teman's arrest and the

filing of Indictment 19 Cr. 696 (PAE) violated the Speedy Trial Act, 18 U.S.C. §§ 3161-62.  (*See*

Dkt. 45).  The Court denied Teman's other pre-trial motions.

Superseding Indictment S2 19 Cr. 696 (PAE) was filed on January 3, 2020, in six counts.

(Dkt. 55).  Counts One and Two charged Teman with bank fraud, in violation of 18 U.S.C. §§ 1344

and 2.  Counts Three and Four charged Teman with wire fraud, in violation of 18 U.S.C. §§ 1343

and 2.  Counts Five and Six charged Teman with aggravated identity theft, in violation of 18 U.S.C.

§§ 1028A and 2.  Before trial, the Government informed the District Court and the defense that it

had elected not to proceed on Counts Five and Six.

## II.  Trial Preparation

Following his arrest, Teman retained two lawyers to represent him: Justin Gelfand, Esq.,

and Joseph DiRuzzo, Esq. (together, "Trial Counsel").  Gelfand graduated in the top 5% of his law

school class before going on to serve for approximately five years as a federal prosecutor in the

U.S. Department of Justice's Tax Division in Washington D.C.  (Gelfand Aff. ¶ 4).  After leaving

the Department, Gelfand worked in private practice, before, in 2018, founding the law firm

4

Margulis Gelfand. (*Id.*). Gelfand's career, as a federal prosecutor and then defense attorney, has focused on criminal law, and he has "frequently tried criminal cases before juries and handled cases . . . in approximately 20 federal judicial districts." (*Id.* ¶ 5). Gelfand has also taught as an adjunct faculty member at Harvard Law School's Trial Advocacy Workshop. (*Id.*) Teman has known Gelfand personally since the two were undergraduates together at Brandeis University, and, following Teman's arrest, he sought to engage Gelfand. (*Id.* ¶¶ 9-10). Teman also retained DiRuzzo, who, for his part, had tried over 50 cases at the state and federal levels prior to Teman's January 2020 trial. (DiRuzzo Aff. ¶ 4(b)).

At the "outset" of Trial Counsel's representation of Teman, they "conducted a thorough investigation of the allegations . . . ." (Gelfand Aff. ¶ 11). Among other things, Trial Counsel:

> [R]equested all relevant documentation from Mr. Teman, reviewed the entirety of discovery and requested supplemental discovery from the prosecution, obtained documentation from third-parties including by subpoena, interviewed all possible witnesses identified by Mr. Teman who were not represented by counsel and who were willing to speak with us, maintained an open dialogue in the ordinary course with the U.S. Attorney's Office, and interviewed Ariel Reinitz (both by phone and in person), whom Mr. Teman initially identified as a possible witness based on a possible reliance on counsel defense.

(*Id.*). Trial Counsel's in-depth review of the case also identified legal issues, including their successful motion to dismiss Count One of Indictment S1 19 Cr. 696 (PAE) on Speedy Trial Act grounds.

Trial Counsel "had several discussions with Mr. Teman about his constitutional right to proceed to trial and expressly advised Mr. Teman he also had the right to have us explore the possibility of a resolution by guilty plea through negotiations with the prosecution." (*Id.* ¶ 12). Trial Counsel also suggested to Teman the creative possibility of a "corporate guilty plea in lieu of any personal criminal exposure." (*Id.*). Nevertheless, throughout, Teman was "adamant that

5

he intended to exercise his constitutional right to a jury trial and expressly prohibited [Trial Counsel] from engaging in any plea negotiations with the prosecution including even the possibility of a corporate plea." (*Id.*).  Trial Counsel therefore dedicated significant time and resources to preparing for trial, in the course of which Trial Counsel successfully identified issues resulting in the Government not proceeding on Counts Five and Six (aggravated identity theft) of Indictment S2 19 Cr. 696 at trial.  (*Id.*).

Trial Counsel worked closely with Teman in preparing for trial and developing strategy. "Teman spent several days at [Gelfand's] office in St. Louis preparing for trial.  This included identifying possible exhibits, addressing anticipated prosecution theories and preparing for them, and extensively preparing for [Teman's] possible testimony in the event he chose to testify in his own defense." (Gelfand Aff. ¶ 13).  DiRuzzo also "spent substantial time with [Teman] (both in and out of court)" in preparing for trial, in working to develop a defense.  (DiRuzzo Aff. ¶ 4(b)). In the course of this preparation and owing, in part, to Gelfand's experience with tax prosecutions, he learned that Teman had failed to file federal income tax returns, which "raised serious concerns that [Teman] would have substantial criminal exposure for uncharged federal tax crimes." (Gelfand Aff. ¶ 14; *see also* ¶ 27 ("Mr. DiRuzzo, a CPA who also has a substantial criminal tax defense practice, expressed to me that he shared these concerns.")).  That, as the Gelfand Affidavit explains, had a significant impact on Teman's viable options for defending his case at trial. Teman's possible uncharged criminal exposure weighed against Teman testifying in his own defense, in addition to other well-founded concerns, which, as explained below, effectively necessitated an advice-of-counsel defense.  (*See, e.g.*, DiRuzzo Aff. ¶ 4(a) ("The only viable trial defense was a reliance of counsel defense.")).

This is because the terminal issue at trial was whether Teman possessed the requisite *mens rea*, and, as the Court and Teman's Trial Counsel have observed, his best—and maybe only—shot to defeat the abundant evidence of his criminal intent in defrauding customers was to provide contemporaneous "Terms and Conditions," or "payment terms," in place prior to the fraudulent transactions, that showed (defying common sense) that Teman was authorized to draw on his customers' accounts unilaterally.  (*See, e.g.*, Tr. 747-51).  Trial Counsel recognized this reality, and, as relevant to the Petition, "collectively concluded strategically that a reliance of counsel defense was one of the only viable factual defenses and that Mr. Reinitz was the *only* witness who could authenticate a document that was at the heart of Mr. Teman's defense throughout these proceedings: the document with the RCC terms."  (Gelfand Aff. ¶ 15 (referring to "remotely created checks," or "RCCs").  Before reaching the decision call Reinitz as a witness at trial, Trial Counsel "went to great lengths for Mr. Teman to identify any witness other than himself (if he chose to testify) or Mr. Reinitz who could authenticate the operative business documents that purported to give Mr. Teman the right to use an RCC for an outstanding debt." (*Id.*).  Trial Counsel tried other avenues as well, "going to great lengths for Mr. Teman to provide any documents with reliable date stamps and/or metadata that established that the operative terms with RCC language were *actually* selected by the customers testifying against him at trial." (*Id.*).  Teman was unable to furnish any such document "[d]espite the fact that Mr. Teman's company was a technology company at its core[.]"  (*Id.*).  Ultimately, Trial Counsel concluded, that the only way to authenticate and introduce this "critical" document was through Teman, Reinitz, or both.  (*See* Gelfand Aff. ¶ 15; DiRuzzo Aff. ¶ 4(b)).

Trial Counsel carefully weighed and vetted those options. As to Teman, following in-person mock direct and cross-examinations, Trial Counsel unequivocally assessed, "that the jury would not find his testimony credible, would not develop positive feelings for him based on how his affect and personality may come across to certain jurors, and that they would likely convict him as a result." (Gelfand Aff. ¶ 18 ("every lawyer that participated in preparing for [Teman's] possible testimony at trial and evaluating it felt strongly that he should not testify in his own defense"); *see also* DiRuzzo Aff. ¶ 4(b)). Beyond credibility and presentation issues, Teman also faced the prospect of additional, uncharged criminal exposure if he took the stand. (Gelfand Aff. ¶ 18). As a result, in a world of very limited options, Trial Counsel, "were faced with the difficult strategic decision: call Mr. Reinitz with the risks inherent in his testimony and other evidence that would inevitably then be admitted, or not call Mr. Reinitz and have literally no viable defense for a client who was unwilling to consider a guilty plea . . . ." (Gelfand Aff. ¶ 16). Before trial, Trial Counsel "interviewed Reinitz extensively," both by phone and in person, and requested and reviewed relevant correspondence between Teman and Reinitz, and Reinitz and other individuals, including Teman's customers and financial institutions. (Gelfand Aff. ¶ 15). Trial Counsel also apprised Teman of the possible downsides of an advice-of-counsel defense, and, specifically, of calling Reinitz, including that "a jury may well be inclined to convict [Teman] based on some of the warnings Mr. Reinitz gave to Mr. Teman in advance of Mr. Teman's alleged criminal conduct . . . ." (*Id.*).

Ultimately, after exhausting all possible avenues—and in careful consultation with Teman, who "vocally encouraged and supported" calling Reinitz as a defense witness (*id.*)—Trial Counsel and Teman, "collectively concluded strategically that a reliance of counsel defense was one of the

only viable factual defenses and that Mr. Reinitz was the *only* witness" who could authenticate and introduce the "Terms and Conditions" that were at the "heart of Mr. Teman's defense . . . ." (*Id.*).  Teman and Trial Counsel were clear-eyed about the possible risks that calling Reinitz could present, recognizing that, "[t]he communications from Mr. Reinitz to [Teman] that were unfavorable (e.g. you will be arrested, this will be a criminal matter) were taken into account in the calculus . . . but ultimately, given that Mr. Reinitz was the only witness besides [Teman] it was a calculated risk that we were willing to accept."  (DiRuzzo Aff. ¶ 4(d)).  Thus, while Teman now disingenuously argues that the decision to call Reinitz "virtually guaranteed a conviction," (Def. Br. at 29), "the opposite is true: given that Mr. Teman decided not to testify in his own defense, not calling Mr. Reinitz would have definitively guaranteed a conviction—because it would have left Mr. Teman with literally no viable defense at all."  (Gelfand Aff. ¶ 15).

Even after reaching that conclusion before trial, Trial Counsel continued to weigh the decision to call Reinitz during trial itself.  The Government's case also played a significant role in the decision to call Reinitz:

> By that point in the trial, each of the alleged victims had testified in no uncertain terms that Mr. Teman effectively attempted to steal their money without their consent by creating RCC's and depositing them, the contract that at least arguably permitted the use of RCC's under certain circumstances was not in evidence, Mr. Teman was exercising his constitutional right not to testify in his own defense and subject himself to cross-examination, and Mr. Teman had failed to identify for [Trial Counsel] a single other witness who could authenticate the contract and the fact that particular contract was in existence at the time the alleged victims at this trial purportedly agreed to be bound by the RCC terms.

9

(*Id.* ¶ 17).   In short, and notwithstanding Teman's self-serving, contradictory claims in the Defendant's Brief accompanying the Petition,[3] Trial Counsel, at Teman's urging and with his full knowledge, made an informed strategic decision to call Reinitz as a witness.  Tellingly, even after Reinitz's testimony, and before the jury returned its guilty verdict, Teman gave DiRuzzo a "thank you" note, in which Teman described DiRuzzo's work as, "heroic, generous, and brilliant" and concluded, "you're an exceptional attorney, and even greater person.  Thank you for being a hero." (DiRuzzo Aff. ¶ 7).

## III.   The Government's Case

The trial evidence proved that Teman obtained corporate bank account information from customers of a business he ran, then misused that information to create fraudulent checks drawing funds from the customers' accounts without their authorization. In addition to financial records and other documentary evidence, the Government's proof included testimony from three representatives of customers whose bank account information was used to write fraudulent checks to Teman's business: (1) Elie Gabay, who testified about 518 West 204 LLC ("West 204"), managed by Coney Management; (2) Bonnie Soon-Osberger, who testified about 18 Mercer Equity Inc. ("18 Mercer"); and (3) Joseph Soleimani, who testified about ABJ Lenox LLC ("ABJ

---

[3] Appended to the Defendant's Brief as Exhibit E is a sworn declaration from Teman.  The declaration states, in relevant part, that "I swear under penalty of perjury pursuant to the laws of the United States of America that the facts stated in my Memorandum of Law . . . are based on my personal knowledge, and are true and correct to the best of my knowledge, information and belief." (Def. Br. Ex. E).  Because Teman did not submit a more specific affidavit delineating which parts of the Petition he adopts as his sworn statements, and instead takes credit broadly for the factual assertions in the Petition, the Government treats the factual assertions made in the Petition as Teman's.  In view of the record in this case, which now includes the Gelfand and DiRuzzo Affidavits, Teman's Declaration is entirely discredited and should be given no weight.

Lenox") and ABJ Milano LLC ("ABJ Milano"), both managed by ABJ Properties LLC ("ABJ Properties"). As referenced *supra*, the Government's case has been detailed in numerous filings and orders. Accordingly, relevant details are described in the Argument.

## IV. Reinitz's Testimony

Reinitz, an attorney for Teman and his company, GateGuard, was the defense's only witness. Through Reinitz, the defense introduced a section from GateGuard's website titled "Payment Terms." (Tr. 787). These were the "Terms and Conditions" that were "at the heart of Mr. Teman's defense throughout these proceedings: the document with the RCC terms." (Gelfand Aff. ¶ 15). Despite Trial Counsel's efforts to locate, including from Teman, "Terms and Conditions" that had been operative prior to, or contemporaneous with, Teman's entry into contracts with his eventual fraud victims, the only version available—and thus the only viable defense—was a copy of the terms that had purportedly been "last revised" on January 27, 2019. (Tr. 748 ("[W]e don't have the original payment terms, not for lack of trying, or for lack of availability, we haven't been able to actually locate them.")). Meaning these terms were dated after the relevant customers had purchased their intercom devices and seen their relationships with Teman deteriorate, and before Teman began writing and depositing checks on the customers' behalf. Among other provisions, the terms purportedly authorized Teman to write checks to GateGuard from his customers' accounts:

> You give us permission to write and sign checks with your checking and/or savings account(s) information to do a bank draw against your entity (or entities) for the amount it (or they) owe(s).
>
> You agree that if you own multiple entities we may draw against one to collect the debt owed by another, and that you and only you are responsible for balancing the moneys owed between the entities. For example, if your Property A owes us $10,000 and we have the checking account information for your Property B, you

11

> agree that Property B is acting as a guarantor of Property A (and all your properties and personal accounts are also acting as a guarantor for all other properties and entities you own in full or partially. To put it in plain English: you agree that if anything you own owes us money, or if you owe us money, we may draw that amount from any bank account or savings or investment account you own in full or in part and it's 100% your responsibility to pay that other account back, not us.

(Defense Ex. 2; *see* Tr. 787).

Reinitz testified that he had represented GateGuard in trying to collect money from customers, including West 204 and ABJ Properties. (Tr. 758, 761). Around "March or April or May" or "mid 2018," Reinitz said, Teman proposed using "remotely created checks," or "RCCs," to collect money from customers. (Tr. 770-71). Reinitz claimed in his direct testimony that he advised Teman that "the RCC payment method was a legitimate, legal method of payment." (Tr. 774-75). Thus, through Reinitz's testimony, Teman introduced documentary evidence that could demonstrate, or at least plausibly allow Teman to argue, that he did not have criminal intent; put differently, that Teman had authorization to draw on his customers' (victims) accounts, and did not simply brazenly steal from them—as the weight of the evidence clearly suggested.

However, as Trial Counsel had advised Teman prior to trial, certain text messages between Teman and Reinitz contradicted Reinitz's testimony. In the messages, which were introduced during Reinitz's cross-examination, Reinitz expressly told Teman not to go forward with a plan to write RCCs from his customers' accounts. (A. 954, 958, 1872-77). For example, when Teman wrote that he had "photos" of "ABJ checks" and that the "contract" allowed him to "draw their account," Reinitz twice responded that Teman's proposal was a "[b]ad idea" and that Teman's customers "are likely to call police. And you will be arrested. And have a criminal case to deal with." (GX 702). Later in the same text conversation, Reinitz added: "My opinion is that you are >50% likely to be arrested for the activities you propose." (A. 1873). In April 2019, after Teman

12

had deposited the March 2019 checks, Reinitz grew frustrated with Teman's efforts to obtain his

blessing for a plan to use RCCs to collect money from ABJ Properties:

> I've already told you I think it's a bad idea. You've been back and forth with abj
> several times now. Your "threats" carry little weight at this point and they have
> indicated they don't believe they owe you $. If you hit their accounts I think 50/50
> they call cops. If I was advising them that's probably what I would tell them to do.

(GX 728).

## V. The Rule 29 Motions

At the close of the Government's case, Trial Counsel moved for a judgment of acquittal

under Rule 29. (Tr. 692-727). Trial Counsel moved on the bases that the Government had not

established venue and also because "the government has put insufficient evidence into the record

to allow this case to proceed and be submitted to the jury." (Tr. 699; *cf.* Def. Br. at 47 (asserting

that Trial Counsel were "ineffective for not motioning for a judgment of acquittal under Fed. R.

Crim. P. 29 on the basis that the evidence was insufficient to sustain Teman's convictions.")).

After extensive colloquy by the Court and argument from the parties, and taking additional time

during a break in the trial day to consider the motion, the Court denied the Rule 29 motion.

Trial Counsel moved for a judgment of acquittal pursuant to Rule 29 for a second time at

the close of the defense case. (Tr. 938-939). Trial Counsel asserted that, "as a general matter that

as to all elements of all counts there is no reasonable basis that a reasonable jury even in the light

most favorable to the government could convict Mr. Teman. We would ask the Court to enter a

judgment of acquittal as to all possible counts." (*Id.*). The Court denied that motion as well.[4]

---

[4] The Government does not further address in the Argument section Teman's claim that Trial
Counsel "were also ineffective for not motioning for a judgment of acquittal under Fed. R. Crim.

## VI. The Verdict

On January 29, 2020, after deliberating for approximately one day, the jury returned a verdict finding Teman guilty on Counts One through Four of Indictment S2 19 Cr. 696 (PAE).

## VII. The Post-Trial Motions

On February 26, 2020, Teman, through Trial Counsel, made a written motion for a judgment of acquittal or, alternatively, a new trial, claiming that (1) there was a constructive amendment of the Indictment; (2) insufficient evidence established venue in the Southern District of New York; (3) insufficient evidence proved that Teman had made a material misrepresentation; (4) insufficient evidence proved that Teman possessed the requisite criminal intent; (5) the Government violated the "rule of sequestration"; (6) the District Court improperly excluded a proposed defense expert; and (7) an alternate juror lied during voir dire. (Dkt. 111). Included in Teman's arguments were a series of allegations about the Government

The District Court denied Teman's post-trial motions in a written opinion and order on June 5, 2020. (*See* Rule 29/33 Decision).

Trial Counsel continued to represent Teman after that ruling, making a sentencing submission on his behalf dated July 7, 2020. (Dkt. 145). However, in the midst of the COVID pandemic and after sentencing had been adjourned, on November 2, 2020, two new (also retained) attorneys, Noam Biale, Esq. and Justine Harris, Esq., entered appearances on behalf of Teman. (Dkts. 154, 155). Following an aborted sentencing hearing in December 2020, Teman filed a letter seeking to terminate Trial Counsel. (Dkt. 190). After additional back-and-forth and Teman's

---

P. 29 on the basis that the evidence was insufficient to sustain Teman's convictions." (Def. Br. at 47). The trial transcript shows that Trial Counsel did make such a motion—twice.

delay in retaining new counsel—after Teman fired Biale and Harris—the Court authorized Trial Counsel's withdrawal from their representation of Teman. (Dkts. 207). In a separate Order, the Court wrote that it wished to "thank and commend trial counsel for the energetic and high-quality representation of Mr. Teman and for their unflagging professionalism." (Dkt. 208).[5]

## VIII.   The Sentencing and the Ruling Granting Teman Bail Pending Appeal

On July 28, 2021, this Court sentenced Teman to a prison term of one year and one day, to be followed by three years' supervised release, and imposed $333,000 in forfeiture, $259,340.32 in restitution, and a mandatory $400 special assessment. (Dkt. 253).

At the hearing, Teman sought to continue his release on bail pending appeal, offering as a basis the ineffective assistance of Trial Counsel; and, namely, their decision to call Reinitz. (Sent. Tr. 111-12). After hearing argument from the parties, the Court swiftly and unambiguously rejected Teman's ineffective assistance claim on the merits. The Court, with the benefit of its "front row seat on the trial," found that, "[t]he *Strickland* standard is what dictates ineffective assistance, and both on the conduct prong and the prejudice prong, I find clearly that this is, in my opinion, a loser of an argument of ineffective assistance." (Sent. Tr. 114). In denying Teman's ineffective assistance claims at sentencing, the Court observed that, "Mr. Gelfand and Mr. DiRuzzo, far from being effective, were excellent and superior lawyers. Mr. Gelfand's advocacy . . . was actually quite special. It was really an eye opener. The ability he had to make something

---

[5] Trial Counsel were Teman's first attorneys, but far from his last. He has also retained the following attorneys: Noam Biale, Justine Harris, Susan Kellman, Andrew Frisch, Edoardo Maffia, Eden Quainton, and Thomas Butler; in addition, for a period, the Court appointed Karloff Commissiong. Unsurprisingly given the distortions and falsehoods targeting Trial Counsel that Teman advances in the Petition, he has expressed displeasure with other of his counsel as well.

out of very little throughout the trial, and I was quite impressed throughout by the lawyering both pretrial and trial . . . . [V]iewing the performance as a whole, I think defense counsel did a superb job, far from falling below a professional level of competence. They were at the very high end of things." (Sent. Tr. at 114). Commenting specifically on Trial Counsel's decision to call Reinitz, the Court stated that "was clearly within the realm of a debatable professional judgment." (*Id.*). The Court then analyzed that decision, contextualizing Reinitz's "memorable and . . . damaging" text messages against the "alternative world" in which "[i]f Reinitz doesn't testify, the defense has literally nothing." (*Id.* at 115). The Court, like the Gelfand and DiRuzzo Affidavits, reached the same conclusion:

> In other words, in a world of very few options, where you had frankly a between-the-eyes bank and wire fraud here, I understand why the defense went with Mr. Reinitz and hoped that a reputable Wall Street lawyer, who at least was prepared to give oral testimony that, if credited, would have been helpful to Mr. Teman, might have saved the day. I understand why, in the light of day, with all of us quoting the text messages, it looks differently. But in real-time, it was absolutely a debatable determination.

(Sent. Tr. at 115-16).

The Court also found no prejudice to Teman from Trial Counsel's decision to call Reinitz. If the defense case were excised, the Court correctly reasoned, "there is nothing left." The Court continued:

> You've got all customers saying we didn't authorize this. You have no contractual basis to argue that they had. The cross-examination, although vigorous and effective and exposing some inconsistencies and the like of the customers, did no damage on the fundamental issue of whether they had consented two remote checks in general or to the specific fees at all. It was destined to be a government verdict without something to change things.

(*Id.* at 116). The Court allowed for the possibility that another judge could reach a different conclusion, but made very clear that, "[f]or the record, I'm speaking to the Second Circuit, I'm not

16

buying that." (*Id.* at 117). The Court concluded that, "there was extremely effective assistance here" and that Trial Counsel's decision to call Reinitz "was absolutely debatable, absolutely justifiable, and completely non-prejudicial." (*Id.*).

## IX. Teman's Direct Appeal

On June 8, 2023, the United States Court of Appeals for the Second Circuit affirmed Teman's convictions. In its summary order affirming Teman's convictions, the Court of Appeals rejected Teman's claims that the Court should have recused itself and of Teman's perceived judicial bias, stating that it could "discern no impropriety in the district court's conduct." (Dkt. 30, "2d Cir. Op." at 7).

The Court of Appeals deemed Teman's ineffective assistance of counsel claim "premature" because "the record is not sufficiently developed to allow for appellate review." (*Id.* at 6). Noting that "the claim was raised only orally, at a post-sentencing hearing" the panel explained that "Teman's trial counsel thus did not have a chance to explain the strategy behind the decision to call Reinitz," and stated that Teman could present his claims in a § 2255 motion. (*Id.* at 6-7).

## X. The Petition

On October 30, 2024, Teman, through counsel Thomas Butler, Esq., filed the Petition and accompanying Brief. (Dkts. 458, 459).

On November 7, 2024, the Court issued an Order, finding that the Petition demonstrated a need for sworn testimonial statements from Trial Counsel, and directing that Teman, if he elected to proceed with the Petition, publicly file a form waiving attorney-client privilege as to Gelfand and DiRuzzo. (Dkt. 466). On November 18, 2024, Teman did so. (Dkt. 468). Thereafter, the

Court directed Gelfand and DiRuzzo to file sworn affidavits addressing the issues raised in the Petition. (Dkt. 469). They did so on January 31, 2025. (Dkts. 489, 490).

## ARGUMENT

### I. Applicable Law

#### A. Ineffective Assistance of Counsel

A claim that defense counsel was constitutionally ineffective is evaluated under the two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). To prevail, a petitioner must (1) show that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice." *Strickland*, 466 U.S. at 687-88, 693-94; *accord Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001); *Cullen v. United States*, 194 F.3d 401, 403 (2d Cir. 1999). Only if both of these elements are satisfied can the petitioner demonstrate that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* test, a reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). "Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective counsel." *Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009)

(defendant failed to show that "his counsel's decisions were anything other than strategic" or that "different choices would have had any likelihood of altering the outcome of the trial").

With respect to Trial Counsel's decision to present or forgo a particular defense, "[a] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *Dupont v. United States*, 224 F. App'x 80, 82 (2d Cir. 2007) (summary order) (quoting *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005)). "Counsel's election to forgo an unsupported argument plainly falls into th[e] category" of "[a]ctions or omissions by counsel that might be considered sound trial strategy"—not ineffective assistance. *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotation marks omitted). "Similarly, counsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" *Id.* (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)).

When considering the two prongs of *Strickland*, the Supreme Court has explained that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Under the second prong of *Strickland*, a defendant must meet the "heavy burden" of showing "actual prejudice." *Id.* at 692. To show prejudice, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94; *see, e.g., United States v. Levy*, 377 F.3d 259, 264 (2d Cir. 2004). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S.

at 693).  "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  *Strickland*, 466 U.S. at 693.

### B.  Limitations on Section 2255 Petitions

Title 28, United States Code, Section 2255 provides a mechanism to "vacate, set aside, or correct" a sentence imposed in violation of the laws or Constitution of the United States.  It is well settled, however, that § 2255 is not designed as a substitute for a direct appeal, *see United States v. Frady*, 456 U.S. 152, 165 (1982), and that a federal prisoner cannot use a Section 2255 motion to litigate questions that could have been raised on direct appeal but were not, *see Rosario v. United States*, 164 F.3d 729, 731 (2d Cir. 1999).  Thus, where a defendant has procedurally defaulted a claim by failing to raise it on direct appeal, the claim may be raised under Section 2255 only if the defendant "can first demonstrate either 'cause' and 'actual prejudice,' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations omitted).

In addition, it is well established that a Section 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'"  *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir. 1992)). "'Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal.'"  *Id.* (quoting *Chin v. United States*, 622 F.2d 1090, 1092 (2d Cir. 1980)).

These limitations on the scope of the claims that are viable in a Section 2255 petition cannot be avoided merely by repackaging defaulted or already considered claims under the rubric of a claim of ineffective assistance of counsel.  While a defendant does not procedurally default a claim of ineffective assistance of counsel that was not raised on direct appeal, *see Massaro v. United*

*States*, 538 U.S. 500, 508-09 (2003), the claim must focus on counsel's conduct under the *Strickland* standard. Absent that, a Court should not consider substantive claims repackaged as ineffective assistance of counsel claims on collateral review. *See Brown v. United States*, No. 95 Civ. 4368 (AGS), 1996 WL 479248, at *4 (S.D.N.Y. Aug. 23, 1996) (defendant's "attempt to recast his substantive arguments . . . in terms of ineffective assistance of counsel is unavailing," and the claims "are procedurally barred by his failure to raise them on direct appeal").

### C.  Procedures for Adjudicating Section 2255 Petitions

The filing of a Section 2255 petition does not, by itself, obligate the district court to conduct an evidentiary proceeding. *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977) (filing of motion "does not entitle petitioner automatically to a hearing"). Rather, a district court may summarily dismiss a Section 2255 petition where the defendant submits no supporting affidavit or fails to raise "detailed and controverted issues of fact." *Id.* Similarly, where the existing record "conclusively show[s] that the petitioner is entitled to no relief," summary dismissal may be appropriate. *Id.; see also* 28 U.S.C. § 2255; *United States v. Stantini*, 85 F.3d 9, 17 (2d Cir. 1996) (no need for further factual development because defendant failed to raise plausible ineffectiveness claim regarding attorney's performance in plea negotiations or at trial); *Hopkins v. Schillinger*, 866 F.2d 1185, 1211 (10th Cir. 1989) ("Conclusory allegations unsupported by specifics are insufficient to require a court to grant an evidentiary hearing, as are contentions that in the face of the record are wholly incredible.").

## II.  Teman's Ineffective Assistance Claims Are Meritless

Teman claims that Trial Counsel were constitutionally ineffective, levying a broad array of accusations about counsel's decision to call Reinitz as a witness; as well as purported failures

by Trial Counsel to seek to certain rulings, including the admission of purported evidence, and to make Rule 29 motion for acquittal during trial (which Trial Counsel did, twice); to request a competency evaluation or a continuance; call certain witnesses, including Shelly Pecot; request a copy of a housing transcript during trial; alert the Court to claimed juror misconduct; and to raise various claims relating to Teman's faith and the Court. These allegations range from disingenuous to absurd to just plain wrong. None has merit and many of Teman's arguments are retreads that have been exposed as false, illogical, and/or misguided, in other contexts. These allegations are both unsupported by the record—indeed, contradicted by it—and legally fall far short of deficient performance of counsel under *Strickland*. Moreover, Teman cannot show that he was prejudiced by Trial Counsel's performance. Indeed, counsel's effective advocacy throughout the case resulted in, at one point, dismissal of Count One of Indictment S1 19 Cr. 696 (PAE), and contributed to the Government's decision not to proceed on Counts Five and Six of Indictment S2 19 Cr. 696, which would have exposed Teman to the possibility of two consecutive two-year mandatory minimum sentences—where, in the end, Teman was sentenced to one year and one day of imprisonment and served a number of months short of that.

Contrary to the assertions in his Brief, the story is a familiar one for Teman: He refuses accountability for his criminal conduct and continues to blame others, who, in this instance, capably and doggedly defended him against a challenging Government case. For the reasons set forth below, the Court should summarily dismiss the Petition without a hearing.

### A. Trial Counsel's Performance Was Not Deficient

#### 1. The Decision to Call Reinitz

Teman's hyperbolic assertion that calling Reinitz was "catastrophic and virtually guaranteed a conviction in a case where the jury could easily have voted to acquit," (Def. Br. 29),

ignores the context of the trial. That context was clear during trial and is explained, in detail, in the Gelfand and DiRuzzo Affidavits. At bottom, without Reinitz's testimony—given Teman's own issues as a witness, including his possible exposure to uncharged criminal conduct, which was spotted by Trial Counsel—Teman would have been unable to admit the "payment terms" page that was the cornerstone of his defense. Reinitz, an attorney, also supported Teman's defense by testifying that he told Teman that creating RCCs was legal. (Tr. 774-75). The Government's ability to admit incriminating text messages through Reinitz does not negate the potential benefits of Reinitz's testimony for the defense. As the Court recognized at Teman's sentencing hearing, the decision to call Reinitz could be second-guessed in retrospect, just as *Strickland* expressly warns against the "distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689. As the Court observed:

> Reinitz at least gave the defense something. Reinitz gave oral testimony that he told Mr. Teman, in effect, notwithstanding the text messages, something about this or that, at least the creation of remote checks was legal. I think the jury rather obviously rejected that and found the written text messages to be far more dispositive and found it relevant that Reinitz never ever memorialized that purported advice, and the other elements of advice of counsel weren't met either.

> In other words, in a world of very few options, where you had frankly a between-the-eyes bank and wire fraud here, I understand why the defense went with Mr. Reinitz and hoped that a reputable Wall Street lawyer, who at least was prepared to give oral testimony that, if credited, would have been helpful to Mr. Teman, might have saved the day.

(Sent. Tr. 115-16). Trial Counsel's assessment comports with that view. The Gelfand Affidavit provides a realistic and to-the-point summary of the decision to call Reinitz: "As trial counsel faced with the factual and legal backdrop we were in, we did consider the significant possible downside with calling Mr. Reinitz and, with Mr. Teman's full agreement, we collectively made the tactical decision to call Mr. Reinitz in large part because it was the only card we had to play."

(Gelfand Aff. ¶ 19). DiRuzzo agreed, concluding, "[a]t bottom, without the testimony of Mr. Reinitz there would not have been a reliance of counsel defense, no jury instruction would be given, and [Teman] wouldn't have had any articulable theory of the case to argue to the jury." (DiRuzzo Aff. ¶ 4(e)). These unequivocal descriptions of Trial Counsel's decision-making before and during trial provide no basis to conclude that Trial Counsel's representation fell "outside the wide range of professionally competent assistance," *Strickland* 466 U.S. at 690.

Indeed, "[i]n evaluating counsel's effectiveness, a court assesses the case from the viewpoint of the attorney *at the time of the challenged conduct or omission*." *Parisi v. United States*, 529 F.3d 134, 141 (2d Cir. 2008) (emphasis added); *Lockhart v. Fretwell*, 506 U.S. 364, 371-72 (1993). In light of this standard, "the record must demonstrate that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment.'" *Strickland*, 466 U.S. at 690. The "Second Circuit has also recognized that '[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.'" *United States v. Romero*, No. 91 CR. 586 (RPP), 1993 WL 485677, at *7 (S.D.N.Y. Nov. 22, 1993), aff'd, 54 F.3d 56 (2d Cir. 1995) (*quoting United States v. Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987)). Courts have generally recognized that tactical decisions concerning which witnesses to call to testify are "ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000). The facts of Teman's prosecution—where, by the Court's observation and Trial Counsel's evaluation, establishing that Teman did not have fraudulent intent through the introduction of "payment terms" was the "only card to play," (Gelfand Aff. ¶ 19)—make clear that Trial Counsel's decision to call Reinitz, at Teman's

24

suggestion and with his encouragement, cannot meet the high legal threshold to show deficient performance.[6]

To the contrary, Teman faced overwhelming evidence of his guilt.  In this Petition, as in his prior motions, Teman continues to attempt to erect an alternate reality that fails to engage with this fact.   Teman's Brief dedicates nearly five pages to copying a block quote from the Government's summation about Reinitz's testimony and Teman's advice-of-counsel defense. (Def. Br. 34-39).  It conveniently, ignores, however, the first more than 20 transcript pages of the Government's initial submission.  (*See* Tr. 976-999).   That summation included facts not in dispute, including the foundational narrative of the case:  West 204, 18 Mercer, and the ABJ Properties stopped using Teman's intercom system, he issued 29 checks against their bank accounts totally $333,000, which he "created from scratch and deposited[] . . . in his bank account[.]"  (Tr. 978-79).   Then, the Government focused in detail on the evidence proving Teman's fraudulent, criminal intent, providing a list of reasons that the evidence demonstrated

---

[6] Almost as an afterthought, Teman argues that if Trial Counsel elected to call Reinitz, they should have requested a limiting instruction—effectively, to admit the evidence and portions of Reinitz's testimony helpful to Teman and exclude those that were not.  (Def. Br. at 52-54).  In support of this argument, Teman cites to boilerplate law articulating the standard statements of Rule 403, the Sixth Amendment's right to trial, and that juries follow limiting instructions.  He does not, however, meaningfully engage with a realistic, albeit *post hoc*, application of the rules of evidence, and how the result he envisions might have been accomplished beyond wishing for it.   Trial Counsel recognizes as much, explaining that, "By placing 'reliance on counsel' into play—a strategy Mr. Teman not only agreed with but insisted on—there was no good faith basis in seeking to exclude the negative statements from Mr. Reinitz to Mr. Teman.  And in my view as a trial lawyer, a limiting instruction often draws attention to a fact to the jury that would not otherwise be emphasized."  (Gelfand Aff. ¶ 24).  Accordingly, this argument, like the rest of Teman's Reinitz-based arguments, should be rejected, as "[t]he failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a defendant is] entitled."  *Forbes v. United States*, 574 F.3d 101, 106 (2d Cir. 2009).

Teman's guilt: (1) that his customers never gave permission for Teman to draw checks on their accounts (Tr. 980-985); (2) the timing of Teman's fraudulent checks, with the original check draw on West 204's account in March 2019, followed by his doubling down with the remaining fraudulent withdrawals in April 2019 (Tr. 985-86); (3) Teman never sent invoices to his customers for the fees he charged (Tr. 986-88); (4) that the "removal" fees Teman stole, totaling more than $300,000 were totally disproportionate to the amount his customers had paid for Teman's service in the first instance (Tr. 988-89); (5) the Teman was well-aware of lawful means to recover money he believed he was rightfully owed, *i.e.*, lawsuits and liens, but chose to simply create checks and steal from his customers instead (Tr. 989-90); (6) that the checks themselves plainly were fake and that Teman attempted to make them look real (Tr. 990-992); (7) the timing of Teman cashing the April 2019 checks, right before the Passover holiday, corroborated by Teman's exceedingly-memorable email to Gabay, threatening to, "place a lien on your building on Pessach," (Tr. 992-93; *see also* Tr. 354-55, GX 418), followed by Teman, in fact, depositing certain of the fraudulent checks on the eve of Passover, *see also* Dkt. 380 ("2d Cir. Op.") at 8; Dkt. 437 at 3; (8) Teman's immediately moving the money he deposited from the fraudulent checks from between his accounts, before Bank of America could freeze those funds (Tr. 993-995).

Only after reviewing that evidence did the Government turn to the defense arguments. In doing so, the Government made clear that "the government bears the burden of proof in this case" and "[t]he defendant has no obligation to cross-examine witnesses, or to put on any evidence, or to call any witnesses[.]" (Tr. 995). Even then, the Government first addressed Teman's argument that he was "authorized" by contract to draw the checks on his customers' accounts, *i.e.*, the front-line argument that the defense advised, which was possible only *because* Reinitz testified, before

then addressing Teman's advice-of-counsel defense. (Tr. 995-1006). Put differently, Trial Counsel's decision to call Reinitz gave Teman a viable defense, without which he would have had no rejoinder to the prosecution's overwhelming evidence of his criminal intent.[7]

### 2. The Purported Failures to Introduce Evidence and Call Witnesses

Next, in addition to taking issue with the witness Trial Counsel did call, Teman takes issue with the strategies Trial Counsel did not pursue. Those include Trial Counsel's claimed failure to (1) "admit the valid 2016 terms," (2) "conversations and [e]mails," and (3) to call certain witnesses, including Shelly Pecot. (*See* Def. Br. at 44-51, 58-66). As a threshold matter, Teman raised *none* of these arguments in his direct appeal; rather, with respect to his argument on direct appeal that Trial Counsel's performance was ineffective, Teman focused exclusively on the decision to call Reinitz. (*See* 21-1920 Dkt. 90 at 49-51, which appears nearly verbatim in Def. Br. at 41-44). These "substantive claims repackaged as ineffective assistance of counsel claims" are arguably procedurally defaulted. *See Brown* 1996 WL 479248 at *4. Regardless, for the reasons described below, as well as in the Gelfand and DiRuzzo Affidavits, these arguments fall far short on the merits of establishing that Trial Counsel performed deficiently.

Teman's claims do not come close to meeting the applicable legal standard. "Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective counsel." *Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009) (defendant failed to show that "his

---

[7] Teman's argument about the Government's rebuttal summation is beside the point. (Def. Br. 43-44). The entire purpose of a rebuttal summation is to *rebut* the defense's arguments. Here, and as set forth above, the fact that the defense had any arguments at all owed to the admission of the "payment terms" through Reinitz, and his testimony that allowed Trial Counsel to argue that Teman believed he was authorized to draw these checks and did not have criminal intent.

counsel's decisions were anything other than strategic" or that "different choices would have had any likelihood of altering the outcome of the trial"). With respect to Trial Counsel's decision to present or forgo a particular defense, *i.e.*, not seeking to admit particular evidence or calling certain witnesses, "[a] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *Dupont*, 224 F. App'x at 82. This is especially so, where, as here, counsel foregoes "unsupported argument[s]," which "plainly falls into th[e] category" of "[a]ctions or omissions by counsel that might be considered sound trial strategy"—not ineffective assistance. *Best*, 219 F.3d at 201.

*First*, as to Teman's claim that Trial Counsel were ineffective because they failed to admit the "Valid 2016 Terms," counsel have been clear any such terms, even assuming *arguendo* their existence, were not available to the defense during trial. (*See* Gelfand Aff. ¶ 22; DiRuzzo Aff. ¶ 5(a)). In effect, Teman blames his counsel for not having the possible silver bullet to demonstrate his absence of criminal intent—but, in point of fact, Trial Counsel tried repeatedly to obtain that *from Teman*. "To be clear, we expressly asked for the metadata from this technology company [GateGuard] that supported Mr. Teman's contention that these customers accepted the various iterations of the terms and conditions he sought to introduce. But not a single witness or reliable document provided in advance of trial supported that contention—and our requests for metadata were met with silence." (Gelfand Aff. ¶ 22; *see also* Tr. 748). DiRuzzo expresses similar puzzlement, observing that, "[Teman] and his companies lacked the documentary evidence regarding the terms and conditions used by customers of GateGuard. I found it to be curious that a purported 'tech' company lacked the various iterations of the terms and conditions that its customers purportedly signed." (DiRuzzo Aff. ¶ 5(a)). In summary, "Teman and his technology

company did not provide a credible road to admissibility of the document he now claims we should have introduced into evidence." (Gelfand Aff. ¶ 22). Teman's logic is twisted; he now blames Trial Counsel for not seeking to admit a document he failed to provide, despite Trial Counsel's recognition of the significance of such a document and their repeated attempts to obtain it—if, in fact, such a document ever actually existed. There is no evidence that was the case. (*See* DiRuzzo Aff. ¶ 5(a) ("Moreover, to the best of my recollection, neither [Teman] nor GateGuard had any evidence that its customers actually agreed to the terms and conditions (there were no signatures, nor 'Docusign' documents).")).

*Second*, Teman complains that Trial Counsel did not seek to admit certain emails from Bank of America. (Def. Br. Ex. 2). In general, the emails contain correspondence from Reinitz to personnel at Bank of America dated from May 2019 seeking to unfreeze certain of Teman's accounts and providing purported documentation in support of that request. Teman claims that these communications, including in particular an email dated May 28, 2019, "cited specific sections of GateGuard's terms and attached invoices and supporting documents." (Def. Br. at 45). As an initial matter, and as the Gelfand Affidavit correctly notes, these emails very likely would have been deemed inadmissible self-serving hearsay. (Gelfand Aff. ¶ 23). So too would have been testimony from Reinitz to the effect that, in substance, his emails seeking to unfreeze the accounts showed that Teman lacked *mens rea*. Even so, at best, the emails and that theoretical testimony would show that Teman sought to unfreeze his accounts *after* committing the fraud, *i.e.*, trying to unfreeze his ill-gotten gains, based on the same faulty documentation that Trial Counsel could not use to disprove Teman's criminal intent at trial. At worst—and, in context, more likely— these emails appear to protest too much. Teman's demands, through Reinitz, to unfreeze his

accounts, could have presented "a very real argument that, in the event this was bank fraud and/or wire fraud (as the prosecution alleged), Mr. Teman's statements to Bank of America could be alleged to have constituted a continuation of that fraud." (Gelfand Aff. ¶ 23). A (very) reasonable interpretation of these emails would be that reflect *additional* misrepresentations to Bank of America, which could have "raised more questions than answers." (*Id.*). Choosing not to seek their admission, which was unlikely regardless, is clearly within the ambit of strategic decisions that Trial Counsel were permitted to make.

*Third*, Teman alleges that Trial Counsel's performance was deficient because they failed to call certain defense witnesses, including Pecot. In applying *Strickland*, reviewing courts are "especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury," *Greiner*, 417 F.3d at 323, and whether to call specific witnesses is a strategic call "ordinarily not viewed as a lapse in professional representation," *id.* (quoting *Best*, 219 F.3d at 201). To overcome the presumption that counsel acted effectively, Teman would have to show that Trial Counsel decision not to call these witnesses resulted from incompetence or negligence or pure luck. *See id.* at 320. He cannot make that showing. To the contrary, Trial Counsel "attempted to speak with literally every possible witness Mr. Teman asked us to reach out to (directly or through counsel) and we interviewed a number of possible witnesses. Based on what those witnesses shared with us, their testimony would not have been favorable to Mr. Teman's defense, so we made the strategic decision not to call them." (Gelfand Aff. ¶ 29). That, under the relevant legal standard, effectively ends any inquiry.

However, for avoidance of doubt, Teman does not make any showing that these uncalled potential witnesses would have been helpful to his defense. Teman dedicates a single paragraph

to three claimed possible witnesses, and provides no sworn documentation in support of his argument, simply a conclusory claim that their testimony would have shown that, "customers had knowledge of the online dispute terms, which allow the deposit of RCCs." (Def. Br. at 58). Somewhat unbelievably, Teman then argues that the defense should have called Pecot as a witness. (Def. Br. at 59-66). This contention ignores two facts, either and both of which easily defeats Teman's claim: (1) Trial Counsel "did attempt to subpoena Ms. Pecot *as a possible witness*"; and (2) Trial Counsel's "diligence in advance of trial revealed correspondence between Mr. Teman and Ms. Pecot that painted Mr. Teman unfavorably." (Gelfand Aff. ¶ 30; *see also* Dkt. 399 at 4, Ex. A (Jan. 17, 2020 Email and Attachment, in which Pecot advised Trial Counsel's process server that she would be out of the country and unavailable for trial)).

Teman previously made this argument—almost verbatim (Dkt. 394 at 4-7)—and the Court resoundingly rejected it. (Dkt. 402, Oct. 6, 2023 Opinion & Order).[8]  The Pecot-related argument in the Petition is instructive of Teman's overall approach to post-trial litigation. The basic contention—that the defense did not seek to call Pecot as a witness at trial—is false; the value judgment that Pecot's testimony would be helpful is contradicted, quite obviously, by the record of Teman's communications with Pecot; and, beyond all that, after the Court forcefully rejected Teman's Pecot-related arguments in the context of a Rule 33 motion, styled as an emergency motion by Teman to delay his then-pending surrender date, Teman simply copy-and-pasted the same argument into this 2255 Petition. And, taking a step back from all that, is the craven nature of this argument—Teman *first* argued, in the context of Rule 33, that his emails with Pecot (of

---

[8] The Pecot-related arguments are *currently* the subject of yet another groundless appeal to the Second Circuit filed by Teman. *See United States v. Teman*, 24-345.

which he was obviously aware) constituted "newly discovered evidence" after trial (*see* Dkt. 394);

now, he argues that Trial Counsel were ineffective for not seeking to call Pecot as a witness and

introduce these materials.  In short, Teman's Pecot-based argument bears all the hallmarks of his

years-long campaign of post-trial litigation: a false assertion, untethered to reality, and which is

"duplicative" of prior motions that have been denied.  *See, e.g.*, *Mai Sa v. Doe*, 406 F.3d 155, 158

(2d Cir. 2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits,

courts may impose sanctions, including restrictions on future access to the judicial system.").  This

effort should be rejected as well.

### 3.  Competency Evaluation and/or Adjournment of Trial

Teman next argues that his trial counsel failed to act reasonably when they failed to request

a competency evaluation or to request an adjournment.  (Def. Br. at 54-57).  This argument, again,

relies on a brief exposition of cherry-picked transcript citations, as well as medical records Teman

has appended to prior motions seeking relief. And, again, it is entirely belied by the Gelfand and

DiRuzzo Affidavits.

Trial Counsel are unequivocal in their view that Teman was competent to stand trial.

According to the Gelfand Affidavit:

> Without question, Mr. Teman did not lack competence during his criminal case.
> Mr. Teman was always fully engaged during our attorney-client relationship and
> was very involved with the defense team as we worked on his case, regularly
> communicating with his lawyers in a way that reflected he understood the
> proceedings and the ramifications of certain decisions assisting with his own
> defense.  In the weeks leading up to trial, Mr. Teman and I spent several days
> together in person in St. Lous—and we had the opportunity to interact both in the
> office and in out-of-office settings.  I never questioned Mr. Teman's competence.

(Gelfand Aff. ¶ 26).  Gelfand's assessment, in particular, carries substantial weight given that he

had known Teman since both were undergraduates at Brandeis, and therefore had both a reference

32

point well in advance of the criminal case and longstanding familiarity with Teman. (Gelfand Aff. ¶ 25 ("Unlike most clients, I also had the benefit of knowing Mr. Teman prior to our attorney-client relationship . . . .  While we were not particularly close friends in college, I communicated and interacted with him.  Mr. Teman was the same person.").  From that vantage point, and as documented in court filings, Gelfand notes his belief that Teman "struggled with certain mental health conditions," and also that, "consistent with the conditions of his release, Mr. Teman saw a mental health professional." (*Id.*).  DiRuzzo shared the same view, stating that, "Teman wasn't incompetent, far from it.  He appreciated the nature of the proceedings, actively engaged with his attorneys . . . and had lucid and insightful discussions before, during, and after trial.  At no point in time was there anything that would have led me to believe that [Teman] was not competent." (DiRuzzo Aff. ¶ 6(b)).  In keeping with those assessments, Teman (nor the Government) ever requested a competency evaluation.

The same is true of Teman's argument, in hindsight, that Trial Counsel was ineffective for failing to request an adjournment of trial.  Teman includes this complaint in the heading of his argument also blaming Trial Counsel for not requesting a competency evaluation (Br. at 54), but only references a continuance, in substance, in the context of obtaining housing court documents (Br. at 69-70).  In any event, Teman's arguments on this point are, again, revealed to be contrary to his position at the time of trial.  Trial Counsel "expressly communicated with Mr. Teman that we could seek an adjournment of the trial date" but he was "adamantly opposed to a continuance, convicted he would be acquitted notwithstanding the risks and determined not to be under the conditions of release any longer." (Gelfand Aff. ¶ 27).  Even if Teman *had* wanted to make a request to adjourn trial, which he did not, Trial Counsel also—in accordance with Teman's

wishes—made a strategic decision to do so.  To be sure, the time from Teman's being arrested in July 2019 to trial in January 2020 was a relatively short one.  But that was, at least in part, the defense's strategy.  Trial Counsel were concerned that, with additional time, the Government "would expand the scope of its investigation."  (Gelfand Aff. ¶ 27).  In particular, and as set forth above, Trial Counsel "were concerned that if the Government had bothered to pull [Teman]'s personal income tax returns (i.e. form 1040) or the returns for GateGuard, it would be apparent that [Teman] had failed to file the required tax returns."  (DiRuzzo Aff. ¶ 6(b)).  Along with the possible criminal tax exposure Teman may have faced through additional investigation, in his Affidavit, Gelfand alluded to his view that, "the prosecution never entirely connected certain dots during trial," in the context of RCCs, suggesting that, there too, further investigation by the Government may not have benefitted Teman.  (Gelfand Aff. ¶ 16).

### 4.  Teman's Remaining Claims

Teman's remaining claims alleging Trial Counsel's purportedly deficient performance are even less substantive than those described above and should be swiftly rejected.  All three arguments—seeking a copy of Soleimani's housing court testimony, alleged alternate juror misconduct, and requesting the Court's recusal—were (1) raised in Teman's post-trial motions and denied in the Court's Rule 29/33 Decision, and not raised on direct appeal; and/or (2) rejected both in the Rule 29/33 Decision and the Second Circuit.  In either event, these arguments either were explicitly foregone or pursued on direct appeal, and a § 2255 petition cannot be used to "relitigate questions which were raised and considered on direct appeal."  *Sanin*, 252 F.3d at 83.

*First*, Teman argues that Trial Counsel failed to act reasonably by not requesting a copy of the transcript of Soleimani's testimony in housing court.  (Def. Br. at 66-71).  This argument was

raised in Teman's first round of post-trial motions (Dkt. 118) and thoroughly reviewed and rejected

by the Court in its Rule 29/33 Decision at 87-101.  Teman did not pursue this Soleimani-based

claim on direct appeal.  As with numerous of Teman's other claims, the factual underpinning of

this one is misplaced.  As the Gelfand Affidavit points out, at trial, the Court directed the

Government to inquire further about Soleimani.  (Gelfand Aff. ¶ 31; *see also* Rule 29/33 Decision

at 96, n.35 (noting that the Court directing the Government to report back to the Court about the

transcript, that the transcript did not come into the Government's possession until after trial, and

that "it is clear that this evidence was not material—there is no reasonable probability that the trial

outcome would have been different had the Housing Court transcript been disclosed.")).  In any

event, Trial Counsel, "made the strategic decision on cross-examination to elicit favorable

testimony from Mr. Soleimani instead of outright attacking him in a *carte blanche* manner while

simultaneously impeaching his credibility where appropriate and tactical."  (Gelfand Aff. ¶ 31).

In other words, even if Teman were not attempting to reconstitute this previously litigated claim

in the context of his Petition, Trial Counsel made a strategic decision regarding their cross-

examination of Soleimani that was well-within their discretion.  *United States v. Luciano*, 158 F.3d

655, 660 (2d Cir. 1998); *see Moreno-Godoy v. United States*, No. 13 Civ. 2383 (JSR) (GWG), No.

07 CR 354, 2014 WL 1088300, at *2 (S.D.N.Y. Mar. 20, 2014) (noting that "decisions about

whether to engage in cross-examination, and if so to what extent and in what manner, are strategic

in nature and generally will not support an ineffective assistance claim" and holding that courts

"should not second-guess such decisions unless there is no strategic or tactical justification for the

course taken") (internal quotations and alterations omitted), *report and recommendation adopted*

(S.D.N.Y. Aug. 4, 2014).

*Second*, Teman argues that Trial Counsel acted unreasonably when they "failed to alert the Court to juror misconduct." (Def. Br. at 71-73). This too was raised in Teman's immediate post-trial motions, rejected by the Court's Rule 29/33 Decision at 83-87, and foregone by Teman on direct appeal. Teman claims that he "immediately informed trial counsel during trial that Juror #13 was making dirty looks at him and whispering to other jurors, and had even . . . made a LinkedIn request to Teman." (Def. Br. at 72). This is, again, contradicted by a sworn affidavit from Teman's Trial Counsel. (Gelfand Aff. ¶ 32 ("To be clear, as best I can recall, Mr. Teman did not express any concern about this juror's purported 'dirty looks' during the jury selection portion of the trial," Teman's "after-the-fact narrative of what transpired does not accurately reflect what happened during *voir dire*" or what was learned after trial, and "[w]hile we advocated zealously for our client in post-trial motions and raised this issue for the Court's consideration, there was no reasonable basis brought to the attention of us at the time of trial to raise an issue with respect to this juror with the Court."). Even now, Teman simply co-signs the factual assertions in his Brief, and does not submit a sworn affidavit specifically set forth purported facts about this juror; regardless, and in any event, the Court has already determined that, even if he had, Teman's claims—about an alternate juror, not a deliberating one—should be rejected. (Rule 29/33 Decision at 83-87). This is, of course, even before reaching the facts set forth in the Gelfand Affidavit, referenced *infra*, recounting Teman's attempt to improperly, and potentially illegally, seek to undermine the verdict by using a "burner phone" to place an anonymous call to the FBI about this topic, which is itself an independent basis to (at a minimum) deny this claim. (Gelfand Aff. ¶ 32).

*Third*, and finally, Teman makes a series of incoherent arguments leveling the claims that (1) Trial Counsel failed to call a witness and/or advance arguments relating to Teman's faith; and

(2) to move for the Court's recusal. (Def. Br. at 73-75). Variations of these arguments were raised on direct appeal and unequivocally rejected by the Second Circuit. The Second Circuit ruled that "[t]here is nothing to Teman's argument that Judge Engelmayer was required to recuse himself . . . ." (2d Cir. Op. at 7). On the, at least in Teman's Brief, related topic of bias relating to Teman's faith, the Second Circuit explicitly recognized that "the court's comment that [Teman] timed his deposits of the checks for the eve of Passover to ensure that his counterparties, observant Jews, would not be able to contest the checks for the next two days" was both "formed by the judge on the basis of the facts introduced" at trial and a "reasonable" one, in view of Teman's threat to Soleimani to "place a lien on your building on Pessach"—which Teman, in fact, carried out. (2d Cir. Op. at 8). Gelfand, for his part, expresses the views that there was no basis to call a witness to "testify about certain aspects of Judaism." (Gelfand Aff. ¶ 33). With respect to Teman's wished-for motion to recuse the Court during trial, Trial Counsel correctly asserts that "such a motion would have been frivolous and not in Mr. Teman's best interest." (Gelfand Aff. ¶ 34). Moreover, and for avoidance of doubt, Gelfand "stand[s] behind that decision and would make the same decision today." (*Id.*).[9] This argument, which is procedurally barred and substantively absurd, should be rejected.

---

[9] The Court has, over the years, addressed with care Teman's many often-frivolous motions. Although the Court has thus far limited its designation as "vexatious" only to certain motions for the Court's recusal made by Teman—those based on claims involving Biale and/or Harris, *see* Dkt. 488—the Government could conceive of a broader array of Teman's repeat motions, for recusal and otherwise, being properly deemed as such.

**B.   Teman Suffered No Prejudice from Trial Counsel's Performance**

Given the strength of the Government's evidence against him, Teman also cannot show the Trial Counsel's decision to call Reinitz, or to do or not do any of the other multitude of things Teman alleges, affected the jury's verdict.   As to Reinitz specifically, without his testimony, Teman would have had no defense to the customers' testimony that they did not authorize Teman's fraudulent checks.   As the District Court commented at sentencing, and as referenced above, Reinitz's testimony was necessary to help the defense try to offset the overwhelming proof of Teman's guilt:

> I don't find prejudice.   Here is why I don't find prejudice.   If you eliminate the counsel testimony and the defense case, in effect, from the trial, there is nothing left there.   You've got all the customers saying we didn't authorize this.   You have no contractual basis to argue that they had.   The cross-examination, although vigorous and effective and exposing some inconsistencies and the like of the customers, did no damage on the fundamental issue of whether they had consented [to] remote checks in general or to the specific fees at all.   It was destinated to be a government verdict without something to change things.

(Sent. Tr. at 116).   Far from prejudicing Teman's defense, under the circumstances, including the evidence presented by the Government in its direct case and potential for additional criminal exposure were Teman to take the stand, calling Reinitz was the "only card" the defense had to play.   (Gelfand Aff. ¶ 19).   Teman cannot, and has not, demonstrated a reasonable probability that, but for the decision to call Reinitz as a witness, the jury would have returned a different verdict.

Assuming *arguendo* that Trial Counsel's performance was deficient—it was not—Teman must still "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.   He cannot. The Government's trial evidence was overwhelming.   The Government presented testimony from three representatives of Teman's customers, who each testified that they did not authorize Teman

to draw deposits on their accounts; the checks themselves, as well as the timeline of their deposit and communications by Teman surrounding those dates; and testimony by a witness from Bank of America, who explained the losses the bank sustained from Teman's fraud. In the backdrop of all this was the sequence of events, with Teman depositing the first fraudulent checks in March 2019, then doubling down the following month, in April 2019, and moving the stolen funds among his accounts at Bank of America to avoid their being frozen. In the face of this evidence, summarized here and detailed in prior filings, *see, e.g.*, Rule 29/33 Decision at 2-12, Teman cannot demonstrate that, had Trial Counsel *not* called Reinitz or taken any of the actions Teman wishes he had, the outcome of the trial would have been different. Indeed, it may have been worse—Trial Counsel's strategic decisions, including to press forward with trial in January 2020 and advice that Teman not testify in his own defense, may have saved Teman from additional criminal exposure for tax-related crimes; and, as noted above, Trial Counsel identified possible issues with Counts Five and Six of Indictment S2 19 Cr. 696 (PAE), the aggravated identity counts, on which the Government did not proceed at trial. These outcomes, along with Trial Counsel successfully moving to dismiss Count One of Indictment S1 19 Cr. 696 (PAE), speak to Trial Counsel's effectiveness and demonstrates that Teman was not prejudiced by their representation.

## III.  An Evidentiary Hearing is Not Necessary

The filing of a Section 2255 petition does not, by itself, obligate the district court to conduct an evidentiary proceeding. *Newfield*, 565 F.2d at 207 (2d Cir. 1977) (filing of motion "does not entitle petitioner automatically to a hearing"). Where, as here, the existing record "conclusively show[s] that the petitioner is entitled to no relief," summary dismissal may be appropriate. *Id.*; *see also* 28 U.S.C. § 2255. Even where the defendant's petition survives this initial hurdle, the district

court still is not required to hold an evidentiary hearing to resolve disputed factual issues. Instead, the district court has the discretion to choose a "middle road" and resolve the petition based on written material, such as affidavits from relevant witnesses. *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003) ("Our precedent . . . permits a 'middle road' of deciding disputed facts on the basis of written submissions."); *Chang v. United States*, 250 F.3d at 86 (finding it "within the district court's discretion" to choose the "middle road" of deciding the case based on written submissions, including affidavits); *Raines v. United States*, 423 F.2d 526, 529-30 (4th Cir. 1970) ("There is a permissible intermediate step that may avoid the necessity of an expensive and time consuming evidentiary hearing in every Section 2255 case. It may instead be perfectly appropriate, depending upon the nature of the allegations, for the district court to proceed by requiring that the record be expanded to include letters, documentary evidence, and, in an appropriate case, even affidavits.").

This Court—which has intimate knowledge of this case from inception to the present day—has all the information required to decide the claims advanced based on the voluminous record before it.[10] Notably, that includes the Gelfand and DiRuzzo Affidavits, in addition to Teman's own sworn Affidavit in support of the Petition and Brief. Beyond that, and as set forth above, Teman has previously advanced many of the same arguments, some verbatim, in prior motions and forums; certain of which this Court and the Second Circuit have already rejected. Accordingly, it is well within this Court's discretion to decide the Petition based on the record currently before it and thus to avoid the "delay, the needless expenditure of judicial resources, the burden on trial

---

[10] In direct answer to the Court's Order at Dkt. 469, the Government does not believe whether additional testimony or fact-finding is necessary to resolve this motion.

counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing."  *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (upholding the district court's decision to decide a habeas petition based on briefing and affidavits where the court concluded testimony would add "little or nothing to the written submissions" and the court was "intimately familiar with the trial proceedings and the events and circumstances surrounding them").

41

## <u>CONCLUSION</u>

For the foregoing reasons, the Petition should be denied in its entirety without an evidentiary hearing.  Because Teman has not made a substantial showing of the denial of a constitutional right, no certificate of appealability should issue.

Dated: New York, New York
       April 7, 2025

                                        Respectfully submitted,

                                        MATTHEW PODOLSKY
                                        Acting United States Attorney for the
                                        Southern District of New York


                            By:    _Jacob Gutwillig_____
                                        Jacob H. Gutwillig
                                        Assistant United States Attorney
                                        212-637-2215