UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:19-cr-00696-PAE-1

---------------------------------------------X

ARI TEMAN,                               :
                                         :
                    Petitioner,          :
                                         :
v.                                       :
                                         :
UNITED STATES OF AMERICA,                :
                                         :
                    Respondent.          :
_____X

## VERIFIED REPLY MEMORANDUM IN SUPPORT OF DEFENDANT ARI TEMAN'S MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENT AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

Defendant Ari Teman (or "Teman"), through undersigned counsel, files this Verified Reply Memorandum in Support of Defendant Ari Teman's Motion to Vacate, Set Aside, or Correct Judgment and Sentence Pursuant to 28 U.S.C. § 2255, and states:

## ARGUMENT

Teman respectfully adopts and incorporates each argument herein.

**A. Counsel's Ineffectiveness Prejudiced Teman.**

**1. Reinitz' testimony was toxic evidence virtually assuring a conviction.**

The Government's Memorandum of Law in Opposition to Teman's Motion to Vacate Pursuant to 28 U.S.C. § 2255 (or "Memorandum") mistakenly argues that the calling of Reinitz was the only viable defense option for Teman.

**2. However, Teman's Trial Counsel Failed to Admit the Valid 2016 Terms, conversations and Emails and Actually Did Motion for a Judgment of Acquittal Under Fed. R. Crim. P. 29, But Did Not Make Any Specific Argument that there was Insufficient Evidence and in Any Event Could Not Make the Argument Because Trial Counsel Failed to Admit the Valid 2016 Terms.**

Teman's trial counsel failed to admit the valid 2016 terms (DE459-1)[1], which permitted Teman to make the deposits.  Instead, Teman's trial counsel attempted to admit the 2019 terms, which Judge Engelmayer ruled inadmissible because it was dated subsequent to the signing up in 2019.  (A-881-886).  For example, Judge Engelmayer indicated "The problem is that I'm not going to permit this document.  You had loads of time to prepare for an advice-of-counsel defense.  Get the document in evidence that bound these customers.  They did not buy into payment terms that were revised on January 27, 2019.  This is lawyering 101."  (A-884).

However, on January 20, 2020, Teman emailed and made his trial Counsel aware of the correct timely terms that bound the customers to

---

[1] In 2016, GateGuard was Subletspy.  The Dispute Terms have not changed since 2016.

permit Teman to make the deposits.  <u>See</u> Exhibit 1 (Sworn Declaration of Ari Teman).   Note, in candor to the Court, Teman had furnished trial Counsel with Mr. Hammer's email dated February 23, 2017 to trial Counsel on January 20, 2020 and in note also, Teman had furnished the May 10, 2016 Mr. Hammer email to trial Counsel subsequent to the trial.   The Government's Response indicates there were no other avenues to present a defense in the jury trial except to call Reinitz.  However, the Government fails to acknowledge that it has the burden to prove a criminal case beyond a reasonable doubt and that a defendant does not have a burden and need not present any witnesses (improper burden shifting).  The Government argues that Teman's trial Counsel did not have any other avenues to present a defense case except for calling Reinitz.   Instead, as shown within the attached Exhibit 1, Teman's trial Counsel should of had the valid terms.  Also, Teman had requested trial Counsel to contact the GKH law firm as to the valid terms, but trial Counsel did not.  <u>See</u> Exhibit 1.

Trial Counsel should have previously asked Teman who created the contract Terms or even where he obtained them from and spoken with the GKH law firm who created it.  If trial Counsel had done so, then they would not have been using the newer 2019 terms.  Also, trial Counsel would have seen that Teman did not create the contract Terms and as such it would have

been shown that Teman did not allegedly bury Terms and had every reason to trust the legal advice he received from the GKH law firm.  Further, the 2016 Dispute Terms were in place for years and remained completely unchanged into 2020 and they are the section that permits RCCs and any other form of draft.  They were provided verbatim by the GKH law firm.

Teman's trial counsel also failed to admit into evidence emails from Reinitz to BOA stating the contract allowed the withdrawals.  The defense counsel could have simply utilized these instead of raising the above purported advice of counsel defense.  The emails are attached at DE459-1.

Teman's trial counsel could have cross-examined BOA's witness to show that Reinitz believed the deposits were authorized by the Terms and Conditions and that BOA should have reversed the chargebacks under the contractual obligations between GateGuard and the customers.  This would have left BOA with no damages and the customers would then need to litigate the matter in civil court if they thought they were entitled to the monies, which they were not under the contractual terms.

Also, Teman's trial Counsel could have called an attorney from the GKH Law Firm as a witness to these terms, but did not.  Also, Teman's trial Counsel could have utilized these terms during the trial, but did not.  The correct terms dated prior to 2018 would have negated the *mens rea*

component of the charge(s). However, Teman's trial Counsel failed to utilize the correct terms and therefore failed to act reasonably and caused Teman to suffer prejudice.

As noted, during Reinitz's direct exam, Teman's trial Counsel attempted to admit payment terms dated January 2019 and question the witness about this. (A-882) However, the Government objected and Judge Engelmeyer indicated the proposed exhibit took effect in January 27, 2019 and the provision in ¶ 5 would make that applicable only in the event of an additional purchase or renewal after that date and therefore is out of time and therefore would not be admitted. Judge Engelmeyer even informed Teman's trial Counsel that they were "at liberty to put the payment terms in that were in place at the time of purchases or renewals…" (A-882)

Teman's trial Counsel incorrectly admitted to the Court that none of the three (3) customers purchased or renewed anything after January 27, 2019. (A-883) Also, as noted, Judge Engelmeyer informed Teman's trial Counsel "The problem is that I'm not going to permit this document. You had loads of time to prepare for an advice-of-counsel defense. Get the document in evidence that bound these customers. They did not buy into payment terms that were revised on January 27, 2019. This is lawyering 101." (A-884) Teman's trial Counsel ineffectively informed the Court

5

"Your Honor, we don't have the original payment terms, not for lack of trying, or for lack of availability, we haven't been able to actually obtain them." (A-885)

Teman's trial counsel not only did not need to raise the ineffective calling of Reinitz for the purpose of an ineffective advice of counsel defense, but also, Teman's trial counsel instead failed to admit the correct terms (DE459-1). These payment terms would clearly show that Teman was entitled to make the deposits. In 2016, GateGuard was SubletSpy and then GateGuard broke off into a separate company. The Dispute Terms remained the same and had been authored by the law firm GKH who informed Teman he was authorized to draft the deposits, none of which was utilized by Teman's trial counsel.

For example, Teman's trial counsel did not admit an email with attachments (DE459-4) from Ran Hammer, Esq., who is from the GKH law firm and who emailed Teman on May 10, 2016 as to drafts for the General Terms of Service, Payment Terms, Governing Law and Dispute Resolution Terms and Privacy Policy. (DE459-4) This all comes in the backdrop of Judge Engelmeyer indicating in relevant part in the Order denying Teman's motion for judgment of acquittal and in the alternative, motion for new trial (DE111) – "[a]nd there was no evidence that these terms were even in place

at the time the Customers had contracted with Teman." (DE138:38)  As shown here, Teman's defense counsel failed to admit the correct Terms and Conditions, which permitted Teman to make the deposits and which ineffective counsel prejudiced Teman.

Trial Counsels' failure to utilize the correct payment terms and in calling Reinitz and as such by even failing to ask for a limited instruction. For example, on direct examination, Reinitz testified that he had expressly advised Teman orally that his use of RCC's to collect payments due from Coney, 18 Mercer and ABJ was legal. (A-1058)  On April 2, Reinitz wrote that "hitting" ABJ's account "out of the blue" would create "50/50" risk ABJ would "call the cops."[2]  (A-1876; GX728)  Reinitz warned Teman in a text message, "you will be arrested."  (A-1872, GX702)  Further, Reinitz informed Teman "[i]f you are hitting their accounts out of the blue, I expect this will be a criminal matter sooner or later".  (A-1874, GX704)  The Government argues that trial Counsel did not want to call any attention to these details by requesting a limiting instruction.  However, a request for a limiting instruction would not have been necessary if trial Counsel did not

---

[2] A text message from Reinitz to Teman states: "I've already told you I think it's a bad idea.  You've been back and forth with abj several times now. Your 'threats' carry little weight at this point and they have indicated they don't believe they owe you $.  If you hit their accounts I think 50/50 they call cops.  If I was advising them that's probably what I would tell them to do.  See Government Exhibit 728, A-1433.

call Reinitz as a witness and instead called an attorney from the GKH Law
Firm and utilized the correct payment terms.

Getting back to the failure to request a limiting instruction. Teman's
trial counsel also failed to request an instruction in order to inform the jury
that an arrest is only based on a much lower standard of probable cause
instead of a much higher burden of beyond a reasonable doubt in order to
prove the convictions. See Sullivan v. Louisiana, 508 U.S. 275 (1993)(Sixth
Amendment guarantee of trial by jury required a jury verdict beyond a
reasonable doubt).

Based on the foregoing, not only were Teman's trial counsel
ineffective for not admitting the correct payment terms and the May 10,
2016 email from the GKH law firm, which worked on the contract terms and
which permitted Teman to make the deposits, but also, this was compounded
by Teman's trial counsel failing to motion for judgment of acquittal under
Fed. R. Crim. P. 29 on all the counts based on the 2016 payment terms
permitting Teman to make the deposits.

Further, the May 10, 2016 GKH email to Teman would have shown
the jury that Teman did not allegedly bury the Terms and Conditions, but
instead, the Terms and Conditions were drafted by a law firm and which
eliminates the allegation of mens rea. Teman's trial counsel not only did not

need to raise the ineffective calling of Reinitz for the purpose of an ineffective advice of counsel defense, but also, Teman's trial counsel instead as noted failed to admit the correct payment terms (DE459-1). These payment terms would clearly show that Teman was entitled to make the deposits. In note, in 2016, GateGuard was SubletSpy and then GateGuard broke off into a separate company. The dispute terms remained the same and had been authored by the law firm GKH who informed Teman he was authorized to draft the deposits, none of which was utilized by Teman's trial Counsel.

Further, Teman's trial counsel also failed to call critical defense witnesses to show that customers had knowledge of the online dispute terms, which allow the deposit of RCCs. The witnesses are Jamie Schreiber, Russell Pearlmutter, who was employed for Coney Realty and who documented that Coney Realty regularly does chargebacks as a matter of business practice and that Signature Bank approves the chargebacks without any due diligence and Yossi Gold, who is an owner of 170 Tillary Street and who indicated the RCCs were approved and drafted for a repair and which consisted of the same terms as the three (3) customers in this case.

Because these clients used the same set of online terms and signed up within the same period as the witnesses, it was ineffective to not call these

clients to testify to the clarity and understanding of the terms, and that, as these clients attest, Teman's company was transparent with clients about the payment procedures and fees.

### B. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Request a Competency Evaluation and or to Request a Continuance.

The Government relies on trial Counsels' self-serving affidavits that indicate Teman was fine. However, trial Counsels' affidavits are subjective and this belies the objective evidence that is necessary under 18 U.S.C. § 4241. Teman's Memorandum cited medical records and his own statements (DE459:55-57), as well as the statements of three independent medical experts, all emphatically indicating he could not assist his own defense. The Government's response does not explain why trial Counsel failed to investigate this further. The United States Supreme Court has expressly recognized that one of the procedural protections is "further inquiry" or a hearing when there is a sufficient doubt raised about a defendant's competency. See Drope v. Missouri, 420 U.S. 162, 180 (1975) and Pate v. Robinson, 383 U.S. 375, 385-86 (1966); 18 U.S.C. § 4241(a)("…The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally

incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense).

Teman's trial Counsel also failed to act reasonably when they failed to request a competency evaluation and or to request a continuance based on Teman's health. For example, at a pre-trial hearing dated October 21, 2019 (DE24), Judge Engelmayer addressed Teman's mental health where Teman expressed his unsteady health at (DE24, pp. 5-7), and where Judge Engelmayer states: "So I'm pushing you, just so I understand, whether there's any ongoing condition." Teman: "I appreciate that, your Honor. I see a mental health provider, and I get somewhat regular ketamine IV."… Judge Engelmayer: "Let me ask you: Are you currently under the care of a doctor or psychiatrist for any condition?" Teman: "I see a psychologist on a regular basis. It's also a requirement of the bond." Also, at (DE265, p. 5), Teman indicated "I was too sleep deprived and mentally unfit (Your Honor knows I was in the mental hospital within weeks of trial) to point my attorneys to the lapses in evidence or to take the stand." The same psychologist treating Teman and the psychiatrist both issued sworn statements that Teman was unfit to stand trial. (DE384)

The Government argues that Teman's trial Counsel did not want to ask for a continuance because Teman may have been facing other criminal charges allegedly due to not filing tax returns.  However, it is a defendant's competency to stand trial pursuant to the Fifth Amendment of the United States Constitution to procedural due process and the Sixth Amendment of the United States Constitution (right to a fair trial) that controls over any of these other issues.

Also, for example, Alon Seifan, MD, MS, a Board Certified Neurologist  (DE384-1), who reviewed Teman's medical records from October 2019 through February 2020, opined that Teman in the period leading to and during jury trial, was extremely mentally unfit to prepare, to make legal decisions and or to stand trial due to but not limited to meeting diagnostic criteria for several, co-morbid Neuropsychiatric diagnoses that cause significant disability in work, education and personal life.  Dr. Seifan also opined but not limited to that Teman has been diagnosed with Migrane with Aura (G43.109), Attention Deficit Disorder, Combined Type (F90.2), Chronic Pain Syndrome (G89.4) and Bipolar Disorder, type 2 (F31.0).  Dr. Seifan and other Doctors at Mt. Sinai Hospital on Miami Beach noted Teman was also diagnosed with Narcolepsy (G47.41) shortly before trial.

Additional medical and or mental health records indicate that Teman was unfit to prepare and to stand trial at (DE384-1 – 384-6).

It was in vivid color in Teman's sleep tracker records, provided to trial Counsel who then did not provide this to the Court, that Teman was not getting any REM sleep, was not sleeping through the night, and could not possibly be mentally sound after such prolonged, extreme sleep deprivation to prepare for trial. Teman informed trial Counsel before trial that he was having memory and behavior issues, as well as severe pain, and was unable to work or think. Trial Counsel did not disclose this to the Court, but instead, because Teman could not afford to pay them, pushed Teman to rush to trial so they could be done with a non-paying client.

"It is well established that the due process clause prohibits the criminal prosecution of a defendant who is not competent to stand trial." See Medina v. California, 505 U.S. 437, 439 (1992). This due process right "spans the duration of a criminal proceeding," including sentencing. See United States v. Arenburg, 605 F.3d 164, 168-69 (2d Cir. 2010). 18 U.S.C. § 4241, states in relevant part:

> **(a) Motion to determine competency of defendant.** At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the

Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Further, 18 U.S.C. § 4241 contains the procedures necessary when a defendant's competency is raised.  However, Teman's defense counsel failed to address any of these procedures even when Teman was suffering from mental competency that precluded him from understanding the nature and consequences of the proceedings, making legal decisions and or to assist his Counsel who knew Teman was suffering from mental competency, i.e. trial Counsel assert they did not have the 2016 Payment Terms or metadata to support that customers assented to the Payment Terms that permitted Teman to deposit the RCCs.

A 'competency hearing must take place, either upon motion or sua sponte, "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.'"  See Cohn v. United States, Case No. 1:19-CR-00279, 2023 U.S. Dist. LEXIS 129163 *20 (N.D.N.Y. July 10, 2023).

The foregoing failures were also exacerbated by the above when Teman's trial counsel waived Teman's attorney-client privilege as to Teman's counsel Reinitz because if Teman was not mentally competent then he was not mentally competent to waive his attorney-client privilege. (A-137.2-137.4). Further, Teman's trial Counsel also failed to request for Judge Engelmayer to colloquy Teman as to the waiver of such privilege especially when Teman was not mentally competent to do so and even if Teman was colloquied then he was not mentally competent to waive the privilege. As such, trial Counsel was confronted with an idea of not calling Teman as a witness, which is obviously his constitutional right, because he was not competent to testify.

Not only did Teman's trial Counsel fail to act reasonably based on the above. Trial Counsel also incorrectly argue Teman did not provide them with metadata to support that customers assented to the Payment Terms that permitted Teman to deposit the RCCs, but this data was easily available via both email -- proving the status of the terms documents at the time the GKH attorneys mailed them -- and the online dashboard the clients used to log in repeatedly and to store the data.

The customers continued using the service after the update. The customers did not terminate the agreements and even logged in after 2019 so

they were bound by the updated 2019 terms because they accepted the updates and because they literally accepted them to sign up and or to login. See Exhibit 1.

Furthermore, the clients never acted to effect the clear Termination instructions and thus were bound by the updated terms. For example, Soon-Osberger provided the Terms and Conditions to the members of the 18 Mercer Board and to Stephanie Phillips, the President of 18 Mercer, who, according to Soon-Osberger "looked at" the document. (A-684:24-25, A-585:1-11)  Soon-Osberger emailed Teman with specific questions on the Terms and Conditions. (A-1860)  Soon-Osberger did not provide any comments on the Payment Terms, despite the prominent placement of the link to the terms in Section 5 of the Terms and Conditions. In response, Teman agreed to limit price increases, but otherwise, explained the reasoning behind the clauses without modifying the language. (A-1859) After receiving Teman's response, Soon-Osberger stated that Teman had addressed 18 Mercer's concerns. (A-1858)

Teman provided an invoice for a total of $3,947 that included a cooperator show price for the GateGuard intercom panel, installation and one-year's prepaid services. (A-1833)  The invoice expressly stated that "Buyer accepts terms and conditions at gateguard.xyz."  The Terms and

Conditions notice was on the same line as the amount to be paid and clearly visible. The invoice, with its express limitation to the Terms and Conditions on GateGuard's website, was reviewed by 18 Mercer's management and, on April 4, 2018, sent to 18 Mercer's property management company, Crystal Real Estate Management, Inc., who paid the invoice in full. (A-572:23-25, 573:1-7, A-1831-2, A-1838).

Further, Elie Gabay (or "Gabay"), managing director of Coney Management received an email dated January 19, 2018 from Teman indicating that Coney would be invoiced $3,600 for the initial invoice installation, to be credited against monthly fees from the 2.0 roll-out, together with a security deposit of $849. (A-1789) Gabay took issue with the $849 and requested a copy of the invoice, which had not been attached to the initial email. (A-1788)

Teman clarified in response that the $849 would be reflected as "0" (not charged) and attached the requested invoice. (A-1788) The cover email expressly requested payment through GateGuard's website portal and the invoice reminded Gabay that the order was subject to GateGuard's Terms and Conditions, a link for which was provided to the left of the amount due. (A-1790) The Terms and Conditions expressly reference GateGuard's

Payment Terms, which provide for the use of RCC's to recover unpaid debts.  (A-1884)

The invoice also expressly noted the limitations of the initial version of the Intercom suite and the buyer's acceptance of the online Terms and Conditions.  The invoice contained, on the bottom left, opposite the price, the following language: "We are installing Version 1.0 ahead of 2.0 being available (90 days).  Client understands 1.0 device does not have 4G, IR, battery, etc.  https://gateguard.xyz.  **Terms** Buyer accepts terms and conditions at https://gateguard.xyz."  (A-1790)

Further, as to the third customer.  Joseph Soleimani (or "Soleimani"), who was an owner of ABJ Properties, a property management company that managed two real estate companies, ABJ Lennox, LLC and ABJ Milano, LLC (or "ABJ"), reached out to Teman to discuss the Subletspy product.  (A-624:8-14; A-626:3-8)  Shortly after meeting Teman, ABJ subscribed for Teman's Subletspy service.  (A-626:9-12)  Soleimani had an opportunity to review GateGuard's online interface.  (A-725:5)  GateGuard's interface included a landing page with references to its Terms and Conditions.

The website homepage contains a form through which the customer provides its contact information and information regarding its properties and

also, as is customary for on-line businesses, contains a link to GateGuard's Terms and Conditions the customer must check to signify its agreement with the terms and place an order for desired products and services. (A-872:21-25, A-873:1-9)  Teman included a link to this web landing page, Gateguard.xyz, on official correspondence with clients. (A-1856)  The Terms and Conditions expressly provide that the customer agrees to updates to the terms and other documents incorporated by reference without any requirement for express agreement to these updates. (A-1809)  The Terms and Conditions also contain a link to payment terms authorizing the use of RCCs in the event of customer defaults or to secure payment of a device removal fee. (A-1884)(Permission to Make Bank Draws and Other Account Draws). (A-1884)

Back to Soleimani, after the office demo, he agreed to have seven GateGuard intercoms installed at ABJ properties. (A-726:15-20)  Soleimani testified that he did not recall whether he signed up for the GateGuard products and services through GateGuard's online platform. (A-726:8-13)  However, Soleimani acknowledged using the online platform, which requires acceptance of the online terms to sign in. (A-727:5-6)  Further, an email from Soleimani to Reinitz dated October 22, 2018 in response to an email from Reinitz dated October 17, 2018, which indicated to Soleimani

that Teman indicated that Soleimani's subscription to 'SubletSpy' remains active (see below report).  (A-1889)  In response, Soleimani asked Reinitz for a general release for anything Teman was claiming.  (A-1889)

Moreover, all three clients continue to maintain possession of the GateGuard devices.  Not one client from the witnesses has made any effort to return the devices.  Note that the Pecot texts confirm that 18 Mercer was continuing to store the device in their basement utility space.  (DE284:7-14)  Because all three clients maintain possession of the devices and none followed the contracted termination procedures the updated 2019 terms applied to them, as with every online or cloud service that updates terms.

For example, Ms. Pecot indicated Teman warned herself and other shareholders of what the terms were in the contract Teman signed with the then Board Vice-President via an online documents such that there was an $18,000 fee for removal of a device, a $10,000 fee for collections and but not limited that Teman believed he had the right to draft owed monies from 18 Mercer's bank account.  (DE284:7)  Said argument as to the denial of Teman's Rule 33 motion for new trial related to new evidence regarding Ms. Pecot is pending on appeal to the United States Second Circuit in Appeal Case No.: 24-345.

Further, in note, an email provided by Ms. Pecot was one dated October 28, 2018, from "Margaret," whom Teman knew to be Ms. Crimmins, an 18 Mercer shareholder and Board member. (DE395) This email was never provided to Teman by the Government or Soon-Osberger, who had been subpoenaed by Teman's defense team. Soon-Osberger had testified at trial that she was "shocked" three months later when Teman reminded her, Ms Pecot and Jackie Monzon, who was the President of 18 Mercer's management company, that the device removal would incur an $18,000 fee. (Trial Trans., at 439, GX443, DE128-57). The Ms. Crimmins email indicates that Soon-Osberger had already been warned months earlier that she would incur "legal liability" by removing the GateGuard device.

Further, the following shows that Soon-Osberger in her email correspondence and contract discussions communicated about contract terms and obligations that align with positions that were later articulated by Reinitz in his legal communications. The shared concepts included GateGuard's right to remove equipment, indemnity agreements, price increases and enforcement remedies for breach. For instance, Government Exhibit 442, p. 5 shows Soon-Osberger referring to GateGuard's right to remove equipment in its discretion. Also, Exhibit 442, p. 5 shows Soon-Osberger citing price increases up to 100% per year capped at 350% over three years. Exhibit

443, p. 1 shows Soon-Osberger discussing indemnity obligations and possible insurance coverage for property damage. Exhibit 442 shows Soon-Osberger referring to the requirement to maintain a Property Panel subscription.

The clients are therefore bound by the online terms as updated even until today, per the plain language of the contract. Thus, trial Counsel was also ineffective in failing to argue why the 2019 terms applied to these clients, and or also failing to have attorney Reinitz explain why he believed the updated 2019 terms applied, as he had emailed the clients telling them such. The invoices also expressly noted the buyers' acceptance of the online Terms and Conditions, which reference GateGuard's Payment Terms, which provide for the use of RCCs to recover unpaid debts except however, trial Counsel failed to utilize the correct Terms. (A-1775-90, 1833, 1884, Exhibit 1 attached hereto) But for trial Counsel erring in utilizing the newer 2019 Terms, the foregoing shows that the customers were well aware of the Terms and that trial Counsel certainly did not need to call Reinitz as a witness.

**C. Teman's Trial and Sentencing Counsel Failed to Act Reasonably When They Failed to call a Witness to Testify about the Violation of Teman's Religious Faith and/or Whether there was any Violation of Jewish Law and also for Counsel to Object and Argue a Violation of Teman's Religious Faith Under The First Amendment.**

The Court had indicated and the Government had argued through trial that drafting accounts on the Friday before Passover is a sign of intent to defraud. (A-701, A-1129, A-1423, A-1977-79, A-1995, A-2035, A-2040, A-2404) However, the first two days of the calendar year fell on a Saturday and Sunday, days in which banks are officially closed. On August 11, 2022, twenty-four (24) Rabbis filed a letter with the Court addressing this issue. (DE326)

The letter (DE326:3-4) indicated in relevant part:

The Government and Court knew full well that Mr. Soleimani, for example, had WhatsApp messaged with Mr. Teman during the Intermediary Days ("Chol Hamoed") of Passover the year prior, and they knew full well that Judaism allows work, travel, and use of electronics on the Intermediary Days, and that Mr. Soleimani would be free to address any billing issues on Monday following the Passover weekend when banks were closed.

Furthermore, the defense was ineffective for failing to motion to recuse Judge Engelmeyer in this case for making findings in violation of Teman's religious Jewish faith. These arguments are supported by the Establishment Clause under the First Amendment of the United States Constitution and <u>Klagsbrun v. Va'ad Harabonim</u>, 53 F. Supp 2d 732 (D.N.J.

1999), which held that the Establishment Clause prohibits a court from hearing ecclesiastical matters.  Here, as noted, the ecclesiastical matters involved the arguments and Court's findings related to the interpretation of the Jewish faith.  The issues raised in this Section were not raised on direct appeal and were not preserved for direct appeal.

### D. Teman's Trial Counsel Failed to Act Reasonably When They Failed to Request a Copy of the Housing Court Transcript.

In the Opinion and Order dated June 5, 2020 (DE138:91-102), Judge Engelmeyer found that the Government did not violate Brady, Giglio and its Jencks Act obligations by failing to disclose Soleimani's personal involvement in the scheme to mislead the tenant in the Housing Court case. On the first day of trial, Judge Engelmeyer Ordered the Government to inquire whether Soleimani had dealings with Stanley Howell (or "Howell") and had made misrepresentations to him and to report back to the Court and the defense.  (See Transcript, pp. 24-35)  On January 19, 2020, not less than 48 hours before trial, the Government first disclosed the existence of critical impeachment evidence regarding Soleimani, which evidence originated from a decision in a New York Housing Court action, ABJ Milano LLC v. Stanley Howell, 2018 NY Slip Op 2822 (DE83-1), which found that Soleimani's company, AMJ Milano LLC, used dishonest tactics in attempting to evict an elderly, disabled tenant, Howell, from his apartment.  (DE118)

On the first day of trial, Judge Engelmeyer noted the importance of Soleimani's testimony and observed that the disclosed housing court order "is indistinct if Soleimani is among the people dealing with the tenant." (Tr., p. 33)   Judge Engelmeyer directed the Government to "inquire of Soleimani whether there was evidence in the housing court case that he was among the ABJ personnel who dealt with Howell.  If his answer leaves any doubt in your mind, you need to follow up and do so immediately.  Then promptly report back to the Court and the defense."  (See Id. at p. 29)  Judge Engelmeyer further explained that "the issue is whether there was evidence at the [Housing Court] proceeding…that he [Soleimani] interacted with the tenant.  If there was evidence that he interacted with the tenant, this is coming in."  (See Id., p. 32)

After trial, the defense moved for a new trial under Rule 33.  (DE 119) The defense asserted that the Government had continued to maintain during trial that nothing in the housing court case was relevant to Soleimani's credibility and at trial, the Government questioned Soleimani about this:

Q.    In 2018, did the housing court find in one case that your company had misled a tenant about whether he could renew his lease?

A.    Yes.

Q.    And did you misrepresent anything to the tenant or was it others in your company?

A.    It was others.

(<u>See</u> <u>Id.</u>, p. 502)

However, the new evidence that the defense did not obtain reveals that the Government's misrepresentations regarding Soleimani and the evidence in the housing court case were false.  The full record of the housing court case would show that Soleimani's testimony under oath testimony in that case establishes his personal involvement in his company's dealing(s) with Howell and that the actions by Soleimani are the very interactions upon which the housing court's findings are based.  (DE118:3)  For example, as documented in the transcript (attached as Exhibit A to DE118), on August 8, 2018, Soleimani testified under oath in the housing court that:

(a) He went to Howell's apartment and personally convinced Howell to sign the agreement on the spot (DE118-1, pp. 58-60);

(b) He personally showed Howell other apartments to further induce Howell to accept the agreement and vacate the apartment (DE118-1, pp. 61);

(c) He personally signed the agreement (DE118-1, pp. 57-58);

(d) He was personally involved in drafting the agreement which the court found to be predatory (DE118-1, pp. 56-57);

(e) He personally directed his attorney to evict Howell (DE118-1, p. 55).

Even the Government's response (DE126:10) to Teman's motion for new trial, states: "Teman did not ask for additional information about the housing court matter prior to Soleimani's testimony, object to the Government's questioning in this regard during trial, or question Soleimani about the Housing Court Order on cross-examination."

In the Opinion and Order, Judge Engelmeyer indicated "[r]regrettably, the Government did not do so (and the defense did not press for such a report) but instead took the matter up by putting questions on this point to Soleimani." (DE138:96) Teman asserts that if defense counsel had pressed for the actual transcript and by requesting a continuance of the trial, then it would have shown that Soleimani lied under oath in this underlying trial and that he was directly involved with Howell and which would have aided Teman in attacking Soleimani's credibility. Furthermore, it would have shown Soleimani to be a liar about his interactions with Howell; it would have opened the door to allow the defense to show the jury that Soleimani was in the TOP TEN worst landlords in New York City according to the ombudsman, with a history of avarice and deceit to customers and others.

Although Judge Engelmeyer in the Opinion and Order (DE138:97-102) found that Teman did not show materiality as to his motion for new trial due to Soleimani's testimony being meaningfully corroborated.

27

However, this argument is being made in conjunction to all of the other arguments made in the memorandum. Because defense counsel made the failures shown within the entirety of this memorandum, then there is materiality for the defense failure to obtain the impeachment material from the housing court case. For example, there is materiality here because not only did Teman's trial counsel fail to press for the housing court transcript and request a continuance, but also, as shown, defense counsel also failed to enforce the subpoena on Ms. Pecot (shareholder of 18 Mercer), which would also show that the Government's other witnesses – Soon-Osberger and Hom were untruthful also and which Teman was convicted by the testimony of these customers who are shown to be perjurers. Teman will not reiterate in full what he has already argued about trial Counsel failing to call Ms. Pecot as a witness, but he adopts that argument herein.

Given that Judge Engelmeyer had made this a prerequisite to challenge Soleimani's business dealings, the defense counsel forfeited Teman the right to confront the Soleimani's credibility before the jury. Teman's trial Counsel also forfeited Teman that right not only by failing to obtain the transcript, but also by allowing the prosecutor to switch the inquiry from whether Soleimani was a participant to a question of whether

he made the misrepresentation to Howell himself. That was never the prerequisite of the Court necessary to confront Soleimani's dishonesty.

A witness who lies loses credibility with the jury. See United States v. Payne, 591 F.3d 56, 60 (2d Cir. 2010)("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses"); United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015)(a Court must defer to "the jury's assessment of witness credibility"); Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 112-13 (2d Cir. 2015)(it is the jury's role to determine whether a witness is credible and to decides what weight to give to that witnesser's testimony).

## **CONCLUSION**

Based on the foregoing, Teman respectfully requests this Honorable Court to grant the motion to vacate, set aside or correct his judgment and sentence, the set an evidentiary hearing and to find actual innocence and in the alternative for a new trial.

Respectfully Submitted,

*/s/* Thomas Butler_____
Thomas J. Butler, Esq.
New York Bar Number:
Florida Bar Number: 569178

P.O. Box 665
Melville, New York 11747
Phone: 877-847-1896
appellatelaw@bellsouth.net
Counsel for Ari Teman

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the

foregoing document was electronically filed and served this 12th day of

May, 2025, to the following counsel of record:

Jacob Harris Gutwillig, Esq.
United States Attorney's Office, SDNY
jacob.gutwillig@usdoj.gov


/s/ Thomas Butler_____
Thomas J. Butler, Esq.