## SUPPLEMENTAL DECLARATION OF JUSTIN K. GELFAND

Justin K. Gelfand does hereby swear to and attest to the following:

1. I am over the age of 18 and of sound mind.

2. I was an attorney of record for the Defendant, Ari Teman, in the above-styled case.

3. I am filing this declaration pursuant to this Court's Order (Doc. 542) dated May 14, 2025, requiring me to submit a supplemental declaration addressing the new factual contentions and exhibits Mr. Teman attached to his reply brief in support of his petition for relief under Title 28, United States Code, Section 2255.

4. In his Reply and in an under-oath declaration he signed, Mr. Teman claims I was ineffective for failing to introduce into evidence what he characterizes as "the correct timely terms that bound the customers to permit Teman to make the deposits" at issue in this case. (*See* Doc. 538 at 2). Mr. Teman includes a footnote stating, "In 2016, GateGuard was Subletspy." (*See id*. at fn. 1).

5. As an initial matter, as explained to me by Mr. Teman and by Ariel Reinitz in his capacity as corporate counsel to GateGuard, GateGuard—in terms of what it did, how it functioned, and the services it provided—did not exist in 2016. In that regard, GateGuard was *not* Subletspy. Indeed, Mr. Teman explained to me during the course of our representation what Subletspy was and the services it provided: a mechanism for landlords to catch and evict Airbnb-style sublease arrangements analogous to hotel rooms that were illegal in certain jurisdictions or otherwise disallowed by landlords. Indeed, on August 19, 2020, *after trial*, Mr. Teman explained to his subsequent legal counsel, Justine Harris, in an email he forwarded to me, that the terms "were reviewed by a top international law firm *months before GateGuard even existed* for SubletSpy (the first company in this industry)" (emphasis added).

6. Throughout the entirety of my representation of Mr. Teman, we discussed a possible reliance on counsel defense with respect to Mr. Reinitz and I also repeatedly requested from Mr. Teman all documents in GateGuard's custody, possession and/or control relevant to the issues in this case. Of course, we requested all iterations of any terms of service, payment terms, contractual representations, and metadata related to any of the GateGuard customers named in the indictment or otherwise addressed in discovery. We worked tirelessly to identify any witness who could authenticate any such documents, fully recognizing that Mr. Teman had a constitutional right not to testify in his own defense (a right he ultimately exercised). As reflected in our comprehensive pretrial motion practice including motions *in limine* and as set out in my original declaration filed in this case, Mr. Teman was personally and directly involved in preparing his defense and in trial preparation from the moment he retained Mr. DiRuzzo and me to represent him in this matter.

7. On January 20, 2020—2 days before *voir dire* and 10 days after the initial pretrial conference during which Mr. Teman was present—Mr. Teman sent Mr. DiRuzzo and me a series of emails. We also engaged in extensive telephone and in-person communications during the weeks and days leading up to trial. The one January 20, 2020 email relevant to Mr. Teman's pending claim was an email dated January 20, 2020 with a timestamp of 3:54 p.m. on my law firm's system that is attached to this declaration as Exhibit 1. As reflected therein, Mr. Teman forwarded Mr.

DiRuzzo and me an email chain without any further context. The first was an email from Jonathan Irom dated June 30, 2016 and cc'ing Ron Hammer, both at GKH Law, stating: "Hi Ari – attached updated payments terms with respect to the eviction success fee and escrow." The second was an email from Mr. Teman dated June 25, 2018 to two individuals in which Mr. Teman states: "They did the June version *which has the escrow*" and further stating, "*We modified it ourselves after* to remove the eviction because you guys were lying to us about whether they evicted" (emphasis added). The email contained an attachment which appeared to be a redlined MS Word document with a last revision date of June 26, 2016. The redlined document did not in any way relate to GateGuard and did not include any terms related to GateGuard's use of RCC's, authorization by GateGuard's customers for RCC's, and perhaps more importantly, the use of RCC's by GateGuard for particular purposes and expenses at issue in this criminal case. Critically, the redlined document was not relevant to the issues related to GateGuard, RCC's, and the particular transactions at issue in this case. Nevertheless, it was my understanding that Mr. DiRuzzo expressly asked Mr. Teman whether the attorney who purportedly drafted the document was going to come to court from Israel to testify and that Mr. Teman said no—rendering the document difficult, if not impossible, to introduce under the Federal Rules of Evidence even if somehow helpful. Given our concerns about Mr. Teman's possible criminal exposure for uncharged tax crimes and given what Mr. Reinitz told us—including that day—he would testify to that was actually relevant to what Mr. Teman was charged with, we continued to pursue the trial strategy without changing it based on this correspondence between Mr. Teman and the GKH law firm related to one of Mr. Teman's other companies.

8.      With respect to the GKH law firm, we also explained to Mr. Teman the parameters of the reliance on advice of counsel defense—a conversation we had extensively as it related in particular to Ariel Reinitz. When it became clear to us that Mr. Teman did not consult with this law firm specifically about the RCC's at issue in this case prior to his conduct that was at issue in the indictment, and even setting aside that it did not appear to us that the attorneys that worked with Mr. Teman at this law firm were licensed to practice law in New York, the bottom line remained clear: Mr. Teman plainly did not have a reliance defense as it related to this particular law firm because he did not seek specific advice, he did not follow their advice, and he even told a third-party that he changed what they had suggested after the fact. As both a substantive and a strategic matter, we quickly concluded this was not a road that was going to help Mr. Teman and it was clear to us he agreed, as evidenced by when this was communicated to his trial team, how this was communicated to his trial team, and the problems briefly identified and discussed.

9.      With respect to the claim that we "could have called an attorney from the GKH Law Firm as a witness to these terms, but did not," that is simply not true. As a threshold matter, Mr. Teman told Mr. DiRuzzo that he believed they would not voluntarily appear and these attorneys were based in Israel. But perhaps more importantly, any such witness would have been faced with questions about what Mr. Teman conveyed to them and whether Mr. Teman sought specific advice, and the answers would not have helped Mr. Teman.

10.     With respect to GateGuard's payment terms, what we had is what we pursued at trial: testimony from GateGuard's corporate counsel as to what was in place and when based on his

2

personal review of the relevant documents. Based on our defense investigation, the only other possible witness was Mr. Teman and he exercised his right not to testify at trial.

11.     In his Reply, Mr. Teman is critical of us as his trial counsel for not introducing into evidence an email from Ron Hammer from the GKH law firm in Israel regarding draft documents for Subletspy. Specifically, Mr. Teman claims we should have introduced *the email* docketed as Exhibit 4 to his Petition (*i.e.* Doc. 459-4). This allegation is difficult to follow but I will address it as best as I can understand it. First, Mr. Teman did not send this email to us until *after* trial, fact not recognized in Mr. Teman's affidavit but a fact his lawyer appears to broadly recognize in the Reply brief by stating, "Note, in candor to the Court, Teman had furnished trial Counsel with Mr. Hammer's email dated February 23, 2017 to trial Counsel on January 20, 2020 and in note also, Teman had furnished the May 10, 2016 Mr. Hammer email to trial Counsel subsequent to the trial." Thus, it is unclear how we as trial counsel could have introduced into evidence—even if otherwise admissible, which it likely was not—a document Mr. Teman did not provide to us until after trial. Second, even when reviewing them upon receipt and now, the documents in Mr. Teman's Exhibit 4 to his Petition do not actually support his defense at trial: that GateGuard was authorized to create and obtain funds directly tied to the particular RCC's alleged to be fraudulent. The closest they come with respect to GateGuard's dispute terms is that, in a paragraph entitled "**Limitations**" (bold in original), the language states: "we may withdraw fees from your accounts, in any way we'd like, at any time" after a subsection that states, "we may order a freeze of your financial accounts, personal and business if we feel you are in breach of any agreement or in arrears." Prior to and during trial, Mr. Teman did not provide any evidence—documentary or otherwise—that this Israeli law firm was ever even asked to review the GateGuard documents and, more importantly, was ever consulted with respect to the RCC's actually at issue in this case. Thus, had it even been possible to call one of these Israeli-based lawyers during Mr. Teman's case-in-chief, the testimony would have been devastating to Mr. Teman—because that attorney would have testified that Mr. Teman never even called or emailed him prior to utilizing the RCC's in this case to find out if he could.

12.     With respect to the allegation that we as trial counsel failed to call three particular witnesses to show they had knowledge of the online dispute terms, Mr. Teman's allegations are misleading. With respect to a person Mr. Teman identified to us as "Jamie Grant" at Schreiber Management (Mr. Teman refers to her as "Jamie Schreiber" in his Reply, presuming it is the same person), Mr. Teman drafted a purported "affidavit" from this potential witness (initially claiming to us that she drafted it) and provided it to us. Based on our investigation, we concluded it was not in Mr. Teman's best interest to call that witness. Furthermore, this Court generally ruled that having other customers who had theoretically authorized RCC's does not prove the RCC's at issue in this case were authorized and therefore calling any of these witnesses was a nonstarter—including Mr. Perlmutter. Furthermore, we *did* interview, at Mr. Teman's request, a number of possible witnesses who fell into this category and, based on their responses to our questions, we concluded it was not in Mr. Teman's best interest to call any of those witnesses because they did not fully appear to understand what the RCC terms authorized. In other words, not a single person we interviewed would have testified in a way that favored Mr. Teman and we, therefore, made the strategic decision not to call them as witnesses—a decision Mr. Teman was both aware of and agreed with.

13.     In this declaration, I addressed what appeared to me to be the "new" allegations and documents based on my best recollection. However, to the extent this declaration does not address any other "new" allegation raised by Mr. Teman, I would be happy to further supplement it.

I make this declaration pursuant to 28 U.S.C. § 1746 and declare under the penalties of perjury that the foregoing is true and correct.

*/s/ Justin K. Gelfand*

Justin K. Gelfand

Date: May 28, 2025
