UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

---

19 Cr. 696 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by defendant Ari Teman for relief pursuant to 28 U.S.C. § 2255.  On January 28, 2020, after a four-day jury trial, Teman was convicted of two counts apiece of bank and wire fraud, based on a $333,000 fraudulent check scheme.  In June 2023, the United States Court of Appeals for the Second Circuit unanimously affirmed the convictions.

In his § 2255 motion, Teman claims ineffective assistance on the part of his trial counsel, Justin Gelfand, Esq., and Joseph DiRuzzo, Esq., ("trial counsel") who represented him from shortly after his arrest until approximately one year after trial.  For the reasons that follow, the Court denies Teman's motion as meritless.

## I.    Background to Teman's § 2255 Motion[1]

### A.    Pretrial Proceedings

On July 3, 2019, Teman, a Miami Beach, Florida resident, was arrested, based on a criminal complaint charging him with one count of bank fraud.  On July 8, 2019, Teman was

---

[1] The background facts have been detailed in numerous rulings.  These include the Court's (1) 107-page decision of June 5, 2020, denying Teman's post-trial motions under Federal Rules of Criminal Procedure 29 and 33, *see* Dkt. 138 ("Rule 29/33 Decision"); (2) decision of October 6, 2023, declining to adjourn Teman's surrender date pending resolution of his later motion under Rule 33, and finding Teman's chances of success on that motion "exceedingly low," *see* Dkt. 402 ("Surrender Date Decision"); *see also* Dkt. 415 (order of January 25, 2024, denying Rule 33

presented in the United States District Court for the Southern District of Florida, and released from custody subject to bail conditions.  On September 6, 2019, Teman was presented in this District and remained on pretrial release.

On September 26, 2019, a grand jury in this District returned Indictment 19 Cr. 696 (PAE), with the same charge as in the Complaint, Dkt. 9, and on November 12, 2019, a grand jury returned Superseding Indictment S1 19 Cr. 696 (PAE), which charged Teman with two counts of bank fraud and two counts of aggravated identity theft.  Dkt. 27.  Teman's trial counsel thereafter filed pretrial motions, including to dismiss the Superseding Indictment on Speedy Trial Act and venue grounds and to suppress certain evidence.  Dkts. 33–34.  The Court granted the motion to dismiss Count One of the Superseding Indictment, but without prejudice, finding that the 85-day period between Teman's arrest and the original Indictment violated the Speedy Trial Act, 18 U.S.C. §§ 3161–62.  Dkt. 45.  The Court denied Teman's other pretrial motions.  Dkt. 48.

On January 3, 2020, a grand jury returned Superseding Indictment S2 19 Cr. 696 (PAE), the ultimately operative Indictment.  Dkt. 55.  Counts One and Two charged Teman with bank fraud, in violation of 18 U.S.C. § 1344; Counts Three and Four charged Teman with wire fraud, in violation of 18 U.S.C. § 1343; and Counts Five and Six charged Teman with aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2.  Before trial, however, the Government informed the Court and the defense that it had elected not to proceed on Counts Five and Six. Dkt. 79.

---

motion for reasons stated in Surrender Date decision); and (3) decisions denying Teman compassionate release, *see, e.g.*, Dkt. 414 (decision of January 24, 2024); Dkt. 434 (decision of March 22, 2024).  The account here draws on those rulings and is based upon the citations therein to the trial record.  The trial record citations herein are on points directly relevant to Teman's ineffective-assistance claim.

**B.    Trial**

Teman's jury trial began January 22, 2020, and ended January 29, 2020, when the jury returned a verdict of guilt on all four counts.

**1.    The Government's Case**

Teman owned GateGuard, Inc. ("GateGuard"), a Florida company that made and installed intercom devices for apartment buildings.  The Government's evidence overwhelmingly established that Teman had obtained bank account information from three corporate customers of GateGuard, then misused that information to create—without authorization—fraudulent checks drawing funds from the customers' accounts, which he then deposited into bank accounts he controlled.

This evidence centered on three New York City-based customers: (1) 518 West 204 LLC ("518 West 204"), managed by Coney Management; (2) 18 Mercer Equity, Inc. ("18 Mercer"), managed by Crystal Real Estate Management; and (3) ABJ Milano LLC and ABJ Lenox LLC (together, "ABJ"), both managed by ABJ Properties, LLC (collectively, the "Customers").  Each had agreed to use GateGuard's services, including purchasing its intercom devices for use in their buildings, generally located in Manhattan or the Bronx.  In addition to financial records and other documentary evidence, the Government's proof included testimony from representatives of each of the three customers whose bank account information Teman used to write fraudulent checks to his business: Elie Gabay, who testified about West 204; Bonnie Soon-Osberger, who testified about 18 Mercer, and Joseph Soleimani, who testified about ABJ.

This evidence established that, in March and April 2019, Teman created, and deposited into accounts he controlled, multiple checks on each Customer's account—ostensibly to pay fees owed to GateGuard, but all without the Customers' foreknowledge or authorization.  As context for Teman's audacious decision unilaterally to draw and deposit these checks, the trial evidence,

including testimony and emails, showed that, during 2018, the Customers had each told Teman they were going to cease using GateGuard devices. They had reported numerous problems with the devices, which Teman had failed to fix. Teman had reacted angrily, sometimes explosively, to the Customers' decisions to end their relationships with GateGuard. His communications included threats to sue the Customers, place liens on their buildings, and refer them to law enforcement. To Gabay, whom Teman understood was an observant Jew, Teman callously sent an email threatening to place a lien on West 204's assets during Passover, when Gabay would be unreachable.

On March 28, 2019, Teman deposited two checks he had created, each for $18,000, into GateGuard's account at Bank of America. One purported to have been issued by 518 West 204; the other, by 18 Mercer. As prepared by Teman, each check stated, "DRAW PER CONTRACT. NO SIGNATURE REQUIRED." Each bore, in the place for a signature, an unintelligible squiggle. According to the memo line of the checks, they were ostensibly for "device removal fees."

Principals for 518 West 204 and 18 Mercer testified that they had not authorized or been aware in advance of those transactions, and that they disputed that their businesses owed Teman $18,000 (or any such fee). They testified that before their relationships with Teman deteriorated, he did not discuss the prospect that they could be subjected to device removal fees, and that they had been unaware of any claim that they owed any such fee. Teman did not send either Customer an invoice cataloguing charges for device removal before he made the deposits, even though he had sent invoices to the Customers for GateGuard purchases in the past. Representatives of each Customer testified that they had been shocked to see charges for a device removal fee, because they owned the devices and believed they should be able to remove them

4

from their buildings, and because the amount of the removal fee was disproportionate to the cost of the intercom (or any other amount they had paid GateGuard). 518 West 204 had paid $3,600 for its intercom, and 18 Mercer had paid $2,499 for its intercom (and with other services, had paid $3,947.88 in total to GateGuard)—far less than the $18,000 device removal fee Teman now claimed to charge.

Bank of America placed a hold on the funds from the two checks. On March 29, 2020, Teman transferred $35,000 from the GateGuard account to an account for Friend or Fraud LLC, another company he owned. On April 1, 2019, Signature Bank, where the Customers had their bank accounts, flagged the checks for fraud. On April 2, 2019, Bank of America completed a chargeback from the GateGuard account to the Customers' accounts at Signature Bank.

Despite the chargebacks, Teman, the next month, escalated his practice of drawing and negotiating remote checks on Customer accounts without notice. On April 19, 2019, Teman entered a Bank of America branch in Florida and deposited 27 more checks, totaling $297,000, into the GateGuard account. These checks were drawn on the accounts of three entities: 518 West 204 and the two ABJ entities. Unlike the first two checks, these 27 did not bear a purported signature. Each instead stated:

> DRAW PER CONTRACT. NO SIGNATURE REQUIRED[.] NOTE TO BANK: This is a valid check. You are required by law to honor it. Contract at gateguard.xyz/legal/terms.php accepted by above client. Contact us 212-203-3714 with questions.

The checks' memo lines stated that they were, variously, for device removal fees, attorney use fees, collections fees, or chargeback fees.

Again, representatives for the affected Customers testified that they had not authorized Teman to remotely create and negotiate the checks, that they lacked notice of these transactions, and that they disputed owing the sums reflected. The Customers also had not been aware of the

fees for device removal, attorney use, or chargebacks which they purportedly owed. The fees again far outstripped the cost of the devices. 518 West 204 had purchased its device for $3,600, and ABJ had paid $1,743 per device for its seven devices. But the checks were for far larger sums. They totaled $33,000 drawn on 518 West 204's account, and $264,000 on the ABJ accounts.

After depositing the checks, Teman received a notice that Bank of America was placing a seven-day hold on the $297,000. The hold's purpose was to determine whether the funds at issue should be released to the account. Bank of America and the drawee banks—JPMorgan for ABJ and Signature Bank for 518 West 204—then reviewed the checks. Signature Bank's review flagged the checks for fraud. As a result, on April 24, 2019, Bank of America completed a chargeback of $33,000 from the GateGuard account to 518 West 204's account at Signature Bank. Teman therefore never received access to those funds.

On April 26, 2019, the day the hold was lifted on the remaining funds, Teman transferred approximately $225,000 from the GateGuard account to the Friend or Fraud account, and $3,600 from the GateGuard account to an account in his name. He then transferred $180,000 from the Friend or Fraud account to an account for Touchless Labs LLC ("Touchless Labs"), and $4,500 from the Friend or Fraud account to his personal account. On April 29, 2019, Teman transferred $125,400 from the Touchless Labs account back to the Friend or Fraud account. On April 29 and May 1, 2019, Teman transferred approximately $143,000 from the Friend or Fraud account to two Chinese accounts.

On May 7, 2019, Bank of America completed a second chargeback, for $264,000 from the GateGuard account to accounts for the two ABJ entities at JPMorgan. The next day, Teman, through an in-person transaction with a bank teller, withdrew $4,000 from the Friend or Fraud

account at a Bank of America branch in Manhattan. After the chargebacks to Signature Bank and JPMorgan, Bank of America suffered a loss of $260,319.81 as a result of Teman's negotiation of these 27 checks.

### 2.    The Defense Case

Teman's trial defense was that the Customers had contractually authorized him to draw remotely created checks ("RCCs") on their accounts, for the reasons and in the amounts at issue, and that he thus had not engaged in (or had the *mens rea* for) fraud.[2] He relied on the fact that GateGuard's contracts with each Customer stated that they were subject to terms and conditions and identified a URL. He contended that the URL in place at the time each Customer contracted with GateGuard had identified additional "Payment Terms" stating that the customer authorized GateGuard to draw remotely created checks on the customers' bank accounts and to charge fees such as the $18,000 device removal fee. None of the three Customers, however, so testified. And, as developed below, Teman's trial counsel, despite sustained efforts, were unable to obtain from him or otherwise any documentary evidence supporting this purported defense, *i.e.*, that such terms were in place at the time the three Customers had contracted for GateGuard's services.

Teman instead called one witness, his corporate attorney, Ariel Reinitz, in support of an attempted advice of counsel defense. Reinitz testified he had orally told Teman that depositing RCC's drawn on the Customers' accounts was "technically legal" and that the Payment Terms

---

[2] Teman's trial counsel secured and proposed to call an expert witness on banking law, to testify that federal regulations permit creation of RCCs, provided that the maker complies with various conditions, including having the accountholder's written authorization. The Court granted the Government's motion to exclude the expert, in favor of an instruction by the Court to the jury that RCCs are permissible, and that the issue at trial was not whether the checks met a technical definition, but whether the Government had proven the elements of bank and wire fraud (which here turned on whether Teman had or believed he had received customer authorization to draw the checks).

that were purportedly in place gave Teman "explicit authority to do so." Through Reinitz, the defense offered a version of the Payment Terms, but it stated that it had last been revised on January 27, 2019, long after Teman had contracted with the Customers and after Teman's feuds with the Customers had begun. That document included language giving GateGuard permission to draw checks on the Customers' accounts to pay debts the Customers owed. Reinitz, however, was not competent to authenticate this document and thus could not testify when the Payment Terms language at issue had been added. He testified that Teman, who did not testify, had told him that these Payment Terms had been in place at the time each Customer had contracted with GateGuard. This testimony was received not for the truth of the matter that Teman asserted, but solely as context for the communications with Teman to which Reinitz testified.

On cross-examination, however, Reinitz admitted that Teman had not shown him the checks he planned to draw or told him the amounts of these checks, and that he was unaware how much the Customers had paid for their devices. Reinitz's testimony also established that Teman was facing severe financial trouble at the time he consulted Reinitz about possibly withdrawing funds directly from the Customers' accounts.

Reinitz also admitted that he never memorialized his purported oral advice to Teman that depositing RCC's drawn on the Customers' accounts was "technically legal." And Reinitz's written communications with Teman reflected contrary guidance. Specifically:

- On January 2, 2019, in a series of WhatsApp messages responding to Teman's proposal to draw checks on Customers' accounts, Reinitz wrote, flatly, "No" and "[b]ad idea." In the same string of messages, Reinitz further wrote to Teman that the Customers "are likely to call police. And you will be arrested. And have a criminal case to deal with. And then you can start explaining about your 'contract' and 'not breaking any laws.'" Presciently, Reinitz predicted that "you are >50% likely to be arrested for the activities you propose."

- On April 2, 2019, Teman contacted Reinitz, revealing that—contrary to Reinitz's January guidance—he had drawn money from the Customers' accounts and that Bank of America had placed a hold on his account. Reinitz sent Teman a text message, which stated, "[n]ot

8

sure I follow but this sounds bad," and another, which stated, "I don't know all the ins and outs of this but sounds like a bad idea." He warned Teman, "[i]f you are hitting their accounts out of the blue, I expect this will become a criminal matter sooner or later."

- On April 3, 2019, Reinitz added: "I've already told you I think it's a bad idea . . . . If you hit their accounts I think 50/50 they call cops. If I was advising them that's probably what I would tell them to do."

- On April 10, 2019, after further communications with Teman, Reinitz wrote, "The banking stuff is not a joke . . . . You can't just hit someone's bank account if you know they dispute the charge." He warned Teman that "[t]here are serious state and fed[eral] regulations on this. You claim that your contract allows you to debit their accounts even after they explicitly protest. I'm just not sure it's that simple." In the same string of messages, Reinitz went on, "[a]nd it may be (again . . . speaking out of ignorance . . . ) a clear violation of some federal banking regulation. In which case your 'simple, can't miss idea' is now a federal crime."

Despite Reinitz's warnings, the following week, Teman, as noted, escalated his practice of drawing and negotiating remote checks on the Customer accounts without notice, depositing the 27 Customer checks totaling $297,000.

### 3. The Verdict

On January 29, 2020, the jury convicted Teman of all four counts. The two counts apiece of bank and wire fraud corresponded to the two sets of checks (the March 2019 and April 2019 checks) Teman had created and negotiated. The Court denied a Government motion for remand and permitted Teman to remain on bail conditions pending sentencing.

### C. Post-Trial Motions

On June 5, 2020, the Court issued a lengthy decision denying Teman's post-trial motions, made under Federal Rules of Criminal Procedure 29 and 33. *See* Dkt. 138. The motions, filed by trial counsel, argued, *inter alia*, that the evidence was insufficient as to Teman's criminal intent and as to the bank fraud element of a material misrepresentation; that the Government and the Court had constructively amended the Indictment; that venue was improper; that the Court had improperly excluded a proposed defense expert witness on RCCs; that an alternate juror had

lied during voir dire; and that the Government had failed to disclose *Brady* and Jencks Act evidence to the defense. The Court's decision also denied a motion by trial counsel for disclosure of grand jury transcripts.

### D.    Sentencing

Teman's sentencing was initially scheduled for December 1, 2020. Dkt. 182. Trial counsel prepared Teman's sentencing submissions. *See* Dkt. 145–147. At the hearing, incoming counsel, from Sher Tremonte LLP, Dkts. 154–155, took the lead representing Teman. The hearing ended without proceeding to sentencing, however, after the Court notified Teman that a *Curcio* hearing would be needed because an incoming lawyer was married to an Assistant United States Attorney for the Southern District of New York, the office prosecuting Teman; Teman thereupon stated his intention to terminate Sher Tremonte. On January 28, 2021, trial counsel moved to withdraw after new counsel, Susan G. Kellman, Esq., and Andrew Frisch, Esq. appeared for Teman. *See* Dkts. 204–205 (motions to withdraw); Dkts. 206–208 (granting motions and "commend[ing] trial counsel for the energetic and high-quality representation of Mr. Teman and for their unflagging professionalism").

Teman's sentencing was held July 28, 2021. Dkt. 276 (transcript) ("Sent. Tr."); *see also* Dkt. 253 (judgment). The Court principally sentenced Teman to a term of 12 months and one day's imprisonment, followed by a three-year supervised release term. The sentence was below the applicable guideline range of 30 to 37 months' imprisonment. Sent. Tr. at 64. Teman then moved for bail pending appeal, which the Government opposed. The Court found the appellate issues that Teman's counsel had identified in advance of the hearing not to present substantial questions of law or fact under 18 U.S.C. § 3143(b)(1)(B). *See* Sent. Tr. at 100–11.

Late in the hearing, however, Kellman identified an additional appellate issue: to claim ineffective assistance by trial counsel based on the decision to call Reinitz, given the damaging

text messages between him and Teman received on cross-examination. *See id.* at 111–12. The Court, noting the unusual nature of Reinitz's testimony, held that claim to satisfy § 3143(b)(1)(B), albeit narrowly. Sent. Tr. at 116–17. But the Court emphasized that it regarded the claim of ineffective assistance as meritless, for two reasons. First, trial counsel Gelfand and DiRuzzo, faced with daunting evidence of Teman's guilt, had done "a superb job," and "far from being ineffective, were excellent and superior lawyers." *Id.* at 114. The decision to call Reinitz, the Court held, was amply defensible, because, in the "alternative world" in which "Reinitz doesn't testify, the defense has literally nothing." *Id.* at 115. The Court added:

> "In other words, in a world of very few options, where you had frankly a between-the-eyes bank and wire fraud here, I understand why the defense went with Mr. Reinitz and hoped that a reputable Wall Street lawyer who at least was prepared to give oral testimony that, if credited, would have been helpful to Mr. Teman, might have saved the day. I understand why, in the light of day, with all of [us] quoting the text messages, it looks differently. But in real-time, it was absolutely a debatable determination."

*Id.* at 115–16. Second, the Court found no prejudice to Teman from trial counsel's decision to call Reinitz. Were Reinitz's testimony excised, the Court stated, there would be "nothing left" for the defense. *Id.* at 116. The Court explained:

> "You've got all customers saying we didn't authorize his. You have no contractual basis to argue that they had. The cross-examination, although vigorous and effective and exposing some inconsistencies and the like [on the part] of the customers, did no damage on the fundamental issue of whether they had consented t[o] remote checks in general or to the specific fees at all. It was destined to be a government verdict without something to change things."

*Id.*; *see id.* at 117 ("there was extremely effective assistance here" and trial counsel's decision to call Reinitz "was absolutely debatable, absolutely justifiable, and completely non-prejudicial").

### E.    Direct Appeal

On June 8, 2023, the Second Circuit affirmed Teman's convictions in a summary order. *See United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974, at *3 (2d Cir. June 8, 2023).[3] The Circuit rejected Teman's claims, *inter alia*, of constructive amendment, improper venue, prosecutorial and judicial misconduct, and a deficient verdict form. The Circuit deemed Teman's ineffective assistance of counsel claim "premature," because "the record [wa]s not sufficiently developed to allow for appellate review." *Id.* at *3. It noted that that claim had been "raised only orally, at a post-sentencing hearing," and thus Teman's trial counsel "did not have a chance to explain the strategy behind the decision to call Reinitz." *Id.* It stated that Teman could present that claim in a § 2255 motion. *Id.*

### F.    Post-Appeal Events

On October 10, 2023, Teman reported to serve his sentence, Dkt. 405. While in custody, Teman moved multiple times for compassionate release; the Court denied these motions. *See, e.g.*, Dkts. 414, 434.

On January 25, 2024, the Court denied a Rule 33 motion that Teman made after the affirmance of his convictions, based on asserted new evidence relating to 18 Mercer, one of his Customers. *See* Dkt. 415. Teman's appeal of that decision is pending before the Second Circuit. *United States v. Teman*, No. 24-345-cr (2d Cir. appeal docketed Feb. 8, 2024).

On May 28, 2024, Teman was released from a residential reentry facility and began his term of supervised release, supervised by the U.S. Probation Office in the Southern District of

---

[3] Shortly after sentencing, Teman terminated Kellman and Fritsch. Dkt. 275. On appeal, he was represented by a new lawyer, Eden P. Quainton, Esq.

Florida. Dkt. 450 at 1.[4]  On September 16, 2024, the Court authorized Teman to travel to Israel, but set a deadline of November 6, 2024, proposed by Teman, for his return.  Dkt. 456.  Teman's stated reason for the travel was to be in Israel, where his parents reside, for the Jewish holidays and to be with his mother while she recovered from surgery.  Dkt. 454.  In a series of orders, the Court extended the return date, at Teman's request, until June 1, 2025, while emphasizing that that deadline was firm.  *See* Dkts. 531, 536, 541, 549, 558.

Teman did not, however, return to the United States.  On June 12, 2025, the United States Probation Department issued a report, charging Teman with violating conditions of supervised release based on his apparent absconding.  These allege a failure to return and a failure to report in person to his probation officer.  Teman is scheduled to be arraigned on those charges on July 7, 2025.  Dkt. 560.

## II.    Teman's § 2255 Motion

On October 30, 2024, Teman, through new counsel, Thomas C. Butler, Esq., filed the instant motion pursuant to § 2255, claiming ineffective assistance by trial counsel Gelfand and DiRuzzo.  Dkt. 458 ("Mtn.").  Teman's memorandum of law in support, Dkt. 459 ("D. Mem."), alleges various lapses on trial counsel's part.

On November 7, 2024, the Court issued an order, finding that Teman's § 2255 motion demonstrated a need for sworn testimonial statements by trial counsel, and directing that Teman, if he elected to proceed with the motion, publicly file a form waiving attorney-client privilege as to Gelfand and DiRuzzo.  Dkt. 466.  On November 18, 2024, Teman did so.  Dkt. 468.  The Court then ordered Gelfand and DiRuzzo to file sworn affidavits addressing the issues raised in

---

[4] The terms of supervised release, as modified, require Teman to obtain authorization from the Probation Department and the Court to travel internationally. Dkts. 453; Dkt. 454 at 2 (order of July 10, 2024, with procedure for foreign travel requests)

the motion. Dkt. 469. On January 31, 2025, they did so. *See* Dkts. 489 ("Gelfand Aff."), 490

("DiRuzzo Aff.") On April 7, 2025, the Government filed a memorandum of law in opposition.

Dkt. 526 ("G. Mem."). On May 12, 2025, Teman filed a reply, Dkt. 538 ("Reply"), which

attached a new affidavit from Teman attaching exhibits not previously part of the record,

Dkt. 538-1 ("Teman Aff."). On May 14, 2025, the Court, noting Teman's introduction of new

factual material in his affidavit, directed trial counsel to submit supplemental affidavits

addressing the new material. Dkt. 542. On May 28, 2025, Gelfand and DiRuzzo did so.

Dkt. 552 ("DiRuzzo Supp. Aff."); Dkt. 553 ("Gelfand Supp. Aff."). On June 6, 2025, Teman's

counsel sought leave to respond to the supplemental affidavits, Dkt. 557, which the Court

approved, Dkt. 558. On June 13, 2025, Teman filed a supplemental affidavit in response.

Dkt. 559 ("Teman Supp. Aff."). On June 24, 2025, the Government filed an authorized reply.

Dkt. 561.

## III.    Discussion

Teman's § 2255 motion broadly accuses his trial counsel of ineffective assistance. The

claimed lapses on their part center on, but go beyond, the decision to call Reinitz at trial in

support of an attempted advice-of-counsel defense. Gelfand and DiRuzzo, for their part, have

submitted detailed affidavits which chronicle their representation of Teman. These definitively

defeat Teman's opportunistic, and graceless, bid to shift responsibility for the jury's guilty verdict

to his dedicated and capable counsel.

For the reasons that follow, the Court denies Teman's § 2255 motion.

### A.    Applicable Legal Standards

#### 1.    Section 2255 Motions

Section 2255 enables a prisoner sentenced by a federal court to petition that court to

vacate, set aside, or correct a sentence "imposed in violation of the Constitution or laws of the

14

United States" or "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Relief under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citation omitted).

### 2. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel, however, is a permissible basis for bringing a § 2255 petition. The Sixth Amendment guarantees a criminal defendant the right "to effective assistance from his attorney at all critical stages in the proceedings." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013); *see also Lafler v. Cooper*, 566 U.S. 156, 162 (2012); *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014).

A defendant claiming ineffective assistance must establish that (1) his "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to the first prong, a court "must judge [counsel's] conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess . . . strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690). The court starts from a "strong presumption" that counsel's conduct fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. That is because there are many ways to provide effective assistance, and "[e]ven the best criminal defense attorneys would not

15

defend a particular client in the same way." *Id.* at 689–90; *see id.* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."); *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015).

With respect to the second *Strickland* prong, a defendant must show that he was prejudiced—*i.e.*, but for counsel's errors, there was a reasonable probability that the outcome would have been different, a "probability sufficient to undermine confidence in the outcome." *Bierenbaum v. Graham*, 607 F.3d 36, 51 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). This requires the court to examine "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *United States v. Lopez*, No. 21 Civ. 2698, 2023 WL 111784, at *3 (S.D.N.Y. Jan. 5, 2023) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citation omitted)).

### B.    Application

Teman's claim of ineffective assistance takes a grapeshot approach, arguing that, in 10 respects, his trial counsel's performance was deficient. The Court first evaluates—and rejects—those arguments. The Court then explains why counsel's overall advocacy, viewed holistically, was highly effective, including securing before trial the dismissal of counts carrying mandatory minimum sentences that had alone exposed Teman to a sentence four times longer than the one ultimately imposed. The Court then explains why, even assuming that trial counsel's strategic decisions had been found deficient, these did not prejudice Teman.

#### 1.    Trial Counsel's Performance

##### a.    *The decision to call Reinitz*

Teman's main basis for claiming ineffectiveness is the strategic decision to call his attorney, Reinitz, as a defense witness at trial. That decision, he argues, was "catastrophic" in

that it enabled the introduction of his damaging text exchanges, which "virtually guaranteed a conviction in a case where the jury could easily have voted to acquit." D. Mem. at 29.

At the post-sentencing hearing on Teman's bail-pending-appeal motion, the Court explained why, even without the benefit of explanatory affidavits from trial counsel, the decision to call Reinitz, far from being deficient, was rational and strategic. As the Court explained, Teman's circumstances as of the close of the Government's case had been dire. The evidence adduced of his guilt was overwhelming. It had conclusively established that Teman had personally created and drawn—and deposited into accounts of his GateGuard company—checks totaling $333,000 on the accounts of three distinct sets of Customers; that the outsized amounts of many individual checks alone exceeded by many multiples the sums the Customer had paid for Teman's products and services; that Teman had done so after disputes about product quality had arisen that had enraged him and led each Customer to terminate doing business with GateGuard; and that Teman had created and deposited the 27 April checks despite Bank of America's having imposed a chargeback on GateGuard's account in the sum of the March checks. Rule 29/33 Decision at 3–12. And the three Customers, who were independent entities, had each forcefully denied under oath that they had, improbably, authorized Teman to unilaterally draw and negotiate checks on their accounts. *See id.* at 10. Given this evidence, a guilty verdict was inevitable, unless some evidence could be received supporting that Teman had acted without fraudulent intent. As the Court explained:

> "Reinitz at least gave the defense something. Reinitz gave oral testimony that he told Mr. Teman, in effect, notwithstanding the text messages, something about this[,] or that[] at least the creation of remote checks was legal. I think the jury rather obviously rejected that and found it relevant that Reinitz never memorialized that purported advice, and the other elements of advice of counsel weren't met either.

17

In other words, in a world of very few options, where you had frankly a between-the-eyes bank and wire fraud here, I understand why the defense went with Mr. Reinitz and hoped that a reputable Wall Street lawyer who at least was prepared to give oral testimony that, if credited, would have been helpful to Mr. Teman, might have saved the day. I understand why, in the light of day, with all of [us] quoting the text messages, it looks differently. But in real-time, it was absolutely a debatable determination.

You've got all customers saying we didn't authorize this. You have no contractual basis to argue that they had. The cross-examination, although vigorous and effective and exposing some inconsistencies and the like [on the part] of the customers, did no damage on the fundamental issue of whether they had consented t[o] remote checks in general or to the specific fees at all. It was destined to be a government verdict without something to change things."

Sent Tr. 116–17.

The affidavits by Gelfand and DiRuzzo powerfully reinforce that calling Reinitz was a strategic call and a reasonable one at that—indeed, the epitome of a real-time decision by trial counsel that the case law applying *Strickland* makes ill-suited to hindsight condemnation. "[W]hether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial," *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see also United States v. Romero*, 1993 WL 485677 at *7 (S.D.N.Y. Nov. 22, 1993), *aff'd*, 54 F.3d 56 (2d Cir. 1995), and courts have widely recognized that tactical decisions as to witness selection "are ordinarily not viewed as a lapse in professional representation," *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000).

Gelfand and DiRuzzo are credentialed and experienced defense lawyers.[5] Their detailed affidavits reflect both their rigorous preparation for trial and clear-eyed assessment of Teman's predicament at the time the decision was made to call Reinitz.

---

[5] Gelfand graduated in the top 5% of his law school class; served as a federal prosecutor at the U.S. Department of Justice's Tax Division in Washington, D.C., for approximately five years; and since 2014 has worked in private practice as a criminal defense lawyer, based in St. Louis, Missouri. He has tried criminal cases in approximately 20 judicial districts; is a member of the

As they explain, leading up to trial, in addition to engaging in motion practice that twice resulted in the dismissal of counts,[6] they had thoroughly investigated the Indictment's allegations and potential lines of defense. They had requested documentation both from Teman and from the Government (beyond the Rule 16 discovery it had provided); they had obtained evidence from third parties via subpoenas; and they had interviewed witnesses, including Reinitz, by phone and in person. Gelfand Aff. ¶ 11. They had also met extensively with Teman to discuss trial strategy, including preparing for his possible trial testimony. *Id.* They had also assessed alternatives to trial, including a guilty plea or even the possibility of a corporate guilty plea in lieu of personal criminal exposure, but Teman was "adamant that he intended to exercise his constitutional right to a jury trial and expressly prohibited [trial counsel] from engaging in plea negotiations with the prosecution" on any terms. *Id.* They had also learned from Teman early on that "neither he nor his businesses had filed federal income taxes for many years." *Id.* ¶ 14. That exposed Teman to federal prosecution for tax crimes; Teman, however, refused counsel's offer to mitigate this risk by helping Teman "become compliant with his federal tax obligations." *Id.* Teman's criminal tax exposure also counseled against seeking to delay trial, as such increased the odds that the Government, consistent with its usual pretrial diligence, would eventually pull Teman's and/or GateGuard's tax returns and discover Teman's failure to file, as to which "there was absolutely no defense" under 26 U.S.C. § 7203. DiRuzzo Aff. ¶ 6(b).

---

Criminal Justice Act panel in the United States District Court for the Eastern District of Missouri, representing indigent defendants; teaches trial advocacy as an adjunct faculty member at Harvard Law School; and teaches continuing legal education courses, and has published, including as to criminal defense issues. Gelfand Aff. ¶¶ 4–7. DiRuzzo has tried more than 50 cases at the federal and state levels. DiRuzzo Aff. ¶ 4(b).

[6] The Court addresses these dismissals and trial counsel's other motions *infra*, in assessing trial counsel's overall performance. *See* pp. 46–47.

As Gelfand and DiRuzzo explained, based on the state of play as of the close of the Government's case, Teman was certain to be convicted. Teman's Customers had each firmly denied authorizing him to draw checks on their accounts. There was no contrary evidence. And the circumstantial evidence that Teman had drawn the checks on his own impulse, without customer permission, was overwhelming. As Gelfand put the point: "By that point in the trial, each of the alleged victims had testified in no uncertain terms that Mr. Teman effectively attempted to steal their money without their consent by creating RCC's and depositing them, [and] the contract that at least arguably permitted the use of RCC's under certain circumstances was not in evidence." Gelfand Aff. ¶ 18.

Critically, despite persistent requests from trial counsel, Teman had not provided counsel with *any* document that supported that terms and conditions purportedly authorizing him to draw remotely created checks on Customer accounts had been in place at the time the three Customers had contracted with GateGuard, so as to support an argument that Teman, in drawing the checks, had acted with non-culpable state of mind. Gelfand attested that he and DiRuzzo had gone "to great lengths for Mr. Teman to provide any documents with reliable date stamps and/or metadata that established that the operative terms with RCC language were actually selected by the customers testifying against him at trial. Despite our repeated requests for this information and despite the fact that Mr. Teman's company was a technology company at its core," Teman had not come forward with any such document, which was "at the core of Mr. Teman's only viable defense at trial." *Id.* ¶ 15. DiRuzzo similarly attested: "The Defendant and his companies lacked the documentary evidence regarding the terms and conditions used by customers of GateGuard. I found it curious that a purported 'tech' company lacked the various iterations of the terms and conditions that its customers purportedly signed." DiRuzzo Aff. ¶ 5(a); *see also id.* ("Neither the

Defendant nor GateGuard had any evident that its customers actually agreed to the terms and conditions (there were no signatures, nor 'Docusign' documents")).[7] Trial counsel also "went to great lengths for Mr. Teman to identify any witness other than himself (if he chose to testify) or Mr. Reinitz who could authenticate the operative business document that purported to give Mr. Teman the right the use an RCC for an outstanding debt," but those efforts, failed, too. Gelfand Aff. ¶ 15.

That left the defense "with only two ways to introduce" the document containing such terms that Teman sought to contend had been in place and authorized him to draw the checks on the Customers' accounts: through Teman's testimony or Reinitz's. *Id.* ¶ 15. As trial counsel attest, they determined that calling Teman would damage his cause. DiRuzzo attested:

> "The Defendant was advised of his right to testify, and I informed him that I thought he would make an exceedingly poor witness if he testified. In short, having tried over 50 cases at the federal and state levels, I concluded that the jury would (i) not find the Defendant to be credible, (ii) would disbelieve the Defendant's testimony, and (iii) would not like the Defendant's personality, and (iv) would not like him as a person. I arrived at that conclusion after having conducted mock examinations (both direct and cross) of the Defendant in advance of trial and having spent substantial time with the Defendant (both in and out of court). It is also my understanding that co-counsel Justin Gelfand had performed multiple mock examinations of the Defendant and arrived at the same conclusion. The Defendant elected to exercise his constitutional right not to testify."

DiRuzzo Aff. ¶ 4(b). And to the extent Teman might testify about legal advice he had received, DiRuzzo concluded, "the jury could easily discount the testimony of the Defendant as being entirely self-serving. In my view, the jury would expect that the defense would call the attorney himself who gave the advice that forms the reliance of counsel defense." *Id.* ¶ 4(c). Gelfand similarly attested:

---

[7] The Court addresses *infra* Teman's claim that such documents in fact existed and that he had furnished them to trial counsel. *See* pp. 31–37.

"[E]very lawyer that participated in preparing for [Teman's] possible testimony at trial and evaluating it felt strongly that he should not testify in his own defense. To be clear, we expressly and repeatedly advised Mr. Teman of his right to testify and that the decision was his and his alone—a point this Court reiterated outside the presence of the jury at trial to Mr. Teman directly. But based on my individual trial experience, I advised Mr. Teman that the jury would not find his testimony credible, would not develop positive feelings for him based on how his affect and personality may come across to certain jurors, and that they would likely convict him as a result. I also advised that he could be asked questions on cross examination that would expose him to other criminal conduct."

Gelfand Aff. ¶ 19 (noting that his law partner, Margulis, had observed Teman's mock testimony and reached the same conclusion). Teman agreed that he should not testify. *Id.*; *see also* DiRuzzo Aff. ¶ 4(b).

That left Reinitz. As both Gelfand and DiRuzzo attested, they, consulting with Teman, carefully weighed calling Reinitz. *See, e.g.*, Gelfand Aff. ¶¶ 15–17; DiRuzzo Aff. ¶ 4. All three concluded that the advantages favored doing so. No other witness could attest to the presence of terms and conditions containing RCCs at any time. And Reinitz's testimony that he had advised Teman that depositing RCCs drawn on customer accounts was legal and that the Payment Terms purportedly in place gave Teman "explicit authority to do so" supported an otherwise unavailable jury instruction on the advice of counsel defense.

DiRuzzo explained the group's reasoning this way: "At bottom, without the testimony of Mr. Reinitz[,] there would not have been a reliance of counsel defense, no jury instruction would have been given, and the Defendant wouldn't have had any articulable theory of the case to argue to the jury." DiRuzzo Aff. ¶ 4(d). The defense team, he attested, took into account the harm from Reinitz's unfavorable texts to Teman, "but ultimately, given that Mr. Reinitz was the only witness besides the Defendant[,] it was a calculated risk that we were willing to accept." *Id.* Gelfand elaborated on the decision:

"As to Mr. Teman's claim that I failed to act reasonably by calling Ariel Reinitz as a defense witness in our case-in-chief at trial—a decision he vocally encouraged and supported—there is no merit to that contention. Prior to trial, Mr. DiRuzzo and I interviewed Mr. Reinitz extensively—by phone and in person in New York. We also requested and obtained documents and correspondence between Mr. Reinitz and Mr. Teman, Mr. Reinitz and other individuals including Mr. Teman's customers and financial institutions, and other information in response to certain questions we asked during the course of our representation. We discussed with Mr. Teman the legal parameters of a "reliance on counsel" defense and the possible downsides of pursuing such a defense. We expressed our concern that a jury may very well be inclined to convict him based on some of the warnings Mr. Reinitz gave to Mr. Teman in advance of Mr. Teman's alleged criminal conduct at issue in this case, and we also collectively concluded strategically that a reliance of counsel defense was one of the only viable factual defenses and that Mr. Reinitz was the *only* witness who could authenticate a document that was at the heart of Mr. Teman's defense throughout these proceedings: the document with the RCC terms."

Gelfand Aff. ¶ 15 (emphasis in original). Gelfand rebuked as dishonest and self-serving the

characterization in Teman's § 2255 petition of the decision to call Reinitz:

"To be clear, [Teman's] suggestion that the decision to call Mr. Reinitz was not strategic and was 'made at the last minute' without strategy is baseless. Mr. Teman made a choice: he elected not to testify in his own defense, and therefore the only viable option to even [] stand a chance of an acquittal at trial was to call Mr. Reinitz. Mr. Teman's new counsel now claims that calling Mr. Reinitz "completely undermined Teman's defense." But with all due respect, that analysis overlooks basic rules of evidence and criminal procedure. Mr. Reinitz's testimony was needed because it was the only way the document with RCC language could be authenticated at trial. In other words, Mr. DiRuzzo and I were faced with the difficult strategic question: call Mr. Reinitz with the risks inherent in his testimony and the other evidence that would inevitably then be admitted, or not call Mr. Reinitz and have literally no viable defense for a client who was unwilling to consider a guilty plea and who was exercising his constitutional right to go a trial. To that extent, even though the prosecution never entirely connected certain dots at trial, we were concerned that some of the RCC's Mr. Teman created were for specific purposes and amounts that had no connection to the contractual terms. Mr. Reinitz's testimony—at a bare minimum—enabled us to introduce his testimony that he told Mr. Teman what he did was *legal*, even if it was a terrible idea that would likely lead to real problems for Mr. Teman. He enabled us to argue to the jury that a big firm New York lawyer, licensed and in good standing, who was Mr. Teman's long term attorney led Mr. Teman to believe the use of RCC's was *legal*.

. . .

23

> As trial counsel faced with the factual and legal backdrop we were in, we did consider the significant possible downside with calling Mr. Reinitz and, with Mr. Teman's full agreement, we collectively made the tactical decision to call Mr. Reinitz in large part because it was the only card we had to play."

*Id.* ¶¶ 16, 19.

Under these circumstances, the decision to call Reinitz—the centerpiece of Teman's § 2255 claim—cannot responsibly be cited as a basis for claiming ineffective assistance of counsel. Teman argues that that decision was mistaken and doomed his fate at trial. In fact, it was a classic tactical decision by defense counsel of the sort the case law has held not a basis for finding a lapse in professional representation. *See, e.g.*, *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Best*, 219 F.3d at 201 ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." (citation omitted)); *accord United States v. Thornhill*, 34 F. Supp. 3d 334, 369 (S.D.N.Y. 2014), *aff'd*, 667 F. App'x 310 (2d Cir. 2016); *Santana v. Capra*, 284 F. Supp. 3d 525, 541 (S.D.N.Y. 2018); *United States v. Daugerdas*, 915 F. Supp. 2d 493, 495 (S.D.N.Y. 2013). And Teman's conviction does not fortify his claim. Courts are to evaluate counsel's performance at the time of the challenged action or omission, not with the benefit of hindsight. *See, e.g.*, *Mayo*, 13 F.3d at 533 (court "must judge [counsel's] conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess . . . strategy choices" (quoting *Strickland*, 466 U.S. at 690)); *Pena v. United States*, 192 F. Supp. 3d 483, 490 (S.D.N.Y. 2016) (such "strategic decision[s], whether wise in retrospect or not, [are] among those professional judgment calls that are 'unchallengeable' under *Strickland*"); *Baran v. United States*, 160 F. Supp. 3d 591, 598 (S.D.N.Y. 2016) (same); *Daugerdas*, 915 F. Supp. 2d at 497 (same).

This case, in fact, supplies an excellent illustration of why courts have respected these familiar principles, and have not premised the relatively rare findings of ineffective assistance based on debatable strategic calls or unsuccessful outcomes. As the affidavits from trial counsel powerfully demonstrate, at the close of the Government's case, Gelfand and DiRuzzo were presented with a difficult decision. The prosecution's proof, centered on the unrefuted denials by all three Customers that they had authorized to draw the outsized checks on their accounts, made Teman's conviction all but certain. *See* G. Mem. at 25–26 (chronicling the overwhelming evidence of Teman's guilt). Evidence—some evidence—somehow supporting that Teman might had acted without fraudulent intent, *i.e.*, believing he had authority to draw the checks, was required to have any chance of averting a conviction. Teman, the client, had not helped his trial cause. Despite counsel's repeated requests, he had been unable to come forward with any document supporting that terms and conditions authorizing him to remotely create checks on customer accounts had been in place at the time the Customers had contracted, let alone evidence that the Customers, improbably, had viewed and approved these terms. Likely none existed. And mock examinations had led trial counsel (and Teman) to firmly rule out calling him as a defense witness. No witness other than Reinitz had any potential to offer evidence bearing on Teman's state of mind. Reinitz at least was prepared to testify that he had orally advised Teman that drawing remote checks on customer was technically legal. And he could testify about a version of the payment terms—albeit one in place in January 2019, after Teman's feuds with the Customers began—that authorized RCCs. Gelfand Aff. ¶ 15. That provided grist for a defense summation. On the other hand, Reinitz's testimony would open the door to his memorable and damaging text messages preceding Teman's March and April 2019 check-writing that warned Teman in strong terms about potential arrest and prosecution.

In these circumstances, the decision whether to call Reinitz was a quintessential hard strategic call over which reasonable conscientious defense counsel could differ. Trial counsel were conscientious. They demonstrably gave thoughtful attention to the pros and cons. Faulting —and terming them ineffective—for the decision to call Reinitz could only be an exercise in hindsight. The same salvo could have been leveled against the opposite decision: *not* to call Reinitz. Either choice (to call him or not to call any witness) entailed a high likelihood of conviction. And given Teman's self-interested second-guessing of his dedicated legal team here, trial counsel likely would have been damned in a § 2255 by a convicted Teman as to either choice they made. The tactical choice they made was defensible, responsible, and considered. The decision to call Reinitz may well have been a Hail Mary pass—a last-chance bid with low odds of success. But if so, it was a Hail Mary pass where there was no other viable option in the playbook. Simply put, counsel defensibly evaluated the alternative scenario, in which the jury would not receive any evidence rebutting the compelling proof of Teman's fraudulent intent, as clinching a conviction, and took the one route they concluded had any promise of success.

For these reasons, the Court rejects Teman's claim of ineffective assistance to the considerable extent that it is based on the decision to call Reinitz.[8] That decision proved ineffective insofar as it did not avert a conviction, but it was not—in the least—an act of ineffective assistance of counsel. *See, e.g.*, *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir. 1987) ("The benchmark for judging any such claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."); *United States v. Yingst*, 623 F. App'x 17, 21 (2d Cir. 2015) ("The standard for evaluating the adequacy of counsel's representation is 'a most deferential one.'" (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011))); *Aparici*, 269 F.3d at 95 (courts must "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and be watchful 'to eliminate the distorting effects of hindsight'" (quoting *Strickland*, 466 U.S. at 689)).

---

[8] Also far off-base is Teman's attack on his counsels' decision not to seek a limiting instruction as to Reinitz's testimony. He argues that counsel should have moved, under Federal Rule of Evidence 403, to exclude the portions of Reinitz's testimony that ultimately proved unhelpful or damaging to Teman's case. D. Mem. at 52–54. That argument is legally baseless. As Gelfand correctly analyzed the point: "By placing 'reliance on counsel' into play—a strategy Mr. Teman not only agreed with but insisted on—there was no good faith basis in seeking to exclude the negative statements from Mr. Reinitz to Mr. Teman." Gelfand Aff. ¶ 14. Moreover, he stated, even had such an instruction been granted, "in my view as a trial lawyer, a limiting instruction often draws attention to a fact to the jury that would not otherwise be emphasized." *Id.* ¶ 24. That choice too is off-limits as a basis to claim ineffective assistance, as counsel's "failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a defendant is] entitled." *Forbes v. United States*, 574 F.3d 101, 106 (2d Cir. 2009); *see also, e.g.*, *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984) ("[T]he Sixth Amendment does not require that counsel do what is impossible or unethical."); *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (same); *Jameson v. Coughlin*, 22 F.3d 427, 429–30 (2d Cir. 1994) (similar).

        *b.*      *Teman's competency during trial*

Teman next argues that his trial counsel performed unreasonably when they failed to request a competency evaluation or to request a trial adjournment on account of competency concerns. *See* D. Mem. at 54–57.

That argument is contrived. It, tellingly, was not raised by any of the estimable counsel who represented Teman post-conviction. Those included the sentencing counsel who identified ineffective assistance of counsel (based solely on the decision to call Reinitz) as an issue that could support bail pending appeal, *see* Sent. Tr. at 111–12, and whose sentencing submissions bespoke deep familiarity with Teman's medical and mental health history, *see* Dkt. 242 at 11– 15; *see also* Dkt. 145. It also included Teman's counsel on his unsuccessful direct appeal, whose formulation of the ineffective assistance claim was also based solely on the decision to call Reinitz. *See United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974, at *3.

Teman's claim is also emphatically refuted by the affidavits of his trial counsel. Gelfand attested:

> "Without question, Mr. Teman did not lack competence during his criminal case. Mr. Teman was always fully engaged during our attorney-client relationship and was very involved with the defense team as we worked on his case, regularly communicating with his lawyers in a way that reflected he understood the proceedings and the ramifications of certain decisions assisting with his own defense. In the weeks leading up to trial, Mr. Teman and I spent several days together in person in St. Louis—and we had the opportunity to interact both in the office and in out-of-office settings. I never questioned Mr. Teman's competency. Furthermore, consistent with the terms of his release, Mr. Teman saw a mental health professional. To be clear, like many clients I have who are charged with criminal offenses, Mr. Teman has sadly struggled with certain mental health conditions—at times throughout our representation including to this Court, he purported to have suicidal thoughts. On a personal level, I found (and find) Mr. Teman's mental health struggles to be incredibly sad and unfortunate, but again, there was absolutely no reason why I would question Mr. Teman's competency."

Gelfand Aff. ¶ 26. Gelfand's assessment carries particular weight because he had known Teman since both were undergraduates at Brandeis University, and thus had both a reference point well in advance of the criminal case and longstanding familiarity with Teman. *See id.* ¶ 25 ("Unlike most clients, I also had the benefit of knowing Mr. Teman prior to our attorney-client relationship, as I knew him when we were both undergraduate students at Brandeis University. While we were not particularly close friends in college, I communicated and interacted with him. Mr. Teman was the same person."). DiRuzzo similarly attested:

> "Teman wasn't incompetent, far from it. He appreciated the nature of the proceedings, actively engaged with his attorneys . . . and had lucid and insightful discussions before, during, and after trial. At no point in time was there anything that would have led me to believe that [Teman] was not competent."

DiRuzzo Aff. ¶ 6(b).

In keeping with trial counsels' assessments, neither Teman nor the Government ever requested a competency evaluation. And the Court's attentive observations of Teman's conduct and comportment through trial and sentencing were also incompatible with his present claim. Teman fully complied with his conditions of pretrial release. He timely appeared at conferences and at trial. That entailed travel to this District from his home in Miami Beach. He presented throughout pretrial and trial proceedings as highly engaged, communicative, composed, and friendly with his counsel. On occasions when the Court engaged directly with him, such as confirming his waiver of his right to testify, he was coherent, articulate, and visibly intelligent. And his remarks both at his originally scheduled sentencing hearing on December 1, 2020, *see* Dkt. 182 at 19–20, 22, 31–37, and at his eventual sentencing hearing on July 28, 2021, *see* Sent. Tr. at 55–63, were notably articulate and balanced, and were leavened at points with appropriate humor.

In this context, the pretrial incident in December 2019 on which Teman bases his present claim, in which he sent a wrought note to the Court expressing suicidal thoughts, although reflecting anguish at his predicament facing trial, did not bespeak a lack of competence. And Teman, in an assessment shared by his counsel, who were present, assured the Court at a follow-on conference that he was well and that his distress at the time of the note had been caused by sleep problems that he had since resolved. *See* Dkt. 321-1, at 3–5 (transcript of January 10, 2020 robing room conference).

The Court thus rejects as baseless and convenient Teman's claim that his trial counsel were ineffective for failing to seek a competency evaluation. *See, e.g., United States v. Diaz*, 176 F.3d 52, 113 (2d Cir. 1999) (counsel's decision not to present mental-incapacity defense did not support claim of ineffective assistance where evidence contemporaneously known to counsel undermined defendant's post-hoc claim of incompetence); *Oyague v. Artuz*, 393 F.3d 99, 106 (2d Cir. 2004) (rejecting post-hoc claim of incompetence based on prior drug use where defendant's contemporaneous representations to the district court supported his competence); *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986) (same, where "court did not observe any unusual behavior by the defendant in the courtroom which would provide a basis for doubting [the defendant's] competence"); *Vaughn v. United States*, No. 4 Civ. 1055, 2007 WL 3084969, at *3 (S.D.N.Y. Oct. 22, 2007) (same, where defendant's contemporaneous "on-the-record statements affirm[ed] his understanding of the [proceedings]"); *Davila v. United States*, No. 7 Civ. 1320, 2008 WL 906691 at *12 (E.D.N.Y. Mar. 31, 2008) (counsel's decision not to request psychiatric examination did not support claim of ineffective assistance where there was "no evidence to suggest that [defendant] was not competent to proceed"); *see also, e.g., Loliscio v. Goord*, 263 F.3d 178, 192 (2d Cir. 2001) (Sotomayor, J.) ("A fair assessment of attorney performance

requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at *the time*." (quoting *Strickland*, 466 U.S. at 689) (emphasis added)); *Mayo*, 13 F.3d at 533 (same).

There is likewise nothing to Teman's argument that trial counsel were ineffective in not requesting an adjournment of trial for reasons relating to his competence. Teman recites this grievance in a header in his brief, D. Mem. at 54, although the substance of his brief references a continuance only in connection with the separate argument that such might have enabled him to obtain housing-court documents that could have been used to impeach the credibility of one Customer. *Id.* at 69–70. In all events, Teman's position at the time of trial was the opposite. As his trial counsel attest, they "expressly communicated with Mr. Teman that [they] could seek an adjournment of the trial date" but he was "adamantly opposed to a continuance, convinced he would be acquitted notwithstanding the risks and determined not to be under the conditions of release any longer." Gelfand Aff. ¶ 27.

> c.   *Failure to admit the "correct payment terms"*

In another argument absent from his earlier iterations of his ineffective-assistance claim, Teman faults his trial counsel for "fail[ing] to admit the correct payment terms." D. Mem. at 49. These, he contends, "would clearly show that Teman was entitled to make the deposit[.]" *Id.*; *see also id.* at 47–51. Teman's petition attaches five documents (or sets of documents). He claims that, if admitted at trial, these would have established that payment terms were in place by 2016—before the three Customers contracted with GateGuard and before his feuds arose with them in 2018—that authorized him to draw remote checks on their accounts for the fees he

imposed in March and April 2019, such as the $18,000 "device removal fee" he took for each GateGuard intercom. *See* Dkt. 459-1-5 ("Exhibits 1 to 5").

This argument is easily put aside.

To begin, viewed singly or together, the five documents (even assuming proper authentication) do not establish—or come close to establishing—that such payment terms were in place at the time the three Customers contracted, let alone that the Customers accessed them.

Exhibit 1 is a typewritten two-page GateGuard document entitled "Governing Law and Dispute Resolution." *See* Dkt. 459-1. It states that it was last revised on October 30, 2017. *Id.* On its face, it is not connected to any Customer. And Teman's Petition is devoid of documentation indicating that any of the Customers agreed to Exhibit 1.

Critically, too, although Exhibit 1 contains a link to GateGuard's terms and conditions, Exhibit 1 does not identify the terms and conditions in place at the time. Neither does any other document identified by Teman. Exhibit 1 thus does not reveal the critical information: what a customer who accessed the information at that link would have learned at the time of contracting. Yet it was the terms and conditions viewable at this link that, Teman has contended, contained the "payment terms" that authorized GateGuard to draw remote checks on Customer bank accounts for the fees he unilaterally exacted. Exhibit 1 instead contains quotidian provisions governing dispute resolution, including the applicable (Delaware) and arbitral forum (the American Arbitration Association). Exhibit 1 says nothing about the remote creation of checks.

Exhibit 1 thus does not assist Teman's cause. And the notion that Exhibit 1 embodied the governing "payment terms" is inconsistent with Teman's trial claim as to the document that purportedly authorized him to write checks on Customer accounts to pay fees due GateGuard. At trial, he contended that the payment terms and conditions in the January 2019 version of the

terms and conditions document about which Reinitz testified had been in place years earlier, authorizing GateGuard to create and deposit checks on customer accounts for fees like the $18,000 "device removal fee." But Exhibit 1 does not bear any resemblance to the January 2019 document. And the one fee that Exhibit 1 mentions is irrelevant here: It authorizes a $5,000 "service fee" payable to GateGuard in the event an attorney for the customer initiated "calls" or "emails" to GateGuard. *Id.* at 2.

The remaining exhibits are even farther afield. Exhibit 2 consists of 43 pages of emails between attorney Reinitz and Bank of America in May and June 2019, after the bank challenged the checks on Customer accounts that Teman had deposited. *See* Dkt. 459-2. Although Reinitz's emails to the bank asserted that GateGuard's Customers had authorized the checks, Reinitz's say-so (which was hearsay) of course did not (and was inadmissible to) establish that. And the attachments to Reinitz's emails did not include GateGuard's terms and conditions, let alone those, if any, in place at the times the Customers had contracted.

Exhibit 3 consists of 67 pages of additional emails of the same nature between Reinitz and the bank. *See* Dkt. 459-3.

Exhibit 4 consists of a two-page May 2016 email to Teman from attorney Ran Hammer of the Israeli law firm of Gross, Kleinhandler, Hodak, Halevy, Greenberg & Co. ("GKH"), which attaches 35 pages of draft policies relating to a separate Teman company, "SubletSpy." *See* Dkt. 459-4. But none of these materials connects the three Customers to SubletSpy, let alone establish their consent to its policies. And the Payment Terms in the SubletSpy policies do not address remote creation of checks. *See id.* at 13–14. They instead purport to authorize SubletSpy to charge the customer's credit card on file for four enumerated fees (monthly, set-up,

government, and court appearance). These do not track the fees (*e.g.*, $18,000 for "device removal") that GateGuard later purported to charge the three Customers. *Id.*

Finally, Exhibit 5 consists of a one-page December 3, 2018 email from LinkedIn, reflecting that the account of an unidentified person asked to join Teman's LinkedIn network. *See* Dkt. 459-5.

The Petition thus on its face fails to support that Teman's offense conduct was authorized by terms and conditions in place in any document at the times the Customers had contracted. On the record before the Court, no such evidence existed. The obvious inference is that Teman added those payment terms in early 2019, after his feuds with the three Customers arose.

Given the absence of any such documentation, Teman's trial counsel cannot be found to have acted deficiently in not obtaining admission of such evidence. A lawyer cannot offer an exhibit that does not exist. Teman's inability to muster such proof is particularly telling, in that the Court has repeatedly noted the lack of such evidence. The Court did so at a sidebar during Reinitz's trial testimony, *see* Dkt. 460-5 ("1/24/2020 Tr.") at 739–43; in its June 2020 decision denying Teman's post-trial motions under Rules 29 and 33, *see* Dkt. 138 at 26–27, 37–38, 43–44; and in its October 2023 decision, finding Teman's second Rule 33 motion meritless and denying his application to adjourn his surrender date, *see* Dkt. 402 at 13.

The affidavits from Teman's trial counsel underscore their efforts to secure such evidence from Teman—if it existed. Gelfand attested that he and DiRuzzo "went to great lengths for Mr. Teman to provide any documents with reliable date stamps or metadata" establishing that the operative terms authorizing RCCs had been in place at the time the Customers contracted, but that "despite our repeated requests for this information and despite the fact [that] Mr. Teman's

34

company was a technology company at its core," none was forthcoming. Gelfand Aff. ¶ 15. He

added:

> "Mr. Teman never provided documentary evidence that helped his case. To be clear,
> we expressly asked for the metadata from this technology company that supported
> Mr. Teman's contention that these customers accepted the various iterations of the
> terms and conditions he sought to introduce. But not a single witness or reliable
> document provided in advance of trial supported that contention—and our requests
> for metadata were met with silence."

*Id.* ¶ 22. Gelfand added that, "at various times, Mr. Teman provided certain documents prepared

for a separate entity by an Israeli law firm—but perhaps inadvertently, Mr. Teman consistently

conflated documents and entities when we made clear we had to introduce evidence relevant to

the claims in the indictment." *Id.*[9] And "Mr. Teman's position that these GateGuard customers

agreed to these terms because a different company had them drafted by a law firm in Israel was

not a viable defense." *Id.* DiRuzzo's affidavit is in accord. *See* DiRuzzo Aff. ¶ 5(a) ("The

Defendant and his companies lacked the documentary evidence regarding the terms and

conditions used by customers of GateGuard" and "neither the Defendant nor GateGuard had any

evidence that its customers actually agreed to the terms and conditions").

Teman's reply brief responding to trial counsels' declarations does not salvage this theory

of ineffectiveness. It declares that "in 2016, GateGuard was Subletspy." Reply at 2 n.1. And it

argues that trial counsel faltered in not introducing Teman's emails with GKH attorney Hammer,

or perhaps for not calling Hammer as a defense witness at trial. *Id.* at 3. But these attacks on his

counsel fail for multiple reasons, including those ably chronicled in trial counsels' supplemental

affidavits. *See* Gelfand Supp. Aff. ¶¶ 4–11; DiRuzzo Supp. Aff. ¶ 4.

---

[9] Importantly, Gelfand's affidavit tracks trial counsel's real-time representation to the Court,
made at a sidebar during Reinitz's testimony: that the reason the defense was not offering the
original payment terms was "not for lack of trying" but because "we haven't been able to
actually obtain them." *See* 1/24/2020 Tr. at 748.

First, as Gelfand explained, citing Teman's oral and written statements, including an on-point post-trial email he sent to his successor counsel, GateGuard and SubletSpy *were* distinct companies that provided distinct services. Unlike GateGuard, which provided intercom services, SubletSpy assisted landlords "to catch and evict Airbnb-style sublease arrangements . . . that were illegal in certain jurisdiction." Gelfand Aff. ¶ 5; *see* DiRuzzo Supp. Aff. ¶ 4 ("GateGuard and Subletspy were not one [and] the same. I have seen nothing that Subletspy was a d/b/a of GateGuard or that GateGuard was a successor in interest to Subletspy."); *see also* Gelfand Supp. Aff. ¶ 5 ("GateGuard . . . did not exist in in 2016.").

Second, the three Customers had contracted only with GateGuard. Teman had not—and even today does not claim to have—come forward with any document in which they contracted with SubletSpy. And Teman carried out the alleged bank and wire fraud scheme exclusively via GateGuard. As a result, SubletSpy's draft policies—unconnected to the Customers and to GateGuard and with payment terms that would not have authorized Teman to draw remote checks to cover the fees the Customers purportedly owed to GateGuard—were irrelevant and inadmissible. *See* Gelfand Supp. Aff. ¶ 7 ("The redlined document did not in any way relate to GateGuard and did not include any terms related to GateGuard's use of RCC's, authorization by GateGuard's customers for RCC's, and perhaps most importantly, the use of RCC's by GateGuard for particular purposes and expenses at issue in this criminal case."). For the same reason, Teman's emails with the GKH attorney, Hammer, were also inadmissible as irrelevant. *Id.*[10]

---

[10] Separately, as Gelfand notes, one email from Hammer (dated May 10, 2016) that Teman claims trial counsel ought to have offered was not furnished to trial counsel by Teman until after trial. Gelfand Supp. Aff. ¶ 11. That point was elided by Teman in his affidavit, but Teman's § 2255 counsel, rightly, disclosed it. *Id.*

Third, there was no proper basis to admit Hammer's testimony. It was irrelevant. Even as proffered by Teman, Hammer advised Teman with respect to SubletSpy, not GateGuard. And there was no evidence that Hammer had counseled Teman on the pertinent issue, which involved the drawing of remote checks on customer accounts and whether such was lawful under U.S. law. That was *Reinitz's* purview. Hammer's testimony thus could not have supplied the basis for an advice-of-counsel defense—or jury instruction. *See* Gelfand Supp. Aff. ¶ 11 ("Prior to and during trial, Mr. Teman did not provide any evidence—documentary or otherwise—that this Israeli law firm was ever even asked to review the GateGuard documents and, more importantly, was ever consulted with respect to the RCC's actually at issue in this case."); DiRuzzo Supp. Aff. ¶ 5 ("[T]he defendant did not seek legal advice from the Israeli law firm regarding RCC's . . . ."); *see also United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) ("[T]o benefit from an advice-of-counsel defense, a party must show that he (1) 'honestly and in good faith' sought the advice of counsel; (2) 'fully and honestly laid all the facts before his counsel'; and (3) 'in good faith and honestly followed' counsel's advice, believing it to be correct and intending that his acts be lawful. Each requirement must be satisfied." (quoting *Williamson v. United States*, 207 U.S. 425, 453 (1908)) (cleaned up)); *United States v. Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) ("Because there was no factual predicate for an advice-of-counsel defense in the record, no prejudice could have arisen from the district court's precluding counsel from arguing the defense in summation.").

Teman's claim of ineffective assistance on this ground thus is meritless.

    *d.*      *Failure to admit the emails between Reinitz and Bank of America*

Teman next faults his trial counsel for failing to secure admission of the May and June 2019 emails between his attorney, Reinitz, and Bank of America. D. Mem. at 58–59 (citing Exs.

3 and 4). Counsel reasonably did not offer these emails, because there was no proper basis for the Court to receive them in evidence. Teman appears to envision these emails being considered by the jury for the truth of the matters asserted by Reinitz to the bank, to wit, that the customers had authorized Teman to draw and deposit the 29 checks totaling $333,000. But those statements by Teman's agent, if offered by the defense, were inadmissible self-serving hearsay. *See* Gelfand Decl. ¶ 23. And Teman does not identify any other purpose for which these post-offense statements by his lawyer could have properly been received.[11]

      *e.    Failure to call Shelly Pecot as a defense witness*

Teman next argues that his trial counsel acted unreasonably in not calling Shelly Pecot, a shareholder at 18 Mercer, as a defense witness at trial. D. Mem. 59–66. That argument is easily put aside, because, as Gelfand explains, there were sound (and obvious) tactical reasons not to call her. *See* Gelfand Aff. ¶ 30.

As the Court has recounted in rejecting Teman's second Rule 33 motion, Pecot did not stand to offer testimony meaningfully helpful to Teman. *See* Dkt. 402 at 10–12.[12] She was not a board member of the 18 Mercer cooperative building. She was not competent to testify about the information known to 18 Mercer at the time it contracted with GateGuard. Her dealings with Teman occurred later, after 18 Mercer had taken issue with GateGuard's product, prompting Teman's ire. In that context, Teman made threats to 18 Mercer, to which Pecot was privy. As the

---

[11] Gelfand notes an additional tactical reason not to introduce Reinitz's correspondence with the bank. To the extent his representations on Teman's behalf were found to be false or misleading, these statements to the bank could have been found to be a continuation of the bank or wire fraud scheme. *See* Gelfand Aff. ¶ 23.

[12] Although not a basis for this decision, the Court agrees with the Government, G. Mem. at 32–33, that Teman's attempt to fault trial counsel for not calling Pecot is cynical, insofar as Teman earlier sought relief under Rule 33 claiming that Pecot's account was newly discovered (*i.e.*, unavailable to trial counsel). *See* Dkt. 394.

Court has explained, contrary to Teman's theory of exculpation, his threat to impose an $18,000 fee on 18 Mercer, before he did so, did not mean that 18 Mercer, a cooperative, at the time of contracting, had authorized that charge. *Id.* at 11–12.

And, weighing against calling Pecot, as Gelfand explains, Teman's correspondence with Pecot "painted Mr. Teman unfavorably." Gelfand Aff. ¶ 30. Teman "repeatedly threatened Ms. Pecot," and "when she said she intended to consult an attorney with respect to the intercom dispute, Mr. Teman insisted on a check for $18,000 and made statements threatening to put a lien on every unit in the building, to file a lawsuit seeking treble damages, and calling her 'two-faced.'" *Id.* Trial counsel, although having attempted to subpoena Pecot, ultimately concluded: "It was clear she would be a hostile, adverse witness and one that would paint Mr. Teman in a bad light. We expressly communicated our intention not to seek the Court's involvement to attempt to secure her presence at trial and Mr. Teman agreed." *Id.*

In these circumstances, trial counsels' decision not to call Pecot, like the decision to call Reinitz, was a reasonable and defensible trial strategy. Trial counsel "attempted to speak with literally every possible witness Mr. Teman asked [them] to reach out to," "interviewed a number of possible witnesses," and assessed that Pecot's testimony would be unhelpful to the defense. Gelfand Aff. ¶ 29. That judgment call is not a basis for finding ineffective assistance. *See, e.g.*, *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) ("Courts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury."); *Morales v. United States*, No. 21-890-pr, 2022 WL 7204972, at *2 (2d Cir. Oct. 13, 2022) (same); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam) ("The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess."); *Best*, 219 F.3d at 201 ("[C]ounsel's decision as to 'whether to call

specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997))).

> f.    *Failure to request housing court transcript*

Teman next faults his trial counsel for purportedly failing to seek a copy of a housing court transcript from a landlord-tenant dispute for potential use impeaching Joseph Soleimani, a principal of Customer ABJ. *See* D. Mem. at 66–71. Teman made a similar argument in his post-trial motions under Rules 29 and 33. There, he attempted to blame the Government for an ostensible *Brady* violation with respect to that transcript. The Court rejected that claim, finding no *Brady* violation, and separately finding the transcript, which the Government obtained and the Court reviewed after trial, immaterial. *See* Rule 29/33 Decision at 87–101. Teman did not challenge that ruling on direct appeal. *See United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974 (2d Cir. June 8, 2023).

Teman's attempt now to fault his counsel for ostensibly failing to seek this item of evidence fails for three independent reasons.

First, it distorts the record. The record shows that, promptly upon the Government's pretrial disclosure of the housing court matter, in connection with the Government's motion in limine to preclude cross examination into it, the Court directed the Government urgently to obtain and produce that transcript, which stood to shed light on whether Soleimani, as opposed to a different person at ABJ, had misled ABJ's tenant. *See* Rule 29/33 Decision at 87–90. Defense counsel reasonably relied on that order as a mechanism to obtain the transcript.

Second, as Gelfand attests, trial counsel made a strategic judgment to focus cross-examination of Soleimani on eliciting favorable testimony from him rather than "outright

attacking him in a *carte blanche* manner." Gelfand Aff. ¶ 31. That judgment was eminently

defensible. With three separate Customers claiming that they did not authorize Teman to draw

remote checks on their accounts, impeaching one as untruthful was unlikely to carry the day for

Teman, and a strategy to persuade the jury that each was mendacious presented a high degree of

difficulty. Counsel's alternative strategy—to seek to extract favorable information on cross-

examination in support of a defense that the customers had chosen not to review terms and

conditions that might have authorized Teman's check-writing—was, given limited options,

reasonable. *See, e.g., Luciano*, 158 F.3d at 660 ("[T]he conduct of examination and cross-

examination is entrusted to the judgment of the lawyer, and a [reviewing] court on a cold record

should not second-guess such decisions unless there is no strategic or tactical justification for the

course taken."); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions

whether to engage in cross-examination, and if so to what extent and in what manner, are . . .

strategic in nature" and ordinarily do not support claims of ineffective assistance); *Dunham v.

Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about whether to engage in cross-

examination, and if so to what extent and in what manner, are strategic in nature and generally

will not support an ineffective assistance claim." (cleaned up)); *United States v. Cohen*, 427 F.3d

164, 170 (2d Cir. 2005) ("[M]atters of trial strategy and tactics . . . are virtually unchallengeable

absent exceptional grounds for doing so.")

Third, as the Court has found, the housing transcript was immaterial. The transcript in

fact did not reveal misrepresentations by Soleimani to his tenant. *See* Rule 29/33 Decision at

101. And this "collateral" matter did not have any prospect of disturbing the jury's verdict,

which was based on overwhelming evidence of Teman's guilt. *Id.* at 101–02. Thus, even had

there been a lapse by defense counsel in seeking the transcript—and there was not—it was

utterly inconsequential. *See, e.g., United States v. Diaz*, 24 F. App'x 54, 57 (2d Cir. 2001) (finding that "representation was effective" where "a number of decisions and actions" by defense counsel "at best, constituted minor errors"); *Greene v. Walker*, 205 F.3d 1322 (2d Cir. 1999) ("The few minor lapses in performance that Greene has highlighted do not negate the overall effectiveness of the representation that his trial counsel provided."); *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (rejecting claim of ineffective assistance where defendant "ha[d] not shown that any of counsel's alleged miscues prevented the jury from considering evidence probative of his innocence").

### g.    Failure to alert the Court to alleged juror misconduct

Teman next argues that trial counsel acted unreasonably when they "failed to alert" the Court to misconduct by an alternate juror who ultimately did not deliberate. D. Mem. at 71. The juror, Teman claims, made "dirty looks" at him and whispered to other jurors and sent a LinkedIn connection request to Teman. *Id.* at 71–73.

This claim recycles an argument Teman made in his initial new trial motion under Rule 33, which the Court rejected, *see* Rule 29/33 Decision at 83–87, in a ruling Teman did not challenge on direct appeal, *see United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974 (2d Cir. June 8, 2023). The Court there noted that Teman had not substantiated his unsworn allegation that the juror had reached out to him, that Teman had not alleged misconduct of a type that could warrant a new trial, that the alternate juror's presence could not have affected the verdict, and that Teman had not alleged that he had first become aware of the juror's ostensible misconduct after trial, making his delay in raising the claim improperly strategic. *See* Rule 29/33 Decision at 85–87.

For multiple reasons, Teman's repackaging of this claim to fault trial counsel for failing to act during trial does not support an ineffective assistance claim. First, trial counsel forcefully repudiated Teman's claim to have notified them about juror's unusual comportment during voir dire. *See* Gelfand Aff. ¶ 32 ("To be clear, as best as I can recall, Mr. Teman did not express any concern about this juror's purported 'dirty looks' during the jury selection portion of the trial[.] . . . [T]here was no reasonable basis brought to the attention of us at the time of trial to raise an issue with respect to this juror with the Court."). No evidence supports Teman's uncorroborated claim about the juror. And Teman, tellingly, did not sign a sworn affidavit setting out facts about the juror's comportment. Second, any uncorroborated factual claim by Teman about a juror must be viewed with suspicion, in light of his trial counsel's reluctant but telling revelation that Teman improperly, and likely illegally, proposed post-trial to undermine the verdict by using a "burner phone" to place an anonymous call to the Federal Bureau of Investigation falsely claiming juror misconduct. *Id.* Third, the alternate juror's presence could not have affected the verdict, as the alternative juror's removal would not have affected the jurors who deliberated. *See* Rule 29/33 Decision at 86 (denying Teman's Rule 33 motion on, among others, this basis).

### h.    *Failure to move for a judgment of acquittal*

Teman next contends that his trial lawyers failed to move for a judgment of acquittal. *See* D. Mem. at 44. That claim is demonstrably false (and reflective of the indiscriminate character of Teman's challenges to the verdict—both in his direct appeal and in the present § 2255 petition). As the trial transcript reflects, at the close of the Government's case, DiRuzzo moved for a judgment of acquittal under Rule 29(a). *See* 1/24/2020 Tr. at 692. And the premise of Teman's motion—that a Rule 29 motion had a prospect of success—is risible. This Court and the Second Circuit have found the evidence sufficient to sustain the verdict. *See, e.g.*, Rule 29/33

Decision at 2–12; *United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974, at *1 (2d Cir. June 8, 2023) (rejecting Teman's challenges, *inter alia*, to sufficiency of evidence). The evidence the Government adduced of Teman's guilt was simply overwhelming. Had defense counsel failed to make such a motion, Teman would not have been prejudiced, as such a motion was certain to be denied.

*i.    Failure to call a witness about Teman's faith and move for relief under the Establishment Clause*

Teman also faults trial counsel for not calling a witness to rebut what he contends was an improper argument by the Government to the effect that he breached his religious faith. In Teman's telling, the Government argued that Teman had acted inconsistent with Judaism by drafting checks on the Friday before Passover. *See* D. Mem. at 73.

The Government's observation to the jury was different—and permissible. It was that Teman had sent an email to Customer Gabay, whom Teman understood was an observant Jew, threatening to place a lien on West 204's assets during Passover, when Gabay would be unreachable. That argument was proper. It supported that Teman's intent in drawing the checks had been retaliatory, not to exercise his supposed contractual rights, as the defense argued.

And the Second Circuit has already rejected much the same argument, in affirming Teman's conviction. On appeal, Teman had complained about a comment the Court made at sentencing, in noting that Teman had timed his deposits for the eve of Passover, argued that the Court has acted improperly at sentencing in noting that Teman had timed his deposits of the April checks for the eve of Passover, to ensure that his counterparties, observant Jews, would not be able to contest the checks for the next two days. As the Circuit pointed out in rejecting that claim, the Court's comment on the evidence "was reasonable" as "Teman had told one of his clients [Gabay], 'I will . . . place a lien on your building on Pessach,' and the checks were, in

44

fact, deposited on the eve of Passover." *United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974, at *3 (2d Cir. June 8, 2023) (record citation omitted).

Teman's claim is therefore both meritless and, insofar as it effectively reprises a claim rejected on appeal, procedurally barred. *See Aparicio*, 269 F.3d at 99 ("The failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which Petitioner was entitled." (citation omitted)); *Jameson v. Coughlin*, 22 F.3d 427, 429–30 (2d Cir. 1994) (similar); *see also United States v. Pitcher*, 559 F.3d 120, 123 (2d Cir. 2009) ("It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" (quoting *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001))).

### j.     Failure to move for the Court's recusal

Teman, finally, faults his trial counsel for not moving for this Court's recusal. *See* D. Mem. at 73–75.

That claim is frivolous. Trial counsel reasonably judged that "such a motion would have been frivolous" and not in Teman's best interests. Gelfand Aff. ¶ 34. And the Second Circuit confirmed that assessment on direct appeal, where Teman argued that the Court had been obliged to recuse. Rejecting that argument, the Circuit held: "There is nothing to Teman's argument that Judge Engelmayer was required to recuse." *United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974, at *3 (2d Cir. June 8, 2023). The Circuit's decision squarely precludes Teman's present claim, insofar as it presupposes that there was a basis to pursue recusal. *See Pitcher*, 559 F.3d at

123 (collecting cases); *Aparicio*, 269 F.3d at 99 ("competent assistance" does not require counsel to raise "meritless argument[s]").[13]

### k.    Counsel's overall performance

For the reasons above, Teman's individual critiques of trial counsel's performance are all meritless—indeed, very far from the mark.

Beyond that, case law applying *Strickland* requires a holistic evaluation of counsel's performance. *See, e.g.*, *United States v. Hall*, 242 F.3d 368 (2d Cir. 2000) (asking whether counsel's performance "fell below an objective standard of reasonableness" under "prevailing professional norms," "on the facts of the particular case, viewed as of the time of counsel's conduct" (quoting *Strickland*, 466 U.S. at 688, 690, 694)); *United States v. Aguirre*, 912 F.2d 555, 561 (2d Cir. 1990) ("The court's central concern is not with 'grading counsel's performance' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" (quoting *Strickland*, 466 U.S. at 696–97)).  Contrary to Teman's portrayal, the assembled record reflects energetic and impressive advocacy by Gelfand and DiRuzzo, in a case in which the daunting proof of Teman's guilt, and Teman's

---

[13] Notwithstanding the Circuit's ruling, Teman has since repeatedly moved, *pro se*, for the Court's recusal and related relief.  The Court has denied these motions as baseless. *See, e.g.*, since the start of 2025, Dkts. 478, 480, 486, 495–96, 498, 500, 502, 505, 507, 509, 513–16, 518, 534.  The Second Circuit has dismissed, as frivolous, Teman's recent *pro se* appeals from the Court's orders denying his motions for recusal and requiring him to return to the United States by June 1, 2025. *See United States v. Teman*, No. 25-452-cr (2d Cir. June 3, 2025), Dkt. 38.1 (quoting *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)).  To the extent that Teman's recusal motions assert that the Court has animus towards him, the assembled record in fact reflects repeated acts of appropriate judicial solicitude towards Teman. *See* Dkt. 484 at 10 n.6 (listing many); *see also* Dkts. 475, 484, 508, 520, 522, 529, 531, 541 (orders extending deadline for Teman's return to United States, notwithstanding skepticism about Teman's purported medical excuses).

insistence on going to trial, made for an uncommonly high degree of difficulty. As chronicled in counsels' affidavits and reflected in the docket record, trial counsels' work bespoke deep preparation and strategic thinking. Counsel undertook vigorous and extensive motions practice, made strong jury addresses, and structured witness examinations with an eye towards a defense that Teman had acted with a non-culpable state of mind.

Moreover, although Teman gracelessly fails to acknowledge the point, his trial counsel won important victories for him. Before trial, they established a Speedy Trial Act violation by the Government, yielding the dismissal, albeit without prejudice, of one count. *See* Dkt. 45. And trial counsel's challenge to Counts Five and Six, which charged aggravated identity theft, led the Government to dismiss those counts before trial. *See* Dkt. 79. That was consequential, as each count carried a mandatory two-year sentence that would have been required to run consecutive to Teman's sentence on the other counts. In addition, as counsels' affidavits demonstrate, their decision to press ahead with trial in January 2020 also potentially saved Teman from additional criminal exposure for federal tax offenses, which the Government might have uncovered had it had more time for pretrial investigation. *See* Gelfand Aff. ¶ 14; DiRuzzo Aff. ¶ 6(a). Trial counsel also prepared Teman's initial sentencing submission, which chronicled Teman's history, and humanized him by underscoring his positive contributions to the community and mitigating aspects of his history. *See* Dkts. 145–147. As the transcript of sentencing reflects, these aspects of Teman's life significantly influenced the Court's decision to impose a prison sentence of one year and one day—far below the Guidelines range (30 to 37 months) and the Guidelines sentences recommended by the Government and the Probation Department. *See* Sent Tr. at 64–96.

Consistent with this, the Court, in authorizing trial counsel's withdrawal in 2021, commended Gelfand and DiRuzzo for their "energetic and high quality representation" and for their "unflagging professionalism." Dkts. 206–208. And Teman's contemporaneous assessment was of a piece. As DiRuzzo notes, Teman—after the close of evidence but before the verdict—wrote him a thank-you card, terming his work "heroic, generous, and brilliant" and stating that DiRuzzo had put "every ounce of energy, intellect, and passion into defending someone who couldn't even pay you on time," adding, "you're an exceptional attorney and an even greater person." *See* DiRuzzo Aff. ¶ 7 & attached letter.

Teman's claim of ineffective assistance therefore fails on the first *Strickland* prong. His counsel's performance, far from being deficient, was well "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and indeed was impressive and effective.

### 2.    Prejudice

For the reasons above, even if there had been a basis to second-guess trial counsel for the decisions cited by Teman, Teman assuredly did not suffer any prejudice.

The evidence the Government adduced of Teman's guilt of bank and wire fraud—that he had drawn checks on the three Customer accounts feigning to the bank that he was acting with their authorization—was overwhelming, if not conclusive. Had Teman not called Reinitz, the defense would not have been left with any basis on which to argue a lack of fraudulent intent. The other evidence Teman proposes should have been offered (Pecot's testimony) or obtained (the housing court transcript) if received would not have had any capacity to move the needle. And the other bids that Teman faults his counsel for not pursuing were legally precluded. The SubletSpy policies and the testimony of GSK's Hammer were inadmissible. And the motions Teman claims his trial counsel should have pursued (challenging his competency, seeking judicial recusal, challenging the Government's arguments about the Passover-eve timing of his

deposits, trying to unseat an alternate juror, and moving for a judgment of acquittal) were legally baseless.

To prevail on a claim of ineffective assistance, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Teman has not shown anything of the sort. His § 2255 petition must be dismissed, too, for failure to prove prejudice. *See, e.g.*, *Nersesian*, 824 F.2d at 1322 (rejecting ineffective-assistance claim where even assuming *arguendo* that counsel's performance were "professionally deficient," there was no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'" (quoting *Strickland*, 466 U.S. at 694)); *Best*, 219 F.3d at 202 (same where, even assuming *arguendo* counsel's performance were deficient, "given the strength of the government's case, . . . we cannot conclude that there is any likelihood that different performance by counsel would have altered the outcome of the trial"); *United States v. Geraldo*, No. 11 Cr. 1032-68 (PAE), 2021 WL 230282, at *7 (S.D.N.Y. Jan. 21, 2021) (same, where "even assuming, *arguendo*, that each [of counsel's challenged] decision[s] was objectively unreasonable, there [wa]s no evidence that any prejudiced Geraldo.").

### C.    Hearing

"In ruling on a motion under § 2255, the district court is required to hold a hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Gonzalez*, 722 F.3d at 130 (quoting 28 U.S.C. § 2255). But "the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" *Id.* (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)).

Instead, "[t]o warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Id.* at 131. "[P]resentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *see also Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("Bald allegations unsupported by evidentiary facts do not" require hearing); *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (court may "expand the record without conducting a full-blown testimonial hearing" through the use of affidavits).

A hearing is not necessary here, because Teman's myriad claims of ineffective assistance are deficient on their face as a basis for relief. His lead claim, that counsel were remiss in calling Reinitz, is palpably meritless, as it challenges a defensible strategic decision well within a trial lawyer's broad discretion. His claim that counsel should have offered records from SubletSky or called its Israeli counsel to testify fails for similar reasons, and because this evidence was facially inadmissible (and did not support a Customer authorization defense). His vague claim that his trial counsel erred in not alerting to his supposed mental incompetence and pursuing a challenge to capacity to stand trial is an *ipse dixit* unsupported by contemporary evidence, and emphatically refuted by all such evidence, including, critically, trial counsel's undisputed and detailed accounts of Teman's participation, acuity, and comportment before and during trial, Teman's real-time admissions to the Court, and the Court's observations of and interactions with Teman. And Teman's other claims are, as noted, facially meritless and frivolous.

Teman's scattered allegations of his trial counsels' ineffectiveness therefore do not require an evidentiary hearing. The Court denies Teman's petition without a hearing. *See, e.g., United States v. Agramonte-Minaya*, No. 21 Cr. 661 (PAE), 2025 WL 856204, at *7 (S.D.N.Y.

Mar. 19, 2025) (evidentiary hearing not warranted where defendant's "claims [we]re either conclusory, belied by the record, and/or insufficient (even if proven true) as a matter of law to secure relief"); *Rosa v. United States*, 170 F. Supp. 2d 388, 399 (S.D.N.Y. 2001) (same, where some of defendant's claims were made "broadly and conclusorily," and for other claims, the documentary record "suppl[ied] the necessary basis for the Court's decision"); *United States v. Ellison*, No. 18 Cr. 834-9 (PAE), 2024 WL 1406650, at *4 (S.D.N.Y. Apr. 2, 2024) ("Ellison's claim of ineffective assistance of counsel is easily put aside based on the trial record, with no need or basis for an evidentiary hearing."); *United States v. Rivera*, No. 15 Cr. 722 (PAE), 2022 WL 17090867, at *2 n.2 (S.D.N.Y. Nov. 21, 2022) ("The Court finds that the parties' filings and the case record conclusively show that Rivera is not entitled to the relief sought and thus declines to hold a hearing.").

## CONCLUSION

For the reasons above, the Court denies Teman's motion for relief pursuant to 28 U.S.C. § 2255 as meritless. Teman has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted. *See* 28 U.S.C. § 2253(c)(2); *Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005). The Court also certifies that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 445 (1962).

The Clerk of Court is respectfully directed to terminate the motion at docket 458.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated:  June 26, 2025
        New York, New York