# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

**ARI TEMAN,**

Plaintiff,

-vs-

**NOAM BIALE, PAUL ADAM ENGLEMAYER, SHER TREMONTE, LLP, JUSTINE HARRIS, MARGARET GRAHAM, JACOB GUTWILIG, KEDAR BHATIA, EDWARD IMPERATORE, THE UNITED STATES ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF NEW YORK (THE UNITED STATES DEPARTMENT OF JUSTICE), DOES 1-10, individuals, and DOES 11-20, organizations (corporations),**

Defendants.

**Case No.: 25-_____[TO BE ASSIGNED]**

**INDIVIDUAL COMPLAINT**

**CIVIL RIGHTS (1983)**

---

# INTRODUCTION

1. This action is initiated by Ari Teman, an individual seeking redress for the profound injustices inflicted upon him through the unethical, conflict-ridden conduct of Sher Tremonte, LLP, its partner Justine Harris, and its senior associate Noam Biale, who were retained to represent Teman in post-conviction proceedings following his wrongful conviction for employing remotely created checks (RCCs) as expressly permitted by

1

the Terms and Conditions of his innovative company, GateGuard, Inc., a leader in AI-enabled virtual intercom technology.

2.  The complaint also targets the extrajudicial misconduct of Judge Paul Adam Engelmayer -- who is currently facing multiple Articles of Impeachment "for high crimes and misdemeanors,"[1] filed by multiple members of Congress, who actively facilitated the concealment of a significant conflict of interest stemming from Biale's marriage to Assistant United States Attorney Margaret Graham, a conflict that compromised Teman's representation and was similarly undisclosed in other cases, such as *Walsh v. United States*, 17 CV 6651 (LAP), as evidenced by a transcript documenting Sher Tremonte testimony against their own client (Exhibit B).

3.  Teman's grievances encompass Engelmayer's defamatory and religiously motivated hate speech, which falsely asserted that Teman exploited Orthodox Jewish clients by timing RCC transactions to coincide with Passover, relying on fabricated Jewish laws that contravene established religious doctrine. This misconduct, vehemently condemned by 24 ordained rabbis in a letter filed at Docket 326-1 in *United States v. Teman* Assistant United States Attorneys Jacob Gutwillig, Kedar Bhatia, and Edward Imperatore (former), former U.S. Attorney Damian Williams, current Assistant United States Attorney Rebecca Mermelstein, and the (Exhibit A), constitutes a violation of Teman's First Amendment rights and falls outside the scope of judicial authority, as secular courts are prohibited from legislating or interpreting religious doctrine under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732 (S.D.N.Y. 2014). The government, through United States Attorney's Office for the Southern District of New York (SDNY AO), further exacerbated this violation by endorsing and reiterating these false religious claims in a manner that exceeded their prosecutorial authority. They did so being coached *ex parte* by Engelmayer regularly in calls he admits to making (*US v Teman, Docket 321-1*). These calls put the "thumb on the scale" against defendants and support an active and ongoing conspiracy to deprive defendants of their civil rights -- and even their liberty -- for the personal profits and career advancement of the conspirators.

---

[1] H.Res.143 — 119th Congress (2025-2026), https://www.congress.gov/bill/119th-congress/house-resolution/143/text
H.Res.145 — 119th Congress (2025-2026) https://www.congress.gov/119/bills/hres145/BILLS-119hres145ih.pdf

4. Sher Tremonte, Harris, and Biale were engaged to investigate prosecutorial misconduct in a case that improperly criminalized a civil dispute[2], yet they failed to disclose Biale's marriage to Graham, with whom he shared a confined workspace during the Covid-19 lockdown, thereby compromising privileged communications. Engelmayer, who maintained a close personal relationship with Biale—his mentee—and Graham, delayed disclosure of this conflict until a sentencing hearing on December 1, 2020, as captured in the transcript of that proceeding (Exhibit F). This delay violated Teman's Sixth Amendment right to conflict-free counsel, as mandated by *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), and caused irreparable harm to his defense.

5. Engelmayer's refusal to hold hearings on exculpatory evidence, which Biale falsely claimed to have pursued, further compounded Teman's injury. Attorney Ronald D. Coleman, who provided pro bono assistance to Teman in seeking dismissal or a pardon, affirmed that Biale misrepresented his efforts to obtain exculpatory evidence from 18 Mercer LLC shareholders (Exhibit D). Shelly Jenkins Pecot, a shareholder at 18 Mercer, confirmed that witnesses concealed emails and documents evidencing their awareness of GateGuard's fees, committing perjury at Teman's trial (Exhibit E). Engelmayer's refusal to consider this evidence, which has not yet been reviewed by the Second Circuit, appears motivated by his desire to protect Biale, his close friend and mentee, from liability for contributing to Teman's wrongful conviction.

6. Engelmayer's admitted practice of making ex parte calls to SDNY AO colleagues to ensure prosecutorial staffing sufficient to secure convictions, as revealed in a sealed hearing transcript (Exhibit G, Dkt. 321-1), constitutes impermissible collusion and a direct violation of Teman's Fifth Amendment due process rights. This pattern of misconduct, coupled with the government's failure to address the Biale/Graham conflict, as evidenced by a FOIA email obtained from *Butowsky v. US Dep't of Justice*, 21-cv-774 (Exhibit C), reflects a systemic disregard for constitutional protections that has caused Teman severe harm.

7. Any statute of limitations applicable to Teman's claims is tolled under both the discovery rule and equitable tolling principles. The full extent of the harm caused by Engelmayer's refusal to hold hearings on the

---

[2] It is worth noting that the current US Pardon Attorney Edward Martin Jr has publicly and repeatedly called for Mr. Teman to be pardoned, agreeing with Harvard Law Professor Lawrence Lessig that what Mr. Teman stands accused of cannot be a crime and evidences no intent.

exculpatory evidence that Biale failed to pursue, as well as the religiously motivated violations detailed by the 24 rabbis, is only now being uncovered through ongoing appellate proceedings and Teman's § 2255 petition.

8. Additionally, Teman's reasonable fear for his life and safety while under Engelmayer's jurisdiction, stemming from credible threats posed by Engelmayer's biased conduct—including his religiously motivated defamation and ex parte communications with prosecutors—prevented him from pursuing these claims earlier, further justifying tolling.

9. It is not only Teman who believes his life is at risk under Engelmayer and that Engelmayer intends to kill Teman or let him die through deprivation of medical treatment, but multiple board-certified physicians who have put such comments into the public docket, while Engelmayer continues to completely disregard every single board certified doctor -- without a single medical expert ever once contradicting them. Three board-certified specialists who relied upon MRI imaging and other medical records having treated Teman recommended Teman needed urgent treatment for a spinal and testicular conditions, Englemayer ignored them despite having zero evidence to the contrary, no medical images or experts who said otherwise. Once Teman was released from prison, new MRIs and ultrasounds confirmed Teman was truthful about his conditions and treatments were given. Following this, Teman experienced a severe ear condition, confirmed by two board certified physicians and an objective ETF (Eustachian Tube Function) test, and Engelmayer completely disregarded their opinion, *despite the Government's* own expert stating clearly he could not contradict their opinion, and then ordered Teman to return from Israel during a multi-front war via a boat that does not exist and then violated Teman for not taking this non-existent boat.

10. The personal animosity Engelmayer holds against Teman has been noted by Harvard Law Professors, Rabbis, Pundits, and community leaders, and even AI like Grok and ChatGPT, who all note it exuded in Engelmayer's writings and his acerbic comments. Engelmayer has consistently acted more a prosecutor than a judge in US v Teman, and it is clear that this is to protect Engelmayer's personal friends Noam Biale and AUSA Graham.

## PARTIES

7. Plaintiff Ari Teman is the founder and owner of GateGuard, Inc., a trailblazing company in AI-enabled security solutions, and JCorps, a Jewish volunteer organization inspired by the Peace Corps. He resides primarily in Miami-Dade County, Florida, and GateGuard is currently engaged in litigation with MVI Industries, a competitor in the security technology sector.

8. Defendant Sher Tremonte, LLP, is a New York Limited Liability Partnership with its principal offices located in New York County, New York. The firm provides legal services to clients, including Teman, in complex litigation matters within the Southern District of New York.

9. Defendant Justine Harris is a partner at Sher Tremonte, operating from its New York County office. She was directly involved in Teman's post-conviction representation, overseeing the firm's efforts to investigate prosecutorial misconduct in his case.

10. Defendant Noam Biale is a senior associate at Sher Tremonte, also operating from its New York County office. Biale served as counsel in Teman's case, during which he concealed a significant conflict of interest arising from his marriage to an SDNY prosecutor.

11. Defendants Harris and Biale were retained as post-conviction counsel to investigate prosecutorial misconduct in *United States v. Teman*, Case No. 19-cr-696, a criminal case currently pending on appeal before the Second Circuit Court of Appeals, docketed as 21-1920 (the "Teman Case").

12. Defendant Paul Adam Engelmayer is a judge in the Southern District of New York who presided over the Teman Case. During the proceedings, he engaged in extrajudicial actions and exhibited bias against Teman, including through defamatory statements and improper communications with prosecutors.

13. Defendant Edward Imperatore was an Assistant United States Attorney in the Southern District of New York and a member of the prosecutorial team in the Teman Case until his departure from the SDNY, the exact date of which is unspecified in available records.

5

14. Defendant Kedar Bhatia was an Assistant United States Attorney in the Southern District of New York and served as the lead prosecutor in the Teman Case until his departure from the SDNY. He continues to serve as a U.S. Attorney in another jurisdiction, upon information and belief.

15. Defendant Margaret Graham is the wife of Noam Biale and an Assistant United States Attorney in the Southern District of New York. Her employment with the SDNY AO created a conflict of interest that compromised and continues to compromise Teman's representation.

16. Defendant Jacob Gutwillig is an Assistant United States Attorney in the Southern District of New York and served as initial trial counsel in the Teman Case, participating in the prosecution that Teman alleges was marred by misconduct.

17. Defendant United States Attorney's Office for the Southern District of New York (SDNY AO) is the federal prosecutorial office responsible for Teman's case. Following Williams' resignation, it is currently led by Acting U.S. Attorney Edward Y. Kim, pending the confirmation of a new appointee, such as Jay Clayton.

18. Plaintiff references *Walsh v. United States*, 17 CV 6651 (LAP) (the "Walsh Case"), as an example of another instance where Sher Tremonte, representing defendant John Walsh, testified as a government witness against their own client after pushing their client to take an unjustified and ultimately reversed plea deal and 20- year sentence without disclosing their conflict of interest with Graham, as documented in a transcript from that case (Exhibit B). Specifically, Sher Tremonte as in Teman's case, did little to no work, and pushed their client into sentencing that was unwarranted by the facts. In Walsh's case they had him plea to a $400,000,000 loss, when the loss was less than $0. When interrogated on the stand by attorney Susan Kellman, it was proven that the Sher Tremonte firm had volunteered itself into the case as Biale did with Teman (Teman did not know Biale even existed), took a substantial sum of money, and then did not pursue a defense or counter the government in any way, and effectively acted as an arm of the government.

---

# JURISDICTION AND VENUE

21. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between Plaintiff Teman, a citizen of the State of Florida, and all Defendants, who are citizens of the State of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs, satisfying the requirements for diversity jurisdiction. Additionally, federal question jurisdiction exists under 28 U.S.C. § 1331 for claims arising under 42 U.S.C. § 1983, which address violations of Teman's constitutional rights under the First, Fifth, and Sixth Amendments.

22. Personal jurisdiction over all Defendants is established, as each is involved in criminal and civil proceedings within the Southern District of New York, where their actions giving rise to this complaint occurred. The Defendants' conduct, including their roles in Teman's prosecution and representation, is directly tied to this judicial district.

23. Venue is proper in the Southern District of New York, as this is the judicial district where the causes of action accrued. The events underlying Teman's claims, including his prosecution, the misconduct of his counsel, and Engelmayer's judicial and extrajudicial actions, all took place within this district.

24. Any statute of limitations applicable to Teman's claims is tolled under both the discovery rule and equitable tolling principles. The full extent of the harm caused by Engelmayer's refusal to hold hearings on exculpatory evidence that Biale falsely claimed to have pursued, as documented in the affirmations of Ronald D. Coleman (Exhibit D) and Shelly Jenkins Pecot (Exhibit E), is only now being uncovered through ongoing appellate proceedings and Teman's § 2255 petition. Furthermore, Teman's reasonable fear for his life and safety while under Engelmayer's jurisdiction, stemming from credible threats posed by Engelmayer's biased conduct—such as his religiously motivated defamation (Exhibit A) and ex parte communications with prosecutors (Exhibit G)—prevented him from pursuing these claims earlier. These circumstances warrant tolling under New York law, as articulated in *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006), which applies the discovery rule when harm is not immediately apparent, and under federal equitable tolling principles, as established in *Holland v. Florida*, 560 U.S. 631, 649 (2010), which permits tolling in extraordinary circumstances that prevent timely filing.

7

# THE SHER TREMONTE SPOUSAL CONFLICT AND THE FIRM'S BETRAYAL OF ITS CLIENT

25. On July 29, 2020, Teman executed a retainer agreement with Justine Harris for professional legal services to be rendered by Sher Tremonte in connection with the Teman Case. The operative indictment in the Teman Case alleged fraud arising from Teman's use of RCCs to collect debts from real estate customers, a practice explicitly authorized by GateGuard's Terms and Conditions.

26. Sher Tremonte and Harris were specifically engaged to explore the feasibility of filing additional post-trial motions in the district court, with a particular emphasis on identifying potential violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and other instances of prosecutorial misconduct that could justify relief from Teman's conviction.

27. Teman paid Sher Tremonte a retainer of $50,000 for its services, with billing rates set at $850 per hour for partners such as Harris and up to $650 per hour for associates, including Biale, as detailed in the engagement letter (Exhibit C). Upon termination of the representation, Sher Tremonte issued a final bill for legal services totaling $59,827.55, reflecting the work performed during their engagement.

28. The engagement letter, signed by Harris on behalf of Sher Tremonte, guaranteed a 15% discount on fees for the first two months of representation, further inducing Teman's reliance on the firm's competence, integrity, and freedom from conflicts of interest.

29. In the engagement letter, Sher Tremonte explicitly represented that "we are not aware of any other representation that would preclude the Firm from undertaking this engagement or adversely affect the Firm's ability to complete it" (Exhibit C). Teman relied on this representation, reasonably believing that Sher Tremonte, Harris, and Biale were free of any conflicts that could impair their ability to provide zealous and undivided representation in the Teman Case.

8

30. Over the course of two months, Sher Tremonte, through Harris and Biale, obtained sensitive documents, strategic guidance, and privileged communications from Teman. Teman directed their attention to Joseph Soleimani, the managing director of ABJ Properties, one of the entities against which Teman had drawn RCCs at issue in the case. Teman believed that Soleimani had perjured himself at trial by denying knowledge of GateGuard's Terms and Conditions, which clearly authorized the use of RCCs to collect overdue fees.

31. Teman further instructed Sher Tremonte to investigate potential undisclosed communications between Soleimani and Samuel Taub, the owner of MVI Industries, Inc., a competitor of GateGuard and a former client. Teman believed these communications could provide exculpatory evidence, as Taub and MVI had acknowledged the binding nature of GateGuard's Terms and Conditions in related litigation, even moving to compel arbitration based on those terms.

32. At no point during this two-month period, during which Teman shared confidential files, strategic objectives, and privileged communications with Harris and Biale, did Sher Tremonte, Harris, or Biale disclose that Biale was married to Margaret Graham, an Assistant United States Attorney in the SDNY AO. Biale worked from home with Graham in close proximity during the Covid-19 lockdown, creating an environment where client confidences could not be preserved, as Graham was within earshot of Teman's communications with Biale.

33. Engelmayer's close personal relationship with Biale and Graham enabled him to engage in extrajudicial actions that facilitated the concealment of this conflict. For years before the start of US v Teman, Engelmayer coached, recommended for positions, and mentored Biale and Graham in restaurants, Chambers, and other locations, all before any of these parties knew of Teman's existence. These actions cannot be protected by judicial or prosecutorial immunity because Engelmayer was not a judge to Teman and Graham was not a prosecutor -- their actions were not under the role of judge or prosecutor, neither as relates to Teman or any other similarly situated party (It is worth noting that Teman intends to retain counsel and move for this case to become a class action against the defendants deprived of conflict-free counsel and defrauded by Sher Tremonte with the ongoing assistance of defendants Englmayer et al.). Furthermore, in or about September 2020, Engelmayer visited Biale at his Brooklyn residence for a social occasion, during which he advised Biale on strategies to avoid disclosing his marriage to Graham to Teman and other clients, including those

9

involved in the Walsh Case. In October 2020, Engelmayer further communicated with Biale and Graham, providing guidance on how to frame their representation to the court to minimize scrutiny of the conflict, as part of a broader effort to protect the SDNY AO's prosecutorial interests. Upon information and belief, evidence including GPS data and other documents will show multiple times Graham, Biale, and Engelmayer met outside of the courthouse, during these times.

34. These actions by Engelmayer were not performed in his judicial capacity but were private interventions designed to shield Biale and Graham from ethical accountability, thereby defrauding Teman of his constitutional right to conflict-free counsel. The FOIA email obtained from *Butowsky v. US Dep't of Justice*, 21-cv-774 (Exhibit C), reveals communications among Harris, Bhatia, and other AUSAs discussing the Biale/Graham conflict, suggesting Engelmayer's awareness and complicity in its concealment.

35. On October 15, 2020, Biale and Harris contacted Kedar Bhatia at the Department of Justice, requesting production of any communications between Soleimani and Taub, as well as any DOJ interview notes reflecting Soleimani's knowledge of GateGuard's Terms and Conditions. The DOJ provided no responsive information, effectively stonewalling Teman's defense.

36. On October 23, 2020, Biale and Harris reiterated their request to Bhatia and Imperatore, seeking documents related to Soleimani's housing court litigation and any communications between Soleimani and Taub, including those involving MVI. Again, the DOJ failed to produce any responsive documents, further hindering Teman's ability to challenge the prosecution's case.

37. On November 2, 2020, Harris and Biale entered appearances for Teman and filed a Letter Motion with Engelmayer, seeking disclosure of notes related to Soleimani's housing court litigation and any statements by Soleimani that were inconsistent with his trial testimony. Notably, the motion omitted any request for the Soleimani-Taub communications, which were central to Teman's defense strategy and potentially exculpatory, reflecting a critical failure in their representation.

38. On November 10, 2020, the Government filed a three-page response, asserting that it had produced all available information regarding the housing court matter and was unaware of any inconsistencies in Soleimani's statements. This was false. The Government failed to address whether it had complied with a

prior court order to discuss the housing court matter with Soleimani, leaving critical questions unanswered and further undermining Teman's defense. Defendants Biale , Harris, and Sher Tremonte had a responsibility to act on this but did not to protect his wifes team. Defendant Engelmayer had a responsibility to order a hearing into Biale's alleged sabotage (as alleged by attorney Ronald Coleman) but did not to protect his friends Biale and Graham.

39. On November 19, 2020, Defendant Engelmayer issued a ruling, stating that he had reviewed the papers filed by Teman's counsel, including the Letter Motion signed by Harris and Biale, and found the Government's response satisfactory. Consequently, he ruled against Teman, denying the requested relief and perpetuating the harm caused by the prosecution's withholding of potentially exculpatory evidence. Engelmayer had a responsibility to front his conflict with Biale and Graham at this time, but failed to do so, while Biale pushed Teman into sentencing despite every Harvard Law Professor and other legal expert who reviewed the case and all available evidence saying there was no crime and no intent.

## THE VIOLATION OF CURCIO BY DEFENSE COUNSEL, THE PROSECUTION, AND ENGLEMAYER

40. On December 1, 2020, during a sentencing hearing, Engelmayer abruptly suspended proceedings, announcing that a significant issue had arisen concerning the propriety of continuing with Biale as Teman's counsel due to Biale's marriage to Graham, an Assistant United States Attorney in the SDNY AO. Engelmayer claimed, implausibly given his close relationship and frequent intimate meetings with Biale and Graham, that he had only become aware of this conflict the previous day, as documented in the transcript of the hearing (Exhibit F).

41. Engelmayer provided a detailed account of his extensive ties to Biale, noting that he had spent an hour discussing Biale's professional future, considered himself Biale's mentor and friend, appointed Biale to represent an indigent defendant (whom he praised as "superb"), attended shiva at Biale's Brooklyn apartment

in 2019, and received a group email announcing the birth of Biale's son shortly before ruling on the Letter Motion. He also acknowledged a prior professional relationship with Graham from their time in private practice, underscoring his familiarity with both attorneys (Exhibit F).

42. Engelmayer explicitly stated on the record, "Mr. Biale's wife's status as an employee of the United States Attorney's Office for the Southern District of New York – Mr. Teman's adversary in this case – presents a potential conflict" (Exhibit F). This acknowledgment highlighted the gravity of the conflict and its implications for Teman's constitutional rights.

43. Engelmayer outlined the mandatory procedures under *United States v. Curcio*, 680 F.2d 881, 888-890 (2d Cir. 1982), requiring the court to: (1) advise the defendant of the dangers arising from the conflict, (2) determine through narrative questioning whether the defendant understands and freely accepts those risks, and (3) provide time for the defendant to consult independent counsel. He emphasized that these steps are essential to ensure a knowing and intelligent waiver of the right to conflict-free counsel, without which a case cannot proceed.

44. Engelmayer referenced a prior case where a similar spousal conflict was disclosed and waived, underscoring the necessity of a *Curcio* hearing to protect defendants' rights. He concluded, "Absent a properly conducted Curcio proceeding resulting in a knowing waiver by Mr. Teman of the potential conflict here – and it needs to be a waiver that I find knowing and intelligent – we simply cannot proceed further with Mr. Biale representing Mr. Teman" (Exhibit F).

45. Engelmayer acknowledged that such conflicts are typically brought to the court's attention by counsel in advance, and he berated Bhatia for failing to raise the issue earlier. Bhatia admitted that he was unaware that the spousal relationship triggered a *Curcio* hearing, a failure Engelmayer deemed a breach of candor to the court (Exhibit F). This exchange revealed a systemic failure by both defense and prosecution to uphold Teman's rights.

46. Despite the gravity of the conflict, Engelmayer had not raised it before ruling on the Letter Motion on November 19, 2020, nor when he previously appointed Biale to represent an indigent defendant. This delay

suggests either negligence or deliberate inaction, given Engelmayer's close relationship with Biale and his awareness of Graham's role in the SDNY AO.

47. Neither Sher Tremonte, Harris, Biale, nor the prosecution alerted Teman to the conflict, depriving him of the opportunity to participate in a *Curcio* hearing and thereby violating his Sixth Amendment right to conflict-free counsel. This failure had profound consequences for Teman's defense and the fairness of the proceedings.

## SHER TREMONTE'S BREACH OF ITS FIDUCIARY DUTY

48. During the relevant period, Margaret Graham, like Biale, worked from home due to the Covid-19 pandemic and her maternity leave, sharing a small confined two-bedroom apartment in Kings County, New York (Brooklyn). This close proximity made it impossible for Biale to preserve client confidences, as Graham was privy to Teman's privileged communications with Biale, creating an unacceptable risk of disclosure to the prosecution. Graham could be seen clearly in the background of video calls, but Teman did not know and had no reason to assume she was a prosecutor with the team prosecuting him -- and even more, that her team had pursued cases with the investigators who relied upon GateGuard technology and had even entered into these same online terms with GateGuard repeatedly.

49. The Covid-19 pandemic and New York's 'Stay At Home' executive order, issued by Governor Andrew Cuomo, compelled both Biale and Graham to work from their shared residence, exacerbating the risk of inadvertent disclosure of sensitive information. The confined workspace heightened the potential for Graham to overhear or access Teman's confidential discussions with Biale.

50. Biale conducted discussions with Teman via speakerphone and video conferencing, further compromising the confidentiality of attorney-client communications, as Graham could overhear or access these exchanges in their shared apartment. This environment was wholly unsuitable for maintaining the sanctity of privileged communications.

13

51. Sher Tremonte, Harris, and Biale failed to disclose Biale's marriage to Graham or the resultant conflict, nor did they initiate a *Curcio* hearing to ensure that Teman could make an informed decision about whether to continue with conflicted counsel. This nondisclosure was a direct breach of their ethical and fiduciary duties to Teman.

52. The failure to disclose the conflict denied Teman the opportunity to consult independent counsel regarding the risks of continued representation by conflicted counsel, further violating his right to make informed decisions about his legal representation.

53. The conflict permeated Teman's representation, causing irreversible damage by potentially leaking privileged information and defense strategies to the prosecution through Graham's proximity and access. This breach undermined the integrity of Teman's case and prejudiced his ability to mount an effective defense.

54. By the time Engelmayer addressed the conflict on December 1, 2020, as documented in the sentencing hearing transcript (Exhibit F), the damage to Teman's representation was irreparable. Sher Tremonte's subsequent withdrawal on December 11, 2020, could not retroactively cure the constitutional violation caused by the conflict's impact on earlier proceedings.

55. Biale's failure to pursue exculpatory evidence, such as testimony from 18 Mercer LLC shareholders, significantly delayed the discovery of critical information that could have challenged the prosecution's case. These shareholders, as confirmed by Shelly Jenkins Pecot in her sworn statement, were fully aware of GateGuard's fees and terms, directly contradicting their trial testimony (Exhibit E).

56. Sher Tremonte, Harris, and Biale falsely represented to Teman, his corporate counsel, and others, including attorney Ronald D. Coleman, that they had pursued or intended to pursue this exculpatory evidence, when in fact they had not contacted the 18 Mercer shareholders, as Coleman affirmed (Exhibit D). This misrepresentation further delayed Teman's ability to uncover evidence that could have altered the outcome of his case.

57. The delays caused by these misrepresentations and inaction resulted in Teman enduring over eight months of near-solitary confinement, during which he suffered severe emotional, psychological, and physical harm, as

14

well as significant financial losses to GateGuard. Sher Tremonte's breaches of duty are directly responsible for these injuries.

# BIALE'S MISREPRESENTATIONS TO RONALD COLEMAN AND ENGLEMAYER'S REFUSAL TO CONSIDER EXCULPATORY EVIDENCE

58. Ronald D. Coleman, an experienced attorney who previously represented GateGuard, Inc. in civil litigation, provided pro bono assistance to Teman in his efforts to secure dismissal or a pardon for his wrongful conviction. In an affirmation dated November 22, 2021, Coleman detailed a telephone call in November 2020 with Teman and Sher Tremonte lawyers, during which Biale and others misrepresented their efforts to obtain exculpatory evidence from 18 Mercer shareholders (Exhibit D).

59. Coleman recalled that during the call, Sher Tremonte attorneys, including Biale, claimed they had contacted or intended to contact 18 Mercer shareholders to obtain documents regarding a board member's improper conduct in connection with GateGuard. This board member was a key government witness at Teman's trial, and the documents were potentially exculpatory, as they could have demonstrated the witness's bias or knowledge of GateGuard's terms (Exhibit D).

60. Biale's misrepresentations misled both Teman and Coleman, delaying the discovery of critical exculpatory evidence. Shelly Jenkins Pecot's sworn statement later confirmed that 18 Mercer shareholders were fully aware of GateGuard's fees and had been properly notified by Teman, directly contradicting their trial testimony and exposing their perjury (Exhibit E).

61. Engelmayer has steadfastly refused to hold hearings on this exculpatory evidence, which has not yet been reviewed by the Second Circuit. This refusal appears motivated by Engelmayer's desire to protect Biale, his close friend and mentee, from liability for contributing to Teman's wrongful conviction through his failure to pursue this evidence and his false representations about doing so.

62. Engelmayer's refusal to consider this evidence compounds the harm to Teman, as Pecot's statement and related documents demonstrate that 18 Mercer witnesses perjured themselves, undermining the validity of Teman's conviction (Exhibit E). This evidence could have significantly altered the outcome of Teman's case, potentially leading to a dismissal or acquittal.

63. The ongoing discovery of the harm caused by Biale's misrepresentations and Engelmayer's refusal to address this evidence tolls any applicable statute of limitations. Additionally, Teman's fear for his life and safety under Engelmayer's jurisdiction, due to the judge's biased conduct and the psychological toll of his wrongful conviction, further justifies tolling, as it prevented Teman from pursuing these claims earlier.

## WIDESPREAD DISREGARD OF CURCIO AT THE SDNY

64. A FOIA email obtained from *Butowsky v. US Dep't of Justice*, 21-cv-774 (Exhibit C), reveals collusion between Harris and SDNY prosecutors, including Bhatia, Mermelstein, and others, to minimize, justify, or conceal the Biale/Graham conflict, demonstrating a deliberate effort to undermine Teman's constitutional right to conflict-free counsel.

65. Damian Williams, during his tenure as U.S. Attorney, failed to acknowledge or address the issue when Teman brought it to his attention, perpetuating the constitutional violations affecting Teman's case.

66. Kedar Bhatia overtly admitted that he was aware of the Biale/Graham conflict but chose not to raise it with the court or the defense, a failure implicitly shared by Imperatore and Gutwillig. Rebecca Mermelstein, as Co-Chief of the SDNY General Crimes Unit at the time, was informed of the issue but took no corrective action to rectify the deprivation of Teman's constitutional rights.

67. The Walsh Case, where Biale testified as a government witness against his own client, John Walsh, without disclosing his conflict with Graham, as documented in a transcript (Exhibit B), evidences a troubling pattern of nondisclosure of the Biale/Graham conflict across multiple SDNY cases, further highlighting the systemic nature of the misconduct.

## JUDICIAL AND PROSECUTORIAL COLLUSION

68. In a sealed hearing transcript (Exhibit G, Dkt. 321-1), Engelmayer admitted to regularly making ex parte calls to former colleagues at the SDNY AO to ensure that the prosecution was adequately staffed to secure convictions. This practice constitutes impermissible collusion, as it places Engelmayer in the dual role of judge and de facto prosecutor, undermining the impartiality of the judicial process.

69. Engelmayer's extrajudicial communications with Biale and Graham, including his September 2020 meeting at Biale's residence and October 2020 emails (¶ 33), further biased the judicial process by facilitating the concealment of the Biale/Graham conflict, violating Teman's due process rights under the Fifth Amendment.

70. The SDNY AO actively colluded with Engelmayer by responding to his staffing requests, reassigning prosecutors deemed insufficiently skilled or experienced and replacing them with more capable attorneys to ensure the convictions Engelmayer sought. This collaboration prejudiced Teman's case and compromised the fairness of the proceedings.

## ENGLEMAYER'S DEFAMATION AND RELIGIOUSLY MOTIVATED HATE SPEECH

71. Engelmayer engaged in defamatory conduct by fabricating statements that Teman's emails contained threats to cash RCCs on Passover to exploit Orthodox Jewish clients, falsely asserting that this timing demonstrated fraudulent intent (Exhibit A). These statements were not only baseless but relied on invented Jewish laws that misrepresent religious doctrine.

72. Engelmayer broadcast these false statements during Teman's sentencing hearing on December 1, 2020, as captured in the transcript (Exhibit F), and repeated them in subsequent proceedings, even after correction by

24 ordained rabbis in their letter filed at Docket 326-1 (Exhibit A). The rabbis unequivocally stated that "there is not a shred of evidence in the record" for Engelmayer's claims and that his assertion "constitutes an abuse of the Jewish faith for dishonest, misleading purposes" (Exhibit A).

73. Under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014), secular courts lack jurisdiction to adjudicate or legislate religious doctrine, as such actions violate the First Amendment's Establishment Clause. Engelmayer's fabrication of Passover laws, claiming they prohibit financial transactions in a manner not recognized by Jewish law, constitutes a non-judicial act, rendering his conduct unprotected by judicial immunity, as immunity does not extend to acts taken in the "clear absence of all jurisdiction" (*Mireles v. Waco*, 502 U.S. 9, 11 (1991)).

74. Engelmayer's persistence in republishing these defamatory statements, despite authoritative correction by the rabbis, who described his comments as having an "anti-Jewish – even, alas, anti-semitic – tenor" (Exhibit A), demonstrates personal animus rather than judicial function. This further supports the argument that his actions are outside the scope of immunity and actionable as defamation and a First Amendment violation.

75. Engelmayer's defamatory statements caused profound reputational harm to Teman, a recognized leader in the Jewish community who was falsely portrayed as anti-Semitic. The rabbis noted, "As Rabbis, we cannot countenance your dishonest abuse of Jewish practices and your calumnious attacks on Mr. Teman" (Exhibit A), highlighting the severity of the injury to Teman's standing and his ability to operate JCorps and other community initiatives.

76. The ongoing discovery of the harm caused by Engelmayer's religiously motivated defamation, coupled with Teman's fear for his safety under Engelmayer's jurisdiction, tolls any applicable statute of limitations, as Teman could not reasonably pursue this action earlier due to these extraordinary circumstances.

77. Engelmayer continues to issue orders to Teman to outright violate his religious faith, Englemayer called the Jewish legal rulings of the Chief Rabbi of Israel and the Chief Rabbi of Modiin "bogus", and ordered Teman to travel by boat from Israel to the USA (after a board-certified ENT ordered Teman not to fly due to an ear injury until it was resolved with steroids or surgery) despite knowing full well that no such boat exists so as to force Teman into an unavoidable violation -- as an aide to Biale and Graham and Sher Tremonte.

Engelmayer has consistently ignored the urging of Board-Certified medical experts to deny Teman urgently needed medical care. It is the believe of these experts, as expressed by Dr. Jonathan Harrison and Dr. Georgiy Brusovanik, that Engelmayer intends to cause Teman significant harm and possibly death. Given the desire to protect Biale, it is clear Englemayer is aiming to disable Teman from being able to file and pursue this litigation -- a draft of which was sent together with Teman's appellate counsel to the defendants previously.

## GOVERNMENT'S VIOLATION OF TEMAN'S RELIGIOUS RIGHTS

77. The government, through Gutwillig, Bhatia, Imperatore, Williams, and the SDNY AO, violated Teman's First Amendment religious rights by fabricating and endorsing false Jewish laws regarding Passover to argue that Teman's timing of RCC transactions demonstrated fraudulent intent (Exhibit A). This argument was advanced during trial and sentencing, falsely claiming that the Friday before Passover was a restricted period that Teman exploited to defraud Jewish clients.

78. The rabbis' letter confirms that the government was aware that these claims were baseless, as evidenced by their knowledge that Soleimani had communicated with Teman via WhatsApp during the Intermediary Days of Passover the previous year, a period when Jewish law permits work, travel, and electronic use (Exhibit A). The government's persistence in this false narrative, even after correction by the 24 rabbis, constitutes an intentional abuse of Teman's religious identity and exceeds the scope of prosecutorial authority.

79. Under *Klagsbrun*, 53 F. Supp. 3d at 740, secular authorities, including prosecutors, lack jurisdiction to interpret or enforce religious doctrine, as such actions entangle the government in religious matters in violation of the First Amendment. The government's fabrication of Passover laws to bolster its case against Teman was an administrative or investigative act, not advocative, and is therefore unprotected by prosecutorial immunity, as established in *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009).

80. The government's actions caused Teman severe reputational and emotional harm, compounding the defamation by Engelmayer. The ongoing discovery of these violations, as revealed through the rabbis' letter and subsequent proceedings, tolls any applicable statute of limitations, ensuring that Teman's claims remain actionable.


# COUNT I – FRAUDULENT MISREPRESENTATION

**(Against Sher Tremonte, Harris, and Biale)**

81. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

82. Defendants Sher Tremonte, Harris, and Biale explicitly represented in the engagement letter that "we are not aware of any other representation that would preclude the Firm from undertaking this engagement or adversely affect the Firm's ability to complete it" (Exhibit C). This representation was knowingly or recklessly false, as Biale's marriage to Graham, an SDNY prosecutor, created a clear conflict of interest that required disclosure and a knowing waiver under *Curcio*.

83. Teman justifiably relied on these representations when retaining Sher Tremonte, believing that the firm was free of conflicts that could impair its representation. But for these false representations, Teman would not have engaged Sher Tremonte, Harris, and Biale, and would instead have hired competent, conflict-free counsel who could have effectively pursued the investigation of prosecutorial abuses.

84. As a direct result of Sher Tremonte's fraudulent misrepresentations, Teman suffered significant damages, including prolonged confinement, financial losses to GateGuard, and severe emotional and psychological distress. The delays caused by Sher Tremonte's inaction, compounded by Biale's misrepresentations about pursuing exculpatory evidence (Exhibit D), prevented Teman from accessing capital markets during a favorable period in 2021, when a competitor, Latch, went public at a $1.56 billion valuation.

85. The ongoing discovery of the harm caused by Sher Tremonte's misrepresentations, particularly through Coleman's affirmation (Exhibit D) and Pecot's statement (Exhibit E), tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction further justifies tolling, as it prevented timely pursuit of these claims.

86. As a result of the foregoing, Teman is entitled to compensatory damages in an amount to be determined at trial, together with punitive damages for Sher Tremonte's malicious and intentional misconduct, as well as attorneys' fees and costs.

# COUNT II – BREACH OF FIDUCIARY DUTY

**(Against Sher Tremonte, Harris, and Biale)**

87. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

88. Sher Tremonte, Harris, and Biale owed Teman a fiduciary duty to act with undivided loyalty, to disclose any conflicts of interest promptly, and to pursue his defense with diligence and competence. This duty required them to inform Teman of Biale's marriage to Graham and to seek a knowing waiver before proceeding with representation.

89. Sher Tremonte, Harris, and Biale breached this fiduciary duty by failing to disclose the Biale/Graham conflict, compromising privileged communications by working in close proximity to Graham, and lying to Teman and others, including Coleman, about their efforts to pursue exculpatory evidence from 18 Mercer shareholders (Exhibit D). These breaches undermined Teman's defense and delayed the discovery of critical evidence (Exhibit E).

90. As a result of these breaches, Teman suffered substantial financial losses, including the diminished value of GateGuard, as well as severe emotional and psychological harm from prolonged confinement and the

betrayal by his counsel. The ongoing discovery of these harms, coupled with Teman's fear for his safety, tolls any applicable statute of limitations.

91. Teman is entitled to compensatory damages in an amount to be determined at trial, together with attorneys' fees and costs, for Sher Tremonte's egregious breach of its fiduciary obligations.

# COUNT III – DEFAMATION AND FIRST AMENDMENT VIOLATION

**(Against Engelmayer)**

92. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

93. Engelmayer knowingly made false and injurious statements, asserting that Teman's emails contained threats to cash RCCs on Passover to exploit Orthodox Jewish clients, claiming this timing showed fraudulent intent due to fabricated Jewish laws prohibiting such actions (Exhibit A). These statements were broadcast during Teman's sentencing hearing on December 1, 2020, attended by Teman's family, friends, and colleagues (Exhibit F).

94. These statements were demonstrably false, as Teman's emails contain no such threats, and the rabbis confirmed that "there is not a shred of evidence in the record" for Engelmayer's claims, noting that Judaism permits financial transactions during Passover's Intermediary Days (Exhibit A). Engelmayer's persistence in repeating these falsehoods after correction by the rabbis constitutes a deliberate act of defamation driven by personal animus.

95. Engelmayer's actions constitute religiously motivated hate speech and an abuse of judicial authority, as they rely on fabricating non-existent Jewish laws. Under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014), secular courts lack jurisdiction to legislate religious doctrine, as this violates the First Amendment's Establishment Clause. Engelmayer's invention of Passover laws to defame

Teman and justify his conviction is a non-judicial act, unprotected by judicial immunity, as it exceeds his authority and entangles the judiciary in religious matters (*Mireles v. Waco*, 502 U.S. 9, 11 (1991)).

96. These statements violated Teman's First Amendment right to free exercise of religion by targeting his Jewish identity and misrepresenting Jewish law to harm his reputation and liberty. The rabbis' condemnation of Engelmayer's "dishonest abuse of Jewish practices" underscores the severity of this violation (Exhibit A).

97. At the time of his arrest, Teman's companies were front-page news, often mentioned alongside Latch, which went public at a $1.56 billion valuation. Engelmayer's lies cast doubt on Teman's character, falsely portraying him as anti-Semitic, causing severe reputational harm, mental anguish, emotional and psychological pain, physical illness, and lifelong damage to his reputation. Teman, recognized as a "North American Jewish Community Hero" by the Jewish Federations of North America, can no longer effectively operate JCorps due to this defamation (Exhibit A).

98. The ongoing discovery of the harm caused by Engelmayer's defamation, coupled with Teman's fear for his safety under Engelmayer's jurisdiction, tolls any applicable statute of limitations, ensuring that this claim remains actionable.

99. As a result, Teman is entitled to compensatory damages in an amount to be determined at trial, together with punitive damages for Engelmayer's malicious conduct, as well as attorneys' fees and costs.

# COUNT IV – VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS UNDER 42 U.S.C. § 1983

**(Against Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO)**

100. Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

101. The failure of the government to disclose, and Engelmayer to address in.Concurrent with the sentencing hearing on December 1, 2020, Engelmayer's belated acknowledgment of the Biale/Graham conflict, as

captured in the transcript (Exhibit F), revealed a profound violation of Teman's Sixth Amendment right to conflict-free counsel. This delay allowed conflicted counsel to influence critical post-conviction motions, irreparably prejudicing Teman's defense. Similarly, Engelmayer's extrajudicial actions, including his September 2020 meeting with Biale and October 2020 emails with Biale and Graham (¶ 33), facilitated the concealment of this conflict, further undermining Teman's Fifth Amendment right to due process by compromising the fairness of the judicial process.

102.    Engelmayer's refusal to hold hearings on exculpatory evidence, which Biale falsely claimed to have pursued, as affirmed by Ronald D. Coleman (Exhibit D) and corroborated by Shelly Jenkins Pecot (Exhibit E), exacerbated these constitutional violations. This evidence, demonstrating that 18 Mercer witnesses perjured themselves regarding their awareness of GateGuard's fees, could have altered the outcome of Teman's case but remains unreviewed by the Second Circuit due to Engelmayer's inaction.

103.    All Defendants acted under color of law when committing these violations, either through their direct participation in the prosecution, their failure to disclose the conflict, or their judicial oversight of the case. The SDNY AO, under Williams' leadership and continuing under Acting U.S. Attorney Edward Y. Kim, bears institutional responsibility for the systemic failures that permitted these violations to persist.

104.    The ongoing discovery of the harm caused by these constitutional violations, particularly through the emergence of exculpatory evidence and Engelmayer's refusal to address it, tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction, compounded by the psychological toll of his wrongful conviction, further justifies tolling, as it prevented timely pursuit of these claims.

105.    As a result of these violations, Teman suffered harm in the form of a wrongful conviction and prolonged confinement, entitling him to compensatory damages in an amount to be determined at trial, together with punitive damages for the Defendants' reckless disregard of his rights, as well as attorneys' fees and costs.

# COUNT V – VIOLATION OF THE FIFTH AND FIRST AMENDMENTS UNDER 42 U.S.C. § 1983

**(Against Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO)**

106.    Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

107.    Engelmayer's practice of making ex parte calls to SDNY AO colleagues to ensure prosecutorial staffing sufficient to secure convictions, as admitted in the sealed hearing transcript (Exhibit G, Dkt. 321-1), constitutes a direct violation of Teman's Fifth Amendment right to due process. By intervening in the prosecution's staffing decisions, Engelmayer assumed the role of both judge and de facto prosecutor, compromising the impartiality of the judicial process and tilting the scales against Teman.

108.    The government, through Gutwillig, Bhatia, Imperatore, Williams, Mermelstein, and the SDNY AO, further violated Teman's First Amendment religious rights by fabricating false Jewish laws regarding Passover to argue that Teman's timing of RCC transactions demonstrated fraudulent intent (Exhibit A). The rabbis confirmed that the government knew these laws were false, as Soleimani had communicated with Teman during Passover's Intermediary Days, when work is permitted (Exhibit A). Under *Klagsbrun v. Vaad Harabonim of Greater Monsey*, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014), such actions entangle the government in religious doctrine, exceeding prosecutorial authority and rendering them unprotected by immunity, as they were administrative or investigative in nature (*Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009)).

109.    Engelmayer's extrajudicial communications with Biale and Graham, including his efforts to conceal their conflict (¶ 33), contributed to these violations by biasing the judicial process against Teman, further undermining his due process rights.

110.    All Defendants acted under color of law in committing these violations, either through their prosecutorial actions, their failure to address the conflict, or their judicial oversight tainted by bias and improper communications.

25

111.    The ongoing discovery of the harm caused by these violations, including the religious rights abuses and Engelmayer's ex parte conduct, tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction further justifies tolling, as it prevented timely pursuit of these claims.

112.    As a result of these violations, Teman suffered harm in the form of a wrongful conviction, prolonged confinement, and severe reputational and emotional damage, entitling him to compensatory damages in an amount to be determined at trial, together with punitive damages for the Defendants' reckless disregard of his rights, as well as attorneys' fees and costs.

# COUNT VI – CIVIL CONSPIRACY

**(Against Engelmayer, Biale, Graham, and Sher Tremonte)**

113.    Plaintiff repeats, re-alleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

114.    Defendants Engelmayer, Biale, Graham, and Sher Tremonte entered into an express or implied agreement to conceal the conflict of interest arising from Biale's marriage to Graham, with the intent to defraud Teman of his constitutional right to conflict-free counsel and due process of law. This conspiracy was designed to protect Biale and Graham from ethical accountability, shield Sher Tremonte from liability, and maintain the SDNY AO's prosecutorial advantage by ensuring Teman remained unaware of the conflict.

115.    Overt acts in furtherance of this conspiracy include, but are not limited to: a. Engelmayer's private meeting with Biale in September 2020 at Biale's Brooklyn residence, where he advised Biale on strategies to avoid disclosing the conflict to Teman (¶ 33). b. Engelmayer's email communications with Biale and Graham in October 2020, providing guidance on framing their representation to minimize court scrutiny (¶ 33). c. Biale and Sher Tremonte's failure to disclose the conflict to Teman, despite their fiduciary duty to do so, as evidenced by the engagement letter (Exhibit C). d. Graham's participation in concealing the conflict while working from home with Biale, sharing privileged information that compromised Teman's defense (¶¶

48-50). e. Biale's false representations to Teman and Coleman about pursuing exculpatory evidence from 18 Mercer shareholders, delaying the discovery of critical evidence (Exhibit D). f. The FOIA email from Harris to Bhatia and others, circulated to Mermelstein, revealing efforts to bury the conflict's implications (Exhibit C).

116.     As a direct and proximate result of this conspiracy, Teman suffered damages, including prolonged confinement, financial losses to GateGuard, severe emotional distress, and reputational harm from Engelmayer's defamatory statements. The conspiracy's impact is evidenced by the Walsh Case, where Biale testified against his client without disclosing the conflict (Exhibit B), indicating a pattern of misconduct.

117.     The ongoing discovery of the harm caused by this conspiracy, particularly through Coleman's affirmation (Exhibit D) and Pecot's statement (Exhibit E), tolls any applicable statute of limitations. Teman's fear for his safety under Engelmayer's jurisdiction further justifies tolling, as it prevented timely pursuit of these claims.

118.     As a result, Teman is entitled to compensatory damages in an amount to be determined at trial, together with punitive damages for the Defendants' malicious and intentional misconduct, as well as attorneys' fees and costs.

# JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

# Request for Disqualification of Judges with Prior Sher Tremonte Involvement

Plaintiff respectfully requests that no judge who has previously presided over any matter in which Sher Tremonte, LLP, or its attorneys, including Justine Harris or Noam Biale, represented a party be assigned to this case, due to the significant conflict of interest posed by the firm's central role as a defendant in

this action. The complaint alleges that Sher Tremonte, Harris, and Biale engaged in fraudulent misrepresentations, breached their fiduciary duties, and conspired to conceal a critical conflict of interest arising from Biale's marriage to Assistant United States Attorney Margaret Graham, thereby causing Plaintiff severe harm, including wrongful conviction and prolonged confinement (¶¶ 81–91, 113–118). A judge who has relied on Sher Tremonte's representations in prior cases may have a personal or professional interest in protecting the integrity of those proceedings, potentially leading to bias in favor of Sher Tremonte to avoid the appearance that large amounts of judicial work must be undone or reexamined due to the firm's alleged misconduct. Such a conflict could compromise the impartiality required under 28 U.S.C. § 455(a), which mandates disqualification where a judge's impartiality might reasonably be questioned. To ensure a fair and unbiased adjudication of this matter, Plaintiff requests that the case be assigned to a judge without prior exposure to Sher Tremonte's representation, thereby safeguarding the integrity of these proceedings and Plaintiff's right to an impartial tribunal.

## WHEREFORE, Plaintiff demands judgment:

(1) Under Count I, for compensatory and punitive damages resulting from Sher Tremonte's, Harris', and Biale's fraudulent misrepresentations, in an amount to be determined at trial, together with attorneys' fees and costs.

(2) Under Count II, for compensatory damages resulting from Sher Tremonte's, Harris', and Biale's breach of fiduciary duty, in an amount to be determined at trial, together with attorneys' fees and costs.

(3) Under Count III, for compensatory and punitive damages resulting from Engelmayer's defamation and First Amendment violation, in an amount to be determined at trial, together with attorneys' fees and costs.

(4) Under Count IV, for compensatory and punitive damages resulting from Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO's violation of Teman's Fifth and Sixth Amendment rights, in an amount to be determined at trial, together with attorneys' fees and costs.

(5) Under Count V, for compensatory and punitive damages resulting from Engelmayer, Williams, Imperatore, Bhatia, Gutwillig, Mermelstein, Graham, and the SDNY AO's violation of Teman's Fifth and First Amendment rights, in an amount to be determined at trial, together with attorneys' fees and costs.

(6) Under Count VI, for compensatory and punitive damages resulting from Engelmayer, Biale, Graham, and Sher Tremonte's civil conspiracy, in an amount to be determined at trial, together with attorneys' fees and costs.

(7) Issuing an injunction requiring the timely disclosure of spousal conflicts and the obtaining of a knowing and voluntary waiver before any proceedings involving conflicted counsel may proceed in Teman's case, and prohibiting judges and prosecutors from conferring or coordinating on staffing matters or engaging in extrajudicial actions to conceal conflicts or fabricate religious laws in Teman's case.

(8) Such other and further relief as this Court deems just and proper.

**Dated**: Tel Aviv, Israel

June 28, 2025 / 3rd of Tamuz, 5785 (After sundown)

s/Ari Teman/

Plaintiff, Pro Se

ari@teman.com

1521 Alton Road #888,

Miami Beach, FL 33139

# Exhibits

- **Exhibit A**: Letter from 24 Rabbis to Judge Paul Engelmayer, filed at Docket 326-1 in *United States v. Teman*, Case No. 19-cr-696, dated August 11, 2022, condemning Engelmayer's fabrication of Jewish laws and defamatory statements.

- **Exhibit B**: Transcript from *Walsh v. United States*, Case No. 17 CV 6651 (LAP), documenting Sher Tremonte counsel's testimony as a government witness against his client, John Walsh, without disclosing their conflict with Margaret Graham.

- **Exhibit C**: FOIA email obtained from *Butowsky v. US Dep't of Justice*, Case No. 21-cv-774, revealing communications among Justine Harris, Kedar Bhatia, Rebecca Mermelstein, and others discussing the Biale/Graham conflict impacting "many SDNY cases".

- **Exhibit D**: Affirmation of Ronald D. Coleman, filed at Docket 350-1 in *United States v. Teman*, dated November 22, 2021, affirming that Biale misrepresented efforts to pursue exculpatory evidence from 18 Mercer shareholders.

- **Exhibit E**: Sworn Statement of Shelly Jenkins Pecot, filed at Docket 326, pp. 9–10 in *United States v. Teman*, dated August 21, 2021, confirming that 18 Mercer witnesses were aware of GateGuard's fees, contradicting their trial testimony.

- **Exhibit F**: Transcript of the December 1, 2020, sentencing hearing in *United States v. Teman*, Case No. 19-cr-696, where Engelmayer exposed the Biale/Graham conflict and suspended proceedings.

- **Exhibit G**: Hearing transcript, filed at Docket 321-1 in *United States v. Teman*, where Engelmayer admitted to making ex parte calls to SDNY AO colleagues to ensure prosecutorial staffing for convictions.

- **Exhibit H:** Engagement letter of Sher Tremonte

B"H

# Rabbi Leibel Khazanovich

---

Judge Paul Engelmayer
Southern District of New York
40 Foley Square
New York, NY 10007

12 Av, 5782
Aug 9, 2022

Dear Judge Engelmayer,

On behalf of the dozens of rabbis and legal experts who have signed the attached letter seeking your immediate resignation, we respectfully request the letter be filed to the docket in *United States v Ari Teman*. We have reviewed publicly filed information in the trial and appellate proceedings involving Mr. Teman, and our considered opinion is that your *ex parte* call providing one party in litigation a material tactical advantage (and your admission that this is a regular practice of yours), the non-disclosure of your interest in Bank of America until after trial and even then in an incomplete and deceptive manner, and your comments about Mr. Teman's faith constitute violations of *Halacha* and should be made public. In addition, we believe your conduct violates the Code of Judicial Conduct and the US Constitution, and should be publicly filed so that Mr. Teman and other parties before you can protect their rights.

Thank you,

*Rabbi Leibel Khazanovich*

Copying:    US Attorney Damian Williams
            AUSA Kedar Bhatia
            AUSA Jacob Guttwillig
            Mr. Ari Teman, Defendant
            Mr. Eden Quainton, Appellate Attorney for Mr. Teman
            *Via Electronic Mail*

B"H
29th of Tamuz, 5782
Yom Kippur Katan Av
Thu, 28 July 2022

Judge Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square
New York, New York

Damian Williams,
United States Attorney
Southern District of New York

**RE: Request for recusal or retirement of Judge Paul Engelmayer (USA v. Teman, 1:19-cr-00696)**

Your Honor,

We write to you as Rabbis and community leaders to express our deep concern over the treatment of Ari Teman, a young man who has been a pillar of the Jewish community and has suffered great hardship for a matter that should never have resulted in criminal prosecution and for which there is no evidence of any criminal intent. We are also deeply concerned with your handling of Mr. Teman's case and we are calling on you to recuse yourself from any further proceedings involving Mr. Teman, against whom you have formed a bias that, sadly, borders on anti-semitism.

**Mr. Teman's strong track record of supporting the Jewish community**

Ari Teman's Jewish practice and *Ahavat Yisrael,* love for the Jewish people, requires a brief overview. Ari Teman has been an outstanding, exceptional leader and volunteer for the Jewish communities of New York, Miami, and across the United States, Israel, Canada, Australia, and beyond.

As the founder of JCorps International, he worked unpaid for years to build a multi-continent international volunteer organization that drove thousands of young adults to volunteer for the first time. There, besides feeding the hungry, visiting the elderly, comforting the sick, and beautifying their cities, young adults often met their spouses and created beautiful families, many formed friendships, and others changed careers and began a life of service.

Ari has consistently been one of the first to step up to help his local synagogues and Chabad Houses. He is active with Israel organizations such as United Hatzalah, FIDF, Aleh Negev, and more. He doesn't just donate, he volunteers to help create and lead programs and events.

**The legally baseless prosecution theory**

Legal experts on all sides of the political spectrum -- from Harvard Law School Professor Lawrence Lessig to SCOTUS attorney Ronald Coleman - have concluded that the case against Mr. Teman is "legally baseless, ""ridiculous" and his conviction a "grave injustice." Although we know you are familiar with these letters, we are attaching relevant communications to the President of the United States and the US Attorney General that have impressed upon us the need to act in defense of an innocent man.

The accusations against Mr. Teman do not withstand objective scrutiny. In a word, Ari stands accused of enforcing a contract all three clients who testified against him admitted they were aware of. All three clients admit GateGuard's invoices state that products and services are provided under a multi-year, non-cancellable contract, but the clients claim they simply chose to not read the Payment Terms subpage. The government's argument is that because these clients claim they didn't read a subpage, Ari should go to prison for enforcing it, an argument so far-fetched we are shocked the government could proceed, and even convict, on this basis.

Moreover, we are profoundly troubled by evidence that your Honor conducted an *ex parte* call with the Southern District of New York prosecutors to ensure there was "adequate supervision" of the government attorneys on the case—in effect signaling that you were taking sides in the dispute and that the government needed to bring in reinforcements to ensure Teman's conviction.

Your Honor's action has, in candor, shocked our consciences. The partiality on display in the ex parte call is also reflected in your insistence that it was the _defense's_ burden to place the 2018 Payment Terms in evidence, even though it was the _Government_'s affirmative burden to establish that allegedly defrauded clients had not assented to the Payment Terms, which of course the Government should have been required to introduce into evidence as part of their own prima facie case. Without this crucial evidence, the Government's case should have been dismissed. Instead, you concluded that it was the Defendant's job to prove his innocence and not the Government's job to prove his guilt!

## Judge Engelmayer's Abuse of Judaism & False Testimony to Convict & Sentence Teman

However, what we find inexcusable, and what requires your recusal from the Teman case, is the anti-Jewish – even, alas, anti-semitic – tenor of your comments towards Mr. Teman.  You claimed that drafting accounts on the Friday before Passover is a sign of intent to defraud, when the first two days of Passover that year fell on Saturday and Sunday, days which banks are officially closed.  Such a claim constitutes an abuse of the Jewish faith for dishonest, misleading purposes. The Government and Court knew full well that Mr. Soleimani, for example, had WhatsApp messaged with Mr. Teman during the Intermediary Days ("Chol Hamoed") of Passover the year prior, and they knew full well that Judaism allows work, travel, and use of electronics on the Intermediary Days, and that Mr. Soleimani would be free to address any billing issues on Monday following the Passover weekend when banks were closed.

You then repeatedly distorted the record and even invented statements by Mr. Teman that he had intentionally chosen to use the Passover weekend to defraud his clients – statements for which there is not a shred of evidence in the record. It appears you were turned against Mr. Teman and then were so blinded with animus against him that you literally saw evidence that did not exist. Such conduct would be inexcusable in any judge, but is outrageous and intolerable in a Jew.

We are aware of a suicide note that the Government provided to you in which Mr. Teman makes irrational and delusional statements relating to Judaism. You knew perfectly well that Mr. Teman was suffering under grave physical and psychiatric distress when he wrote the suicide letter, due to a then-undiagnosed spinal condition, which was highly prejudicial and should only have been considered for the narrow purpose of determining whether Mr. Teman was fit to stand trial. Even a cursory review of the letter – completely at odds with Mr. Teman's character and his lifelong devotion to Judaism – should have been enough to convince you that Mr. Teman was not of sound mind and could not fairly be tried.

Instead, you appear to have taken the letter at face value, and, without introducing it into evidence or informing the jury that you were in possession of highly damaging evidence that you chose to keep to yourself, used the letter to fuel your animus against Mr. Teman and paint him to the attorneys, the jury, his family and friends as a religious bigot — allegedly because of his drafting of checks on the Friday before Passover. When the Government argued to the jury that Mr. Teman's drafting of checks on this normal working day separated from Intermediary Days by a weekend when banks would be closed showed intent to defraud you sat by impassively, apparently endorsing this horrible accusation and then adopting it as your own.

As Rabbis, we cannot countenance your dishonest abuse of Jewish practices and your calumnious attacks on Mr. Teman. If anything, you should have seen Mr. Teman's letter as a cry for help from a very sick person who completely lacked capacity to stand trial, not as a basis for the animus you then displayed against him. We believe your conduct is so egregious that you should immediately recuse from any further proceedings in the case and extend an apology to Mr. Teman and the Jewish community. Americans of all faiths must have confidence that judges are not guided by improper sentiments and do not abuse the Jewish faith to convict anyone, under any circumstances.

**Judge Engelmayer's personal & financial bias**

In addition to the many instances of prosecutorial misconduct described in Mr. Teman's filings and in his brief on appeal, which we have read with equal parts sadness and anger, we are particularly troubled by your delay in disclosing that you and your family are beneficial owners of over $2,000,000 in Bank of America shares, when Bank of America was the only alleged economic victim in the case. For you to sit as judge in a case with such a strong motive to find in favor of Bank of America is unbefitting any Judge. Even if you believed you could rule impartially in this case, the confidence of the public, Jewish and Gentile, in the rule of law is profoundly shaken by the sight of a judge with a substantial financial interest in a case sending a defendant to prison over an amount that pales in comparison with the judge's financial interest. For a Jew, who should stand as a light to the nations, to engage in such subterfuge and self-interested obfuscation undermines and discredits our faith.

**A note on Jewish laws violated by Judge Engelmayer**

As Jews we have an obligation to correct moral and Halachic failings of a fellow Jew, in this case, your Honor. We can only condemn your Honor's multiple, significant violations of Jewish law. These include:

1. Requiring a Jewish, defendant to appear on Jewish Holidays (Shemini Atzeret) and stay in court into the Sabbath. Also, requiring a Jewish observant witness (Reinitz) and defendant to remain in court into the Sabbath despite protest from the defendant (Dkt _).[1] In fact, requiring even the non-Jewish attorneys to participate was and is a violation of Jewish law.[2]

   The foregoing judgments are not esoteric Halacha (Jewish Law), but rather stem from the plain text of one of the Ten Commandments: "But the seventh day is a sabbath unto the LORD thy God, in it thou shalt not do any manner of work, thou, nor thy son, nor thy daughter, nor thy man-servant, nor thy maid-servant, nor thy cattle, nor thy stranger that is within thy gates;"[3]

   Moreover, by causing Teman to disrespect the Sabbath, you are guilty of prohibition of *Lifnei iver,*

---

[1] Shemot (Exodus) 20:9; *Mechilta,* Shemot (Exodus) 12:16
[2] Beit Yosef end of D.C. 344, Shulchan Aruch HaRav, Orach Chaim 343:1; Maimonides, Laws of Shabbat 6.
[3] Shemot (Exodus), 20:9

causing another Jew to sin.[4]

2. Making false testimony by fabricating "statements Teman did not make and do not appear at all in evidence (not even the Government or its witnesses suggested Teman said he would draft accounts on Passover) and then basing sentencing on it. (Exodus 20:12, "You shall not bear false witness against your neighbor.") , While also turning a blind eye to exculpatory evidence (Dkt. 284, 294, etc.) and delaying hearings on exculpatory evidence.[5]

3. Judging a case in which you have a significant ($2M+!) financial interest in the only alleged economic victim in the case,[6] and in which you are close personal friends with attorneys on both sides (Mr. Noam Biale and his wife AUSA Margaret Graham) who willfully violated disclosure obligations and violated Mr. Teman's right to conflict-free counsel and attorney-client confidentiality. Your Honor's conduct in this respect constitutes and egregious violation of Jewish law[7].

4. Making ex parte call(s) to ensure "extra supervision" to only one side .

.
Violating the Sabbath, bearing false witness, hiding material evidence, displaying favoritism toward an accuser — such behavior is unacceptable and unbefitting of a Jew.

Under Jewish law, your Honor has a duty to apologize and make Mr. Teman whole. Jewish Law is clear that only Mr. Teman, not G-d nor any Rabbis, can forgive the grave abuses you have committed. We call on you to atone for your conduct without delay.

**Summary**

For the above reasons, and in light of the severity of the conduct described, your Honor should not only recuse yourself from any further involvement in the Teman matter, but your Honor should retire from the bench immediately.

---

[4] Rav Ovadiah Yosef, *Teshuvot Yechaveh Da'at 4:6*5; Also, Chazon Ish (*Sanhedrin* 15:4))

[5] Rambam, Hilchot Sanhedrin 24,2; Rav Ovadia Yosef, Responsa Yabia Omer 1,41.

[6] Talmud Bavli, Bava Basra 43a (("If one says, 'Give a sum of money to the people of my city,' the case may not be judged by judges of that city, nor may evidence be presented based on the testimony of residents of that city."); Shulchan Aruch, Choshen Mishpat 37:1 (ruling that where two partners own a single property and a suit is brought against one of the partners alleging that the whole property had been stolen from the plaintiff and illegally sold to the partner-defendant, the non-party partner is disqualified from judging the case) and Shulchan Aruch, Choshen Mishpat 37:4 (ruling that a debtor holding a debt in partnership with another party is disqualified from judging a case brought by the creditor against only the partner for repayment of the loan) with Shulchan Aruch, Choshen Mishpat 37:11 (holding that where A holds a note of credit against B and conveys the note to C, B is disqualified from judging an action seeking to invalidate the conveyance since he may prefer to be indebted to A over C, or vice versa) and SHULCHAN ARUCH, Choshen Mishpat 37:15 (ruling that where A sells property to B without a guarantee and C subsequently brings a suit against B to recover title to the property, A is disqualified from judging the case since he may prefer that the property remain with B so that his own creditors can attach the property to pay debts owed to them by A). (From
https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=2418&context=ulj )

[7] R. ASHER B. YECHIEL, RESPONSA ROSH 6:25 (disqualifying a judge from deciding a case involving a bequest of books and lamps to the synagogue the judge frequented, even though the members of the congregation would be under no obligation to purchase these items themselves if the bequest was invalidated);) (Ibid)

We also respectfully ask that the United States Attorney for the Southern District of New York, Mr. Damian Williams, seek the immediate dismissal of this case. Mr. Williams inherited this case but he has had ample time and notice to stop the injustice and has failed to do so.

America has a Constitution. Jews have the Torah and oral and written commentary developed over millennia. No judge should disrespect the former, no Jew should disrespect the latter. Alas, your Honor has run afoul of both. We respectfully ask that your Honor examine his conscience and take the only appropriate steps under the circumstances: immediate recusal and withdrawal from the bench.

Any action short of these steps sends an unmistakable message that the Constitution and our sacred laws and traditions can be ignored and violated to serve the needs of the rich and well-connected. The damage to the Jewish community from your Honor's continued involvement in the Teman case would be incalculable. We are confident that, in your heart, you know the right course of action. We call on you to follow the conscience G-d has given you and step down so that Mr. Teman can be free again to devote himself to the Jewish community for which he has such love and of which he is so proud. .

Signed,

*Rabbi Reuben Koolyk, Esq., MD*
Yeshiva University

*Rabbi Menachem Mayberg, Esq.*
LEC

*Rabbi Andrew Schein*
Yeshiva University

*Rabbi Sidney Slivko*
Bay Terrace Garden Jewish
Center Queens (ret),
Yeshiva University

*Rabbi Jeffrey Shron*
Yeshiva Pirchei Shoshanim,
Kehilath Israel, Kansas City (ret)

*Rabbi Zvi Karpel*
Chaplain (ret) Daughters of Israel,
West Orange, NJ.

*Rabbi Chezky Wolff*
The Chelsea Shul

*Rabbi Shmuel Druin LCSW*
Chaplain, North Miami Police
Dept.

*Rabbi Eitan Webb*
Princeton University

*Rabbi Yonah Blum*
Columbia University

*Rabbi Chayim B. Alevsky*
Chabad Family Programs, NYC

*Rabbi Leibel Khazanovich*
YJP South Beach,
Hebrew Academy (RASG)

*Rabbi Ephraim Simon*
Friends of Lubavitch of Bergen
County

*Rabbi Levi Teldon*
Alamo Chabad

*Rabbi Mendy Krinsky*
Chabad Jewish Center Needham

*Rabbi Moshe Z. Schapiro*
Chabad of Hoboken

*Rabbi Aryeh Weil*
Congregation Bnai Yeshurun,
Teaneck (ret)

*Rabbi Shraga Mann*
Chabad of South Beach

*Rabbi Zev Katz*
Miami Beach Chabad

*Rabbi Yakov Bankhalter*
Chabad Loft

*Rabbi Moishe Korf*
Chabad of Miami Gardens

*Rabbi Eliezer Tewel*
Chabad Israeli Center

*Rabbi Moshe Klar*
JETS, Beis Menachem

*Rabbi Yossi Smierc*
KSPACE



# HARVARD LAW SCHOOL

LAWRENCE LESSIG
ROY L. FURMAN PROFESSOR OF LAW AND LEADERSHIP
1563 MASSACHUSETTS AVE
CAMBRIDGE · MASSACHUSETTS · 02138
TEL. (617) 496-8853
LESSIG@LAW.HARVARD.EDU

November 12, 2020

President Donald J. Trump
1600 Pennsylvania Avenue
Washington, DC 20500

The Honorable William Barr Attorney General

The Honorable Jeffrey Rosen
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC, 20530

Re: Ari Teman

I have reviewed, *pro bono*, the case involving Ari Teman. Ari was convicted for acts that certainly do not establish a crime nor evince any criminal intent. I urge the Justice Department to dismiss the case or the President to pardon Mr. Teman.

The facts underlying this case involve a business dispute between Mr. Teman's company, GateGuard, and some of its clients. Those clients had failed to pay for the services GateGuard had provided. Pursuant to the terms agreed to by the clients and GateGuard, Mr. Teman effected a transfer of funds from the clients' bank accounts to GateGuard. The clients had contractually authorized GateGuard to collect overdue fees in this way. The contract that authorized this was not crafted by Mr. Teman, but by his lawyers. They had patterned the agreement on other well known companies (such as AirBnB). The lawyers' work obviously cannot be the foundation for a finding of Mr. Teman's fraudulent intent.

Whether GateGuard's contract should be enforceable in a civil court is an interesting question for academics to consider. GateGuard's customers acknowledged they received the contracts; they claimed they hadn't read it. Again, that poses an interesting question for a contracts exam. It doesn't evince fraudulent intent by

1

Mr. Teman. Indeed, the reality of online commerce is that agreements like this are the norm. The judge in this case suggested that the terms authorizing the transfer of funds were buried in the contract. GateGuard's contract is actually quite concise relative to many online agreements. The suggestion that a surprising term in an online agreement constitutes an intent to defraud would render most banks and credit card companies guilty of fraud. Nothing in GateGuard's terms of service is extreme or unusual.

The judge in this case, writing to uphold a jury verdict, was constrained to justify the jury's verdict. He was therefore persuaded that the fees charged were unreasonable. And he was skeptical that the terms authorizing a transfer were in fact present at the time the clients agreed to the contract.

But the fees were charged as many contracts — cell phones contracts for example — provide today: a low monthly fee that is accelerated if a contract is terminated early, or not kept current. And the evidence in this case demonstrates conclusively that the term authorizing transfers from the clients' accounts was both part of the original agreements and expressly acknowledged by at least some of the clients.

What explains this prosecution is not the law, nor the justice within this commercial dispute. What explains it, apparently, is the relative inexperience of the front line prosecutors. Those prosecutors were new to the U.S. Attorney's office. They allowed their inexperience to guide their intuitions. And once it was clear that they had uncovered not a criminal commercial enterprise but ordinary online commerce, rather than acknowledging their error, and the injustice in prosecuting a commercial dispute as a crime, they continued to press the prosecution against Mr. Teman.

This behavior is surprising and troubling to those like me who have high regard for United States Attorneys. Yet it is clear that sometimes, winning becomes more important than justice. The prosecution of Mr. Teman is not justice. It is not a credit to the work of the Department. I urge you to take whatever steps are possible to stop this prosecution before Mr. Teman is sentenced to prison.

Sincerely,



Lawrence Lessig

Shelly Jenkins Pecot
18 Mercer St. New York NY 10013
shelly.pecot@gmail.com (917) 561-6505

Judge Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square
New York, NY 10008

August 21, 2021

Your Honor,

My name is Shelly Jenkins Pecot. I am a shareholder at 18 Mercer. I was out of the country when I was subpoenaed to testify.

With regard to 18 Mercer, I do not believe Ari Teman should go to prison.

Ari Teman did warn myself and other shareholders of what he said were the following terms in the contract he signed with our then board Vice President via an online document.

1. There was an $18,000 fee for removing the device
2. There was a $10,000 fee for collections
3. There would be attorney fees
4. There was binding arbitration
5. That he believed he had the right to draft owed monies from our bank account

I confirm that I did text with Mr. Teman and that the texts he has shown to me are accurate and match those on my phone.

I also confirm that I did forward the two attached emails to Mr. Teman on Aug 19th.

I do not live in New York and was only at the coop for a few days while Mr. Teman's device was installed. During that time, the device was connecting to the app but seemed to be disconnected from the door lock.

My personal interactions with Mr. Teman on this matter were amicable at first. I believed that he wanted to work with us to get his device working properly. Mr. Teman told me that our internet was not sufficient to run the device and that he had informed the board of this. Mr. Teman also told me that he had added a new router to help with this issue.

I was informed by another shareholder that this shareholder had been told by contractors that Bonnie Soon-Osberger had instructed them to disconnect the device. At the time, my suspicion was that it had been sabotaged to justify going with a different company. However, I had no direct proof of this and now believe they were referring to when the device was removed to be replaced.

I have no direct knowledge of Mr. Teman's interactions with the board or management. However the management team did insist to shareholders that they had no interactions with Mr. Teman. Mr. Teman forwarded me emails between himself and management to show me that they were not being truthful.

I am out of state, but I would be happy to speak by Zoom on this matter if you have any further questions.

Shelly Jenkins Pecot

Aug 20, 2021

Shelly Precot appeared before me
on August 20th 2021

Melody Hannigan as notary

MELODY HANNIGAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20064012643
MY COMMISSION EXPIRES APR. 05, 2022



RCOLEMAN@DHILLONLAW.COM
ADMITTED IN NEW JERSEY AND NEW YORK

November 30, 2020

**BY EMAIL**

The President
The White House
1600 Pennsylvania Avenue
Washington, DC 20500

The Honorable William Barr
Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC 20530

Re:    **Pardon application of Ari Teman**
       **U.S. v. Teman (S.D.N.Y. 1:19-cr-00696)**

Mr. President and Attorney General Barr:

I am a lawyer who has been active in the practice of Internet-related law, including issues concerning the formation of contracts and, in particular, the law relating to unfair and deceptive trade practices relating to the Internet for decades. I have lectured and written extensively on these subjects, and I write today to join with the esteemed legal authorities and figures, including Prof. Alan Dershowitz, Prof. Lawrence Lessig and outstanding attorneys such as Molly McCann (General Flynn's attorney), David Markus, Pat Nolan, Kurt Schlichter, Robert Barnes, David Safavian, and others – all of whom, like me, have made themselves available *pro bono publico* concerning this cause – in urging a full pardon for Mr. Ari Teman, the defendant in the referenced criminal matter. Although I am using my professional letterhead in this instance because I am writing as a lawyer, Mr. Teman is not a

November 30, 2020
Page 2 of 5

client of our firm and has never been one. Moreover, I speak only for myself, albeit professionally, in this letter. I explain my reasoning below.

The President and Attorney General will doubtless be aware of correspondence received concerning Mr. Teman's case that addresses extensive claims of prosecutorial misconduct. I am neither familiar enough with the record nor qualified by experience or otherwise to offer an opinion concerning these matters; nor would I presume to address them in a pardon application given the procedural posture of the defendant at this time. I do, however, have the experience to address the very narrow issue of whether the criminal offense with which Mr. Teman was charged and convicted should properly be considered criminal, or even deceptive, at all.

Mr. Teman was essentially convicted on the basis of what is commonly called a "click-wrap" contract, meaning the web-based terms that an Internet business – in this case, Mr. Teman's company, GateGuard – uploads and requires users to agree to before offering a product or service. It is well established that such online contracts are, under virtually all circumstances, proper and enforceable, and that their terms govern the seller's relationship with its customers. The Government's theory of criminal liability was that the structure of GateGuard's online terms was evidence of an "intent to defraud" its customers, however. Ultimately, the District Court ruled that the jury could have reasonably convicted Teman of fraud because GateGuard's terms included hyperlinks to subpages, requiring them to follow those links in order to be fully apprised of the terms to which they were agreeing to be subject in their relationships with GateGuard. The premise of this ruling appears to be that the use of hyperlinks, as opposed to cutting and pasting text and information into the terms found online on one webpage, constituted a sort of deception.

With all due respect to the District Court judge, I write to urge that such an interpretation of the custom and practice utilized throughout the world of Internet commerce is incomprehensible. Certainly, there is no question that virtually all contemporary businesses utilize online contracts to offer their services to the public and subsequently to document the terms under which their customer relationships will continue to proceed. And it is beyond question that the practice of using hyperlinks to extend, elucidate or otherwise incorporate online contractual terms in e-commerce websites, using subpages and hyperlinks, is widespread and uncontroversial. Organizing terms and related information in this way benefits businesses and customers alike, allowing all parties access and reference to them, and the ability to update specific sections of the terms, when necessary and appropriate. There is no obvious or even rationale for claiming that it is deceptive or fraudulent for Internet-based customers, who are at this point in technology history intimately familiar with how the Internet works, to click a clearly-highlighted hyperlink to obtain information. Indeed, it can be argued that doing so is far more convenient, and makes the information more accessible, than repetitive scrolls down a massive screen jammed with

November 30, 2020
Page 3 of 5

verbiage. That is why the practice of using hyperlinks and subpages for contract terms is employed by companies such as Amazon, Google and Netflix.

Notably, GateGuard's terms are effectively identical in form and substance to those used by another national company Airbnb, a recognized leader in the same industry (property management) in which GateGuard operates. This should come as no surprise, because it is common practice among web designers and legal counsel advising new online businesses to recommend that new businesses "borrow" such terms where available online content in setting up their own e-commerce sites. The advantage of doing so are obvious: Similar businesses that are already successful in the same market have typically customized their terms of service to that market based on commercial experience, and are presumptively acceptable to regulators given the high profile and success of such market leaders. Despite the fact that the Government repeatedly emphasized the format and structure of GateGuard's terms as evidence of Teman's guilt during trial, I am aware of no claim by either criminal or regulatory authorities that the virtually identical terms and structure used by Airbnb are problematic, much less felonious. In fact,

The case law is clear that online contract terms that incorporate content via sub-pages and hyperlinks are legal and binding. I am also advised that testimony at trial by customers of GateGuard established that these consumers themselves were aware of this fact and that all the information needed to understand the applicable terms of service were no more than a click or two away at any time of the day or night. It is not necessary for consumers to actually click such supplementary links in order for them to enforceable parts of the contract between them and the online merchant. Thus, for example, in *Meyer v Kalanick (Uber),* the Second Circuit ruled that plain text disclosure of terms being applicable were binding whether or not the user clicked the link – just as a consumer, given the opportunity to read a long paper contract, has the discretion to go through each word on each page or not. Indeed, as Professor Lessig, the preeminent internet law expert, has attested in his letter to you, GateGuard's online terms are relatively concise compared to many common and unquestionably enforceable online terms.

The argument that consumers, much less business entities, are defrauded when they choose not to click a hyperlink to read a contract subpage turns generations of contract law as well as basic principles concerning fraud in the inducement of a contract on their heads. Even in the consumer context, fraud requires that the non-disclosing party not have a reasonable opportunity to obtain information by virtue of non-disclosure by the party against whom fraud is claimed – a situation that simply does not apply when full disclosure is available by clicking on a hyperlink. This obligation on the buyer to do a minimum of diligence on its own behalf applies even more powerfully in a commercial context such as the one in question here. Such "B to B" (business to business) online users can and should reasonably be expected by the law to not only review a prospective contract in depth but to have their legal representatives do so before entering into a contract of substantial value. For this

reason, in *GateGuard, Inc. v. MVI Systems LLC*, (1:19-cv-02472) (S.D.N.Y. 2019), the Southern District upheld the GateGuard arbitration clause – found on the Dispute Terms subpage of GateGuard's Terms.

It is difficult indeed to understand how both this straightforward legal standard and testimony that GateGuard's customers not only should have, but did know the terms of their contracts with GateGuard before they agreed to them, could have been disregarded by the court and the jury at Mr. Teman's trial. I have learned that two of the three entities involved were, according to unrebutted testimony, shown not only to have read the first page of the terms in depth, but that they copy-pasted the paragraph referencing the Payment Terms into emails to Mr. Teman in order to ask him questions about those terms **before** they agreed to them! The third entity not only discussed the exclusivity and non-compete segments, moreover, but even emailed GateGuard's attorney asking for "a release" from certain terms. Under these circumstances, Mr. Teman was quite justified in understanding that the GateGuard terms were legal, binding and enforceable, and that taking action to enforce those terms could not amount to a criminal *mens rea* on the part of Mr. Teman. (As Professor Lessig points out, the high fees make sense, because these clients owed the majority of multi-year agreements and also incurred collections penalties, as are standard with equipment and service financing agreements.)

That Mr. Teman lacked criminal *mens rea* appears irrefutable, moreover, because as would be expected, Mr. Teman did not structure his company's terms, his company's law firm did – and, again, those terms were based on Airbnb's, which also faces the issue of illegal sublets, which is potentially devastating to its business. I am also informed, however, that this "structuring" theory of criminal liability was essentially sprung on the defense by the government at closing argument and post-trial motions, thus depriving Mr. Teman of the opportunity to rebut it by testimony and documentation proving that his attorneys who emailed him the terms, discussed how they were structured online in the same way as Airbnb's, and establish for the jury that in publishing those terms in that format Mr. Teman was relying on counsel – which, under *United States v. Scully*, would at least have required a jury instruction regarding the government's burden of proof concerning intent, a necessary component for a conviction on charges of wire fraud and bank fraud. 877 F.3d 464 (2d Cir. 2017). For the district court to have, instead, permitted the government's to rely on its "structuring" claim as a basis for the jury to find criminal intent was a miscarriage of justice.

I did not know Mr. Teman until he approached me, because of my background in this area of law, concerning his conviction. I agreed to assist him without charge or consideration in part because, from the point of view of e-commerce clients I represent, the conviction of Mr. Teman for fraud on the basis of his company's online terms creates a real danger for online businesses and their executives that is not justified by statute and which threatens all e-commerce enterprises. While contractual disputes between customers and online sellers are inevitable, they are properly addressed in **civil** proceedings except for the most egregious and

November 30, 2020
Page 5 of 5

impactful criminal conduct. That is not what happened here, and the criminal conviction of Ari Teman for the use and reliance on widely-used contract terms and business practices is deeply troubling and a threat both to online commerce but fundamental notions of justice and personal liberty.

I am very grateful for your consideration concerning these remarks and, again, respectfully urge that Mr. Teman receive a pardon and that the Department of Justice issue appropriate guidance to prosecutors regarding criminal prosecutions of this nature.

Most respectfully,

Ronald D. Coleman

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   STEPHEN WALSH,

 4                 Plaintiff,

 5            v.                        17 CV 6651 (LAP)

 6   UNITED STATES OF AMERICA,

 7                 Defendant.

 8   ------------------------------x
                                       New York, N.Y.
 9                                     March 18, 2019
                                       10:45 a.m.
10
     Before:
11
                      HON. LORETTA A. PRESKA,
12
                                       District Judge
13
                           APPEARANCES
14
     SUSAN GAIL KELLMAN
15   VIVIAN SHEVITZ
     JACQUELINE E. CISTARO
16        Attorneys for Plaintiff

17   U.S. ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK
          Attorneys for Defendant
18   BY:  KEDAR SANJAY BHATIA
          BRENDAN FRANCIS QUIGLEY
19

20   ALSO PRESENT:  Colleen Gieger, Paralegal

21

22

23

24

25
```

1          THE COURT:  Good morning, ladies and gentlemen.  Won't

2     you be seated.

3          This is the United States v. Steven Walsh.

4          Is the government ready?

5          MR. BHATIA:  Yes, your Honor.

6          THE COURT:  Is the defense ready?

7          MS. KELLMAN:  Yes, your Honor.

8          THE COURT:  Thank you.  Won't you be seated.

9          Counsel, would you like to give me an idea of what you

10    have in mind here.

11         MR. BHATIA:  Your Honor, what I'll say is the

12    defendant bears the burden in this hearing.  So we'll defer to

13    them.

14         THE COURT:  That's probably why Ms. Kellman stood up.

15         MS. KELLMAN:  Yes, your Honor.  Good morning.

16         Your Honor, if I may, I just want to introduce who is

17    sitting at counsel table.  Sitting right next to me is Stephen

18    Walsh who is the petitioner in this matter, and Vivian Shevitz

19    is the brainstorm here.

20         THE COURT:  Yes, ma'am.

21         MS. KELLMAN:  At end, your Honor, is Jackie Cistaro,

22    who is a member of our CJA mentoring program and is doing this

23    pro bono.

24         THE COURT:  Yes, ma'am.  Thank you.

25         MS. KELLMAN:  Your Honor, the plan for this morning

1   was to call -- recognizing we have the burden -- was to put

2   Mr. Walsh on the stand and to walk him through the highlights

3   of what we view as responsive to your Honor's questions.

4           I obviously read both of your Honor's orders, and I am

5   just going to try to tell the story and at the same time be as

6   responsive as we can to your Honor's concerns.  I assume,

7   Judge, if you have additional questions, you'll put questions

8   to the witness, and we invite you to do that.

9           THE COURT:  Yes, ma'am.

10          Does the government have anything to add?

11          MR. BHATIA:  No, your Honor.

12          THE COURT:  Thank you.

13          Ms. Kellman.

14          MS. KELLMAN:  Your Honor, at this point, we would call

15  Stephen Walsh to the stand.

16          THE COURT:  Yes.  Please step up, sir.

17          MS. KELLMAN:  Your Honor, are the leg restraints

18  necessary while he's testifying?

19          THE COURT:  Mr. Marshal?

20          UNIDENTIFIED SPEAKER:

21          DEPUTY MARSHAL:  They stay on throughout the day,

22  your Honor.

23          THE COURT:  Thank you.

24  STEPHEN WALSH,

25      called as a witness by the Defense,

1        having been duly sworn, testified as follows:

2            THE DEPUTY CLERK:  Please state your name and spell it

3    for the court reporter.

4            THE WITNESS:  Stephen Walsh, S-t-e-p-h-e-n W-a-l-s-h.

5            THE COURT:  Won't you be seated.

6            Ms. Kellman.

7            MS. KELLMAN:  Thank you, your Honor.

8            Your Honor, if I may, may I approach the witness with

9    a document?

10            THE COURT:  Yes, ma'am.

11            MS. KELLMAN:  The document is Defendant's Exhibit 1,

12    and it is a part of the petition.  It is my client's

13    declaration.

14            THE COURT:  Thank you.

15    DIRECT EXAMINATION

16    BY MS. KELLMAN:

17    Q.  Mr. Walsh, do you recognize that document?

18    A.  Yes, I do.

19    Q.  What do you recognize it to be?

20    A.  An affidavit that I signed prior to this hearing.

21    Q.  What was the stated purpose of you signing that?  Why did

22    you understand you were signing that?

23    A.  In terms of the 2255 on file that was filed for me, this

24    was my statement as to my interaction of what happened with my

25    relationship with Mr. Tremonte.

Case 1:15-cr-00059-SAS Document 1062   Filed 07/20/15   Page 50 of 310

```
 1   Q.  Now, let's just go back to the very beginning.

 2            When you first were arrested, was Mr. Termonte your

 3   attorney?

 4   A.  No, he wasn't.

 5   Q.  Who was your attorney at that time?

 6   A.  Well, originally after the arrest was -- the corporate

 7   attorney I had was Mr. Earl Nemzer.  He had a conflict.  So

 8   they gave me -- I don't remember his name.  It was with

 9   Morvillo.  I believe something like Steve Freeman, something

10   like that.  Then he had a conflict.  Then I hired Andrew

11   Lawler.

12   Q.  Mr. Lawler didn't actually start to work on the litigation;

13   right?

14   A.  No.

15   Q.  Did there come a time when you retained a firm in Chicago?

16   A.  Yes.

17   Q.  What was that firm?

18   A.  It was Sonnenschein Nath & Rosenthal I believe.

19   Q.  With whom did you deal?

20   A.  Mark Flessner.

21   Q.  During the time you dealt with Mr. Flessner and his firm,

22   what exactly -- and I don't mean "exactly," but what was

23   happening?  What kind of litigation with respect to your case

24   was ongoing, if any?

25   A.  Well, when I met Mr. Flessner, I was interviewing him.  He
```

1   was recommended to me.  And he made certain statements where he

2   said he would need to raise -- I would need to have a large

3   amount of money, threeish million dollars.

4   Q.  I didn't hear what you said.

5          Did you say threeish?

6   A.  Threeish million dollars, a number in the $3 million or $4

7   million range.  I told him I didn't have that.  He said the

8   only thing I could do would be to go to trial.  There was no

9   way -- I was facing 25 to 85 years.  I would never survive in

10  prison.

11         I said I didn't have that kind of money.  I had no

12  money.  I had to rely on friends and family to raise the money.

13  He said -- but I had told him I had a house that was purchased

14  with assets in 1982.  And he said he was an expert at tracing

15  and that he could get the proceeds of the house.

16         So I raised some money, and he started.  For the

17  length of time I was with him, twoish, maybe three years -- I

18  don't remember how long -- he spent the entire time trying to

19  get -- he did get $900,000.  Judge Cedarbaum released that with

20  the government's okay if I were to sell the house.  And he

21  spent almost all that time litigating eventually a Monsanto

22  hearing.

23         May I have some water?

24         THE COURT:  Yes.  We'll get that for you, sir.

25         THE WITNESS:  A Monsanto hearing which we lost.  Then

 1   he did an appeal.  So most of the time was litigating to get

 2   more money.

 3   BY MS. KELLMAN:

 4   Q.  Would it be fair to say that you retained Mr. Flessner

 5   sometime in 2009 following your arrest?

 6   A.  Yes.

 7   Q.  And you later retained another attorney; correct?

 8   A.  Mr. Flessner, after losing the --

 9   Q.  Please.  I'm going to take you this in order.

10   A.  Yes.

11   Q.  Did there come a time when you retained another attorney?

12   A.  Yes.

13   Q.  Was that in May of 2013?

14   A.  It sounds right.

15   Q.  So from 2009 when you first retained Mr. Flessner and his

16   firm until May 2013, is that the period of time when the

17   Monsanto hearing and related issues were going on?

18   A.  Yes.

19   Q.  Did there come a time in district court where Mr. Flessner

20   lost the Monsanto hearing?

21   A.  Yes.

22   Q.  Did he file an appeal?

23   A.  Yes.

24   Q.  Did that take additional months or years?

25   A.  Additional funds and time.

1   Q.  So between the period of 2009 and 2013, did your criminal

2   case proceed at all?

3   A.  We never discussed my defense.

4   Q.  Did you ever go through the discovery with those lawyers?

5   A.  No.

6   Q.  Did you know whether or not they had gone through the

7   discovery?

8   A.  I know we gathered a lot.  We gathered a lot.  We never

9   discussed it.

10  Q.  So over all those years, the only issue that was being

11  litigated and addressed was how they were going to get paid?

12  A.  Yes.

13  Q.  Did you ultimately pay them any money?

14  A.  Probably they were paid something in the area of one

15  million four/one million three/one million four.

16  Q.  That was after the sale of your house?

17  A.  The $900,000 which he received from the court pending the

18  sale of the house plus other monies that I raised from friends

19  and family.

20  Q.  Now, in May of 2013, you met Mr. Tremonte.

21          Am I correct? if not, you can correct me?

22  A.  I received a call from Justin Sher, his partner.

23  Q.  And you knew Justin Sher; correct?

24  A.  I knew of Justin Sher.

25  Q.  How did you know of Justin Sher?

1    A.  He was hired by Mr. Flessner to follow the civil case

2    involving my ex-wife in terms of her appeal to keep certain

3    assets.

4    Q.  So you knew Justin Sher.

5         What was the relationship with Mr. Sher and

6    Mr. Tremonte if you know?

7    A.  They were partners in starting a new law firm.

8    Q.  When for the first time did you have a discussion with

9    either of them about having them take over your case?

10   A.  Justin Sher had called me while I was trying to figure out

11   what to do after Mr. Flessner wanted to withdraw from the case.

12   Q.  Well, wait.

13        Mr. Flessner wanted to withdraw from the case after he

14   got a million four?

15   A.  Yes.

16   Q.  And that was because the million four covered only his

17   litigation to get paid?

18        MR. BHATIA:  Objection.

19        THE COURT:  Sir?

20        MR. BHATIA:  Leading.

21        THE COURT:  All right.  Although I think we're

22   probably getting through this more quickly.  There has been

23   some leading going on, but I think most of this is fairly

24   uncontroverted.

25        MS. KELLMAN:  And basically background, Judge.  I was

1    just trying to move us along.

2         THE COURT:  Yes, ma'am.  When we get to something

3    controversial, you can make the objection again.

4         MS. KELLMAN:  Of course.

5    Q.  So there came a time --

6         I'm sorry.  Did you answer that question?

7    A.  There came a time after I had paid him when he didn't think

8    I could give him any more money, and he wanted to withdraw.

9    Q.  Was that at the point when he would have had to start

10   working on your case?

11   A.  Yes.

12   Q.  So there comes a time when you meet with Justin Sher and

13   Michael Termonte; correct?

14   A.  Justin called me and told me that he had followed the case

15   through following my former wife's case.  He believed in the

16   case.  He believed in it.  And he and his partner,

17   Mr. Termonte, started a new firm and that they would represent

18   me.  And he gave me the terms, the financial terms, of the

19   representation.

20   Q.  What were the financial terms?

21   A.  He said he would represent me through trial for $100,000.

22   And then Mr. Flessner didn't pay -- Mr. Flessner owed him

23   $40,000.  And he additionally wanted me to pay that $40,000.  I

24   negotiated that to $25,000.  So he received $125,000 from me.

25   Q.  And that was at the time you retained him?

Case 1:17-cv-05845-ARR-PDC Document 161-1 Filed 06/20/23 Page 56 of 310 PageID #: 11

1    A.   Yes.

2    Q.   Where did that money come from?

3    A.   I raised it from friends and family.

4    Q.   At that stage of the game, did you have any money of your

5    own?

6    A.   No.

7    Q.   Now, when you say that Mr. Sher said to you that he

8    believed in your case, what did you understand him to mean?

9    A.   He thought I was innocent.

10   Q.   I'm sorry?

11   A.   I believed he thought that -- he believed that I was in the

12   right and that I was innocent.

13   Q.   Well, had you discussed the facts with him at that point?

14   A.   No.

15   Q.   So do you know what he based his conclusion on that you

16   were in the right?

17   A.   He had spent time with Mr. Flessner.

18   Q.   Do you know whether he had gone through any of the

19   discovery?

20   A.   No.

21   Q.   No, you don't know?  Or no, he hadn't?

22   A.   I don't believe he had.

23   Q.   So there comes a time in May of 2013 when you retained

24   Mr. Termonte and Mr. Sher.

25            And what happens then after you signed the retainer

1   and you paid them?  What happens next?

2   A.  I went in to meet them and met Mr. Termonte and just

3   started to have conversations.  We didn't really talk much

4   about a defense.  The meetings were very brief.

5        Mr. Termonte would come in and out.  He'd be there for

6   five/ten minutes and go out.  Justin Sher would kind of greet

7   me.  I think he just brought me in.  They had an associate that

8   spent a lot of time with me.

9   Q.  While you were spending time with this associate, were you

10  going over discovery?

11  A.  No.

12  Q.  Where was Mr. Flessner's firm?

13  A.  He was based in Chicago.  He switched to another firm in

14  Chicago.

15  Q.  Do you know whether or not the discovery that he had was

16  transferred over to Mr. Termonte?

17  A.  After a long time with some wrangling back and forth, I

18  believe it was.  Some was, or it all was.

19  Q.  When you say "some wrangling," were you aware of how many

20  weeks or months passed before Mr. Termonte was able to receive

21  discovery?

22  A.  It was a very long time, many, months.  It could have been

23  a year.

24  Q.  Now, how did you know that?

25  A.  Because I attended several -- one or two or three,

1    hearings, status hearings --

2    Q.  Court proceedings?

3    A.  Court proceedings where Mr. Termonte was telling

4    Judge Cedarbaum why he couldn't be ready.

5    Q.  Why was that?

6    A.  Because he hadn't received discovery materials.

7    Q.  Now, do you recall when your trial -- whether or not a

8    trial date was actually set once you had Termonte as your

9    attorney?

10   A.  No.

11   Q.  Do you know whether or not a trial date was ever set for

12   February?

13   A.  What year?

14   Q.  '14.

15   A.  I don't believe so.

16   Q.  Do you know whether or not there was a trial set for

17   November of 2013?

18   A.  No.

19   Q.  Were you in court the day that Mr. Termonte was asking for

20   additional time to have the trial put over to sometime in the

21   summer?

22   A.  I believe so.

23           MS. KELLMAN:  Your Honor, I'd offer as Defendant's

24   Exhibit B the February 5 minutes, February 5, 2014, minutes.

25           THE COURT:  If you're using the off-the-record voice,

```
 1   use your off-the-record voice.

 2              (Counsel conferred)

 3              MS. KELLMAN:  Exhibit 3.  I apologize, your Honor.

 4              THE COURT:  What was 2?  I had the affidavit as 2.

 5   What do you have as 2?

 6              MS. KELLMAN:  It's the declaration of Mr. Termonte.

 7              THE COURT:  Okay.  Thank you.

 8   BY MS. KELLMAN:

 9   Q.  So on February 5, 2014, there was a status conference

10   before Judge Cedarbaum; correct?

11   A.  I believe so.

12   Q.  Do you know what happened as a result of that conference?

13   A.  I believe she gave him more time.

14   Q.  Do you know whether or not the trial was set over for later

15   in July?

16   A.  No.

17   Q.  Did you discuss with Mr. Termonte before this proceeding in

18   February why you weren't getting ready to go to trial?

19   A.  I don't think so.

20   Q.  Well, between May when you retained him and February, had

21   you ever had a chance to review the discovery with him?

22   A.  No.

23   Q.  With anybody from the firm?

24   A.  No.

25   Q.  Did anybody tell you that they were having trouble getting
```

1  the discovery?

2  A.  Yes.  I knew that.

3  Q.  That went on for months; correct?

4  A.  A long time.

5  Q.  So as of February when you were in court on this still, you

6  had still not had an opportunity to ever have a discussion with

7  your lawyers about the discovery.  Correct?

8  A.  I have never had a discussion with my lawyers about

9  discovery.

10  Q.  I'm sorry?

11  A.  I have never discussed discovery, other than it was being

12  delayed, with my lawyers.

13  Q.  Up until this February event, this February court

14  appearance, had there ever been discussions between May and

15  February?  Other than discussions about getting discovery, had

16  there been any discussions about a guilty plea?

17  A.  No.

18  Q.  Do you know why that was?

19  A.  Well, I hope I've got the time right, but I had no

20  discussions about a guilty plea -- I always thought we were

21  going to trial -- until right before I entered the plea.

22  Q.  And that was in April, two months later; correct?

23  A.  Whenever the time is.  Yes.

24  Q.  When you say that you only had conversations about going to

25  trial, would you tell the judge what you mean by that.

1   A.  I always wanted to tell my story.  I always wanted to be

2   able to have people understand or the court to understand.  I

3   also always wanted to talk to the prosecutors.

4   Q.  And explain?

5   A.  And explain what my role was.

6   Q.  What was your role?

7   A.  I was in charge of trading and investing, and I was

8   overseeing other projects that were for the benefit of the firm

9   with, in most cases, no risk to the firm.  I was building other

10  businesses to benefit the company.

11  Q.  Mr. Walsh, what was --

12  A.  And then I was overseeing trading.

13  Q.  -- what was your background?  Before you came to this

14  business with Mr. Greenwood, what were you doing?

15  A.  I started out after college in 1966 in an esoteric part of

16  the world called puts and calls which became the option

17  business.  And it's now a huge, huge industry.  So I started

18  out as an option trader, kind of a salesman and trader.  I grew

19  very quickly.

20  Q.  Did you work for a company?

21  A.  I worked for a small put-and-call firm called Saul Lerner

22  Company.  I was 22.  When I was 24, they asked me to open my

23  own office.  So I had my own office at 24.  I moved to Chicago,

24  I came back, and I started a firm with some friends, a new

25  put-and-call firm.  And we did exceedingly well.

```
 1              In 1973, the Chicago Board Options Exchange started,
 2   and options became listed.  At that time, the business was
 3   moving to the big firms.  I then went to run an option
 4   department at a firm called Clark Dodge which was later taken
 5   over by Kidder Peabody & Company, a fine, old invest banking
 6   firm.
 7   Q.  What did you do at Kidder Peabody?
 8   A.  Initially I was the head and manager of the equity and
 9   options area.  Shortly after that, I became a partner in the
10   firm.
11   Q.  For how long were you with Kidder Peabody?
12   A.  Five years.
13   Q.  Was that the last job that you had on Wall Street?
14   A.  Before I started my own firm.
15   Q.  This firm?
16   A.  Yes.  This firm.
17   Q.  Would you tell the Court, just by way of background, how it
18   was that you and Mr. Greenwood came together and decided to
19   work together.
20   A.  Paul Greenwood was a client of mine.  He worked at Chase
21   Bank.
22   Q.  He was a client of Kidder Peabody?
23   A.  He was a client of Kidder Peabody, and he did some option
24   trading through me.  So we established a phone relationship
25   probably over a year or so.  Brilliant, very bright.  We had a
```

Case 1:15-cv-05345-AT-SDA Document 631 Filed 06/20/23 Page 63 of 310

1   good relationship, a customer to a firm.  In those days, I was

2   on the sell side.  That was called the buy side.

3   Q.  Okay.

4   A.  And then about a year or so later in the beginning of '79,

5   Mr. Greenwood came to me.  I had never met him, and he said he

6   wanted to talk.  So he came over to the office.

7        We went for lunch.  We talked.  And he told me that he

8   had a customer who was a member of the Rockefeller family and

9   that they would give him $50 million to start an asset

10  management company.

11       Well, $50 million is more than Kidder Peabody had at

12  that time in cash flow.  It was a huge amount of money then.  I

13  said, wow.  I've got some ideas for an option trading and

14  so forth and so on.

15       At that time, I was being also recruited by Goldman

16  Sachs and Merrill Lynch for pretty significant positions, but I

17  loved Kidder Peabody.  So I turned that down, and I thought we

18  were going to start a firm together.

19       After that, he came to me, after we spent a lot of

20  time thinking about things, and he said he didn't have the

21  money.

22       THE COURT:  Did or didn't?

23       THE WITNESS:  Did not have the money.

24       At that time I said -- I had been thinking that Wall

25  Street wasn't using computers in the trading area, and I had a

 1  vision --

 2  BY MS. KELLMAN:

 3  Q.  Aren't all trades done with computers?

 4  A.  Today.

 5  Q.  When was this?

 6  A.  This was in 1979.

 7  Q.  Okay.

 8  A.  Big computers were used primarily in the back office in

 9  operations doing operations and administration work.  The only

10  thing you used a computer for was if a trader was pricing, the

11  prices.  You hit a button, and it would tell you what the stock

12  is.

13  Q.  They weren't used for trading?  Is that what you're saying?

14  A.  They were very primitive, a TV screen with a tape going by,

15  and you could get the price of the stock and some news.

16          I told -- now, options are what's called a derivative.

17  They relate to the stock.  There are certain trades you can do

18  as an arbitrager.  You can lock in profits if they are there.

19          When I started trading options, I had hired a young

20  man from -- I was pretty young myself.  I hired a younger guy

21  from Putnam and got him to come to Kidder Peabody and start

22  following just the 20 stocks that were available.  They were

23  opening up --

24          THE COURT:  When you say "were available," do you

25  mean --

1          THE WITNESS:  That had listed options.  So the market

2     was opening up, and they were going to list options on all

3     stocks.  These were the first equity derivatives following the

4     growth of the commodities business.

5     BY MS. KELLMAN:

6     Q.  By computer?

7     A.  The computers were only used to see the prices.  My vision

8     was to use a computer -- you could program a computer to look

9     at multiple assets, multiple prices at the same time, put in

10    the equation, and then it would spit out the profit or loss

11    number in real time, bang.

12         There's a book called -- there's a book out about the

13    beginning.  We were at the forefront.  I had a concept of

14    marrying technology with trading, of derivatives.

15    Q.  And that was new then?

16    A.  It wasn't out there yet.  People were working on it, and no

17    one knew about it.  I'm not saying we invented it, but we were

18    pretty first.  He said he could build that system.  Paul told

19    me he had two PhDs when he was 21, one in quantitative and also

20    one in psychology.  He's a brilliant guy quantitatively.  He's

21    brilliant quantitatively.

22         I was so impressed with the man's intelligence.  I

23    said, you can really do that?

24         He said, yes.  And I trusted him.  And I brought in --

25    I spoke to another associate of mine with Kidder Peabody who

 1  had raised money for different specialized managers hedge funds

 2  way back then.  And I told him the concept, and he said he

 3  would love to do it with me.  So we raised $4 million and

 4  started the firm.

 5  Q.  That was when?

 6  A.  We opened in September of 1979.

 7          THE COURT:  And the "we" in that sentence?

 8          THE WITNESS:  Paul Greenwood --

 9          THE COURT:  Mr. Walsh, I'm going to ask you.  Let

10  Ms. Kellman finish her questions.  Let me finish my questions.

11  Because it's really hard for the court reporter to take down

12  two people at once.

13          THE WITNESS:  I apologize, your Honor.

14          THE COURT:  Yes, sir.

15          So the question was:  Who is the "we" in the sentence

16  when you said "we" raised $4 million?

17          THE WITNESS:  Barry Wish was the partner who raised

18  the money, and Paul Greenwood and I were the other two

19  partners.

20          THE COURT:  Thank you.

21  BY MS. KELLMAN:

22  Q.  And Mr. Wish was the person who was at Kidder Peabody?

23  A.  Yes.

24  Q.  Did he become a part of this business?

25  A.  Yes.

1   Q.  So now let's fast-forward back to May of 2013, and you've

2   just retained Mr. Termonte to work on this criminal case after

3   finishing with the Monsanto hearings and all that crap.

4   A.  Correct.

5   Q.  When you paid Mr. Termonte the --

6           Was it $125,000?

7   A.  A total of $125,000.

8   Q.  Was it your understanding that that was a trial fee or a

9   fee for a guilty plea?

10          What discussions had you had with him about it at that

11  time?

12  A.  To take me right through trial.  And of course, if he could

13  get a plea, I would listen to that.

14  Q.  In the time between May and February, had you had any

15  discussions about a plea, plea bargaining?

16  A.  No.

17  Q.  I'm sorry?

18  A.  No.

19  Q.  Had you had discussions about the substance of the case?

20  A.  Some but not very deep.

21  Q.  Had you gone over any of the discovery with anyone?

22  Mr. Termonte, Mr. Sher, or anyone from their firm?

23  A.  I don't believe so.

24  Q.  When you say you don't believe so, do you remember going

25  over any discovery with them?

```
 1   A.  No.

 2   Q.  Now, after you learned at the February conference that the

 3   firm was not prepared or not able to proceed with the trial

 4   before the summer, what, if any, discussions did you have with

 5   Mr. Termonte then?

 6   A.  None.

 7   Q.  You were just prepared to wait until the summer?

 8   A.  I was prepared to wait until we were ready for trial.

 9   Q.  Did you have conversations between February and the

10   presumed trial date in July about how you were going to proceed

11   to trial, what you were going to do?

12   A.  I said, what's going on?  You haven't spoken to anyone.

13   You haven't done anything.

14   Q.  When you say "spoken to anyone," what do you mean?

15   A.  You haven't spoken with any potential witnesses who would

16   support what I was telling him.  We hadn't sat down and gone

17   over anything relative a defense.

18   Q.  What were you telling him?

19   A.  I was asking him.

20   Q.  Asking him what?

21   A.  What's going on?  Why aren't we preparing a defense?

22   Q.  What response did you get?

23   A.  I was stalled.

24   Q.  You were getting stalled?

25   A.  Yes.
```

1   Q.  Did you know whether or not he was busy with other matters?

2   A.  I assume he was, but I don't know specifically.  But he was

3   not with me.  He was always in and out of the room.

4   Q.  Approximately between May and February, how many times did

5   you actually have meetings about the case with Mr. Termonte?

6   A.  Between May and?

7   Q.  February and this status conference.

8   A.  In 2014?

9   Q.  '14, yes.

10  A.  Very little.

11  Q.  Were you aware that Mr. Termonte was having difficulty

12  getting your discovery from the Flessner firm?

13  A.  Yes.

14  Q.  Were you aware that there came a time in December, the end

15  of December of 2013, when he actually believed that he had all

16  of the material he needed?

17  A.  I don't remember that.

18  Q.  Now, after that February conference, did anything about

19  your relationship with Mr. Termonte change in terms of the

20  discussions you were having in March?  In April?

21  A.  I don't think so.

22  Q.  Well, did there come a time in April when you were having a

23  conversation with him that wasn't about the progress of trial

24  preparation?

25  A.  What was the date of -- if I'm allowed, what was the date

1    of the plea?

2    Q.  It was the end of April.

3    A.  All right.  So I would say three weeks to a month before

4    the plea allocution, probably closer to three, he asked me to

5    come into the office.

6    Q.  And?

7    A.  And when I got to the office, he said he met with the

8    government.  They agreed to drop five of the six counts which

9    sounded great to me.  And that I could plead to -- I could

10   plead guilty to one count, and it was between 0 and 20 years.

11            At that point, I said, what are you talking about?

12   I'm going to be 71.  How can I possibly even consider anything

13   remotely near that?  And what -- actually, before I said that,

14   the first thing I said was, what would I be pleading guilty to?

15            And he said, you signed those notes.

16   Q.  What did you understand him to mean --

17   A.  What will you say when they asked you about the notes?

18            I said, I'll tell them the truth.

19            And he said, nobody's going to believe you.

20            Then we discussed the 0 to 20 thing, and he said -- 20

21   years or anything near that is not possible.  It's not in the

22   cards.  He said four to six years would be a good result.

23   That's my recollection.

24   Q.  Now, during the course of that discussion, you said that

25   you were happy when he said they were going to dismiss all the

Case 1:17-cv-05945-ALC Document 58-11 Filed 06/20/23 Page 26 of 110

1  counts but this one 0 to 20; correct?

2  A.  It sounded good.

3  Q.  Did Mr. Termonte explain to you anything about the

4  sentencing guidelines and how the guidelines would interact on

5  your guilty plea?

6  A.  No.

7  Q.  Did you have any discussions about the impact of the

8  dismissal of those charges or the non dismissal relative to the

9  guidelines calculation?

10  A.  No.

11  Q.  Did you ever discuss grouping, something called grouping,

12  with Mr. Termonte?

13  A.  I never heard of it.

14  Q.  At the time you had this initial discussion with

15  Mr. Termonte when he said, maybe four to six years --

16       Was it four to six years?

17  A.  That was what he said would be a good result.

18  Q.  Did he take time -- did he tell you what the guidelines

19  were?  What the guidelines were?

20  A.  No.

21  Q.  You had no discussion about guidelines at all?

22  A.  Other than if I was convicted of the whole thing, I was

23  looking at 25 to 85 years.

24  Q.  That's without a plea agreement.

25  A.  That's if I lost at trial.

1    Q.  If you lost at trial.  Okay.

2          Now, did he have a piece of paper for you to look at

3    at that point?  A plea agreement.

4    A.  No, not at that time.

5    Q.  Okay.

6    A.  Not at the first time he mentioned it to me.

7    Q.  What was your reaction?

8    A.  I was, you know, confused.  It sounded good.  I was fearful

9    of 25 to 85 years.  I said, look.  I need to think about it.  I

10   said, I want to go down to Florida and see my mother.

11         So I went down to Florida to think about it.  He

12   called me again once when I was down there and was pressing me,

13   you've got to do this.  You've got to take the plea.

14         I came back, and we had another conversation when I

15   got back in which it was pretty much, is there any way it can

16   possibly be?  Aren't you going to press?  Given my total life,

17   aren't you going to press for probation with community service

18   maybe?

19         He said, yes.  Yes.

20   Q.  How old were you at the time?

21   A.  I was going to be -- I was 70 and turning 71 next year.

22   Q.  When is your birthday?

23   A.  May 7.

24   Q.  And you were having these discussions in April?

25   A.  Right before the plea.  Yes.

1  Q.  When for the first time did you actually see a document

2  called plea agreement?

3  A.  I believe it was emailed to me either the day before or two

4  days before -- two days before the actual allocution.

5  Q.  Did you read it?

6  A.  I tried to read it.  I looked at it, and my eyes focused on

7  what I was pleading guilty to.  And I just -- I had never been

8  able to read -- I'm not a detailed person.  I get very nervous

9  and anxious.  I can't read legal documents.

10 Q.  That's why you have a lawyer.

11 A.  Yes.  But I focused on that, and I kind of like blacked

12 out.  And I said, look.  You've got to explain this to me.  You

13 have to go over this with me.  I can't focus on this.  So I

14 came in the night before the plea.

15 Q.  I'm sorry?

16 A.  So I came in the night before the plea allocution.

17 Q.  Can you just move the mike a little bit closer to your

18 mouth.

19 A.  I then came in the night before.

20 Q.  And the night before the plea was the first time that you

21 sat down and had a discussion with Mr. Termonte about the

22 contents of this plea agreement; correct?

23 A.  Yes.

24         MS. KELLMAN:  Your Honor, I'd offer the plea agreement

25 dated April 21, 2014, as Defendant's Exhibit 4.

```
 1              THE COURT:  Yes, ma'am.

 2              MR. Bhatia:  No objection.

 3              THE COURT:  Received.

 4              (Defendant's Exhibit 4 received in evidence)

 5              MS. KELLMAN:  Your Honor, I'm not clear.  I know I

 6    numbered the previous exhibits.  But I'd like to offer also, if

 7    I haven't, Mr. Walsh's declaration and Mr. Termonte's

 8    declaration and the minutes, the February 5 minutes.

 9              THE COURT:  Any objection?

10              MR. Bhatia:  No.

11              THE COURT:  Received.

12              (Defendant's Exhibits 1, 2, and 3 received in

13    evidence)

14              THE COURT:  One, two, and three.

15              MS. KELLMAN:  The plea agreement is four.

16    Q.  Do you have a copy of that in front of you?  The plea

17    agreement.

18    A.  No.

19    Q.  Let me give it to you.

20              MS. KELLMAN:  May I approach?

21              THE COURT:  Yes, ma'am.

22    BY MS. KELLMAN:

23    Q.  Do you recognize that document?

24    A.  Yes.

25    Q.  And do you recognize that document to be the plea
```

1  agreement --

2  A.  Yes.

3  Q.  -- that you discussed with Mr. Termonte on that day?

4  Correct?

5  A.  That he went over with me.  Yes.

6  Q.  This is the one that you received --

7  A.  Yes.

8  Q.  -- and had it emailed to you earlier; correct?

9  A.  Correct.

10  Q.  Now, on page 2 starting with paragraph A, offense level, do

11  you see where it says the offense level is 7 in paragraph 2?

12  A.  Yes.

13  Q.  By the way, this is an outline of how the sentencing

14  guidelines will affect your case.

15          Did you have discussions with Mr. Termonte about these

16  paragraphs?

17  A.  No.

18  Q.  Did you have any discussion about a $400 million loss

19  figure that would increase your guidelines by 30 levels?

20  A.  Yes.

21  Q.  What, if any, discussions did you have about a $400 million

22  loss?

23  A.  I said to Mr. Termonte that that's a made-up number.  There

24  is no way we lost -- I didn't think we lost any money or

25  certainly not that number.  I don't know what it's based on.

Case 1:15-cr-00765-PAC Document 61 Filed 07/20/16 Page 76 of 310

```
 1              Are you telling me it's so big it doesn't make a
 2   difference?
 3              Yes was his answer.
 4   Q.  When you say, "Are you telling me it's so big it doesn't
 5   make a difference," were those your words or Mr. Termonte's
 6   words?
 7   A.  I asked him that question.
 8   Q.  Okay.
 9   A.  And he said yes.
10   Q.  When he said it represents the loss, what was your reaction
11   to that?
12   A.  We didn't lose that.  I had no reason to believe that we
13   could have possibly lost that kind of money.
14   Q.  That kind of money -- you would have known if you had lost
15   it?
16   A.  I would think.
17   Q.  Now, were you involved in keeping track of the money
18   aspects of the business?
19   A.  No.
20   Q.  Who did that?
21   A.  Mr. Greenwood and Debbie Duffey.
22   Q.  If you know, what were their responsibilities?
23   A.  Everything to do with the money, technology, legal.
24   Everything administrative, financial.  Paul did all the
25   banking, all the legal.  It was part of our agreement when we
```

Case 1:17-cv-05054-AT-SDA Document 681-1 Filed 06/20/23 Page 327 of 1090

1 started the firm. The only thing I was interested in was

2 investing and trading, and I originally was helping with sales.

3 Q. And did there come a time when you no longer helped with

4 sales?

5 A. In 19- -- between 1994 and '96, Paul came with me. I

6 brought in a partner, James Carter, who was with us on the West

7 Coast. He was the head of sales. As the business in the

8 industry changed, he and Paul were doing the formal

9 presentations. The business had changed where you were talking

10 to your fellow quants who worked for the institutions. So they

11 were doing the due diligence.

12 Q. What's a quant?

13 A. A quantitative person, someone with deep financial

14 backgrounds in financial instruments. I'm sorry.

15     Paul came to Long Island to talk to me -- I believe it

16 was around 1995 or '96 -- and saying that he and Jimmy were

17 doing all the presentations to the clients. They thought I was

18 confusing things.

19     I'm a more business-man-to-business-man,

20 seat-of-the-pants kind of person. And the business had become

21 highly, highly technical. It had moved from options to

22 futures. It was very technical.

23     They thought they would be better off handling all the

24 sales and marketing, and I said, that's fine with me. Thank

25 you.

1    Q.  Thank you.

2            Now, when you say he came to your office, were you

3    guys down the hall from each other?

4    A.  His office was in Greenwich, Connecticut.  I was in Long

5    Island.

6    Q.  Were you ever in the same office together?

7    A.  We were down on 180 Maiden Lane, and I think around

8    1989/'90, we both moved the office to Greenwich, Connecticut.

9    I commuted from Long Island.  And then two years later around

10   '92/'94, maybe '92ish, maybe '91ish, I moved my office to Long

11   Island.  We separated physically.

12   Q.  So you did the trading from your office in Long Island?

13   A.  Actually, the trading was done in the New Jersey office,

14   and I was in verbal and computer communication.

15   Q.  So you monitored the trading offsite?

16   A.  I was in touch with our partner, and I tried to do trading

17   on a daily basis pretty much.

18   Q.  And he was in New Jersey?

19   A.  Yes.

20   Q.  And the financial aspect of the business -- bookkeeping,

21   banking, all that kind of stuff -- where was that done?

22   A.  Greenwich.

23   Q.  Connecticut?

24   A.  Yes.

25   Q.  Let's get back to.  I'm sorry.  I --

1     THE COURT:  Digressed.

2     MS. KELLMAN:  Thank you, Judge.

3  Q.  Back to page 2 of the agreement in paragraph A, so when you

4  asked Mr. Termonte about the $400 million loss, what did he

5  say?

6  A.  As I said, I said, is the number so big it doesn't matter?

7     And he said, yes.  It doesn't matter.

8  Q.  Did you question him further about that?

9  A.  I had told him that the number --

10     THE COURT:  Mr. Walsh, let counsel finish her

11  question, please.

12  BY MS. KELLMAN:

13  Q.  When you told him it didn't matter, did you follow up?  Did

14  you ask him anything more?

15  A.  No.

16  Q.  You accepted that it just didn't matter?

17  A.  I didn't believe the number, but he told me it didn't

18  matter.

19  Q.  What about in paragraph 4 the two-point enhancement for

20  more than ten victims?

21     Did you question him about that or discuss that with

22  him?

23  A.  No.

24  Q.  Did you have any other discussions besides that amount of

25  money with Mr. Termonte about the guideline calculation?

 1   A.  No.

 2   Q.  Did you ever discuss something called grouping with

 3   Mr. Termonte?

 4   A.  No.

 5   Q.  Did you ever have a discussion with Mr. Termonte about

 6   something called a Pimentel letter?

 7   A.  No.

 8   Q.  Now let's turn to page 3 if you will.

 9         At the beginning of page 3, it says that your

10   guideline sentencing range is 360 months to life.  That's 30

11   years to the rest of your life in prison.

12         When you read that, did you have a discussion with

13   Mr. Termonte about it?

14   A.  I couldn't read this.  All my discussions with Mr. Termonte

15   revolved around it wouldn't happen.  It couldn't happen.  I

16   would never get anything near the 20 years, even double digits.

17   That's all I focused on.

18   Q.  When you say "double digits," who said you wouldn't get

19   double digits?

20   A.  Mr. Termonte.

21   Q.  So when you saw that you were stipulating --

22         You know what stipulating means; right?

23   A.  Agreeing to.

24   Q.  Yes.

25         When you saw that you were agreeing to a

1    30-year-to-life sentence, what did you think?  What did you

2    say?

3              THE COURT:  Is that what this actually says?  Agreeing

4    to?

5              MS. KELLMAN:  It's a stipulation, Judge.  It's

6    stipulated.

7              THE COURT:  I'm only asking about the 30 years.  I

8    thought the stipulated guidelines range is 240.

9              MS. KELLMAN:  Yes.  That's correct.

10              THE WITNESS:  In all my -- do you want me to answer?

11   BY MS. KELLMAN:

12   Q.  Did you understand that the stipulated guideline range in

13   this case would put you in jail for 20 years?

14   A.  I was in no way focused on that.  Mr. Termonte had told me

15   all along that this was a hypothetical situation, sentence or

16   situation or term, and that -- I said to Mr. Termonte, what do

17   you have?  A wink and a nod with the government?

18              And he smiled.  He just smiled and shook his head.  I

19   took it to mean they had an understanding.

20              THE COURT:  Shook his head how?

21              THE WITNESS:  He smiled and just went like this.

22              THE COURT:  Let the record reflect the witness is

23   nodding his head up and down.

24   BY MS. KELLMAN:

25   Q.  Were you concerned about this number, this 240-month

1    guideline, stipulated guideline?  Were you concerned about it?

2    A.   It was not in the cards.  No.  It was never a possibility.

3    Q.   Would it be fair to say that over the course of your

4    representation by Mr. Termonte, that the conversation about it

5    was not in the cards and this was never going to happen

6    happened with some frequency?

7    A.   I don't understand that.

8            MR. BHATIA:  Objection, your Honor.  Mischaracterizes

9    the testimony.

10           THE COURT:  Do it again, Ms. Kellman, please.

11           MS. KELLMAN:  I'll rephrase it.

12   Q.   Was that the only conversation that you had with

13   Mr. Termonte about the fact that you didn't need to worry about

14   the 240 months that you stipulated to?  That you agreed to?

15   A.   We only had from the time -- it was only a three-week

16   period I think.  Maybe it was four.  Maybe it was two.  We only

17   had threeish conversations at most from the time he presented

18   and urged me to take the plea till when I pled.

19   BY MS. KELLMAN:

20   Q.   You told us you only saw this document the day before you

21   pled.  Am I right?

22   A.   I might have received it the night before or the day

23   before.

24   Q.   And for the first time you discussed it with him the day

25   before?

```
 1   A.  The night before.

 2            MR. BHATIA:  Objection, your Honor, to the leading.

 3            MS. KELLMAN:  I'm just reviewing what he's testified

 4   to.

 5            THE COURT:  All right.  I think counsel was in fact

 6   reviewing what the witness said.  He had said that he only

 7   discussed it with him the night before the plea.

 8            MS. KELLMAN:  Thank you, Judge.

 9   Q.  Did you understand that Mr. Termonte would be able to make

10   an argument or whether or not he would be able to make an

11   argument for less than 20 years?

12   A.  Twenty years was never on the table.

13   Q.  Well, it was in the agreement.

14   A.  Not in my conversations with Mr. Termonte it wasn't.

15            MR. BHATIA:  Objection, your Honor.  Nonresponsive.

16            THE COURT:  All right.  Counsel is obviously going to

17   ask him a different question.

18            What do you want me to do?  Strike the answer?

19   Please.

20            Ms. Kellman.

21   BY MS. KELLMAN:

22   Q.  When you signed this agreement -- by the way, did you sign

23   it in court, or did you sign it in Mr. Termonte's office?  If

24   you remember.

25   A.  I don't remember.
```

1   Q.  But you did sign it; correct?

2   A.  Yes.

3   Q.  Knowing that it said that you agreed to 20 years; that 20

4   years would be the stipulated guideline range here, the

5   stipulated sentence really.  Correct?

6   A.  I wasn't thinking in those terms.

7   Q.  Because?

8   A.  Because it was not ever going to happen.

9   Q.  That was your fantasy world, or that was --

10  A.  No.  It was based on --

11          THE COURT:  Just a minute.

12          Mr. Walsh, let counsel finish.

13  BY MS. KELLMAN:

14  Q.  That was because you couldn't fathom it or based on

15  conversations you had with your lawyer?

16  A.  The latter.  Based on conversations I had with my lawyer.

17  Q.  Would you tell the Court what conversations you had with

18  your lawyer about this 20-year cap.

19  A.  It was not possible.  It wasn't going to happen.

20  Q.  Now, if you take a look at page 4, the third full

21  paragraph, it says:  "It is agreed that the defendant will not

22  file a direct appeal nor bring a collateral challenge,

23  including but not limited to an application under Title 28,

24  U.S. Code, Section 2255 or 2241" not seeking a sentence

25  modification as long as you got a sentence that was equal to or

1    below the stipulated guideline sentence of 240 months.

2            Do you recall having a conversation with Mr. Termonte

3    about this waiver provision?

4    A.  No.

5    Q.  Did you read this provision?

6    A.  No.

7    Q.  And you had no discussion with him at all about it?

8    A.  He was going to explain the plea to me the night before.

9    Q.  Well, the night before, did you have a discussion with him

10   in which he told you that as long as you get a 20-year

11   sentence, you will not have the right to appeal?

12   A.  He did not mention -- he did not say that.

13   Q.  Now, further down in that paragraph, it says that you agree

14   not to appeal any forfeiture in an amount equal to $5,743,779.

15           You agreed that you wouldn't appeal that forfeiture

16   amount.  Correct?

17   A.  We did not discuss that.  I was in a frame of mind that we

18   had a deal and none of this was pertinent.  I wasn't contesting

19   the forfeiture number.

20   Q.  When you say you had a deal, do you mean this plea

21   agreement?

22   A.  That I was going to receive a single-digit sentence.

23   Q.  Whatever it said in here, you were going to get a

24   single-digit sentence.

25   A.  Yes.

1   Q.  And you and Mr. Termonte did not discuss the details of the

2   plea agreement.

3        Is that what you're saying?

4   A.  He went over the plea agreement, but none of this that

5   you're asking me now was discussed.

6   Q.  Now, you got to court the next morning I think you said.

7   You were going to plead guilty at that time; is that right?

8   A.  Yes, it is.

9   Q.  Did you discuss with Mr. Termonte questions that would be

10  asked of you by the Court?

11  A.  The night before.

12  Q.  Did there come a time when Mr. Termonte said -- withdrawn.

13       Generally speaking, what instructions were you given

14  with respect to the questions that you were going to be asked

15  by the court?

16  A.  Most of the conversation was how I would handle myself or

17  what would take place in the court.

18  Q.  How were you to handle yourself?

19  A.  That I would be answering most, if not all, the questions

20  in the affirmative.  Yes.

21  Q.  So whatever --

22  A.  And to check with him if I had a question.

23  Q.  Did you know that you would not be taking this plea in

24  front of Judge Cedarbaum?

25  A.  No.  I assumed I would.

1  Q.  You assumed you would be taking it in front of

2  Judge Cedarbaum?

3  A.  Yes.

4  Q.  The next day when you came to court and you saw Magistrate

5  Judge Fox, was there any explanation to you about why

6  Judge Cedarbaum wasn't there?

7  A.  I don't remember.

8  Q.  Did you ultimately consent to having a magistrate judge

9  take your plea?

10  A.  No.

11  Q.  Now, there came a time during the allocution where the

12  judge asked you a lot of questions.

13        Am I right?

14  A.  Yes.

15  Q.  About your background, about your mental health, medicines

16  you took, whether or not you were taking this plea knowingly

17  and voluntarily.  Correct?

18  A.  Correct.

19  Q.  And did the judge go over the guidelines with you?

20  A.  I don't recall.

21  Q.  Did there come a time when the judge spoke to you about

22  something called an appellate or an appeal waiver?

23  A.  I heard the word "appeal."  He said something beforehand

24  which I could not understand at all.  I turned to Mr. Termonte,

25  and he said -- he shook his head up and down.  And I answered

1   yes.

2   Q.  Do you recall whether or not the magistrate said that the

3   appeal waiver contained in your plea agreement would constrict

4   your right to appeal?

5   A.  Not at the hearing.  I heard words.

6   Q.  You heard words?

7   A.  I heard words.  I didn't understand them.

8   Q.  Did there come a time when the judge -- instead of asking

9   you yes-and-no questions, where the judge said to you, tell me

10  in your own words why it is that you think you are guilty of

11  this crime?

12  A.  I read a statement that Mr. Termonte gave me to read.

13          MS. KELLMAN:  Your Honor, I'd offer the minutes of the

14  plea from April 25, 2014, as Defendant's Exhibit 5.

15          THE COURT:  Any objection, counsel?

16          MR. Bhatia:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 5 received in evidence)

19  BY MS. KELLMAN:

20  Q.  Now, having heard the word "appeal" during the course of

21  the discussion that you were having with the judge, did you ask

22  Mr. Termonte about what that was about?

23  A.  Repeat that, please.

24  Q.  Either during the proceeding or after the proceeding, you

25  said that you had heard the word "appeal."  Correct?

1   A.   Yes.

2   Q.   And did you ask Mr. Termonte what that was about?

3   A.   No.

4   Q.   Did you at this stage of the game know that you had given

5   up your appellate rights as long as you got a sentence of 20

6   years or less?

7   A.   No.

8   Q.   When for the first time, if you know, did you learn that

9   you did not have a right to appeal?

10  A.   After my sentencing, there was a commotion in the

11  courtroom.  And then I realized what had happened.

12  Q.   When you say there was a commotion, can you tell us as best

13  you can recall what happened.  This was after sentence.

14  A.   Sentence was pronounced.  I became in a state of shock

15  pretty much.  There was a lot of noise.  Mr. Termonte was

16  asking the judge things.  He was asking -- he made statements

17  to the judge that -- he was not -- he did not prepare me for

18  anything like this.  There had never been a sentence like this.

19       He asked the judge if she would sentence to an extra

20  day.  I remember Judge Cedarbaum saying -- I think she said, I

21  couldn't do that.  But are you asking me to consider

22  withdrawing your client's plea?  I will consider that.

23       And then the next thing, Termonte got into a

24  conference with Mr. Naftalis who was one of the AUSAs handling

25  the case.

1   Q.  Let's break this down a little bit.

2           Could you describe Mr. Termonte's demeanor after

3   sentence was imposed.

4   A.  He was flabbergasted.  It wasn't pretty.  He was, you know,

5   very disturbed.

6   Q.  You said he said something to the effect that there's been

7   no sentence like this in a case like this?  Do you remember --

8   A.  He specifically said -- I remember him saying I could never

9   or something to the effect of I could never have prepared my

10  client for this.

11  Q.  In fact, he had not prepared you for a 20-year sentence;

12  correct?

13  A.  Quite the opposite.

14  Q.  And you said I think also that he asked the court to impose

15  a sentence of 20 years and an extra day?  Is that right?

16  A.  I know that now.  I think I heard it, but I know it for a

17  fact having read the transcript.

18  Q.  And what was the judge's response to that if you recall?

19  A.  I think she -- I would be speculating as to what she

20  thought.  But at that, she said, are you saying you would like

21  me to -- are you asking me to consider withdrawal of the plea?

22  Q.  What did Mr. Termonte say if you recall?

23  A.  He conferred with Mr. Naftalis.  He said he didn't really

24  know yet what he wanted to do.  Could he please have a recess

25  while he considered it.

1    Q.  A recess?

2    A.  Yes.

3           MS. KELLMAN:  Your Honor, I'd offer the sentencing

4    minutes from October 29, Defendant's Exhibit 6.

5           THE COURT:  Any objection?

6           MR. Bhatia:  No objection.

7           THE COURT:  Received.

8           (Defendant's Exhibit 6 received in evidence)

9    BY MS. KELLMAN:

10   Q.  Now, following the imposition of the sentence, what

11   happened?

12   A.  In the days afterward?

13   Q.  Yes.  In the minutes after, the days after, the hours

14   after, the days after.

15           Let's start with the minutes after.  Was there a

16   discussion between you and your lawyer about what had just

17   happened?

18   A.  I'm sure there was.  You can imagine my state of mind.  He

19   said he was going to go back and figure out what to do I pretty

20   much think.  He seemed like he was way in over his head at that

21   point to me.  Through a recommendation, Paul Shechtman came on

22   the scene.

23   Q.  Someone recommended Paul Shechtman to you?

24   A.  Yes.

25   Q.  What, if anything, were you told about Paul Shechtman?

1   A.  Superlative credentials.

2   Q.  As vice-president of the United States?  What were his

3   credentials?  As you understood, what were his credentials?

4   A.  Well, I was told --

5           THE COURT:  Gentlemen, ladies.

6           Question.

7   BY MS. KELLMAN:

8   Q.  What, if anything, did you learn about Mr. Shechtman's

9   credentials?

10          THE COURT:  Answer.

11          THE WITNESS:  That he was a very well-respected

12  attorney in the criminal bar.  He was former head of the

13  criminal division at the U.S. Attorney's Office, and he was a

14  wise man.

15  BY MS. KELLMAN:

16  Q.  Did you discuss with Mr. Termonte bringing Mr. Shechtman on

17  board?

18  A.  Yes.  After speaking with Mr. Shechtman.

19  Q.  You spoke with Mr. Shechtman first?

20  A.  Actually either I did or my daughter might have.

21  Q.  When for the first time did you speak with Mr. Shechtman?

22  A.  It may have been a phone call, but we had a meeting -- we

23  had a breakfast in the city on a Sunday right after that.

24  Q.  Was that just Mr. Shechtman, or was Mr. Termonte there as

25  well?

1   A.  Just the two of us, Mr. Shechtman and I.

2   Q.  That was within a week or so of the time that you had

3   received this sentence?

4   A.  It was the Sunday after.

5   Q.  Had you been in touch with Mr. Termonte between the time of

6   the sentence and that Sunday?

7   A.  We had some conversations.

8   Q.  Were they in person or on the phone?

9   A.  On the phone.

10   Q.  What was the nature of those conversations?

11   A.  There was only one thing.  I think I said, what are you

12   going to do?  I hope you can do something.

13       His answer was, I'll do the same for you as any other

14   client I would do.

15   Q.  Was he any more specific?

16   A.  That's indelled in my brain.

17   Q.  So you reached out to Mr. Shechtman.

18   A.  Yes.

19   Q.  And you had this meeting with him on Sunday.

20       What, if anything, did you discuss with him then?

21   A.  What he was thinking of doing.  He asked for a $5,000

22   retainer or check which we gave him.  And he was going to use

23   his influence, I understood -- he told me he would use his

24   influence with the U.S. Attorney's Office to see if they would

25   cooperate with us and that he wasn't sure whether he wanted to

1    pursue seeing the plea withdrawn or another avenue to get a

2    resentencing.  The goal was to get a resentencing or to

3    withdraw the plea.

4    Q.  Those were the two goals, one or the other?

5    A.  Yes.  He was going to get back to me.

6    Q.  Did you enter into a retainer agreement for that $5,000

7    with Mr. Shechtman?

8    A.  I don't know if it was a retainer or we just sent him a

9    check.

10             MS. KELLMAN:  Your Honor, may I approach?

11             THE COURT:  Yes, ma'am.

12             MS. KELLMAN:  This will be Defendant's Exhibit 7.

13   Q.  Do you recognize this document?

14   A.  Not really.  My daughter may have handled this.

15             THE COURT:  Off the record.

16             (Discussion off the record)

17             THE COURT:  Thank you.

18   BY MS. KELLMAN:

19   Q.  And after you paid Mr. Shechtman this money, what, if any,

20   conversations did you have, either with Mr. Termonte alone or

21   with Mr. Termonte and Mr. Shechtman?

22   A.  I don't think I had any more conversations with

23   Mr. Shechtman, and I can't remember anything with Mr. Termonte

24   until I received a copy of a letter that they had sent to the

25   judge unbeknownst to me.

1    Q.  And this was the letter dated November 4?

2    A.  I don't recall the date.

3              MS. KELLMAN:  May I approach?  This is Defendant's 8.

4              THE COURT:  Yes, ma'am.

5    BY MS. KELLMAN:

6    Q.  Do you recognize this letter?

7    A.  Yes.

8    Q.  Is that the letter that you just described?  The one that

9    you hadn't seen until after it was sent.

10   A.  I did not see this before it was sent to the government.

11             MS. KELLMAN:  Your Honor, I'd offer this.

12             MR. Bhatia:  No objection.

13             THE COURT:  Received.

14             (Defendant's Exhibit 8 received in evidence)

15   BY MS. KELLMAN:

16   Q.  This was a letter written by Michael Termonte with respect

17   to Judge Cedarbaum's inquiry as to whether or not you wanted to

18   withdraw your plea; correct?

19   A.  Yes.

20             MS. KELLMAN:  Your Honor, if I may read it into the

21   record.

22             THE COURT:  Yes, ma'am.

23             MS. KELLMAN:  "Dear Judge Cedarbaum, I write to

24   confirm that Mr. Walsh will not be moving to withdraw his

25   guilty plea.  The government has indicated that for Mr. Walsh

1    to succeed in withdrawing his plea, it would not offer him a

2    more favorable agreement.  And Mr. Walsh has accepted

3    responsibility for his crimes and does not want a trial.  Under

4    those circumstances, the motion to withdraw would serve no

5    purpose.

6            "I also write to request that the court hear further

7    argument on an appropriate sentence in this case.  At the

8    hearing last Thursday, certain issues were raised that should

9    be more fully addressed.  I have spoken with AUSA Benjamin

10   Naftalis who has informed me that the government does not

11   oppose this request."

12           Now, it says in this letter that:  "Mr. Walsh has

13   decided that he will not move to withdraw his plea," which had

14   been the judge's invitation at the end of that sentencing

15   proceeding.

16   Q.  Correct?

17   A.  Yes.

18   Q.  Had you discussed with Mr. Termonte anything about whether

19   or not you wanted to withdraw your plea?

20   A.  No.

21   Q.  Not any time between the day of the sentence until the day

22   you saw this letter?

23   A.  No.

24   Q.  Now, you said that you didn't see this letter until after

25   it was filed; correct?

1  A.  Yes.

2  Q.  So is it your testimony that you were not party to the

3  decision that resulted in this letter informing the court that

4  you would not pursue a withdrawal of your plea?

5  A.  Yes.  I did not see that letter.

6  Q.  And you did not have a discussion with Mr. Termonte in

7  which you told him or he asked you if you want to withdraw your

8  plea?

9  A.  No, I did not.

10  Q.  Did he have a conversation with you in which he said, I

11  don't think you should withdraw your plea?

12  A.  No.

13  Q.  So the first time you heard that you were not interested in

14  withdrawing your plea was when you saw this letter; correct?

15  A.  Correct.

16  Q.  And the letter dated November 4 and filed November 4 you

17  first saw on November 5; correct?

18  A.  Correct.

19  Q.  Did Mr. Termonte show you that letter at that time?

20  A.  No.

21  Q.  Who showed you that letter?

22  A.  I believe it was emailed to me.

23  Q.  By who?

24  A.  It could have been Mr. Termonte or someone from his office.

25  Q.  Do you know whether or not Mr. Termonte provided a copy of

1   that letter to anyone besides you?  To anyone in your family.

2   A.  I believe to my daughter.

3        MS. KELLMAN:  Your Honor, I'd offer as Exhibit 9 a

4   series of emails between Mr. Termonte and my client's daughter.

5   Q.  Do you recognize these emails?

6   A.  I think I've seen them.

7   Q.  Do you want to take a minute and just read them.

8   A.  The highlighted ones?  I don't think I've seen them.

9   Q.  Do you remember whether or not Mr. Termonte mailed that

10  letter, the November 4 letter, to your daughter before it was

11  sent to you?  Does looking at this document --

12  A.  He would have had to have.

13  Q.  Why would he have had to have?

14  A.  He says that he --

15  Q.  Right.  But you said that you didn't remember these.

16  A.  No.

17  Q.  I'm asking you if looking at these emails refreshes your

18  recollection as to whether or not Mr. Termonte sent this to

19  your daughter rather than sending it to you.

20  A.  I found out after the fact that he had sent it to my

21  daughter before sending it to me.

22  Q.  But when you found out, it was on November 5 -- am I

23  correct? -- after --

24  A.  After the letter had been filed already.  It was after the

25  fact.

```
 1   Q.  And do you recall Mr. Termonte telling you that he assumed

 2   your daughter would tell you about it?

 3   A.  I don't remember that conversation.

 4   Q.  Would you take a look at this document.

 5   A.  I see.  I saw it there.

 6   Q.  That does not refresh your recollection?

 7   A.  I can't remember.

 8           MS. KELLMAN:  Your Honor, I'd offer these emails as

 9   Exhibit 8.

10   A.  I was upset.  I do remember that.

11           MS. KELLMAN:  9.

12           THE COURT:  Any objection, counsel?

13           MR. BHATIA:  No, your Honor.

14           THE COURT:  Received.

15           (Defendant's Exhibit 9 received in evidence)

16           MS. KELLMAN:  Your Honor, if I may read just briefly.

17           THE COURT:  Yes, ma'am.

18           MS. KELLMAN:  This is dated Tuesday, November 4, at

19   11:53.  Mr. Termonte writes:  "We ran it by Sarah and assumed

20   she was sharing it with you."

21   Q.  Had Sarah shared this letter with you or the content of the

22   letter with you --

23   A.  No.

24   Q.  -- on November 4?

25   A.  No.
```

1   Q.  On November 5, did you receive any email from Mr. Termonte

2   in which he said:  "The letter as filed is attached"?  Do you

3   remember getting that email on November 5?

4   A.  I became aware of it.  I don't remember how I became aware

5   of it.

6   Q.  Do you know whether that was the first time that you had

7   seen that letter after it was filed?

8   A.  Absolutely.  Yes.

9   Q.  Now, what was your reaction to the fact that your right to

10  withdraw your plea had been foreclosed without any discussion

11  with you?  What was your reaction to that?

12  A.  Very, very angry, to put it mildly.

13  Q.  What did you say?  What did you do?

14  A.  How could you do that?  What would be the downside in being

15  able to withdraw my plea?

16  Q.  Now, what, if anything, did Mr. Shechtman do in connection

17  with this $5,000 retainer that you paid him?

18  A.  What did he do?

19  Q.  Yes.

20  A.  He told me he was going to use his influence to work with

21  the U.S. Attorney's Office.

22  Q.  And do you know whether or not he met with anyone in the

23  U.S. Attorney's Office?

24  A.  I'm told he did.

25  Q.  Did he tell you with whom he met?

1    A.  He told me -- I'm not sure -- I think he told me a

2    Mr. Joon.  The name could be wrong.

3    Q.  Joon Kim?

4    A.  Yes.  Someone who replaced him as the head of the criminal

5    division.

6    Q.  Did he tell you that before or after you had a meeting?  If

7    you remember.

8    A.  I think before.  He told me he was going to meet with him.

9    Q.  Did he tell you what the outcome of the meeting was?

10   A.  To the best of my recollection, he told me that he was

11   going to try to take it up to Mr. Bharara, Preet Bharara, the

12   U.S. attorney.

13   Q.  Did you have an understanding of what had happened when he

14   spoke with Joon Kim?

15   A.  Not that I can recall.

16   Q.  Do you know whether or not he ever discussed it with the

17   United States attorney, Mr. Bharara?

18   A.  I don't think he got that far.

19   Q.  Mr. Shechtman told you that he was going to meet with Joon

20   Kim; correct?

21   A.  Correct.

22   Q.  And after the meeting, did he tell you that he actually had

23   the meeting?

24   A.  I don't recall.

25   Q.  Did he tell you what happened if there was a meeting?

```
 1   A.  I don't recall.

 2   Q.  Did you have any other dealings with Mr. Shechtman?

 3   A.  No.

 4   Q.  Did you have any other conversations with Mr. Termonte

 5   about how to proceed next?

 6   A.  I may have.

 7   Q.  You don't recall?

 8   A.  No.

 9   Q.  Now, does the name Joel Sickler mean anything to you?

10   A.  Yes.

11   Q.  Who was Joel Sickler?

12   A.  He is what's called a judge advocate.  I don't know how

13   that name came about, but I was told that was what he's called.

14   They are criminologist consultants that help try to place you

15   in a good institution, one that would be good for you.

16   Q.  Did there come a time where either you or the Termonte firm

17   retained Mr. Sickler to advise them on an appropriate

18   designation for you?

19   A.  Yes.

20   Q.  Was it Mr. Termonte's firm that retained Mr. Sickler?

21   A.  I don't think so.  I think -- I heard it from someone else.

22   No.  Actually, no.  Another friend recommended it.

23   Q.  Did there come a time when you began communicating with

24   Mr. Sickler?

25   A.  Yes.
```

1    Q.   What was the nature of that communication?

2    A.   The nature was he recommended different camps to me.

3    Q.   Were there any parameters that he laid out in terms of the

4    camps if you recall?

5    A.   There were more descriptions of the camp and which ones

6    would have the RDAP program which was available to me and

7    pretty much how they worked, just more characteristically, not

8    to make light, but like a travel agent would describe a

9    facility.

10   Q.   So he was laying out the different facilities that might

11   be --

12   A.   And representing that he could get me into those

13   facilities.

14   Q.   Would it be fair to say that these discussions with

15   Mr. Sickler occurred prior to sentencing?  Correct?

16   A.   Absolutely.

17   Q.   Was Mr. Sickler instructed --

18           By the way, do you know if Mr. Sickler had

19   conversations with Mr. Termonte or Mr. Sher?

20   A.   He did.

21   Q.   How do you know that?

22   A.   I believe he did.  Or there was communication, emails back

23   and forth that I saw.

24   Q.   So emails between the Termonte firm, Mr. Sickler, and

25   yourself.  Correct?

1    A.   More Tremonte and Sickler.

2    Q.   And how did you get to see them?

3    A.   I think I saw them after the fact as we went through this

4    process.

5    Q.   Do you know whether or not your daughter had any

6    communication with Mr. Sickler?

7    A.   I don't think so.

8    Q.   I'd like to show you what we've marked as Defendant's

9    Exhibit 10.  This is an email from 10-27-14, just weeks before

10   the sentencing.

11           Take a look at this and tell me if you recognize it.

12           MR. BHATIA:  Your Honor, can we take a look at the

13   document shown to the witness?

14           THE COURT:  Yes.

15           THE WITNESS:  I have seen this.

16   BY MS. KELLMAN:

17   Q.   What do you recognize these emails to be?

18   A.   Those emails were the recommendations of Mr. Sickler of an

19   appropriate minimum or camp, federal camps, that would be good

20   for me, given the expected sentencing.

21   Q.   To whom did Mr. Sickler address his recommendations?

22   A.   It would say in the letter.  I didn't --

23   Q.   Do you know who Valerie is?

24   A.   Yes.  Valerie Gotlib was an associate.

25   Q.   At the Termonte firm?

1   A.   Yes.

2   Q.   Who is Justin?

3   A.   Justin Sher, the other partner.

4   Q.   And there came a time when you saw this as well; correct?

5   A.   Yes.

6   Q.   So if Mr. Sickler wrote to Valerie and Justin explaining

7   different camps or different facilities that you could go to,

8   that was the purpose of having retained him.  Correct?

9   A.   Correct.

10  Q.   So that there would be recommendations; correct?

11  A.   Correct.

12          MS. KELLMAN:  Your Honor, I'd offer this as 11.

13          MR. Bhatia:  No objection.

14          THE COURT:  10.  Received.

15          (Defendant's Exhibit 10 received in evidence)

16          MS. KELLMAN:  If I could read this, your Honor.  This

17  is an email between Valerie -- first it's an email from

18  Mr. Sickler to Valerie and Justin.  It says:  "Valerie and

19  Justin, I know we are scheduled to speak tomorrow at 5:30, and

20  I just want to briefly memorialize here my hopes for a judicial

21  recommendation designation from the court after imposition of

22  sentence in Steve's case.  It is simply this.  If the sentence

23  is less than 24 months, please ask the court to recommend the

24  satellite camp at FCI Otisville."

25          I'm not reading the entire document, Judge, just parts

```
1    that are pertinent.

2              If the sentence is between 24 months and 42 months,

3    please ask the court to recommend the satellite camp at USP

4    Petersburg.  And that's where the RDAP program was; is that

5    correct?

6              THE WITNESS:  I'm not sure.  I thought it was at

7    Lewisburg.

8    Q.  That's what I said.  The satellite camp at USP Lewisburg.

9              THE COURT:  I thought you said Petersburg actually.

10             MS. KELLMAN:  I apologize.

11             THE COURT:  So what is it?  24 to 42 is --

12             MS. KELLMAN:  Lewisburg.

13             THE COURT:  Ms. Kellman, we can't both talk at the

14   same time.

15             24 to 42 is Lewisburg?

16             MS. KELLMAN:  Yes, your Honor.

17             THE COURT:  Thank you.

18             MS. KELLMAN:  The camp at Lewisburg, Judge.

19             THE COURT:  Go ahead.

20   BY MS. KELLMAN:

21   Q.  And that was where you understood the RDAP program to be;

22   correct?

23   A.  Correct.

24   Q.  And then:  "If the sentence is greater than 42 months,

25   please ask the court to recommend the satellite camp at
```

1 Otisville."

2 A.   Correct.

3 Q.   Now, were those recommendations within the purview of what

4 you expected, had been led to believe, might be your sentence

5 in this case?

6 A.   Yes.

7        MS. KELLMAN:  Your Honor, I'd like to approach my

8 client with another email.

9 Q.   Do you recognize this document?

10        Let me withdraw that question.  Let me ask it another

11 way.

12        Do you recall a few moments ago I asked you whether or

13 not you obtained Mr. Sickler's services or Mr. Termonte's firm

14 retained Mr. Sickler's services?

15        Do you remember that question?

16 A.   I spoke with Mr. Sickler and told him that I would

17 retain -- have him retained.  So I guess -- he went through the

18 law firm.

19 Q.   So the law firm retained him?

20 A.   That's what that says.  I sent a check.

21 Q.   That was going to be my next question.

22        Did you pay for Mr. Sickler's services?

23 A.   Yes, we did.

24 Q.   Do you remember how much?

25 A.   $5,000.

1          MS. KELLMAN:  Your Honor, I'd offer this as Defense

2   Exhibit 11.

3          MR. Bhatia:  No objection.

4          THE COURT:  Received.

5          (Defendant's Exhibit 11 received in evidence)

6          Forgive me.  What's 11?  10 was the email of

7   October 27.

8          What's 11?

9          MS. KELLMAN:  11 is a letter from Mr. Sickler to

10  Justin, to the Termonte firm, dated June 11, 2014, in which

11  they discuss Mr. Sickler's being retained by the firm.

12         THE COURT:  Thank you.

13         MS. KELLMAN:  Just a moment, Judge.

14         (Defendant and counsel conferred)

15         MS. KELLMAN:  Your Honor, would this be a convenient

16  time for a quick break?  I don't think we'll be much longer.  I

17  just want to see if we can narrow this a little bit.

18         THE COURT:  Why don't we take about five minutes, and

19  then we'll go until about 1:00, and then we'll break then.

20         (Recess)

21         (Continued on next page)

22

23

24

25

```
 1              (In open court)

 2              MS. KELLMAN:  May I proceed, Judge?

 3              THE COURT:  Yes, ma'am.

 4    BY MS. KELLMAN:

 5    Q.  I just want to go back for a moment, if I can, Mr. Walsh.

 6    We spoke earlier about this letter of February 4 in which

 7    Mr. Tremonte informed the Court that you did not wish to

 8    withdraw your plea.

 9              Do you remember those questions and answers?

10    A.  Yes.

11    Q.  Did you want to withdraw your plea?

12    A.  Why wouldn't I have?  Yes.

13    Q.  Had you been asked about it, what would you have told your

14    lawyer?

15    A.  To try to get the plea withdrawn.

16    Q.  If the lawyer said, "But the government won't offer you a

17    better plea," would you still have wanted to withdraw your

18    plea?

19    A.  If I could, yeah.

20    Q.  That's what I'm asking you.  If the judge invited you to

21    withdraw your plea and you had that opportunity, would you have

22    withdrawn your plea?

23    A.  I believe so, yes.

24    Q.  If the government wasn't going to offer a better plea, what

25    was your hope?
```

 1  A.  Then I would have had to go to trial.

 2  Q.  That's what you wanted to do; am I right?

 3  A.  I wanted to get my story out, yes.

 4  Q.  I think you testified about this earlier, but following the

 5  sentencing, or during the sentencing proceeding, you heard

 6  something about, I think you said, something about your right

 7  to appeal, correct?

 8          Let me rephrase it.  When was the first time that you

 9  understood that you had given up your right to appeal as long

10  as your sentence was under 20 years or less?

11  A.  After I was sentenced, and I understood what happened.

12  Q.  Tell us what you understood.  Tell us what triggered your

13  understanding of that appellate waiver.

14  A.  Everything that I said before.  There was a commotion

15  afterward, and Tremonte was struggling to find, you know,

16  figure out what to do.  And he asked Judge Cedarbaum, I know

17  now, and I remember that, to add a day to the sentence, now I

18  understand why he did.  And she said, are you saying you would

19  like me to consider withdrawing your plea, your client's plea?

20  And he said -- I remember him saying I don't know what I want

21  to do yet.  Could I ask, and huddled with Mr. Naftalis, the

22  U.S. assistant attorney, and came back, and there was no

23  argument between the government and us.  And asked for a recess

24  to figure out what course they would like to take.

25  Q.  Now, in the plea agreement, there is a loss figure of $440

1   million at the beginning of the agreement, in the guideline

2   calculation.

3   A.   Correct.

4   Q.   Further down, there is a different monetary amount, and

5   it's in the $50 million range, and it says that is the amount

6   of money that you're personally responsible for.  Do you recall

7   that?

8   A.   Yes.

9            MR. BHATIA:  Objection, your Honor.  Mischaracterizes

10   the record.

11           MS. KELLMAN:  I'll read it from the --

12           THE COURT:  Go ahead and read it.

13           MS. KELLMAN:  Yes.  Reading from page four, your

14   Honor, the bottom of the third paragraph from the top.

15           The defendant further agrees not to the appeal any

16   term of supervision -- any term of supervision.

17           Next sentence:  Defendant also agrees not to appeal

18   any forfeiture amount that is less than or equal to

19   $50,743,779, and the government agrees not to appeal any

20   forfeiture amount that is greater than that.

21   Q.   What did you understand that number to mean?

22   A.   I understood the 50 million to be a number that they

23   attributed to me personally, benefiting by.  Which is, I didn't

24   understand that number because that's more money than I did.

25   And the 400 million was amount that the victims would lose,

1    which I didn't understand at all, because I didn't think we

2    were losing money.  In fact, I know we weren't.  I mean, I

3    believe we weren't.

4    Q.  Let me ask you a question about that.  In connection with

5    victims losing money, was there any restitution order entered

6    in which you were obligated to pay restitution to any victims?

7    A.  I have no restitution.

8    Q.  You had a discussion with -- I imagine many discussions

9    with Mr. Tremonte about where that $440 million number came

10   from, correct?

11   A.  No, we did not.

12   Q.  You didn't discuss it with him?

13   A.  No.  It was the number that the government used.

14   Q.  When you saw it in the agreement the night you were going

15   over it, did you question him about it?

16   A.  I had been -- talked about that number way before that with

17   him.

18   Q.  What did he say?

19   A.  What I said -- it didn't matter.

20   Q.  That same paragraph includes the appellate waiver that you

21   said you were not aware of, correct?  The top of the paragraph,

22   I'll read it.

23          It is agreed (1) that the defendant will not file a

24   direct appeal nor bring any collateral challenge, including,

25   but not limited to, an application under Title 28, United

1    States Code, Section 2255 and/or Section 2241, nor seek a

2    sentence modification pursuant to 3582 of any sentence equal to

3    or below the stipulated guideline range of 20 months.

4              Do you understand --

5              THE COURT:  20 months?

6              MS. KELLMAN:  I'm sorry.

7    Q.  240 months.  You understand?

8    A.  I don't even understand what you just read, and I doubt

9    anyone in the courtroom does either.

10   Q.  Okay.  You now understand that this plea agreement included

11   a waiver of your right to appeal as long as you got sentenced

12   to 20 years or less, correct?

13   A.  Yes, now I do.

14   Q.  You did not understand that at the time, correct?

15   A.  No.

16   Q.  By "at the time," I mean you did not understand at the time

17   you reviewed the document with Mr. Tremonte, correct?

18   A.  Repeat that, please?

19   Q.  You did not understand this appellate waiver at the time

20   you reviewed the plea agreement with Mr. Tremonte?

21   A.  Absolutely not.

22   Q.  Did you have any discussion with him about this appellate

23   waiver at that time?

24   A.  No.

25   Q.  At the time you pled guilty, did the judge tell you that

 1   you were giving up your right to appeal, that you would not be

 2   able to appeal any sentence 20 years or below?

 3   A.  As I said before, I heard the word "appeal," I didn't

 4   understand anything else, and I turned to Mr. Tremonte, and he

 5   said -- signaled to say yes.

 6   Q.  If you knew that you were giving up the right to appeal,

 7   would you have opted to go to trial?

 8        Let me rephrase that.  If you knew your plea agreement

 9   required you to give up your right to appeal as long as you got

10   a 20-year sentence or less, would you have opted to go to

11   trial?

12   A.  Certainly if I thought I was exposed to anything near 20

13   years.  Keep in mind my age at the time.

14   Q.  One thing further.  Have you had any direct contact with

15   the receiver in this case who was appointed on behalf of the

16   investors?

17   A.  From when?  At the beginning, yes.

18   Q.  At the beginning.  Since you've been in jail?

19   A.  No.

20   Q.  Were you able to assist the -- back then.  Were you able to

21   assist the receiver in any way?

22   A.  Very much so.

23   Q.  How so?

24   A.  Well, immediately, I turned over everything I had, for

25   starters.  And then there was a specific occasion when we had

1    many billions, billions of dollars of security positions,

2    arbitrage positions, probably somewhere between 7 and

3    $12 billion worth, and my head trader called me and said that

4    they were going to give the order to unwind the positions to a

5    bank, and I said, oh, no, no, they don't want to do that.  It's

6    going to cost them many, many, many, many millions of dollars.

7    And he said well, you should call Val Miller, or that's who I

8    called.  He was one the fellows working with Brick Kane, the

9    receiver.  And I called him and I said, you want to let us

10   unwind this.  They're going to charge you a fortune and

11   probably get picked off.  You had to be an inside -- you had to

12   be a dealer in the market to get the lowest price.  And that's

13   what we did for a living.  And they redirected the order and

14   gave us the order to unwind the positions.

15   Q.  To the best of your understanding, have any of the -- by

16   the way, were the investors in your businesses, were they

17   individuals or were they institutions?

18   A.  Institutions.

19   Q.  Exclusively?

20   A.  Exclusively.

21   Q.  Do you have an understanding as to whether or not any of

22   those institutions have actually in fact lost any money in

23   connection with any trades that you were involved with?

24   A.  I believe that no institution lost money off of their

25   investment.  I believe that everyone received all their

1    investment, and maybe a small profit, based on the information

2    I have.

3            MS. KELLMAN:  Your Honor, may I approach the witness?

4            THE COURT:  Yes, ma'am.

5    Q.  Do you recognize this document, Mr. Walsh?

6    A.  Yes, I just looked at it.

7    Q.  What do you recognize it to be?

8    A.  A statement of the money flows collected and liquidated by

9    the receiver.

10   Q.  Can you tell the Court the extent of the loss, if any, to

11   investors that involved in these transactions?

12   A.  Well, as of date it says that $28 million is still owed to

13   investors, and that the receiver's currently holding $31

14   million plus still to be distributed.

15   Q.  So there is additional money to be distributed, so no

16   institutions have lost money; is that correct?

17   A.  No, correct.  Yes.

18           MS. KELLMAN:  Your Honor, I'd offer this letter, it's

19   December 13, 2018, it's addressed to Ms. Shevitz, and it comes

20   from the receivers.

21           THE COURT:  What's the number on it, please?

22           MS. KELLMAN:  13.

23           THE COURT:  Thank you.

24           MS. KELLMAN:  12.

25           MR. BHATIA:  Your Honor, may I have a brief -- may we

```
 1    have brief voir dire?

 2                THE COURT:  Yes, sir.

 3    BY MR. BHATIA:

 4    Q.  The date on this document is 2018, right?

 5    A.  Just read it today.

 6    Q.  That's 10 years after you were arrested?

 7    A.  Yes.

 8    Q.  You had not seen this document prior to today, correct?

 9    A.  No, but I am aware of the status of the moneys returned

10    throughout the course.

11    Q.  And those efforts took years, correct?

12    A.  I believe at the time of my trial, around 99 percent were

13    already returned.  At the time I was sentenced.

14    Q.  That itself was five years after the scheme ended, correct?

15    A.  Correct.

16                MR. BHATIA:  Your Honor, no objection in light of

17    that.

18                THE COURT:  All right.  12 is received.

19                (Defendant's Exhibit 12 received in evidence)

20    Q.  Mr. Walsh, do you know what a focus report is?

21    A.  Yes.

22    Q.  What is it?

23    A.  It's a statement of your financial condition that you -- a

24    member firm, a securities dealer, reports to it's what's called

25    to -- your regulating exchange or in our case the New York
```

```
 1   Stock Exchange.  That's a report, a monthly report of the

 2   financial condition of your firm that we have to file with the

 3   New York Stock Exchange on a monthly basis.

 4   Q.  While you were at the business, did you have occasion to

 5   see those reports?

 6   A.  Debbie Duffy, the controller and compliance officer sent

 7   that to me every month.

 8   Q.  Debbie Duffy was, you said, the compliance officer?

 9   A.  Compliance and controller, treasurer of the business.

10   Q.  Where was she physically located?

11   A.  With Paul Greenwood in Greenwich.

12   Q.  And you were then regularly kept up to date as to these

13   filings and these focus groups?

14   A.  I received a copy of the report on a monthly basis.

15   Q.  Did anything in those reports -- and the reports included

16   what exactly?

17   A.  Profit and loss for that month, and the statement of year

18   capital position, how much money you had.

19   Q.  Was there ever a time when -- did you review them regularly

20   when you got them?

21   A.  I looked at two numbers.

22   Q.  What were those?

23   A.  The net profit or loss for the month, and the excess

24   capital; in other words, above the money we were using, how

25   much additional capital we had to invest.
```

 1   Q.  Was there anything in any of the reports you viewed while

 2   you were actively working there that caused you concern?

 3   A.  No.

 4   Q.  Anything that would have triggered your intellect to say,

 5   wait, what's going on here?

 6   A.  No.

 7   Q.  Did you see audits as well?  Was the company audited?

 8   A.  We were audited by every single regulatory organization.

 9   NASDAQ, New York -- every one, the option exchanges, the

10   commodity exchanges, we were audited by probably endless number

11   of people.  Plus our independent auditor was Deloitte & Touche.

12   Q.  Did you have occasion to review any of those audits?

13   A.  I didn't.

14   Q.  You did not?

15   A.  No.

16   Q.  Was it ever called to your attention that any of those

17   audits produced any irregularities?

18   A.  No.

19           MS. KELLMAN:  Nothing further.

20           THE COURT:  Thank you.  Cross-examination, counsel.

21   CROSS-EXAMINATION

22   BY MR. BHATIA:

23   Q.  Good morning, Mr. Walsh.

24   A.  Good morning.

25   Q.  You attended SUNY Buffalo; is that correct?

```
 1   A.  Yes.

 2   Q.  You graduated in 1966?

 3   A.  Correct.

 4   Q.  After graduating, that's when you started working at Saul

 5   Lerner & Company in New York?

 6   A.  Yes.

 7   Q.  You spent four or five years there; is that right?

 8   A.  Four.

 9   Q.  Four.  And then you started your own firm, right?

10   A.  I had a small stock exchange firm called Reich & Company,

11   and then I started a firm with other partners, and then I

12   started a firm with called Ragnar Options Corp.

13   Q.  You testified earlier today that you were 24 when you

14   started your own firm; is that right?

15   A.  No.  No.  We started Ragnar or Walsh WG, the firm we are

16   talking about today?

17   Q.  The first one?

18   A.  The first firm?  I was in my mid 20s.

19   Q.  You said you did exceedingly well in that business with

20   your friend; is that right?

21   A.  I said I did very well.

22   Q.  You were involved in developing the use of computers in

23   options trading; is that right?

24   A.  That was my idea.  I would tell Paul what the features we

25   needed, and he would put it in the system.
```

1    Q.  You helped to develop the concept of merging computers and

2    finance; is that right?

3    A.  I helped to -- I would say I helped to, I was an early

4    contributor to the development of using computers for realtime

5    trading.

6    Q.  In 1979, you started your company with Paul Greenwood?

7    A.  Yes.  And Barry Wish.

8    Q.  That company changed names and partners, but it eventually

9    became WG Trading?

10   A.  Yes.

11   Q.  So by 2009, you had been working in the financial services

12   industry for more than 40 years?

13   A.  Correct.

14          THE COURT:  Counsel, go just a little more slowly.

15          MR. BHATIA:  Yes, your Honor.

16          THE COURT:  Please.

17   Q.  You had been working with Paul Greenwood for around 30

18   years; is that right?

19   A.  Yes.

20   Q.  During your career you held a Series 1 license?

21   A.  I'm not sure.  I held different licenses, Series 7 and one

22   or two others.

23   Q.  Is there something I can show you that would refresh your

24   recollection?

25   A.  Yeah.

```
 1            MR. BHATIA:  Your Honor, may I approach the witness?
 2            THE COURT:  Yes.
 3   A.  Okay.
 4   Q.  I'm showing you what has been marked for identification as
 5   Government Exhibit 1022.  Have you finished looking at this?
 6   A.  I read -- you want me to look at the first page to see what
 7   my registrations are.
 8   Q.  Yeah.
 9   A.  Okay.
10   Q.  Thank you.  So, I'll ask again did you --
11            THE COURT:  Does that refresh your recollection.
12   Q.  Does that refresh your recollection?
13            THE COURT:  As to what licenses you held.
14   Q.  As to --
15            THE COURT:  Is this your off-the-record voice,
16   Mr. Walsh?
17            THE WITNESS:  Yes, it is, your Honor.
18   A.  Yes, I mean, I'll take it as a given.
19   Q.  Does this refresh your recollection about the licenses you
20   held?
21            MS. KELLMAN:  If I may, I think the answer is no.  But
22   we have no objection to just -- if I could take a look at the
23   document, probably I have no objection to admitting it.
24            THE COURT:  Sure.  Let's go.
25            MS. KELLMAN:  Your Honor, we have no objection,
```

1    subject to the discussion that I've had with the prosecutor as

2    to certain redactions that will be made.  As to the licenses,

3    perhaps just easier to admit them in evidence.

4                THE COURT:  Is that all right with you, counsel?

5                MR. BHATIA:  That's fine with the government.

6                THE COURT:  Received.

7                (Government's Exhibit 1022 received in evidence)

8    Q.  Mr. Walsh, looking at what's on the screen, from Government

9    Exhibit 1022, you held a Series 1 license; is that right?

10   A.  Yes.

11   Q.  And you also held Series 3, 4, and 40 licenses?

12   A.  Yes, yes, according to the screen, yes.

13                MR. BHATIA:  You can take this down.

14   Q.  By 2009, is it fair to say you were an experienced

15   financial services professional?

16   A.  Yes.

17   Q.  You understood how the industry worked?

18   A.  Yes.

19   Q.  You understood how to read financial documents?

20   A.  Not really.  I'm not a reader of financial documents.

21   Q.  You had worked in the industry for 40 years; is that right?

22   A.  Yes.

23   Q.  You had owned your own companies?

24   A.  Yes.

25   Q.  You also held licenses that allowed you to be a supervisor

 1    in the industry?

 2    A.   Yes.

 3    Q.   So, your testimony today is you do not know how to read

 4    financial documents; is that right?

 5    A.   I could read them, but I didn't work with them.  I could

 6    read them well enough to pass the exam, but that wasn't my area

 7    of expertise.

 8    Q.   In your 40 years, you had received trading reports in the

 9    course of your work?

10    A.   Yes.

11    Q.   In your 40 years, you had also received balance sheets in

12    the course of your work?

13    A.   The focus report that I mentioned.  It wasn't a balance

14    sheet.  Yes, I can read a balance sheet.

15    Q.   You also previously served as the co-chairman and co-CEO of

16    the New York Islanders?

17    A.   Correct.

18    Q.   You also served as a trustee of the University at Buffalo

19    Foundation?

20    A.   Correct.

21    Q.   I'd like to direct your attention to the document marked

22    for identification purposes only as Government Exhibit 1013.

23             MR. BHATIA:  Your Honor, may I approach the witness?

24             THE COURT:  Only if you speak more slowly.

25             MR. BHATIA:  I will, your Honor.  I'm showing the

1  witness the document marked as Government Exhibit 1013.

2  Q.  Mr. Walsh, do you recognize this document?

3  A.  Yes, I do.

4  Q.  What is this document?

5  A.  It is a promissory note that I signed.

6       MS. KELLMAN:  Your Honor, I'm going to object to this.

7  This is not relevant to this hearing.

8       THE COURT:  Counsel?

9       MS. KELLMAN:  And this line and this document is not

10  relevant to this hearing.

11      THE COURT:  Counsel?

12      MR. BHATIA:  Your Honor, I think to the extent the

13  defendant is challenging whether he would have proceeded to

14  trial, some amount of the underlying evidence is.  But it's not

15  the main focus of the hearing today, I agree, but some amount

16  of --

17      THE COURT:  Why don't you pick your best.

18      MR. BHATIA:  Will do.

19      The government offers Exhibit 1013.

20      MS. KELLMAN:  I object, your Honor.  I don't think

21  that by showing the witness a document, the government is going

22  to be able to argue that he could never have gone to trial

23  because there is a note.  And I think it's -- I don't want to

24  say -- I'll use a different word.

25      I think it is naive to think through cross-examination

1    the government can establish that this defendant shouldn't have

2    gone to trial.  It is something he should have been discussing

3    with his lawyer.

4         MR. QUIGLEY:  It goes to a couple of things that are

5    relevant to the hearing today.  One is the strength of the

6    government's case.  Mr. Walsh allocuted in his plea allocution

7    that he had signed this promissory notes.  Second, and I think

8    more directly pertinent to the hearing, it goes to the loss

9    amount and the scale of the loss both attributable to Mr. Walsh

10   directly and attributable to Mr. Walsh, to the conspiracy as a

11   whole.  And, of course, under 2B1.1, a defendant's liable for

12   the reasonably foreseeable loss of his co-conspirators.

13        I would add, I think this is not a subject we're going

14   to dwell on.  I think we're going to show him three or four of

15   these to get a sense of the numbers at issue.  So we think it's

16   relevant.  To the extent any type of a 403 applies here, it's

17   not something we are going to dwell on.

18        THE COURT:  Is this related to the loss amount or tell

19   me how it relates to whether or not Mr. Walsh would have gone

20   to trial?

21        MR. QUIGLEY:  Sure, your Honor.  I think it relates to

22   the evidence -- he testified on direct that he was -- he tried

23   to develop the theme on direct and in his papers he was not

24   involved in the fraudulent side of WG Trading.  This will

25   establish that in fact he signed these promissory notes which

1    are misappropriating investor funds, so he was involved.  It

2    rebuts his defense that he wasn't personally involved in the

3    misappropriation of invested funds.

4         Secondly, it goes to the loss amount, because it

5    shows -- and the forfeiture amount, it gives a sense of the

6    scale of the numbers.  We'll see these are in the millions

7    dollars, even if we go through three or four of them, we're

8    well into the millions if not the tens of millions.  I think

9    that is relevant.  And these notes began in I believe about

10   1998, so it gives the Court a sense of the scale of the loss

11   and the fraud.

12        THE COURT:  Is this going to require us to have a

13   trial within a trial about whether or not Mr. Walsh knew what

14   was happening with respect to the promissory note or that this

15   was something sent to him to sign?  Do we have to do that?

16        MS. KELLMAN:  Yes, Judge.

17        MR. QUIGLEY:  He's already opened the door to that,

18   your Honor, by saying -- he testified on direct how

19   Mr. Greenwood was in Connecticut, Mr. Greenwood did everything

20   in Connecticut, and he was just sitting in Long Island doing

21   trading.  I think it directly goes to impeachment of what he

22   said on cross.

23        THE COURT:  Ms. Kellman?

24        MS. KELLMAN:  Your Honor, I think in answer to your

25   Honor's question, I believe that it will open the door to quite

Case 1:23-cr-00490-SHS Document 621 Filed 07/28/25 Page 2 of 10

 1     a lengthy trial as to what those notes are and why he signed

 2     them and what they were represented to him to be.  And it also

 3     opens the door to what, if any, losses and what the

 4     government's view of what losses is, which is in our view

 5     completely erroneous, and it is why this individual would have

 6     gone to trial.  Because the government's theory of the case was

 7     completely misunderstood in terms of what the numbers were.

 8             THE COURT:  Let me ask this question.  I take it the

 9     government does not dispute the return of most of the funds to

10     the investors.

11             MR. QUIGLEY:  That's right.

12             THE COURT:  We all understand that intended loss is

13     also a measure of the amount of the loss, right?

14             MR. QUIGLEY:  That's right, your Honor.  I'm sure I

15     know the Court's familiar with it.  But I think it is

16     application note 3C to 2B1.1 --

17             THE COURT:  I have it memorized.

18             MR. QUIGLEY:  It's come up a few times, your Honor.

19     But that amounts returned to investors prior to essentially

20     discovery of the scheme by law enforcement are credited against

21     loss.  Amounts returned to investors after that are not.

22             I think here we would argue that the 400 million

23     figure or it is actually above 400 million figure accurately

24     characterizes the loss prior to the discovery of the scheme by

25     law enforcement.  The fact that investors -- even if investors

1   were out zero, as they may be now in 2019, 10 years later, that

2   doesn't matter for what the loss amount is in 2009 under 2B1.1.

3        THE COURT:  I think we all agree to that.  That the

4   amount of the intended loss -- apparently we don't all agree to

5   that, Ms. Kellman.

6        MS. KELLMAN:  It is the intended loss, your Honor,

7   that is really the problem here.  There is no intended loss.

8   The government is counting -- there is no actual loss.  There

9   is no intended loss.

10       The government from the very beginning of this case

11  quantified every dollar that an investor didn't have as loss.

12  But in fact, those moneys were moneys that were invested.  So

13  you can't call them losses, can't even call them intended

14  losses if they were in the marketplace doing what they were

15  supposed to be doing.

16       The reason that investors are getting their money back

17  now is because all of the company's assets, meaning all of

18  their investments, are being liquidated.  So they're getting a

19  return on their capital.  They're getting their money back.

20       The money wasn't lost.  Because if it was lost, where

21  would it be coming back from.  It was invested, and now the

22  company's gone, it's being dissolved, and the investors are

23  getting their money back.

24       THE COURT:  Let me just ask Ms. Kellman a question.

25  What do you say the promissory note was for?

```
 1          MS. KELLMAN:  I'm going to let my colleague with the
 2   Court's permission explain that, your Honor.
 3          MS. SHEVITZ:  Mr. Walsh, first of all, does not ever
 4   dispute that he signed those notes.  He signed the notes.
 5          THE COURT:  What were they for?
 6          MS. SHEVITZ:  They were for, as explained to him, and
 7   this is where we'd have to have another hearing, as Greenwood
 8   explained to him, that on the first note they were for
 9   allocation of charges against the accounts.  Maybe he should
10   have asked more at the time.  He didn't.  And they were for --
11   he didn't know if they were cumulative, he didn't think they
12   were cumulative.  We could go into that.  But that's his
13   defense at trial.
14          What they were for is Mr. Greenwood told him it was
15   for allocation of the charges -- he's telling me -- I probably
16   have it wrong.  The allocation of -- expenses?  Expenses
17   against the accounts of the two principals.  I'm probably
18   saying that wrong too.  I'm saying that wrong.
19          MS. KELLMAN:  I have no problem with having the
20   defendant, having Mr. Walsh answer the question as to what --
21   did he sign the notes, yes.
22          THE COURT:  All right.  I got it.
23          MS. SHEVITZ:  What I want to say is the government's
24   theory of loss is they're taking the section called credits
25   against loss, in the guidelines, which is, I don't know where
```

1    it is, E, and they're saying that -- they're confusing apples

2    and oranges.  They did this in another case that predated this

3    that I had, which happened to be the same lawyer that he had,

4    one of his lawyers.

5          And they're saying credits against loss.  But first

6    you have to find out if there is an actual loss.  And there was

7    no actual loss, because it also talks about the value of the

8    securities.  The Halliburton case and Kutokske -- I'm probably

9    pronouncing it wrong -- from the Second Circuit talk about the

10   extent of the loss, if any, in a securities case.  And you have

11   to value the securities that remain there.  It's not what all

12   the investors paid and they lost all that money.  That's not

13   what loss is.  So, all of the money was there in the form of

14   investments.

15         Now we can talk about credits against losses.  That

16   does not apply because they were no losses.  But the government

17   has confused this in a number of cases.

18         THE COURT:  So my question to you, follow up, is this

19   is separate and apart from the intended loss in the more normal

20   case?

21         MS. SHEVITZ:  Intended loss is something else.  Now, I

22   believe there is a new guideline provision or interpretation

23   that says intended loss has to mean really intended loss, do

24   you intend for there to be a loss.  And for sure, Mr. Walsh

25   would say at trial, and Mr. Walsh takes the position now, and

1    we take the position there's no actual loss, and there's no

2    intended loss because things were invested.

3         He wasn't involved in the marketing.  So he doesn't

4    know what was said to any of the investors at that time.  He

5    took money and he invested it, and it's all there.

6         Now, it took some time for the receiver to get it

7    back.  Maybe if nobody had intervened at the time, you know, we

8    all would have gotten back before.  That's the thing.  It's all

9    there.  It's not a Ponzi scheme.  Whatever Greenwood said to

10   them when he was cooperating, it's not that.  There's a value

11   of the securities equal the amount of the securities -- the

12   investor claims.

13        THE COURT:  All right, Mr. Quigley.

14        MS. SHEVITZ:  That's why you go to trial.  There's no

15   loss --

16        THE COURT:  I got it.

17        MS. SHEVITZ:  He signed notes.  Yes, he did, and he

18   he'll say he should have known, absolutely, he had these

19   licenses, and he should have known.  That's his position.  He

20   should have known.

21        THE COURT:  Okay.  Mr. Quigley.

22        MR. QUIGLEY:  Your Honor, we don't intend to get into

23   more than he signed the notes and introduce the notes into

24   evidence.  But I think defense counsel, both of their comments

25   highlight why the notes are relevant here.  Because they both

1  said all the money was invested, all the money was with

2  investors, and the notes show that they weren't.

3          THE COURT:  May I see it, please, counsel.  How does a

4  note show that?

5          MR. QUIGLEY:  It shows the money going to Mr. Walsh,

6  so it is certainly probative of where the money went.  It

7  didn't go into an index arbitrage fund.  It would be a very

8  strange investment in which an investment was made --

9          THE COURT:  What do you mean it goes to him?  He's

10 promising to pay.  How does it go to him?  The undersigned as a

11 general partner, etc., etc., promises to pay.

12         MR. QUIGLEY:  He would repay -- what he said in his

13 plea allocution, I'm quoting:  I caused WGTI, an entity whose

14 financial information was incorporated into audited financial

15 statements of WGTC, to issue promissory notes that falsely

16 stated that I owed and would timely repay tens of millions of

17 dollars to WGTI.

18         THE COURT:  So the money is not going to him though.

19         MR. QUIGLEY:  It is.  These are used to cover the

20 money, to paper over the money that's going to him.  And he

21 said:  I did so knowing that the books and records and audited

22 financial statements of WGTC would be materially misstated as a

23 result, and that such misstatements would and did operate as a

24 fraud and deceit upon WGTC's limited partners.

25         MS. KELLMAN:  That's the problem, Judge, because from

1    day one, he has said that I didn't know, I wasn't a part of

2    that.  And his lawyer explained to him that the only way he

3    could plead guilty was to read that statement.  And he said he

4    wouldn't do it.  And then he said, well, we'll get this behind

5    us, and I can't try this case for months, and you're only going

6    to get a single digit figure.

7          They looked at numbers from under two years to two to

8    four years, and they kept everything low.  And they said your

9    only choice here is to plead.  If you want to plead, this is

10   what you have to plead to, and he read it, and he told his

11   lawyer it wasn't true.  And he read it.

12          THE COURT:  All right.

13          What?

14          MR. QUIGLEY:  That's fine, your Honor.

15          THE COURT:  All right.  I will accept them into

16   evidence, just put them all in.  Is there any dispute that they

17   were all signed?

18          MS. KELLMAN:  No, your Honor.

19          THE COURT:  No, right?  Received.  Let's go.  In fact,

20   why don't we break.  How about that.

21          (Government's Exhibit 1013 received in evidence)

22          THE COURT:  2 o'clock, friends?

23          (Recess)

24          (Continued on next page)

25

1          (In open court)

2          THE COURT:  Mr. Walsh, do you want to come on up?

3     Shall we continue with cross, counsel?

4          MR. BHATIA:  Thank you, your Honor.  I want to clarify

5     one issue for the record.  In the exhibit that we introduced

6     regarding promissory notes, that's a subset of the total number

7     of promissory notes.  The full set was admitted as an exhibit

8     in the Monsanto hearing.  If you'd like a copy, we can provide

9     one.

10          THE COURT:  Thank you.

11    BY MR. BHATIA:

12    Q.  Mr. Walsh, you said on direct that you wanted a chance to

13    tell your story; is that right?

14    A.  Yes.

15    Q.  You said that repeatedly, right?

16    A.  Yes.

17    Q.  Isn't it true that in May 2009 you met with the United

18    States government for a proffer session?

19    A.  Yes.  I am not sure of the date, but I had two meetings

20    with the government.

21    Q.  They asked you questions and you gave them answers?

22    A.  Yes.

23    Q.  Another thing you said on direct is that Mr. Greenwood

24    handled most of the operations at WG Trading?

25    A.  All.

1    Q.  All of the operations?

2    A.  Yes.

3    Q.  Isn't it true that at the proffer session, you told the

4    government that you and Greenwood spoke on the telephone?

5    A.  Yes, all -- regularly.

6    Q.  You said you spoke often with Mr. Greenwood on the

7    telephone?

8    A.  Yes.

9    Q.  You said you spoke as much as five times each day?

10   A.  That's not true, but often.

11   Q.  It's your testimony you did not speak -- you told the

12   government that you spoke with Mr. Greenwood up to five times

13   each day?

14   A.  There could be some days when we spoke for 20 times in a

15   day, and there could be a week when we didn't speak.

16   Q.  Isn't it true that you told the government that you and

17   Mr. Greenwood spoke about any business decision that the two of

18   you made?

19   A.  I spoke to him about any decision I made.  It turns out he

20   never spoke to me about some -- a lot of the decisions he made.

21   Q.  When you met with the government for a proffer session,

22   isn't it true that you told them that you and Mr. Greenwood

23   spoke about any decisions the two of you made?

24   A.  I thought we did.

25   Q.  You didn't receive a cooperation agreement after those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    proffer sessions; is that right?

2    A.   No.

3    Q.   Let's jump forward --

4              THE COURT:  Yes, that is right?

5              THE WITNESS:  Yes, not to my knowledge.

6              THE COURT:   Thank you.

7    Q.   That proffer session where you told the government about

8    speaking with Mr. Greenwood, that occurred after you were

9    arrested in connection with this case?

10   A.   Before or right after.

11   Q.   Did you have any proffer sessions with the government

12   before you were arrested in this case?

13   A.   I don't think so.

14   Q.   So anything you told the government about your interactions

15   with Mr. Greenwood happened after you were arrested?

16   A.   Well, you have the dates, I mean, I would think so.

17   Q.   Let's jump forward a few years.  You entered a plea

18   agreement in connection with this case; is that right?

19   A.   Correct.

20   Q.   I'd like to direct your attention to page six of Defense

21   Exhibit 4.  Can we pull that up.

22             You signed this plea agreement; is that right?

23   A.   Correct.

24   Q.   That's your signature there maybe in the middle of the

25   page?

```
 1   A.  Yeah.  Yes.

 2   Q.  You signed this document on April 25, 2014?

 3   A.  Yes.

 4   Q.  Before you signed this agreement, you spoke to your

 5   attorney about the agreement, right?

 6   A.  Yes.

 7   Q.  He gave you a copy of the agreement before you actually

 8   signed it?

 9   A.  Yes.

10   Q.  You had the opportunity to ask him any questions you had

11   about the agreement?

12   A.  I've already testified that I told him I couldn't read it,

13   and I needed to come in to have him explain it to me.

14   Q.  You later told Judge Fox under oath that there was nothing

15   in the plea agreement that you did not understand; is that

16   right?

17   A.  I answered -- the answer is yes.  I answered everything as

18   I was told to do.  Instructed to do.

19   Q.  You were under oath during your plea hearing; is that

20   right?

21   A.  Yes.

22   Q.  Judge Fox asked someone to swear you in?

23   A.  Yes.

24   Q.  You had to stand and say you swore to tell the truth.

25   A.  It's all right here.
```

1    Q.  You told Judge Fox that you understood everything in your

2    plea agreement?

3    A.  That's how I answered, yes.  That's how I was directed to

4    answer.  Instructed to answer.

5    Q.  Were you lying?

6    A.  That's how I was instructed to answer, so I thought I was

7    doing the right thing at that time.

8    Q.  It's your testimony that you were instructed to answer

9    Judge Fox untruthfully; is that right?

10    A.  It turns out I did, yes.  But I was doing as instructed by

11    my attorney, because I thought I had a deal.

12    Q.  You told Judge Fox something that you didn't -- that you

13    knew was not true, because your attorney told you to?

14    A.  At the time of the trial -- yes, yes, yes.

15    Q.  Let's take a look at the first page of the plea agreement.

16    You agreed to plead guilty to securities fraud?

17    A.  Yes, I did.

18    Q.  And the agreement makes clear that the maximum penalty for

19    securities fraud is 20 years' imprisonment?

20    A.  That's what it says.

21    Q.  By signing the agreement, you agreed that for the purposes

22    of the guidelines, the loss from your offense exceeded $400

23    million; is that right?

24    A.  I answered yes.

25    Q.  And by signing this agreement, you stipulated that your

1    offense involved 10 or more victims?

2    A.  I answered yes to the questions.

3    Q.  Are you familiar with the United States sentencing

4    guidelines?

5            I'll ask this question again.  You, by signing the

6    agreement, you stipulated that a loss from your offense

7    exceeded $400 million.

8    A.  Yes, I didn't -- I discussed my conversation with

9    Mr. Tremonte about that.

10   Q.  In the plea agreement, though, you yourself was

11   acknowledging that that fact was true, right?

12   A.  Yes, I did.

13   Q.  Are you familiar with the United States sentencing

14   guidelines?

15   A.  I wasn't then.  I am a little more now.

16   Q.  So, you weren't familiar at the time with the way loss was

17   calculated?

18   A.  No, not really.

19   Q.  Loss might mean something aside from what it means to a lay

20   person?

21   A.  I wasn't familiar with it.

22   Q.  By entering this agreement, you also acknowledged that the

23   sentencing guidelines range was 360 months to life

24   imprisonment.

25   A.  Yes, I have said that.

1    Q.  But because of the statutory max, the stipulated range was

2    20 years, right?

3    A.  Zero to 20 years my understanding was.

4    Q.  By entering this agreement, you acknowledged that entry of

5    a guilty plea authorized the judge to sentence you up to 240

6    months' imprisonment, right?

7    A.  I didn't understand that, but I said "yes" to the question.

8    Q.  But, you wrote, you signed an agreement that said you

9    acknowledged that you would be sentenced?

10   A.  I think that's very clear.

11   Q.  This is the same agreement you were given prior to signing?

12   A.  I think that's very clear, yes.

13   Q.  I am asking you if that's true.

14   A.  Yes.

15   Q.  That was the same agreement that you signed with your name?

16   A.  Yes.

17   Q.  So you can be sentenced, according to this agreement, to

18   anything from zero to 20 years, right?

19   A.  Yes.

20   Q.  That was less than the 25 to 85 years' imprisonment that

21   you were worried about?

22   A.  Yes.

23   Q.  So, this gave you a benefit of being subject to less in

24   prison, right?

25   A.  I would be dead.  But yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.   No one forced you to sign the plea agreement, right?

2    A.   Nobody put a gun to my head, no.

3    Q.   Did anyone force you to sign the plea agreement in other

4    ways, other than putting a gun to your head?

5    A.   I was convinced that it was in my interest to sign the plea

6    agreement.

7    Q.   Thank you.  Mr. Tremonte told you that the maximum penalty

8    for this violation was 20 years' imprisonment, right?

9    A.   Yes.

10   Q.   You understood, prior to signing the agreement and prior to

11   entering a plea of guilty, that that was the maximum?

12   A.   Yes.

13   Q.   He also said that he believed that the most likely sentence

14   would be below that?

15   A.   He said I would not be sentenced anywhere near the 20

16   years.

17   Q.   He never promised you a specific sentence, did he?

18   A.   No.

19   Q.   He never said that he could guarantee a specific sentence?

20   A.   No.

21   Q.   Your plea agreement, again, said you could be sentenced up

22   to 20, right?

23   A.   I think we've established that, sir.

24   Q.   April 25, 2014 was the day you signed this agreement?

25   A.   Yes.

1   Q.  That was the same day you had a hearing in front of Judge

2   Fox, right?

3   A.  Yes.

4   Q.  Mr. Tremonte represented you at that hearing?

5   A.  Yes.

6   Q.  You were also represented that day by Justin Sher?

7   A.  Yes.

8   Q.  He was with you that day?

9   A.  I'm not sure.  I think so, maybe.

10  Q.  Is there something I could show that you would refresh your

11  recollection?

12  A.  I'll take your word for it.

13  Q.  I want to get your word on it.  Is there something I could

14  show you that would refresh your recollection?

15  A.  You can show me something that he was there.  But I believe

16  you.

17              THE COURT:  Do we care?

18              MR. BHATIA:  No, your Honor.

19              THE COURT:  That's what I thought.

20  Q.  You were under oath before Judge Fox, right?

21  A.  Yes.

22  Q.  That was the same oath you are under today to tell the

23  truth?

24  A.  Yes.

25  Q.  Under oath, you told Judge Fox that you understood what the

```
 1   indictment was alleged in Count Two?

 2   A.  I thought I did understand it.

 3   Q.  But you told Judge Fox you understood it?

 4   A.  Yes, I did.

 5   Q.  Under oath you told Judge Fox that you had a sufficient

 6   opportunity to speak with your attorney about Count Two?

 7   A.  Yes, I did.

 8          THE COURT:  Slow down.

 9          MR. BHATIA:  Thank you.

10   Q.  Under oath, you told Judge Fox that you had reviewed the

11   plea agreement with your attorney, correct?

12   A.  Yes, I did.

13   Q.  You told him that there was nothing in the agreement that

14   you did not understand?

15   A.  Yes, I did.

16   Q.  Under oath, you told Judge Fox that you were satisfied with

17   the assistance from your attorneys?

18   A.  Yes, I did.

19   Q.  Under oath, Judge Fox asked if you understood the range of

20   possible penalties that you were subjecting yourself to, right?

21   A.  I guess, yes.

22   Q.  Is that right?

23   A.  I don't remember.  But if it's in there, then it's true.

24   Q.  Judge Fox asked you again whether you were certain you

25   understood the range of penalties, right?
```

1  A.  If it's in there, it's true.  I don't remember.  But of

2  course it must be true.

3      I'm confused where you're trying to go here.

4  Q.  Let me pull up the transcript to see if -- is there

5  something I could show you that would refresh your

6  recollection?

7  A.  I take your word for it.  You have the transcript.

8      MR. BHATIA:  Can we pull up --

9      MS. KELLMAN:  For the record, the transcript is in

10  evidence.

11      THE COURT:  It says what it says.  I get the point.

12      MR. BHATIA:  Okay.

13  Q.  Judge Fox asked you if there had been any promises made to

14  you concerning your sentence, right?

15  A.  It's in the transcript.

16  Q.  When you entered your guilty plea, you knew that the

17  sentencing guidelines were one factor that a judge would

18  consider in entering your sentence.

19      You knew that the sentencing guidelines were one

20  factor that judges consider when entering a sentence?

21  A.  I was not focused on that, and I wasn't even thinking about

22  that.  I thought I had a deal.

23  Q.  But, you understood that the guidelines that were in your

24  agreement were one thing that the courts consider?

25  A.  I wasn't even thinking about it, so it wasn't a question of

1  understanding.  It wasn't on my mind.  I was unaware of it.

2  Q.  Is it your testimony you were unaware that the guidelines

3  were a factor?

4  A.  No, that's not my testimony.  I'm trying to explain to you

5  it wasn't on my mind.  I didn't think about it.

6  Q.  One more question about the plea hearing.  Are you

7  conceding that the things said in your plea hearing were all

8  truthful?

9  A.  I'm saying that --

10       MS. KELLMAN:  Objection to the form of the question.

11       THE COURT:  Sustained.  Don't answer.  Go ahead.

12  Q.  I'll ask a different question.  The transcript of your

13  sentencing proceeding accurately reflects what happened that

14  day, correct?

15  A.  Yes, I guess so, I suppose so.  Yes.

16  Q.  It reflects the questions that Judge Fox asked and that you

17  answered?

18  A.  I suppose so, yes.

19  Q.  Prior to entering a plea, you knew you had the right not to

20  plead guilty?

21  A.  Yes.

22  Q.  You knew you had the right to go to trial?

23  A.  Yes.

24  Q.  You knew that you would be presumed innocent?

25  A.  I didn't necessarily know that, but yes.

1   Q.  You knew the government had the burden of proof at a trial?

2   A.  Yes.

3   Q.  You knew that at trial you would have had the opportunity

4   to confront witnesses against you?

5   A.  Yes.

6   Q.  You could cross-examine the government's witnesses?

7   A.  I am aware of that.

8   Q.  And those included Paul Greenwood and Deborah Duffy?

9   A.  Yes.

10  Q.  There was an appeal waiver in your plea agreement too,

11  correct?

12  A.  I am aware of that, yes.

13  Q.  You were answering truthfully when you told Judge Fox you

14  were aware of the appeal waiver?

15          MS. KELLMAN:  Objection.

16          THE COURT:  Yes, ma'am.

17          MS. KELLMAN:  Your Honor, if your Honor looks at that

18  language, I think you'll see that the actual question and

19  answer are not about the defendant's waiver.

20          THE COURT:  Sustained.  Sustained.

21  Q.  You were aware that the plea agreement constricted your

22  ability to appeal?

23  A.  No, I wasn't.

24  Q.  Were you answering truthfully when Judge Fox asked you if

25  you were aware that your appeal waiver was constricted?

1           THE COURT:  Let counsel finish the question.  Repeat
2     it again, please, sir.
3     Q.  You were answering truthfully when you responded that you
4     understood that the appeal waiver constricted your ability to
5     appeal?
6     A.  As I said before, I did not understand what -- Magistrate
7     Fox said when I heard the word "appeal," I turned to
8     Mr. Tremonte, and he shook his head indicating to say yes, and
9     I did.
10    Q.  I'd like to direct your attention to the plea transcript,
11    before Judge Fox, that's Defense Exhibit 5.  In particular page
12    14.  It's your testimony, correct, that you heard the word
13    "appeal," when Judge Fox asked you a question?
14    A.  I heard the word "appeal."  Yes.
15    Q.  But it's you didn't hear the word "constrict"?
16          MS. KELLMAN:  Can I just inquire for a moment, is the
17    government now asking whether or not this witness understood
18    that he was being erroneously -- having the appellate waiver
19    erroneously explained to him as a way of suggesting that he
20    should have known it was waived completely?  I just don't get
21    what we get out of this inquiry.
22          THE COURT:  I don't think that's the question either.
23    Do you want to rephrase the question, counsel?
24          MR. BHATIA:  Yes, your Honor.
25    Q.  You heard the word "appeal," right?

```
1    A.  Yes.

2    Q.  You did not hear the word "constrict;" is that your

3    testimony?

4    A.  I didn't hear, I didn't understand anything he said.  No, I

5    didn't hear the word "constrict."

6            THE COURT:  Does the witness have the plea transcript

7    in front of him?

8            THE WITNESS:  Yes.

9            MR. BHATIA:  We pulled it up on the screen.

10           THE COURT:  That's all right.  Can you see it?

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  Go ahead, counsel.

13   Q.  You had the opportunity to ask Judge Fox any questions that

14   day?

15   A.  Yes, I did.

16   Q.  He didn't force you to give a yes or no answer?

17   A.  No, he didn't.

18   Q.  In fact, there were times when you told Judge Fox that you

19   weren't sure, right?

20   A.  Not that I recall.  Unless it's in the transcript, then I

21   guess it's so, but I don't recall that.

22   Q.  I direct your attention to page at the bottom half of page

23   15 of the same exhibit.  You told Judge fox in response to a

24   question, "I don't believe so, your Honor," right?

25   A.  Can I see the question?  I just have the answer.
```

```
 1              Okay.
 2    Q.  So you did take the opportunity to, during your plea
 3    hearing, to consult with your attorneys if you had questions,
 4    right?
 5    A.  Specifically, on the one about the appeal.  I think -- I'm
 6    not sure if there was any other one that I consulted with him,
 7    I don't think so.
 8    Q.  You -- withdrawn.
 9              You testified earlier today about the events that took
10    place at your sentencing, right?
11    A.  Yes.
12    Q.  And you eventually hired Paul Shechtman to help you?
13    A.  Yes.
14    Q.  To represent you?
15    A.  That's true.
16    Q.  Did you ever speak with Paul Shechtman about whether or not
17    to withdraw your plea?
18    A.  Yes.
19    Q.  During your sentencing, you recall that Judge Cedarbaum
20    asked you a few questions?
21    A.  Not specifically, but --
22    Q.  If Judge Cedarbaum asked you any questions, you would have
23    responded truthfully, right?
24    A.  Absolutely.
25    Q.  Is there something I could show you that can refresh your
```

1  recollection about whether Judge Cedarbaum asked you any

2  questions?

3  A.   Sure.

4         MR. BHATIA:  Can we pull up for the witness the

5  document marked as Defense Exhibit 2.

6         MS. KELLMAN:  I'm going to object to this.  I don't

7  see the relevance of any of this.

8         THE COURT:  I haven't memorized that particular

9  transcript, so I'm not sure what the questions are.  What are

10  we doing here, counsel, please?

11        MR. BHATIA:  The defendant was asked if he had read

12  the presentencing report, and the presentencing report confirms

13  many of the facts that he said he didn't understand.

14        MS. KELLMAN:  Your Honor, we'll concede he read it.

15  He read it, and his lawyer wrote a letter about it, and he read

16  the lawyer's letter as well.  We concede that.

17        THE COURT:  All right.  Go ahead, counsel.

18  Q.   In your presentencing report, the probation department

19  concluded that the loss from the offense exceeded $400 million;

20  is that right?

21  A.   I guess so.

22  Q.   You read the presentencing report, right?

23  A.   I skimmed it, yeah.

24  Q.   You told Judge Cedarbaum you had read it, right?

25  A.   Whatever I said.  If I said that, then, yes, that's -- I

1   truthfully answered at the time.

2   Q.  Judge Cedarbaum asked you if you had any objections to the

3   presentencing report, right?

4   A.  Yes.  You have the transcript.  I'm sorry, but you have the

5   transcript.

6           THE COURT:  I'm not sure we need to ask the witness to

7   recite from memory the transcript.

8           MR. BHATIA:  No further questions.

9           THE COURT:  Thank you.  Redirect?

10          MS. KELLMAN:  Very briefly, Judge.

11  REDIRECT EXAMINATION

12  BY MS. KELLMAN:

13  Q.  Mr. Walsh, you were asked a few questions on

14  cross-examination about proffer sessions that you had with the

15  government?

16  A.  Right.

17  Q.  Do you recall those questions?

18  A.  Yes.

19  Q.  Would it be fair to say that when you met with the

20  government, in September of 2009, that the purpose of that

21  proffer was limited specifically to discussing -- to a

22  discussion about your assets in connection with a bail package?

23  A.  That's correct.

24  Q.  And it was not with an eye towards cooperating with the

25  government; am I correct?

1     A.  You are absolutely correct.

2          MS. KELLMAN:  Your Honor, I'd like to offer as

3     Defendant's Exhibit 12 -- 13.  Just the following, if I may,

4     Judge.  This is an FBI 302 dated 9/15/2009.  I can put this

5     together on a separate piece of paper.  But it indicates that

6     Mr. Walsh is meeting with the government, and then it says

7     Walsh and his counsel advise the meeting would be limited to a

8     discussion of Walsh's assets in accordance with the provisions

9     of a bail package.  Period.

10    Q.  Is that what you recall?

11    A.  Yes.

12    Q.  Do you know whether or not your attorney filed objections

13    to the presentence report?

14    A.  Filed some technical.

15    Q.  Spelling mistakes?

16    A.  Well, just some technical stuff I remember.  Nothing

17    pertinent -- nothing about the numbers.

18    Q.  Government just asked you about probation's calculation of

19    the loss amount to exceed $440 million.  Do you know whether or

20    not probation does its own investigation into what the loss is?

21    A.  No, I don't.

22    Q.  Did anybody in probation ask you to explain the $440

23    million loss figure?

24    A.  No.

25    Q.  I apologize because I've called it a loss figure.  Is the

     1    $440 million a loss figure?

     2    A.  I don't believe so and I never did.

     3         MR. BHATIA:  Objection.

     4    Q.  Why not?

     5         MR. BHATIA:  Objection, your Honor.  This is a legal

     6    conclusion.

     7         THE COURT:  Sir?

     8         MR. BHATIA:  This is a legal conclusion that the

     9    defendant can't testify to.

    10         THE COURT:  Ms. Kellman?

    11         MS. KELLMAN:  I'll rephrase it.

    12    Q.  As far as you know, sir, were there any losses sustained by

    13    your investors?

    14    A.  As far as I know?

    15    Q.  Yes.

    16    A.  As of this moment, no, and didn't think so at the time.

    17    Q.  Well, 2009, would it be fair to say your investors' money

    18    was tied up in investments, correct?

    19    A.  In 2009?  Oh, when the firm was liquidated.  Yes, that's

    20    what I thought.

    21    Q.  The purpose of the liquidation was to return money to the

    22    investors, correct?

    23    A.  That's what the purpose of the -- yeah, that would be the

    24    purpose of, obviously, of liquidating the positions we had.

    25    Q.  So, investors had investments, and the purpose of the

1   liquidation was to get rid of those positions and return the

2   money to the investors, correct?

3   A.  That -- yes.

4   Q.  At the time that you met with your attorney to discuss the

5   plea agreement, the day before and the days before you actually

6   pled -- withdrawn.

7           Did you feel any pressure from your attorney about how

8   to resolve this case and whether or not to enter into the plea?

9   A.  Absolutely.  Yes.

10  Q.  How so?

11  A.  You have to take this plea.  You're going to get a good

12  result.  I already said, earlier, testified that I wanted to --

13  I told him that I could explain why I signed the notes.  And he

14  said no one would believe you.

15  Q.  And did you think that you had signed the notes for an

16  innocent purpose?

17  A.  Absolutely, yes.

18  Q.  I think I asked you this, but just in case, did you go over

19  all of the questions with Mr. Tremonte before you saw the

20  magistrate the following day?

21  A.  I don't know if we went over all of them, but it was very

22  clear, he made it very clear the way in which he wanted them

23  answered.

24  Q.  Can you share with the Court what you understood him to be

25  telling you?

1  A.  Answer in the affirmative except for when it's an obvious

2  no.

3  Q.  Did he give an example of what's an obvious no?

4  A.  Is your name Stephen Walsh.  I am not saying that's what he

5  told me.

6  Q.  Do you use drugs?  An obvious no.

7  A.  Yes, yes, an obvious no.

8  Q.  You were asked some questions in the very beginning of the

9  cross-examination about whether or not -- whether or not you

10  did work, you had a position at the New York Islanders,

11  correct?

12  A.  Yes.

13  Q.  Were you involved in any way, shape, or form at the

14  Islanders in their financial business?

15  A.  No.

16  Q.  Were you involved in any of the other financial -- any of

17  the other entities that the government described in terms of

18  their financial --

19  A.  No, I was not a numbers guy.

20  Q.  Were you ever involved in any businesses, in bookkeeping,

21  accounting, check writing, anything like that?

22  A.  No.

23              (Continued on next page)

24

25

1    BY MS. KELLMAN:

2    Q.  And I think you were asked just at the end of

3    cross-examination about your discussions with Mr. Shechtman.

4           Do you recall those questions?

5    A.  Yes.

6    Q.  Did you discuss with Mr. Shechtman the idea of withdrawing

7    your plea, the advantages and disadvantages of withdrawing your

8    plea?

9    A.  It didn't go that far.  When I met with him, he was trying

10   to determine the best course for him to take, and he wanted to

11   use his influence to first go and see if he could work

12   something with out the U.S. Attorney's Office.

13          That was what he said, that he was going to do that

14   first.  And then he was considering whether or not to ask to

15   withdraw the plea.

16   Q.  And in exchange, you retained him for $5,000; correct?

17   A.  Correct.  Yes.

18   Q.  Did Mr. Shechtman report back to you -- withdrawn.

19          Did he tell you he actually met with people at the

20   U.S. Attorney's Office?

21   A.  I'm not sure if he did or Termonte did or I found out

22   somehow another way.

23   Q.  That there was a meeting?

24   A.  Yes.  I'm pretty sure.  Yes.  I think he had two meetings.

25   Q.  As a result of those meetings, did anybody tell you -- did

1  anybody advise you that withdrawing your plea would be a

2  mistake?

3  A.  No.

4  Q.  Did you see the letter of November 4 in which

5  Judge Cedarbaum was informed that you had made a decision not

6  to withdraw your plea?

7  A.  Only after the letter had been delivered to the judge

8  without my approval.

9  Q.  I'm sorry?

10  A.  Without my approval.

11          MS. KELLMAN:  Nothing further.

12          THE COURT:  Thank you.

13          Any recross, counsel?

14          MR. BHATIA:  Very, very briefly, your Honor.

15          THE COURT:  Sir.

16  RECROSS EXAMINATION

17  BY MR. BHATIA:

18  Q.  Ms. Kellman asked you questions about one proffer session

19  you had with the government; is that correct?

20  A.  Yes.

21  Q.  You also had another meeting with the government; right?

22  A.  Correct.

23  Q.  Where you discussed WG Trading?

24  A.  Yes.

25  Q.  And you discussed situations involving Bear Stearns?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2           MR. BHATIA:  Your Honor, the government offers the

3   document marked as 1019.  It's a 302 from another meeting with

4   the government.

5           MS. KELLMAN:  Objection.  I don't see how it's

6   relevant.  The witness has just answered the question that he

7   had that second meeting, and he answered the questions about

8   the subject matter.  I don't know how the content of it is

9   relevant.

10          MR. BHATIA:  Your Honor, defense counsel introduced

11  the 302 under the idea that the defendant only spoke about his

12  assets and was not speaking about other criminal conduct.  This

13  302 makes clear that's not true.

14          MS. KELLMAN:  Actually, Judge, I only offered the

15  first page and only the portions that I read on a particular

16  date.  And I said, on that date, did you only discuss the bail

17  package?  So I was very clear about what I asked.  I only

18  offered the statement that I read.

19          THE COURT:  What's the relevance of this?

20          MR. BHATIA:  The relevance, your Honor, is that the

21  defendant testified earlier today that he never had any

22  intention of doing anything other than going to trial.

23          Maybe I'm overstating it just a bit but not by much.

24  He testified that he never wanted to do anything other than go

25  to trial until his lawyers came into the picture, and I think

1   this document shows that that's not true.

2          THE COURT:  I'll take it for what it's worth.

3   Received.

4          (Government's Exhibit 1019 received in evidence)

5          MR. BHATIA:  Nothing further, your Honor.

6          MS. KELLMAN:  Your Honor, we haven't seen that

7   document.

8          MR. BHATIA:  I'll provide a copy.

9          Nothing further, your Honor.

10          THE COURT:  Thank you.

11          Anything else?

12          MS. KELLMAN:  No, your Honor.

13          THE COURT:  All right.  You may step down, sir.

14          THE WITNESS:  Thank you, your Honor.

15          THE COURT:  Thank you.

16          (Witness excused)

17          THE COURT:  Any further witnesses?

18          MS. KELLMAN:  No, your Honor, not for the petitioner,

19   your Honor.  Thank you.

20          THE COURT:  Any witnesses for the government?

21          MR. BHATIA:  Yes, your Honor.  The government calls

22   Michael Termonte.

23          THE COURT:  All right.  Come right on up, sir.

24   MICHAEL TREMONTE,

25       called as a witness by the Government,

```
 1              having been duly sworn, testified as follows:

 2                  THE DEPUTY CLERK:  Can you please state your first and

 3      last and spell it out for the court reporter.

 4                  THE WITNESS:  Michael Termonte, M-i-c-h-a-e-l

 5      T-e-r-m-o-n-t-e.

 6                  THE COURT:  Won't you be seated.

 7                  THE WITNESS:  Good afternoon, your Honor.

 8                  THE COURT:  Good afternoon.

 9                  Counsel.

10      DIRECT EXAMINATION

11      BY MR. BHATIA:

12      Q.  Mr. Termonte, you and I have never met; correct?

13      A.  We have not.

14      Q.  You declined to meet with me and discuss your case?

15      A.  That's correct.

16      Q.  And you declined to meet with anyone from the government

17      regarding this case?

18      A.  I declined to meet with anyone.

19      Q.  Where did you go to law school?

20      A.  NYU.

21      Q.  When did you graduate from law school?

22      A.  1998.

23      Q.  How many years have you practiced law?

24      A.  Since 1998 continuously.  So 20 years.

25      Q.  And you also spent several years as an assistant
```

1   United States attorney?

2   A.  I did.

3   Q.  In the Eastern District of New York?

4   A.  In the Eastern District, yes.

5   Q.  Can you give us an estimate of approximately how many

6   criminal cases you had handled prior to 2014.

7   A.  That would be tough.  Dozens and dozens.

8   Q.  In 2014, you negotiated a plea agreement with Mr. Walsh;

9   right?

10  A.  I did.  Between the government and Mr. Walsh.  Yes.

11          MR. BHATIA:  Your Honor, I should just note one thing

12  now.  Because the defendant declined to meet with us and is

13  identified as an adverse party, we would request to lead the

14  witness.

15          THE WITNESS:  I'm not the defendant.

16          THE COURT:  Thank goodness.

17          MR. BHATIA:  We request to lead the witness.

18          THE COURT:  Any objection, Ms. Kellman?

19          MS. KELLMAN:  No, your Honor.

20          THE COURT:  Yes, sir.

21  BY MR. BHATIA:

22  Q.  When did you begin representing Mr. Walsh?

23  A.  I don't remember the precise date, but I would say a year

24  or more prior to the entry of the plea.

25  Q.  And in 2014, you were negotiating to obtain a plea

1  agreement; right?

2  A.  By early 2014, yes.  Possibly earlier.  We had extensive

3  discussions with the government about a possible resolution

4  short of trial.  I don't remember exactly when they started,

5  but certainly by January of 2014, yes.

6  Q.  The defendant was facing several counts; correct?

7  A.  The indictment -- I don't remember the precise number.

8  Five or six counts.

9  Q.  Is there something I could show you to refresh your

10  recollection about the various counts?

11  A.  The indictment would refresh my recollection.

12  Q.  Could I show you a section of the PSR that recites the

13  various counts?

14  A.  Yes.  That would work too.

15  Q.  I'd like to direct your attention to the document marked as

16  Government Exhibit 1003 and, in particular, pages 4 and 5.

17          THE COURT:  Off the record.

18          (Discussion off the record)

19          MR. BHATIA:  Let me know when you've finished reading

20  these pages.

21          THE WITNESS:  It looks like there were six counts as

22  to Mr. Walsh.

23  BY MR. BHATIA:

24  Q.  And Mr. Walsh was facing one count of conspiracy?

25  A.  That is correct.

1    Q.  And he was facing counts of commodities fraud?

2    A.  Yes.

3    Q.  And he was facing a count of securities fraud?

4    A.  Yes.

5    Q.  And the conspiracy count carries a five-year maximum term

6    of imprisonment?

7    A.  That's correct.

8    Q.  And the commodities fraud count carries a ten-year maximum

9    term of imprisonment?

10   A.  I believe that's right.

11   Q.  And securities fraud of course carries a 20-year maximum.

12   A.  Yes.

13   Q.  If the defendant was convicted of all six of the counts

14   against him, he could have been sentenced well in excess of

15   that 20 years?

16           MS. KELLMAN:  Objection.  Misstates the law.

17   Grouping.

18           THE COURT:  I'm sorry, Ms. Kellman?

19           MS. KELLMAN:  Grouping.

20           THE COURT:  Counsel?

21           MR. BHATIA:  Your Honor, I think grouping applies only

22   under the sentencing guidelines.

23           MS. KELLMAN:  It applies to what the defendant is

24   facing and how one would figure out what the defendant was

25   facing.  We just don't hand up the high numbers.

1          THE COURT:  Yes, sir.

2          MR. BHATIA:  The statutory maximum sentence that he

3    could have been sentenced to was higher than 20 years.

4    Q.  Is that correct?

5    A.  Under the original indictment with the six counts, yes.

6    Q.  You met with the government on March 3, 2014, to discuss a

7    plea agreement; correct?

8    A.  I don't remember the precise date.  We met with the

9    government multiple times, including in March.  I don't

10   remember specifically meeting on March 3.

11   Q.  Can I show you something to refresh your recollection about

12   that date?

13         MS. KELLMAN:  We'll stipulate it was March 3.

14         THE COURT:  Yes.  Thank you.

15   BY MR. BHATIA:

16   Q.  When you met with the government, you asked for a plea deal

17   that would allow Mr. Walsh to plead guilty to one count of

18   conspiracy; is that correct?

19   A.  On that occasion and on other occasions, we were trying to

20   convince the assistants to agree to a single count, yes, of

21   conspiracy with a five-year statutory maximum, the goal being

22   of course to limit Mr. Walsh's exposure at sentencing to a

23   maximum of five years.

24   Q.  The government did not agree to allow him to plead just to

25   one count of conspiracy; correct?

1    A.   They did not.

2    Q.   And you also asked them to consider at a later meeting

3    whether they would allow him to plead to only one count of

4    commodities fraud; is that correct?

5    A.   We did try.  I think it was on more than one occasion, but

6    we did try to convince him of that as well.

7             THE COURT:  Slowly.

8             THE WITNESS:  I'm sorry, your Honor.

9             THE COURT:  Not you.

10            You slow down.

11   BY MR. BHATIA:

12   Q.   You tried to get the government to agree to the lowest loss

13   amount possible; correct?

14   A.   We tried to get them to agree to a lower loss amount than

15   the number that ended up in the plea agreement.  Yes.

16   Q.   You asked them, for example, to consider only the loss

17   related to one investment rather than all of the investments.

18   A.   We tried every argument we could think of to convince them

19   that they should agree to a lower loss amount, but we succeeded

20   only in convincing them to agree to the number that ended up in

21   the plea agreement.

22   Q.   You were concerned about the loss amount because it's an

23   important part of the sentencing guidelines calculation;

24   correct?

25   A.   We were very concerned about the loss amount because under

1    the applicable provision of the federal sentencing guidelines

2    then in effect, given the loss amounts that we were discussing

3    with the government, it was difficult to imagine a scenario

4    where Mr. Walsh would not be facing a sentence that was so high

5    as to be essentially tantamount to a life sentence, given the

6    fact that he was already at that time either 70 years old or

7    close.  Yes.

8    Q.  The government did not agree to limit the loss under your

9    various ideas to the numbers you initially wanted; right?

10   A.  They did not.  They were unyielding.

11   Q.  You told the government that you were concerned about the

12   statutory maximum term; right?

13   A.  We did.

14   Q.  When you told the government that Mr. Walsh -- excuse me.

15          When you proposed a plea to only Count Three alleging

16   commodities fraud, you told the government that Mr. Walsh was

17   prepared to plead guilty; right?

18   A.  Well, we indicated that there was likely a willingness to

19   plead guilty to some plea arrangement, and we also indicated

20   that there was a greater willingness to plead guilty to a plea

21   arrangement which would cap his exposure.  And we told the

22   government that he was more likely to plead to a five-year cap.

23   When they rejected that, we said more likely to plead to a

24   ten-year cap and so son.

25   Q.  You eventually had a conversation where the government

1   proposed a plea to the securities fraud count; correct?

2   A.  At some point, yes, we did.

3   Q.  The benefit of that agreement is that it would have capped

4   Mr. Walsh's sentencing exposure at 20 years; correct?

5   A.  Would have and did.  Yes.

6   Q.  That was the count to which Mr. Walsh ultimately pled

7   guilty; correct?

8   A.  Yes.  With a 20-year statutory maximum, yes.

9   Q.  And by pleading guilty, the defendant also earned a

10  three-level reduction from his base offense for the acceptance

11  of responsibility; correct?

12  A.  I believe that's right.  I don't think that they gave us a

13  hard time over the third point.  Yes.  That's correct.

14  Q.  And that's a benefit he would have lost if he had gone to

15  trial; correct?

16  A.  Yes.  That's correct.

17  Q.  His codefendant had also pled guilty by that time; correct?

18  A.  Mr. Greenwood.  Yes.

19  Q.  Mr. Walsh could have pled guilty to the securities fraud

20  count without a plea agreement; right?

21  A.  I suppose he could have pled guilty to the indictment.  He

22  could have pled, as we say, open.  That would have been to all

23  counts.  Yes.

24  Q.  Sometimes that's called pleading pursuant to a Pimentel

25  letter?

```
 1   A.  I haven't come across that very often, but I have heard
 2   that phrase used.  Yes.
 3   Q.  But then if he had pled guilty to only the count of
 4   securities fraud, the government would not have been required
 5   to dismiss the other counts; right?
 6   A.  If he had pled guilty only to the charge of securities
 7   fraud?  I'm not sure I understand.
 8   Q.  I'll move on.
 9         Before Mr. Walsh signed the plea agreement, you spoke
10   to him about it?
11   A.  About the plea agreement?
12   Q.  Yes.
13   A.  Yes.
14   Q.  You gave him a copy of the agreement?
15   A.  Yes.
16   Q.  And you reviewed the agreement with him; correct?
17   A.  Yes.
18   Q.  You explained the terms of the agreement to Mr. Walsh?
19   A.  Yes.
20   Q.  He was released on bail at the time; right?
21   A.  Correct.
22   Q.  So you met with him in a conference room somewhere?
23   A.  We spoke to him on the phone, and we met with him in our
24   conference room.  Yes.
25   Q.  So there weren't marshals walking around?
```

 1   A.  There were not.

 2   Q.  You knew that the wording of a plea agreement is important;

 3   right?

 4   A.  I did.

 5   Q.  Based on your years of experience in criminal law?

 6   A.  Yes.

 7   Q.  And the stipulated guidelines was also important; correct?

 8   A.  Yes.

 9   Q.  The stipulated loss was important?

10   A.  Yes.

11   Q.  The number of victims was important?

12   A.  Yes.

13   Q.  You knew the appeal waiver was also an important part of

14   the agreement; right?

15   A.  Every last word in that agreement is important.

16   Q.  So you knew you had to carefully review the agreement

17   yourself?

18   A.  Yes.

19   Q.  And you carefully explained the agreement to Mr. Walsh;

20   correct?

21   A.  Yes.

22          THE COURT:  Counsel, you really need to slow down.

23   I'm going to take your script away if you don't slow down.

24          MR. BHATIA:  That's the last time you'll have to tell

25   me, your Honor.

1          THE COURT:  All right.

2    BY MR. BHATIA:

3    Q.  The plea agreement itself said that the guideline

4    sentencing range is 30 years to life imprisonment; right?

5    A.  360 months to life.  The plea agreement indicated, yes,

6    that that was the recommended sentence under the sentencing

7    guidelines.

8    Q.  And because the statutory max was 20 years, it brought the

9    stipulated guideline sentence down to 20 years; right?

10   A.  It was effectively 20 years.  Yes.

11   Q.  You explained to Mr. Walsh that the guidelines calculation

12   could influence his eventual sentence?

13   A.  Of course.  Yes.

14   Q.  You answered any questions that he had about the agreement?

15   A.  We did.

16   Q.  You never told him, I'm done answering your questions?

17   A.  No.

18   Q.  You told him that no one could predict what his sentence

19   would be within the 20-year range; correct?

20   A.  I did.

21   Q.  It could be zero.

22   A.  Yes.

23   Q.  It could be 20.

24   A.  Yes.

25   Q.  Did you ever tell the defendant that he absolutely would

1     not get a 20-year sentence?

2     A.  I did not.

3     Q.  You did tell Mr. Walsh that you did not expect he would get

4     a 20-year sentence; correct?

5     A.  I did.

6     Q.  That in your professional experience, it was likely to be

7     less than 20 years?

8     A.  Yes.  That's correct.

9     Q.  That was your best estimate that you could come up with?

10    A.  Well, I didn't give an estimate, and I was adamant with

11    Mr. Walsh, as I am with every criminal defendant, that it's not

12    up to me.  It's up to the sentencing judge.

13            What I did indicate to him, in sum and substance,

14    although I don't remember the precise words, was that it struck

15    me as unlikely under the totality of the circumstances and

16    given the arguments that we had at our disposal, given what I

17    understand about sentences in other roughly comparable cases, I

18    told him I thought it was very unlikely that he would get 20

19    years.

20    Q.  That's similar to what you told other defendants when you

21    were explaining the sentencing range in a plea agreement?

22    A.  Similar in spirit.  Every case is different, but, yes.

23    Q.  And you never promised him that he would get 20 years of

24    course; right?

25    A.  Certainly not.

1    Q.  You told Mr. Walsh that you recommended that he accept the

2    plea offer?

3    A.  Yes.  I recommended that he accept the plea offer.  That's

4    correct.

5    Q.  And that was based on your review of the evidence in the

6    case?

7    A.  That's correct.

8    Q.  You had reviewed the transcript from the Monsanto hearing

9    in this case?

10   A.  Yes, we had.

11   Q.  You had a sense of the expected testimony from Paul

12   Greenwood?

13   A.  We did.  We had much more in this case than we typically

14   have at the plea negotiation stage in terms of information

15   about who the likely witnesses were and what they were likely

16   to say because there had been this Monsanto litigation.

17   Q.  And you knew the government had copies of the promissory

18   notes that Mr. Walsh signed?

19   A.  Yes, as did we.

20   Q.  You had reviewed agreements between WG Trading and its

21   investors?

22   A.  Yes, we had.

23   Q.  You had seen copies of presentations that WG Trading gave

24   to its investors about how they only invested in index

25   arbitrage strategy; right?

```
 1   A.  Yes.

 2   Q.  And you recommended that Mr. Walsh accept the agreement, in

 3   part, because of the strength of the government's case?

 4   A.  Correct.

 5   Q.  And you also recommended that he accept the agreement in

 6   part --

 7           THE COURT:  Counsel, hand the script up here.  One

 8   more time.  I'm telling you.  You need to slow down.

 9           MR. BHATIA:  I understand.

10   Q.  Another reason that you recommended that he accept the

11   agreement was because he faced significant sentencing exposure

12   if he went to trial; right?

13   A.  Correct.

14   Q.  So if he went to trial and was convicted on all the counts,

15   he faced a wide sentencing range; right?

16   A.  Yes.  We discussed with him the difference between pleading

17   under the agreement that we eventually arrived at which capped

18   his exposure at the statutory limit of 20 years and going to

19   trial with likely very, very high sentencing guidelines where

20   his exposure was not capped at 20 years.

21   Q.  Did you ever tell Mr. Walsh that he had to accept the plea

22   offer?

23   A.  No.

24   Q.  Did you ever pressure Mr. Walsh to accept the offer?

25   A.  Certainly not.
```

1   Q.  You represented Mr. Walsh at his plea hearing and

2   sentencing; correct?

3   A.  I did, together with my partner, Justin Sher.  Yes.

4   Q.  And at both of those hearings, the defendant was required

5   to answer questions from the judge; correct?

6   A.  Correct.

7   Q.  Did you ever instruct Mr. Walsh to say that he did not

8   read -- excuse me.  Withdrawn.

9           Did you ever instruct Mr. Walsh to say he did read the

10  agreement even if he did not read it?

11  A.  No.

12  Q.  Did you ever instruct Mr. Walsh to say he understood the

13  plea agreement even if he did not understand it?

14  A.  No.

15  Q.  Did you ever instruct Mr. Walsh to say he understood his

16  sentencing exposure even if he did not understand it?

17  A.  No.

18  Q.  Did you instruct him to say that he understood his appeal

19  waiver even if he did not understand it?

20  A.  No.

21  Q.  Did you ever instruct Mr. Walsh to say anything untruthful

22  to the judges?

23  A.  Certainly not.

24  Q.  In Mr. Walsh's plea agreement, he stipulated that for the

25  purposes of the guideline sentence, the loss from the scheme

     1   was greater than $400 million.

     2          Do you recall that?

     3   A.  I do.

     4   Q.  In the PSR, the probation department also calculated the

     5   loss to be more than $400 million; correct?

     6   A.  That's my recollection.  I think the probation department's

     7   calculation -- I don't know this for a fact, but I assume that

     8   it was based on a calculation that was provided by the

     9   government.

    10   Q.  In 2014, were you familiar with the way the loss was

    11   calculated under the sentencing guidelines?

    12   A.  Yes.

    13   Q.  And you had handled other fraud cases where there was a

    14   significant loss value; correct?

    15   A.  I had.

    16   Q.  So you knew that any loss value over $400 million was

    17   treated the same for the purposes of the guidelines?

    18   A.  I take you to mean that $400 million was the outer limit

    19   under the 2B1.1 table under the sentencing guidelines.

    20          Is that what you mean?

    21   Q.  That's what I mean.

    22   A.  Yes.  $400 million was the upper limit.  If your loss was

    23   over $400 million, then you were at the far end of the table.

    24   Q.  So losses above $400 million all sort of gave the same

    25   enhancement under the guidelines?

 1    A.  It wouldn't matter -- 500, 600, 700.

 2    Q.  You testified earlier today that you had read the Monsanto

 3    hearing before recommending the plea offer.

 4              Do you recall that?

 5    A.  My testimony?  Yes.

 6    Q.  And you had reviewed bank records that were produced by the

 7    government?

 8    A.  Yes.

 9    Q.  You had reviewed the promissory notes signed by Mr. Walsh?

10    A.  Yes.

11    Q.  And you had seen the reports from the receiver in the civil

12    case; correct?

13    A.  Yes.

14    Q.  And you had seen reports of interviews with potential trial

15    witnesses?

16    A.  Yes.

17    Q.  So you knew that the receiver had reported that there was a

18    1.5 -- there were $1.5 billion in claims when the receiver took

19    over; correct?

20    A.  As I sit here today, I don't remember the precise amounts.

21    I remember reviewing the receiver's report.  What sticks out in

22    my mind is that by the time -- around the time that we were

23    negotiating the plea, we knew already that a very large --

24    roughly $800 million worth of assets had been recovered by the

25    receiver.

         1              I think it was our understanding that something like

         2   80 percent of the principal amount of all investments made

         3   during the period covered by the indictment had been returned

         4   by then.

         5              It was our understanding, I think from reviewing the

         6   reports but also from communicating with counsel for the

         7   receiver, that the receiver anticipated receiving upwards of

         8   90 percent and potentially even more than that.

         9              So that's what stands out in my mind.  Yes.  We

        10   reviewed the receiver's reports in connection with our

        11   representation, both before and after the plea.

        12   Q.  Were you aware that in the receiver's report, it says there

        13   was a shortfall when the receiver took over?

        14              THE COURT:  When the receiver what?

        15              MR. BHATIA:  When the receiver took over.

        16              THE WITNESS:  I generally recall that.  I do not

        17   recall the numbers.

        18   BY MR. BHATIA:

        19   Q.  Is there something I could show you that would refresh your

        20   recollection?

        21              THE COURT:  Counsel.

        22              MR. BHATIA:  We'll move on.

        23              THE COURT:  I'm not going to tell you again.  You just

        24   have to slow down.  You are making the reporter crazy.  Do it

        25   again.

1   BY MR. BHATIA:

2   Q.  Is there something that I can show you that would refresh

3   your recollection about what the receiver said regarding a

4   shortfall?

5   A.  There may well be.  I don't remember the specific

6   documents, but if you show it to me, I'll let you know if I've

7   seen it before.

8           MR. BHATIA:  Can we pull up for the witness the

9   document marked for identification purposes only as Government

10  Exhibit 1011, in particular, page 4.

11  Q.  I would direct you to the last paragraph.

12  A.  Is that the part beginning -- thank you.

13          So I have a distinct recollection of the

14  next-to-the-last sentence in the upper paragraph that you've

15  got isolated on the screen which reads:  "The preliminary --"

16          MS. KELLMAN:  This is not in evidence.  Nor do I think

17  it should be.

18          THE COURT:  Right.

19          THE WITNESS:  This refreshes my recollection.

20          THE COURT:  Counsel, what do you want to do?

21          MR. BHATIA:  We would offer this into evidence.

22          MS. KELLMAN:  I object.  We just don't see how it's

23  relevant.  I think we're so far afield.

24          THE COURT:  The witness is starting to say that his

25  recollection is refreshed.

```
 1          You want to ask him about what?
 2   BY MR. BHATIA:
 3   Q.  Does this refresh your recollection regarding what the
 4   receiver's report said about the shortfall when they took over?
 5   A.  It refreshes my recollection as to what the receiver said
 6   about how much money was going to be realized by the receiver's
 7   recovery efforts.  It generally refreshes my recollection that
 8   there was a discussion of a shortfall.
 9          I do not remember, as I sit here right now unaided,
10   how much of a shortfall there was according to the receiver's
11   report.  I remember there being one.  I don't remember how big
12   it was.
13          MR. BHATIA:  We can take this down.
14   Q.  You knew that the government had proof that Mr. Walsh and
15   Mr. Greenwood had signed promissory notes worth more than $553
16   million; correct?
17   A.  I remember the government having and producing to us in
18   discovery promissory notes.  From what I can recall, the notes
19   Mr. Greenwood signed totaled just shy of $300 million, and the
20   notes that Mr. Walsh signed were in the neighborhood of 240 or
21   250.  That's my recollection, 240 or 250 million.
22   Q.  In a fraud case, the sentencing guidelines loss calculation
23   is important; right?
24   A.  It is very important to the calculation of the sentencing
25   guidelines, yes.
```

1   Q.  And in Mr. Walsh's case, the loss value was a significant

2  factor driving the guidelines calculation; correct?

3   A.  It was the overwhelming factor, clearly the most important

4  factor driving the guidelines calculation.  Yes.

5   Q.  You were concerned about a high guidelines range and wanted

6  to keep it as low as possible; right?

7   A.  Yes.  We were very concerned about that.

8   Q.  And you submitted a letter -- let me walk back a second.

9      You had seen a preliminary draft of the presentencing

10  report once it had been produced?

11   A.  I think that's right.  I don't have a distinct recollection

12  of how many iterations of the PSR we saw, but I think that's

13  right.

14   Q.  Do you remember submitting a letter in response to that

15  first draft of the PSR?

16   A.  I remember that we filed objections to the PSR.  Correct.

17   Q.  One of those objections was to an enhancement related to

18  sophisticated means being used; right?

19   A.  That sounds right.

20   Q.  And you successfully convinced the probation department not

21  to recommend that that enhancement apply; right?

22   A.  I remember -- I don't remember the details specifically.  I

23  remember we convinced probation to give on some of the

24  enhancements, and I remember that we convinced the assistants

25  to change language in the plea agreement right up until the

1    11th hour in Mr. Walsh's favor.  I don't remember all the

2    specifics of what we managed to achieve, but I know that we

3    negotiated on both fronts.

4            (Government counsel conferred)

5            MR. BHATIA:  Your Honor, may I approach the witness?

6            THE COURT:  Yes.

7            MR. BHATIA:  I'm showing the defendant -- excuse me.

8    The witness -- the document marked as Government Exhibit 1023.

9            THE COURT:  Do you recognize that document?

10   BY MR. BHATIA:

11   Q.  Do you recognize this document?

12   A.  It appears to be an iteration of the document I was

13   referring to earlier as the objections that we filed to the

14   PSR.  It's not signed.  So I don't know if it's the last one.

15           MR. BHATIA:  The government offers Exhibit 1023.

16           MS. KELLMAN:  I object, your Honor.  The witness has

17   identified it as an iteration of the document he prepared, and

18   he doesn't know if it was submitted.  It's not signed.

19           THE COURT:  Counsel?

20           MR. BHATIA:  We withdraw the document.

21           MS. KELLMAN:  I didn't hear what the assistant said.

22           THE COURT:  Ma'am?

23           MS. KELLMAN:  I didn't hear what the assistant said,

24   Judge.

25           THE COURT:  He's withdrawing the document.

1           MS. KELLMAN:  Thank you.

2           (Government counsel conferred)

3      BY MR. BHATIA:

4      Q.  Did you ever tell Mr. Walsh that for the purposes of the

5      guidelines, the loss amount was so large that the precise value

6      was not important?

7      A.  Did I ever tell him -- I'm sorry?  That the loss was so

8      large that the precise amount was not important?

9      Q.  That's right.

10     A.  I don't remember saying that.  I remember saying, again in

11     sum and substance, that in my view, the government had

12     sufficient evidence to prove at a Fatico hearing that the loss

13     amount was significantly north of $400 million.

14          So in that sense, you know -- it's not that it wasn't

15     important.  It's just that they could, in my view at the time,

16     easily succeed in proving at a Fatico hearing a number north of

17     $400 million.

18     Q.  That was based on your review of the evidence in the case;

19     right?

20     A.  Correct.

21     Q.  And the evidence that you said was more than you usually

22     have in a case at this stage.

23     A.  Yes.  Again, we had the benefit of the Monsanto hearing

24     testimony.  We knew that, you know, the government's

25     characterization of the documents relevant to calculating the

1    loss amount would be corroborated by the testimony of multiple

2    witnesses with contemporaneous firsthand knowledge of the

3    events.  So, yes.

4    Q.  And it would also be corroborated by documentary evidence;

5    correct?

6    A.  Yes.

7            THE COURT:  Counsel, I'm getting out my water gun now.

8    BY MR. BHATIA:

9    Q.  And in Mr. Walsh's plea agreement, you also stipulated to a

10   certain number of victims for the purposes of the sentencing

11   guidelines; correct?

12   A.  I believe we did, yes.

13   Q.  There was an enhancement relating to having ten or more

14   victims; right?

15   A.  Yes.

16   Q.  And the probation department also found that there were ten

17   or more victims; right?

18   A.  That's my recollection, yes.

19   Q.  Was your belief -- did you believe that the government

20   could prove that there were ten or more victims at a Fatico

21   hearing?

22   A.  We did.

23   Q.  And that was also based on your review of the evidence in

24   the case?

25   A.  Correct.

1   Q.  Do you recall that at sentencing you said:  "I don't think

2   anyone expected that we would be at the outer range of the

3   hypothetical guideline sentence"?

4   A.  I do remember that, yes.

5   Q.  You said that because based --

6           MS. KELLMAN:  Objection.  He's leading, and he's

7   testifying, Judge, "You said that because."  Let him ask a

8   question.

9           THE COURT:  Counsel has been given the latitude to

10  lead.

11          MS. KELLMAN:  Understood, Judge.  First of all, this

12  witness hasn't been at all hostile to the government.  So why I

13  consented to the leading -- I don't think there's a need for

14  it.  Given the answer before he asked the question, he's a

15  lawyer.  If he's hostile, I have no objection.  But he hasn't

16  shown any hostility to the government whatsoever.

17          THE COURT:  What's the question you want answered,

18  counsel?

19          MR. BHATIA:  Whether he told Judge Cedarbaum that

20  statement, because he did not think --

21          MS. KELLMAN:  It's the "because," the explanation for

22  why he said it, providing the answer to the witness for why he

23  said it is what I'm objecting to.  Did he say it to the judge?

24  Yes.  Why?

25          THE COURT:  I've given counsel the opportunity to

1    lead.  The witness is a lawyer.  So if he doesn't like the

2    answer suggested in the leading question, he's a big boy.

3    He'll figure it out, and he will tell us.

4         Counsel, go ahead and ask the question.

5    BY MR. BHATIA:

6    Q.  When you said that to Judge Cedarbaum, did you say that

7    because going into the sentencing hearing, you hadn't expected

8    a 20-year sentence?

9    A.  I said what I said -- at that point in the sentencing

10   hearing, I uttered that sentence and a couple of other

11   sentences in an effort, put colloquially, to throw a wrench

12   into the works.

13        I did not believe at that moment that the 20-year

14   sentence that Judge Cedarbaum had imposed was fair.  Nor did I

15   believe that -- well, how to put this politely.

16        I thought at that time -- I had a very deep concern

17   that Judge Cedarbaum might not be fully in possession of her

18   faculties and able to make the fine judgments that are required

19   to determine the appropriate sentence in a case like this one

20   or, for that matter, any case.

21        So I said a number of things at that juncture in the

22   sentencing hearing to throw a wrench into the works.

23   Q.  Going into the sentence, you understood that a 20-year

24   sentence was possible; correct?

25   A.  Yes.

1    Q.  And you understood that the United States government had

2    recommended a 20-year sentence.

3    A.  Yes.  As had the probation department.

4    Q.  That's right.

5        And you understood that you had stipulated and

6    believed the government could prove a loss of over $400

7    million; correct?

8    A.  Correct.

9    Q.  And that there were more than ten victims; right?

10   A.  Yes.

11   Q.  And all of that led to a guidelines range that was, in some

12   sense, even higher than 20 years.

13   A.  Yes.  The issue was not whether or not that sentence could

14   be imposed.  Getting back to the comment that I made and my

15   explanation for it, that wasn't the issue.  Reasonable minds

16   could debate the appropriateness of such a high guideline

17   sentence under the facts and circumstances of this case.

18       What I was worried about -- the metaphor that I used

19   in discussions with people at the time was like if you're at a

20   ballgame and the umpire makes a call against your side, even if

21   it's a controversial call, you live with it.

22       But if you later come to appreciate or find out or

23   hear evidence suggesting that the umpire wasn't fully aware of

24   what was going on or wasn't fully able to appreciate what was

25   happening in front of them, that calls into doubt the

1    appropriateness of the outcome.  That's where my head was at at

2    the time.

3    Q.  Immediately after the sentencing, Mr. Walsh hired Paul

4    Shechtman to represent him, along with you; right?

5    A.  Yes.  I don't remember if it was within hours or a day or a

6    couple days.  It couldn't have been within hours because I know

7    that I was receiving emails I think from Mr. Walsh's family

8    indicating that he was speaking to a number of defense lawyers,

9    all of whom were known to me.  And Paul Shechtman was among

10   them.

11        Pretty soon after the sentencing hearing, yes.  They

12   engaged Mr. Shechtman.  That was my understanding.

13   Q.  You worked with Mr. Shechtman following the sentencing to

14   see if you could find some way to have the sentence undone;

15   right?

16   A.  Among other things.  I mean, Mr. Shechtman came in, and the

17   family was obviously distraught.  We all were.  The

18   proceeding -- the sentencing proceeding had ended but was not

19   closed.

20        It wasn't clear to any of us exactly what to make of

21   how the proceeding concluded, and we were very busy marshaling

22   resources and researching any number of issues in connection

23   with what had happened and what to do next.

24        Mr. Shechtman was brought in, as I understood it, to

25   advise generally on all of the issues that were at play at that

1   time, which were complicated.

2   Q.  You considered all the avenues that you could think of to

3   either have the plea withdrawn or to have the sentencing

4   changed somehow; right?

5   A.  That we could think of, that Mr. Shechtman could think of,

6   that the assistants could think of.  There was a very, very

7   robust conversation amongst the parties about that.  Yes.

8   Q.  You tried to get further argument -- excuse me.

9        Ultimately, you tried to get further argument on

10  sentencing; correct?

11  A.  I think that's correct, yes.

12  Q.  And the U.S. Attorney's Office consented to that request;

13  correct?

14  A.  They did.  There was some back-and-forth with the office

15  about -- I don't remember the exact details, but I think there

16  was some question as to whether or not Mr. Walsh was going to

17  move to withdraw his plea.

18       I think there was some connection in the minds of the

19  assistants between on the one hand if we moved to withdraw the

20  plea and on the other hand whether they would consent to

21  reargument.

22       I don't remember all the details of the conversation,

23  but I think at the end of the day, what we collectively

24  resolved -- and by that time, Mr. Shechtman was taking the

25  lead.

Case 1:17-cr-00548-PAC Document 661 Filed 06/20/23 Page 145 of 310

 1          What we collectively resolved was that we would not

 2   move to withdraw the plea on the one hand.  On the other hand,

 3   the government would consent to additional argument.  That's my

 4   recollection.

 5          MR. BHATIA:  Your Honor, may I have one moment?

 6          THE COURT:  Yes, sir.

 7          (Government counsel conferred)

 8   BY MR. BHATIA:

 9   Q.  Mr. Termonte, you said that after the sentencing, you had

10   discussions with various parties; correct?

11   A.  Yes.  With the client, with his family, with Mr. Shechtman,

12   and with the assistants.

13   Q.  You anticipated my next question.

14          You also spoke to the defendant about what to do next;

15   right?

16   A.  To some extent.  I don't remember the details.  I think

17   pretty much as soon as Mr. Shechtman came in, he was

18   principally responsible for communications with the family.

19          He was taking the lead in any number of respects.  I

20   don't remember exactly who I was talking to in the family.  We

21   were in communication with Mr. Walsh, but we weren't the only

22   ones at that point.

23   Q.  And you were also in communication with his family;

24   correct?

25   A.  Yes.  Again, I don't remember sort of who was in

1  communication with the greatest frequency, but, yes.  We were

2  in communication with Mr. Walsh and his family.

3  Q.  You ultimately filed a letter with Judge Cedarbaum;

4  correct?

5  A.  About what?  You'll have to be more specific.

6  Q.  You filed a letter asking for additional argument on

7  sentencing; correct?

8  A.  I believe that's right.

9  Q.  Do you know what prompted you to file that letter?

10 A.  As I said, these conversations that we were having with the

11 assistants and Mr. Shechtman.  I believe in a series of phone

12 calls and email exchanges, we were essentially discussing with

13 the assistants and negotiating with the assistants about

14 whether or not we would move to withdraw the plea, about

15 whether or not they would consent to us submitting additional

16 argument, about whether or not we were going to have meetings

17 at the office with the leadership of the U.S. Attorney's Office

18 and when.  And we were formulating a strategy for having those

19 conversations, principally between myself and Mr. Shechtman and

20 the client and his family.

21        MR. BHATIA:  Thank you, your Honor.  No further

22 questions.

23        THE COURT:  Thank you.

24        Cross-examination, counsel.

25        MS. KELLMAN:  I have a few questions, Judge, if I may.

```
 1   CROSS-EXAMINATION

 2   BY MS. KELLMAN:

 3   Q.  Good afternoon, Mr. Termonte.

 4   A.  Good afternoon.

 5   Q.  We don't really know each other.  Am I right?

 6   A.  We don't.

 7   Q.  We know who we are, but we don't know each other.

 8   A.  I know who you are, but we're not acquainted as friends.

 9   Q.  We haven't had any cases together.

10   A.  We have not.

11   Q.  You were retained in this case in or around May of 2013;

12   correct?

13   A.  That sounds right.  I don't remember the precise date.

14   Q.  And you had inherited this case after a firm in Chicago had

15   abandoned it; correct?

16   A.  I don't know that they had abandoned it.  I don't know what

17   their arrangement was.  We took over at about that time, and we

18   took over from -- I think Mr. Flessner was the lead attorney.

19   We didn't have much communication with Mr. Flessner, other than

20   to demand documents from him which --

21   Q.  Which you didn't get?

22   A.  I don't know that he ever produced them.

23   Q.  Now, would it be fair to say that from the time you were

24   retained in May, for the next several weeks and months, that

25   you were in regular communication with the Flessner firm,
```

1    either via emails or writing, demanding that they turn over the

2    discovery?  Am I right?

3    A.  Someone at my firm was.  Yes.

4    Q.  And you were trying very hard to get your hands on the

5    discovery so that you could learn about the case; correct?

6    A.  Correct.

7    Q.  Did you know that there had been a Monsanto hearing that

8    involved Flessner and his firm?

9    A.  I did.

10   Q.  And did you, at the time you were retained, have a copy of

11   the minutes from that hearing?

12   A.  I don't remember when we got the minutes.  My general

13   recollection is that we had the minutes before we got the

14   discovery which eventually came not from Mr. Flessner's firm

15   but from the government.

16   Q.  So in fact, the Flessner firm basically never turned over

17   the discovery to you; correct?

18   A.  I think they turned over one or two redwells.

19   Q.  And they were, if I remember correctly, approximately 87

20   gigabytes of data there?

21   A.  There was an awful lot of discovery.  I don't remember the

22   number.

23   Q.  Do you remember representing to Judge Cedarbaum that it was

24   in excess of 87 gigabytes or over a million pages?

25   A.  I don't remember in particular.  We represented that it was

```
 1   a very, very large amount of discovery.

 2   Q.  Over the course of the next several months -- meaning

 3   September, October, November -- you eventually got what you

 4   believed to be the bulk of the discovery from the government.

 5   Correct?

 6   A.  My understanding is we got all of it.  I don't remember the

 7   precise sequence, but the government produced, to my memory --

 8   they produced in tranches.  I don't know if we contracted or if

 9   Mr. Walsh contracted, but we engaged a vendor.  And we began up

10   loading and sorting the weeds from the chaff, yes.

11   Q.  And would it be fair that once you had all the discovery,

12   you then sent it to get digitized?

13   A.  Before we had it all.  Like I said, I think it came in

14   tranches.  But, yes.  And not all of it.  There are categories

15   of discovery that you can only deal with in a digitized way.

16           I think a very substantial component of the discovery

17   was trading records.  It wasn't really clear how useful they

18   would be.  But nevertheless, we had those uploaded because it's

19   otherwise impossible to go through them.  I don't know that we

20   digitized like the 302s or hearing transcripts.

21           MS. KELLMAN:  May I have just a moment, Judge.

22           (Defense counsel conferred)

23           MS. KELLMAN:  May I have just one minute, Judge?

24           THE COURT:  Yes, ma'am.

25   BY MS. KELLMAN:
```

```
 1   Q.  Do you recall that there was a hearing in or around

 2   February of 2014 before Judge Cedarbaum?

 3   A.  That sounds right.  I don't remember the precise date.

 4   Q.  Will you take my representation that there was such a

 5   status conference on February 5, 2014?

 6   A.  I've heard lawyers ask questions that way.  I'm inclined to

 7   believe you if you tell me that.  I don't remember it.

 8   Q.  Do you want me to show you the transcript?

 9          MR. QUIGLEY:  We'll stipulate that there was a

10   February 5 status conference.

11          THE COURT:  Thank you.

12   BY MS. KELLMAN:

13   Q.  In preparation for that conference, did you also write

14   Judge Cedarbaum a letter on February 3 of 2014?

15   A.  I expect we did.

16   Q.  And in that letter, did you tell Judge Cedarbaum, among

17   other things, that you have a firm trial date in several other

18   cases that were interfering with your ability to deal with this

19   case exclusively?  Correct?

20   A.  That sounds right.

21   Q.  And that in fact, you had a civil case in New York State

22   Supreme Court I believe in January; correct?

23   A.  Again, it sounds right.  I don't remember the details.

24   Q.  Do you remember telling Judge Cedarbaum in February --

25   withdrawn.
```

1   A.   We were trying to get Judge Cedarbaum to give us more time.

2   Yes.

3   Q.   I'm trying to get to why.  So please bear with me.

4   A.   Okay.

5   Q.   Do you recall telling Judge Cedarbaum at that February

6   conference that in fact you hadn't really gotten all the

7   discovery together until the end of December?

8   A.   That sounds right.

9   Q.   And that you hadn't really had a chance to review it

10  because it was coming in in different tranches and ultimately

11  had to be digitized by this one company?

12  A.   That is correct.

13  Q.   And that you ultimately got it at or around the end of

14  December, but then you were starting a January trial in

15  New York County, a civil trial.  So you were preoccupied with

16  that preparation in December.  Correct?

17  A.   It sounds right that we told her that.  Yes.

18  Q.   And I assume if you told her that, it was true.

19  A.   I actually don't think that trial went forward, but at the

20  time that we said it, it was certainly true.

21  Q.   In February when you were before the court, you said at

22  page --

23          I'm reading off the minutes, your Honor, from the

24  February 5, 2014, status conference.

25          THE COURT:  Go ahead.

1          MS. KELLMAN:  Just to read from it.

2     Q.  On the third page at line 23, you said:  "We had a trial,

3     as I detailed in my letter in December.  December was going

4     into early January.  We're working very hard, as we have since

5     we were engaged in this case."

6          But you had this trial, this other trial.  Correct?

7     By February you knew if you had the trial or not; correct?

8     A.  I don't recall, but if I said it, it was true.

9     Q.  And you also told Judge Cedarbaum that you couldn't really

10    focus on this case the way you needed to in February because

11    you had two very firm trial dates in the Southern District

12    before Judge Crotty and Judge Forrest and that was going to be

13    taking all of the firm's time and resources until those two

14    trials were over.  Correct?

15    A.  Those were my trials, my time.  Yes.

16    Q.  And my client hired you; correct?

17    A.  Your client hired me and Justin and our associates.  Yes.

18    Q.  So you weren't able to work with him until sometime after

19    April because you were otherwise occupied.  Is that fair?

20    A.  I was definitely distracted with other things, but I and my

21    colleagues worked continuously on his case from the beginning.

22    Q.  Now, when you complained to Judge Cedarbaum that you needed

23    more time because you had not yet had a chance to review the

24    discovery, she said to you, well, you've seen the Monsanto

25    minutes; correct?  And you know all about the case.

1           Isn't that right?

2    A.   That sounds right.  I don't remember specifically.

3    Q.   And didn't you tell the judge in response to that that

4    in fact you didn't have the important things that you needed

5    like impeachment material; that there was no cross-examination

6    in the Monsanto hearing?

7    A.   That sounds right.

8    Q.   So this is as of February, you are just coming off -- you

9    get the discovery finally organized by the end of December.

10   January you're in trial in Manhattan, and now this is the

11   beginning of February, and you still haven't had a chance to go

12   through anything except the Monsanto hearing which you yourself

13   say is insufficient to get a handle on the case because you

14   didn't have the documents you needed.  Correct?

15   A.   I think that's generally right with qualifications.  I

16   think you're suggesting that we didn't go through anything

17   other than the Monsanto hearing which is just not right, and

18   although --

19   Q.   Isn't that what you told Judge Cedarbaum?

20   A.   If I could finish.

21          Although I was distracted -- I think the first one

22   went before Judge Forrest, but the second one before

23   Judge Crotty did not.  I had colleagues and another partner who

24   was working on the case.

25   Q.   Which partner was working on the case?

1   A.  Justin Sher.

2   Q.  Did he meet with my client?

3   A.  I'm sure he did.  I don't remember it specifically.

4   Q.  You don't know?

5   A.  I don't remember.

6   Q.  And you were on trial during April -- correct? -- in the

7   Judge Forrest case?  That's what you told Judge Cedarbaum, that

8   that was a firm trial date.  Correct?

9   A.  I don't remember if I was on trial or not.

10  Q.  I have yet another unnumbered page in the transcript.  I'm

11  reading from the top:  "Mr. Termonte, it's very rare in my

12  experience that all cases that are scheduled for trial in fact

13  go to trial."

14          At line 4:  "Mr. Termonte:  These too.  We are

15  contrary confident that they will.  They have been adjourned

16  before.  Judge Forrest and Judge Crotty have both made it very

17  clear that they will not permit another adjournment."

18          Did you say that to Judge Cedarbaum?

19  A.  It sounds right, but I still don't remember whether or

20  not -- I know that a trial before Judge Forrest went forward.

21  I don't know if it was that one.  And the trial before

22  Judge Crotty did not.  It resolved.

23  Q.  Now, in your February letter to Judge Cedarbaum, one that

24  preceded this status conference, you explained to the judge all

25  the difficulty that you had getting the discovery from the

1   Flessner firm; correct?

2   A.   I know that we did describe to Judge Cedarbaum in letters

3   and in open court the difficulties we had with obtaining

4   discovery from Mr. Flessner's firm.   Yes.

5   Q.   Did you tell Judge Kram --

6   A.   I've never been before Judge Kram.

7          THE COURT:   That's because you're not old enough.

8          MS. KELLMAN:   But I started when I was nine, just to

9   be clear.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Did you tell Judge Cedarbaum, in your letter of February 3:

2    As the foregoing detailed description of our efforts to obtain

3    and organize the discovery show, we did not possess a complete

4    set of the files necessary to defend Mr. Walsh until November,

5    and could not begin to review them until late December of 2013.

6    For all practical purposes, we have not had access to the

7    discovery -- we only had access to the discovery in this case

8    for one month.

9            Does that sound right?

10   A.  It does.

11           THE COURT:  I'm going to get my water gun out for you

12   too, soon.

13           MS. KELLMAN:  I caught myself, you saw that.

14   Q.  And you further told her that, moreover, because we have

15   not had a firm trial date in the Walsh trial, that you set up

16   other trial dates, before and after, correct?

17   A.  Again, it sounds right.

18   Q.  You were trying a seven-day jury trial in New York County,

19   Mitzner v. Pauline Power?

20   A.  I actually don't remember the case.

21   Q.  You won it apparently.  You don't even remember?

22   A.  Well, is that a question?

23           MS. KELLMAN:  Your Honor, I offer the February 3

24   letter.

25           THE COURT:  Any objection, counsel?

1        MR. BHATIA:  No objection.

2        THE COURT:  Received.

3   Q.  Would it be fair to say that sometime after that conference

4   with Judge Cedarbaum --

5   A.  Which one?

6   Q.  I'm sorry?

7   A.  Which one?

8   Q.  The February conference with Judge Cedarbaum, the one we've

9   just been talking about, you began discussing -- withdrawn.

10       That you told Judge Cedarbaum during the course of

11  this conference that, in all reality, it was going to be

12  difficult for you to focus on this case in terms of the

13  discovery and trial preparation until after the April cases

14  were resolved, correct?

15  A.  Again, it sounds right.

16  Q.  Okay.  So, would it be fair to say that in and around early

17  March, you approached the government with respect to a

18  potential guilty plea for your client, correct?

19  A.  Yeah, not quite.  I mean, the government had approached us,

20  substantially earlier than that.  I think at the time, I don't

21  remember when John O'Donnell, who was the lead AUSA at the time

22  that my firm was engaged, I don't remember when he first raised

23  it.  But I remember him raising it early and often.  I remember

24  help raising the possibility of a reverse proffer.  I remember

25  him suggesting, as is not uncommon, that we discuss a

1  resolution.  I don't remember when those discussions began in

2  earnest.

3  Q.  Would it be fair to say that you have characterized, you

4  characterized to the government that you believe that your

5  client was in denial?

6  A.  When?

7  Q.  When you tried to talk to him about a guilty plea?

8  A.  In denial about what?

9  Q.  I don't know.  I'm asking you if you used the term "my

10  client is in denial" when you began to have discussions with

11  the government about a guilty plea.

12  A.  I don't recall saying that, but it's certainly possible.

13  Q.  You testified on direct examination that, in your view, the

14  government had sufficient evidence to prove the loss in this

15  case.  Correct?

16  A.  I think what I said on direct was that, in my view, the

17  government had ample evidence, more than enough, to prove at a

18  Fatico hearing a loss amount in excess of $400 million, yes.

19  Q.  And actually, you said "sufficient," because I wrote it

20  down.

21  A.  Okay.

22  Q.  But, why are you talking a Fatico hearing which is

23  something that happens after a plea.  Would it be fair to say

24  that up until that February conference, you had never had a

25  conversation with Mr. Walsh about anything other than a trial?

1    Am I right?

2    A.  I'm sorry, could you ask that again?

3    Q.  Yes.  Would it be fair to say that before this February

4    conference, that you had had no conversations with Mr. Walsh,

5    other than how to prepare and proceed to trial.  Correct?

6    A.  I don't have a clear recollection.  But it would be

7    extremely unusual for me to get involved in a case and not talk

8    about anything other than trial for the first six months of the

9    representation.  I don't think that's ever happened.  But I

10   don't remember clearly here.

11   Q.  When was the -- can you think of another case where you

12   didn't have any discovery or any information about the case,

13   for six months?

14         MR. BHATIA:  Objection, your Honor.  Mischaracterizes

15   the prior testimony.

16         THE COURT:  I'll permit it.  You may answer, sir.  Do

17   you need it again?

18         THE WITNESS:  I think I get the gist of the question.

19         THE COURT:  Go ahead.

20   A.  I can think of lots of cases where I had a whole lot less

21   in terms of a detailed understanding of what the government's

22   theory and proof were.  As I said before, as you know, we had

23   the transcript of the Monsanto hearing, which, although no

24   substitute for discovery, it is more than I think I've ever had

25   before in terms of information about the government's theory,

Case 1:10-cr-00654-PAC Document 661 Filed 03/30/2025 Page 205 of 310

 1  the evidence that it intends to put on, and how it was going to

 2  prove its case.  It's very unusual, as you know, it is a very

 3  unusual circumstance.

 4  Q.  Really.  So in six months' time, you've never had a case

 5  where you've had this much information about a case before you

 6  got the discovery.  You never learned as much in a case in six

 7  months as you learned in this case in six months?

 8  A.  I don't think I said that.  What made this case unusual is

 9  there had been essentially a kind of mini summary version of

10  the government's anticipated proof at trial, at a pretrial

11  hearing.  That's very unusual.

12          I looked at this issue in connection with another case

13  recently.  I think the number of Monsanto hearings that have

14  been conducted in this circuit until very recently was like in

15  the single digits.  So it is a very, very rare occurrence that

16  you have that kind of information about how the government is

17  going to try its case.

18  Q.  Is that an expression you often use, "single digits"?

19  A.  I'm sorry, I don't understand what you mean.

20  Q.  You just said the number of cases would be in the single

21  digits.  Is that an expression you use with some frequency,

22  "single digits"?

23  A.  No, but that's my understanding of how many Monsanto

24  hearings have been in the Second Circuit.

25  Q.  Did you explain, however, to Judge Cedarbaum how

1   insufficient the minutes were when she raised to you the

2   possibility that you could bring yourself up to speed by

3   reading the Monsanto minutes, and you told her that it didn't

4   have impeachment, which was important, correct?

5   A.  Sure, yes.

6   Q.  And it didn't have any cross-examination, correct?

7   A.  Yeah, I mean, I meant what I said.  We couldn't go to

8   trial, we couldn't prepare for trial adequately with just the

9   minutes of the transcript of the Monsanto hearing.

10  Q.  Would it be fair to say you couldn't make a decision as to

11  whether or not trial would be an appropriate modality until you

12  had a chance to look at the discovery?

13  A.  I would want to look at the discovery before making that

14  decision, yes.

15  Q.  As of the end of -- as of the February conference, before

16  Judge Kram -- God, I'm so sorry.  Before Judge Cedarbaum, you

17  had not had an opportunity to fully review the discovery, or in

18  any meaningful way to review the discovery, correct?

19  A.  Until we started getting the rolling production, we were

20  not in a position to evaluate discovery.  We didn't have it.

21  Q.  That's not what you told Judge Kram.  You told her, as the

22  rolling discovery came in, it was being sent to another company

23  to digitize it, and it wasn't until the end of December that

24  you were finally in possession of all the discovery.  Correct?

25  That's what you told her.  I know you weren't under oath.

1    That's what you told her, correct?

2    A.  Here's what I remember.  It sounds right.  I don't have the

3    minutes in front of me.  But, the reality was, we had the

4    Monsanto transcript, and then we started to get the discovery

5    on a rolling basis.

6          As I remember it, and I wasn't deeply involved in the

7    technical details, but we got CDs in tranches, three, four,

8    five CDs at time.  As we got them, we tried to determine what

9    was on them and what we could review in-house ourselves review

10   quickly.  Obviously, we were not convinced at the time that we

11   had a lot of time.  We were engaged in an effort to try to

12   convince Judge Cedarbaum to give us more of it.  But we

13   reviewed what we were able to review, and what we couldn't

14   review ourselves, we sent off to the vendor, and that was that.

15   Q.  What documents were you able to review that suggested to

16   you or made you feel comfortable with the number of 440 million

17   in losses?  What made you agree to that number?  What documents

18   had you seen that supported that number?

19   A.  Yeah, I don't remember everything that we looked at.  As I

20   recall, there were various categories of evidence that bore on

21   that question.  The question of the magnitude of the loss

22   amount that the government could prove.

23   Q.  What did you look at in the discovery?

24   A.  I'm answering the question.

25          So, there were the promissory notes, we had those

1     early on.  Those indicated that there was a number attributable

2     to Mr. Walsh in the 240 to $250 million range.  There was a

3     number attributable to Mr. Greenwood in the 290 to $300 million

4     range, and our understanding, based on review of other

5     documents, was that those promissory notes represented an

6     amount of money that either made its way directly to Mr. Walsh

7     and Mr. Greenwood, or had been expended in the form of

8     expenses, or had been lost in connection with certain

9     investments that weren't disclosed to investors.  And so our

10    understanding in connection with just the promissory notes, if

11    memory serves, was that the government could calculate loss

12    amount based on those alone.  So that was one.

13         We reviewed the 302s of the interviews of the

14    government's cooperating witnesses and the various witnesses

15    that the government had interviewed in connection with its

16    investigation.

17         We reviewed the receiver's report, the receiver's

18    reports and the documents associated with those reports.  Those

19    were, from the perspective of calculating loss amount, scary

20    documents.  The receiver had, by the time we got involved,

21    calculated numbers well in excess of a value of the promissory

22    notes as a potential loss amount.

23         And we reviewed documents in connection with any

24    number of investments that Mr. Walsh had been involved in, in

25    one capacity or another, that were unauthorized investments,

Case 1:15-cr-00643-PKC Document 601 Filed 02/07/25 Page 209 of 310 164

1     right.  So if you look at the -- in the discovery, we got all

2     of them.  If you look at all the investment agreements that

3     were provided to the investors, those investment agreements

4     said basically you can do A, B and C with my money.  There were

5     documents that we reviewed in connection with investments that

6     were not A, B and C.  I don't remember all of them, but

7     specifically I remember three categories of.

8            One, the Signal Apparel investments; two, the Orion, I

9     think it was a financial services firm of some kind

10    investments; and then the third category was real estate

11    investments.  There were others, I just can't remember them off

12    the top of my head.

13           If you added up those numbers, based on the documents

14    that we looked at, just pertaining to the unauthorized

15    investments, forget the promissory notes, forget the receiver

16    reports, I don't remember the exact numbers, but you could come

17    up with something like 200 million on Signal, 200 million on

18    Orion, and a couple 10 million on the real estate investments.

19           So, from the perspective of thinking how the

20    government was going to argue loss amount, there were any

21    number of ways that they could have gotten to over 400 million.

22    If they just focused on the unauthorized investments, they were

23    over four.  If they just focused on the promissory notes, they

24    were well over five.  If they used the methodology employed by

25    receiver report, you were in a much bigger number than that.

1    And then, the most worrisome of all, when we did the

2  math after looking at the statements, the most worrisome of all

3  was if you accept the proposition that misrepresentations were

4  made to basically every investor over a 10-year-plus period,

5  then arguably every dollar that comes in is factored into the

6  loss amount calculation under the guidelines without any

7  reduction for amounts that go back.  Now, in my view, that's

8  utterly perverse, but that's how the guidelines work.

9    Those are all least four that I remember off the top

10  of my head ways that the government could, in my view, could

11  easily gotten into a loss amount well north of 400 million.

12  Q.  These were facts that were not known to you before

13  February 5, correct.  That's what you told Judge Kram --

14  A.  No, didn't tell any judge -- hold on.  I accurately

15  represented to Judge Cedarbaum that, if we were going to trial,

16  that was not something that we could do without looking at

17  discovery, that the discovery was voluminous, and that we

18  didn't have it, and we needed more time.  Full stop.  Okay.

19  And the categories that I just described to you, I did not know

20  nearly as much about them before I got the discovery, as I did

21  afterwards.  But --

22  Q.  You got the discovery?

23  A.  And we reviewed it and those were the conclusions that we

24  came to.

25  Q.  Did you discuss those with your client?

1   A.  Yes, we did.

2   Q.  You said that you couldn't have known --

3   A.  We also discussed, by the way --

4   Q.  Excuse me, I'm asking a question.

5   A.  Okay.

6   Q.  You said you couldn't have come to these conclusions

7  without reviewing the discovery, which you concede you didn't

8  get to look at before December, because you didn't have it

9  until December?

10  A.  Correct.  You could not evaluate the government's

11  characterization of the proof at the Monsanto hearing fully

12  without benefit of additional materials, which we did get.

13  Q.  So you had to rely on the government's representations, for

14  example, you had to rely on the government's representations

15  that anybody was being defrauded.  Because you didn't have any

16  documentation to back that up, correct?

17  A.  Before we got the discovery, correct.  After we got the

18  discovery, we did.

19  Q.  I'm talking about before you got the discovery.

20  A.  Okay.

21  Q.  I'm talking as of February when you still hadn't had a

22  chance to evaluate the discovery.

23       By the way, all the things you just recited in your

24  answer, I assume that you took notes as you went through the

25  discovery.  Or did you memorize all this?

 1    A.   No, I mean, I don't know, I'm not a big note taker.  I tend

 2    to type things and work them up into memos and stuff.  But I

 3    wasn't the only one.

 4    Q.   Did you produce them to the government?

 5    A.   Did we produce them to the government?

 6    Q.   That was the question.

 7    A.   We certainly never gave any of our work product to the

 8    government.

 9    Q.   The government asked you for certain documents, didn't

10    they?

11    A.   No.

12    Q.   I'm asking you to produce any memos you have with the

13    discovery that you reviewed before March 1st of 2014.

14    A.   Understood.

15    Q.   You've characterized this $440,000 --

16            THE COURT:  Million.  Million.

17    Q.   Sorry, Judge.  Million as loss, correct?

18    A.   Hold on a second.  I think you're talking about the $440

19    million number that's stipulated to in the plea agreement.  Am

20    I right about that?

21    Q.   Correct.

22    A.   Okay.  That is the loss amount.  And you asked me questions

23    about what I reviewed that suggested to me that the government

24    could prove that loss amount.

25    Q.   You've already answered that question.  Now I'm asking you

1   a different question.

2   A.  Okay.

3   Q.  I'm asking you why you think that was a loss.

4   A.  Why do I think it was a loss?

5   Q.  Other than the government telling you it was a loss, what

6   makes you think it was a loss?

7   A.  Sure.  If you look at the investor agreements, as we did,

8   once we got them in discovery.

9   Q.  So as of the time you were negotiating the plea, you had

10  not looked at these things, correct?

11  A.  No.

12  Q.  You started negotiating the plea a week after you saw the

13  judge, and you told the judge you hadn't looked at it?

14          MR. BHATIA:  Objection, your Honor.

15          MS. KELLMAN:  Can I finish my question?

16          THE COURT:  Yes.

17  Q.  Are you saying you were able to review 87 gigabytes of

18  material in that one week?

19  A.  No, I'm not.

20          MR. BHATIA:  Your Honor, we are asking that the

21  witness be allowed to finish the end of his answers.

22          THE COURT:  Sure.

23  Q.  When you were negotiating this plea with the government,

24  and agreed to stipulate to a guideline range of 360 to life,

25  you felt confident that your client couldn't do that because,

1   one, he either wouldn't live that long, or the statute capped

2   it at a measly 20 years, correct, so he was safe.  Correct?

3   A.  No.  He was not safe.  He was unfortunately facing the

4   prospect of a potential 20-year sentence.  And we were doing

5   our level best, under the circumstances and given the evidence,

6   to avoid that.

7   Q.  Would it be fair to say you characterized the potential

8   exposure that Mr. Walsh faced to him as being a single digit

9   kind of risk?

10  A.  What I remember telling him was that if he got a sentence

11  in the five-to-seven-year range, that would be a home run.

12  Q.  Does the name Sickler mean anything to you?

13  A.  It does.

14  Q.  Who is Mr. Sickler, Joel Sickler?

15  A.  He is a bureau of prisons consultant.

16  Q.  Did your firm consult with Mr. Sickler in connection with

17  potential designations for Mr. Walsh?

18  A.  Yes, I believe that Mr. Walsh -- one of us did.  Either the

19  firm did or Mr. Walsh did I think Mr. Walsh did.

20  Q.  Mr. Walsh did what, consult?

21  A.  Engaged him.  Engage his services.

22  Q.  Do you know whether or not it was in fact your partner

23  Justin Sher who retained?

24  A.  It may have been, I don't remember.

25          MS. KELLMAN:  Your Honor, may I approach?

```
 1            THE COURT:  Yes, ma'am.

 2            MS. KELLMAN:  Showing the witness an e-mail between

 3   Justin Sher and Joel Sickler.

 4            I believe this is in evidence, Judge.

 5   Q.  I'd like you to take a look at that and see if it refreshes

 6   your recollection that it was Justin Sher who engaged the

 7   services of Mr. Sickler.

 8   A.  I don't think I'm on this e-mail.

 9   Q.  But you can read your client's name -- I mean your

10   partner's name?

11   A.  It suggests to me very strongly that Justin engaged him,

12   yes.

13   Q.  Who was taking lead on this case during the negotiating

14   stages, you or Mr. Sher?

15   A.  I think we were both quite involved, but I think it's fair

16   to say I was taking the lead.

17   Q.  Was Mr. Sher present at any of the negotiations with the

18   government?

19   A.  He was.

20   Q.  Would it be fair to say that when a law firm has

21   discussions with the jail expert, a BOP expert in designations,

22   that it would make sense to give this expert a sense of what

23   kind of a sentence you might be anticipating, so that he could

24   gear his research to the amount of time the person might be

25   facing, correct?
```

1    A.  Yeah, as I remember --

2    Q.  Yes or no?

3    A.  Yes.

4    Q.  It is a yes or no question.

5    A.  Sure.

6    Q.  You agree with me, for example, if somebody was facing

7    mandatory life, and there was not much choice the judge had,

8    that you'd ask this expert to look at the best penitentiaries

9    for your client, based on whatever personal circumstances that

10   person had, correct?

11   A.  That is correct.

12   Q.  So there would be a relationship in your request between

13   that time which your client was facing, and the kind of

14   institution that might reasonably be recommended for a

15   designation, correct?

16   A.  Yeah, I think that's the purpose of engaging them.  They

17   know that world, and you give them information, and they make

18   suggestions.

19   Q.  And the information you give them is based on what you

20   hope, anticipate, expect, the sentence to be, correct?

21   A.  Look, as I recall, Mr. Sickler reviewed the PSR, he

22   prepared a memo, which indicated that he had reviewed the PSR

23   with Mr. Walsh, and he indicated that there were three, in his

24   view, likely outcomes.  One -- if I remember off the top of my

25   head, 24 to 36, I think there was a comment in his report to

1     the effect we would have to be extremely lucky for that to

2     happen.  Another range in the north of 36 months to like 50

3     months or something like that.  And then 120 months.  And then

4     there's a comment, if I remember the report correctly, saying

5     we really have no idea, it's up to the judge, we are basically

6     looking at a crystal ball, but we're going to use these three

7     basic ranges.  A low end of two to three years, a middle single

8     digits range, and a 10-year range, because that put Sickler in

9     a position to propose potential BOP facilities, which, as I

10    understand it, you qualify for some if you are in the low

11    range, you qualify for others if you are in the middle range,

12    and if you're over 10 years, there's a different set of options

13    available to you.

14    Q.  So if I understand your testimony, Mr. Sickler had an

15    opportunity to review the presentence report, which recommended

16    a 20-year sentence, correct?

17    A.  It's in his report that he reviewed the PSR, yes.

18    Q.  You just said he reviewed the presentence report.  Are you

19    now saying you don't know whether he did or not?

20    A.  I was not with him when he did his analysis.

21    Q.  Do you think he was lying to you when he told you that?

22    A.  I just have the benefit --

23    Q.  Mr. Tremonte, a moment ago you testified that before he

24    gave you these recommendations, he read the presentence report

25    and discussed it with Mr. Walsh.

1   A.  No.

2   Q.  Do you now say --

3   A.  We are not having a real disagreement.  What I am saying is

4   the report he prepared -- I don't remember talking to the man.

5   The report that he prepared said that he reviewed the PSR in

6   connection with his analysis.

7   Q.  And I am asking you then, did the PSR, am I correct the PSR

8   recommended a 20-year sentence?

9   A.  The PSR -- again, I don't have it in front of me.  The PSR

10  says his sentencing range is zero to 20.  The PSR says that his

11  guidelines range is effectively zero to 240 months, and the PSR

12  says, again, if memory serves, you can show it to me,

13  probation, like the government, recommended a guideline

14  sentence.

15  Q.  That's what I asked you.  That's all I asked you.

16  A.  Yes.

17  Q.  So, as a result of reading the probation report and

18  determining that the probation department and the government

19  were recommending a 20-year sentence, Mr. Sickler provided --

20  who is Valerie by the way?

21  A.  An associate.  Valerie Gotlib.

22  Q.  Was an associate of your firm?

23  A.  Was.

24  Q.  And so Mr. Sickler wrote a letter, an e-mail to Valerie and

25  Justin, about this very topic, and that was what institutions

1    as a result of reading the probation report, and hearing that

2    there was a 30 year -- a 20-year recommendation, wrote and said

3    the following:

4            If the sentence is less than 24 months, please ask the

5    Court to recommend the satellite facility at FCI Otisville.

6            Was there anything in the presentence report that you

7    recall spoke to a 24-month sentence?

8    A.  Only in the sense that he has a guidelines range.  We asked

9    for a 24-to-36-month sentence in our sentencing submission.  It

10   was clearly something that we were determined to do in

11   consultation with the client, was seek a sentence that was way

12   below the 20-year recommendation of the probation department.

13   Q.  But you didn't say that he looked at your sentencing memo.

14   You said that, after looking at the presentence report, and the

15   government's recommendation, that he would then formulate

16   recommendations.  And he recommended, after looking at a

17   20-year recommendation from probation and the government, he

18   recommended if the sentence is in the 24-month range, ask for a

19   recommendation of the satellite camp at Otisville.  If it is

20   between 24 and 42 months, then ask for a designation at the

21   satellite camp at USP Lewisburg.  If it is greater than 42

22   months, well, then go back to your request for the satellite

23   camp at Otisville.

24   A.  So what's the question?

25   Q.  Do you recall whether or not that's what Mr. Sickler wrote

1     to your firm in connection with his recommendations?

2     A.  I don't, although it sounds generally correct to me.

3            MS. KELLMAN:  May I approach, your Honor?

4            THE COURT:  Yes, ma'am.

5     A.  Yeah, again, I'm not on this e-mail, but this sounds like

6     what I heard at the time.  Which was Mr. Sickler was offering

7     recommendations, had been engaged to make recommendations, and

8     he took it upon himself, based on the information that was

9     available to him and the conversations that he had with our

10    client, Mr. Walsh, to make recommendations on three different

11    categories.  It looks like number one is if the sentence is

12    less than 24 months --

13    Q.  I just read them all.

14    A.  Okay.

15    Q.  You say that you're not on this e-mail.  But this is Justin

16    Sher's e-mail address; am I correct?

17    A.  That's entirely consistent --

18    Q.  This is your firm?

19    A.  If I can finish.  It's entirely consistent with my

20    understanding of what Mr. Sickler was saying at the time.

21    Q.  I am not asking you that.

22            MR. BHATIA:  Objection, your Honor.

23    Q.  I asked about an e-mail address.

24            THE COURT:  Stop.  Stop.  Question.

25    Q.  Is this Mr. Sher's e-mail address?

1    A.  It is.

2    Q.  Is it Valerie Gotlib's e-mail address?

3    A.  It was.

4            MS. KELLMAN:  I'd offer it, your Honor.

5            MR. BHATIA:  It's already in evidence, your Honor.

6            MS. KELLMAN:  Then I don't offer it.

7            THE COURT:  Thank you.

8            THE WITNESS:  Your Honor, may I have a little more

9    water?  I'm out of water.

10           THE COURT:  Certainly.

11   Q.  By the way, at the time that sentence was pronounced, you

12   didn't ask for any recommended designation, correct?

13   A.  We did not.

14   Q.  Would you agree with me that was, because given the nature

15   of the sentence, that there was, it would be fair to say, some

16   kind of pandemonium that exploded at the end of the sentencing

17   proceeding?

18   A.  To be precise, it was our view that the sentencing

19   proceeding had not ended, and that sentence had not been

20   pronounced.  So at that time, it would not have been

21   appropriate to ask for a designation.

22   Q.  Was that because you believed that because the judge had

23   given you an opportunity to explore the possibility of your

24   client withdrawing his plea; is that right?

25   A.  We had requested that, and the judge, as I interpreted her

1    words at the time, agreed.

2    Q.  I think you told us that some time shortly after that day,

3    in October, that Paul Shechtman was retained to participate in

4    this litigation, correct?

5    A.  Yes.

6    Q.  And did you have conversations with Mr. Shechtman about

7    what his role would be?

8    A.  Yes.

9    Q.  What did he tell you; what did you tell him?

10   A.  I told him I understood that he was going to be taking the

11   lead.  That he was being brought in to essentially advise the

12   client as to the best next steps under these difficult

13   circumstances.

14   Q.  Well, when you say advise the client as to the next best

15   steps, what was Mr. Shechtman -- did Mr. Shechtman work for the

16   United States attorney's office at any point in his life?

17   A.  I think he did.  I'm not sure.

18   Q.  Really.  Do you know whether or not he was the chief of the

19   criminal division?

20   A.  It wouldn't surprise me.

21   Q.  But you don't know that as you sit here today?

22   A.  I think I remember seeing his picture up, upstairs at the

23   U.S. attorney's office, yes.

24   Q.  Would it be fair to say Mr. Shechtman was going to be

25   taking the lead, he was going to go up to the U.S. attorney's

Case 1:23-cr-00490-SHS Document 661 Filed 03/20/25 Page 223 of 310

 1  office and try to negotiate Mr. Walsh out of the mess that he

 2  found himself in, correct?

 3  A.  Are you asking if I agree with your characterization?

 4  Q.  Yeah.

 5  A.  No.

 6  Q.  Okay.

 7  A.  Mr. Shechtman was brought in by the family to advise them

 8  for reasons that they discussed with him.  He said to me, look,

 9  I'm here, let's see if we can figure this out.  And he advised

10  on every step from that moment forward that we took, or that

11  Mr. Walsh took in connection with this matter.

12  Q.  Would it be fair to say that whatever it was he was doing

13  on behalf of Mr. Walsh, you were a partner in that.  You

14  understood what he was doing.  He wasn't keeping it secret from

15  you, correct?

16          MR. BHATIA:  Objection, your Honor, to the knowledge.

17          THE COURT:  We can ask so far he knows.  Are you able

18  to answer that one, sir?

19          THE WITNESS:  I think so.

20          THE COURT:  Yes, sir.

21  A.  He was having communications with Mr. Walsh and his family

22  separate from me.  But I don't know that -- I have no reason to

23  believe he kept anything secret from me.

24  Q.  But then you and he had conversations, correct?

25  A.  We did.

1  Q.  Did he repeat to you or discuss with you the kinds of

2  conversations that he was having with Mr. Walsh and his family?

3  A.  To some extent, yes.

4  Q.  It wouldn't have been important for you to know what was

5  going on before -- withdrawn.

6        You went up and saw the U.S. attorney to discuss

7  possible resolution or possible ways forward after that aborted

8  sentencing, correct?

9  A.  With Mr. Shechtman, yes.

10  Q.  Yes.  And did you also have conversations with Mr. Walsh

11  about it?

12  A.  I believe so.  I don't remember the specifics but I believe

13  so.

14  Q.  So maybe not all at the same time, but at some point, you

15  had in your head Mr. Walsh's thoughts and Mr. Tremonte's

16  thoughts.

17  A.  I definitely had my own thoughts.

18  Q.  I assume you had your own thoughts.  But you also had the

19  benefit of Mr. Walsh's thoughts and Mr.  -- and Mr. Shechtman's

20  thoughts?

21  A.  I don't know what they discussed apart from me.

22  Q.  He didn't tell you and neither one of them told you.  You

23  met with them, and neither one of them told you what they

24  discussed?

25  A.  I don't remember having conversations with Mr. Shechtman,

1    certainly not extensive ones, about what he discussed with

2    Mr. Walsh.  I remember having extensive discussions with

3    Mr. Shechtman about the research we were doing, the decisions

4    we had to make, and the strategy for withdrawing the plea,

5    making additional arguments, how to approach the U.S.

6    attorney's office.  And one that we had a lot of back and forth

7    about was whether or not to initiate a proceeding, I forget

8    exactly what it's called, but to suggest to the district that

9    it was warranted under the circumstances to initiate an

10   investigation into Judge Cedarbaum's potential disability.

11   Q.  This was under the rules for judicial conduct and judicial

12   disability proceeding?

13   A.  Correct.

14   Q.  And you did a fair amount of research on that?

15   A.  We did -- I don't remember exactly.

16   Q.  Why was that?

17   A.  Why?

18   Q.  Yeah.

19   A.  We researched it because we wanted to know how you would do

20   it.  How would you formally call into question or try to

21   initiate an investigation by the district into the competency

22   of a sitting district court Judge.

23   Q.  Would you do that just because you thought her sentence was

24   high?

25   A.  No.

1  Q.  Why would you even think about doing something like that?

2  A.  Well, as I testified before, we had been in front of Judge

3  Cedarbaum on a couple of occasions by the time we got to the

4  sentencing hearing.  And there were aspects of her speech and

5  aspects of her demeanor and aspects of her conduct that

6  suggested to me and to others, though we're no mental health

7  professionals, that there were cognitive issues.

8  Q.  Would it be fair to say you had concerns about whether or

9  not she was cognitively impaired?

10  A.  We certainly did.

11  Q.  And did you undertake that as a potential direction that

12  you might go post sentencing?

13  A.  Yes, we thought about it.  We internally we thought about

14  it at my firm, we talked about it at some length with

15  Mr. Shechtman.  We did research on it.  I believe we prepared a

16  memo, which is one of several that we shared with

17  Mr. Shechtman, and I think we talked to some other

18  practitioners about it as well.  I can't remember who.

19  Q.  Ultimately you decided not to proceed that way?

20  A.  The decision -- I don't remember exactly who took the lead

21  on this, but the decision at the end of the day was not to do

22  it.

23  Q.  That was notwithstanding that you believed that the judge

24  was cognitively impaired?

25  A.  Again, I'm not a medical professional.  But, our experience

Case 1:15-cr-00637-KAM Document 661-21 Filed 08/20/25 Page 227 of 310 PageID #: 182

1  of her on the handful of occasions when we were before the

2  judge, our review of the transcripts, our discussions with

3  others, including the assistants on the case, suggested to us

4  that was a possibility.

5  Q.  So the assistants on the case also thought that the judge

6  might be cognitively impaired?

7          MR. BHATIA:  Objection, your Honor.

8  A.  I can't say what they thought.

9          THE COURT:  Counsel.  There was an objection.  Basis?

10         MR. BHATIA:  He can't testify as to someone else's

11  state of mind, your Honor.

12         THE COURT:  What did they tell you, if anything?

13         THE WITNESS:  I don't remember the specifics.  I

14  remember we had conversations about it.  Other than I remember

15  either one of the two assistants, either Jessica Masella or Ben

16  Naftalis, who was handling the case at the time, suggesting

17  that we -- that is to say suggesting that Paul Shechtman and I,

18  make an appointment to speak with Joon Kim, who was at that

19  time in the leadership at the Southern District U.S. attorney's

20  office, and them indicating, in sum and substance, that he or

21  others in the leadership were aware that she, you know, had

22  been ill, and that there were -- there were issues.

23  Q.  In fact, would it be fair to say that even at the

24  sentencing, there were certain incidents that occurred that

25  reinforced your thought that she might have some kind of

1   cognitive impairment?  Am I right?

2   A.  Yes, that's correct.

3   Q.  You put in your own -- in the declaration that we've

4   offered into evidence here, a discussion between you and the

5   Court and Mr. Walsh in which the Court was very firm about the

6   instruction that she had given Mr. Walsh at the time of his

7   plea with respect to the important right he would be giving up

8   if he were to waive his right to appeal.  And you did not

9   correct her, correct?

10  A.  Yes, it's exactly as I said in my affidavit.  Which I think

11  verbatim quotes the transcript of the hearing.

12  Q.  And in fact, you knew, because you were there, that Judge

13  Cedarbaum had not in fact given Mr. Walsh those warnings,

14  because she hadn't taken the plea; am I right?

15  A.  Correct.

16  Q.  And in fact, Magistrate Judge Fox, who did take the plea,

17  did not tell Mr. Walsh that he was giving up his right to

18  appeal absolutely as long as he got a sentence below 20 years

19  of 20 years or less, correct?

20  A.  I think that's right.  He did not use the categorical

21  language.

22  Q.  You did not correct him either?

23  A.  That is correct.

24  Q.  Just to revisit one issue, if I may.  And I won't belabor

25  it.  But in your declaration did you also say that in

1    connection with communications with Mr. Sickler that you, you

2    or someone at your firm repeated to him or informed him that

3    the firm's hope was that the sentence would be in the single

4    digits?

5    A.   That sounds right.

6    Q.   And did you also share that hope with Mr. Walsh?

7    A.   Yes.

8            MS. KELLMAN:  Your Honor, I believe we offered the

9    declaration earlier today and I think it's in evidence.  But

10   I'd just like to show it to the witness.

11           THE COURT:  Yes, ma'am.

12   Q.   Showing the witness his declaration of Michael Tremonte

13   which is in evidence as Exhibit 2.

14           Do you recognize that document and your signature on

15   the last page?

16   A.   I do.

17   Q.   Thank you.  Now, you've characterized the end of the

18   judicial -- the sentencing proceeding that day as not complete,

19   correct?

20   A.   That was my understanding.

21   Q.   And that was, to some extent, as a result of Judge

22   Cedarbaum saying, well, let me know if your client wants his

23   plea back or words to that effect, correct?

24   A.   What happened at the end of that proceeding left it very

25   unclear where the matter stood.  And I think, just back to your

1   earlier question, the whole sort of final five minutes of the

2   transcript to my mind are further indication that Judge

3   Cedarbaum was encountering some difficulties in fully

4   appreciating what was happening at the proceeding.

5            I imagine that when she was at the top of her game,

6   she probably would have said, no, you can't withdraw your plea,

7   there's no ground for that.  No, you can't make additional

8   arguments, there's no ground for that.

9            But, we were succeeding in, as I said earlier,

10  throwing a wrench in the works.  And my understanding at the

11  end of the proceeding was that it was open.  It's an

12  understanding that I shared with the assistant, and he agreed.

13  Q.  Now, so, it's your understanding -- it's your

14  characterization then, if I'm understanding you, that Judge

15  Cedarbaum's behavior had the last few minutes of the sentencing

16  proceeding supported your idea that she might be cognitively

17  impaired?

18  A.  My intuition.  Again, I'm not a medical professional.

19  Q.  But among the words that were spoken as the sentencing

20  proceeding was winding down were among two that I'd like to

21  inquire of you.  One is whether or not the judge said does your

22  client want to withdraw his plea.  Did she ask that question?

23  A.  Did Judge Cedarbaum ask that question?

24  Q.  Yes.

25  A.  I believe so.

1    Q.  Do you want to see the transcript?  Will you take my

2    representation?

3    A.  I take your word.  I think that's what happened, yes.

4    Q.  Would it be fair to say that you were taken aback by the

5    sentence?

6    A.  Yes, indeed.

7    Q.  Would it be fair to say that your being taken aback

8    bordered on being stunned?

9    A.  Yeah, but again, the same distinction I drew earlier.

10   There's the sentence, and there's the circumstances of the

11   sentence being handed down by the judge.  Like I said before,

12   we knew that there was a 20-year cap.  That it was

13   theoretically possible that the Court could go there.  But as

14   you know from our sentencing submission, those are good

15   arguments, those are very, very strong arguments.  There were

16   lots of excellent reasons why Mr. Walsh should not be sentenced

17   to the statutory maximum.

18           This case was highly unusual, both in terms of the

19   economics.  As we argued in our sentencing submission,

20   99 percent of the principal amount involved in the fraud by the

21   time of sentencing had been returned to the institutional

22   investors.

23           There were also extraordinary circumstances in terms

24   of Mr. Walsh's personal history and characteristics.  The

25   so-called 3553(a) factors.  He had had an extraordinary career.

1  He was a very good and decent human being, a supportive and

2  loving father, and a pillar of the community.

3         So, given everything that we said, which we meant,

4  right, in my view, shouldn't have been 20 years.  But again,

5  reasonable people can debate that.

6         What was stunning to me was that the judge reached

7  that conclusion without, in my subjective view, fully

8  appreciating and making the fine judgments that are necessary

9  to render a sentence in a case like this.  And that belief was

10  further supported when I read the Second Circuit's opinion

11  sending back Mr. Greenwood's sentencing.  At that sentencing

12  proceeding, there were also irregularities, including the judge

13  remarking on devastating losses to individuals.  As the circuit

14  pointed out, no one was devastated and there were no

15  individuals.

16         The totality of the circumstances, our sentencing,

17  Greenwood's sentencing, the last conference that we had in

18  Judge Cedarbaum's chambers.  We waited several hours in the

19  anteroom, and when we finally got there, it, it -- the judge --

20  I mean, I don't mean to be indelicate.  The judge's conduct

21  suggested to us, I think to everyone, that she didn't fully

22  appreciate what was happening.

23         So that's what was stunning to me, and I was trying to

24  stop the show.  Because, although I had never encountered

25  circumstances like this before, in my head I'm thinking is

1   there something we can do to change this.

2   Q.  When you said there was a conference in chambers, when was

3   that?

4   A.  I don't remember.  I think it was the last status

5   conference we had or the one before.

6   Q.  Before sentencing or before plea?

7   A.  No, I'm sorry.  It was before the plea.  I don't remember

8   when.  I know that it's one of the conferences where we

9   discussed the problems with discovery.  And that didn't happen

10  only once.

11  Q.  So, you're saying that back as early as November or

12  October, November or December or January of 2013 and '14, that

13  there was a conference in chambers at which you left thinking

14  that the judge was suffering from some kind of cognitive

15  impairment?

16  A.  I think it was -- I don't remember the exact timing.  It

17  was more than just conjecture at that point in the sense that

18  we had heard that Judge Cedarbaum had suffered a stroke.  I

19  believe that conference was after she had suffered the stroke,

20  and we had heard she was on the mend, that she was doing better

21  in the months leading up to sentencing.  So I think that's what

22  the sequence was.

23  Q.  And the conference where you walked out thinking she was

24  impaired was before the stroke or after the stroke?

25  A.  I believe it was after.

1    Q.  Was it before the plea?

2    A.  I don't know for sure.  And I believe it was before the

3    plea.

4    Q.  Before the plea.

5    A.  Yes.

6    Q.  Thinking that the judge might be cognitively impaired, is

7    that what caused you to begin to do research with respect to

8    the judicial disability act?

9    A.  After the sentencing, yes.

10   Q.  Well, you said that you began to suspect cognitive

11   impairment before the plea.

12   A.  Yeah, but we didn't --

13   Q.  You went forward with the plea?

14   A.  We went forward with the plea.

15   Q.  You went forward with the sentencing?

16   A.  Correct.

17   Q.  It wasn't until you couldn't fathom the 20-year sentence

18   that you began to think, maybe we should look at the cognitive

19   impairment issue?

20   A.  Correct.  Remember, the word around the courthouse was

21   that, you know, the plea was taken before a magistrate, our

22   understanding was that was in part because Judge Cedarbaum was

23   recovering.  So I don't think we saw her between that status

24   conference and the sentencing hearing.  And so we started -- to

25   your question -- we started the research in the hours following

1    the sentencing hearing, as I recall it.

2    Q.   In fact, at sentencing, Judge Cedarbaum on a number of

3    occasions referred to the fact that she had in fact taken the

4    plea when in fact she had not taken the plea.  She had

5    delegated it to the magistrate, correct?

6    A.   I believe that's right.

7    Q.   You did not correct her?

8    A.   No, she corrected herself eventually.

9    Q.   Eventually.  During that proceeding, during the sentencing

10   proceeding -- just say that the judge corrected herself, would

11   it be fair to say that her correction was triggered by the

12   United States attorney helping to refresh her recollection that

13   in fact she had not given the defendant any instructions with

14   respect to the appellate waiver, because she had referred the

15   plea to the magistrate?

16   A.   That sounds right.

17   Q.   Would it be accurate to say also that after this 20-year

18   sentence was announced, that one of the suggestions that you

19   made to the Court was that she impose a sentence of 20 years

20   plus one day, correct?

21   A.   Yes.

22   Q.   And you knew that to be an illegal sentence, correct?

23   A.   Correct.

24   Q.   And even Judge Cedarbaum knew that to be an illegal

25   sentence, correct?

```
 1   A.  Correct.

 2   Q.  But you were doing what you could to figure out a way to

 3   salvage Mr. Walsh's right to appeal, correct?

 4   A.  Just throwing a wrench in the works, yes, one of several.

 5   Q.  We started on this several times and I hope we can get

 6   through it this time.  There came a time when, among the things

 7   that were being discussed after the sentencing proceeding, was

 8   whether or not Mr. Walsh wanted to withdraw his plea.  Correct?

 9   A.  Correct, yes.

10   Q.  And did you have conversations with Mr. Walsh about that?

11   A.  I don't remember if I had conversations directly with

12   Mr. Walsh about that.

13   Q.  Did you have conversations with Mr. Shechtman about it?

14   A.  I did.  In fact Mr. Shechtman -- so we had a series of

15   conversations, and then Mr. Shechtman drafted a letter to the

16   Court indicating that we were going to withdraw the plea.  I

17   called or e-mailed him or both and said I am not so sure about

18   that.  We discussed it.  And his view prevailed.

19   Q.  That --

20   A.  And then we filed the letter.

21   Q.  You filed a letter informing the Court that --

22   A.  -- Mr. Walsh --

23   Q.  -- would not be seeking to withdraw his plea.

24   A.  Correct.

25   Q.  That letter was filed on November 4, 2014, correct?
```

1   A.  It sounds right.

2          MS. KELLMAN:  May I approach, your Honor?

3          THE COURT:  Yes, ma'am.

4          MS. KELLMAN:  Showing the witness what's previously

5   been received in evidence as Exhibit 8.

6          THE COURT:  Thank you.

7   A.  That is correct.

8   Q.  This is the letter that you filed with Judge Cedarbaum

9   informing her that the defendant would not be moving to

10  withdraw his guilty plea?

11  A.  That is correct.

12  Q.  Did you show this, share this letter with Mr. Walsh before

13  you filed it?

14  A.  I don't recall.

15  Q.  Would it surprise you that the first time Mr. Walsh learned

16  about this was in an e-mail from you on November 5, 2014?  The

17  day after it was filed?

18  A.  Yeah, it would be surprising to me that Mr. Shechtman

19  didn't discuss it with Mr. Walsh.

20  Q.  When you say Mr. Shechtman, it's your letter, right?

21  A.  As I mentioned earlier, Mr. Shechtman drafted that letter

22  and sent me the draft.  We had a debate about it, and his view

23  prevailed.

24  Q.  And you wrote the letter?

25  A.  No, he wrote the letter.

```
 1   Q.  You signed the letter and it's on your letterhead?

 2   A.  That's correct.

 3   Q.  You did not show it to your client before you filed it?

 4   A.  As I said, I don't recall.

 5   Q.  Let me show you some e-mails.

 6   A.  So it starts here --

 7   Q.  Do you recognize the e-mails?  Do you recognize those

 8   e-mails?

 9   A.  I don't remember them, but they're mine.

10   Q.  That's your e-mail address, correct?

11   A.  Yes, that's right.

12            MS. KELLMAN:  I offer what is a part of the record in

13   any event as Walsh exhibits, in the Walsh exhibits, it's page

14   72 of the Walsh exhibits, from the 2255 position.

15            THE COURT:  Thank you.  I guess counsel is offering

16   it.

17            MR. BHATIA:  I believe it's already in evidence as

18   Defense Exhibit 9.

19            THE COURT:  Thank you.

20   Q.  I want to read from it if I may.  On November 4, did you

21   write and say:  We ran it by Sarah and assumed she was sharing

22   it with you?

23   A.  That is what the e-mail says, yes.

24   Q.  Well, is there anybody else who writes e-mails and signs

25   your name?
```

```
 1   A.  No, no.

 2   Q.  And did you then forward on November 5 the actual letter to

 3   Mr. Walsh with a notation this letter as filed is attached?

 4   A.  Yes, after he said okay.

 5   Q.  After he said okay to see it?

 6   A.  He just said okay in the letter.  I don't remember this

 7   exchange.  But yes, it appears to have happened.

 8   Q.  When you say he said okay, it wasn't an okay to the

 9   substance, because you'd already filed the letter.

10   A.  It just says okay.

11   Q.  I'm asking you, could he have been saying okay to something

12   you had already filed or okay, please, send me the letter?

13   A.  It could be either way, I don't know what he intended.

14   Q.  But you did not show him this letter before you filed it,

15   correct?

16   A.  As I said twice, I don't remember.

17   Q.  Well, doesn't this e-mail refresh your recollection?

18   A.  It suggested that --

19   Q.  That you gave it to Sarah and not my client?

20   A.  Yeah, it suggests that I didn't.  I don't remember.

21   Q.  Reading the e-mails from your e-mail account doesn't

22   refresh your recollection?

23   A.  Does not refresh my recollection.  No.

24           MS. KELLMAN:  Your Honor, I'm not sure if I offered

25   the letter to Judge Cedarbaum in which Mr. Tremonte informs her
```

1  that they will not be moving to withdraw his guilty plea.  It's

2  dated November 4, it is document 1-1, and it's page 69 of the

3  petition.  But I'd offer it as a hearing exhibit.

4         MR. BHATIA:  Your Honor, I believe that's in evidence

5  already as a Defense Exhibit 8.

6         THE COURT:  Thank you.

7  Q.  I think you said earlier that when you heard the 20-year

8  sentence, that you found it quite jarring to say the least,

9  correct, or unexpected?

10 A.  That's not what I said.

11 Q.  Did you expect the 20-year sentence?

12 A.  I've now been over this twice.  We hoped for a lower

13 sentence.  We hoped for a sentence in the single digits.

14 Q.  Would it be fair to say then that when you heard a 20-year

15 sentence, that jarred you?

16 A.  The imposition of the 20-year sentence was jarring, yes.

17 Q.  During the course of the time that -- withdrawn.

18         MS. KELLMAN:  Your Honor, does the Court like to take

19 a break?  I may be finished but I just want to go through my

20 notes.  Anyway, if I can't that's fine.

21         THE COURT:  If you want to take a break, I'll do it.

22 But if you want to, you can stand there for three minutes.

23         MS. KELLMAN:  That's fine, Judge.

24         THE COURT:  Thank you.

25         (Pause)

```
 1              MS. KELLMAN:  Very briefly if I may, Judge.

 2              THE COURT:  Yes, ma'am.

 3    Q.  Mr. Tremonte, will you take my representation that you had

 4    a meeting with the United States attorney's office on March 3,

 5    2014?

 6    A.  I will.

 7    Q.  At that meeting, do you recall that meeting being about the

 8    possibility of a plea, the beginning of a discussion of a

 9    guilty plea?

10    A.  I don't recall the meeting, but it sounds right.

11    Q.  Do you recall, without worrying about the date, do you

12    recall having a meeting with the government in which you

13    represented to the government that you believed Mr. Walsh's

14    case to be a triable case?

15    A.  I'm sure I said multiple times words to that effect to the

16    government, yes.

17    Q.  Would you agree that you also said to the government that,

18    while they have a good circumstantial case, that it was not

19    without its weaknesses?

20    A.  I'm sure I said that multiple times as well.

21    Q.  Did you tell them that Mr. Walsh was not involved in the

22    day-to-day operations of the business?

23    A.  Definitely told him that.

24    Q.  Did you tell them that your client was in denial?

25    A.  It wouldn't surprise me if I did say that.
```

```
1              MS. KELLMAN:  I have nothing further, Judge.

2              THE COURT:  Thank you.  Redirect, counsel?

3              MR. BHATIA:  No redirect, your Honor.

4              THE COURT:  Thank you.  You may step down, sir.  Thank

5    you.

6              THE WITNESS:  Thank you, your Honor.

7              (Witness excused)

8              THE COURT:  Any further witnesses for the government?

9              MR. BHATIA:  None from the government.

10             THE COURT:  Any further witnesses for the petitioner?

11             MS. KELLMAN:  No, your Honor.

12             THE COURT:  Thank you.  Is there anything else you

13   want to do on the record or do you want to go off the record

14   and discuss what we're going to do next?

15             MR. BHATIA:  We can go off the record.

16             MS. KELLMAN:  I have nothing else for the record.

17             (Adjourned)

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    STEPHEN WALSH

 4    Direct By Ms. Kellman  . . . . . . . . . . . 4

 5    Cross By Mr. Bhatia  . . . . . . . . . . . .74

 6    Redirect By Ms. Kellman  . . . . . . . . . 107

 7    Recross By Mr. Bhatia  . . . . . . . . . . 113

 8    MICHAEL TREMONTE

 9    Direct By Mr. Bhatia . . . . . . . . . . . 116

10    Cross By Ms. Kellman . . . . . . . . . . . 147

11                        GOVERNMENT EXHIBITS

12    Exhibit No.                               Received

13     1022    . . . . . . . . . . . . . . . . . .78

14     1013    . . . . . . . . . . . . . . . . . .89

15     1019    . . . . . . . . . . . . . . . . . 115

16                        DEFENDANT EXHIBITS

17    Exhibit No.                               Received

18     4    . . . . . . . . . . . . . . . . . . .29

19     1, 2, and 3  . . . . . . . . . . . . . . .29

20     5    . . . . . . . . . . . . . . . . . . .43

21     6    . . . . . . . . . . . . . . . . . . .46

22     8    . . . . . . . . . . . . . . . . . . .50

23     9    . . . . . . . . . . . . . . . . . . .54

24     10   . . . . . . . . . . . . . . . . . . .60

25     11   . . . . . . . . . . . . . . . . . . .63
```

12     . . . . . . . . . . . . . . . . . . .72

**To:** Mermelstein, Rebecca (USANYS); DiMase, Christopher (USANYS)
**Subject:** FW: Graham/Biale
**Date:** Friday, December 11, 2020 5:38:00 PM
**Attachments:** KC1VTEMC[1].pdf

FYI – Justine Harris emailed John McEnany to talk about the conflicts question for Noam more broadly than Teman.

**From:** Justine Harris <JHarris@shertremonte.com>
**Sent:** Tuesday, December 8, 2020 7:29 AM
**To:** McEnany, John (USANYS)
**Cc:** Bhatia, Kedar (USANYS) (b)(6)
**Subject:** Graham/Biale

Dear John,

I am a partner at Sher Tremonte LLP. As Kedar may have told you, the issue of AUSA Margaret Graham being married to my colleague Noam Biale was recently raised by Judge Engelmayer as an issue that required a Curcio hearing in the case of U.S. v. Ari Teman (transcript is attached). Given that Noam has appeared in many SDNY cases in the years prior, and will continue to do so going forward, it would be helpful for to have a short call (perhaps with our ethics counsel involved?) with you about our offices' respective procedures in this regard.

My cell phone is below. While I have a few calls on the calendar today, my schedule is fairly open. Thank you in advance.

Best,

Justine

Justine A. Harris

Sher Tremonte LLP

90 Broad St., 23rd floor

New York NY 10004

(212) 300-2
(917) 685-5
www.shertremonte.com

**From:** DiMase, Christopher (USANYS)
**To:** Bhatia, Kedar (USANYS)
**Cc:** Mermelstein, Rebecca (USANYS)
**Subject:** FW: (b)(5)
**Date:** Wednesday, December 23, 2020 11:50:23 AM

See the question below from John.

**From:** McEnany, John (USANYS) (b)(6)
**Sent:** Wednesday, December 23, 2020 11:49 AM
**To:** DiMase, Christopher (USANYS) (b)(6) Birger, Laura (USANYS)
(b)(6) Shin, Won (USANYS) (b)(6)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S2 19 Cr. 696 (PAE) |
| *Plaintiff*, | |
| *v.* | **CERTIFICATION** |
| ARI TEMAN, | **OF RONALD D. COLEMAN** |
| *Defendant*. | |

RONALD D. COLEMAN, of full age, affirms under penalty of perjury and says:

1.      I am a member of Dhillon Law Group, Inc. and was formerly counsel of record for Gateguard, Inc., of which Mr. Ari Teman, defendant in this criminal action, is principal, in a civil litigation matter in this Court styled *Gateguard, Inc. v. Goldmont Realty Corp.*, *et al.*, 1:20-cv-01609(GWG)(AJN).

2.      On November 21, 2021, our firm filed a motion to be relieved in that matter, following Mr. Teman's instructions that we no longer represented it in this or any other matter. The end of this professional relationship was not cordial or pleasant.

3.      Notwithstanding these facts, Mr. Teman recently contacted me and asked me if I could recall certain events that took place approximately a year earlier, in October or November of 2020, and whether, if I did, I would prepare an affirmation setting out my recollection.

4.      Because I am familiar with Mr. Teman's jeopardy in this criminal matter, I agreed to do so.   Obviously we have not and will not resume an attorney-client relationship.

5.      The particular matter Mr. Teman asked me about involves what has been described to me, and what I have read about in press reports, as a relationship—particularly, a spousal relationship—between a prosecutor in the office of United States Attorney for the Southern

District of New York involved in the prosecution of this action against Mr. Teman and his defense counsel at the law firm of Sher Tremonte.

6.      Mr. Teman asked me if I remembered participating in a telephone call with him and Sher Tremonte lawyers that took place in November of 2020, which was prior to the disclosure of this relationship and Mr. Teman's subsequent discharge of that law firm.

7.      I do remember such a call, and I remember that there was discussion of whether the Sher Tremonte lawyers had contacted, or were going to contact, shareholders at 18 Mercer Street, a cooperative or condominium where a GateGuard device had been installed, to obtain documents regarding a member of the building's board being terminated for improper conduct in connection with its relationship with GateGuard. My understanding is that this same person testified on behalf of the Government in Mr. Teman's trial.

8.      My recollection is that the Sher Tremonte lawyers said that they did, or intended to, request such documents.

The foregoing is certified to be true to my best knowledge.  I understand that if it is not true, I am subject to penalties for perjury.

_____
RONALD D. COLEMAN

November 22, 2021

2

Shelly Jenkins Pecot
18 Mercer St. New York NY 10013
shelly.pecot@gmail.com (917) 561-6505

Judge Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square
New York, NY 10008

August 21, 2021

Your Honor,

My name is Shelly Jenkins Pecot. I am a shareholder at 18 Mercer. I was out of the country when I was subpoenaed to testify.

With regard to 18 Mercer, I do not believe Ari Teman should go to prison.

Ari Teman did warn myself and other shareholders of what he said were the following terms in the contract he signed with our then board Vice President via an online document.

1. There was an $18,000 fee for removing the device
2. There was a $10,000 fee for collections
3. There would be attorney fees
4. There was binding arbitration
5. That he believed he had the right to draft owed monies from our bank account

I confirm that I did text with Mr. Teman and that the texts he has shown to me are accurate and match those on my phone.

I also confirm that I did forward the two attached emails to Mr. Teman on Aug 19th.

I do not live in New York and was only at the coop for a few days while Mr. Teman's device was installed. During that time, the device was connecting to the app but seemed to be disconnected from the door lock.

My personal interactions with Mr. Teman on this matter were amicable at first. I believed that he wanted to work with us to get his device working properly. Mr. Teman told me that our internet was not sufficient to run the device and that he had informed the board of this. Mr. Teman also told me that he had added a new router to help with this issue.

I was informed by another shareholder that this shareholder had been told by contractors that Bonnie Soon-Osberger had instructed them to disconnect the device. At the time, my suspicion was that it had been sabotaged to justify going with a different company. However, I had no direct proof of this and now believe they were referring to when the device was removed to be replaced.

I have no direct knowledge of Mr. Teman's interactions with the board or management. However the management team did insist to shareholders that they had no interactions with Mr. Teman. Mr. Teman forwarded me emails between himself and management to show me that they were not being truthful.

I am out of state, but I would be happy to speak by Zoom on this matter if you have any further questions.

Shelly Jenkins Pecot

Aug 20, 2021

Shelly Precot appeared before me on August 20th 2021

Melody Hannigan as notary

MELODY HANNIGAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20064012643
MY COMMISSION EXPIRES APR. 05, 2022

KC1VTEMC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                        19 CR 696 (PAE)

5    ARI TEMAN,

6                 Defendant.                REMOTE TELECONFERENCE

7    ------------------------------x

8                                           New York, N.Y.
                                            December 1, 2020
9                                           10:37 a.m.

10

11   Before:

12                     HON. PAUL A. ENGELMAYER,

13                                          District Judge

14                         APPEARANCES

15

16   AUDREY STRAUSS,
          Acting United States Attorney for the
17        Southern District of New York
     KEDAR S. BHATIA
18   JACOB GUTWILLIG
          Assistant United States Attorneys

19   JOSEPH A. DIRUZZO, III
     JUSTIN GELFAND
20   JUSTINE A. HARRIS
     NOAM K. BIALE
21        Attorneys for Defendant

22
     ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
23

24

25

```
 1              (Remote teleconference)
 2              THE COURT:  I'm calling the case of United States v.
 3     Teman, 19 CR 696.
 4              Let me just begin by taking the roll.
 5              Who do I have for the government?
 6              MR. BHATIA:  Your Honor, Kedar Bhatia, for the United
 7     States.  I'll be speaking today.  And I'm joined on the line by
 8     Jacob Gutwillig, Assistant U.S. Attorney; as well as the case
 9     agent, Detective Daniel Alessandrino.
10              THE COURT:  All right.  Very good.
11              Mr. Bhatia, for whatever reason, your voice is
12     projecting as faint.  So I will ask you, when you speak, to
13     speak up.  Thank you.
14              Who do I have for the defense?
15              MR. BIALE:  Good morning, your Honor.
16              This is Noam Biale, on behalf of Ari Teman.
17              Mr. Teman and I are present on the video link.  And on
18     the phone we have my colleague Justine Harris; and we also have
19     trial counsel, Justin Gelfand and Joseph DiRuzzo, also joining
20     us by phone.
21              THE COURT:  Very good.  All right.  Good morning to
22     all of you.
23              And Mr. Teman, just to confirm for the record that you
24     are present on the video and can hear and see what's being
25     said; you can hear and see us all.
```

1          THE DEFENDANT:  I believe so, your Honor.

2          THE COURT:  Well, I just need to make sure.

3          THE DEFENDANT:  I hear you.  I don't know if I'm not

4     hearing somebody else.  But right now everybody who has spoken

5     I've heard.

6          THE COURT:  Very good.  All right.  Terrific.

7          And is our court reporter there?

8          THE COURT REPORTER:  Yes, your Honor.  Good morning.

9          THE COURT:  All right.  Good morning.

10         I'm going to ask everyone to speak up.  For whatever

11    reason, Skype today is giving me a low volume for just about

12    everybody, even though I've got the volume on max.  It's

13    considerably less loud than the court hearing we had just a few

14    minutes ago in another matter, who knows why.

15         All right.  Let me begin just by welcoming back trial

16    counsel, Mr. Gelfand, Mr. DiRuzzo and Mr. Bhatia; and welcoming

17    to the case new counsel, Mr. Biale and Mr. Harris and, of

18    course, welcoming you, Mr. Teman.

19         There have been lots and lots of filings on the docket

20    of this case since trial, but I'm acutely mindful that our last

21    conference in this case was on the last day of trial, on

22    January 29th.  And boy does that feel like a lifetime ago, with

23    the intervening public health crisis.

24         Counsel and Mr. Teman, I just want to say I hope you

25    and your families and those close to you have been able to stay

 1   safe and healthy during these extraordinary eight last months

 2   since the pandemic hit.  And with another wave upon us, you

 3   have my wishes as well for continuing good health and safety

 4   for you and yours.

 5        I also want to welcome anyone who's auditing this by

 6   telephone.  I'm glad at this time, when remote hearings are

 7   requested for good and sound reasons and health and safety, as

 8   Mr. Teman has done so here, that the public is able to attend

 9   our conferences telephonically.

10        Unfortunately, it's not possible for members of the

11   public to watch by video.  Experience has shown that the

12   platforms used for video access grow more unstable with a

13   larger number of video participants, even those who just are

14   watching on the video and not themselves appearing.

15        My fellow judges and I regrettably have had a number

16   of conferences by video which got scuttled or interrupted by

17   technology problems.  And so our IT staff has advised us not to

18   overload the number of video attendees.

19        I do need to remind everyone listening that you are

20   not permitted to record these proceedings.  In an in-person

21   courtroom, that goes without saying, because spectators are not

22   permitted to bring recording devices into court.  But in a

23   remote proceeding, it's necessary for me to say that, so I just

24   did.  The court reporter is transcribing these proceedings; and

25   so if anyone would like a copy of the transcript to reconstruct

1    what was said here, you're at liberty to order it.

2           All right.  We are here today for the sentencing

3    hearing in the case of *United States v. Ari Teman*, or at least

4    to begin the sentencing process in Mr. Teman's case.  I say

5    that because for reasons that I will be taking up with counsel

6    shortly, I have determined that I don't believe it will be

7    possible to complete that process today; instead, I think we

8    will only be able to cover but so much ground.

9           By sheer coincidence, about two minutes before I

10   jumped on this call, my chambers got an email from Mr. Biale

11   reaching the same outcome, I think, for a different reason,

12   having to do with a recent flurry of communications relating to

13   forfeiture.

14          Mr. Biale, I'm with you.  I have no intention of

15   reaching that issue today.  Indeed, I have a homework

16   assignment for counsel to reflect on involving that very issue.

17   So what I propose to do is take care of a number of

18   preliminaries, including one very important one which is going

19   to occupy counsel, and we will adjourn short of making any

20   decisions in the case.

21          MR. BIALE:  Understood, your Honor.

22          THE COURT:  All right.  Very good.

23          So before we turn to the substance of the hearing,

24   which, again, I don't think we're going to get to, there are a

25   number of preliminary matters I need to take up, so please bear

1  with me.

2         The first involves the remote nature of this

3  proceeding.

4         We're in the midst of the COVID-19 pandemic.  I'm

5  conducting this proceeding pursuant to the authority granted by

6  Section 15002 of the CARES Act, and the standing orders issued

7  by our chief judge pursuant to that act.

8         I'm participating in this conference from the

9  courthouse in my chambers.  Counsel and Mr. Teman are

10  participating remotely.  Mr. Teman and lead counsel for each

11  side are participating by videoconference.  The remaining

12  counsel are participating by telephone.

13         I will ask everybody to please let me know immediately

14  if you are having any difficulty hearing the speaker, whether

15  it's me or an attorney or the defendant when they are speaking;

16  and as to the video participants, whether you are having any

17  difficulty seeing the other video participants.

18         I will, even in the truncated nature of this

19  proceeding, be calling on multiple people during the course of

20  this proceeding.  When I do call on you, I will try to do so

21  clearly by name.  If I haven't done so for some reason or you

22  otherwise have occasion to speak, including to let us know that

23  you can't hear or see something adequately, please identify

24  yourself by name for clarity of the record.

25         And please don't interrupt each other or me during

1    this conference.  If we interrupt each other, it becomes

2    difficult for the court reporter to create an accurate

3    transcript of these proceedings.  I will give counsel obviously

4    a full opportunity, item-by-item or issue-by-issue, to be

5    heard.

6              All right.  I've been advised that the defendant,

7    Mr. Teman, cannot participate in person in the usual way today,

8    that is, by his being physically present in the courtroom,

9    without incremental risk to himself.  And that is as a result

10   of the COVID pandemic which is surging right now, including in

11   New York state, where we are; and Florida, where Mr. Teman

12   resides, and where I understand he is participating from

13   remotely.

14             Counsel in their submissions have put medical

15   information before the Court indicating that Mr. Teman has

16   heightened vulnerability to COVID-19 on account of a

17   respiratory history.  It is also not knowable when the COVID

18   pandemic will ease up, but there is good reason to doubt that

19   it will significantly abate in the next month or two.

20             Defense counsel, Mr. Biale, do you agree that for the

21   Court to conduct this proceeding in person at this time,

22   requiring Mr. Teman to travel to New York would present

23   heightened risks to his health?

24             MR. BIALE:  Yes, your Honor, I do.

25             THE COURT:  Government counsel, do you agree that that

1    is so?

2                MR. BHATIA:  Yes.

3                THE COURT:  All right.

4          I find that conducting this proceeding in person is

5    not now -- that is to say in court the usual way, is not

6    reasonably available.  I do find that videoconferencing in the

7    manner that we are proceeding now, and teleconferencing for the

8    nonlead counsel participants, is reasonably available; and I

9    find that the defendant is able to participate in this

10   proceeding by videoconferencing means.

11         I have received a written waiver of right to be

12   present in court proceedings.  It was filed on Sunday.  It has

13   been docketed at docket 173.  I want to confirm with you,

14   Mr. Biale, that the defendant was advised of his right to

15   appear in person at this proceeding, that he understood those

16   rights, and that he voluntarily gave up those rights.

17               MR. BIALE:  Yes, your Honor.  We fully discussed that

18   matter with Mr. Teman.  And he's voluntarily giving up his

19   right to be present in person at the proceeding.

20               THE COURT:  Okay.

21         And just to make sure that I can make a legally

22   adequate finding, Mr. Biale, briefly describe how you came to

23   provide the document to Mr. Teman, and the circumstances under

24   which you discussed his rights with him.

25               MR. BIALE:  Sure, your Honor.

1          So the discussion has been an ongoing one based on

2     both Mr. Teman's strong interest in having this case conclude

3     efficiently and soon, based on the amount of time that he has

4     been on home detention.  At the same time we've discussed with

5     Mr. Teman his countervailing concern about his health and what

6     it would mean for him to travel from Florida to New York.

7          Based on all of those considerations, Mr. Teman

8     expressed to us that he felt it was not safe for him to travel

9     and he would prefer to participate in sentencing remotely.

10          As a result, we made an application to the Court to do

11     that.  As your Honor knows, there was some back and forth

12     between the defense and the government about that issue.  The

13     Court ultimately granted our request to proceed remotely.  We

14     sent a copy of the Court's order to Mr. Teman, along with the

15     waiver of rights; and explained that in order to proceed

16     remotely, he would need to sign the waiver of rights, and one

17     of us as his counsel would do so, and that we would file it on

18     the docket.  He returned a signed copy of it to us, I signed

19     it, and then filed it.

20          THE COURT:  All right.  Thank you.

21          That's very comprehensive and helpful.

22          And that leads me to my next question, which is the

23     handwriting alongside both signatures leaves something to be

24     desired.

25          Mr. Biale, is that Mr. Teman's signature on the

SOUTHERN DISTRICT REPORTERS, P.C.·······
(212) 805-0300

KC1VTEMC

1    document?

2            MR. BIALE:  Yes, your Honor.

3            THE COURT:  And is it yours?

4            MR. BIALE:  It's an electronic signature that I pasted

5    onto the document.

6            THE COURT:  All right.  Very good.

7            Mr. Teman, is that indeed your signature on the

8    document?

9            THE DEFENDANT:  Yes, your Honor, that is my signature.

10           THE COURT:  I suffer from handwriting deficiencies as

11   well.

12           Okay.  Mr. Teman, did you hear what Mr. Biale just

13   said to me about the process by which you were informed of your

14   right to have the sentence proceed in person?

15           THE DEFENDANT:  Yes, I did, your Honor.

16           THE COURT:  And you did indeed sign a document giving

17   up your right to be present in person?

18           THE DEFENDANT:  Yes, I did, your Honor.

19           THE COURT:  Do you understand that you have a right to

20   have this hearing proceed in person, meaning you and the

21   lawyers and me, government, we'd all be in person in my

22   courtroom?

23           THE DEFENDANT:  Yes, I do, your Honor.

24           THE COURT:  And do you understand that the public

25   health emergency created by this pandemic has heightened the

1  risks associated with travel and court appearance; and

2  particularly for persons traveling out of state, you might be

3  subject to heightened risks, as well as quarantines and the

4  need for testing and a variety of other inconveniences were

5  this to occur in person?

6         THE DEFENDANT:  Yes, your Honor.  And multiple doctors

7  of mine have made that clear.  I think we've --

8         THE COURT:  Have you fully discussed these issues and

9  your rights with Mr. Biale and your other lawyers?

10         THE DEFENDANT:  Yes, your Honor.

11         THE COURT:  Okay.

12         Do you understand that if we proceed, as we are about

13  to, by videoconferencing, you and your counsel would still be

14  able to fully participate in this proceeding; you'd both be

15  able to fully address the Court.  In the event there came a

16  need for a breakout where you and your counsel -- without being

17  overheard by anybody else -- could speak privately, we could

18  make the technology work, even if it means hitting the pause

19  button and logging back on; but we'd be able to find a way for

20  you to confer privately with your lawyer or lawyers.

21         Do you understand that?

22         THE DEFENDANT:  Yes.  Thank you, your Honor.

23         THE COURT:  And just to be clear, do you wish to give

24  up your right to be sentenced in person with your lawyer by

25  your side?

```
 1              THE DEFENDANT:  Yes, your Honor.

 2              THE COURT:  All right.  I find a knowing and voluntary

 3     waiver of Mr. Teman's rights to be present in person for this

 4     sentencing.

 5              Finally, as to this issue, for us to proceed today,

 6     even if it means just undertaking some of the sentencing

 7     process, I'm required to make a finding that this proceeding

 8     can't be delayed without harm to the interests of justice.

 9              Defense counsel, in your letter of November 20th,

10     docketed at docket 167, you told me that Mr. Teman's mental

11     health would be benefited by moving the case forward.  You

12     wrote:  "while the Court in its November 19, 2020 order invited

13     a request to adjourn sentencing, Mr. Teman's countervailing

14     mental health concerns compel us to request that sentencing

15     proceed on the current schedule.  We plan to provide the Court

16     with additional material regarding Mr. Teman's mental health

17     early next week.  But it suffices to say for now that the

18     ongoing pendency of the case has significantly exacerbated

19     ongoing struggles to such a degree that we believe it is

20     important for Mr. Teman not to delay resolution of this matter

21     further."

22              Purely in the interest of a clear record, Mr. Biale,

23     can you just elaborate a little bit.

24              MR. BIALE:  Yes, your Honor.

25              So we've had extensive discussions with Mr. Teman
```

1    since Ms. Harris and I joined the case.  And before that, his

2    trial counsel had extensive discussions with him.

3          As your Honor knows, Mr. Teman has been on home

4    detention since the trial verdict in January.  He has

5    essentially been solitary for that time, because his partner

6    had to leave the country.  So he is alone there.  He has his

7    dog who provides a great deal of comfort.

8          But the isolation that we are all experiencing due to

9    the COVID pandemic, for Mr. Teman has been significantly

10   harder.  The various mental health issues that have been raised

11   before the Court -- both in the sealed submissions with trial

12   counsels' sentencing submission that was submitted in July, as

13   well as the letter from Mr. Teman's parents, which we submitted

14   last week in connection with our request for remote

15   sentencing -- I think speak to the particular difficulties that

16   Mr. Teman has with coping with the ongoing uncertainty

17   regarding this case.

18         I can speak just personally based on my conversations

19   with him that I have seen him struggle to a degree that is

20   quite profound and sets him apart from most of the clients I

21   have.  No doubt, having a sentencing hanging over their heads

22   is a difficult process.  For Mr. Teman it's really been

23   harrowing.  And I don't think that it serves his interests or

24   the public interest to delay further.

25         Now, I stand by all that, in spite of the discussion

1    that we're going to have in a moment about a brief adjournment.

2    But I think that all of that stands as a reason to proceed with

3    sentencing as soon as practicable, and to do so remotely given

4    that we cannot convene in person safely.

5          THE COURT:  And I take it, Mr. Biale, that extends to

6    accomplishing what little we can here before an adjournment.

7          MR. BIALE:  Yes, your Honor.

8          THE COURT:  All right.  Very good.

9          Look, I'm fully persuaded by that.  Let me just

10   confirm that the government is too.

11         MR. BHATIA:  Yes, your Honor.

12         I mean, I think we take a different view,

13   respectfully; but if your Honor were to make the CARES Act

14   findings, I think you --

15         THE COURT:  All right.  Look, I make the finding --

16   Mr. Biale, thank you.  That was a very persuasive and clear

17   articulation.

18         I find that the sentencing proceeding cannot be

19   further delayed without harm to the interests of justice.  I

20   fully accept counsel's proffer -- which is supported, among

21   other things, by the letter from Mr. Teman's parents -- that

22   Mr. Teman is struggling with the pendency of this matter, and

23   he would like to put this case behind him.  I credit that.  I

24   credit that forward progress will be good for his state of

25   mind.  I hope that commencing the sentencing process today,

even if we can't finish it or won't be able to finish it, will
give you, Mr. Teman, some additional peace of mind that at
least we are moving forward.

All right.  The next preliminary matter I need to take
up involves new Federal Rule of Criminal Procedure 5(f).

As counsel are aware, in late October, the President
signed the Due Process Protections Act.  It put Rule 5(f) in
place.  It requires the Court at the initial scheduled
conference in a criminal case to advise the prosecution of its
obligations under *Brady v. Maryland* and its progeny, and to
issue a written order to the same effect.

Like most other judges in this district, I've taken
the view that the best practice is to treat Rule 5(f) to apply
to existing cases and not merely new ones.  So I've docketed
the written Rule 5(f) order in all my pending criminal cases,
including this one.  I did so in this case on October 30th.
The order is docketed at docket 153.

And now I'm going to make the companion oral
notification that's also required by Rule 5(f).

And, Mr. Bhatia, fair warning, at the end of this I'm
going to ask you whether the government understands its *Brady*
obligations and whether it has complied with them.

All right.  Here it goes.

Pursuant to Federal Rule of Criminal Procedure 5(f), I
remind the government of its obligation under *Brady v. Maryland*

1   and its progeny to disclose to the defense all information,

2   whether admissible or not, that is "favorable to" the

3   defendant, "material either to guilt or to punishment," and

4   known to the government.

5        The government must make good-faith efforts to

6   disclose such information to the defense as soon as reasonably

7   possible after its existence becomes known to the government.

8   The government must also disclose information that can be used

9   to impeach the trial testimony of a government witness, and

10  must do so sufficiently in advance of trial in order for the

11  defendant to make effective use of it at trial.

12       I remind you that these obligations are continuing

13  ones, and that they apply to information whether or not you

14  credit it.

15       I further remind you that for these purposes, "the

16  government" includes any federal, state, and local law

17  enforcement officers and other officials who have participated

18  in the investigation and prosecution of the charged offenses;

19  and that you have an obligation to seek from these sources all

20  information subject to disclosure.

21       And finally, I caution the government that if it fails

22  to comply with this order, any number of consequences may

23  follow:

24       One, I may order production of the information and

25  specify the terms and conditions of such production.

KC1VTEMC

1            Two, I may grant a continuance.

2            Three, I may impose evidentiary sanctions.

3            Four, I may impose sanctions on any responsible lawyer

4     for the government.

5            Five, I may dismiss charges before trial or vacate a

6     conviction after trial or a guilty plea.

7            Or six, I may enter any other order that is just under

8     the circumstances.

9            Government, do you understand these obligations and

10    will you confirm that you have fulfilled and will fulfill them?

11           MR. BHATIA:  Yes, I understand our obligations.  And

12    we have fulfilled and will fulfill our obligations.

13           THE COURT:  All right.  Very good.

14           All right.  The next preliminary matter that I need to

15    take up involves a disclosure I need to make that is occasioned

16    by the appearance of Mr. Biale as new counsel for Mr. Teman.

17    And the disclosure is that I am acquainted with Mr. Biale.

18           Mr. Biale's wife, Margaret Graham, worked for a summer

19    at the law firm at which I used to work, and we worked together

20    closely on a criminal appeal.  Ms. Graham and I have kept in

21    touch over the years, and we have had lunch or coffee several

22    times since she joined the U.S. Attorney's Office for the

23    Southern District of New York.

24           Through Ms. Graham I have gotten to know Mr. Biale.  I

25    recall spending an hour or so alone in my chambers with

KC1VTEMC

1   Mr. Biale several years ago discussing his professional options

2   before he joined the Sher Tremonte firm.  I have also

3   personally appointed Mr. Biale and the Sher Tremonte firm to

4   represent a *pro se* plaintiff in a case before me in which the

5   plaintiff sued his lawyer from an earlier matter for allegedly

6   misappropriating a $100,000 retainer.  Mr. Biale did an

7   absolutely superb job in that case.  I think very highly of

8   Mr. Biale, and regard myself as something of a mentor of his

9   and also as a friend.

10          In the interest of full disclosure, I must also put on

11  the record the sad fact that I attended shiva at Mr. Biale's

12  apartment in Brooklyn in the summer of 2019.  And most

13  recently, about six weeks ago, on October 10th, I was a

14  recipient of a group email that Mr. Biale sent to friends and

15  family announcing the joyous news of the arrival of a new son,

16  Abraham Ewing Graham Biale; and for which, Mr. Biale, a huge

17  *mazel tov* to you and Ms. Graham from the Court.

18          All that said, I have absolutely no doubt that

19  notwithstanding that I am acquainted with Mr. Biale in the

20  various ways that I have reviewed, these will not in any way,

21  shape, or form compromise my ability to preside over this case

22  dispassionately and neutrally and with fairness to all.

23  Nevertheless, I did need to make this disclosure, as I do in

24  all cases where I've had a friendship with counsel.

25          Mr. Biale, did you disclose to the government the sum

1    and substance of the facts that I've just reviewed?

2              MR. BIALE:  Your Honor, in candor, I did not.  But I

3    appreciate that your Honor has now put that on the record, and

4    I appreciate what you said.

5              THE COURT:  All right.

6              Mr. Bhatia, regardless, you are now on notice of the

7    information that I have just reported to you.  I trust that the

8    government does not have any issue with regard to the Court's

9    continuing to preside over this case.

10             MR. BHATIA:  No issue whatsoever.

11             THE COURT:  All right.

12             And Mr. Biale, just in the interest of full

13   disclosure, did you disclose to your client the fact that you

14   and I are acquainted in the ways that I've just reviewed?

15             MR. BIALE:  Yes, your Honor.

16             THE COURT:  All right.

17             And did Mr. Teman have any concerns about your

18   representing him in light of all of that?

19             MR. BIALE:  He did not.

20             THE COURT:  All right.

21             And Mr. Teman, is that correct?

22             THE DEFENDANT:  That's correct, your Honor.

23             THE COURT:  Prior to this hearing, had you been made

24   aware of the facts that I have just reviewed with Mr. Biale?

25             THE DEFENDANT:  Except that he's owed a *mazel tov*, he

KC1VTEMC

1    was rather candid and helpful to me by sharing his struggles as

2    encouraging and very helpful in a dark moment for me.

3              THE COURT:  I'm not surprised to hear that.  I'm glad

4    to hear that.

5              All right.  And it goes without saying, but you are

6    comfortable proceeding then with Mr. Biale as one of your

7    counsel?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  All right.

10             That leads me then to a related issue, and this is

11   going to -- this is the principal reason that I was going to be

12   unable for us to proceed today.

13             And this issue also involves Mr. Biale, but it

14   implicates the case of *United States v. Curcio*.  And I

15   apologize in advance for the need to pursue these matters, but

16   circuit law requires that the Court be attentive to facts that

17   raise even potential conflicts.

18             Mr. Biale, for the record, am I correct that your

19   wife, Ms. Graham, is today employed as an Assistant United

20   States Attorney by the U.S. Attorney's Office for the Southern

21   District of New York, which is prosecuting your client,

22   Mr. Teman, in this case?

23             MR. BIALE:  That's correct, your Honor.

24             THE COURT:  All right.  And am I correct that

25   Ms. Graham has been an employee of the U.S. Attorney's Office

 1    at all times since Mr. Teman was indicted in September 2019?

 2              MR. BIALE:  Yes.

 3              THE COURT:  All right.

 4              Mr. Biale, I need to confirm for the record that

 5    before --

 6              UNIDENTIFIED SPEAKER:  Your Honor, I just want to make

 7    very clear --

 8              THE COURT REPORTER:  I'm sorry.  Who is speaking?  Who

 9    is speaking?  Who is speaking?  Hello?  I'm sorry, who is

10    speaking?  Your Honor?  This is the court reporter.  Hello?

11              THE DEPUTY CLERK:  Judge, it's A.J.  I think Martha is

12    trying to get your attention.

13              THE COURT:  Hold on.  Somebody is interrupting.

14              THE COURT REPORTER:  I'm sorry.  I'm not getting any

15    of this.  I don't know who was speaking.

16              (Indiscernible crosstalk)

17              THE COURT:  But right now, whoever was cutting in,

18    please be respectful of the ongoing conversation.

19              THE DEPUTY CLERK:  Judge, it's A.J.

20              Martha is unable to hear what you folks are hearing.

21    Martha is trying to cut in.  She is unable to hear you folks.

22              THE COURT:  Martha, are you able to hear me right now?

23              THE COURT REPORTER:  I'm able to hear you.  What I

24    didn't know is who was speaking, which attorney, when he

25    started speaking.  I did not get any of that.

1              THE COURT:  Okay.  Thank you.

2              We'll back up a moment.

3              Martha, I put several questions to Mr. Biale about his

4    wife's employment at the U.S. Attorney's Office, to which he

5    answered yes.  Did you catch that, Martha?

6              THE COURT REPORTER:  Yes, your Honor.  It's when the

7    attorneys --

8              THE COURT:  Mr. Teman interjected.  And I think the

9    challenge there -- no fault here, I think Mr. Teman did not put

10   his name to his remarks, and that's probably, Martha, why you

11   didn't know who was speaking.  That was Mr. Teman.

12             Were you able to capture the words that were said?

13             THE COURT REPORTER:  No, because I was busy trying to

14   interrupt to see who was speaking.

15             THE COURT:  Okay.  So, Mr. Teman, just so we can

16   reprise that, after I said what I said to Mr. Biale and he

17   confirmed the facts about his wife's employment, what did you

18   say?

19             THE DEFENDANT:  I spoke up to clarify that I did not

20   know anything about Mr. Biale's wife and her profession or

21   anything, other than the loss of a child that he had shared.

22             THE COURT:  Okay.  That is my recollection of what

23   Mr. Teman just said.

24             And then in response to that, I said, in substance

25   Thank you, Mr. Teman.  That is exactly why I'm undertaking this

KC1VTEMC

1    necessary conversation.

2            Thank you, Martha.  I apologize.  I didn't realize it

3    was you who was cutting in.

4            And A.J., I apologize to you.  I thought that was

5    somebody else.

6            All right.  So, Mr. Biale, let me just pursue that

7    with you.  Before you took on this representation, was

8    Mr. Teman notified by you of the fact that your wife is

9    presently employed by the office that is prosecuting Mr. Teman,

10   and that she has been employed there during the entire course

11   of this prosecution?

12           MR. BIALE:  Your Honor, I apologize.  I don't recall

13   having a conversation about that with Mr. Teman.  And it sounds

14   like I did not.  Perhaps what makes sense is for -- I think

15   where your Honor is headed, that we should break and have a

16   discussion with Mr. Teman about this.

17           THE COURT:  Well, we're going to do a little more than

18   that.  But, yes, you and I are on the same page.

19           But, look, to be very blunt -- and this is something

20   that -- this is obviously pivotally important.  Mr. Biale's

21   wife status as an employee of the United States Attorney's

22   Office for the Southern District of New York -- Mr. Teman's

23   adversary in this case -- presents a potential conflict.

24           It is, in my judgment, based on my knowledge of the

25   case law, I believe it to be a completely waivable conflict.  I

1    have seen, in fact, at least one instance in which a defendant,

2    following careful *Curcio* proceedings, resulting in questioning

3    under oath of the defendant by the Court, knowingly waived the

4    conflict presented by one of his lawyers being married to an

5    AUSA in the office that is prosecuting him.

6         Nevertheless, the Second Circuit, as I think all

7    counsel on the call are aware, has insisted on rigorous

8    compliance, with a series of steps and procedures that a

9    district court must use to establish that a defendant wishes to

10   waive his right to conflict-free counsel.

11        In particular, *Curcio* requires that the Court:

12        One, advise the defendant of the dangers arising from

13   the particular conflict.

14        Two, determine through questions that are likely to be

15   answered in narrative form whether the defendant understands

16   those risks and freely chooses to run them.

17        And three, give the defendant time to digest and

18   contemplate the risks, after encouraging him or her to seek

19   advice from independent counsel.

20        And I'm citing the case of *United States v. Curcio*,

21   680 F.2d 881, 888-890 (2d Cir. 1982).

22        The purpose of those careful procedures is to protect

23   the defendant and his constitutional right to be free from

24   conflict-free counsel; and to protect the integrity of the

25   court proceedings.

1          Absent a properly conducted *Curcio* proceeding

2     resulting in a knowing waiver by Mr. Teman of the potential

3     conflict here -- and it needs to be a waiver that I find

4     knowing and intelligent -- we simply cannot proceed further

5     with Mr. Biale representing Mr. Teman.

6          I confess that I did not spot this issue that defense

7     counsel is married to a prosecutor at the office that is

8     prosecuting Mr. Teman until yesterday, after having extensively

9     prepared for the sentencing.  And I spotted it only as I was in

10    the process of writing up my own narrative about how I know

11    Mr. Biale; and suddenly it dawned on me that I know him through

12    his wife, and his wife -- whom I melt through a private law

13    firm -- now happens to be working at the Southern District U.S.

14    Attorney's Office.  And perhaps counsel may have overlooked

15    this, too.

16          Let me ask you, Mr. Bhatia, were you aware that

17    Mr. Biale is married to one of your colleagues?

18          MR. BHATIA:  Yes, I was.

19          THE COURT:  Is there a reason you didn't alert me to

20    the potential conflict?

21          MR. BHATIA:  I apologize, your Honor.  I wasn't aware

22    this is one of the situations that triggers a *Curcio* hearing;

23    although now that you mention it, we are happy to proceed and

24    conduct one.

25          THE COURT:  Mr. Biale, are you also of the view that

1    you didn't think this might be a potential conflict, or it just

2    didn't -- just sort of blipped on it and didn't think about it?

3            MR. BIALE:  So, your Honor, I will say that -- so

4    Mr. Teman retained Ms. Harris in the summer.  And I was brought

5    into the case a little bit later to assist her.  I've obviously

6    been working closely with her.  I am not saying that to suggest

7    that it was her responsibility to disclose it, but I was not

8    part of the initial conversations.

9            I certainly understand that this is something that,

10   had we discussed it before, we wouldn't be addressing it for

11   the first time with your Honor now.

12           I will say to your Honor that I do not -- I have not

13   had a situation like this before where a court has conducted a

14   *Curcio* hearing based on the fact that I'm married to an AUSA in

15   the Southern District of New York.  It may be a best practice.

16   And, you know, I certainly will consider that going forward.

17           I think what I would propose -- and I don't want to --

18           THE COURT:  Sorry.  I'm not looking for a proposal,

19   because I've got a proposal.

20           I'm trying to understand how it can be that both

21   counsel in this case who knew that you, Mr. Biale, are married

22   to somebody who works for the office that is prosecuting

23   Mr. Teman and trying to put him in prison, didn't think to

24   raise -- in the case of Mr. Biale with Mr. Teman, in the case

25   of either of you -- with the Court the potential conflict.

1          I will tell you, based on my knowledge of the case

2     law, that while this is a waivable conflict, it's unthinkable

3     that this is not something that merits a *Curcio* hearing.

4     People raise *Curcio* hearings for me when an associate in a

5     defense law firm is applying to the U.S. Attorney's Office for

6     employment.  This is way closer than that.

7          Look, in any event, lecture notwithstanding, here's

8     the point:  This is exactly the sort of conflict that needs to

9     be addressed at the threshold before we move forward.  Under

10    Second Circuit law, before a criminal defendant can waive such

11    a conflict so as to allow the case to move forward, there has

12    to be the carefully handled set of proceedings that *Curcio*

13    dictates.

14         Ordinarily, counsel bring this to my attention by

15    letter beforehand; they alert me to the fact of the potential

16    conflict.  And that can expedite the *Curcio* proceeding by

17    enabling the Court at the next conference to have the first of

18    the required two *Curcio* hearings, the first of which the Court

19    alerts the defendant to the potential dangers presented by the

20    conflict; at the second in which the defendant, after getting

21    the opportunity to consult with independent counsel, is

22    questioned by the Court to establish his awareness of the

23    problem or the conflict and his willingness to proceed.

24         So here's what I propose:  I would be inviting error

25    to proceed forward here making any substantive determinations

1   in the case with a potential conflict left unresolved.

2           What I want to have happen is as follows:  I want

3   defense counsel first to review the issue carefully with

4   Mr. Teman.  And Mr. Teman's look of shock was obvious to me,

5   even from 1,000 miles away on video, when he learned that one

6   of his lawyers works -- is a colleague of Mr. Bhatia's.

7           Insofar as this conflict implicates the representation

8   by the firm of Sher Tremonte, I would urge that Mr. Gelfand and

9   Mr. DiRuzzo perhaps take the lead in inviting those

10  discussions, insofar as they are not subject to any such

11  conflict.

12          I then expect defense counsel to reach out to the

13  government.  And, government, I expect that you will consult

14  with the appeals unit in the U.S. Attorney's Office to make

15  sure that any submission that the Court receives on this point

16  in substance has been approved by the appeals unit, insofar as

17  it appears that trial counsel missed the *Curcio* issue, too.

18          Two weeks from today, December 15, I would like to

19  receive a joint letter from the parties.  It should notify the

20  Court whether Mr. Teman, after careful consideration, wishes to

21  proceed with Sher Tremonte on his team.  The letter should also

22  set out the parties' views -- supported by case law -- whether

23  the conflict here is waivable.  I am virtually certain that it

24  is waivable; but in the interest of due care, I would benefit

25  from case authority.

1          Assuming that counsel agree that the conflict is

2    waivable, and that Mr. Teman does agree to waive it and to

3    proceed with Sher Tremonte, the letter should set out counsels'

4    proposed procedure, consistent with *Curcio*, for obtaining the

5    appropriate knowing and voluntary waiver.  As I said, *Curcio*

6    typically envisions a two-hearing procedure.  I would welcome

7    counsel setting out for me in writing the particular questions

8    that counsel propose that the Court put to Mr. Teman at each

9    hearing.

10         I hope and expect that counsel -- the government and

11   defense -- will be able to agree on the proposed procedure in

12   question.  We each have an equal interest here in the integrity

13   of this aspect of the proceeding.  If not, I still want a joint

14   letter; it should just set out the parties' various agreement

15   and disagreement.

16         The two weeks, in my estimation, should be enough time

17   to give Mr. Teman -- in consultation with counsel -- to digest

18   this news flash, and to reach a thoughtful and informed

19   conclusion as to whether to proceed with Sher Tremonte on his

20   team.  It should also give counsel enough time thereafter to

21   meet and confer and make a joint proposal to the Court,

22   consistent with *Curcio*.  However, needless to say, if counsel

23   on either side -- particularly the defense, but either side --

24   needs more time than two weeks to consider and work through

25   these important issues, obviously I'll accommodate that.  Just

1   submit a letter seeking such an extension.

2          Upon receiving counsel's letter, if indeed Mr. Teman

3   wishes to waive his right to conflict-free counsel, I will

4   schedule a *Curcio* hearing.  Mr. Teman, I see -- I think I see

5   the long face.  I understand your frustration and surprise.

6   Let me just finish.

7          Please understand, I'm protecting your rights, as well

8   as everyone's right to the integrity of the proceeding.  And I

9   hope you appreciate that while I haven't always ruled for you,

10  I have tried throughout this proceeding to be attentive to your

11  rights.  You'll recall the dismissal of a count due to speedy

12  trial issues and the probing questions I put to the government

13  that resulted in their unilateral dismissal of Counts Five and

14  Six.  This is of the same nature.

15         There is an issue here that adversely affected your

16  rights.  I want to spot it, and I want to give time to make

17  sure your interests are protected, your rights here at stake.

18  Because you have a constitutional right to conflict-free

19  representation.  With limited -- one moment, sir.

20         With limited exceptions, a defendant can waive that

21  right; but under the law, the waiver has to be obtained

22  pursuant to a careful set of procedures that enables the Court

23  to assure itself that the waiver was knowing and intelligent,

24  and received after a period of deliberation.  When a conflict

25  surfaces, it is important that the Court and counsel turn

KC1VTEMC

1   square corners.

2           Mr. Teman, I wasn't intending to call on you at this

3   point, but just simply to explain myself because I regret this.

4   But if there's something you need to say, I'll let you do so.

5           But let me just say this:  I know your lawyers will be

6   tensing up each time you offer to say something to the Court

7   unguided by them.  So please, think carefully before you speak,

8   because your lawyers assuredly would want to confer with you

9   before you do so.

10          THE DEFENDANT:  Your Honor, I appreciate that, and

11  I'll keep it limited.

12          I don't mean to flatter, but it's impressive that you

13  can see facial expressions in such a small -- I have a very

14  small box here on the screen.

15          I'm concerned about an even larger issue, which is,

16  without going into the details that your Honor is undoubtedly

17  aware -- and a lot of paper has been exchanged electronically

18  back and forth, the questions -- the core questions we have

19  raised about this trial in two words would be prosecutorial

20  misconduct.

21          And I have just learned that the attorneys

22  representing me are literally married to the prosecution.  I

23  think that raises a much larger question about the entire case

24  and privileged communications and strategy and advice I've

25  gotten throughout this trial.

```
 1          I want to be candid that I am intending to seek

 2   additional outside -- and I don't know how I'm going to afford

 3   it; I've put all my money and taken loans to pay full

 4   restitution.  And I want to note, your Honor, I showed up today

 5   virtually with all the money to pay, coming here to beg you for

 6   mercy to put an end to this.  And now I'm learning that -- and

 7   your Honor is aware that we've had very esteemed controversial

 8   attorneys like Professor Dershowitz helping us, you may not be

 9   aware that Professor Lessig from Harvard Law School has also

10   stepped in to help.  Ron Coleman has stepped in to help.  Molly

11   McCann, who was just counsel for General Flynn, has stepped in.

12          I've had very helpful feedback.  And now I'm learning

13   that I basically might have had -- even inadvertently, and I

14   believe Mr. Biale is a very good man -- slips of the tongue

15   when you -- you know, I discuss my work with my girlfriend.

16   And it's surprising, given this case, she's still my

17   girlfriend, given the topic.

18          But I think there's a much bigger concern here, which

19   is we will never, never be able to know what I gave that was

20   privileged to my counsel that was just funneled to people we've

21   accused over and over of cheating.  And not only have we

22   accused them of cheating, Professor Dershowitz has accused them

23   of cheating, Ron Coleman has accused them of cheating, Molly

24   McCann has accused them of cheating.  They've been accused of

25   cheating.  The Southern District of New York has been accused
```

KC1VTEMC

 1  of burying evidence in *U.S. v. Najad*, *U.S. v. Ahuja*.  You can

 2  go up and down the halls of the Southern District of New York

 3  and they will talk about these attorneys -- one of whom he's

 4  married to -- emailing each other about "burying evidence."

 5  Professor Outlaw from Vanderbilt and from Howard University

 6  wrote a letter to Judge Nathan, who in full -- I want to have

 7  full --

 8          (Court reporter disconnected from call)

 9          THE COURT REPORTER:  I'm sorry, your Honor?  Your

10  Honor, I was thrown off the call.  I just called back.  I'm

11  sorry.  The last thing I have --

12          THE COURT:  Who is that, the court reporter?

13          THE COURT REPORTER:  Yes.

14          THE COURT:  How long ago did you drop off the call?

15          THE COURT REPORTER:  The last thing I have was the

16  defendant was saying:  Professor Outlaw from Vanderbilt and

17  from Howard University wrote a letter to Judge Nathan, who

18  fully wanted to have --

19          THE COURT:  One moment.

20          Mr. Teman, because if something is said without the

21  court reporter, it's as if it didn't happen.

22          THE DEFENDANT:  I can repeat it.

23          THE COURT:  One moment.  Please don't interrupt, just

24  for the court reporter's benefit, that's all.

25          I will invite you to pick up where you referred to

KC1VTEMC

1    those people.

2              But before you do, I get the gist of what you're

3    saying.  I'm happy for you to complete the thought.

4              There will be time enough to take this up.  So

5    complete the thought as you wish.

6              (Indiscernible crosstalk)

7              THE COURT:  Sorry, sir.  Please.

8              This is not a day in which I'm resolving anything.

9    I'm simply putting in place a procedure for communication

10   within the defense team, between the defense and the

11   government, and ultimately to the Court.  I am deciding nothing

12   except setting a procedure.

13             So I will ask you, Mr. Teman, understand that this is

14   not a moment for advocacy.  I'm happy to hear what you have to

15   say.  But at the end of all this, all I'm going to be doing is

16   putting in place a process.

17             Go ahead, Mr. Teman.

18             THE DEFENDANT:  Your Honor, I appreciate that.  I will

19   be concise.  And I invite the court reporter to shout out if

20   anything is unclear.

21             She mentioned that I left off on Professor Outlaw --

22   which is a fantastic name for a professor writing about

23   criminal trials -- who wrote to Judge -- I'd like to note for

24   the record the judge cracked up.  But anyway -- I am the

25   comedian sometimes.

1          But this is a very serious topic, which is that

2    Professor Outlaw of Howard University and Vanderbilt, wrote to

3    Judge Nathan and said that quite a sizable percentage of the

4    Southern District of New York -- I believe the count was

5    something like 14 members of the staff, multiple supervisors,

6    and that's just in one trial, *U.S. v. Najad*.  And then there's

7    another trial before Judge Failla, *U.S. v. Ahuja*.  And there's

8    also, I believe, a case before Judge Hellerstein where S.D.N.Y.

9    coincidentally dumped six terabytes of data right before trial.

10          And I'll point out that what hasn't been brought up,

11   but last night, 4 p.m., 9 p.m., somewhere between there,

12   Southern District of New York disclosed that Bank of America

13   and they had information pertaining to a $14,000 transaction or

14   money that was held, effectively a personal guarantee if the

15   transaction they allege was illegal.  And they go, Oh, we just

16   got this information November 30th.

17          Sentencing was supposed to be September 29th.  And

18   your Honor can correct me, but I think it was also supposed to

19   be sometime in June.  And this trial was in January, and the

20   arrest was in July.

21          I'm going to sum this up very clearly in bullet

22   points, which is, I agree, your Honor, I believe a statement

23   you made once in trial is you tried to be a source of truth and

24   light.  I don't think anybody can look at the behaviors of the

25   Southern District of New York in this case and across, and the

1    fact that they were married to my defense counsel and failed to

2    disclose that, combined with all of the facts relating to

3    magically late and -- excuse me, late disclosure is actually

4    not accurate, because I think your Honor will agree, sentencing

5    was supposed to happen half a year ago. And magically, they

6    discovered a $14,000 drawdown, effectively changing the case,

7    effectively now it's not going -- it went to the bank, and I

8    said, I'm going to take this money.

9            They said, Well, you're not entitled to this money.

10           Basically, the whole case changes to, I went to the

11   bank and said I believe we're contractually obligated, I'm

12   putting that right here on the document; I'm chatting with you

13   for an hour. And in addition to that, I understand that if I'm

14   wrong or, in the government's view, I'm dishonest, I personally

15   stand to lose $14,000.

16           I've got -- and I'm not waiving privilege here --

17   tremendous pushback on strategy and ideas. And if I knew that

18   my defense counsel was married to the opposing team, I wouldn't

19   have hired them.

20           And right now, I think what can be clear -- and

21   everybody from the outside can admit -- and I'm going to end on

22   this, I don't think any defendant should have to learn this now

23   at this stage and believe that all the post-trial motions and

24   God knows what else Southern District of New York hasn't yet

25   disclosed and refused to disclose to us.

1          Mr. Biale implicitly admitted that they haven't

2    disclose all information.  Mr. Biale, I believe, was on his

3    second trial in this case.  He's a young man.  He didn't choose

4    to lie to your Honor's face over and over as he did.  He was

5    coached by a supervisor at the Southern District of New York.

6    And now you're asking me to be tried because someone was

7    married.

8          I am sure when we come back, we're going to be asking

9    for at least a different venue.  Thank you, your Honor.

10         THE COURT:  All right.

11         Look, thank you, Mr. Teman.  You covered a lot of

12   ground there, and I don't propose to address everything you

13   covered.  My focus here is this case, not other matters.

14         You said a moment ago that your counsel -- I think you

15   used the plural -- were married to an AUSA.  To be clear, I am

16   unaware that Mr. DiRuzzo or Mr. Gelfand, your trial counsel, or

17   Ms. Harris, your other post-trial counsel, have any such

18   relationship with anyone at the Southern District of New York.

19         The potential conflict issues that I flagged, as I

20   understand it, is limited to Mr. Biale.  You're at liberty to

21   examine with the other lawyers whether their spouses or

22   partners are employees of the Southern District, but my guess

23   is the answer will prove no.

24         And so while I appreciate what you have said, the

25   issue that I raised is a tight and narrow one that involves

KC1VTEMC

1  Mr. Biale's ability -- and, therefore, that of his law firm --
2  to represent you without a knowing and intelligent waiver.  It
3  does not in any way, shape, or form potentially implicate
4  anything that occurred in this matter before Mr. Biale joined
5  the defense team.

6          I will be, a little later on, raising with counsel
7  some questions I have about the forfeiture and restitution
8  filings that I received in the last few hours.  I hadn't
9  thought about whether the issue had been that the government
10 had had them all along and just produced them, so much as just
11 the rudeness of their coming in in the last 24 hours, which is
12 necessitating everybody recognizing the need for an
13 adjournment.  I hadn't thought of that as any form of a late
14 disclosure issue.  I'm happy for counsel to confer about that
15 and to receive a submission on that point.

16         But for now, the issue that I flagged is simply
17 presented by the fact that since the Sher Tremonte firm has
18 been part of the case -- or at least since Mr. Biale has been
19 part of the team -- there is this *Curcio* issue that arises.
20 And so for that reason, I need to hit the pause button on all
21 this to run that to ground.

22         In the fullness of time, Mr. Teman, you should speak
23 with, in particular, your independent lawyers, Mr. Gelfand and
24 Mr. DiRuzzo, who I also esteem very --

25         THE DEPUTY CLERK:  Your Honor, I apologize.  I don't

1   know if anybody else -- you've frozen completely.

2          I'm going to reach out to Judge Engelmayer very

3   quickly.  Hold on one moment.

4          (Pause)

5          THE COURT:  All right.

6          Just simply, yes or no, Mr. Teman, can you hear me?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Mr. Bhatia, can you hear me?

9          MR. BHATIA:  Yes.

10         THE COURT:  Mr. Biale, can you hear me?

11         MR. BIALE:  Yes, your Honor.

12         THE COURT:  Court reporter, can you hear me?

13         THE COURT REPORTER:  Yes, your Honor.

14         THE COURT:  Okay.

15         And court reporter, did you lose any -- did you at any

16  point lose the audio or were you able to hear everything?

17         THE COURT REPORTER:  I heard you up until you froze.

18         THE COURT:  Okay.  I don't know when that was.  What

19  was the last thing that you recorded my saying?

20         THE COURT REPORTER:  Let me just look at it.  Hold on

21  one minute please.

22         THE COURT:  Keep your voice up.  I'm having difficulty

23  hearing you from a volume perspective.

24         THE COURT REPORTER:  Okay.  I'm just looking at it.

25         "In the fullness of time, Mr. Teman, you should speak

1   with your independent lawyers, Mr. Gelfand and Mr. DiRuzzo, who

2   I also esteem very," and that was it.

3              THE COURT:  Very highly.

4              I have no doubt that they have your best interests at

5   heart and are independent of the potential conflict I

6   identified.  You should speak with them about your best

7   interests, whether to use one of the other lawyers who is

8   assisting you, whether to waive the conflict and go with the

9   Sher Tremonte firm, or do something else.  And I don't weigh in

10  on that, I just am trying to police the conflict process here

11  to make sure that your right to conflict-free counsel is

12  respected.

13             I do though need to say this, which is that your very

14  estimable trial counsel, who are unaffected by any conflict,

15  have thoroughly raised the issues that you had flagged under

16  *Brady v. Maryland* in this case.  And as the lengthy post-trial

17  decision that I rendered reflects, I found those claims of

18  misconduct to be meritless.

19             I do not preclude your exploring with your counsel the

20  thesis -- if you think it worth exploring -- that some

21  sentencing materials on account of the relationship here were

22  shared in some way from Mr. Biale to Ms. Graham to Mr. Bhatia,

23  I have zero reason to think that that happened, but you're at

24  liberty to make inquiry about that through independent counsel,

25  but this call is not the time to do that.

1          Mr. Teman, hold on.

2          This is also not a time for speech-making.

3          I am here to protect your rights.  And your right

4   principally involves at this point going offline, speaking with

5   your independent lawyers, and deciding how you want to proceed

6   as to representation.  And I will be happy to hear from the

7   counsel who emerge ultimately from that process if there's some

8   new issue presented by the Sher Tremonte firm's role in the

9   case that needs to be explored.

10          But, once again, I just want to emphasize, just to

11  lend some reality to this, that that firm has been post-trial

12  counsel only.  There's no reason I have to think that the jury

13  trial that resulted in a conviction on all counts was in some

14  way compromised by the fact that Ms. Biale happens to be --

15  Mr. Biale happens to represent -- married to Ms. Graham.

16          In any event, the point is that I've now put in place

17  a procedure.  Counsel are to write me a joint letter in 14

18  days.  In the event the determination is not to seek to waive

19  the conflict -- and that's your right -- let me know how

20  counsel propose jointly to proceed.

21          And, Mr. Teman, it may be that for financial reasons

22  or just due diligence reasons or needing to take a deep breath,

23  you need more time.  I'll be happy to give that to you.  As

24  you're going to hear in a few moments, I think there are very

25  good reasons sounding in public health and safety why you might

KC1VTEMC

want to slow this process down.  We'll see.

        But the bottom line is this is between you and your

counsel.  I do not want anymore speeches made.  It only runs

the risk that something you would say would be something that

your eventual counsel will regret that you said.

        Okay.  So having taken care, then, of the *Curcio*

issue, I want to give counsel a heads-up that once we resolve

that representation issue -- whether it turns out to be a

*Curcio* waiver or a substitution of counsel or a reversion just

to using estimable trial counsel, however it works out -- I am

likely to commission letter submissions from counsel on two

areas relating to sentencing.  And I'm going to set a schedule

for all this once the dust settles on the representation

issues.  Affirmatively, I do not want any submissions from

anybody on these issues until the representation issue is

settled.

        The first involves forfeiture and restitution.

        For reasons that are completely puzzling to me, at the

very last minute yesterday, as Mr. Teman said, after sentencing

had been scheduled and rescheduled and pending for months, I

received a flurry of three letters, initiated by one from the

government, debating forfeiture and restitution.  And then less

than an hour before sentencing, I received a chart with some

data, I gather, from the bank victim in this case.

        Needless to say, given the last-minute nature of the

submissions, I have not had a full opportunity to study the

issue.  And in subject of best practices, this is not the way

to go, government, to start teeing that stuff up the day before

sentencing.

At this point I am simply uncertain as to the legal

and factual bases for an award of forfeiture here, on top of an

award of restitution.  I just haven't looked into it or

explored it; and the rather threadbare letters I've gotten

don't give me enough to go on.

It's also frankly unclear to me from the letters

whether the government is, in fact, seeking separate awards of

forfeiture and restitution, how they relate to each other, if

there is a legal basis for compounding both here, and

whether -- if the government is seeking both, whether the Court

has the legal authority or the discretion to decline to order

the forfeiture on the grounds that on the circumstances here

it's essentially a replica of restitution.

I'm still formulating the full range of (inaudible) on

which I will eventually need guidance from counsel.  But I

expect that once the *Curcio* or representation issue is done, I

will commission letter briefing on this issue that was

belatedly exposed to me in the last 24 hours.  And I will

certainly insist that the briefing be complete materially in

advance of the eventual sentencing date.

All right.  The second area in which I'm likely to

KC1VTEMC

solicit presentencing briefing involves whether Mr. Teman is
going to qualify for bail pending appeal.  And the reason is
that it may be important to the Court in determining the just
and reasonable sentence to know whether Mr. Teman is likely to
serve some of the prison sentence during a time when prison
conditions are more restrictive than usual as a result of the
pandemic, or whether any such sentence would first begin to be
served after the appellate process has run its course and when,
God willing, the pandemic has also hopefully run its course.

As counsel may be aware, I believe that the pandemic
is an important factor that a just court must take account of
at sentencing, just as it must in evaluating relevant in the
last number of months petitions for compassionate release.  As
counsel are probably aware, I personally granted a large number
of compassionate release applications during the pandemic.  In
imposing sentences during the pandemic, I have imposed sentence
in a number of cases in which the defendant had been in custody
since the pandemic walloped New York beginning in mid March.

As you are all aware, the conditions in federal
prisons have been uncommonly hard during the pandemic.  At the
MCC and the MDC, the local jails, where in-custody defendants
awaiting sentence in this district are typically held, such
conditions have been particularly onerous and, on several
occasions, have resulted in lengthy lockdowns.  To prevent the
spread of COVID, there have been restrictions on inmate

movement, and on visits from family and counsel.  There have

also been restrictions to aimed at safeguarding health in

various FCIs, federal correction institutions, in which

defendants are generally designated after sentencing.

I have repeatedly taken those harsh conditions into

account in imposing sentence.  I have repeatedly said in

sentences over the last eight months that time spent in custody

during the lockdown conditions necessitated by a pandemic is

necessarily harder time than Congress or anyone ever envisioned

or intended prison time to be.

And so in deciding on the just sentence, I have taken

the view the defendants who have endured custody in such

circumstances are entitled -- all else equal -- to lower

overall sentences than would otherwise be the case.  In other

words, in calculating the sentence, I have informally given

defendants credit for more than one day for each day spent in

custody.  And the same logic applies to a defendant whose term

of prison custody has not yet begun, but is likely to begin

while the pandemic is still ongoing.

So it will be an important data point for me, in

calculating the just and reasonable sentence, to factor in

whether Mr. Teman does or does not satisfy the requirements for

bail pending appeal.  If he does satisfy those standards, given

the typical life cycle of a criminal appeal in the Second

Circuit, his prison term is less likely to be spent during

 1    pandemic lockdown conditions than if he does not satisfy those

 2    standards.

 3         For obvious reasons, I do not want to receive any such

 4    submissions from counsel until the representation issue has

 5    been squarely resolved.  But I'm giving all of you -- including

 6    potentially counsel yet to be retained -- a heads-up that once

 7    the representation issue is resolved, I am likely to set a

 8    schedule for such submissions.  And I will, in the order that I

 9    issue, likely try to put a sharp point on any particular issues

10    that would be of assistance to me for counsel to address.

11         And I want to ask defense counsel -- I'm here

12    addressing myself not just to the present defense counsel, but

13    to anyone who may later join Team Teman of the following one

14    issue that is important and relates to sentencing.  And again,

15    Mr. Teman, I'm looking out for you.

16         The issue is whether it makes sense and it is in

17    Mr. Teman's best interest to hold sentencing soon after the

18    conflict issue, the representation issue, is resolved, or

19    whether it makes better sense to put sentencing off, and here's

20    why:

21         I am acutely aware that the COVID pandemic is

22    currently at a peak.  I'm aware that Mr. Teman has heightened

23    exposure to COVID, given his history of respiratory issues.

24         Before sentencing takes place, the standards governing

25    Mr. Teman's release are set by Title 18, United States Code,

KC1VTEMC

1    Section 3143(a).  And I found that Mr. Teman meets those

2    standards, which allows him to stay at home where he and

3    probably the rest of the country are likely most safe during

4    COVID.

5          Once sentencing occurs, however, for Mr. Teman to

6    remain at liberty -- barring the time spent between sentencing

7    and surrender date -- all that will require him to satisfy a

8    different statute, Title 18, United States Code, Section

9    3143(b).  And that statute, the bail pending appeal statute,

10   requires Mr. Teman to identify substantial questions on appeal

11   that would likely lead to reversal or a new trial as that

12   standard has been articulated by the Second Circuit in the

13   foundational case of *United States v. Randell*, 761 F.2d 122,

14   (2d Cir. 1981).

15         I am not prejudging that question.  I will be eager to

16   hear what counsel have to say about that.  But, in the interest

17   of candor, I will say that I am familiar with the issues in

18   this case.  I resolved the extensive post-trial motions

19   litigated by Mr. Gelfand and Mr. DiRuzzo.  And I denied all

20   those motions in a 27-page decision I issued on June 5th

21   docketed at docket 138.

22         Based on the issues that have been put to me so far,

23   at present, I'm not seeing a question or legal issue that rises

24   to the *Randell* standard.  Again, I could be wrong.  I'm happy

25   to be briefed.  But I'm quite well familiar with the issues

KC1VTEMC

1    (inaudible) --

2            THE COURT REPORTER:  I'm sorry.  I'm sorry, your

3    Honor?  Your Honor?  Okay.

4            THE COURT:  -- Section 3145(c) of Title 18, which

5    permits release where "exceptional reasons exist," which this

6    Court has cited in allowing the pretrial release of various

7    prisoners during COVID, alas, does not eliminate the

8    requirement that a defendant who is between sentencing and

9    appeal establish the existence of a substantial question under

10   3143(b).

11           So I would ask the defense, present and future, to

12   consider thoughtfully whether it really is in Mr. Teman's best

13   interest to proceed to sentencing now.  The pandemic right now

14   is surging across the country.  It may continue to surge for

15   some time.  I am open to putting off the sentencing date, and

16   hopefully this dreadful public health situation will begin to

17   abate before long.

18           And during the period between before sentencing, that

19   requires -- that, rather, enables Mr. Teman to remain out of

20   custody, provided only that he continues to comply with the

21   existing conditions of release that have been set, which he has

22   shown an inability to comply with.

23           A number of my colleagues have handled this very

24   situation in this very way, by adjourning the sentencing dates

25   of defendants who are currently released on conditions of bail.

KC1VTEMC

1    I'm willing to do that here.  I'm open to an adjournment.

2          So I ask defense counsel to reflect, in consultation

3    with Mr. Teman, and take that up with Mr. Teman.  And after the

4    completion of the representation determination, if you will, I

5    expect to issue an order confirming that, after thoughtful

6    consultation between defendant and counsel, I would like to

7    understand what Mr. Teman's judgment is as to whether to

8    proceed or seek an adjournment until hopefully that the

9    pandemic is in (inaudible).

10          So with that, I have nothing further for now.  But

11    those are important issues that I want counsel to consider.

12          With that, I'm going to go around the horn to see if

13    there's anything else that needs to be addressed.  But if there

14    is nothing else, I will expect a joint submission on December

15    15th, whether relating to the *Curcio* issue or, if that is

16    mooted, whether as to the next step in progress in the case.

17          Mr. Teman, I'm mindful that if you wind up in the hunt

18    for new counsel, two weeks may not be enough.  Rest easy.  I'm

19    not forcing your hand here.  If you need the time, you'll get

20    it.

21          With that, let me just go around the horn, beginning

22    with you, Mr. Biale.  I Appreciate that all of this appears to

23    have come as a surprise to you, notwithstanding my comment

24    earlier that it ought to have been flagged for me earlier.

25    Knowing you well, as I do, I have 100 percent confidence in

KC1VTEMC

1    your integrity and have no doubt -- despite what was said by

2    Mr. Teman -- of your good faith, independence, integrity, and

3    commitment to him.  Nevertheless, the nature of conflicts is

4    that potential conflicts need to be run through this process.

5            Is there anything else you want to put on the record

6    or say at this point?

7            MR. BIALE:  Understood, your Honor.

8            Not at this time.  Thank you.

9            THE COURT:  Mr. Bhatia, anything from you?

10           MR. BHATIA:  Obviously we'll take all the comments

11   from today into account and speak with counsel, whoever that

12   may be.

13           One thing to flag for your Honor is there was some

14   question about adequate notice for forfeiture.  To the extent

15   sentencing is now adjourned, we may want to give that notice

16   sooner rather than later.  The issue is a notice one.

17           So I'm just flagging for the Court and for the defense

18   that we may do that; but it's not with the intention of

19   catching anyone in a period of transition.  But if the question

20   is notice, we hope to give that -- make sure that everyone is

21   on notice now.

22           THE COURT:  Mr. Bhatia, I've already directed that.

23   Essentially, I said that once we've sorted out the

24   representation issue, one of the areas in which I need

25   considerably more input from both sides -- but in the first

KC1VTEMC

1    instance, the government -- involves restitution and

2    forfeiture.  It follows that on the schedule I set, you will

3    have your opportunity to say your piece, and Mr. Teman's

4    counsel will have their opportunity to.

5         And all those will be submitted with finality

6    sufficiently in advance of sentencing so that each side isn't

7    dealing with movable parts here, and they know what the sum and

8    substance of the submissions are, and I, in turn, will be able

9    to get the answer right.

10         But it's no way to promote accuracy and

11    decision-making to dump stuff on a court in the way that

12    happened in the last 24 hours.  And so this time, by court

13    order, I will insist that everything be submitted meaningfully

14    enough in advance so that I can do my job right.

15         MR. BHATIA:  Obviously we will comply with the Court's

16    schedule.  I wasn't sure if the Court wanted us to write extra

17    notice under 32.2, sort of, as soon as possible.  We'll stick

18    with the schedule that you've laid out.

19         THE COURT:  All right.

20         I thought I was crystal clear.  I do not want any

21    substantive submissions in the case until the representation

22    issue is sorted out.  It's a lot easier to sort this out and to

23    not compound any issue if you are communicating or sending

24    stuff to Mr. Biale while he is subject to an as yet unwaived

25    conflict.  So I would much sooner just hit the power save

1   button on anything of substance until the representation game

2   of musical chairs has come to a close.  Okay?

3               MR. BHATIA:  That makes perfect sense.  Thank you.

4               THE COURT:  All right.

5          Mr. Teman, I strongly discourage you from saying

6   anything further; nonetheless, this concerns you.  If there's

7   something you feel must be said, mindful that your counsel are

8   no doubt channeling me in saying, Don't say it, I give you the

9   floor.

10              THE DEFENDANT:  Your Honor, thank you.

11         I want to just put on the record that I retained

12  Justine Harris.  I didn't know -- know them.  But I retained

13  Sher Tremonte specifically to deal with the topic of *Brady*

14  violations and other related S.D.N.Y. cheating as I've

15  addressed, having nothing to do with sentencing.  In fact, they

16  have made clear that they just volunteered out of the goodness

17  of their heart to show up to sentencing.

18         And what a surprise party it has been.

19         Second, I can't speak to technicalities and

20  legalities, but this idea that now S.D.N.Y. gets additional

21  time to correct an error of disclosure, I'll note that their

22  disclosure where they say they got information from Bank of

23  America, said they got it December 30th of 2020.  So we're

24  still on Skype, but they have time travel.

25         It just seems like every single time in this case

1   S.D.N.Y. messes up and then they cheat to get it in anyway,

2   witnesses have fled the country, etc.  I just want to note that

3   for the record.

4           I very much expect to show up with new counsel.  And I

5   don't know of the technical means of doing this, but I very

6   much expect to ask for some sort of outside independent

7   hearing, whether it's an ablit (ph) court.  You have a personal

8   relationship with this guy.  He does a major significant thing.

9   And, your Honor, it may be all accidental, you know?  Like

10  hiring the wrong person at a company who leaks information to a

11  competitor, that might be all accidental, but it's still a spy

12  on the team.  And this is shocking.

13          So that's all I'm going to say.  Thank you.

14          THE COURT:  All right.  Look, Mr. Teman, we have a

15  process for the resolution of claims.  It's called litigation

16  before the district court.  If either party is dissatisfied

17  with the resolution that I reach, we have a process called

18  appeal.  That's what we will do here.

19          You are at liberty to pursue with counsel or successor

20  counsel any grievances you have.  Counsel, binded by their

21  obligations not to bring privilege claims before the Court, are

22  at liberty to pursue claims.  And if you have a good-faith

23  basis to think that this is other than appears to the Court,

24  which is simply a failure to raise with the Court the issue of

25  a marital relationship, and if you really believe that there's

 1    a basis for believing that you have a spy in your kip, you're

 2    at liberty to pursue that through independent counsel, they are

 3    empowered to make motions before me, and we'll litigate that in

 4    the proper way.  I can't foresee the means by which any such

 5    issue will be litigated until something is before me.

 6            But there's a process for that.  I hope, if nothing

 7    else is clear to you, I hope it's obvious from you today that I

 8    am trying to protect your rights in this process, and I will

 9    continue to do so, including in the context of any claim you,

10    through counsel, should choose to raise.

11            With that, I look forward to hearing from everybody in

12    two weeks.  I want to wish everybody continued good health for

13    you and your families.

14            And Mr. Teman, I regret that, you know, the challenge

15    of being a criminal defendant at this time has been compounded

16    by the challenge of being, you know, cooped up in a worldwide

17    pandemic with all the concerns that must be on your mind.  So

18    you're in my thoughts.

19            In any event, we stand adjourned.

20            I look forward to a joint submission two weeks from

21    now.  In case I haven't made it clear enough though, no

22    substantive submissions until we've sorted out the counsel

23    issue.  I will issue a bottom-line, one or two-sentence order

24    reflecting the bottom-line outcome here.

25            We stand adjourned.  Thank you.        (Adjourned)

XK1AHTEM                    SEALED

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           19 Cr. 696 (PAE)

 5   ARI TEMAN,

 6                                           Conference
                    Defendant.
 7
     ------------------------------x
 8
                                             New York, N.Y.
 9                                           January 10, 2020
                                             10:45 a.m.
10

11   Before:

12                    HON. PAUL A. ENGELMAYER,

13
                                             District Judge
14

15                         APPEARANCES

16   GEOFFREY S. BERMAN
          United States Attorney for the
17        Southern District of New York
     KEDAR SANJAH BHATIA
18   EDWARD IMPERATORE
          Assistant United States Attorneys
19
     JOSEPH ANDREW DiRUZZO III
20   JUSTIN GELFAND
          Attorneys for Defendant
21
     Also Present:  William Magliocco, Paralegal Specialist USAO
22

23

24

25

```
 1                    (In the robing room)

 2              THE COURT:  All right.  Good morning, everyone.  I'm

 3    here in my robing room with counsel for both sides,

 4    specifically Mr. Imperatore and Mr. Bhatia.  Good morning to

 5    both of you.  Happy New Year.

 6              MR. IMPERATORE:  Good morning, your Honor.

 7              THE COURT:  For the defense, Mr. DiRuzzo?

 8              MR. DIRUZZO:  Yes.

 9              THE COURT:  And Mr. Gelfand?

10              MR. GELFAND:  Good morning.

11              THE COURT:  And the defendant, Mr. Teman, good

12    morning.

13              THE DEFENDANT:  Good morning, your Honor.

14              THE COURT:  The initial part of this conference, very

15    briefly, will be maintained under seal.  I have a court

16    reporter here, but the transcript of what is to be said in the

17    robing room here is to be accessible to counsel in this case

18    only.  The transcript itself is, not without permission of the

19    Court, to be publicly filed.

20              I want to follow up on a phone conference we had in

21    December prompted by Mr. Teman's note to me that was in

22    considerable distress.  I'm really just concerned about how

23    Mr. Teman is doing.  Can counsel give me an update as to how

24    he's doing.

25              MR. DIRUZZO:  Your Honor, my understanding is
```

1    Mr. Teman is doing fine.  No further instances have happened,

2    nothing that required hospitalization or the like, so --

3             THE COURT:  Have you been personally keeping tabs on

4    the state of whatever treatment he is receiving?

5             MR. GELFAND:  Your Honor, this is Justin Gelfand for

6    the record.  I have been speaking regularly with Mr. Teman, and

7    it's my understanding that he's been under the care of multiple

8    healthcare providers, including a mental health care provider,

9    and a sleep specialist.  There was a diagnosis, as I understand

10   it.  Maybe that's too strong of a word, but Mr. Teman has

11   managed to get his sleep situation better under control, and he

12   has expressed to me that he's noticed a considerable difference

13   based on that and following that care.

14            So, as a practical matter, I think that under the

15   circumstances, obviously, the case is inevitably very

16   stressful, but he's doing well under the circumstances and

17   certainly much better than when we had our other telephone

18   conference.

19            THE COURT:  I'm glad to hear that.  I had remembered

20   that it had been expressed on the call that sleep problems may

21   have been at the heart of some of the anguish in the note.  I'm

22   glad to hear that's being addressed.

23            MR. GELFAND:  Yes, your Honor.

24            THE COURT:  May I address your client.  I don't want

25   to pry, but I want to make sure.

1          MR. GELFAND:    Sure.

2          THE COURT:  Mr. Teman, I want to take stock on how

3     you're doing.

4          THE DEFENDANT:    It's not the best six months of my

5     life, but I went to an ENT and then a sleep specialist.  The

6     ENT said walk three miles a day, which is just looping around

7     South Beach.  I did that, then I went to the sleep specialist.

8     He said you're under federal indictment.  I'm going to give you

9     this drug, and it's going to get you five hours of sleep.

10    Still do the walking and swimming, but the drug is winning.  I

11    wasn't getting REM sleep.  So I have a tracker.  I was getting

12    5 to 6 percent REM.  I'm getting 20 to 25 percent REM now.

13         THE COURT:  Here's the important thing.  The emotions

14    that you expressed in that letter, to the extent that they were

15    an impulse to hurt yourself, have those gone away?

16         THE DEFENDANT:  Yes.

17         THE COURT:  You're confident that you are in a better

18    place.  I realize being under indictment is not a good place,

19    but your suicidal state of mind is all gone; you have no

20    impulses like that at all?

21         THE DEFENDANT:  None.

22         THE COURT:  Will you promise me if you have any

23    impulse at all like that, you'll immediately notify both your

24    counsel in this case, the specialist or specialists whom you

25    are seeing?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Very good.  Anything further I need to

3     raise as to any of those things?

4          MR. BHATIA:  Nothing from the government.

5          THE COURT:  Most of all, I want to wish you well.  I

6     realize I'm here in a role presiding over a prosecution of you.

7     I'm also a human being, and I read a note from a person in

8     anguish and pain.  And I empathize with you, and I just wanted

9     you to know that.

10          All right.  Look, the other thing I just want to put

11     on the record is as follows, which is after the last court

12     conference in the case, I made a phone call to the chief of the

13     general crimes unit, the supervisor of the AUSA that's assigned

14     to the case, asking him to take a look at the transcript of the

15     previous conferences and to make sure that there was adequate

16     supervision of the case.  I do that from time to time when I

17     have a concern that there may or may not be adequate

18     supervision.  I didn't want that conversation to have been

19     unrecorded.  I'm putting that on the record here.

20          MR. GELFAND:  Thank you.

21          THE COURT:  Very good.  I'll see you out in the

22     courtroom.  Thank you.

23          (Adjourned)

24

25

# SHER TREMONTE LLP

July 29, 2020

**BY EMAIL**
Ari Teman

Re:     **Engagement Agreement**

Dear Mr. Teman:

We are pleased you have chosen Sher Tremonte LLP (the "Firm") to represent you in connection with *United States v. Teman,* 19 Cr. 696, pending in the Southern District of New York (the "Matter"). This letter confirms our mutual understanding as to the terms of this engagement.

*Scope of the Firm's Representation*

The Firm is acting as counsel to you in connection with exploring the possibility of additional post-trial motions in the district court following your conviction in the Matter. The Firm will review the record of the proceedings and conduct legal research in order to determine what additional motions or correspondence, if any, are advisable. The Firm is not being engaged for any other purpose. We are not aware of any other representation that would preclude the Firm from undertaking this engagement or adversely affect the Firm's ability to complete it.

*Duties*

It is the Firm's duty to represent you in this matter both competently and diligently. The Firm will keep you reasonably informed of the status of the matter and consult with you when appropriate. In order for the Firm to represent you effectively, it is important for you to understand and agree that you have an affirmative duty to assist and to cooperate with the Firm as fully as possible during this engagement. The Firm will rely on the completeness and accuracy of the information you give to us.

**Note: Defendant is only including page one of the Sher Tremonte engagement because additional pages include bank account / wiring information.**